## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THE PENNSYLVANIA STATE
UNIVERSITY,

      Plaintiff,

    v.

VINTAGE BRAND, LLC,

      Defendant.

No. 4:21-CV-01091

(Chief Judge Brann)

## MEMORANDUM OPINION

### JULY 14, 2022

In June 2021, The Pennsylvania State University sued Vintage Brand, LLC, an online retailer of goods bearing screen-printed, and often retro, logos and images. Penn State contends that this practice violates federal and state trademark and unfair competition laws. Vintage Brand, however, denies these charges and asserts four counterclaims attacking the validity of Penn State's marks—emphasizing that while it sold goods with Penn State's marks, these images and logos are in the public domain and not subject to further protection under trademark law. Penn State now seeks to dismiss Vintage Brand's fourth counterclaim, where the Company contends that three of the University's marks should be canceled because they are ornamental and fail to function as trademarks.

While this case touches on broad and substantial questions about collegiate merchandising rights under trademark and unfair competition law, the fate of Penn

State's motion turns on a far narrower question: Under the Lanham Act, does a symbol identify the source of the goods if it merely creates an association between it and the trademark holder?

Because the Court finds that it does not, Penn State's motion to dismiss is denied.

## I.      FACTS ALLEGED IN THE COMPLAINT

For today's motion, the Court need not delve deeper than the allegations about the three marks.[1] First among them is the University's 1984 registration of the text "Penn State."[2] The University holds this registration across a host of goods, including everything from apparel, banners, and flasks to USB flash drives, manual toothbrushes, and salt and pepper shakers.[3] Second is the image of the so-called "Pozniak Lion,"[4] which Vintage Brand contends was used as a school logo until it was phased out in 1987.[5] Penn State registered this mark in 2017 for use on metal novelty license plates and apparel.[6] And third is the image of the Penn State seal.[7] Similarly registered in 2017, this mark—which displays the Pennsylvania Coat of

---

[1]     *See* Doc. 31 ¶¶ 39–48.
[2]     U.S. Federal Registration No. 5,766,698.
[3]     Doc. 23 ¶ 17; Doc. 39 at 3–4.
[4]     U.S. Federal Registration No. 5,305,910.
[5]     Doc. 31 ¶¶ 16, 17, 19.
[6]     *Id.*
[7]     U.S. Federal Registration No. 5,877,080.

Arms ringed by the University's name and date of founding—covers various apparel and drink-related goods, such as decanters, coasters, and ceramic mugs.[8]

For each, Vintage Brand alleges the same deficiencies. The Company pleads that they are "used as mere decoration, printed in large font and in a prominent location, and [do] not serve to identify Penn State as the source or origin of the goods"; that "[o]n information and belief, consumers perceive . . . [the marks] to be merely a decorative feature of the goods and not an indication of the source of the goods"; and finally that their "overall commercial impression . . . is purely ornamental or merely a decorative feature[,] . . . [and they] do not identify and distinguish Penn State's goods from those of others and, therefore, do not function as a trademark . . . ."[9]

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint, in whole or in part, if the plaintiff has failed to "state a claim upon which relief can be granted." Following the landmark decisions *Bell Atlantic Corp. v. Twombly*[10] and *Ashcroft v. Iqbal*,[11] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that

---

[8]   Doc. 31 ¶¶ 11, 12; Doc. 39 at 4.
[9]   Doc. 31 ¶¶ 39–48.
[10]   550 U.S. 544 (2007).
[11]   556 U.S. 662 (2009).

is plausible on its face.'"[12] In its assessment, the Court must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]."[13] Still, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[14] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[15]

## III.   ANALYSIS

Under the Lanham Act, a trademark can be obtained for "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods . . . ."[16] When a trademark fails to fulfill this purpose, it is subject to cancellation.[17] Because Penn State has registered these three marks with the United States Patent and Trademark Office Vintage Brand must show that they are invalid.[18]

---

[12]   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[13]   *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

[14]   *Iqbal*, 556 U.S. at 678; *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.) ("After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.").

[15]   *Iqbal*, 556 U.S. at 678.

[16]   15 U.S.C. § 1127.

[17]   Given the parties' focus on merchandise-related registration categories, I assume that Vintage Brand's ornamentality challenge is "as applied," and thus an effort to deny protection in these narrow categories, rather than an effort to cancel the marks as a whole. *See also Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 918–20 (9th Cir. 1980) (considering an as-applied functionality defense to a trademark-infringement claim).

