**McGuireWoods**

**McGuireWoods LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Phone: 804.775.1000
Fax: 804.775.1061
www.mcguirewoods.com

**Lucy Jewett Wheatley**
Direct: 804.775.4320
lwheatley@mcguirewoods.com
Fax: 804.698.2017

March 29, 2023

The Honorable Chief Judge Brann
United States District Court Judge
William J. Nealon Federal Bldg. & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18503

      Re: *The Pennsylvania State University v. Vintage Brand, LLC* (No. 4:21-CV-01091)

Dear Chief Judge Brann,

      We write on behalf of Plaintiff The Pennsylvania State University ("Penn State"), in response to Defendant Vintage Brand, LLC's ("Vintage Brand"), March 22, 2023, letter to the Court requesting a pre-motion conference and briefing schedule regarding an unresolved expert discovery dispute. As explained below, Penn State seeks to compel Vintage Brand to produce pretest data relied upon by its proffered expert, Tülin Erdem—discovery that Vintage Brand refuses to provide.

### I.    Background

      The parties are currently engaged in expert discovery. In accordance with the Case Management Order in this case, Penn State served its expert report on December 20, 2022; Vintage Brand served two expert reports on January 23, 2023; and Penn State served its rebuttal report on February 13, 2023. The parties have taken depositions of the three experts in this case, and expert discovery is set to conclude on March 31, 2023. (ECF 80). The issue at hand concerns Vintage Brand's obligations to produce information relied on by their proffered expert Tülin Erdem.

      Dr. Erdem offers two sets of opinions in this case. First, she opines about a survey she conducted to assess whether there is a likelihood of confusion in this case. Second, Dr. Erdem offers opinions to rebut the expert report that Penn State submitted from Professor David Franklyn.

      As detailed in her expert report, in the process of constructing her consumer survey, Dr. Erdem performed a pretest. *See* Dkt. 83-1 at p. 7-8 of 340 (Erdem Report, ¶¶ 16-18). Her research consulting group, Analysis Group, performed this pretest by calling and interviewing 8 respondents while they took the survey. The respondents were asked to complete the survey while "thinking out loud" and were asked follow-up questions. *See* Dkt. 83-1 at p. 7-8 of 340 (Erdem Report, ¶ 16). Dr. Erdem attaches two appendices relating to the pretest to her report (Appendix E and part of Appendix D) and asserts that the pretest means that "respondents thought the questions, answer options, and stimuli were 'clear and unambiguous.'" *See* Dkt. 83-1 at p. 29 of 340 (Erdem Report, ¶ 45); *see also* Dkt. 83-1 at p. 161 of 340 (Erdem Report, App'x D, at D-5). She also claims that the pretest results allowed her to assess whether "demand artifacts" were created from her survey. *See* Dkt. 83-1 at p. 7 of 340 (Erdem Report, ¶ 16). She also asserts that certain questions

she asked were inserted specifically in response to results from the pretest. *See* Dkt. 83-1 at p. 7 of 340 (Erdem Report, ¶ 17). Dr. Erdem also criticizes Professor Franklyn on the basis that he did not conduct a pretest. *See* Dkt. 83-1 at p. 55 of 340 (Erdem Report, ¶ 94).

Dr. Erdem makes clear that information was recorded from the pretest by discussing how respondents: 1) provided feedback regarding the time it took for images to load on their screens, 2) expressed concerns about how to answer some questions, and 3) complained that certain wording choices were vague. *See* Dkt. 83-1 at p. 7-8 of 340 (Erdem Report, ¶¶ 17-18). The pretest instrument attached as Appendix E also specifically also states that the results of the pretest were required to be recorded by the notetaker. *See* Dkt. 83-1 at p. 165 of 340 (Erdem Report, App'x E, at E-1). These responses were given to Dr. Erdem's associates in the Analysis Group, who then relayed information to Dr. Erdem. *See* Dkt. 83-1 at p. 7-8 of 340 (Erdem Report, ¶¶ 16-18); *see also* Dkt. 83-1 at p. 162 of 340 (Erdem Report, App'x D, at D-6). Dr. Erdem also expressly states that in conducting the pretest, Analysis Group was acting at the direction of Dr. Erdem. *See* Dkt. 83-1 at p. 161 of 340 (Erdem Report, App'x D, at D-5).

Clearly, data was generated from the pretest, Dr. Erdem used that data to assess and craft the survey, and Dr. Erdem chose to criticize Professor Franklyn for not conducting a pretest. Dr. Erdem thus expressly relied on the pretest results. And Dr. Erdem has selectively disclosed certain information from the pretest in the body of her report. *See* Dkt. 83-1 at p. 52-53 of 340 (Erdem Report, ¶¶ 86-87). Dr. Erdem has not, however, disclosed the full results from this pretest. Specifically, she has not disclosed:

- The pretest survey instrument that was administered;
- The responses that were provided from the pretest respondents; or
- Any data recorded by the Analysis Group or by her concerning respondents' interview responses.

