**EXHIBIT F**

**EXHIBIT F**

*CONFIDENTIAL*

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

THE PENNSYLVANIA STATE UNIVERSITY,

       Plaintiff,

  v.

VINTAGE BRAND, LLC,

       Defendants.

Case No. 4:21-cv-01091-MWB

**EXPERT REPORT OF TÜLIN ERDEM, PH.D.**

**January 23, 2023**

*CONFIDENTIAL*

# TABLE OF CONTENTS

I.  Introduction .................................................................................................... 1

   A.  Qualifications ........................................................................................ 1

   B.  Background ............................................................................................ 2

       1.  Parties Involved ......................................................................... 2
       2.  Claims Relevant to My Opinion ............................................... 3

   C.  Assignment ............................................................................................ 4

II. Summary of Opinions ..................................................................................... 5

III. My Likelihood of Confusion Survey Shows that Consumer Confusion
    Between Vintage Brand and Penn State is Unlikely ...................................... 6

   A.  Overview of the Likelihood of Confusion Survey ................................. 7

   B.  Key Measures of the Likelihood of Confusion Survey ........................ 21

       1.  Confusion as to Source ............................................................ 21
       2.  Confusion as to Business Relationship .................................... 21
       3.  Measuring Certainty and the Impact of a Pre-Existing Legal
           Belief ....................................................................................... 22
       4.  Measuring the Responsibility for Product Quality ................. 25

   C.  Likelihood of Confusion Survey Implementation and Administration ... 27

   D.  Analysis of the Likelihood of Confusion Survey Results ..................... 28

       1.  Analysis of Confusion as to Source ........................................ 30
       2.  Analysis of Confusion as to Business Relationship ................ 33
       3.  Analysis of Responsibility for Product Quality ...................... 36

IV. Mr. Franklyn's Surveys Are Unreliable and Fail to Address the Research
    Question in a Relevant Way ......................................................................... 43

   A.  Summary of Mr. Franklyn's Commercial Impression and Confusion
       Surveys ................................................................................................ 43

       1.  Commercial Impression Survey ............................................... 44
       2.  Confusion Survey ..................................................................... 45

   B.  The Franklyn Surveys Do Not Provide Reliable or Relevant Results ... 47

       1.  The Franklyn Commercial Impression Survey Contains
           Multiple Demand Artifacts that Render the Results
           Unreliable ................................................................................ 48
       2.  The Franklyn Confusion Survey Lacks Necessary
           Marketplace Context and a Proper Control, Rendering the
           Survey Results Unreliable ....................................................... 52
       3.  Neither of Mr. Franklyn's Surveys Address the Research
           Question in a Relevant Way .................................................... 54

i

*CONFIDENTIAL*

# I.   INTRODUCTION

## A.   Qualifications

1.   I am the Leonard N. Stern Professor of Business Administration and Professor of Marketing at the Stern School of Business, New York University. I previously served as the Co-Director of the Center for Digital Economy Research and the Director of NYU's Stern Center for Measurable Marketing. I am currently serving as the Chair of the Stern Marketing Department.

2.   Before joining the Stern School of Business in 2006, I was the E.T. Grether Professor of Business Administration and Marketing at the Haas School of Business, University of California at Berkeley. I joined the Haas School of Business in 1993 where I served as the Associate Dean for Academic Affairs, the Marketing Group Chair, and the Ph.D. Director. I was also the Chair of the campus-wide Committee on Research (COR) and the university of California, Berkeley representative of the University of California system-wide Committee on Research.

3.   I hold a B.A. from Boğaziçi University in Turkey and an M.A. in Economics and a Ph.D. in Business Administration from the University of Alberta in Canada, with a major in marketing and minors in economics and statistics. My research interests include consumer behavior and choice, consumer decision-making under uncertainty, advertising, brand management and equity, econometric modeling, empirical modeling and quantitative analysis, marketing mix effectiveness, marketing research and pricing. I have published several papers in top journals in my field and have received best paper awards, as well as major research grants, including two major National Science Foundation (NSF) grants. I have been also named an ISMS (INFORMS Society for Marketing Science) fellow for my life-time contributions to the marketing field and ISMS.

4.   I served as the editor-in-chief of the *Journal of Marketing Research*, the preeminent academic journal of the American Marketing Association, which publishes work on consumer behavior, marketing science models, marketing strategy and marketing research methodologies. I also served as an Area Editor at a top-tier journal called *Marketing Science* and as Associate Editor for Quantitative Marketing and Economics at the *Journal of Consumer Research*. Currently, I am on the advisory council for both *Marketing Science* and the *Journal of Marketing Research*. I am also serving as a Senior Editor at *International Journal of Research in Marketing* and as an Area Editor of the *Journal of Market Behavior*. I serve as an editorial board member of many scholarly journals, including the Journal of the Academy of Marketing Science and Marketing Letters.

*CONFIDENTIAL*

5.      I have more than 25 years of teaching experience, during which I have taught empirical market research, branding, brand and product management, marketing management and international marketing in undergraduate, MBA and executive education programs. I also have taught doctoral seminars on consumer choice and various aspects of marketing modeling. A complete list of my publications, honors, awards, and professional activities is provided in my CV, attached in **Appendix A**.

6.      From 2008 to 2012, I was an Academic Partner at Prophet, a branding and marketing consultancy firm. In this role, I helped Prophet to run several marketing research and consumer decision-making studies for Prophet's clients.

7.      I have served as an expert witness in several cases, on matters relating to marketing, consumer behavior, brand positioning, and brand equity. I have conducted, analyzed, and evaluated consumer surveys in these roles. My testimony has never been excluded from litigation due to any issue involving my qualifications or expertise. The list of cases where I submitted my testimony is available in **Appendix B**.

8.      I am compensated at my standard rate of $1,350 per hour, plus expenses, for my work in this case. In addition, I receive compensation based on the professional fees of Analysis Group, Inc., a financial and economic consulting firm, which has provided research support under my direction and supervision. My compensation is not contingent on my findings or on the outcome of this case. The opinions I express are in no way contingent on the compensation I will receive.

## B.      Background

### 1.      *Parties Involved*

9.      The Plaintiff in this matter is The Pennsylvania State University ("Penn State"), a not-for-profit public university which enrolls approximately 100,000 students per year across its 24 campuses and online programs.[1] Founded in 1855, and beginning to operate under the name "The Pennsylvania State University" in 1953,[2] Penn State offers "educational services, research,

---

[1]     "This is Penn State," 2022, https://www.psu.edu/this-is-penn-state/, accessed January 5, 2023; First Amended Complaint, The Pennsylvania State University v. Vintage Brand, LLC, 4:21-cv-01091-MWB ("Complaint"), ¶ 4.

[2]     Complaint, ¶ 11.

*CONFIDENTIAL*

outreach, development and other related scholarly pursuits"[3] as well as a robust athletics program consisting of 29 NCAA Division I athletic teams at its main campus.[4]

10.     Defendant Vintage Brand, LLC ("Vintage Brand") was founded in 2017 and operates an online store at the web domain vintagebrand.com. Vintage Brand offers a large collection of vintage college and professional sports apparel and merchandise, including retro t-shirts, tailgating drinkware, reproduced event tickets and posters, and more.[5] Vintage Brand's products are "created from over 20,000 historic tickets, programs, decals, scorecards, game schedules, and other classic sports images… reproduced from an original work of art that is in the public domain."[6] Vintage Brand offers merchandise from a variety of professional sports leagues, including the MLB, NBA, and NFL, as well as from NCAA colleges and universities, among others.[7]

### 2.     Claims Relevant to My Opinion

11.     Among other things, I understand that Penn State alleges the following against Vintage Brand:

- **Counterfeiting and Infringement.** Vintage Brand is "willfully infringing Penn State's trademarks by branding and marketing apparel and other goods sold through its website <vintagebrand.com> under the PENN STATE name and/or with at least one of the Lionhead Logo, the Nittany Lion Logos, the Pozniak Lion Logo, and/or the Penn State Seal."[8]

- **Unfair Competition and False Designation of Origin.** Vintage Brand is "causing unfair competition and false designation of origin by claiming that the logos on its apparel are Penn State's logos."[9]

---

[3]     Complaint, ¶ 12.

[4]     "Penn State Athletics and Recreation," 2022, https://admissions.psu.edu/life/athletics/#:~:text=For%20student%2Dathletes%20involved%20in,national%20c hampionships%20through%20the%20USCAA, accessed January 5, 2023.

[5]     Complaint, ¶ 54; "Welcome to Vintage Brand," 2022, https://vintagebrand.com/about, accessed January 5, 2023.

[6]     "Welcome to Vintage Brand," 2022, https://vintagebrand.com/about, accessed January 5, 2023.

[7]     "Home," 2022, https://vintagebrand.com/, accessed January 5, 2023.

[8]     Complaint, ¶¶ 1, 3.

[9]     Complaint, ¶ 3.

*CONFIDENTIAL*

- **Trademark Dilution.** Vintage Brand is "intentionally capitalizing on Penn State's name, marks, and goodwill to promote its business."[10]

12.     I also understand that Vintage Brand denies these allegations and emphasizes that "these images and logos are in the public domain and not subject to further protection under trademark law." [11] I understand that Vintage Brand also claims the following:

- That the at-issue images are "used as mere decoration, printed in large font and in a prominent location and [do] not serve to identify Penn State as the source or origin of the goods."[12]

- That "[on] information and belief, consumers perceive… [the at-issue images] to be merely a decorative feature of the goods and not an indication of the source of the goods."[13]

- That the at-issue images' "overall commercial impression… is purely ornamental or merely a decorative feature[,]… [and they] do not identify and distinguish Penn State's goods from those of others and, therefore, do not function as a trademark…"[14]

## C.     Assignment

13.     I was retained by Stokes Lawrence, P.S. on behalf of Vintage Brand to design, conduct, and analyze a consumer survey to evaluate whether and to what extent consumers are confused regarding (i) the source of Vintage Brand's products as they relate to Penn State or (ii) whether a business relationship exists between Vintage Brand and Penn State. I was also asked to test whether consumers believe that Penn State is responsible for the quality of Vintage Brand's products that bear Penn State-related images. In making these inquiries, I was asked to examine the extent to which any apparent consumer confusion is the product of consumers' belief that there is a legal requirement for Vintage Brand to obtain Penn State's permission to use Penn State's name or imagery that originated with Penn State. I have also been asked to comment on

---

[10]   Complaint, ¶ 3.

[11]   Memorandum Opinion The Pennsylvania State University v Vintage Brand, LLC, No. 4:21-CV-01091, July 14, 2022 ("Memorandum Opinion"), p. 1.

[12]   Memorandum Opinion, p. 3.

[13]   Memorandum Opinion, p. 3.

[14]   Memorandum Opinion, p. 3.

*CONFIDENTIAL*

the Report of David Franklyn ("Franklyn Report").[15] Specifically, I have been asked to evaluate whether the design of the Franklyn Report's Confusion Survey and Commercial Impression Survey lead to valid results in evaluating consumer confusion.

14.     In preparing this report, I relied on information from a variety of sources, including, among others: academic literature, news sources, internal Vintage Brand documents, and other materials produced in this case. A list of the materials that I have relied upon in reaching my conclusions is provided in **Appendix C**.

15.     I reserve the right to supplement the opinions expressed in this report in response to any new information provided by the parties after the date of signature below.

## II.      SUMMARY OF OPINIONS

16.     My opinions are based on (i) my expertise in marketing, consumer behavior and decision-making, and marketing research; (ii) materials I have reviewed in this matter; and (iii) the results of the Likelihood of Confusion Survey that I designed, conducted, and analyzed.

17.     My Likelihood of Confusion Survey uses a non-leading approach, marketplace stimuli, and proper control stimuli. Based on the results of my survey, I arrive at the following opinions:

      a.   I find that confusion as to source or business relationship is insubstantial. I further find that consumer confusion as to source and business relationships is even lower when controlling for the strength of consumer certainty regarding their survey answers. I also find that the majority of consumers who express source or business relationship confusion have a pre-existing belief that Vintage Brand is legally required to have a business relationship with Penn State.

      b.   I find that few consumers identify Penn State as an entity that is responsible for the quality of Vintage Brand products containing imagery that originated with Penn State. This result is robust when controlling for the strength of consumer certainty regarding their survey answers. I similarly find that the vast majority of consumers who identify Penn State as an entity that is responsible for the quality of Vintage Brand products

---

[15]   Expert Report of David Franklyn in the Matter of *Pennsylvania State University v. Vintage Brand, LLC.* , 4:21-cv-01091, 2022 ("Franklyn Report"), United States District Court for the Middle District of Pennsylvania, December 20, 2022.

containing imagery that originated with Penn State also believe that Vintage Brand is legally required to have a business relationship with Penn State.

    c.  All results regarding confusion as to source, confusion as to business relationship, and responsibility for product quality are robust to alternative disclosures regarding Vintage Brand products on the Vintage Brand website.

18.    Mr. Franklyn's surveys in this matter suffer from numerous flaws and fail to produce reliable results. Among other issues, the Franklyn surveys lack necessary marketplace context, show guessing in respondent answers, and fail to implement an appropriate control group.

