## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY,<br><br>    Plaintiff and<br>    Counter-Claim Defendant,<br><br>  v.<br><br>VINTAGE BRAND, LLC;<br><br>    Defendant and<br>    Counter-Claim Plaintiff<br><br>and<br><br>SPORTSWEAR INC. d/b/a PREP SPORTWEAR; CHAD HARTVIGSON; ERIK HARTVIGSON; and MICHELLE YOUNG,<br><br>    Defendants. | Case No. 4:21-cv-01091-MWB<br>(Hon. Matthew W. Brann)<br><br>JURY TRIAL DEMANDED |

## BRIEF IN SUPPORT OF VINTAGE BRAND, LLC'S MOTION FOR SUMMARY JUDGMENT

Jodi S. Wilenzik, Esq.
Mark H. Perry, Esq.
PA I.D. Nos. 89205/68610
POST & SCHELL, P.C.
1600 JFK Boulevard, 13th Floor
Philadelphia, PA 19103
Phone: (215) 587-1101
Fax: (215) 320-4159
jwilenzik@postschell.com
mperry@postschell.com

Joshua D. Harms, Esq., *pro hac vice*
Washington I.D. No. 55679
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
Phone: (206) 626-6000
Fax: (206) 464-1496
Joshua.Harms@stokeslaw.com

# **TABLE OF CONTENTS**                     Page

I.      INTRODUCTION AND RELIEF REQUESTED ..........................................1

II.     STATEMENT OF FACTS....................................................................4

III.    PROCEDURAL HISTORY .................................................................7

IV.     STATEMENT OF QUESTIONS INVOLVED ...........................................8

V.      AUTHORITY AND ARGUMENT ........................................................9

     A.      The University Does Not Own Trademark Rights in the
         Litigated Images .................................................................9

     B.      The University Cannot Prove Vintage Brand's Use of the
         Historic Images is Likely to Cause Confusion Regarding the
         Source of Vintage Brand's Tangible Products...................12

         1.      Empirical Evidence Demonstrates that Consumers Are
             Not Confused about the Source of Vintage Brand's
             Tangible Products ...................................................15

             (a)   Actual Confusion...............................................23

             (b)   Intent to Confuse ..............................................25

             (c)   The Other Likelihood of Confusion Factors Favor
                    Vintage  Brand .................................................26

     C.      Vintage Brand's Historic Images are Aesthetically Functional..........27

     D.      The University's Counterfeiting, Dilution, and False
         Advertising and Endorsement Claims Fail for Additional
         Reasons...............................................................................29

         1.      The University's Counterfeiting Claim is Not Colorable.........29

             (a)   Many University Marks Fail at the Threshold.................29

             (b)   Vintage Brand's Designs Are Not Substantially
                   Indistinguishable From the University's
                   Registered Marks...............................................30

              (c)   There Is No Likelihood of Confusion ...............................32

             (d)   Vintage Brand's Designs Do Not Indicate Who
                   Made the Underlying Product and Thus Cannot Be
                   Counterfeit........................................................33

          2.      The Undisputed Facts Fail to Establish Dilution .....................34

(a) The PENN STATE Text is Not Famous ........................... 35

(b) Vintage Brand's Historic Designs Are Not Sufficiently Similar to the PENN STATE text ................ 40

(c) Vintage Brand is Not Using the Historic Images as Trademarks ........................................................................ 40

(d) The University Cannot Establish Likely or Actual Dilution ............................................................................. 41

3. False Advertising Cannot be Premised on Confusion as to Sponsorship or Affiliation ..................................... 43

4. False Endorsement Fails for the Same Reasons ...................... 43

E. The Registrations for the Seal Designs must be Cancelled ............... 44

VI. CONCLUSION .................................................................................. 45

## TABLE OF AUTHORITIES

__Cases__                                                                        **Page(s)**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
   237 F.3d 198 (3d Cir. 2000)........................................................................ 23, 25

*Allied Interstate LLC v. Kimmel & Silverman P.C.*,
   2013 WL 4245987 (S.D.N.Y. Aug. 12, 2013) ..................................... 41

*Arcona, Inc. v. Farmacy Beauty, LLC*,
   976 F.3d 1074 (9th Cir. 2020)........................................................ 31, 32

*Ayres v. City of Chicago*,
   125 F.3d 1010 (7th Cir. 1997).......................................................... 13

*Bd. of Governors of Univ. of N. Carolina v. Helpingstine*,
   714 F. Supp. 167 (M.D.N.C. 1989)................................................... 18

*Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*,
   510 F.2d 1004 (5th Cir. 1975)........................................................... 14

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
   425 F.3d 211 (3d Cir. 2005).............................................................. 16

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*,
   696 F.3d 206 (2d Cir. 2012).............................................................. 27

*Coach Servs., Inc. v. Triumph Learning LLC*,
   668 F.3d 1356 (Fed. Cir. 2012)......................................... 35, 36, 37, 39

*Colgate-Palmolive Co. v. J.M.D. All-Star Import & Export Inc.*,
   486 F. Supp. 2d 286 (S.D.N.Y. 2007)............................................... 30

*Componentone, L.L.C. v. Componentart, Inc.*,
   2007 WL 4302108 (W.D. Pa. Dec. 6, 2007)...................................... 35

*Componentone, L.L.C. v. Componentart, Inc.*,
   2008 WL 4790661 (W.D. Pa. Oct. 27, 2008) ...................................... 2

**<u>Cases</u> (cont.)** Page(s)

*Cornette v. Graver*,
  473 F. Supp. 3d 437 (W.D. Pa. 2020) .................................................... 25

*Coty Inc. v. Excell Brands, LLC*,
  277 F. Supp. 3d 425 (S.D.N.Y. 2017) .................................................... 32

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
  539 U.S. 23 (2003) ........................................................ 1, 12, 13, 14

*De La Salle High School of Concord v. Sportswear, Inc.*,
  Case No. C11-00182 (Contra Costa, Cal. Super. Ct., Oct. 22, 2012) ................ 28

*Designer Skin, LLC v. S & L Vitamins, Inc.*,
  560 F. Supp. 2d 811 (D. Ariz. 2008) ..................................................... 41

*DigitAlb, Sh.a v. Setplex*, LLC,
  284 F. Supp. 3d 547 (S.D.N.Y. 2018) .................................................... 36

*Dille Family Tr. v. Nowlan Family Tr.*,
  276 F. Supp. 3d 412 (E.D. Pa. 2017) .................................................... 34

*Dille Family Tr.*,
  207 F. Supp. 3d ........................................................................ 35

*Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*,
  40 F.3d 1431 (3d Cir. 1994) ...................................................... 11, 34, 41

*Eastland Music Grp., LLC v. Lionsgate Entm't, Inc.*,
  707 F.3d 869 (7th Cir. 2013) ............................................................ 13

*Facenda v. N.F.L. Films, Inc.*,
  542 F.3d 1007 (3d Cir. 2008) ............................................................ 43

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,
  925 F. Supp. 2d 1067 (C.D. Cal. 2012) .................................................. 28

*Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC*,
  2019 WL 274967 (S.D.N.Y. 2019) ......................................................... 33

**<u>Cases</u> (cont.)**                                                                                   **Page(s)**

*Gaudiya Vaishnava Soc'y v. City & Cnty. of S.F.,*
   952 F.2d 1059 (9th Cir. 1990)...................................................................... 13

*Gucci Am., Inc. v. Guess?, Inc.,*
   868 F. Supp. 2d 207 (S.D.N.Y. 2012).......................................................... 29

*Hershey Co. v. Promotion in Motion, Inc.,*
   2013 WL 12157828 (D.N.J. Jan. 18, 2013) .................................................. 42

*Iancu v. Brunetti,*
   139 S. Ct. 2294 (2019) .................................................................................. 44

*ICON Sols., Inc. v. IKON Off. Sols., Inc.,*
   1998 WL 314672 (E.D. Pa. June 15, 1998) .................................................. 10

*Illinois Tool Works Inc. v. J-B Weld Co., LLC,*
   469 F. Supp. 3d 4 (D. Conn. 2020)............................................................... 33

*In Re Cnty. of Orange,*
   2022 WL 3137036 (T.T.A.B. Aug. 4, 2022) ................................................. 44

*In Re Family Emergency Room LLC,*
   121 U.S.P.Q.2d 1886 (T.T.A.B. 2017) .......................................................... 44

*In re Fox,*
   702 F.3d 633 (Fed. Cir. 2012)....................................................................... 44

*In re Nat'l Data Corp.,*
   753 F.2d 1056 (Fed Cir. 1985)......................................................................... 9

*Interface Corp. v. Lapp, Inc.,*
   721 F.2d 460 (3d Cir. 1983)..................................................................... 23, 28

*International Order of Job's Daughters v. Lindeburg & Co.,*
   633 F.2d 912 (9th Cir. 1980)................................................................... 20, 28

*Kelly-Brown v. Winfrey,*
   717 F.3d 295 (2d Cir. 2013)......................................................................... 32

**Cases** (cont.)                                              **Page(s)**

*La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*,
495 F.2d 1265 (2d Cir. 1974) .............................................................. 10

*Limited v. Macy's Merchandising Group Inc*,
2016 WL 4094913 (S.D.N.Y. 2016) ...................................................... 22

*Lontex Corp. v. Nike, Inc.*,
384 F. Supp. 3d 546 (E.D. Pa. 2019) ......................................... 30, 31, 33

*LTTB LLC v. Redbubble, Inc.*,
840 Fed. Appx. 148 (9th Cir. 2021) ............................................... 11, 27

*Madama v. Genesis Rehab Servs.*,
2014 WL 3695976 (D.N.J. July 24, 2014) ............................................. 43

*Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*,
703 F. Supp. 2d 671 (W.D. Ky. 2010) ............................................ 38, 39

*Moseley v. V Secret Catalogue, Inc.*,
537 U.S. 418 (2003) ............................................................................. 35

*Navajo Nation v. Urban Outfitters, Inc.*,
2016 WL 3475342 (D.N.M. May 13, 2016) .......................................... 36

*Parks LLC v. Tyson Foods, Inc*,
863 F.3d 220 (3d Cir. 2017) ................................................................ 43

*Pellegrino v. Epic Games, Inc.*,
451 F. Supp. 3d 373 (E.D. Pa. 2020) ....................................... 18, 19, 40

