# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY,<br><br>      Plaintiff and<br>      Counter-Claim Defendant,<br><br>  v.<br><br>VINTAGE BRAND, LLC;<br><br>      Defendant and<br>      Counter-Claim Plaintiff<br><br>and<br><br>SPORTSWEAR INC. d/b/a PREP SPORTWEAR; CHAD HARTVIGSON; ERIK HARTVIGSON; and MICHELLE YOUNG,<br><br>      Defendants. | Case No. 4:21-cv-01091-MWB<br>(Hon. Matthew W. Brann)<br><br>JURY TRIAL DEMANDED |

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF VINTAGE BRAND, LLC'S MOTION FOR SUMMARY JUDGMENT

Jodi S. Wilenzik, Esq.
Mark H. Perry, Esq.
PA I.D. Nos. 89205/68610
POST & SCHELL, P.C.
1600 JFK Boulevard, 13th Floor
Philadelphia, PA 19103
Phone: (215) 587-1101
Fax: (215) 320-4159
jwilenzik@postschell.com
mperry@postschell.com

Joshua D. Harms, Esq., *pro hac vice*
Washington I.D. No. 55679
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
Phone: (206) 626-6000
Fax: (206) 464-1496
Joshua.Harms@stokeslaw.com

# **TABLE OF CONTENTS**                                Page

A.   VINTAGE BRAND ...................................................................3

  1.   Vintage Brand's Organization and Relationship with Sportswear ............3

  2.   Vintage Brand's Business Model ......................................................4

  3.   Vintage Brand's Website................................................................7

  4.   Vintage Brand's "Penn State Nittany Lions Vintage Designs" ...............12

B.   THE UNIVERSITY ...............................................................18

  5.   The University's Branding .............................................................18

  6.   The University's Claimed Trademarks ...............................................20

  7.   The University's Trademark Licensing Program .....................................44

  8.   The Sale of "Official" Merchandise Bearing the University's
     Claimed Trademarks ....................................................................49

C.   ACTUAL CONFUSION ...........................................................57

D.   THE CONSUMER SURVEYS...................................................61

  9.   Experts Retained..........................................................................61

  10.  Franklyn LOC Survey ...................................................................62

  11.  Vintage Brand's Survey Expert.........................................................66

## STATEMENT OF FACTS

Pursuant to Local Rule 56.1, Vintage Brand, LLC ("Vintage Brand") submits the following statement of facts in support of its motion for summary judgment, filed contemporaneously herewith. Support for this statement of facts includes the following:

- The declaration of Chad Hartvigson, which is appended to this Statement of Material Facts and referenced herein as "**Hartvigson Decl**.";

- Documents produced in discovery by Vintage Brand, which are appended to the declaration of Chad Hartvigson and referenced herein as "**Ex**." followed by an alphanumeric designation;

- Documents produced in discovery by The Pennsylvania State University (the "University"), which are appended to this Statement of Material Facts and referenced herein as "**Ex**." followed by a numeric designation (except where the documents are cited in the declaration of Chad Hartvigson, in which case an alphanumeric designation is used);

- Excerpts from the transcript of the deposition of C. Thomas McGrath, the University's Rule 30(b)(6) designee, which are appended to this Statement of Material as Ex. 1 and referenced herein as "**30(b)(6) Dep**.";

- Excerpts from the transcript of the deposition of Meghan Maffey, a potential witness identified by the University, which are appended to this

# TABLE OF CONTENTS

Page

A.    VINTAGE BRAND ....................................................................3

  1.    Vintage Brand's Organization and Relationship with Sportswear ...........3

  2.    Vintage Brand's Business Model ....................................................4

  3.    Vintage Brand's Website.............................................................7

  4.    Vintage Brand's "Penn State Nittany Lions Vintage Designs" ...............12

B.    THE UNIVERSITY ...............................................................18

  5.    The University's Branding ........................................................18

  6.    The University's Claimed Trademarks ..................................20

  7.    The University's Trademark Licensing Program.....................44

  8.    The Sale of "Official" Merchandise Bearing the University's Claimed Trademarks ...............................................................49

C.    ACTUAL CONFUSION...............................................................57

D.    THE CONSUMER SURVEYS........................................................61

  9.    Experts Retained...................................................................61

  10.   Franklyn LOC Survey .............................................................62

  11.   Vintage Brand's Survey Expert................................................66

ii

## STATEMENT OF FACTS

Pursuant to Local Rule 56.1, Vintage Brand, LLC ("Vintage Brand") submits the following statement of facts in support of its motion for summary judgment, filed contemporaneously herewith. Support for this statement of facts includes the following:

- The declaration of Chad Hartvigson, which is appended to this Statement of Material Facts and referenced herein as "**Hartvigson Decl**.";

- Documents produced in discovery by Vintage Brand, which are appended to the declaration of Chad Hartvigson and referenced herein as "**Ex**." followed by an alphanumeric designation;

- Documents produced in discovery by The Pennsylvania State University (the "University"), which are appended to this Statement of Material Facts and referenced herein as "**Ex**." followed by a numeric designation (except where the documents are cited in the declaration of Chad Hartvigson, in which case an alphanumeric designation is used);

- Excerpts from the transcript of the deposition of C. Thomas McGrath, the University's Rule 30(b)(6) designee, which are appended to this Statement of Material as Ex. 1 and referenced herein as "**30(b)(6) Dep**.";

- Excerpts from the transcript of the deposition of Meghan Maffey, a potential witness identified by the University, which are appended to this

1

Statement of Material Facts as Ex. 2 and referenced herein as "**Maffey Dep**.";

- Excerpts from the transcript of the deposition of Nicole Armentrout, a potential witness identified by the University, which are appended to this Statement of Material Facts as Ex. 3 and referenced herein as "**Armentrout Dep**.";

- Excerpts from the transcript of the deposition of Tülin Erdem, Vintage Brand's expert witness, which are appended to this Statement of Material Facts as Ex. 4 and referenced herein as "**Erdem Dep**.";

- Excerpts from the transcript of the deposition of David Franklyn, The University's expert witness, which are appended to this Statement of Material Facts as Ex. 5 and referenced herein as "**Franklyn Dep**."; and

- The pleadings and documents on file with the Court, which are referenced herein as "**Doc**. **#**", including but not limited to the Expert Report of Dr. Tülin Erdem, Doc. 94-7 (also Doc. 96-3), referenced herein as "**Erdem Report**"; the Expert Report of David Franklyn, Doc. 94-2, referenced herein as "**Franklyn Report**"; and the Expert Report of David Neal, Doc. 94-5, referenced herein as "**Neal Report**."

## A.   <u>VINTAGE BRAND</u>

### 1. Vintage Brand's Organization and Relationship with Sportswear

1.     Vintage Brand, LLC ("Vintage Brand") is a Washington limited liability company formed in 2017. Hartvigson Decl. ¶ 2, Ex. A. It has three members: Co-Defendants Chad Hartvigson, Erik Hartvigson, and Michelle Young. *Id*. ¶ 3, Ex. B. Chad Hartvigson owns ▮ of Vintage Brand, while Erik Hartvigson and Michelle Young ▮▮▮▮▮▮▮▮▮▮▮ *Id*. Vintage Brand has no W-2 employees and did not, during the timeframe relevant to this lawsuit, have its own manufacturing facility. Hartvigson Decl. *Id* ¶ 3.

2.     Sportswear is a Washington corporation that is separate from Vintage Brand. *Id*. ¶ 4. Chad Hartvigson owns ▮ of the outstanding shares in Sportswear; the remaining ▮▮▮▮▮▮▮▮▮. *Id*. ¶ 5. The largest individual shareholder owns a ▮ interest and is not an owner of Vintage Brand. *Id*. Neither Vintage Brand nor Sportswear owns an interest in the other, directly or indirectly. *Id*. ¶¶ 6–7.

3.     Sportswear owns a manufacturing facility in Kentucky. *Id*. ¶ 8 . After Vintage Brand was formed in September 2017, it approached Sportswear's Board of Directors (through Chad Hartvigson) about possibly entering a Fulfillment Agreement. *Id*. Sportswear, after taking appropriate steps to address any conflict of interest, decided to pursue a Fulfillment Agreement with Vintage Brand. *Id*.

Sportswear, acting through an independent board member, executed the Agreement in November 2017. *Id.* ¶ 8, Ex. C .

### 2. Vintage Brand's Business Model

4.    Chad Hartvigson is a lifelong sports enthusiast and former professional baseball player. *Id.* ¶¶ 9–10. His passion for sports, and in particular, sports history, is central to Vintage Brand's business model. *Id.* ¶ 11.

5.    Vintage Brand owns a large collection of sports memorabilia, which consists of original, historic game tickets, decals, brochures, patches, stickers, trading cards, and programs bearing artistic images from school sporting events of long-ago ("memorabilia"). *Id.* ¶ 12.

6.    Vintage Brand scanned and enhanced the images on that memorabilia, and it sells print-on-demand merchandise bearing those images through its website, www.vintagebrand.com. *Id.* ¶ 13. Customers can choose to have those images printed on a range of tangible goods, including t-shirts, sweatshirts, hats, socks, koozies, mugs, tumblers, wall art, magnets, puzzles, and cutting boards. *Id.*; *see also* Doc. 67 ¶ 83.

