## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY,<br><br>　　　　Plaintiff and<br>　　　　Counter-Claim Defendant,<br><br>　v.<br><br>VINTAGE BRAND, LLC;<br><br>　　　　Defendant and Counter-<br>　　　　Claim Plaintiff<br><br>and<br><br>SPORTSWEAR INC. d/b/a PREP SPORTWEAR; CHAD HARTVIGSON; ERIK HARTVIGSON; and MICHELLE YOUNG,<br><br>　　　　Defendants. | Case No. 4:21-cv-01091-MWB<br>(Hon. Matthew W. Brann)<br><br>JURY TRIAL DEMANDED |

## BRIEF IN SUPPORT OF MOTION OF 18 INTELLECTUAL PROPERTY PROFESSORS FOR LEAVE TO FILE BRIEF *AMICI CURIAE* IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Movants, 18 professors of intellectual property (IP) law, have moved for leave to file the attached proposed *amici* brief in support of Vintage Brand's Motion for Summary Judgment. This brief is in support of that motion.

## PROCEDURAL HISTORY

This action involves a dispute over Vintage Brand's use of retro depictions of historic university artwork on their products. Pennsylvania State University ("Penn State") filed a lawsuit against Vintage Brand on June 21, 2021, alleging that this use constitutes trademark infringement, counterfeiting, unfair competition and false designation of origin, false advertising and endorsement, and dilution. *See* Doc. 67 ¶¶ 99-145.

Penn State subsequently filed a motion to dismiss, but this Court denied that motion on July 14, 2022. In its denial, the Court noted the considerable amount of academic literature over recent years involving "sharp criticism of the creation of a broad merchandising right." Doc. 43 at 18-21. The Court expressed interest in further discussion about academics' conclusions that a broad merchandising right was "unmoored from trademark law's 'twin goals of encouraging investment in product quality and preventing consumer deception.'" *Id.* (quoting Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687, 1688 (1999)).

Vintage Brand now seeks summary judgment on these claims. The only counterclaim on which Vintage Brand seeks summary judgment is for cancelation of the registrations for Penn State's Seal Designs. Vintage Brand filed their Motion for Summary Judgment on June 2, 2023.

**STATEMENT OF FACTS**

*Amici* are 18 law professors who teach and write extensively about trademark law and other IP law subjects.[1] *Amici* have no personal interest in this case. Their sole interest is in the orderly development of trademark law in a way that serves the public, in part by balancing legitimate trademark interests, free expression, and informed and competitive markets.

A full list of *amici* can be found in the Appendix.[2]

**STATEMENT OF THE QUESTION**

Should 18 IP professors be granted leave to file the attached proposed brief as *amici curiae* in support of Vintage Brand's Motion for Summary Judgment filed on June 2, 2023.

<u>Suggested Answer:</u> Yes.

**ARGUMENT**

There are no rules in the Federal Rules of Civil Procedure directly applicable to requests for participation as *amici curiae* in district court. Rather, the decision of whether *amici* should be permitted to participate is committed to the broad discretion of the district court. *Wayne Land & Min. Grp. v. Del. River Basin Comm'n*, No. 3:16-CV-00897, 2016 WL 7256945, at *1 (M.D. Pa.

---

[1] *Amici* make the following disclosure similar to the one required for appellate *amicus* briefs by Federal Rule of Appellate Procedure 29(a)(4)(E): No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund its preparation or submission. No person other than the *amici* or their counsel made a monetary contribution to the preparation or submission of this brief. Out of an abundance of caution, counsel for *amici* also note that one of the attorneys in the law firm Lex Lumina, PLLC, one of Defendant Vintage Brand's counsel in this case, is a member of the faculty at Stanford Law School where counsel for *amici*, the Juelsgaard IP & Innovation Clinic, is based. In addition, several attorneys at Lex Lumina, PLLC have, over recent years in their capacity as IP law professors, sometimes signed on to and/or assisted in drafting *amicus* briefs in other IP cases submitted by the Juelsgaard Clinic. However, in this case those professors/attorneys have had no involvement in drafting any of the substance of this proposed *amici* brief.

[2] *Amici* thank Juelsgaard Clinic certified law students Erich Remiker, Lexie Shah, and Benjamin Welton for their valuable contributions to the Motion for Leave and the proposed *amici* brief.

Dec. 15, 2016); *Behar v. Pa. Dep't of Transp.*, 791 F. Supp. 2d 383, 389 n.1 (M.D. Pa. 2011); *Waste Mgmt. of Pa., Inc. v. City of York*, 162 F.R.D. 34, 36 (M.D. Pa. 1995).

A court may grant leave to appear as *amici* if the information offered is timely and relevant. *Waste Mgmt.*, 162 F.R.D. at 36. *Amici* IP professors are experts in trademark law, and many have written about the merchandising issues raised in this case and by this Court in its order denying the University's Motion to Dismiss. *See, e.g.*, Stacey L. Dogan & Mark A. Lemley, *The Merchandising Right: Fragile Theory or* Fait Accompli, 54 Emory L.J. 461, 467 (2005); James Gibson, *Risk Aversion and Rights Accretion in Intellectual Property Law*, 116 Yale L.J. 882 (2007); Laura A. Heymann, *The Public's Domain in Trademark Law: A First Amendment Theory of the Consumer*, 43 Ga. L. Rev. 651 (2009); s*ee also* Doc. 43 at 18-21. Their familiarity with the oft-critiqued case law in this area offers a unique perspective on how to properly apply the Lanham Act to the broader merchandising context. Providing a perspective that may contribute to the Court's understanding of the Lanham Act and the on-point case law is a relevant and important purpose for their participation. *See Harris v. Pernsley*, 820 F.2d 592, 603 (3d Cir. 1987) ("[P]ermitting persons to appear . . . as friends of the court . . . may be advisable where third parties can contribute to a court's understanding.").

The IP professors' participation in this case would be very similar to *amicus* participation in the appellate context, where *amicus* briefs are routinely accepted if the moving party has specialized knowledge, the offered information is relevant, and receiving it may be desirable for the Court.

The IP professors' proposed *amici* brief is timely and will benefit the Court. It is appropriate to look for guidance to the Third Circuit's application of Rule 29 of the Federal Rules of Appellate Procedure for specific requirements. *See United States v. Alkaabi*, 223 F. Supp. 2d

583, 592 (D.N.J. 2002) ("[T]he Third Circuit's application of Fed. R. App. P. 29, which governs the appearance of *amici* in the United States Courts of Appeals, provides guidance to this Court."). Rule 29 requires that *amicus* briefs be filed "no later than 7 days after the principal brief of the party being supported is filed." Fed. R. App. P. 29(a)(6). *Amici* are submitting this motion, with the proposed brief attached, in that same time period.

Because *amici* are experts in the precise legal issues this Court is considering in addressing Defendants' Motion for Summary Judgment and on which it is seeking clarity, and they are filing in a timely fashion, they respectfully request that the Court exercise its broad discretion and grant their Motion for Leave to File Brief *Amici Curiae*.

## CONCLUSION

For the above reasons, *amici* IP professors respectfully request that the Court grant their Motion for Leave to File the Brief *Amici Curiae*.

The proposed *amici* brief is attached.

Dated: June 9, 2023

Respectfully submitted,

**BARLEY SNYDER**

By: /s/ Justin Tomevi
Justin Tomevi
Pa. ID No. 313661
Barley Snyder
100 East Market Street
York, PA 17401
Tel: 717-852-4977
Fax: 717-843-8492
Email: JTomevi@barley.com

Phillip R. Malone (*pro hac vice* pending)
Juelsgaard Intellectual Property &

Innovation Clinic
Mills Legal Clinic, Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Tel: 650-725-6369
Fax: 650-723-4426
Email: PMalone@law.stanford.edu

## APPENDIX—LIST OF *AMICI*

*Amici curiae* are the 18 IP professors listed below. Affiliation is provided for identification purposes only; all signatories are participating in their individual capacity and not on behalf of their institutions.

**Professor Zachary L. Catanzaro**
St. Thomas University College of Law

**Professor Margaret Chon**
Seattle University School of Law

**Professor Stacey Dogan**
Boston University School of Law

**Professor Dave Fagundes**
University of Houston Law Center

**Professor William T. Gallagher**
Golden Gate University School of Law

**Professor James Gibson**
University of Richmond School of Law

**Professor Laura A. Heymann**
William & Mary Law School

**Professor Stacey M. Lantagne**
Western New England University School of Law

**Professor Yvette J. Liebesman**
Saint Louis University School of Law

**Professor Glynn S. Lunney, Jr.**
Texas A&M University School of Law

**Professor Sari Mazzurco**

Yale Law School

**Professor Joseph S. Miller**

University of Georgia School of Law

**Professor Tyler T. Ochoa**

Santa Clara University School of Law

**Professor Aaron Perzanowski**

University of Michigan Law School

**Professor Betsy Rosenblatt**

Case Western Reserve University Law School

**Professor Pamela Samuelson**

Berkeley School of Law

**Professor Jessica Silbey**

Boston University School of Law

**Professor Jason Schultz**

New York University School of Law

# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | |
|         Plaintiff and Counter-Claim Defendant, | Case No. 4:21-cv-01091-MWB (Hon. Matthew W. Brann) |
|    v. | JURY TRIAL DEMANDED |
| VINTAGE BRAND, LLC; | |
|         Defendant and Counter-Claim Plaintiff | |
| and | |
| SPORTSWEAR INC. d/b/a PREP SPORTWEAR; CHAD HARTVIGSON; ERIK HARTVIGSON; and MICHELLE YOUNG, | |
|         Defendants. | |

## [PROPOSED] BRIEF *AMICI CURIAE* OF 18 INTELLECTUAL PROPERTY LAW PROFESSORS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

**Page**

INTEREST OF *AMICI CURIAE*...................................................................1

SUMMARY OF ARGUMENT.......................................................................1

ARGUMENT ................................................................................................3

I.     AN OVERBROAD INSTITUTIONAL MERCHANDISING RIGHT
      UNDERMINES TRADEMARK LAW'S SOURCE-IDENTIFYING
      PURPOSE. ...............................................................................................3

       A.    Trademark Law Is Meant to Protect Source Identifiers.......................3

       B.    *Boston Hockey*'s Erroneous Application of Trademark Law to
              Institutional Merchandising Set Case Law Off Course. ......................5

II.    AN OVERBROAD MERCHANDISING RIGHT HARMS
      CONSUMERS. ........................................................................................9

       A.    Institutional Trademarks on Merchandise Serve an Expressive
              Function, and Trademark Law Should Not Be Used to Stifle
              Those Free Speech Interests. ...............................................................9

       B.    An Overbroad Merchandising Right Inhibits Competition. ...............10

III.   THIS CASE CAN HELP CORRECT YEARS OF MISTAKEN LAW,
      RESHAPING CONSUMER PERCEPTIONS AND PROTECTING
      THE PUBLIC...........................................................................................12

       A.    This Case Can Fix *Boston Hockey*'s Mistake....................................13

       B.    Clear Labeling Can Address Any Risk of Confusion While
              Correcting Consumer Perceptions. .....................................................14

IV.   CONCLUSION .....................................................................................16

APPENDIX—LIST OF *AMICI*................................................................A1

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Greetings Corp. v. Dan-Dee Imps., Inc.*,
807 F.2d 1136 (3d Cir. 1986) ............................................................. 15

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
457 F.3d 1062 (9th Cir. 2006) ........................................................ 7, 8

*Bi-Rite Enters., Inc. v. Button Master*,
555 F. Supp. 1188 (S.D.N.Y. 1983) ..................................................... 8

*Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack
Apparel Co.*,
550 F.3d 465 (5th Cir. 2008) .............................................................. 7

*Bos. Athletic Ass'n v. Sullivan*,
867 F.2d 22 (1st Cir. 1989) ................................................................. 7

*Boston Pro. Hockey Ass'n, Inc. v. Dallas Cap Emblem Mfg., Inc.*,
510 F.2d 1004 (5th Cir. 1975) .................................................... *passim*

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003) ............................................................................. 6

*Int'l Ord. of Job's Daughters v. Lindeburg & Co.*,
633 F.2d 912 (9th Cir. 1980) ..................................................... 7, 8, 10

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
No. 22-148, 599 U.S. _____ (2023) ............................................ 4, 5, 13

*King-Seeley Thermos Co. v. Aladdin Indus., Inc.*,
321 F.2d 577 (2d Cir. 1963) .............................................................. 15

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
543 U.S. 111 (2004) ........................................................................... 9

*Mattel, Inc. v. MCA Recs., Inc.*,
296 F.3d 894 (9th Cir. 2002) ......................................................... 9, 10

