# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, <br><br> Plaintiff and Counter-Claim Defendant, <br><br> v. <br><br> VINTAGE BRAND, LLC, <br><br> Defendant and Counter-Claim Plaintiff, <br><br> and <br><br> SPORTSWEAR INC. d/b/a PREP SPORTWEAR; CHAD HARTVIGSON; ERIK HARTVIGSON; and MICHELLE YOUNG, <br><br> Defendants. | Case No. 4:21-cv-01091-MWB <br> (Hon. Matthew W. Brann) <br><br> JURY TRIAL DEMANDED |

## DEFENDANTS' BRIEF IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Mark P. McKenna, Esq., *pro hac vice*
Illinois I.D. No. 6272699
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
Phone: (646) 898-2055
Fax:    (646) 906-8657
Mark@lex-lumina.com

Joshua D. Harms, Esq., *pro hac vice*
Washington I.D. No. 55679
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
Phone: (206) 626-6000
Fax:    (206) 464-1496
Joshua.Harms@stokeslaw.com

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..............................................................................1

II.   ARGUMENT IN OPPOSITION ....................................................4

    A.    The University Cannot Establish a Likelihood of Confusion
        because None Exists .................................................................4

        1.    When Viewed as a Whole, Vintage Brand's Historic
                Images are Clearly Distinguishable From the
                University's Purported Marks .......................................7

        2.    The Goods Only Compete to the Extent Consumers
                Want Vintage Brand's Historic Images to Express
                Their Affiliation with the University .........................13

        3.    There Is No Evidence of Actual Confusion, and the
                University's Witness Actually Indicates Confusion as
                to Source Is Unlikely .................................................15

        4.    There is No Evidence that Vintage Brand Intended to
                Cause Confusion ........................................................19

    B.    Vintage Brand's Products are Not Counterfeits...................22

    C.    False Endorsement and Broader Website Elements ............27

    D.    The University Cannot Establish Willfulness Because It
        Cannot Conceivably Establish Vintage Brand's Non-Trademark
        Use of Public Domain Images Is Clearly Barred By Law .................31

    E.    Defendants' Affirmative Defenses, on which the University is
        Silent, Preclude Summary Judgment ..................................33

        1.    Aesthetic Functionality is a Complete Defense.......................33

        2.    Defendants' Section 33(b)(7) Defense Precludes
                Summary Judgment ..................................................36

    F.    The University is not Entitled to Summary Judgment on Vintage
        Brand's Counterclaims..........................................................40

        1.    The University Cannot Escape the Ornamentality
                Counterclaim.............................................................40

        2.    The Seal Designs Incorporate the Pennsylvania Coat
                of Arms .....................................................................44

III.  CONCLUSION...............................................................................45

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir. 2000) .................................................................... 9, 10, 19

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
    537 F.2d 4 (2d Cir. 1976) ...................................................................................... 41

*American Automobile Association of Northern California, Nevada & Utah v. General Motors LLC*,
    367 F. Supp. 3d 1072 (N.D. Cal. 2019) ............................................................... 31

*Arcona, Inc. v. Farmacy Beauty, LLC*,
    976 F.3d 1074 (9th Cir. 2020) ....................................................................... 24, 25

*Athletic Association v. Laite*,
    756 F.2d 1535 (11th Cir. 1985) ..................................................................... 21, 22

*Ayres v. City of Chicago*,
    125 F.3d 1010 (7th Cir. 1997) ............................................................................. 10

*Bausch & Lomb Inc. v. Leupold & Stevens Inc.*,
    1 U.S.P.Q.2d 1497 (TTAB 1986) ........................................................................ 41

*Bd. of Governors of Univ. of N. Carolina v. Helpingstine*,
    714 F. Supp. 167 (M.D.N.C. 1989) ....................................................................... 7

*British Broad. Corp. v. Scott Stander & Associates, Inc.*,
    2017 WL 11682913 (C.D. Cal. Mar. 17, 2017) ................................................... 40

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
    425 F.3d 211 (3d Cir. 2005) ................................................................................ 30

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
    269 F.3d 270 (3d Cir. 2001) ......................................................................... 20, 21

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*,
    696 F.3d 206 (2d Cir. 2012) ........................................................................... 4, 42

**Cases** (cont.)                                                    **Page(s)**

*City of New York v. Blue Rage, Inc.*,
   435 F. Supp. 3d 472 (E.D.N.Y. 2020) ................................................................ 45

*Cohen & Co., Ltd. v. Cohen & Co., Inc.*,
   2022 WL 5250271 (E.D. Pa., Oct. 6, 2022)........................................... 23, 24, 26

*Colgate-Palmolive Co. v. J.M.D. All-Star Import & Export Inc.*,
   486 F. Supp. 2d 286 (S.D.N.Y. 2007)................................................................ 24

*Cooper v. Dearhearts, Inc.*,
   1997 WL 325868 (E.D. Pa. June 11, 1997) ......................................................... 9

*Coty Inc. v. Excell Brands, LLC*,
   277 F. Supp. 3d 425 (S.D.N.Y. 2017)................................................................ 25

*D.C. One Wholesaler, Inc. v. Jonathan E. Chien*,
   120 U.S.P.Q.2d 1710 (TTAB 2016) ................................................................... 41

*Dastar Corp. v. Twentieth Century Fox Film Corp*,
   539 U.S. 23 (2003) ............................................................................... *Passim*

*De La Salle High School of Concord v. Sportswear, Inc.*,
   Case No. C11-00182 (Contra Costa, Cal. Super. Ct., Oct. 22, 2012)................. 34

*Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*,
   40 F.3d 1431 (3d Cir. 1994)................................................................................. 5

*Eastland Music Grp., LLC v. Lionsgate Entm't, Inc.*,
   707 F.3d 869 (7th Cir. 2013)............................................................................. 10

*Facenda v. N.F.L. Films, Inc.*,
   542 F.3d 1007 (3d Cir. 2008)............................................................................ 27

*Family Emergency Room LLC*,
   121 U.S.P.Q.2d 1886 (TTAB 2017) ............................................................. 44, 45

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,
   925 F. Supp. 2d 1067 (C.D. Cal. 2012) ............................................................ 34

**<u>Cases</u> (cont.)**                                                     **Page(s)**

*Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC,*
   2019 WL 274967 (S.D.N.Y. 2019)........................................ 23

*G.D. Searle & Co. v. Hudson Pharm. Corp.,*
   715 F.2d 837 (3d Cir. 1983)............................................... 30

*Gaudiya Vaishnava Soc'y v. City & Cnty. of S.F.,*
   952 F.2d 1059 (9th Cir. 1990)............................................ 10

*Genovese Drug Stores, Inc. v. TGC Stores, Inc.,*
   939 F. Supp. 340 (D.N.J. 1996) ......................................... 10

*Groeneveld Transport Efficiency, Inc. v. Lubecore Intern., Inc.,*
   730 F.3d 494 (6th Cir. 2013).............................................. 20

*Gucci Am., Inc. v. Guess?, Inc.,*
   868 F. Supp. 2d 207 (S.D.N.Y. 2012)................................ 23

*Holley Performance Products, Inc. v. Quick Fuel Technology, Inc.,*
   624 F. Supp. 2d 610 (W.D. Ky. 2008)................................ 40

*In re Alabama Tourism Dept.,*
   2020 U.S.P.Q.2d 10485 (TTAB 2020) ............................... 45

*In re Electrolyte Labs. Inc.,*
   929 F.2d 645 (Fed. Cir. 1990)............................................ 11

*In re Nat'l Data Corp.,*
   753 F.2d 1056 (Fed Cir. 1985)............................................. 9

*Int'l Order of Job's Daughters v. Lindeburg & Co.,*
   633 F.2d 912 (9th Cir. 1980).............................................. 34

*Jack Daniel's Props., Inc. v. VIP Products LLC,*
   599 U.S. __ (2023) ....................................................*Passim*

*La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,*
   495 F.2d 1265 (2d Cir. 1974)........................................ 6, 21

v

**Cases** (cont.)                                                                 **Page(s)**

*Lontex Corp. v. Nike, Inc.*,
    384 F. Supp. 3d 546 (E.D. Pa. 2019) ............................................................ 23, 24

*LTTB LLC v. Redbubble, Inc.*,
    840 Fed. App'x 148 (9th Cir. 2021) .......................................................... 4, 34, 42

*Madama v. Genesis Rehab Servs.*,
    2014 WL 3695976 (D.N.J. July 24, 2014) .......................................................... 27

*March Madness Athletic Association., LLC v. Netfire, Inc.*,
    310 F. Supp. 2d 786 (N.D. Tex. 2003) ................................................................ 29

*Mobile v. Globalgurutech LLC*,
    2023 WL 3998459 (D. Ariz. Jun. 14, 2023) ....................................................... 30

*N.L.R.B. v. FES, a Div. of Thermo Power*,
    301 F.3d 83 (3d Cir. 2002) ..................................................................................... 6

*National Football League Props., Inc. v. New Jersey Giants, Inc.*,
    637 F. Supp. 507 (D. NJ. 1986) ........................................................................... 21

*New Kids on the Block v. News Am. Pub., Inc.*,
    971 F.2d 302 (9th Cir. 1992) ................................................................................. 5

*Phi Delta Theta Fraternity v. J. A. Buchroeder & Co.*,
    251 F. Supp. 968 (W.D. Mo. 1966) ................................................................ 36, 39

*Phoenix Entm't Partners v. Rumsey*,
    829 F.3d 817 (7th Cir. 2016) ................................................................................. 9

*Prestonettes, Inc., v. Coty*,
    264 U.S. 359 (1924) ............................................................................................. 22

*Ringling Brothers-Barnum & Bailey Combined Shows, Inc. v.
Utah Div. of Travel Development*,
    955 F. Supp. 598 (E.D. Va. 1997) ....................................................................... 31

**Cases** (cont.)                                                     **Page(s)**

*Rudovsky v. W. Publ'g Corp.*,
   2010 WL 2804844 (E.D. Pa. July 15, 2010) ....................................... 27

*Sabinsa Corp. v. Creative Compounds, LLC*,
   609 F.3d 175 (3d Cir. 2010) .......................................................... 19

*San Diego Comic Convention v. Dan Farr*,
   2018 WL 4078588 (S.D. Cal. Aug. 23, 2018) .................................... 31

