# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY,<br><br>    Plaintiff and<br>    Counter-Claim Defendant,<br><br>  v.<br><br>VINTAGE BRAND, LLC;<br><br>    Defendant and<br>    Counter-Claim Plaintiff<br><br>and<br><br>SPORTSWEAR INC. d/b/a PREP SPORTWEAR; CHAD HARTVIGSON; ERIK HARTVIGSON; and MICHELLE YOUNG,<br><br>    Defendants. | Case No. 4:21-cv-01091-MWB<br>(Hon. Matthew W. Brann)<br><br>JURY TRIAL DEMANDED |

## THE PENNSYLVANIA STATE UNIVERSITY REPONSES TO STATEMENT OF MATERIAL FACTS IN SUPPORT OF VINTAGE BRAND, LLC'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Plaintiff The Pennsylvania State responds

in opposition to Vintage Brand's Statements of Undisputed Material Facts as

follows.  For the Court's convenience, Penn State is including the text of the

Statements of Fact herein, along with Penn State's response to each.[1]

---

[1] In providing citations to the record to show what factual statements included by Vintage Brand are not undisputed and material facts established for purposes of its summary judgment motion, Penn State is citing to many exhibits that had been included in Penn State's papers filed with its own Motion for Summary Judgment (Dkt. 113, 114, 123).  In an effort to keep exhibits easily identifiable, where the evidence Penn State is citing in this Response/Opposition contains the same evidence that Penn State had previously submitted as a summary judgment exhibit, Penn State will simply use the same exhibit number.  Additional exhibits being used for the first time in opposing Vintage Brand's motion will be numbered sequentially, to follow the prior set of exhibits (and therefore beginning at Exhibit Number 58).

## A.    <u>VINTAGE BRAND</u>

### 1.    Vintage Brand's Organization and Relationship with Sportswear

1.    Vintage Brand, LLC ("Vintage Brand") is a Washington limited liability company formed in 2017. Hartvigson Decl. ¶ 2, Ex. A. It has three members: Co-Defendants Chad Hartvigson, Erik Hartvigson, and Michelle Young. *Id*. ¶ 3, Ex. B. Chad Hartvigson owns ▄▄▄ of Vintage Brand, while Erik Hartvigson and Michelle Young ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ *Id*. Vintage Brand has no W-2 employees and did not, during the timeframe relevant to this lawsuit, have its own manufacturing facility. Hartvigson Decl. *Id* ¶ 3.

**<u>Response</u>**: Undisputed.

2.    Sportswear is a Washington corporation that is separate from Vintage Brand. *Id*. ¶ 4. Chad Hartvigson owns ▄▄▄ of the outstanding shares in Sportswear; the remaining ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄. *Id*. ¶ 5. The largest individual shareholder owns a ▄▄▄ interest and is not an owner of Vintage Brand. *Id*. Neither Vintage Brand nor Sportswear owns an interest in the other, directly or indirectly. *Id*. ¶¶ 6–7.

**<u>Response</u>**: Undisputed that Chad Hartvigson owns ▄▄▄ of the outstanding shares of Sportswear and that the remaining ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄.

Undisputed that the largest individual shareholder owns a ▄▄▄ interest and is not an owner of Vintage Brand. Undisputed that Sportswear is separately incorporated from Vintage Brand.

Disputed that these facts are material to Vintage Brand's motion for summary judgment, as the evidence shows that Vintage Brand and Sportswear are each liable for their infringing conduct, and this liability does not grow from any purported formal relationship between the companies or from any sort of alter ego theory of liability. *See Second Amended Compl. (Dkt. 67), ¶ 66 & Answer (Dkt. 72), ¶ 66*

(admitting that Sportswear is responsible for manufacturing and shipping of clothes sold by Vintage Brand); Deposition Transcript of Chad A. Hartvigson (9-13-2022) (herein "**Sportswear Dep. (Vol. 1)**") (*PSU Ex. 35, Dkt. 123-38*) at 17:5-15; Deposition Transcript of Chad A. Hartvigson (07-21-2022) (herein "**Vintage Brand Dep.**") (PSU Ex. 30, Dkt. 123-33) at 81:21-82:5 (Sportswear manufactures and ships the merchandise with Penn State's trademarks at issue in this case (the "**University Marks**" that has been sold through vintagebrand.com (the "**VB Penn State Merchandise**"); id. at 161:4-11 (Vintage Brand first offered the VB Penn State Merchandise 2018). See generally PSU Ex. 31 (Dkt. 123-34), PSU Ex. 32 (Dkt. 123-35), and PSU Ex. 33 (Dkt. 123-36) (2021 and 2022 screenshots of the Vintage Brand Website offering various Penn State-related merchandise for sale). See also Deposition Transcript of Michelle Young (9-13-2022) (herein "**Young Dep.**") (PSU Ex. 34, Dkt. 123-37) at 117:10-19 (testimony from Michelle Young confirming that the screenshots shown in PSU Ex. 31 are images of the Vintage Brand Website); Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 133:20-134:7, 155:16-159:9 (testimony from Chad Hartvigson confirming that the website screenshots shown in PSU Exs. 32 and 33 are images of the Vintage Brand Website).

Disputed that Sportswear is "separate" from Vintage Brand. Vintage Brand was formed by three Sportswear employees, including Chad Hartvigson who owns significant portions of both companies. *Ex. 58 (Vintage Brand Dep.) at 29:7-9*

*(discussing Chad Hartvigson's ownership interest in Sportswear); Vintage Brand's Statement of Undisputed Material Facts ([Dkt. 116](#)) ("**DSMF**") ¶ 1 (Chad Hartvigson's ownership stake in Vintage Brand).* The three founders and owners of Vintage Brand—Chad Hartvigson, Erik Hartvigson, and Michelle Young—have each been working for Sportswear for at least ten years. *Sportswear Dep. (Vol. 2) (PSU Ex. 36, [Dkt. 123-39](#)) at 45:23-46:4; Vintage Brand Dep. (PSU Ex. 30, [Dkt. 123-33](#)) at 26:22-27:13, 32:11-18, 37:2-6, 73:11-16; M. Young Dep. (PSU Ex. 34, [Dkt. 123-37](#)) at 15:10-21; E. Hartvigson Dep. (PSU Ex. 50, [Dkt. 123-53](#)) at 12:10-14.* The day-to-day operations of Vintage Brand are handled entirely by Sportswear employees. *Ex. 58 (Vintage Brand Dep.) at 38:3-44:25; Ex. 59 (M. Young Dep.) at 58:20-25, 60:8-16, 62:16-18; Ex. 60 (D. DeLong Dep.) at 10:2-10, 12:9-22.*

3.       Sportswear owns a manufacturing facility in Kentucky. *Id*. ¶ 8 . After Vintage Brand was formed in September 2017, it approached Sportswear's Board of Directors (through Chad Hartvigson) about possibly entering a Fulfillment Agreement. *Id*. Sportswear, after taking appropriate steps to address any conflict of interest, decided to pursue a Fulfillment Agreement with Vintage Brand. *Id*. Sportswear, acting through an independent board member, executed the Agreement in November 2017. *Id*. ¶ 8, Ex. C.

**Response**:   Undisputed that Sportswear owns a manufacturing facility in Kentucky.  Undisputed that Vintage Brand was formed in September 2017 and entered into an Agreement with Sportswear in November 2017 that is titled "Licensing & Fulfillment Agreement".

Disputed that the parties "[took] appropriate steps to address any conflict of interest" because this is a legal conclusion and is supported by nothing other than the statements in Chad Hartvigson's declaration (Dkt. 116-2) ("**C. Hartvigson Decl.**"), ¶ 7. "[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir.2009) (internal quotation marks and citation omitted *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990). This statement in Mr. Hartvigson's declaration is not competent evidence, and the corresponding reference in Paragraph 3 is unsupported and cannot establish a fact for summary judgment. *See LR 56.1; FRCP 56(c)*.

### 2. Vintage Brand's Business Model

4. Chad Hartvigson is a lifelong sports enthusiast and former professional baseball player. *Id*. ¶¶ 9–10. His passion for sports, and in particular, sports history, is central to Vintage Brand's business model. *Id*. ¶ 11.

**<u>Response</u>**: Undisputed that Chat Hartvigson was a former professional baseball player. Disputed that Statement 4 is material. (*FRE 401*; *FRCP 56(c)*). Trademark infringement and counterfeiting are strict liability offenses, and Mr. Hartvigson's motivations for entering the sports merchandising business has no bearing on whether Defendants are liable on the claims at issue. *Nike, Inc. v. Eastern Ports Custom Brokers, Inc.*, 2018 WL 3472628, *6 (D.N.J. July 19, 2018).

5. Vintage Brand owns a large collection of sports memorabilia, which consists of original, historic game tickets, decals, brochures, patches, stickers,

trading cards, and programs bearing artistic images from school sporting events of long-ago ("memorabilia"). *Id*. ¶ 12.

      **Response**: Undisputed that Vintage Brand purchases genuine sports collectibles—including collectibles related to Penn State—and scans those items to create images that it uses on the merchandise it sells. Undisputed that some of this memorabilia includes decals, brochures, patches, stickers, and programs.

      Disputed that the memorabilia consists only of the items listed in this Paragraph 5. Vintage Brand has not produced a complete catalog of its collection of memorabilia, or even just the entire subset of memorabilia relating to Penn State. *Compare PSU Ex. 38 (Dkt. 123-41) at 2-87 (full set of memorabilia produced for inspection by Vintage Brand), with PSU Ex. 39 (Dkt. 123-42) at 18-19 (images from Vintage Brand's digital files related to Penn State)*. However, the memorabilia that Vintage Brand did produce for inspection shows additional categories of items, including pennants, pins, and mugs. *See PSU Ex. 38 (Dkt. 123-41) at 2-4, 68-87 (images of Vintage Brand's memorabilia showing pennants, pins, and mugs)*.

      Disputed that this memorabilia can be described as "original, historic" items "from school sporting events of long-ago." There is no evidence in the record to show that the memorabilia can be described as "historic" or that it comes from "long-ago." Mr. Hartvigson testified that Vintage Brand owns over 25,000 individual pieces of sports collectibles. *See Ex. 58 (Vintage Brand Dep.) at 105:10-11, 105:17-22*. He states in his Declaration that he has spent "hundreds of hours searching for

historic images in the public domain" to ensure that the memorabilia meets certain criteria, *C. Hartvigson Decl. (Dkt. 116-2), ¶ 15,* but even giving a very generous meaning to this vague reference to "hundreds of hours" would amount to spending about two minutes per piece of memorabilia acquired, making his self-serving declaration about the research he conducted to study the attributes of memorabilia not credible. *See Penn State's Response to Vintage Brand's Statement of Undisputed Fact ("PRSMF") ¶ 8, infra (assuming 900 hours were spent to collect 25,000 pieces of memorabilia, this divides out to 2.16 minutes per item).*

The assertions that the memorabilia is "historic" or comes from "long-ago" is contradicted by the corporate representative testimony from Mr. Hartvigson on behalf of Vintage Brand, as the only basis he could provide for Vintage Brand's knowledge about the date the memorabilia was sold or produced was that many pieces "are dated", such as sports tickets and sports programs. *See Ex. 58 (Vintage Brand Dep.) at 106:4-25.* Mr. Hartvigson defined his use of "long-lost art" to include an item that is "nearly 100 years old" and that contains features "that most people haven't seen", and as an example suggested that a "rare ticket from [a] 1929 Penn State football game" would be "long-lost art." *Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 116:5-16 (testimony described).* The memorabilia that Vintage Brand acquired for Penn State does not satisfy this criteria, however. The dates on many pieces of the memorabilia show that they come from the 1970's or 1980's.

*See PSU Ex. 38 (Dkt. 123-41) at 6-24, 37-49, 52-68, 77, 83 (pieces of the Penn State-related memorabilia produced for inspection by Vintage Brand that contain on their faces dates from the 1970s and 1980s).* Similarly, there are pieces of memorabilia in this collection that contain the Lionhead Logo that Penn State presently uses as its primary logo for its Athletics program, contradicting Vintage Brand's assertion in this Paragraph that the "memorabilia" in its collection is "historic." *See DSMF ¶ 32 (Lionhead Logo is currently Penn State's primary Athletics logo); PSU Ex. 38 (Dkt. 123-41) at 54-55, 57-59, 61, 65, 68, 71, 72, 78 (pieces of the Penn State-related memorabilia produced for inspection by Vintage Brand that contain images of the Lionhead Logo).* Those pieces do not meet Vintage Brand's own standard for what constitutes historic and long-lost art, and it is not a reasonable inference that these products are "historic" or "long-lost." And the shortcomings of Vintage Brand's evidence here are illustrated by the fact that Vintage Brand has not produced any memorabilia showing a ticket stub from Penn State football games in the 1920s, or even the next couple decades. *See generally, PSU Ex. 38 (Dkt. 123-41) (complete collection of memorabilia that Vintage Brand produced for inspection in this case).* Vintage Brand's suggested inference that the memorabilia at issue is "historic" or comes from "long-ago" is particularly improper and unreasonable given that Vintage relies on the copyright law concept of "public domain" after expiration of a copyright to assert that Penn State does not have a legal right to prevent third parties from using

images obtained from these pieces of "memorabilia" yet Vintage Brand cannot reliably date any of these items. *See, e.g.,* Dkt. 115 *at* 24 *(example of Vintage Brand arguing in its motion for summary judgment brief that Penn State may not "restrain Vintage Brand's use of historic public domain images"); C. Hartvigson Decl. (*Dkt. 116-2*),* ¶ 12 *(referring to the "works of authorship" on the memorabilia collected "are believed to be in the public domain"); see also 17 U.S.C. § 302 (copyrights in works created on or after 1978 run from date of creation until 70 years after the author's death); id. § 304 (provisions concerning copyright term for pre-1978 works, with length of copyright depending on various facts and continuing in some cases for additional 67-year terms).*

There is no evidence to support Vintage Brand's assertion that these pieces of memorabilia are "original". Vintage Brand is making arguments in its motion concerning copyright issues, and originality is a legal element in copyright. *See Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 281-82 (3d Cir. 2004) (discussing element that a work must be "original" to be protected by copyright).

Vintage Brand's description of the memorabilia as coming "from school sporting events" is disputed to the extent that there is no evidence that all of the memorabilia comes from sporting events. While some pieces of memorabilia consist of programs or ticket stubs from Penn State football games in the 1970s and 1980s, many other pieces of memorabilia have no relationship to sporting events. *See, e.g.,*

*PSU Ex. 38 (Dkt. 123-41) at 2-5, 25-33, 50-51, 69-70, 72-74, 76, 78, 81-82, 84-87 (pieces of the Penn State-related memorabilia produced for inspection by Vintage Brand that does not have any indication of coming from school sporting events).*

Disputed that the age of the memorabilia or whether the memorabilia comes from Penn State sports events has any relevance to Vintage Brand's motion. The date when the images and designs used on the VB Penn State Merchandise were first created or used does not determine whether or not Penn State owns valid and enforceable trademark rights. It is black-letter law that trademark rights (unlike patent and copyright rights) do not expire. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33-34 (2003) (trademark rights do not have a fixed period of protection after which the rights go to the public). Therefore, it does not matter when the memorabilia Vintage Brand collects was first created or distributed, because, as a matter of law, any rights that Penn State owns in trademarks used on that memorabilia do not expire, terminate, or pass into a "public domain" after some period of time.

Disputed that the images Vintage Brand obtained by scanning the Penn State-related memorabilia are "enhanced" to the extent that this implies or suggests that Vintage Brand transforms the scanned images in any meaningful respect. The testimony from Defendants shows that after the physical pieces of memorabilia are scanned, the scanned image files are edited in order to clean up the image if

11

necessary, reduce blurriness, and ensure that the image will be capable of printing in a high-quality format. *See Young Dep. (PSU Ex. 34,* Dkt. 123-37*) at 43:13-44:17 ("[s]ometimes these are old products or assets ... they might have ketchup on them or something, so we remove that"); Vintage Brand Dep. (PSU Ex. 30,* Dkt. 123-33*) at 115:10-25 (Chad Hartvigson testimony that digital images are "enhanced" to "make sure that it can be reproduced in a printing format that produces a high quality image and product").*

6.     Vintage Brand scanned and enhanced the images on that memorabilia, and it sells print-on-demand merchandise bearing those images through its website, www.vintagebrand.com. *Id.* ¶ 13. Customers can choose to have those images printed on a range of tangible goods, including t-shirts, sweatshirts, hats, socks, koozies, mugs, tumblers, wall art, magnets, puzzles, and cutting boards. *Id.*; *see also* Doc. 67 ¶ 83.

**Response**: Undisputed that Vintage Brand offers for sale on www.vintagebrand.com (the **"VB Website"**) merchandise bearing trademarks scanned from pieces of genuine Penn State memorabilia. Undisputed that the VB Penn State Merchandise includes t-shirts, sweatshirts, hats, socks, koozies, mugs, tumblers, wall art, magnets, puzzles, and cutting boards.

Disputed that Vintage Brand alters the scanned trademarks in any way that affects the overall impression of the mark. The scanned trademarks are merely "cleaned up" by brightening the colors or lines, or by improving the resolution. *Ex. 59 (M. Young Dep.) at 44:7-45:16. See also Vintage Brand Dep. (PSU Ex. 30,* Dkt.

*123-33*) *at 115:12-18.* These changes are made to ensure the trademarks print well on the merchandise; they do not alter the overall impression of the marks. *See Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 115:15-18 (testifying that the changes are made to "make sure that it can be reproduced in a printing format").*

Disputed that Vintage Brand customers can "choose to have those images printed on a range of tangible goods." The VB Website offers merchandise that bears images—not images themselves. *See Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 116:2-4 (testifying that the "website shows the images actually on products").* Nor does the VB Website permit customers to provide any customization or make creative decisions about the merchandise shown for sale. The following testimony from Chad Hartvison, testifying as Vintage Brand's corporate representative, directly contradicts the assertion that customers "choose to have … images printed on a range of tangible goods":

| | |
|---|---|
| Q. | Can customers put any image on any product? |
| A. | No. |
| Q. | So to what degree can the customer customize a product through the Vintage Brand website? |
| A. | So they get to choose from a large selection of images that we've published and pick them, pick from them, on the product that they're showcased on. |
| Q. | Okay. So a customer's never going to just click on an image; they're always going to click on a product that has an image on it? Is that – |
| A. | Correct. |

*See Ex. 58 (Vintage Brand Dep.) at 126:23-127:9.*

7.      Some examples of such memorabilia, resultant enhanced images, and digital mockups of purportedly infringing goods are shown below. Hartvigson Decl. ¶ 14.

| Memorabilia | Enhanced Image | Mockup Products |
| --- | --- | --- |
|  Ex. D |  Ex. G |  Ex. J |
|  Ex. E |  Ex. H |  Ex. K |
|  Ex. F |  Ex. I |  Ex. L |

**Response**:  Undisputed that the chart in Paragraph 7 contains images of some of the genuine Penn State merchandise Vintage Brand has produced for inspection, examples of image files that Vintage Brand has used on the VB Penn State Merchandise, and examples of VB Penn State Merchandise.

Disputed to the extent that Vintage Brand describes the images in column 2 as being "enhanced" images. The digital images that Vintage Brand obtains from scanning genuine Penn State memorabilia are not enhanced in any way that affects the overall impression of the mark. As Michelle Young testified, the scanned trademarks are merely "cleaned up" by brightening the colors or lines, or by improving the resolution. *Ex. 59 (M. Young Dep.) at 44:7-45:16; see also Ex. 58 (Vintage Brand Dep.) at 45:23-46:3, 115:12-18 (testifying that the image is "enhanced" through graphical packages to crop it and change some of the colors).* These changes are made to ensure the trademarks print well on the merchandise rather than to make meaningful or noticeable changes to the overall image. *See 58 (Vintage Brand Dep.) at 115:15-18 (testifying that the changes are made to "make sure that it can be reproduced in a printing format").*

8.     In curating Vintage Brand's collection of memorabilia, Chad Hartvigson has spent hundreds of hours over the course of many years searching for historic images in the public domain. *Id.* ¶ 15 . Each historic image must meet four criteria: The ***first*** criteria is that the images must appear on memorabilia from before 1989. *Id.* The **second** selection criteria is that there is no copyright symbol © on any image. *Id.* The **third** selection criteria is that the image is not currently being used in connection with educational services or athletic teams by the college or team from which the memorabilia originated. *Id.* The ***fourth*** criteria is that the historic image is both unique (not widely available from collectors) and has artistic value. *Id.* For images that have satisfied all four of those selection criteria, Vintage Brand researches the history of the game, art, mascot, etc. in order to tell the history of the image on the Vintage Brand website in the description for mockups of products bearing the image. *Id.* In addition, to the best of Chad Hartvigson's knowledge, all of the historic images were authored or created by third parties; none of the images were authored by Plaintiff. *Id.*; *see also* Ex. 6 at 8401.

**Response**: Disputed.  ***First,*** the evidence does not support the assertion that Vintage Brand's Penn State memorabilia contains "historic images in the public domain."  The assertions that the memorabilia is "historic" is contradicted by the corporate representative testimony from Mr. Hartvigson on behalf of Vintage Brand, as the only basis he could provide for Vintage Brand's knowledge about the date the memorabilia was sold or produced was that many pieces "are dated", such as sports tickets and sports programs.  *See Ex. 58 (Vintage Brand Dep.) at 106:4-25.*   Mr. Hartvigson described Vintage Brand's collection of "long-lost art" but defined "long-lost art" to include an item that is "nearly 100 years old" and that contains features "that most people haven't seen", and as an example suggested that a "rare ticket from [a] 1929 Penn State football game" would be "long-lost art."  *Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 116:5-16 (testimony described).* The memorabilia that Vintage Brand acquired for Penn State does not satisfy Mr. Hartvigson's definition of long-lost art, however.  The dates on many pieces of the memorabilia show that they come from the 1970's or 1980's.  *See PSU Ex. 38 (Dkt. 123-41) at 6-24, 37-49, 52-68, 77, 83 (pieces of the Penn State-related memorabilia produced for inspection by Vintage Brand that contain on their faces dates from the 1970s and 1980s).*  Similarly, there are pieces of memorabilia in this collection that contain the Lionhead Logo that Penn State presently uses as its primary logo for its Athletics program, contradicting Vintage Brand's assertion in this Paragraph that the

"memorabilia" in its collection are "historic." *See DSMF ¶ 32 (Lionhead Logo is currently Penn State's primary Athletics logo); PSU Ex. 38 (Dkt. 123-41) at 54-55, 57-59, 61, 65, 68, 71, 72, 78 (Penn State-related memorabilia produced for inspection by Vintage Brand that contain images of the Lionhead Logo).* Those pieces do not meet Vintage Brand's own standard for what constitutes historic and long-lost art, and there is nothing here to support an inference that the memorabilia is "historic" or "long-lost." This fact is unsupported and cannot be accepted to establish a fact for summary judgment. *See LR 56.1; FRCP 56(c).* The shortcomings of Vintage Brand's evidence here are illustrated by the fact that Vintage Brand has not produced any memorabilia showing a ticket stub from Penn State football games in the 1920s, or even the next couple decades. *See generally, PSU Ex. 38 (Dkt. 123-41) (complete collection of memorabilia that Vintage Brand produced for inspection in this case).*

References in this Paragraph to memorabilia and/or images being "in the public domain" is unsupported by the record. *See LR 56.1; FRCP 56(c).* Vintage Brand uses this term and other similar copyright-related terms to assert that under copyright law, Penn State does not have a legal right to prevent third parties from using images obtained from these pieces of "memorabilia." *See, e.g., Dkt. 115 at 24 (example of Vintage Brand arguing in its summary judgment brief that Penn State may not "restrain Vintage Brand's use of historic public domain images"); see also*

*17 U.S.C. § 302* (copyrights in works created on or after 1978 run from date of creation until 70 years after the author's death); id. § 304 (provisions concerning copyright term for pre-1978 works, with length of copyright depending on various facts and continuing in some cases for additional 67-year terms). The statement in this Paragraph regarding the public domain is also directly contradicted by Mr. Hartvigson's deposition testimony that he has no personal knowledge regarding whether any of the images Vintage Brand uses are in the public domain. *See Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 121:24-122:3.* Mr. Hartvigson may not make conclusory and unsupported statements in his declaration here that contradict prior deposition testimony. *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) ("a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conduct").

*Second,* disputed that Vintage Brand has meaningfully applied the criteria described in Paragraph 8 to the items in its collection of sports memorabilia. Mr. Hartvigson testified that Vintage Brand owns over 25,000 individual pieces of sports collectibles. *See Ex. 58 (Vintage Brand Dep.) at 105:10-11, 105:17-22.* The statement in his Declaration that he has spent "hundreds of hours searching for historic images in the public domain" to ensure that the memorabilia meets certain criteria, *C. Hartvigson Decl. (Dkt. 116-2), ¶ 15,* even applied with a very generous

interpretation of the amount of time spent, would amount to spending about two minutes per piece of memorabilia acquired. Math shows that if Mr. Hartvigson spent 900 hours researching 25,000 pieces of memorabilia, this equates to spending about 2 minutes per item. It is not plausible that Mr. Hartvigson took the steps described in this Paragraph with respect to each of the 25,000 items, or that he conducted any meaningful review to ensure that Vintage Brand was respecting others' intellectual property rights. His declaration on this point is not supported by any objective evidence and is not credible. *See LR 56.1; FRCP 56(c)*.

*Third*, disputed that the memorabilia satisfies each of these elements because Vintage Brand has not produced a full set of Penn State-related memorabilia from which they sourced the images used on the VB Penn State Merchandise. For example, the memorabilia Vintage Brand produced for inspection did not include the following images that appear on the VB Penn State Merchandise:



*Compare PSU Ex. 38 (Dkt. 123-41) at 2-87 (full set of memorabilia produced for inspection by Vintage Brand), with PSU Ex. 39 (Dkt. 123-42) at 18-19 (images from Vintage Brand's digital files related to Penn State). See also, e.g., PSU Ex. 32 (Dkt. 123-35) at 3 (screenshot of the VB Penn State Store showing Vintage Brand offering merchandise using the two images shown in this paragraph).*

**Fourth,** regarding Criteria 1, disputed that the memorabilia comes "from before 1989", as many pieces of Penn State memorabilia produced for inspection are dated on their face from 1989, and Mr. Hartvigson testified that several images do not satisfy the first criteria. *See PSU Ex. 38 (Dkt. 123-41) at 19-24 (examples of Penn State-related memorabilia produced for inspection by Vintage Brand that contain dates from 1989); Ex. 58 (Vintage Brand Dep.) at 174:17-18 (testifying some of the memorabilia contains images from 1989); see also id. at 179:9-11 (testifying that Vintage Brand's Penn State memorabilia may include images created after 1989).* Similarly, there are pieces of memorabilia in this collection that contain the Lionhead Logo that Penn State presently uses as its primary logo for its Athletics program, and which are undated, meaning that there is no reasonable way for Vintage Brand to know whether or not this memorabilia comes from before 1989. *See DSMF ¶ 32 (Lionhead Logo currently is Penn State's primary Athletics logo); PSU Ex. 38 (Dkt. 123-41) at 72, 78 (undated Penn State-related memorabilia produced for inspection by Vintage Brand that contain images of the Lionhead Logo).* Disputed that the age of the memorabilia has any relevance to Vintage Brand's motion, as this does not determine whether or not Penn State owns valid and enforceable trademark rights. *Dastar, 539 U.S. at 33-34* (trademark rights do not have a fixed period of protection after which the rights go to the public).

**Fifth,** regarding Criteria 2, disputed to the extent that this Paragraph suggests or implies that any measures Vintage Brand may have taken to determine whether a copyright symbol © appeared on merchandise demonstrates good faith, that the absence of that symbol indicates that something is not protected by copyright, or that Vintage Brand actually believes the absence of that symbol indicates something is in the public domain. The Copyright Act permits copyright owners to include notice of copyright but does not require that the symbol © be used in order for a work to be protected. *See 17 U.S.C. § 401 ("Whenever a work protected under this title is published … a notice of copyright … may be placed on publicly distributed copies …" (emphasis added)).* Moreover, as these images contain trademarks, there is no legal reason to include a copyright symbol, or implication from a failure to do so.

**Sixth,** regarding Criteria 3, Penn State specifically disputes that Vintage Brand meaningfully applied this criteria. First, many pieces of the memorabilia that Vintage Brand acquired for Penn State contain the Lionhead Logo that—Vintage Brand knows is Penn State's current primary trademark for its Athletics program. *See DSMF ¶ 32; PSU Ex. 38 (Dkt. 123-41) at 54-55, 57-59, 61, 65, 68, 71, 72, 78 (pieces of the Penn State-related memorabilia produced for inspection by Vintage Brand that contain images of the Lionhead Logo).* Vintage Brand also uses PENN STATE on its products, and that designation is obviously Penn State's most prominent trademark that it uses in connection with its educational services and

athletics. *See, e.g., DSMF B.6.41 (Vintage Brand noting that the University is often referred to as "Penn State" and noting that "Penn State" is, for example, used as the prominent part of many social media accounts associated with the University); PSU Ex. 22 (Dkt. 123-25) at 3-4 (1982 memorandum recommending that the University implement a formal trademark registration and licensing program, discussing that PENN STATE was a protectible trademark as and name for the University); PSU Ex. 21 (Dkt. 123-24) at 2-6 (Penn State art sheets from 2011 to present calling PENN STATE a "primary mark[]"; further showing that the University's primary mark for educational services throughout this period has specifically incorporated PENN STATE, and specifically permitting PENN STATE to be used along with the primary logo used for athletic services).* Second, Mr. Chad Hartvigson's testimony contradicts any assertion that he ever investigated whether Penn State owns rights in the trademarks at issue in this case. *Ex. 58 (Vintage Brand Dep.) at 243:13-18 (testimony that Chad Hartvigson has not done any investigation into Penn State's use or ownership of its trademarks).* Third, to the extent that Vintage Brand did undertake the search described here, the limited scope of a search for whether an image is "currently being used in connection with educational services or athletic teams by the college or team from which the memorabilia originated" shows its bad faith. This search omits any trademarks being used by a University like Penn State in connection with merchandise such as apparel, hats, and

other products that Vintage Brand sells. Mr. Hartvigson further testified that he does not have personal knowledge of whether this criteria is satisfied by the Penn State products. *See Ex. 58 (Vintage Brand Dep.) at 116:16-119:10 (Chad Hartvigson's testimony that to determine whether Penn State is currently using a given image, he did online research including searching CLC "who controls all the licensing" and on Fanatics.com, but does not know whether all licensed Penn State merchandise is sold through Fanatics and does not know how he might determine through CLC "whether an image from one of Vintage Brand's collectibles is still being used by Penn State"); see also id. at 234:2-5 (testifying that he does not know whether third parties use logos similar to the Penn State trademarks Vintage Brand prints on its merchandise); id. at 242:2-8 (testimony that neither Chad Hartvigson nor anyone else at Vintage Brand has knowledge about Penn State's licensing program).*

**Seventh,** regarding Criteria 4, disputed as to the word "unique" as Mr. Hartvigson made no mention of determining whether the image is currently being used by the college from which the memorabilia originated or whether the image is unique. *Ex. 58 (Vintage Brand Dep.) at 229:17-230:10 (testifying that Vintage Brand is "looking at things that are artistically relevant," "need to be pre-1989," "may not have a copyright insignia on them," and are "at a price point that ... makes sense to acquire that collectible").* This assertion cannot be used for summary judgment because it contradicts Mr. Hartvigson's prior testimony. *Baer, 392 F.3d*

at 624 ("a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conduct").

**Eighth,** disputed that all of the historic images were authored or created by third parties and that none of these images were authored by Penn State. Mr. Hartvigson testified during his deposition that he never tried to identify or find the artists responsible for the images on Vintage Brand's merchandise, and he never asked permission from anyone to use it on Vintage Brand's website. *Ex. 58 (Vintage Brand Dep.) at 172:24-176:17 (testifying that Vintage Brand had never tried to locate the artists for any images appearing on the Penn State memorabilia it has acquired, and that Vintage Brand never asked Penn State who the artist may be for any of these images).* Vintage Brand's citation to VB Exhibit 6 is inapposite as that email only became available to Vintage Brand during discovery in this matter, and therefore does not support its purchase criteria. *See VB Ex. 6 [Sealed]*. *Baer*, 392 F.3d at 624 ("a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conduct").

