**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | |
|       Plaintiff and Counterclaim Defendant, | |
| v. | Case No. 4:21-cv-01091-MWB (Hon. Matthew W. Brann) |
| VINTAGE BRAND LLC, | JURY TRIAL DEMANDED |
|       Defendant and Counterclaim Plaintiff | |
| And | |
| SPORTWEAR INC., d/b/a PREP SPORTSWEAR; CHAD HARTVIGSON; ERIK HARTVIGSON; and MICHELLE YOUNG, | |
|       Defendants. | |

***AMICUS CURIAE* BRIEF BY THE SOCIETY OF PRODUCT LICENSORS
COMMITTED TO EXCELLENCE IN SUPPORT OF THE PLAINTIFF THE
PENNSYLVANIA STATE UNIVERSITY'S OPPOSITION TO
DEFENDANT VINTAGE BRAND, LLC'S MOTION FOR SUMMARY
JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

INTEREST OF THE *AMICUS CURIAE* ............................................................1

SUMMARY OF ARGUMENT .............................................................................3

SUMMARY OF FACTS AND PROCEEDINGS ..................................................6

ARGUMENT .........................................................................................................6

   I.   Licensing Programs Generate Significant Global Revenue and Protect Brand Integrity ....................................................................................................6

     A.   Trademark Licensing Benefits the Consuming Public by Providing Consistent Quality Relative to all Aspects of the Licensed Products ..............8

     B.   Brand Licensor's Diligence and Oversight of Trademark Licensing Ensures Marketing Practices that Safeguard the Public ..................................11

     C.   Trademark License Agreements Ensure that Manufacturers Engage in Ethical Business Practices. ...............................................................................13

     D.   Licensing Agreements are a Critical to Ensure that Consumer Products Comply with Legal Regulations....................................................................15

     E.   Licensing Programs Enforce Social Accountability of Product Manufacturers..................................................................................................18

     F.   Trademark Licenses Prevent Counterfeit Goods Which Can Harm the Public. ...............................................................................................................19

   Conclusion ........................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Boston Pro. Hockey Ass'n v. Dallas Cap & Emblem Mfg.,
510 F.2d 1004 (5th Cir. 1975) ....................................................................4

Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.,
735 F.3d 735 (7th Cir. 2013) ....................................................................10

**Statutes**

Lanham Act. Pursuant to the Lanham Act (15 U.S.C. § 1051 et seq.).........2, 3, 4, 9

**Other Authorities**

3.5% during 2023-2028. https://www.marketresearch.com/IMARC-
v3797/Licensed-Sports-Merchandise-Global-Trends-33784850/ ............................8

https://perma.cc/QM2N-PU94].....................................................................8

https://sss.thelicensingletter.com/licensed-retail-sales-in-u-s-canada-
jump-3-2-to-reach-114-billion-in-2019/ ........................................................8

https://www.cbp.gov/newsroom/local-media-release/attention-
holiday-shoppers-cbp-just-seized-over-30-million-worth-fake.............................23

https://www.globenewswire.com/en/news-
release/2022/06/09/2459633/0/en/Cost-Reduction-With-REV3AL-s-
Digital-Anti-Counterfeiting.html ...............................................................22

https://www.globenewswire.com/news-
release/2019/09/05/1911804/0/en/Anti-Counterfeit-Packaging-
Market-To-Reach-USD-248-90-Billion-By-2026-Reports-And-
Data.html........................................................................................20

https://www.licenseglobal.com/industry-news/sales-licensed-goods-
and-services-45-percent .........................................................................7

https://www.shipify.com/retail/brand-licensing ...............................................7

https://www.uschamber.com/intellectual-property/back-to-school-
business-and-law-enforcement-team-up-to-protect-students-parents-
and-teachers-from-counterfeit-goods.......................................................................21

LICENSING INTERNATIONAL,
https://licensinginternational.org/get-survey/ ..........................................................8

Licensing Letter ("TLL") (www.thelicensingletter.com)..........................................8

**INTRODUCTION**

Movant, The Society of Product Licensors Committed to Excellence ("SPLiCE") has moved for leave to file this *amicus* brief in support of The Pennsylvania State University's ("Penn State") Opposition to Vintage Brand, LLC's ("Vintage Brand") Motion for Summary Judgment.