[18]   15 U.S.C. § 1057(b) ("A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or

Vintage Brand attempts to do so here through an ornamentality challenge. A registration fails on this ground when its overall commercial impression is "solely as attractive ornamentation" and not "also as a symbol that identifies and distinguishes a single source."[19] In assessing aesthetic ornamentation, the first half of this conjunctive requirement, courts have considered the symbol's "size, location[,] and dominance," and whether it is accompanied by a ™ or ®.[20] Sitting at the non-ornamental end of this continuum are the small symbols affixed to the tag of a shirt or stamped on the bottom of a mug. While on the ornamental side stand the large, dominant, and centrally located symbols, such as shirts with text emblazoned across the chest or a coaster with a mascot featured across the top. By both allegation and appearance, Penn State's marks fall into the latter.[21]

But this finding does not settle the matter. The ornamentality requirement is conjunctive; that "a design is pleasing to the eye and serves a decorative purpose

---

services specified in the certificate, subject to any conditions or limitations stated in the certificate.").

[19]   J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 7:81 (5th ed., June 2022) (McCarthy on Trademarks and Unfair Competition); *see Macy's Inc. v. Strategic Marks, LLC*, 2016 WL 374147, at *3 (N.D. Cal. Feb. 1, 2016); *Bobosky v. Adidas AG*, 843 F. Supp. 2d 1134, 1145 (D. Or. 2011). For the purposes of today's motion. I have proceeded using the standard described in McCarthy on Trademarks and Unfair Competition. I will note, however, that Vintage Brand contends that the seemingly more lenient Third Circuit standard for trade dress claims should be imported instead. Doc. 39 at 8 (quoting *Duraco Prods., Inc. v. Joy Plastic Enterps., Ltd.*, 40 F.3d 1431, 1449–50 (3d Cir. 1994)) ("[T]he configuration for which protection is sough must not appear to the consumer as a mere component, or the essence, of the product gestalt, but rather must appear as something attached (in a conceptual sense) to function in actuality as a source designator—it must appear to the consumer to act as an independent signifier of origin rather than as a component of the good.").

[20]   *Bobosky*, 843 F. Supp. 2d at 1145.

[21]   *See* Doc. 31 ¶¶ 7, 8, 10, 16–17, 24, 27, 40–48.

does not mean that the design cannot also serve a trademark purpose."[22] The Court must also consider whether the marks "identify and distinguish" the goods. This requirement, which invokes the Lanham Act's definition of a trademark, broadens the analysis to the fundamental trademark question: does the mark serve a source identifying function?[23] And here, the parties' understanding of the law diverges.

Vintage Brand contends that consumers believe that the essence of these marks is to signal their support for the University, not that the University has produced, approved, or guaranteed the quality of the item.[24] So in its view, the marks do not "identify and distinguish" Penn State as the source of the goods. Penn State, on the other hand, contends that "it would be unimaginable that using PENN STATE, the University, or the Pozniak Lion Logo on a good, no matter how prominently, could be perceived by the consuming public as anything other than an identification of Penn State as the source or second source of the good."[25] These arguments are nothing new. They have been raised across a host of decisions that assess whether a symbol is eligible for trademark protection to begin with (the so-called "eligibility" cases) or whether another entity's use of a trademark symbol

---

[22]   McCarthy on Trademarks and Unfair Competition § 7:24.

[23]   *Id.* § 7:81 ("The 'merely ornamental' rule is simply a facet of the basic trademark factual question: is the disputed feature in fact perceived by customers as a trademark or not?").

[24]   Doc. 39 at 10–14.

[25]   Doc. 38 at 12 (internal alternations, emphasis, and quotations omitted); *see also id.* at 15 ("common sense dictates that the consumers of university-branded apparel would readily understand that a university's name, seal, and mascots (like the Accused Marks here) are identifiers of that university, and not of any other source").

constitutes infringement (the so-called "infringement" cases).[26] And while these cases' terminologies and postures vary, they center on a common question: should trademark holders—particularly those in the business of education, research, and New Year's Six appearances—have an exclusive right to control merchandise bearing their marks when consumers are purchasing the products not for their guaranteed quality, but to signal their support for or affiliation with the trademark holder?