Following Dr. Erdem's deposition on March 3, 2023, Penn State requested this pretest data from counsel for Vintage Brand. On March 22, 2023, following a meet-and-confer, Vintage Brand's counsel refused to produce the result data from Dr. Erdem's pretesting.

**II.     Argument**

Vintage Brand has asserted that a protective order is necessary to preclude the production of Dr. Erdem's pretest data. Vintage Brand's assertion rests on its improper application of Federal Rule of Civil Procedure 26(a)(2) to the facts at issue.

Federal Rule of Civil Procedure 26(a)(2) requires that an expert witness's written report must be accompanied by, among other things, "the facts or data considered by the witness in forming" the opinions that the witness will provide. While Vintage Brand asserts that Dr. Erdem only received "takeaways" from the pretest, that does not change the fact that the pretest results were facts and data on which she relied under Rule 26(a)(2). The argument that Dr. Erdem never received any written records of the pretest data is mere semantics; Dr. Erdem was undoubtedly relayed information from the Analysis Group regarding pretest data.  Defendants cannot shield the complete pretest dataset by opting to discuss only part of it in her report. Nor can Dr. Erdem shield

part of the results of a study directly discussed in her report by having an agent (acting at her direction) "shield" her from negative results by only conveying selected data. Dr. Erdem cannot use partial results from the pretest as a sword against Penn State and shield the full results from discovery.

Dr. Erdem testified in her deposition that the pretest data from the survey in this case was written down and received:

```
 9      Q.  Now your report refers to a pretest.
10    Have you produced the data from the pretest?
11      A.  No.  The pretest data I don't provide
12  in any of the cases.  The report has the pretest
13  instructions to the pretesters and the main
14  takeaways, because the results are not important.
15  I don't even analyze the results.  The pretest
16  mission is about whether the questions are clear,
17  et cetera, and not the results.
18      Q.  But did you receive the data from the
19  pretest?
20      A.  Once the pretests were done, it was
21  only eight people anyway, I talked to my team and
22  got the feedback.
23      Q.  But did you actually receive the
24  data?
25      A.  No, because they are like data are
 2  not kept, because we don't care about the
 3  answers.  The data are not analyzed.  That is not
 4  what pretests are for.
 5      Q.  How are the answers recorded?
 6      A.  People write it down sometimes.
 7  Sometimes they verbally answer.  I think in this
 8  case they were written down.
```

*See* Dkt. 83-2 at p. 4 of 50 (Erdem Deposition, 11:8:25 and 12:2:8) (emphasis added).

Dr. Erdem further testified that written notes as well as audio recordings may exist from the pretest, and that this "feedback" was received:

```
19      Q.  Alright, and appendix E to your
20  report, Exhibit 37, indicates that a note-taker
21  should record the pretest respondents' answers.
22  Do you know if this was done?
23      A.  As I said, I just talked to them
24  about the takeaways.  At the time they might have
25  done.  I don't know.  Usually – I mean not
 2  usually. In any case I have done before, I don't
```

>    3   listen to recordings or any written documents.
>    4   They know exactly what to do, and they give me
>    5   the feedback, and based on the feedback I make
>    6   changes.

*See* Dkt. 83-2 at p. 16 of 50 (Erdem Deposition, 60:19:25 and 61:2:6).

Furthermore, Dr. Erdem's deposition and report make clear that, not only were facts and data from the pretest provided to her by the Analysis Group, but that this information was used to create her report. Dr. Erdem cites to her pretest as a basis for several of her opinions, such as by invoking the pretest data as evidencing that her survey questions were clear and unambiguous. *See* Dkt. 83-1 at p. 29 of 340 (Erdem Report, ¶ 45). She notes that she revised her survey instrument, including by inserting additional questions, in response to the pretest results. It is irrelevant that Dr. Erdem allegedly deems the pretest data as "not important," or that she does not "analyze the data" herself, because it is irrefutable that Dr. Erdem used pretesting survey results to shape the survey questions that thereafter formed the basis for her report.

Penn State is entitled to this pretest data—data commissioned and paid for by Dr. Erdem and Vintage Brand. The information is further encompassed in Penn State's Request for Production No. 16, which asks for "non-privileged documents or communications … relied on" by Vintage Brand's experts "in preparing [their] opinions." Dr. Erdem is required to disclose the information from her pretest, including the version of the questionnaire that was administered, the responses provided to that pretest questionnaire, and any recordings or notes pertaining to the interviews that were conducted with respondents in the pretest.

### III.     Requested Relief

Penn State therefore seeks to compel Vintage Brand to disclose all documents, communications, and things related to the pretest conducted in constructing Dr. Erdem's consumer survey, and requests that the Court grant Penn State's request for a pre-motion conference and briefing schedule to file a Motion to Compel this data.

*s/ Lucy Jewett Wheatley*
Lucy Jewett Wheatley

CC:     Counsel of Record