## III.    MY LIKELIHOOD OF CONFUSION SURVEY SHOWS THAT CONSUMER CONFUSION BETWEEN VINTAGE BRAND AND PENN STATE IS UNLIKELY

19.    To address my assignment, I designed and conducted a survey (my "Likelihood of Confusion Survey") that generally follows the aided *Eveready* format and utilizes a test/control experimental design.[16] The aided *Eveready* format is appropriate in this matter as Penn State claims that its mark and logos are well-known. This design allows me to assess whether and to what extent there is any consumer "confusion" regarding source and business relationship between Vintage Brand and Penn State, whether uncertainty of opinion affects any of this "confusion," and whether this confusion is correlated with a belief that there is a legal requirement for Vintage Brand to obtain Penn State's permission to use Penn State's name or imagery that originated with Penn State. Analyzing the results, I find that consumers are (i) not confused regarding the source of Vintage Brand's products as they relate to Penn State and (ii) not confused as to whether a business relationship exists between Vintage Brand and Penn State.

20.    My design allows me to assess whether consumers identify Penn State as an entity that is responsible for the quality of Vintage Brand products containing imagery that originated with Penn State. My design also allows me to assess whether uncertainty of belief affects consumer confusion about who puts out the Vintage Brand products or whether there is a business relationship between Vintage Brand and Penn State. My design also lets me test the extent to which any consumer confusion or beliefs about responsibility for quality are correlated with a

---

[16]   The *Eveready* survey format is a "reliable measure of the real world as to mark accessibility and similarity," which courts have endorsed for both trademarks and trade dress litigation matters. Jerre B. Swann and R. Charles Henn Jr., "Likelihood of Confusion Surveys: The Ever-Constant Eveready Format; The Evervolving Squirt Format " *The Trademark Reporter*, 2019, pp. 106-671, at p. 673. *See also* Jerre B Swann, "Eveready and Squirt - Cognitively Updated," *Trademark Rep.*, 2016, pp. 106-727, at pp. 729-730.

*CONFIDENTIAL*

belief that there is a legal requirement for Vintage Brand to obtain Penn State's permission to use Penn State's name or imagery that originated with Penn State.

21. In the following subsections I provide an overview of my Likelihood of Confusion Survey, outline the key measures, describe the survey administration, and present an analysis of my results.

### A. Overview of the Likelihood of Confusion Survey

22. I designed my Likelihood of Confusion Survey to determine whether and to what extent consumers are (i) confused regarding the source of Vintage Brand's products, (ii) confused as to the existence of a business relationship between Vintage Brand and Penn State, and/or (iii) confused as to the entity that is responsible for the quality of Vintage Brand's products. Further, I designed my Likelihood of Confusion Survey to examine the extent to which any apparent "confusion" I found was strongly held, and/or was the product of a pre-existing belief that there is a legal requirement for Vintage Brand to obtain Penn State's permission to use Penn State's name or imagery that originated with Penn State.

23. **Screening questions.** As the allegations relevant to my assignment relate to the extent to which Vintage Brand's products decorated with Penn State's name or imagery that originated with Penn State confuses consumers, I defined the target population as current or perspective purchasers of "collegiate apparel or merchandise" who reside in the U.S. and are at least 18 years old. I designed my screener so that my sample would include (i) anyone who had purchased collegiate apparel or merchandise in the past six months; or (ii) anyone who was planning on purchasing collegiate apparel or merchandise in the next six months. Only respondents who matched my target population qualified for and reached the survey's main questionnaire.[17] See **Figure 1** and **Figure 2** below.

---

[17] "The target population consists of all elements (i.e., individuals, or other units) whose characteristics or perceptions the survey is intended to represent." See Shari S. Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition, The National Academies Press*, 2011, pp. 359-423, at p. 376.

*CONFIDENTIAL*

**Figure 1**

**Respondent Demographics**

*All Survey Completes*

|  | **Number of Respondents** | **% of Respondents** |
|---|---|---|
| **Age** | | |
| 18 - 29 | 258 | 20% |
| 30 - 39 | 272 | 21% |
| 40 - 49 | 310 | 24% |
| 50 - 59 | 256 | 20% |
| 60 or older | 196 | 15% |
| **Region** | | |
| Midwest | 340 | 26% |
| Northeast | 211 | 16% |
| South | 530 | 41% |
| West | 211 | 16% |
| **Gender** | | |
| Male | 643 | 50% |
| Female | 648 | 50% |
| Other | 1 | 0% |
| **Total** | 1292 | 100% |

**Source:**

Likelihood of Confusion Survey.

*CONFIDENTIAL*

**Figure 2**

**Likelihood of Confusion Response Statistics**

| Status | Number of Respondents |
|---|---|
| **Total Survey Starts** | **16,352** |
| **Screened out of survey, due to:** | **13,924** |
| *Panel Provider Quality Checks* | 81 |
| *CAPTCHA* [1] | 73 |
| *Eyeglasses* [2] | 362 |
| *Eyeglasses (Refused to wear)* [3] | 382 |
| *Age* [4] | 113 |
| *Age (Did not match panel provider records)* [5] | 777 |
| *Gender* [6] | 17 |
| *Gender (Did not match panel provider records)* [7] | 235 |
| *State of Residence* [8] | 134 |
| *Attention Check* [9] | 343 |
| *Household Employment* [10] | 830 |
| *Didn't buy collegiate apparel or merchandise* [11] | 10,509 |
| *Didn't see images clearly* [12] | 36 |
| *Validation Statement* [13] | 4 |
| *Quality Check* [14] | 28 |
| **Unspecified Terminates** | **1,136** |
| **Completed Survey** | **1,292** |
| **Completion Rate** | **7.90%** |

**Notes:**
[1] QS1 ("Captcha").
[2] QS2 ("Do you or do you not usually wear eyeglasses or contact lenses when reading material on a computer screen?").
[3] QS3 ("Will you please wear your eyeglasses or contact lenses for the remainder of the survey?").
[4] QS4 ("Into which of the following categories does your age fall?").
[5] Respondents were terminated if the age they indicated did not match the panel providers records.
[6] QS5 ("Are you…?").
[7] Respondents were terminated if the gender they indicated did not match the panel providers records (unless "other" was selected).
[8] QS6 ("In which state do you live?").
[9] QS7 ("For quality control purposes, please select "Second" from the list below).
[10] QS8 ("Have you or any member of your household ever worked for any of the following types of companies?").
[11] QS9 ("Which of the following have you purchased online in the past six months, or would consider purchasing online in the next six months?").
[12] Q3 ("Were you or were you not able to see the webpages in the previous screens clearly?").
[13] QF3 ("Please select which option best describes how you feel about the validation statement below.").
[14] Respondents who completed the survey in under 3 minutes or over 45 minutes were removed from the analytical sample.

**Source:**
Likelihood of Confusion Survey.

24.     **Stimuli**. My Likelihood of Confusion Survey presented respondents with a series of four stimuli images of Vintage Brand's website, re-creating a real-world shopping experience for the respondents. These images were: (i) the main Vintage Brand homepage ("home page"), (ii) the landing page for Penn State merchandise ("landing page"), (iii) a product page for a Vintage Brand sweatshirt product decorated with Penn State imagery ("product page"), and (iv) a

*CONFIDENTIAL*

checkout cart page ("cart page"). I designed the survey stimuli to show respondents images of the Vintage Brand website for two reasons: (i) these stimuli allowed me to evaluate the potential for confusion under existing marketplace conditions by re-creating a real-world shopping experience for Penn State-decorated merchandise on Vintage Brand's website[18]; and (ii) these stimuli allowed me to test for potential confusion under different scenarios by manipulating two key parts of the webpage images: the disclaimer and product logo images.

25.     **Experimental Groups**. The appropriate survey design to capture the impact on consumer confusion of Vintage Brand products decorated with Penn State imagery involves randomly assigning respondents into test and control experimental groups. To eliminate all alternative explanations for any confusion other than that the confusion is attributable to use of the Penn State images, qualified respondents were randomly assigned to one of three experimental groups to view one of three logos on a gray hooded sweatshirt, within the Vintage Brand purchasing environment. Two of the logo stimuli alternatives were real Vintage Brand products decorated with Penn State imagery (which I refer to as the "1929 Penn State Nittany Lions" logo and the "1950 Penn State Nittany Lions" logo). The third logo stimuli alternative was a "State of Pennsylvania Seal" logo, based on the obverse side of the Commonwealth of Pennsylvania's state seal.[19] I designed the State of Pennsylvania Seal logo stimuli to be as close as possible to the Vintage Brand products decorated with Penn State imagery and to control for the potential influence of elements other than the at-issue imagery on confusion. See **Figure 3** below.

---

[18]     "…a survey is designed to prove the state of mind of a prospective purchaser." *See* Thomas J. McCarthy, "Chapter 32. Procedure in Trademark Infringement and Unfair Competition Litigation," *McCarthy on Trademarks and Unfair Competition § 32:163*, 2020.

[19]     "Seal of Pennsylvania," 2022, https://statesymbolsusa.org/symbol-or-officially-designated-item/pennsylvania/state-seal/seal-pennsylvania, accessed January 17, 2023.

CONFIDENTIAL

**Figure 3**

**Likelihood of Confusion Survey Test and Control Groups**

| **Test Group 1** | **Test Group 2** | **Control Group** |
|:---:|:---:|:---:|
| *1929 Penn State Nittany Lions Logo* | *1950 Penn State Nittany Lions Logo* | *State of Pennsylvania Seal Logo* |

  

26.    Although my primary test for confusion relies on testing the impact of different logos using the current Vintage Brand website, I also created additional stimuli conditions that allow me to estimate the impact of disclaimers on respondents' perception of the source of Vintage Brand's products, Vintage Brand's business relationships, and quality of Vintage Brand's products as they relate to products decorated with Penn State imagery. To that end, I designed four website condition groups with variations on Vintage Brand's existing disclaimer. Respondents within each website condition group then viewed one set of four (or five) total stimuli images,[20] described in **Figure 4** and in **Figure 5** below.[21]

---

[20]    *Condition D (Acknowledgment Disclaimer)* also saw an additional stimulus image (the current disclaimer as a pop-up on the website home page), and then the same four images as *Condition A (Current Vintage Brand Website)* as well as a version of the other four images.

[21]    *See* **Appendix F** for the stimuli images.

*CONFIDENTIAL*

**Figure 4**

**Website Condition Groups – Description of Disclaimer Types**

| Website Condition Group | Description of Stimuli Images |
|---|---|
| **Condition A (Current Vintage Brand Website)** | • Current Vintage Brand website<br>• Current disclaimer |
| **Condition B (No Disclaimer)** | • Current Vintage Brand website<br>• All disclaimers removed. |
| **Condition C (Official Licensing Statement)** | • Current Vintage Brand website<br>• Official licensing statements replace all disclaimers |
| **Condition D (Acknowledgment Disclaimer)** | • Current Vintage Brand website<br>• Additional stimuli at the beginning with a pop-up with current disclaimer. |

27.    To illustrate the respondent experience, I present *Test Group 1 (1929 Penn State Nittany Lions Logo)* in *Condition A (Current Vintage Brand Website)* in **Figure 5** below.

*CONFIDENTIAL*

**Figure 5**

**Test Group 1 "1929 Penn State Nittany Lions" Logo**

**Vintage Brand Website Flow – Condition A (Current Vintage Brand Website)**

<u>**Home Page**</u>                    <u>**Penn State Landing Page**</u>



*CONFIDENTIAL*

**Product Page**     **Cart Page**

 

28.   The respondents assigned to the three other website conditions viewed modified versions of the four stimuli pages:

- Respondents assigned to *Condition B (No Disclaimer)* were exposed to stimuli images of the current Vintage Brand website but *without* the current disclaimer.

- Respondents assigned to *Condition C (Official Licensing Statement)* were exposed to stimuli images of the current Vintage Brand website but with the disclaimers replaced with statements saying the products on Vintage Brand's website were "Officially licensed merchandise."

- Respondents assigned to *Condition D (Acknowledgment Disclaimer)*, were shown stimuli images of the current Vintage Brand website and current disclaimer, and were also shown an additional initial screen with a pop-up that presented the current disclaimer with an "I Acknowledge" button.

29.   To illustrate how respondents in different conditions viewed the disclaimers in the context of the simulated purchase flow, I provide images of the stimuli in each of the conditions in **Figure 6** below, using *Test Group 1 (1929 Penn State Nittany Lions Logo)* throughout. These images show the manipulations of the disclaimer in each condition, as well as the acknowledgement statement for *Condition D (Acknowledgment Disclaimer)*.