*Pharmacia Corp. v. Alcon Labs., Inc.*,
201 F. Supp. 2d 335 (D.N.J. 2002) ...................................................... 40

*Phoenix Entm't Partners v. Rumsey*,
829 F.3d 817 (7th Cir. 2016) ............................................................... 13

*Playboy Enterprises, Inc. v. Universal Tel-A-Talk, Inc.*,
48 U.S.P.Q.2d 1779 (E.D. Pa. June 3, 1998) ...................................... 29

**Cases** (cont.)                                                      **Page(s)**

*Procter & Gamble Co. v. Johnson & Johnson, Inc.*,
  485 F. Supp. 1185 (S.D.N.Y. 1979) ...................................................... 10

*Renna v. Cnty. of Union, N.J.*,
  88 F. Supp. 3d 310 (D.N.J. 2014) ........................................................ 45

*Rudovsky v. W. Publ'g Corp.*,
  2010 WL 2804844 (E.D. Pa. July 15, 2010) ........................................ 43

*S&P Glob. Inc. v. S&P Data LLC*,
  2022 WL 3098096 (D. Del. Aug. 4, 2022) ...................................... 37, 38

*Sanofi-Aventis v. Advancis Pharm. Corp.*,
  453 F. Supp. 2d 834 (D. Del. 2006) ..................................................... 41

*Scott Fetzer Co. v. House of Vacuums Inc.*,
  381 F.3d 477 (5th Cir. 2004) ................................................................. 3

*SMJ & J, Inc. v. NRC Heat & Power, LLC*,
  912 F.Supp. 2d 189 (M.D. Pa. 2012) .................................................... 12

*Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*,
  2022 WL 605724 (D. Del. Jan. 25, 2022) ............................................. 42

*Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*,
  912 F.3d 805 (5th Cir. 2019) ................................................................ 32

*Steak Umm Co., LLC v. Steak 'Em Up, Inc.*,
  2011 WL 3679155 (E.D. Pa. Aug. 23, 2011) ....................................... 37

*Supreme Assembly, Order of Rainbow for Girls v. J. H. Ray Jewelry Co.*,
  676 F.2d 1079 (5th Cir. 1982) ................................................... 14, 20, 28

*THOIP v. Walt Disney Co.*,
  690 F. Supp. 2d 218 (S.D.N.Y. 2010) .................................................. 20

*THOIP v. Walt Disney Co.*,
  788 F. Supp. 2d 168 (S.D.N.Y. 2011) .................................................. 22

<u>Cases</u> **(cont.)** **Page(s)**

*Tiffany & Co. v. Costco Wholesale Corp.*,
971 F.3d 74 (2d Cir. 2020)................................................................ 33, 34, 41

*Tiffany (NJ) Inc. v. eBay Inc.*,
600 F.3d 93 (2d Cir. 2010)................................................................ 41

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
532 U.S. 23 (2001) ........................................................................... 28

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
505 U.S. 763 (1992) ......................................................................... 12

*United States v. Chong Lam*,
677 F.3d 190 (4th Cir. 2012)............................................................ 33

*Univ. of Ga. Athletic Ass'n v. Laite*,
756 F.2d 1535 (11th Cir. 1985)........................................................ 14

*Univ. of Pittsburgh v. Champion Products, Inc.*,
566 F. Supp. 711 (W.D. Pa. 1983)................................... 19, 23, 25, 28

*Bd. of Regents, Univ. of Texas Sys. ex rel. Univ. of Texas*
*at Austin v. KST Elec., Ltd.*,
550 F. Supp. 2d 657 (W.D. Tex. 2008)............................................. 37, 39

*Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*,
511 F. Supp. 2d 482 (E.D. Pa. 2007) ............................................... 21

*Varsity Spirit LLC v. Varsity Tutors, LLC*,
2021 WL 9893514 (N.D. Tex. Sept. 17, 2021)................................. 39

*Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.*,
50 F.3d 189 (3d Cir. 1995)............................................................... 23

*Volkswagenwerk Aktiengesellschaft v. Church*,
411 F.2d 350 (9th Cir. 1969)............................................................ 16

**Cases** (cont.)                                                            **Page(s)**

*Water Pik, Inc. v. Med-Systems, Inc.*,
   726 F.3d 1136 (10th Cir. 2013)................................................................ 17

*World Entm't, Inc. v. Brown*,
   2011 WL 2036686 (E.D. Pa. May 20, 2011) ......................................... 12

**Statutes**

15 U.S.C. § 1052(b) ................................................................................... 44

15 U.S.C. § 1114 .................................................................................... 8, 12

15 U.S.C. § 1116(d) ............................................................................. 29, 30

15 U.S.C. § 1117 ........................................................................................ 32

15 U.S.C. § 1119 ........................................................................................ 45

15 U.S.C. § 1125 .............................................................................. *passim*

15 U.S.C. § 1064(3) ................................................................................... 45

15 U.S.C. § 1127 ........................................................................................ 30

54 Pa. C.S.A. § 1124 ................................................. 8, 34, 35, 36, 40

**Rules**

Fed. R. Civ. P. 5(b)(2)(E) .......................................................................... 49

**Legislative Materials**

130 Cong. Rec. H12076 (Daily Ed. Oct. 10, 1983)................................. 29

Act of June 13, 1907, Penn. P.L. 560, No. 373 ...................................... 45

**Other Authorities**                                                   **Page(s)**

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed., 2023) ...... *passim*

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 25 ........................................... 42

QUESTIONS ABOUT QUESTIONS: INQUIRES INTO THE
COGNITIVE BASES OF SURVEYS (1992) ..................................................................... 18

THE QUANTITATIVE ANALYSIS OF SOCIAL PROBLEMS 168–89 (1970) .................... 18

MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th ed.) .................................. 36

BLACK'S LAW DICTIONARY (10th ed.) ................................................................... 33

Stacey L. Dogan & Mark A. Lemley,
*The Merchandising Right: Fragile Theory or Fait Accompli?*,
  54 EMORY L.J. 461 (2005) ......................................................... 14, 19, 28

Stacey L. Dogan & Mark A. Lemley
*The Trademark Use Requirement in Dilution Cases*,
  24 SANTA CLARA COMP. & HIGH TECH. L.J. 541 (2008) ..................................... 40

Lee Sigelman & Dan Thomas,
*Opinion Leadership & the Crystallization of Nonattitudes: Some*
*Experimental Results*,
  16 POLITY 484 (1984) ......................................................................... 18

## I.     INTRODUCTION AND RELIEF REQUESTED

Vintage Brand, LLC operates an online retail store through which it sells print-on-demand apparel, wall art, coasters, and similar merchandise, all bearing public domain images reproduced from historic memorabilia. Those images relate to various college and professional sports teams, including the University's teams.

There is no evidence the University has ever used the public domain images at issue as trademarks. In fact, the University's claims depend almost entirely on comparison of its asserted trademarks to *parts* of the historic images Vintage Brand uses. Doc. 67 ¶ 86. Vintage Brand doesn't use the historic images as trademarks either; those images are decorative features of Vintage Brand's otherwise blank products. Consumers purchase Vintage Brand merchandise because the artwork serves a communicative function—it allows consumers to express their affinity for, or allegiance to, the University and its history—not because the artwork identifies the source or sponsor of the tangible merchandise.

All of the University's claims boil down to its assertion that consumers will associate the imagery on Vintage Brand's products with the University. But that cannot be the basis of a trademark claim. As the Supreme Court has made clear, only confusion about the origin of tangible goods is actionable under the Lanham Act. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003). As such, the University must show that Vintage Brand's use of the images is likely to cause

confusion about the source of the tangible products that Vintage Brand sells. It is not sufficient that consumers understand that *the images*, as opposed to the tangible products that bear the images, are associated with or refer to the University.

The University has no evidence of confusion regarding the source of Vintage Brand's tangible products. A methodologically sound and thorough survey performed by Dr. Tülin Erdem shows essentially no net confusion regarding (i) who puts out Vintage Brand's goods or (ii) any business relationship between the entity that puts out the merchandise and the University. SMF ¶ 131; *see generally* Doc. 94-7 ("Erdem Report") at Part III. That result is no surprise, because Vintage Brand's tangible products are just substrate for the historic artwork, which is what consumers are really buying.

The University's survey expert, David Franklyn, designed two fundamentally flawed surveys, neither of which made any attempt to address the questions this Court raised in its ruling on the University's motion to dismiss. *See* SMF ¶¶ 111, 114–120; *see generally* Doc. 94-2 ("Franklyn Report"). As explained below, Mr. Franklyn's confusion study primed respondents to refer to the University, used a manipulated and unrealistic stimulus, overcounted confusion, and artificially inflated net "confusion" by using an inadequate control. Courts regularly reject unreliable surveys such as Mr. Franklyn's at the summary judgment stage, *e.g.*, *Componentone, L.L.C. v. Componentart, Inc.*, 2008 WL 4790661, at *24 (W.D. Pa.

Oct. 27, 2008); *see also Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004), and this Court should do so here.

Apart from its flawed survey evidence, the University has nothing but conclusory allegations and unsupported argument. It has no evidence of actual confusion, even though products bearing the allegedly infringing artworks were available on Vintage Brand's website for approximately three years. The University cannot show that it has ever used the historic images used by Vintage Brand as trademarks at all, let alone that those composite images (*i.e.*, images that combine words with designs) are strong trademarks for t-shirts or other merchandise. And it certainly cannot show an intent to confuse, because each page of Vintage Brand's website contains legal disclaimers. To the extent it matters to some subgroup of consumers that merchandise be officially licensed, the University's own evidence shows that those consumers rely on tags and other labeling to identify the "officially licensed" merchandise. The University's infringement claims should be dismissed.

The University's counterfeiting claim is even worse. Counterfeiting is for cases where consumers believe that the defendant's product *is the plaintiff's*, not just that there's some vague relationship between the parties. The University doesn't even attempt to provide evidence of that form of confusion. The counterfeiting claim must be dismissed.

Likewise, the dilution claims fail: PENN STATE is not a famous mark, and

Vintage Brand's non-trademark use of composite historic images does not risk diminishing the distinctiveness of that purported trademark.

The remaining claims merely reiterate the infringement claim and, under controlling law, must fall with it.