7.    Some examples of such memorabilia, resultant enhanced images, and digital mockups of purportedly infringing goods are shown below. Hartvigson Decl. ¶ 14.

| Memorabilia | Enhanced Image | Mockup Products |
|:---:|:---:|:---:|
|  |  |  |
| Ex. D | Ex. G | Ex. J |
|  |  |  |
| Ex. E | Ex. H | Ex. K |
|  |  |  |
| Ex. F | Ex. I | Ex. L |

8.     In curating Vintage Brand's collection of memorabilia, Chad Hartvigson has spent hundreds of hours over the course of many years searching for historic images in the public domain. *Id*. ¶ 15 . Each historic image must meet four criteria: The ***first*** criteria is that the images must appear on memorabilia from before 1989. *Id*. The ***second*** selection criteria is that there is no copyright symbol © on any image. *Id*. The ***third*** selection criteria is that the image is not currently being used in

connection with educational services or athletic teams by the college or team from which the memorabilia originated. *Id*. The ***fourth*** criteria is that the historic image is both unique (not widely available from collectors) and has artistic value. *Id*. For images that have satisfied all four of those selection criteria, Vintage Brand researches the history of the game, art, mascot, etc. in order to tell the history of the image on the Vintage Brand website in the description for mockups of products bearing the image. *Id*. In addition, to the best of Chad Hartvigson's knowledge, all of the historic images were authored or created by third parties; none of the images were authored by Plaintiff. *Id*.; *see also* Ex. 6 at 8401.

9. Vintage Brand does not use any historic images as a trademark. *Id*. ¶ 16. Vintage Brand has its own trademark, which it uses on its website, its products, and its packaging, *id*., as further discussed *infra*, at Paragraphs 12 and 19. The historic images are attractive decoration for the front of the apparel and other merchandise that Vintage Brand offers; they are what make customers want to buy the merchandise in the first place. *Id*. The attractive nature of these historic images satisfies customer preferences for a custom item with a retro look and a nostalgic feeling, while also allowing customers to express affinity for the team or school referred to in the historic image. *Id*. Customers decide if they like a historic image enough to place it on a canvas or t-shirt or other item and order the product. *Id*.; *see also* Doc. 67 ¶ 83.

10.     In the roughly six years that the company has operated, Vintage Brand has never received any communication (written or verbal) from an actual or prospective customer indicating that the customer was confused about the source or sponsorship of any Vintage Brand products. Hartvigson Decl. ¶ 17.

### 3.  Vintage Brand's Website

11.     The Vintage Brand website has over 118,000 pages, including: (a) one "Home Page," the main landing page on the domain www.vintagebrand.com, *id*. ¶ 18; (b) over 350 "Team Pages," secondary landing pages with historic imagery related to specific teams or institutions, *id*. ¶ 18, Ex. M; and (c) over 29,000 "Product Pages," pages showing digital mock-ups of potential product offerings utilizing historic artwork from Vintage Brand's collection of vintage memorabilia, *id*. ¶ 18, Ex. N. The historic artwork is associated with hundreds of other colleges and sports teams. *Id*. ¶ 18.

12.     On the top of the Home Page, as well as every Team Page, Product Page, and page appearing during the checkout process, Vintage Brand's trademark (U.S. Reg. No. 6,029,818) is prominently displayed:



*Id*. ¶ 19, Exs. M–N.

13.     And on the bottom of the Home Page, as well as every Team Page, Product Page, and page appearing during the checkout process, the following disclaimer appears in contrasting colors:

> Our products are not affiliated with, licensed, sponsored, or endorsed by any college, team, league, event or licensing entity…. All products are designed by Vintage Brand® and manufactured for Vintage Brand®.

*Id*. ¶ 20, Exs. M–N.

14.     When visitors navigate to a Team Page, they are presented with another disclosure in the first visual field of the page, beneath the descriptive header:

## PENN STATE NITTANY LIONS VINTAGE DESIGNS
Vintage designs not affiliated with, licensed, or sponsored by any college, team or league

*Id*. ¶ 21, Ex. M. The same text also appears when the Team Page is narrowed to a type of product, such as "Cutting Boards." *Id*. ¶ 21, Ex. O. There are also scrollable text boxes at the top and bottom of each Team Page, which contain an additional disclaimer of licensure, sponsorship, or endorsement. *Id*. ¶ 21; Exs. M & O; *see also* Ex. P.

15.     If a visitor selects an item from a Team Page, she is taken to a Product Page, which displays a digital mockup of the product bearing the historic image the customer chose from the Team Page. *Id*. ¶ 22. For example:



*Id.* ¶ 22, Ex. M (red annotation added).



*Id.* ¶ 22, Ex. Q.

9

16.     Like each Team Page, a disclaimer appears under the descriptive header of each Product Page:

**1929 PENN STATE NITTANY LIONS MEN'S PREMIUM BLEND RING-SPUN T-SHIRT**

By Vintage Brand™ not affiliated with or sponsored by Penn State Nittany Lions

*Id*. ¶ 23, Ex. Q.

17.     And the space below the description of the product contains yet another disclaimer:

> …. Vintage Brand® and its products are not affiliated with, licensed, sponsored, or endorsed by any college, university, professional team, league, event, or licensing entity. All designs are derived from actual historic works of art existing in the public domain.

*Id*. ¶ 24, Ex. Q.

18.     Digital mockups of other blank goods with the same historic image appear beneath the digital mockup that is the subject of the Product Page. *Id*. ¶ 25. Vintage Brand's website operates in this manner because a customer's selection of a particular digital mockup indicates that customer's interest in the historic image itself, such that the customer might also be interested in purchasing other tangible products bearing the same image. *Id*. For example, below are digital mockups appearing on the Product Page for the shirt shown *supra*, at Paragraph 15:



*Id.* ¶ 25, Ex. Q.

19. Once an order is placed, the selected image is applied to the blank tangible product. *Id.* ¶ 26. The products are shipped in packaging bearing the Vintage Brand trademark, and many (but not all) products are labeled directly with the Vintage Brand trademark. *Id.* Below are examples of the product and packaging labelling:





*Id.* ¶ 26, Exs. R–V.

### 4. Vintage Brand's "Penn State Nittany Lions Vintage Designs"

20. From 2018 to 2021, Vintage Brand's website included a Team Page entitled "Penn State Nittany Lions Vintage Designs," on which it made available roughly 35 University-related historic images. *Id.* ¶ 27, Ex. M; *see also id.* ¶ 29, Ex. W. Vintage Brand has disabled that Team Page during the pendency of this lawsuit. *Id.* ¶ 28. Additionally, prior to the initiation of the lawsuit, in April 2021, certain images that had previously appeared on the Vintage Brand website were permanently removed following receipt of a cease-and-desist letter from the University's counsel. *Id.* ¶ 30.

21. The gross revenue from items bearing University-related designs was less than $25,000. *Id.* ¶ 31.

22. Some images related to the University that appeared on the Vintage Brand website were derived from scanned game tickets or the like. *Id.* ¶ 32, Ex. X. These do not seem to be the thrust of the University's infringement and counterfeiting allegations. *See* Doc. 67 ¶¶ 75, 76, 79, 86; Ex. 102 (Interrogatory No. 7). Examples of images understood to be more genuinely at issue are shown on the purportedly infringing product mockups previously appearing on the University-related Team Page:

| Mockup Products |
|:---:|
|  |
| 1950 Penn State Nittany Lions Men's Retro Heather T-Shirt<br>Ex. J |
|  |
| 1950 Penn State Nittany Lions Mug<br>Ex. K |
|  |
| 1975 Nittany Lions Men's Tri-Blend T-Shirt<br>Ex. L |
|  |
| 1950 Penn State Nittany Lions Cutting Board<br>Ex. O |



1967 Penn State Nittany Lions Hat
Ex. W



1972 Penn State Nittany Lions Hat
Ex. W



1979 Penn State vs. Army Poster
Ex. W



1950 Penn State Nittany Lions Men's Tri-Blend Varsity T-Shirt
Ex. W



1929 Penn State Nittany Lions Aluminum Wall Art
Ex. W



1953 Penn State Nittany Lions Men's T-Shirt
Ex. W



1983 Penn State Nittany Lions Men's Cotton Jersey Hooded
Long Sleeve T-Shirt
Ex. W



1978 Penn State Nittany Lions Poster
Ex. W



1978 Penn State Nittany Lions Women's T-Shirt
Ex. W

1958 Penn State Nittany Lions Pennant
Ex. W

23.    And examples of the University's asserted marks (left column) compared to Vintage Brand's historic images (right column) are included below.

| Asserted Marks | Vintage Brand's Historic Images |
|---|---|
| PENN STATE<br><br>(*infra*, Paragraphs 35–42) | Exs. H, I and X |
| THE PENNSYLVANIA STATE UNIVERSITY<br><br>(*infra*, Paragraphs 43–48) | Ex. G |



| (*infra*, Paragraphs 49–53) | Ex. X |
| (*infra*, Paragraphs 54–55) | Ex. G |
| (*infra*, Paragraphs 56–68) | Exs. W |
| (*infra*, Paragraphs 69–75) | Exs. G-H |

**B.** **THE UNIVERSITY**

**5. The University's Branding**

24.    The University is primarily an educational institution; it "provides educational services, research, outreach, development and other related scholarly pursuits …." Doc. 67 ¶ 17; *see also id* ¶¶ 5, 15, 18.

25.    In 2018, the University engaged in a rebranding effort with goals directly related to furthering the perception and brand of the University as an educational institution:

— **Support** the University's reputation for academic, research and service excellence
— **Nurture** pride and attachment to the University
— **Build** understanding and support for the University's needs and priorities
— **Grow** the value of a Penn State degree

Ex. 7 at 4647 (emphasis in original); *see also* 30(b)(6) Dep. at 21:13–22:16, 25:10–27:6.

26.    The 2018 Brand Framework goes on to premise the re-branding on aspirations related not to the University as the source or sponsor of consumer merchandise, but on goals related to the University as an educational institution:

Communications that advance these various objectives will help to drive recognition and support, attract outstanding faculty, staff and students, and improve our already strong reputation for research and educational excellence.

Ex. 7 at 4647; *see also* 30(b)(6) Dep. at 27:7–28:4. Indeed, the University conducted survey research during the re-branding process and concluded that, "[a]s expected, quality of education, sense of pride and community, and football were top of mind for respondents." Ex. 7 at 4649.