*Nat'l Football League Props., Inc. v. Wichita Falls Sportswear, Inc.*,
 532 F. Supp. 651 (W.D. Wash. 1982) ................................................. 9

*New Kids on the Block v. News Am. Publ'g, Inc.*,
 971 F.2d 302 (9th Cir. 1992) ................................................. 4, 10

*Qualitex Co. v. Jacobson Prods. Co., Inc.*,
 514 U.S. 159 (1995) ................................................. 4, 5

*Rogers v. Grimaldi*,
 875 F.2d 994 (2d Cir. 1989) ................................................. 9

*Supreme Assembly, Ord. of Rainbow for Girls v. J. H. Ray
 Jewelry Co.*,
 676 F.2d 1079 (5th Cir. 1982) ................................................. 6, 7

*United States v. Giles*,
 213 F.3d 1247 (10th Cir. 2000) ................................................. 8

*Univ. of Ga. Athletic Ass'n v. Laite*,
 756 F.2d 1535 (11th Cir. 1985) ................................................. 7

*Univ. of Pittsburgh v. Champion Prods.*,
 686 F.2d 1040 (3d Cir. 1982) ................................................. 13

## Statutes

15 U.S.C. § 1114 ................................................. 3

15 U.S.C. § 1125 ................................................. 3, 13

15 U.S.C. § 1127 ................................................. 3, 13

## Other Authorities

Stacey L. Dogan & Mark A. Lemley, *The Merchandising Right:
 Fragile Theory or* Fait Accompli, 54 Emory L.J. 461 (2005) ............................. 4, 5

Fed. R. App. P. 29(a)(4)(E) ................................................. 1

James Gibson, *Risk Aversion and Rights Accretion in Intellectual
 Property Law*, 116 Yale L.J. 822 (2007) ................................................. 8

Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687 (1999) ...................................................................4, 9

Glynn S. Lunney Jr., *Trademark Monopolies*, 48 Emory L.J. 367 (1999) ...........................................................................................11, 12, 14

*Penn State Athletics Online Store*, https://perma.cc/98ES-3TRE (last visited June 5, 2023) ...........................................................................12

## INTEREST OF *AMICI CURIAE*

*Amici* are 18 law professors who teach and write extensively about trademark law and other intellectual property law subjects.[1] *Amici* have no personal interest in this case. *Amici*'s sole interest is in the orderly development of trademark law in a way that serves the public interest, in part by balancing legitimate trademark interests, free expression, and informed and competitive markets.

A full list of *amici* can be found in the Appendix.[2]

## SUMMARY OF ARGUMENT

Trademark law has gone awry, and this Court can help fix it. Trademarks are, as a matter of both law and policy, supposed to function as source identifiers. When consumers see a source-identifying trademark, they know they are receiving goods[3] made or endorsed by a particular producer. When trademark law is applied to regulate non-source-identifying uses and expressions, consumers suffer from higher prices and reduced market choice. If the trademark represents a cultural institution, such as a sports team or university, there is an additional cost: consumers' ability to express support for that institution is hindered. When most consumers buy a Chicago Cubs shirt, they are probably not doing so because they think the Cubs make high-quality clothing. If they were concerned about that, they would look for the logo in a trademark space, such as the tag or the sleeve. Instead, by purchasing and wearing a Cubs shirt, they are sending a message to

---

[1] *Amici* make the following disclosure similar to the one required for appellate *amicus* briefs by Federal Rule of Appellate Procedure 29(a)(4)(E): No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund its preparation or submission. No person other than the *amici* or their counsel made a monetary contribution to the preparation or submission of this brief.

[2] *Amici* thank Juelsgaard Intellectual Property and Innovation Clinic certified law students Erich Remiker, Lexie Shah, and Benjamin Welton for their valuable contributions to the Motion for Leave and this *amici* brief.

[3] Trademarks also apply to services. This brief uses the term "goods" given the products at issue in this case, but all the argumentation would apply to services as well.

the public. That message may be "I support the same team as you," or it may be "I am okay with losing many games," but it is an expressive message, nonetheless. Expanding trademark law to cover these expressive uses mistakes its purpose.

Unfortunately, as this Court has itself noted, one misguided ruling has confused the law in this area. *See* Doc. 43 at 16. In *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap Emblem Manufacturing, Inc.*, 510 F.2d 1004 (5th Cir. 1975), the Fifth Circuit failed to properly ask if consumers used a mark to identify the source or sponsorship of the *goods*, instead granting a broad merchandising right merely because consumers associated the source or sponsorship of the *mark* with the plaintiff. This erroneous decision has befuddled courts and misled consumers for nearly fifty years. A clear ruling from this Court curtailing an overbroad merchandising right would promote consumer interests and realign trademark law with its intended goal of enabling informed and competitive markets.

*Amici* do not express a position on what to do when the trademark owner is not a cultural institution like a sports team or university. When the trademark owner is a cultural institution, it is almost certainly the case that a significant number of consumers are using the trademark for expressive, non-source-identifying purposes. Accordingly, this Court can and should limit itself to the easier question: whether consumers should have access to merchandise that allows them to express their support for a cultural institution, even if that merchandise is not authorized by the institution.

**ARGUMENT**

## I.   AN OVERBROAD INSTITUTIONAL MERCHANDISING RIGHT UNDERMINES TRADEMARK LAW'S SOURCE-IDENTIFYING PURPOSE.

Trademark law aims to protect the accuracy of information about who makes or stands behind the quality of products sold in the marketplace. But when cultural institutions like Pennsylvania State University ("Penn State") enforce their trademarks against the types of uses in which companies like Vintage Brand are engaging, they are doing nothing to improve the public's access to information about the quality or source of the products that consumers buy.

Unfortunately, some of the case law has failed to recognize the importance of determining whether institutional marks are truly source identifying for consumers when displayed on t-shirts and similar goods. Beginning with *Boston Hockey*, some courts have found trademark infringement in the institutional merchandising context simply because consumers associate the marks emblazoned on merchandise with the trademark owners. This is inconsistent with the law on trademark infringement, which asks whether consumers are confused as to the source or sponsorship of the product. These opinions have extended trademark owners' rights beyond what Congress intended and have created uncertainty about the law. Trademark holders have then used these opinions to justify further control over the use of their marks on merchandise, to the detriment of consumers.

### A.   Trademark Law Is Meant to Protect Source Identifiers.

The Lanham Act defines trademarks as words, designs, or symbols used to distinguish goods "from those manufactured or sold by others and *to indicate the source of the goods.*" 15 U.S.C. § 1127 (emphasis added). The Act then creates a cause of action for the use of a mark that is likely to cause confusion as to a good's "origin, sponsorship, or approval." 15 U.S.C. § 1125; *see also* 15 U.S.C. § 1114 (establishing the cause of action for registered marks). Courts and

scholars have long recognized that identification of a product's source or sponsorship is a central tenet of trademark law. *See, e.g.*, *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, No. 22-148, 599 U.S. ____ (2023) (slip op., at 3) ("[A] trademark is not a trademark unless it identifies a product's source."); *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 305 (9th Cir. 1992) ("[T]he purpose of trademarks remain[s] constant and limited: Identification of the manufacturer or sponsor of a good . . . ."); Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687, 1695 (1999) ("We give protection to trademarks for one basic reason: to enable the public to identify easily a particular product from a particular source."). Trademark law preserves source identification by preventing competitors from using such marks when doing so is likely to confuse consumers about the source or sponsorship of the goods.

Protecting the source-identifying function of trademarks enables more competitive markets, which benefits buyers and sellers. Source-identifying marks reduce consumer costs by serving as a heuristic for consumers to more easily find goods from familiar producers. *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 164 (1995) (noting that trademark law "quickly and easily assures a potential customer that *this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past"). This, in turn, means that "consumers will make better-informed purchases, which will increase their overall utility and push producers to develop better quality products." Stacey L. Dogan & Mark A. Lemley, *The Merchandising Right: Fragile Theory or* Fait Accompli, 54 Emory L.J. 461, 467 (2005).

Trademark law ensures the reliability of these source identifiers by protecting consumers and producers from parties who deceptively market their own product as that of another—for example, the cola manufacturer that labels its product Popsi in the hopes of confusing consumers

who are looking for Pepsi. Trademark law ensures producers "will reap the financial, reputation-related rewards associated with a desirable product" rather than their competitors. *Qualitex*, 514 U.S. at 164. Trademark law also protects consumers by "discourag[ing] those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale." *Id.* The Supreme Court recently affirmed the importance of protecting against source or sponsorship confusion in *Jack Daniel's Properties, Inc. v. VIP Products LLC*, No. 22-148, 599 U.S. ____ (2023) (slip op., at 4): "[c]onfusion as to source is the bête noire of trademark law—the thing that stands directly opposed to the law's twin goals of facilitating consumers' choice and protecting producers' good will."

But it is almost certainly the case that a significant number of consumers do not view trademarks in the institutional merchandising context as identifying source or sponsorship. These consumers purchase merchandise featuring the logo of a university or sports team not because the trademark tells them who stands behind the quality of the merchandise, but simply because they want to communicate to others their support for the institution by wearing or displaying the item. Dogan & Lemley, *supra*, at 471-72 ("But the mark in these cases is rarely serving the traditional function of a trademark. Rather than indicating something to the consumer about the source or sponsorship of a product, the mark *is* the product."). Granting cultural institutions the broad right to prevent these expressive, non-source-identifying uses of their marks thus does not advance trademark law's core informational goals.

**B.** ***Boston Hockey*'s Erroneous Application of Trademark Law to Institutional Merchandising Set Case Law Off Course.**

Unfortunately, *Boston Hockey* ignored the law and uncritically granted an overbroad institutional merchandising right. There*,* the National Hockey League and thirteen of its member teams sued Dallas Cap & Emblem Manufacturing to stop it from making and selling embroidered

patches featuring the plaintiffs' trademarked hockey team logos. *Boston Pro. Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1008-09 (5th Cir. 1975). The court did not ask if consumers believed the plaintiffs were manufacturing the goods. It did not ask whether the marks were serving to identify the product's source or sponsorship. It did not consider the expressive value of the marks. Instead, the court held that consumers were confused merely because they believed the plaintiffs were "the source and origin *of the trademark symbols*." *Id.* at 1012 (emphasis added). That is, the court asked only whether consumers had a mental association between the trademarks and the trademark owners.

This is not the law. Indeed, this Court has recognized that this "per se approach" is "a clear loser." Doc. 43 at 16. Furthermore, the Supreme Court has precluded *Boston Hockey*'s logic by reinforcing that infringement requires that consumers are confused as to the source of the *goods*, not the source of the *mark. Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003) ("[W]e conclude that ['origin of goods' in the Lanham Act] refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods."). Concluding otherwise would erode the distinction between trademark law and copyright and patent law that the Court has insistently maintained. *Id.* at 34.

The Fifth Circuit later qualified *Boston Hockey*, but it did not fully correct its initial mistake. In *Supreme Assembly, Order of Rainbow for Girls v. J. H. Ray Jewelry Co.*, 676 F.2d 1079, 1085 (5th Cir. 1982), it emphasized that courts should determine "whether in a given case knowledge of the source of the symbol supports the inference that many of the product's typical purchasers would believe that the product itself originated with or was somehow endorsed by the owner of the mark." The *Rainbow for Girls* court thus affirmed the district court's conclusion that

no infringement had occurred. *Supreme Assembly, Ord. of Rainbow for Girls v. J. H. Ray Jewelry Co.*, 676 F.2d 1079, 1085 (5th Cir. 1982). However, in *Board of Supervisors for Louisiana State University Agricultural & Mechanical College v. Smack Apparel Co.*, 550 F.3d 465, 485 (5th Cir. 2008), the Fifth Circuit seemed to return to the assumptions underlying *Boston Hockey*—namely, that consumers' perception of the source of the mark is the same as consumers' perception of the source of the good on which the mark appears.

As in *Smack*, some courts have continued to follow the *Boston Hockey* approach. *See, e.g.*, *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546 (11th Cir. 1985) (stating that under *Boston Hockey*, confusion "need not relate to the origin of the challenged product" but can relate only to "the public's knowledge that the trademark . . . originates with the plaintiff."); *Bos. Athletic Ass'n v. Sullivan*, 867 F.2d 22, 33-34 (1st Cir. 1989) (adopting *Boston Hockey*'s presumption of confusion if consumers associate the mark at issue with the mark owner).