*San Miguel Pure Foods Co., Inc. v. Ramar Inter. Corp.*,
   625 F. App'x 322 (9th Cir. 2015) .................................................. 31

*Sazerac Brands, LLC v. Peristyle, LLC*,
   892 F.3d 853 (6th Cir. 2018) ......................................................... 5

*SecuraComm Consulting Inc. v. Securacom Inc.*,
   166 F.3d 182 (3d Cir. 1999) ......................................................... 32

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
   59 F.3d 902 (9th Cir. 1995) ........................................................... 6

*SportFuel, Inc. v. PepsiCo, Inc.*,
   932 F.3d 589 (7th Cir. 2019) ....................................................... 32

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
   588 F.3d 97 (2d Cir. 2009) .......................................................... 20

*Straus v. Notaseme Hosiery Co.*,
   240 U.S. 179 (1916) ................................................................... 32

*Streetwise Maps, Inc. v. VanDam, Inc.*,
   159 F.3d 739 (2d Cir. 1998) ........................................................ 20

*Supreme Assembly, Order of Rainbow for Girls v. J. H. Ray Jewelry Co.*,
   676 F.2d 1079 (5th Cir. 1982) ................................................ 14, 34

*Tiffany & Co. v. Costco Wholesale Corp.*,
   971 F.3d 74 (2d Cir. 2020) .......................................................... 23

vii

**Cases** (cont.)                                                              **Page(s)**

*Toyota Motor Sales U.S.A., Inc. v. Tabari*,
    610 F.3d 1171 (9th Cir. 2010)................................................................. 30

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
    532 U.S. 23 (2001) ...................................................................... 33, 35

*UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.*,
    446 F. Supp. 2d 1164 (E.D. Cal. 2006)..................................................... 32

*Univ. of Georgia. Athletic Association v. Laite*,
    756 F.2d 1535 (11th Cir. 1985).............................................................. 21

*Univ. of Pittsburgh v. Champion Products Inc.*,
    686 F.2d 1040 (3d Cir. 1982).................................................................. 7

*Univ. of Pittsburgh v. Champion Products, Inc.*,
    566 F. Supp. 711 (W.D. Pa. 1983)...................................... 17, 34, 35

*Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.*,
    50 F.3d 189 (3d Cir. 1995).......................................................... 16, 22

*Volkswagenwerk Aktiengesellschaft v. Church*,
    411 F.2d 350 (9th Cir. 1969)....................................................... 29, 30

*Weiss v. York Hosp.*,
    745 F.2d 786 (3d Cir. 1984)............................................................. 39

**Statutes**

15 U.S.C. § 1064(6) ........................................................................ 40, 41

15 U.S.C. § 1065(2) ............................................................................ 40

15 U.S.C. § 1115(b)(7)......................................................................... 36

15 U.S.C. § 1116(d)(1)(B)(ii) ............................................................... 23

15 U.S.C. § 1127................................................................................. 23

**Rules**                                                          **Page(s)**

Fed. R. Evid. 901 ...................................................................... 6

**Administrative Materials**

U.S. Dep't of Justice and Fed'l Trade Comm.,
  *Horizontal Merger Guidelines* (2010) ................................................ 36

T.M.E.P. § 1202.03(a)..................................................................... 43

T.M.E.P. § 1204.01(a)................................................................. 44, 45

T.M.E.P. § 1204.01(b)..................................................................... 45

T.M.E.P. § 1216.02 ......................................................................... 41

T.M.E.P. § 1605.04......................................................................... 40

**Other Authorities**

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed., 2023)......*Passim*

BLACK'S LAW DICTIONARY (10th ed., 2014) ........................................ 23

THE CULTURAL LIFE OF INTELLECTUAL PROPERTIES: AUTHORSHIP,
APPROPRIATION, AND THE LAW (1998).................................................. 38

Jodi S. Balsam,
*Timeout for Sports Trademark Overprotection: Comparing the United States,*
*European Union, and United Kingdom*,
  52 CAL. W. INT'L L.J. 351 (2022) .................................................. 39

James Boyle & Jennifer Jenkins,
*Mark of the Devil: The University As Brand Bully*,
  31 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 391 (2020) .............................. 39

Stacey L. Dogan & Mark A. Lemley,
*The Merchandising Right: Fragile Theory or Fait Accompli?*,
  54 EMORY L.J. 461 (2005) ......................................................... 14, 35

Leah Chan Grinvald,
*Shaming Trademark Bullies*,
  2011 Wis. L. Rev. 625 (2011) ............................................................... 39

Glynn S. Lunney, Jr.,
*Trademark Monopolies*,
  48 Emory L.J. 367 (1999) .................................................................... 39

Matthew J. Mitten,
*From* Dallas Cap *to* American Needle *and Beyond: Antitrust Law's Limited*
*Capacity to Stitch Consumer Harm from Professional Sports Club*
*Trademark Monopolies*,
  86 Tul. L. Rev. 901 (2012) .................................................................. 39

Alexandra Roberts,
*Trademark Failure to Function*,
  104 Iowa L. Rev. 1977 (2019) .............................................................. 43

Transcript of Oral Argument, *Jack Daniel Properties, Inc. v. VIP Products LLC*,
  599 U.S. __ (Mar. 22, 2023) ................................................................. 4

# I. INTRODUCTION

The University sued Vintage Brand for selling merchandise bearing public domain images drawn from historic memorabilia. Vintage Brand has offered a rigorous, comprehensive survey that shows that consumers are not confused about the source of merchandise bearing those images. *See generally* Erdem Report (Doc. 94-7) at Part III; VBSMF ¶¶ 121–33. That empirical result is not surprising—the record lacks any serious evidence that Vintage Brand uses the composite images to identify the source of its products. That is, the record is devoid of evidence that Vintage Brand uses the public domain images *as trademarks. See Jack Daniel's Props., Inc. v. VIP Products LLC*, 599 U.S. __, slip op. at 3 (2023) (describing a trademark's "primary function" as identifying "the origin or ownership of the article to which it is affixed"); *see also* Counter PSMF ¶ 5.

Instead, the evidence shows that those images are ornamental features of Vintage Brand's products. Consumers who purchase merchandise bearing University-related historic images from Vintage Brand are buying *the images* for the purpose of affiliating themselves with the University—for example, to show support for the University or its athletic teams—not because they believe (or care) that the University is the source of Vintage Brand's tangible products. *See Dastar Corp. v. Twentieth Century Fox Film Corp*, 539 U.S. 23, 37 (2003) (holding that only confusion about the origin of tangible goods is actionable under the Lanham Act).

The clearest indication of the University's distortion of the case is its attempt to demonstrate the identity of its purported marks and the images used by Vintage Brand by showing zoomed-in images that crop out the majority of the content that Vintage Brand actually prints on its merchandise. PSU Brief at 16. That presentation flouts the anti-dissection rule, which requires comparison of marks in their entireties and prohibits splitting the marks into their component parts.

Dissection is especially inappropriate in this case because the images Vintage Brand uses come as composites from historic merchandise. And it leads the University to absurd positions—for example, the University claims that images taken from historical game tickets that refer to *both of the teams* playing in the game are identical to the University's claimed PENN STATE word mark.

  

(From left to right: PSMF ¶ 162 row 8 (puzzle), row 20 (poster), and row 34 (coasters).)

The University is attempting to draw the Court's attention away from the critical difference between use of features that *refer to* the University, which are not trademark law's concern, and use of features *as trademarks* to identify the source of

2

the tangible goods bearing those features. In both its survey and its briefing, the University conspicuously avoids any questions about the reasons for consumers' beliefs. But those issues are fundamental to the criticisms courts and scholars have levied against broad trademark merchandising claims for decades, and they were just underscored by the Supreme Court, which highlighted the centrality of trademark use and instructed courts to be cautious about recognizing alleged "confusion" that might simply reflect consumers' assumptions about the law. *See Jack Daniel's Properties*, 599 U.S. __, slip op. at 3; *id*., slip op. at 1 (Sotomayor, J., concurring) (warning against finding infringement based on survey answers that reflect a mistaken belief that all uses require legal permission).

At bottom, the University is arguing that *any* reference to it constitutes use of an identical mark, no matter what else surrounds that reference or where it is located.[1] That is a claim to rights in gross, and trademark law does not give the University such broad rights. The University has the burden of proving that Vintage Brand's use of the historic images is likely to cause confusion about the source of Vintage Brand's tangible goods. *Dastar*, 539 U.S. at 37. The University cannot meet that burden. The Court should deny the University's summary judgment motion and grant summary judgment in favor of Defendants.

---

[1] The University even claims that University-related historic images that were never uploaded to the Vintage Brand website are infringing. PSMF ¶ 162 (rows 27 and 28).

## II.     ARGUMENT IN OPPOSITION

## A.     <u>The University Cannot Establish a Likelihood of Confusion Because None Exists</u>

The fundamental problem with the University's claim is that it completely fails to grapple with the difference between references to the University and uses of trademarks *as trademarks* for tangible goods. *See Jack Daniel's Properties*, 599 U.S. __, slip op. at 10 (describing use "as a designation of source for the infringer's own goods" as the use the Lanham Act "most cares about"); *see also id*., slip op. at 12–13 (distinguishing use of trademarks "as trademarks" from uses that perform some other expressive function).[2]

That difference is essential because the University has the burden of proving that Vintage Brand's use of the historic images is likely to cause confusion about the source of Vintage Brand's tangible products. *Dastar*, 539 U.S. at 37. There can be no confusion about the source of those tangible goods if consumers do not regard the historic images as source indicators. *See LTTB LLC v. Redbubble, Inc*., 840 F. App'x 148, 151 (9th Cir. 2021); *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 228 (2d Cir. 2012) (no confusion analysis required

---

[2] Transcript of Oral Argument at 12:4–12, *Jack Daniel Properties, Inc. v. VIP Products LLC*, 599 U.S. __ (Mar. 22, 2023)  (Jackson, J.) ("[I]s the artist using this mark as a source identifier, … if they aren't, then I guess the Lanham Act doesn't apply because … the Lanham Act worries about confusion that arises from use of a mark as a source identifier.").

where monochromatic red shoe with red sole did not "use" Louboutin's contrasting red sole mark); *cf. Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1449–50 (3d Cir. 1994) ("The configuration for which protection is sought must not appear to the consumer as a mere component, or the essence, of the product gestalt, but rather must appear as something attached (in a conceptual sense) to function in actuality as a source designator—it must appear to the consumer to act as an independent *signifier* of origin rather than as a component of the good." (emphasis in original)).[3]

The cases the University invokes as involving identical marks on identical goods are not analogous along any dimension. For one thing, there is no evidence that the University has ever used the composite images that appear on Vintage Brand merchandise as trademarks. Counter PSMF ¶ 90.[4] The University's use of its

---

[3] There is an ongoing debate about whether trademark use is a threshold question that courts must resolve prior to engaging likelihood of confusion. Several circuit courts have held that it is a threshold issue. *See Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 859 (6th Cir. 2018) ("[P]laintiffs carry a threshold burden to show that the defendant is using a mark 'in a trademark' way that 'identifies the source of their goods.'"); *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 307 (9th Cir. 1992) (describing "non-trademark use of a mark" as "a use to which the infringement laws simply do not apply"). But even if trademark use is not properly considered a *threshold* question, it is an essential question in resolving likelihood of confusion. *See* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:11.50 (5th ed., 2023) ("[A] non-trademark use is unlikely to cause actionable confusion.").