9.      Vintage Brand does not use any historic images as a trademark. *Id*. ¶ 16. Vintage Brand has its own trademark, which it uses on its website, its products, and its packaging, *id*., as further discussed *infra*, at Paragraphs 12 and 19. The historic images are attractive decoration for the front of the apparel and other merchandise that Vintage Brand offers; they are what make customers want to buy the merchandise in the first place. *Id*. The attractive nature of these historic images

satisfies customer preferences for a custom item with a retro look and a nostalgic feeling, while also allowing customers to express affinity for the team or school referred to in the historic image. *Id.* Customers decide if they like a historic image enough to place it on a canvas or t-shirt or other item and order the product. *Id.*; see *also* Doc. 67 ¶ 83.

**Response**: Undisputed that Vintage Brand owns a federal trademark registration for a logo that includes a design and the words "Vintage Brand". *See Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 96:3-16.* Undisputed that Vintage Brand uses this logo on its website, and on some packaging and products, but disputed that the Vintage Brand logo appears on all of the products that it sells. *See, e.g., Ex. 61 at 2-31 (images of VB Penn State Merchandise, showing that most of the Merchandise does not have the Vintage Brand logo on the actual product).*

Disputed that "Vintage Brand does not use any historic images as a trademark". This is not an asserted fact but is a legal conclusion and Penn State is not required to respond, and which should not be adopted by the Court for summary judgment. *First Bank Puerto Rico v. Misite*, 813 F. App'x 758, 765-66 (3d Cir. 2020) ("[T]he purported 'facts' to which she cites are merely legal conclusions and allegations unsupported by proper citations to evidence in the record. … As we have explained, such conclusory statements are insufficient to withstand a motion for summary judgment.") (internal quotation omitted); *Kidd v. Prudential Co. of America*, No. 3:cv-05-1177, 2008 WL 163055, at *4-6 & nn.3, 6 (M.D. Pa. Jan. 15, 2008) (refusing to adopt legal conclusions as facts that can support a motion for

summary judgment and confirming that the non-movant is not required to respond to such conclusory statements).  Further, Chad Hartvigson's conclusory statements concerning trademark use are not supported by any facts or specific information that lends credence to the statement, and therefore cannot provide an evidentiary basis for assertions about trademark use.  A party may not rely on a conclusory, self-serving affidavit to make a showing for summary judgment, particularly when those conclusory allegations are not supported by additional facts or evidence to support that conclusion.  *See, e.g., Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) ("conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment"); *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985) ("[T]he affiant must ordinarily set forth facts, rather than opinions or conclusions. An affidavit that is 'essentially conclusory' and lacking in specific facts is inadequate to satisfy the movant's burden.").

Paragraph 9 is disputed entirely because the assertions therein are not supported by competent evidence.  *LR 56.1; FRCP 56(c)(1).*  Defendant may not rely on Chad Hartvigson's declaration to support this Paragraph because the relevant portion of his declaration (which mirrors this Paragraph) is unsupported, contradicts his prior deposition testimony, and would constitute inadmissible hearsay.  *Baer, 392 F.3d at 624* ("a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony

without demonstrating a plausible explanation for the conduct"). Mr. Hartvigson admitted that he lacks the training and personal knowledge to testify regarding whether an image is used as a trademark or whether it is ornamental use. *See, e.g.*, *Ex. 58 (Vintage Brand Dep.) at 166:15-168:3 (testifying that he has no knowledge of trademark law, including whether an image is being used as a trademark as opposed to ornamental use); Ex. 62 (Sportswear Dep. (Vol. 2)) at 87:20-23 (Chad Hartvigson's testimony that he has no personal knowledge of whether Penn State's marks are ornamental).* Disputed as to all references and implications that Vintage Brand offers and sells images rather than merchandise. *See Ex. 58 (Vintage Brand Dep.) at 116:2-4 (testifying that the "website shows the images actually on products"); PSU Exs. 31-33 (Dkt. 123-34, 123-35, 123-36) (screenshots of the Penn State-related pages of the VB Website (the "**VB Penn State Store**") (showing Vintage Brand offering merchandise).*

Disputed as to all assertions about the reasons that customers purchase certain products, what makes customers want to buy merchandise, how customer preferences are satisfied, and whether (or how) customers are expressing an affinity for a school or team when making purchases. Those assertions pertain to information that is in the mind of customers, and not information that Chad Hartvigson has personal knowledge of. Mr. Hartvigson's declaration on these points is impermissible under FRCP 56(c)(4). Further, his declaratory statements here

contradict his deposition testimony, as Mr. Hartvigson testified that while he has theories and beliefs about why customers might purchase the VB Penn State Merchandise, he does not actually know why. *See Ex. 58 (Vintage Brand Dep.) at 171:19-24, 172:17-20 (testimony from Chad Hartvigson as Vintage Brand's corporate representative that he does not know with certainty why customers buy Penn State-related merchandise from Vintage Brand, and that he does not know anything about any of the customers who purchase Penn State items on the Vintage Brand website).* Mr. Hartvigson may not contradict this deposition testimony through conclusory allegations in his declaration where he provides no additional facts and no explanation to explain the change in his testimony. Baer, 392 F.3d at 624. *See FRCP 56(c)(4) (stating requirements for a declaration to be used to support a motion for summary judgment, and specifically requiring that the declaration be based on personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify on the matter stated).*

10.     In the roughly six years that the company has operated, Vintage Brand has never received any communication (written or verbal) from an actual or prospective customer indicating that the customer was confused about the source or sponsorship of any Vintage Brand products. Hartvigson Decl. ¶ 17.

**Response:** Disputed. Paragraph 10 is not supported by competent evidence and therefore must be disregarded. *LR 56.1; FRCP 56(c)(1).* Vintage Brand may not rely on this statement because Vintage Brand refused to provide discovery on the full set of information that is covered by this Paragraph. Penn State issued a

Request for Production asking for "all communications between any agent or representative of Vintage Brand (including Sportswear employees) and any customers or potential customers. *See Ex. 63 (Vintage Brand's September 9, 2022 Responses to Penn State's Second Set of RFPs) at 12 (RFP 50).* Vintage Brand objected to this Request as "not limited to the Vintage Brand product offerings that are the subject of this lawsuit" and declined to produce communications with customers that were not specifically related to Penn State-related merchandise. *Id. See also Ex. 64 (Vintage Brand's December 21, 2022 Third Supplemental Responses to Penn State's First Set of RFPs) at 6, 8, 24, 26, 32 (Responses to RFPs 4, 5, 14, 15, 21) (responses that are incorporated by reference in Vintage Brand's objection to RFP 50 and are cited here for completeness, but which do not show anything contradicting Vintage Brand's objection and refusal to product customer communications that were not specifically related to Penn State merchandise).* The only cited evidence purporting to support most of this Paragraph is Chad Hartvigson's declaration. Mr. Hartvigson testified during his deposition that he lacks personal knowledge of customer service inquiries including customer complaints. *See Ex. 58 (Vintage Brand Dep.) at 220:6-11 (testifying that he is unaware about the customer complaints Vintage Brand has received regarding its Penn State merchandise); see also id. 38:17-40:5 (testifying that customer service inquiries are handled by two other individuals); see also id. at 38:8-16 (testifying*

*that his job responsibilities are limited to "manag[ing] the finances" and "curat[ing] sports collectibles on behalf of the company").*

### 3. Vintage Brand's Website

11.     The Vintage Brand website has over 118,000 pages, including: (a) one "Home Page," the main landing page on the domain www.vintagebrand.com, *id.* ¶ 18; (b) over 350 "Team Pages," secondary landing pages with historic imagery related to specific teams or institutions, *id.* ¶ 18, Ex. M; and (c) over 29,000 "Product Pages," pages showing digital mock-ups of potential product offerings utilizing historic artwork from Vintage Brand's collection of vintage memorabilia, *id.* ¶ 18, Ex. N. The historic artwork is associated with hundreds of other colleges and sports teams. *Id.* ¶ 18.

**Response:** Undisputed that the Vintage Brand Website contains (a) a home page at www.vintagebrand.com; (b) "landing pages" for specific teams and institutions showing for sale various merchandise; and (c) individual product pages offering specific goods. Undisputed that Vintage Brand sells goods bearing images that come from Vintage Brand scanning images of authentic merchandise and then applying those images to the products sold on the Vintage Brand Website. Undisputed that Vintage Brand sells merchandise connected with hundreds of colleges and sports teams, including Penn State.

Disputed that the product pages "show[] digital mock-ups of potential product offerings" to the extent that Vintage Brand suggests or asserts that customers design merchandise, or that the VB Website indicates to customers that the images shown on the website are "digital mockups" and not images of actual products. *See Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 116:2-4 (testifying that the "website shows*

30

*the images actually on products")*.  Nor does the VB Website permit customers to customize merchandise or make creative decisions about the products shown for sale.  *See Ex. 58 (Vintage Brand Dep. at 126:23-127:9 (customers shopping on the VB Website cannot choose to put any image on any product, and the only customization a customer can do to a product for sale on the VB Website is to select an image of a product).*  Screenshots of the VB Website and the VB Penn State Store consistently and uniformly show that the website appears to sell products that are already in existence—there is nothing in this evidence that suggests customers are aware that the VB Penn State Merchandise is not manufactured or printed before it is ordered by a customer.  *See PSU Exs. 31, 32,33 (*Dkt. 123-34*, *123-35*, *123-36*) (screenshots of VB Website taken in 2021 and 2022, which all show Penn State merchandise for sale); Young Dep. (PSU Ex. 34) (*Dkt. 123-37*) at 117:10-19 (confirming PSU Exhibit 31 shows images of the VB Website); Vintage Brand Dep. (PSU Ex. 30, *Dkt. 123-33*) at 133:20-134:7, 155:16-159:9 (confirming PSU Exhibits 32 and 33 are images of the VB Website); VB Ex. L (*Dkt. 116-14*) at *2* (product page for a Penn State t-shirt submitted by Vintage Brand showing the shirt with a Penn State-related image on the front of the shirt, and including multiple views of the shirt—such as front and back—giving the impression of what the physical item looks like); VB Ex. M (*Dkt. 116-15*) (example of a Penn State landing page from the VB Penn State Store submitted by Vintage Brand showing images of merchandise like t-*

*shirts, sweatshirts, and hats for sale that include the Penn State-related images appearing to be directly on the merchandise).* That the VB Website appears to offer preexisting merchandise rather than digital mockups is illustrated by the VB Website showing people wearing actual Vintage Brand merchandise. *See, e.g., C. Hartvigson Decl. (Dkt. 116-2) at 16-17, ¶ 18 (declaration setting out images of Vintage Brand's home page which shows images of people wearing actual Vintage Brand merchandise, including t-shirts that bear images related to different sports teams).*

The only evidence in the record that even purports to support the assertion that customers are presented with "digital mockup[s]" rather than with what appears to be images of actual products comes from the declaration of Chad Hartvigson. The relevant portions of this declaration—including in Paragraph 25—are devoid of competent evidence supporting this assertion. For example, the only citation to evidence in paragraph 25 confirms that Vintage Brand advertises products, not stand-alone images:



1929 Penn State Nittany Lions Aluminum ...
$4.89 $6.99
You Save: $2.10

1929 Penn State Nittany Lions Metal Wall ...
$27.99 $39.99
You Save: $12.00

1929 Penn State Nittany Lions Drink Coa...
$22.95 $32.79
You Save: $9.84

1929 Penn State Nittany Lions Socks
$9.79 $13.99
You Save: $4.20

*VB Ex. Q (Dkt. 116-19) at 3.*   There is no competent evidence that customers view perceive the Vintage Brand website as showing "digital mockups" of "potential" products, and that assertion is unsupported to the extent that Vintage Brand tries to use this Paragraph to show evidence of customer perception or customer motivation, or for any purpose related to how the VB Website appears.

Disputed that the merchandise Vintage Brand sells features "historic artwork."  The assertion that the memorabilia is "historic" is contradicted by the corporate representative testimony from Mr. Hartvigson on behalf of Vintage Brand, as the only basis he could provide for Vintage Brand's knowledge about the date the memorabilia was sold or produced was that many pieces "are dated", such as sports tickets and sports programs.  *See Ex. 58 (Vintage Brand Dep.) at 106:4-25.*   Mr. Hartvigson defined his use of "long-lost art" to include an item that is "nearly 100 years old" and that contains features "that most people haven't seen", and as an example suggested that a "rare ticket from [a] 1929 Penn State football game" would be "long-lost art."  *Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 116:5-16 (testimony described).*   The memorabilia that Vintage Brand acquired for Penn State does not satisfy this criteria, however.  The dates on many pieces of the memorabilia show that they come from the 1970's or 1980's.  *See PSU Ex. 38 (Dkt. 123-41) at 6-24, 37-49, 52-68, 77, 83 (pieces of the Penn State-related memorabilia produced for inspection by Vintage Brand that contain on their faces dates from the 1970s and*

*1980s)*.  Similarly, there are pieces of memorabilia in this collection that contain the Lionhead Logo that Penn State presently uses as its primary logo for its Athletics program, contradicting Vintage Brand's assertion in this Paragraph that the "memorabilia" in its collection are "historic."  *See DSMF ¶ 32  (Lionhead Logo is the mark that Penn State currently uses as its primary Athletics logo); PSU Ex. 38 (Dkt. 123-41) at 54-55, 57-59, 61, 65, 68, 71, 72, 78 (pieces of the Penn State-related memorabilia with images of the Lionhead Logo)*.  Those pieces do not meet Vintage Brand's own standard for what constitutes historic and long-lost art, and it is not a reasonable inference that these products are "historic" or "long-lost."

Disputed that the age of the memorabilia is relevant, as the date when the images and designs used on the VB Penn State Merchandise were first created or used does not determine whether or not Penn State owns valid and enforceable trademark rights.  *Dastar*, 539 U.S. at 33-34 (trademark rights do not have a fixed period of protection after which the rights go to the public).

12.    On the top of the Home Page, as well as every Team Page, Product Page, and page appearing during the checkout process, Vintage Brand's trademark (U.S. Reg. No. 6,029,818) is prominently displayed:



*Id*. ¶ 19, Exs. M–N.

**Response:** Undisputed that the Vintage Brand name and logo appearing in Paragraph 12 appear at the top left of the VB Website.

This Paragraph is not material to Vintage Brand's motion to the extent that Vintage Brand suggests or implies that the appearance of the Vintage Brand name and logo on the website negates the likelihood of confusion here, or distinguishes the VB Penn State Store from any other e-commerce site that sells genuine Penn State Merchandise under a license by Penn State. In fact, a visual comparison of screenshots from other online retailers selling genuine Penn State merchandise shows that many of these retailers' websites include their own name and/or logo on the website pages. *See, e.g., PSU Ex. 48 (Dkt. 123-51) at 4 (screenshot of 19Nine website selling genuine Penn State merchandise with the logo 19NINE appearing in the upper lefthand corner of the webpage and bearing the ® symbol); id. at 6-105 (screenshots of the '47 brand website selling genuine Penn State merchandise with the stylized logo for this brand appearing at the top center of the webpage of each and every webpage); id. at 107 (same for Nike website, with Nike's "swoosh" logo appearing in the top left of the screen); id. at 111 (same for Homefield, with Homefield name appearing at the top left of the screen showing different products for sale). See also PSU Ex. 18 (Dkt. 123-21) at 2-9 (list of authorized Penn State licensees showing that 19NINE, '47 brand, Nike, and Homefield are all authorized to sell Penn State merchandise).*

13.    And on the bottom of the Home Page, as well as every Team Page, Product Page, and page appearing during the checkout process, the following disclaimer appears in contrasting colors:

> Our products are not affiliated with, licensed, sponsored, or endorsed by any college, team, league, event or licensing entity…. All products are designed by Vintage Brand® and manufactured for Vintage Brand®.

*Id.* ¶ 20, Exs. M–N.

**Response:** Disputed. The exhibits that Vintage Brand cites in support of this Paragraph show that the quoted language appears only at the very bottom of the webpage, several lines below any information about products. For example, Exhibit M contains twenty pages worth of product offerings, meaning that a customer reviewing this page on the VB Website would need to scroll down through the equivalent of 20 pages' worth of information, go past all of the information about different products for sale, before this "disclaimer" would "appear." *See VB Ex. M (Dkt. 116-15) at* 2-21. Further disputed that the disclaimer is in contrasting colors. The disclaimer appears in the same colors as the rest of the text in the bar at the bottom of the page, as shown here, in this screenshot that was produced by Vintage Brand and is cited here by Vintage Brand, with the "disclaimer" marked in red.



*Id. See also VB Ex. M (Dkt. 116-15) at* 21.

Disputed to the extent that Vintage Brand suggests or implies that customers actually read this "disclaimer" language, that this "disclaimer" dispels confusion, or that this "disclaimer" demonstrates good faith on their part. The evidence shows otherwise on all three points. **First**, Meghan Maffey testified that she has been on the Vintage Brand Website and the VB Penn State Store multiple times, and that she does not recall seeing any language on the website speaking to whether Vintage Brand has an affiliation or relationship with Penn State, or seeing any of sort of disclaimer or legalese. *See, e.g., Maffey Dep. (PSU Ex. 37, Dkt. 123-40) at 54:25-55:10.* **Second**, although Vintage Brand's expert Tülin Erdem designed her consumer survey to test for the effect of disclaimers on customer confusion on the Vintage Brand Website, her results showed high confusion rates across all survey conditions and demonstrated that Vintage Brand's disclaimers do not have appreciable impact on consumer confusion. *See Rebuttal Expert Report of David Franklyn (PSU Ex. 56, Dkt. 123-59) at 32; see also Erdem Report (PSU Ex. 42, Dkt. 123-45) at 31-45 (Erdem's written report showing that she expressed no opinions indicating that the presence or absence of disclaimer language affected consumer confusion rates).* Third, testimony from Defendants' own employee who is responsible for User Interface on the VB Website shows that Vintage Brand purposely designs its website to hide and conceal "disclaimer" language, and to prevent consumers from actually focusing on it. *See DeLong Dep. (PSU Ex. 40, Dkt.*

*[123-43](#)) at 13:23-16:2 (DeLong testimony that Vintage Brand only makes 2 lines of the "disclaimer" at the top of the VB Website visible because "it's just that you want to hide some of it so it doesn't take up a lot of the priority"), 20:9-21:12 (DeLong testimony that the "disclaimer" language that appears near the bottom of the page on the VB Website similarly has only one and a half lines visible unless a customer actually scrolls).* Mr. DeLong was clear that Vintage Brand seeks to "hide" the "disclaimer" language and considers this to be "best practice". *Id. at [21:7-12](#)*

*(DeLong testimony regarding the viewability of the "disclaimer" language on the VB Website: "I would say it's kind of like best practice. If you go to a lot of other e-commerce shops, they always have just paragraphs of legal stuff at the bottom, so ... and they usually hide at least half of it or something.").*

14. When visitors navigate to a Team Page, they are presented with another disclosure in the first visual field of the page, beneath the descriptive header:

## PENN STATE NITTANY LIONS VINTAGE DESIGNS
Vintage designs not affiliated with, licensed, or sponsored by any college, team or league

*Id.* ¶ 21, Ex. M. The same text also appears when the Team Page is narrowed to a type of product, such as "Cutting Boards." *Id.* ¶ 21, Ex. O. There are also scrollable text boxes at the top and bottom of each Team Page, which contain an additional disclaimer of licensure, sponsorship, or endorsement. *Id.* ¶ 21; Exs. M & O; *see also* Ex. P.

**Response:** Undisputed that on the "Team Page" on the VB Penn State Store, the page is titled PENN STATE NITTANY LIONS VINTAGE DESIGNS. Undisputed that the partial screenshot included in Paragraph 14 shows that the

"disclaimer" language stating "Vintage designs not affiliated with, licensed, or sponsored by any college, team or league" appears below the page title, in font that is much smaller in size and much lighter in color. Undisputed that Vintage Brand's other purported "disclaimers" are only visible through "scrollable text boxes".

Disputed to the extent that Vintage Brand suggests or implies that customers actually read the "disclaimer" language, that the "disclaimers" dispel confusion, or that the "disclaimers" demonstrates good faith on Vintage Brand's part. The evidence shows otherwise on all three points. **First**, Meghan Maffey testified that she has been on the Vintage Brand Website and the VB Penn State Store multiple times, and that she does not recall seeing any language on the website speaking to whether Vintage Brand has an affiliation or relationship with Penn State, or seeing any of sort of disclaimer or legalese. *See, e.g., Maffey Dep. (PSU Ex. 37, Dkt. 123-40) at 54:25-55:10.* **Second**, although Vintage Brand's expert Tülin Erdem designed her consumer survey to test for the effect of disclaimers on customer confusion on the VB Website, her results showed high confusion rates across all survey conditions and demonstrated that Vintage Brand's disclaimers do not have appreciable impact on consumer confusion. *See Rebuttal Expert Report of David Franklyn (PSU Ex. 56, Dkt. 123-59) at 32; see also Erdem Report (PSU Ex. 42, Dkt. 123-45) at 31-45 (Erdem's written report showing that she expressed no opinions indicating that the presence or absence of disclaimer language affected consumer*

*confusion rates).* Third, testimony from Defendants' own employee who is responsible for User Interface on the VB Website shows that Vintage Brand purposely designs its website to hide and conceal "disclaimer" language, and to prevent consumers from actually focusing on it. *See DeLong Dep. (PSU Ex. 40, Dkt. 123-43) at 13:23-16:2 (DeLong testimony that Vintage Brand only makes 2 lines of the "disclaimer" at the top of the VB Website visible because "it's just that you want to hide some of it so it doesn't take up a lot of the priority"), 20:9-21:12 (DeLong testimony that the "disclaimer" language that appears near the bottom of the page on the VB Website similarly has only one and a half lines visible unless a customer actually scrolls).* Mr. DeLong was clear that Vintage Brand seeks to "hide" the "disclaimer" language and considers this to be "best practice". *Id. at 21:7-12 (DeLong testimony regarding the viewability of the "disclaimer" language on Vintage Brand's website: "I would say it's kind of like best practice. If you go to a lot of other e-commerce shops, they always have just paragraphs of legal stuff at the bottom, so ... and they usually hide at least half of it or something.").*

Further disputed that any of the text in these "disclaimers" is sufficiently prominent and unambiguous to offset in any way the confusion caused by Vintage Brand's use of the University Marks and references to Penn State throughout the VB Penn State Store. For example, the purported "disclaimer" under the title PENN STATE NITTANY LIONS VINTAGE DESIGNS fails to offset the impression

created by the title that Penn State owns and/or sources the displayed products. *See VB Ex. M (Dkt. No. 116-15) at 3; see also Ex. 58 (Vintage Brand Dep.) at 143:5-9 (testifying that "PENN STATE NITTANY LIONS VINTAGE DESIGNS" was chosen instead of "Vintage Brand Vintage Designs" because the former was more descriptive of the products).* Similarly, the scrollable text boxes begin with text encouraging visitors to "Shop Penn State Nittany Lions vintage designs", not "Vintage Brands vintage designs". *See Dkt. No. 116-15 (Exhibit M to C. Hartvigson's Decl.) at 3.*

15.     If a visitor selects an item from a Team Page, she is taken to a Product Page, which displays a digital mockup of the product bearing the historic image the customer chose from the Team Page. *Id.* ¶ 22. For example:



*Id*. ¶ 22, Ex. M (red annotation added).



*Id*. ¶ 22, Ex. Q.

**Response:** Undisputed that selecting the product in Exhibit M leads to the product page in Exhibit Q.

Disputed that the product pages "displays a digital mockup" or that customers "cho[o]se" an "image" to possibly purchase, rather than choosing a product that is already designed and appears to have been already created. The evidence shows that the VB Website and the VB Penn State Store appear to offer actual products, with no indication that pictured products are "digital mockups" or that the products have not actually been created. *See Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 116:2-4 (testifying that the "website shows the images actually on products"). See also PSU Exs. 31, 32,33 (Dkt. 123-34, 123-35, 123-36) (screenshots of VB Website*

*taken in 2021 and 2022, which all show Penn State merchandise for sale); Young*

*Dep. (PSU Ex. 34) (Dkt. 123-37) at 117:10-19; Vintage Brand Dep. (PSU Ex. 30,*

*Dkt. 123-33) at 133:20-134:7, 155:16-159:9; VB Ex. L (Dkt. 116-14) at 2 (product*

*page for a Penn State t-shirt submitted by Vintage Brand showing the shirt with a*

*Penn State-related image on the front of the shirt, and including multiple views of*

*the shirt—such as front and back—giving the impression of what the physical item*

*looks like); C. Hartvigson Decl. (Dkt. 116-2) at 16-17, ¶ 18 (images of Vintage*

*Brand's home page, showing people wearing actual Vintage Brand merchandise,*

*including t-shirts that bear images related to different sports teams).*

Disputed that the images appearing on product pages are "historic". Disputed that the images shown on the products offered for sale on the product pages are "historic". Mr. Hartvigson testified that the only basis for Vintage Brand's purported knowledge about the date the memorabilia was sold or produced was that many pieces "are dated", such as sports tickets and sports programs. *See Ex. 58 (Vintage Brand Dep.) at 106:4-25.* The dates on many pieces of the memorabilia show that they come from the 1970's or 1980's, and many pieces show the trademark that Penn State currently uses as it primary athletics logo. *See PSU Ex. 38 (Dkt. 123-41) at 6-24, 37-49, 52-68, 77, 83 (Penn State-related memorabilia produced for inspection by Vintage Brand that contain on their faces dates from the 1970s and 1980s); id. at 54-55, 57-59, 61, 65, 68, 71, 72, 78 (Penn State-related memorabilia produced for*

inspection by Vintage Brand that contain images of the Lionhead Logo currently used by Penn State as its primary trademark for the Athletics program); see also *DSMF ¶ 32 (statement that the Lionhead Logo is the mark that Penn State currently uses as its primary Athletics logo, which Penn State admits in its response, infra).* The inferences that Vintage Brand relies on to support the assertion that the memorabilia and/or images at issue are "historic" is particularly improper given that Vintage Brand makes arguments about copyright-related principles—such as the public domain—to assert that Penn State does not have a legal right to prevent third parties from using images obtained from these pieces of "memorabilia" but has no evidence to support this characterization. *See, e.g., Dkt. 115 at 24 (arguing in its motion for summary judgment brief that Penn State may not "restrain Vintage Brand's use of historic public domain images").*

Disputed that the age of the memorabilia or whether it is "historic" has any relevance to Vintage Brand's motion given that trademark rights do not expire after some period of time, and so whether or not a piece of memorabilia or an image shown thereon is "historic" has no bearing on any rights that Penn State owns in trademarks used on that memorabilia. *See Dastar, 539 U.S. at 33-34* (trademark rights do not have a fixed period of protection after which the rights go to the public).

16.    Like each Team Page, a disclaimer appears under the descriptive header of each Product Page:

## 1929 PENN STATE NITTANY LIONS MEN'S PREMIUM BLEND RING-SPUN T-SHIRT

By Vintage Brand™ not affiliated with or sponsored by Penn State Nittany Lions

*Id*. ¶ 23, Ex. Q.

**Response:** Undisputed that VB Exhibit Q depicts the text "1929 PENN STATE NITTANY LIONS MEN'S PREMIUM BLEND RING-SPUN T-SHIRT". Undisputed that the partial screenshot included in Paragraph 16 accurately shows that the "disclaimer" language stating "By Vintage Brand™ not affiliated with or sponsored by Penn State Nittany Lions" appears below the product title, in font that is much smaller in size and much lighter in color.

Disputed to the extent that Vintage Brand suggests or implies that customers actually read the "disclaimer" language, that the "disclaimers" dispel confusion, or that the "disclaimers" demonstrates good faith by Vintage Brand. The evidence shows otherwise on all three points. **First**, Meghan Maffey testified that she has been on the VB Website and the VB Penn State Store multiple times, and that she does not recall seeing any language on the website speaking to whether Vintage Brand has an affiliation or relationship with Penn State or seeing any of sort of disclaimer or legalese. *See, e.g., Maffey Dep. (PSU Ex. 37,* [Dkt. 123-40](#)*) at 54:25-55:10.* **Second**, although Vintage Brand's expert Tülin Erdem designed her consumer survey to test for the effect of disclaimers on customer confusion on the VB Website, her results showed high confusion rates across all survey conditions

45

and demonstrated that Vintage Brand's disclaimers do not have appreciable impact on consumer confusion. *See Rebuttal Expert Report of David Franklyn (PSU Ex. 56, Dkt. 123-59) at 32; see also Erdem Report (PSU Ex. 42, Dkt. 123-45) at 31-45 (Erdem's written report showing that she expressed no opinions indicating that the presence or absence of disclaimer language affected consumer confusion rates).* Third, testimony from Defendants' own employee who is responsible for User Interface on the VB Website shows that Vintage Brand purposely designs its website to hide and conceal "disclaimer" language, and to prevent consumers from actually focusing on it. *See DeLong Dep. (PSU Ex. 40, Dkt. 123-43) at 13:23-16:2 (DeLong testimony that Vintage Brand only makes 2 lines of the "disclaimer" at the top of the Vintage Brand website visible because "it's just that you want to hide some of it so it doesn't take up a lot of the priority"), 20:9-21:12 (DeLong testimony that the "disclaimer" language that appears near the bottom of the page on the VB Website similarly has only one and a half lines visible unless a customer actually scrolls).* Mr. DeLong was clear that Vintage Brand seeks to "hide" the "disclaimer" language and considers this to be "best practice". *Id. at 21:7-12 (DeLong testimony regarding the viewability of the "disclaimer" language on the VB Website: "I would say it's kind of like best practice. If you go to a lot of other e-commerce shops, they always have just paragraphs of legal stuff at the bottom, so ... and they usually hide at least half of it or something.").*

17.     And the space below the description of the product contains yet another disclaimer:

> …. Vintage Brand® and its products are not affiliated with, licensed, sponsored, or endorsed by any college, university, professional team, league, event, or licensing entity. All designs are derived from actual historic works of art existing in the public domain.

*Id*. ¶ 24, Ex. Q.

**Response:** Undisputed that VB Ex. Q depicts in small font the text quoted in this Paragraph. Disputed to the extent that Vintage Brand suggests or implies that customers actually read the "disclaimer" language, that the "disclaimers" dispel confusion, or that the "disclaimers" demonstrates good faith on Vintage Brand's part. The evidence shows otherwise on all three points. **First**, Meghan Maffey testified that she has been on the Vintage Brand Website and the VB Penn State Store multiple times, and that she does not recall seeing any language on the website speaking to whether Vintage Brand has an affiliation or relationship with Penn State, or seeing any of sort of disclaimer or legalese. *See, e.g., Maffey Dep. (PSU Ex. 37, Dkt. 123-40) at 54:25-55:10.* **Second**, although Vintage Brand's expert Tülin Erdem designed her consumer survey to test for the effect of disclaimers on customer confusion on the VB Website, her results showed high confusion rates across all survey conditions and demonstrated that Vintage Brand's disclaimers do not have appreciable impact on consumer confusion. *See Rebuttal Expert Report of David Franklyn (PSU Ex. 56, Dkt. 123-59) at 32; see also Erdem Report (PSU Ex. 42, Dkt.*

*123-45*) at *31-45* (*Erdem's written report showing that she expressed no opinions indicating that the presence or absence of disclaimer language affected consumer confusion rates*). Third, testimony from Defendants' own employee who is responsible for User Interface on the VB Website shows that Vintage Brand purposely designs its website to hide and conceal "disclaimer" language, and to prevent consumers from actually focusing on it. *See DeLong Dep. (PSU Ex. 40, Dkt. 123-43) at 13:23-16:2 (DeLong testimony that Vintage Brand only makes 2 lines of the "disclaimer" at the top of the Vintage Brand website visible because "it's just that you want to hide some of it so it doesn't take up a lot of the priority"), 20:9-21:12 (DeLong testimony that the "disclaimer" language that appears near the bottom of the page on the Vintage Brand Website similarly has only one and a half lines visible unless a customer actually scrolls).* Mr. DeLong was clear that Vintage Brand seeks to "hide" the "disclaimer" language and considers this to be "best practice". *Id. at 21:7-12 (DeLong testimony regarding the viewability of the "disclaimer" language on Vintage Brand's website: "I would say it's kind of like best practice. If you go to a lot of other e-commerce shops, they always have just paragraphs of legal stuff at the bottom, so … and they usually hide at least half of it or something.").*

18. Digital mockups of other blank goods with the same historic image appear beneath the digital mockup that is the subject of the Product Page. *Id.* ¶ 25. Vintage Brand's website operates in this manner because a customer's selection of a particular digital mockup indicates that customer's interest in the historic image

itself, such that the customer might also be interested in purchasing other tangible products bearing the same image. *Id*. For example, below are digital mockups appearing on the Product Page for the shirt shown *supra*, at Paragraph 15:



*Id*. ¶ 25, Ex. Q.