**INTEREST OF THE *AMICUS CURIAE***

Founded in 2004, SPLiCE is a 501(c)(6) not-for-profit trade organization created as a best practice think-tank for trademark brand licensors ("Brand Licensors"). The mission of SPLiCE is to provide a platform for Brand Licensors to share best practices for protecting and enhancing brand integrity. SPLiCE member companies represent a significant sector of the licensing industry, comprised of over 70 member companies from academia, the business sector, the nonprofit arena and the government, (including all four branches of the armed forces), across 50 industries ("SPLiCE Member Companies"). Specifically, SPLiCE Member Companies represent 20% of the Dow Jones Industrial Average, 10% of the 2022 Interbrand Top Brands, 50% of the top 10 and 29% of the collective 84 reported in the 2023 License Global Top brand, and in excess of 30,000 manufacturers and licensees impacting global brand protection.

SPLiCE Member Companies operate their licensing programs in accordance

federal trademark law as found in the Lanham Act. Pursuant to the Lanham Act (15 U. S. C. § 1051 et seq.), a trademark owner must establish that it has a protectable ownership interest in its mark, and that a third party's use of the mark is likely to cause consumer confusion as to the source of goods.

The central issue herein that the Court addressed on Penn State's motion to dismiss Vintage Brand's counterclaims (and currently at issue in the pending summary judgment motion) concerns the scope and protectability of Penn State's trademarks and related merchandising. The Court is faced with deciding whether Vintage Brand is free to utilize Penn State trademarks on T-shirts and other merchandise, without a license or authorization from Penn State, under the theory that Vintage Brand's proposed use of the use of the mark is not indicative of its source and is merely decoration or ornamental, and therefore, not deserving of trademark protection.

If this Court grants summary judgment on this issue in favor of Vintage Brand, not only will it upend the federal trademark licensing industry for collegiate institutions, their athletics programs as well as professional sports associations, it will wreak havoc within the national licensing arena for all trademark brand licensors who rely on merchandising in support of their licensing programs. Further, it will set a dangerous precedent for other courts to follow. Finally, if this Court grants summary judgment in favor of Vintage Brand, and third party manufacturers

are permitted to indiscriminately utilize brand owner trademarks without any accountability to or permission of the licensor (and without compensation to brand owner), the consuming public will bear the consequences flowing from this errant decision, including (i) being subject to inferior and counterfeit goods that lack any meaningful regulation on quality, compliance with legal requirements and safety and (ii) loss of social accountability and environmental sustainability in product manufacturing.

Accordingly, for the benefit of Brand Licensors and the licensing industry, SPLiCE is submitting this *Amicus Curiae* filing.

## SUMMARY OF ARGUMENT

Vintage Brand is singlehandedly attempting to upend the trademark licensing and merchandising industry. This Court is uniquely positioned to prevent Vintage Brand from destroying trademark licensing which was sanctioned with the passing of the Lanham Act in 1946. Vintage Brand's argument that Penn State's trademarks are merely ornamental, do not identify the source of goods and therefore, are not protectable as trademarks is built on a house of cards that collapses under scrutiny. In reality, Vintage Brand's has advanced the "merely ornamental" and "lack of identifying source" arguments relative to Penn State's trademarks to back door its way into a multibillion dollar industry and hitch a free ride on the good will, reputation and financial investment of Penn State.

The fact is that Vintage Brand _could use_ the Penn State trademarks at issue, _without contest_ by Penn State, as do countless of other third-party manufacturers, if they negotiated and paid for the right to do so via bona fide trademark license agreement. Penn State's trademarks are extremely valuable. In the article "Why Penn State's Brand is One of the most valuable in college football" [Why Penn State's brand is one of the most valuable in college football | Local News | lancasteronline.com](#) it was estimated that Penn State's brand is worth millions. Instead of entering into an arm's length agreement for right to legitimately use Penn State's highly coveted and valuable trademarks, Vintage Brand is nefariously attempting to steal said trademarks under the cover the "merely ornamental" and "non-source identifying" exceptions to trademark infringement.