Perhaps it should come as no surprise that our modern trademark regime has struggled with this question. Trademark law has traditionally served to promote competitive markets.[27] Indeed, protecting marks "enable[s] sellers to develop

---

[26]  Determining whether distinct tests interlock or pass by one another can pose difficulties. But here, where Vintage Brand is using the exact trademarked symbols in a market that Penn State is also engaged in, there appears to be little difference between the cases undertaking an infringement analysis (through the likelihood of confusion) and an eligibility analysis (whether the mark identifies the source of the goods). Indeed, the cross-pollination of these cases appears to be common practice. *E.g.*, *Univ. Book Store v. Bd. of Regents of the Univ. of Wisconsin Sys.*, 33 U.S.P.Q. 1385, 1994 WL 747886, at *22 (Trademark Tr. & App. Bd. June 22, 1994) (citing *Boston Pro. Hockey Ass'n v. Dallas Cap & Emblem Mfg.*, 510 F.2d 1004 (5th Cir. 1975)) and *In re Olin Corp.*, 181 U.S.P.Q. 182, 1973 WL 19761, at *1–2 (Trademark Tr. & App. Bd. Nov. 19, 1973). It's also worth noting the obvious: no court can find infringement for a plaintiff on a Rule 12 motion. Still, infringement claims are generally considered using a multifactor fact-intensive inquiry. *E.g.*, *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215 (3d Cir. 2000) (delineating 10 likelihood of confusion factors). But if a court weighing similar facts in the infringement context disposes of the traditional inquiry and enters an automatic finding of likely confusion, *e.g.*, *Boston Pro. Hockey Ass'n v. Dallas Cap & Emblem Mfg. Inc.*, 510 F.2d 1004, 1012 (5th Cir. 1975), it suggests that the issue, in the eligibility context, could be disposed of on the pleadings, as any claim that there's no source identification would be rendered implausible.

[27]  *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1985) (noting that Congress found "National protection of trademarks . . . desirable . . . because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation").

reputations for quality," while also "assur[ing] customers that products sold under the seller's brand will live up to that reputation."[28] Up until the mid-20th century, the law focused narrowly on preventing sellers from using similar marks to "pass off" their goods as those made by another.[29] Over time, however, the law has come to include more instances when a consumer may be confused about a good's source.[30] Owing to expansion, trademark protection is no longer limited to mere word marks; logos, packaging, and even the shape of products may now be protected.[31] Nor is it limited to directly competing products; under current law, trademark holders can protect against the use of similar marks outside of their core business provided consumers would presume some form of affiliation or sponsorship.[32]

Entities' efforts to control the use of their marks on merchandise beginning in the 1970s represented yet another attempt to expand the protections provided to sellers under the law. For universities, this trademark use diverged from traditional areas of trademark protection, such as Penn State preventing an unaffiliated

---

[28]   Stacey L. Dogan & Mark A. Lemley, The Merchandising Right: Fragile Theory or *Fait Accompli*, 54 Emory L.J. 461, 466 (2005) (Dogan & Lemley); *see, e.g.*, *Park 'N Fly, Inc.*, 469 U.S. at 198 ("The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.").

[29]   Dogan & Lemley, at 466; *see, e.g.*, *S.C. Johnson & Son v. Johnson*, 116 F.2d 427, 429 (2d Cir. 1940) (Hand, J.) ("We are nearly sure to go astray in any phase of the whole subject [of trademark law], as soon as we lose sight of the underlying principle that the wrong involved is diverting trade from the first deal with him.").

[30]   Dogan & Lemley, at 469.

[31]   *Id.*

[32]   *Id.*

educational institution from using its name. In this hypothetical, a consumer might reasonably believe that they are enrolling in a Penn State affiliate. But university-trademarked apparel and merchandise present a different case; the mark itself is the product.

From the outset views diverged on whether, given this overriding non-trademark function, the marks still identified the entity as the source or sponsor of the goods. Some, notably the United States Court of Appeals for the Fifth Circuit in *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Manufacturing* (*Boston Hockey*)[33] and the Trademark Trial and Appeals Board in *In re Olin Corp.*,[34] found that the marks inherently do.[35] The Fifth Circuit drew this conclusion from the fact that consumers only purchase the merchandise because of the mental association it

---

[33]   510 F.2d 1004, 1011–12 (5th Cir. 1975), *cert. denied*, 423 U.S. 868 (1975).
[34]   1973 WL 19761.
[35]   *See also Univ. Book Store*, 1994 WL 747886, at *21–22. While couched in a broader fact-intensive discussion of consumers' likelihood of confusion, in *Univ. of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1545–47 (11th Cir. 1985), the court emphasized that "'confusion' need not relate to the origin of the challenged *product*. Rather, 'confusion' may relate to the public's knowledge that the *trademark*, which is 'the triggering mechanism' for the sale of the product, originates with the plaintiff." *Id.* at 1546 (citing *Boston Professional Hockey Ass'n*, 510 F.2d at 1012). I find this description of the law difficult to square with *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 388 (5th Cir. 1977), *Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1082 (5th Cir. 1982), and *Savannah Coll. of Art and Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1264–65 (11th Cir. 2017); *see also* McCarthy on Trademarks and Unfair Competition § 24:10 (discussing the retreat from *Boston Hockey*). But minimally, the court's analysis was included as part of a broader review of the fact-intensive inquiry into consumers' likelihood of confusion, which—while it suggests Penn State is likely to succeed on its broader claims—does not support its efforts to dispose of this counterclaim at the motion to dismiss stage. *See Laite*, 756 F.2d at 1546 (detailing how a University of Georgia professor received 10 to 15 inquiries from people concerned that the University was licensing its mascot to a brewing company); *see* Doc. 38 at 13 (citing *Laite*, 756 F.2d at 1246); Doc. 40 at 13 (citing *Laite*, 756 F.2d at 1541).