14

*CONFIDENTIAL*

**Figure 6.1**

**Likelihood of Confusion Survey Website Conditions**

**Stimuli Image 1 – Acknowledgment of Disclaimer Page**

*Only Condition D (Acknowledgment Disclaimer)*



*CONFIDENTIAL*

**Figure 6.2**

**Likelihood of Confusion Survey Website Conditions**

**Stimuli Image 2 – Home Page (Cropped)**

*All Conditions*



*CONFIDENTIAL*

**Figure 6.3**

**Likelihood of Confusion Survey Website Conditions**

**Stimuli Image 3 – Penn State Landing Page**

*All Conditions*

<u>**Condition A**</u>
*<u>(Current Vintage Brand Website)</u>*



<u>**Condition B**</u>
*<u>(No Disclaimer)</u>*



<u>**Condition C**</u>
*<u>(Official Licensing Statement)</u>*



<u>**Condition D**</u>
*<u>(Acknowledgment Disclaimer)</u>*



*CONFIDENTIAL*

**Figure 6.4**

**Likelihood of Confusion Survey Website Conditions**

**Stimuli Image 4 – Product Page**

*All Conditions*

<u>**Condition A**</u>
*(Current Vintage Brand Website)*



<u>**Condition B**</u>
*(No Disclaimer)*



<u>**Condition C**</u>
*(Official Licensing Statement)*



<u>**Condition D**</u>
*(Acknowledgment Disclaimer)*



18

CONFIDENTIAL

**Figure 6.5**

**Likelihood of Confusion Survey Website Conditions**

**Stimuli Image 5 – Cart Page**

*All Conditions*

**<u>Condition A</u>**
*<u>(Current Vintage Brand Website)</u>*



**<u>Condition B</u>**
*<u>(No Disclaimer)</u>*



**<u>Condition C</u>**
*<u>(Official Licensing Statement)</u>*



**<u>Condition D</u>**
*<u>(Acknowledgment Disclaimer)</u>*



19

CONFIDENTIAL

30. **Questions to assess confusion and responsibility for product quality**. After viewing the stimuli images, respondents were asked a series of closed-ended and open-ended questions.[22] My Likelihood of Confusion Survey employed closed-ended, full-filter[23] questions followed by open-ended questions using the aided *Eveready* format to evaluate whether and to what extent consumers were confused into thinking that (i) Vintage Brand's products on its Penn State page are put out by Penn State and/or (ii) that Vintage Brand has some other business relationship with Penn State. I also asked questions to determine whether consumers had the impression that (iii) Penn State is at least partly responsible for the quality of Vintage Brand's products containing imagery originating with Penn State. I also included (iv) questions regarding the strength of certainty in responses to the questions, and I asked whether each respondent believed that the law requires Vintage Brand to obtain permission from Penn State to sell products with imagery originating from Penn State. I provide additional details in the next section on these key measures.

31. **Follow-up questions.** After completing the main questionnaire, respondents were asked a brief series of follow-up questions. These questions probed whether respondents were aware of any lawsuits related to collegiate apparel and merchandise, and if so, to describe in their own words what the lawsuit was about. At the end of the survey, all respondents were asked to read and agree to a validation statement attesting that their responses to the survey questions were truthful and unaided by outside sources. To be admitted to my analytical sample, respondents had to be (i) unaware of lawsuits and (ii) agree that their responses to the survey questions were truthful and unaided by outside sources.[24]

---

[22] As respondents proceeded through the main questionnaire, the stimuli images that they viewed remained available to them as clickable thumbnail images. *See* **Appendix G**, Survey Instrument, p. 9 and **Appendix H**.

[23] "[T]he survey can include full-filter questions, that is, questions that lay the groundwork for the substantive question by first asking the respondent if he or she has an opinion about the issue or happened to notice the feature that the interviewer is preparing to ask about[…] The interviewer then asks the substantive question only of those respondents who have indicated that they have an opinion on the issue." Shari S. Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition, The National Academies Press*, 2011, pp. 359-423, p. 390. *See* **Appendix D**.

[24] See **Figure 2**.

**B.      Key Measures of the Likelihood of Confusion Survey**

*1.      Confusion as to Source*

32.      I determined whether respondents were confused as to who or what entity puts out the sweatshirt featured in the stimuli images by analyzing their responses to the following survey questions:[25]

- **Q4.** Who or what entity do you believe puts out the sweatshirt you saw? (Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure")

- **Q5.** In the previous question, you said you believe **[PIPE IN ANSWER FROM Q4]** puts out the sweatshirt you saw. Why do you say that? *(Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure")*

*2.      Confusion as to Business Relationship*

33.      Next, I determined whether respondents were confused as to whether the entity who puts out the sweatshirt featured in the stimuli images has a business relationship with another entity or entities by analyzing their responses to the following survey questions:[26]

- **Q7.** Do you believe whoever puts out the sweatshirt you saw, (Select one only. If you do not know the answer or are unsure, please select "Unsure / No opinion")

  o   Has a has a business relationship with any other entity or entities

  o   Does not have a business relationship with any other entity or entities

  o   Unsure / No opinion

- **Q8.** What other entity or entities do you believe have a business relationship with whoever puts out the sweatshirt you saw? (*Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure)*

- **Q10.** In a previous question you answered that you believe: **[PIPE IN ANSWER TO Q8]** has a business relationship with whoever puts out the sweatshirt. Please explain why

---

[25]   *See* **Appendix G**, Survey Instrument, pp. 9-10.

[26]   *See* **Appendix G**, Survey Instrument, pp. 10-12.

you believe there is a business relationship. *(Please type in your response below. If you do not know the answer or are unsure, please select "Don't know / Unsure")*

3.      *Measuring Certainty and the Impact of a Pre-Existing Legal Belief*

34.     In my survey design, I found it important to capture the certainty respondents had regarding their responses, as well as the potential impact of a pre-existing legal belief in my assessment of likelihood of confusion.

35.     I introduced the certainty questions to assess strength-of-belief in my study after reviewing Mr. Franklyn Confusion Survey results, where a number of respondents indicated they were guessing in their responses.[27] Even though the presence of guessing is not surprising in trademark surveys (which is why a proper control is necessary),[28] I included follow-up questions to capture respondents' strength-of-belief in their answer to questions related to confusion (as well as their answers regarding their beliefs of the entity or entities responsible for product quality) given the retail environment in which Vintage Brand offers products for sale.

36.     Recent academic literature also discusses the role that consumer uncertainty may play in survey evidence that is introduced in trademark litigation.[29] Consumer survey evidence has the potential to drive the outcomes of disputes involving likelihood of confusion, and thus should be designed carefully. Typically, trademark surveys test for whether consumers hold particular beliefs, but do not test for the strength or certainty of those beliefs.

---

[27] To the questions "What company makes or puts out this product?" or "What company or institution is affiliated with the company that makes or puts out this product?" followed by "Why do you say that" in the Franklyn Confusion Survey, respondents provided answers such as: "I am guessing that" (respondent ID 322), "only a guess" (respondent ID 430), "It was a mere guess" (respondent ID 545). (Franklyn Report, *Appendix D - Final Data*).

In my survey, open-ended answers of respondents in my study indicate uncertainty in their beliefs, providing answers such as "Just a guess…" (respondent ID 2258), "Just my guess…" (respondent ID 13061 and "I can at least make a good guess…" (respondent ID 10362).

[28] "Respondents in trademark surveys are typically asked to avoid guessing, but the survey setting itself invites respondents to provide answers to the questions they are being asked and, having agreed to participate in the survey, many respondents will make an effort to offer answers." Shari S. Diamond and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, American Bar Association, Section of Intellectual Property Law, 2012, p. 205. *See also* Shari S. Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition, The National Academies Press*, 2011, pp. 359-423, p. 390.

[29] Barton Beebe *et al.*, "The Role of Consumer Uncertainty in Trademark Law: An Experimental and Theoretical Investigation," *NYU Law and Economics Research Paper*, No. 21-13, 2021.

37.     To minimize this risk, my Likelihood of Confusion Survey included a proper control along with questions that measured each respondent's level of certainty for the answers that they gave in response to key questions about confusion as to source, business relationship, and responsibility for product quality. For example, I determined whether respondents were confused as to who or what entity puts out the sweatshirt featured in the stimuli images by not only analyzing their responses to key confusion questions, but also taking into consideration their answers to follow-up survey questions. Specifically, the following question was asked of respondents to measure the certainty of their answers:[30]

- **Q6.** How likely do you think that your answer is correct?

    o   Just guessing

    o   Somewhat likely correct

    o   Very likely correct

    o   Definitely correct

38.     The same approach was taken to measure certainty for answers to questions that relate to whether the respondent believes that there is a business relationship with whoever puts out the sweatshirt (**Q9**), what entity is responsible for the quality of the sweatshirt shown (**Q17**), and whether the law requires Penn State's permission to sell apparel or merchandise with the design on the sweatshirt shown (**Q19**).[31]

39.     It is my understanding that in this case, the judge has provided guidance on several key questions that he would like to see addressed given scholarly critiques regarding the potential creation of a broad merchandising right.[32] Specifically, the judge sought information about these questions: "[W]hat percentage of consumers are confused about the source or sponsorship of Vintage Brand's products?" and to what extent does any confusion "stem from [consumers'] belief that the law requires Penn State's permission?"[33] Respondents hold various pre-existing beliefs and "[a]ll respondents answer questions against a background of preconceived notions."[34] But if any

---

[30]   *See* **Appendix G**, Survey Instrument, p. 10.

[31]   *See* **Appendix G**, Survey Instrument, pp. 11, 14-15.

[32]   Memorandum Opinion, pp. 18, 23.

[33]   Memorandum Opinion, p. 23.

[34]   Shari S. Diamond and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, American Bar Association, Section of Intellectual Property Law, 2012, p. 204.

confusion is attributable to pre-existing beliefs about legal requirements, there might be a circularity involved.[35] To respond to those questions, and because data from Mr. Franklyn's confusion survey indicate that pre-existing legal beliefs may influence respondent answers,[36] I included in my survey a question designed to test beliefs regarding a legal requirement that Vintage Brand get permission from Penn State to use these images.

40.     Specifically, to provide a direct answer to this area of inquiry in accordance with my assignment, my Likelihood of Confusion Survey asked questions that carefully test for pre-existing legal beliefs. More specifically, I decided to ask respondents about their beliefs related to whether the law required Penn State's permission toward the end of the survey instrument to ensure that the question did not impact the answers to the key confusion questions.[37] The final key question in my Likelihood of Confusion Survey asked:

- **Q18.** You may have already said this, but based on the pages you viewed, which of the following, if any, do you believe is true? *(Select one only)*

  o  I believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt

  o  I do not believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt

  o  Don't know / Unsure

41.     As pre-existing legal beliefs can also be strongly or weakly held, I added a final certainty question (**Q19**) to determine the strength of the respondent's belief as to whether the law requires Penn State's permission.

---

[35]   Memorandum Opinion, p. 22.

[36]   Some example answers indicating a pre-existing legal belief in the "Why do you say that" questions include: "If Vintage Brands were not licensed to sell Penn State merchandise then this would not seem legal," "This brand features baseball, football, and collegiate apparel. It has to have some sort of affiliation with these entities in order to legally sell their apparel," "Because that is the way selling licensed apparel works. You need some form of affiliation with the brand in order to obtain a license to sell their products," and "The description says that this is the company selling it & they could not legally sell it if they were not licensed to." (Franklyn Report, *Appendix D - Final Data*).

[37]   "Survey results may be affected not only by the wording of a question, but by the context in which the question is asked. Thus, decisions about the ordering of items in a questionnaire — fashioning a questionnaire from a set of questions — should be guided by the same aim that guides wording decision — minimizing error. Question order has two major facets: serial (location in a sequence of items) and semantic (location in a sequence of meanings). Both may affect measurement by influencing the cognitive processes triggered by questions." Jon A. Krosnick and Stanley Presser, "Question and Questionnaire Design," *Handbook of Survey Research*, 2010, p. 291.

CONFIDENTIAL

42.  I apply the results from the certainty question and the legal belief question in two ways.
Specifically, in my results summary, I conduct an analysis to explore the extent to which
confusion as to source or business relationship, or impressions of responsibility for product
quality, was strongly held by counting those who answered "very likely correct" or "definitely
correct" as confused as to source or business relationship, or responsibility for product quality. I
also conduct an additional analysis by correlating the responses to my key measures with legal
belief.[38]

> 4.  *Measuring the Responsibility for Product Quality*

43.  I then determined whether respondents were confused as to who or what entity is responsible for
the product quality of the sweatshirt featured in the stimuli images by analyzing their responses to
the following survey questions:[39]

- **Q11.** Based on the images you viewed, do you or do you not have an opinion about the
  quality of this sweatshirt? *(Select one only. If you don't know the answer or are unsure,
  please select "Don't know / Unsure")*

  o  Yes, I have an opinion about the quality of this sweatshirt

  o  No, I do not have an opinion about the quality of this sweatshirt

  o  Don't know / Unsure

- **Q12.** Based on the images you viewed, what is your opinion about the quality of the
  sweatshirt? *(Please type in your response below)*[40]

- **Q13.** Based on the images you viewed, do you or do you not have an opinion about who
  is responsible for the quality of this sweatshirt? *(Select one only. If you don't know the
  answer or are unsure, please select "Don't know / Unsure")*

  o  Yes, I have an opinion about who is responsible for the quality of this sweatshirt

---

[38]   It is possible to add additional sensitivity analyses by combining legal belief and certainty about the legal belief.
My conclusions are robust to these additional sensitivity analyses. See Code.