## II.    STATEMENT OF FACTS

Vintage Brand sells print-on-demand merchandise bearing vintage artwork derived from its collection of historic memorabilia. Statement of Material Facts ("SMF") ¶¶ 4–8. It sells its merchandise exclusively through its website at www.vintagebrand.com. SMF ¶ 6. Each of the more than 118,000 pages of Vintage Brand's website is prominently branded with Vintage Brand's trademark, SMF ¶¶ 11–12, and the bottom of every webpage on the domain includes a disclaimer in contrasting colors:

> Our products are not affiliated with, licensed, sponsored, or endorsed by any college, team, league, event or licensing entity…. All products are designed by Vintage Brand® and manufactured for Vintage Brand®.

 SMF ¶ 13. Additional disclaimers appear on every Team Page and Product Page. SMF ¶¶ 14–17.

Customers themselves design the products Vintage Brand sells. They may apply the historic images to over a dozen types of products, including t-shirts, sweatshirts, hats, magnets, tumblers, mugs, pennants, wall art, and puzzles. SMF ¶¶ 6, 18–19; Doc. 67 ¶ 83. The products are shipped in packaging bearing the

Vintage Brand trademark, and many products are labeled with the Vintage Brand trademark. SMF ¶ 19.

From 2018 to 2021, Vintage Brand had a Team Page entitled "Penn State Nittany Lions Vintage Designs," on which it made available roughly 35 University-related vintage images, all from historic memorabilia predating 1989, such as game tickets, pennants, decals and buttons. SMF ¶ 20, 22–23; *see also* SMF ¶¶ 7–8. Vintage Brand's gross revenue from items bearing University-related designs was less than $25,000. SMF ¶ 21.

Currently, the University's primary logo for the school is the "Lion Shield Design" (left) and its primary logo for athletics is the "Lionhead Design" (right):

 

SMF ¶¶ 30–32. Vintage Brand has never made the Lion Shield Design or the Lionhead Design available on its website.[1] SMF ¶ 33; *see also* SMF ¶¶ 7–8.

The University's claims focus on Vintage Brand's use of the University's purported marks within the historic, public domain images that Vintage Brand made available to consumers. SMF ¶¶ 23, 42, 48, 50, 56, 69. For example, the University

---

[1] The University does not contend Vintage Brand infringed the Lion Shield Design. *See generally* Doc. 67. But it does complain that Vintage Brand infringed the Lionhead Design, *id.* ¶¶ 33, 49, 80, despite admitting in discovery that Vintage Brand never displayed or made available that design, SMF ¶ 34.

claims that Vintage Brand infringed its rights in the PENN STATE word mark by making available these historic images:



Prior to 1982, the University took no steps to license or prevent third-party use of any of its alleged marks. SMF ¶¶ 80–82. To the limited extent the University "███████████████████████████████████," it exercised no "███████████ ███████████████████████████████" SMF ¶ 81. In 1982, the University decided to develop a program to derive revenue from the licensing of its purported marks on merchandise. SMF ¶ 81–82. Thereafter, the University retained Collegiate Licensing Company ("CLC") as its exclusive licensing agent for retail merchandise. SMF ¶ 83. CLC's licensing was indiscriminate: As of 1988, the University had over 785 licensees for retail merchandise. SMF ¶ 84. By August 3, 2022, the University had reduced that number to 386 to curb "████████████." SMF ¶ 84.

The University licenses its alleged marks through CLC, and it also participates in CLC's "College Vault" trademark maintenance program—a limited licensing program for "███████████████████████████." SMF ¶¶ 85–90; *see also* SMF ¶¶ 77–79. CLC advised the University to partake in the College Vault program to allow the University to "maintain and protect [its] ownership of marks" it was not genuinely using. SMF ¶ 88.

Under both CLC licensing programs, licensees are required to attach a label to all retail merchandise, packaging, and advertising materials identifying "Officially Licensed Collegiate Products" ("Official Label"), as shown below.



SMF ¶¶ 94–100. Since at least 1991, CLC has required the use of the Official Label as part of its "Look for the Label" marketing program, because "the label is the symbol that the products bearing it are licensed." SMF ¶ 96. Websites that sell licensed merchandise prominently advertise the goods as "officially licensed." SMF ¶ 93. The University agrees that, without such notifications, consumers might not know that products decorated with University-related designs are, in fact, licensed. SMF ¶ 93. The University further agrees that consumers' purchases are driven by their desire to express support of or allegiance with the University. SMF ¶ 29; *see also* SMF ¶¶ 9, 18, 27–28, 39–40, 49, 60, 80, 101–02.

### III.   PROCEDURAL HISTORY

The University filed this lawsuit on June 21, 2021. Doc. 1. Vintage Brand interposed various counterclaims for cancellation of the University's trademark registrations. Doc. 31 (Counterclaim IV). The Court denied the University's motion

to dismiss that counterclaim. Doc. 43.

The University's operative pleading contains the following claims: (1) trademark infringement pursuant to 15 U.S.C. § 1114(1)(a); (2) counterfeiting pursuant to 15 U.S.C. §§ 1114(1)(a) and 1117; (3) unfair competition and false designation of origin pursuant to 15 U.S.C. § 1125(a); (4) false advertising and endorsement also pursuant to 15 U.S.C. § 1125(a); (5) dilution pursuant to 15 U.S.C. § 1125(c); (6) dilution pursuant to 54 Pa. C.S.A. § 1124; and (7) common law trademark infringement and unfair competition. Doc. 67 ¶¶ 99–145. Vintage Brand seeks summary judgment on all of those claims.

The only counterclaim on which Vintage Brand seeks summary judgment is for cancellation of the registrations for the Seal Designs.

### IV.   STATEMENT OF QUESTIONS INVOLVED

Whether summary judgment in Vintage Brand's favor is warranted on:

1.    All of the University's claims other than its dilution claims because there is no actionable confusion.

2.    All of the University's claims because the University-related historic images are functional when used ornamentally on merchandise.

3.    The University's counterfeiting claim because the historic images are neither substantially indistinguishable from the University's purported marks nor spurious.

4.    The University's dilution claims because PENN STATE is not a famous mark,

not sufficiently similar to the composite historic images, not used by Vintage Brand as a trademark, and not likely to be or actually blurred or tarnished.

5.     The University's false advertising claim because it does not allege an actionable false statement.

6.     The University's false endorsement claim because the purported "endorsement" comes only from the University's association with the historic images, and because Vintage Brand's website contains numerous disclaimers.

7.     Vintage Brand's counterclaim to cancel the registrations for the Seal Designs because those designs comprise the Coat of Arms of Pennsylvania.

Vintage Brand submits that summary judgment should be granted.

## V.     AUTHORITY AND ARGUMENT

### A.     The University Does Not Own Trademark Rights in the Litigated Images

The University claims that any merchandise bearing University-related images infringes its rights. But there is no evidence the University has ever used the composite public domain images that appear on Vintage Brand products as trademarks. *See* Doc. 67 ¶ 86; *see also* SMF ¶¶ 23, 42, 48, 50, 56, 69. The University's claims rely on illegitimate *dissection* of the composite images. "[M]arks must be compared in their entireties .... It follows from that principle that likelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark." *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed Cir. 1985)

(cleaned up); *ICON Sols., Inc. v. IKON Off. Sols., Inc.*, 1998 WL 314672, at *6 (E.D. Pa. June 15, 1998) (citing McCarthy on Trademarks and Unfair Competition § 11:27 (5th ed., 2023) (formerly § 11:26) (hereinafter "McCarthy")). Dissection is especially inappropriate here, because the composite public domain images come *as a whole* from vintage memorabilia. SMF ¶¶ 7–8.

The University's claims would be weak regardless, because, the University's "use" of the asserted marks amounts to limited licensing[2] for use as ornamental features of merchandise. SMF ¶¶ 36–40, 44–47, 51–53, 57, 64, 67, 70–71, 73–74, 78.[3] Overwhelmingly, consumers aren't buying merchandise with University-related

---

[2] Trademark maintenance programs do not constitute bona fide use of a mark in the ordinary course of trade. *E.g.*, *Procter & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F. Supp. 1185, 1204–07 (S.D.N.Y. 1979), *aff'd*, 636 F.2d 1203 (2d Cir. 1980). Here, CLC's College Vault program was "obviously contrived solely for trademark maintenance purposes." *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1273 (2d Cir. 1974). The University could not identify any reason for the College Vault licensing program other than "to maintain and protect [its] ownership of these marks[.]" SMF ¶ 88; *see also* SMF ¶¶ 85–87, 89–90.

[3] The University's evidence of use is especially weak for the Pozniak Lion and the S-Lion Design. There is no evidence, for example, that the University has ever made bona fide use of the Pozniak Lion Design in connection with apparel; the only "use" offered by the University is on apparel worn by the Lion Ambassadors, a campus student group that wears school-supplied shirts as uniforms to identify them as tour guides. SMF ¶¶ 57–68. The Pozniak Lion Design does not appear on the University's standard licensing art sheets, nor does it appear in the University's Brand Book. SMF ¶ 63. The S-Lion Design appears only in a 2011 Art Sheet related to the College Vault program, and the University could not identify any "use" of the S-Lion Design before it was added to the College Vault trademark maintenance program. SMF ¶¶ 77, 79. The evidence of record shows quintessentially ornamental use of the design and the only admissible evidence of such ornamental use is dated after this lawsuit was initiated. SMF ¶ 78.

imagery because of the highly varied characteristics of the merchandise. <u>They're buying the imagery</u>. *See LTTB LLC v. Redbubble, Inc.*, 840 Fed. Appx. 148 (9th Cir. 2021); *cf. Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1449–50 (3d Cir. 1994) ("The configuration for which protection is sought must not appear to the consumer as a mere component, or the essence, of the product gestalt, but rather must appear as something attached (in a conceptual sense) to function in actuality as a source designator—it must appear to the consumer to act as an independent *signifier* of origin rather than as a component of the good." (emphasis in original)). Indeed, if decorative use of such designs on fan apparel were meaningfully source-designating—much less primarily source-designating—CLC's "Official Label" requirement would be unnecessary. SMF ¶¶ 97–100. CLC regards that requirement as essential. SMF ¶¶ 94–96.

Even if the University's marks are valid, its claims fail because Vintage Brand does not use the composite images as trademarks; it uses the historic artworks as ornamental features of its products. SMF ¶¶ 9, 22. Consumers purchase Vintage Brand merchandise because the artwork serves an important communicative function—it allows them to express their affinity for, or allegiance to, the University and its history—not because the artwork serves to identify the source or sponsor of the tangible merchandise. SMF ¶¶ 9, 18, 27–29, 39–40, 49, 60, 80, 87, 92, 96, 101–02.