27. One of the University's three brand pillars is the "Culture of We," which is a "central part" of the University's branding. 30(b)(6) Dep. at 41:9–42:2; *see also* Ex. 8 at 5724. This is further described in the University's current "Brand Book," which is the product of the 2018 re-branding:

> There is something special at Penn State that converts the "I" to the "we" and puts us all on a path together—students, faculty, staff and alumni—to create meaningful impact in Pennsylvania and beyond. It's important that we recognize individuality but shows that we are stronger and better together. It's what unites all of us and connects Penn Staters anywhere in the world. We're not just a university, we're a community driven to make a difference.

Ex. 8 at 5723; *see also* 30(b)(6) Dep. at 39:8–9, 40:14–41:8.

28. Consistent with the University's brand "Culture of We," the University developed the tagline "We Are Penn State" which is meant to "evoke[] a shared experience of family, community, and intense pride that extends beyond athletics." Ex. 7 at 4653; *see also* 30(b)(6) Dep. at 31:21–33:12.

29. The University concedes that merchandise bearing its logos and designs allow individuals to express their affinity or affiliation of the University by engaging in the "Culture of We":

Q: Would you agree with me that one of the ways that one could shout, "We are Penn State" is by wearing apparel that references Penn State's logos and designs?

A: Yes.

30(b)(6) Dep. at 44:8–12.

Q: … [O]ne of the ways that someone can express affinity or affiliation with Penn State is by wearing clothing decorated with Penn State's logos. Could you agree with that?
    [objection]

A: Yes.

Q: Also people's decisions in terms of what apparel they buy or put on their bodies, would you say that the aesthetic look and feel of the designs, that that's an important factor in terms of what someone wears on their body?
    [objection]

A: Yes.

*Id.* at 91:10–92:3.

### 6. The University's Claimed Trademarks

#### (a) *The University's Primary Logos – The Lion Shield Design and the Lionhead Design*

30.    As is typical for most institutions of higher education, the University has two primary logos: one for educational services and the other for athletics. 30(b)(6) Dep. at 45:8–15.

31.    During the 2018 rebranding, the University developed and adopted a new primary logo for educational services, known as the "Lion Shield Design," shown below:



30(b)(6) Dep. at 22:11–16, 44:20–45:3; Ex. 8 at 5755.

32.     The University's primary athletic logo, known as the "Lionhead Design," is shown below:



(30)(b)(6) Dep. at 46:20–47:10; Ex. 8 at 5756, 5791. The Lionhead Design was the University's primary athletic logo before the 2018 re-branding. *See* (30)(b)(6) Dep. at 23:12–17 (explaining that marks used with respect to athletics were "not part of the [rebranding] objective"). The University intends the Lionhead Design to be used "to represent Penn State Intercollegiate athletic activities … not … the University's academic areas or non-athletic communications and may not be used as a replacement for the [Lion Shield Design]." Ex. 8 at 5791; (30)(b)(6) Dep. at 50:4–51:2.

33.     Because Vintage Brand limits its offerings to historic images, it has never made the University's <u>current</u> logos for educational services or athletics (the Lion Shield Design and Lionhead Design, respectively) available on the Vintage Brand website. Hartvigson Decl. ¶ 34; *see also id*. ¶ 15.

34. The University does not contend Vintage Brand infringed the Lion Shied Design. *See generally* Doc. 67. However, the University complains that Vintage Brand infringed the Lionhead Design. Doc. 67 ¶¶ 33, 49, 80. The University does so despite admitting that it had no evidence that Vintage Brand ever displayed the Lionhead Design on its website or affixed it to any product. Ex. 103 (Request for Admission No. 8). The University more recently conceded that the Lionhead Design is not relevant to this lawsuit. Ex. 102 (Interrogatory Nos. 2, 5, 7, 20).

### (b)    The PENN STATE Text

35. The University asserts its purported trademark rights in the text PENN STATE, which is the subject of Registration Nos. 1,308,610 (the "'610 Registration") and 5,766,698 (the "'698 Registration"). Doc. 67 ¶¶ 21, 23, 28, 30, 31; Ex. 102 (Interrogatory Nos. 2, 5).

36. The '610 Registration was issued in 1984 and covers various goods as well as educational and research services. Exs. 9–10. The specimens of use submitted in support of the University's application to register the mark for the various goods identified in the '610 Registration, including the below, show use of the PENN STATE text as the decorative element of merchandise:

 

Ex. 9 at 10972, 11012.

37.     Likewise, the specimens of use submitted in support of the 2014 renewal of the '610 Registration also show use of the PENN STATE text as the decorative element of merchandise:



Ex. 9 at 11116, 11118, 11122, 11130.

38.     The '698 Registration was initially refused because the text PENN STATE is primarily geographically descriptive of the claimed goods and services. Ex. 11 at 12193; Ex. 12. In response, the University made a Section 2(f) claim of acquired distinctiveness, thereby conceding that the text PENN STATE is geographically descriptive. Ex. 11 at 12197. The '698 Registration was ultimately issued in 2019 and covers a dizzying number of unrelated goods, ranging from "pet

clothing for dogs" to "sour cream." Ex. 12 at 10621–22. The specimens of use submitted in connection with the application that matured into the '698 Registration, including those below, show use of the PENN STATE text as the decorative element of merchandise:



Ex. 11 at 12072, 12076, 12077.

39.    Documents produced by the University show merchandise bearing the PENN STATE text as decoration, in contexts that suggest the PENN STATE text is not being used in a source-indicating manner for the goods themselves but, rather, to allow consumers to express affinity for or affiliation with the University or its sports teams (*e.g.*, the hockey team) or educational programs (*e.g.*, the College of Nursing):



Exs. 13–15.

40.     Further evidence that purchasing impetus stems from consumers' desire to express affinity for or affiliation with one of the University's teams are the Plaintiff's "Pick-A-Sport" products, i.e. articles that can be customized by a consumer with his or her preference of sport under the PENN STATE text:



Ex. 16 (red annotations added); *see also* Ex.17.

41.     Although "The Pennsylvania State University" is the formal name of the University, Doc. 67 ¶ 16, the PENN STATE text is also used to refer to the University, for example in connection with the University's social media accounts, which in general have an unremarkable following: the "Penn State Admissions" Instagram account (@psuadmissions) has 9,294 followers, Ex. 18; the "Penn State Alumni Association" Instagram (@pennstatealums) has roughly 13,100 followers, Ex. 19; the "Penn State Athletics" Instagram account (@gopsusports) has roughly 59,900 followers, Ex. 20; the "Penn State Football" Instagram account (@pennstatefball) has roughly 398,000 followers, Ex. 21; the "Penn State University" Instagram account (@pennstate) has roughly 209,000 followers, Ex. 22; the "Penn State" Facebook page has 396,649 followers, Ex. 23; the "Penn State Football" Facebook page has 663,573 followers, Ex. 24; the "Penn State" Twitter account (@penn_state) has roughly 219,500 followers, Ex. 25; and the "Penn State University" YouTube account has roughly 11,800 subscribers, Ex. 26.

42.     Vintage Brand never made available the PENN STATE text alone. Hartvigson Decl. ¶ 35. The University's assertion of infringement arises solely from that text being incorporated within composite historic artwork, such as the following:

26

| Examples of Vintage Brand Images Incorporating the PENN STATE Text |
|---|



| Ex. Y | Ex. Y | Ex. Y |
|---|---|---|
| Ex. X | | Ex. X |

### (c) THE PENNSYLVANIA STATE UNIVERSITY Text

43. Similarly, the University asserts its purported trademark rights in the text comprising its name, THE PENNSYLVANIA STATE UNIVERSITY (the "TPSU text"), which is the subject of Registration Nos. 1,315,693 (the "'693 Registration"), 5,399,989 (the "'989 Registration"), and 5,742,516 (the "'516 Registration"). Doc. 67 ¶¶ 22, 23, 25–27, 29; Ex. 102 (Interrogatory Nos. 2, 5).

44. The '693 Registration, which disclaims an exclusive right to use the text STATE UNIVERSITY and includes a Section 2(f) distinctiveness claim with respect to services, was issued in 1985 and covers limited goods as well as various services, including educational, broadcasting, and research services. Exs. 27–28. The specimens of use in connection with goods submitted in support of the

application that matured into the '693 Registration, such as those below, show use of the TPSU text as a decorative element of merchandise:

 

Ex. 27 at 11224, 11234.

45.     Likewise, the specimens of use submitted in support of the 2015 renewal of the '693 Registration also show use of the TPSU text as a decorative element of merchandise:

  

Ex. 27 at 11487–89.

46.     The '989 Registration, which disclaims an exclusive right to use the text PENNSYLVANIA, was issued in 2018 and covers only apparel. Exs. 29-30. The single specimen of use submitted in connection with the application that

matured into the '989 Registration shows use of the TPSU text as the decorative element of apparel:



Ex. 29 at 12000.

47.     The '516 Registration, which includes a claim of acquired distinctiveness as to the text PENNSYLVANIA, was issued in 2019 and covers magnets and flags. Exs. 31–32. The specimens of use submitted in connection with the application that matured into the '516 Registration show use of the TPSU text as a decorative element of merchandise:



Ex. 31 at 12018–19.

48.     Vintage Brand never made available the TPSU text alone. Hartvigson Decl. ¶ 36. The University's assertion of infringement arises solely from that text

being incorporated into the Seal Designs, which themselves are incorporated into two composite images, shown *infra* at Paragraph 69.

### *(d)*     *The Nittany Lion Rock Design*

49.     The University has previously used designs depicting the "Nittany Lion Shrine," a statute on the University's campus, described by the University as "[h]allowed ground" and "something tangible associated with [alumni's] relationship with the University." 30(b)(6) Dep. at 49:4–50:3 (referencing depiction of the statue at Ex. 8 at 5790).