Other courts have tried to distance themselves from *Boston Hockey* but have failed to do so with clarity. The Ninth Circuit, for example, originally rejected *Boston Hockey*'s expansive view of merchandising rights. It correctly interpreted the Lanham Act to narrowly "protect consumers against deceptive designations of the origin of *goods*." *Int'l Ord. of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 918-19 (9th Cir. 1980) (emphasis added) (noting that "[t]he *Boston Hockey* decision transmogrifies this narrow protection into a broad monopoly" and extends it "beyond that intended by Congress"). However, the Ninth Circuit partially walked this position back in *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062 (9th Cir. 2006), by holding that Volkswagen could stop sales of keychains bearing their logo. It distinguished *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912 (9th Cir. 1980), as a "somewhat unique case" involving a collective mark—a mark indicating membership in an

7

association or organization. *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1069 (9th Cir. 2006). By preserving *Job's Daughters* for certain types of marks, *Au-Tomotive Gold* has muddied the waters. Cultural institutions' trademarks are arguably like collective marks since they signal association. However, the law in the Ninth Circuit is still enshrouded in considerable smog.

Some courts have more clearly rejected *Boston Hockey*, as this Court has noted. *See, e.g.*, *United States v. Giles*, 213 F.3d 1247, 1250 (10th Cir. 2000) (admonishing *Boston Hockey*'s "reli[ance] upon a novel and overly broad conception of the rights that a trademark entails"); *Bi-Rite Enters., Inc. v. Button Master*, 555 F. Supp. 1188, 1194 (S.D.N.Y. 1983) (explaining that *Boston Hockey*'s "zeal to protect the full value of marks . . . cannot negate the fact that unfair competition law clearly requires confusion as to the source of goods before it will protect against the unauthorized use of a mark"); *see also* Doc. 43 at 10, 10 n.37 (collecting cases). But incongruent case law has led to substantial uncertainty. This case is an opportunity to inject much-needed clarity into the law.

Injecting this clarity is particularly important because *Boston Hockey* may have affected consumers' understandings and expectations, leading to a circular expansion of trademark law. James Gibson, *Risk Aversion and Rights Accretion in Intellectual Property Law*, 116 Yale L.J. 822, 920-23 (2007). The ambiguous case law around the country has led many risk-averse manufacturers to play it safe by getting a license for merchandise featuring institutional marks. *Id.* When merchandise producers avoid using others' institutional trademarks even when it is legally allowed, consumers may internalize the incorrect conclusion that trademark owners get to control all uses of their marks. This, in turn, may lead consumers to assume that the trademark of a cultural institution on merchandise has been or should be licensed by the trademark owner, which then

feeds into the confusion analysis. *See, e.g.*, *Nat'l Football League Props., Inc. v. Wichita Falls Sportswear, Inc.*, 532 F. Supp. 651, 661 (W.D. Wash. 1982) ("53.6% of the interviewees who were shown jerseys with a player's name on the front and 47.8% of those shown shirts with the team nickname felt that authorization from the NFL or the member club was required."); Lemley, *supra*, at 1708. These consumers are confused as to the law, not as to the source of any product. The law should not perpetuate a mistake—and reinforce a cycle of confusion—merely because the public has been conditioned to accept that mistake as the law.

## II.     AN OVERBROAD MERCHANDISING RIGHT HARMS CONSUMERS.

Trademark law's narrow purpose is by design, since overprotection of trademarks raises prices, decreases product diversity, and stifles free expression. These problems are particularly acute in the context of institutional trademarks.

### A.     Institutional Trademarks on Merchandise Serve an Expressive Function, and Trademark Law Should Not Be Used to Stifle Those Free Speech Interests.

When marks are not being used to identify a product's source or sponsorship, trademark law should yield to free speech. As courts have recognized, overly broad rights harm free expression. *See, e.g.*, *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989) ("Because overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict."); *Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894, 900 (9th Cir. 2002) ("Were we to ignore the expressive value that some marks assume, trademark rights would grow to encroach upon the zone protected by the First Amendment.").

Accordingly, unauthorized uses of another's mark are permitted when the interest in free expression outweighs the interest in protecting against consumer confusion. The law endorses defenses like descriptive and nominative fair use to balance free speech interests. *See, e.g.*, *KP*

*Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004) ("The Lanham Act adopts a similar leniency, there being no indication that the statute was meant to deprive commercial speakers of the ordinary utility of descriptive words."); *Mattel*, 296 F.3d at 900 ("[T]he trademark owner does not have the right to control public discourse whenever the public imbues his mark with a meaning beyond its source-identifying function."); *New Kids on the Block*, 971 F.2d at 308 ("Such *nominative use* of a mark—where the only word reasonably available to describe a particular thing is pressed into service—lies outside the strictures of trademark law . . . .").

Institutional trademarks displayed prominently on merchandise serve such an expressive function. This merchandise can promote a wide range of messages for consumers who use and wear it, as "[w]e commonly identify ourselves by displaying emblems expressing allegiances." *Job's Daughters*, 633 F.2d at 918. Our "jewelry, clothing, and cars are emblazoned with inscriptions showing the cultural institutions we belong to, the schools we attend, the landmarks we have visited, the sports teams we support." *Id.* Students wear shirts bearing their university's name to signal their association. Sports fans wear their Steelers jerseys on Sundays to demonstrate their support for their team. High schoolers wear Harvard sweaters to indicate their academic aspirations. These are all legitimate ways that individuals express themselves, and these uses push back against the notion that consumers purchase these goods because they believe the cultural institution was the source that designed, manufactured, or sponsored the goods. It is unlikely that these marks are being used by consumers to identify the source or sponsorship of the product, and their important expressive value should accordingly outweigh the minimal risk of confusion.

**B.    An Overbroad Merchandising Right Inhibits Competition.**

In addition to threatening self-expression, an overbroad merchandising right also harms consumers economically. Consumers benefit from competition through lower prices and a greater

variety of goods. Giving cultural institutions the power to block non-source-identifying uses of their marks creates an unjustified monopoly at the public's expense. *Boston Hockey* itself acknowledged that its decision could "slightly tilt the trademark laws from the purpose of protecting the public to the protection of business interests of plaintiffs." 510 F.2d at 1011. This Court should tilt them back.

Granting an overbroad trademark right has costs for consumers. A merchandising right grants a monopoly over a good for which there are no close substitutes. If a fan wants to signal their support for the Yankees, no other cap will do—it must have the interlocking NY logo. The lack of substitutes enables trademark owners to extract monopoly rents at the expense of consumers. *See* Glynn S. Lunney Jr., *Trademark Monopolies*, 48 Emory L.J. 367, 423-24 (1999). No new value or surplus is created from this monopoly. *Id* at 459-60. Wealth is simply transferred from consumers to brands. *Id.* Indeed, society is made worse off: some consumers who would have purchased a piece of merchandise at a lower price do not do so at the price a monopolist sets, creating deadweight loss. *Id.* at 431. Monopoly rents manifest here, as everywhere, in the form of higher prices and reduced variety of goods. *Id.* at 431, 460. Vintage Brand itself illustrates the point, as the designs it produces fulfill a unique market niche that the trademark owners did not exploit. By doing so, Vintage Brand gives at least some consumers a product they wanted and would not have otherwise had. Trademark law should—and is designed to—incentivize this competition.

Increased competition will naturally lead to a range of quality in goods, benefiting consumers. Some manufacturers may produce high-quality expressive merchandise, while others may produce lower-quality expressive merchandise. So long as consumers can identify the producer of a good via accurate labeling (e.g., by using a trademark on a hang tag or an inscription

inside a shirt collar), consumers will be able to build brand preferences and choose products and price points with accurate information about the provenance and quality of goods. *Id.* at 460.

There is no reason to think that cultural institutions will be unable to compete in the marketplace absent a broad merchandising right. Indeed, trademark owners like Penn State will always enjoy a competitive advantage with regard to consumers who want the "official" merchandise because only Penn State can label its merchandise as such—and it can charge a premium for the privilege. Accurate labeling allows consumers to identify officially licensed goods in the marketplace, empowering their purchasing decisions.[4]

The overbroad merchandising right for which Plaintiff advocates elevates the interests of trademark owners above those of consumers. Whether in the form of higher prices, reduced product diversity, or limited expression, an overbroad institutional merchandising right for these non-source-identifying marks results in societal harms.

## III.   THIS CASE CAN HELP CORRECT YEARS OF MISTAKEN LAW, RESHAPING CONSUMER PERCEPTIONS AND PROTECTING THE PUBLIC.

This case offers an opportunity to correct *Boston Hockey*'s historical mistake. To the extent that the Fifth Circuit's error has altered consumer expectations about licensing relationships, accurate labeling can resolve latent confusion. Having a clear distinction between licensed and unlicensed products preserves the benefits of competition for all consumers while reducing any risk of confusion. Indeed, accurate labeling can improve the information marketplace by educating consumers about the true relationship between cultural institutions and the manufacturers who sell products featuring their marks.

---

[4] In fact, Penn State already uses "official" merchandise labeling. *See Penn State Athletics Online Store*, https://perma.cc/98ES-3TRE (last visited June 5, 2023) (the first item advertised is "The Official Penn State White Out Collection").

A. **This Case Can Fix *Boston Hockey*'s Mistake.**

This case can help correct the confusion stemming from ambiguous and circular cases like *Boston Hockey*. Although *Boston Hockey* has led other courts astray, the decision is not binding case law in the Third Circuit. *See* Doc. 43 at 15 (noting that *Univ. of Pittsburgh v. Champion Prods.*, 686 F.2d 1040 (3d Cir. 1982), did not create binding precedent). This Court can properly refocus infringement analysis on confusion about source or sponsorship of the product, rather than of the trademark.

Part of the corrective role this case can play is clearly articulating the standards for evaluating survey evidence in the institutional merchandising context. Merely asking if a consumer associates the appearance of a trademark with its owner, as *Boston Hockey* did, will overestimate consumer confusion and lead to mistaken legal outcomes. Similarly, surveys should not ask whether consumers believe permission is required to use another's trademark, especially since consumers may merely be taking cues from risk-averse licensing by manufacturers. *Cf. Jack Daniel's*, 599 U.S. at ____ (Sotomayor, J., concurring) (slip op., at 1) (warning against finding infringement based on "[s]urvey answers [that] reflect a mistaken belief among some survey respondents that all parodies require permission from the owner of the parodied mark"). Instead, in accordance with the Lanham Act and the longstanding goals of trademark law, surveys should ask whether consumers believe that the trademark owner is the source or sponsor of the good, not the mark. *See* 15 U.S.C. §§ 1125, 1127.

Vintage Brand's survey asks the proper questions, examining "whether and to what extent consumers are confused" about "the source of Vintage Brand's products as they relate to Penn State" and "whether a business relationship exists between Vintage Brand and Penn State." Doc. 94-7 ¶ 13. Meanwhile Penn State's survey failed to note that many of the purportedly

13

"confused" responses were due to respondents' beliefs that anyone referencing the University must have legal permission. Doc. 115 at 20.

Rejecting Penn State's trademark claims would also help correct consumers' misconceptions about institutional merchandising. Research suggests that the law influences consumers' experiences in the marketplace and shapes their expectations. Lunney, *supra*, at 396. The more unclear the law remains regarding the use of trademarks on institutional merchandise, the more that merchandise producers will be unwilling to engage in activity that ultimately should be deemed lawful. Consequently, consumers will learn the wrong lesson about what trademark law requires. Other courts pushing back against *Boston Hockey* and its progeny have started this corrective work, but they have been insufficient to discourage questionable trademark claims like this one. An additional and more complete rejection of *Boston Hockey* will more easily and quickly correct case law's historical error. This Court can facilitate this process by refocusing infringement analysis on confusion as to source or sponsorship of goods, rather than mere mental association between mark and mark-holder.

### B.   Clear Labeling Can Address Any Risk of Confusion While Correcting Consumer Perceptions.

It may be the case that some consumers view institutional trademarks on merchandise as an indicator of source or sponsorship. Such consumers may not use the trademark primarily as a means of expression. Rather, they may use it to select merchandise that is authorized by the cultural institution, whether because they believe that the institution stands behind the quality of the product or because they believe their money will go directly to the institution.

Given the possibility that such consumers exist, clear labeling can indicate that the goods are (or are not) authorized by the trademark holder. Consumers who want to buy officially authorized products can look for information about source or sponsorship on the label, hang tag,

or another trademark space. Such labeling corrects any misperception about the relationship between the trademark holder and the manufacturer while preserving consumer benefits in the form of lower prices, greater product variety, and increased freedom of expression. Labeling benefits those consumers who want to buy merchandise officially authorized by the trademark holder while giving those consumers who merely want to express their support the benefits of competition. Clear labeling also corrects the circularity problem identified above. *See* Part II.A, *supra*. As consumers grow accustomed to these labels, they will begin to expect official merchandise only when it is labeled as such.