[4] The University purports to have three sources of that evidence. PSMF ¶ 5; *see also* Doc. 136 (Defendants' motion to strike). The first is conclusory deposition testimony from its own Director of Licensing (Petulla Decl. (Doc. 123-1) ¶ 15).

purported marks to adorn merchandise is an ornamental use, not a trademark use. Counter PSMF ¶ 5.[5] Even if the University did make trademark use of its claimed marks, those marks are only component features of the composite images Vintage

The second is a belatedly-produced survey that is plainly inadmissible because it constitutes hearsay and does not even support the University's argument (Doc. 123-15). And the third is Mr. Franklyn's first survey, which is fundamentally flawed and does not address the key questions identified by this Court (Docs. 94, 99).

[5] Even if decorative use was plausibly considered trademark use, the University has failed to offer evidence sufficient to establish trademark rights in the Pozniak Lion Design and the S-Lion Design. Counter PSMF ¶¶ 30–41, 60. For the Pozniak Lion Design, two of the three purported uses (uniforms for the Lion Ambassadors and gear for the Nittany Lion Wrestling Club) do not constitute use in commerce, and the third use (a license plate program) is a limited ornamental use, and no reasonable consumer would believe that the University is the source or in control of the quality of state-issued license plates. Counter PSMF ¶¶ 30, 33, 37; VBSMF ¶¶ 57–68. The evidence of pre-lawsuit "use" of the S-Lion Design consists of Wayback machine captures (PSMF ¶ 40), which are not admissible. Fed. R. Evid. 901; *see also* Doc. 136. And even if they were, the S-Lion Design was only "used" in the context of the College Vault program, which was "obviously contrived solely for trademark maintenance purposes." *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1273 (2d Cir. 1974); *see also* Counter PSMF ¶ 38. The University cannot establish pre-lawsuit continuous use of such designs on the conclusory declaration testimony of its Director of Licensing (*see* Petulla Decl. ¶¶ 7–8), because she lacks personal knowledge as to historical use of the University's purported marks and was not disclosed to provide testimony on that topic. VBEx. 102 (Doc. 117-52) (Interrogatory No. 1); VBEx. 105 (Rule 26(a)(1) disclosures); *see also N.L.R.B. v. FES, a Div. of Thermo Power*, 301 F.3d 83, 95 (3d Cir. 2002) ("Roche's testimony … amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment"); *cf. Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995). Jackie Esposito's declaration (Doc. 123-10) is likewise conclusory, in conflict with the record— including the University's own asserted facts—and at any rate not capable of establishing continuous use to 2018. Counter PSMF ¶¶ 56, 59–60; *see also* 30(b)(6) Dep. (Doc. 116-28) at 67:25–68:25.

Brand uses. As a result, the University's claims depend almost entirely on comparison of purported University marks to *parts* of the historic, public domain images printed on Vintage Brand's products, in violation of trademark law's general prescription against dissection.

The University also has no admissible evidence that Vintage Brand uses the historic images that appear on its merchandise as trademarks. Counter PSMF ¶ 114; *see also id*. ¶ 5. Those images are ornamental features of Vintage Brand's tangible goods; they are the products consumers are really buying. Doc. 43 at 9 (in the context of "university-trademarked apparel and merchandise … the mark itself is the product"); *Univ. of Pittsburgh v. Champion Products Inc.*, 686 F.2d 1040, 1047 (3d Cir. 1982) ("With negligible exception, a consumer does not desire a 'Champion' T-shirt, he (or she) desires a 'Pitt' T-shirt."); *Bd. of Governors of Univ. of N. Carolina v. Helpingstine,* 714 F. Supp. 167, 173 (M.D.N.C. 1989); *see also* VBSMF ¶¶ 18, 27–29, 39–40, 49, 60, 80, 87, 92, 101–02.

There cannot be "identical marks" when neither party is using the relevant features as marks; there couldn't be "identical marks" even if the University had legitimate rights because Vintage Brand is not using the composite historic images *as marks*. The cases the University invokes are simply not analogous to this case.

### 1. When Viewed as a Whole, Vintage Brand's Historic Images are Clearly Distinguishable from the University's Purported Marks

The University's arguments that its marks and the images on Vintage Brand's

products are "identical" are definitionally inapposite, because the University has never used the composite images that appear on Vintage Brand merchandise as marks for its own goods or services and because Vintage Brand does not use the images as "marks." That said, the University's similarity argument fails on its own terms. That argument relies on comparison of the claimed University marks to *parts* of the public domain images used by Vintage Brand. Counter PSMF ¶ 90; VBSMF ¶¶ 23, 42, 48, 50, 54, 56, 69. It claims, for example, that Vintage Brand uses identical copies of the PENN STATE and TPSU text because those words appear as parts of various historic images.



PSU Brief at 16. Only by ignoring the rest of those images can the University assert identity with anything approaching a straight face.

The University attempts to disguise its improper dissection in the specific context of the claimed Seal Designs by inviting the Court to compare its claimed Seal to zoomed-in images that crop out most of the historic images used by Vintage Brand in which a seal is embedded and all of the context in which those images appear.



*Id*. But the law is clear that the proper comparison is between marks as a whole, and that is not even what the University pretends to do. "[M]arks must be compared in their entireties .... It follows from that principle that likelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark." *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed Cir. 1985) (cleaned up); *see also A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 216 (3d Cir. 2000) (noting the general rule that marks should be compared "in their entirety"); *Cooper v. Dearhearts, Inc.*, 1997 WL 325868, at *5 (E.D. Pa. June 11, 1997) (denying motion for preliminary injunction brought by owner of JAKE'S mark against defendant using JAKE AND OLIVER'S mark because "[t]he two marks, when viewed as a whole, and not dissected, are clearly distinguishable from each other"); MCCARTHY § 11:27.

Dissection is especially improper here because Vintage Brand is not simply assembling different University marks into some composite; it takes those images as a whole from historic merchandise whose imagery is in the public domain. *See Dastar*, 539 U.S. at 33 ("The right to copy, and to copy without attribution, once a copyright has expired … passes to the public.") (cleaned up); *Phoenix Entm't*

*Partners v. Rumsey*, 829 F.3d 817, 829 (7th Cir. 2016) ("When the copyright on [] a creative work expires, enabling any member of the public to copy and use the work without license, it is not a trademark violation simply to display the work without first deleting the mark that was inserted into its content."); *Eastland Music Grp., LLC v. Lionsgate Entm't, Inc.*, 707 F.3d 869, 872 (7th Cir. 2013) ("*Dastar* tells us not to use trademark law to achieve what copyright law forbids.").[6]

As a result, even if it were possible to describe Vintage Brand's images as "marks" subject to comparison, the correct comparison would be between the University's claimed marks and the composite images in their entirety, presented in context. *See Jack Daniel's Properties*, 599 U.S. __, slip op. at 15, n.2 (noting that courts should dismiss claims of trademark infringement when there is no plausible likelihood of confusion "because of dissimilarity in the marks or various contextual considerations"); *A & H Sportswear*, 237 F.3d at 217–19 (district court properly evaluated entire context of use, including house mark and disclaimer, in similarity assessment); *Genovese Drug Stores, Inc. v. TGC Stores, Inc.*, 939 F. Supp. 340, 346 (D.N.J. 1996) ("This Court has consistently refused to allow a plaintiff to focus on

---

[6] This rule is also consistent with the First Amendment, given citizens' interests in using clothing and similar items to express a message. *See Gaudiya Vaishnava Soc'y v. City & Cnty. of S.F.*, 952 F.2d 1059, 1063–65 (9th Cir. 1990) (message-bearing items such as t-shirts and jewelry were fully First Amendment-protected noncommercial speech despite being sold); *Ayres v. City of Chicago*, 125 F.3d 1010, 1014 (7th Cir. 1997) (same).

an abbreviated mark when analyzing confusing similarity.").[7]

The composite images on Vintage Brand's merchandise are only similar to the University's claimed marks in that the images include some of those claimed marks as embedded features of the historic images. Counter PSMF ¶ 90.[8] The context is essential here. Vintage Brand sells its merchandise exclusively on its own website, which it prominently brands with the "Vintage Brand" mark. VBSMF ¶ 12; *see also id.* ¶ 19. On that website, Vintage Brand sells vintage merchandise referring to hundreds of different college and professional sports teams. VBSMF ¶ 11. Vintage Brand not only makes no attempt to claim affiliation with any of the Universities or professional teams, its website is replete with disclaimers. Counter PSMF ¶ 107; VBSMF ¶¶ 13–17. For example, there is a prominent disclaimer in the first visual field of each Team Page, beneath the descriptive header.

## PENN STATE NITTANY LIONS VINTAGE DESIGNS

Vintage designs not affiliated with, licensed, or sponsored by any college, team or league

There is also a disclaimer under the descriptive header of each Product Page.

---

[7] "There is no general rule as to whether letters or designs will dominate in composite marks; nor is the dominance of letters or design dispositive of the issue." *In re Electrolyte Labs. Inc.*, 929 F.2d 645, 647 (Fed. Cir. 1990).

[8] The University's description of Vintage Brand's process for selecting those images is misleading: Vintage Brand does not "scan[] merchandise and extract copies of the University marks," as the University claims—it scans historic memorabilia and extracts public domain images as a whole. The fact that the University's claimed marks are embedded within those images does not make the images as a whole identical to the marks.