**Response:**  Undisputed that the partial screenshot included in Paragraph 18 shows that Vintage Brand offers for sale several products containing the images using the University Marks, and that many of the product pages contain links to additional pieces of merchandise.

Disputed that "digital mockups of other blank goods … appear" on the Vintage Brand Website.  The evidence shows that the VB Website appears to offer actual products, with no indication that pictured products are "digital mockups" or that the products have not actually been created.  *See Vintage Brand Dep. (PSU Ex. 30,* [Dkt. 123-33](#)*) at 116:2-4 (testifying that the "website shows the images actually on products"); PSU Exs. 31, 32,33 (*[Dkt. 123-34](#)*,* [123-35](#)*,* [123-36](#)*) (screenshots of VB Penn State Store and VB Website taken in 2021 and 2022, which all show Penn State merchandise for sale); Young Dep. (PSU Ex. 34) (*[Dkt. 123-37](#)*) at 117:10-19;*

*Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 133:20-134:7, 155:16-159:9; VB*

*Ex. L (Dkt. 116-14) at 2 (product page for a Penn State t-shirt submitted by Vintage*

*Brand showing the shirt with a Penn State-related image on the front of the shirt,*

*and including multiple views of the shirt—such as front and back—giving the*

*impression of what the physical item looks like); C. Hartvigson Decl. (Dkt. 116-2)*

*at 16-17, ¶ 18 (images of Vintage Brand's home page, showing people wearing*

*actual Vintage Brand merchandise).*

Disputed that the images appearing on product pages are "historic". The dates

on many pieces of the memorabilia show that they come from the 1970's or 1980's,

and many pieces show the trademark that Penn State currently uses as its primary

athletics logo. *See PSU Ex. 38 (Dkt. 123-41) at 6-24, 37-49, 52-68, 77, 83 (Penn*

*State-related memorabilia produced for inspection by Vintage Brand that contain*

*on their faces dates from the 1970s and 1980s); id. at 54-55, 57-59, 61, 65, 68, 71,*

*72, 78 (Penn State-related memorabilia produced for inspection by Vintage Brand*

*that contain images of the Lionhead Logo); see also DSMF ¶ 32 (statement that the*

*Lionhead Logo is the mark that Penn State currently uses as its primary Athletics*

*logo, which Penn State admits in its response, infra).* The inferences that Vintage

Brand relies on to support the assertion that the memorabilia and/or images at issue

are "historic" is particularly improper given that Vintage Brand makes arguments

about copyright-related principles—such as the public domain—to assert that Penn

State does not have a legal right to prevent third parties from using images obtained from these pieces of "memorabilia" but has no evidence to support characterizing the images as historic. *See, e.g.,* Dkt. 115 at 24 *(arguing in its motion for summary judgment brief that Penn State may not "restrain Vintage Brand's use of historic public domain images").*

Disputed that the age of the memorabilia or whether it is "historic" has any relevance to Vintage Brand's motion given that trademark rights do not expire after some period of time, and so whether or not a piece of memorabilia or an image shown thereon is "historic" does not determine whether or not Penn State owns valid and enforceable trademark rights. *Dastar*, 539 U.S. at 33-34 (trademark rights do not have a fixed period of protection after which the rights go to the public).

19. Once an order is placed, the selected image is applied to the blank tangible product. *Id.* ¶ 26. The products are shipped in packaging bearing the Vintage Brand trademark, and many (but not all) products are labeled directly with the Vintage Brand trademark. *Id.* Below are examples of the product and packaging labelling:

 

  

*Id.* ¶ 26, Exs. R–V.

      **Response:**  Undisputed that Vintage Brand prints and ships products that are ordered by consumers.  Undisputed that not all Vintage Brand products are labeled with the Vintage Brand trademark.  Disputed to the extent this statement suggests or implies that the presence of a Vintage Brand trademark makes customer confusion here less likely.  As set forth in Penn State's claims, Penn State sells genuine merchandise bearing the University Marks through licensees, who similarly use their own branding, as shown in the example below of a genuine Penn State t-shirt sold by Lion's Pride, with a close-up of the hang-tag showing branding for Lion's Pride:

 

*See PSU Ex. 8 (Dkt. 123-11) at 31; Petulla Decl. (PSU Ex. 1, Dkt. 123-1) ¶ 17 (Lion's Pride sells genuine Penn State merchandise).*

### 4.    Vintage Brand's "Penn State Nittany Lions Vintage Designs"

      20.    From 2018 to 2021, Vintage Brand's website included a Team Page entitled "Penn State Nittany Lions Vintage Designs," on which it made available roughly 35 University-related historic images. *Id.* ¶ 27, Ex. M; *see also id.* ¶ 29, Ex. W. Vintage Brand has disabled that Team Page during the pendency of this lawsuit.

*Id.* ¶ 28. Additionally, prior to the initiation of the lawsuit, in April 2021, certain images that had previously appeared on the Vintage Brand website were permanently removed following receipt of a cease-and-desist letter from the University's counsel. *Id.* ¶ 30.

**Response:** Undisputed that beginning in 2018, the VB Penn State Store was active on the VB Website, and sold merchandise bearing the University Marks. Undisputed that the evidence shows that Vintage Brand was offering and selling merchandise with the Pozniak Lion Logo prior to around April 2021, and that those products were later removed from the VB Penn State Store.

Disputed that the Penn State Nittany Lions Vintage Designs page is not currently available. Multiple witnesses have testified to having accessed the VB Penn State Store while this lawsuit has been pending, including Vintage Brand's own expert. Further, the VB Penn State Store remains accessible to this day. *See PSU Ex. 61 (screenshots of pages of the VB Penn State Store captured on June 21, 2023 showing that some of the VB Penn State Merchandise remains available for sale through the Vintage Brand website).* Disputed that Vintage Brand has permanently removed from its website any merchandise bearing Penn State indicia. Chad Hartvigson testified that he was unaware of any merchandise bearing Penn State indicia that Vintage Brand has permanently discontinued. *See Ex. 58 (Vintage Brand Dep.) at 170:4-19 (testimony asserting that Vintage Brand had disabled the links to all VB Penn State Merchandise but making clear that Vintage Brand may sell that merchandise again in the future).*

21.    The gross revenue from items bearing University-related designs was less than $25,000. *Id*. ¶ 31.

**Response:** Undisputed.

22.    Some images related to the University that appeared on the Vintage Brand website were derived from scanned game tickets or the like. *Id*. ¶ 32, Ex. X. These do not seem to be the thrust of the University's infringement and counterfeiting allegations. *See* Doc. 67 ¶¶ 75, 76, 79, 86; Ex. 102 (Interrogatory No. 7). Examples of images understood to be more genuinely at issue are shown on the purportedly infringing product mockups previously appearing on the University-related Team Page:

| Mockup Products |
|:---:|
|  |
| 1950 Penn State Nittany Lions Men's Retro Heather T-Shirt Ex. J |
| 1950 Penn State Nittany Lions Mug Ex. K |



1975 Nittany Lions Men's Tri-Blend T-Shirt Ex. L



1950 Penn State Nittany Lions Cutting Board Ex. O



1967 Penn State Nittany Lions Hat Ex. W



1972 Penn State Nittany Lions Hat Ex. W



1979 Penn State vs. Army Poster Ex. W



1950 Penn State Nittany Lions Men's Tri-Blend Varsity T-Shirt
Ex. W



1929 Penn State Nittany Lions Aluminum Wall Art Ex. W



1953 Penn State Nittany Lions Men's T-Shirt
Ex. W



1983 Penn State Nittany Lions Men's Cotton Jersey Hooded
Long Sleeve T-Shirt
Ex. W



1978 Penn State Nittany Lions Poster
Ex. W



1978 Penn State Nittany Lions Women's T-Shirt Ex. W



1958 Penn State Nittany Lions Pennant Ex. W

**Response:** Undisputed that the items listed in Paragraph 22 are some of the pieces of VB Penn State Merchandise that are at issue in this case. Disputed to the extent that Paragraph 22 suggests or implies that Penn State is not asserting or pursuing claims against all infringing uses of the University Marks at issue, including from Vintage Brand's use of those Marks and references to Penn State on merchandise and on the Vintage Brand Website. The characterizations made by Vintage Brand purporting to summarize or construe Penn State's legal theories are not proper statements of fact and are not relevant to Defendants' motion for summary judgment. *See LR 56.1; FRCP 56(c).*

23. And examples of the University's asserted marks (left column) compared to Vintage Brand's historic images (right column) are included below.

| Asserted Marks | Vintage Brand's Historic Images |
|---|---|
| PENN STATE<br><br>(*infra*, Paragraphs 35–42) | Exs. H, I and X |

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY<br><br>(*infra*, Paragraphs 43–48) | <br>Ex. G |
| <br>(infra, Paragraphs 49–53) | <br>Ex. X |
| <br>(infra, Paragraphs 54–55) | <br>Ex. G |
| <br>(infra, Paragraphs 56–68) | <br>Exs. W |
| <br>(infra, Paragraphs 69–75) | <br>Exs. G-H |

**Response:** Undisputed that the chart contains a non-exhaustive list of University Marks and corresponding images that have been used on VB Penn State Merchandise. Disputed that the right-hand column shows "historic images". Mr. Hartvigson testified that the only basis for Vintage Brand's purported knowledge about the date the memorabilia was sold or produced was that many pieces "are dated", such as sports tickets and sports programs. *See Ex. 58 (Vintage Brand Dep.) at 106:4-25.* The dates on many pieces of the memorabilia show that they come from the 1970's or 1980's, and many pieces show the trademark that Penn State currently uses as it primary athletics logo. *See PSU Ex. 38 (Dkt. 123-41) at 6-24, 37-49, 52-68, 77, 83 (Penn State-related memorabilia produced for inspection by Vintage Brand that contain on their faces dates from the 1970s and 1980s); id. at 54-55, 57-59, 61, 65, 68, 71, 72, 78 (Vintage Brand's Penn State memorabilia containing images of the Lionhead Logo currently used by Penn State as its primary trademark for the Athletics program); see also DSMF ¶ 32 (Lionhead Logo is the mark that Penn State currently uses as its primary Athletics logo).* Disputed that the age of the memorabilia or whether it is "historic" has any relevance to Vintage Brand's motion given that trademark rights do not expire after some period of time, and so whether or not a piece of memorabilia or an image shown thereon is "historic" does not determine whether or not Penn State owns valid and enforceable trademark

rights.  *Dastar*, 539 U.S. 23 at 33-34 (trademark rights do not have a fixed period of protection after which the rights go to the public).

## B.   THE UNIVERSITY

### 5.   The University's Branding

24.    The University is primarily an educational institution; it "provides educational services, research, outreach, development and other related scholarly pursuits …." Doc. 67 ¶ 17; *see also id* ¶¶ 5, 15, 18.

**Response:**  Undisputed.

25.    In 2018, the University engaged in a rebranding effort with goals directly related to furthering the perception and brand of the University as an educational institution:

— **Support** the University's reputation for academic, research and service excellence

— **Nurture** pride and attachment to the University

— **Build** understanding and support for the University's needs and priorities

— **Grow** the value of a Penn State degree

Ex. 7 at 4647 (emphasis in original); *see also* 30(b)(6) Dep. at 21:13–22:16, 25:10–27:6.

**Response:**  To the extent Paragraph 25 quotes from the cited document, the document speaks for itself.  Disputed that Penn State engaged in a "rebranding" in 2018, and this statement is not supported by the evidence cited which shows simply that Penn State engaged in efforts to strengthen its brand framework (not "rebrand"). *See VB Ex. 7 (Dkt. 116-34) at 2 (cited document, titled "Penn State Brand Framework 2018" and not discussing any rebranding).*  The only "rebranding"

referenced here concerns Penn State's decision to make the Lion Shield Logo its primary academics logo around this time. *See PSU Dep. (VB Ex. 1, Dkt. 116-28) at 22:3-23:11*. The Lion Shield Logo replaced a separate Logo that Penn State had been previously using, shown below:



*PSU Ex. 21 (Dkt. 123-26) at 3 (showing 1855 Shield Logo)*. To the extent that Paragraph 25 purports to suggest or imply that Penn State abandoned or stopped using any of the University Marks in 2018, the record shows that Penn continued selling merchandise bearing the University Marks. *See, e.g., PSU Ex. 48 (Dkt. 123-51) at 2-129 (screenshots of genuine Penn State merchandise sold by Penn State licensees, including 19nine, '47 brand, Nike, Hillflint, and Homefield, bearing the University Marks); PSU Ex. 47 (Dkt. 123-50) at 2-30 (listing of Penn State licensees, showing that merchandise in PSU Ex. 48 is genuine)*.

Disputed that Penn State's branding efforts relating to a separate trademark have any bearing on Penn State's rights in the University Marks at issue in this case and which are relevant to Vintage Brand's motion. Penn State has been using the University Marks since before Vintage Brand was formed, owns incontestable federal registrations for most of these Marks, and Penn State owns superior rights in

all of the Marks in connection with the types of merchandise at issue here. *See, generally, e.g. PSU Exs. 4, 6, 9, 11, 17 (Dkts.* [123-7](#), [123-9](#), [123-12](#), [123-14](#), [123-20](#)) *(registration certificates for each of the Registered Marks); PSU Exs. 3, 5, 8, 13, 14, 16 (Dkts.* [123-6](#), [123-8](#), [123-11](#), [123-16](#), [123-17](#), [123-19](#)) *(showing genuine use of the University Marks in connection with the types of merchandise Vintage Brand sells); Petulla Decl. (PSU Ex. 1,* [Dkt. 123-1](#)), [¶¶ 7-8](#) *(Penn State has been selling merchandise using the University Marks continuously going back at least as early as 2017); Vintage Brand Dep. (PSU Ex. 30,* [Dkt. 123-33](#)) *at 161:4-11 (VB Website first launched in 2018).* Statements of fact concerning other trademarks owned and developed by Penn State do not impact the validity of Penn State's rights in the University Marks. *See, e.g.*, [Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 713-14 (3d Cir. 2004)](#) (evidence related to plaintiff's statements and actions about different trademarks that were not at issue in the instant case was irrelevant to infringement issue at hand*); *[Avco Corp. v. Turn & Bank Holdings, LLC, No. 4:12-CV-01313, 2022 WL 3970830, at *10 (M.D. Pa. Aug. 31, 2022) (Brann, C.J.)](#) (excluding from trial evidence about trademark applications and registrations not at issue, noting "[a]n individual analysis is necessary for each alleged trademark", and that evidence about other trademarks is irrelevant to the highly fact dependent issue).

26.    The 2018 Brand Framework goes on to premise the re-branding on aspirations related not to the University as the source or sponsor of consumer merchandise, but on goals related to the University as an educational institution:

Communications that advance these various objectives will help to drive recognition and support, attract outstanding faculty, staff and students, and improve our already strong reputation for research and educational excellence.

Ex. 7 at 4647; *see also* 30(b)(6) Dep. at 27:7–28:4. Indeed, the University conducted survey research during the re-branding process and concluded that, "[a]s expected, quality of education, sense of pride and community, and football were top of mind for respondents." Ex. 7 at 4649.

**Response:**  To the extent this Paragraph purports to quote from VB Ex. 7 (Dkt. 116-34), that document speaks for itself.  Otherwise, disputed.

Specifically, Penn State disputes that it engaged in a "rebranding" in 2018 related to the document set out at VB Exhibit 7.  That document clearly discusses developing a branding framework, not rebranding.  *See VB Ex. 7 (Dkt. 116-34) at 2 (cited document, titled "Penn State Brand Framework 2018" and not mentioning a "rebrand").*  The only rebranding that is described in the cited documents is a change to the trademark Penn State uses as its primary logo for educational services.  *See PSU Dep. (VB Ex. 1, Dkt. 116-28) at 22:3-23:11 (discussing change to implement updated logo to be primary trademark used for educational services).*  Paragraph 26 refer to a broader "rebranding", and the evidence cited does not support that assertion.  *See LR 56.1; FRCP 56(c).*

Disputed that the brand framework referenced in Paragraph 26 is premised on "aspirations related not to the University as the source or sponsor of consumer merchandise".  This assertion is unsupported because Vintage Brand uses this phrase

to characterize a "rebranding" which (as explained above) is not supported. Further disputed to the extent that this Paragraph purports to convey or imply that Penn State's branding efforts did not relate to the University as a source or sponsor of consumer merchandise. As Mr. McGrath testified, University Marks that are used with respect to Penn State educational services are also used on licensed merchandise. *See, e.g., PSU Ex. 65 (Penn State Dep.) at 46:5-9*. Indeed, as Vintage Brand asserts in this Paragraph, survey research revealed that respondents consider the University Marks to represent more than just an educational institution. *See, e.g., VB Ex. 7 (Dkt. 116-34) at 4*.

Disputed to the extent that this Paragraph is not relevant to the issues to be decided on Vintage Brand's motion. The evidence shows that Penn State has been using the University Marks since before Vintage Brand was formed, owns incontestable federal registrations for most of these Marks, and that Penn State owns superior rights in all of the Marks in connection with the types of merchandise at issue here. *See, generally, e.g. PSU Exs. 4, 6, 9, 11, 17 (Dkts. 123-7, 123-9, 123-12, 123-14, 123-20) (registration certificates for each of the Registered Marks); PSU Exs. 3, 5, 8, 13, 14, 16 (Dkts. 123-6, 123-8, 123-11, 123-16, 123-17, 123-19) (showing genuine use of the University Marks in connection with the types of merchandise Vintage Brand sells); Petulla Decl. (PSU Ex. 1, Dkt. 123-1), ¶¶ 7-8 (Penn State has been selling merchandise using the University Marks continuously*

*going back at least as early as 2017); Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 161:4-11 (Vintage Brand Website first launched in 2018).* Statements of fact concerning other trademarks owned and developed by Penn State do not impact the validity of Penn State's rights in the University Marks. *See, e.g.*, *Kos*, 369 F.3d at 713-14 (evidence related trademarks that were not at issue in the instant case was irrelevant to infringement issue at hand); *Avco*, 2022 WL 3970830, at *10 (evidence about trademarks not at issue is not relevant).

27. One of the University's three brand pillars is the "Culture of We," which is a "central part" of the University's branding. 30(b)(6) Dep. at 41:9–42:2; *see also* Ex. 8 at 5724. This is further described in the University's current "Brand Book," which is the product of the 2018 re-branding:

> There is something special at Penn State that converts the "I" to the "we" and puts us all on a path together—students, faculty, staff and alumni—to create meaningful impact in Pennsylvania and beyond. It's important that we recognize individuality but shows that we are stronger and better together. It's what unites all of us and connects Penn Staters anywhere in the world. We're not just a university, we're a community driven to make a difference.

Ex. 8 at 5723; see also 30(b)(6) Dep. at 39:8–9, 40:14–41:8.

**Response:** Undisputed, except to the extent that this Paragraph refers to the "2018 re-branding" because the evidence shows that the evidence cited at VB Exhibit 8 refers to Penn State developing a branding framework, not rebranding. *See generally VB Ex. 8 (Dkt. 116-35) at 2; PSU Dep. (VB Ex. 1, Dkt. 116-28) at 22:3-23:11 (discussing the only "rebranding" that Penn State described and which involves a separate logo that is not one of the trademarks at issue in this case).*

28.    Consistent with the University's brand "Culture of We," the University developed the tagline "We Are Penn State" which is meant to "evoke[] a shared experience of family, community, and intense pride that extends beyond athletics." Ex. 7 at 4653; *see also* 30(b)(6) Dep. at 31:21–33:12.

**Response:**  Undisputed that the cited document states that Penn State's tagline "We Are Penn State"  is meant to "evoke[] a shared experience of family, community, and intense pride that extends beyond athletics."  Disputed that Penn State developed the "We Are Penn State" in 2018, as this phrase has been used in connection with Penn State for decades.  *See PSU Ex. 66  at 2 (article titled "We Are Penn State" – What Does it Mean?, available at: https://www.worldcampus.psu.edu/about-us/news-and-features/we-are-penn-state-what-does-it-mean#:~:text=The%20phrase%20is%20iconic%20for,by%20Lou%20Prato%20in%202011).*

29.    The University concedes that merchandise bearing its logos and designs allow individuals to express their affinity or affiliation of the University by engaging in the "Culture of We":

> Q: Would you agree with me that one of the ways that one could shout, "We are Penn State" is by wearing apparel that references Penn State's logos and designs?
> A: Yes.

30(b)(6) Dep. at 44:8–12.

> Q: … [O]ne of the ways that someone can express affinity or affiliation with Penn State is by wearing clothing decorated with Penn State's logos. Could you agree with that?
>     [objection]
> A: Yes.

Q: Also people's decisions in terms of what apparel they buy or put on their bodies, would you say that the aesthetic look and feel of the designs, that that's an important factor in terms of what someone wears on their body?
    [objection]
A: Yes.

*Id*. at 91:10–92:3.

**Response:**  To the extent this Paragraph quotes from Penn State's 30(b)(6) deposition testimony, the testimony speaks for itself.  Disputed that the when the University Marks appear on merchandise, their only function is to allow individuals to express affinity for or association with Penn State.  The evidence cited here does not support that assertion, as Tom McGrath's transcript shows that he responded to questions by Vintage Brand's counsel that called for speculation and that did not even purport to ask about the full scope of functions that the University Marks might serve.  As shown in the deposition excerpts that are cited in Paragraph 29, the questions at issue ask (over the objection of counsel) for Mr. McGrath to speculate about the reasons or intent that individuals might have for wearing Penn State t-shirts.  *VB Ex. 1 (Dkt. 116-28) at 44:8-12, 90:10-92:3.*  And setting aside the speculative testimony called for in these questions, the testimony does not indicate that every person (or even most people) who wear Penn State apparel are doing so to "shout" or express some message.  *Id.*

Disputed because this Paragraph is not relevant to the issues raised in Vintage Brand's motion.  Vintage Brand uses this Paragraph to support the Defendants'

arguments that the University Marks are aesthetically functional and therefore not protectible. *See Dkt. 115 at* [38-39](#) *(Vintage Brand's brief in support of summary judgment motion, arguing that aesthetic functionality and citing to this Paragraph).* As a matter of law, whether a hypothetical customer might want to express affiliation with or affiliation with Penn State does not determine whether the University Marks are functioning as trademarks (rather than serving an aesthetically functional purpose). Trademarks can play multiple functions at once—acting as source indicators and serving expressive purposes. *[Jack Daniel's Properties, Inc. v. VIP Products LLC](#)*, 599 U.S. __, 2023 WL 3872519, *3 (2023) ("Trademarks can of course do other things: catch a consumer's eye, appeal to his fancies, and convey every manner of message."). Because something can be a trademark and can also express a message, this Paragraph is not relevant to the analysis. *[Id.](#)* Further, this Paragraph is not material to the motion at hand to the extent that Vintage Brand argues that likelihood of confusion analysis is not appropriate here under Defendants' aesthetic functionality theory. Here again, the relevant issue is not whether any purportedly expressive message is implicated; the relevant issue is whether there is a likelihood of confusion. *[Id.](#) at *6* (where allegedly infringing marks were on non-competing products and were used to send message (in that case, parody), Supreme Court held: "[T]he infringement claim ... rises or falls on

likelihood of confusion" and this analysis takes into account any purportedly expressive message intended by the defendant).

**6.** The University's Claimed Trademarks

*(a)* ***The University's Primary Logos – The Lion Shield Design and the Lionhead Design***

30.    As is typical for most institutions of higher education, the University has two primary logos: one for educational services and the other for athletics. 30(b)(6) Dep. at 45:8–15.

**<u>Response</u>:**    Undisputed that Penn State owns trademarks that it uses as its primary logos in connection with educational and athletics services.

Disputed as to "primary".  The evidence cited does not support the assertion here, that there are two logos that Penn State has designated as or treats as the "primary" logos for the University.  *See VB Ex. 1 (Dkt. 116-28) at 45:8-15 (responding to a question about why Penn State has a trademark used for educational services separate from the logo it uses for athletics, and testimony saying that this is typical, and also noting additional marks that universities commonly designate such as a mascot).*  The evidence shows that Penn State has separate logos that it primarily uses for its educational services versus for its athletic services.  *See id. at 44:20-45:7, 46:20-47:10 (discussing the Lion Shield Logo and the Lionhead Logo that Penn State uses separately with the former used for educational services and the latter for athletics).*  The fact that Penn State uses one logo primarily with educational services and a different logo primarily with athletics

70

does not mean that these are the "primary" logos for the University, or that Penn State does not own valid and enforceable rights in its other trademarks. The evidence shows that Penn State has been using the University Marks since before Vintage Brand was formed, owns incontestable federal registrations for most of these Marks, and that Penn State owns superior rights in all of the Marks in connection with the types of merchandise at issue here. *See, e.g. PSU Exs. 4, 6, 9, 11, 17 (Dkts. [123-7](), [123-9](), [123-12](), [123-14](), [123-20]()) (registration certificates for each of the Registered Marks); PSU Exs. 3, 5, 8, 13, 14, 16 (Dkts. [123-6](), [123-8](), [123-11](), [123-16](), [123-17](), [123-19]()) (showing genuine use of the University Marks in connection with the types of merchandise Vintage Brand sells); Petulla Decl. (PSU Ex. 1, [Dkt. 123-1]()), [¶¶ 7-8]() (Penn State has been selling merchandise using the University Marks continuously going back at least as early as 2017); Vintage Brand Dep. (PSU Ex. 30, [Dkt. 123-33]()) at 161:4-11 (Vintage Brand Website first launched in 2018).*

31.    During the 2018 rebranding, the University developed and adopted a new primary logo for educational services, known as the "Lion Shield Design," shown below:



30(b)(6) Dep. at 22:11–16, 44:20–45:3; Ex. 8 at 5755.

**Response:** Undisputed that Penn State adopted the logo shown in Paragraph 31 as its primary logo for educational services.

Disputed that this logo (the "**Lion Shield Logo**") was first adopted in 2018.

Art sheets produced by Penn State show the University had developed this mark and

was using it as of at least as early as 2016. *See PSU Ex. 21 (Dkt. 123-24) at 4 (art*

*sheet dated August 21, 2016 showing the Lion Shield Logo listed as one of the*

*trademarks that was being licensed through CLC).*

32.     The University's primary athletic logo, known as the "Lionhead Design," is shown below:



(30)(b)(6) Dep. at 46:20–47:10; Ex. 8 at 5756, 5791. The Lionhead Design was the University's primary athletic logo before the 2018 re-branding. *See* (30)(b)(6) Dep. at 23:12–17 (explaining that marks used with respect to athletics were "not part of the [rebranding] objective"). The University intends the Lionhead Design to be used "to represent Penn State Intercollegiate athletic activities … not … the University's academic areas or non-athletic communications and may not be used as a replacement for the [Lion Shield Design]." Ex. 8 at 5791; (30)(b)(6) Dep. at 50:4–51:2.

**Response:**  Undisputed that the Lionhead Logo shown in Paragraph 32 is

Penn State's primary logo for its athletics program, and that Penn State has used that

Logo since before 2018.  To the extent Paragraph 32 quotes exhibits, those

documents speak for themselves. Disputed that Penn State engaged in rebranding in

2018, as the cited evidence does not support that proposition.

33.     Because Vintage Brand limits its offerings to historic images, it has never made the University's current logos for educational services or athletics (the Lion Shield Design and Lionhead Design, respectively) available on the Vintage Brand website. Hartvigson Decl. ¶ 34; *see also id*. ¶ 15.

**Response:**   Undisputed that the screenshots that have been captured and produced in this case do not show the Lion Shield or the Lionhead Logo being used on the Vintage Brand Website.

Disputed to the extent that this Paragraph asserts that "Vintage Brand limits its offerings to … images" and suggests or implies that Vintage Brand is selling consumers images rather than products.  Vintage Brand sells merchandise.  *See Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 116:2-4 (testifying that the "website shows the images actually on products").  See also PSU Exs. 31, 32, 33 (Dkt. 123-34, 123-35, 123-36) (screenshots of Vintage Brand website taken in 2021 and 2022, which all show Penn State merchandise for sale); Young Dep. (PSU Ex. 34) (Dkt. 123-37) at 117:10-19; Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 133:20-134:7, 155:16-159:9; VB Ex. L (Dkt. 116-14) at 2; C.  Hartvigson Decl. (Dkt. 116-2) at 16-17, ¶ 18*.

Disputed that "Vintage Brand limits its offerings to historic images" or that the images appearing on the merchandise sold on the VB Penn State Store use "historic images".  Mr. Hartvigson testified that the only basis for Vintage Brand's purported knowledge about the date the memorabilia was sold or produced was that many pieces "are dated", such as sports tickets and sports programs.  *See Ex. 58 (Vintage Brand Dep.) at 106:4-25.*   The dates on many pieces of the memorabilia show that they come from the 1970's or 1980's, and many pieces show the Lionhead

Logo.  *See PSU Ex. 38 (Dkt. 123-41) at 6-24, 37-49, 52-68, 77, 83 (Penn State-related memorabilia produced for inspection by Vintage Brand that contain on their faces dates from the 1970s and 1980s); id. at 54-55, 57-59, 61, 65, 68, 71, 72, 78 (Penn State-related memorabilia produced for inspection by Vintage Brand containing the Lionhead Logo).*  Disputed that the age of the memorabilia or whether it is "historic" has any relevance to Vintage Brand's motion given that trademark rights do not expire after some period of time, and so whether or not a piece of memorabilia or an image shown thereon is "historic" does not determine whether or not Penn State owns valid and enforceable trademark rights therein.  *Dastar, 539 U.S. at 33-34 (trademark rights do not have fixed period of protection).*

34.    The University does not contend Vintage Brand infringed the Lion Shied Design. *See generally* Doc. 67. However, the University complains that Vintage Brand infringed the Lionhead Design. Doc. 67 ¶¶ 33, 49, 80. The University does so despite admitting that it had no evidence that Vintage Brand ever displayed the Lionhead Design on its website or affixed it to any product. Ex. 103 (Request for Admission No. 8). The University more recently conceded that the Lionhead Design is not relevant to this lawsuit. Ex. 102 (Interrogatory Nos. 2, 5, 7, 20).

**Response:**  Undisputed that Penn State does not contend that Vintage Brand infringes the Lion Shield Design and that Penn State has not alleged infringement of the Lionhead Logo.  Paragraph 34 is therefore not relevant to the outcome of Vintage Brand's Motion for Summary Judgment and should be disregarded as, on its face, it addresses contentions that are not at issue in this dispute.  *FRE 401*; *FRCP 56(c)*.  Further, to the extent that Vintage Brand suggests or implies that Penn State included

allegations in its pleadings that are not supported, any such allegations are baseless given that the evidence shows that Vintage Brand has modified the contents of its website to add and remove different Penn State-related products. *See, e.g., PSU Ex. 31 (Dkt. 123-34) at 17 (screenshots of Vintage Brand Website showing merchandise for sale bearing Pozniak Lion Logo); Sportswear Dep. (Vol. 2) (PSU Ex. 36, Dkt. 123-39) at 11:20-14:15 (Defendants removed VB Penn State Merchandise bearing the Pozniak Lion Logo after receiving cease and desist letter from Penn State).* In addition, Vintage Brand derives the images it uses on the VB Penn State Merchandise from pieces of genuine Penn State memorabilia (*DSMF ¶¶ 5, 7, supra*), and Vintage Brand has shown that the Penn State-related memorabilia in its collection includes multiple items bearing the Lionhead Logo. *PSU Ex. 38 (Dkt. 123-41) at 54-55, 57-59, 61, 65, 68, 71, 72, 78.*

### (b) The PENN STATE Text

35.    The University asserts its purported trademark rights in the text PENN STATE, which is the subject of Registration Nos. 1,308,610 (the "'610 Registration") and 5,766,698 (the "'698 Registration"). Doc. 67 ¶¶ 21, 23, 28, 30, 31; Ex. 102 (Interrogatory Nos. 2, 5).

**Response:**  Undisputed that Penn State asserts trademark rights in the text PENN STATE, which is the subject of Registration Nos. 1,308,610 (the "'610 Registration") and 5,766,698 (the "'698 Registration").  Disputed to the extent that the word "purported" implies or suggests that Penn State does not own valid trademark rights in the PENN STATE Mark. *PSU Ex. 4 (Dkt. 123-7) at 2-17*

*(registration certificates for U.S. Reg. Nos. 1308610 and 5766698, along with Trademark Status Reports showing that these registrations remain valid for the listed goods and services); Second Amended Compl. (Dkt. 67), ¶ 25 & Answer (Dkt. 72), ¶ 25 (admitting that Penn State owns the above registrations).*

36.     The '610 Registration was issued in 1984 and covers various goods as well as educational and research services. Exs. 9–10. The specimens of use submitted in support of the University's application to register the mark for the various goods identified in the '610 Registration, including the below, show use of the PENN STATE text as the decorative element of merchandise:



Ex. 9 at 10972, 11012.