If the Court rejects the well-established case law which holds that trademarks on merchandise are presumptively source identifying and subject to protection from infringement under the Lanham Act, _see Boston Pro. Hockey Ass'n v. Dallas Cap & Emblem Mfg._, 510 F.2d 1004 (5th Cir. 1975), and finds that trademarks used in merchandising are not "source identifying" and therefore free for use by unlicensed third parties, not only will such a ruling have an immediate and devastating impact on Penn State, said ruling will profoundly and catastrophically harm the licensing industry. Significantly, the potential damage of such an errant ruling will not only impact trademark owners in the collegiate and sports licensing industry, it will

undoubtedly impact trademark licensors across all industries.

This case is on the precipice of a very slippery slope. While this case involves university merchandising, the potential impact of the court's decision extends far beyond academic institutions and sports organizations. This issue could be applicable to any company or organization whose brand fosters a high degree of consumer loyalty. Apple, Inc., Peloton Interactive, Inc., Starbucks Corp. and Tesla, Inc. are just a few examples of well-known brands that have created a strong culture and community within their large and extremely loyal customer bases. Should their trademarks be free for exploitation by any third-party manufacturer as "merely ornamental" and non-source identifying simply because they end up on a T-shirt or some other merchandising item outside of their core product? Further, would someone wishing to purchase a T-shirt bearing the infamous Apple logo expect a certain level of quality merely because of the reputation inherent in the brand? And if so, and if trademarks on merchandise become "merely ornamental" and thus not protectable, as per Vintage Brand's argument, where does this leave Apple and other similarly situated brand owners? Where does this leave the licensing industry? How will quality be regulated and who will be held accountable for the lack thereof? These are critical real life implications of the Court's decision in this case and they cannot and should not be ignored.

## SUMMARY OF FACTS AND PROCEEDINGS

SPLiCE adopts the Summary of Facts and Proceedings set forth in Penn State's Opposition Brief.

## ARGUMENT

**I.        Licensing Programs Generate Significant Global Revenue and Protect Brand Integrity**

In order to ascertain the impact that a ruling in favor of Vintage Brand could potentially have on the licensing industry, it is imperative to understand the scope and breadth of product licensing and how it directly impacts the public.

As reported in Spotify, brand owners license their patents, software or trademarks to other companies. Licensees can re-sell the intellectual property at a higher price or manufacture merchandise with the IP on it. Under either scenario, the licensor is compensated by the brand owner, either by a percentage commission or a one-time fee, as consideration for permission to use the IP. In simple terms, brand licensing is partnership building. One of the main benefits of these partnerships is the ability reach more consumers.

When licensors work together, they exponentially expand the reach of their brand. It doesn't matter if the brand owner is the licensor or licensee in a collaboration scenario, both parties lend each other their consumer bases and are able to grow and expand in new demographic arenas and geographic locations. It goes without saying that market penetration is much easier when working with an

established licensee.

Licensing in the field of sport merchandising is huge. It reached a value of $30 billion in 2020 according to the Global Licensing Group. This figure is estimated to grow at a compounding annual growth rate of 5% through 2026.

Sports teams in the NBA and NFL, as well as the European soccer league, participate in licensing deals. The licensing arrangements authorize third-party manufacturers to produce merchandise with the team's logo and/or player name. By way of example, the soccer team Manchester United earns more than $115 million annually from licensing arrangements. https://www.shipify.com/retail/brand-licensing.

Global sales revenue of licensed products and services are unparalleled. The sale of licensed merchandise grew to $292.8 billion in 2019, a 4.5% increase from $280.3 billion in sales made in 2018. https://www.licenseglobal.com/industry-news/sales-licensed-goods-and-services-45-percent. Additionally, according to the International Licensing Industry Merchandisers Association, global trademark licensing reached $315.5 billion in 2021, with $17.4 billion in royalty revenue. "2022 Global Licensing Industry Study," LICENSING INTERNATIONAL, https://licensinginternational.org/get-survey/ [https://perma.cc/QM2N-PU94].