creates between the trademark and trademark holder.[36] The question as they saw it was answered by sole reference to whichever party's toil generated the sale, with no need to undertake a fact-intensive inquiry into whether consumers believed the trademark holder had manufactured or sponsored the product.[37] The Trademark Trial and Appeals Board, on the other hand, reasoned from the negative. It found that a mark—like that of New York University's—"inherently . . . . advise[s] the purchaser [that] the university is the secondary source of that shirt" because "[i]t is not imaginable that Columbia University will be the source of an N.Y.U. T-Shirt."[38] This per se approach (as I'll call it) is forwarded by Penn State here; and, if adopted, it would entitle the University to its motion to dismiss as there can be no doubt that Vintage Brand's customers are buying its Penn State products because of the associations they create with the University.

That said, still more have rejected this per se approach—even if they ultimately found that a bona fide mark had been infringed.[39] Instead, as these courts

---

[36]  *Boston Professional Hockey Ass'n*, 510 F.2d at 1012 ("The certain knowledge of the buyer that the source and origin of the trademark symbols were in plaintiffs satisfies the requirement of the act. The argument that confusion must be as to the source of the manufacture of the emblem itself is unpersuasive, where the trademark, originated by the team, is the triggering mechanism for the sale of the emblem.").

[37]  *Id.*

[38]  1973 WL 19761, at *1.

[39]  *See Savannah Coll. of Art and Design, Inc.*, 872 F.3d at 1264–65; *United States v. Giles*, 213 F.3d 1247, 1250–51 (10th Cir. 2000); *Supreme Assembly, Order of Rainbow for Girls*, 676 F.2d at 1082; *Int'l Ord. of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 918 (9th Cir. 1981), *cert. denied*, 452 U.S. 941 (1981); *Kentucky Fried Chicken Corp.*, 549 F.2d at 388; *Bd. of Governors of Univ. of North Carolina v. Helpinstine*, 714 F. Supp. 167, 171 (M.D.N.C. 1989); *Nat'l Football League Props., Inc. v. N.J. Giants, Inc.*, 637 F. Supp. 507, 515 (D.N.J. 1986); *Nat'l Football League Props., Inc. v. Wichita Falls Sportswear, Inc.*, 532 F. Supp. 651,

have emphasized, trademark law requires more than a mental association between the trademark and trademark holder. As they see it, the consumer must instead believe that the trademark indicates that the trademark holder is the source, sponsor, or is otherwise affiliated with the good—a question of fact.[40] Vintage Brand contends that the Court must minimally follow this approach (though it also suggests the marks may inherently not serve a source identifying function, as I'll address later),[41] thus allowing its claim to move past the motion to dismiss.[42]

This dispute has arisen in this Court, however, because many courts have still not squarely addressed the question. And that list includes the Supreme Court and the United States Court of Appeals for the Third Circuit. For the latter, that was nearly not the case. In the early 1980s, a binding decision on the subject appeared to be in the offing, as *Champion Products v. University of Pittsburgh* migrated back and forth between the Western District of Pennsylvania and the Third Circuit.[43]

---

659–61 (W.D. Wash. 1982); *see also* Restatement (Third) of Unfair Competition § 25(1) ("one may be subject to liability under the law of trademarks for the use of a designation that resembles the trademark . . . of another without proof of a likelihood of confusion only under an applicable antidilution statute."); McCarthy on Trademarks and Unfair Competition § 7:24 ("whether an ornamental design also serves as a trademark requires a highly fact-dependent analysis and a close examination of the probable impression made on the buying public").

[40]   *E.g.*, *Supreme Assembly, Ord. of Rainbow for Girls*, 676 F.2d at 1085 (treating as a fact question "whether in a given case knowledge of the source of the symbol supports the inference that many of the product's typical purchasers would believe that the product itself originated with or was somehow endorsed by the owner of the mark").

[41]   Doc. 39 at 14.

[42]   *Id.* at 10–14.