[39]   *See* **Appendix G**, Survey Instrument, pp. 12-14.

[40]   If "Yes, I have an opinion about the quality of this sweatshirt" was chosen, respondents were prompted to
answer **Q12**.

CONFIDENTIAL

      ○  No, I do not have an opinion about who is responsible for the quality of this sweatshirt

      ○  Don't know / Unsure

- **Q14.** Based on the images you viewed, who do you believe is responsible for the quality of the sweatshirt? (Please type in your response below. If you do not know the answer or are unsure, please select "Don't know / Unsure")[41]

- **Q15.** You may have already said this, but based on the images you viewed, please select one of the following regarding your expectations about who is responsible for the quality of the sweatshirt. *(Select only one. If you don't know the answer or are unsure, please select "Don't know / Unsure")*

      ○  I expect Vintage Brand alone is responsible for the quality of the sweatshirt

      ○  I expect Penn State alone is responsible for the quality of the sweatshirt

      ○  I expect that neither Vintage Brand nor Penn State is responsible for the quality of the sweatshirt

      ○  I expect that both Vintage Brand and Penn State are responsible for the quality of the sweatshirt

      ○  Other: [please specify]

      ○  Don't know / Unsure

- **Q16.** Please explain why you answered **[PIPE IN ANSWER TO Q15]** to the previous question. *(Please type in your response below)*

44.    Open-ended questions allow respondents to provide their preferred response without the influence of any pre-established answer options. Respondents were therefore asked to answer the key questions of my Likelihood of Confusion Survey (**Q4**, **Q8**, and **Q14**) in an open-ended way to "give the respondents fewer hints about preferred answers."[42] Ahead of the open-ended questions related to business relationships and quality of the sweatshirt stimulus, I employed "full-filter"

---

[41]   If "Yes, I have an opinion about who is responsible for the quality of this sweatshirt" was chosen, respondents were prompted to answer **Q14**.

[42]   Shari S. Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition, The National Academies Press*, 2011, pp. 359-423, at p. 392.

CONFIDENTIAL

questions.[43] These questions ask if a respondent has an opinion about the topic of the open-ended question before being asked what their opinion is. This approach allowed me to make sure the open-ended answers were meaningful. For **Q15**, I provided a closed-ended follow-up question to further probe respondent perceptions about the entity or entities that are either individually or jointly responsible for product quality.

### C.   Likelihood of Confusion Survey Implementation and Administration

45.   My Likelihood of Confusion Survey was administered by Dynata.[44] Before the fielding of the survey, I pretested the survey to ensure respondents thought the questions, answer options, and stimuli were "clear and unambiguous."[45,46] I then fielded my Likelihood of Confusion Survey from January 9 to January 17, 2023. A total of 1,320 respondents qualified for and completed the survey. After applying quality checks, a total of 1,292 respondents are included in my analytical sample. For additional details on survey design, implementation, and administration see **Appendix D** (Survey Implementation and Administration) and **Appendix E** (Pre-test Moderator Instructions). For the stimuli images, see **Appendix F** (Survey Stimuli). For the survey programmer instructions, see **Appendix G** (Survey Instrument). For screenshots of the survey as experienced by the respondents, see **Appendix H** (Survey Screenshots).

---

[43]   "[T]he survey can include full-filter questions, that is, questions that lay the groundwork for the substantive question by first asking the respondent if he or she has an opinion about the issue or happened to notice the feature that the interviewer is preparing to ask about[…] The interviewer then asks the substantive question only of those respondents who have indicated that they have an opinion on the issue." Shari S. Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition, The National Academies Press*, 2011, pp. 359-423, p. 390.

[44]   Dynata is a survey provider with the with a reputable online consumer panel consisting of 62+ million opted-in consumers worldwide. See, "Market Research and Insights," 2022, https://www.dynata.com/research-insights, accessed January 5, 2023; *See also* "About," 2022, https://www.dynata.com/about-us/?utm_medium=cpc&utm_source=google&utm_campaign=ad_brand&utm_content=ad.

[45]   Shari S. Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition, The National Academies Press*, 2011, pp. 359-423, p. 388.

[46]   Before the administration of the final survey, my Likelihood of Confusion survey was pre-tested on January 4, 2023. During the pre-testing, respondents were asked several questions to ensure all parts of the survey were clear, including, among others, "Did you think any questions were unclear? If so, which ones and why?" and "Did you or did you not have any issues viewing the survey or images in the survey?" Of note, I inserted a full filter question to address a pre-test respondent's comment. The moderator's pretesting script is shown in **Appendix E**. Based on the feedback received, minor changes were made to the survey instrument. See **Appendix D** for further discussion of the pretesting procedure and these minor changes.

*CONFIDENTIAL*

**D.      Analysis of the Likelihood of Confusion Survey Results**

46.      The results of my Likelihood of Confusion Survey, discussed in detail in this section, show that consumers are <u>not</u> confused as to the source of Vintage Brand's products as they relate to Penn State, nor are they confused as to the existence of a business relationship between Vintage Brand and Penn State. I also found that controlling for levels of certainty as well as the pre-existing belief that Vintage Brand requires Penn State's permission to use Penn State's name and imagery that originated with Penn State further decreases confusion. My results for each of these types of confusion can be seen below in **Figure 7.1, 7.2, and 7.3.**

CONFIDENTIAL

**Figure 7.1**

**Net Confusion Regarding Source and Business Relationship**

**Condition A (Current Vintage Brand Website)**

| | Test Group 1 (1929 Penn State Nittany Lions Logo) | | Test Group 2 (1950 Penn State Nittany Lions Logo) | | Control Group (State of Pennsylvania Seal Logo) | | Net Confusion | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
| # of Respondents | 107 | | 107 | | 109 | | | |
| Confusion as to Source[1] | 14 | 13% | 22 | 21% | 18 | 17% | -3% | 4% |
| Confusion as to Business Relationship[2] | 6 | 6% | 11 | 10% | 1 | 1% | 5% | 9% |
| Confusion - Any | 20 | 19% | 32 | 30% | 19 | 17% | 1% | 12% |

**Notes:**
[1] Confusion as to Source is based on respondents mentioning Penn State or variations thereof in Q4 ("Who or what entity do you believe puts out the sweatshirt you saw?")
[2] Confusion as to Business Relationship is based on respondents mentioning Penn State or variations thereof in Q8 ("What other entity or entities do you believe have a business relationship with whoever puts out the sweatshirt you saw?")
[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the results that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.
[4] Percentages are calculated as the percentage of respondents within each group.
[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.

**Source:**
Likelihood of Confusion Survey.

**Figure 7.2**

**Net Confusion Regarding Source and Business Relationship**

**Condition A (Current Vintage Brand Website)**

*Controlling for Certainty*

| | Test Group 1 (1929 Penn State Nittany Lions Logo) | | Test Group 2 (1950 Penn State Nittany Lions Logo) | | Control Group (State of Pennsylvania Seal Logo) | | Net Confusion | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
| # of Respondents | 107 | | 107 | | 109 | | | |
| Confusion as to Source[1] | 8 | 7% | 15 | 14% | 11 | 10% | -3% | 4% |
| Confusion as to Business Relationship[2] | 6 | 6% | 5 | 5% | 0 | 0% | 6% | 5% |
| Confusion - Any | 14 | 13% | 20 | 19% | 11 | 10% | 3% | 9% |

**Notes:**
[1] Confusion as to Source is based on respondents mentioning Penn State or variations thereof in Q4 ("Who or what entity do you believe puts out the sweatshirt you saw?")
[2] Confusion as to Business Relationship is based on respondents mentioning Penn State or variations thereof in Q8 ("What other entity or entities do you believe have a business relationship with whoever puts out the sweatshirt you saw?")
[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the results that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.
[4] Percentages are calculated as the percentage of respondents within each group.
[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.
[6] Q6 reads "In a previous question, you said you believe [PIPE IN ANSWER FROM Q4] puts out the sweatshirt you saw. How likely do you think that your answer is correct?" and Q9 reads "How likely do you think that your answer is correct?" Both of these questions have the following answer options: "Definitely correct," "Very likely correct," "Somewhat likely correct," and "Just guessing."
[7] Respondents were included in the "Top Two Boxes" if they selected "Definitely correct" or "Very likely correct" in Q6 or Q9 for their respective open-ended questions.

**Source:**
Likelihood of Confusion Survey.

CONFIDENTIAL

**Figure 7.3**

**Net Confusion Regarding Source and Business Relationship**

**Condition A (Current Vintage Brand Website)**

*Controlling for Legal Belief*

| | Test Group 1 (1929 Penn State Nittany Lions Logo) | | Test Group 2 (1950 Penn State Nittany Lions Logo) | | Control Group (State of Pennsylvania Seal Logo) | | Net Confusion | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
| # of Respondents | 107 | | 107 | | 109 | | | |
| Confusion as to Source[1] | 9 | 8% | 17 | 16% | 14 | 13% | -4% | 3% |
| Confusion as to Business Relationship[2] | 5 | 5% | 11 | 10% | 1 | 1% | 4% | 9% |
| Confusion - Any | 14 | 13% | 27 | 25% | 15 | 14% | -1% | 11% |

Notes:
[1] Confusion as to Source is based on respondents mentioning Penn State or variations thereof in Q4 ("Who or what entity do you believe puts out the sweatshirt you saw?")
[2] Confusion as to Business Relationship is based on respondents mentioning Penn State or variations thereof in Q8 ("What other entity or entities do you believe have a business relationship with whoever puts out the sweatshirt you saw?")
[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the results that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.
[4] Percentages are calculated as the percentage of respondents within each group.
[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.
[6] Q18 reads "You may have already said this, but based on the pages you viewed, which of the following, if any, do you believe is true?" and had the following answer options "I believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt," "I do not believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt," and "Don't know / Unsure."
[7] Respondents were included in this exhibit if they selected "I believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt" in Q18.

Source:
Likelihood of Confusion Survey.

47.   My analysis and conclusions rely on the key open-ended questions of my Likelihood of Confusion Survey, following the accepted *Eveready* format. I measure the likelihood of confusion for each type of confusion discussed above as the percentage of respondents who indicate "Penn State" or variations thereof. Under my direction, two individual coders categorized each open-ended response. The coders were blind to the purpose and sponsor of the study. The coders were provided with groups of categories for each open-ended question and instructed to categorize each respondent's answer into these categories.[47] Following their initial categorizations, the blind coders met to identify and rectify any differences in their categorizations and then provided a final consolidated encoding of the responses, which I then used in my analysis.[48]

*1.    Analysis of Confusion as to Source*

48.   **Confusion as to Source.** To measure confusion as to source, I analyzed the responses to the question "Who or what entity do you believe puts out the sweatshirt you saw?" (**Q4**). Based on

---

[47]   *See* **Appendix I** for the list of open-ended questions and the categories given to the coders.

[48]   For example, responses classified by blind coders as relating to Penn State include "Penn State Nittany Lions" (respondent ID 2270), "The Penn State mascot" (respondent ID 8326), "Penn State sells the shirt in their student center stores. Who makes the shirt, unable to clearly determine. That said, I like the look of the shirt." (respondent ID 13821), "University of Penn state" (respondent ID 3824), "nitani" (respondent ID 6917). See "Blind Coding Sheet – Final.xlsx."

*CONFIDENTIAL*

my analysis, I find that the percentage of respondents who mentioned "Penn State" or variations thereof in **Q4** within *Condition A (Current Vintage Brand Website)* accounted for 17 percent for respondents assigned to the *Control Group (State of Pennsylvania Seal Logo),* 13 percent for respondents assigned to the *Test Group 1 (1929 Penn State Nittany Lions Logo)*, 21 percent for respondents assigned to the *Test Group 2 (1950 Penn State Nittany Lions Logo)*. *See* **Figure 7.1**.

49. Comparing the experimental logo groups in *Condition A* (*Current Vintage Brand Website*), I find that the net confusion as to the source of Vintage Brand's products as they relate to Penn State is -3 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 4 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*. See **Figure 7.1** above. My results show that confusion as to source remains so low as to be insubstantial,[49] and the conclusions I draw from these results do not change when conducting the same analysis for *Condition B (No Disclaimer)*,[50] *Condition C (Official Licensing Statement)*,[51] or *Condition D (Acknowledgment Disclaimer)*.[52]

50. **Confusion as to Source, Controlling for Certainty.** As discussed above in **Section III.B.3**, I also included questions that measure certainty of each respondent's answer to minimize the risk of a weakly-held belief affecting a finding of confusion. Therefore, I included a question (**Q6**) asking respondents to indicate their level of certainty with their answer to the source confusion question (**Q4**).[53] In order to control for respondent certainty, I performed the same analysis

---

[49] Matthew G. Ezell and AnnaBelle Sartore, "Survey Percentages in Lanham Act Matters," *Shari Diamond & Jerre Swanned. Trademark and Deceptive Advertising Surveys [Z]. ABA*, 2022.