**B.**   **The University Cannot Prove Vintage Brand's Use of the Historic Images is Likely to Cause Confusion Regarding the Source of Vintage Brand's Tangible Products**

All of the University's claims are based fundamentally on the assertion that consumers will associate the *imagery* on Vintage Brand's products with the University. But that cannot be the basis of a trademark claim. As the Supreme Court has made clear, only confusion about the origin of tangible goods is actionable under the Lanham Act. *Dastar*, 539 U.S. at 37 (holding that "origin of goods" refers only to "the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods"). While the concept of origin "might be stretched to include not only the actual producer" but the party who stands behind production of the physical product, "origin of goods" is "incapable of connoting the person or entity that originated the ideas or communications that 'goods' embody or contain." *Id.* at 31–32.[4]

In order to state a claim under the Lanham Act or corresponding state law,[5]

---

[4] While the Court in *Dastar* was interpreting the language of Section 43(a) specifically, 15 U.S.C. § 1125(a)(1)(A), the same rule applies in cases of infringement of registered marks under Section 32 despite that section's slightly less specific language. 15 U.S.C. § 1114. It is well established that the principles applicable to registered and unregistered marks are largely the same. *See, e.g.*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *SMJ & J, Inc. v. NRC Heat & Power, LLC*, 912 F.Supp. 2d 189, 201 (M.D. Pa. 2012).

[5] *World Entm't, Inc. v. Brown*, 2011 WL 2036686, at *2 (E.D. Pa. May 20, 2011) ("The test for common law trademark infringement and unfair competition is essentially the same as the test for infringement and unfair competition under the Lanham Act.") (citation omitted).

the University must show that Vintage Brand's use of the historic composite images is likely to cause confusion about the source of the *tangible products*—the t-shirts and other merchandise that Vintage Brand sold. It is not sufficient that consumers understand that the *images* originate from or refer to the University or its athletic teams. *Dastar*, 539 U.S. at 34.

*Dastar*'s focus on the source of tangible goods is especially important here, where the University seeks to restrain Vintage Brand's use of historic public domain images. *Id*. at 33 ("The right to copy, and to copy without attribution, once a copyright has expired … passes to the public." (cleaned up)); *Phoenix Entm't Partners v. Rumsey*, 829 F.3d 817, 829 (7th Cir. 2016) ("When the copyright on [] a creative work expires, enabling any member of the public to copy and use the work without license, it is not a trademark violation simply to display the work without first deleting the mark that was inserted into its content."); *Eastland Music Grp., LLC v. Lionsgate Entm't, Inc.*, 707 F.3d 869, 872 (7th Cir. 2013) ("*Dastar* tells us not to use trademark law to achieve what copyright law forbids.").[6]

Some pre-*Dastar* merchandising cases suggested that plaintiffs could state

---

[6] This rule is also consistent with the First Amendment, given citizens' interests in using clothing and similar items to express a message. *See Gaudiya Vaishnava Soc'y v. City & Cnty. of S.F.*, 952 F.2d 1059, 1063-65 (9th Cir. 1990) (message-bearing items such as t-shirts and jewelry were fully First Amendment-protected noncommercial speech despite being sold); *Ayres v. City of Chicago*, 125 F.3d 1010, 1014 (7th Cir. 1997) (same).

13

claims for trademark infringement when consumers merely associated certain trademarks with the plaintiff. *See Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1012 (5th Cir. 1975) ("The certain knowledge of the buyer that the source and origin of the trademark symbols were in plaintiffs satisfies the requirement of the act."); *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546 (11th Cir. 1985) (similar).

As this Court previously noted, the Fifth Circuit itself has walked back *Boston Hockey*. *See* Doc. 43 at 16 & n.67 (citing *Supreme Assembly, Order of Rainbow for Girls v. J. H. Ray Jewelry Co.*, 676 F.2d 1079, 1084 n.7 (5th Cir. 1982) ("Our cases demonstrate unbroken insistence upon likelihood of confusion and by doing so they reject any notion that a trademark is an owner's 'property' to be protected irrespective of its role in the operation of our markets.")); McCARTHY § 24.10 (*Boston Hockey* "violated a basic rationale of trademark law"). *Boston Hockey* and its progeny are now even more clearly wrong in light of *Dastar*. *See* Stacey L. Dogan & Mark A. Lemley, *The Merchandising Right: Fragile Theory or Fait Accompli?*, 54 EMORY L.J. 461, 500 (2005) (describing *Dastar* as "particularly applicable in the merchandising context").

Under *Dastar*, the University must prove that Vintage Brand's use of historic, public domain images is likely to cause confusion about the source of Vintage Brand's tangible goods. The University has no such evidence.

14

### 1. Empirical Evidence Demonstrates that Consumers Are Not Confused about the Source of Vintage Brand's Tangible Products

Vintage Brand retained Dr. Tülin Erdem,[7] who designed and implemented a survey "to evaluate whether and to what extent consumers are confused regarding (i) the source of Vintage Brand's products as they relate to Penn State or (ii) whether a business relationship exists between Vintage Brand and Penn State." SMF ¶ 121. Dr. Erdem also tested "whether consumers believe that Penn State is responsible for the quality of Vintage Brand's products that bear Penn State-related images," and "the extent to which any apparent consumer confusion is the product of consumers' belief that there is a legal requirement for Vintage Brand to obtain Penn State's permission to use Penn State's name or imagery that originated with Penn State." SMF ¶ 121.

In Dr. Erdem's modified *Eveready* study, qualified respondents were shown Vintage Brand products with historic University-related images in the context of the Vintage Brand website, the only place where Vintage Brand sells its merchandise.[8] After viewing the Vintage Brand homepage and a landing page with various types

---

[7] Dr. Erdem is the Leonard N. Stern Professor of Business Administration and Professor of Marketing at the Stern School of Business, New York University, and Chair of the Stern Marketing Department. SMF ¶ 112.

[8] She tested those images across several different conditions that varied the disclaimer respondents saw, but, because net confusion was so low in all conditions, it was difficult to detect meaningful differences between those conditions. Erdem Report at 32, ¶ 52.

of merchandise on which consumers can choose to print the historic University-related imagery, respondents saw a particular product page and the product in the shopping cart. In the two test conditions, the specific products were sweatshirts with different historic images (the "1929 Penn State Nittany Lions Logo" and the "1950 Penn State Nittany Lions Logo"). Respondents in the control group were shown a sweatshirt with the Seal of the State of Pennsylvania.[9]

**Likelihood of Confusion Survey Test and Control Groups**

| **Test Group 1** *1929 Penn State Nittany Lions Logo* | **Test Group 2** *1950 Penn State Nittany Lions Logo* | **Control Group** *State of Pennsylvania Seal Logo* |
|---|---|---|
|  |  |  |

---

[9] Dr. Erdem used the same purchase flow format in the control condition in order to isolate the effect of the images themselves. The University criticizes Dr. Erdem for using the purchase flow context on the ground that its claim is not specifically about the images on the shirts, but about the entire website context. But Dr. Erdem's approach is correct: if consumers are not confused about the source of Vintage Brand's products because of the images on those products, then it has the legal right to sell those products. If it has the right to sell the products, then Vintage Brand is entitled to tell consumers what it is selling. *See Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 352 (9th Cir. 1969) (repair shop allowed to use Volkswagen mark to advertise that it repaired Volkswagen vehicles); *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 214 (3d Cir. 2005) (citing *Volkswagenwerk*).

Respondents were all then asked (1) who they thought put out the sweatshirt they saw (measuring confusion about actual source), and (2) whether they thought the entity that put out the sweatshirt had a business relationship with any other entity (measuring confusion about sponsorship or affiliation). The net confusion levels are extremely low in both test conditions: 1% in Test Group 1, and only 12% in Test Group 2.[10] *See Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1149 (10th Cir. 2013) (net confusion rate of 6.5% (subtracting 16.7% control cell confusion from 23.15% test cell) was "insignificant").[11]

Those results are sufficient to dispose of the University's claims. But Dr. Erdem's study shows more: Overall net confusion among respondents who believed their responses were "definitely correct" or "very likely correct" was between 3% and 9%. SMF ¶ 128; *see* MCCARTHY § 32:189 (survey results below 10% "can become evidence which will indicate that confusion is not likely"). These are more meaningful figures, because they remove subjects who admitted that their answers

---

[10] The "net" confusion level refers to the percentage of "confused" respondents (those who referred to Penn State) after subtracting the percentage of respondents who were "confused" (referred to Penn State) in the control condition. Net confusion is the right measure because Penn State responses in the control condition cannot be attributed to features of the control stimulus that are University trademarks—those responses indicate that some percentage of respondents are guessing or naming Penn State for reasons unrelated to the stimuli themselves, and there is no reason to believe respondents in the test condition are different. SMF ¶ 125.

[11] Net confusion with respect to who puts out the test products (true source confusion) is -3% in Test Group 1 and 4% in Test Group 2. SMF 127.

were only "somewhat likely correct" or that they were "just guessing."[12] And when Dr. Erdem controlled for respondents' belief that the law required a licensing relationship, net confusion based on perception of a business relationship, already very low, fell further (4% for Test Group 1, and 9% for Test Group 2). SMF ¶¶ 129–30.

It should be no surprise that Dr. Erdem's studies show no confusion: Vintage Brand's tangible products are just substrate for the historic artwork.[13] Consumers want that imagery not because it tells them who makes the merchandise, but to show their allegiance to the University and its history. *Bd. of Governors of Univ. of N. Carolina v. Helpingstine*, 714 F. Supp. 167, 173 (M.D.N.C. 1989); SMF ¶¶ 9, 18, 29, 39–40, 60, 96, 101–02. That is, consumers are using the imagery unidirectionally: The attendees waving signs at a political rally endorse their

---

[12] Weakly-held beliefs are less likely to affect consumer behavior. *See* Jon A. Krosnick & Robert P. Abelson, *The Case for Measuring Attitude Strength in Surveys*, in QUESTIONS ABOUT QUESTIONS: INQUIRES INTO THE COGNITIVE BASES OF SURVEYS 177–78 (1992). Additionally, weakly-held beliefs are more likely to be an artifact of the tendency of subjects to want to supply a helpful response to survey questions even when they do not, in fact, have an opinion. *See* Philip E. Converse, *Attitudes and Non-Attitudes: Continuation of a Dialogue*, in THE QUANTITATIVE ANALYSIS OF SOCIAL PROBLEMS 168–89 (1970); *see also* Lee Sigelman & Dan Thomas, *Opinion Leadership & the Crystallization of Nonattitudes: Some Experimental Results*, 16 POLITY 484, 484 (1984) ("What is it that prompts as many as one respondent in three to express an opinion, pro or con, on a given issue with absolutely no information or knowledge on the matter to guide his or her response?").