50.     The University asserts trademark rights in a stylized design of the Shrine (the "Nittany Lion Rock Design"), shown below (left), which is the subject of Registration No. 1,350,286 (the "'286 Registration"). Doc. 67 ¶ 34; Ex. 102 (Interrogatory Nos. 2, 5). Vintage Brand never made available the Nittany Lion Rock Design alone; rather, a single composite image from a 1979 scanned game ticket incorporating a variant of the design appeared on Vintage Brand's website, shown below (right). Hartvigson Decl. ¶ 37.

| Nittany Lion Rock Design | Vintage Brand Image |
|---|---|
|  | ENTER STUDENT GATES<br>2 — 15 — 16 — 17<br>SA TO SJ $4.00<br>SOPH/FR SEC. PRICE<br>GAME 3<br>PENN STATE<br>VS.<br>ARMY<br>SAT. OCT. 13, 1979<br>AT 1:30PM<br>BEAVER STADIUM<br>STUDENT<br>Ex. X |

51.     The '286 Registration was issued in 1985 and covers miscellaneous goods, ranging from license plates to decorative needlepoint clips, but does not cover any services. Exs. 33–34. The specimens of use submitted in connection with the application that matured into the '286 Registration, including the specimen shown below, show use of the Nittany Lion Rock Design as a decorative element of merchandise:



Ex. 33 at 11550.

52.     Likewise, the specimens of use submitted with the 2015 renewal of the '286 Registration, such as those below, show use of the Nittany Lion Rock Design as a decorative element of merchandise:



Ex. 33 at 11768–70.

53.     Documents produced by the University show use of the Nittany Lion Rock Design as a decorative element of merchandise, typically but not always accompanied by the PENN STATE text:



Exs. 35–37.

### (e)    The Nittany Lion Frankfurter Design

54.    The University also asserts rights in a different depiction of the Nittany Lion Shrine, which includes the text NITTANY LION (the "Nittany Lion Frankfurter Design"), shown below (left), which is the subject of Registration No. 1,397,810 (the "'810 Registration"). Doc. 67 ¶ 35; Ex. 102 (Interrogatory Nos. 2, 5). Vintage Brand never made available the Nittany Lion Frankfurter Design alone; rather, two composite images, both from vintage pennants, incorporating a variant of the Nittany Lion Frankfurter Design appeared on Vintage Brand's website, shown below (right). Hartvigson Decl. ¶ 37. Nor was the Nittany Lion Frankfurter Design listed in a 2011 chart of the University's purported trademarks. Ex. 38.

| Nittany Lion Frankfurter Design | Vintage Brand Images |
|---|---|
|  | |
| | Exs. G and W |

55.    The '810 Registration was issued in 1986 and covers only "frankfurters." Ex. 40. The University does not allege that Vintage Brand has ever offered for sale, advertised, or sold any frankfurters, much less that Vintage Brand ever advertised the sale of frankfurters with the Nittany Lion Frankfurter Design. Ex. 102 (Interrogatory No. 21); Ex. 103 (Request for Admission No. 9). Indeed,

Vintage Brand has never been in the business of selling meat products or any other food. Hartvigson Decl. ¶ 37.

### (f) The Pozniak Lion Design

56. The University asserts trademark rights in the stylized Nittany Lion head (the "Pozniak Lion Design"), shown below (left), which is the subject of Registration No. 5,305,910 (the "'910 Registration"). Doc. 67 ¶ 37; Ex. 102 (Interrogatory Nos. 2, 5). Vintage Brand never made available the Pozniak Lion Design alone; rather, two historic images incorporating the Pozniak Lion Design and the text PENN STATE BASKETBALL appeared on Vintage Brand's website, shown below (right). Hartvigson Decl. ¶ ●.



| Pozniak Lion Design | Vintage Brand Images |
|---|---|
|  | Ex. W |

57. The '910 Registration was issued in 2017 and covers license plates, clothing, and certain services related to the Lion Ambassadors, the University's student alumni group. Exs. 41–42; *see* 30(b)(6) Dep. at 98:22–99:11. The specimen of use submitted with the application that matured into the '910 Registration is a

digital mockup of a t-shirt bearing the Pozniak Lion Design as a decorative element of the article:



Ex. 41 at 11970.

58.     The Pozniak Lion Design was created by Ray Pozniak, a ▮▮▮ graduate of the University. 30(b)(6) Dep. at 98:3–17; Ex. 6 at 8401. The University's use of the Pozniak Lion Design was phased out around 1986 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 6 at 8412. Following that phase-out, the Pozniak Lion Design was used by the Nittany Lion Wrestling Club, the Lion Ambassadors, and the University's license plate program ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. 30(b)(6) Dep. at 98:18–99:11; *see also* Ex. 6 at 7950, 8298, 8413. The Lion Ambassadors are students who serve as ambassadors on campus for visiting guests and partner with the alumni association. 30(b)(6) Dep. at 99:6–8; *see also* Ex. 43 (requiring that ambassador candidates be full-time students, and stating that

ambassadors directly connect with the alumni association) (last visited May 26, 2023).

59.     In 2012, in the wake of the Jerry Sandusky scandal, ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ Ex. 6 at 8401. The University initially ███████████████. Ex. 6 at 8400.

60.     Shortly thereafter, a University alumnus contacted the University to express ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. In so doing, the alumnus indicated ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████. Ex. 6 at 8403– 05. The University acknowledged the Pozniak Lion Design █████████████ ████████████████████████████████████████ evincing that consumers would draw an affiliation between the Pozniak Lion Design and the University. Ex. 6 at 8403. Nonetheless, the University was then not interested in ███████████ ████████ Ex. 6 at 8403.

61.     Ultimately, ████████████████████████████████████████ ████████████████████████████████████████████████████████,

██████████████████████████████████████████████

██████████████████████████████████████████████

████████. Ex. 6 at 8287–8288.

62. Following the ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████ Ex. 6 at 8298.

63. Presently, the University claims that the Pozniak Lion Design is part of its licensing program. 30(b)(6) Dep. at 101:22–25. However, the Pozniak Lion Design does not appear in the University's licensing Art Sheets or Brand Book. *See generally* Exs. 8, 51. When the University was asked whether the Pozniak Lion Design was licensed through its licensing agent, however, the University only restated that any use of the Pozniak Lion Design is limited to the Nittany Lion Wrestling Club, the Lion Ambassadors, and the license plate program. 30(b)(6) Dep. at 102:1–6 (referring to the "three areas" he previously mentioned).

64. The Nittany Lion Wrestling Club and the University are separate entities. Ex. 103 (Request for Admission No. 10). And the University is not aware

of any apparel emblazoned with the Pozniak Lion Design being made available for sale in connection with the Nittany Lion Wrestling Club. 30(b)(6) Dep. at 100:13–21.

65.     Likewise, although the Lion Ambassadors wear apparel such as t-shirts ornamentally bearing the Pozniak Lion Design, they are provided with such apparel "as their uniform to perform their functions." 30(b)(6) Dep. at 99:16–100:3; *see also* Ex. 43 (stating that ambassadors receive apparel from the Alumni Association) (last visited May 26, 2023). The University is not aware of any such t-shirts being made available for purchase to the public. 30(b)(6) Dep. at 100:4–8.

66.     Indeed, documents produced in discovery show apparel bearing the Pozniak Lion Design being worn by members of the Lion Ambassadors and Nittany Lion Wrestling Club, without any indication such apparel was available in commerce, i.e. to consumers. Exs. 44–47.

67.     According to the statement of use the University submitted in connection with the application that matured into the '910 Registration, the submitted specimen of use, shown *supra*, at Paragraph 57, "show[ed] the [Pozniak Lion Design] as used in commerce …." Ex. 41 at 11966. The University's representative was apprized of the penalties for willful false satements, and she signed the declaration submitted with the application, attesting to the veracity of that statement. Ex. 41 at 11967–68. However, the evidence the University produced

depicting apparel consistent with that specimen reflects only that the shirt was worn by a Lion Ambassador, not that it was sold in commerce. Ex. 47.



| University's Specimen | Lion Ambassador Facebook Photo |
|---|---|
| Ex. 41 at 11970. | Ex. 47 at 4785. |

68.     The University has not made bona fide use of the mark in commerce since purporting to adopt it. *Cf.* Ex. 48.

### (g)     *The Seal Designs*

69.     The University asserts trademark rights in two iterations of its seal (the "Seal Designs"), shown below (left), which are the subject of Registration Nos. 1,276,712 (the "'712 Registration") and 5,877,080 (the "'080 Registration"). Doc. 67 ¶¶ 43–45; Ex. 102 (Interrogatory Nos. 2, 5). Vintage Brand has never made either of the Seal Designs available alone; it has only ever offered two composite images that incorporated variations of the Seal Designs, shown below (right). Hartvigson Decl. ¶ 37.

| The Seal Designs | Vintage Brand Images |
|:---:|:---:|
|  | |
| | Ex. G    Ex. H |

70.    The old Seal Design is the subject of the '712 Registration, which was issued in 1984 and covers a variety of goods. Ex. 49–50. The '712 Registration previously covered research and educational services, but the registration was voluntarily abandoned in relation to those services in 2014. Ex. 49 at 10785. The specimens of use submitted in connection with the application that matured into the '712 Registration, including the specimen shown below, show use of the old Seal Design as a decorative element of merchandise:

 

Ex. 49 at 10645, 10694.

71.    Likewise, the specimens of use submitted with the 2014 renewal of the '712 Registration, such as those below, show use of the old Seal Design as a decorative element of merchandise:



Ex. 49 at 10792, 10796, 10800.

72. Further, the specimens shown in the preceding paragraph do not show actual use of the old Seal Design whatsoever, because they each incorporate the distinct proportions of the new Seal Design, most notably the proportion of Pennsylvania's Coat of Arms within the inner circle. Neither the University's Brand Book nor its licensing Art Sheets show the old Seal Design. Ex. 8 at 5788; Ex. 51.

73. The new Seal Design is the subject of the '080 Registration, which was issued in 2019 and covers a variety of goods but, like the '712 Registration, does not cover services. Exs. 52–53. The specimens of use submitted with the application that matured into the '080 Registration show use of the new Seal Design as a decorative element of merchandise:



Ex. 52 at 12218, 12223, 12228.