Although courts often describe disclaimers as disfavored in trademark cases, they can play an important role in situations that require a balancing between trademark-holder interests and other core trademark interests such as speech and competition. Courts have successfully used clear labeling in the genericide context to transition consumer expectations for a portion of consumers who still use a mark as a source identifier while protecting the speech of those that use the mark generically. *See King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577, 579-81 (2d Cir. 1963) (holding that "thermos" had become generic when only 12% of consumers used the term as a source identifier but requiring defendants to use clear labeling to protect against confusion among the minority of consumers). Likewise, functional features are unprotected by trademark law because of their competitive significance, but sometimes consumers associate those features with a single original manufacturer. *See Am. Greetings Corp. v. Dan-Dee Imps., Inc.*, 807 F.2d 1136, 1142 (3d Cir. 1986). In that context, courts sometimes require clear labeling to dispel any risk of confusion. *See, e.g.*, *Id.* at 1141 ("[I]f the functional feature or combination is also found to have acquired secondary meaning, the imitator may be required to take reasonable steps to minimize the risk of source confusion."). Applying similar logic here, the use of clear labeling and

disclaimers could help transition consumer expectations while respecting consumers who do not use cultural institutions' marks as source identifiers.

## IV.    CONCLUSION

For the above reasons, we urge the Court to grant Vintage Brand's Motion for Summary Judgment.

Dated: June 9, 2023

<div style="margin-left: 40%;">

Respectfully submitted,

**BARLEY SNYDER**

By: /s/ Justin Tomevi
Justin Tomevi
Pa. ID No. 313661
Barley Snyder
100 East Market Street
York, PA 17401
Tel: 717-852-4977
Fax: 717-843-8492
Email: JTomevi@barley.com


Phillip R. Malone (*pro hac vice* pending)
Juelsgaard Intellectual Property &
   Innovation Clinic
Mills Legal Clinic, Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Tel: 650-725-6369
Fax: 650-723-4426
Email: PMalone@law.stanford.edu

</div>

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.8(b)</u>

I hereby certify that 18 IP professors' Brief *Amici Curiae* complies with the word limit for briefs exceeding fifteen pages, set forth in Local Rule 7.8(b). This brief is 4,784 words from Interest of *Amici Curiae* through the Conclusion, less than the 5,000-word limit prescribed by Local Rule 7.8(b).


DATED: June 9, 2023

<div style="margin-left:40%">

By: /s/ Justin Tomevi
Justin Tomevi
Pa. ID No. 313661
Barley Snyder
100 East Market Street
York, PA 17401
Tel: 717-852-4977
Fax: 717-843-8492
Email: JTomevi@barley.com

Phillip R. Malone (*pro hac vice* pending)
Juelsgaard Intellectual Property &
    Innovation Clinic
Mills Legal Clinic, Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Tel: 650-725-6369
Fax: 650-723-4426
Email: PMalone@law.stanford.edu

</div>

## APPENDIX—LIST OF *AMICI*

*Amici curiae* are the 18 IP professors listed below. Affiliation is provided for identification purposes only; all signatories are participating in their individual capacity and not on behalf of their institutions.

**Professor Zachary L. Catanzaro**
St. Thomas University College of Law

**Professor Margaret Chon**
Seattle University School of Law

**Professor Stacey Dogan**
Boston University School of Law

**Professor Dave Fagundes**
University of Houston Law Center

**Professor William T. Gallagher**
Golden Gate University School of Law

**Professor James Gibson**
University of Richmond School of Law

**Professor Laura A. Heymann**
William & Mary Law School

**Professor Stacey M. Lantagne**
Western New England University School of Law

**Professor Yvette J. Liebesman**
Saint Louis University School of Law

**Professor Glynn S. Lunney, Jr.**
Texas A&M University School of Law

**Professor Sari Mazzurco**
Yale Law School

**Professor Joseph S. Miller**
University of Georgia School of Law

**Professor Tyler T. Ochoa**
Santa Clara University School of Law

**Professor Aaron Perzanowski**
University of Michigan Law School

**Professor Betsy Rosenblatt**
Case Western Reserve University Law School

**Professor Pamela Samuelson**
Berkeley School of Law

**Professor Jessica Silbey**
Boston University School of Law

**Professor Jason Schultz**
New York University School of Law

# UNPUBLISHED/UNREPORTED OPINIONS

**Pursuant to Local Rule 7.8(a)**

(Slip Opinion) OCTOBER TERM, 2022 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JACK DANIEL'S PROPERTIES, INC. *v.* VIP PRODUCTS LLC

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 22–148.  Argued March 22, 2023—Decided June 8, 2023

The Lanham Act, the core federal trademark statute, defines a trademark by its primary function: identifying a product's source and distinguishing that source from others.  In serving that function, trademarks help consumers select the products they want to purchase (or avoid) and help producers reap the financial rewards associated with a product's good reputation.  To help protect trademarks, the Lanham Act creates federal causes of action for trademark infringement and trademark dilution.  In a typical infringement case, the question is whether the defendant's use of a mark is "likely to cause confusion, or to cause mistake, or to deceive."  15 U. S. C. §§1114(1)(A), 1125(a)(1)(A).  In a typical dilution case, the question is whether the defendant "harm[ed] the reputation" of a famous trademark. §§1125(c)(2)(A), (C).

Respondent VIP Products makes a squeaky, chewable dog toy designed to look like a bottle of Jack Daniel's whiskey.  But not entirely.  On the toy, for example, the words "Jack Daniel's" become "Bad Spaniels."  And "Old No. 7 Brand Tennessee Sour Mash Whiskey" turns into "The Old No. 2 On Your Tennessee Carpet."  These jokes did not impress petitioner Jack Daniel's Properties, which owns trademarks in the distinctive Jack Daniel's bottle and in many of the words and graphics on its label.

Soon after the Bad Spaniels toy hit the market, Jack Daniel's demanded that VIP stop selling it.  VIP filed suit, seeking a declaratory judgment that Bad Spaniels neither infringed nor diluted Jack Daniel's trademarks.  Jack Daniel's counterclaimed for infringement and dilution.  At summary judgment, VIP argued that Jack Daniel's infringement claim failed under the so-called *Rogers* test—a threshold

test developed by the Second Circuit and designed to protect First Amendment interests in the trademark context. See *Rogers* v. *Grimaldi*, 875 F. 2d 994. When "expressive works" are involved, VIP contended, that test requires dismissal of an infringement claim at the outset unless the complainant can show either (1) that the challenged use of a mark "has no artistic relevance to the underlying work" or (2) that it "explicitly misleads as to the source or the content of the work." *Id.,* at 999. Because Jack Daniel's could not make that showing, VIP claimed, the Lanham Act's statutory "likelihood of confusion" standard became irrelevant. And as for the dilution claim, VIP urged that Jack Daniel's could not succeed because Bad Spaniels was a parody of Jack Daniel's and therefore made "fair use" of its famous marks. §1125(c)(3)(A)(ii).

The District Court rejected both of VIP's contentions for a common reason: because VIP had used the cribbed Jack Daniel's features as trademarks—*i.e.,* to identify the source of its own products. As the District Court saw it, when another's trademark is used for "source identification," *Rogers* does not apply, and instead the infringement suit turns on likelihood of confusion. The court likewise rejected VIP's invocation of the fair-use exclusion, holding that parodies fall within that exclusion only when they do not use a famous mark to identify the source of the alleged diluter's product. The case proceeded to a bench trial, where the District Court found that consumers were likely to be confused about the source of the Bad Spaniels toy and that the toy's negative associations with dog excrement (*e.g.,* "The Old No. 2") would harm Jack Daniel's reputation. The Ninth Circuit reversed. Finding the infringement claim subject to the threshold *Rogers* test, the Court of Appeals remanded the case to the District Court to decide whether Jack Daniel's could satisfy either prong of that test. And the Court of Appeals awarded judgment on the dilution claim to VIP, holding that because Bad Spaniels parodies Jack Daniel's, it falls under the "noncommercial use" exclusion. §1125(c)(3)(C). On remand, the District Court found that Jack Daniel's could not satisfy either prong of *Rogers*, and so granted summary judgment to VIP on infringement. The Court of Appeals summarily affirmed.

*Held*:

1. When an alleged infringer uses a trademark as a designation of source for the infringer's own goods, the *Rogers* test does not apply. Pp. 10–19.

(a) The Second Circuit created the *Rogers* test for titles of "artistic works" based on its view that such titles have an "expressive element" implicating "First Amendment values" and carry only a "slight risk" of confusing consumers about the "source or content" of the underlying work. 875 F. 2d, at 998–1000. Over the decades, lower courts adopting

Syllabus

*Rogers* have confined it to similar cases, in which a trademark is used not to designate a work's source, but solely to perform some other expressive function. See, *e.g., Mattel, Inc.* v. *MCA Records, Inc.*, 296 F. 3d 894, 901 (use of the Barbie name in band's song "Barbie Girl" was "not [as] a source identifier"). The same courts, though, routinely conduct likelihood-of-confusion analysis in cases where trademarks are used as trademarks—*i.e.*, to designate source. See, *e.g., Tommy Hilfiger Licensing, Inc.* v. *Nature Labs, LLC*, 221 F. Supp. 2d 410, 414–415 (parodic pet perfumes did not trigger *Rogers* because defendant's use of Tommy Hilfiger's mark was "at least in part" for "source identification"). Thus, whatever *Rogers'* merit—an issue on which this Court takes no position—it has always been a cabined doctrine: It has not insulated from ordinary trademark scrutiny the use of trademarks as trademarks.

That conclusion fits trademark law, and reflects its primary mission. Consumer confusion about source—trademark law's cardinal sin—is most likely to arise when someone uses another's trademark as a trademark. In such cases, *Rogers* has no proper application. Nor does that result change because the use of a mark has other expressive content. Under the Ninth Circuit's approach, Bad Spaniels was automatically entitled to *Rogers'* protection because it "communicate[d] a humorous message." 953 F. 3d 1170, 1175. On that view, few trademark cases would ever get to the likelihood-of-confusion analysis. And the Ninth Circuit was mistaken to believe that the First Amendment demanded such a result. When a mark is used as a source identifier, the First Amendment does not demand a threshold inquiry. Pp. 10–17.

(b) In this case, VIP conceded that it used the Bad Spaniels trademark and trade dress as source identifiers. And VIP has said and done more in the same direction with respect to Bad Spaniels and other similar products. The only question remaining is whether the Bad Spaniels trademarks are likely to cause confusion. Although VIP's effort to parody Jack Daniel's does not justify use of the *Rogers* test, it may make a difference in the standard trademark analysis. This Court remands that issue to the courts below. Pp. 17–19.

2. The Lanham Act's exclusion from dilution liability for "[a]ny noncommercial use of a mark," §1125(c)(3)(C), does not shield parody, criticism, or commentary when an alleged diluter uses a mark as a designation of source for its own goods. The Ninth Circuit's holding to the contrary puts the noncommercial exclusion in conflict with the statute's fair-use exclusion. The latter exclusion specifically covers uses "parodying, criticizing, or commenting upon" a famous mark owner, §1125(c)(3)(A)(ii), but does not apply when the use is "as a designation of source for the person's own goods or services," §1125(c)(3)(A). Given

4    JACK DANIEL'S PROPERTIES, INC. *v.* VIP PRODUCTS LLC

Syllabus

that carve-out, parody is exempt from liability only if *not* used to designate source. The Ninth Circuit's expansive view of the noncommercial use exclusion—that parody is always exempt, regardless whether it designates source—effectively nullifies Congress's express limit on the fair-use exclusion for parody. Pp. 19–20.

953 F. 3d 1170, vacated and remanded.

KAGAN, J., delivered the opinion for a unanimous Court. SOTOMAYOR, J., filed a concurring opinion, in which ALITO, J., joined. GORSUCH, J., filed a concurring opinion, in which THOMAS and BARRETT, JJ., joined.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–148

_____

## JACK DANIEL'S PROPERTIES, INC., PETITIONER *v.* VIP PRODUCTS LLC

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 8, 2023]

JUSTICE KAGAN delivered the opinion of the Court.

This case is about dog toys and whiskey, two items seldom appearing in the same sentence. Respondent VIP Products makes a squeaky, chewable dog toy designed to look like a bottle of Jack Daniel's whiskey. Though not entirely. On the toy, for example, the words "Jack Daniel's" become "Bad Spaniels." And the descriptive phrase "Old No. 7 Brand Tennessee Sour Mash Whiskey" turns into "The Old No. 2 On Your Tennessee Carpet." The jokes did not impress petitioner Jack Daniel's Properties. It owns trademarks in the distinctive Jack Daniel's bottle and in many of the words and graphics on the label. And it believed Bad Spaniels had both infringed and diluted those trademarks. Bad Spaniels had infringed the marks, the argument ran, by leading consumers to think that Jack Daniel's had created, or was otherwise responsible for, the dog toy. And Bad Spaniels had diluted the marks, the argument went on, by associating the famed whiskey with, well, dog excrement.