Those disclaimers are in addition to contrasting-color disclaimers that appear on the bottom of each page of the Vintage Brand website as well as two disclaimers appearing in interactive text boxes on each Team Page.

Vintage Brand's website contrasts sharply with outlets that offer "officially-licensed merchandise." Not only do those outlets clearly and prominently proclaim that their merchandise is "official," the merchandise itself always carries an "Official Label."

 

VBEx. 75 (Doc. 117-25) (red annotation added); VBEx. 88 (Doc. 117-38). The "Official Label" is the real indicator of affiliation for any consumers who care, and that is why the University's exclusive marketing agent, CLC, believes the tag is

essential. VBSMF ¶¶ 93–100; Counter PSMF ¶ 5. Indeed, the University has conceded that absent affirmative indications of "official" status, consumers might not know that merchandise is, in fact, official. 30(b)(6) Dep. (Doc. 116-28) at 88:12–89:3 (Q: "And in the absence of this verbiage, would your consumers not know [they're buying licensed merchandise]?" A: "Not necessarily.").[9]

### 2. The Goods Only Compete to the Extent Consumers Want Vintage Brand's Historic Images to Express Their Affiliation with the University

The University argues that Vintage Brand competes directly with it because the University licenses the same types of merchandise that Vintage Brand sells.[10] But the market here is defined by the images. The images are what consumers are really buying when they buy Vintage Brand merchandise; the tangible goods are just

---

[9] The University's claim that Vintage Brand "sources its images directly from genuine branded merchandise," PSU Brief at 5–6, strips the words "genuine" and "branded" of all legal meaning. The University has proffered no evidence that the memorabilia in Vintage Brand's collection is "genuine" in the sense of having been legitimately licensed by the University—and in fact that is exceedingly unlikely, since all of the memorabilia in Vintage Brand's collection is historic, and the University did not even engage in licensing its purported marks for use in connection with retail merchandise until 1983 at the earliest. VBSMF ¶¶ 8, 81; PSMF ¶¶ 56, 74. That memorabilia was not "branded" with the historic images; the images were ornamental and informational features, just as they are on Vintage Brand's products. The University's misleading description demonstrates again that the University's true claim is to rights in gross—i.e., that any reference to the University infringes, whether or not the University has relevant trademark rights and whether or not Vintage Brand uses any imagery as a trademark.

[10] It does so to imply that both parties are using the same marks for the same goods, but not only are the images not trademarks for merchandise, the parties do not sell merchandise bearing the same historic images. Counter PSMF ¶ 90.

substrate for those images. *See Dastar*, 539 U.S. at 31–34 (making clear that intangible works are not relevant goods for purposes of Lanham Act claims). That fact is critical. Consumers value Vintage Brand's images because they enable the wearer to show his or her affiliation with the University, not because the images indicate the source of the tangible goods on which they appear.

> When fans buy Harvard shirts, Chicago Cubs hats, Rolling Stones tattoos, or Winnie the Pooh cakes from the local bakery, they are doing so not because they believe that Harvard or the other trademark holders made or sponsored the goods, but because the trademark in this context serves an important communicative function for them.

Stacey L. Dogan & Mark A. Lemley, *The Merchandising Right: Fragile Theory or Fait Accompli?*, 54 EMORY L.J. 461, 500 (2005).[11]

The University wants to monopolize the market for anything that refers to it: that is the errant path suggested by *Boston Hockey*, from which the Fifth Circuit has now retreated. *See* Doc. 43 at 16 & n.67 (citing *Supreme Assembly, Order of Rainbow for Girls v. J. H. Ray Jewelry Co.*, 676 F.2d 1079, 1084 n.7 (5th Cir. 1982) ("Our cases demonstrate unbroken insistence upon likelihood of confusion and by doing so they reject any notion that a trademark is an owner's 'property' to be

---

[11] For example, the Nike trademark on a hangtag tells consumers that Nike made the shirt, and the CLC trademark on the Official Label may tell consumers that the shirt was licensed by the University, but the design on the front of the shirt does neither. Not surprisingly, there is no evidence that the University requires any of its "marks" to be placed on products in the traditional homes for trademarks. *See* VBEx. 110 (CLC's "quick tips" for identifying counterfeit products include "[c]ounterfeit hangtag," "[c]ounterfeit hologram," and "[c]ounterfeit label.").

14

protected irrespective of its role in the operation of our markets.")); *see also* MCCARTHY § 24.10 (*Boston Hockey* "violated a basic rationale of trademark law"); Doc. 131-3 (Proposed Brief of *Amici Curiae* Law Professors). Trademark law does not give the University the right to monopolize features that consumers value for their own sake, and not because those features indicate the source of the tangible goods on which they are printed.

Even if Vintage Brand's tangible goods were the relevant comparison here, it is abundantly clear to consumers that Vintage Brand's products are not licensed by the University. To the extent it matters to consumers whether University-related merchandise is "official," Vintage Brand's products do not compete with the University's licensed goods. That means that the parties' goods only conceivably compete among consumers who do not care whether the goods are licensed by the University or not. *See Dastar*, 539 U.S at 32–33 ("The words of the Lanham Act should not be stretched to cover matters that are typically of no consequence to purchasers."). The University only considers Vintage Brand a competitor because it believes it should have monopoly control over all references to it, regardless of whether those references are serving a source-identifying function.

### 3. There Is No Evidence of Actual Confusion, and the University's Witness Actually Indicates Confusion as to Source Is Unlikely

Tellingly, the University's brief barely mentions actual confusion, even though Vintage Brand's allegedly infringing mockup products appeared on Vintage

Brand's website for approximately three years before Vintage Brand voluntarily disabled those pages. The reason is that the University has no evidence of actual confusion. *Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 205 (3d Cir. 1995) ("If a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future."). If this were really a case of identical marks and identical goods, it is inconceivable that the University would not have evidence of actual confusion after three years of use by Vintage Brand. That it does not have such evidence is a powerful indication that consumers understand perfectly well that Vintage Brand is not in fact using the images as marks, but rather as ornamental features of its merchandise.

The University's only purported actual confusion comes from the deposition testimony of Meghan Maffey. PSMF ¶¶ 136–37; *see also* VBSMF ¶¶ 10, 103. Ms. Maffey is the President of the University's Washington, D.C. alumni chapter, on whose behalf she sent over one hundred emails soliciting donations. VBSMF ¶ 104.[12] Ms. Maffey is not an ordinary consumer of University-related fan merchandise. Still, Ms. Maffey testified that she does not remember the Vintage Brand website specifically; she was not aware of whether the Seal Designs or even the PENN STATE text appeared on the website. VBSMF ¶¶ 105, 107. She only

---

[12] These facts are also recited at Counter PSMF ¶ 137.

recalled seeing "[t]he paw print and the chipmunk logo" on Vintage Brand's website. VBSMF ¶¶ 105–06. But neither of those images were ever on the website. VBSMF ¶¶ 106–07.[13]

It is no surprise that Ms. Maffey doesn't have a specific memory of the website—she made clear that, before speaking with the University's counsel, she "did not think about" whether Vintage Brand was a licensee or otherwise affiliated with the University.[14] VBSMF ¶ 104. This is not evidence of actual confusion, but of the University trying (and failing) to solicit evidence of confusion from a loyal alum. *See Univ. of Pittsburgh v. Champion Products, Inc.*, 566 F. Supp. 711, 720 (W.D. Pa. 1983), *vacated by stipulation* (Feb. 2, 1984) ("vague and infrequent" evidence of actual confusion implied "there is no likelihood of confusion").[15]

For the reasons Vintage Brand has described at length (Doc. 115 at 20–22; VBSMF ¶¶ 114–20; *see also* Neal Report (Doc. 94-2); Erdem Report (Doc. 94-7) at Part IV), Mr. Franklyn's confusion survey is deeply flawed and offers no reliable evidence of confusion. Mr. Franklyn primed respondents to name the University by

---

[13] The University-related Team Page was not even available when Ms. Maffey claims she viewed it, because it was taken down during the pendency of this lawsuit. VBSMF ¶ 108.

[14] Ms. Maffey wanted a donation of merchandise bearing University-related imagery; neither Vintage Brand's nor the University's reputation as a source of quality tangible goods was implicated. *See Dastar*, 539 U.S at 32–33.

[15] Ms. Maffey also made clear that, whatever her views are now, they are based on her assumption that any merchandise making reference to the University must be licensed. VBSMF ¶ 110.

referring to it multiple times in screener questions that Mr. Franklyn did not use in any way. He removed critical commercial context from the test image, specifically by cropping out the vintagebrand.com URL. And he used a fundamentally flawed "control" image that did not function as a control at all. As if that did not skew the results enough, Mr. Franklyn inappropriately counted respondents as "confused" when their answers did not specifically refer to the University, despite having primed respondents to do exactly that. Mr. Franklyn also made no effort whatsoever to evaluate the reasons for any "confused" responses, despite the Court's earlier recognition that those responses might simply reflect mistaken beliefs about the law, and despite the fact that many of Mr. Franklyn's "confused" respondents said explicitly that their responses were based on their assumptions that the University must have had to grant permission.[16] That failure to probe the reasons for "confused" responses is precisely what the Supreme Court has just cautioned against. *See Jack Daniel's Properties*, 599 U.S. __, slip op. at 1 (Sotomayor, J., concurring).

---

[16] *See* VBSMF ¶ 115; Counter PSMF ¶ 138. For example, where one respondent identified "penn state college" as the entity sponsoring or approving the product, she explained "penn state would have to give its consent for vintage to make this shirt." Doc. 101-1 at Respondent ID No. 29 (Q205 and Q206). The respondent knew Vintage Brand was the source of the shirt and merely assumed the University's involvement because of their beliefs about what the law required. It would be perverse to allow such legal beliefs to drive what is, and is not, actionable, particularly where the University has proffered no evidence that consumers believe any control over the quality of the underlying tangible good is necessarily attendant to the University's "consent."

The University makes no serious effort to rely on Mr. Franklyn's survey, merely mentioning it in passing and offering no meaningful defense of its methodology or its results. The Court should give that survey even less weight than the University did.