**Response:**   Undisputed that the '610 Registration was issued in 1984 and covers various goods as well as educational and research services. Undisputed that the specimens of use submitted in support of the University's application to register the mark for the various goods identified in the '610 Registration, including the below, show use of the PENN STATE text. Disputed that the specimens show the PENN STATE Mark as a "decorative element" because Vintage Brand does not support this characterization with citation to any evidence in the record.   *See LR*

*56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*  VB Exhibit 9 cited by Defendants shows additional specimens with the PENN STATE Mark being used in a variety of ways, appearing in different fonts, styles, and locations on clothing and other merchandise, such as seen below:



*VB Ex. 9 (Dkt. 116-36) at 68, 91, 92.*

37.    Likewise, the specimens of use submitted in support of the 2014 renewal of the '610 Registration also show use of the PENN STATE text as the decorative element of merchandise:



Ex. 9 at 11116, 11118, 11122, 11130.

**Response:**  Undisputed that the specimens of use submitted in support of the 2014 renewal of the '610 Registration also show use of the PENN STATE Mark.

Disputed that the specimens show the PENN STATE Mark used as a "decorative element" because Vintage Brand does not support this characterization by citing to any evidence in the record. *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

Further disputed to the extent Vintage Brand seeks to use this Paragraph to support the inference that the PENN STATE Mark is merely ornamental and not a trademark. Any such argument is barred because this registration is incontestable. *See PSU Ex. 4 (Dkt. 123-7) at* 2-9 *(registration certificate showing designation under Section 15); Lanham Act § 15, 15 U.S.C. § 1065 (provision setting out grant of incontestability for qualifying trademark registrations); 15 U.S.C. § 1115(b);* Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 205 (1985)*.

38.     The '698 Registration was initially refused because the text PENN STATE is primarily geographically descriptive of the claimed goods and services. Ex. 11 at 12193; Ex. 12. In response, the University made a Section 2(f) claim of acquired distinctiveness, thereby conceding that the text PENN STATE is geographically descriptive. Ex. 11 at 12197. The '698 Registration was ultimately issued in 2019 and covers a dizzying number of unrelated goods, ranging from "pet clothing for dogs" to "sour cream." Ex. 12 at 10621–22. The specimens of use submitted in connection with the application that matured into the '698 Registration, including those below, show use of the PENN STATE text as the decorative element of merchandise:



Ex. 11 at 12072, 12076, 12077.

**Response:** Disputed in part. To the extent Vintage Brand attempts to characterize the file history in Vintage Brand Exhibit 11, the file history speaks for itself. Undisputed that the '698 Registration was issued in 2019 and that Penn State made a claim of acquired distinctiveness. Undisputed that the '698 Registration covers a variety of goods and services, including decorative magnets, drinking glasses, cutting boards, fabric flags, hooded sweatshirts, sweatpants, caps being headwear, coasters, and jigsaw puzzles. *See PSU Ex. 4 (Dkt. 123-7) at* 14-16 *(Trademark Status Report for U.S. Reg. 5,766,698, showing the goods and services currently covered by this registration).* Undisputed that Penn State submitted a number of specimens in support of the '698 Registration, including the images depicted above.

Disputed that the PENN STATE Mark is primarily geographically descriptive, or that Penn State "conced[ed]" as such. The only support for this assertion cited in this Paragraph comes from the prosecution history for that registration, and the Trademark Trial and Appeal Board ("TTAB") has previously considered and rejected this argument. *In re: The Pennsylvania State Univ.*, at 13-15 (T.T.A.B. 2021) (finding the term "Penn State" is not geographically descriptive under Lanham Act and finding that Penn State had not conceded geographic descriptiveness in making acquired distinctiveness claims). Vintage Brand has no

other support for its assertion that the PENN STATE Mark is primarily geographically descriptive, and this assertion may not be considered. *See LR 56.1; FRCP 56(c).*

This Paragraph's assertion that the specimens show the PENN STATE Mark as a "decorative element" is disputed because Vintage Brand does not support this assertion with citation to any evidence in the record that supports this characterization. *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

Further disputed to the extent Vintage Brand seeks to use this Paragraph to support the inference that the PENN STATE Mark is merely ornamental and not a trademark. Any such argument is barred because this registration protects the same salient features as the '610 Registration, which is incontestable, and because the '698 Registration itself is valid and enforceable. *See PSU Ex. 4 (Dkt. 123-7) at* 2-9 *(registration certificates showing the '610 Registration and '698 Registration are both valid and enforceable, and showing '610 Registration has incontestable designation under Section 15); 15 U.S.C. § 1115(b);* Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1264 (S.D. Cal. 2018)* (contestable registration protecting the same "salient feature" of an incontestable registration cannot be attacked on a defense unavailable for the incontestable registration).

39. Documents produced by the University show merchandise bearing the PENN STATE text as decoration, in contexts that suggest the PENN STATE text is

not being used in a source-indicating manner for the goods themselves but, rather, to allow consumers to express affinity for or affiliation with the University or its sports teams (*e.g.*, the hockey team) or educational programs (*e.g.*, the College of Nursing):



Exs. 13–15.

**Response:** Disputed. Vintage Brand offers no competent evidence to support its *ipse dixit* attorney argument that the PENN STATE Mark is being used to allow consumers to express affinity for or affiliation with the University and therefore, this Paragraph should be disregarded. *LR 56.1; FRCP 56(c)(1).* All of the surveys conducted by the University in this case confirm that consumers readily assume that the University is, if not the source, at a minimum the sponsor of, merchandise which bears the University Marks. *See PSU Ex. 41 (Dkt. 123-44) (Franklyn Opening Rep.) at 9-26, 44-45, 63-68.*

Further disputed to the extent that this Paragraph suggests or implies that the PENN STATE Marks are invalid or are functional. Penn State owns valid registrations for the PENN STATE Mark, and the '610 Registration is incontestable,

constituting conclusive evidence that the PENN STATE Mark is valid and that Penn State owns the exclusive right to use this Mark with the registered goods, which includes the type of merchandise sold by Vintage Brand. *See PSU Ex. 4 (Dkt. 123-7) at 2-17 (registration certificates for U.S. Registration Nos. 1,308,610 and 5,766,698, also showing designation under Section 15 for the '610 Registration); id. at 5-8, 14-16 (showing the goods covered by these registrations, which include things like decorative wall plaques, tumblers, pennants, t-shirts, sweatshirts, decorative magnets, and cutting boards); Lanham Act § 15, 15 U.S.C. § 1065 (provision setting out grant of incontestability for qualifying trademark registrations).*

Further disputed to the extent that this Paragraph suggests or implies that any communicative or expressive function of the PENN STATE Mark would mean that the Mark does not serve as a trademark or is not protectible. That merchandise may also allow consumers to indicate affinity for or affiliation with the University does not undermine that the PENN STATE Mark is an indicator of source. *Jack Daniel's, 599 U.S. at __, 2023 WL 3872519, at *3, *6 (discussing the different functions that trademarks can serve and specifically addressing that something can be both expressive and a trademark).*

40.     Further evidence that purchasing impetus stems from consumers' desire to express affinity for or affiliation with one of the University's teams are the Plaintiff's "Pick-A-Sport" products, i.e. articles that can be customized by a consumer with his or her preference of sport under the PENN STATE text:



Ex. 16 (red annotations added); *see also* Ex.17.

  **<u>Response</u>:** Disputed as unsupported and not relevant. A consumer's purchasing impetus for purchasing PENN STATE-branded products is not relevant to likelihood of confusion, validity of the PENN STATE Mark, or any other element of the parties' claims. Further, Vintage Brand offers no competent evidence to support its *ipse dixit* attorney argument that a consumer's purchasing impetus stems from consumers' desire to express affinity for or affiliation with the University. *LR 56.1; FRCP 56(c)(1).* The only evidence in the record related to how consumers view the University Marks show that they are viewed as trademarks. *See PSU Ex. 41 (Dkt. 123-44) (Franklyn Opening Rep.) at 9-26, 63-68.* Disputed to the extent that this Paragraph suggests or implies that the PENN STATE Mark does not function as a trademark. *Id.* Further disputed that the cited evidence shows that

purchasing impetus does not stem from a customer's perception that this merchandise is put out or is sponsored or licensed by Penn State, particularly given that this shirt is offered for sale on Penn State's official Athletics website. *See VB Ex. 16 (Dkt. 116-43) at 2.* Presumably customers visiting Penn State's website to purchase products expect and intend to purchase those products from Penn State.

41.    Although "The Pennsylvania State University" is the formal name of the University, Doc. 67 ¶ 16, the PENN STATE text is also used to refer to the University, for example in connection with the University's social media accounts, which in general have an unremarkable following: the "Penn State Admissions" Instagram account (@psuadmissions) has 9,294 followers, Ex. 18; the "Penn State Alumni Association" Instagram (@pennstatealums) has roughly 13,100 followers, Ex. 19; the "Penn State Athletics" Instagram account (@gopsusports) has roughly 59,900 followers, Ex. 20; the "Penn State Football" Instagram account (@pennstatefball) has roughly 398,000 followers, Ex. 21; the "Penn State University" Instagram account (@pennstate) has roughly 209,000 followers, Ex. 22; the "Penn State" Facebook page has 396,649 followers, Ex. 23; the "Penn State Football" Facebook page has 663,573 followers, Ex. 24; the "Penn State" Twitter account (@penn_state) has roughly 219,500 followers, Ex. 25; and the "Penn State University" YouTube account has roughly 11,800 subscribers, Ex. 26.

**Response:**    Undisputed that Penn State is commonly used to refer to the University, and that it is used in connection with many of the University's social media accounts.  To the extent this Paragraph purports to recite information about social media followers, the documents speak for themselves.

Disputed that the number of followers on various social media accounts is "unremarkable" as this characterization is nothing more than attorney *ipse dixit* without factual support.  *See LR 56.1; FRCP 56(c).*

42.     Vintage Brand never made available the PENN STATE text alone. Hartvigson Decl. ¶ 35. The University's assertion of infringement arises solely from that text being incorporated within composite historic artwork, such as the following:



| Examples of Vintage Brand Images Incorporating the PENN STATE Text |
| :---: |

I LIKE PENN STATE — Ex. Y

PENN·STATE — Ex. Y

PENN STATE — Ex. Y

PENN STATE 1947 FOOTBALL — Ex. X

PENN STATE MARYLAND — Ex. X

**Response:** Disputed. Penn State's infringement claims here are based on Vintage Brand's use of the PENN STATE Mark on the VB Penn State Merchandise as well as its use of the PENN STATE Mark on the VB Penn State Store. *See, e.g.,* *Dkt. 67, ¶¶ 2-4*, *73-81*, *89*, *117-120*. Defendants have used the PENN STATE Mark on the VB Penn State Store in text outside of designs and logos, as can be seen in the representative screenshots below:





*See* PSU Ex. 32 (Dkt. 123-35) at *3*, *173* (examples of a landing page and a product page from the VB Penn State Store that show PENN STATE being used outside of an image).

Disputed to the extent that Vintage Brand purports to use this Paragraph to suggest or imply that the "composite" nature of these images dispels confusion or negates that they are using the PENN STATE Mark as a trademark. The evidence

shows that the "composite images" Vintage Brand uses came, fully, from pieces of genuine Penn State merchandise. *Compare PSU Ex. 38 (Dkt. 123-41) at 2-87 (full set of memorabilia produced for inspection by Vintage Brand), with PSU Ex. 39 (Dkt. 123-42) at 2-25 (images from Vintage Brand's digital files related to Penn State).* The different elements of the "composite", then, were all included in the original genuine merchandise.

### *(c)* *THE PENNSYLVANIA STATE UNIVERSITY Text*

43. Similarly, the University asserts its purported trademark rights in the text comprising its name, THE PENNSYLVANIA STATE UNIVERSITY (the "TPSU text"), which is the subject of Registration Nos. 1,315,693 (the "'693 Registration"), 5,399,989 (the "'989 Registration"), and 5,742,516 (the "'516 Registration"). Doc. 67 ¶¶ 22, 23, 25–27, 29; Ex. 102 (Interrogatory Nos. 2, 5).

**Response:** Undisputed that Penn State asserts its trademark rights in the text THE PENNSYLVANIA STATE UNIVERSITY, which is the subject of Registration Nos. 1,315,693 (the "'693 Registration"), 5,399,989 (the "'989 Registration"), and 5,742,516 (the "'516 Registration). Disputed to the extent that the word purported implies or suggests that Penn State does not own valid trademark rights in the PENN STATE Mark. *PSU Ex. 6 (Dkt. 123-9) at 2-18 (registration certificates for the TPSU Marks along with Trademark Status Reports showing that these registrations remain valid for the listed goods and services); Second Amended Compl. (Dkt. 67), ¶ 25 & Answer (Dkt. 72), ¶ 25 (admitting that Penn State owns the above registrations).*

44.     The '693 Registration, which disclaims an exclusive right to use the text STATE UNIVERSITY and includes a Section 2(f) distinctiveness claim with respect to services, was issued in 1985 and covers limited goods as well as various services, including educational, broadcasting, and research services. Exs. 27–28. The specimens of use in connection with goods submitted in support of the application that matured into the '693 Registration, such as those below, show use of the TPSU text as a decorative element of merchandise:



Ex. 27 at 11224, 11234.

**Response:**   Undisputed that the '693 Registration was issued in 1985 and covers a variety of goods and services including many types of merchandise. Undisputed that the '693 Registration does not claim the exclusive right to use the words "State University" and includes a Section 2(f) distinctiveness claim. Undisputed that the specimens of use submitted in support of the '693 Registration also show use of the TPSU Mark. Disputed that the specimens show the TPSU Mark used as a "decorative element" because Vintage Brand does not support this characterization by citing to any evidence in the record.  *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

90

45.    Likewise, the specimens of use submitted in support of the 2015 renewal of the '693 Registration also show use of the TPSU text as a decorative element of merchandise:



Ex. 27 at 11487–89.

**Response:**  Undisputed that the specimens of use submitted in support of the 2015 renewal of the '693 Registration also show use of the TPSU Mark.  Disputed that the specimens show the TPSU Mark used as a "decorative element" because Vintage Brand does not support this characterization by citing to any evidence in the record.  *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

Further disputed to the extent Vintage Brand seeks to use this Paragraph to support the inference that the TPSU Mark is merely ornamental and not a trademark. Any such argument is barred because this registration is incontestable.  *See PSU Ex. 6 (Dkt. 123-9) at 8-13 (registration certificate showing designation under Section 15); Lanham Act § 15, 15 U.S.C. § 1065 (provision setting out grant of incontestability for qualifying trademark registrations); 15 U.S.C. § 1115(b); Park 'N Fly, 469 U.S. at 205.*

46. The '989 Registration, which disclaims an exclusive right to use the text PENNSYLVANIA, was issued in 2018 and covers only apparel. Exs. 29-30. The single specimen of use submitted in connection with the application that matured into the '989 Registration shows use of the TPSU text as the decorative element of apparel:



Ex. 29 at 12000.

**Response:**  Undisputed that the '989 Registration was issued in 2018 and covers hats, shirts, sweat shirts, and t-shirts.  *See PSU Ex. 6 (Dkt. 123-26) at 15.* Undisputed that the '989 Registration does not claim the exclusive right to use the word "PENNSYLVANIA" apart from the mark "THE PENNSYLVANIA STATE UNIVERSITY."  Undisputed that the specimens of use submitted in support of the '989 Registration show use of the TPSU Mark. Disputed that the specimens show the TPSU Mark used as a "decorative element" because Vintage Brand does not support this characterization by citing to any evidence in the record.  *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

47. The '516 Registration, which includes a claim of acquired distinctiveness as to the text PENNSYLVANIA, was issued in 2019 and covers magnets and flags. Exs. 31–32. The specimens of use submitted in connection with the application that matured into the '516 Registration show use of the TPSU text as a decorative element of merchandise:



Ex. 31 at 12018–19.

**Response:** Undisputed that Penn State's '516 Registration was issued in 2019, includes a Section 2(f) claim as to "PENNSYLVANIA," and covers magnets and flags. Undisputed that the specimens of use submitted in support of the '516 Registration show use of the TPSU Mark. Disputed that the specimens show the TPSU Mark used as a "decorative element" because Vintage Brand does not support this characterization by citing to any evidence in the record. *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

48. Vintage Brand never made available the TPSU text alone. Hartvigson Decl. ¶ 36. The University's assertion of infringement arises solely from that text being incorporated into the Seal Designs, which themselves are incorporated into two composite images, shown *infra* at Paragraph 69.

**Response:** Undisputed that the VB Penn State Merchandise using the TPSU Mark also shows use of additional Penn State marks and imagery. Disputed to the extent that Vintage Brand purports to use this Paragraph to suggest or imply that the

"composite" nature of these images dispels confusion or negates that they are using the TPSU Mark as a trademark. The evidence shows that the "composite images" Vintage Brand uses came, fully, from pieces of genuine Penn State merchandise. *Compare PSU Ex. 38 (Dkt. 123-41) at 2-87 (full set of memorabilia produced for inspection by Vintage Brand), with PSU Ex. 39 (Dkt. 123-42) at 2-25 (images from Vintage Brand's digital files related to Penn State).* The different elements of the "composite", then, were all included in the original genuine merchandise.

### (d)    *The Nittany Lion Rock Design*

49.    The University has previously used designs depicting the "Nittany Lion Shrine," a statute on the University's campus, described by the University as "[h]allowed ground" and "something tangible associated with [alumni's] relationship with the University." 30(b)(6) Dep. at 49:4–50:3 (referencing depiction of the statue at Ex. 8 at 5790).

**Response:**  Undisputed that Penn State has previously used designs depicting the "Nittany Lion Shrine."  Disputed to the extent that this Paragraph incorrectly quotes the cited deposition testimony.  Mr. McGrath testified that Nittany Lion Shrine is "a place where Penn Staters come to have photography, graduation," which is "an opportunity for the community to have something tangible associated with their relationship with the University."  *See VB Ex. 1 (Penn State 30(b)(6) Dep.)* (Dkt. 116-28) at 49:4-9.

50.    The University asserts trademark rights in a stylized design of the Shrine (the "Nittany Lion Rock Design"), shown below (left), which is the subject of Registration No. 1,350,286 (the "'286 Registration"). Doc. 67 ¶ 34; Ex. 102 (Interrogatory Nos. 2, 5). Vintage Brand never made available the Nittany Lion Rock

Design alone; rather, a single composite image from a 1979 scanned game ticket incorporating a variant of the design appeared on Vintage Brand's website, shown below (right). Hartvigson Decl. ¶ 37.

| Nittany Lion Rock Design | Vintage Brand Image |
|---|---|
|  | <br>Ex. X |

**Response:** Undisputed that Penn State asserts trademark rights in the Nittany Lion Shrine Logo, including Registration No. 1,350,286 (the "'286 Registration"). Undisputed that Vintage Brand has not sold merchandise that contains only the Lion Shrine Logo.

Disputed that only a single composite image from a 1979 ticket appeared on Vintage Brand's website. The evidence here does not show that the image described in the righthand column of the chart in Paragraph 50 was used on VB Penn State Merchandise, but shows that variations of this image were used on several items, including the following power and canvas wall art:



*See PSU Ex. 32 (Dkt. 123-35) at [117](), [143]() (showing these pieces of merchandise for sale on VB Penn State Store).  See also id. at 208, 213 (showing additional items for sale using these images).*

Disputed that the image shown in the righthand column of the chart in Paragraph 50 is the only image that that Vintage Brand used on VB Penn State Merchandise that infringed Penn State's rights in the Lion Shrine Logo.  Vintage Brand also offered the following VB Penn State Merchandise that is confusingly similar to the Lion Shrine Logo:

 

*See PSU Ex. 31 (Dkt. 123-36) at 10; PSU Ex. 32 (Dkt. 123-36) at 5. See also PSU Ex. 33 (Dkt. 123-36) at 38 (mug), 73 (koozies), 115 (coasters), 125 (bottle); PSU Ex. 32 (Dkt. 123-35) at 26 (t-shirts), 68 (hats), 82 (mugs), 138 (pennant), 228 (socks).* Consumers who view the VB Penn State Merchandise using this design perceive the image of the lion on the rock to be a trademark, and a significant percent of those consumers are confused as to Penn State's relationship to the product. *See PSU Ex. 41 (Dkt. 123-44) at 9-10, 24-25 (results of commercial impression survey, showing 45% of respondents perceive the image of the lion on a rock as a trademark); id. at 26-27, 44-45 (results of likelihood of confusion survey, showing 31% of consumers viewing a Vintage Brand t-shirt showing the image including the lion on a rock were confused as to Penn State's with source, sponsorship, affiliation, or licensure for this product).*

51.    The '286 Registration was issued in 1985 and covers miscellaneous goods, ranging from license plates to decorative needlepoint clips, but does not cover any services. Exs. 33–34. The specimens of use submitted in connection with the application that matured into the '286 Registration, including the specimen shown

below, show use of the Nittany Lion Rock Design as a decorative element of merchandise:



Ex. 33 at 11550.

**Response:** Undisputed that U.S. Registration No. 1,380,286 covers a variety of different goods, including license plates and decorative needlepoint clips. This Registration also covers decorative magnetic stickers, decorative wall plaques, drinking mugs, tankards, glasses, cups, tumblers, pennants, shirts, t-shirts, and sweatshirts. *See PSU Ex. 9 at 8-9, 11-13 (registration certificate and Trademark Status Document for U.S. Reg. 1,380,286 showing what goods are covered by this registration).* Undisputed that this registration does not cover services.

Disputed that the specimens show the Lion Shrine Logo as a "decorative element" because Vintage Brand does not support this characterization with citation to any evidence in the record. *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

52.     Likewise, the specimens of use submitted with the 2015 renewal of the '286 Registration, such as those below, show use of the Nittany Lion Rock Design as a decorative element of merchandise:



Ex. 33 at 11768–70.

**Response:**  Undisputed that the specimens of use submitted in support of the 2015 renewal of the '286 Registration also show use of the Lion Shrine Logo. Disputed that the specimens show the Lion Shrine Logo as a "decorative element" because Vintage Brand does not support this characterization with citation to any evidence in the record. *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

Further disputed to the extent Vintage Brand seeks to use this Paragraph to support the inference that the Lion Shrine Logo is merely ornamental and not a trademark.   Any such argument is barred because the '286 Registration is incontestable.  *See PSU Ex. 9 (Dkt. 123-12) at 7 (registration certificate showing designation under Section 15); Lanham Act § 15, 15 U.S.C. § 1065 (provision setting out grant of incontestability for qualifying trademark registrations); 15 U.S.C. § 1115(b); Park 'N Fly, 469 U.S. at 205.*

53.　　Documents produced by the University show use of the Nittany Lion Rock Design as a decorative element of merchandise, typically but not always accompanied by the PENN STATE text:



Exs. 35–37.

**Response:**　Undisputed that the Lion Shrine Logo is used on merchandise including that pictured in Paragraph 53, and that it is often used along with the PENN STATE Mark.　Disputed that the images show the Lion Shrine Logo as a "decorative element" because Vintage Brand does not support this characterization with citation to any evidence in the record. *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

Further disputed to the extent Vintage Brand seeks to use this Paragraph to support the inference that the Lion Shrine Logo is merely ornamental and not a trademark.　Any such argument is barred because the '286 Registration is incontestable. *See PSU Ex. 9 (Dkt. 123-12) at 7 (registration certificate showing designation under Section 15); Lanham Act § 15, 15 U.S.C. § 1065 (provision*

*setting out grant of incontestability for qualifying trademark registrations); 15*

*U.S.C. § 1115(b); Park 'N Fly, 469 U.S. at 205.*

### (e) *The Nittany Lion Frankfurter Design*

54. The University also asserts rights in a different depiction of the Nittany Lion Shrine, which includes the text NITTANY LION (the "Nittany Lion Frankfurter Design"), shown below (left), which is the subject of Registration No. 1,397,810 (the "'810 Registration"). Doc. 67 ¶ 35; Ex. 102 (Interrogatory Nos. 2, 5). Vintage Brand never made available the Nittany Lion Frankfurter Design alone; rather, two composite images, both from vintage pennants, incorporating a variant of the Nittany Lion Frankfurter Design appeared on Vintage Brand's website, shown below (right). Hartvigson Decl. ¶ 37. Nor was the Nittany Lion Frankfurter Design listed in a 2011 chart of the University's purported trademarks. Ex. 38.

| Nittany Lion Frankfurter Design | Vintage Brand Images |
|---|---|
|  | Exs. G and W |

Exs. G and W

**Response:** Disputed in part. Undisputed that the University also asserts its rights in the text NITTANY LION and the Lion Design subject to Registration No. 1,397,810 (the "'810 Registration"). Undisputed that Vintage Brand never made available the Lion Design alone, as this Logo was always made available on merchandise as opposed to a stand-alone image. Undisputed that the Lion Logo was not listed in a 2011 chart that contained a non-exhaustive list of Penn State

trademarks, shown in VB Exhibit 38. Disputed that the chart in VB Exhibit 38 contains or even purports to contain a complete list of Penn State's trademarks.

Disputed to the extent that Vintage Brand implies that the '810 Registration is for a design that is wholly unrelated to the Lion Shrine Logo covered by Penn State's '286 Registration, and tries to limit the scope of what trademark rights were infringed by different pieces of the VB Penn State Merchandise. The images shown in the righthand column in Paragraph 54's table are not somehow limited to infringing Penn State's rights in the '810 Registration (and not the '286 Registration). Vintage Brand's assertions amount to legal conclusions that are improper, cannot be considered material facts for summary judgment, and do not require a response from Penn State. *Kos*, 369 F.3d at 713-14 (evidence related to plaintiff's statements and actions about different trademarks that were not at issue in the instant case was irrelevant to infringement issue at hand); *Avco*, 2022 WL 3970830, at *10 (excluding from trial evidence about trademark applications and registrations not at issue, noting that "[a]n individual analysis is necessary for each alleged trademark", and that evidence about other trademarks is irrelevant to the highly fact dependent issue).

55. The '810 Registration was issued in 1986 and covers only "frankfurters." Ex. 40. The University does not allege that Vintage Brand has ever offered for sale, advertised, or sold any frankfurters, much less that Vintage Brand ever advertised the sale of frankfurters with the Nittany Lion Frankfurter Design. Ex. 102 (Interrogatory No. 21); Ex. 103 (Request for Admission No. 9). Indeed,

Vintage Brand has never been in the business of selling meat products or any other food. Hartvigson Decl. ¶ 37.

**Response:** Undisputed.

### (f) *The Pozniak Lion Design*

56.    The University asserts trademark rights in the stylized Nittany Lion head (the "Pozniak Lion Design"), shown below (left), which is the subject of Registration No. 5,305,910 (the "'910 Registration"). Doc. 67 ¶ 37; Ex. 102 (Interrogatory Nos. 2, 5). Vintage Brand never made available the Pozniak Lion Design alone; rather, two historic images incorporating the Pozniak Lion Design and the text PENN STATE BASKETBALL appeared on Vintage Brand's website, shown below (right). Hartvigson Decl. ¶ ●.

| Pozniak Lion Design | Vintage Brand Images |
|---|---|
|  | |
| | Ex. W |

**Response:** Undisputed that the University also asserts its rights in the Pozniak Lion Logo, which is the subject of Registration No. 5,305,910 (the "'910 Registration"). Undisputed that the VB Penn State Merchandise using the Pozniak Lion Logo also incorporated other University Marks, including the PENN STATE Mark. Undisputed that Vintage Brand has used the Pozniak Lion Logo on merchandise, including the merchandise depicted in VB Exhibit W.

Disputed as to the term "historic images". The VB Penn State Store offers merchandise bearing images; the Store does not advertise the trademarks as stand-

alone images. *See Ex. 58 (Vintage Brand Dep.) at 116:2-4 (testifying that the "website shows the images actually on products").* Further disputed that the merchandise depicted in the table is exhaustive of the VB Penn State Merchandise offered that used the Pozniak Lion Logo. Vintage Brand offers or has offered for sale a wide array of merchandise bearing the Pozniak Lion Logo, including but not limited to t-shirts, sweatshirts, hats, socks, hats, koozies, drinkware, decorative wall plaques, puzzles, cutting board, magnets, and coasters. *See PSU Ex. 31 (Dkt. 123-34) at 13, 26-27, 30, 48, 53, 58, 62, 66, 71, 76; PSU Ex. 33 (Dkt. 123-36) at 12-13, 15.*

57. The '910 Registration was issued in 2017 and covers license plates, clothing, and certain services related to the Lion Ambassadors, the University's student alumni group. Exs. 41–42; see 30(b)(6) Dep. at 98:22–99:11. The specimen of use submitted with the application that matured into the '910 Registration is a digital mockup of a t-shirt bearing the Pozniak Lion Design as a decorative element of the article:



Ex. 41 at 11970.

**Response:**  Undisputed that the '910 Registration was issued in 2017 and covers license plates, clothing and various entertainment services.  Undisputed that the specimens of use submitted in support of the '910 Registration show use of the Pozniak Lion Logo, including on the t-shirt depicted above.  Disputed that the specimens show the Pozniak Lion Logo used as a "decorative element" because Vintage Brand does not support this characterization by citing to any evidence in the record.  *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence)*.

Further disputed to the extent that Vintage Brand seeks to support the inference that the Pozniak Lion Logo is merely ornamental and not a trademark. Any such argument is barred because this registration now qualifies for incontestability status.  *See PSU Ex. 11 (Dkt. 123-14) at 2-3 (showing that the '910 Registration was issued more than five years ago, on October 10, 2017); 15 U.S.C. § 1065 (setting out criteria for incontestability status, including that the registered mark has been in continuous use for five consecutive years following date of registration); id. (requiring that declaration of incontestability be submitted to the USPTO within 1 year of meeting the criteria for incontestability); see also PSU Ex. 71 (2-7) (Declaration of Incontestability of a Mark under Section 15, submitted on June 9, 2023, and signed by Paul J. Clifford, Associate Vice President for Alumni Relations and Chief Executive Officer of Penn State Alumni Association, declaring*

*that the '910 Registration satisfies criteria for incontestability). See also Petulla*

*Decl. (PSU Ex. 1, Dkt. 123-1), ¶¶ 7-9 (each of the University Marks, including the*

*Pozniak Lion Logo, has been in continuous use since well before 2017, and that*

*there are no adverse legal decisions regarding those Marks).* Because the Pozniak

Lion Logo meets the criteria for incontestability, arguments that this Mark is merely

ornamental are barred. *See 15 U.S.C. § 1115(b); Park 'N Fly, 469 U.S. at 205.*

58.  The Pozniak Lion Design was created by Ray Pozniak, a ▮▮▮ graduate of the University. 30(b)(6) Dep. at 98:3–17; Ex. 6 at 8401. The University's use of the Pozniak Lion Design was phased out around 1986 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 6 at 8412. Following that phase-out, the Pozniak Lion Design was used by the Nittany Lion Wrestling Club, the Lion Ambassadors, and the University's license plate program ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. 30(b)(6) Dep. at 98:18–99:11; *see also* Ex. 6 at 7950, 8298, 8413. The Lion Ambassadors are students who serve as ambassadors on campus for visiting guests and partner with the alumni association. 30(b)(6) Dep. at 99:6–8; *see also* Ex. 43 (requiring that ambassador candidates be full-time students, and stating that ambassadors directly connect with the alumni association) (last visited May 26, 2023).

**Response:**  Undisputed.

59.  In 2012, in the wake of the Jerry Sandusky scandal, ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 6 at 8401. The University initially ▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 6 at 8400.

**Response:**  Undisputed.

60.  Shortly thereafter, a University alumnus contacted the University to express ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In so doing, the alumnus indicated ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████. Ex. 6 at 8403–05. The University acknowledged the Pozniak Lion Design ███████████ ████████████████████████████████████████████ evincing that consumers would draw an affiliation between the Pozniak Lion Design and the University. Ex. 6 at 8403. Nonetheless, the University was then not interested in ████████████████████ Ex. 6 at 8403.