Further details of the size of the licensing industry can be found in The Licensing Letter ("TLL") (www.thelicensingletter.com) published by Plain

Language Media. TLL publishes newsletters, industry guides, annual reports, and research studies, which focus on management, marketing, consumer, and retail trends. TLL found that licensed retail sales in the U.S. and Canada alone rose 3.2% from the prior year to reach $114 billion in 2019. https://sss.thelicensingletter.com/licensed-retail-sales-in-u-s-canada-jump-3-2-to-reach-114-billion-in-2019/.

Finally, the global licensed sports merchandise market size reached US$ 31.3 Billion in 2022. Looking forward, IMARC Group expects the market to reach US$ 39.9 Billion by 2028, exhibiting a growth rate (CAGR) of 3.5% during 2023-2028. https://www.marketresearch.com/IMARC-v3797/Licensed-Sports-Merchandise-Global-Trends-33784850/. Clearly, the licensing industry is big business.

### A.    Trademark Licensing Benefits the Consuming Public by Providing Consistent Quality Relative to all Aspects of the Licensed Products

Significantly, while it is axiomatic that trademark licensing is advantageous to both the licensor and licensee, it is also invaluable to consumers and the public. Many corporate licensing programs utilize revenue generated from licensing to support non-profit and philanthropic causes. Apart from allowing brand owners to expand their distribution and product categories, licensing also allows those brand owners to build bridges towards social justice (e.g., Black Lives Matter movement) and therefore has a broader societal impact beyond merely economic benefits. Moreover, licensing helps preserve the goodwill, reputation, uniformity, and

expectation of the public as to the nature and quality of goods or services associated with a trademark (Sec. 5A of the Lanham Act) and therefore serves a powerful public policy purpose.

The Lanham Act defines "trademark" as "any word, name, symbol, or device, or any combination thereof (1) used by a person, or (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter, to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate <u>the source of goods, even if that source is unknown</u>." (emphasis supplied). 15 U.S.C. § 1127.

A critical component of trademark, as defined by the Lanham Act, is the *source of goods*, even if that source, albeit a proprietary ingredient, technology, or system, is unknown. A key element of the "source of goods" requirement is consistent quality. The "quality" does not necessarily mean "high quality" but rather, a consistent level of quality commensurate with the brand.

In *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.* 735 F.3d 735 (7th Cir. 2013), the Seventh Circuit explained this aspect of trademark licensing as follows:

> A trademark's value is the saving in search costs made possible by the information that the trademark conveys about the quality of the trademark owner's brand. The brand's reputation for quality depends on the owner's expenditures on product quality and quality control, service, advertising, and so on. Once the reputation is

> created, the firm will obtain greater profits because repeat
> purchases and word-of-mouth endorsements will add to
> sales and because consumers will be willing to pay a
> higher price in exchange for a savings in search costs and
> an assurance of consistent quality. These benefits depend
> on the firm's ability to maintain that consistent quality.

*Id.* at 739

When managed with dependable quality, trademarks produce consistency which protects consumers from being misled as to the quality of the goods. The investment by the Brand Licensors to maintain that quality comes with great responsibility to ensure care is taken with all forms of trademark brand management including both core and licensed or merchandised products.

As such, licensing acts as a protection for consumers. It provides oversight by the licensor of good business practices to be engaged in by the licensee or manufacturer. *Without licensing, the consuming public is at risk for marketing practices which may mislead and or harm the public, particularly as to the quality of goods being manufactured and sold.* The quality component transcends simply the end product, but rather, is interwoven with the entire manufacturing process. For example, quality is critical to the labor used to manufacture the goods. Quality is also important as it pertains to compliance with governmental regulations. Consistent quality equates with consistent compliance with regulations.

Quality is also integral to the nature and types of composite materials used for manufacturing. Consistent quality is critical to ethical business management

practices and social accountability.

Vintage Brand's seeks to eviscerate the need for trademark licenses for trademarked merchandise deemed "merely ornamental" and "non-source" identifying. If the Court adopts that argument, Brand Licensors' will lose control over the quality and integrity of products containing their mark, posing a serious threat to all components of quality that goes into product manufacturing.

Ultimately, such an erroneous ruling will endanger the consuming public.