[43]   *See Univ. of Pittsburgh v. Champion Prods. Inc.*, 529 F. Supp. 464 (W.D. Pa. 1982) (*Pitt I*); *Univ. of Pittsburgh v. Champion Prods. Inc.*, 686 F.2d 1040 (3d Cir. 1982), *cert. denied*, 459 U.S. 1087 (1982) (*Pitt II*); *Univ. of Pittsburgh v. Champion Prods. Inc.*, 566 F. Supp. 711 (W.D. Pa. 1983), *order vacated* (3d Cir. Feb. 2, 1984).

Because the cases make several appearances in the parties' briefs, it's worth setting out what this trilogy did—and did not—say.[44]

The parties' dispute emerged after Champion, who had long sold apparel with the University's name, logos, and mascot printed on it, balked at the University's request for a $100 licensing fee and a 6% royalty on its University of Pittsburgh sales.[45] The first of these cases considered not the bounds of the universities' merchandising rights, but whether laches barred the University's efforts to obtain a retrospective accounting for past infringement and a prospective injunction.[46] After finding that the University had not objected to Champion's practice between 1936 and 1980—and had in fact sent out catalogs with Champion products and stocked them for many of those years in its school store—the lower court concluded that laches barred the suit.[47]

On appeal, the Third Circuit found that while the lower court rightfully rejected the University's efforts to obtain an accounting for past infringement, it had erred in denying prospective relief.[48] The basis for its decision was a misapplication of the laches doctrine.[49] As the Third Circuit explained, in the laches-trademark

---

[44]  *See* Doc. 39 at 15; Doc. 40 at 12–13.
[45]  *Pitt I*, 529 F. Supp. at 468.
[46]  *Id.* at 469.
[47]  *Id.* at 467–69.
[48]  *Pitt II*, 686 F.2d at 1041.
[49]  *Id.* at 1045 ("[W]e do not believe that Pitt's action rises to the level of outrageous and inexcusable delay which will bar all relief even absent a showing of detriment to Champion. Neither do we understand the district court to have believed this to be the case.").

context there are two classes of delay: one for lapses of a hundred years or more and another for lesser delays.[50] And while laches ordinarily requires a showing of prejudice, for the first, none is required because in cases of abandonment-like delays it's "highly dubious that any court of equity would grant injunctive relief against even a fraudulent infringer."[51] For the second, prejudice is required to avoid prospective injunctive relief, but it is not required to avoid an accounting for past infringement so long as the defendant can show that the trademark holder was silent in the face of known use.[52] Based on this bifurcated set-up, the Third Circuit concluded that the facts established a lesser delay coupled with the University's knowledge and silence, barring the accounting claim.[53] But that was not the case for the prospective-relief claim. On this front, the court found not only that the facts did not meet the abandonment standard, but that no such finding could be made as a matter of law.[54] In its view, there was no consequence to the lower court's detrimental reliance findings.[55] And in this analysis, the court touched on the

---

[50]  *Id.* at 1044–45.

[51]  *Id.* at 1044 (quoting *Anheuser-Busch v. Du Bois Brewing Co.*, 175 F.2d 370, 374 (3d Cir. 1949), *cert. denied*, 339 U.S. 934 (1950)).

[52]  *Id.* at 1044–45 (citing *Menendez v. Holt*, 127 U.S. 514, 524 (1888)).

[53]  *Id.* at 1045.

[54]  *Id.* at 1046, n.19.

[55]  *Id.* The district court found that Champion had "borne the risk of building the insignia soft goods business," invested in "an extensive creative art department for the development of graphics and designs," and "built up substantial goodwill in the business of selling soft goods bearing college or university insignia," with "a sales force of between 100 and 125 salesmen who serve[d] more than 10,000 accounts." *Id.*

burgeoning circuit split—then centered on the Ninth Circuit's rejection of the Fifth Circuit's approach in *Boston Hockey*.

The Third Circuit framed the discussion around Champion's position that it had "created, developed and expanded the imprinted soft-goods industry with the full knowledge of Pitt who should not now be permitted to profit from the markets developed by Champion."[56] In the Third Circuit's view, this was simply not true.[57] It believed that Champion had built a plant, developed an art department, and deployed a sales staff not in reliance on the University's inaction, but on "its own ability to develop and market such imprinted goods that the public, for whatever reason, wishes to buy."[58] That made Champion's circumstances unlike those in laches cases in where "the junior [trademark] user had developed its entire business around one name or product which the senior user then [sought] to prohibit it from using or producing."[59] What's more, as the court detailed, that Champion had developed a local market for the University's goods was "due not to the efforts of Champion but rather to the efforts of the school" who made "that imprint desirable."[60] These factual observations, which sunk Champion's efforts to attain prospective equitable relief, were drawn from *Boston Hockey* and its progeny. The teachings of these cases, the court wrote, "is that, whatever the ultimate scope of