[50] *Condition B (No Disclaimer)*: Net confusion as to the source is -2 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and -3 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[51] *Condition C (Official Licensing Statement)*: Net confusion as to the source is 2 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 1 percentage point when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[52] *Condition D (Acknowledgement Disclaimer)*: Net confusion as to the source is 3 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 2 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[53] Q6 asked respondents: "In a previous question, you said you believe **[PIPE IN ANSWER FROM Q4]** puts out the sweatshirt you saw. How likely do you think that your answer is correct?" Respondents were asked to choose one of the following responses: "Definitely correct," "Very likely correct," "Somewhat likely correct," or "Just guessing." *See* **Appendix G**, Survey Instrument, p. 10.

described above, but only including those respondents who indicated in **Q6** that their response to **Q4** was "Definitely correct" or "Very likely correct."

51.  With this certainty criteria, I find that the percentage of respondents who mentioned "Penn State" or variations thereof in **Q4** within *Condition A (Current Vintage Brand Website)* accounted for 10 percent for respondents assigned to the *Control Group (State of Pennsylvania Seal Logo),* 7 percent for respondents assigned to the *Test Group 1 (1929 Penn State Nittany Lions Logo)*, 14 percent for respondents assigned to the *Test Group 2 (1950 Penn State Nittany Lions Logo)*. *See* **Figure 7.2.**

52.  Across all experimental logo groups in *Condition A* (*Current Vintage Brand Website*) when controlling for certainty, I find that the net confusion as to the source of Vintage Brand's products as they relate to Penn State is -3 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 4 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*. See **Figure 7.2** above. My results show that confusion as to source (controlling for certainty) remains so low as to be insubstantial, and the conclusions I draw from these results do not change when conducting the same analysis for *Condition B (No Disclaimer)*,[54] *Condition C (Official Licensing Statement)*,[55] or *Condition D (Acknowledgment Disclaimer)*.[56]

53.  **Confusion as to Source, Controlling for Belief in Legal Relationship.** In my analysis, I also controlled for respondents who indicated that they believe that there is a legal requirement to obtain Penn State's permission to use the Penn State name and imagery that originated with Penn State in **Q18**.[57]

---

[54]  *Condition B (No Disclaimer)*: Net confusion as to the source (controlling for certainty) is 2 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and -5 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[55]  *Condition C (Official Licensing Statement)*: Net confusion as to the source (controlling for certainty) is 3 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 6 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[56]  *Condition D (Acknowledgement Disclaimer)*: Net confusion as to the source (controlling for certainty) is 8 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 6 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[57]  Q18 asked respondents: "You may have already said this, but based on the pages you viewed, which of the following, if any, do you believe is true?" Respondents were asked to select one of the following responses: "I

CONFIDENTIAL

54.     Applying this legal belief criterion, I find that the percentage of respondents who mentioned "Penn State" or variations thereof in **Q4** within *Condition A (Current Vintage Brand Website)* accounted for 13 percent for respondents assigned to the *Control Group (State of Pennsylvania Seal Logo),* 8 percent for respondents assigned to the *Test Group 1 (1929 Penn State Nittany Lions Logo)*, 16 percent for respondents assigned to the *Test Group 2 (1950 Penn State Nittany Lions Logo). See* **Figure 7.3**.

55.     Comparing the experimental logo groups in *Condition A* (*Current Vintage Brand Website*) when controlling for certainty, I find that the net confusion as to the source of Vintage Brand's products as they relate to Penn State is -4 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 3 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*. See **Figure 7.3** above. My results show that confusion as to source (controlling for belief in legal relationship) remains so low as to be insubstantial and the conclusions I draw from these results do not change when conducting the same analysis for *Condition B (No Disclaimer)*,[58] *Condition C (Official Licensing Statement)*,[59] or *Condition D (Acknowledgment Disclaimer)*.[60]

                    2.     *Analysis of Confusion as to Business Relationship*

56.     **Confusion as to Business Relationship**. To measure confusion as to business relationship, I analyzed the responses to the question "What other entity or entities do you believe have a business relationship with whoever puts out the sweatshirt you saw?" (**Q8**). Based on my analysis, I find that the percentage of respondents who mentioned "Penn State" or variations

---

believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt"; "I do not believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt"; or "Don't know / Unsure." *See* **Appendix G**, Survey Instrument, p. 14.

[58]   *Condition B (No Disclaimer)*: Net confusion as to the source (controlling for legal belief) is 4 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 1 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[59]   *Condition C (Official Licensing Statement)*: Net confusion as to the source (controlling for legal belief) is 4 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 6 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[60]   *Condition D (Acknowledgement Disclaimer)*: Net confusion as to the source (controlling for legal belief) is 4 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 4 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

CONFIDENTIAL

thereof in **Q8** within *Condition A (Current Vintage Brand Website)* accounted for 1 percent for respondents assigned to the *Control Group (State of Pennsylvania Seal Logo)*, 6 percent for respondents assigned to the *Test Group 1 (1929 Penn State Nittany Lions Logo)*, 10 percent for respondents assigned to the *Test Group 2 (1950 Penn State Nittany Lions Logo)*. *See* **Figure 7.1.**

57.    Comparing the experimental logo groups in *Condition A* (*Current Vintage Brand Website*), I find that the net confusion as to the business relationship of Vintage Brand's products as they relate to Penn State is 5 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 9 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*. See **Figure 7.1** above. My results show that confusion as to business relationship remains so low as to be insubstantial and the conclusions I draw from these results do not change when conducting the same analysis *Condition B (No Disclaimer)*,[61] *Condition C (Official Licensing Statement)*,[62] or *Condition D (Acknowledgment Disclaimer)*.[63]

58.    **Confusion as to Business Relationship, Controlling for Certainty.** As with my analysis for confusion as to source, I again included a question (**Q9**) asking respondents to indicate their level of certainty with their answer to the business relationship confusion question (**Q8**).[64] To control for respondent certainty, I performed the same analysis, including only those respondents who indicated their response to the certainty question was "Definitely correct" or "Very likely correct."

59.    With this certainty criterion, I find that the percentage of respondents who mentioned "Penn State" or variations thereof in **Q8** within *Condition A (Current Vintage Brand Website)* accounted

---

[61]    *Condition B (No Disclaimer)*: Net confusion as to business relationship is -6 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and -3 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[62]    *Condition C (Official Licensing Statement)*: Net confusion as to business relationship is 6 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 7 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[63]    *Condition D (Acknowledgment Disclaimer)*: Net confusion as to business relationship is 0 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 2 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[64]    Q9 asked respondents: "How likely do you think your answer is correct?" Respondents were asked to choose one of the following responses: "Definitely correct," "Very likely correct," "Somewhat likely correct," or "Just guessing." *See* **Appendix G**, Survey Instrument, p. 12.

CONFIDENTIAL

for 0 percent for respondents assigned to the *Control Group (State of Pennsylvania Seal Logo),* 6 percent for respondents assigned to the *Test Group 1 (1929 Penn State Nittany Lions Logo)*, 5 percent for respondents assigned to the *Test Group 2 (1950 Penn State Nittany Lions Logo)*. See **Figure 7.2.**

60.   Comparing the experimental logo groups in *Condition A (Current Vintage Brand Website)* when controlling for certainty, I find that the net confusion as to the business relationship of Vintage Brand's products as they relate to Penn State is 6 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 5 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*. See **Figure 7.2** above. My results show that confusion as to business relationship (controlling for certainty) remains so low as to be insubstantial and the conclusions I draw from these results do not change when conducting the same analysis for *Condition B (No Disclaimer)*,[65] *Condition C (Official Licensing Statement)*,[66] or *Condition D (Acknowledgment Disclaimer)*.[67]

61.   **Confusion as to Business Relationship, Controlling for Belief in Legal Relationship.** In analyzing confusion as to business relationship, I controlled for respondents who indicated they believe there is a legal requirement to obtain Penn State's permission to use the Penn State name and imagery that originated with Penn State in **Q18**.[68]

---

[65]   *Condition B (No Disclaimer)*: Net confusion as to business relationship (controlling for certainty) is -6 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and -4 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[66]   *Condition C (Official Licensing Statement)*: Net confusion as to business relationship (controlling for certainty) is 3 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 7 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[67]   *Condition D (Acknowledgement Disclaimer)*: Net confusion as to business relationship (controlling for certainty) is 0 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 0 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[68]   Q18 asked respondents: "You may have already said this, but based on the pages you viewed, which of the following, if any, do you believe is true?" Respondents were asked to select one of the following responses: "I believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt"; "I do not believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt"; or "Don't know / Unsure." *See* **Appendix G**, Survey Instrument, p. 14.

62.     Applying this legal belief criterion, I find that the percentage of respondents who mentioned
        "Penn State" or variations thereof in **Q8** within *Condition A (Current Vintage Brand Website)*
        accounted for 1 percent for respondents assigned to the *Control Group (State of Pennsylvania
        Seal Logo),* 5 percent for respondents assigned to the *Test Group 1 (1929 Penn State Nittany
        Lions Logo)*, 10 percent for respondents assigned to the *Test Group 2 (1950 Penn State Nittany
        Lions Logo)*.Comparing the experimental logo groups in *Condition A* (*Current Vintage Brand
        Website*) when controlling for certainty, I find that the net confusion as to the business
        relationship of Vintage Brand's products as they relate to Penn State is 4 percentage points when
        comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn
        State Nittany Lions Logo)*, and 9 percentage points when comparing the *Control Group (State of
        Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*. See **Figure 7.3**
        above. My results show that confusion as to business relationship (controlling for belief in legal
        relationship) remains so low as to be insubstantial and the conclusions I draw from these results
        do not change when conducting the same analysis for *Condition B (No Disclaimer),*[69] *Condition
        C (Official Licensing Statement),*[70] or *Condition D (Acknowledgment Disclaimer).*[71]

            3.     *Analysis of Responsibility for Product Quality*

63.     To measure the impact of the confusion as to source and business relationship on consumer
        impressions regarding the entity or entities the responsibility for product quality, I analyzed the
        responses to the questions "Based on the images you viewed, who do you believe is responsible
        for the quality of the sweatshirt?" (**Q14**) and "You may have already said this, but based on the
        images you viewed, please select one of the following regarding your expectations about who is
        responsible for the quality of the sweatshirt**" (Q15)**. Based on my analysis, I find that the
        percentage of respondents who mentioned "Penn State" or variations thereof in **Q14** or **Q15**

---

[69]   *Condition B (No Disclaimer)*: Net confusion as to business relationship (controlling for legal belief) is -6
       percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929
       Penn State Nittany Lions Logo)*, and -2 percentage points when comparing the *Control Group (State of
       Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo).*

[70]   *Condition C (Official Licensing Statement)*: Net confusion as to business relationship (controlling for legal
       belief) is 5 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test
       Group 1 (1929 Penn State Nittany Lions Logo)*, and 7 percentage points when comparing the *Control Group
       (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo).*

[71]   *Condition D (Acknowledgement Disclaimer)*: Net confusion as to business relationship (controlling for legal
       belief) is 0 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test
       Group 1 (1929 Penn State Nittany Lions Logo)*, and 3 percentage points when comparing the *Control Group
       (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo).*

*CONFIDENTIAL*

within *Condition A (Current Vintage Brand Website)* accounted for 15 percent for respondents assigned to the *Control Group (State of Pennsylvania Seal Logo),* 18 percent for respondents assigned to the *Test Group 1 (1929 Penn State Nittany Lions Logo)*, 19 percent for respondents assigned to the *Test Group 2 (1950 Penn State Nittany Lions Logo)*. See **Figure 8.1**.

CONFIDENTIAL

**Figure 8.1**

**Net Belief Regarding Responsibility for Product Quality**

**Condition A (Current Vintage Brand Website)**

| | Test Group 1 *(1929 Penn State Nittany Lions Logo)* | | Test Group 2 *(1950 Penn State Nittany Lions Logo)* | | Control Group *(State of Pennsylvania Seal Logo)* | | Net Belief | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
| # of Respondents | 107 | | 107 | | 109 | | | |
| Belief Regarding Responsibility for Product Quality (Open-Ended)[1] | 0 | 0% | 5 | 5% | 4 | 4% | -4% | 1% |
| Belief Regarding Responsibility for Product Quality (Closed-Ended)[2] | 19 | 18% | 19 | 18% | 16 | 15% | 3% | 3% |
| Belief - Any | 19 | 18% | 20 | 19% | 16 | 15% | 3% | 4% |

Notes:

[1] Belief Regarding Responsibility for Product Quality (Open-Ended) is based on respondents mentioning Penn State or variations thereof in Q14 ("Based on the images you viewed, who do you believe is responsible for the quality of the sweatshirt?")

[2] Belief Regarding Responsibility for Product Quality (Closed-Ended) is based on respondents selecting "I expect Penn State alone is responsible for the quality of the sweatshirt" or "I expect that both Vintage Brand and Penn State are responsible for the quality of the sweatshirt" in Q15 ("You may have already said this, but based on the images you viewed, please select one of the following regarding your expectations about who is responsible for the quality of the sweatshirt.")