[13] "[T]he law is clear that a trademark cannot serve as a trademark for itself." *Pellegrino v. Epic Games, Inc*., 451 F. Supp. 3d 373, 391 (E.D. Pa. 2020).

candidate, but the candidate does not endorse any particular attendee. Likewise, consumers of Vintage Brand's products are expressing their own preferences, a use that is fundamentally ornamental rather than source-indicating. *See Univ. of Pittsburgh v. Champion Products, Inc.*, 566 F. Supp. 711, 722 (W.D. Pa. 1983), *vacated* (Feb. 2, 1984).

> When fans buy Harvard shirts, Chicago Cubs hats, Rolling Stones tattoos, or Winnie the Pooh cakes from the local bakery, they are doing so not because they believe that Harvard or the other trademark holders made or sponsored the goods, but because the trademark in this context serves an important communicative function for them.

Dogan & Lemley, *supra*, at 500; *see also id.* at 504.[14]

As the Ninth Circuit explained in *International Order of Job's Daughters v. Lindeburg & Co.*,

> It is not uncommon for a name or emblem that serves in one context as a collective mark or trademark also to be merchandised for its own intrinsic utility to consumers. We commonly identify ourselves by displaying emblems expressing allegiances. Our jewelry, clothing, and cars are emblazoned with inscriptions showing the organizations we belong to, the schools we attend, the landmarks we have visited, the sports teams we support, the beverages we imbibe. Although these inscriptions frequently include names and emblems that are also used as collective marks or trademarks, it would be naive to conclude that the name or emblem is desired because consumers believe that the product somehow originated with or was sponsored by the organization

---

[14] Vintage Brand moved to exclude University expert David Franklyn's first survey, which purported to evaluate whether the images used by Vintage Brand "make the commercial impression of trademarks." Doc. 94. That survey used a made-up methodology that did not address the only relevant question in this case: whether those historic images function as trademarks for Vintage Brand's physical goods. Mr. Franklyn also inflated his results by failing to properly account for responses to the control stimulus.

the name or emblem signifies.

633 F.2d 912, 918 (9th Cir. 1980); *see also Supreme Assembly*, 676 F.2d at 1084 & n.7.

The ornamentality of the historic images explains why virtually none of the respondents in Dr. Erdem's study believed the University was responsible for the quality of Vintage Brand's products. *See* SMF 132 (Erdem Report Fig. 8.1). This result confirms that, while consumers may associate the images with the University, they do not view the University as the *source* of Vintage Brand's products.

By contrast, the University's "confusion" survey is fundamentally flawed and cannot prevent summary judgment. *See* Erdem Report at 43–56, ¶¶ 71–99; *see generally* Doc. 94-5 ("Neal Report"). First, Mr. Franklyn's survey made no attempt to address the questions this Court raised in its ruling on the University's motion to dismiss. Verbatim responses to Mr. Franklyn's follow-up questions demonstrate that very many of the purportedly "confused" responses were attributable to respondents' beliefs that anyone referencing the University must have legal permission. SMF ¶ 115. Mr. Franklyn did not take those responses into account in any way.

Mr. Franklyn also artificially inflated net confusion by using an entirely inappropriate "control" stimulus that did not function as a control at all. A control is supposed to be as close as possible to the test stimulus, except for the allegedly infringing features. *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D. N.Y.

2010); McCarthy § 32:187. Mr. Franklyn's control stimulus has almost nothing in common with the test stimuli, except that it also shows a t-shirt. *See* SMF ¶¶ 116–117. Even worse, Mr. Franklyn's "control" product is emblazoned with Vintage Brand's trademark—a trademark that happens to have the word "BRAND" in it. *Id.* The Vintage Brand name also appears in the product description on the control stimulus, unlike the test stimulus. *Id.*



It is common sense that respondents seeing the Vintage Brand mark on Mr. Franklyn's purported "control," along with the Vintage Brand marks that appear elsewhere on the Vintage Brand website in Mr. Franklyn's survey, are more likely to identify Vintage Brand, and not the University, as the source. Mr. Franklyn's control *suggests a particular source* and thus artificially deflates the number of people who will identify the control stimulus with the University, thus correspondingly *inflating* the apparent level of "net" confusion. *Cf. Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*, 511 F. Supp. 2d 482, 499–500 (E.D. Pa. 2007) (criticizing the use of "Classic" as a control mark because it was not "neutral"); *see*

21

*also Limited v. Macy's Merchandising Group Inc*, 2016 WL 4094913, \*10 (S.D.N.Y. 2016), *aff'd*, 695 Fed. Appx. 633 (2d Cir. 2017) (control inadequate because not sufficiently similar to accused webpage); *THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 181 (S.D.N.Y. 2011) (control inappropriate because it "shared very few similarities with" items at issue).

These flaws in Mr. Franklyn's survey render it entirely unreliable. But the problems don't stop there. Mr. Franklyn also repeatedly primed respondents with the University's name in the screener questions. Mr. Franklyn did not use the data from those responses in any way. SMF ¶ 119. The only possible effect of those questions was to inflate the number of "Penn State" responses to later questions. *Id.*

Moreover, Mr. Franklyn removed, without explanation or a discernable reason, important context from the test stimulus by cropping out the www.vintagebrand.com URL. Neal Report at 32–33, ¶ 5.5; SMF ¶ 118. Mr. Franklyn's survey design admits that commercial context is relevant and important here: his test stimulus is a screenshot from the Vintage Brand website, not simply an image of a Vintage Brand product. But he distorts that context by removing highly relevant information about source, misrepresenting reality. *Id.* Finally, Mr. Franklyn inexplicably coded as "confused" responses that did not specifically refer to "Penn State" and instead referred to "college," "university," or even "NCAA." He counted those responses even though respondents were repeatedly primed to answer "Penn

22

State." *Id*. at 35–36, ¶ 5.7. There is No Other Evidence of Relevant Confusion

Courts in the Third Circuit typically evaluate likelihood of confusion using the factors set forth in *Interface Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983). But the *Lapp* factors assume a comparison between two traditional source-identifying trademarks, and casual application of those factors in the markedly different context of decorative or ornamental display of a design risks ignoring marketplace realities. *See* MCCARTHY § 23:11.50 ("a non-trademark use is unlikely to cause actionable confusion"). The Court should follow the approach taken in *University of Pittsburgh*, which focused on actual confusion and the accused infringer's intent. 566 F. Supp. at 713, 720. That approach is consistent with the Third Circuit's longstanding embrace of flexibility. *See, e.g.*, *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215 (3d Cir. 2000) ("Not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting.").

### (a)     *Actual Confusion*

Vintage Brand's allegedly infringing products appeared on Vintage Brand's website for approximately three years before Vintage Brand voluntarily disabled those pages. Yet, there is no evidence of any actual confusion during that time. *Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 205 (3d Cir. 1995) ("If a defendant's product has been sold for an appreciable period of time without evidence

23

of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future.").

The only "evidence" of actual confusion the University has offered comes from the deposition testimony of Meghan Maffey. SMF ¶ 103; *see also* SMF ¶ 10. Ms. Maffey is the President of the University's Washington, D.C. alumni chapter, on whose behalf she sent over one hundred emails soliciting donations; she is not an ordinary consumer. SMF ¶ 104. Still, Ms. Maffey does not remember the Vintage Brand website specifically, and she is not aware of whether the Seal Designs or even the PENN STATE text appeared on the website. SMF ¶¶ 105, 107.[15] Indeed, she only recalled seeing "[t]he paw print and the chipmunk logo" on Vintage Brand's website. SMF ¶¶ 105–06. But neither of those images were ever on the website. SMF ¶¶ 105–07.

It is no surprise that Ms. Maffey doesn't have a specific memory of the website—she made clear that, before speaking with the University's counsel, she did not even consider whether Vintage Brand was a licensee or otherwise affiliated with the University. SMF ¶ 104. This is not evidence of a consumer reporting actual confusion, but of the University trying (and failing) to solicit evidence of confusion

---

[15] The University-related Team Page was not even available when Ms. Maffey claims she viewed it. SMF ¶ 108.

from a loyal alum.[16] The fact that the University has nothing else speaks volumes. *See Univ. of Pittsburgh*, 566 F. Supp. at 720 ("vague and infrequent" evidence of actual confusion implied "there is no likelihood of confusion").

### (b)    *Intent to Confuse*

A defendant's intent is probative of whether confusion is likely. "This inquiry goes to more than just intent to copy, it goes to *intent to confuse* by copying[.]" *Cornette v. Graver*, 473 F. Supp. 3d 437, 465 (W.D. Pa. 2020) (emphasis added) (citing *A & H Sportswear*, 237 F.3d at 226). In *University of Pittsburgh*, the court found confusion was not likely in large part because "[t]he soft goods products at issue [were] clearly marked as made by Champion. They [were] not advertised, described or denominated as 'official' or in any way sanctioned by Pitt." 566 F. Supp. at 720.

The record here is even more compelling than that in *University of Pittsburgh*. Not only does Vintage Brand not make any suggestion that its products are "official" or sanctioned by the University, Vintage Brand's website is replete with prominent disclaimers of any such relationship. SMF ¶¶ 13–17. Vintage Brand's house mark appears on each page of the website, product packaging, and even some of the blank goods. SMF ¶ 12, 19. Vintage Brand is emphatically not using any type of "Official

---

[16] Ms. Maffey also made clear that, whatever her views are now, they are based on her assumption that any merchandise making reference to the University must be licensed. SMF ¶ 110.

Label," which, as Vintage Brand's licensing agent CLC makes clear, serves as the true source-indicator on the University's licensees' goods. SMF ¶ 97 (CLC communication regarding efforts to make Official Label "██████████

██████").