74.　Documents produced by the University show merchandise bearing the

new Seal Design only as a decorative element of merchandise:



Exs. 54–56.

75.　The Seal Designs incorporate the Coat of Arms of the Commonwealth

of Pennsylvania, referenced as a "crest" in the University's Brand Book:

> The seal has been in existence in one form or another since the founding
> of the University. The current version was introduced in 1953 *and
> features the crest of the Commonwealth of Pennsylvania* surrounded by
> the name of the University. It bears a striking resemblance to the seals
> of the many other state agencies, including the State System of Higher
> Education, which is the one reason it does not serve as the University's
> logo. Since implementation of the University mark in 1987, the seal has
> served primarily as an official stamp of validation—like a notary's
> stamp—on official documents such a [sic] contracts and diplomas.

Ex. 8 at 5788 (emphasis added); *see also* 30(b)(6) Dep. at 47:15–48:14.

### (h)    The S-Lion Design

76.    The University also asserts rights in the below design (the "S-Lion Design"). The S-Lion Design is not registered. Doc. 67 ¶¶ 38, 39; Ex. 102 (Interrogatory Nos. 2, 5).



77.    The S-Lion Design does not appear in the University's licensing Art Sheets or its Brand Book. *See generally* Exs. 8, 51. Nor was it listed in a 2011 chart of the University's supposed trademarks. Ex. 38. The S-Lion Design only appears in a 2011 Art Sheet related to the College Vault trademark maintenance program, described *infra* at Paragraphs 86–89. Ex. 51 at 8656.

78.    Documents produced by the University show the S-Lion Design used only as a decorative element of merchandise, in contexts where it is referenced as an "Old School Logo" or a "Vault Logo."





Exs. 57–58 (red annotations added).

79.     Other than the S-Logo Design being listed on the 2011 College Vault art sheet, the University is unaware of any other use or sales of items bearing that design, at least since 2000. 30(b)(6) Dep. at 67:25–68:25.

### 7. The University's Trademark Licensing Program

80.     As of 1981, the University took no steps to license, enforce, or prevent third-party use of any of its alleged marks. Ex. 59. In a 1981 article in the Daily Collegian titled *Logos: $$ for others — but not for Penn State*, the University's then-director of educational relations expressed that "[a]lthough Penn State allows just about everyone to use its service marks without paying for them the University would fight any attempt to register its service marks by someone else[.]" *Id*. Robert Custard, then intellectual property counsel for the University, was quoted as saying, "[s]ince the only people who buy the products are students and alumni, we get more goodwill from not charging than we would money by charging for it." *Id*.

81.     However, the University began developing a licensing program shortly thereafter. 30(b)(6) Dep. at 53:24–54:3. A 1982 internal memorandum first reported that, ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████ Ex. 60 at 10582–83 (¶ A). The memorandum acknowledged that ███████████████████████████████████████

Ex. 60 at 10582–83 (¶ A).

82.     The memorandum went on to recommend that the University ███

███████████████████████████████████████████████████████, Ex. 60

at 10582, 10585 (¶ B.2), 10589–90 (¶ E), ████████████████████████

████████████████████████. Ex. 60 at 10584–85 (¶ B.1),

10589–90.

83.     At some point after deciding to proceed with a licensing program, the

University retained Collegiate Licensing Company ("CLC") as its exclusive

licensing agent for retail merchandise, which relationship has continued for several

decades to the present. *See* Ex. 61; 30(b)(6) Dep. at 54:4–18. CLC is the licensing

agent for more than ███ colleges and universities. Ex. 62 at 8320. At least in 2015,

sales from colleges and universities for which CLC acted as licensing agent

"████████████████████████████████████████." Ex. 63 at 7887.

84. In 1988, no more than six years after the University adopted a trademark licensing program, it had licensed more than 785 entities for retail items. Ex. 64. As of August 3, 2022, the University had reduced that number to 386. Ex. 65; 30(b)(6) Dep. at 60:18–61:8. The marked decrease appears to be at least partially the result of the University's 2011 "████████████████████████" program (████), by which it made "████████████████████████████████████ ████████████████████████████████████████." Ex. 66 at 8440. The University described the purpose of the ████ program as a method ████ ████████████:



Ex. 66 at 8440 (emphasis added); *see also* Ex. 67 (refusing internal request ████ ████████████████████████████████████████████████ ████████.

85. The University participates in two CLC licensing programs. The first is a standard licensing program, through which the University (via CLC) licenses the

Lion Shield Design and the Lionhead Design—its primary educational and athletic logos, as discussed *supra* at Paragraphs 30–34—as well as the PENN STATE and TPSU text, the Seal Designs, the Nittany Lion Rock Design, and various other purported trademarks. Ex. 51.

86. The second CLC licensing program in which the University participates is the College Vault trademark maintenance program. Ex. 51 at 8656; 30(b)(6) Dep. at 61:9–62:14. As described by CLC, the program " ██████████████████████ " including " ██████████████████████ ." Ex. 68 at 8889, 8891. Because the historic designs in the College Vault program do not reflect an institution's current branding, that program is " ██████████████████████ ██████████████████████ " Ex. 68 at 8892. ██████████████████ ██████████████████████████████████ ██████████████████████ . Ex. 68 at 8888.

87. The University cannot explain how the historic designs  that are licensed through its College Vault program were used prior to that licensing program:

> Q: How had these logos and designs been used before Penn State entered the College Vault Program?
> A: At some point they would have been used probably quite liberally.
> Q: How so?
> A: Well, they are retro marks and they were thought of within our community as certainly being a mark associated with Penn State especially an alumni that maybe this was the mark that was used when they went to school.

30(b)(6) Dep. at 63:6–17.

88.     The University could not explain any purpose for the separate College

Vault program other than to maintain/manufacture purported trademark rights in

historical designs associated with the University:

> Q: In terms of present in the current functioning of the College Vault
>    Program, why have a separate group of licensees?
> A: Well, in the vault program is that we certainly want to maintain and
>    protect our ownership of these marks, and that's one facet that's
>    important to us.
> Q: Sure. And how do you achieve that with a separate group of
>    licensees?
>    [objection]
> A: I don't know. I mean that is something that CLC has advised us on
>    and they have said this is the approach that we should be taking.
> Q: Just to make sure I understand. So part of the objective of the
>    College Vault Program is to ensure continued protection of Penn
>    State's trademarks; is that right?
> A: That's correct.

30(b)(6) Dep. at 64:13–65:8.

89.     Revenue related to the "███████████████" sales of goods bearing

University-related historic designs that are in the College Vault maintenance

program are paltry. For example, in the 2010/2011 fiscal year, there was a total of

$██████ in revenue related to the University's participation in the College Vault

program; in the 2011/2012 fiscal year, there was a total of $██████ in revenue;

and in the 2012/2013 fiscal year there was a total of $██████ in revenue. Ex. 69.

There is no available record of what amount of revenue was attributable to which

designs in the College Vault. 30(b)(6) Dep. at 71:4–73:5, 84:10–19.

48

90.     Revenue and royalties related to the University's standard licensing program under CLC dwarf those related to the College Vault program. The revenues and royalties from the University's standard CLC licensing program are shown below:

| Period | Revenue | Royalties |
|---|---|---|
| FY2010/2011 | ███ | ███ |
| FY2012/2013 | ███ | ███ |
| FY2014/2015 | ███ | ███ |
| FY2015/2016 | ███ | ███ |
| FY2017/2018 | ███ | ███ |
| FY2019/2020 | ███ | ███ |

Ex. 70 at 8473; Ex.71 at 8096; Ex. 62 at 8302; Ex. 63 at 7898; Ex. 72 at 8922; Ex. 73 at 8867. All of the revenue reported by CLC, as set forth in the foregoing table, was reported in the aggregate; neither revenue nor royalties were broken down by design, region, or country. These numbers lag behind the University's "peer" institutions. Ex. 62 at 8302–03; Ex. 63 at 7898; Ex. 70 at 8473; Ex. 71 at 8096; Ex. 72 at 8922; Ex. 73 at 8867.

### 8. The Sale of "Official" Merchandise Bearing the University's Claimed Trademarks

91.     Although the University claims to "invest[] significant resources in promoting, advertising, and protecting its trademarks," it was not able to provide any advertising or promotion information "broken down by mark or by good/service." Ex. 102 (Interrogatory No. 12). The University points to the CLC annual licensing reports, referenced *supra*, at Paragraph 90, which show only generic

advertising/marketing conducted by CLC on behalf of the University (and other institutions). *See* Exs. 62–63, 70–73. The University also identifies a document entitled *Penn State Information* with a bullet pointed list under the header "███████," apparently showing marketing "██████" and ████████████████" from fiscal year 2018 to fiscal year 2022. Ex. 74. This document does not show any marketing or promotional expenditures broken down by any of the asserted marks. *See id*.

92.     The University concedes its target consumers "for goods and services bearing its marks" are not the general U.S. population but, rather, "students, alumni, and faculty and staff of [the University]," and "also fans and supporters of [the University] throughout both Pennsylvania and the entire United States, as well as internationally." Ex. 102 (Interrogatory No. 19). The purchase process for the University's merchandise does not involve any steps to verify that the purchaser has any formal affiliation with the University.