The Court of Appeals, in the decision we review, saw things differently. Though the federal trademark statute

Opinion of the Court

makes infringement turn on the likelihood of consumer confusion, the Court of Appeals never got to that issue. On the court's view, the First Amendment compels a stringent threshold test when an infringement suit challenges a so-called expressive work—here (so said the court), the Bad Spaniels toy. And that test knocked out Jack Daniel's claim, whatever the likelihood of confusion. Likewise, Jack's dilution claim failed—though on that issue the problem was statutory. The trademark law provides that the "noncommercial" use of a mark cannot count as dilution. 15 U. S. C. §1125(c)(3)(C). The Bad Spaniels marks, the court held, fell within that exemption because the toy communicated a message—a kind of parody—about Jack Daniel's.

Today, we reject both conclusions. The infringement issue is the more substantial. In addressing it, we do not decide whether the threshold inquiry applied in the Court of Appeals is ever warranted. We hold only that it is not appropriate when the accused infringer has used a trademark to designate the source of its own goods—in other words, has used a trademark as a trademark. That kind of use falls within the heartland of trademark law, and does not receive special First Amendment protection. The dilution issue is more simply addressed. The use of a mark does not count as noncommercial just because it parodies, or otherwise comments on, another's products.

## I

### A

Start at square 1, with what a trademark is and does. The Lanham Act, the core federal trademark statute, defines a trademark as follows: "[A]ny word, name, symbol, or device, or any combination thereof" that a person uses "to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods." §1127. The first part of that definition, identifying the kind of things covered, is broad: It encompasses

Opinion of the Court

words (think "Google"), graphic designs (Nike's swoosh), and so-called trade dress, the overall appearance of a product and its packaging (a Hershey's Kiss, in its silver wrapper). See *Wal-Mart Stores, Inc.* v. *Samara Brothers, Inc.*, 529 U. S. 205, 209–210 (2000). The second part of the definition describes every trademark's "primary" function: "to identify the origin or ownership of the article to which it is affixed." *Hanover Star Milling Co.* v. *Metcalf*, 240 U. S. 403, 412 (1916). Trademarks can of course do other things: catch a consumer's eye, appeal to his fancies, and convey every manner of message. But whatever else it may do, a trademark is not a trademark unless it identifies a product's source (this is a Nike) and distinguishes that source from others (not any other sneaker brand). See generally 1 J. McCarthy, Trademarks and Unfair Competition §3:1 (5th ed. 2023). In other words, a mark tells the public who is responsible for a product.

In serving that function, trademarks benefit consumers and producers alike. A source-identifying mark enables customers to select "the goods and services that they wish to purchase, as well as those they want to avoid." *Matal* v. *Tam*, 582 U. S. 218, 224 (2017). The mark "quickly and easily assures a potential customer that *this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past." *Qualitex Co.* v. *Jacobson Products Co.*, 514 U. S. 159, 164 (1995). And because that is so, the producer of a quality product may derive significant value from its marks. They ensure that the producer itself—and not some "imitating competitor"—will reap the financial rewards associated with the product's good reputation. *Ibid.*

To help protect marks, the Lanham Act sets up a voluntary registration system. Any mark owner may apply to the Patent and Trademark Office to get its mark placed on a federal register. Consistent with trademark law's basic purpose, the lead criterion for registration is that the mark

"in fact serve as a 'trademark' to identify and distinguish goods." 3 McCarthy §19:10 (listing the principal register's eligibility standards). If it does, and the statute's other criteria also are met, the registering trademark owner receives certain benefits, useful in infringement litigation. See, *e.g.*, *Iancu* v. *Brunetti*, 588 U. S. ___, ___ (2019) (slip op., at 2) (noting that "registration constitutes 'prima facie evidence' of the mark's validity"). But the owner of even an unregistered trademark can "use [the mark] in commerce and enforce it against infringers." *Ibid.*

The Lanham Act also creates a federal cause of action for trademark infringement. In the typical case, the owner of a mark sues someone using a mark that closely resembles its own. The court must decide whether the defendant's use is "likely to cause confusion, or to cause mistake, or to deceive." §§1114(1)(A), 1125(a)(1)(A). The "keystone" in that statutory standard is "likelihood of confusion." See 4 McCarthy §23:1. And the single type of confusion most commonly in trademark law's sights is confusion "about the source of a product or service." *Moseley* v. *V Secret Catalogue, Inc.*, 537 U. S. 418, 428 (2003); see 4 McCarthy §23:5. Confusion as to source is the bête noire of trademark law—the thing that stands directly opposed to the law's twin goals of facilitating consumers' choice and protecting producers' good will.

Finally, the Lanham Act creates a cause of action for the dilution of famous marks, which can succeed without likelihood of confusion. See §1125(c); *Moseley*, 537 U. S., at 431. A famous mark is one "widely recognized" by the public as "designati[ng the] source" of the mark owner's goods. §1125(c)(2)(A). Dilution of such a mark can occur "by tarnishment" (as well as by "blurring," not relevant here). §1125(c)(1). As the statute describes the idea, an "association arising from the similarity between" two marks—one of them famous—may "harm[] the reputation of the famous mark," and thus make the other mark's owner liable.

Opinion of the Court

§1125(c)(2)(C).  But there are "[e]xclusions"—categories of activity not "actionable as dilution."  §1125(c)(3).  One exclusion protects any "noncommercial use of a mark." §1125(c)(3)(C).  Another protects a "fair use" of a mark "in connection with . . . parodying, criticizing, or commenting upon the famous mark owner or [its] goods." §1125(c)(3)(A)(ii).  The fair-use exclusion, though, comes with a caveat.  A defendant cannot get its benefit—even if engaging in parody, criticism, or commentary—when using the similar-looking mark "as a designation of source for the [defendant's] own goods."  §1125(c)(3)(A).  In other words, the exclusion does not apply if the defendant uses the similar mark as a mark.

B

A bottle of Jack Daniel's—no, Jack Daniel's Old No. 7 Tennessee Sour Mash Whiskey—boasts a fair number of trademarks.  Recall what the bottle looks like (or better yet, retrieve a bottle from wherever you keep liquor; it's probably there):



"Jack Daniel's" is a registered trademark, as is "Old No. 7." So too the arched Jack Daniel's logo.  And the stylized label

Opinion of the Court

with filigree (*i.e.*, twirling white lines). Finally, what might be thought of as the platform for all those marks—the whiskey's distinctive square bottle—is itself registered.

VIP is a dog toy company, making and selling a product line of chewable rubber toys that it calls "Silly Squeakers." (Yes, they squeak when bitten.) Most of the toys in the line are designed to look like—and to parody—popular beverage brands. There are, to take a sampling, Dos Perros (cf. Dos Equis), Smella Arpaw (cf. Stella Artois), and Doggie Walker (cf. Johnnie Walker). VIP has registered trademarks in all those names, as in the umbrella term "Silly Squeakers."

In 2014, VIP added the Bad Spaniels toy to the line. VIP did not apply to register the name, or any other feature of, Bad Spaniels. But according to its complaint (further addressed below), VIP both "own[s]" and "use[s]" the "'Bad Spaniels' trademark and trade dress." App. 3, 11; see *infra*, at 8, 17. And Bad Spaniels' trade dress, like the dress of many Silly Squeakers toys, is designed to evoke a distinctive beverage bottle-with-label. Even if you didn't already know, you'd probably not have much trouble identifying which one.



Bad Spaniels is about the same size and shape as an ordi-
nary bottle of Jack Daniel's. The faux bottle, like the origi-
nal, has a black label with stylized white text and a white
filigreed border. The words "Bad Spaniels" replace "Jack
Daniel's" in a like font and arch. Above the arch is an image
of a spaniel. (This is a dog toy, after all.) Below the arch,
"The Old No. 2 On Your Tennessee Carpet" replaces "Old
No. 7 Tennessee Sour Mash Whiskey" in similar graphic
form. The small print at the bottom substitutes "43% poo
by vol." and "100% smelly" for "40% alc. by vol. (80 proof)."

The toy is packaged for sale with a cardboard hangtag (so
it can be hung on store shelves). Here is the back of the
hangtag:



At the bottom is a disclaimer: "This product is not affiliated
with Jack Daniel Distillery." In the middle are some warn-
ings and guarantees. And at the top, most relevant here,
are two product logos—on the left for the Silly Squeakers
line, and on the right for the Bad Spaniels toy.

Soon after Bad Spaniels hit the market, Jack Daniel's sent VIP a letter demanding that it stop selling the product. VIP responded by bringing this suit, seeking a declaratory judgment that Bad Spaniels neither infringed nor diluted Jack Daniel's trademarks. The complaint alleged, among other things, that VIP is "the owner of all rights in its 'Bad Spaniels' trademark and trade dress for its durable rubber squeaky novelty dog toy." App. 3; see *supra*, at 6. Jack Daniel's counterclaimed under the Lanham Act for both trademark infringement and trademark dilution by tarnishment.

VIP moved for summary judgment on both claims. First, VIP argued that Jack Daniel's infringement claim failed under a threshold test derived from the First Amendment to protect "expressive works"—like (VIP said) the Bad Spaniels toy. When those works are involved, VIP contended, the so-called *Rogers* test requires dismissal of an infringement claim at the outset unless the complainant can show one of two things: that the challenged use of a mark "has no artistic relevance to the underlying work" or that it "explicitly misleads as to the source or the content of the work." *Rogers* v. *Grimaldi*, 875 F. 2d 994, 999 (CA2 1989) (Newman, J.). Because Jack Daniel's could make neither showing, VIP argued, the likelihood-of-confusion issue became irrelevant. Second, VIP urged that Jack Daniel's could not succeed on a dilution claim because Bad Spaniels was a "parody[]" of Jack Daniel's, and therefore made "fair use" of its famous marks. §1125(c)(3)(A)(ii).

The District Court rejected both contentions for a common reason: because VIP had used the cribbed Jack Daniel's features as trademarks—that is, to identify the source of its own products. In the court's view, when "another's trademark is used for source identification"—as the court thought was true here—the threshold *Rogers* test does not apply. App. to Pet. for Cert. 89a. Instead, the suit must address the "standard" infringement question: whether the

use is "likely to cause consumer confusion." *Ibid.* And likewise, VIP could not invoke the dilution provision's fair-use exclusion. Parodies fall within that exclusion, the court explained, only when the uses they make of famous marks do not serve as "a designation of source for the [alleged diluter's] own goods." *Id.*, at 104a (quoting §1125(c)(3)(A)).

The case thus proceeded to a bench trial, where Jack Daniel's prevailed. The District Court found, based largely on survey evidence, that consumers were likely to be confused about the source of the Bad Spaniels toy. See 291 F. Supp. 3d 891, 906–911 (D Ariz. 2018). And the court thought that the toy, by creating "negative associations" with "canine excrement," would cause Jack Daniel's "reputational harm." *Id.*, at 903, 905.

But the Court of Appeals for the Ninth Circuit reversed, ruling that the District Court had gotten the pretrial legal issues wrong. In the Ninth Circuit's view, the infringement claim was subject to the threshold *Rogers* test because Bad Spaniels is an "expressive work": Although just a dog toy, and "surely not the equivalent of the *Mona Lisa*," it "communicates a humorous message." 953 F. 3d 1170, 1175 (2020) (internal quotation marks omitted). The Court of Appeals therefore returned the case to the District Court to decide whether Jack Daniel's could satisfy either of *Rogers*' two prongs. And the Ninth Circuit awarded judgment on the dilution claim to VIP. The court did not address the statutory exclusion for parody and other fair use, as the District Court had. Instead, the Court of Appeals held that the exclusion for "noncommercial use" shielded VIP from liability. §1125(c)(3)(C). The "use of a mark may be 'noncommercial,'" the court reasoned, "even if used to sell a product." 953 F. 3d, at 1176 (internal quotation marks omitted). And here it was so, the court found, because it "parodies" and "comments humorously" on Jack Daniel's. *Id.*, at 1175; see *id.*, at 1176.

On remand, the District Court found that Jack Daniel's

could not satisfy either prong of *Rogers*, and so granted summary judgment to VIP on infringement.  Jack Daniel's appealed, and the Ninth Circuit summarily affirmed.

We then granted certiorari to consider the Court of Appeals' rulings on both infringement and dilution.  598 U. S. ___ (2022).