### 4. There is No Evidence that Vintage Brand Intended to Cause Confusion

The University argues that Vintage Brand intentionally adopted similar marks, but in fact Vintage Brand did not intend to adopt any of the images as marks, and it never did so. Vintage Brand's "preclearance searches" were in fact to confirm that the composite images were in the public domain and not in current use for merchandise. Counter PSMF ¶ 144; VBSMF ¶ 8. Intent to compete is not bad intent for trademark purposes. *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 187 (3d Cir. 2010) ("[C]ourts must look at whether the defendant chose the mark to intentionally *confuse* consumers, and *thereby* capitalize on the senior user's goodwill, and whether the defendant gave adequate care to investigating its *proposed mark.*") (emphasis added); *A & H Sportswear*, 237 F.3d at 225–26 ("[A] defendant's mere intent to copy, without more, is not sufficiently probative of the defendant's success in causing confusion to weigh such a finding in the plaintiff's favor; rather, defendant's intent will indicate a likelihood of confusion only if an intent to *confuse* consumers is demonstrated via purposeful manipulation of the *junior mark* to resemble the senior's.") (first emphasis in original).

The sort of intent that is relevant to trademark liability "is not the intent to *copy* but rather the intent to *deceive or confuse*." *Groeneveld Transport Efficiency, Inc. v. Lubecore Intern., Inc.*, 730 F.3d 494, 514 (6th Cir. 2013) (emphasis in original; collecting cases); *see also Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009) ("We reject Starbucks' argument, however, because the 'only relevant intent is intent to confuse. There is a considerable difference between an intent to copy and an intent to deceive.'"); *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998) ("The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product."); McCarthy § 23:113 ("An 'intent' sufficient to support, along with other evidence, a finding of a likelihood of confusion must be an intent to confuse, not just an intent to copy. … [C]opying to compete is not the same as copying to confuse. … There is a considerable difference between an intent to copy and an intent to deceive."). At most, intent to copy is relevant insofar as the only explanation for the copying is intent to confuse—but here, ornamentality and functionality provide the necessary reasons.

The University cites the Third Circuit's decision in *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270 (3d Cir. 2001), for the proposition that "evidence of intentional, willful and admitted adoption of a mark similar to the existing marks weighs strongly in favor of a finding of likelihood of confusion."

PSU Brief at 22 (quoting *Checkpoint*, 269 F.3d at 286). *Checkpoint* was a standard

trademark case in which the defendant unambiguously used the challenged term as

its own name and trademark. *Checkpoint*, 269 F.3d at 286. And the quoted language

is actually from *National Football League Props., Inc. v. New Jersey Giants, Inc.*, a

case in which a professional football team selected the name "New Jersey Giants"

as the name of its team, admitting that it hoped the New York Giants would acquire

the mark from the defendants at a profit. 637 F. Supp. 507, 518 (D. NJ. 1986). These

cases are inapposite: Vintage Brand never adopted the University's name as its

own—Vintage Brand sells merchandise with historic images relating to hundreds of

professional and college teams on its prominently branded website, and it has never

hoped to be affiliated with the University. Indeed, it has explicitly and repeatedly

disclaimed any affiliation. VBSMF ¶¶ 11–14, 16–17, 19.

The University's claim is perhaps most clearly exposed by its reliance on

*Univ. of Georgia. Athletic Association v. Laite*, 756 F.2d 1535 (11th Cir. 1985), to

suggest that it is bad faith for Vintage Brand to compete for consumers interested in

historic University-related images. PSU Brief at 23. *Laite* is based on the incorrect

reasoning of *Boston Hockey*, and specifically *Boston Hockey*'s suggestion that

trademark claims can be based on association of the *images* with the plaintiff. *Laite*,

756 F.2d at 1547 ("Here, … as in *Boston Pro. Hockey*, the confusion stems not from

the defendant's unfair competition with the plaintiff's *products*, but from the

defendant's misuse of the plaintiff's reputation and good will as embodied in the plaintiff's mark.") (emphasis in original). The Eleventh Circuit's comments on intent in *Laite* cannot be separated from that erroneous reasoning, and specifically the claim that mere association of the claimed marks with the University constitutes infringement. There is nothing wrong with Vintage Brand's intent to attract customers for products that allow consumers to show their affiliation with the University when consumers are not confused about the source of those products. That is called competition, and it is lawful, however much the University wishes to avoid it. *Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 207 (3d Cir. 1995) ("[D]eterrents to copying of product designs—as opposed to product packaging or trademarks—would inhibit even fair competition, thus distorting the Lanham Act's purpose."); *see also Prestonettes, Inc., v. Coty*, 264 U.S. 359, 368 (1924) ("When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo.").

**B.     Vintage Brand's Products are Not Counterfeits**

The University's counterfeiting argument is based on the same misleading comparison between its purported marks and the composite images used by Vintage Brand. The University makes no attempt to deal with the entire composite image, or with the caselaw making clear that commercial context is essential in evaluating

whether the accused mark is identical or substantially indistinguishable. Here too, the University waves away the realities of the case.

A "counterfeit" in trademark law is "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. §§ 1127, 1116(d)(1)(B)(ii).[17] "[I]n assessing counterfeiting claims, 'courts have uniformly applied [the counterfeiting] provision to products that are stitch-for-stitch copies of those of another brand.'" *Cohen & Co., Ltd. v. Cohen & Co., Inc.*, 2022 WL 5250271, at *2 (E.D. Pa., Oct. 6, 2022) (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012)). Indeed, confusion as to *sponsorship or affiliation* is insufficient as a matter of law. Consumers must believe the infringer's product is in fact the plaintiff's product. *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 95 n.18 (2d Cir. 2020); *Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC*, 2019 WL 274967, at *3 (S.D.N.Y. 2019) (counterfeiting occurs only if a substantially identical mark is used "to pass off the infringer's product as the original, rather than merely presented in a manner likely to confuse some consumers as to the origin or sponsorship of the infringer's product").

"Counterfeiting has a higher standard for similarity so the 'likelihood to cause

---

[17] The Lanham Act does not define "spurious," so courts look to Black's Law Dictionary, which defines the term as "[d]eceptively suggesting an *erroneous origin*; fake." *Spurious*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added); *see also Lontex Corp. v. Nike, Inc.*, 384 F. Supp. 3d 546, 555 (E.D. Pa. 2019); *Tiffany & Co.*, 971 F.3d at 95 n.18.

confusion' standard used for infringement violations is insufficient." *Cohen & Co.*, 2022 WL 5250271, at *2 (quoting *Lontex*, 384 F. Supp. 3d at 556). The heightened similarity required by the substantially indistinguishable prong is exacting: "a mark that differs from a registered mark by a few letters, let alone one or two words," cannot be a counterfeit. *Lontex*, 384 F. Supp. 3d at 557; *see also Colgate-Palmolive Co. v. J.M.D. All-Star Import & Export Inc.*, 486 F. Supp. 2d 286, 289–90 (S.D.N.Y. 2007) (rejecting counterfeit claim where word and design differences, shown below, created distinguishability despite quite similar impressions).

 

Counterfeiting analysis requires comparison of a claimed trademark with the purportedly counterfeit composite design as a whole, without dissecting and comparing constituent elements. *See Lontex*, 384 F. Supp. at 557–58; MCCARTHY § 23:41. And because counterfeiting is concerned with passing off, courts consider how the genuine and counterfeit products "appear in the marketplace, rather than how two marks appear in the abstract." *Lontex Corp.*, 384 F. Supp. 3d at 557 (cleaned up); *see also Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1076–77 (9th Cir. 2020) (finding defendant's EYE DEW not counterfeit despite identical EYE DEW mark because of differences in the products' appearance).

Side-by-side comparison makes abundantly clear that none of Vintage

Brand's composite historic designs alleged to be counterfeit are substantially indistinguishable from the University's asserted registered marks. Counter PSMF ¶ 90; VBSMF ¶¶ 23, 42, 48, 50, 54, 56, 69. A factfinder would have to dissect these images to find in the University's favor; for example, dissecting the TPSU text from the Seal Design (below left), and further dissecting the Seal Design from other elements of the composite design used by Vintage Brand (below right).



In addition to the marked differences between the University's asserted marks and Vintage Brand's composite historic designs, substantial indistinguishability does not exist here because Vintage Brand's house mark appears prominently on the top of each page of its website, as well as its packaging and various physical goods. VBSMF ¶¶ 12, 19; *see also Arcona, Inc.*, 976 F.3d at 1081 ("[I]t is implausible that a consumer would be deceived because the products had their respective housemarks … prominently on the packaging."). And each Vintage Brand webpage contains prominent disclaimers. VBSMF ¶¶ 13–17; *see also Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 468 (S.D.N.Y. 2017) (rejecting counterfeiting claim because, among other reasons, disclaimers created important contextual difference). That contrasts starkly with the marketplace context of the University's licensed goods,

25

which are explicitly described as "officially licensed" and which each have affixed the contractually required Official Label. VBSMF ¶¶ 93–101; Counter PSMF ¶ 5. Indeed, CLC has expressed on numerous occasions that the Official Label mark (VBEx. 104) indicates source, and that copying *that* mark constitutes counterfeiting. VBEx. 85 (Doc. 117-35); VBEx. 87 (Doc. 117-37) at 7907; VBEx. 110.

In *Cohen & Co.*, the court dismissed plaintiff's counterfeiting claim on a motion to dismiss where the plaintiff contended that the defendant "market[ed] to many of the same consumers," that it "willfully and intentionally misappropriated Plaintiff's COHEN & COMPANY Name in order to capitalize on Plaintiff's extensive goodwill," and that there were multiple instances of actual confusion. *Cohen & Co.*, 2022 WL 5250271, at *3. Those allegations, like the ones the University makes here, were insufficient; they are, as the court said, "far different than claiming Defendant engaged in counterfeiting, that is, intentionally using a spurious mark to sell knockoff services to unwitting customers." *Id*.

The University has no evidence indicating that "[Vintage Brand's] use of [the University's claimed marks] was meant to 'trick the consumer' into believing they were receiving [officially-licensed merchandise] when instead they were buying Defendant's 'imitation' [products]." *Id*. To the contrary, all of the evidence demonstrates that Vintage Brand never claimed to be officially licensed and in fact went out of its way to make clear that it was not affiliated with the University. The

University's counterfeiting claims are not colorable.