**Response:** Undisputed that Penn State received correspondence from an alumni who indicated that he had purchased merchandise bearing the Pozniak Lion Logo from a website selling apparel that was licensed by the Pozniak Family, and that the alumnus encouraged Penn State to consider adopting the Pozniak Lion Logo as the official symbol for its Athletics Program. *See VB Ex. 6 at 16-17 (correspondence cited by Vintage Brand, bearing Bates label PSU0008404-405) (filed under seal).* Undisputed that in subsequent internal Penn State discussions about this email, Penn State officials noted that the Pozniak Lion Logo "is very recognizable (and dare I say beloved) by alums from the 70's, 80's, and 90's," but decided that the University would not adopt the Logo as its official Athletics logo. *Id. at 15-16 (cited correspondence, bearing Bates label PSU0008403-4040).*

Disputed that the email from the alum "indicated awareness that merchandise bearing the Pozniak Lion [Logo] was not sponsored or endorsed by the University but was nonetheless purchased because it was emblazoned with the Pozniak Lion [Logo]." This assertion is not supported by the evidence cited. *See LR 56.1; FRCP 56(c).* In this cited email, the alum states that he had purchased merchandise "from the Cat on The Hat website". *See VB Ex. 6 at 16.* The evidence in this same exhibit

shows that Cat on the Hat was run by the Pozniak family before they sold their rights in the Pozniak Lion Logo to Penn State.  *Id. at 15.*  Trademark rights from these sales therefore have accrued to Penn State. Therefore, the merchandise that the alum purchased was not counterfeit or infringing merchandise and was not being sold in violation of Penn State's rights.  *Id. at 15-16.*

In the emails at issue, the alumnus raises that he is aware of the Pozniak Lion Logo being used by "the Alumni Association, PSFCU, and other University associated organizations."  *See VB Ex. 6 at 16-17 (filed under seal).*  He further urges the University to "replace the current logo" with the Pozniak Lion Logo because "[m]any Penn Staters still recognize [that Logo] and have loyally displayed it for decades."  *Id. at 17.*  He further remarked that he recalled seeing the Pozniak Lion Logo "in the endzone in the '70s."  *Id. at 16.*  These messages show that the alumnus was encouraging the University to replace the official Athletics Logo with the Pozniak Lion Logo.  *Id. at 15-17.*  The University officials who communicated about this message clearly interpreted his emails as such, commenting specifically about the issue of possibly changing the Athletics logo.  *Id. at 15.* The comments of this alum about the Athletics logo do not mean that he was representing or indicating that merchandise bearing the Pozniak Lion Logo was not sponsored or endorsed by the University.  The characterization in Paragraph 60 about what this email shows is unsupported *ipse dixit*.

Further, this email can reasonably be interpreted as evidencing that the alum seeks to buy merchandise that is put out, sponsored, or endorsed by Penn State. In his email to the University, the alum specifically asks the University to add more merchandise to its lineup that includes the Pozniak Lion Logo. *See VB Ex. 6 at 16 (email from alumnus to Penn State Alumni Store stating "As you roll out the new fall merchandise, I would love to see this [Pozniak Lion] logo embraced as part of our University and Alumni [sic] once again.").* It is reasonable to infer from the alum's request that the source and sponsorship of merchandise is important to him in purchasing merchandise.

61. Ultimately, ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████ Ex. 6 at 8287–8288.

**Response:** Undisputed.

62. Following the ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ Ex. 6 at 8298.



**Response:** Undisputed that after the University acquired the Pozniak family's rights in the Pozniak Lion Logo, there was internal discussion about use of this Logo.

To the extent that this Paragraph quotes from documents, those documents speak for themselves.

63. Presently, the University claims that the Pozniak Lion Design is part of its licensing program. 30(b)(6) Dep. at 101:22–25. However, the Pozniak Lion Design does not appear in the University's licensing Art Sheets or Brand Book. *See generally* Exs. 8, 51. When the University was asked whether the Pozniak Lion Design was licensed through its licensing agent, however, the University only restated that any use of the Pozniak Lion Design is limited to the Nittany Lion Wrestling Club, the Lion Ambassadors, and the license plate program. 30(b)(6) Dep. at 102:1–6 (referring to the "three areas" he previously mentioned).

**Response:** Undisputed that Tom McGrath testified that the Pozniak Lion Logo is part of the University's licensing program and is used in connection with the University's wrestling booster club, by the Lion Ambassadors student group and on approved state license plates. Undisputed that the Pozniak Lion Logo does not appear in the University's licensing Art Sheets or Brand Book. To the extent this Paragraph seeks to imply that there is some conflict here or tries to undermine Penn State's rights in the Pozniak Lion Logo, disputed. The evidence that Vintage Brand cites here is not inconsistent: Penn State licenses the Pozniak Lion Logo for limited purposes (*see VB Ex. 1 (Dkt. 116-28) (30(b)(6) deposition) at 102:1-6)* and does not include the Pozniak Lion Logo as part of its broader merchandise licensing program run through CLC (*see VB Exs. 8, 51)*).

64. The Nittany Lion Wrestling Club and the University are separate entities. Ex. 103 (Request for Admission No. 10). And the University is not aware of any apparel emblazoned with the Pozniak Lion Design being made available for sale in connection with the Nittany Lion Wrestling Club. 30(b)(6) Dep. at 100:13–21.

**Response:**  Undisputed that the Nittany Lion Wrestling Club is a separate tax-exempt, charitable, educational organization under IRS Code Section 501(c)(3) from Penn State.  Undisputed that the University is not presently aware of any apparel using the Pozniak Lion Logo that is currently being sold for commercial purposes by the Nittany Lion Wrestling Club.

Disputed to the extent that this Paragraph asserts or implies that the Nittany Lion Wresting Club has not made use of the Pozniak Lion Logo.  The evidence cited here from the deposition of Tom McGrath states only that Mr. McGrath was not aware if the general public was able to purchase apparel with the Pozniak Lion Logo in association with the wrestling club, and his testimony that their merchandise would need to be approved by the Office of Licensing Programs.  *See VB Ex. 1 (Dkt. 116-28) at 100:13-21.*  Further, the evidence shows that the Nittany Lion Wrestling Club has distributed shirts with the Pozniak Lion Logo, as the evidence includes pictures obtained from social media of those shirts being worn.  *See, e.g., PSU Ex. 13 (Dkt. 123-16) at 20, 22.*

65.    Likewise, although the Lion Ambassadors wear apparel such as t-shirts ornamentally bearing the Pozniak Lion Design, they are provided with such apparel "as their uniform to perform their functions." 30(b)(6) Dep. at 99:16–100:3; *see also* Ex. 43 (stating that ambassadors receive apparel from the Alumni Association) (last visited May 26, 2023). The University is not aware of any such t-shirts being made available for purchase to the public. 30(b)(6) Dep. at 100:4–8.

**Response:**  Undisputed that the Lion Ambassadors wear apparel such as t-shirts bearing the Pozniak Lion Logo.  Undisputed that some apparel is provided to the Lion Ambassadors by the Penn State Alumni Association.

Disputed that the apparel distributed to the Lion Ambassadors bearing the Pozniak Lion Logo shows that Logo being used "ornamentally" because Vintage Brand does not support this characterization by citing to any evidence in the record. *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*  The USPTO's Examining Attorney that reviewed Penn State's application for the Pozniak Lion Logo granted a Notice of Allowance on Penn State's application, meaning that the Examining Attorney concluded that the Pozniak Lion Logo appearing on merchandise functions as a trademark.  *See VB Ex. 41 (Dkt. 116-68) at 23 (Notice of Allowance issued by the United States Patent and Trademark Office stating that the application with Serial No. 87-349,218 "appears to be entitled to registration" and providing that the application would be published for opposition); PSU Ex. 6 (Dkt. 123-9) at 17-18 (Trademark Status Report for U.S. Reg. 5,5305,910 showing that this registration had borne the application serial number 87-349,218 and therefore corresponds to the Notice of Allowance cited).*

Disputed to the extent that this Paragraph asserts or implies that the Lion Ambassadors program has not made use of the Pozniak Lion Logo.  *See, e.g., PSU Ex. 13 (Dkt. 123-16) at 4, 7-8, 15, 17, 20, 22-30 (examples of Penn State's authorized*

*uses of the Pozniak Lion Logo, drawn almost entirely from social media accounts for the Penn State Lion Ambassadors Program); see also PSU Ex. 2 (Penn State Dep.) (Dkt. 123-5) at 100:9-12.*

66. Indeed, documents produced in discovery show apparel bearing the Pozniak Lion Design being worn by members of the Lion Ambassadors and Nittany Lion Wrestling Club, without any indication such apparel was available in commerce, i.e. to consumers. Exs. 44–47.

**Response:**  Undisputed that the documents produced during discovery, including Vintage Brand Exhibits 44-47, show apparel bearing the Pozniak Lion Logo being worn by members of the Lion Ambassadors and Nittany Lion Wrestling Club.  Disputed that these documents do not indicate use in commerce because Vintage Brand does not support this characterization with any citation to record evidence.  *See LR 56.1; FRCP 56(c).*  Vintage Brand's *ipse dixit* characterization of this evidence appears to misapprehend the law on use in commerce.  *In Re McDonald's Corp.*, 199 U.S.P.Q. 702, 1978 WL 21263, *1-3 (BNA) ¶ 702 (T.T.A.B. July 25, 1978)* (reversing refusal to register logo for use on clothing items worn by employees).  The produced documents show the Pozniak Lion Logo being used in connection with clothing, hats, and t-shirts.  *See, e.g., VB Ex. 44-47 (Dkt. Nos. 116-71, 116-72, 116-73, 116-74).*

67. According to the statement of use the University submitted in connection with the application that matured into the '910 Registration, the submitted specimen of use, shown *supra*, at Paragraph 57, "show[ed] the [Pozniak Lion Design] as used in commerce …." Ex. 41 at 11966. The University's representative was apprized of the penalties for willful false statements, and she

signed the declaration submitted with the application, attesting to the veracity of that statement. Ex. 41 at 11967–68. However, the evidence the University produced depicting apparel consistent with that specimen reflects only that the shirt was worn by a Lion Ambassador, not that it was sold in commerce. Ex. 47.

| University's Specimen | Lion Ambassador Facebook Photo |
|---|---|
|  Ex. 41 at 11970. |  Ex. 47 at 4785. |

**Response:**  Undisputed that the University submitted several specimens of use showing the Pozniak Lion Logo as used in commerce.  Undisputed that these specimens were accompanied by a signed declaration, attesting to the veracity of the statement of use.

Disputed that the submitted specimens are not evidence that the Pozniak Lion Logo was used in commerce, and as to the implicit accusation here that Penn State's representative submitted a willful false statement.  These assertions hinge on the unsupported statement that Penn State has not made bona fide use of the Pozniak Lion Logo in commerce, which Vintage Brand supports with nothing more than attorney *ipse dixit*.  *See LR 56.1; FRCP 56(c)*.  Vintage Brand appears to misapprehend the law on use in commerce.  *In Re McDonald's Corp.*, 199 U.S.P.Q. 702, 1978 WL 21263, *1-3 (BNA) ¶ 702 (T.T.A.B. July 25, 1978) (reversing refusal

to register logo for use on clothing items worn by employees). The produced documents show the Pozniak Lion Logo being used in connection with clothing, hats, and t-shirts. *See, e.g., VB Ex. 44-47 (Dkt. Nos.* [116-71](#), [116-72](#), [116-73](#), [116-74](#)). As is clear from the cited Exhibit, the specimen submitted in support of Penn State's statement of use appears on an actual t-shirt used in connection with registered goods. *VB Ex. 47 (Dkt. 116-74) at* [2](#).

68. The University has not made bona fide use of the mark in commerce since purporting to adopt it. *Cf.* Ex. 48.

**Response:** Disputed. The evidence cited here (VB Ex. 48) does not support this assertion as this contains an email thread that does not even purport to mention the Pozniak Lion Logo, or to address rights in that Logo. *See LR 56.1; FRCP 56(c).* Further, Paragraph 68 contains a legal conclusion and not a fact appropriate for consideration on summary judgment. *First Bank Puerto Rico*, 813 F. App'x at 765-66 ("[T]he purported 'facts' to which she cites are merely legal conclusions and allegations unsupported by proper citations to evidence in the record. … As we have explained, such conclusory statements are insufficient to withstand a motion for summary judgment.") (internal quotation omitted); *Kidd*, 2008 WL 163055, at *4-6 & nn.3, 6 (refusing to adopt legal conclusions as facts that can support a motion for summary judgment and confirming that the non-movant is not required to respond to such conclusory statements).

Disputed because the evidence shows that Penn State uses the Pozniak Lion Logo in connection with, *inter alia*, clothing, hats, t-shirts, and license plates. *See PSU Ex. 13 (Dkt. 123-16) at 2, 5-7, 9-12, 15-21, 24, 26 (composite examples of Penn State's authorized uses of the Pozniak Lion Logo).* Penn State owns a federal registration for this Logo, which creates the evidentiary presumption under the Lanham Act that the registered mark is valid and that Penn State has the exclusive right to use the registered mark in commerce. *15 U.S.C. § 1115(b).* Vintage Brand has asserted neither fraud nor abandonment. Therefore, this Paragraph is neither supported by competent evidence nor relevant to Vintage Brand's Motion for Summary Judgment and should be disregarded. *LR 56.1; FRCP 56(c)(1).*

### (g)    *The Seal Designs*

69.    The University asserts trademark rights in two iterations of its seal (the "Seal Designs"), shown below (left), which are the subject of Registration Nos. 1,276,712 (the "'712 Registration") and 5,877,080 (the "'080 Registration"). Doc. 67 ¶¶ 43–45; Ex. 102 (Interrogatory Nos. 2, 5). Vintage Brand has never made either of the Seal Designs available alone; it has only ever offered two composite images that incorporated variations of the Seal Designs, shown below (right). Hartvigson Decl. ¶ 37.

| The Seal Designs | Vintage Brand Images |
|---|---|
|  | |
| | Ex. G          Ex. H |

Ex. G Ex. H

**Response:**   Undisputed that Penn State asserts its trademark rights in the University Seal, which is the subject of Registration Nos. 1,276,712 (the "'712 Registration") and 5,877,080 (the "'080 Registration").   Undisputed that the VB Penn State Merchandise bearing the University Seal has included other elements and trademarks together with the Seal.   Disputed that only two composite images appeared on Vintage Brand's website.   Vintage Brand advertised the University Seal on a wide range of merchandise, t-shirts, sweatshirts, socks, koozies, coasters, mugs, magnets, cutting boards, etc.   *See PSU Ex. 32 (Dkt. 123-35) at 23 (t-shirts), 24 (sweatshirts), 44 (hats), 76 (mugs), 104 (cutting boards), 143 (coasters), 149 (magnet), 232 (socks).*

70.   The old Seal Design is the subject of the '712 Registration, which was issued in 1984 and covers a variety of goods. Ex. 49–50. The '712 Registration previously covered research and educational services, but the registration was voluntarily abandoned in relation to those services in 2014. Ex. 49 at 10785. The specimens of use submitted in connection with the application that matured into the '712 Registration, including the specimen shown below, show use of the old Seal Design as a decorative element of merchandise:



Ex. 49 at 10645, 10694.

**Response:** Undisputed that the University Seal is subject to the '712 Registration, which was issued in 1984 and covers a variety of goods, including decorative magnet stickers, decals, stickers, decorative wall plaques, drinking mugs, tankards, glasses, cups, tumblers, pennants, shirts, t-shirts, sweatshirts, shorts and hats. Undisputed that the '712 Registration no longer covers research and educational services. Disputed as to the term "old Seal Design" and the implication that Penn State does not own rights in this Mark anymore. *See PSU Ex. 17 (Dkt. 123-20) at 2-18 (registration certificates covering the University Seal along with Trademark Status Reports showing that these registrations remain valid for the listed goods and services).* Disputed that the specimens show the University Seal used as a "decorative element" because Vintage Brand does not support this characterization by citing to any evidence in the record. *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

71. Likewise, the specimens of use submitted with the 2014 renewal of the '712 Registration, such as those below, show use of the old Seal Design as a decorative element of merchandise:



Ex. 49 at 10792, 10796, 10800.

**Response:** Undisputed that Penn State's '712 Registration was renewed in 2014. Undisputed that the specimens of use submitted in support of the 2014 renewal of the '712 Registration also show use of the University Seal. Disputed that the specimens above show the University Seal as a "decorative element" because Vintage Brand does not support this characterization by citing to any evidence in the record. *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

Further disputed to the extent Vintage Brand seeks to use this Paragraph to support the inference that the University Seal is merely ornamental and not a trademark. Any such argument is barred because this registration is incontestable. *See PSU Ex. 17 (Dkt. 123-20) at 2-4 (registration certificate showing designation under Section 15); Lanham Act § 15, 15 U.S.C. § 1065 (provision setting out grant of incontestability for qualifying trademark registrations); 15 U.S.C. § 1115(b); Park 'N Fly, 469 U.S. at 205.*

72.     Further, the specimens shown in the preceding paragraph do not show actual use of the old Seal Design whatsoever, because they each incorporate the distinct proportions of the new Seal Design, most notably the proportion of Pennsylvania's Coat of Arms within the inner circle. Neither the University's Brand Book nor its licensing Art Sheets show the old Seal Design. Ex. 8 at 5788; Ex. 51.

**Response:** Disputed. The only evidence in the record regarding how the specimens cited by Vintage Brand are perceived comes from the USPTO's Examining Attorney that reviewed these specimens and granted a Notice of

Acceptance on Penn State's application for renewal, meaning that the Examining Attorney concluded that the University Seal appearing on these specimens—and the other specimens submitted by Penn State—constitutes use of the applied for mark. *See VB Ex. 49 (Dkt. 116-76) at 186 (Notice of Acceptance of Renewal issued by the United States Patent and Trademark Office stating that the renewal application meets the requirements of continued use as a trademark under Section 9 of the Trademark Act, 15 U.S.C. § 1059).* The examination of specimens is the province of an examining attorney, guided by the applicable regulatory guidelines. *See* 37 C.F.R. § 2.56 (setting requirements for how specimen may show use). Vintage Brand may not challenge the Examining Attorney's conclusion here that the specimens show use of the mark covered by the '712 Registration. *See Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 874 (3d Cir. 1992); *Century 21 Real Est. Corp. v. Century Life of Am.*, 10 U.S.P.Q.2d 2034, 1989 WL 281901, at *1-2 (T.T.A.B. 1989) (articulating rule and rationale for limiting review of specimens of use). Moreover, the '712 Registration is incontestable and is therefore, conclusive evidence of the validity of the registered mark and Penn State's exclusive right to use the registered mark in commerce. 15 U.S.C. § 1115(b). Vintage Brand has asserted neither fraud nor abandonment. Therefore, this Paragraph is neither supported by competent evidence nor relevant to Vintage

Brand's Motion for Summary Judgment and should be disregarded. *LR 56.1; FRCP 56(c)(1); FRE 401.*

73.     The new Seal Design is the subject of the '080 Registration, which was issued in 2019 and covers a variety of goods but, like the '712 Registration, does not cover services. Exs. 52–53. The specimens of use submitted with the application that matured into the '080 Registration show use of the new Seal Design as a decorative element of merchandise:



Ex. 52 at 12218, 12223, 12228.

**Response:**  Disputed in part.  Undisputed that the University Seal is subject to the '080 Registration, which was issued in 2019 and covers a variety of goods, including coasters, ceramic mugs, fabric flags, banners of textile, and hooded sweatshirts.  Undisputed that the specimens of use shown above show use of the University Seal.  Disputed as to the term "new Seal Design" because this improperly suggests that Penn State has stopped using some other Seal and is unsupported by any citation to evidence.  *See LR 56.1; FRCP 56(c).*  Disputed that the specimens show the University Seal used as a "decorative element" because Vintage Brand does not support this characterization by citing to any evidence in the record.  *See*

*LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

74. Documents produced by the University show merchandise bearing the new Seal Design only as a decorative element of merchandise:



Exs. 54–56.

**Response:** Undisputed that the evidence, including the pictures above, show use of the University Seal. Disputed that the images show the University Seal used as a "decorative element" because Vintage Brand does not support this characterization by citing to any evidence in the record. *See LR 56.1; FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

75. The Seal Designs incorporate the Coat of Arms of the Commonwealth of Pennsylvania, referenced as a "crest" in the University's Brand Book:

> The seal has been in existence in one form or another since the founding of the University. The current version was introduced in 1953 *and features the crest of the Commonwealth of Pennsylvania* surrounded by the name of the University. It bears a striking resemblance to the seals of the many other state agencies, including the State System of Higher Education, which is the one reason it does not serve as the University's logo. Since implementation of the University mark in 1987, the seal has served primarily as an official

stamp of validation—like a notary's stamp—on official documents such a [sic] contracts and diplomas.

Ex. 8 at 5788 (emphasis added); *see also* 30(b)(6) Dep. at 47:15–48:14.

**Response:** Disputed. The evidence cited simply contains the quoted text (or testimony from Tom McGrath, Penn State's 30(b)(6) witness) confirming that this statement is correct regarding the University Seal. The quote, however, contains no reference to the Coat of Arms of the Commonwealth of Pennsylvania. Nor does the Paragraph cite to any evidence to establish what the Coat of Arms is, or to support the fact being asserted here (that the quoted text intends to refer to the Pennsylvania Coat of Arms—a term that it does not mention). Because this statement of fact is not supported, it must be disregarded. *See LR 56.1; FRCP 56(c)(1)(A).*

### *(h)    The S-Lion Design*

76.    The University also asserts rights in the below design (the "S-Lion Design"). The S-Lion Design is not registered. Doc. 67 ¶¶ 38, 39; Ex. 102 (Interrogatory Nos. 2, 5).



**Response:** Undisputed.

77.    The S-Lion Design does not appear in the University's licensing Art Sheets or its Brand Book. *See generally* Exs. 8, 51. Nor was it listed in a 2011 chart of the University's supposed trademarks. Ex. 38. The S-Lion Design only appears in a 2011 Art Sheet related to the College Vault trademark maintenance program, described *infra* at Paragraphs 86–89. Ex. 51 at 8656.

**Response:** Undisputed that the S-Lion Logo does not appear in the University's Brand Book or in a 2011 chart presenting a non-exhaustive list of Penn State trademarks that was not created the University. Undisputed that the S Lion Logo appears on the art sheet used for Penn State marks that are part of the College Vault licensing program.

78. Documents produced by the University show the S-Lion Design used only as a decorative element of merchandise, in contexts where it is referenced as an "Old School Logo" or a "Vault Logo."



Exs. 57–58 (red annotations added).

**Response:** Undisputed that Penn State and its authorized licensees have sold genuine merchandise bearing the S Lion Logo, as shown in the screenshots included in Paragraph 78. *See also PSU Ex. 14 (Dkt. 123-17) (showing genuine Penn State merchandise bearing the S Lion Logo being offered for sale currently or since 2018); PSU Ex. 15 (Dkt. 123-18) (showing genuine Penn State merchandise being offered for sale bearing the S Lion Logo prior to 2018).* Disputed that the S Lion Logo is used "only as a decorative element of merchandise" because Vintage Brand does not support this characterization by citing to any evidence in the record. *See LR 56.1;*

*FRCP 56(c) (requiring that asserted facts be supported by citations to record evidence).*

Disputed that genuine Penn State merchandise bearing the S Lion Logo is used only "in contexts where it is reference as an 'Old School Logo' or a 'Vault Logo'." For instance, the following examples show genuine Penn State merchandise for sale bearing the S Lion Logo that do not include this verbiage:







*See, e.g., PSU Ex. 14 (Dkt. 123-17) at 2, 6, 8, 12 (examples of genuine merchandise being offered for sale by the Penn State Bookstore or Athletics department, none of which use the terms "Old School Logo" or "Vault Logo" in the product titles).*

79.     Other than the S-Logo Design being listed on the 2011 College Vault art sheet, the University is unaware of any other use or sales of items bearing that design, at least since 2000. 30(b)(6) Dep. at 67:25–68:25.

**Response:**  Disputed.  The evidence shows many examples of Penn State and its licensees selling merchandise bearing the S Lion Logo since 2000.  *See PSU Ex. 14 (123-17) at 7, 10-11, 14, 31, 35, 37-38, 40-41, 43, 46, 48 (examples of genuine Penn State merchandise bearing the S Lion Logo including on goods manufactured or sold by Penn State Athletics Online Store, The Penn State Bookstore, McLanahans, Hex Head Art, 19NINE, '47 brand, and Hillflint); see also PSU Ex. 1 (Petulla Decl.) (Dkt. 123-1), ¶ 17 (Lions Pride, Family Clothesline, and McLanahans sell authorized Penn State merchandise); PSU Ex. 2 (Penn State Dep.) (Dkt. 123-5) at 80:17-82.5, 85:5-87:6 (Penn State Athletics store and the Penn State Bookstore sell authorized merchandise); PSU Ex. 18 (Dkt. 123-21; Dkt. 130-2) at 3-4, 9 (list of authorized Penn State licensees showing that 19NINE, '47 brand, Hex Head (business name of Cobalt Design) and Hillflint (denominated as TL x HF LLC) are Penn State licensees); PSU Ex. 47 (Dkt. 123-50) at 27 (search for Penn State licensees showing TL x HF LLC listed as an authorized licensee that operates at website hillflint.com).*  Further, to the extent that Vintage Brand disputes the

authenticity of evidence obtained through the Wayback Machine, this evidence is properly considered at summary judgment because it can be authenticated via affidavit at trial. *See, e.g.*, *United States v. Bansal*, 663 F.3d 634, 667-68 (3d Cir. 2011) (affirming that screenshots from the Wayback Machine may be properly authenticated and admitted via testimony from someone who is generally familiar with the Wayback Machine and its reliability, satisfying FRE 901(b)); *see also* FRCP 56(c)(2) (material may be considered at summary judgment is capable of being admitted at trial).

### 7. The University's Trademark Licensing Program

80. As of 1981, the University took no steps to license, enforce, or prevent third-party use of any of its alleged marks. Ex. 59. In a 1981 article in the Daily Collegian titled *Logos: $$ for others — but not for Penn State*, the University's then-director of educational relations expressed that "[a]lthough Penn State allows just about everyone to use its service marks without paying for them the University would fight any attempt to register its service marks by someone else[.]" *Id*. Robert Custard, then intellectual property counsel for the University, was quoted as saying, "[s]ince the only people who buy the products are students and alumni, we get more goodwill from not charging than we would money by charging for it." *Id*.

**Response:** To the extent that Paragraph 80 purports to quote from the *Daily Collegian* article cited, that article speaks for itself.

Disputed that "as of 1981, the University took no steps to license, enforce, or prevent third-party use of any of its alleged marks." First, the cited evidence does not support this assertion. *See LR 56.1; FRCP 56(c)*. The exhibit that Vintage Brand cites talks about Penn State's decision, as of the time of that article in 1981, not to

register its trademarks through the United States Patent and Trademark Office. *See VB Ex. 59 (Dkt. 117-9) at 2.* The assertion here—that Penn State "took no steps" on licensing, enforcing, or preventing unauthorized use goes beyond what this article states. In fact, the article makes clear that Penn State owned its marks (including specifically the PENN STATE Mark, the TPSU Mark, and the University Seal among others) and that while Penn State was choosing not to register or charge royalties for all third-party uses, the University was maintaining limits on how its marks could be used. *See id. (discussing decision not to register the marks given the cost that would be associated with registering and maintaining registrations for all of the University's Marks across the different classes of goods and services; discussing University policies prohibiting certain uses of Penn State's trademarks and that Penn State had decided to permit the University Marks to be used on certain goods typically associated with the university community and for goods primarily purchased or used by "members of the University community, the local community, and other friends of the University"; making clear that beyond certain limited categories of goods, Penn State would permit exceptions to its blanket prohibition on the use of its marks for commercial purposes only if the use was specifically approved and found to enhance Penn State's image or educational mission; discussing other limits that Penn State imposed on the use of its marks, including a prohibition on using its marks in connection with liquor).* This assertion is not

supported and cannot be considered for summary judgment. *See LR 56.1; FRCP 56(c).*

Second, evidence in the record contradicts this asserted fact. A 1982 Memorandum from the University Archives noted the many requests that Penn State had received "since 1973" to license the University Marks on various goods. *PSU Ex. 22 (Dkt. 123-25) at 2-3.* The Memorandum notes clearly that "the University has already established, in an informal way, a licensing program". *Id. at 3.* The Memorandum recommended adopting a formal program that would enhance the licensing procedures, but the Memorandum contradicts the assertion here that Penn State had taken no steps to license, enforce, or prevent third-party uses of its marks. Indeed, the Memorandum notes that Penn State's responses to different licensing requests had "varied, depending upon the nature of the intended use" by a hopeful licensee, meaning that Penn State was exercising control over its marks and responding to licensing requests based on the specific intended use. *Id. at 2-3. See also id. at 4-5 (noting some of Penn State's goals and considerations in making licensing decisions, such as ensuring that its marks are not used in connection with inappropriate or scandalous goods and services, or goods of inferior quality); id. at 3 (listing some examples of Penn State's marks and related goods, and specifically identifying many of the University Marks at issue here along with goods at issue here as part of a non-exhaustive list of Penn State's protected trademarks).*

81.    However, the University began developing a licensing program shortly thereafter. 30(b)(6) Dep. at 53:24–54:3. A 1982 internal memorandum first reported that,

 Ex. 60 at 10582–83 (¶ A). The memorandum acknowledged that

Ex. 60 at 10582–83 (¶ A).

**Response:**  Undisputed that as of 1982, the University had received at least 93 requests to license the University Marks on various goods.  Undisputed that Penn State developed a formal licensing program in 1983, and that Penn State had decided to seek trademark registrations for Penn State's name and identifying symbols in 1982.  *See Declaration of Jacqueline Esposito ("**Esposito Decl.**") (PSU Ex. 7, Dkt. 123-10), ¶¶ 14-16; PSU Ex. 23 (Dkt. 123-26) at 2-4 (article dated September 23, 1982 from the Daily Collegian newspaper at Penn State reporting on decision to seek trademark registrations for the University's name and identifying symbols).*

Disputed that Penn State "only began developing its licensing program" in 1982, to the extent that this Paragraph implies that Penn State did not engage in

licensing activities prior to 1982. The Memorandum notes clearly that as of 1982, "the University ha[d] already established, in an informal way, a licensing program". *Id. at 3.* Further disputed that the University granted naked licenses and was aware of, but did nothing about, numerous other third parties using the University Marks. This assertion is not supported by evidence. The exhibit that Vintage Brand cites states only that "it is reasonable to assume, moreover, that in the past most uses of the University name and symbols have occurred without a request to or consent from the University." *VB Ex. 60 (Dkt. 117-10) at 3.* Because the evidence does not support the assertion that Penn State was aware of unauthorized uses of the University Marks, the assertion should be struck. *See LR 56.1; FRCP 56(c).*

Disputed that Penn State had taken no steps to license, enforce, or prevent third-party uses of its marks, as this is contradicted by the cited Memorandum which notes that Penn State's responses to different licensing requests had "varied, depending upon the nature of the intended use" by a hopeful licensee, meaning that Penn State was exercising control over its marks and responding to licensing requests based on the specific intended use. *PSU Ex. 22 (Dkt. 123-25) (also VB Ex. 60) at 2-3. See also id. at 4-5 (noting some of Penn State's goals and considerations in making licensing decisions, such as ensuring that its marks are not used in connection with inappropriate or scandalous goods and services, or goods of inferior quality); id. at 3 (listing some examples of Penn State's marks and related*

*goods, and specifically identifying many of the University Marks at issue here along with goods at issue here as part of a non-exhaustive list of Penn State's protected trademarks).*

82.    The memorandum went on to recommend that the University ███████ ██████████████████████████████████████████████████████ Ex. 60 at 10582, 10585 (¶ B.2), 10589–90 (¶ E), ████████████████ ████████████████████████████████████████. Ex. 60 at 10584–85 (¶ B.1), 10589–90.

**Response:**  Disputed in part.  Undisputed that the Memorandum recommends that the University register its marks and develop a formal licensing program and enforcement program.  Undisputed that the Memorandum identifies as advantages of protecting the University Marks the ability to prevent unauthorized use of the University Marks and the ability to derive licensing revenue.

Disputed as to the word "adopt" to the extent this suggests that Penn State had not previously taken steps to license, enforce, or prevent third-party uses of its marks.  The Memorandum notes that Penn State's responses to different licensing requests had "varied, depending upon the nature of the intended use" by a hopeful licensee, meaning that Penn State was exercising control over its marks and responding to licensing requests based on the specific intended use.  *See PSU Ex. 22 (Dkt. 123-25) (also VB Ex. 60) at 2-3; see also id. at 4-5*.

Disputed to the extent this Paragraph sets out only a partial list of the stated reasons for developing a formal licensing program.  The cited Memorandum lists

other reasons include: to ensure that its marks are not used with goods or services that are inherently hazardous, such as firearms or certain athletic equipment; to ensure that its marks are not used with inappropriate goods such as alcohol, tobacco, or pornography; and to ensure that its marks are not used with inappropriate services like academic coaching or academic cheating; and to ensure that the marks are used on goods and services that meet Penn State's standards for appropriateness and quality. *Id. at 4-5*.