### B. Brand Licensor's Diligence and Oversight of Trademark Licensing Ensures Marketing Practices that Safeguard the Public

Without trademark licensing arrangements, the public is at risk for marketing practices which may be misleading or harmful, particularly for vulnerable populations, including children. This will undoubtedly occur if Vintage Brand prevails on its motion for summary judgment.

In a licensing relationship, a Brand Licensor exercises significant oversight and control of the licensee's marketing activities. This is an extremely important component of the licensing relationship as this oversight ensures that the communications and the promises made by licensees are factually accurate and comply legal requirements. Further, since the Brand Licensor monitors its licensee's marketing programs, it ensures compliance with the contractual guidelines so that the Licensor's marketing intentions, approved delivery methods, and marketing messaging are appropriately addressed by licensees. In sum, a licensor's oversight

11

of its licensees' product marketing campaigns safeguards potential misinformation to the consuming public. Without a licensing relationship (which would occur if Vintage Brand's position is adopted), there would be no such protection to the consuming public.

Under a trademark license, Brand Licensors' critically assess their licensees' marketing campaigns to guarantee that there is alignment across all product lines and for all licensees and that consistent quality and appearance is maintained. Therefore, a Brand Licensor's oversight over their licensees' marketing campaigns is critical because how a licensee's products leverage the Brand Licensor's messaging ensures that there will be clear and consistent communication in all of the licensee's marketing campaigns. This strategic alignment of brand messaging safeguards against false and misleading marketing materials from being disseminated to the g public and prevents vulnerable populations from being exploited by untrue and unsafe advertising campaigns.

This is especially important for digital marketing arenas. In trademark licensing agreements, a Licensor undertakes a thorough review of its licensees' website to be sure that said website is compliant per specified guidelines established in the license agreement. This usually necessitates that a licensee employ an effective digital marketing strategy to maintain compliance. Some license agreements require licensees to conduct comprehensive marketing research with

consumers and retailers to guarantee effective product development. This oversight by the Brand Licensor prevents licensees from including false, misleading and untrue marketing claims on their websites. The Brand Licensor's oversight of social media marketing provides protection to the consumers which but for the licensing agreement, would not be in place.

The rigorous set of guidelines a Brand Licensor implements relative to its marketing and advertising programs not only protects the public from false claims, it also ensures that the "good will" of a Brand Licensor's trademarks will continue in the future. In other words, trademark licensing is a business model where oversight of the marketing and advertising process not only protects consumers from misleading and untrue claims, it also creates longevity for the brand by guaranteeing safe business practices by its licensees so that consumer expectations are not simply met but exceeded.

### C.   Trademark License Agreements Ensure that Manufacturers Engage in Ethical Business Practices.

Without trademark licensing, the consuming public is at risk of being subjected to unethical business practices.

Licensing arrangements protect against unscrupulous business transactions by regulating the conduct of their licensees. One way this is accomplished is by Brand Licensors conducting financial audits of the licensee's license program to ensure ethical business practices. Financial reports (including but not limited to profit and

loss statements, income statements, statements of cash flow and balance sheets) are filed by licensees with Brand Licensors the year following the financial reporting year. The financial reports provide transparency in the licensing process and help to prevent price gouging and other unsavory business practices.

Additionally Brand Licensor's oversee licensee marketing plans. For certain licenses, including children's products, food and/or wellness items, a licensee may be required to provide its Brand Licensor with quarterly marketing plan updates. All of above checks and balances imposed by the Brand Licensor via a licensing program serve to regulate and maintain ethical business practices by licensees.

An additional way that licensing programs safeguard ethical business practices is through licensee insurance requirements. Licensees must submit timely filing of its Certificate of Insurance with the Licensor, meeting all policy limits set forth in the licensing agreement.

Further, trademark licenses protect intellectual property rights. Brand Licensor's have strict guidelines requiring that their licensees adhere to intellectual property laws. As such, Brand Licensors can monitor and check how licensees and their manufacturing partners respect the intellectual property rights of others.