---

[56]   *Id.* at 1047.
[57]   *Id.* at 1048.
[58]   *Id.* at 1049.
[59]   *Id.* at 1047.
[60]   *Id.* at 1049.

protection afforded, the crucial element is consumer desire to associate with the entity whose imprint is reproduced," and "[t]his desire is based on success or notoriety which, in turn, is a result of the efforts of that entity."[61]

Yet while the Third Circuit used *Boston Hockey* to highlight the nature of Champion's business and thus deconstruct the Company's laches argument, it took pains to note that it was not adopting the case as the law of the circuit. In fact, in detailing the decisions, the court emphasized that the "precise contours" of the doctrine were "by no means settled,"[62] and later added that it "decline[d] to delve into this fray without the benefit of its consideration by the district court and full briefing of these most recent cases by the parties."[63]

On remand, the district court did just that, rejecting the *Boston Hockey* approach. It found that there was no likelihood of confusion as to the good's source, origin, authorization, or sponsorship; that the marks served the solely functional

---

[61]   *Id.*

[62]   *Id.* at 1048.

[63]   *Id.* Given that the Third Circuit offered this clear admonition and discussed these cases in the context of whether Champion was entitled to equitable relief, the Court views the use of a quote from the decision in McCarthy on Trademarks and Unfair Competition § 24:8 as misleading. In discussing "Collateral Uses of a Mark," the treatise points to the decision for the notion that "the mark of a university on clothing can signify that the university endorses and licenses the sale of such swearing apparel by the manufacturer," which it then follows with the statement: "In this context, the Third Circuit remarked that, '[T]he crucial element is consumer desire to associate with the entity whose imprint is reproduced. This desire is based on success or notoriety which, in turn, is a result of the efforts of that entity.'" Read charitably, the general discussion of these cases, as the court ferreted out the laches issue, could be seen as an acknowledgment that some courts have found that a mark *can* (not *must*) identify a second source, but it seems plain to this Court that the quoted statement from the Third Circuit was not made in this context, nor would the court have wanted this statement to be taken as its position on the trademark issue.

purpose of "allow[ing] the consumer to show his or her allegiance to Pitt"; and finally that apparel with Pitt's mark did not primarily serve a secondary purpose of "identify[ing] the source of the product rather than the product itself."[64] But soon after the lower court issued its opinion, the order was vacated by the Third Circuit—a move prompted by a consent decree that was included in the parties' settlement agreement.[65]

Although the deluge of cases in the 1970s and 1980s were soon reduced to a trickle—leaving this issue unresolved at the national and circuit levels—I see a clear loser: the per se approach forwarded by Penn State in its motion to dismiss. My reasoning is twofold. First, in the infringement context, efforts to walk back *Boston Hockey* began not long after the decision came down. Within two years, the Fifth Circuit sidelined the mental-associations approach, stressing that the analysis turns not on whether consumers tie the symbol to the trademark holder, but on whether they tie the product to the trademark holder.[66] And that finding, the court emphasized, requires a fact-intensive inquiry.[67]

---

[64] *Pitt III*, 566 F. Supp. at 721 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851, n.11)

[65] Glenn Wong, Recent Trademark Law Cases Involving Professional and Intercollegiate Sports, 1986 Detroit Coll. of L. Rev. 87, 107 (citing Telephone interview with Gerald Norton, Champion Products, Inc. (Mar. 15, 1986)).

[66] *Supreme Assembly, Ord. of Rainbow for Girls*, 676 F.2d at 1084, 1084 n.7.

[67] *Id.* at 1084 n.7 ("In *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368 (5th Cir. 1977), we explained that *Boston Hockey* does not always equate knowledge of a symbol's source with confusion sufficient to establish trademark infringement and we treated as a fact question . . . whether in a given case knowledge of the source of the symbol supports the inference that many of the product's typical purchasers would believe that the product itself originated with or was somehow endorsed by the owner of the mark. . . . 'Our

Second, I find the analysis offered by the Trademark Trial and Appeals Board in its eligibility cases unconvincing. In the university context, these revolve around *In re Olin Corp.* There, in explaining why a New York University-branded shirt would identify the university as the sponsor or authorizer, the Board reasoned, "[i]t is not imaginable that Columbia University will be the source of an N.Y.U. T-shirt."[68] But this play on an intercollegiate rivalry distracts from an error in reasoning: you cannot determine whether consumers believe an entity is the source or secondary source of a good by crossing out one entity that consumers obviously believe is not. The conclusion that purchasers will think that N.Y.U. sponsored or authorized the shirt does not necessarily follow from the statement that no purchaser will think that Columbia University is the source. There's a gulf of other possibilities.