[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the results that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.

[4] Percentages are calculated as the percentage of respondents within each group.

[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.

Source:
Likelihood of Confusion Survey.

**Figure 8.2**

**Net Belief Regarding Responsibility for Product Quality**

**Condition A (Current Vintage Brand Website)**

*Controlling for Certainty*

| | Test Group 1 *(1929 Penn State Nittany Lions Logo)* | | Test Group 2 *(1950 Penn State Nittany Lions Logo)* | | Control Group *(State of Pennsylvania Seal Logo)* | | Net Belief | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
| # of Respondents | 107 | | 107 | | 109 | | | |
| Belief Regarding Responsibility for Product Quality (Open-Ended)[1] | 0 | 0% | 4 | 4% | 3 | 3% | -3% | 1% |
| Belief Regarding Responsibility for Product Quality (Closed-Ended)[2] | 17 | 16% | 14 | 13% | 14 | 13% | 3% | 0% |
| Belief - Any | 17 | 16% | 15 | 14% | 14 | 13% | 3% | 1% |

Notes:

[1] Belief Regarding Responsibility for Product Quality (Open-Ended) is based on respondents mentioning Penn State or variations thereof in Q14 ("Based on the images you viewed, who do you believe is responsible for the quality of the sweatshirt?")

[2] Belief Regarding Responsibility for Product Quality (Closed-Ended) is based on respondents selecting "I expect Penn State alone is responsible for the quality of the sweatshirt" or "I expect that both Vintage Brand and Penn State are responsible for the quality of the sweatshirt" in Q15 ("You may have already said this, but based on the images you viewed, please select one of the following regarding your expectations about who is responsible for the quality of the sweatshirt.")

[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the results that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.

[4] Percentages are calculated as the percentage of respondents within each group.

[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.

[6] Q17 reads "How likely do you think that your previous answers (shown on this page) are correct?" has the following answer options "Definitely correct," "Very likely correct," "Somewhat likely correct," and "Just guessing."

[7] Respondents were included in the "Top Two Boxes" if they selected "Definitely correct" or "Very likely correct" in Q17.

Source:
Likelihood of Confusion Survey.

CONFIDENTIAL

**Figure 8.3**

**Net Belief Regarding Responsibility for Product Quality**

**Condition A (Current Vintage Brand Website)**

*Controlling for Legal Belief*

| | Test Group 1 (1929 Penn State Nittany Lions Logo) | | Test Group 2 (1950 Penn State Nittany Lions Logo) | | Control Group (State of Pennsylvania Seal Logo) | | Net Belief | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
| # of Respondents | 107 | | 107 | | 109 | | | |
| Belief Regarding Responsibility for Product Quality (Open-Ended)[1] | 0 | 0% | 4 | 4% | 3 | 3% | -3% | 1% |
| Belief Regarding Responsibility for Product Quality (Closed-Ended)[2] | 16 | 15% | 18 | 17% | 13 | 12% | 3% | 5% |
| Belief - Any | 16 | 15% | 19 | 18% | 13 | 12% | 3% | 6% |

**Notes:**

[1] Belief Regarding Responsibility for Product Quality (Open-Ended) is based on respondents mentioning Penn State or variations thereof in Q14 ("Based on the images you viewed, who do you believe is responsible for the quality of the sweatshirt?")

[2] Belief Regarding Responsibility for Product Quality (Closed-Ended) is based on respondents selecting selected "I expect Penn State alone is responsible for the quality of the sweatshirt" or "I expect that both Vintage Brand and Penn State are responsible for the quality of the sweatshirt" in Q15 ("You may have already said this, but based on the images you viewed, please select one of the following regarding your expectations about who is responsible for the quality of the sweatshirt.")

[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the results that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.

[4] Percentages are calculated as the percentage of respondents within each group.

[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.

[6] Q18 reads "You may have already said this, but based on the pages you viewed, which of the following, if any, do you believe is true?" and had the following answer options "I believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt," "I do not believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt."

[7] Respondents were included in this exhibit if they selected "I believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt" in Q18.

**Source:**
Likelihood of Confusion Survey.

64.　Comparing the experimental logo groups in *Condition A* (*Current Vintage Brand Website*), I find that the net belief regarding responsibility for product quality of Vintage Brand's products as they relate to Penn State is 3 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 4 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*. See **Figure 8.1** above. My results show that net belief regarding responsibility for product quality remains so low as to be insubstantial and the conclusions I draw from these results do not change when conducting the same analysis for

*Condition B (No Disclaimer),*[72] *Condition C (Official Licensing Statement),*[73] or *Condition D (Acknowledgment Disclaimer).*[74]

65.  **Analysis of Responsibility for Product Quality, Controlling for Certainty**. As with my analysis for confusion as to source and business relationship, I again included a question (**Q17**) asking respondents to indicate their level of certainty with their answer to the responsibility for product quality question (**Q15**). To control for respondent certainty, I performed the same analysis, including only those respondents who indicated their response to the certainty question was "Definitely correct" or "Very likely correct."

66.  With this certainty criterion, I find that the percentage of respondents who mentioned "Penn State" or variations thereof in **Q15** within *Condition A (Current Vintage Brand Website)* accounted for 13 percent for respondents assigned to the *Control Group (State of Pennsylvania Seal Logo),* 16 percent for respondents assigned to the *Test Group 1 (1929 Penn State Nittany Lions Logo)*, 14 percent for respondents assigned to the *Test Group 2 (1950 Penn State Nittany Lions Logo)*. See **Figure 8.2.**

67.  Comparing the experimental logo groups in *Condition A* (*Current Vintage Brand Website*) when controlling for certainty, I find that the net belief regarding responsibility for product quality of Vintage Brand's products as they relate to Penn State is 3 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 1 percentage point when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*. See **Figure 8.2** above. My results show that net belief regarding responsibility for product quality (controlling for certainty) remains so low as to be insubstantial and the conclusions I draw from these results do not change when

---

[72]  *Condition B (No Disclaimer)*: Net belief regarding responsibility for product quality of Vintage Brand's products as they relate to Penn State is -6 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and -5 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo).*

[73]  *Condition C (Official Licensing Statement)*: Net belief regarding responsibility for product quality of Vintage Brand's products as they relate to Penn State is 6 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 6 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo).*

[74]  *Condition D (Acknowledgement Disclaimer)*: Net belief regarding responsibility for product quality of Vintage Brand's products as they relate to Penn State is -3 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and -8 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo).*

*CONFIDENTIAL*

conducting the same analysis for *Condition B (No Disclaimer)*,[75] *Condition C (Official Licensing Statement)*,[76] or *Condition D (Acknowledgment Disclaimer)*.[77]

68.   **Analysis of Responsibility for Product Quality, Controlling for Belief in Legal Relationship.** In analyzing responsibility for product quality, I controlled for respondents who indicated they believe there is a legal requirement to obtain Penn State's permission to use the Penn State name and imagery that originated with Penn State in **Q18**.

69.   Applying this legal belief criterion, I find that the percentage of respondents who mentioned "Penn State" or variations thereof in **Q15** within *Condition A (Current Vintage Brand Website)* accounted for 12 percent for respondents assigned to the *Control Group (State of Pennsylvania Seal Logo),* 15 percent for respondents assigned to the *Test Group 1 (1929 Penn State Nittany Lions Logo)*, 18 percent for respondents assigned to the *Test Group 2 (1950 Penn State Nittany Lions Logo).* See **Figure 8.3.**

---

[75]   *Condition B (No Disclaimer)*: Net belief regarding responsibility for product quality (controlling for certainty) of Vintage Brand's products as they relate to Penn State is -2 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and -2 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo).*

[76]   *Condition C (Official Licensing Statement)*: Net belief regarding responsibility for product quality (controlling for certainty) of Vintage Brand's products as they relate to Penn State is 4 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 1 percentage point when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo).*

[77]   *Condition D (Acknowledgement Disclaimer)*: Net belief regarding responsibility for product quality (controlling for certainty) of Vintage Brand's products as they relate to Penn State is -5 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and -8 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo).*

70.     Comparing the experimental logo groups in *Condition A* (*Current Vintage Brand Website*) when controlling for belief in legal relationship, I find that the net belief regarding responsibility for product quality of Vintage Brand's products as they relate to Penn State is 3 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 6 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*. See **Figure 8.3** above. My results show that net belief regarding responsibility for product quality (controlling for belief in legal relationship) remains so low as to be insubstantial, and the conclusions I draw from these results do not change when conducting the same analysis for *Condition B (No Disclaimer)*,[78] *Condition C (Official Licensing Statement)*,[79] or *Condition D (Acknowledgment Disclaimer)*.[80]

---

[78]   *Condition B (No Disclaimer)*: Net belief regarding responsibility for product quality (controlling for belief in legal relationship) of Vintage Brand's products as they relate to Penn State is -8 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and -6 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[79]   *Condition C (Official Licensing Statement)*: Net belief regarding responsibility for product quality (controlling for belief in legal relationship) of Vintage Brand's products as they relate to Penn State is 7 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and 8 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

[80]   *Condition D (Acknowledgement Disclaimer)*: Net belief regarding responsibility for product quality (controlling for belief in legal relationship) of Vintage Brand's products as they relate to Penn State is 0 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 1 (1929 Penn State Nittany Lions Logo)*, and -8 percentage points when comparing the *Control Group (State of Pennsylvania Seal Logo)* to *Test Group 2 (1950 Penn State Nittany Lions Logo)*.

## IV.    MR. FRANKLYN'S SURVEYS ARE UNRELIABLE AND FAIL TO ADDRESS THE RESEARCH QUESTION IN A RELEVANT WAY

71.    In addressing the second part of my assignment, I have also reviewed the Franklyn Report and Mr. Franklyn's two consumer surveys: his "Commercial Impression Survey" and his "Confusion Survey."[81] In this section, I will first provide an overview of each of Mr. Franklyn's surveys, including his key questions and conclusions. I then present the conclusions from my review. Namely, I find that both surveys suffer from critical demand artifacts that prime respondents toward giving desired answers. Both surveys fail to appropriately approximate real-world marketplace conditions, and both fail to implement a proper control group. In addition, neither survey presents evidence that is relevant to the research question in this matter (i.e., whether consumers have pre-existing legal beliefs about the requirement for a business relationship between Vintage Brand and Penn State).

### A.    Summary of Mr. Franklyn's Commercial Impression and Confusion Surveys

72.    Mr. Franklyn states that he was retained to "assess, using standard and generally accepted statistical and consumer market survey methods, (1) whether the trademarks belonging to Penn State are perceived as ornamental features or make the commercial impression of trademarks; and (2) the level of confusion between Vintage Brand and Penn State."[82] Mr. Franklyn states that "[b]ased on the extensive consumer research and statistical analysis I describe in this report, it is clear that the Penn State marks make the commercial impression of trademarks and that a significant percentage of consumers are confused as to the relationship between Penn State and Vintage Brand as it pertains to source, sponsorship, affiliation, and/or licensure."[83]

73.    Mr. Franklyn's surveys relied on samples of qualified respondents who "indicated that they had purchased college/university apparel in the past 12 months and/or plan to purchase collegiate/university apparel in the next 12 months."[84] A total of 674 respondents qualified for

---

[81]    Franklyn Report, *Appendix B - Survey Questionnaire*.

[82]    Franklyn Report, *Appendix B - Survey Questionnaire*, p. 2.

[83]    Franklyn Report, p. 2.

[84]    Franklyn Report, p. 16 and *Appendix B*. Per his Appendix B, I note that Mr. Franklyn's "purchased" question asked about "College sports apparel (apparel featuring teams at the collegiate level)" while the "plan to purchase" question asked for "College/University apparel (apparel featuring colleges/universities or college/university sports teams)." Mr. Franklyn does not explain the reason for this discrepancy. Franklyn Report, *Appendix B - Survey Questionnaire*.

CONFIDENTIAL

and completed the Commercial Impression Survey, while a total of 616 respondents qualified for and completed the Confusion Survey.[85] Both surveys were created and hosted under "double-blind conditions" by the Halstead Strategy Group under Mr. Franklyn's direction,[86] using "a random selection of consumers who are part of an online panel" provided by Lucid.[87]

### 1.   *Commercial Impression Survey*

74.   Mr. Franklyn states that he conducted a "Commercial Impression Survey" to "test the commercial impression of the products sold on the Vintage Brand website."[88] After qualifying for the Commercial Impression Survey through the screener, the 674 qualified respondents were assigned to one of three experimental groups and viewed an image of a standalone t-shirt:

- Test Cell 1 (N = 243) was shown a t-shirt with a "Nittany Rock" logo, which included the word "Nittany" and the Penn State seal;

- Test Cell 2 (N = 242) was shown a t-shirt with a "Penn State Basketball" logo, which featured the words "Penn State Basketball" above the image of a lion's head; and the

- Control Cell (N = 189) was shown a t-shirt with the words "GAME DAY" and a generic football image.[89]

75.   After indicating that they could view the t-shirt image clearly, respondents were then shown the same t-shirt image along with a definition of the term "trademark."[90] Respondents were then asked two closed-ended questions, first asking respondents if they saw any trademarks on the t-shirt, and, if so, what elements of the t-shirt they believed were trademarks.[91] The answer options

---

[85]   Franklyn Report, pp. 7, 24.