### (c)    The Other Likelihood of Confusion Factors Favor Vintage Brand

The other *Lapp* factors also favor Vintage Brand. Most significantly, the University cannot show that it has ever used the composite images used by Vintage Brand as trademarks at all, let alone that those images are *strong* trademarks for t-shirts or other merchandise. The University hardly even uses any of its asserted marks except by licensing them for decorative use on merchandise, and the "vault" program deliberately limits the extent of the use. SMF ¶¶ 36–40, 44–47, 51–53, 57, 64, 67, 70–71, 73–74, 78.

The composite historic images used by Vintage Brand are also not similar to the asserted marks. The University improperly dissects the images in order to isolate certain features, but with a single insignificant exception, Vintage Brand has never used any of the asserted marks except as parts of composite ornamental images. *See* Doc. 67 ¶ 86; *see also* SMF ¶¶ 23, 42, 48, 50, 56, 69.[17] Dissection is particularly inappropriate here, where Vintage Brand uses composite images drawn *as a whole*

---

[17] Vintage Brand made available the S-Lion Design itself, but, as noted *supra* at Note 3, the University has never made bona fide use of the S-Lion Design.

from vintage memorabilia.

## C.   Vintage Brand's Historic Images are Aesthetically Functional

Although functionality can appropriately be used to find a putative mark invalid, it can also establish that a defendant's use is protected even if the mark is otherwise valid. When the feature is the actual benefit that the consumer wishes to purchase for reasons independent of any source-related meaning, use of that feature is not within the scope of the trademark owner's rights. When use is functional, that is, not source indicating, no likelihood of confusion analysis is needed.

The images here are what consumers seek to buy. SMF ¶¶ 9, 18, 27–29, 39–40, 49, 60, 80, 87, 92, 96, 101–02. Consumers who want to express their affiliation with the University are a different market from consumers who want to express their affiliation with any other university. Thus, the images are central to the articles' uses and purposes, as well as to its quality for the interested consumers. Such uses are not infringing even if uses of the same feature in other contexts (such as on hangtags or for promoting educational services) might primarily have source-indicating value and therefore fall within the scope of the claimant's rights. *See LTTB*, 840 Fed. Appx. at 150–51; *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 228 (2d Cir. 2012) (finding that Louboutin's valid rights in a contrasting red sole did not extend to YSL's use of an all-red shoe; holding that no confusion analysis was necessary because YSL wasn't using the Louboutin mark);

*Job's Daughters*, 633 F.2d at 918; *Supreme Assembly*, 676 F.2d at 1084; *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 925 F. Supp. 2d 1067, 1074–75 (C.D. Cal. 2012); *Univ. of Pittsburgh*, 566 F. Supp. at 716; *De La Salle High School of Concord v. Sportswear, Inc.*, Case No. C11-00182 (Contra Costa, Cal. Super. Ct., Oct. 22, 2012).

Absent the ability to decorate goods with the relevant historical images, Vintage Brand simply cannot compete with the University's licensees—and the resulting monopoly would be allocated for reasons unrelated to the University's reputation as a source for quality goods. *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001) (features are aesthetically functional when exclusive use would put competitors at a "significant, non-reputation-related disadvantage").

The University has no evidence that consumers purchase University-related merchandise *because of* any source- or quality-indicative function of the decorations appearing on the merchandise. At most there exists a hypothetical (and unproven) group of consumers that want their purchases to benefit the University financially. Those consumers already have plenty of information to direct their purchases because "officially licensed" merchandise is easily identifiable by the holographic tags attached to those products—a signal CLC has consistently emphasized as central. SMF ¶¶ 93–101; *see also* Dogan & Lemley, *supra*, at 485 (describing exactly this market distinction).

**D.**   **The University's Counterfeiting, Dilution, and False Advertising and Endorsement Claims Fail for Additional Reasons**

**1.  The University's Counterfeiting Claim is Not Colorable**

"[C]ounterfeiting is the 'hard core' or 'first degree' of trademark infringement that seeks to trick the consumer into believing he or she is getting the genuine article, rather than a 'colorable imitation.'" *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012) (quoting MCCARTHY § 25:10)); *see also* 130 Cong. Rec. H12076, at H12078 (Daily Ed. Oct. 10, 1983) (Joint statement on 1984 trademark counterfeiting legislation) ("arguable, but not clear-cut, cases of trademark infringement" are not counterfeiting). As such, the requirements for establishing the offense are strict. The University cannot meet any of them.

*(a)     Many University Marks Fail at the Threshold*

Although largely academic for the reasons discussed below, the University's counterfeiting claim is exceptionally overbroad. That claim encompasses all of the University's asserted marks except for the Lionhead Design and the S-Lion Design. Doc. 67 ¶¶ 106–12. But counterfeiting requires that the goods on which the allegedly spurious mark is used be "the same goods or services as are covered by" the plaintiff's registration. *Playboy Enterprises, Inc. v. Universal Tel-A-Talk, Inc.*, 48 U.S.P.Q.2d 1779, 1998 WL 288423, at *4 (E.D. Pa. June 3, 1998) (citing 15 U.S.C. § 1116(d)(1)(B)(i)). The registration of the Nittany Lion Frankfurter Design covers only "frankfurters," which Vintage Brand has never sold. SMF ¶ 55. The University

29

has never made bona fide use of the Pozniak Lion for apparel, so no counterfeiting claim can be based on registration of that purported mark. 15 U.S.C. § 1116(d)(1)(B) (counterfeiting remedies only available when mark is registered and "in use" on "such goods" as are registered). Nor can a counterfeiting claim be based on registrations of the Seal Designs (Reg. Nos. 1,276,712 and 5,877,080), because those registrations are invalid and subject to cancellation as set forth *infra*, at Part V.E.

### (b) *Vintage Brand's Designs Are Not Substantially Indistinguishable From the University's Registered Marks*

A "counterfeit" in trademark law is "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. §§ 1127, 1116(d)(1)(B)(ii). The heightened similarity required by the substantially indistinguishable prong is exacting: "a mark that differs from a registered mark by a few letters, let alone one or two words," cannot be a counterfeit. *Lontex Corp. v. Nike, Inc.*, 384 F. Supp. 3d 546, 557 (E.D. Pa. 2019); *see also Colgate-Palmolive Co. v. J.M.D. All-Star Import & Export Inc.*, 486 F. Supp. 2d 286, 289-90 (S.D.N.Y. 2007) (rejecting counterfeit claim where word and design differences, shown below, created distinguishability despite quite similar impressions).

 

Counterfeiting analysis requires comparison of a claimed trademark with the

purportedly counterfeit composite design as a whole, without dissecting and comparing constituent elements. *See Lontex*, 384 F. Supp. at 557–58; MCCARTHY § 23:41. Further, because counterfeiting is concerned with passing off, courts consider how the genuine and counterfeit products "appear[] in the marketplace, rather than how two marks appear in the abstract." *Lontex Corp.*, 384 F. Supp. 3d at 557 (cleaned up); *see also Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1076–77 (9th Cir. 2020) (finding defendant's EYE DEW not counterfeit despite identical EYE DEW mark because of differences in the products' appearance).

The University's counterfeiting claim fails for a simple reason: a side-by-side comparison makes abundantly clear that none of Vintage Brand's composite historic designs alleged to be counterfeit are substantially indistinguishable from the University's asserted marks. Doc. 67 ¶ 86; *see also* SMF ¶¶ 23, 42, 48, 50, 56, 69. A factfinder would have to dissect these images to find in the University's favor; for example, dissecting the TPSU text from the Seal Design (below left), and further dissecting the Seal Design from other elements of the composite design used by Vintage Brand (below right).



In addition to the marked differences between the University's asserted marks

31

and Vintage Brand's composite historic designs, substantial indistinguishability does not exist here because Vintage Brand's house mark appears prominently on the top of each page of its website, as well as its packaging and various physical goods. SMF ¶¶ 12, 19; *see also Arcona, Inc.*, 976 F.3d at 1081 ("it is implausible that a consumer would be deceived because the products had their respective housemarks … prominently on the packaging"). And each Vintage Brand webpage contains prominent disclaimers. SMF ¶¶ 13–17; *see also Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 468 (S.D.N.Y. 2017) (rejecting counterfeiting claim because, among other reasons, disclaimers created important contextual difference). That contrasts starkly with the marketplace context of the University's licensed goods, which are explicitly described as "officially licensed" and which each have affixed the contractually required Official Label. SMF ¶¶ 93–101.

### (c)    *There Is No Likelihood of Confusion*

The counterfeiting provision of the Lanham Act contemplates additional remedies for particularly egregious infringements. But no remedy of any kind is available unless the plaintiff can prove that confusion is likely. 15 U.S.C. § 1117(b) (referring to violations of § 1117(a), which requires infringement of a registered mark); *see Arcona, Inc.*, 976 F.3d at 1078–79 (confusion is a predicate for a counterfeiting claim); *Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 818 (5th Cir. 2019) (same); *Kelly-Brown v. Winfrey*, 717 F.3d 295, 315

32

(2d Cir. 2013) (same). The University cannot prove that confusion is likely.

> ### (d)   Vintage Brand's Designs Do Not Indicate Who Made the Underlying Product and Thus Cannot Be Counterfeit

To be counterfeit, an accused mark "must *both* be substantially indistinguishable from the registered mark *and* be 'spurious[.]'" *Illinois Tool Works Inc. v. J-B Weld Co., LLC*, 469 F. Supp. 3d 4, 9 (D. Conn. 2020) (emphasis in original). The Lanham Act does not define "spurious," so courts look to Black's Law Dictionary,[18] which defines the term as "[d]eceptively suggesting an *erroneous origin*; fake." *Spurious*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added). Confusion as to *sponsorship or affiliation* is insufficient as a matter of law. Consumers must believe the infringer's product is in fact the plaintiff's product. *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 95 n.18 (2d Cir. 2020); *Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC*, 2019 WL 274967, at *3 (S.D.N.Y. 2019) (counterfeiting occurs only if a substantially identical mark is used "to pass off the infringer's product as the original, rather than merely presented in a manner likely to confuse some consumers as to the origin or sponsorship of the infringer's product").