93.     The context in which the University's "officially licensed" goods are sold is markedly different than that in which Vintage Brand's are sold, as described *supra*, at Paragraphs 11–19. For example, websites on which the University's "official" goods are sold prominently and frequently reference the fact that the goods are "official" or "licensed." *E.g.*, Ex. 75 at 342 ("Officially Licensed Penn State Clothing & Merchandise"); Ex. 76 at 3 ("We pride ourselves on … carrying a large

selection of officially licensed products ….”); Ex. 77 at 251 (“The Collegiate Licensing Company officially licenses every product we sell.”); Ex. 78 at 256 (“We’re proud to be an Officially Licensed Distributor of top quality Penn State Clothing and Nittany Lions Merchandise ….”); Ex. 79 at 364 (“Whether you’re looking for officially licensed mens, [sic] womens, [sic] or youth PSU jerseys, the Penn State University Penn State Nittany Lions Team Store has every fan covered.”); Exs. 80 at 744 (“Whatever style or brand you’re searching for, the Official Penn State Nittany Lions shop has a PSU T-shirt that is perfect.”). The University concedes that such verbiage informs consumers that the goods are, in fact, licensed merchandise:

> Q: Do you know why there’s any information at all stating that this --
> these product offerings are officially licensed?
> [objection]
> A: Probably because it’s important for our fan base to know they’re
> buying licensed merchandise.
> Q: And in the absence of this verbiage, would your consumers not
> know that?
> [objection]
> A: Not necessarily.

30(b)(6) Dep. at 88:12–89:3; *see also* Ex. 81.

94.     There are also other indications that such websites are selling “official” merchandise. For example, the Lionhead Logo, the University’s primary athletic logo, appears on the top of every page of the Penn State Athletics Online Store. *E.g.,* Exs. 76, 79–80. Similarly, the domain name of one licensed retailer is

www.pennstateclothes.com. *E.g.*, Exs. 78, 82. To make such "official" affiliation clear to consumers, the University also requires, as a matter of the Standard Retail Licenses, that licensees affix the "Official Label" to all officially licensed goods:

(a) 

Ex. 83 at 7490 (§ 11(a)–(b)) (emphasis added). The Standard Retail License defines the term "Official Label" as:



Ex. 83 at 7479 (§ 1(t)) (emphasis in original).

95. The "Official Label" requirement extends to the College Vault trademark maintenance program:

(a) 



(b) ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████.

Ex. 84 at 7563 (§ 10(a)–(b)) (emphasis added).

96.    For over three decades the "Official Label" requirement has been central to CLC's "Look for  the Label" marketing strategy. For example, in 1991, CLC sent a letter to a retailer that was removing the Official Labels, in which it set forth how removal of the Official Label interferes with collegiate merchandising:

> \* Interference with enforcement efforts. The Collegiate Licensing Company has established an enforcement program to prevent the sale of infringing products. This serves to protect the university marks and the market position of licensees and retailers that sell licensed products. Our enforcement program includes staff members and outside investigators who shop the marketplace for unauthorized products. *The "Officially Licensed Collegiate Products" label is the bedrock of our enforcement program, as the label is the symbol that the products bearing it are licensed.* Products not containing the "Officially Licensed Collegiate Products" label are suspected of being infringing, and subject to seizure. Thus, your removal of this label seriously hampers our enforcement efforts.
>
> \* Interference with licensing requirements. As you know, with regard to the colleges represented by The Collegiate Licensing Company, *display of the "Officially Licensed Collegiate Products" label is required as per our license agreements with licensees.* Failure to use the label can result in legal problems for the licensee, including contract

termination. Thus, by removing the labels, you may cause legal problems for the licensee.

….

\* Interference with consumer rights. Your removal of these tags or labels materially changes the nature of the products in a manner which *interferes with the consumers' right to be fully informed as to the nature of the product that they are purchasing*.

\* Interference with marketing program. Our marketing efforts are based in part upon the "Look for the Label" concept; the label is featured prominently in advertisement and informational materials, such as those that we showed you during our meeting, and is *recognized by the public as the symbol of quality collegiate products*. Retailers and consumers are encouraged to buy only items containing the label, as they can be assured that those items are authorized by the school, and that the school benefits from their sale. Further, we are advising retailers to refuse to accept unlabeled merchandise. Our goal is 100% compliance with the label requirement. Your removal of the label eliminates the benefit that you would otherwise receive from our marketing efforts centered around the label. In addition, *it thwarts our "Look for the Label" marketing program and confuses consumers who are looking to buy licensed products*.

Ex. 85 at 10135–36 (emphasis added); *see also* Ex. 86.

97.    In 2011, CLC introduced an updated "Official Label" hologram, the purpose for which was " ███████████████████████████████ " by adding

████████████████████████████████████████████████████ ."

Ex. 87 at 7907 (emphasis added).

98.   CLC[1] owns two federal registrations for the design used with the holographic, source-identifying Official Labels, Registration Nos. 1,578,038 (the "'038 Registration") and 3,221,094 (the "'094 Registration").



99.   The '038 Registration was issued in 1990 and covers "licensing services in the field of collegiate products and promotions for college, universities, and post-season bowls." The '094 Registration was issued in 2007 and covers a wide range of typical merchandise, such as jewelry and apparel, all with a claimed first use in commerce date of August 1984.

100.   Below is an example of the "Official Label" prominently affixed to a College Vault product via an attention-grabbing tag:

---

[1] The registrations are owned by "IMG COLLEGE LICENSING, LLC," which is the previous name of CLC. Armentrout Dep. at 23:13–20.



Ex. 88 (red annotation added).

101. University-related merchandise, including officially licensed merchandise, is frequently marketed and sold as a way to express affinity for, or affiliation with, the University. *E.g.*, Ex. 89 at 1546 ("There are more ways than you might think to honor your alma mater with clothing, gear, and decor from the team shop…. Distinguish yourself from other college sports fans by wearing team apparel that shows everyone exactly who you're rooting for."); Ex. 90 ("Take your Penn State fandom to the next level with our extensive selection of t-shirts, jerseys, hats, sweatshirts, and more.").

102. The desire for merchandise bearing the University's alleged marks to demonstrate consumers' affinity for, or affiliation with, the University is further shown by e-mail received by the licensing department. For example, the University

██████████████████████████████████ Ex. 91; *see also*

Exs. 92–98. Other correspondence clearly evinces individuals' desire to ██████

████████████████████████████████████. Ex. 99.

And further examples include the ██████████████ Chapter of the

University's Alumni Association █████████████████████████

██████. Ex. 100.

## C.   **ACTUAL CONFUSION**

103.   The only "actual confusion" evidence offered by the University is the

testimony of Meghan Maffey. 30(b)(6) Dep. at 107:19–109:13. Ms. Maffey is a 2017

graduate of the University and President of the Washington D.C. Chapter of the

University's Alumni Association. Maffey Dep. at 20:13–19, 26:22–32:5.

104.   On behalf of the D.C. Chapter of the Alumni Association, Ms. Maffey

sent an e-mail to Vintage Brand in August, 2022, soliciting a donation. Ex. 101. Ms.

Maffey reached out to "over a hundred" websites during that solicitation process.

Maffey Dep. 42:22–43:5. She sent the "[e]xact same email" to solicit each such

company. Maffey Dep. 48:19–49:2. Upon receiving a copy of that e-mail in

discovery, counsel for the University contacted Ms. Maffey to discuss her potentially

acting as a witness. Maffey Dep. at 9:4–12:9. Prior to being contacted by the

University's counsel, Ms. Maffey "did not think about" whether Vintage Brand was

a licensee of the University. Maffey Dep. at 15:8–14.

105.    Ms. Maffey testified that she "specifically recall[ed] looking at product offerings" on the Vintage Brand website. Maffey Dep. at 38:13–15. However, when asked what University-related designs she recalled seeing on the Vintage Brand Website, she testified "[t]he paw print and the chipmunk logo." Maffey Dep. at 39:11. Ms. Maffey described the paw print:

Q: … can you describe what the paw print logo looks like?
A: It is the Penn State paw print. It's navy and white, as every Penn State logo is. It has a slash or a white -- the line, rounded line in the left, I believe the left side. But it is the Penn State paw print.

Maffey Dep. at 39:15–19. That description is consistent with the "Nittany Lion Paw Print" shown in the University's Brand Book as well as its licensing Art Sheets:



Ex. 51; *see also* Ex. 8 at 5790–91. However, that image has <u>never</u> appeared on the Vintage Brand website. Hartvigson Decl. ¶ 40.

106.    The University's "Lionhead Design" is sometimes colloquially referred to as the "Chipmunk." *See* Maffey Dep. at 39:20–40:2; *see also* Hartvigson Decl. ¶ 39. That is consistent with Ms. Maffey's description:

Q: And the other one you mentioned was the chipmunk logo, I think. What's that one look like?
A: It is the lion head, it is the Penn State lion head.
Q: It's like a profile of the lion head; is that right?
A: Correct.

Maffey Dep. at 39:20–40:2. As described *supra*, at Paragraphs 30–34, the Lionhead Design—a/k/a the "Chipmunk"—<u>never</u> appeared on the Vintage Brand website. Hartvigson Decl. ¶ 40.

107.    As such, the two designs Ms. Maffey recalled appearing on Vintage Brand's website did not, in fact, appear on the website at any time. Upon questioning by the University's counsel, Ms. Maffey could not recall any products with the PENN STATE text, the Seal Designs, or any of the University's other claimed marks appearing on the website. Maffey Dep. at 54:9–22, 56:10–17.

108.    Perhaps even more telling of Ms. Maffey's clearly mistaken testimony is that she stated unequivocally that she visited and reviewed the Vintage Brand website in late July, 2022, or on August 1, 2022, the latter being the date on which she sent the solicitation e-mail. Maffey Dep. at 38:3–9. She had not looked at Vintage Brand's website prior to that time. Maffey Dep. at 52:21–53:6. She testified to reviewing a University-specific page:

> Q: When you visited it, there was -- you've testified -- I want to make clear. When you visited it, there was a page for Penn State gear available?
> A: Yes.
> Q: Is that right?
> A: Yes.

Maffey Dep. at 54:3–8. Ms. Maffey testified to navigating the Vintage Brand website to that University-specific webpage. Maffey Dep. at 40:9–41:11. However, her declared action was impossible, because Vintage Brand had taken down the

59

University-related pages during the pendency of this lawsuit, disabling it in mid-August, 2021, and enabling it only for a brief period in February, 2022, in order to capture images of webpages to produce in discovery. Hartvigson Decl. ¶¶ 28, 41.