## II

Our first and more substantial question concerns Jack Daniel's infringement claim: Should the company have had to satisfy the *Rogers* threshold test before the case could proceed to the Lanham Act's likelihood-of-confusion inquiry?[1]  The parties address that issue in the broadest possible way, either attacking or defending *Rogers* in all its possible applications.  Today, we choose a narrower path. Without deciding whether *Rogers* has merit in other contexts, we hold that it does not when an alleged infringer uses a trademark in the way the Lanham Act most cares about: as a designation of source for the infringer's own goods.  See §1127; *supra*, at 2–3.  VIP used the marks derived from Jack Daniel's in that way, so the infringement claim here rises or falls on likelihood of confusion.  But that inquiry is not blind to the expressive aspect of the Bad Spaniels toy that the Ninth Circuit highlighted.  Beyond source designation, VIP uses the marks at issue in an effort to "parody" or "make fun" of Jack Daniel's.  Tr. of Oral Arg. 58, 66.  And that kind of message matters in assessing confusion because consumers are not so likely to think that the maker of a mocked product is itself doing the mocking.

### A

To see why the *Rogers* test does not apply here, first consider the case from which it emerged.  The defendants there

─────────────

[1] To be clear, when we refer to "the *Rogers* threshold test," we mean any threshold First Amendment filter.

had produced and distributed a film by Federico Fellini titled "Ginger and Fred" about two fictional Italian cabaret dancers (Pippo and Amelia) who imitated Ginger Rogers and Fred Astaire.  When the film was released in the United States, Ginger Rogers objected under the Lanham Act to the use of her name.  The Second Circuit rejected the claim. It reasoned that the titles of "artistic works," like the works themselves, have an "expressive element" implicating "First Amendment values."  875 F. 2d, at 998.  And at the same time, such names posed only a "slight risk" of confusing consumers about either "the source or the content of the work."  *Id.*, at 999–1000.  So, the court concluded, a threshold filter was appropriate.  When a title "with at least some artistic relevance" was not "explicitly misleading as to source or content," the claim could not go forward.  *Ibid.* But the court made clear that it was not announcing a general rule.  In the typical case, the court thought, the name of a product was more likely to indicate its source, and to be taken by consumers in just that way.  See *id.*, at 1000.

Over the decades, the lower courts adopting *Rogers* have confined it to similar cases, in which a trademark is used not to designate a work's source, but solely to perform some other expressive function.  So, for example, when the toymaker Mattel sued a band over the song "Barbie Girl"— with lyrics including "Life in plastic, it's fantastic" and "I'm a blond bimbo girl, in a fantasy world"—the Ninth Circuit applied *Rogers*.  *Mattel, Inc.* v. *MCA Records, Inc.*, 296 F. 3d 894, 901 (2002).  That was because, the court reasoned, the band's use of the Barbie name was "not [as] a source identifier": The use did not "speak[] to [the song's] origin."  *Id.*, at 900, 902; see *id.*, at 902 (a consumer would no more think that the song was "produced by Mattel" than would, "upon hearing Janis Joplin croon 'Oh Lord, won't you buy me a Mercedes Benz?,' . . . suspect that she and the carmaker had entered into a joint venture").  Similarly, the Eleventh Circuit dismissed a suit under *Rogers* when a sports artist

depicted the Crimson Tide's trademarked football uniforms solely to "memorialize" a notable event in "football history." *University of Ala. Bd. of Trustees* v. *New Life Art, Inc.*, 683 F. 3d 1266, 1279 (2012).  And when Louis Vuitton sued because a character in the film The Hangover: Part II described his luggage as a "Louis Vuitton" (though pronouncing it *Lewis*), a district court dismissed the complaint under *Rogers*.  See *Louis Vuitton Mallatier S. A.* v. *Warner Bros. Entertainment Inc.*, 868 F. Supp. 2d 172 (SDNY 2012).  All parties agreed that the film was not using the Louis Vuitton mark as its "own identifying trademark."  *Id.*, at 180 (internal quotation marks omitted).  When that is so, the court reasoned, "confusion will usually be unlikely," and the "interest in free expression" counsels in favor of avoiding the standard Lanham Act test.  *Ibid.*

The same courts, though, routinely conduct likelihood-of-confusion analysis, without mentioning *Rogers*, when trademarks are used as trademarks—*i.e.*, to designate source.  See, *e.g.*, *JL Beverage Co., LLC* v. *Jim Beam Brands Co.*, 828 F. 3d 1098, 1102–1103, 1106 (CA9 2016); *PlayNation Play Systems, Inc.* v. *Velex Corp.*, 924 F. 3d 1159, 1164–1165 (CA11 2019).  And the Second Circuit—*Rogers*' home court—has made especially clear that *Rogers* does not apply in that context.  For example, that court held that an offshoot political group's use of the trademark "United We Stand America" got no *Rogers* help because the use was as a source identifier.  See *United We Stand Am., Inc.* v. *United We Stand, Am. New York, Inc.*, 128 F. 3d 86, 93 (1997).  True, that slogan had expressive content.  But the defendant group, the court reasoned, was using it "as a mark," to suggest the "same source identification" as the original "political movement."  *Ibid.*  And similarly, the Second Circuit (indeed, the judge who authored *Rogers*) rejected a motorcycle mechanic's view that his modified version of Harley Davidson's bar-and-shield logo was an

expressive parody entitled to *Rogers*' protection.  See *Harley-Davidson, Inc.* v. *Grottanelli*, 164 F. 3d 806, 812–813 (1999).  The court acknowledged that the mechanic's adapted logo conveyed a "somewhat humorous[]" message.  *Id.*, at 813.  But his use of the logo was a quintessential "trademark use": to brand his "repair and parts business"— through signage, a newsletter, and T-shirts—with images "similar" to Harley-Davidson's.  *Id.*, at 809, 812–813.

The point is that whatever you make of *Rogers*—and again, we take no position on that issue—it has always been a cabined doctrine.  If we put this case to the side, the *Rogers* test has applied only to cases involving "non-trademark uses"—or otherwise said, cases in which "the defendant has used the mark" at issue in a "non-source-identifying way."  S. Dogan & M. Lemley, Grounding Trademark Law Through Trademark Use, 92 Iowa L. Rev. 1669, 1684 (2007); see *id.*, at 1683–1684, and n. 58.  The test has not insulated from ordinary trademark scrutiny the use of trademarks as trademarks, "to identify or brand [a defendant's] goods or services."  *Id.*, at 1683.

We offer as one last example of that limitation a case with a striking resemblance to this one.  It too involved dog products, though perfumes rather than toys.  Yes, the defendant sold "a line of pet perfumes whose names parody elegant brands sold for human consumption."  *Tommy Hilfiger Licensing, Inc.* v. *Nature Labs, LLC*, 221 F. Supp. 2d 410, 412 (SDNY 2002) (Mukasey, J.).  The product at issue was named Timmy Holedigger—which Tommy Hilfiger didn't much like.  The defendant asked for application of *Rogers*.  The court declined it, relying on *Harley-Davidson*.  See 221 F. Supp. 2d, at 414.  *Rogers*, the court explained, kicks in when a suit involves solely "nontrademark uses of [a] mark—that is, where the trademark is not being used to indicate the source or origin" of a product, but only to convey a different kind of message.  221 F. Supp. 2d, at 414.

Opinion of the Court

When, instead, the use is "at least in part" for "source identification"—when the defendant may be "trading on the good will of the trademark owner to market its own goods"—*Rogers* has no proper role. 221 F. Supp. 2d, at 414–415. And that is so, the court continued, even if the defendant is *also* "making an expressive comment," including a parody of a different product. *Id.*, at 415. The defendant is still "mak[ing] trademark use of another's mark," and must meet an infringement claim on the usual battleground of "likelihood of confusion." *Id.*, at 416.

That conclusion fits trademark law, and reflects its primary mission. From its definition of "trademark" onward, the Lanham Act views marks as source identifiers—as things that function to "indicate the source" of goods, and so to "distinguish" them from ones "manufactured or sold by others." §1127; see *supra*, at 2–3. The cardinal sin under the law, as described earlier, is to undermine that function. See *supra*, at 3. It is to confuse consumers about source— to make (some of) them think that one producer's products are another's. And that kind of confusion is most likely to arise when someone uses another's trademark as a trademark—meaning, again, as a source identifier—rather than for some other expressive function. To adapt one of the cases noted above: Suppose a filmmaker uses a Louis Vuitton suitcase to convey something about a character (he is the kind of person who wants to be seen with the product but doesn't know how to pronounce its name). See *supra*, at 12. Now think about a different scenario: A luggage manufacturer uses an ever-so-slightly modified LV logo to make inroads in the suitcase market. The greater likelihood of confusion inheres in the latter use, because it is the one conveying information (or misinformation) about who is responsible for a product. That kind of use "implicate[s] the core concerns of trademark law" and creates "the paradigmatic infringement case." G. Dinwoodie & M. Janis, Confusion Over Use: Contextualism in Trademark Law, 92

Opinion of the Court

Iowa L. Rev. 1597, 1636 (2007). So the *Rogers* test—which offers an escape from the likelihood-of-confusion inquiry and a shortcut to dismissal—has no proper application.[2]

Nor does that result change because the use of a mark has other expressive content—*i.e.*, because it conveys some message on top of source. Here is where we most dramatically part ways with the Ninth Circuit, which thought that because Bad Spaniels "communicates a humorous message," it is automatically entitled to *Rogers*' protection. 953 F. 3d, at 1175 (internal quotation marks omitted). On that view, *Rogers* might take over much of the world. For trademarks are often expressive, in any number of ways. Consider how one liqueur brand's trade dress (beyond identifying source) tells a story, with a bottle in the shape of a friar's habit connoting the product's olden monastic roots:



_____

[2]That is not to say (far from it) that every infringement case involving a source-identifying use requires full-scale litigation. Some of those uses will not present any plausible likelihood of confusion—because of dissimilarity in the marks or various contextual considerations. And if, in a given case, a plaintiff fails to plausibly allege a likelihood of confusion, the district court should dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). See 6 McCarthy §32:121.75 (providing examples).

Opinion of the Court

Or take a band name that "not only identifies the band but expresses a view about social issues." *Tam*, 582 U. S., at 245 (opinion of ALITO, J.) (discussing "The Slants"). Or note how a mark can both function as a mark and have parodic content—as the court found in the Hilfiger/Holedigger litigation. See *supra*, at 13–14. The examples could go on and on. As a leading treatise puts the point, the Ninth Circuit's expansion of *Rogers* "potentially encompasses just about everything" because names, phrases, symbols, designs, and their varied combinations often "contain some 'expressive' message" unrelated to source. 6 McCarthy §31:144.50. That message may well be relevant in assessing the likelihood of confusion between two marks, as we address below. See *infra*, at 18–19. But few cases would even get to the likelihood-of-confusion inquiry if all expressive content triggered the *Rogers* filter. In that event, the *Rogers* exception would become the general rule, in conflict with courts' longstanding view of trademark law.

The Ninth Circuit was mistaken to believe that the First Amendment demanded such a result. The court thought that trademark law would otherwise "fail[] to account for the full weight of the public's interest in free expression." 953 F. 3d, at 1174. But as the *Mattel* (*i.e.*, Barbie) court noted, when a challenged trademark use functions as "source-identifying," trademark rights "play well with the First Amendment": "Whatever first amendment rights you may have in calling the brew you make in your bathtub 'Pepsi'" are "outweighed by the buyer's interest in not being fooled into buying it." 296 F. 3d, at 900. Or in less colorful terms: "[T]o the extent a trademark is confusing" as to a product's source "the law can protect consumers and trademark owners." *Tam*, 582 U. S., at 252 (Kennedy, J., concurring in part and concurring in judgment); see *Friedman* v. *Rogers*, 440 U. S. 1, 15 (1979) (rejecting a First Amendment challenge to a law restricting trade names because of the "substantial" interest in "protecting the public from [their]

deceptive and misleading use"). Or yet again, in an especially clear rendering: "[T]he trademark law generally prevails over the First Amendment" when "another's trademark (or a confusingly similar mark) is used without permission" as a means of "source identification." *Yankee Publishing Inc.* v. *News Am. Publishing Inc.*, 809 F. Supp. 267, 276 (SDNY 1992) (Leval, J.) (emphasis deleted). So for those uses, the First Amendment does not demand a threshold inquiry like the *Rogers* test. When a mark is used as a mark (except, potentially, in rare situations), the likelihood-of-confusion inquiry does enough work to account for the interest in free expression.

### B

Here, the District Court correctly held that "VIP uses its Bad Spaniels trademark and trade dress as source identifiers of its dog toy." See App. to Pet. for Cert. 105a. In fact, VIP conceded that point below. In its complaint, VIP alleged that it both "own[s] and "use[s]" the "'Bad Spaniels' trademark and trade dress for its durable rubber squeaky novelty dog toy." App. 3, 11. The company thus represented in this very suit that the mark and dress, although not registered, are used to "identify and distinguish [VIP's] goods" and to "indicate [their] source." §1127. (Registration of marks, you'll recall, is optional. See *supra*, at 3–4.)