## C. <u>False Endorsement and Broader Website Elements</u>

The evidence showing lack of confusion applies equally to the University's false endorsement claim. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1019 (3d Cir. 2008) (tailoring the standards where the putative endorser is a person, but not changing the relevant factors, including length of time without actual confusion). The fundamental mistake in the University's argument is its assumption that a unidirectional expression—Vintage Brands' accused images appeal to consumers who like the University—is bidirectional (the University must therefore approve of Vintage Brands' website). The latter is a proposition for which the University has not provided evidence and which defies common sense. This theory of liability is nothing more than a thinly veiled recast of *Boston Hockey*. Vintage Brand clearly and repeatedly disclaims the University's sponsorship or approval of the tangible goods. VBSMF ¶¶ 13–17. That is the opposite of false endorsement.[18]

The University argues that "Vintage Brand's website is virtually

---

[18] The University's false endorsement claim also fails under *Dastar* because the purported "endorsement" comes only from the University's association with the historic images, which are the relevant products. *Rudovsky v. W. Publ'g Corp.*, 2010 WL 2804844, at *1–2 (E.D. Pa. July 15, 2010) (relying on *Dastar* to reject false advertising and endorsement claims); *see also Madama v. Genesis Rehab Servs.*, 2014 WL 3695976, at *8 (D.N.J. July 24, 2014) (rejecting false endorsement claim where the "images of Plaintiff … were part of the product itself").

27

indistinguishable from the e-commerce sites that sell licensed Penn State collegiate merchandise." PSU Brief at 7. That is incorrect. The sites selling "official" merchandise are only similar in that they are also ecommerce sites selling print-on-demand merchandise with imagery that refers to the University. *First*, the sites selling "licensed" merchandise each contain numerous references to items being "official" or "licensed." In contrast, Vintage Brand's website is replete with disclaimers. *Second*, the sites selling "licensed" merchandise sell goods bearing the University's current logos, which Vintage Brand does not do. VBSMF ¶¶ 31–33; *see also, e.g.*, PEx. 48 (Doc. 123-51) at 3; VBEx. 75 (Doc. 117-25) at 2. *Third*, the record shows that Vintage Brand's website appeared in the generic, print-on-demand format *before* the sites selling "official" merchandise (*compare* PEx. 48 (Doc. 123-51) (website captures dated November 2022), *with* PEx. 32 (Doc. 123-51) (website captures dated August 2021)). The University has no right to control the format of websites that offer print-on-demand merchandise.

The University further contends that its false endorsement claim is broader than its trademark infringement claim because the false endorsement claim relates to the overall design of Vintage Brand's website and particularly Vintage Brand's descriptions of its University-related products with references to the University and

its mascot.[19] For example, it takes issue with the descriptive title of the University-related team page, "PENN STATE NITTANY LIONS VINTAGE DESIGNS," as well as various product names such as "1929 Penn State Nittany Lion Socks," and even use the of "Penn State Nittany Lions" in the following disclaimer:

> Shop Penn State Nittany Lions vintage designs for apparel, clothing, gear, and merchandise for all sports fanatics at the Penn State Nittany Lions Shop on VintageBrand.com. Vintage Brand is not affiliated with the Penn State Nittany Lions Bookstore or the Penn State Nittany Lions.

PSMF ¶ 162, row 45 (referencing Doc. 123-35 at 3).

But the central question in this case is whether Vintage Brand's use of the historic images on merchandise is likely to cause confusion regarding the source of the tangible products. If use of those images does not cause confusion—and the evidence is clear that it does not—then Vintage Brand is entitled to sell those products, and it is therefore entitled to tell consumers what it is selling. *See Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 352 (9th Cir. 1969)

---

[19] There is some irony in the University's citation of *March Madness Athletic Association., LLC v. Netfire, Inc.*, 310 F. Supp. 2d 786, 812–13 (N.D. Tex. 2003), a case involving use of the domain name marchmadness.com for a website devoted to the NCAA basketball tournament. The essential feature of that case was the domain name. Vintage Brand operates its website at vintagebrand.com—a URL the University's expert deliberately cropped out of his test image because he knew its presence would decrease levels of confusion. More generally, the University's false endorsement argument—that the entire context of the website is relevant to confusion—is in conflict with Mr. Franklyn's survey methodology, which focused on a single Product Page absent the URL, not other parts of Vintage Brand's dynamic website.

(repair shop allowed to use Volkswagen mark to advertise that it repaired Volkswagen vehicles); *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 214 (3d Cir. 2005) (citing *Volkswagenwerk* with approval); *see also G.D. Searle & Co. v. Hudson Pharm. Corp.*, 715 F.2d 837, 842 (3d Cir. 1983). At most, the University's claim about the other website elements would entitle it to a limited injunction relating to the nature of its description. *See Toyota Motor Sales U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010). That remote possibility cannot prevent entry of summary judgment against the University on its claims regarding use of the images on the merchandise.

Moreover, the overall design of Vintage Brand's website—even without disclaimers—cuts against the false endorsement claim because of the breadth of vintage images offered by Vintage Brand. Reasonable consumers are unlikely to perceive endorsement by the University when Vintage Brand makes available on its website historical images that refer to over 350 different teams and institutions. VBSMF ¶ 11; *see Xfinity Mobile v. Globalgurutech LLC*, 2023 WL 3998459 (D. Ariz. Jun. 14, 2023) (false endorsement by one cellphone provider implausible where website used logos of multiple cellphone providers to identify phones it would buy).

**D.** **The University Cannot Establish Willfulness Because It Cannot Conceivably Establish Vintage Brand's Non-Trademark Use of Public Domain Images Is Clearly Barred By Law**

The University calls Vintage Brand's business model "willful" because its founder knew how licensing worked. PSU Brief at 31–32. But willfulness does not turn on knowledge of what the University—and other institutions that have brought lawsuits against Vintage Brand—wants to be the rule regarding merchandising. *See San Miguel Pure Foods Co., Inc. v. Ramar Inter. Corp.*, 625 F. App'x 322, 325 (9th Cir. 2015) ("Infringement is not willful if the party reasonably believes that its usage of a trademark is not barred by law."); *American Automobile Association of Northern California, Nevada & Utah v. General Motors LLC*, 367 F. Supp. 3d 1072, 1104 (N.D. Cal. 2019) (granting summary judgment based on reasonable, good faith belief in noninfringement); *San Diego Comic Convention v. Dan Farr Prods.*, 2018 WL 4078588, at *13 (S.D. Cal. Aug. 23, 2018) (defendant who researched and concluded that term was unprotected was reasonable and not willful); *Ringling Brothers-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Development*, 955 F. Supp. 598, 604 (E.D. Va. 1997) (in trademark dilution case, granting summary judgment on willfulness where defendant had "a good faith, reasonable belief that its use of THE GREATEST SNOW ON EARTH was entirely lawful").

Indeed, the Third Circuit has held that even refusing to stop use after receiving

a cease-and-desist letter is not evidence of willfulness where the defendant had colorable grounds for believing it was not infringing. *SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 189 (3d Cir. 1999) ("A defendant's refusal to cease using a mark upon demand is not necessarily indicative of bad faith," especially where defendant has reason to doubt plaintiff's rights; reversing willfulness finding for clear error). As Justice Oliver Wendell Holmes said over a century ago, no intent to confuse can be inferred from a defendant's mere knowledge that the plaintiff objects to the use. *Straus v. Notaseme Hosiery Co.*, 240 U.S. 179, 181–82 (1916); *see also* McCarthy § 23:120.

As this Court has already explained, there is a lack of judicial and scholarly consensus on "merchandising rights." Thus, Vintage Brand's decision to use historical materials in an ornamental manner after a search to ensure they were in the public domain cannot be deemed willful. *Cf. SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 600 (7th Cir. 2019) (defendant acted in good faith when it "believed it had every right to use [the accused mark] in a descriptive sense" and not as a mark for its own goods).

Even were Vintage Brand not entitled to summary judgment on infringement, the University cannot win summary judgment given Vintage Brand's evidence of its good faith. *UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.*, 446 F. Supp. 2d 1164, 1174 (E.D. Cal. 2006) (willfulness is ordinarily "a factual issue that is not

usually susceptible to summary judgment").

### E. Defendants' Affirmative Defenses, on which the University is Silent, Preclude Summary Judgment

#### 1. Aesthetic Functionality is a Complete Defense

When the challenged features are the actual benefit that the consumer wishes to purchase for reasons independent of any source-related meaning, use of those features (here, the historic images) is not within the scope of the trademark owner's rights. The use is not source indicating, and therefore no likelihood of confusion analysis is needed. More specifically, the images are functional as used in this context because they are central to the articles' uses and purposes, as well as to the articles' quality for the interested consumers. Exclusive use of those features would put competitors like Vintage Brand at a significant non-reputation-related disadvantage. *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001). That disadvantage is "non-reputation-related" because—as the survey evidence establishes—consumers do not want those images because they indicate the source of any merchandise on which they are printed. Rather, consumers want the images so they can express their own affiliation with the University. Vintage Brand is not trading on the University's reputation for producing quality T-shirts or other merchandise, if any such reputation exists.

Ornamental uses that allow consumers to express their own opinions and commitments are not infringing even if uses of the same feature in other contexts

(such as on hangtags or for promoting educational services) might primarily have source-indicating value and therefore fall within the scope of the claimant's rights. *See LTTB*, 840 F. App'x at 150–51 (distinguishing decorative front-of-product use, which was aesthetically functional, from source-indicating use on hangtags, etc.).

Aesthetic functionality is particularly appropriate for situations where consumers may wish to express unidirectional support. As the Ninth Circuit explained in the context of another organizational confusion claim:

> [T]he name "Job's Daughters" and the Job's Daughters insignia are indisputably used to identify the organization, and members of Job's Daughters wear the jewelry to identify themselves as members. In that context, the insignia are trademarks of Job's Daughters. But in the context of this case, the name and emblem are functional aesthetic components of the jewelry, in that they are being merchandised on the basis of their intrinsic value, not as a designation of origin or sponsorship.
>
> It is not uncommon for a name or emblem that serves in one context as a collective mark or trademark also to be merchandised for its own intrinsic utility to consumers. We commonly identify ourselves by displaying emblems expressing allegiances. Our jewelry, clothing, and cars are emblazoned with inscriptions showing the organizations we belong to, the schools we attend, the landmarks we have visited, the sports teams we support, the beverages we imbibe. Although these inscriptions frequently include names and emblems that are also used as collective marks or trademarks, it would be naive to conclude that the name or emblem is desired because consumers believe that the product somehow originated with or was sponsored by the organization the name or emblem signifies.

*Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 918 (9th Cir. 1980); *see also Supreme Assembly*, 676 F.2d at 1084; *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 925 F. Supp. 2d 1067, 1074–75 (C.D. Cal. 2012); *Univ. of Pittsburgh*, 566 F. Supp. at 716; *De La Salle High School of Concord v. Sportswear,*

*Inc.*, Case No. C11-00182 (Contra Costa, Cal. Super. Ct., Oct. 22, 2012) (citing *University of Pittsburgh* when granting summary judgment in Sportswear's favor).[20]

As the evidence in this case indicates, the images here are what consumers seek to buy. VBSMF ¶¶ 9, 18, 27–29, 39–40, 49, 60, 80, 87, 92, 96, 101–02. Consumers do not consider the University's involvement in their production relevant to their quality. Erdem Report (Doc. 94-7) at 36–42, ¶¶ 63–70.

Absent the ability to decorate goods with the relevant historical images, Vintage Brand simply cannot compete with the University's licensees—and, unlike uses relating to educational services, the resulting monopoly would be allocated for reasons unrelated to the University's reputation as a source for quality goods or services. *See TrafFix*, 532 U.S. at 33 (features are aesthetically functional when exclusive use would put competitors at a "significant, non-reputation-related disadvantage").[21]

---

[20] The University has no evidence that consumers purchase University-related merchandise *because of* any source- or quality-indicative function of the decorations appearing on the merchandise. At most there exists a hypothetical (and unproven) group of consumers that want their purchases to benefit the University financially. Those consumers already have plenty of information to direct their purchases because "officially licensed" merchandise is easily identifiable by the holographic tags attached to those products—a signal CLC has consistently emphasized as central. VBSMF ¶¶ 93–100; Counter PSMF ¶ 5; *see* Dogan & Lemley, *supra*, at 485 (describing exactly this market distinction).

[21] Consumers who want to express their affiliation with the University are a different market from consumers who want to express their affiliation with any other university—for fans of Penn State, goods bearing the name of another university are no substitute.

### 2. Defendants' Section 33(b)(7) Defense Precludes Summary Judgment

Section 33(b)(7) of the Lanham Act provides that a trademark claim will not lie where the plaintiff's "mark has been or is being used to violate the antitrust laws of the United States[.]" 15 U.S.C. § 1115(b)(7); *see also Phi Delta Theta Fraternity v. J. A. Buchroeder & Co.*, 251 F. Supp. 968, 975 (W.D. Mo. 1966). The University and its exclusive licensing agent, CLC, have entered into an agreement to license on terms that are meant to restrict competition and raise the price of the merchandise that the University licenses through CLC. Further, CLC licenses the merchandise of many other universities on equivalent or identical terms. Whether viewed as separate vertical agreements, or as part of a "hub and spoke" conspiracy between the licensors that CLC has ringmastered, the agreements harm competition and violate the antitrust laws.

The relevant antitrust market in this case is limited to merchandise bearing references or images related to the University. The accepted methodology for defining antitrust markets, as applied here, asks whether a consumer looking to buy merchandise bearing such references or images would switch to another university's merchandise in response to a small but significant and non-transitory increase in price of between 5–10%. *See* U.S. Dep't of Justice and Fed'l Trade Comm., *Horizontal Merger Guidelines* § 4.1.2 (2010) (defining the "SSNIP" test for market definition that is used across antitrust cases). A consumer eager to show affiliation

with the University is unlikely to respond to a price increase by switching to another university's merchandise—the University's merchandise simply does not compete with merchandise bearing names or images associated with other universities or with merchandise that bears no names or images.

The University exercises substantial market power within this relevant market, and the University's share is protected by a substantial barrier to entry—namely, the threat of lawsuits, like this one, which, while meritless, nonetheless successfully leverage overreaching trademark claims to deter lawful competition. Additionally, the threat of lawsuits is bolstered by CLC's "Look for the Label" program, through which CLC and the University (as well as other CLC licensors) require that each sub-licensee affix to every collegiate product a holographic "Official Label." That label allows consumers to differentiate between "official" and unofficial merchandise and would, under different circumstances, be an entirely appropriate market signal. But in the context of lawsuits that are not based on claimed violations of trademark rights in the Official Label but instead claim that decorative use of University-related historic images infringes University marks, that label sends a false message (i.e., that all references to the University must be licensed) and harms competition. VBSMF ¶¶ 93–100; Counter PSMF ¶ 5.

These restraints that CLC and the University impose on the market exert an inexorable anticompetitive effect. Indeed, the University openly describes its

licensing program as a means to ██████ REDACTED ██████," VBSMF ¶ 84—i.e., to ██████ REDACTED ██████—permitting the University and CLC to take an increased cut of artificially inflated prices of fan merchandise. This is accomplished by manufacturing sham trademark rights by propagating the misconception among both distributors and consumers that trademark law grants the University (and other universities) far more encompassing control over merchandising markets than it actually does.[22] Through these strategies, "[p]rotecting consumers from potential confusion bec[ame] the ruse by which [universities] protect themselves from competition and from uncompensated circulation of their cultural indicators." Rosemary J. Coombe, THE CULTURAL LIFE OF INTELLECTUAL PROPERTIES: AUTHORSHIP, APPROPRIATION, AND THE LAW 66 (1998). As leading sports law Professor Jodi Balsam explains:

> The result for sports fans is that they have no alternative but to buy high-priced "authorized" goods and curtail their expressions of allegiance to their teams. Also at stake is the availability of language for both competitive market entry (trademark) and expressive (non-trademark) uses.

---

[22] For example, in 1981 (shortly after the *Boston Hockey* decision), more third parties began contacting the University to request approval to use "the Penn State name and symbols," which the University attributed to mistaken belief: "We were getting so many requests for licenses from people because the other universities required them and they figured we did too." PEx. 23 (Doc. 123-26). Yet, the University seized this opportunity to implement an aggressive licensing program. Counter PSMF ¶ 56; VBSMF ¶ 83; *see also* VBEx. 66 (Doc. 117-16) at 8440 (recognizing that ██████ REDACTED ██████ ██████).

Jodi S. Balsam, *Timeout for Sports Trademark Overprotection: Comparing the United States, European Union, and United Kingdom*, 52 CAL. W. INT'L L.J. 351, 359 (2022) (footnotes omitted).

The bottom line is that the collegiate trademark merchandising industry—which is dominated by CLC[23]—hinders competition and harms consumers.[24] *See Phi Delta Theta Fraternity*, 251 F. Supp. at 971 (holding that similar trademark and licensing abuses by college fraternities and sororities constituted illegal restraints of trade and provided an absolute defense under Section 33(b)(7)).[25]

---

[23] As of 2015, sales by CLC's sublicensees " REDACTED ," (VBEx. 63 (Doc. 117-13) at 7887), a market share that constitutes monopoly power. *See Weiss v. York Hosp.*, 745 F.2d 786, 827 (3d Cir. 1984).

[24] *See, e.g.*, Glynn S. Lunney, Jr., *Trademark Monopolies*, 48 EMORY L.J. 367 (1999); James Boyle & Jennifer Jenkins, *Mark of the Devil: The University As Brand Bully*, 31 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 391, 432 (2020); Matthew J. Mitten, *From Dallas Cap to American Needle and Beyond: Antitrust Law's Limited Capacity to Stitch Consumer Harm from Professional Sports Club Trademark Monopolies*, 86 TUL. L. REV. 901, 930 (2012); Leah Chan Grinvald, *Shaming Trademark Bullies*, 2011 WIS. L. REV. 625, 651 (2011).

[25] Before The University ever claimed the right to control merchandising, there was a market for products bearing references and images related to the University. That market did not go away when the University obtained trademark registrations. To the extent there is a sub-market for "officially licensed" merchandise, the University already dominates that market and actively polices it through the use of CLC with specific CLC trademarks telling a prospective consumers that the article is licensed by the University. *E.g.*, VBEx. 85 (Doc. 117-35); VBEx. 104; VBEx. 110. There is no allegation and no evidence that Vintage Brand has tried to enter that sub-market by making claims of selling "official" or "authorized" merchandise; although there are surely bad actors that do. The remaining sub-market is comprised of products that show affiliation with the University but are not manufactured or licensed by the University. The products

**F.**    **The University is not Entitled to Summary Judgment on Vintage Brand's Counterclaims**

### 1. The University Cannot Escape the Ornamentality Counterclaim

The University claims that Vintage Brand is barred from asserting invalidity for the marks that are incontestable.[26] But incontestability does not save registrations from cancellation at any time after the three-year period following the date of registration, if the registered mark has never been used in commerce on or in connection with some or all of the goods or services. 15 U.S.C. § 1064(6). "Use" for purposes of that rule requires use *as a mark*—that is the only kind of use that entitles

---

in this market are typically less expensive but still serve the function of allowing purchasers to show their own affiliation with the school or its teams. The two markets exist side by side and consumers know the difference between them in part because the University and CLC want consumers to know the difference— primarily so that the University and CLC can charge higher prices. This case is simply an attempt to meld the two sub-markets into one, extend a monopoly, reduce output, reduce choice, and raise prices.