83.     At some point after deciding to proceed with a licensing program, the University retained Collegiate Licensing Company ("CLC") as its exclusive licensing agent for retail merchandise, which relationship has continued for several decades to the present. *See* Ex. 61; 30(b)(6) Dep. at 54:4–18. CLC is the licensing agent for more than ██ colleges and universities. Ex. 62 at 8320. At least in 2015, sales from colleges and universities for which CLC acted as licensing agent ███████████████████████████████████████████" Ex. 63 at 7887.

**Response:**  Undisputed that Penn State has engaged with CLC as its exclusive licensing agent for retail merchandise, and this continues to the present day.  To the extent that Paragraph 83 quotes from an exhibit, the document speaks for itself.  Disputed that the final sentence of Paragraph 83 contains an accurate quote.  *See VB Ex. 63 (Dkt. 117-13) (Sealed) at 4 (*███████████████████████████

███████████████████████

84.     In 1988, no more than six years after the University adopted a trademark licensing program, it had licensed more than 785 entities for retail items. Ex. 64. As of August 3, 2022, the University had reduced that number to 386. Ex. 65; 30(b)(6) Dep. at 60:18–61:8. The marked decrease appears to be at least partially the result of the University's 2011 ████████████████████████ program ██████, by which it made ██████████████████████████

███████████████████████████████████████████████.” Ex. 66 at
8440. The University described the purpose of the ███ program as a method ████
████████████:



Ex. 66 at 8440 (emphasis added); *see also* Ex. 67 (refusing internal request ██████
█████████.

**Response**:  To the extent this Paragraph purports to quote from Exhibit 66,

the Exhibit speaks for itself.  Undisputed that the University has reduced its number

of licensees to protect and preserve its brand integrity in the marketplace.

Disputed that the Product Category Management program was created by the

University or reflects the University's decision-making process.  The document

Vintage Brand cites here as VB Ex. 66 comes from CLC, and the statement that the

Product Category Management program was created "██████████████████████

████████████████████████" is attributable to CLC, not Penn

State.  *VB Ex. 66 (Dkt. 117-16)* at 5-6.  Vintage Brand has failed to produce any

competent evidence that proposed responses included in the document reflect the University's decision-making process regarding its licensee base. *LR 56.1; FRCP 56(c)(1).*

Further disputed to the extent this Paragraph suggests that the University only began developing its licensing program in 1982. The Memorandum cited in Paragraphs 80-82 states that as of 1982, "the University ha[d] already established, in an informal way, a licensing program". *PSU Ex. 22 (Dkt. 123-25) at 3.*

Disputed to the extent that Vintage Brand suggests or implies that restrictions on licensees has in any way affected Vintage Brand's business model, negates its bad faith intent, or in any way justifies Vintage Brand's infringement. The only relevance that Paragraph 84 could conceivably have to Vintage Brand's motion would be to suggest or imply that Vintage Brand has been unable to obtain a license to use the University Marks because of restrictions imposed by Penn State and/or CLC. However, the evidence shows that Vintage Brand never requested permission to use the University Marks. *See Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 121:12-15 (testimony that Vintage Brand never requested permission or license to use "Penn State" on merchandise).* Further, any such inference is improper here given that Sportswear has previously licensed trademarks from other universities through CLC. *See Sportswear Dep. (Vol. 2) (PSU Ex. 36, Dkt. 123-39) at 25:23-26:17.*

85.     The University participates in two CLC licensing programs. The first is a standard licensing program, through which the University (via CLC) licenses the Lion Shield Design and the Lionhead Design—its primary educational and athletic logos, as discussed *supra* at Paragraphs 30–34—as well as the PENN STATE and TPSU text, the Seal Designs, the Nittany Lion Rock Design, and various other purported trademarks. Ex. 51.

**Response:** Undisputed.

86.     The second CLC licensing program in which the University participates is the College Vault trademark maintenance program. Ex. 51 at 8656; 30(b)(6) Dep. at 61:9–62:14. As described by CLC, the program █████████████ including ███████████████████████████ Ex. 68 at 8889, 8891. Because the historic designs in the College Vault program do not reflect an institution's current branding, that program is ████████████████████ ██████████████████████████ Ex. 68 at 8892. █████████████ ████████████████████████████████████████████ █████████████████████████ Ex. 68 at 8888.

**Response:** Undisputed that Penn State participates in CLC's College Vault program. Disputed that the College Vault program is a "trademark maintenance program." Vintage Brand uses this term "trademark maintenance program" to insinuate that the College Vault program is some sort of sham meant to make it appear that marks are continuing to be used, when that is not the case. *Vintage Brand Br. (Dkt. 115) at 10 n.2.* The record evidence is that Penn State sold goods bearing the S Lion Logo, the PENN STATE Mark, the University Seal, and the TPSU Mark through the College Vault program, showing that Penn State was actually using these marks through the College Vault program. *See, e.g., PSU Ex. 15 (Dkt. 123-18) at 40-67 (screen captures from August 3, 2017 taken through Wayback Machine showing products for sale at shop.collegevault.com, with genuine merchandise*

*bearing the PENN STATE Mark shown on p. 46, and showing genuine merchandise*
*bearing the S Lion Logo and PENN STATE Mark on pp. 51, 60).*

College Vault is a program for licensing a select set of university trademarks and merchandise "in a premium way, and to have the opportunity to sell college products in mid- or better-tier distribution outlets." *See PSU Ex. 24 (N. Armentrout Dep.) at 28:11-18, 29:11-22.* The trademarks included in the College Vault program often include trademarks considered "vintage". *See id. at 52:2-20.* To develop this exclusivity, the College Vault program purposely limits the distribution and licensing of trademarks in this program because "premium can equate to exclusivity. And when something is not seen all the time, it can become more exclusive. So [the trademarks that included in the College Vault program] were considered more exclusive than others." *Id. at 29:11-30:6.* Trademarks that are in the College Vault program are purposely limited to being sold in premium outlets, at higher price points, and are marketed with higher-quality advertising. *Id. at 36:16-41:23.*

Disputed that "Because the historic designs in the College Vault program do not reflect an institution's current branding, that program is "purposely limited to protect the value and position of the [institution's current] brand ….". The evidence contradicts this statement that the College Vault program trademarks are not "current" trademarks, as well as the statement that the College Vault program limits the Vault trademarks in order to protect the other "current" branding. This assertion

137

is completely unsupported by the evidence to which Vintage Brand cites, and distorts the cited evidence. *See VB Ex. 68 at 11.* The page Vintage Brand cites—which is taken from a presentation put out by CLC concerning the College Vault Program—is reproduced here for reference:



This evidence is discussing how marks and brands within the College Vault program are used, saying that "the program will remain purposely limited in order to protect the value and positioning of the brand while ensuring consumers get the highest-quality product." *Id.* This refers to protecting the value and positioning of *the logos*

*and brands in the College Vault program. Id.* Vintage Brand's alternative reading (that the Vault trademarks are not used, or that the Vault program is meant to drive up the value of non-Vault marks) is not supported by the evidence. Nor is there any other competent evidence to support Vintage Brand's assertions. *See LR 56.1; FRCP 56(c).* Further, record evidence (including the evidence that Vintage Brand cites here) directly contradicts this assertion, as the evidence shows that the College Vault program is an avenue by which Penn State and other schools use their marks. *See VB Ex. 68 at 11; PSU Ex. 15 (Dkt. 123-18) at 40-67 (screen captures from August 3, 2017 taken through Wayback Machine showing products for sale at shop.collegevault.com, with genuine merchandise bearing the PENN STATE Mark shown on p. 46, and showing genuine merchandise bearing the S Lion Logo and PENN STATE Mark on pp. 51, 60).*

87.    The University cannot explain how the historic designs that are licensed through its College Vault program were used prior to that licensing program:

> Q: How had these logos and designs been used before Penn State entered the College Vault Program?
> A: At some point they would have been used probably quite liberally.
> Q: How so?
> A: Well, they are retro marks and they were thought of within our community as certainly being a mark associated with Penn State especially an alumni that maybe this was the mark that was used when they went to school.

30(b)(6) Dep. at 63:6–17.

**Response:** Disputed. The cited evidence does not support the statement asserted, and in fact undercuts it. As Mr. McGrath testified, the University Marks that are licensed through the College Vault program were used and continue to be used as trademarks associated with the University. *PSU Ex. 2 (Penn State Dep.)* (*Dkt. 123-5*) *at 63:6-17.* Mr. McGrath further testified that several of the University Marks in the College Vault program were previously used as the University's primary logos. *Id.* Further, the fact asserted here is not relevant to the pending motion. The evidence shows that Penn State has been using the S Lion Logo on merchandise similar to that sold by Vintage Brand going back to before Vintage Brand first was created. *See, e.g., PSU Ex. 15 (Dkt. 123-18) at 2-68 (showing genuine Penn State merchandise for sale using the S Lion Logo, including on screenshots showing use from 2013-2018).* Vintage Brand has not produced any evidence in this litigation to dispute that Penn State owns superior rights in that mark.

88. The University could not explain any purpose for the separate College Vault program other than to maintain/manufacture purported trademark rights in historical designs associated with the University:

> Q: In terms of present in the current functioning of the College Vault Program, why have a separate group of licensees?
> A: Well, in the vault program is that we certainly want to maintain and protect our ownership of these marks, and that's one facet that's important to us.
> Q: Sure. And how do you achieve that with a separate group of licensees?
> [objection]

> A: I don't know. I mean that is something that CLC has advised us on and they have said this is the approach that we should be taking.
>
> Q: Just to make sure I understand. So part of the objective of the College Vault Program is to ensure continued protection of Penn State's trademarks; is that right?
>
> A: That's correct.

30(b)(6) Dep. at 64:13–65:8.

**Response:** Disputed. The cited deposition testimony refutes the stated assertion. As Mr. McGrath testified, the University Marks that are licensed through the College Vault program were separately classified to, among other things, allow Penn State to be more selective in its licensing practice, as not all licenses are granted as to all of the University Marks. *See, e.g., PSU Ex. 2 (Penn State Dep.) (Dkt. 123-5) at 63:22-64:7.* Further disputed that the College Vault program "manufactures" rights in the University Marks. Penn State owns valid trademark rights, based on bona fide commercial use, in each of the University Marks licensed through the College Vault program. *See, e.g., PSU Ex. 4 (Dkt. 123-7) at 3-4, 11-12 (registration certificates covering Penn State's federal registrations for the PENN STATE Marks and showing dates of first use for this mark); PSU Ex. 14 (Dkt. 123-17) at 2-6, 9-11, 14, 40-42, 53-57 (composite examples of Penn State's authorized uses of the S Lion Logo); see also VB Ex. 51 (Dkt. 117-1) at 3.*



89.     Revenue related to the ███████████████" sales of goods bearing University-related historic designs that are in the College Vault maintenance program are paltry. For example, in the 2010/2011 fiscal year, there was a total of ███████████ in revenue related to the University's participation in the College Vault program; in the 2011/2012 fiscal year, there was a total of ███████████ in revenue; and in the 2012/2013 fiscal year there was a total of ██████████4 in revenue. Ex. 69. There is no available record of what amount of revenue was attributable to which designs in the College Vault. 30(b)(6) Dep. at 71:4–73:5, 84:10–19.

**Response:**  Paragraph 89 is not relevant to the outcome of Vintage Brand's

Motion for Summary Judgment and should be disregarded. *FRE 401*; *FRCP 56(c)*.

Further, the *ipse dixit* characterization by counsel of "paltry" sales have no support

in the cited evidence and must be disregarded. *LR 56.1; FRCP 56(c)*.

90.     Revenue and royalties related to the University's standard licensing program under CLC dwarf those related to the College Vault program. The revenues and royalties from the University's standard CLC licensing program are shown below:

| Period | Revenue | Royalties |
|--------|---------|-----------|
| FY2010/2011 | ████████ | ████████ |
| FY2012/2013 | ████████ | ████████ |
| FY2014/2015 | ████████ | ████████ |
| FY2015/2016 | ████████ | ████████ |
| FY2017/2018 | ████████ | ████████ |
| FY2019/2020 | ████████ | ████████ |

Ex. 70 at 8473; Ex.71 at 8096; Ex. 62 at 8302; Ex. 63 at 7898; Ex. 72 at 8922; Ex. 73 at 8867. All of the revenue reported by CLC, as set forth in the foregoing table, was reported in the aggregate; neither revenue nor royalties were broken down by design, region, or country. These numbers lag behind the University's "peer" institutions. Ex. 62 at 8302–03; Ex. 63 at 7898; Ex. 70 at 8473; Ex. 71 at 8096; Ex. 72 at 8922; Ex. 73 at 8867.

**Response:** Paragraph 90 is not relevant to the outcome of Vintage Brand's

Motion for Summary Judgment and should be disregarded. *FRE 401*; *FRCP 56(c)*.

### 8. The Sale of "Official" Merchandise Bearing the University's Claimed Trademarks

91. Although the University claims to "invest[] significant resources in promoting, advertising, and protecting its trademarks," it was not able to provide any advertising or promotion information "broken down by mark or by good/service." Ex. 102 (Interrogatory No. 12). The University points to the CLC annual licensing reports, referenced *supra*, at Paragraph 90, which show only generic advertising/marketing conducted by CLC on behalf of the University (and other institutions). *See* Exs. 62–63, 70–73. The University also identifies a document entitled *Penn State Information* with a bullet pointed list under the header "███████" apparently showing marketing "█████" and "████████████" from fiscal year 2018 to fiscal year 2022. Ex. 74. This document does not show any marketing or promotional expenditures broken down by any of the asserted marks. *See id.*

**Response:** Undisputed that the University invests significant resources in

promoting, advertising, and protecting its trademarks evidenced in part by the CLC

annual licensing reports and the Penn State Information sheet filed as VB Exhibit

74. Further undisputed that the University's investment is not broken down by

individual mark. Disputed to the extent Vintage Brand contends that this advertising

and marketing does not demonstrate evidence that is relevant to the fame of the

PENN STATE Mark, given that "Penn State" is commonly used to refer to the

University, and so advertising and promotion of various marks owned by Penn State

promote the University overall. *See 6.41, supra.*

92. The University concedes its target consumers "for goods and services bearing its marks" are not the general U.S. population but, rather, "students, alumni,

and faculty and staff of [the University]," and "also fans and supporters of [the University] throughout both Pennsylvania and the entire United States, as well as internationally." Ex. 102 (Interrogatory No. 19). The purchase process for the University's merchandise does not involve any steps to verify that the purchaser has any formal affiliation with the University.

**Response:** Undisputed that Penn State's target customers for its genuine merchandise and services include students, alumni, faculty and staff, fans, and supports of Penn State throughout Pennsylvania and the United States, and globally.

Disputed that "The purchase process for the University's merchandise does not involve any steps to verify that the purchaser has any formal affiliation with the University." Vintage Brand does not cite to any evidence in the record to support this assertion, and so it must be disregarded. *See LR 56.1; FRCP 56(c).* Further, there is no contention or allegation in this case that consumers are limited to people with a formal affiliation to Penn State, and so this assertion is not material to this dispute.

93. The context in which the University's "officially licensed" goods are sold is markedly different than that in which Vintage Brand's are sold, as described *supra*, at Paragraphs 11–19. For example, websites on which the University's "official" goods are sold prominently and frequently reference the fact that the goods are "official" or "licensed." *E.g.*, Ex. 75 at 342 ("Officially Licensed Penn State Clothing & Merchandise"); Ex. 76 at 3 ("We pride ourselves on … carrying a large selection of officially licensed products …."); Ex. 77 at 251 ("The Collegiate Licensing Company officially licenses every product we sell."); Ex. 78 at 256 ("We're proud to be an Officially Licensed Distributor of top quality Penn State Clothing and Nittany Lions Merchandise …."); Ex. 79 at 364 ("Whether you're looking for officially licensed mens, [sic] womens, [sic] or youth PSU jerseys, the Penn State University Penn State Nittany Lions Team Store has every fan covered."); Exs. 80 at 744 ("Whatever style or brand you're searching for, the Official Penn State Nittany Lions shop has a PSU T-shirt that is perfect."). The

University concedes that such verbiage informs consumers that the goods are, in fact, licensed merchandise:

> Q: Do you know why there's any information at all stating that this -- these product offerings are officially licensed?
> [objection]
> A: Probably because it's important for our fan base to know they're buying licensed merchandise.
> Q: And in the absence of this verbiage, would your consumers not know that?
> [objection]
> A: Not necessarily.

30(b)(6) Dep. at 88:12–89:3; see also Ex. 81.

**Response:** To the extent Paragraph 93 purports to quote contents of websites selling genuine Penn State merchandise and deposition testimony, those websites and transcripts speak for themselves.

Disputed that "The context in which the University's "officially licensed" goods are sold is markedly different than that in which Vintage Brand's are sold, as described *supra*, at Paragraphs 11–19." First, the assertions set out in Vintage Brand's Paragraphs 11-19 do not accurately describe the context in which VB Penn State Merchandise is sold. *See PRSMF 11-19, supra*. Further while Paragraph 93 relies on the presence or absence of language on websites concerning whether merchandise is officially licensed, the evidence shows that this language is not effective. The survey conducted by Tülin Erdem for Vintage Brand demonstrates this—she specifically tested for differences in confusion rates based on licensure of disclaimer language, by running the survey across four separate variations on the

Vintage Brand Website: a version replicating the current "disclaimer" language (Condition A), a version with no disclaimer (Condition B), a version replacing the "disclaimers" on the current website with statements that the merchandise was "officially licensed merchandise" (Condition C), or a version with the current "disclaimer" and pop-up presenting the current "disclaimer" and requiring respondents to click an "I Acknowledge" button. *See Erdem Report (PSU Ex. 42; Dkt. 123-45) at* 14-20. A comparison of results between Condition A and Condition C to this survey contradict the fact asserted here, that the inclusion of language about licensing creates "marked differences" between customers where the Vintage Brand website contained disclaimers (both as currently set out on the website and under a condition where the disclaimer appeared on a pop-out screen and the consumer must click an acknowledgement button), contained no disclaimer, or contained a statement that the merchandise was officially licensed. *See Erdem Report (PSU Ex. 42; Dkt. 123-45) at* 14-20. The following tables show a comparison of the confusion rates across test groups based on whether respondents viewed the current VB Website, or viewed a version where "disclaimers" were replaced with an official licensing statement:

*Results where only "Penn State" verbatims were counted as confused:*

|  | Condition A<br>Current VB Website | Condition C<br>Official Licensing Statement |
|---|---|---|
| Test Group 1 | 19% | 28% |

| | | |
|---|---|---|
|  | | |
| Test Group 2<br> | 30% | 29% |
| Control Group<br> | 17% | 22% |

*See PSU Ex. 42 (Dkt. 123-45) at 32; Erdem Rep. (Dkt. 83-1), Ex. 4.1.C (exhibit attached to T. Erdem Report showing confusion rates calculated under Condition C).*

*Revised results including answers referencing College or University as confused:*

| | Condition A<br>Current VB Website | Condition C<br>Official Licensing Statement |
|---|---|---|
| Test Group 1<br> | 35% | 44% |
| Test Group 2<br> | 44% | 47% |
| Control Group<br> | 30% | 34% |

*See PSU Ex. 67 at 2, 8 (revised likelihood of confusion rates calculated by T. Erdem).*

This data shows that replacing the "disclaimer" language with an "officially licensed" statement resulted in slightly higher confusion about whether Penn State was a source or sponsor for Test Group 1, but the overall confusion rates are significant in both conditions. Further, the fact that the rate of confusion in Erdem's original calculations for Test Group 2 actually *decreased* when a "disclaimer" was replaced with an "officially licensed" statement totally contradicts Vintage Brand's assertion that these statements create markedly different shopping environments for customers.

94. There are also other indications that such websites are selling "official" merchandise. For example, the Lionhead Logo, the University's primary athletic logo, appears on the top of every page of the Penn State Athletics Online Store. *E.g.*, Exs. 76, 79–80. Similarly, the domain name of one licensed retailer is www.pennstateclothes.com. *E.g.*, Exs. 78, 82. To make such "official" affiliation clear to consumers, the University also requires, as a matter of the Standard Retail Licenses, that licensees affix the "Official Label" to all officially licensed goods:

(a) ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████

(b) ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████

Ex. 83 at 7490 (§ 11(a)–(b)) (emphasis added). The Standard Retail License defines the term "Official Label" as:



Ex. 83 at 7479 (§ 1(t)) (emphasis in original).

**Response:** Undisputed that the Penn State Athletics website at <gopsurv.com> includes the Lionhead Logo at the top left of the website. *See VB Exs. 76, 79-80 (Dkts. 117-26, 117-29, 117-30).* Disputed that the Lionhead Logo appears in this manner on websites run by Penn State licensees. Disputed that the inclusion of the Lionhead Logo at the top left of the official Penn State Athletics online store negates or dispels confusion in this case. Vintage Brand's statement that this is one way consumers know whether or not merchandise is genuine, but the evidence shows that websites run by Penn State's authorized licensees include those licensees' own logos and marks in the header of the website, often in the top left spot, just like the Vintage Brand logo appears on the VB Penn State Store:



Vintage Brand Website
*PSU Ex. 32 (Dkt. 123-35) at 3*

19NINE Website
*PSU Ex. 48 (Dkt. 123-51) at 3*



’47 Brand Website
*PSU Ex. 48 (Dkt. 123-51) at 6*

Nike Website
*PSU Ex. 48 (Dkt. 123-51) at 107*


Homefield Website
*PSU Ex. 48 (Dkt. 123-51) at 111*

*See also PSU Ex. 18 (Dkt. 130-2) at 2-9 (list of authorized Penn State licensees showing that 19NINE, '47 brand, Nike, and Homefield are all authorized to sell Penn State merchandise). See also PSU Ex. Franklyn Report (Ex. 41) at 6, 44-45 (likelihood of confusion survey conducted by David Franklyn where stimuli showed screenshots of VB Penn State Merchandise with the Vintage Brand logo visible at the top left of the website, and where net confusion scores indicated that 27% - 37% of consumers were nonetheless confused about source, sponsorship, affiliation, or licensure as to Penn State).*

Undisputed that one licensed retailer is permitted to use a domain name that incorporates "Penn State." Disputed that this negates or dispels confusion in this

case, as the evidence shows that Penn State has many licensees and most do not use domain names that include "Penn State" or any other University Mark. *See, e.g.* *PSU Ex. 18 (Dkt. 130-2) at 2-9; PSU Ex. 47 (Dkt. 123-50) at 3-30 (licensee search run through CLC showing domain names for 386 licensees, with only Family Clothesline using a domain name with "Penn State").* This evidence about 1 of the domain names for hundreds of licensees does not show any indication that domain names provide a clear indication to consumers about whether the site is selling official Penn State merchandise. Further, there is evidence contradicting this inference that a website run through a domain name without "Penn State"—such as the VB Website—will negate any confusion. *See Maffey Dep. (PSU Ex. 37, Dkt. 123-40) at 54:25-55-13 (testimony that Meghan Maffey, who visit the VB Website had the impression that Vintage Brand was authorized to use Penn State's trademarks).*

Undisputed that the Standard Retail License for merchandise that is licensed through CLC requires that merchandise be affixed with an "Official Label." Disputed that this requirement applies to all merchandise that is authorized by Penn State, as the evidence here does not support that statement. The Agreement cited in Paragraph 94 covers only licenses entered through CLC, and there is nothing in this Paragraph to show that this requirement would apply to licensing agreements that Penn State enters directly with third parties. *See LR 56.1; FRCP 56(c).* Disputed

that the requirement that merchandise, packaging, and advertisements use an "Official Label" on licensed merchandise supports the asserted fact that this is an indication that "websites are selling 'official' merchandise" because this requirement does not provide any such indication on the websites. A customer who buys a product online (or in a retail store) will encounter the "Official Label" affixed to the merchandise and (if applicable) the packaging, but that Official Label is not present at the point of purchase. This is illustrated below, where a physical item that was purchased shows the "Official Label" affixed to the product, but screenshots of that same shirt and a similar shirt being sold online do not show the "Official Label" in the online purchasing environment:



| *Purchased T-Shirt Put Out by '47 Brand with Hangtag:* | *'47 Brand T-Shirt Online:* |
|---|---|

*See PSU Ex. 14 (Dkt. 123-17) at 38.*

*Additional '47 Brand T-Shirt Online:*



*See PSU Ex. 14 (Dkt. 123-17) at 42;*
*PSU Ex. 42 (Dkt. 123-45) at 6.*

*See also PSU Ex. 18 (Dkt. 130-2) at 2-9 (list of authorized Penn State licensees showing that '47 Brand is authorized to sell Penn State merchandise).* Because the evidence does not support the assertion that the "Official Label" indicates to consumers whether or not a website is selling official licensed merchandise, this statement of fact must be disregarded. *See LR 56.1; FRCP 56(c).*

95. The "Official Label" requirement extends to the College Vault trademark maintenance program:

(a) 



(b)

Ex. 84 at 7563 (§ 10(a)–(b)) (emphasis added).

**Response:**   To the extent that Paragraph 95 quotes from exhibits, that document speaks for itself.   Disputed that the requirement that merchandise, packaging, and advertisements use an "Official Label" on licensed merchandise supports the asserted fact here, which is used to support the assertion in Paragraph 94 that the "Official Label" initiative tells consumers whether or not "websites are selling 'official' merchandise". *See DSMF ¶ 94.* The "Official Label" requirements described here do not provide any such indication.   A customer who buys a product online (or in a retail store) will encounter the "Official Label" affixed to the merchandise and (if applicable) the packaging, but that Official Label is not present at the point of purchase. *Compare PSU Ex. 14 (Dkt. 123-17) at 38 (image of a purchased t-shirt from the '47 brand, which shows the "Official Label" affixed to the shirt), with PSU Ex. 14 (Dkt. 123-17) at 42 & PSU Ex. 42 (Dkt. 123-45) at 6 (screenshots of the same and a nearly identical t-shirt both from the '47 brand being offered for sale online, with no "Official Label" or reference thereto visible on the*

website).  *See also PSU Ex. 18 (Dkt. 130-2) at 2 (list of authorized Penn State licensees showing that '47 Brand is authorized to sell Penn State merchandise).* Because the evidence does not support the assertion that the "Official Label" indicates to consumers whether or not a website is selling official licensed merchandise, this statement of fact must be disregarded.  *See LR 56.1; FRCP 56(c).*

Disputed that the College Vault program is a "trademark maintenance program."  Vintage Brand uses this term "trademark maintenance program" to insinuate that the College Vault program is some sort of sham meant to make it appear that marks are continuing to be used, when that is not the case.  Vintage Brand Br. (Dkt. 115) at 10 n.2.  The record evidence is that Penn State sold goods bearing the S Lion Logo, the PENN STATE Mark, the University Seal, and the TPSU Mark through the College Vault program, showing that Penn State was actually using these marks through the College Vault program.  *See PSU Ex. 15 (Dkt. 123-18) at 40-67 (screen captures from August 3, 2017 taken through Wayback Machine showing products for sale at shop.collegevault.com, with genuine merchandise bearing the PENN STATE Mark shown on p. 46, and showing genuine merchandise bearing the S Lion Logo and PENN STATE Mark on pp. 51, 60).* Disputed that this fact is material to any claim or defense in this case.

96.    For over three decades the "Official Label" requirement has been central to CLC's "Look for the Label" marketing strategy. For example, in 1991, CLC sent a letter to a retailer that was removing the Official Labels, in which it set forth how removal of the Official Label interferes with collegiate merchandising:

\*       Interference with enforcement efforts. The Collegiate Licensing Company has established an enforcement program to prevent the sale of infringing products. This serves to protect the university marks and the market position of licensees and retailers that sell licensed products. Our enforcement program includes staff members and outside investigators who shop the marketplace for unauthorized products. *The "Officially Licensed Collegiate Products" label is the bedrock of our enforcement program, as the label is the symbol that the products bearing it are licensed*. Products not containing the "Officially Licensed Collegiate Products" label are suspected of being infringing, and subject to seizure. Thus, your removal of this label seriously hampers our enforcement efforts.

\*       Interference with licensing requirements. As you know, with regard to the colleges represented by The Collegiate Licensing Company, *display of the "Officially Licensed Collegiate Products" label is required as per our license agreements with licensees*. Failure to use the label can result in legal problems for the licensee, including contract termination. Thus, by removing the labels, you may cause legal problems for the licensee.

….

\*       Interference with consumer rights. Your removal of these tags or labels materially changes the nature of the products in a manner which *interferes with the consumers' right to be fully informed as to the nature of the product that they are purchasing*.

\*       Interference with marketing program. Our marketing efforts are based in part upon the "Look for the Label" concept; the label is featured prominently in advertisement and informational materials, such as those that we showed you during our meeting, and is *recognized by the public as the symbol of quality collegiate products*. Retailers and consumers are encouraged to buy only items containing the label, as they can be assured that those items are authorized by the school, and that the school benefits from their sale. Further, we are advising retailers to refuse to accept unlabeled merchandise. Our goal is 100% compliance with the label requirement. Your removal of the label eliminates the benefit that you would otherwise receive from our marketing efforts centered around the label. In addition, *it thwarts our*

*"Look for the Label" marketing program and confuses consumers who are looking to buy licensed products.*

Ex. 85 at 10135–36 (emphasis added); see also Ex. 86.

**Response:**  Disputed in part.  To the extent this Paragraph purports to quote from the 1991 letter attached as Vintage Brand Exhibit 85, the letter speaks for itself. Disputed that "For over three decades the 'Official Label' requirement has been central to CLC's 'Look for the Label' marketing strategy."  The cited evidence shows correspondence from 1991 and 1998 do not support this characterization of the role that the "Official Label" requirement played in CLC's overall marketing plans across three decades.

Further disputed that this Paragraph is relevant given that Vintage Brand is an e-commerce company that operates online.  *Vintage Brand Dep. (PSU Ex. 30, Dkt. 123-33) at 81:4-13, 231:7-232:8.*  The evidence shows that the "Official Label" requirement for CLC licensees does not provide consumers shopping online any indication of whether or not merchandise is genuine.  *Compare PSU Ex. 14 (Dkt. 123-17) at 38 (image of a purchased t-shirt from the '47 brand, which shows the "Official Label" affixed to the shirt), with PSU Ex. 14 (Dkt. 123-17) at 42 & PSU Ex. 42 (Dkt. 123-45) at 6 (screenshots of the same and a nearly identical t-shirt both from the '47 brand being offered for sale online, with no "Official Label" or reference thereto visible on the website).  See also PSU Ex. 18 (Dkt. 130-2) at 2 (list of authorized Penn State licensees showing that '47 Brand is authorized to sell Penn*

*State merchandise).  See also generally PSU Exs. 3, 5, 8, 13, 14, 15, 16, 48 (Dkt. 123-6, 123-8, 123-11, 123-16, 123-17, 123-18, 123-19, 123-51) (examples of genuine Penn State merchandise showing that websites selling genuine Penn State merchandise do not show the "Official Label" online to consumer at point of sale).*

Disputed that this fact is material to any claim or defense in this case.

97.    In 2011, CLC introduced an updated "Official Label" hologram, the purpose for which was "███████████████████████████████████" by adding "███████████████████████████████████████████████████████████." Ex. 87 at 7907 (emphasis added).

**Response:**  Paragraph 97 is not relevant to the outcome of Vintage Brand's

Motion for Summary Judgment and should be disregarded.  *FRE 401*; *FRCP 56(c)*.

98.    CLC[2] owns two federal registrations for the design used with the holographic, source-identifying Official Labels, Registration Nos. 1,578,038 (the "'038 Registration") and 3,221,094 (the "'094 Registration").



**Response:**  Paragraph 98 is not relevant to the outcome of Vintage Brand's

Motion for Summary Judgment and should be disregarded.  *FRE 401*; *FRCP 56(c)*.

---

[2] The registrations are owned by "IMG COLLEGE LICENSING, LLC," which is the previous name of CLC. Armentrout Dep. at 23:13–20.

99.    The '038 Registration was issued in 1990 and covers "licensing services in the field of collegiate products and promotions for college, universities, and post-season bowls." The '094 Registration was issued in 2007 and covers a wide range of typical merchandise, such as jewelry and apparel, all with a claimed first use in commerce date of August 1984.

**Response:**  Paragraph 99 is not relevant to the outcome of Vintage Brand's

Motion for Summary Judgment and should be disregarded.  *FRE 401*; *FRCP 56(c)*.