A final way that licensing arrangements ensure ethical business practices relates to the accountability that licensees must maintain with their retail and industry partners. License agreements require that licensees establish secure and

trusted retail distribution through business channels that are complaint with all governmental rules in addition to supporting the image of the Licensor's Brand. The Licensor's ability to oversee and monitor the licensee's business partners (which would not occur without the contractual obligations found in a license agreement) allows for secure and ethical points of purchase and distribution and guarantees that the Brand Licensor's products will be sold in the appropriate retail channels.

A Brand Licensor's ability to oversee and monitor its licensees' business practices, from financial accountability, insurance requirements, intellectual property safeguards and points of distribution and sale is indispensable to safeguarding the integrity of Brand Licensor's products and ensuring that the consuming public purchases safe and quality products consummate with the established goodwill of the brand owner.

If this Court holds that licensing agreements are not required for trademarked merchandise deemed "merely ornamental" and "non-source" identifying, Brand Licensors will lose control over the quality and integrity of products bearing their trademarks as there will no longer be a licensor/licensee relationship.

### D.   Licensing Agreements are a Critical to Ensure that Consumer Products Comply with Legal Regulations

Without trademark licensing programs, the consuming public is at risk for exposure to manufactured goods which may not be in compliance with governmental regulations. Further, without the safety protocols inherent in brand licensing, there

is a serious risk that many household goods and products manufactured and produced with composite materials which may harm the public. Without oversight by the Brand Licensor of manufacturing selection policies utilized by licensees, banned substances may be substituted due to price point and ultimately compromise consumer safety.

In a license agreement, the Licensee is contractually obligated to comply with all applicable laws relating to product manufacturing. A Licensor can enforce their manufacturing standards by requiring a Licensee's manufacturing facilities to be audited. As such, the Licensee will be obligated to maintain best manufacturing processes, techniques, and quality control so as to not violate the terms of their license agreement. In the event a licensee fails an audit inspection, the licensee must respond with swift remedial action to the outstanding issues identified during the audit or risk having their license agreement with the Licensor terminated for breach. A Brand Licensor's ability to institute quality standards for its licensees and thereafter, to conduct audits to ensure compliance is an invaluable mechanism to ensure that manufactured products comply with governmental rules and regulations and are safe for the public.

Additionally, the regulatory framework codified a license agreement results in Brand Licensors being able to institute ethical manufacturing and production policies on their licensees. Ethical production practices are imperative to protect

16

product integrity. By way of example, in a typical license agreement, a Licensor will require its licensees to adhere to stringent ethical production policies as well as fair employment practices in the following areas: (i) child or involuntary labor, (i) freedom of association, (iii) working hours and conditions, (iv) coercion and harassment avoidance, (v) anti-discrimination and equal employment opportunities, (vi) employee health and safety, (vii) compensation (wages and benefits) and (vii) workplace safety.

Licensing directly promotes product stewardship. Product stewardship is the act of minimizing the health, safety, environmental, and social impacts of a product and its packaging throughout its lifecycle, while maximizing economic benefits. The manufacturer of the product has the greatest ability to minimize adverse impacts, but other stakeholders, such as suppliers, retailers, and consumers, also play a role. A strong licensing arrangement will make product stewardship an essential part of the licensor/licensee relationship.

One type of product stewardship found in trademark licenses is extended producer responsibility. Two hallmark features of extended producer responsibility include (i) shifting financial and management responsibility (with governmental oversight) for products upstream to the manufacturer and away from the public sector; and (ii) providing incentives to manufacturers to incorporate "green initiatives" into the design of their products and packaging.

In essence, product stewardship, as codified in a license agreement, results in the engagement between a brand owner and its licensee (manufacturer) resulting in the licensee implementing sound business practices so that the quality and integrity of the end product is consistent with the historical reputation and integrity of the brand.

If this Court holds that licensing agreements are not required for trademarked merchandise deemed "merely ornamental" and "non-source" identifying, Brand Licensors will lose control over the quality and integrity of licensed products as they will no longer have oversight over the licensee's manufacturing policies, procedures and processes. This will directly impact the integrity of products and their compliance with manufacturing requirements. The end result is that the consuming public will be at risk for unsafe products.

### E. Licensing Programs Enforce Social Accountability of Product Manufacturers

If Vintage Brand's argument prevails thereby nullifying the requirement for licensor/licensee arrangement for the sale of merchandise bearing a Brand Licensor's registered trademark, there will be no oversight of social accountability concerning the labor employed to produce trademarked product. This could have disastrous consequences.