The Court accordingly sees no reason to perpetuate or resuscitate this per se approach. Whether consumers believe that a university is the source, sponsor, or authorizer of merchandise bearing its marks should—minimally—turn on just that: what the consumers believe. And for that reason, Penn State's motion to dismiss is denied.

---

cases demonstrate unbroken insistence upon likelihood of confusion and by doing so they reject any notion that a trademark is an owner's "property" to be protected irrespective of its role in the operation of our markets.'"); *see* McCarthy on Trademarks and Unfair Competition § 24.10 ("The Fifth Circuit itself later retreated from the heresies of *Boston Hockey*" and that its "attempt to stretch trademark law failed (and rightly so) because it violated a basic rationale of trademark law.").

[68] *In re Olin Corp.*, 1973 WL 19761, at *1.

Now, as either approach championed by Vintage Brand allows its case to move forward, this Court declines to choose between them at this early stage. But to ensure fulsome briefing of the issue in future proceedings and focus the parties' minds on the sort of evidence to be adduced in discovery, the Court feels compelled to offer an initial assessment.

By my categorization, the per se and fact-intensive approaches effectively present the Court with the options *always* and *maybe* to the question: do purchasers believe that the university authorized the merchandise bearing its emblems? Although Vintage Brand stakes much of its case to the *maybe* approach, it also contends that the answer may well be *never*.[69] Its support for this proposition comes from one area where, over the past two decades, the faucet has remained open: the academic literature. In the pages of law reviews, there has been sharp criticism of the creation of a broad merchandising right[70]—including from the intellectual property field's preeminent scholar.[71] These criticisms are not rooted in the caselaw, or at least the on-point caselaw, but as I see it, they are criticisms that Penn State should be prepared to answer.

---

[69]   Doc. 39 at 14.

[70]   Dogan & Lemley; Mark A. Lemley, The Modern Lanham Act and the Death of Common Sense, 108 Yale L.J. 1687 (1999) (Lemley); *see also* James Boyle & Jennifer Jenkins, Mark of the Devil: The University as Brand Bully, 31 Fordham Intell. Prop. Media & Ent. L.J. 391 (2021); Jessica Litman, Breakfast with Batman: The Public Interest in the Advertising Age, 108 Yale L.J. 1717 (1999) (Litman).

[71]   According to one measure of scholarly impact, Lemley is the eighth most-cited legal scholar of all time—ranking two spots back of Justice Oliver Wendell Holmes, Jr. and one ahead of Judge Frank H. Easterbrook. Frank R. Shapiro, The Most-Cited Legal Scholars Revisited, 88 U. Chi. L. Rev. 1595, 1602 (2021).

As a matter of first principle, these scholars contend that a merchandising right, with its propertizing focus, is unmoored from trademark law's "twin goals of encouraging investment in product quality and preventing consumer deception."[72] And they further assert that such a right is downright irreconcilable with these goals when consumers' confusion comes not from their belief about the source, but from their belief "that the defendant might have needed a license to use the mark."[73] As these scholars emphasize, trademarks are not protected to dole out economic awards to the party in the case caption that is most deserving; nor are they protected to encourage entities to seek more of them. They are instead protected "to enable the public to identify easily a particular product from a particular source."[74] This rationale separates them from patents and copyrights, which offer *limited* "exclusive economic rights to cure the presumed market failure that would result if copiers could replicate expressive works and inventions without the cost of their development."[75]

This is not a bad thing. It may disincentivize investment in the school's merchandising; but it does not discourage investment in the underlying product—the school's academic and athletic programs.[76] And while it likewise will not encourage entities to seek out more trademarks, more trademarks have never been

---

[72]   Lemley, at 1688.
[73]   *Id.* at 1707.
[74]   *Id.* at 1695, 1708.
[75]   Dogan & Lemley, at 468–69.
[76]   Lemley, at 1708.

the goal of the law. In fact, more (particularly when they identify just one entity) may be worse.[77] Additionally, as these scholars highlight, absent this market-correcting justification, awarding a right works an economic harm.[78] If through trademark-created exclusivity an entity is free from competition, consumers suffer— on price and on preference. Indeed, T-shirts are more expensive (that licensing royalty has to come out of someone's pocketbook). And as is perhaps shown by this case, which involves a company that gained a toehold by offering gear with vintage graphics, the entity may be less incentivized to come up with creative products that meet consumer demand.