[86]   Mr. Franklyn states that Lucid is "a leading supplier of online sample for surveys […] and offers the world's largest pool of global respondents and is highly regarded as a reputable source of respondents for online surveys within the field of market research." Franklyn Report, p. 17; Mr. Franklyn states that double-blind conditions mean "respondents were uninformed as to the purpose and sponsorship of the study and […] there is no person administering the survey that can do anything to influence the results." Franklyn Report, pp. 17, 18.

[87]   Franklyn Report, p. 16.

[88]   Franklyn Report, p. 5.

[89]   Franklyn Report, pp. 7-10.

[90]   The trademark definition presented to respondents in the Commercial Impression Survey was: "The term 'trademark' includes any word, name, symbol, device (e.g., a drawing or design), or any combination thereof, used by an entity to identify and distinguish its merchandise-from merchandise manufactured or sold by others and to indicate the source of the merchandise." Franklyn Report, p. 11.

[91]   Franklyn Report, pp. 11-13.

for elements that respondents could indicate were trademarks included the graphics on the t-shirts, words and phrases that appeared on the t-shirts, and the color of the t-shirt. Respondents in each group could also select a "Don't know / no opinion" option.[92]

76.     Mr. Franklyn reports that 81 percent of consumers in Test Cell 1 and 80 percent of consumers in Test Cell 2 indicated in their closed-ended responses that "[t]he above image contains one or more trademarks." Mr. Franklyn then subtracts the 24 percent of respondents in the Control Cell who reported that the "GAME DAY" t-shirt contained one or more trademarks to conclude that "after controlling for the noise associated with the control ["GAME DAY"] image, 56 to 57% of consumers […] identity at least one element of the shirt being a trademark."[93]

77.     From these results, Mr. Franklyn further concludes that "the images used on the Penn State apparel creates [*sic*] the commercial impression of a trademark for an overwhelming portion of the interested universe" and that "this commercial impression is driven by the Penn State name and imagery, rather than other elements of the shirt design."[94]

### 2.     Confusion Survey

78.     Mr. Franklyn also conducted a "Confusion Survey" to "test the confusion between Vintage Brand and Penn State."[95] After qualifying for the Confusion Survey, the 616 qualified respondents were similarly assigned to one of three experimental groups and viewed a purported image of a Vintage Brand product page:

- Test Cell 1 (N = 195) was shown a t-shirt with the "Nittany Rock" logo, featuring the same t-shirt from Test Cell 1 in the Commercial Impression Survey;

- Test Cell 2 (N = 197) was shown a t-shirt with the "Nittany S" logo; and the

- Control Cell (N = 224) was shown a t-shirt with the Vintage Brand logo.[96]

---

[92]   Franklyn Report, pp. 12-13.

[93]   Franklyn Report, p. 21.

[94]   Franklyn Report, p. 23.

[95]   Franklyn Report, p. 5.

[96]   Franklyn Report, p. 24. I understand that the t-shirt with the Vintage Brand logo is not a real product and has not been offered on the Vintage Brand website.

79.     After similarly indicating that they could see the webpage image clearly, respondents were then asked the following series of questions:[97]

- **Source confusion.** Respondents were asked an open-ended question on the company that makes or puts out the product, with a follow-up question asking respondents "Why do you say that?"

- **Sponsorship by another company or institution.** Respondents were then asked a closed-ended yes/no question on whether they believe the product is/is not "sponsored or approved by another company or institution." Respondents who answered affirmatively were asked two follow-up, open-ended questions asking the respondent to name the "company or institution" and "Why do you say that?"

- **Affiliation with another company or institution.** Respondents were then asked a similar closed-ended yes/no question on whether they believe the product is/is not "affiliated with another company or institution." Respondents who answered affirmatively were then asked similar versions of the same two follow-up questions.

- **Licensure.** Finally, respondents were asked a closed-ended yes/no question on whether they believe that "the company that sells this product [is / is not] licensed to sell this product by a company or institution." If they answered affirmatively, respondents were then asked "What company or institution is licensed to sell this product?" and "Why do you say that?"

80.     From the survey results, Mr. Franklyn concludes that "a significant percentage of consumers are confused as to source, sponsorship, approval, or licensure of the product."[98] Specifically, Mr. Franklyn concludes the following:

a.  **Source confusion.** In response to the initial source confusion question, Mr. Franklyn finds that "[a]fter controlling for noise, source confusion is between 5% and 9% for Penn State and Vintage Brand."[99]

b.  **Sponsorship by another company or institution.** Mr. Franklyn finds that a net of approximately 10-15 percent of consumers believe the product they saw was sponsored

---

[97]   Franklyn Report, pp. 27-30; Franklyn Report, *Appendix B - Survey Questionnaire*.

[98]   Franklyn Report, p. 37; Franklyn Report, *Appendix B - Survey Questionnaire*, pp. 12-14.

[99]   Franklyn Report, p. 38.

or approved by another company or institution.[100] After reviewing follow up open-ended responses, he ultimately concludes that the net confusion levels are within 19-23 percent for sponsorship/approval between Vintage Brand and Penn State and/or any college/university/NCAA.[101]

    c.   **Affiliation with another company or institution.** Mr. Franklyn states that approximately 20 percent of consumers in all cells believe the company that makes or puts out the product they saw is affiliated with another company or institution. After reviewing follow-up open ends, Mr. Franklyn concludes that the net level of affiliation confusion between Vintage Brand and Penn State and/or any college/university/NCAA is 10 percent.[102]

    d.   **Licensure.** Mr. Franklyn states that approximately 50 percent of consumers across all cells believe that the company that sells this product is licensed to sell the product by a company or institution. After reviewing follow-up open-ended questions, Mr. Franklyn concludes that "the net level of licensure confusion between Vintage Brand and Penn State and/or any college/university/NCAA is between 7% and 13%."[103]

    e.   **Overall conclusions.** Lastly, Mr. Franklyn combines results across all confusion questions and concludes that "there is a significant level of consumer confusion, ranging from 27% to 39% of the interested universe, that exists between Vintage Brand and Penn State[…] with the vast majority of the confusion based on explicit mentions of 'Penn State.'"[104]

    **B.**    **The Franklyn Surveys Do Not Provide Reliable or Relevant Results**

81.    Both of Mr. Franklyn's surveys are flawed, rendering his results unreliable. The Commercial Impression Survey primes respondents with a potentially confusing definition of "trademark" and leads respondents to "hunt" for trademarks in the stimulus t-shirt images in an exercise that lacks

---

[100]  Franklyn Report, p. 39.

[101]  Franklyn Report, pp. 39-40.

[102]  It is important to note here that Mr. Franklyn finds a higher percentage of respondents thinking that the product they saw is affiliated with another company within the control group than either test groups. Franklyn Report, pp. 40-41.

[103]  It is important to note here that Mr. Franklyn also finds that 50% of respondents in the control cell believe that the product they saw was licensed to the seller by a company or institution. Franklyn Report, pp. 41-42.

[104]  Franklyn Report, p. 43.

CONFIDENTIAL

real-world context. The Confusion Survey, similarly, asks repeated leading questions that inappropriately draw respondents' attention to the concept of "another institution." Additionally, both surveys fail to reflect marketplace conditions in their unjustified shortcuts in the presentation of the stimuli, and both fail to implement a proper control group. Finally, neither of Mr. Franklyn's studies control for respondents pre-existing legal beliefs and thus fail to address the research question in a relevant way.

    1.    *The Franklyn Commercial Impression Survey Contains Multiple Demand Artifacts that Render the Results Unreliable*

82.    The design of Mr. Franklyn's Commercial Impression Survey contains numerous demand artifacts that cause an overstatement of his alleged measure of Penn State apparel creating the commercial impression of a trademark and ultimately render his study unreliable. In particular, the Commercial Impression Survey primes respondents to "hunt" for alleged trademarks under a potentially confusing definition of the term, which Mr. Franklyn neither pretested nor performed any other analysis to confirm that the questions were not confusing to respondents. The Commercial Impression Survey divorces respondents from the marketplace context of the Vintage Brand purchase flow and fails to implement an appropriate control stimulus. Taken together, the results of the Commercial Impression Survey are both irrelevant and unreliable.

83.    **Mr. Franklyn's definition of "trademark" and the ensuing closed-ended questions lead respondents through a "hunting" exercise that biases the Commercial Impression Survey results in favor of Penn State.** As noted above, Mr. Franklyn presents respondents with the following bolded definition of "trademark" beneath the t-shirt stimuli images in his Commercial Impression Survey: "The term 'trademark' includes any word, name, symbol, device (e.g., a drawing or design), or any combination thereof, used by an entity to identify and distinguish its merchandise from merchandise manufactured or sold by others and to indicate the source of the merchandise."[105] On the very same page, the Commercial Impression Survey then asks respondents:[106]

- "Based on your understanding, do you think…"

---

[105]  Franklyn Report, *Appendix B - Survey Questionnaire*, p. 8; Franklyn Report, *Appendix C - Survey 1 Screenshots*.

[106]  Franklyn Report, *Appendix B - Survey Questionnaire*, p. 8; Franklyn Report, *Appendix C - Survey 1 Screenshots*.

CONFIDENTIAL

    o   The above image contains one or more trademarks

    o   The above image does not contain any trademarks

    o   I do not understand what a trademark is

    o   Don't know / no opinion

84.    This approach is troubling, insofar as the reasonable respondent, presented with a definition of trademarks, is primed to "hunt" for trademarks in the stimulus image. When information in a survey is presented in a leading manner, "[r]espondents may sense what the researcher is getting at and alter their responses to accommodate what they think the researcher expects."[107] In the case of Mr. Franklyn's Commercial Impression Survey, it would have been important to review a respondent's initial thoughts about the definition of a trademark as a quality control measure to see if there was any confusion, and then ask whether anything in the image constitutes a trademark. Instead, Mr. Franklyn's definition does not equip respondents with the ability to distinguish between what a trademark is, and what a trademark is not.[108] Respondents are led to believe that the images presented include *at least one* trademark,[109] after being "educated" with a broadly applicable and potentially confusing definition about what a trademark is, followed by what amounts to a yes/no question about the image they reviewed.[110]

85.    Respondents in the Commercial Impression Survey did not have an option to describe their beliefs openly, nor were they allowed to independently identify the parts of the shirt, if any, that they perceived to be a trademark. When respondents select the affirmative response ("The above

---

[107] "The wording of questions and the context in which questions appear can affect the responses to questionnaires and interviews. Respondents may sense what the researcher is getting at and alter their responses to accommodate what they think the researcher expects." Terence A. Shimp *et al.*, "A Critical Appraisal of Demand Artifacts in Consumer Research," *Journal of Consumer Research*, Vol. 18, 1991, pp. 273-283, at p. 281.

[108] Q103 asks: "Here is the same image that you were previously shown. [IMAGE]. Please review the following definition of a trademark.

The term 'trademark' includes any word, name, symbol, device (e.g., a drawing or design), or any combination thereof, used by an entity to identify and distinguish its merchandise from merchandise manufactured or sold by others and to indicate the source of the merchandise." [Emphasis removed]. Franklyn Report, *Appendix B - Survey Questionnaire*, p. 8.

[109] Answer options included "1) The above image contains one or more trademarks, 2) The above image does not contain any trademarks, 3) I do not understand what a trademark is, 4) Don't know / no opinion."

[110] "[T]he wording of a question, open-ended or closed-ended, can be leading or non-leading, and the degree of suggestiveness of each question must be considered in evaluating the objectivity of a survey." Shari S. Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition, The National Academies Press*, 2011, pp. 359-423, at p. 393.

image contains one or more trademarks"), in line with the researcher's expectation, they are asked "Please select all parts of the image, if any, that you believe are trademarks" and presented a closed-ended list of potential-trademark response options that include the phrases "Penn State," "Nittany," and/or "The Pennsylvania State University," as well as the graphical components of each t-shirt image.[111] While consumer surveys often include closed-ended questions to elicit beliefs, they should follow open-ended questions so that the respondent can provide thoughts with "fewer hints about the answer that is expected or preferred."[112] It is quite possible that an open-ended question or series of questions would have yielded vastly different results, as open-ended questions would not have suggested Penn State or the possibility of multiple trademark elements to the respondents. When respondents are "[f]aced with a direct question, particularly one that provides response alternatives, the respondent obligingly may supply an answer" and "[s]uch answers will reflect only what the respondent can glean from the question, or they may reflect pure guessing."[113] Mr. Franklyn does not test whether the images are functioning as trademarks for the goods and services they are used on.

86.    Unlike Mr. Franklyn, I designed the questions and answer options included in my Likelihood of Confusion Survey to avoid confusing respondents, steering them toward a particular answer, or forcing them to guess. Accordingly, my survey does not suffer from such problems. Furthermore, unlike Mr. Franklyn, I thoroughly pretested my survey, using feedback to make necessary adjustments to minimize any unclear and ambiguous questions or potential influence from guessing, leading questions, order effects, and lack of participant objectivity.[114] Pretests are valuable in identifying areas of difficulty or confusion that should be adjusted or clarified before administering the final survey.[115]

87.    Without pretesting, Mr. Franklyn has no way of knowing if respondents understood his included definition of a trademark as applied to the at-issue Vintage Brand products. Although Mr. Franklyn provided an answer option that allow respondents to indicate "I do not understand what

---

[111]    Franklyn Report, *Appendix B - Survey Questionnaire*, p. 8.

[112]    Shari S. Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition, The National Academies Press*, 2011, pp. 359-423, p. 392.

[113]    Shari S. Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition, The National Academies Press*, 2011, pp. 359-423, pp. 389-390.

[114]    Alan G. Sawyer, "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, Vol. 1, at p. 20.

[115]    "Texts on survey research generally recommend pretests as a way to increase the likelihood that questions are clear and unambiguous." Shari S. Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition, The National Academies Press*, 2011, pp. 359-423, p. 388.

a trademark is,"[116] respondents typically try to present themselves as educated and therefore are unlikely to choose such an answer option.[117] Additionally, none of Mr. Franklyn's "[s]everal quality control metrics employed to ensure the validity of responses" considered potential confusion of respondents.[118]

88.     **The Commercial Impression Survey lacks meaningful and necessary marketplace context**. Approximating marketplace conditions is a key consideration for designing a survey instrument. In fact, "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."[119] Although Mr. Franklyn states that the goal of his Commercial Impression Survey is to test "the commercial impression of the products sold on the Vintage Brand website," his survey design does not and cannot achieve the stated goal.[120] Specifically, the stimuli shown to respondents are not of the products on the Vintage Brand website, but instead t-shirts taken entirely out of marketplace context and presented on a blank background with different logos (including the Penn State logos). A true test of the commercial impression of any product would depend, in part, on the way the product is presented to the relevant consumers in the commercial marketplace. This lack of marketplace context means that the responses to the study are even less relevant, as there was no ability to consider the products decorated with Penn State imagery within the setting of the Vintage Brand website.

89.     **The Commercial Impression Survey uses improper control stimuli**. Although Mr. Franklyn suggests that "arguably 'Game Day' or any other phrase could be considered a trademark, [and thus] serves as a good control because it's not specific to any team or other affiliated entity and expresses an informational message about football,"[121] Mr. Franklyn's control t-shirt image does

---

[116]   Franklyn Report, *Appendix B - Survey Questionnaire*, p. 8.

[117]   "Demand characteristics refer to features introduced into a research setting by virtue of the fact that it *is* a research study and that the participants know that they are part of it. As aware participants, they are motivated to make sense of the experimental situation, to avoid negative evaluation from the experimenter, and perhaps even to cooperate in a way intended to help the experimenter confirm the research hypothesis." Ran Kivetz and Itamar Simonson, "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," *Trademark and Deceptive Advertising Surveys*, 2012, pp. 243-259, p. 245, quoting Aronson, Wilson, and Brewer (1998).

[118]   Franklyn Report, pp. 35-37.

[119]   Thomas J. McCarthy, "Chapter 32. Procedure in Trademark Infringement and Unfair Competition Litigation," *McCarthy on Trademarks and Unfair Competition § 32:163*, 2020.

[120]   Franklyn Report, pp. 5, 7.

[121]   Franklyn Report, p. 10.

*CONFIDENTIAL*

not follow best practices for the design of control stimuli. Further, Mr. Franklyn's purported control does not serve as a control at all. An appropriate control stimulus would be one that "shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[122] Mr. Franklyn not only changes the color scheme and the imagery in the control, he also removes the product from its marketplace context. As a result, it is impossible to determine if respondents selected Penn State as a trademark because of the manipulated imagery, manipulated color scheme, or the removal of relevant marketplace context.

90.     In contrast, my Likelihood of Confusion Survey presents respondents with a series of stimuli images of Vintage Brand's website, re-creating a real-world shopping experience for the respondents (*e.g.,* main Vintage Brand homepage, the Penn State section landing page, a Penn State product page, and a cart page). Further, I used several appropriately designed sets of control stimuli that allow me to rule out alternative explanations for my results, including varying the disclaimers shown on the Vintage Brand website, as well as the imagery on the product pages.

> ### 2.     *The Franklyn Confusion Survey Lacks Necessary Marketplace Context and a Proper Control, Rendering the Survey Results Unreliable*

91.     Mr. Franklyn's Confusion Survey similarly overstates his alleged measure of consumer confusion between Vintage Brand and Penn State and contains several design flaws that render his study unreliable. As with the Commercial Impression Survey, Mr. Franklyn fails to situate respondents to the Confusion Survey in the relevant marketplace context and again fails to implement an appropriate control stimulus. In addition, the Confusion Survey introduces a demand artifact by repeatedly asking respondents about a relationship between the "company" that makes or puts out the product and "another company or institution." Taken together, the results of the Confusion Survey are both irrelevant and unreliable.

92.     **Although the Confusion Survey presents a Vintage Brand product page, the survey similarly lacks meaningful and necessary marketplace context**. As I discussed above, approximating marketplace conditions is a key consideration for designing a survey instrument. To investigate likelihood of confusion, respondents should view the at-issue Vintage Brand

---

[122]   Shari S. Diamond and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, American Bar Association, Section of Intellectual Property Law, 2012, Chapter 9; *See also* Thomas J. McCarthy, "Chapter 32. Procedure in Trademark Infringement and Unfair Competition Litigation," *McCarthy on Trademarks and Unfair Competition § 32:163*, 2020.

*CONFIDENTIAL*

products in a context that approximates marketplace conditions, as "the closer the survey context comes to marketplace conditions, the greater the evidentiary weight it has."[123] Not only does Mr. Franklyn treat his test and control conditions differently by removing the Vintage Brand URL in the test condition, Mr. Franklyn abruptly presents a single product page which prevents respondents from being exposed to other Vintage Brand pages containing, for example, disclosures or non-Penn State products.

93.     **The Confusion Survey similarly uses improper control stimuli**. Mr. Franklyn's image for his control group uses a "Vintage Brand logo" that is not offered on the Vintage Brand website. Mr. Franklyn states that "[t]he test stimuli for this survey were selected from a variety of Penn State products offered by Vintage Brand…The control cell stimulus was selected in order to find an identical item of apparel (i.e., a t-shirt) which should not have any outside affiliation, sponsorship, or licensure."[124] Mr. Franklyn further states that "[t]he role of the control cell is to account for noise in the dataset (i.e. could any shirt offered on the Vintage Brand website create a latent connection with a university of Penn State specifically)."[125] Notwithstanding that Vintage Brand sells products decorated with imagery that originated from entities across several professional sports leagues, in addition to universities and Penn State specifically, Mr. Franklyn fails to justify how his chosen control "shares as many characteristics with the experimental stimulus as possible."[126] Further, the chosen control stimulus all but ensures that most respondents would have almost no basis to offer any entity other than Vintage Brand to any of the confusion questions.

94.     **The Confusion Survey introduces a severe demand artifact that repeatedly leads respondents to find and consider a relationship with "another institution."** Despite Mr. Franklyn's use of an *Eveready* design in the Confusion Survey, the answer options to several of the key questions contain a repeated demand artifact by introducing the concept of "another company or institution" to respondents. Specifically, respondents answering the sponsorship, affiliation, and licensure questions of the Confusion Survey repeatedly encounter answer options that contain responses related to "another company or institution." The desired response to these

---

[123]   Thomas J. McCarthy, "Chapter 32. Procedure in Trademark Infringement and Unfair Competition Litigation," *McCarthy on Trademarks and Unfair Competition § 32:163*, 2020.

[124]   Franklyn Report, p. 27.

[125]   Franklyn Report, p. 38.

[126]   Shari S. Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition, The National Academies Press*, 2011, pp. 359-423, p. 399.

questions, Penn State, is, by definition, an "institution" in common parlance, and thus a potential cue to respondents that such a relationship exists.[127] Mr. Franklyn does not justify the use of the specific phrasing of his answer options, nor did he pretest his Confusion Survey to determine that the survey answer options were clear and unbiased. Demand artifacts of this nature "can be particularly problematic when the survey design and related questions[…] cause respondents to make comparisons or consider relations and other aspects, which they would not have done outside the context of that study (i.e., in the marketplace)."[128] By contrast, my Likelihood of Confusion Survey, similarly conducted with an aided *Eveready* format, used neutral language (e.g., "entity" and "whoever puts out…") that did not introduce or suggest specific types of organizations to respondents.

> 3.    *Neither of Mr. Franklyn's Surveys Address the Research Question in a Relevant Way*

95.    Mr. Franklyn states he was retained to "assess, using standard and generally accepted statistical and consumer market survey methods, (1) whether the trademarks belonging to Penn State are perceived as ornamental features or make the commercial impression of trademarks; and (2) the level of confusion between Vintage Brand and Penn State." [129] However, myriad problems with the design, execution, and analysis of his surveys forbid Mr. Franklyn from concluding that "it is clear that the Penn State marks make the commercial impression of trademarks and that a significant percentage of consumers are confused as to the relationship between Penn State and Vintage Brand as it pertains to source, and/or licensure."[130] Rather, an appropriate, non-leading approach that uses marketplace stimuli while properly weighing the potential for uncertainty and pre-existing legal beliefs finds that confusion as to source, business relationships, or responsibility for product quality is insubstantial when using appropriate controls while weighing strength of belief. Further, additional analysis reveals that any confusion is strongly

---

[127]  "Demand effects (also referred to as demand artifacts) are produced when respondents use cues provided by the survey procedures and questions to figure out the purpose of the survey and to identify the 'correct' answers to the questions they are asked. The respondents may then provide what they perceive as the correct or expected answers, to make sure that the results 'come out right.'" Ran Kivetz and Itamar Simonson, "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," *Trademark and Deceptive Advertising Surveys*, 2012, p. 243.

[128]  Ran Kivetz and Itamar Simonson, "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," *Trademark and Deceptive Advertising Surveys*, 2012, p. 244.

[129]  Franklyn Report, p. 2.

[130]  Franklyn Report, p. 2.

corelated with pre-existing legal beliefs about the requirement for a business relationship between Vintage Brand and Penn State.

96.  **Consumer understanding of trademarks should be examined in a non-leading way**. The Commercial Impressions Survey begins with a limited definition of a trademark, using an inaccurate control group that is irrelevant to Vintage Brand's commercial context. Mr. Franklyn's survey methodology is leading and primes the respondents to "hunt" for trademarks for each of the questions. In my survey design, I appropriately introduce questions relevant to the respondents' legal belief at the end of the survey. The order effect is an important factor to consider in survey design, as inappropriate ordering of questions can lead to biased and inaccurate results.[131]

97.  **Initial levels of confusion appear in-line with my own study, and any finding of confusion appears to rely on uncertain, weakly-held consumer opinions, and/or legal beliefs**. Any finding of confusion from Mr. Franklyn's confusion study is likely to rely upon guessing or a pre-existing legal belief. As discussed in **Section III.B.3** above, I found it important to capture the certainty respondents had regarding their responses, as well as the potential impact of a pre-existing legal belief in my assessment of likelihood of confusion. Like Mr. Franklyn, I was retained to use a consumer survey to evaluate if and to what extent consumers are confused regarding the source of Vintage Brand's products as they relate to Penn State. However, when accounting for certainty as well as pre-existing legal beliefs, I find that any apparent "confusion" actually appears to be the product of a pre-existing belief that there is a legal requirement for Vintage Brand to obtain Penn State's permission to use Penn State's name or imagery that originated with Penn State.[132]

98.  Mr. Franklyn uncritically accepts the results of his flawed survey, ignoring the potential for uncertainty and pre-existing beliefs to affect his results and the conclusions he draws from them. This is even more puzzling given clear indications that respondents were guessing in his own data. Based on my own analysis, it is important to examine certainty and pre-existing legal beliefs given the specific marketplace context surrounding the products at-issue in this case and the

---

[131] "The order in which questions are asked on a survey and the order in which response alternatives are provided in a closed-ended question can influence the answers." Shari S. Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition, The National Academies Press*, 2011, pp. 359-423, p. 395. *See also* Jon A. Krosnick and Stanley Presser, "Question and Questionnaire Design," *Handbook of Survey Research*, 2010, p. 291.

[132] *See* **Section III.B.3** for my discussion of pre-existing legal beliefs in the context of this matter.

*CONFIDENTIAL*

uniqueness of merchandising, as the court suggested in its ruling on Vintage Brand's motion to dismiss.

99.    Mr. Franklyn's surveys submitted in this matter suffer from numerous flaws and fail to produce reliable results. Among other issues, both surveys suffer from a critical lack of necessary marketplace context, contain key measures inflated by guessing, and both fail to implement an appropriate control group.

Signed on the 23rd day of January, 2023.

_____

Tülin Erdem