The evidence makes clear that virtually no one thinks the University is the

---

[18] *Lontex Corp.*, 384 F. Supp. 3d at 555; *Tiffany & Co.*, 971 F.3d at 95 n.18; *United States v. Chong Lam*, 677 F.3d 190, 202 (4th Cir. 2012).

actual source of Vintage Brand's t-shirts and other merchandise; no reasonable person could. Erdem Report at 30–33, ¶¶ 48–55. The University is not in the business of making merchandise; it is an institution of higher education. SMF ¶ 24. Vintage Brand sells its products on its own prominently-branded website, where it also sells merchandise with imagery associated with hundreds of other colleges and sports teams. SMF ¶¶ 11–12.

In any event, a mark cannot be counterfeit if it is not applied to a product as a source-indicative trademark in the first place. *Tiffany*, 971 F.3d at 95 n.18 ("[B]ecause terms not used as marks are not 'spurious,' they cannot, as a matter of law, be *counterfeit*." (emphasis in original)). Vintage Brand's retro designs are quintessentially ornamental features and do not serve as "an independent *signifier* of origin rather than as a component of the good." *Duraco Products, Inc.*, 40 F.3d at 1450 (emphasis in original).

### 2.  The Undisputed Facts Fail to Establish Dilution

The University's claims for dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), and 54 Pa. C.S.A. § 1124 are limited to the PENN STATE text. Doc. 67 ¶¶ 126–40. Only the owners of famous marks—defined as "widely recognized by the general consuming public"—have a dilution claim, precluding "niche fame" from serving as a basis for a dilution claim. *Dille Family Tr. v. Nowlan Family Tr.*, 276 F. Supp. 3d 412, 435 (E.D. Pa. 2017) (citation omitted). Because

courts "construe Pennsylvania dilution law in accordance with federal law," and niche fame "is a creature of judicial construction of federal law," niche fame is no longer sufficient for purposes of state law. *Componentone, L.L.C. v. Componentart, Inc.*, 2007 WL 4302108, at *3 (W.D. Pa. Dec. 6, 2007).

There is a key difference between federal and Pennsylvania dilution law: Federal law covers uses of a nationally famous mark that are "likely to cause dilution," 15 U.S.C. § 1125(c)(1), while the plain language of Pennsylvania's anti-dilution statute requires a showing that the alleged use (of a mark that is famous state-wide) actually "causes dilution." 54 Pa. C.S.A. § 1124; *Dille Family Tr.*, 207 F. Supp. 3d at 548; *cf. Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 432–33 (2003) (interpreting such language to require actual, not mere likely, dilution).[19] Consequently, establishing dilution under Pennsylvania law is more difficult than under federal law, with the exception that fame need only be shown in Pennsylvania. 54 Pa. C.S.A. § 1124.

### *(a)     The PENN STATE Text is Not Famous*

Dilution does not require confusion; this exceptional scope of protection is granted only to a small number of famous marks, those that qualify as a "household name" throughout the United States. *Coach Servs., Inc. v. Triumph Learning LLC*,

---

[19] The actual dilution requirement is contained in the plain language of the statute, distinguishing it from the judicially created concept of niche market fame, and thus remains good law in Pennsylvania.

668 F.3d 1356, 1373 (Fed. Cir. 2012) (noting that "[i]t is well-established that dilution fame is difficult to prove"); *DigitAlb, Sh.a v. Setplex*, LLC, 284 F. Supp. 3d 547, 557 (S.D.N.Y. 2018) (dilution is for marks that are "so well-known that they are essentially household names, such as Coca–Cola, Nike, or Budweiser") (cleaned up). Thus, courts "frequently grant summary judgment in favor of defendants" on dilution claims. *Navajo Nation v. Urban Outfitters, Inc.*, 2016 WL 3475342, at *4 (D.N.M. May 13, 2016); *see also* MCCARTHY § 24:104 (courts should be "rigorous and demanding" in fame inquiry). Fame is the requirement; the factors given by the statutes are only guides to that determination. 15 U.S.C. § 1125(c)(2)(A)(i)–(iv); 54 Pa. C.S.A. § 1124(1)–(8).

***Inherent Distinctiveness***. The text PENN STATE is geographically descriptive and, therefore, not inherently distinctive.[20] The University conceded as much by seeking registration under Section 2(f) of the Lanham Act in response to the USPTO's initial refusal to register the mark that ultimately issued as Registration No. 5,766,698. SMF ¶ 38; MCCARTHY § 15:68. A lack of inherent distinctiveness weighs strongly against fame. *Coach Servs., Inc.*, 668 F.3d at 1373. The geographic descriptiveness is also related to the University's lack of exclusive rights over many indicia of the state of Pennsylvania, including the shorthand "Penn."

---

[20] *Penn*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th ed.) ("**Penn** *or* **Penna** *abbr* Pennsylvania").

36

***Advertising Expenditures and Revenue***. The University's evidence of sales and advertising is insufficient to allow a factfinder to infer fame. *Steak Umm Co., LLC v. Steak 'Em Up, Inc.*, 2011 WL 3679155, at *8 (E.D. Pa. Aug. 23, 2011) (citing MCCARTHY § 24:106). The University has only produced specific marketing numbers for the years 2018 through 2022. SMF ¶ 91. Those figures are irrelevant because they are from after Vintage Brand began selling the accused merchandise. *See* 15 U.S.C. §1125(c)(1); *S&P Glob. Inc. v. S&P Data LLC*, _ F. Supp. 3d _, 2022 WL 3098096, at *11 (D. Del. Aug. 4, 2022) (fame must be proven to precede defendant's first use).[21] Even if the numbers were relevant, they are emphatically insufficient. *See Coach Servs., Inc.*, 668 F.3d at 1367, 1374–76 (COACH mark not famous despite $30–$60 million in annual advertising expenditures).

The University's evidence of sales revenue is likewise insufficient. CLC's reports show annual royalties from 2011 to 2018 ranging from roughly $▮ million to $▮ million, with gross revenue being $▮ million to $▮ million. SMF ¶ 90. A factfinder could not infer fame from those figures. *See Bd. of Regents, Univ. of Texas Sys. ex rel. Univ. of Texas at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 677–78 (W.D. Tex. 2008) (institution identified by CLC as "the number one university for licensing royalties" with annual retail sales "total[ing] nearly $400

---

[21] The only pre-2018 information the University has produced comes from annual licensing reports from CLC. SMF ¶ 91. Those reports do not demonstrate advertising expenditures whatsoever.

million" could not establish fame of primary design mark). The sales numbers lag behind other "peer" institutions. SMF ¶ 90; *see Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 698–99 (W.D. Ky. 2010), *aff'd*, 679 F.3d 410 (6th Cir. 2012) (trade dress not famous despite annual advertising expenditures of $22 million and annual sales of 800,000 cases because "Maker's Mark is not the nation's largest whisky producer" and "market dominance tracks fame"). Anti-dilution laws are for the leaders of the pack, not for less-successful pack members.

No reasonable factfinder could consider the University's advertising and sales figures evidence of the fame of the PENN STATE word mark, because all of the information the University has produced is aggregate data not broken down by mark. SMF ¶¶ 90–91. There is no way to know how much consumer recognition can be attributed to any one of the multiple marks the University licenses. *See S&P Glob. Inc.*, 2022 WL 3098096, at *12 (roughly $100 million in annual advertising expenditures and $4.7 billion in annual revenue not probative of fame because the figures were not specifically tied to asserted marks). Moreover, the record does not permit a factfinder to determine what percentage is attributable to advertising and sales outside of the United States, much less outside Pennsylvania. *See* Doc. 67 ¶ 17. The University had the burden of producing evidence of fame sufficient to avoid summary judgment; its vague and general evidence does not satisfy that burden.

***Actual Recognition***. Finally, "[t]he lack of survey evidence leaves the Court

with little to rely on as to … the extent of actual recognition of the mark." *Maker's Mark Distillery, Inc.*, 703 F. Supp. 2d at 698. The University cannot simply rely on rankings of its educational or athletic programs, because that is not evidence that the PENN STATE word mark is famous *as a trademark*, much less as a trademark for merchandise. Moreover, "[f]ame in the trademark context must be based upon evidence and case law, not upon the personal opinion of industry commentators." *Id*; *see also Coach*, 668 F.3d at 1374–75 (references to plaintiff as one of many in a list not probative of fame).

Nor is a high level of recognition among students and potential students sufficient for "household name" status, given that most Americans are not in this category. *Varsity Spirit LLC v. Varsity Tutors, LLC*, 2021 WL 9893514, at *20 (N.D. Tex. Sept. 17, 2021).[22] Indeed, the University conceded in discovery that the target of its goods and services bearing any of its alleged marks are "students, alumni, and faculty of [the University]" and "fans and supporters of [the University]," as opposed to the general consuming public, either in Pennsylvania or the United States. SMF ¶ 92; *see also* SMF ¶ 80. Recognition by this limited audience cannot support a finding of fame. *See Univ. of Texas at Austin*, 550 F. Supp. 2d at 678 (national prominence of collegiate athletics insufficient to support finding of fame as a matter

---

[22] The meager number of individuals subscribing to or following the University's social media accounts cuts strongly against a finding of fame. SMF ¶ 41.

of law). The University must show that its mark is "widely recognized by the general consuming public of the United States as a designation of source" of its products. 15 U.S.C. § 1125(c)(2)(A). It cannot make that showing.

### (b)    Vintage Brand's Historic Designs Are Not Sufficiently Similar to the PENN STATE text

"Courts have repeatedly rejected dilution claims unless the marks are essentially the same, which they are not here." *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 379 (D.N.J. 2002) (collecting cases). The University only claims dilution of the PENN STATE word mark, but Vintage Brand has only made available composite historic images in which that text is stylized and incorporated in a much larger context. SMF ¶ 42. A finding of dilution would necessarily require improper dissection of the composite images.

### (c)    Vintage Brand is Not Using the Historic Images as Trademarks

By their plain language, both Section 43(c) and Pennsylvania's anti-dilution law are limited to a junior user's "use of a *mark or trade name*." 15 U.S.C. § 1125(c)(1) (emphasis added); 54 Pa. C.S.A. § 1124 (same). That is, the University's dilution claim is only colorable if Vintage Brand "used the [PENN STATE text] as [Vintage Brand's] own mark to identify its own goods or services." *Pellegrino*, 451 F. Supp. 3d at 390; *see also* Stacey L. Dogan & Mark A. Lemley, *The Trademark Use Requirement in Dilution Cases*, 24 SANTA CLARA COMP. &

40

HIGH TECH. L.J. 541 (2008). Vintage Brand is not making a source-indicative trademark use of any of the historic imagery. *See Duraco Products, Inc.*, 40 F.3d at 1450; *cf. Tiffany & Co.*, 971 F.3d at 95 n.18.

For similar reasons, use by a consumer to identify herself as a supporter of the University can't cause dilution or likely dilution because it doesn't create a new trademark meaning. *Designer Skin, LLC v. S & L Vitamins, Inc.*, 560 F. Supp. 2d 811, 822 (D. Ariz. 2008); *Allied Interstate LLC v. Kimmel & Silverman P.C.*, 2013 WL 4245987, *4 (S.D.N.Y. Aug. 12, 2013); *cf. Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 111–12 (2d Cir. 2010) (eBay's referential use of Tiffany mark could not dilute because it did not create new trademark meaning).

### (d)   The University Cannot Establish Likely or Actual Dilution

The University submits no evidence that actual dilution—the diminution of the ability of PENN STATE to uniquely identify the University—has occurred. *See Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 854 (D. Del. 2006) (no actual dilution without consumer survey or "circumstantial evidence, such as identical marks"). Nor is there any evidence that Vintage Brand's use is likely to diminish the distinctiveness of the PENN STATE word mark. MCCARTHY § 24:120 ("The fact that people 'associate' the accused mark with the famous mark does not in itself prove the likelihood of dilution by blurring."). To the contrary, consumers' use of images to show support for the University, if anything, strengthens rather than

blurs the connection between the term and the University.

A key factor here is the extent to which the University's use has been substantially exclusive. 15 U.S.C. § 1125(c)(2)(B)(iii). Because of the already-widespread use of "Penn" to describe Pennsylvania and as a shorthand reference to a different university (the University of Pennsylvania), no reasonable factfinder could find that defendant's use is likely to dilute the mark further. *Hershey Co. v. Promotion in Motion, Inc.*, 2013 WL 12157828, at *25 (D.N.J. Jan. 18, 2013) ("Where there are several identical or very similar marks, a new junior user that may have some similarities to the senior mark is unlikely to cause any significant further dilution"); MCCARTHY § 24:120. Indeed, the record showing decades of uncontrolled use prior to 1982 shows that the claimed mark was unaffected by rampant ornamental and referential third-party use. SMF ¶¶ 81–82.

Dilution by tarnishment, asserted only as to the federal claim, Doc. 67 ¶¶ 130–31, 138, "typically involve[s] … 'a clearly unwholesome or degrading context.'" *Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*, 2022 WL 605724, at *19 (D. Del. Jan. 25, 2022) (quoting MCCARTHY § 24:89). Vintage Brand's historic images allow consumers to celebrate the positive history of the University's athletic programs. SMF ¶¶ 8–9, 80. That is the opposite of "undermin[ing] or damag[ing] the positive associations evoked by the mark," as necessary for tarnishment. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 25 cmt. g (1995).

42

### 3.  False Advertising Cannot be Premised on Confusion as to Sponsorship or Affiliation

"[T]he statement at issue in a false advertising claim must 'misrepresent[] the nature, characteristics, qualities, or geographic origin' of a product." *Parks LLC v. Tyson Foods, Inc*, 863 F.3d 220, 226 (3d Cir. 2017). Settled law precludes a false advertising claim where, as here, it is premised on a purportedly false association between two businesses, or confusion as to the "creator, manufacture or any broader conception of the term 'origin.'" *Id*. at 229; *see also* Doc. 67 ¶ 118–19. The University's false advertising claim must be dismissed.

### 4.  False Endorsement Fails for the Same Reasons

The evidence showing lack of confusion applies equally to the University's false endorsement claim. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1019 (3d Cir. 2008). The University's false endorsement claim also fails under *Dastar* because the purported "endorsement" comes only from the University's association with the historic images, which are the relevant products. *Rudovsky v. W. Publ'g Corp.*, 2010 WL 2804844 (E.D. Pa. July 15, 2010) (relying on *Dastar* to reject false advertising and endorsement claims); *see also Madama v. Genesis Rehab Servs.*, 2014 WL 3695976, at *8 (D.N.J. July 24, 2014) (rejecting false endorsement claim where the "images of Plaintiff … were part of the product itself"). Vintage Brand clearly and repeatedly disclaims the University's sponsorship or approval of the tangible goods. SMF ¶¶ 13–17. That is the opposite of false endorsement.

43

**E.**     **<u>The Registrations for the Seal Designs must be Cancelled</u>**

Section 2(b) of the Lanham Act precludes registration of a design that "[c]onsists of or comprises the flag or coat of arms or other insignia … of any State or municipality[.]" 15 U.S.C. § 1052(b). The Federal Circuit has determined "[t]he word 'comprises,' at the time of the statute's enactment in 1905, meant 'includes.'" *In re Fox*, 702 F.3d 633, 638 (Fed. Cir. 2012), *overruled on other grounds*, *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019). Cancellation is thus appropriate where the official insignia is "subsumed in its entirety" by the design that is the subject of a registration. *In Re Cnty. of Orange*, 2022 WL 3137036, at *12 (T.T.A.B. Aug. 4, 2022) (precedential) (refusing registration of a design that incorporated a municipal insignia); *see also In Re Family Emergency Room LLC*, 121 U.S.P.Q.2d 1886 (T.T.A.B. 2017) (refusing registration of a design that incorporated a stylized version of the flag of Switzerland).

Vintage Brand's first counterclaim is for cancellation of Registrations Nos. 1,276,712 and 5,877,080, the subject of which are the Seal Designs, because those designs incorporate the coat of arms of Pennsylvania. Doc. 72 ¶¶ 7–14.

| The Seal Designs | Pennsylvania's Coat of Arms[23] |
|---|---|
|  | |

The University's own website concedes its seal "features the crest of the Commonwealth of Pennsylvania surrounded by the name of the University," the accuracy of which was confirmed by the University's 30(b)(6) designee. SMF ¶ 75. Therefore, the '712 and '080 Registrations should never have issued and should be cancelled. 15 U.S.C. §§ 1064(3), 1119. And because the Seal Designs are not registrable under Section 2(b), the University cannot seek to protect them under the Lanham Act or otherwise. *See Renna v. Cnty. of Union, N.J.*, 88 F. Supp. 3d 310, 319–21 (D.N.J. 2014).

## VI.   CONCLUSION

For the foregoing reasons, Vintage Brand respectfully requests that the Court grant this motion for summary judgment, dismissing all of the University's claims and directing the USPTO to cancel Registration Nos. 1,276,712 and 5,877,080.

---

[23] Pennsylvania's coat of arms is properly subject to judicial notice because it is generally known within the Court's jurisdiction and determinable from sources that cannot reasonably be questioned. Fed. R. Evid. 201(b)(1)–(2); *see also* Act of June 13, 1907, Penn. P.L. 560, No. 373 (designating the coat of arms as the subject of Pennsylvania's state flag).

Dated:  June 2, 2023                    Respectfully submitted,

By: /s/  *Joshua D. Harms*                    
    Joshua D. Harms, Esq., *pro hac vice*
    Washington I.D. No. 55679
    Leslie Vander Griend, Esq., *pro hac vice*
    Washington I.D. No. 28090
    John T. Fetters, Esq., *pro hac vice*
    Washington I.D. No. 40800
    Valerie A. Walker, Esq., *pro hac vice*
    Washington I.D. No. 52584
    STOKES LAWRENCE, P.S.
    1420 Fifth Avenue, Suite 3000
    Seattle, WA 98101
    Phone:   (206) 626-6000
    Fax:       (206) 464-1496
    Joshua.Harms@stokeslaw.com
    Leslie.VanderGriend@stokeslaw.com
    John.Fetters@stokeslaw.com
    Valerie.Walker@stokeslaw.com

    Mark P. McKenna, Esq., *pro hac vice*
    Illinois I.D. No. 6272699
    LEX LUMINA PLLC
    745 Fifth Avenue, Suite 500
    Phone:   (646) 898-2055
    Fax:       (646) 906-8657
    New York, NY 10151
    Mark@lex-lumina.com

    Jodi S. Wilenzik, Esq.
    PA Supreme Court I.D. No. 89205
    Mark H. Perry, Esq.
    PA Supreme Court I.D. No. 68610
    POST & SCHELL, P.C.
    1600 JFK Boulevard, 13th Floor
    Philadelphia, PA 19103
    Phone:  (215) 587-1101
    Fax:       (215) 320-4159
    jwilenzik@postschell.com

mperry@postschell.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.8(b)</u>

The undersigned certifies that Vintage Brand, LLC's Brief in Support of its Motion for Summary Judgment complies with the length limits set forth in Local Rule 7.8(b). This Court authorized Vintage Brand, LLC to file a brief exceeding the Court's standard word and page limit. Doc. 107. Vintage Brand's Brief does not exceed 45 pages and therefore complies with this Court's Order and with Local Rule 7.8(b)(3).

Dated:  June 2, 2023

By: <u>/s/  *Joshua D. Harms*            </u>
Joshua D. Harms, Esq., *pro hac vice*
Washington I.D. No. 55679
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
Phone:   (206) 626-6000
Fax:       (206) 464-1496
Joshua.Harms@stokeslaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing document with the

Clerk of the Court using the CM/ECF system on this 2nd day of June 2023, which

constitutes service on Plaintiff pursuant to Fed. R. Civ. P. 5(b)(2)(E):

>       Allison L. Ebeck, Esquire
>       McGuire Woods LLP
>       Tower Two-Sixty
>       260 Forbes Avenue, Suite 1800
>       Pittsburgh, PA  15222-3142
>
>       Claire H. Eller, Esquire (admitted pro hac)
>       Lucy J. Wheatley, Esquire (admitted pro hac)
>       Matthew G. Rosendahl, Esquire (admitted pro hac)
>       McGuire Woods LLP
>       Gateway Plaza
>       800 East Canal Street
>       Richmond, VA  23219-3916
>       Attorneys for Plaintiff,
>       The Pennsylvania State University

Dated:  June 2, 2023          By: /s/  *Joshua D. Harms*
>                                  Joshua D. Harms, Esq., *pro hac vice*
>                                  Washington I.D. No. 55679
>                                  STOKES LAWRENCE, P.S.
>                                  1420 Fifth Avenue, Suite 3000
>                                  Seattle, WA 98101
>                                  Phone:   (206) 626-6000
>                                  Fax:      (206) 464-1496
>                                  Joshua.Harms@stokeslaw.com