109. Ms. Maffey testified that she learned about Vintage Brand from another Big Ten alumni chapter in Washington D.C. Maffey Dep. at 12:20–13:2. Ms. Maffey could not recall if she received Vintage Brand's e-mail address from the Vintage Brand website. Maffey Dep. at 41:12–15. However, she testified that she possibly received Vintage Brand's contact information from the member of the Big Ten alumni chapter that informed her of Vintage Brand. Maffey Dep. at 42:5–15.

110. Regardless of whether Ms. Maffey actually visited Vintage Brand's website to get contact information and review available products, she testified firmly that her views about use of alleged University marks were based entirely on her assumptions about the legal requirements for printing of those marks:

> Q: … [W]e talked about how [the University's counsel] mentioned on the phone that Vintage brand wasn't authorized to sell Penn State products. And I asked before she said that on the phone, is that something that you even thought about, and I believe you said no.
> A: I -- with my knowledge of Penn State and Penn State athletics, and spending four years a -- at the University, apologies, I in good faith would -- and -- can I rephrase everything I just said?
> Q: Sure.
> A: I, I did not -- you're correct, I did not think about the licensing, as my experience with Penn State licensing is that if it has the logo on it, it's trademarked through the University.
> Q: So is it fair to say, and correct me if it's not accurate, is it fair to say that you have an assumption that if an item of apparel makes

reference to Penn State, that Penn State owns that reference and it must be licensed; is that sort of your operating assumption?

A: Yes.

Maffey Dep. at 57:4–58:2.

## D.   THE CONSUMER SURVEYS

### 9.  Experts Retained

111.   The University retained David Franklyn. Mr. Franklyn conducted two surveys for the University, a survey purporting to test whether respondents recognize trademarks ("**Franklyn Recognition Survey**") and a second survey, regarding likelihood of confusion ("**Franklyn LOC Survey**"). *See* Franklyn Report. Defendants have moved to exclude the Franklyn Recognition Survey and all testimony based on that survey. *See* Docs. 93, 94, and 99. That motion is fully briefed and pending before the Court.

112.   Vintage Brand retained Dr. Tülin Erdem, the Leonard N. Stern Professor of Business Administration and Professor of Marketing at the Stern School of Business, New York University, and Chair of the Stern Marketing Department. Erdem Report at 1.[2] Dr. Erdem conducted her own consumer survey ("**Erdem Survey**") and issued a report with her conclusions, explaining why her survey methodology differed from Mr. Franklyn's. Erdem Report at 4–6, ¶¶ 13–18.

---

[2] Citations to page numbers of expert reports reference the internal document numbering, not the CM/ECF page numbering.

113.   Vintage Brand also retained Dr. David Neal who issued a report criticizing Mr. Franklyn's surveys. *See* Neal Report.

**10. Franklyn LOC Survey**

114.   The Franklyn LOC Survey does not include any questions attempting to determine whether any confusion is a result of consumers' beliefs that use of University-related imagery on merchandise requires the University's permission. *See* Franklyn Report; *see also* Doc. 43 at 23 (Court asking whether consumer confusion or beliefs were impacted by "their belief that the law requires Penn State's permission"); Neal Report at 36–37, ¶¶ 6.1–6.2 (noting Mr. Franklyn's surveys' silence on this key issue); Franklyn Dep. at 224:7–232:13.

115.   As Dr. Erdem noted, verbatim responses to follow-up questions in the Franklyn LOC Survey demonstrate that many of the "confused" responses were attributable to respondents' beliefs that anyone referencing the University must have legal permission. *See* Erdem Report at 24, ¶ 39 n.36 ("Some example answers indicating a pre-existing legal belief in the 'Why do you say that' questions include: 'If Vintage Brands were not licensed to sell Penn State merchandise then this would not seem legal,' 'This brand features baseball, football, and collegiate apparel. It has to have some sort of affiliation with these entities in order to legally sell their apparel,' 'Because that is the way selling licensed apparel works. You need some form of affiliation with the brand in order to obtain a license to sell their products,'

and 'The description says that this is the company selling it & they could not legally sell it if they were not licensed to.'"); *see also* Doc. 101-1 (Exhibit 13 (Appendix D to Mr. Franklyn's Report), which the University provided via USB) at Respondent ID Nos. 51 (Q206 and Q212), 70 (Q212), 102 (Q205, Q206 and Q212), 104 (Q209 and Q212), 119 (Q206), 249 (Q206 and Q212), 262 (Q206), 280 (Q208), 341 (Q212), 345 (Q206 and Q212), 543 (Q205, Q206, Q211 and Q212), 607 (Q205), 677 (Q206), 772 (Q212), 801 (Q209), 808 (Q206), 848 (Q211 and Q212), 864 (Q206 and Q212), 876 (Q206), 931 (Q206 and Q212), 1083 (Q206), 1193 (Q206 and Q212), 1214 (Q205, Q206, Q211 and Q212), 1216 (Q206 and Q212), 1276 (Q206), 1295 (Q206 and Q212), 1406 (Q212), 1429 (Q206, Q209, and Q212), 1443 (Q206), 1457 (Q205 and Q209), 1570 (Q205 and Q206), 1589 (Q209 and Q212), 1680 (Q211 and Q212), 1766 (Q212), 1813 (Q206 and Q212).

116. For his Franklyn LOC Survey, Mr. Franklyn selected the following "control" stimulus:



Franklyn Report at 27; *see also* Franklyn Dep. at 233:9–239:14.

117.   The test stimuli used in the Franklyn LOC Survey were the following:



Franklyn Report at 25–26.

118.   The test stimulus that Mr. Franklyn used, a screenshot of the Vintage Brand website, removed the vintagebrand.com URL. Neal Report at 13, ¶ 2.5.2

("Mr. Franklyn cropped out a critical and prominent source-identifying cue"); Franklyn Dep. at 189:6–191:4.

119. Mr. Franklyn also used the following question in the Franklyn LOC Survey:



Franklyn Report (Doc. 94-2 at 88). But Mr. Franklyn did not actually use the responses to this question to screen survey participants. Neal Report at 17, ¶ 3.1.5; Franklyn Dep. at 126:15–128:24.

120. Finally, Mr. Franklyn coded as "confused" responses that did not specifically refer to "Penn State" but instead referred only to "college" or "university" or "NCAA." Neal Report at 35, ¶ 5.7; *see also* Franklyn Dep. at 192:16–195:3.

**11. Vintage Brand's Survey Expert**

121.    Dr. Erdem designed and implemented a survey "to evaluate whether and to what extent consumers are confused regarding (i) the source of Vintage Brand's products as they relate to Penn State or (ii) whether a business relationship exists between Vintage Brand and Penn State." Erdem Report at 4, ¶ 13. Dr. Erdem also tested "whether consumers believe that Penn State is responsible for the quality of Vintage Brand's products that bear Penn State-related images," and "the extent to which any apparent consumer confusion is the product of consumers' belief that there is a legal requirement for Vintage Brand to obtain Penn State's permission to use Penn State's name or imagery that originated with Penn State." *Id*.

122.    Dr. Erdem conducted an aided *Eveready* survey to address these questions. Erdem Report at 6, ¶ 19. Qualified respondents were presented with images of: "the main Vintage Brand homepage ('home page'), (ii) the landing page for Penn State merchandise ('landing page'), (iii) a product page for a Vintage Brand sweatshirt product decorated with Penn State imagery ('product page'), and (iv) a checkout cart page ('cart page')." Erdem Report at 9–10, ¶ 24.

123.    Qualified respondents were put in one of three groups, two test groups and one control group: "Two of the logo stimuli alternatives were real Vintage Brand products decorated with Penn State imagery (... the '1929 Penn State Nittany Lions'

logo and the '1950 Penn State Nittany Lions' logo). The third logo stimuli alternative was a 'State of Pennsylvania Seal' logo[.]" Erdem Report at 10, ¶ 25.



**Figure 3**
**Likelihood of Confusion Survey Test and Control Groups**

| Test Group 1 | Test Group 2 | Control Group |
|---|---|---|
| *1929 Penn State Nittany Lions Logo* | *1950 Penn State Nittany Lions Logo* | *State of Pennsylvania Seal Logo* |

Erdem Report at 11.

124.   Among other questions, Respondents were asked: (1) who they thought put out the sweatshirt they saw (measuring confusion about actual source), and (2) whether they thought the entity that put out the sweatshirt had a business relationship with any other entity (measuring confusion about sponsorship or affiliation). Erdem Report at 21–22, ¶ 32–33.

125.   The "net" confusion levels are 1% for Test Group 1 and 12% for Test Group 2 (see Figure 7.1 below). The term "net" confusion level refers to the percentage of "confused" respondents (those who referred to "Penn State") after subtracting the percentage of respondents who were "confused" in the control condition.

**Figure 7.1**

**Net Confusion Regarding Source and Business Relationship**

**Condition A (Current Vintage Brand Website)**

| | Test Group 1 (1929 Penn State Nittany Lions Logo) | | Test Group 2 (1950 Penn State Nittany Lions Logo) | | Control Group (State of Pennsylvania Seal Logo) | | Net Confusion | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
| # of Respondents | 107 | | 107 | | 109 | | | |
| Confusion as to Source[1] | 14 | 13% | 22 | 21% | 18 | 17% | -3% | 4% |
| Confusion as to Business Relationship[2] | 6 | 6% | 11 | 10% | 1 | 1% | 5% | 9% |
| Confusion - Any | 20 | 19% | 32 | 30% | 19 | 17% | 1% | 12% |

Notes:
[1] Confusion as to Source is based on respondents mentioning Penn State or variations thereof in Q4 ("Who or what entity do you believe puts out the sweatshirt you saw?")
[2] Confusion as to Business Relationship is based on respondents mentioning Penn State or variations thereof in Q8 ("What other entity or entities do you believe have a business relationship with whoever puts out the sweatshirt you saw?")
[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the results that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.
[4] Percentages are calculated as the percentage of respondents within each group.
[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.

Source:
Likelihood of Confusion Survey.

Erdem Report at 29.

126. "Penn State" responses in the control condition cannot be attributed to features of the control stimulus that are University trademarks—those responses indicate that some percentage of respondents are guessing or naming "Penn State" for reasons unrelated to the stimuli themselves, and there is no reason to believe respondents in the test condition are different. *See* Erdem Dep. at 98:15–99:7 (explaining that the same influence that may have affected the control group may have affected the test group).

127. The net confusion levels for questions focused on true source confusion are -3% in Test Group 1 and 4% in Test Group 2. Erdem Report at 29 (Figure 7.1). Most of the overall net "confusion" in Dr. Erdem's study is thus attributable to

answers about whether Vintage Brand has a business relationship with any other entity, not source confusion. *See id.*

128.  Dr. Erdem's survey also analyzed respondent's certainty in their responses. Overall net confusion (for both types of confusion) among respondents who believed their responses were "definitely correct" or "very likely correct" was between 3% and 9%.



**Figure 7.2**

**Net Confusion Regarding Source and Business Relationship**

**Condition A (Current Vintage Brand Website)**

*Controlling for Certainty*

| | Test Group 1 (1929 Penn State Nittany Lions Logo) | | Test Group 2 (1950 Penn State Nittany Lions Logo) | | Control Group (State of Pennsylvania Seal Logo) | | Net Confusion | |
| | | | | | | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
| # of Respondents | 107 | | 107 | | 109 | | | |
| Confusion as to Source[1] | 8 | 7% | 15 | 14% | 11 | 10% | -3% | 4% |
| Confusion as to Business Relationship[2] | 6 | 6% | 5 | 5% | 0 | 0% | 6% | 5% |
| Confusion - Any | 14 | 13% | 20 | 19% | 11 | 10% | 3% | 9% |

Notes:
[1] Confusion as to Source is based on respondents mentioning Penn State or variations thereof in Q4 ("Who or what entity do you believe puts out the sweatshirt you saw?")
[2] Confusion as to Business Relationship is based on respondents mentioning Penn State or variations thereof in Q8 ("What other entity or entities do you believe have a business relationship with whoever puts out the sweatshirt you saw?")
[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the results that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.
[4] Percentages are calculated as the percentage of respondents within each group.
[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.
[6] Q6 reads "In a previous question, you said you believe [PIPE IN ANSWER FROM Q4] puts out the sweatshirt you saw. How likely do you think that your answer is correct?" and Q9 reads "How likely do you think that your answer is correct?" Both of these questions have the following answer options: "Definitely correct," "Very likely correct," "Somewhat likely correct," and "Just guessing."
[7] Respondents were included in the "Top Two Boxes" if they selected "Definitely correct" or "Very likely correct" in Q6 or Q9 for their respective open-ended questions.

Source:
Likelihood of Confusion Survey.

Erdem Report at 29.

129.  Dr. Erdem included questions in her survey addressing the impact of consumer belief regarding what the law requires with respect to the University's permission. Erdem Report at 7, 24, ¶¶ 22, 40.

130. Overall net confusion based on perception of a business relationship, when Dr. Erdem controlled for respondents' belief that the law required a licensing relationship, fell to 4% for Test Group 1, and 9% for Test Group 2.

### Figure 7.3

#### Net Confusion Regarding Source and Business Relationship
#### Condition A (Current Vintage Brand Website)

*Controlling for Legal Belief*

| | Test Group 1 (1929 Penn State Nittany Lions Logo) | | Test Group 2 (1950 Penn State Nittany Lions Logo) | | Control Group (State of Pennsylvania Seal Logo) | | Net Confusion | |
| | | | | | | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
|---|---|---|---|---|---|---|---|---|
| # of Respondents | 107 | | 107 | | 109 | | | |
| Confusion as to Source[1] | 9 | 8% | 17 | 16% | 14 | 13% | -4% | 3% |
| Confusion as to Business Relationship[2] | 5 | 5% | 11 | 10% | 1 | 1% | 4% | 9% |
| Confusion - Any | 14 | 13% | 27 | 25% | 15 | 14% | -1% | 11% |

Notes:
[1] Confusion as to Source is based on respondents mentioning Penn State or variations thereof in Q4 ("Who or what entity do you believe puts out the sweatshirt you saw?")
[2] Confusion as to Business Relationship is based on respondents mentioning Penn State or variations thereof in Q8 ("What other entity or entities do you believe have a business relationship with whoever puts out the sweatshirt you saw?")
[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the results that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.
[4] Percentages are calculated as the percentage of respondents within each group.
[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.
[6] Q18 reads "You may have already said this, but based on the pages you viewed, which of the following, if any, do you believe is true?" and had the following answer options: "I believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt," "I do not believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt," and "Don't know / Unsure."
[7] Respondents were included in this exhibit if they selected "I believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt" in Q18.

Source:
Likelihood of Confusion Survey.

Erdem Report at 30.

131. Dr. Erdem concluded that confusion as to source or business relationship is insubstantial. Erdem Report at 5, ¶ 17.a.

132. The following Figure 8.1 reflects Dr. Erdem's results regarding respondents' beliefs about whether the University was responsible for the quality of Vintage Brand's products.

**Figure 8.1**

**Net Belief Regarding Responsibility for Product Quality**

**Condition A (Current Vintage Brand Website)**

| | Test Group 1 (1929 Penn State Nittany Lions Logo) | | Test Group 2 (1950 Penn State Nittany Lions Logo) | | Control Group (State of Pennsylvania Seal Logo) | | Net Belief | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | N | % | N | % | N | % | Test Group 1 - Control Group % | Test Group 2 - Control Group % |
| # of Respondents | 107 | | 107 | | 109 | | | |
| Belief Regarding Responsibility for Product Quality (Open-Ended)[1] | 0 | 0% | 5 | 5% | 4 | 4% | -4% | 1% |
| Belief Regarding Responsibility for Product Quality (Closed-Ended)[2] | 19 | 18% | 19 | 18% | 16 | 15% | 3% | 3% |
| Belief - Any | 19 | 18% | 20 | 19% | 16 | 15% | 3% | 4% |

Notes:
[1] Belief Regarding Responsibility for Product Quality (Open-Ended) is based on respondents mentioning Penn State or variations thereof in Q14 ("Based on the images you viewed, who do you believe is responsible for the quality of the sweatshirt?")
[2] Belief Regarding Responsibility for Product Quality (Closed-Ended) is based on respondents selecting selected "I expect Penn State alone is responsible for the quality of the sweatshirt" or "I expect that both Vintage Brand and Penn State are responsible for the quality of the sweatshirt" in Q15 ("You may have already said this, but based on the images you viewed, please select one of the following regarding your expectations about who is responsible for the quality of the sweatshirt.")
[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the results that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.
[4] Percentages are calculated as the percentage of respondents within each group.
[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.

Source:
Likelihood of Confusion Survey.

Erdem Report at 38.

133.   Dr. Erdem concluded that "few consumers identify Penn State as an entity that is responsible for the quality of Vintage Brand products." Erdem Report at 5, ¶ 17.b.

Dated:  June 2, 2023                    Respectfully submitted,

By: /s/ *Joshua D. Harms*
    Joshua D. Harms, Esq., *pro hac vice*
    Washington I.D. No. 55679
    Leslie Vander Griend, Esq., *pro hac vice*
    Washington I.D. No. 28090
    John T. Fetters, Esq., *pro hac vice*
    Washington I.D. No. 40800
    Valerie A. Walker, Esq., *pro hac vice*
    Washington I.D. No. 52584
    STOKES LAWRENCE, P.S.
    1420 Fifth Avenue, Suite 3000
    Seattle, WA 98101

Phone:   (206) 626-6000
Fax:       (206) 464-1496
Joshua.Harms@stokeslaw.com
Leslie.VanderGriend@stokeslaw.com
John.Fetters@stokeslaw.com
Valerie.Walker@stokeslaw.com

Mark P. McKenna, Esq., *pro hac vice*
Illinois I.D. No. 6272699
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
Phone:   (646) 898-2055
Fax:       (646) 906-8657
Mark@lex-lumina.com

Jodi S. Wilenzik, Esq.
PA Supreme Court I.D. No. 89205
Mark H. Perry, Esq.
PA Supreme Court I.D. No. 68610
POST & SCHELL, P.C.
1600 JFK Boulevard, 13th Floor
Philadelphia, PA 19103
Phone:  (215) 587-1101
Fax:       (215) 320-4159
jwilenzik@postschell.com
mperry@postschell.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system on this 2nd day of June 2023, which constitutes service on Plaintiff pursuant to Fed. R. Civ. P. 5(b)(2)(E):

> Allison L. Ebeck, Esquire
> McGuire Woods LLP
> Tower Two-Sixty
> 260 Forbes Avenue, Suite 1800
> Pittsburgh, PA  15222-3142
>
> Claire H. Eller, Esquire (admitted pro hac)
> Lucy J. Wheatley, Esquire (admitted pro hac)
> Matthew G. Rosendahl, Esquire (admitted pro hac)
> McGuire Woods LLP
> Gateway Plaza
> 800 East Canal Street
> Richmond, VA  23219-3916
> Attorneys for Plaintiff,
> The Pennsylvania State University

Dated:  June 2, 2023                    By: /s/  *Joshua D. Harms*
                                           Joshua D. Harms, Esq., *pro hac vice*
                                           Washington I.D. No. 55679
                                           STOKES LAWRENCE, P.S.
                                           1420 Fifth Avenue, Suite 3000
                                           Seattle, WA 98101
                                           Phone:   (206) 626-6000
                                           Fax:      (206) 464-1496
                                           Joshua.Harms@stokeslaw.com