In this Court, VIP says the complaint was a mere "form allegation"—a matter of "rote." Tr. of Oral Arg. 73. But even if we knew what that meant, VIP has said and done more in the same direction. First, there is the way the product is marketed. On the hangtag, the Bad Spaniels logo sits opposite the concededly trademarked Silly Squeakers logo, with both appearing to serve the same source-identifying function. See *supra*, at 7. And second, there is VIP's practice as to other products in the Silly Squeakers line. The company has consistently argued in court that it owns, though has never registered, the trademark and trade dress

in dog toys like "Jose Perro" (cf. Jose Cuervo) and "HeinieSniff'n" (cf. Heineken).[3]  And it has chosen to register the names of still other dog toys, including Dos Perros (#6176781), Smella Arpaw (#6262975), and Doggie Walker (#6213816).  See *supra*, at 6.  Put all that together, and more than "form" or "rote" emerges: VIP's conduct is its own admission that it is using the Bad Spaniels (née Jack Daniel's) trademarks as trademarks, to identify product source.

Because that is so, the only question in this suit going forward is whether the Bad Spaniels marks are likely to cause confusion.  There is no threshold test working to kick out all cases involving "expressive works."  But a trademark's expressive message—particularly a parodic one, as VIP asserts—may properly figure in assessing the likelihood of confusion.  See, *e.g.*, *Louis Vuitton Malletier S. A.* v. *Haute Diggity Dog, LLC*, 507 F. 3d 252, 265 (CA4 2007) (Parody "influences the way in which the [likelihood-of-confusion] factors are applied"); Brief for United States as *Amicus Curiae* 17–22 (same).  A parody must "conjure up" "enough of [an] original to make the object of its critical wit recognizable."  *Campbell* v. *Acuff-Rose Music, Inc.*, 510 U. S. 569, 588 (1994) (internal quotation marks omitted).  Yet to succeed, the parody must also create contrasts, so that its message of ridicule or pointed humor comes clear.  And once that is done (*if* that is done), a parody is not often likely to create confusion.  Self-deprecation is one thing; self-mockery far less ordinary.  So although VIP's effort to ridicule Jack Daniel's does not justify use of the *Rogers* test,

———————

[3]See, *e.g.*, *VIP Products, LLC* v. *Tequila Cuervo La Rojena, S. A. de C. V.*, No. 20–cv–0319 (D Ariz., Feb. 11, 2020), ECF Doc. 1, p. 3 ("Jose Perro"); *VIP Products, LLC* v. *Heineken USA, Inc.*, No. 13–cv–0319 (D Ariz., Feb. 13, 2013), ECF Doc. 1, pp. 3–4 ("HeinieSniff'n"); *VIP Products, LLC* v. *Pabst Brewing Co.*, No. 14–cv–2084 (D Ariz., Sept. 19, 2014), ECF Doc. 1, pp. 3–4 ("Blue Cats Trippin") (cf. Pabst Blue Ribbon); *VIP Products, LLC* v. *Champagne Louis Roederer, S. A.*, No. 13–cv–2365 (D Ariz., Nov. 18, 2013), ECF Doc. 1, pp. 3–4 ("Crispaw") (cf. Cristal).

Opinion of the Court

it may make a difference in the standard trademark analysis. Consistent with our ordinary practice, we remand that issue to the courts below. See *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005) (noting that this Court is generally "a court of review, not of first view").

III

Our second question, more easily dispatched, concerns Jack Daniel's claim of dilution by tarnishment (for the linkage of its whiskey to less savory substances). Recall that the Ninth Circuit dismissed that claim based on one of the Lanham Act's "[e]xclusions" from dilution liability—for "[a]ny noncommercial use of a mark." §1125(c)(3)(C); see *supra*, at 9. On the court's view, the "use of a mark may be 'noncommercial' even if used to sell a product." 953 F. 3d, at 1176 (internal quotation marks omitted). And VIP's use is so, the court continued, because it "parodies" and "convey[s] a humorous message" about Jack Daniel's. *Id.*, at 1175–1176. We need not express a view on the first step of that reasoning because we think the second step wrong. However wide the scope of the "noncommercial use" exclusion, it cannot include, as the Ninth Circuit thought, every parody or humorous commentary.

To begin to see why, consider the scope of another of the Lanham Act's exclusions—this one for "[a]ny fair use." As described earlier, the "fair use" exclusion specifically covers uses "parodying, criticizing, or commenting upon" a famous mark owner. §1125(c)(3)(A)(ii); see *supra*, at 5. But not in every circumstance. Critically, the fair-use exclusion has its own exclusion: It does not apply when the use is "as a designation of source for the person's own goods or services." §1125(c)(3)(A). In that event, no parody, criticism, or commentary will rescue the alleged dilutor. It will be subject to liability regardless.

The problem with the Ninth Circuit's approach is that it

Opinion of the Court

reverses that statutorily directed result, as this case illustrates. Given the fair-use provision's carve-out, parody (and criticism and commentary, humorous or otherwise) is exempt from liability only if *not* used to designate source. Whereas on the Ninth Circuit's view, parody (and so forth) is exempt always—regardless whether it designates source. The expansive view of the "noncommercial use" exclusion effectively nullifies Congress's express limit on the fair-use exclusion for parody, etc. Just consider how the Ninth Circuit's construction played out here. The District Court had rightly concluded that because VIP used the challenged marks as source identifiers, it could not benefit from the fair-use exclusion for parody. See App. to Pet. for Cert. 105a; *supra*, at 8–9, 17–18. The Ninth Circuit took no issue with that ruling. But it shielded VIP's parodic uses anyway. In doing so, the court negated Congress's judgment about when—and when not—parody (and criticism and commentary) is excluded from dilution liability.

## IV

Today's opinion is narrow. We do not decide whether the *Rogers* test is ever appropriate, or how far the "noncommercial use" exclusion goes. On infringement, we hold only that *Rogers* does not apply when the challenged use of a mark is as a mark. On dilution, we hold only that the noncommercial exclusion does not shield parody or other commentary when its use of a mark is similarly source-identifying. It is no coincidence that both our holdings turn on whether the use of a mark is serving a source-designation function. The Lanham Act makes that fact crucial, in its effort to ensure that consumers can tell where goods come from.

For the reasons stated, we vacate the judgment below and remand for further proceedings consistent with this opinion.

*It is so ordered.*

SOTOMAYOR, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–148

_____

## JACK DANIEL'S PROPERTIES, INC., PETITIONER *v.* VIP PRODUCTS LLC

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 8, 2023]

JUSTICE SOTOMAYOR, with whom JUSTICE ALITO joins,
concurring.

I join the Court's opinion in full. I write separately to
emphasize that in the context of parodies and potentially
other uses implicating First Amendment concerns, courts
should treat the results of surveys with particular caution.
As petitioner did here, plaintiffs in trademark infringement
cases often commission surveys that purport to show that
consumers are likely to be confused by an allegedly infring-
ing product. Like any other evidence, surveys should be un-
derstood as merely one piece of the multifaceted likelihood
of confusion analysis. See, *e.g.*, *Uncommon, LLC* v. *Spigen,
Inc.*, 926 F. 3d 409, 425 (CA7 2019). Courts should also
carefully assess the methodology and representativeness of
surveys, as many lower courts already do. See, *e.g.*, *Water
Pik, Inc.* v. *Med-Systems, Inc.*, 726 F. 3d 1136, 1144–1150
(CA10 2013); *Starbucks Corp.* v. *Wolfe's Borough Coffee,
Inc.*, 588 F. 3d 97, 117 (CA2 2009).

When an alleged trademark infringement involves a par-
ody, however, there is particular risk in giving uncritical or
undue weight to surveys. Survey answers may reflect a
mistaken belief among some survey respondents that all
parodies require permission from the owner of the parodied
mark. Some of the answers to the survey in this case illus-
trate this potential. See App. 81–82, n. 25 ("'I'm sure the

2    JACK DANIEL'S PROPERTIES, INC. *v.* VIP PRODUCTS LLC

SOTOMAYOR, J., concurring

dog toy company that made this toy had to get [Jack Daniel's] permission and legal rights to essentially copy the[ir] product in dog toy form'"); *ibid.* ("'The bottle is mimicked after the Jack Daniel BBQ sauce. So they would hold the patent therefore you would have to ask permission to use the image'"); see also *Anheuser-Busch, Inc.* v. *Balducci Publications*, 28 F. 3d 769, 772–773, 775 (CA8 1994) (describing a similar situation). Plaintiffs can point to this misunderstanding of the legal framework as evidence of consumer confusion. Cleverly designed surveys could also prompt such confusion by making consumers think about complex legal questions around permission that would not have arisen organically out in the world.

Allowing such survey results to drive the infringement analysis would risk silencing a great many parodies, even ones that by other metrics are unlikely to result in the confusion about sourcing that is the core concern of the Lanham Act. See *ante*, at 4, 10, 14. Well-heeled brands with the resources to commission surveys would be handed an effective veto over mockery. After all, "[n]o one likes to be the butt of a joke, not even a trademark." 6 J. McCarthy, Trademarks and Unfair Competition §31:153 (5th ed. 2023). This would upset the Lanham Act's careful balancing of "the needs of merchants for identification as the provider of goods with the needs of society for free communication and discussion." P. Leval, Trademark: Champion of Free Speech, 27 Colum. J. L. & Arts 187, 210 (2004). Courts should thus ensure surveys do not completely displace other likelihood-of-confusion factors, which may more accurately track the experiences of actual consumers in the marketplace. Courts should also be attentive to ways in which surveys may artificially prompt such confusion about the law or fail to sufficiently control for it.

Cite as: 599 U. S. ____ (2023)            1

GORSUCH, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–148

_____

## JACK DANIEL'S PROPERTIES, INC., PETITIONER *v.* VIP PRODUCTS LLC

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 8, 2023]

JUSTICE GORSUCH, with whom JUSTICE THOMAS and
JUSTICE BARRETT join, concurring.

I am pleased to join the Court's opinion. I write sepa-
rately only to underscore that lower courts should handle
*Rogers* v. *Grimaldi*, 875 F. 2d 994 (CA2 1989), with care.
Today, the Court rightly concludes that, even taken on its
own terms, *Rogers* does not apply to cases like the one be-
fore us. But in doing so, we necessarily leave much about
*Rogers* unaddressed. For example, it is not entirely clear
where the *Rogers* test comes from—is it commanded by the
First Amendment, or is it merely gloss on the Lanham Act,
perhaps inspired by constitutional-avoidance doctrine? *Id.*,
at 998. For another thing, it is not obvious that *Rogers* is
correct in all its particulars—certainly, the Solicitor Gen-
eral raises serious questions about the decision. See Brief
for United States as *Amicus Curiae* 23–28. All this remains
for resolution another day, *ante*, at 13, and lower courts
should be attuned to that fact.

2016 WL 7256945
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Wayne LAND and Mineral Group, LLC, Plaintiff,

v.

DELAWARE RIVER BASIN
COMMISSION, Defendant,
and
Delaware Riverkeeper Network and
Maya K. Van Rossum, the Delaware
Riverkeeper, Interveners-Defendants

3:16-CV-00897
|
Filed 12/15/2016

**Attorneys and Law Firms**

Christopher R. Nestor, Overstreet & Nestor, LLC, Harrisburg, PA, David R. Overstreet, Overstreet & Nestor, LLC, Pittsburgh, PA, Jeffrey Belardi, Belardi Law Offices, Scranton, PA, Joseph Robert Rydzewski, Spall, Rydzewski & Anderson, P.C., Hawley, PA, for Plaintiff.

Jordan B. Yeager, Curtin & Heefner LLP, Doylestown, PA, Kenneth J. Warren, Warren Environmental Counsel LLP, Bryn Mawr, PA, John J. Zimmerman, Zimmerman & Associates, Potomac, MD, for Defendant/Intervenors-Defendants.

### MEMORANDUM OPINION

Robert D. Mariani, United States District Judge

 *1 Presently before the Court are two "Motions for Permission to Appear, File Brief, and Make Oral Argument, if necessary, as Amicus Curiae on Behalf of the Plaintiff." (Docs. 37, 53). The first motion was filed by non-parties Lackawaxen Honesdale Shippers Association, Northern Wayne Property Owner's Alliance, Inc., and Landowner Advocates of New York, Inc., (Doc. 37), and the second motion was filed by non-parties County of Wayne and the Wayne Economic Development Council. (Doc. 53). For

the reasons that follow, the motions will be granted in part and denied in part.

### I. **INTRODUCTION AND PROCEDURAL HISTORY**

On May 17, 2016, Plaintiff Wayne Land & Mineral Group LLC filed a Complaint against Defendant Delaware River Basin Commission. (Doc. 1). In the Complaint, Plaintiff asks the Court to enter a declaratory judgment holding that the Defendant lacks jurisdiction or the authority to require it to seek prior approval for Plaintiff's intended plan to construct a well pad and drill a natural gas well on property which Plaintiff owns in Wayne County, Pennsylvania (75 acres of which is located in the Delaware River Basin).

The Delaware Riverkeeper Network and Maya K. Van Rossum, the Delaware Riverkeeper, filed a motion to intervene on July 5, 2016, (Doc. 10), which the Court granted on September 12, 2016. (Doc. 26). Thereafter, non-parties Lackawaxen Honesdale Shippers Association, Northern Wayne Property Owner's Alliance, Inc., and Landowner Advocates of New York, Inc. filed the instant motion on October 13, 2016. (Doc. 37). Non-parties County of Wayne and the Wayne Economic Development Council filed their motion on November 30, 2016. (Doc. 53).

### II. **ANALYSIS**

"Meaning friend of the court, *amicus curiae* has historically been used to describe an impartial individual who suggests the interpretation and status of the law, gives information concerning it, and whose function is to advise in order that justice may be done, rather than to advocate a point of view so that a cause may be won by one party or another." *Sciotto v. Marple Newtown Sch. Dist.*, 70 F. Supp. 2d 553, 554 (E.D. Pa. 1999) (internal citation and quotation marks omitted).

Amici status is typically granted where the following conditions are present: (1) petitioner has a 'special interest' in the particular case, *see Waste Management of Pa. v. City of York*, 162 F.R.D. 34, 36 (M.D. Pa. 1995); (2) petitioner's interest is not represented competently or at all in the case, *see Liberty Lincoln v. Ford Marketing Corp.*, 149 F.R.D. 65, 82 (D.N.J. 1993); (3) the proffered information is timely and useful, *see Hoptowit v. Ray*, 682 F.3d 1237, 1260 (9th

Land v. Delaware River Basin Commission, Not Reported in Fed. Supp. (2016)

Cir. 1982); and (4) petitioner is not partial to a particular outcome in the case, *see Yip v. Pagano*, 606 F. Supp. 1566 (D.N.J. 1985), *but see Hoptowit*, 682 F.2d at 1260 ("there is no rule ... that amici be totally disinterested.").

*Id* at 555.

Courts in this Circuit have found that participation as *amicus* at the level of the trial court, as opposed to the appellate court, "is rather more the exception than the rule." *Abu-Jamal v. Price*, Civ. A. No. 95-618, 1995 WL 722518, at *1 (W.D. Pa. Aug. 25, 1995); *see also Yip*, 606 F. Supp. at 1568 ("At the trial level, where issues of fact as well as law predominate, the aid of *amicus curiae* may be less appropriate than at the appellate level."). Nevertheless, "[t]he extent, if any, to which an *amicus curiae* should be permitted to participate in a pending action is solely within the broad discretion of the district court." *Waste Management*, 162 F.R.D. at 36 (citations omitted); *see also In re Nazi Era Cases Against German Defendants Litig.*, 153 Fed.Appx. 819, 827 (3d Cir. 2005) ("[A] district court's decision to accept or reject an amicus filling is entirely within the court's discretion.").

### A. Lackawaxen Honesdale Shippers Association, Northern Wayne Property Owner's Alliance, Inc., & Landowner Advocates of New York, Inc.

**\*2** The Lackawaxen Honesdale Shippers Association is "a Non-Profit Association organized and existing under the laws of the State of Pennsylvania for the purpose of making available, promoting and protecting interests of railroad users in Wayne County and Pike County Pennsylvania." (Doc. 37-1, at 1). Thomas Shepstone, the manager of the Lackawaxen Honesdale Shippers Association, is further authorized to act on behalf of not-for-profit corporations Northern Wayne Property Owners Alliance, Inc. and Landowner Advocates of New York, Inc. [1] Both the Defendant and the Intervenors-Defendants oppose the motion. (Docs. 41, 42).

Turning to the four factors identified in *Sciotto*, the Court first notes that it is the movants burden to demonstrate that it has a "particularized kind of special interest" appropriate for *amici* status. *Sciotto*, 70 F. Supp. 2d at 555. According to the movants, "[t]he question at issue in this case is one

that is of vital interest to the Movants and to its members and the general public in that the outcome of this case will significantly affect property rights and values, railroad use, industry growth, business and employment and regional commerce in Wayne and Pike Counties, Pennsylvania and New York's Southern Tier." (Doc. 37, at 2). They further allege that "resolution of the action will have a vital impact on the manner of which members may use their property rights as deeded to them or pay for and use rail service, receive fair and just compensation for their property rights, retain employment and industries in their region and for the members financial well-being, and to succeed in assisting established business and possible growth of new businesses in these areas." (Doc. 37-1, at 2). The Court finds that the movants have articulated a sufficient interest in the litigation and therefore have satisfied the first factor.

Second, the Court finds that the movants interests— specifically those pertaining to railroads, railroad uses, and landowners in the Southern Tier of New York—do not appear to be represented in this matter. Third, the Court finds that the proffered information to be both timely and potentially useful to the resolution of the issues before the Court, and rejects Defendant's argument that the motion is untimely because "[b]riefing on the Motion to Dismiss is complete, and reopening the briefing would delay a ruling." (Doc. 42, at 8).

Finally, the Court considers whether the movant is partial to a particular outcome. Defendant and the Intervenors-Defendants oppose the motion on the basis that the movants are not neutral parties and therefore should not be permitted to file an amicus brief, directing the Court to the affidavit of Thomas Shepstone. (Doc. 41, at 5). The Intervenors-Defendants note that "Mr. Shepstone is an advocate for the shale gas industry. His previous employers include Energy in Depth, an organization dedicated to promoting shale gas exploration. Mr. Shepstone currently works at Natural Gas Now which, as its name suggests advocates for natural gas development." [2] (Doc. 45, at 5). Accordingly, the Defendant and Intervenors-Defendants maintain that the movant's motion must be denied because they are partial to a particular outcome.

**\*3** When a movant "has a specific pecuniary interest," *Sciotto*, 70 F. Supp. 2d at 555, in a party's perspective of a particular case, or where the "amici represents business

Land v. Delaware River Basin Commission, Not Reported in Fed. Supp. (2016)

interests that will be ultimately and directly affected by the court's ruling on the substantive matter before it, amicus participation is not appropriate." *Id.* (internal citation and quotation marks omitted). However, "[w]hile the partiality of an *amicus* is a factor to consider in deciding whether to allow participation, there is no rule ... that amici must be totally disinterested." *Waste Management*, 162 F.R.D. at 36 (internal citation and quotation marks omitted). Indeed, "[p]arties with pecuniary and policy interests have been regularly allowed to appear as *amici.*" *United States v. Alkaabi*, 223 F. Supp. 2d 583, 592 (D.N.J. 2002).

Upon consideration of the relevant factors, the Court will exercise its discretion and grant in part and deny in part the motion as follows: non-parties Lackawaxen Honesdale Shippers Association, Northern Wayne Property Owner's Alliance, Inc., and Landowner Advocates of New York, Inc. may file a joint brief, not to exceed ten pages, as *amicus curiae* on behalf of the Plaintiff. No other participation will be permitted.

### B. County of Wayne & Wayne
### Economic Development Council

Non-parties County of Wayne and the Wayne Economic Development Council, through the same counsel as non-parties Lackawaxen Honesdale Shippers Association, Northern Wayne Property Owner's Alliance, Inc., and Landowner Advocates of New York, Inc., also requests leave to appear as *amicus* on behalf of the Plaintiff and assert that they do so "to protect their governing authority and the

property rights of its residents as duly elected members of Wayne County." (Doc. 54, at 4). Both the Defendants and Intervenors-Defendants oppose the motion. (Docs 57, 60).

Applying the four *Sciotto* factors identified above, the Court first finds that the movants have some interest in the litigation, although the Court questions whether the interest is sufficiently specialized and concrete. Second, the Court finds that the movants' interest may not be adequately represented in this matter, but notes that the movants and Plaintiff appear to share the same or similar interests. Third, the Court finds that the movants' submission is timely and that it may have some usefulness to the resolution of matters before the Court. Finally, the Court notes that, although the movants may be partial to a particular outcome, that is not a *per se* bar to participation as *amicus.* Accordingly, the Court will exercise its discretion and grant in part and deny in part the movants motion as follows: the County of Wayne and Wayne Economic Development Council may file a joint brief, not to exceed ten pages, as *amicus curiae* on behalf of the Plaintiff. No other participation will be permitted. [3]

### III. CONCLUSION

For the reasons set forth above, the motions will be granted in part and denied in part. A separate order follows.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7256945

## Footnotes

1    Nowhere in the Movants submissions do they identify the purposes of Northern Wayne Property Owners Alliance, Inc. or Landowner Advocates of New York, Inc. However, Defendant notes that the Northern Wayne Property Owners Alliance Inc., "is an association of property owners who have leased natural gas and/or mineral interests to energy companies," (Doc. 42, at 3), whereas Landowner Advocates of New York, Inc. is an organization that consists of "referenced landowners in the Southern Tier of New York." (*Id.* at 11).

2    The Intervenors-Defendants further note that Mr. Shepstone "refers to the Governor of the State of New York, Andrew Cuomo, as 'Corruptocrat' and accuses the Governor of running the state 'like a mob family.' " (Doc. 41, at 5). Mr. Shepstone has also referred to the Intervenor-Defendants "as 'a bitter fringe group' which has

Shah, Lexie 6/9/2023
For Educational Use Only

Land v. Delaware River Basin Commission, Not Reported in Fed. Supp. (2016)

'morphed into a cult of personality,' " and has argued "that 'fractivism' is a 'mental illness.' " *Id.* Mr. Shepstone is further alleged to refer "to the National Resources Defense Council as a 'den of thieves,' " and has referred to "a Geisinger Health study on natural gas development as a 'hit job' orchestrated by a doctor" he refers to "as a 'radical,' a 'renewables utopian' and a 'shale hater' who has 'produced one junk science study after another.' " (*Id.* at 5-6).

3   The Third Circuit has noted that, as a general rule, an amicus *curiae* may only participate in oral argument "for extraordinary reasons." *Am. Coll. of Obstetricians & Gynecologists Pennsylvania Section v. Thornburgh,* 699 F.2d 644, 646 (3d Cir. 1983) (citing Fed. R. App. P. 29). Because all of the movants have failed to identify any "extraordinary reasons" necessitating their participation in oral argument, the Court will deny the motions in this respect.

---

**End of Document**                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system on this 9th day of June 2023, which constitutes service on Plaintiff and Defendant pursuant to Fed. R. Civ. P. 5(b)(2)(E):

Allison L. Ebeck, Esquire
Pa. ID No. 322837
McGuire Woods LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222-3142
AEbeck@mcguirewoods.com

Claire H. Eller, Esquire (admitted *pro hac vice*)
Lucy J. Wheatley, Esquire (admitted *pro hac vice*)
Matthew G. Rosendahl, Esquire (admitted *pro hac vice*)
McGuire Woods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
CEller@mcguirewoods.com
LWheatley@mcguirewoods.com
*Attorneys for Plaintiff,*
*The Pennsylvania State University*

Jodi S. Wilenzik, Esquire
Pa. ID No. 89205
Marc H. Perry, Esquire
Pa. ID No. 6810
Post & Schell, P.C.
1600 JFK Boulevard, 13th Floor
Philadelphia, PA 19103
JWilenzik@postschell.com
MPerry@postschell.com

Leslie Vander Griend, Esquire (admitted *pro hac vice*)
John Fetters, Esquire (admitted *pro hac vice*)
Bradford J. Axel (admitted *pro hac vice*)
Joshua D. Harms (admitted *pro hac vice*)
Valerie A. Walker (admitted *pro hac vice*)
Theresa H. Wang (admitted *pro hac vice*)
Stokes Lawrence, P.S.
1420 Fifth Avenue, Suite 3000

Seattle, WA 98101
Leslie.VanderGriend@stokeslaw.com
John.Fetters@stokeslaw.com
Josh.Harms@stokeslaw.com
Valerie.Walker@stokeslaw.com
BJA@stokeslaw.com
Theresa.Wang@stokeslaw.com
*Attorneys for Defendants,*
*Vintage Brand, LLC,* et al.

By: /s/ Justin Tomevi
Justin Tomevi
Pa. ID No. 313661
Barley Snyder
100 East Market Street
York, PA 17401
Tel: 717-852-4977
Fax: 717-843-8492
Email: JTomevi@barley.com

Phillip R. Malone (*pro hac vice* pending)
Juelsgaard Intellectual Property &
  Innovation Clinic
Mills Legal Clinic, Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Tel: 650-725-6369
Fax: 650-723-4426
Email: PMalone@law.stanford.edu