[26] On June 9, 2023, after it submitted its Brief, the University filed with the PTO a Section 15 affidavit for the Pozniak Lion Design Registration (Reg. No. 5,305,910). However, incontestability cannot be claimed where there is a "proceeding involving said rights pending in the United States Patent and Trademark Office or in a court and not finally disposed of[.]" 15 U.S.C. § 1065(2). Although the PTO has interpreted Section 15(2) to not apply where the mark owner is the plaintiff and there is not a counterclaim directed at the mark, *see* Trademark Manual of Examining Procedure ("T.M.E.P.") § 1605.04, Vintage Brand's affirmative defenses challenging the validity of the registered mark preclude achieving incontestable status. *See In Holley Performance Products, Inc. v. Quick Fuel Technology, Inc.*, 624 F. Supp. 2d 610, 616 (W.D. Ky. 2008); *see also British Broad. Corp. v. Scott Stander & Associates, Inc.*, 2017 WL 11682913, at *6 (C.D. Cal. Mar. 17, 2017) (rejecting incontestable status in light of "affirmative defense that plaintiffs 'are not the rightful owners of any trademarks or rights to trademarks'").

an applicant to registration, and registrations can only remain valid if registrants continue to make that kind of use. *See D.C. One Wholesaler, Inc. v. Jonathan E. Chien*, 120 U.S.P.Q.2d 1710, 2016 WL 7010638, at *6 (TTAB 2016) ("The Trademark Act is not an act to register mere words, but rather to register trademarks. Before there can be registration, there must be a trademark, and unless words have been so used they cannot qualify.") (cleaned up). If the University's only use of the claimed marks for merchandise are ornamental, then the University has not made trademark use of those claimed marks in relation to the relevant goods, and cancellation is appropriate notwithstanding incontestability. *See* 15 U.S.C. § 1064(6).[27]

---

[27] The University wrongly argues that *contestable* registrations cannot be cancelled when the registered mark is identical to another mark that is the subject of an incontestable registration. PSU Brief at 34–45. But incontestability requires proof of use as a mark, and the fact that one might prove use of a mark for some goods or services does not remotely show that it has used that mark for other goods or services. *See Bausch & Lomb Inc. v. Leupold & Stevens Inc.*, 1 U.S.P.Q.2d 1497, 1986 WL 83320, at *3 (TTAB 1986) ("Applicant's prior registration defense" based on Registration No. 884,610, which achieved incontestable status in 1975, was "unavailable in an opposition proceeding based on ornamentation"). Indeed, the reason why the same mark might be the subject of multiple registrations is that trademark rights are specific to the goods and services with which they are used. T.M.E.P. § 1216.02 ("Ownership of an incontestable registration does *not* give the applicant a right to register the same mark for different goods or services, even if they are closely related to the goods or services in the incontestable registration.") (emphasis in original); *cf. Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976) (noting that, in terms of assessing distinctiveness, "a term that is in one category for a particular product may be in quite a different one for another").

Also, regardless of incontestability, the University's registrations have no evidentiary value in relation to attempts to suppress ornamental uses by others. *See LTTB*, 840 F. App'x at 151 ("Despite the fact that LTTB's trademarks are registered and two of them are incontestable … they are not protectable against any type of allegedly infringing activity."); *cf. Christian Louboutin*, 696 F.3d at 228 (red sole of YSL's monochromatic red shoe "neither a use of, nor confusingly similar to [registered] Red Sole Mark"). The University's registrations do not claim the marks as used on merchandise—the registrations depict word marks or logos without context. VBExs. 10 (Doc. 116-37), 12 (Doc. 116-39), 50 (Doc. 116-77), 53 (Doc. 117-3). Registration of those marks for merchandise does not mean the marks are valid with respect to every possible use of the marks in relation to that merchandise. *See LTTB*, 840 F. App'x at 151.

Nor is the PTO's secondary source rule persuasive here. The secondary source rule is merely a rule of registration; it is not relevant with respect to allegedly infringing uses, and it is not binding on this Court. More importantly, as this Court previously recognized, that rule is wrong. *See* Doc. 43 at 16; *id*. at 17 ("The conclusion that purchasers will think that N.Y.U. sponsored or authorized the shirt does not necessarily follow from the statement that no purchaser will think that Columbia University is the source. There's a gulf of other possibilities."). The fact that a sign can be recognized as functioning as a trademark in some other setting

does not mean it can be assumed to be operating as a trademark when depicted on merchandise.[28] Consumers might readily recognize that CAMPBELL'S is a trademark for soup; that does not mean that the Campbell's name functions as a trademark in Andy Warhol's paintings of the soup cans.

The PTO generally recognizes that use of a design in large format on the front of a shirt is not use as a mark. T.M.E.P. § 1202.03(a); *see also* Alexandra Roberts, *Trademark Failure to Function*, 104 Iowa L. Rev. 1977, 2006 (2019) ("The TTAB seems implicitly to understand and apply the 'trademark spot' requirement[.]"). This is not a case where the feature depicted in that large, front-of-shirt format is separately recognizable as a trademark for the same types of goods—as it might be if this was about large format depiction of the Nike Swoosh on the front of a t-shirt. The University has no expertise in producing t-shirts or any other products; it's an institution of higher education. Application of the secondary source rule in this context is simply parroting the incorrect reasoning of *Boston Hockey*. As the empirical evidence here shows, there is no reason to assume that reference to a University on a shirt tells consumers who is the source of tangible merchandise. The record is replete with evidence that the University's purported marks are ornamental

---

[28] Even if the secondary source rule applied, it would only be relevant to marks originally used by the University as service marks for the University's educational services; it would not apply to purported trademarks that have only ever been "used" as licensed features of merchandise.

components of goods and not source indicators. VBSMF ¶¶ 18, 27–29, 36–40, 44–47, 49, 51–53, 57, 60, 64, 67, 70–71, 73–74, 78, 80, 87, 92, 101–02; *see also* Counter PSMF ¶ 5.

### 2. The Seal Designs Incorporate the Pennsylvania Coat of Arms

Section 2(b) of the Lanham Act prohibits registration of any trademark which "[c]onsists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof." The University fails to contend with the meaning of the statutory term "comprises" when it argues that the Seal Design registrations should not be cancelled because it contains additional elements beyond the Pennsylvania Coat of Arms. *See Family Emergency Room LLC*, 121 U.S.P.Q.2d 1886, 1887 n.2 (TTAB 2017) (Section 2(b) "prohibits registration of a mark that *includes* a flag ... or any simulation thereof") (emphasis in original).

The University argues that its use of color changes everything. But the standard for registrability looks to whether what is visible is, unmistakably, the prohibited insignia, as opposed to distorted or obscured versions of that insignia. *See* T.M.E.P. § 1204.01(a) ("For example, merely amending a 'red, white, and blue' American flag to a black-and-white American flag will not overcome a §2(b) refusal."); *In re Alabama Tourism Dept.*, No. 87599292, 2020 U.S.P.Q.2d 10485 (TTAB 2020); *Family Emergency Room*, 121 U.S.P.Q.2d at 1887–88 (Section 2(b)

applies "if the design would be perceived by the public as a flag, regardless of whether other matter appears with or on the flag"); *see also* T.M.E.P. § 1204.01(b) ("Marks containing elements of flags in a *stylized or incomplete form* are not refused under §2(b).") (emphasis added). Thus, where the prohibited matter is unmistakably included in the putative mark, the mark cannot be registered, as in the *Alabama Tourism* and *Family Emergency Room* cases and in examples given in T.M.E.P. § 1204.01(a), where the additional matter reinforces the state connection:



The decision in *City of New York v. Blue Rage, Inc.*, 435 F. Supp. 3d 472 (E.D.N.Y. 2020), cited by the University, actually demonstrates the unregistrability of the Seal Designs. The determinative factor in *Blue Rage* was "that the NYPD Shield *does not* reproduce the City Seal in its entirety[.]" *Id.* at 488 (emphasis added). Here, the Seal Designs reproduce Pennsylvania's Coat of Arms in its entirety, warranting cancellation under Section 2(b).

### III.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny the University's motion for partial summary judgment.

Dated:  June 23, 2023

Respectfully submitted,

By: /s/ *Joshua D. Harms*
 Joshua D. Harms, Esq., *pro hac vice*
 Leslie Vander Griend, Esq., *pro hac vice*
 John T. Fetters, Esq., *pro hac vice*
 Valerie A. Walker, Esq., *pro hac vice*
 Washington I.D. Nos. 55679, 28090,
 40800, 52584
 STOKES LAWRENCE, P.S.
 1420 Fifth Avenue, Suite 3000
 Seattle, WA 98101
 Phone:   (206) 626-6000
 Fax:       (206) 464-1496
 Joshua.Harms@stokeslaw.com
 Leslie.VanderGriend@stokeslaw.com
 John.Fetters@stokeslaw.com
 Valerie.Walker@stokeslaw.com

 Mark P. McKenna, Esq., *pro hac vice*
 Illinois I.D. No. 6272699
 LEX LUMINA PLLC
 745 Fifth Avenue, Suite 500
 New York, NY 10151
 Phone:   (646) 898-2055
 Fax:       (646) 906-8657
 Mark@lex-lumina.com

 Jodi S. Wilenzik, Esq.
 Mark H. Perry, Esq.
 PA Supreme Court I.D. Nos. 89205,
 68610
 POST & SCHELL, P.C.
 1600 JFK Boulevard, 13th Floor
 Philadelphia, PA 19103
 Phone:  (215) 587-1101
 Fax:       (215) 320-4159
 jwilenzik@postschell.com
 mperry@postschell.com

 *Attorneys for Defendants*

46

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.8(b)

The undersigned certifies that Defendants' Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment complies with the length limits set forth in Local Rule 7.8(b). This Court authorized the parties to file opening and opposing briefs exceeding the Court's standard word and page limit. Doc. 107. This Brief does not exceed 45 pages and therefore complies with this Court's Order and with Local Rule 7.8(b)(3).

Dated:  June 23, 2023        By: /s/  *Joshua D. Harms*
                                         Joshua D. Harms, Esq., *pro hac vice*
                                         Washington I.D. No. 55679
                                         STOKES LAWRENCE, P.S.
                                         1420 Fifth Avenue, Suite 3000
                                         Seattle, WA 98101
                                         Phone:  (206) 626-6000
                                         Fax:     (206) 464-1496
                                         Joshua.Harms@stokeslaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the

Clerk of the Court using the CM/ECF system on this 23rd day of June 2023, which

constitutes service on Plaintiff pursuant to Fed. R. Civ. P. 5(b)(2)(E):

> Allison L. Ebeck, Esquire
> McGuire Woods LLP
> Tower Two-Sixty
> 260 Forbes Avenue, Suite 1800
> Pittsburgh, PA  15222-3142
>
> Claire H. Eller, Esquire (admitted pro hac)
> Lucy J. Wheatley, Esquire (admitted pro hac)
> Matthew G. Rosendahl, Esquire (admitted pro hac)
> McGuire Woods LLP
> Gateway Plaza
> 800 East Canal Street
> Richmond, VA  23219-3916
> Attorneys for Plaintiff,
> The Pennsylvania State University

Dated:  June 23, 2023          By: /s/  *Joshua D. Harms*
                                Joshua D. Harms, Esq., *pro hac vice*
                                Washington I.D. No. 55679
                                STOKES LAWRENCE, P.S.
                                1420 Fifth Avenue, Suite 3000
                                Seattle, WA 98101
                                Phone:   (206) 626-6000
                                Fax:     (206) 464-1496
                                Joshua.Harms@stokeslaw.com