100.    Below is an example of the "Official Label" prominently affixed to a College Vault product via an attention-grabbing tag:



Ex. 88 (red annotation added).

**Response:**  Undisputed that Vintage Brand Exhibit 88 depicts an example of

genuine Penn State merchandise that bears a label indicating the College Vault

program.   Disputed that the College Vault label is "prominently affixed" or

"attention-grabbing."   The only evidence Vintage Brand cites to support those

characterizations is a picture of the merchandise with a College Vault label affixed,

which notably needed to be annotated, cropped and enlarged to draw attention to the

label.  This statement should therefore be disregarded as unsupported by competent evidence.  *LR 56.1; FRCP 56(c)(1)*.  Disputed that this Paragraph is relevant to the pending motion, given that it shows an image of a purchased item and does not reflect the point of sale environment for this same product.  *Compare PSU Ex. 14 (Dkt. 123-17) at 38 (image of a purchased t-shirt from the '47 brand, which shows the "Official Label" affixed to the shirt), with PSU Ex. 14 (Dkt. 123-17) at 42 & PSU Ex. 42 (Dkt. 123-45) at 6 (screenshots of the same and a nearly identical t-shirt both from the '47 brand being offered for sale online, with no "Official Label" or reference thereto visible on the website)*.  Disputed that the asserted fact is material to any claim or defense in this case.

101.  University-related merchandise, including officially licensed merchandise, is frequently marketed and sold as a way to express affinity for, or affiliation with, the University. *E.g*., Ex. 89 at 1546 ("There are more ways than you might think to honor your alma mater with clothing, gear, and decor from the team shop…. Distinguish yourself from other college sports fans by wearing team apparel that shows everyone exactly who you're rooting for."); Ex. 90 ("Take your Penn State fandom to the next level with our extensive selection of t-shirts, jerseys, hats, sweatshirts, and more.").

**Response**: Disputed.  To the extent that this Paragraph quotes from website copy set out on websites selling genuine Penn State merchandise, that copy speaks for itself.

Disputed that the fact asserted here is material or can support Vintage Brand's argument that the sole function of the University Marks on merchandise is to serve an expressive purpose rather than any source indicating function.  *See Dkt. 115 at*

*38-39 (citing DSMF ¶ 101 to argue that aesthetic functionality applies and renders traditional likelihood of confusion analysis inapplicable).* Aesthetic functionality does not apply simply because something serves an expressive function; the <u>sole</u> function must be expressive. *See Jack Daniel's, 599 U.S. at _, 2023 WL 3872519, at \*3, \*6 (discussing the different functions that trademarks can serve and specifically addressing that something can be both expressive and a trademark).* This Paragraph does not purport to assert that the only function of the University Marks on merchandise such as apparel is to provide "a way to express affinity for, or affiliation with" Penn State; it at most asserts that this expressive function is something some websites seek to use to market their products. This is irrelevant to aesthetic functionality. *See id.* Disputed to the extent that Vintage Brand seeks to imply or suggest that the evidence shows that the University Marks do not serve a source-indicating function, as this is not supported by the evidence and amounts to unsupported attorney *ipse dixit*. *LR 56.1; FRCP 56(c).*

Disputed that the evidence cited supports the assertion written. The evidence shows copy from just two websites, out of hundreds of licensees authorized to sell Penn State merchandise. *See PSU Ex. 47 (Dkt. 123-50) at 2-30 (list of licensees authorized through CLC).* There is nothing in the evidence speaking to how customers perceive the marketing on these two websites, or whether merchandise

bearing the University Marks is commonly used by customers for expressive purposes.

The evidence contradicts the assertion here, which cites to just two examples of website copy to support a broad assertion about how the University Marks function on merchandise. The evidence shows that the University Marks are used on merchandise in many different ways—appearing in different locations, in different formats, and in different sizes. The following chart shows different examples of genuine Penn State merchandise that bear the University Marks in different locations, sizes, and formats, along with a close-up view of the University Mark for viewability:



*PSU Ex. 3 (Dkt. 123-6) at 66*

*PSU Ex. 8 (Dkt. 123-11) at 15*

| PSU Ex. 8 (*Dkt. 123-11*) at *17* |
|:---:|
|   |
| *PSU Ex. 13 (Dkt. 123-16) at 5* |
|   |
| *PSU Ex. 13 (Dkt. 123-16) at 21* |
|   |
| *PSU Ex. 13 (Dkt. 123-16) at 22* |
|   |
| *PSU Ex. 14 (Dkt. 123-17) at 16* |
|   |
| *PSU Ex. 14 (Dkt. 123-17) at 21* |
| |



*PSU Ex. 14 (Dkt. 123-17) at 28*



*PSU Ex. 14 (Dkt. 123-17) at 33*



*PSU Ex. 14 (Dkt. 123-17) at 46*



*PSU Ex. 14 (Dkt. 123-17) at 54*



*PSU Ex. 14 (Dkt. 123-17) at 54*

*PSU Ex. 16 (Dkt. 123-19) at 47*

*PSU Ex. 5 (Dkt. 123-8) at 28*

And as shown in the above examples of use, the University Marks are frequently used alongside trademark notifiers such as the symbols ® and ™. *See generally PSU Ex. 3 (Dkt. 123-6); PSU Ex. 5 (Dkt. 123-8); PSU Ex. 14 (Dkt. 123-17); PSU Ex. 16 (Dkt. 123-19);* -Given that the evidence shows that the University Marks are used in a variety of different manners, Vintage Brand cannot establish an undisputed fact that the University Marks are as a whole expressive as applied to the merchandise at issue in this case.

102. The desire for merchandise bearing the University's alleged marks to demonstrate consumers' affinity for, or affiliation with, the University is further shown by e-mail received by the licensing department. For example, the University ██████████████████████████████████████████████████████████████████████ ” Ex. 91; *see also* Exs. 92–98. Other correspondence clearly evinces individuals' desire to ███████████ ███████████████████████████████████████████████████████████████. Ex. 99. And further examples include the president of the ████████████████Chapter of the University's Alumni Association ██████████████████████████████████████ ███████████. Ex. 100.

**Response:** Undisputed that Penn State has received requests from people seeking to obtain merchandise through authorized channels. Disputed that the exhibits cited support the assertion here, or that they show that customers seek to buy Penn State merchandise "to demonstrate [their] affinity for, or affiliation with" Penn State or to use non-licensed vendors. VB Exhibits 91-98 show only that customers had attempted to order merchandise through the website CustomInk, that this website told these individual that approval from Penn State was needed in order for CustomInk to create the merchandise, and that these people then reached out to Penn State's Licensing Department to request that approval. *See VB Ex. 91 at 9; VB Ex. 92 at 9;VB Ex. 94 at 10; VB Ex. 95 at 9; VB Ex. 96 at 8-9; VB Ex. 97 at 4; VB Ex. 98 at 9.* In fact, Vintage Brand Exhibit 93 even more squarely contradicts the assertion here, as the student seeking to have merchandise created using the University Seal asked specifically for the Licensing Department to "send me a list of approved websites that offer 'design you own' t-shirts"—showing that she sought to use a licensed and permitted vendor. *See VB Ex. 93 at 8-9.* These exhibits also

undercut Vintage Brand here because many of these exhibits specifically show customers asking for Penn State's approval not just to have a design printed by a specific vendor, but to use Penn State's trademarks. *See, e.g., VB Ex. 98 at 8-9 (email from a student who had designed a logo to use with the Vietnamese Student Association at Penn State and asking for "permission to use the Nittany Lion's head on our organization logo", and sending a copy of that proposed logo for the Licensing Office's review); VB Ex. 98 at 9 (email from a student who had designed a shirt to give her parents, and contacting Penn State Office of Licensing Programs because "I wanted to make sure that making the shirts would be ok. I did not use any Penn State logos or official print, I just mentioned the name 'Penn State'" and asking for the Licensing Office to review those designs).*

Disputed that the cited correspondence "clearly evidences individuals' desire to use a non-licensed vendor for the 'quality and low cost' of the specific vendor's shirts. This assertion is not supported by the cited evidence, VB Exhibit 99, which is an email chain discussing someone who was interested in becoming a licensee, and discussing how to help this potential licensee undergo the licensing process. *VB Ex. 99 at 2 (discussing how to help a potential licensee become licensed, with no reference made to an individual wanting to use a vendor that is not licensed).* Similarly, VB Exhibit 100 is an email chain where customer requests information about licensed vendors and indicating "Not a problem using one of the licensed

vendors", and in discussing printing shirts for alumni group in Frederick, Maryland, noting that customer had been interested in "help[ing] a local business also". *Ex. 100 at 2.*

The evidence cited here does not support the facts asserted about customers' desires in purchasing Penn State merchandise. Because the assertions are not supported by evidence—and because some of the evidence contradicts the assertions—this Paragraph does not establish a material fact. *See LR 56.1; FRCP 56(c).* Disputed that the asserted fact is material to any claim at issue in this case.

## C.     ACTUAL CONFUSION

103.   The only "actual confusion" evidence offered by the University is the testimony of Meghan Maffey. 30(b)(6) Dep. at 107:19–109:13. Ms. Maffey is a 2017 graduate of the University and President of the Washington D.C. Chapter of the University's Alumni Association. Maffey Dep. at 20:13–19, 26:22–32:5.

**Response:** Disputed in part. Undisputed that Ms. Maffey is a 2017 graduate of the University and is President of the Washington D.C. Chapter of the University's Alumni Association. Undisputed that Ms. Maffey's testimony goes to actual confusion.

Disputed that Ms. Maffey is the University's only evidence of actual confusion. The University's expert report establishes actual confusion as to source, sponsorship, approval, or licensure among survey respondents who observed two Vintage Brand webpages selling products bearing the VB Penn State Marks. *See PSU Ex. 41 (Franklyn Report) (Dkt. 123-44) at 6 ("After viewing the Penn*

*State apparel as offered on the Vintage Brand website, a significant percentage of*

*consumers are confused as to source, sponsorship, approval, or licensure of the*

*products.").*

104. On behalf of the D.C. Chapter of the Alumni Association, Ms. Maffey sent an e-mail to Vintage Brand in August, 2022, soliciting a donation. Ex. 101. Ms. Maffey reached out to "over a hundred" websites during that solicitation process. Maffey Dep. 42:22–43:5. She sent the "[e]xact same email" to solicit each such company. Maffey Dep. 48:19–49:2. Upon receiving a copy of that e-mail in discovery, counsel for the University contacted Ms. Maffey to discuss her potentially acting as a witness. Maffey Dep. at 9:4–12:9. Prior to being contacted by the University's counsel, Ms. Maffey "did not think about" whether Vintage Brand was a licensee of the University. Maffey Dep. at 15:8–14.

**Response:** Disputed in part. Undisputed that Ms. Maffey emailed Vintage

Brand in August 2022 seeking items to be donated for raffle at Penn State watch

parties. Undisputed that Ms. Maffey testified that she sent the same email to more

than one hundred other companies seeking items to be donated. Undisputed that

outside counsel for the University contacted Ms. Maffey after learning about her in

the discovery that was produced by Defendants. Undisputed that counsel for Penn

State discussed with Ms. Maffey the possibility of her providing testimony

concerning her relevant knowledge.

Disputed that Ms. Maffey had not formed an opinion about whether Vintage

Brand was a licensee of the University at the time she visited the website. To the

contrary, Ms. Maffey testified that her review of the Vintage Brand website gave her

the impression that Vintage Brand was authorized to use Penn State's trademarks.

*Maffey Dep. (PSU Ex. 37, [Dkt. 123-40](#)) at 54:25-55-13 (Meghan Maffey testifying that she did not see any language on the Vintage Brands website speaking to whether Vintage Brand has any affiliation or relationship to Penn State and that it was her impression that Vintage Brand was authorized to use Penn State's trademarks)*.  In fact, she testified that she would not have been comfortable accepting any of Vintage Brand's Penn-State-branded merchandise if she had known it was not authorized by the University.  *Id. at 52:10-13.*

Disputed to the extent that this Paragraph suggests or implies that Ms. Maffey did not provide honest testimony or that she was coached in any way.  She testified that neither Penn State nor the Alumni Club had not tried to persuade her testimony in one way or another, and that her deposition testimony was true and accurate.  *Id. at 55:14-24.*

105.   Ms. Maffey testified that she "specifically recall[ed] looking at product offerings" on the Vintage Brand website. Maffey Dep. at 38:13–15. However, when asked what University-related designs she recalled seeing on the Vintage Brand Website, she testified "[t]he paw print and the chipmunk logo." Maffey Dep. at 39:11. Ms. Maffey described the paw print:

> Q: … can you describe what the paw print logo looks like?
> A: It is the Penn State paw print. It's navy and white, as every Penn State logo is. It has a slash or a white -- the line, rounded line in the left, I believe the left side. But it is the Penn State paw print.

Maffey Dep. at 39:15–19. That description is consistent with the "Nittany Lion Paw Print" shown in the University's Brand Book as well as its licensing Art Sheets:



Ex. 51; *see also* Ex. 8 at 5790–91. However, that image has <u>never</u> appeared on the Vintage Brand website. Hartvigson Decl. ¶ 40.

**Response:** Disputed in part. Undisputed that Ms. Maffey testified that she remembered looking at product offerings on Vintage Brand's website.

Disputed to the extent that this Paragraph does not set out the full scope of testimony. When Ms. Maffey was asked about what specific product offerings she recalled seeing on the Vintage Brand Website, she responded, "I can't recall which one." *PSU Ex. 70 (Maffey Dep.) at 38:13-39:3.* When pressed on this, she again responded, "I can't recall – I can't confirm which one …" before saying that she saw the "paw print and the chipmunk logo." *Id. at 39:3-11.* Ms. Maffey was then asked to describe what each of those logos looks like for "someone[ who's] not familiar [with] what either of those might refer to", and she gave the description quoted in this Paragraph. *Id. at 39:12-40:2.* Further disputed because Ms. Maffey testified that the PENN STATE Mark and the University Seal may have been on the merchandise she saw offered on the VB Website. *Id. at 54:9-24.*

106. The University's "Lionhead Design" is sometimes colloquially referred to as the "Chipmunk." *See* Maffey Dep. at 39:20–40:2; *see also* Hartvigson Decl. ¶ 39. That is consistent with Ms. Maffey's description:

> Q: And the other one you mentioned was the chipmunk logo, I think. What's that one look like?
> A: It is the lion head, it is the Penn State lion head.
> Q: It's like a profile of the lion head; is that right?
> A: Correct.

Maffey Dep. at 39:20–40:2. As described *supra*, at Paragraphs 30–34, the Lionhead Design—a/k/a the "Chipmunk"—never appeared on the Vintage Brand website. Hartvigson Decl. ¶ 40.

**Response:**  Disputed in part.  Undisputed that the Lionhead Logo is sometimes colloquially referred to as the "chipmunk" and that Ms. Maffey described this logo as appearing on Vintage Brand merchandise offered for sale on the Vintage Brand website.

Disputed that the Lionhead Logo has never appeared on the VB Website.  The only cited evidence purporting to rebut Ms. Maffey's testimony is the self-serving testimony of Chad Hartvigson, who admittedly does not know all of the merchandise that has been made available for sale on the Vintage Brand Website.  *Ex. 58 (Vintage Brand Dep.) at 169:6-13 (Chad Hartvigson testifying that Erik Hartvigson and Michelle young decided what to load onto the website and that "there is nobody" that "knows what's actually on there."); PSU Ex. 38 (Dkt. 123-41) at 54-55, 57-59, 61, 65, 68, 71, 72, 78 (Penn State-related memorabilia produced for inspection by Vintage Brand that contain images of the Lionhead Logo currently used by Penn State as its primary trademark for the Athletics program).*

107.  As such, the two designs Ms. Maffey recalled appearing on Vintage Brand's website did not, in fact, appear on the website at any time. Upon questioning

by the University's counsel, Ms. Maffey could not recall any products with the PENN STATE text, the Seal Designs, or any of the University's other claimed marks appearing on the website. Maffey Dep. at 54:9–22, 56:10–17.

**Response:** Disputed. Ms. Maffey's testimony was clear that she recalled seeing Penn State merchandise for sale on the VB Website, but that she could not specifically recall what trademarks and logos she had seen on the Website. *See 38:13-40:11, 54:3-24.* The only cited evidence purporting to rebut Ms. Maffey's testimony that Vintage Brand offered for merchandise bearing Penn State's paw print and lion head logos is the self-serving testimony of Chad Hartvigson, who admittedly does not know all of the merchandise that has been made available for sale on the Vintage Brand Website. *Ex. 58 (Vintage Brand Dep.) at 169:6-13 (Chad Hartvigson testifying that Erik Hartvigson and Michelle young decided what to load onto the website and that "there is nobody" that "knows what's actually on there.").*

108. Perhaps even more telling of Ms. Maffey's clearly mistaken testimony is that she stated unequivocally that she visited and reviewed the Vintage Brand website in late July, 2022, or on August 1, 2022, the latter being the date on which she sent the solicitation e-mail. Maffey Dep. at 38:3–9. She had not looked at Vintage Brand's website prior to that time. Maffey Dep. at 52:21–53:6. She testified to reviewing a University-specific page:

> Q: When you visited it, there was -- you've testified -- I want to make clear. When you visited it, there was a page for Penn State gear available?
> A: Yes.
> Q: Is that right?
> A: Yes.

Maffey Dep. at 54:3–8. Ms. Maffey testified to navigating the Vintage Brand website to that University-specific webpage. Maffey Dep. at 40:9–41:11. However,

her declared action was impossible, because Vintage Brand had taken down the University-related pages during the pendency of this lawsuit, disabling it in mid-August, 2021, and enabling it only for a brief period in February, 2022, in order to capture images of webpages to produce in discovery. Hartvigson Decl. ¶¶ 28, 41.

**Response:** Disputed. There is no competent evidence to support Vintage Brand's assertion that Ms. Maffey's testimony was mistaken. Evidence shows that the VB Penn State Store has not been removed, and that as recently as June 21, 2023, the Store could be accessed publicly. *See PSU Ex. 61*. Further, Vintage Brand's own expert Tulin Erdem testified that she viewed the VB Penn State Store in December 2022, undercutting Vintage Brand's assertion that the VB Penn State Store has not been accessible. *See PSU Ex. 68 (Erdem Dep.) at 65:3-66:20 (testimony that Erdem and her team reviewed the Vintage Brand Website in December 2022 and decided from that website what images to include in the consumer survey, selecting the test images showing Penn State apparel from that website); id. at 36:11-14 (testimony from Erdem that she was first approached to work on this case in August 2022).*

109.   Ms. Maffey testified that she learned about Vintage Brand from another Big Ten alumni chapter in Washington D.C. Maffey Dep. at 12:20–13:2. Ms. Maffey could not recall if she received Vintage Brand's e-mail address from the Vintage Brand website. Maffey Dep. at 41:12–15. However, she testified that she possibly received Vintage Brand's contact information from the member of the Big Ten alumni chapter that informed her of Vintage Brand. Maffey Dep. at 42:5–15.

**Response:** Undisputed.

110.   Regardless of whether Ms. Maffey actually visited Vintage Brand's website to get contact information and review available products, she testified firmly that her views about use of alleged University marks were based entirely on her assumptions about the legal requirements for printing of those marks:

Q: … [W]e talked about how [the University's counsel] mentioned on the phone that Vintage brand wasn't authorized to sell Penn State products. And I asked before she said that on the phone, is that something that you even thought about, and I believe you said no.

A: I -- with my knowledge of Penn State and Penn State athletics, and spending four years a -- at the University, apologies, I in good faith would -- and -- can I rephrase everything I just said?

Q: Sure.

A: I, I did not -- you're correct, I did not think about the licensing, as my experience with Penn State licensing is that if it has the logo on it, it's trademarked through the University.

Q: So is it fair to say, and correct me if it's not accurate, is it fair to say that you have an assumption that if an item of apparel makes reference to Penn State, that Penn State owns that reference and it must be licensed; is that sort of your operating assumption?

A: Yes.

Maffey Dep. at 57:4–58:2.

**Response:** Disputed. The implication and suggestion that Ms. Maffey did not actually visit the VB Website is contradicted by her testimony which is clear that she visited the website, and which is confirmed by the fact that she subsequently reached out to Vintage Brand. *See PSU Ex. 70 (Maffey Dep.) at 40:13-42:11, 54:3-8; PSU Ex. 52 (Dkt. 123-55) at 2 (email from Ms. Maffey to Vintage Brand seeking Penn State merchandise to use as for a fundraiser).* Further, the evidence undercuts Vintage Brand's assertion that the VB Penn State Store was not accessible at the time Ms. Maffey said she visited. Evidence shows that the VB Penn State Store has not been removed, and that as recently as June 21, 2023, the Store could be accessed publicly. *See PSU Ex. 61.* Further, Vintage Brand's own expert Tülin Erdem

testified that she viewed the VB Penn State Store in December 2022, undercutting Vintage Brand's assertion that the VB Penn State Store has not been accessible. *See PSU Ex. 68 (Erdem Dep.) at 65:3-66:20 (testimony that Erdem and her team reviewed the Vintage Brand Website and decided from that website what images to include in the consumer survey, selecting the test images showing Penn State apparel from that website); id. at 36:11-14 (testimony from Erdem that she was first approached to work on this case in August 2022)*

Disputed that Ms. Maffey's belief that Vintage Brand was selling genuine Penn State merchandise "were based entirely on her assumption about the legal requirements for printing of those marks", as the record does not support that assertion. The record shows that Ms. Maffey testified that her confusion about whether the Vintage Brand merchandise was licensed came from "my knowledge of Penn State and Penn State athletics," and that "my experience with Penn State licensing is that if it has the logo on it, it's trademarked through the University." *See VB Ex. 2 (Maffey Dep.) (Dkt. 116-29) at 57:4-58:2.*

## D. THE CONSUMER SURVEYS

### 9. Experts Retained

111. The University retained David Franklyn. Mr. Franklyn conducted two surveys for the University, a survey purporting to test whether respondents recognize trademarks ("**Franklyn Recognition Survey**") and a second survey, regarding likelihood of confusion ("**Franklyn LOC Survey**"). *See* Franklyn Report. Defendants have moved to exclude the Franklyn Recognition Survey and all

testimony based on that survey. *See* Docs. 93, 94, and 99. That motion is fully briefed and pending before the Court.

**Response:** Disputed to the extent that Paragraph 111 does not properly describe the surveys that Mr. Franklyn conducted. Mr. Franklyn conducted a survey testing whether consumers perceive the merchandise sold by Vintage Brand bearing the University Marks as being trademarks, and a survey testing whether consumers of Vintage Brand's merchandise bearing the University Marks are confused as to source, sponsorship, affiliation, or licensure. *See Franklyn Report (PSU Ex. 41, Dkt. 123-44) at 6, 9-26.* Otherwise, undisputed.

112. Vintage Brand retained Dr. Tülin Erdem, the Leonard N. Stern Professor of Business Administration and Professor of Marketing at the Stern School of Business, New York University, and Chair of the Stern Marketing Department. Erdem Report at 1.[3] Dr. Erdem conducted her own consumer survey ("**Erdem Survey**") and issued a report with her conclusions, explaining why her survey methodology differed from Mr. Franklyn's. Erdem Report at 4–6, ¶¶ 13–18.

**Response:** Undisputed. Penn State further notes that its Motion in Limine to Exclude Erdem's consumer survey is currently pending. *See* Dkt. 95.

113. Vintage Brand also retained Dr. David Neal who issued a report criticizing Mr. Franklyn's surveys. *See* Neal Report.

**Response:** Disputed in part. Neal's report did not criticize Mr. Franklyn's surveys in whole, and in fact Neal explicitly noted that "I respect Mr. Franklyn and his experience" and that his criticisms were limited to the specific issues he set out—

---

[3] Citations to page numbers of expert reports reference the internal document numbering, not the CM/ECF page numbering.

but that he did not view Mr. Franklyn's surveys as wholly unreliable. *See Neal*

*Report (Dkt. 94-5) at 10, ¶ 2.1 ("I note at the outset that I respect Mr. Franklyn and*

*his experience, and I regard certain isolated aspects of his surveys as comporting*

*with generally accepted methods.").*

## 10. Franklyn LOC Survey

114. The Franklyn LOC Survey does not include any questions attempting to determine whether any confusion is a result of consumers' beliefs that use of University-related imagery on merchandise requires the University's permission. *See* Franklyn Report; *see also* Doc. 43 at 23 (Court asking whether consumer confusion or beliefs were impacted by "their belief that the law requires Penn State's permission"); Neal Report at 36–37, ¶¶ 6.1–6.2 (noting Mr. Franklyn's surveys' silence on this key issue); Franklyn Dep. at 224:7–232:13.

**Response:** Disputed. Mr. Franklyn's opening report addresses each of the

court's questions, including whether any confusion is the result of consumer's

beliefs that use of University-related imagery on merchandise requires the

University's permission. *See VB Ex. 5 (Franklyn Dep.) (Dkt. 116-32) at 90:2-17*

*(testifying that Survey Number 2 addresses the court's question as to whether*

*customer confusion stems from a belief that the law requires Penn State's*

*permission).* For example, Mr. Franklyn testified that at least pages 41-43 of his

Opening Report and questions 210-212 of Survey Number 2 account for consumers'

belief that use of University-related imagery on merchandise requires the

University's permission. *See VB Ex. 5 (Franklyn Dep.) (Dkt. 116-32) at 95:2-100:6;*

*see also PSU Ex. 41 (Franklyn Report) (Dkt. 123-44) at 41-43, 72.*

115. As Dr. Erdem noted, verbatim responses to follow-up questions in the Franklyn LOC Survey demonstrate that many of the "confused" responses were attributable to respondents' beliefs that anyone referencing the University must have legal permission. *See* Erdem Report at 24, ¶ 39 n.36 ("Some example answers indicating a pre-existing legal belief in the 'Why do you say that' questions include: 'If Vintage Brands were not licensed to sell Penn State merchandise then this would not seem legal,' 'This brand features baseball, football, and collegiate apparel. It has to have some sort of affiliation with these entities in order to legally sell their apparel,' 'Because that is the way selling licensed apparel works. You need some form of affiliation with the brand in order to obtain a license to sell their products,' and 'The description says that this is the company selling it & they could not legally sell it if they were not licensed.'"); *see also* Doc. 101-1 (Exhibit 13 (Appendix D to Mr. Franklyn's Report), which the University provided via USB) at Respondent ID Nos. 51 (Q206 and Q212), 70 (Q212), 102 (Q205, Q206 and Q212), 104 (Q209 and Q212), 119 (Q206), 249 (Q206 and Q212), 262 (Q206), 280 (Q208), 341 (Q212), 345 (Q206 and Q212), 543 (Q205, Q206, Q211 and Q212), 607 (Q205), 677 (Q206), 772 (Q212), 801 (Q209), 808 (Q206), 848 (Q211 and Q212), 864 (Q206 and Q212), 876 (Q206), 931 (Q206 and Q212), 1083 (Q206), 1193 (Q206 and Q212), 1214 (Q205, Q206, Q211 and Q212), 1216 (Q206 and Q212), 1276 (Q206), 1295 (Q206 and Q212), 1406 (Q212), 1429 (Q206, Q209, and Q212), 1443 (Q206), 1457 (Q205 and Q209), 1570 (Q205 and Q206), 1589 (Q209 and Q212), 1680 (Q211 and Q212), 1766 (Q212), 1813 (Q206 and Q212).

**Response:** To the extent this paragraph quotes Dr. Erdem's report, her report speaks for itself. Disputed that the cited responses demonstrate, as Vintage Brand asserts here, "that many of the 'confused' responses were attributable to respondents' beliefs that anyone referencing the University must have legal permission." These quoted verbatim responses speak to the respondents' views about whether the Vintage Brand merchandise they viewed was licensed. *See Erdem Report, PSU Ex. 42 (Dkt. 123-45) at 27 (Erdem Report quoting responses from respondents in Franklyn's Likelihood of Confusion Survey); Dkt. 101-1 (Exhibit 13 to Penn State's Motion to Partially Exclude the Opinions of Tülin Erdem, containing*

*a flash drive with the native survey data from surveys performed by David Franklyn,*
*including the data containing the responses described in Erdem's report).* The
responses do not indicate that "anyone referencing the University must have legal
permission", because "referencing" Penn State is different than selling merchandise
with Penn State's trademarks. The evidence does not support this broad assertion.
*See LR 56.1; FRCP 56(c).*

Further disputed that the evidence supports the assertion that the verbatim
responses to the Franklyn Survey reflect pre-existing legal belief[s]". These
verbatim responses—coming <u>after</u> respondents viewed the stimuli, and which
Vintage Brand properly calls "follow-up questions"—cannot be categorized as
reflecting pre-existing beliefs because these responses are necessarily capturing
respondents' impressions from having viewed the survey. A "preexisting belief"
necessarily refers to a belief that a respondent would have before taking the survey,
and so these post-survey responses are not measuring preexisting beliefs. Thus, the
asserted fact here should be disregarded because Vintage Brand has not cited to
evidence that supports the assertion. *See LR 56.1.* Disputed that this is a material
fact, as a preexisting belief does not invalidate consumer confusion.

116. For his Franklyn LOC Survey, Mr. Franklyn selected the following
"control" stimulus:



Franklyn Report at 27; *see also* Franklyn Dep. at 233:9–239:14.

**Response:** Undisputed that the control stimulus used in Franklyn's survey is shown in Paragraph 116. *PSU Ex. 41 (Dkt. 123-44) at 29).*

117. The test stimuli used in the Franklyn LOC Survey were the following:



Franklyn Report at 25–26.

**Response:** Undisputed.

118. The test stimulus that Mr. Franklyn used, a screenshot of the Vintage Brand website, removed the vintagebrand.com URL. Neal Report at 13, ¶ 2.5.2 ("Mr. Franklyn cropped out a critical and prominent source-identifying cue"); Franklyn Dep. at 189:6–191:4.

**Response:** Undisputed that the vintagebrand.com URL was not visible on the stimulus images used in Franklyn's likelihood of confusion survey. Disputed as to the word "removed", which implies that a URL is always visible when viewing a website. Vintage Brand relies here on the rebuttal report of David Neal, but Neal admitted in his deposition that he does not know whether a URL is visible to people shopping on the Vintage Brand Website on different browsers or different devices like a phone or tablet. *See Ex. 69 (Neal Dep.) at 160:9-161:6.*

119. Mr. Franklyn also used the following question in the Franklyn LOC Survey:



Franklyn Report (Doc. 94-2 at 88). But Mr. Franklyn did not actually use the responses to this question to screen survey participants. Neal Report at 17, ¶ 3.1.5; Franklyn Dep. at 126:15–128:24.

**Response:** Undisputed that as part of the screening questionnaire used in Franklyn's Commercial Impression and Likelihood of Confusion Survey involved questions asking potential respondents whether they had purchased, or planned to purchase, merchandise from a list of universities, and that the screenshot shown in Paragraph 119 depicts one of these questions.

Disputed that "Franklyn did not actually use the responses to this question to screen survey participants." As Franklyn testified during his deposition, Question 5B was used to determine whether the survey results were representative of past and prospective purchasers of Penn-State merchandise. *VB Ex. 5 (Franklyn Dep.) (Dkt. 116-32) at 126:25–127:21.* Although sample sizes for that customer base were low, Mr. Franklyn was able to determine that survey result results for these participants were not appreciably different from the entire survey population. *See, e.g.*, *PSU Ex. 41 (Dkt. 123-44) (Franklyn Opening Rep.) at 45 ("While sample sizes were limited for past and prospective purchasers of Penn-State merchandise, my review of these responses show no appreciable differences from the above findings.").* Further, as Franklyn explained in his Expert Report, these questions provide a datapoint allowing for results to be filtered to include only past and prospective purchasers of Penn State-related merchandise. *See PSU Ex. 41 (Dkt. 123-44) at 25.*

120. Finally, Mr. Franklyn coded as "confused" responses that did not specifically refer to "Penn State" but instead referred only to "college" or "university" or "NCAA." Neal Report at 35, ¶ 5.7; *see also* Franklyn Dep. at 192:16–195:3.

**Response:** Disputed in part. Undisputed that Franklyn included in some of his aggregate calculations consumers that identified as the sponsoring company "the college on the face of the stimuli," such as customers that identified as the sponsoring company the "university on the shirt," as opposed to only those that specifically recited Penn State. *See VB Ex. 5 (Franklyn Dep.) (Dkt. 116-32) at 195:11-18; see also, e.g., Dkt. 101-1 (Exhibit 13 (Appendix D to Mr. Franklyn's Report)) at Tab 2, ID No. 390 (Q205).* Disputed to the extent that Paragraph 120 suggests Mr. Franklyn's results are over-inclusive and/or unreliable. As Mr. Franklyn testified, the inclusion of those responses is appropriate given the context of the survey and the anonymous source rule. *See VB Ex. 5 (Franklyn Dep.) (Dkt. 116-32) at 195:11-196:8.* Moreover, Mr. Franklyn's results specify which consumers said "Penn State" and which consumers referred to a "college, university, or NCAA." *See, e.g., PSU Ex. 41 (Dkt. 123-44) (Franklyn Opening Rep.) at 45 ("While sample sizes were limited for past and prospective purchasers of Penn-State merchandise, my review of these responses show no appreciable differences from the above findings.").*

### 11.    Vintage Brand's Survey Expert

121. Dr. Erdem designed and implemented a survey "to evaluate whether and to what extent consumers are confused regarding (i) the source of Vintage Brand's products as they relate to Penn State or (ii) whether a business relationship

exists between Vintage Brand and Penn State." Erdem Report at 4, ¶ 13. Dr. Erdem also tested "whether consumers believe that Penn State is responsible for the quality of Vintage Brand's products that bear Penn State-related images," and "the extent to which any apparent consumer confusion is the product of consumers' belief that there is a legal requirement for Vintage Brand to obtain Penn State's permission to use Penn State's name or imagery that originated with Penn State." *Id*.

**Response:** To the extent this paragraph quotes Erdem's report, that report speaks for itself. Disputed that Erdem's survey reliably tested for or evaluated consumer confusion. *See PSU Ex. 56 (Dkt. 123-59) (Franklyn Rebuttal Rep.), ¶¶ 9-44 (describing fundamental flaws in Erdem's survey design and calculation methods, including the inclusion of an infringing control, applying illegitimate methods to interpret her data which undercounted confusion rates, applying invalid techniques to intentionally suppress confusion rates, using vague terminology in key questions purportedly meant to identify potentially confused respondents, and violating fundamental rules for designing an Eveready survey).* Penn State further notes that its Motion in Limine to Exclude Erdem's consumer survey is currently pending. *See Dkt. 95*.

122. Dr. Erdem conducted an aided *Eveready* survey to address these questions. Erdem Report at 6, ¶ 19. Qualified respondents were presented with images of: "the main Vintage Brand homepage ('home page'), (ii) the landing page for Penn State merchandise ('landing page'), (iii) a product page for a Vintage Brand sweatshirt product decorated with Penn State imagery ('product page'), and (iv) a checkout cart page ('cart page')." Erdem Report at 9–10, ¶ 24.

**Response:** To the extent this paragraph quotes Dr. Erdem's report, that report speaks for itself. Otherwise, disputed. Specifically, Penn State disputes that Dr.

Erdem followed fundamental Eveready rules because Erdem's survey identified to respondents the two brands at issue. *See PSU Ex. 56 (*Dkt. 123-59*) (Franklyn Rebuttal Rep.),* ¶ 44 *("Identifying these brands cuts against the fundamental purpose of the Eveready format, which tests whether viewing the defendant's mark calls to mind, for respondents, the plaintiff's mark").* Disputed that Erdem's survey reliably tested for or evaluated consumer confusion. *See PSU Ex. 56 (*Dkt. 123-59*) (Franklyn Rebuttal Rep.),* ¶¶ 9-44. Penn State further notes that its Motion in Limine to Exclude Erdem's consumer survey is currently pending. *See* Dkt. 95.

123. Qualified respondents were put in one of three groups, two test groups and one control group: "Two of the logo stimuli alternatives were real Vintage Brand products decorated with Penn State imagery (... the '1929 Penn State Nittany Lions' logo and the '1950 Penn State Nittany Lions' logo). The third logo stimuli alternative was a 'State of Pennsylvania Seal' logo[.]" Erdem Report at 10, ¶ 25.



Erdem Report at 11.

**Response:** Undisputed that Paragraph 123 sets out the three test groups that Erdem used in her consumer survey. Disputed that the third group is a "control group" because the survey did not include use a proper control stimulus that would

measure noise and permit accurate net confusion figures to be calculated for the test groups. Rather, the control stimulus included repeated references to Penn State and its trademarks, instructions that respondents were shopping for Penn State merchandise, and a control product that is confusingly similar to the University Seal. *See Erdem Report (Dkt. 83-1) at F-12, G-6, G-8 ; see also Exhibit 5 to Penn State's Motion to Exclude Erdem (Dkt. 96-7) at 2-7 (enlarged views of the control stimulus used in Erdem's consumer survey). See also PSU Ex. 56 (Dkt. 123-59) (Franklyn Rebuttal Rep.), ¶¶ 9-20, 44 (explaining that Erdem's control is improper and renders her survey fundamentally flawed).* Penn State further notes that its Motion in Limine to Exclude Erdem's consumer survey is currently pending. *See Dkt. 95.*

124. Among other questions, Respondents were asked: (1) who they thought put out the sweatshirt they saw (measuring confusion about actual source), and (2) whether they thought the entity that put out the sweatshirt had a business relationship with any other entity (measuring confusion about sponsorship or affiliation). Erdem Report at 21–22, ¶ 32–33.

**Response:** Undisputed that Erdem's survey instrument included questions that asked respondents who "put out" the sweatshirt they viewed, and that respondents who indicated that they had a belief about whether that company had a "business relationship" with other entities were asked about that business relationship.

Disputed that Erdem's survey reliably measures source confusion, or reliably measures sponsorship or affiliation confusion. *PSU Ex. 56 (Dkt. 123-59) (Franklyn*

*Rebuttal Rep.),* *¶¶ 40-41*.  She used non-standard terminology for both measures, asking about "puts out" rather than the standard "makes or puts out"; and that "business relationship" is non-specific and fails to reliably capture whether consumers believe that Vintage Brand is affiliated with Penn State or whether they believe that Penn State sponsors or approves of the merchandise.  *Id.*  The verbatim survey responses on the "business relationship" question show that many respondents interpreted this phrase as referring to relationships other than licensing, sponsorship, or affiliation.  Verbatim responses to Erdem's question about who had a business relationship with the entity that put out the shirt they viewed named companies that would likely be sweatshirt suppliers, manufacturers, or distributors such as:

- "Starter"

- "Manufacturer of the sweatshirt; web developers; payment processor; shipping firm; fulfillment provider"

- "Nike or Adidas"

- "nike"

- "Local retailers of selling them at a mass production"

- "Jockey"

*See Erdem Report (*Dkt. 83-1*) at* 95 *(Data in Exhibit 3.2 setting out verbatim answers to questions about "business relationship" and showing that significant numbers of*

*respondents provided answers reflecting a "business relationship" of some sort other than one related to sponsorship or licensing).* Given that the data from Erdem's own survey demonstrates that respondents did not reliably understand the questions designed to measure confusion about sponsorship or affiliation, this Paragraph is contradicted in saying that Erdem's survey "measur[ed] confusion about sponsorship or affiliation". *Id.*; *PSU Ex. 56 (Dkt. 123-59) (Franklyn Rebuttal Rep.), ¶¶ 40-41.*

Penn State further notes that its Motion in Limine to Exclude Erdem's consumer survey is currently pending. *See* Dkt. 95.

125. The "net" confusion levels are 1% for Test Group 1 and 12% for Test Group 2 (see Figure 7.1 below). The term "net" confusion level refers to the percentage of "confused" respondents (those who referred to "Penn State") after subtracting the percentage of respondents who were "confused" in the control condition.

**Figure 7.1**

**Net Confusion Regarding Source and Business Relationship**

**Condition A (Current Vintage Brand Website)**

| | Test Group 1 (1929 Penn State Nittany Lions Logo) | | Test Group 2 (1950 Penn State Nittany Lions Logo) | | Control Group (State of Pennsylvania Seal Logo) | | Net Confusion | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
| # of Respondents | 107 | | 107 | | 109 | | | |
| Confusion as to Source[1] | 14 | 13% | 22 | 21% | 18 | 17% | -3% | 4% |
| Confusion as to Business Relationship[2] | 6 | 6% | 11 | 10% | 1 | 1% | 5% | 9% |
| Confusion - Any | 20 | 19% | 32 | 30% | 19 | 17% | 1% | 12% |

Notes:
[1] Confusion as to Source is based on respondents mentioning Penn State or variations thereof in Q4 ("Who or what entity do you believe puts out the sweatshirt you saw?")
[2] Confusion as to Business Relationship is based on respondents mentioning Penn State or variations thereof in Q8 ("What other entity or entities do you believe have a business relationship with whoever puts out the sweatshirt you saw?")
[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the results that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.
[4] Percentages are calculated as the percentage of respondents within each group.
[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.

Source:
Likelihood of Confusion Survey.

Erdem Report at 29.

**Response:** Undisputed that "net confusion" is calculated by subtracting the percentage of respondents confused by a control from the percentage of respondents confused by the infringing product. Disputed that the "Control Group" in Erdem's survey and shown in the data depicted in this Paragraph actually function as a proper control. *PSU Ex. 56 (Dkt. 123-59) (Franklyn Rebuttal Rep.), ¶¶ 9-20, 44 (explaining that Erdem's control is improper and renders her survey fundamentally flawed).*

Further disputed that the data included in this Paragraph (Figure 7.1 of the Erdem Report) show properly calculated data from Erdem's survey. Those calculations were the product of a flawed methodology wherein only respondents whose verbatim answers expressly referenced "Penn State" were counted as confused. This left out respondents who gave responses stating that the entity who puts out the product has a business relationship with "Athletic programs of the schools shown," "the colleges on the products for sale," and similar responses. *See Franklyn Rebuttal Report (PSU Ex. 56, Dkt. 123-59) at 20 (explaining problems with Erdem's coding and giving examples of verbatim responses that were counted as not confused under Erdem's initial set of calculations, despite these responses clearly intending to reference Penn State and possibly other colleges that the respondents viewed in the different pages of Erdem's test stimulus).*

Erdem subsequently provided new calculations that attempted to correct this error, and which counted as confused respondents whose answers referred to "the

University" or "College/University/NCAA." These revised calculations showed confusion for Test Groups 1 and 2 was 35% and 44% respectively. The Control Group confusion was 30%, leading to net confusion rates of 4% and 14%. *See Dkt. 96-8 at 2 (revised likelihood of confusion calculations); Erdem Deposition (Dkt. 83-2) at 135:5-142:25 (Erdem's testimony that her initial calculations did not include respondents who mentioned university, college, or NCAA as confused, but that in response to Franklyn's rebuttal report, she provided new calculations to include those responses as confused).*

Disputed that Erdem's net confusion rates (in either her preliminary or revised calculations) are valid or reliable. Erdem's survey is fundamentally and fatally flawed because she used an infringing control that resulted in significant numbers of respondents within the control group being "confused" and consequently driving down net confusion rates. *See Dkt. 96 at 17-27 (Penn State's briefing explaining that Erdem's control is indefensibly infringing because it contains numerous references to Penn State and includes an image on the control product that is arguably infringing of the University Seal, thereby violating the fundamental rule that a control stimulus may not itself be infringing); Dkt. 101 at 5-19 (same).*

Penn State further notes that its Motion in Limine to Exclude Erdem's consumer survey is currently pending. *See Dkt. 95.*

126. "Penn State" responses in the control condition cannot be attributed to features of the control stimulus that are University trademarks—those responses

indicate that some percentage of respondents are guessing or naming "Penn State" for reasons unrelated to the stimuli themselves, and there is no reason to believe respondents in the test condition are different. *See* Erdem Dep. at 98:15–99:7 (explaining that the same influence that may have affected the control group may have affected the test group).

      **Response:**  Disputed.  The control condition repeatedly exposed respondents to Penn State references and to University Marks—the very things that are at issue in this litigation.  Erdem showed respondents in the control group a webpage *full* of Penn State imagery, on the Control Group Landing Page, shown here:



VINTAGE BRAND

COLLEGE    BASEBALL    FOOTBALL    BASKETBALL    VINTAGE ATHLETES    MORE    [Search]    🛒

**40% Off Sitewide!**



Shop Penn State Nittany Lions vintage designs for apparel, clothing, gear, and merchandise for all sports fanatics at the Penn State Nittany Lions Shop on VintageBrand.com. Vintage Brand is not affiliated with the Penn State Nittany Lions Bookstore or the Penn State Nittany Lions Shop. Shop historic Penn State Nittany Lions fan gear and vintage college apparel to give

## PENN STATE NITTANY LIONS VINTAGE DESIGNS

Vintage designs not affiliated with, licensed, or sponsored by any college, team or league

Sort    [Recommended ▼]

| ALL | T-SHIRTS | SWEATSHIRTS | HATS | DRINKWARE | KOOZIES | POSTERS | COASTER |

**1962 PRODUCTS**          Clear All

YOUR SELECTIONS

College ⊗
Penn State Nittany Li... ⊗

PRODUCTS          −

T-Shirts          ⌄
Sweatshirts       ⌄
Hats              ⌄
Drinkware         ⌄
Koozies
Posters
Coaster
Canvas
Magnets
Pennants
Aluminum Wall Art
Socks
Cutting Boards
Puzzles
Jerseys
− Less

PRICE             +



1929 Penn State Nittany Lions Men's Pre...
$27.99 $39.99
You Save: $12.00



1950 Penn State Nittany Lions Men's Dri...
$41.99 $59.99
You Save: $18.00



1929 Penn State Nittany Lions Snow Hea...
$27.99 $39.99
You Save: $12.00



1929 Penn State Nittany Lions ICONIC® ...
$27.99 $39.99
You Save: $12.00



1929 Penn State Nittany Lions ICONIC® ...
$27.99 $39.99
You Save: $12.00



1983 Penn State Nittany Lions Men's Cot...
$48.99 $69.99
You Save: $21.00



1975 Penn State Nittany Lions ICONIC® ...
$27.99 $39.99
You Save: $12.00



1950 Penn State Nittany Lions Hat
$31.49 $44.99
You Save: $13.50



1950 Penn State Nittany Lions ICONIC® ...
$41.99 $59.99
You Save: $18.00



1983 Penn State Nittany Lions Men's Sof...
$48.99 $69.99
You Save: $21.00



1983 Penn State Nittany Lions Snow Hea...
$48.99 $69.99
You Save: $21.00



1929 Penn State Nittany Lions Men's Col...
$24.84 $35.49
You Save: $10.65





1950 Penn State Nittany Lions 20 oz Stai...
**$38.49** $54.99
You Save: $16.50

1950 Penn State Nittany Lions Koozie
**$27.99** $39.99
You Save: $12.00

1929 Penn State Nittany Lions Mug
**$41.99** $59.99
You Save: $18.00





1983 Penn State Nittany Lions Coaster
**$48.99** $69.99
You Save: $21.00

1929 Penn State Nittany Lions Hat
**$24.49** $34.99
You Save: $10.50

1975 Penn State Nittany Lions Men's Dri-...
**$6.99** $9.99
You Save: $3.00





1929 Penn State Nittany Lions Koozie
**$12.59** $17.99
You Save: $5.40

1950 Penn State Nittany Lions Koozie
**$22.95** $32.79
You Save: $9.84

1954 Penn State vs. Pennsylvania Alumi...
**$6.99** $9.99
You Save: $3.00





1983 Penn State Nittany Lions Men's Tri-...
**$24.84** $35.49
You Save: $10.65

1950 Penn State Nittany Lions Snow Hea...
**$6.99** $9.99
You Save: $3.00

State of Pennsylvania Snow Hea...
**$41.99** $69.99
You Save: $28.00

More

**VINTAGE APPAREL AND MERCHANDISE DECORATED WITH PENN STATE NITTANY LIONS HISTORIC IMAGES.**

Vintage Brand products are not affiliated with, licensed, sponsored, or endorsed by any college, university, professional team, league, event, or licensing entity. The designs appearing on our products have been created from authentic game tickets and other vintage sports memorabilia that exist in the public domain. Our designs are reproduced from original, historic, memorabilia



SUBSCRIBE AND RECEIVE 40% OFF

Email address →

HELP

Contact us

ABOUT US

Our story

INFO

Vintage Athletes

SOCIAL MEDIA

*Erdem Report (Dkt. 83-1) at F-11.* This "control" page shows 23 images relating to

Penn State and using University Marks.

The control group was further shown a "control product" bearing an image

that is visually similar to the University Seal and to genuine Penn State merchandise:

| Control Product | Authorized Penn State Apparel |
|:---:|:---:|
|  | |

*Erdem Report (Dkt. 83-1) at Fig. 3; Exhibit 10 to Penn State's Motion to Exclude*

*Erdem (Dkt. 96-12) at 2-3.*

Overall, respondents in the control group were instructed to imagine that they

were shopping for a Penn State sweatshirt, were then led through a series of

webpages in which they were shown repeated references to Penn State and the

University Marks and were then shown a product bearing an image that is visually similar to genuine Penn State merchandise. This survey design alone renders the assertion in Paragraph 126 that the "'Penn State' responses in the control condition … indicate that some percentage of respondents are guessing or naming 'Penn State' for reasons unrelated to the stimuli themselves" completely unfounded.

Disputed to the extent that Vintage Brand asserts that any improper aspects of the control condition do not render the survey unreliable because "there is no reason to believe respondents in the test condition are different." This assertion is unsupported by the evidence and misunderstands how Eveready surveys operate. Respondents in the test groups properly viewed the allegedly infringing merchandise and website; the control group should not be exposed to the alleged infringement. *See* Shari Diamond, Control Foundations: Rationales and Approaches, *Trademark and Deceptive Advertising Surveys* (2d ed. 2022) at 252-53 (Dkt. 96-10 at 17) (the control cannot be infringing).

Paragraph 126 is contradicted by the evidence and cannot be accepted as a genuine fact for summary judgment. Penn State further notes that its Motion in Limine to Exclude Erdem's consumer survey is currently pending. *See Dkt. 95*.

127. The net confusion levels for questions focused on true source confusion are -3% in Test Group 1 and 4% in Test Group 2. Erdem Report at 29 (Figure 7.1). Most of the overall net "confusion" in Dr. Erdem's study is thus attributable to answers about whether Vintage Brand has a business relationship with any other entity, not source confusion. *See* id.

**Response:** Disputed. The net calculations set out in Figure 7.1 were revised by Erdem. These revised calculations showed confusion for Test Groups 1 and 2 was 35% and 44% respectively. The Control Group confusion was 30%, leading to net confusion rates of 4% and 14%. *See PSU Ex. 67 at 2 (revised likelihood of confusion calculations). See also Franklyn Rebuttal Report (PSU Ex. 56, Dkt. 123-59) at 20 (explaining problems with Erdem's coding and giving examples of verbatim responses that were counted as not confused under Erdem's initial set of calculations, despite these responses clearly intending to reference Penn State).* Disputed that any of the net confusion calculations provided by Erdem are reliable or valid because her survey used an infringing control and therefore captures actual confusion rather than just noise. *PSU Ex. 56 (Dkt. 123-59) (Franklyn Rebuttal Rep.), ¶¶ 9-20, 44 (explaining that Erdem's control is improper and renders her survey fundamentally flawed).* Penn State further notes that its Motion in Limine to Exclude Erdem's consumer survey is currently pending. *See Dkt. 95.*

128. Dr. Erdem's survey also analyzed respondent's certainty in their responses. Overall net confusion (for both types of confusion) among respondents who believed their responses were "definitely correct" or "very likely correct" was between 3% and 9%.

**Figure 7.2**

**Net Confusion Regarding Source and Business Relationship**

**Condition A (Current Vintage Brand Website)**

*Controlling for Certainty*

| | Test Group 1 (1929 Penn State Nittany Lions Logo) | | Test Group 2 (1930 Penn State Nittany Lions Logo) | | Control Group (State of Pennsylvania Seal Logo) | | Net Confusion | |
| | | | | | | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
|---|---|---|---|---|---|---|---|---|
| # of Respondents | 107 | | 107 | | 109 | | | |
| Confusion as to Source[1] | 8 | 7% | 15 | 14% | 11 | 10% | -3% | 4% |
| Confusion as to Business Relationship[2] | 6 | 6% | 5 | 5% | 0 | 0% | 6% | 5% |
| Confusion - Any | 14 | 13% | 20 | 19% | 11 | 10% | 3% | 9% |

Notes:
[1] Confusion as to Source is based on respondents mentioning Penn State or variations thereof in Q4 ("Who or what entity do you believe puts out the sweatshirt you saw?")
[2] Confusion as to Business Relationship is based on respondents mentioning Penn State or variations thereof in Q8 ("What other entity or entities do you believe have a business relationship with whoever puts out the sweatshirt you saw?")
[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the results that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.
[4] Percentages are calculated as the percentage of respondents within each group.
[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.
[6] Q6 reads "In a previous question, you said you believe [PIPE IN ANSWER FROM Q4] puts out the sweatshirt you saw. How likely do you think that your answer is correct?" and Q9 reads "How likely do you think that your answer is correct?" Both of these questions have the following answer options: "Definitely correct," "Very likely correct," "Somewhat likely correct," and "Just guessing."
[7] Respondents were included in the "Top Two Boxes" if they selected "Definitely correct" or "Very likely correct" in Q6 or Q9 for their respective open-ended questions.

Source:
Likelihood of Confusion Survey.

Erdem Report at 29.

**Response:** Undisputed that Erdem included questions and analyses in her survey to purportedly "analyze[] respondent[s'] certainty in their responses." Disputed that this methodology is reliable, valid, or helpful.

Disputed that Erdem's survey provided any valid, reliable, or helpful measurements by including questions related to "certainty", or that Erdem's analysis of this data is valid. The *sole* "authority" Erdem could identify supporting this analysis was an article coauthored by one of Vintage Brand's own lawyers. *Erdem Dep. (Dkt. 83-2) at 158:9-159:3, 161:11-24.* Further, Erdem provided pretextual reasons for including this analysis, and analyzed and applied the data in a way designed simply to decrease confusion rates. *See Dkt. 96 at 30-33, Dkt. 101 at 24-*

*28 (Penn State's prior briefing on the unreliable, invalid, and irrelevant analysis related to "certainty" controls used in Erdem's survey).*

Disputed that Figure 7.2 reflects Erdem's most recent calculations on this issue. The net calculations set out in Figure 7.2 were revised by Erdem. *See PSU Ex. 67 at 3 (revised likelihood of confusion calculations). See also Franklyn Rebuttal Report (PSU Ex. 56, Dkt. 123-59) at 20 (explaining problems with Erdem's coding and giving examples of verbatim responses that were counted as not confused under Erdem's initial set of calculations, despite these responses clearly referencing Penn State).*

Disputed that any of the net confusion calculations provided by Erdem are reliable or valid because her survey used an infringing control and therefore captures actual confusion rather than just noise. *PSU Ex. 56 (Dkt. 123-59) (Franklyn Rebuttal Rep.), ¶¶ 9-20, 44 (explaining that Erdem's control is improper and renders her survey fundamentally flawed).*

Penn State further notes that its Motion in Limine to Exclude Erdem's consumer survey is currently pending. *See* Dkt. 95.

129. Dr. Erdem included questions in her survey addressing the impact of consumer belief regarding what the law requires with respect to the University's permission. Erdem Report at 7, 24, ¶¶ 22, 40.

**Response:** Undisputed that Erdem's survey included a question asking respondents to indicate whether or not they believe the law requires Penn State's

permission to sell the sweatshirt used in the survey, or whether respondents did not know or were not sure; and a question asking how certain respondents were in their answers. Disputed as to the characterization that these questions actually provide any relevant information about "the impact of consumer belief". These questions were asked at the very end of the survey, after respondents had viewed the entire stimulus and responded to a series of different questions purporting to measure perception about Penn State's role in or relationship to the products. *See Erdem Rep. (Dkt. 83-1) at G-2-G-15 (showing Q18 and Q19 to be the questions asking about legal permission, with these questions coming at the very end of the instrument).* Furthermore, the sample size for this question was inadequate to form a conclusion on the impact of legal belief.

Penn State further notes that its Motion in Limine to Exclude Erdem's consumer survey is currently pending. *See Dkt. 95*.

130. Overall net confusion based on perception of a business relationship, when Dr. Erdem controlled for respondents' belief that the law required a licensing relationship, fell to 4% for Test Group 1, and 9% for Test Group 2.

**Figure 7.3**

**Net Confusion Regarding Source and Business Relationship**

**Condition A (Current Vintage Brand Website)**

*Controlling for Legal Belief*

| | Test Group 1 (1929 Penn State Nittany Lions Logo) | | Test Group 2 (1930 Penn State Nittany Lions Logo) | | Control Group (State of Pennsylvania Seal Logo) | | Net Confusion | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
| # of Respondents | 107 | | 107 | | 109 | | | |
| Confusion as to Source[1] | 9 | 8% | 17 | 16% | 14 | 13% | -4% | 3% |
| Confusion as to Business Relationship[2] | 5 | 5% | 11 | 10% | 1 | 1% | 4% | 9% |
| Confusion - Any | 14 | 13% | 27 | 25% | 15 | 14% | -1% | 11% |

Notes:
[1] Confusion as to Source is based on respondents mentioning Penn State or variations thereof in Q4 ("Who or what entity do you believe put out the sweatshirt you saw?")
[2] Confusion as to Business Relationship is based on respondents mentioning Penn State or variations thereof in Q8 ("What other entity or entities do you believe have a business relationship with whoever puts out the sweatshirt you saw?")
[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the result that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.
[4] Percentages are calculated as the percentage of respondents within each group.
[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.
[6] Q18 reads "You may have already said this, but based on the pages you viewed, which of the following, if any, do you believe is true?" and had the following answer options "I believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt," "I do not believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt," and "Don't know / Unsure."
[7] Respondents were included in this exhibit if they selected "I believe the law requires Penn State's permission to sell apparel or merchandise with the design on this sweatshirt" in Q18.

Source:
Likelihood of Confusion Survey.

Erdem Report at 30.

**Response:** Undisputed that Paragraph 130 states the results of Erdem's initial calculations for Net Confusion under the current Vintage Brand website conditions, and applying Erdem's methodology to control for preexisting legal beliefs.

Disputed that Figure 7.3 reflects Erdem's most recent calculations on this issue. The net calculations set out in Figure 7.3 were revised by Erdem. *See PSU Ex. 67 at 4 (revised likelihood of confusion calculations).* *See also Franklyn Rebuttal Report (PSU Ex. 56, Dkt. 123-59) at 20 (explaining problems with Erdem's coding and giving examples of verbatim responses that were counted as not confused under Erdem's initial set of calculations, despite these responses clearly intending to reference Penn State).* Disputed that any of the net confusion calculations

provided by Erdem are reliable or valid because her survey used an infringing control and therefore captures actual confusion rather than just noise. *PSU Ex. 56 (Dkt. 123-59) (Franklyn Rebuttal Rep.), ¶¶ 9-20, 44 (explaining that Erdem's control is improper and renders her survey fundamentally flawed).* Penn State further notes that its Motion in Limine to Exclude Erdem's consumer survey is currently pending. *See* Dkt. 95.

131. Dr. Erdem concluded that confusion as to source or business relationship is insubstantial. Erdem Report at 5, ¶ 17.a.

**Response:** Undisputed that Paragraph 131 summarizes Erdem's purported findings. Disputed that Erdem's survey reliably tested for or evaluated consumer confusion, or that her conclusions have any validity or relevance. *See PSU Ex. 56 (Dkt. 123-59) (Franklyn Rebuttal Rep.), ¶¶ 9-44.* Erdem's conclusion here is entirely dependent on her survey using an infringing control that produced 17-30% confusion in her control group. That Erdem's control group showed confusion rates that were nearly as high, or even higher, than the confusion rates in the test groups reflects only that the control did not properly function as a control, and was itself infringing. *See Erdem Report (Dkt. 83-1) at F-12, G-6, G-8 ; see also Exhibit 5 to Penn State's Motion to Exclude Erdem (Dkt. 96-7) at 2-7 (enlarged views of the control stimulus used in Erdem's consumer survey). See also PSU Ex. 56 (Dkt. 123-59) (Franklyn Rebuttal Rep.), ¶¶ 9-20, 44 (explaining that Erdem's control is improper and renders her survey fundamentally flawed).* Penn State further notes

that its Motion in Limine to Exclude Erdem's consumer survey is currently pending.

*See* Dkt. 95.

132. The following Figure 8.1 reflects Dr. Erdem's results regarding respondents' beliefs about whether the University was responsible for the quality of Vintage Brand's products.

**Figure 8.1**

**Net Belief Regarding Responsibility for Product Quality**

**Condition A (Current Vintage Brand Website)**

| | Test Group 1 (1929 Penn State Nittany Lions Logo) | | Test Group 2 (1950 Penn State Nittany Lions Logo) | | Control Group (State of Pennsylvania Seal Logo) | | Net Belief | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
| # of Respondents | 107 | | 107 | | 109 | | | |
| Belief Regarding Responsibility for Product Quality (Open-Ended)[5] | 0 | 0% | 5 | 5% | 4 | 4% | -4% | 1% |
| Belief Regarding Responsibility for Product Quality (Closed-Ended)[2] | 19 | 18% | 19 | 18% | 16 | 15% | 3% | 3% |
| Belief - Any | 19 | 18% | 20 | 19% | 16 | 15% | 3% | 4% |

Notes:
[1] Belief Regarding Responsibility for Product Quality (Open-Ended) is based on respondents mentioning Penn State or variations thereof in Q14 ("Based on the images you viewed, who do you believe is responsible for the quality of the sweatshirt?")
[2] Belief Regarding Responsibility for Product Quality (Closed-Ended) is based on respondents selecting selected "I expect Penn State alone is responsible for the quality of the sweatshirt" or "I expect that both Vintage Brand and Penn State are responsible for the quality of the sweatshirt" in Q15 ("You may have already said this, but based on the images you viewed, please select one of the following regarding your expectations about who is responsible for the quality of the sweatshirt.")
[3] The difference in confusion ("net confusion") between groups is measured in percentage points. Due to rounding, some net confusion estimates vary by up to two percentage points from the results that would be obtained by subtracting the rounded confusion estimates displayed in the table across test and control groups.
[4] Percentages are calculated as the percentage of respondents within each group.
[5] Open-ended responses were coded by two independent coders blind to the purpose and sponsor of the study.

Source:
Likelihood of Confusion Survey.

Erdem Report at 38.

**Response:** Undisputed that the information in this Paragraph purports to set out Erdem's calculations for consumers' belief about responsibility for product quality as it appears in her report. Penn State further notes that its Motion in Limine to Exclude Erdem's consumer survey is currently pending. *See* Dkt. 95.

133. Dr. Erdem concluded that "few consumers identify Penn State as an entity that is responsible for the quality of Vintage Brand products." Erdem Report at 5, ¶ 17.b.

**Response:** Undisputed that Paragraph 133 summarizes Erdem's purported findings. Disputed that the cited evidence supports this assertion. Penn State further

notes that its Motion in Limine to Exclude Erdem's consumer survey is currently pending. *See* *Dkt. 95*.

Dated:  June 23, 2023

Respectfully submitted,

By: /Lucy Jewett Wheatley
Lucy Jewett Wheatley (Pro Hac Vice)
Claire Hagan Eller (Pro Hac Vice)
Matthew G. Rosendahl (Pro Hac Vice)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-1368
Fax: (804) 698-2130
lwheatley@mcguirewoods.com
celler@mcguirewoods.com
mrosendahl@mcguirewoods.com

Allison Ebeck, Esquire
Pa. I.D. No. 322837
MCGUIREWOODS LLP
Tower Two Sixty – Suite 1800
260 Forbes Avenue
Pittsburgh, PA 15222
(412) 667-6000
E-mail: aebeck@mcguirewoods.com

Attorneys for The Pennsylvania State
University

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system on this 23rd day of June, 2023, which constitutes service on Defendants pursuant to Fed. R. Civ. P. 5(b)(2)(E):

Jodi S. Wilenzik, Esquire
PA Supreme Court I.D. No. 89205
Marc H. Perry, Esquire
PA Supreme Court I.D. 6810
POST & SCHELL, P.C.
1600 JFK Boulevard, 13th Floor
Philadelphia, PA 19103
jwilenzik@postschell.com
mperry@postschell.com

Leslie Vander Griend, Esquire (Pro Hac Vice)
John Fetters, Esquire (Pro Hac Vice)
Theresa Wang, Esquire (Pro Hac Vice)
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
Leslie.VanderGriend@stokeslaw.com
John.Fetters@stokeslaw.com
Theresa.Wang@stokeslaw.com

By: <u>/s/ Lucy Jewett Wheatley</u>
Lucy Jewett Wheatley (*Pro Hac Vice*)
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-1368
Fax: (804) 698-2130
Email: lwheatley@mcguirewoods.com

*Attorney for The Pennsylvania State University*