License Agreements contain licensee "Codes of Conduct" which dictate compliance with ethical and humane labor practices relative to the manufacture and

distribution of licensed products. Typically, licensee "Codes of Conduct" include requirements for hiring, employment standards, the health and safety of the workplace so that local laws are followed and company standards are upheld.

Social accountability, as found in licensee Codes of Conduct, provides a mechanism for Licensors to investigate where products are manufactured, but also if the factories are following local laws and also whether humane labor practices are being implemented. Without licensing agreements, tracking and monitoring the conduct of manufacturers relative to legal compliance and ethical workforce initiatives would be nearly impossible. Consumers will suffer if there is no accountability in manufacturing.

A decision Vintage Brand's favor will have the practical effect of legitimizing trademark infringement through merchandising. The ripple effect of such a decision will have significant and unintended consequences because the safety and accountability programs currently in place through legal license agreement will be gutted, effectively destroying social accountability in product manufacturing.

### F.   Trademark Licenses Prevent Counterfeit Goods Which Can Harm the Public.

Without a formal regulated process to vet authorized licensees and manufacturers, as contained in license agreements, the counterfeit market will surge. With counterfeiting growing over $1 trillion globally, a region, state or territory without legitimate licensing distribution processes will inevitably result in

substandard products being manufactured which are plagued by unsavory methods of production including terroristic influences and child labor. https://www.globenewswire.com/news-release/2019/09/05/1911804/0/en/Anti-Counterfeit-Packaging-Market-To-Reach-USD-248-90-Billion-By-2026-Reports-And-Data.html

Counterfeit products harm consumers. They subject the public to dangerous merchandise that is untested and unregulated. Further, the merchandise is likely manufactured under inhumane conditions, including utilizing indentured or child labor thereby resulting in products manufactured in conditions lacking basic human rights protections. Further, counterfeit products often contain substandard materials, which can be harmful and/or lethal to the consumer.

On August 11, 2022, the U.S. Chamber of Commerce ("Chamber of Commerce") published a report on the danger of counterfeit goods ("2022 Report"). Kassie Brill, Vice President for Brand Protection at the Chamber of Commerce Global Innovation Policy Center advised: "Fake goods are a danger to American families, particularly children who are about to start another school year." https://www.uschamber.com/intellectual-property/back-to-school-business-and-law-enforcement-team-up-to-protect-students-parents-and-teachers-from-counterfeit-goods.

The Report went on to state:

> Buying a substandard, fake good may save money in the short term, but when it breaks down quickly or causes a safety issue for your child, your costs will double to replace the product. Counterfeiters lure customers with convincing advertisements and low prices, but shoddy, or potentially harmful products and materials are not worth the risk.

As reported by the International Chamber of Commerce Business Action to Stop Counterfeiting and Piracy, the estimated value in 2022 for counterfeit and pirated goods is between $1.9 and $2.8 trillion. Moreover, according to the Economic Impacts of Counterfeiting and Piracy (published in 2017 by INTA and the International Chamber of Commerce Business Action to Stop Counterfeiting and Piracy), the estimated value of international and domestic trade in counterfeit and pirated goods is expected to reach between $1.9 trillion and $2.8 trillion in 2022, an increase of between $710 billion and $917 billion since 2013. This does not include the wider economic and social costs, estimated to reach approximately $1.5 trillion to $1.9 trillion (which includes fiscal losses, costs of crime and the displacement of legitimate economic activity). As reported by Global News Wire, the current estimate of the cost of global counterfeiting accounts for $1.7 trillion in yearly lost revenues. This equates to almost 7% of all global trade. https://www.globenewswire.com/en/news-release/2022/06/09/2459633/0/en/Cost-Reduction-With-REV3AL-s-Digital-Anti-Counterfeiting.html

Counterfeit products are a huge concern. SPLiCE Member companies expend substantial resources to combat counterfeit goods including:

- conducting global investigations and taking legal action against those that are engaged in selling, distributing, or manufacturing counterfeit goods;

- contracting with outside service providers to monitor online marketplaces, such as eBay and Amazon, and to detect and remove counterfeit product listings;

- creating robust anti-counterfeit customs system including recording their brands with customs organizations, building a manual for customs officials to identify counterfeit goods, and assisting with the seizure process when counterfeit goods are found.

The U.S. government has recognized the threat posed by counterfeit goods. In a December 2021 publication on the U.S. Customs and Border Protection website, the danger of counterfeit products was explained. "Bad actors exploit e-commerce by selling counterfeit and unsafe goods through online platforms, particularly during holiday season when shoppers are looking for deals… Trade in counterfeit and pirated goods threatens American's innovation economy, the competitiveness of businesses, and, in some cases, national security and the health and safety of consumers." https://www.cbp.gov/newsroom/local-media-release/attention-

holiday-shoppers-cbp-just-seized-over-30-million-worth-fake

Each time a counterfeit product is sold, a legitimate company loses revenue. This translates to lost profits and the loss of jobs over time. Without the protection of trademark brand licensing, the consumer is at grave risk. Counterfeit and unregulated products in the marketplace of have significant economic impacts, health and safety concerns and legal implications.

For all of the above reasons, it is imperative that this Court weigh the significant and far-reaching industry implications of a ruling in favor of Vintage Brand.  Failure to do so will have disastrous consequences for significant aspects of the global economy as there will be no way to police legitimate licensing arrangements. This will ultimately jeopardize the consumer as counterfeit and unregulated products will be the norm. Product integrity, responsible manufacturing and sourcing will all but disappear and the ability to buy safe, good quality products no longer be guaranteed.

## Conclusion

If this Court rules in favor of Vintage Brand, it will create havoc in the licensing industry. One of the immediate and largest threats will be the unrestricted influx of counterfeit products. If license agreement are marginalized, there will be no check on the nature and quality of products using a brand owner's mark. Virtually anyone will be able to manufacture anything and put a brand owner's label on it.

This immediately puts the public at risk for harm by being exposed to untested, unsafe and unpredictable consumer products. There will be no consistency, reliability and accountability.

The consequences for both the United States, and the global community cannot be understated. If retailers feel they can legally create and produce university-themed merchandise or by extrapolation, any merchandise outside a brand owner's core products, without a license or approval from the brand owner, with legal impunity, this will inevitably up Pandora's box to endless possibilities for unauthorized uses, counterfeit products and the potential for wide-scale infringement by unlicensed parties. This outcome would not only interfere with the brand owners ability to control and police their marks in the retail marketplace, but also it would provide less certain outcomes in trademark litigation involving merchandising rights going forward.

Accordingly, SPLiCE, as *amicus curie,* respectfully requests that this Court rule in favor of Penn State and deny Vintage Bran's motion for summary judgment.

Respectfully submitted,

By: /s/ Sean P. Hvisdas
Sean P. Hvisdas
Pa. ID No. 317987

Laura A. Colca (*pro hac vice* pending)
Goldberg Segalla
1700 Market Street, Suite 1418
Philadelphia, PA 19103-3907
Tel:  (267) 519-6800
Fax:  (267) 519-6801
shvisdas@goldbergsegalla.com
lcolca@goldbergsegalla.com
*Attorneys for* Amicus Curiae

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.8(b)</u>

I hereby certify that the SPLiCE *Amicus Curiae* brief complies with the word limit for briefs exceeding fifteen pages, set forth in Local Rule 7.8(b). This brief is 4989 words from Interest of *Amicus Curiae* through the Conclusion, less than the 5,000-word limit prescribed by Local Rule 7.8(b).

DATED:  August 24, 2023

<div style="margin-left:40%">

By: <u>/s/ Sean P. Hvisdas</u>
Sean P. Hvisdas
Pa. ID No. 317987
Laura A. Colca (*pro hac vice* pending)
Goldberg Segalla
1700 Market Street, Suite 1418
Philadelphia, PA 19103-3907
Tel:  (267) 519-6800
Fax:  (267) 519-6801
shvisdas@goldbergsegalla.com
lcolca@goldbergsegalla.com
*Attorneys for* Amicus Curiae

</div>