Beyond these theoretical issues, these scholars also emphasize that the Supreme Court's recent trademark decisions suggest that it may agree. One example they give is the *Dastar Corp. v. Twentieth Century Fox Film Corp.*[79] There, the Supreme Court rejected an unfair competition claim under a "reverse passing off" theory and, in doing so, emphasized the contours of the Lanham Act's "origin of goods requirement."[80] As the Court wrote, while the words could extend to those "who commissioned or assumed responsibility for the product," they were "incapable of connoting the person or entity that originated the ideas or communications that 'goods' embody or contain" and, as a general matter, "should

---

[77]   *Id.* at 1695.
[78]   Dogan & Lemley, at 481–82.
[79]   539 U.S. 23 (2003).
[80]   *Id.* at 32–34.

not be stretched to cover matters that are typically of no consequence to purchasers."[81] In the scholars' view, these statements not only foreclose a *Boston Hockey*-like approach where the analysis turns on "'the ideas or communications' embodied in the product," but if read broadly, "could require proof that it matters to consumers whether the trademark holder officially sponsors merchandise bearing its mark."[82]

At the very least, these scholars conclude, if there is confusion about the source, but the alleged infringer is making no claim of official sponsorship, recent Supreme Court cases suggest the remedy should be a disclaimer.[83] This is perhaps the most serious charge, given its roots in Supreme Court precedent, the weight of authority in favor of the fact-intensive approach, and the growing body of evidence in similar contexts where consumers have in fact been confused about a good's source or sponsorship.

---

[81]   *Id.* at 32, 33.

[82]   Dogan & Lemley, at 500–01.

[83]   *Id.* at 465 n.14, 505 (citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 154 (1989), *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 122 (1938), *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 34–35 (2001), and *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 232 (1964)) ("If there is an identifiable product market, in the sense that the trademark holder can command an above-market price because of the feature, the Supreme Court has suggested that some remedy short of an injunction—such as a disclaimer is most appropriate to alleviate any confusion. . . . The Court's refusal to allow control over product markets applies even in the face of clear evidence of trademark confusion."). *But see Boston Professional Hockey Ass'n*, 510 F.2d at 1013 ("The exact duplication of the symbol as the team's emblem satisfying the confusion requirement of the law, words which indicate it was not authorized by the trademark owner are insufficient to remedy the illegal confusion. Only a prohibition of the unauthorized use will sufficiently remedy the wrong.").

And I'd be remiss not to mention the latter. Though the data is now decades old, early N.F.L. trademark cases saw consumer confusion rates above 50%.[84] These results are not determinative here and can certainly be quibbled with at the margin. (For instance, when Penn State is wearing its multimillion-dollar sports enterprise hat and the goods are of an N.F.L.-like ilk, consumers may well be more confused than they are when the University has its world-class research institution hat on and the goods trend more classically collegiate.)

But the case for a disclaimer rather than an injunction lies at the base, not the margin. Consumer-survey data taken at the same time as the N.F.L. cases showed widespread belief among consumers that "[n]o product can bear the name of an entertainer, cartoon character, or some other famous person unless permission is given for its use"[85]—a belief that appears to have come from what they thought the law required.[86] The circularity is apparent: the law only offers protection if there's belief, yet the belief comes from consumers' (mis)conception about the law. It would seem perverse to award market exclusivity based on a fake-it-until-you-make-it approach. If consumers' confusion stems from their incorrect belief that goods

---

[84] *N.J. Giants, Inc.*, 637 F. Supp. at 515; *Wichita Falls Sportswear, Inc.*, 532 F. Supp. at 661.

[85] McCarthy on Trademarks and Unfair Competition § 24:12 (citing Harrison, "The Merchandising Reporter's First Consumer Survey on Licensing," 2 Merchandising Rep. 22 (Aug. 1983) (Harrison)).

[86] *Id.* § 24:12, n.9 (quoting Harrison) ("Some people indicated that, although this was legally true, the law was not always obeyed.").

bearing Penn State's emblem must be licensed, shouldn't that belief be corrected, not perpetuated?

## IV.   CONCLUSION

Ultimately, these are legal issues to be decided another day. Still, the discussion should focus the parties' minds on the issues to briefed in future motions. And it should highlight a few essential questions that cannot, at summary judgment, be answered through mere supposition: Indeed, what percentage of consumers are confused about the source or sponsorship of Vintage Brand's products? Does this belief vary by logo or merchandise type? And does it stem from their belief that the law requires Penn State's permission?

The modern collegiate trademark- and licensing-regime has grown into a multibillion-dollar industry. But that a house is large is of little matter if it's been built on sand.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge