**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-01091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; CHAD HARTVIGSON; ERIK HARTVIGSON; and MICHELLE YOUNG, | |
| Defendants. | |

**MEMORANDUM OPINION**

**FEBRUARY 6, 2024**

Vintage Brand, LLC ("Vintage Brand") produces goods featuring historical sports images that feature various universities, including The Pennsylvania State University ("Penn State"). Penn State challenges Vintage Brand's use of the historical images on the goods that it produces, as many of those images incorporate in some form one or more of Penn State's trademarks. Although the historical images indisputably incorporate Penn State trademarks, the images are visually distinct from those trademarks, and Vintage Brand provides numerous disclaimers on its website that disavow affiliation with any university. These facts mean that many of Penn State's claims fail. However, the existence of dueling facts regarding likelihood of

confusion mean that Vintage Brand's trademark infringement claim must proceed to trial.

## I.  BACKGROUND

### A.  Underlying Facts[1]

Penn State is a public research university located in State College, Centre County, Pennsylvania.[2] Like many colleges and universities, it sells merchandise and licenses others to sell merchandise in stores and online.[3] It promotes its goods and services through a variety of images and text that it claims as trademarks.[4] Such examples are the text: "THE PENNSYLVANIA STATE UNIVERSITY," "TPSU," and "PENN STATE" [5] and images like the following:

---

[1]   Unless otherwise noted, the following facts are undisputed.
[2]   Doc. 138 ¶ 1.
[3]   *Id.* ¶ 68.
[4]   *Id.* ¶ 6.
[5]   *Id.* ¶ 7.



"S Lion Logo"[6]          "Penn State Seal"[7]          "Pozniak Lion Logo"[8]

          

"Nittany Lion Rock Design"[9]          "Nittany Lion Frankfurter Design"[10]

Collectively, the Court terms the images and text the "Penn State Marks." Penn State owns trademark registrations in the Penn State Marks and uses them on a variety of merchandise, but Vintage Brand disputes the contexts in which those marks are valid.[11] Penn State licenses the Penn State Marks to other entities to use on merchandise.[12] It has a formal licensing program that it began in 1983.[13] To this

---

6    *Id.* ¶¶ 38-41.
7    *Id.* ¶¶ 43-49.
8    *Id.* ¶¶ 30-37.
9    *Id.* ¶¶ 20-29.
10   *Id.*
11   *See id.* ¶¶ 8-41. Vintage Brand admits that the "PENN STATE," "TPSU," "Lion Shrine Logo," and "Penn State Seal" marks are incontestable. *Id.* ¶¶ 10, 16, 26, 44. There are two "Penn State Seal" marks that Penn State owns and purports to use. *See id.* ¶ 47.
12   *Id.* ¶ 55.
13   *Id.* ¶ 56.

day, it continues to create and execute procedures for the purpose of limiting the use of its claimed marks.[14] Vintage Brand disputes that Penn State adheres to its own procedures, however.[15]

Penn State has an exclusive licensing agent, the Collegiate Licensing Company ("CLC") to operate its licensing program.[16] "CLC facilitates agreements between [Penn State] and potential licensees, helps review and evaluate prospective licensees' merchandise to determine quality, and helps enforce Penn State's rights against counterfeiters."[17] Penn State also puts out standards for use of the Penn State Marks.[18]

Vintage Brand is a Washington-based corporation whose three members are co-Defendants Chad Hartvigson, Erik Hartvigson, and Michelle Young.[19] Sportswear, Inc. is also a Washington-based corporation owned in part by Chad Hartvigson.[20] Vintage Brand owns a large collection of sports memorabilia.[21] It scans images from these items and reproduces them on products (shirts, hats, mugs

---

[14] *Id.* ¶ 59. Penn State asserts that it has used all of the marks since 1986. *See id.* ¶ 60. Vintage Brand does not dispute that Penn State used PENN STATE, TPSU, and the Penn State Seal "for decades" but disputes that Penn State used the Pozniak Lion, the S Lion Logo, and the Lion Shrine Logo since the 1980s, as it claims. *Id.* At some point, the S Lion Logo image offered on Vintage Brand's website had a trademark symbol ("TM") on it. *See id.* ¶ 120. Vintage Brand contends that the presence of the symbol was a mistake. *See id.*

[15] *Id.* ¶ 59.

[16] *Id.* ¶ 63.

[17] *Id.* ¶ 64.

[18] *Id.* ¶ 66.

[19] Doc. 153 ¶ 1.

[20] *Id.* ¶ 2.

[21] *Id.* ¶ 5.

etc.) chosen by its customers on its website.[22] Sportswear manufactures Vintage Brand's apparel and ships it to consumers.[23] Vintage Brand's website contains a Home Page, a landing page for specific teams and institutions (a "Team Page"), and individual product pages that offer specific goods (a "Product Page").[24]

Vintage Brand's trademark (a stylized "V" followed by the words Vintage Brand) appears on each of its website's pages.[25] The team page for Penn State is titled: "PENN STATE NITTANY LIONS VINTAGE DESIGNS."[26] Underneath that title is a disclaimer that reads: "Vintage designs not affiliated with, licensed, or sponsored by any college, team or league."[27] Although the parties dispute its exact location on the page, each of Vintage Brand's pages also has a disclaimer reading:

> Our products are not affiliated with, licensed, sponsored, or endorsed by any college, team, league, event or licensing entity . . . All products are designed by Vintage Brand® and manufactured for Vintage Brand.[28]

One Vintage Brand customer, Meghan Maffey, testified at her deposition that she did not see "any language that [she] might consider legalese or a disclaimer on the website" when she visited it in July 2022.[29]

---

[22]  *Id.* ¶¶ 5-6.
[23]  *Id.* ¶ 3.
[24]  *Id.* ¶ 11.
[25]  *Id.* ¶¶ 9, 12.
[26]  *Id.* ¶ 14.
[27]  *Id.*
[28]  *Id.* ¶ 13.
[29]  Doc. 123-40 at 10; *see* Doc. 153 ¶¶ 13, 103-10. Maffey is an alumna of Penn State who researches and reaches out to companies selling apparel featuring Penn State to raffle off to raise funds for charitable purposes. *See* Doc. 153 ¶ 103-04.

Once a customer chooses an item from a Team Page, they are taken to a Product Page.[30] On that page, the customer will see an image of the product associated with that Product Page.[31] Under the title on each Product Page (example of such a title: "1929 PENN STATE NITTANY LIONS MEN'S PREMIUM BLEND RING-SPUN T-SHIRT"), there is another disclaimer that reads: By Vintage Brand™ not affiliated with or sponsored by Penn State Nittany Lions" in font smaller than that of the title.[32] Once the customer orders a product, the selected image is printed onto a tangible product and shipped to consumer in packaging bearing Vintage Brand's trademark.[33] Many, but not all, of Vintage Brand's products are also labeled with its trademark.[34]

In 2018, Vintage Brand sold merchandise on its website depicting Penn State Marks.[35] Vintage Brand contends that it has disabled the Team Page for Penn State.[36] Penn State disagrees and asserts that the page remained accessible beyond that

---

[30] *Id.* ¶ 15.
[31] *See id.* Vintage Brand asserts that the images on Product Pages are "digital mockups." *See id.* Penn State asserts that the image depicts a physical product that has already been created. *See id.* ¶¶ 15, 18.
[32] *Id.* ¶ 16.
[33] *Id.* ¶ 19.
[34] *Id.*
[35] *Id.* ¶ 20. In 2021, Vintage Brand sold merchandise depicting the Pozniak Lion but later removed those products from its store. *Id.* Vintage Brand contends that it did not make any Penn State Marks available alone on its products save the S Lion Logo. *See id.* ¶ 96.
[36] *Id.*

date.[37] The gross revenue from items bearing Penn State Marks and other related designs was less than $25,000.[38]

Penn State claims some images offered on Vintage Brand's website as images it has trademarked.[39] It never granted Defendants permission to use the Penn State Marks.[40] Penn State asserts its alleged trademark rights in the Penn State Marks through several registrations.[41]Its targets for merchandise sales include "students,

---

[37] *Id.*

[38] *Id.* ¶ 21.

[39] *See id.* ¶¶ 7, 22.

[40] *Id.* ¶ 141.

[41] PENN STATE is the subject of Registration Nos. 1,308,610 (the "610 Registration") and 5,766,698 (the "698 Registration") (collectively the "PENN STATE Marks"). Doc. 153 ¶ 35. "The 610 Registration was issued in 1984 and covers various goods as well as educational and research services." *Id.* ¶ 36. The 698 Registration was issued in 2019 and covers a variety of goods, including "decorative magnets, drinking glasses, cutting boards, fabric flags, hooded sweatshirts, sweatpants, caps being headwear, coasters, and jigsaw puzzles." *Id.* ¶ 37. To obtain the 698 Registration, Penn State claimed that the mark PENN STATE had "acquired distinctiveness." *Id.* The TPSU text is subject of Registration Nos. 1,315,693 (the "693 Registration"), 5,399,989 (the "989 Registration"), and 5,742,516 (the "516 Registration"). *Id.* ¶ 43. "The 693 Registration was issued in 1985 and covers a variety of goods and services." *Id.* ¶ 44. It "does not claim the exclusive right to use the words 'State University' and includes" an acquired distinctiveness claim. *Id.* "[T]he 989 Registration was issued in 2018 and covers hats, shirts, sweatshirts, and t-shirts but does not claim the exclusive right to use the word 'PENNSYLVANIA.'" *Id.* ¶ 46. The 516 Registration was issued in 2019 and includes an acquired distinctiveness claim as to the word "PENNSYLVANIA." *Id.* ¶ 47. The Lion Shrine Logo is the subject of Registration No. 1,350,286 (the "286 Registration"). *Id.* ¶ 50. The 286 Registration "covers a variety of different goods, including license plates and decorative needlepoint clips" but not services. *Id.* ¶ 51. Penn State also asserts its rights in the text NITTANY LION and the Lion Design subject to Registration No. 1,397,810 (the "810 Registration"). *Id.* ¶ 54. "The 810 Registration was issued in 1986 and covers only "frankfurters." *Id.* ¶ 55. The Pozniak Lion Logo is the subject of Registration No. 5,305,910 (the "910 Registration"). *Id.* ¶ 56. The 910 Registration was issued in 2017 and covers license plates, clothing and various entertainment services. *Id.* The Penn State Seal is the subject of Registration Nos. 1,276,712 (the "712 Registration") and 5,877,080 (the "80 Registration"). *Id.* ¶ 69. The 712 Registration was renewed in 2014 and covers an older version of the Penn State Seal. *Id.* A newer version of the Penn State Seal is the subject of the 80 Registration and covers a variety of goods. *Id.* ¶ 73. The S Lion Logo is not registered as a trademark. *Id.* ¶ 76.

alumni, and fans of Penn State throughout Pennsylvania and the entire United States."[42]

### B.   The Experts

#### 1.   David Franklyn

Penn State offers the expert testimony of David Franklyn, an intellectual property law professor at the Sandra Day O'Connor College of Law at Arizona State University.[43] Professor Franklyn prepared a report (the "Franklyn Report") summarizing his findings.[44] He performed two surveys: (1) a commercial impression survey and (2) a likelihood of confusion survey.[45]

##### a.   Franklyn's Commercial Impression Survey ("Survey 1")

The commercial impression survey presented a sample of individuals with three images in cells: (1) an image of a Product Page from Vintage Brand's website depicting a t-shirt with some Penn State Marks on it, (2) a Vintage Brand Product Page depicting a t-shirt with the text "PENN STATE BASKETBALL" and the Pozniak Lion Logo, and (3) an image of a t-shirt with the text "GAME DAY" on it along with a football.[46] Cell 3 served as a control cell.[47]

---

[42]   Doc. 151 ¶ 124.
[43]   Doc. 94-2 at 5.
[44]   *Id.*
[45]   *See id.* at 4, 7-8.
[46]   *Id.* at 7, 9-12.
[47]   *Id.*



Cell 1               Cell 2               Cell 3

After viewing the three images, the respondents were shown this definition of trademark, which Professor Franklyn adapted from the Lanham Act's statutory definition:

> The term "trademark" includes any word, name, symbol, device (e.g., a drawing or design), or any combination thereof, used by an entity to identify and distinguish its merchandise from merchandise manufactured or sold by others and to indicate the source of the merchandise.[48]

After viewing the definition, respondents were shown one of the images and asked if it contained any trademarks.[49] Respondents who indicated that they believed the image contained a trademark were asked to identify which parts of the image, if any, they believed were a trademark.[50] The survey results indicated that 81% of

---

[48]   *Id.* at 13.

[49]   *Id.* Respondents were also permitted to express that they did not understand what a trademark was or that they had had no opinion. *Id.* at 13-14.

[50]   *Id.* For Cell 1, the options were "the image of the lion on the rock," "the image of the seal with the words The Pennsylvania State University," "the phrase The Pennsylvania State University," "the word Nittany," and "the color of the shirt." *Id.* at 14. For Cell 2, the options were "the face of the lion," "the phrase Penn State," "the word basketball," and "the color of the shirt." *Id.* For Cell 3, the options were "the phrase Game Day," "the image of the football," "the color of the shirt," and a fill-in "other" option. *Id.* at 15. Each question also allowed a

respondents believed that Cell 1 contained a trademark, 80% for Cell 2, and 24% for Cell 3.[51]

At the *Daubert* hearing conducted by this Court, Franklyn explained that he has done the survey before and referred to a similar survey in a case in the United States District Court for the Southern District of California, *Bauer Brothers LLC v. Nike, Inc.* (the "Rea Survey") and a survey he performed in a pending action before the United States Patent and Trademark Office, *Nike v. Van's*.[52] Franklyn also explained his process for testing the survey. He had members of his team take it to ensure that respondents would not face any obstacles in taking the survey.[53]

### 2.    Tülin Erdem

Dr. Tülin Erdem is a professor of marketing and business administration at the Stern School of Business at New York University.[54] She serves as the editor-in-chief of the Journal of Marketing Research, the academic journal of the American Marketing Association.[55] She has "served as an expert witness in several cases, on

---

[  ]   respondent to express that they did not know or had no opinion on whether the Cell contained a trademark. *See id.* at 14-15.

[51]   *Id.* at 23. For Cell 1, 45% of respondents identified the image of a lion on a rock as a trademark, 70% identified the image of the seal with the words "The Pennsylvania State University" as a trademark, 45% identified the words "The Pennsylvania State University," 44% identified the word "Nittany," and 7% identified the color of the shirt. *Id.* at 24. For Cell 2, 65% of respondents identified the Pozniak Lion Logo as a trademark, 65% identified the text "Penn State," 11% identified the word "basketball," and 6% identified the color of the shirt. *Id.* For Cell 3, 20% identified the phrase "Game Day" as a trademark, 14% identified the image of a football, and 3% identified the color of the shirt. *Id.*

[52]   Doc. 185 at 21-24, 131-33.

[53]   *Id.* at 34-35.

[54]   Doc. 94-7 at 4.

[55]   *Id.*

matters relating to marketing, consumer behavior, brand positioning, and brand equity" and worked with consumer surveys.[56] For this matter, she conducted an "Eveready" consumer survey to assess whether consumers "are confused regarding (i) the source of Vintage Brand's products as they relate to Penn State or (ii) whether a business relationship exists between Vintage Brand and Penn State," and "whether consumers believe that Penn State is responsible for the quality of Vintage Brand's products that bear Penn State-related images."[57]

For her survey, Erdem defined the target population as "current or perspective purchasers of 'collegiate apparel or merchandise' who reside in the United States and are at least [eighteen] years old."[58] She then "presented respondents with a series of four stimuli images of Vintage Brand's website," which included "(i) the main Vintage Brand homepage ("home page"), (ii) the landing page for Penn State merchandise ("landing page"), (iii) a product page for a Vintage Brand sweatshirt product decorated with Penn State imagery, and (iv) a checkout cart page.[59] Her rationale for the above approach was twofold: "to evaluate the potential for confusion under existing marketplace conditions by re-creating a real-world

---

[56] *Id.* at 5.
[57] *Id.* at 7. Erdem was also asked to evaluate Franklyn's surveys. The Court discusses her evaluation below in the context of Vintage Brand's motion to exclude Franklyn's Survey 1.
[58] *Id.* at 10. Erdem designed the screening process such that the resultant sample included "(i) anyone who had purchased collegiate apparel or merchandise in the past six months; or (ii) anyone who was planning on purchasing collegiate apparel or merchandise in the next six months." *Id.*
[59] *Id.* at 12-13.

shopping experience" for Vintage Brand products bearing Penn State Marks and "to test for potential confusion under different scenarios by manipulating two key parts of the webpage images: the disclaimer and product logo images."[60]

Qualified respondents were placed into one of three experimental groups "to view one of three logos on a gray hooded sweatshirt, within the Vintage Brand purchasing environment."[61] The three logos were: the "1929 Penn State Nittany Lions" logo, the "1950 Penn State Nittany Lions" logo, and a "State of Pennsylvania Seal" logo, the last of which she "designed . . . to be as close as possible to the Vintage Brand products decorated with Penn State imagery and to control for the potential influence of elements other than the at-issue imagery on confusion."[62]

**Figure 3**
**Likelihood of Confusion Survey Test and Control Groups**



| **Test Group 1** | **Test Group 2** | **Control Group** |
| *1929 Penn State Nittany Lions Logo* | *1950 Penn State Nittany Lions Logo* | *State of Pennsylvania Seal Logo* |

---

[60] *Id.* at 13.
[61] *Id.*
[62] *Id.*

In addition to the above stimuli, Erdem "also created additional stimuli conditions that allow [her] to estimate the impact of disclaimers on respondents' perception of the source of Vintage Brand products, Vintage Brand's business relationships, and quality of Vintage Brand's products as they relate to products decorated with Penn State imagery."[63] She designed "four website condition groups with variations on Vintage Brand's existing disclaimer."[64]

**Figure 4**
**Website Condition Groups – Description of Disclaimer Types**

| Website Condition Group | Description of Stimuli Images |
|---|---|
| **Condition A (Current Vintage Brand Website)** | • Current Vintage Brand website<br>• Current disclaimer |
| **Condition B (No Disclaimer)** | • Current Vintage Brand website<br>• All disclaimers removed. |
| **Condition C (Official Licensing Statement)** | • Current Vintage Brand website<br>• Official licensing statements replace all disclaimers |
| **Condition D (Acknowledgment Disclaimer)** | • Current Vintage Brand website<br>• Additional stimuli at the beginning with a pop-up with current disclaimer. |

Erdem's survey then asked respondents a series of questions regarding whether they were confused about the source of the products on the pages they saw on Vintage Brand's webpages or the business relationship between Vintage Brand and Penn State.[65] The source questions included an open-ended question asking the

---

[63] *Id.* at 14.
[64] *Id.*
[65] *See id.* at 23-25.

respondent to identify who produced the sweatshirt they saw and an open-ended question asking the respondent why they felt that way.[66] The business-relationship questions included a close-ended question asking whether the respondent thought the entity putting out the sweatshirt had a business relationship with another entity, followed by an open-ended question asking the respondent to identify that entity.[67] Respondents who indicated the presence of a business relationship were then asked why they believed one existed.[68] Erdem then queried respondents on their level of certainty in their answers after each substantive question.[69]

Erdem also asked whether respondents believed that the "law requires Penn State's permission to sell apparel or merchandise with the design on the sweatshirt shown below."[70] She also assessed respondents' belief that their answer to the legal permission question was correct.[71]

Next, Erdem asked respondents whether they had an opinion on the quality of the pictured sweatshirt and what entity they felt was responsible for the quality of the sweatshirt.[72] Respondents were also asked whether Penn State, Vintage Brand,

---

[66] *Id.* at 24.
[67] *Id.*
[68] *Id.* at 24-25.
[69] *See id.* at 25. Respondents were asked whether they were "just guessing," or if they felt that their answer was "somewhat likely correct," "very likely correct," or "definitely correct." *Id.* at 26.
[70] *Id.*
[71] *Id.* at 27-28.
[72] *Id.* at 28-29.

neither, or both were responsible for the quality of the sweatshirt.[73] Erdem pretested her survey to ensure that putative respondents thought the questions were unambiguous.[74]

Based on the results of her survey, Erdem concluded that respondents were not confused as to the source of Vintage Brand's products or the existence of a business relationship between Vintage Brand and Penn State.[75]

## C.    Procedural History

By way of its Second Amended Complaint, Penn State sues Vintage Brand for (1) willfully infringing on Penn State's trademarks in violation of 15 U.S.C. § 1114 (Count One);[76] (2) selling and marketing counterfeit products in violation of Sections 1114, 1116(d) and 1117 (Count Two);[77] (3) unfair competition and falsely designating Penn State as the source of Vintage Brand's products in violation of Section 1125(a) (Count Three);[78] (4) falsely advertising and endorsing its products' affiliation with Penn State in violation of Section 1125(a) (Count Four);[79] diluting Penn State's trademarks in violation of Section 1125(c) and 54 Pa. C.S. § 1124

---

[73]  *Id.* at 30.
[74]  *Id.* at 31.
[75]  *Id.* at 31-45 (detailing and analyzing survey results).
[76]  Doc. 67 ¶¶ 99-105. Specifically, Penn State alleges that Vintage Brand infringed on its PENN STATE, TPSU, Nittany Lion Logo, Pozniak Lion Logo, and Penn State Seal marks. *Id.*
[77]  *Id.* ¶¶ 106-12.
[78]  *Id.* ¶¶ 113-16.
[79]  *Id.* ¶¶ 117-25.

(Counts Five and Six, respectively);[80] and (7) infringing on Penn State's common-law trademarks.[81]

Vintage Brand denies all of Penn State's allegations.[82] Relevant to the motions before the Court, Vintage Brand raises the following affirmative defenses: the Seventh Affirmative Defense, asserting that Penn State's claims are barred because it uses its own marks only for ornamental purposes, and the Eighth Affirmative Defense, asserting that Penn State's claims are barred because Vintage Brand uses the images only in an ornamental fashion.[83]

Lastly, Vintage Brand counterclaims to cancel the registration of Penn State's Seal Marks on the ground that the marks incorporate the Commonwealth of Pennsylvania's Coat of Arms.[84] Vintage Brand further counterclaims to cancel the PENN STATE Marks on the ground that such marks are merely ornamental.[85]

## II. LAW

### A. Federal Rule of Evidence 702

Under Federal Rule of Evidence 702 "a trial judge acts as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also

---

[80] *Id.* ¶¶ 126-34 (Count Five), 135-40.
[81] *Id.* ¶¶ 141-45.
[82] Doc. 72.
[83] *Id.* at 40.
[84] *Id.* at 44-47.
[85] *Id.* at 47-50.

reliable."[86] As gatekeeper, trial judges have three duties: (1) "confirm the witness is a qualified expert"; (2) "check [that] the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge"; and (3) "ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact."[87] "The text of Rule 702 contains no exception to these requirements, so if they are not satisfied, an expert cannot testify before the 'trier of fact.'"[88]

Reliable expert testimony must be "based on the methods and procedures of science, not on subjective belief and unsupported speculation" or "mere haphazard, intuitive inquiry."[89] But it need not have the "best foundation" or be "supported by the best methodology or unassailable research."[90] It need only be based on "good grounds."[91] To test the basis for the opinion, courts should consider the following list of factors, none of which are dispositive:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness

---

[86]   *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (internal quotation marks omitted).

[87]   *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)).

[88]   *Id.* (citing Fed. R. Evid. 702).

[89]   *Id.* at 833-34 (internal quotation marks omitted).

[90]   *Id.* (internal quotation marks omitted).

[91]   *Id.* (internal quotation marks omitted).

testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.[92]

Whether the opinion "fits" depends on "whether it 'will help the trier of fact to understand the evidence or to determine a fact in issue.'"[93] "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."[94] "Thus, even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of the case."[95]

## B.  Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[96] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[97] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[98] Conversely, to survive summary judgment, a plaintiff must "point to

---

[92]  *Id.* (internal quotation marks omitted).
[93]  *Id.* (quoting Fed. R. Evid. 702).
[94]  *Id.* (quoting *Daubert*, 509 U.S. at 591).
[95]  *Id.* (internal quotation marks omitted).
[96]  Fed. R. Civ. P. 56(a).
[97]  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).
[98]  *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).

admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[99]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[100] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[101] The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[102] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[103]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[104] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[105] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the

---

[99] *Id.*
[100] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[101] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).
[102] *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).
[103] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (internal quotation marks omitted).
[104] *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).
[105] *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

motion."[106] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[107]

## III.    ANALYSIS

Both parties' respective motions for summary judgment and their oppositions rely on the expert reports discussed above. Accordingly, the Court addresses the *Daubert* motions first.

### A.    Vintage Brand's *Daubert* Motion to Exclude Franklyn's Survey 1

Vintage Brand argues that Franklyn's Survey 1 is not reliable and does not fit the case. As for fit, Vintage Brand asserts that Franklyn's Survey 1 does not test a relevant question.[108] With regard to reliability, Vintage Brand contends that Franklyn's methodology is largely novel, and therefore fails under the *Daubert* factors.[109] Vintage Brand also challenges Franklyn's qualifications.[110]

#### 1.    Fit

As discussed above, Franklyn's Survey 1 supplied respondents with a definition of trademark adapted from the Lanham Act's definition and then asked them whether they perceived trademarks on images of two Vintage Brand products.[111]

---

[106] Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).
[107] Fed. R. Civ. P. 56(c)(3).
[108] Doc. 94 at 11.
[109] *Id.* at 11-21.
[110] *Id.* at 15.
[111] That definition read:

Vintage Brand argues that Franklyn's Survey 1 failed to properly assess whether the respondents regarded the trademarks they identified to indicate Penn State "as the source, provider, licensor, or sponsor of the apparel itself."[112] Penn State responds that Franklyn's reference to merchandise in his definition of a trademark does just that.[113] The Court agrees with Vintage Brand as to fit. Vintage Brand's arguments focus on Survey 1's identification question, which asks respondents if they think the image they are shown contains one or more trademarks.[114]

Vintage Brand correctly notes that the question does not refer respondents to the proper inquiry—whether the images contain trademarks for the apparel. But the question appears directly underneath the definition of trademark, which includes the term "merchandise."[115] A reasonable respondent seeing the definition's reference to merchandise would understand that they are looking for trademarks indicating the

_____

The term "trademark" includes any word, name, symbol, device (e.g., a drawing or design), or any combination thereof, used by an entity to identify and distinguish its merchandise from merchandise manufactured or sold by others and to indicate the source of the merchandise.

Doc. 94-2 at 13.

[112] Doc. 94 at 11.

[113] Doc. 98 at 13.

[114] Doc. 94-2 at 14.

[115] *See id.*

source of the merchandise.[116] And the only merchandise the respondents were shown were shirts. Accordingly, Franklyn's Survey 1 fits the case.

### 2.    Reliability

Vintage Brand also challenges the reliability of Franklyn's survey on numerous grounds.

#### a.    Acceptance

Vintage Brand's first line of attack is that the novelty of Survey 1's methodology precludes its use in this case because it has not been assessed in scholarly literature, has not been generally accepted, and has no non-judicial use.[117] Vintage Brand's rebuttal expert, David Neal, does not believe that Franklyn's methodology has ever been used before in any context.[118]

Neal also asserts that Franklyn's survey does not identify the underlying "trademark construct" he purports to test such as "recognition" or "secondary meaning."[119] He explains that if the tested construct is secondary meaning, then the proper analysis is to subtract the percentage of respondents who identified a trademark on the Game Day shirt (20%) from the percentages that identified a trademark on either of the other two shirts.[120] That analysis substantially reduces the

---

[116] Vintage Brand points to Erdem's survey as a more appropriate test of the relevant question.
[117] Doc. 94 at 13.
[118] Doc. 94-5 at 11.
[119] *Id.* at 20.
[120] *See id.* at 23-25.

percentage of respondents who identified the Penn State Marks on Vintage Brand's products as trademarks.[121]

Penn State offers two counterarguments. First, it notes the United States District Court for the Southern District of California's acceptance of what it suggests is a similar survey in *Bauer Brothers, LLC v. Nike, Inc.*[122] Second, it offers academic literature that it argues shows prior use of surveys like Franklyn's.[123]

The *Bauer Brothers* survey sought to determine whether consumers perceived a certain mark as branding or a trademark.[124] But as Vintage Brand notes, the *Bauer Brothers* survey's methodology is markedly different from that of Survey 1.[125] Some of these differences overlap with Vintage Brand's other criticisms of Franklyn's methodology, which the Court discusses below. One notable difference is that the *Bauer Brothers* survey provided examples of a brand or trademark that were unrelated to the goods at issue in the case, whereas Survey 1 does not.[126] The *Bauer Brothers* survey does little to establish prior use and acceptance of Franklyn's methodology due to those differences.

---

[121] *See id.* at 26.

[122] Doc. 98 at 14-15 (citing *Bauer Bros., LLC v. Nike, Inc.*, 159 F. Supp. 3d 1202, 1211 (S.D. Cal. 2016)).

[123] *Id.* at 15-16 (citing TRADEMARK & DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE, AND DESIGN, 115 (ABA 2d ed. 2022) (S. Diamond & J. Swann, eds.) ("DIAMOND & SWANN")).

[124] *See* 159 F. Supp. 3d at 1211.

[125] Doc. 99 at 10-12.

[126] *See Bauer Bros, LLC v. Nike, Inc.*, No. 3:09-CV-00500, ECF 134-11 at 3 (Oct. 12, 2011, S.D. Cal.) ("For example, 'Ford' is a brand/trademark for cars. The oval shaped emblem with 'Ford' written in the center is also a brand/trademark for cars").

Penn State next cites to Diamond & Swann's discussion of "Teflon surveys" as evidence of general acceptance of Franklyn's methodology as well as one case from the United States District Court for the Eastern District of New York that accepted a similar survey: *DuPont Cellophane Co. v. Waxed Products Co.*[127] As Diamond & Swann explains, a Teflon survey "define[s] a brand name and a common name in the introductory section and then ask[s] respondents to classify a list of names (including the challenged mark) as one or the other."[128] Diamond & Swann notes that the *DuPont Cellophane* survey provided a list of names and asked respondents to identify which were trademarks, defined as "a name or mark which indicates that the goods bearing this name or mark are manufactured or sponsored by one concern only."[129]

Vintage Brand responds that both Teflon surveys and the *DuPont Cellophane* survey go to the question of whether a disputed term is a trademark or a generic term, which it contends is not the relevant question.[130] The Court agrees. The differences between the Teflon and *DuPont Cellophane* surveys and Survey 1 are inherent in the survey's different structures. The first two provide a list of several names, both

---

[127] Doc. 98 at 15-16 (citing DIAMOND & SWANN at 115; *DuPont*, 6 F. Supp. 859 (E.D.N.Y. 1934)). The *DuPont Cellophane* court found the survey to be "fairly presented" but did not ultimately rely on it on hearsay grounds, a view to which modern courts no longer subscribe. 6 F. Supp. at 885.

[128] DIAMOND & SWANN at 115.

[129] *Id.* at 115-16 n. 32. The *DuPont Cellophane* survey may have served as the inspiration for the Teflon survey. *Id.*

[130] Doc. 99 at 13.

generic and trademarked, to assess whether consumers perceive the disputed term as generic. Here, no one argues that Penn State is or has become a generic term. The relevant question is whether consumers perceive the Penn State Marks to associate Penn State with goods that carry the Penn State Marks.

Given the novelty of Franklyn's approach, Vintage Brand also cites the lack of any error rate or standards to measure Franklyn's methods.[131] Penn State responds that Franklyn's work meets generally accepted standards for general consumer surveys.[132] The Court agrees that the lack of any error rate adds to the difficulty in assessing Franklyn's Survey 1, and indicates its further unreliability.

### b.    Demand Artifacts

Vintage Brand also maintains that Franklyn's methods are unreliable because his survey is structured in such a way to bias respondents to find trademarks.[133] Erdem refers to these biased aspects as demand artifacts, which are cues or other aspects of a survey that suggest to respondents what goal the survey seeks to accomplish.[134] She explains that that Franklyn's definition of a trademark "primed"

---

[131]  Doc. 94 at 14-15.

[132]  Doc. 98 at 17.

[133]  Doc. 94 at 12-13.

[134]  Doc. 94-7 at 51-52; *see* Alan G. Sawyer, *Demand Artifacts in Laboratory Experiments in Consumer Research*, JOURNAL OF CONSUMER RESEARCH (March 1975) ("Sawyer"); *see also Simon Prop. Group L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1048 (D. Ind. 2000) ("The question about whether the two [non-competing] items are put out by the same or a related source is likely to generate so-called 'demand effects' that bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items"); *Gov't Employees Ins. Co. v. Google, Inc.*,

respondents to "hunt" for trademarks, biasing the results in favor of Penn State.[135]

Lastly, she criticizes Franklyn's failure to portray the images of Vintage Brand's

products in a marketplace context.[136]

Erdem claims that the combination of Franklyn's trademark definition and

his questions asking the respondents to state whether the images contain trademarks

gave respondents the impression that Franklyn wanted them to find trademarks

and/or that the images contained at least one trademark.[137] She explains that "[i]t

would have been important to review a respondent's initial thoughts about the

definition of a trademark as a quality control measure to see if there was any

confusion, and then ask whether anything in the image constitutes a trademark."[138]

Similarly, Erdem criticizes as out of line with generally accepted survey practices

Franklyn's failure to offer open-ended questions after the close-ended questions to

better contextualize the responses.[139] She also faults Franklyn for not pretesting his

questions and definition of trademark as she did to assess whether they confused

respondents, suggesting that without pretesting, "Franklyn has no way of knowing

---

No. 1:04CV507, 2005 WL 1903128, at *6 (D. Va. Aug. 8, 2005) ("demand effect results when the interviewer's questions or other elements of the survey design influence participants' responses by suggesting what the 'correct' answers might be or by implying associations that might not otherwise occur to participants").

[135]  Doc. 94-7 at 51.

[136]  *Id.*

[137]  *Id.* at 52.

[138]  *Id.*

[139]  *Id.* at 52-53 (citing Shari S. Diamond, *Reference Guide on Survey Research*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 392 (Nat'l Acad. Press 2011) ("*Reference Guide on Survey Research*").

if respondents understood his included definition of a trademark as applied to the at-issue Vintage Brand products."[140]

Neal also criticizes Franklyn's Survey 1 for priming respondents to think of Penn State by naming it in multiple screening questions, which he contends made Penn State "artificially salient in survey respondents' mind just prior to key questions."[141] He notes that Diamond & Swann recommends that the party names "should not be mentioned to respondents during the screener" because such identifications can "bias or influence the participants' responses to the questions that follow in the main questionnaire."[142] He also suggests that the screening questions at issue (which asked whether respondents had purchased apparel featuring any of a list of several universities, including Penn State), had no functional role in the survey.[143]

As to priming respondents to hunt for trademarks, Penn State responds that the structure of the survey allays any concerns over priming.[144] Penn State breaks Survey 1 into three steps:

---

[140] *Id.* (citing Sawyer at 20). As noted above, Franklyn provided an option for respondents to indicate that they did not know what a trademark is. But Erdem contends that this option fails to meaningfully assess respondents' knowledge because survey respondents are generally motivated to avoid such answers. *Id.* at 53-54 (citing Ran Kivetz & Itamar Simonson, *Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions*, in TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS 245 (2012)). Neal echoes this criticism. *See* Doc. 94-5 at 21.

[141] *Id.* at 10-11, 15-19.
[142] *Id.* at 18 (quoting DIAMOND & SWANN at 55-56).
[143] *Id.* at 17-18.
[144] Doc. 98 at 18.

(1) respondents were shown one of the test Images or the Control Image;

(2) respondents were shown the definition for "trademark" and asked whether they believed one or more trademarks was present on the image; and

(3) respondents who had indicated that at least one trademark was present were then given the option to select what specific components they believed to be trademarks.[145]

Penn State contends that step two is a filter question that "insulated against the sort of priming effects [Vintage Brand] claim[s] here."[146] But respondents were shown the images again in connection with the filter question. So, as Vintage Brand notes, the combination of the image and the definition may have "affected how they responded to the filter question itself—i.e., by making them more likely to report that they did believe a trademark was present."[147]

The Court is also troubled with Franklyn's trademark definition. There is no doubt that it accurately tracks the Lanham Act's language, but Neal's and Erdem's concerns regarding respondents' ability to apply the definition are well-taken. Neal explains that "Franklyn failed to test if people understood, and could accurately apply, his definition of a trademark, even though such a test is standard practice in trademark surveys with comparable goals."[148] Notably, Neal cites to Diamond &

---

[145] *Id.*
[146] *Id.* at 19.
[147] Doc. 99 at 14.
[148] Doc. 94-5 at 21.

Swann's discussion of Teflon surveys and how they "first teach[] respondents the distinction between a brand name and a common name and then test[] respondents' ability to apply this definition accurately to two terms," only allowing respondents who pass the test to proceed.[149]

### c.    Marketplace Conditions

Vintage Brand next contends that Survey 1 is unreliable because it fails to sufficiently replicate the marketplace conditions in which consumers would see Vintage Brand's products.[150] Erdem discusses Franklyn's alleged failure to use a marketplace context, pointing out that Franklyn cannot reliably test the commercial impression of Vintage Brand products without showing respondents the products on Vintage Brand's website, where a putative consumer would be able to purchase them.[151]

Penn State responds that showing the test images in a marketplace condition "would have been improper here because this would have injected information other than the Penn State Marks on the relevant goods which could affect respondents' perceptions," citing to two cases.[152] Penn State first cites to *Thomas & Betts Corp. v. Panduit Corp.*, where the United States Court of Appeals for the Seventh Circuit

---

[149] *Id.* at 21 n.55 (citing DIAMOND & SWANN, at 107-161).

[150] Doc. 94 at 19-20 (citing *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230-41 (S.D.N.Y. 2010)).

[151] Doc. 94-7 at 54 (citing *Survey methodology—Approximating market conditions*, 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 32:163 (5th ed., June 2022) ("MCCARTHY")).

[152] Doc. 98 at 22 (citing *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662-63 (7th Cir. 1995); *Gucci America, Inc. v. Guess?*, Inc., 831 F. Supp. 2d 723, 745-46 (S.D.N.Y. 2011)).

took issue with a survey because it showed both the protectable trade-dress along with "clearly non-protectable elements."[153] Because most survey respondents explained that they identified the product at issue from a non-protectable element, the court found the survey worthless.[154] In *Gucci America, Inc. v. Guess?*, the Honorable Shira A. Scheindlin of the United States District Court for the Southern District of New York excluded a survey that presented products at the point-of-sale context because they were irrelevant to the plaintiff's theory of post-sale confusion.[155] Penn State further contends that "[s]howing the shirts in a store or marketplace setting would have also been entirely inconsistent with the law on whether a mark is merely ornamental, which requires an examination of the mark as used on the relevant good and does not consider point of sale context."[156]

However, the Court agrees with Vintage Brand that the cases on which Penn State relies are inapposite.[157] This is not a case involving consumers' perception of non-protectable elements of a product as was the case in *Thomas & Betts*. Nor does this case involve a theory of post-sale confusion, as was the case in *Gucci America*.[158]

---

[153] 65 F.3d at 662.
[154] *Id.* at 663.
[155] 831 F. Supp. 2d at 745-46.
[156] *Id.* (citing TMEP § 1202.03(a)-(g)).
[157] Doc. 99 at 17-18.
[158] Although the Third Circuit does not appear to have precisely answered the question, the great weight of authority holds that post-sale confusion is reserved for cases where the junior use of the mark makes substantially inferior products; most cases involve luxury brands. *See*

The Court finds the marketplace context of substantial importance in a case like this one, where the allegedly infringing defendant claims that its use of the plaintiff's marks is not a trademark use. The context in which a consumer sees the product naturally informs their perception of whether a product is associated with a particular source or endorsed/sponsored by a particular entity.

### d.    Improper Control

Vintage Brand next challenges Franklyn's control image (the "Game Day" shirt) as improper. Franklyn chose his control because it was "not specific to any team or other affiliated entity and expresses an informational message about football."[159] Erdem disagrees with his choice, maintaining that it "does not serve as a control at all."[160] She notes that a proper control is one that "shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[161] She explains that Franklyn "not only changes the color scheme and the imagery in the control, he also removes the product from its marketplace context."[162] She therefore argues that "[a]s a result, it is impossible to determine if respondents selected Penn State as a trademark

---

MCCARTHY, § 23:7. Penn State does not appear to allege that Vintage Brand's products are inferior.
[159]   Doc. 94-2 at 12.
[160]   Doc. 94-7 at 55.
[161]   *Id.* (quoting DIAMOND & SWANN Ch. 9 and citing MCCARTHY § 32:163).
[162]   *Id.*

because of the manipulated imagery, manipulated color scheme, or the removal of relevant marketplace context."[163]

Penn State responds that Vintage Brand and Erdem's argument miss the mark because Franklyn's survey sought to determine *whether* respondents were confused about Vintage Brand's products' association with Penn State rather than *why* respondents were confused.[164] But as Vintage Brand correctly notes, Franklyn does appear to inquire into what caused respondents' confusion.[165] Moreover, the Court believes that the failure to use marketplace conditions in the survey also undermines Franklyn's choice of a control image for the same reasons stated above.

### 3.   Qualifications

Vintage Brand additionally argues that Franklyn is unqualified to testify to his novel survey because he lacks training in "marketing, statistics, or psychology" despite having performed numerous consumer surveys in the past.[166] The Court disagrees to the extent that Franklyn's lack of qualifications independently warrants

---

[163] *Id.*

[164] Doc. 98 at 24 (citing Jacob Jacoby*, Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, TRADEMARK REPORTER, 92 TMR 890, 903 (2002)).

[165] *See* Doc. 94-2 at 24 ("Consumers who indicated that they believed that the image contained trademarks were shown a follow up question to further understand what caused this perception"); 25 ("Furthermore, this commercial impression is driven by the Penn State name and imagery, rather than other elements of the shirt design such as the color of the shirt or descriptions of the sport").

[166] Doc. 94 at 15-16.

his exclusion. But the Court is concerned about the combination of Franklyn's lack of training in relevant disciplines and the novel method he appears to have used.

### 4.    Conclusion

In sum, Vintage Brand has presented persuasive arguments as to Survey 1's unreliability that Penn State largely fails to rebut. The overarching issue is the Court's concern that, without pretesting or examples of trademarks to guide respondents (or any similar efforts to that end), there is no way to adequately assess whether respondents applied Franklyn's definition of trademark properly. From a broad level, it appears that Franklyn's Survey 1 asks respondents to perform the same sort of analysis that a USPTO examining attorney might undertake when presented with an application for registration. That seems to be a tall order for a layperson respondent. Asking survey respondents to perform such a complex analysis is not in itself an insurmountable problem. But doing so without ensuring that respondents can reliably apply a legal definition (or a simplified version of it) is a fatal flaw in this Court's view. Accordingly, based on a totality of the circumstances, the Court will grant Vintage Brand's motion to exclude Franklyn's testimony on Survey 1.

### B.    Penn State's Motion to Exclude Erdem

Penn State moves to exclude Erdem's testimony regarding the conclusions she reached from her survey research because her methodology is unreliable due to

several flaws. Penn State contends that (1) Erdem used an improper control[167] and (2) improperly assessed respondents' certainty in a way that departs from accepted survey research practices.[168] Penn State also argues that Erdem's work does not fit the relevant question in this case because her query on whether Penn State and Vintage Brand have a business relationship improperly measured respondents' confusion.[169]

### 1. Fit

Penn State challenges Erdem's business-relationship questions to measure confusion because they do not address the full scope of the question in this case: whether consumers are confused about Penn State's potential approval or sponsorship of Vintage Brand products.[170] Penn State notes that traditional Eveready surveys ask questions related to sponsorship, such as: "Who do you believe, if anyone, is sponsoring or promoting [the product]?"[171] Based on that accepted practice, Penn State argues that Erdem's business-relationship questions are overly general and confusing.[172] Vintage Brand responds that the wording of Erdem's questions has been accepted in academic literature.[173] Erdem's justification for using

---

[167] Doc. 96 at 17-27.

[168] *Id.* at 30-33.

[169] *Id.* at 27-30.

[170] *Id.* at 27-28.

[171] *Id.* at 28 (quoting Jerre Swann, *Eveready and Squirt—Cognitively Updated*, 106 TRADEMARK REPORTER 727, 729 (2016)).

[172] *Id.* at 29-30.

[173] Doc. 97 at 20 (citing Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 TRADEMARK REPORTER 739, 740-42 (2008)).

alternative wording was her own experience that questions regarding "business relationships" resonate better with respondents.[174]

The Court concludes that Erdem's wording of the question "fits" the issues present in this case. As she suggests, a "business relationship" arguably brings to mind sponsorship and/or official approval and the like.

### 2.   Erdem's Allegedly Infringing Control

Erdem's control was a sweatshirt with the Seal of the Commonwealth of Pennsylvania.[175] She chose that logo "to be as close as possible to the Vintage Brand products decorated with Penn State imagery and to control for the potential influence of elements other than the at-issue imagery on confusion."[176] Penn State first argues that Erdem used an infringing control by placing the control image in the context of Vintage Brand's website, which itself contains Penn State Marks like "PENN STATE."[177] Second, Penn State asserts that Erdem's control image itself, the Seal of Pennsylvania, is substantially similar to the Penn State Seal such that it also infringes.[178]

---

[174]  Doc. 97-1 at 18-20.
[175]  Doc. 94-7 at 13-14.
[176]  *Id.* at 13.
[177]  *Id.* at 17-19.
[178]  *Id.* at 19-24.

| *Example of one of Penn State's Registered Seal Marks* | *Control Product Image* |
|---|---|
|  | |

Penn State also directs the Court's attention to Erdem's results. Approximately 17-30% of Erdem's controlled group was confused, a figure that Penn State argues is unacceptably high.[179]

Vintage Brand responds that the presence of the text "PENN STATE" on its pages is not improper because Erdem sought to test whether consumers were confused about the merchandise bearing Penn State Marks, not the website.[180] As for the similarities between the seals, Vintage Brand asserts that Penn State's argument "inappropriately dissects the seals for comparison, in violation of trademark law's anti-dissection rule."[181] Beyond its point regarding dissection, Vintage Brand contends that Penn State's argument is overbroad. Under its

---

[179] *Id.* at 25 (citing Jacob Jacoby, *Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, 92 TRADEMARK REPORTER 890, 931-32 (2002)).

[180] Doc. 97 at 11.

[181] *Id.* at 15-16 (citing *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed Cir. 1985)).

36

reasoning, any circular seal could potentially infringe on the Penn State Seal.[182] Vintage Brand also admits that Erdem's results for confusion in the control group are high but argues that they are not unacceptably high and are overshadowed by the difference in confusion between the test and control groups, which is the more appropriate measure.[183]

As Penn State argues, the Seal of Pennsylvania and the Penn State Seal do have some similarities.[184] They both incorporate the words "Pennsylvania" and "State" as well as some elements of the Pennsylvania Coat of Arms.[185] But in the Court's view, these are similarities that nearly all seal-type logos will share. They are usually all circles. They often contain symbolic images like the ones in the Penn State Seal. These similarities alone do not render Erdem's control infringing or invalid. Nor does the high confusion rate render the survey invalid, due to the difference in confusion between the test and control groups.

### 3.    Erdem's Measurement of Certainty

Lastly, Penn State challenges Erdem's certainty questions as deviations from accepted survey practice.[186] Erdem had respondents assess how certain they were of their answers on a four-point scale from "definitely correct" to "just guessing" and

---

[182]  *Id.*
[183]  *Id.* at 17 (citing Jacoby, *supra* note 150 at 932 n.76).
[184]  *Id.* at 25-26.
[185]  *Id.*
[186]  Doc. 96 at 30-33.

excised any response marked as "somewhat likely correct" and "just guessing."[187] Penn State argues that Erdem's approach has no basis in academic research and therefore undermines the reliability of Erdem's survey.[188] In its view, "confused people are generally uncertain, and asking someone if they are 'certain of their answer' prompts them to assume they are not."[189]

Penn State further argues that even if it had a basis, Erdem's four-point certainty scale is problematic because she does not include more options, such as an option indicating 50% certainty.[190] Penn State argues that Erdem's certainty-adjusted results should be excluded even if the rest of results are not.[191]

Vintage Brand responds by noting that Erdem provided her unadjusted results, which still showed low levels of confusion.[192] Vintage Brand questions Penn State's argument about the effect of certainty questions in a likelihood-of-confusion survey, noting that under Penn State's reasoning, respondents who answer "don't know" should be marked as confused, a conclusion with which even Franklyn disagrees.[193] Lastly, Vintage Brand notes that at least one court has held that certainty-adjustment was not grounds for exclusion.[194]

---

[187]   *See* Doc. 94-7 at 26.
[188]   Doc. 96 at 30-31.
[189]   *Id.* at 8.
[190]   *Id.* at 32.
[191]   *Id.* at 33.
[192]   Doc. 97 at 22-23.
[193]   *Id.* at 24.
[194]   *Id.* at 25 (citing *BBK Tobacco & Foods LLP v. Cent. Coast Agric. Inc.*, 615 F. Supp. 3d 982, 1004-05 (D. Ariz. 2022)).

The Court concludes that the issues cited by Penn State do not warrant exclusion of Erdem's survey or the analysis related to controlling for certainty. The inclusion of a certainty analysis does not itself warrant exclusion of Erdem's survey.[195] Particularly so here, where the information gathered by this portion of Erdem's survey provides additional data for evaluating the responses, but did not result in the exclusion of any of the respondents, and Erdem provided her unadjusted results which still demonstrate confusion. Erdem's methodology is not therefore flawed; regardless of whether it is the best method, Erdem's results are sufficiently reliable, and sufficiently fit the case, for their admission at trial. Accordingly, Penn State's motion to exclude Erdem's survey will be denied.

### C.      Vintage Brand's Motion to Strike

Vintage Brand moves to strike several paragraphs and portions of paragraphs from Penn State's SUMF in support of its motion for summary judgment.[196] They are: paragraphs 1, 5, and 114 of Penn State's SUMF, the first sentence of paragraph 6, the entirety of paragraph 15 of the Declaration of Stephanie Petulla (Penn State's Director of Licensing and Visual Identity), the entirety of exhibit 12 to Penn State's SUMF, and portions of exhibits 3, 5, 8, 14, 15, 16, 48, and 57.[197] The Court turns to these items in turn.

---

[195] *See BBK Tobacco*, 615 F. Supp. 3d at 1004-05 (noting that the inclusion of such questions and analysis "does not so distort the survey's results as to render them wholly inadmissible").

[196] Doc. 135.

[197] *Id.*

### 1.   Paragraph 1 of Penn State's SUMF

Paragraph 1 of Penn State's SUMF states: "Penn State is the flagship public research university in the Commonwealth of Pennsylvania and is famous throughout the United States and the world for its educational programs, athletics programs, and many other goods and services."[198]

That paragraph has one source: paragraph 6 of the Petulla Declaration, which reads:

> Penn State is the flagship public research university in the Commonwealth of Pennsylvania and is famous throughout the United States and the world for its educational programs, athletics programs, and many other goods and services that Penn State offers and provides to students, alumni, and members of the general public. Penn State enrolls approximately 100,000 students from across the United States and abroad each year and employs over 31,000 faculty and staff. Penn State has one of the largest living alumni bases among all U.S.-based universities. Almost one percent of all college graduates in the United States are Penn State alumni.[199]

Vintage Brand argues that Petulla's observation violates Federal Rule of Evidence 701 because her lay opinion that Penn State is famous is not, and cannot be, based on Petulla's perception and/or is not based on her own personal knowledge.[200] Penn State responds that it does not intend to use Petulla's testimony to show Penn State's fame for the purposes of trademark dilution.[201] Rather, her

---

[198]  Doc. 122 ¶ 1.

[199]  Doc. 123-1 ¶ 6.

[200]  Doc. 136 at 9-10 (citing *Adidas-Salomon AG v. Target Corp.*, No. CV-01-1582-ST, 2002 WL 35633578, at *4 (D. Or. Jan. 17, 2002)).

[201]  Doc. 157 at 2-3.

testimony "is squarely about the recognition of the University around the country."[202]

In the Court's view, regardless of the purpose for which Penn State uses it, Petulla's observation that Penn State is famous cannot be based on her personal knowledge. The only support Penn State offers is a case admitting an executive's opinions about a business' particular practices.[203] Petulla's testimony goes much farther than that and is accordingly inadmissible. The Court will therefore strike Paragraph 1 of Penn State's SUMF, along with Paragraph 15 and the first sentence of Paragraph 6 of Petulla's Declaration.

### 2.     Paragraphs 5 and 114 of Penn State's SUMF

Paragraph 5 of Penn State's SUMF reads "[t]hese students, faculty, staff, and alumni, as well as the general public nationwide, have come to recognize and associate the University Marks, as defined below, with goods sourced from or licensed by Penn State," and cites Paragraph 15 of the Petulla Declaration, a document depicting the results of a Penn State engagement study, and the Franklyn Report.[204]

---

[202] *Id.* at 3.

[203] *See Webster v. Dollar Gen., Inc.*, 197 F. Supp. 3d 692, 701 (D.N.J. 2016) (cited in Doc. 157 at 3).

[204] Doc. 122 ¶ 5. Paragraph 114 of Penn State's SUMF reads: "Consumers perceive the merchandise sold by Vintage Brand bearing the University Marks as being trademarks," and cites the Franklyn Report. *Id.* ¶ 114.

The relevant portion of the Petulla Declaration explains consumers' general recognition of the Penn State Marks, their expectation that goods displaying Penn State Marks are of a certain standard of quality, and their desire to purchase such goods to support Penn State.[205]

Vintage Brand appears to argue that Petulla lacks the personal knowledge to support her statements in Paragraph 15 of her Declaration. Again, Vintage Brand is correct. Petulla has no personal basis evident in her Declaration to understand consumers' attitudes about the Penn State Marks or the quality of Penn State-sponsored goods.

Vintage Brand next argues that the engagement study is inadmissible because it was submitted after the discovery deadline and has no expert attached to it.[206] Penn State disclosed the ongoing study to Vintage Brand before the discovery deadline, and therefore its late submission is entirely excusable. Penn State contends that the study is an example of a business record, which is generally admissible under Rule 803(6) and it could authenticate it as such at trial.[207] Penn State notes that other courts have accepted similar documents in other cases, but in the one case most on point,

---

[205] *See* Doc. 123-1 ¶ 15.
[206] Doc. 136 at 6.
[207] Doc. 157 at 8-9.

the court accepted the survey as admissible but concluded it had no evidentiary value for the proponent's claims.[208]

As an initial matter, the Court cannot rely on other cases finding that such surveys constitute business records—those cases are based upon the evidence presented therein, and this Court must make its determination based upon the evidence presented—or not presented—by Penn State in support of its contention that the survey is a business record.

To qualify under the business records exception to the hearsay rule, the proponent of the evidence must demonstrate, through the testimony of the custodian or another qualified witness, that the purported business record was: (1) made at or near the time of the event the record describes; (2) was made by a person with knowledge of the record's contents; and (3) was kept in the regular course of business.[209] At oral argument this Court asked Penn State to forecast what evidence it would offer in support of its assertion that the survey was a business record, as Penn State provided no such evidence in its briefing; other than unsupported statements that the survey was "done in the ordinary course of business," Penn State

---

[208] *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 507 F. Supp. 3d 1289, 1369 (D. Kan. 2020), *aff'd sub nom. In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) (cited in *id.*).

[209] Fed. R. Evid. 803(6). *See also United States v. Bansal*, 663 F.3d 634, 666 (3d Cir. 2011).

provided no genuine evidence or explanation to support its claim that the survey is a business record.[210]

In absence of any explanation or evidence relating how the survey was kept in the regular course of business, or even relating to when the report was recorded in relation to the survey itself, the Court cannot conclude that the survey constitutes a business record. Accordingly, Paragraphs 5 and 114 may not properly rely on that survey.

Finally, Vintage Brand argues that the statement cannot permissibly be based upon the Franklyn Survey 1, given the flaws inherent in that survey.[211] The Court has excluded the Franklyn Survey 1 and, as a result, agrees that Paragraphs 5 and 114 may not be based upon that evidence. Because there is no evidentiary support for Paragraphs 5 and 114, the Court will grant Vintage Brand's motion to strike those paragraphs.

### 3.     The Wayback Machine Screenshots

Finally, Vintage Brand argues that the Court should exclude from consideration Exhibits 3, 5, 8, 14-16, 48, and 57 because they are all screen captures using the "Wayback Machine," an internet application that allows users to see how webpages appeared in the past.[212] Vintage Brand argues that in the absence of a

---

[210]  Doc. 186 at 233-36.
[211]  Doc. 136 at 13.
[212]  *Id.* at 14-16; *see Bansal*, 663 F.3d at 667 (explaining the Wayback Machine).

witness authenticating the screenshots, they are inadmissible.[213] Penn State advises the Court that it will be able to produce an authenticating witness at trial,[214] and the Court therefore defers consideration of this aspect of Vintage Brand's motion to strike, pending authentication of the exhibits at trial.

### D.   Penn State's Motion to Strike Portions of Hartvigson's Declaration

Penn State moves to strike portions of Chad Hartvigson's declaration and their use in Vintage Brand's SUMF.[215] Penn State seeks to strike the following portions:[216]

1.  ". . . all works of authorship contained thereon are believed to be in the public domain."[217]

2.  ". . . to the best of my knowledge, all of the historic images were authored or created by third parties; none of the images were authored by [Penn State]."[218]

3.  "Customers can choose to have those images printed on a range of tangible goods. . . ."[219]

4.  ". . . The historic images . . . are what makes customers want to buy the merchandise in the first place. The attractive nature of these historic images satisfies customer preferences for a custom item with a retro look and a nostalgic feeling, while also allowing customers to express affinity for the team or school referred to in the historic images. Customers decide if they like a historic image enough to place it on a t-shirt or other item and order the product."[220]

---

[213] *Id.*

[214] Doc. 157 at 10-11.

[215] Doc. 141.

[216] Doc. 142 at 4-14.

[217] Doc. 116-2 ¶ 12.

[218] *Id.* ¶ 15.

[219] *Id.* ¶ 13.

[220] *Id.*

5.   ". . . a customer's selection of a particular digital mockup indicates that customer's interest in the historic image itself . . ."[221]

6.   "Vintage Brand does not use any historic images as a trademark."[222]

With respect to the first statement, Penn State argues that Hartvigson's statement on his personal beliefs are inadmissible because they are subjective and unsupported by personal knowledge.[223] Vintage Brand counters that Hartvigson's statement is based on his belief about the law and his belief is relevant because Penn State sues Vintage Brand for willful trademark infringement.[224] The Court agrees with Vintage Brand, and concludes that the statement is relevant to this case.[225]

With respect to the second statement, Penn State first offers the same argument it did in connection with the first: that Hartvigson's beliefs are insufficient. Again, the Court finds them relevant to his and, by extension, Vintage Brand's state of mind. Penn State also argues that Hartvigson's assertion is contradicted by his prior deposition, in which he testified that he did not search for the artists of memorabilia that did not have an artist listed.[226]

The relevant excerpt of the deposition transcript reads:

Q: And so you've never asked any artist their permission to use their work?

---

[221]   *Id.* ¶ 25.
[222]   *Id.* ¶ 16.
[223]   Doc. 142 at 5-6.
[224]   Doc. 154 at 5-6.
[225]   Of course, the Court gives no weight to Hartvigson's beliefs with respect to whether Vintage Brand objectively infringed on Penn State's trademarks.
[226]   Doc. 142 at 8.

A: Game tickets and programs, you know, a lot of these things—well, most of them there's no copyright notice, nor is there any authorization or author established on that item. Most of these items are throwaway, printed for one day only. A few people decided to start collecting these things, and that's how we've come across them. But these—these are works of art that, you know, never meant to be copyrighted.

Q: But how do you know that? I mean, have you asked the artist?

A: Most of the artists are dead.

Q: Artists from 1989 are dead?

A: Well, it is 33 years ago. But majority of the stuff that's on our website is from the '40s, '50s, and '60s.

Q: But, I mean, you don't know 'cause you never bothered to find the artist, correct?

A: I haven't searched for artists. I don't know how you go about doing that for items when there's no artist listed.[227]

Based on the above excerpt, Vintage Brand contends that Hartvigson's testimony does not show that he never researched any artists, just that he did not specifically locate artists who were unlisted.[228] The Court does not find the blatant contradiction between the two testimonies that Penn State suggests, and will not strike that portion of Hartvigson's declaration based on its *possible* inconsistency with his deposition testimony.

---

[227] Doc. 142-1 at 9-10.
[228] Doc. 154 at 8.

Moving onto the third statement, Penn State contends that Hartvigson's assertion that customers can choose what images to have printed contradicts his prior testimony that "a customer's never going to just click on an image; they're always going to click on a product that has an image on it."[229] Penn State argues that given Hartvigson's "testimony conceding that Vintage Brand customers select and click on *products* rather than images, Hartvigson's contrary statements in his declaration must be struck."[230] The Court discerns no contradiction. Based on its understanding of Vintage Brand's business model, customers can choose from a variety of products depicting a variety of graphics.

Penn State next seeks to strike portions of the Hartvigson declaration regarding customers' motivations for purchasing Vintage Brand products because he lacks foundation as to those customers' motivations.[231] On this point, the Court agrees with Penn State for the same reasons it agreed with Vintage Brand that portions of the Petulla Declaration must be stricken. Hartvigson has no basis to say that the "[historic images] make customers want to buy the merchandise in the first place" or "satisf[y] customer preferences" or indicate where a consumer's "interest" lies.[232] Consequently, Paragraphs 16 and 25 of Hartvigson's declaration will be stricken.

---

[229] Doc. 142 at 9 (quoting Doc. 142-1 at 3).

[230] *Id.*

[231] *Id.* at 10-11.

[232] Doc. 116-2 ¶¶ 16, 25.

Finally, Penn State moves to strike Hartvigson's statement that Vintage Brand does not use any historic images as a trademark because it is a legal conclusion.[233] However, the statement has value outside of the alleged legal proposition it contains because it demonstrates a lack of willfulness on Hartvigson's part, which is a contested issue in this matter. That statement is therefore admissible. Consequently, the Court will grant Penn State's motion to strike only as to Paragraphs 16 and 25, and will deny the remainder of the motion.

### E.   Penn State's Motion to Strike Portions of Hartvigson's Supplemental Declaration

Penn State also seeks to strike portions of Chad Hartvigson's supplemental declaration.[234] Specifically, Penn State seeks to strike portions of Paragraphs 5 and 7:[235]

1.   ". . . Vintage Brand would have scanned both images below from historic memorabilia:



---

[233]  Doc. 142 at 12.
[234]  Doc. 159.
[235]  *Id.* at 2-3.

The image on the left was most likely sourced from a decal created by a third party around the early 1950s. . . . I believe the image on the right was sourced from a historic ticket for the 1929 Penn State v. University of Pennsylvania (ticket image below):"



2. "Vintage Brand consumers typically browse or purchase merchandise from multiple teams."

As to the first statement, the Court concludes that Hartvigson's assertion regarding the first image is inappropriately speculative. With no explanation, Hartvigson declares that it is likely that the image was culled from a decal. But without any further explanation, it is impossible to determine that Hartvigson speaks from any sort of personal knowledge, and it is not likely that he would possess such knowledge. That is not the case, however, as to the second image, and Hartvigson's statement regarding that image appears, at this time, to be sufficiently based upon Hartvigson's personal knowledge. Hartvigson is intimately familiar with Vintage Brand and its procedures for obtaining historical items; that he only "believes" that the image was pulled from one historical item rather than another—and does not

know with absolute certainty—does not render his statement inadmissible. And he points to the very historical item from which he believes the image was pulled.[236] This is sufficient for the statement to be admissible at this time.

With respect to the second statement, Penn State argues that Hartvigson's assertion is not based on personal knowledge and is contradicted by other testimony.[237] The Court agrees with Vintage Brand that the testimony to which Penn State cites does not explicitly contradict Hartvigson's challenged statement.[238] Moreover, there is no evidence that the statement is not based on his personal knowledge and would appear to be within Hartvigson's purview at Vintage Brand, meaning the statement is admissible.[239] Accordingly, Vintage Brand's motion to exclude portions of Hartvigson's supplemental declaration will be granted in part and denied in part.

### F.    Vintage Brand's Motion for Summary Judgment

Vintage Brand moves for summary judgment on:

1.    All of Penn State's claims other than its dilution claims because there is no actionable confusion.

---

[236] The Court disagrees with Penn State's assertion that the historical item is markedly different from the image used by Penn State. Doc. 160 at 7. And Penn State's argument that the image would have required more work to edit than Vintage Brand performed on other images does not impact the admissibility of Hartvigson's statement..

[237] Doc. 160 at 8-11.

[238] See Doc. 162 at 8-11.

[239] Regardless of its admissibility, the statement has no impact on this Court's summary judgment opinion.

2.   All of Penn State's claims because the Penn State-related historic images are functional when used ornamentally on merchandise.

3.   Penn State's counterfeiting claim because the historic images are neither substantially indistinguishable from Penn State's purported marks nor spurious.

4.   Penn State's dilution claims because PENN STATE is not a famous mark.

5.   Penn State's false advertising claim because it does not allege an actionable false statement.

6.   Penn State's false endorsement claim because the purported "endorsement" comes only from Penn State's association with the historic images, and because Vintage Brand's website contains numerous disclaimers.

7.   Vintage Brand's counterclaim to cancel the registrations for the Seal Designs because those designs comprise the Coat of Arms of Pennsylvania.[240]

## 1.   Willful Trademark Infringement Claim

To successfully demonstrate trademark infringement, in accordance with 15 U.S.C. § 1114(1)(a), "a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion."[241] "If a mark is both

---

[240] Doc. 127 at 12-15.
[241] *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

federally registered and 'incontestible,' the mark is presumed to meet the first two requirements."[242] "The plaintiff bears the burden of proof."[243]

Penn State's marks that are at issue here are all incontestable save for one, the Pozniak Lion Design, registration number 5,305,910.[244] Vintage Brand's motion for summary judgment therefore rises or falls on the issue of whether its use of Penn State's marks causes a likelihood of confusion.

"A likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark."[245] The Third Circuit has "developed a nonexhaustive list of factors to consider in determining whether there is a likelihood of confusion between marks."[246] Those factors, known at the "*Lapp* factors," are:

---

[242] *Express Servs., Inc. v. Careers Exp. Staffing Servs.*, 176 F.3d 183, 185 (3d Cir. 1999) (internal citation omitted). "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 n.7 (3d Cir. 1994).

[243] *A & H Sportswear*, 237 F.3d at 210-11.

[244] Vintage Brand argues in a footnote that Penn State does not own rights in the marks because it only uses those marks in a trademark maintenance program, which does not qualify as a bona fide use of the marks. Doc. 127 at 21 n.2. However, "[w]hether a particular use constitutes a 'trademark maintenance program' depends upon the specifics of the use," and here Vintage Brand's arguments are insufficiently developed for the Court to reach any reasoned decision on this particular issue. *Bd. of Trustees of Univ. of Ill. v. Vintage Brand, LLC*, No. 21-CV-6546, 2023 WL 6388302, at *6 (N.D. Ill. Sept. 29, 2023). Accordingly, the Court will not address Vintage Brand's argument at this time.

[245] *A & H Sportswear*, 237 F.3d at 211 (internal quotation marks omitted).

[246] *Id.*

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.[247]

Vintage Brand offers four broad reasons why Penn State's trademark infringement claims fail: (1) the marks are merely ornamental; (2) Vintage Brand's use of the marks creates no confusion as to the source of the tangible goods; (3) the images used by Vintage Brand are aesthetically functional; and (4) under the relevant *Lapp* factors, there is insufficient likelihood of confusion.[248]

---

[247] *Id.* (quoting *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)).
[248] Doc. 127 at 20-39.

### a.      Ornamentality

Vintage Brand first argues that Penn State cannot prove likelihood of confusion because consumers perceive that Penn State uses its marks for purely ornamental/aesthetic, rather than trademark, purposes.[249] Vintage Brand asserts that there is no evidence that Penn State uses the images that appear on Vintage Brand products as trademarks and any claims to the contrary "rely on illegitimate dissection of the composite images" in violation of trademark law's anti-dissection rule.[250]

As an initial matter, as noted above, several of the marks that Penn State seeks to protect are incontestable. Incontestable registrations may only be challenged on limited grounds, and a defendant cannot defend against trademark infringement claims for incontestable registrations "on the ground that they are merely" ornamental.[251] Therefore, Vintage Brand is prohibited from presenting this defense as to most of Penn State's marks at issue in this case. And even if it were not, there remains a genuine issue of material fact as to whether Penn State's marks are merely ornamental.

Although "[a]ny picture, design or symbol may be capable of playing the role of a trademark, . . . a design [that] is solely or merely ornamental and does not also

---

[249] *Id.* at 9-12.
[250] *Id.* at 10.
[251] *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1264 (S.D. Cal. 2018) (citing *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985); 15 U.S.C. § 1115(b)).

identify and distinguish source" cannot be a trademark.[252] "To be a trademark, a design or ornamentation must do the job of a trademark: to identify and distinguish a source."[253] "If customers perceive a design solely and only as attractive ornamentation, then the design is not a trademark."[254] "If customers perceive a design as not only attractive, but also as an indicator of source, then it is a trademark."[255]

A registration fails on this ground when its overall commercial impression is "solely as attractive ornamentation" and not "also as a symbol that identifies and distinguishes a single source."[256] In assessing aesthetic ornamentation—the first half of this conjunctive requirement—courts have considered the symbol's "size, location[,] and dominance," and whether it is accompanied by a ™ or ®.[257] Sitting at the non-ornamental end of this continuum are the small symbols affixed to the tag of a shirt or stamped on the bottom of a mug. On the ornamental side stand the large, dominant, and centrally located symbols, such as shirts with text emblazoned across the chest or a coaster with a mascot featured across the top. As this Court has previously noted, Penn State's marks appear to fall into the latter category.[258]

---

[252] MCCARTHY § 7:24.
[253] *Id.*
[254] *Id.*
[255] *Id.*
[256] *Id.* § 7:81; *see Macy's Inc. v. Strategic Marks, LLC*, No. 11-CV-06198-EMC, 2016 WL 374147, at *3 (N.D. Cal. Feb. 1, 2016); *Bobosky v. Adidas AG*, 843 F. Supp. 2d 1134, 1145 (D. Or. 2011).
[257] *Bobosky*, 843 F. Supp. 2d at 1145.
[258] Doc. 43 at 5.

But that finding does not settle the matter. The ornamentality requirement is conjunctive; that "a design is pleasing to the eye and serves a decorative purpose does not mean that the design cannot also serve a trademark purpose."[259] The Court must also consider whether the marks "identify and distinguish" the goods. This requirement, which invokes the Lanham Act's definition of a trademark, broadens the analysis to the fundamental trademark question: does the mark serve a source identifying function?[260] And here, the parties' understanding of the law diverges.

Vintage Brand contends that a mark only serves a source identifying function if it indicates the source of the tangible goods themselves.[261] And since the Penn State Marks do not indicate the source of the tangible goods sold by Vintage Brand, they are merely ornamental.[262] Penn State in turn argues that marks serve a source identifying function if they indicate the secondary source of the marks[263]—i.e. "sources such as licensors who authorize licensees to use the licensor's trademark in a manner that indicates sponsorship or authorization of the product."[264] Because, Penn State asserts, it has proffered evidence demonstrating that its marks indicate it as a secondary source, the marks are not merely ornamental.[265]

---

[259] McCarthy § 7:24.
[260] *Id.* § 7:81 ("The 'merely ornamental' rule is simply a facet of the basic trademark factual question: is the disputed feature in fact perceived by customers as a trademark or not?").
[261] Doc. 127 at 23-25.
[262] *Id.*
[263] Doc. 143 at 28-29.
[264] *Ducks Unlimited, Inc. v. Boondux, LLC*, No. 214CV02885SHMTMP, 2017 WL 3579215, at *23 (W.D. Tenn. Aug. 18, 2017).
[265] Doc. 143 at 28-29.

Case 4:21-cv-01091-MWB   Document 194   Filed 02/06/24   Page 58 of 109

As this Court stated in ruling on Penn State's motion to dismiss, it is not willing to adopt the per se approach utilized by the Trademark Trial and Appeal Board ("TTAB"), wherein the use of a university's marks will always identify that university as a sponsor of the physical goods.[266] However, neither is the Court willing to adopt the opposite position advocated for by Vintage Brand—that the use of a mark is ornamental unless it is perceived as indicative only of the source of the tangible product itself.[267]

Rather, the ground staked out by numerous other courts—and the ground that seems to be proposed by amicus counsel—is the better position.[268] Those courts have held that a plaintiff must demonstrate that the use of a "mark[] is likely to create consumer confusion as to origin, source, approval, affiliation, association, or sponsorship," not merely as to the source of the tangible good itself.[269] This test is consistent with the plain language of the statute, and adequately addresses the interests of the mark holder in protecting its reputation[270] while permitting the free

---

[266]  Doc. 43 at 9-10, 16-17.

[267]  Doc. 127 at 23-25.

[268]  *See* Doc. 167 at 18 ("This Court can properly refocus infringement analysis on confusion about source *or sponsorship* of the product, rather than of the trademark" (emphasis added)).

[269]  *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1264 (11th Cir. 2017).

[270]  The mark holder may, for instance, be concerned with the prospect of being associated with a goods manufacturer whose practices are in opposition to the values mark holder—i.e., perhaps the manufacturer uses child labor, or engages in strong political activities when the mark holder prefers to express only neutrality on political topics.

market to operate in ways that do not deceive consumers or diminish the rights or interests of the mark holder.[271]

Applying that standard here, the Court cannot conclude that, as a matter of law, Penn State's marks are merely ornamental. Relevant to that inquiry is Professor Franklyn's second survey, which raises questions as to whether Penn State's marks identify it as a secondary source when used on Vintage Brand's goods.[272] In that survey, respondents were asked to examine the three images shown below—with Cell C being a control cell[273]—and identify who made the tangible goods.[274]

---

[271] *See* 15 U.S.C. § 1125(a)(1)(A) (a trademark claim may lie where use of a mark "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person").

[272] Although Vintage Brand sought to exclude Franklyn's Survey 1, it did not move to exclude the second survey, which this Court describes below.

[273] According to Franklyn, "[t]he role of the control cell is to account for noise in the dataset (i.e. could any shirt offered on the Vintage Brand website create a latent connection with a university or Penn State specifically)." Doc. 94-2 at 40.

[274] *Id.* at 27-29.

59



**Cell A**

**Cell B**



**Cell C**

The vast majority of respondents correctly identified Vintage Brand as the manufacturer, with 5% identifying Penn State as the manufacturer for Cell A, and 9% identifying Penn State as the manufacturer for Cell B.[275] When those same respondents were asked whether the product was sponsored or approved by another entity, 30% believed that the product in Cell A was sponsored or approved by another institution, while 43% believed it was not, and 35% believed that the product in Cell B was sponsored or approved by another institution, while 36% believed it was not.[276] However, 20% of respondents believed that the item in Cell C was sponsored or approved by another institution, with 36% believing it was not.[277] "This

---

[275] *Id.* at 39-40.
[276] *Id.* at 41.
[277] *Id.*

creates a net of 10 to 15% sponsorship or affiliation."[278] In Cell A, 16% of respondents identified Penn State as the sponsor or affiliate, while 20% did so in Cell B.[279]

Respondents were far less clear in answering whether they believed the company that made the products were affiliated with another company: 19% responded in the affirmative for Cell A, 21% for Cell B, and 22% for Cell C, while 48% responded in the negative for Cell A, 44% for Cell B, and 36% for Cell C.[280] In both Cell A and Cell B 11% of respondents identified the affiliate as Penn State, whereas in Cell C 0% identified the affiliate as Penn State.[281]

Finally, the survey also measured whether respondents believed that any of the products were licensed by a company or institution.[282] Many of the respondents believed they were: 43% for Cell A, 52% for Cell B, and 50% for Cell C.[283] In answer to whether the respondents believed the product was *not* licensed, 31% answered affirmatively for Cell A, 28% for Cell B, and 8% for Cell C.[284] In Cell A, 7% of respondents identified the licensor as Penn State, while 12% said so for Cell B, and 0% provided that answer for Cell C.[285]

---

[278] *Id.*
[279] *Id.*
[280] *Id.* at 42.
[281] *Id.* at 42-43.
[282] *Id.* at 43.
[283] *Id.*
[284] *Id.*
[285] *Id.* at 44.

From this data, Franklyn "created a composite metric, which aggregated responses" and "included consumers who were confused as to source, sponsorship, affiliation, or licensure and indicated Penn State or 'college, university, NCAA' within their open-ended responses."[286] He concluded that, for Cell A, "31% of consumers were confused as to source, sponsorship, affiliation, or licensure and mentioned 'Penn State' or 'college, university, NCAA', with 28% explicitly mentioning 'Penn State.'"[287] As to Cell B, "43% of consumers were confused as to source, sponsorship, affiliation, or licensure and mentioned 'Penn State' or 'college, university, NCAA', with 37% explicitly mentioning 'Penn State.'"[288] And, with Cell C, "4% of consumers were confused as to source, sponsorship, affiliation, or licensure and mentioned 'Penn State' or 'college, university, NCAA', with 0% explicitly mentioning 'Penn State.'"[289]

While that survey was primarily concerned with determining whether the use of Penn State's marks created a likelihood of confusion, it also reveals something about whether the marks are perceived as identifying a secondary source of those goods.[290] That survey reveals that many of the respondents believe the marks identify a secondary source—often Penn State. And while the Court has concerns about

---

[286] *Id.*

[287] *Id.*

[288] *Id.*

[289] *Id.* at 45.

[290] Vintage Brand raises issues that it claims render Franklyn's survey inherently unreliable. Doc. 127 at 31-34. Again, however, Vintage Brand has not moved to exclude Franklyn's survey.

whether this survey is influenced by a consumer belief that, as a legal matter, permission must be obtained to use a university's logos, images, or marks, that issue has not been offered as a ground to exclude the survey, and therefore must be left to a jury to evaluate.

This is not to say that Penn State's evidence is incontrovertible. To the contrary, in addition to the Erdem survey data presented by Vintage Brand, other evidence raises questions as to whether consumers view the marks as indicators of primary or secondary source. As Vintage Brand notes, under its licensing agreements, Penn State requires that licensees attach a label to all goods that states they are officially licensed by Penn State.[291] The very fact that Penn State requires such labels indicates that the marks themselves may not be source indicators, and something more is required to direct consumers to the primary or secondary source of the goods.

Nevertheless, Penn State's evidence is sufficient, at the summary judgment stage, to defeat any claim that the marks are merely ornamental. Accordingly, Vintage Brand is not entitled to summary judgment on this ground.

### b. Aesthetic Functionality

The Court turns next to the question of whether Penn State's marks are aesthetically functional, and therefore not protectable. Vintage Brand argues that the

---

[291] *Id.* at 18.

marks are aesthetically functional because consumers purchase goods featuring the marks "for reasons independent of any source-related meaning"—that is, they buy such goods for the sole purpose of expressing affiliation with Penn State.[292] Because the marks are central to any goods' uses, and because depriving Vintage Brand of use of the marks would place it at a significant, non-reputational disadvantage in sourcing Penn State-related goods, it argues that the marks are aesthetically functional and non-trademarkable.[293]

It is well established that, regardless of whether a mark is protected, and whether a competitor's use of that mark is likely to cause confusion, "the competitor can nevertheless prevail [on a trademark infringement claim] by showing that the mark is functional—a traditional defense to the enforcement of a trademark."[294] A mark is functional even if it is only aesthetically functional, rather than functional in a utilitarian sense.[295] The United States Supreme Court has

> explained that, in general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.[296]

---

[292]  Doc. 127 at 38; *see id.* at 38-39.

[293]  *Id.* at 38-39.

[294]  *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 217 (2d Cir. 2012) (brackets, ellipsis, and internal quotation marks omitted).

[295]  *Id.*

[296]  *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 165 (1995) (brackets and internal quotation marks omitted). *See also Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 257-58 (3d Cir. 2021) (discussing doctrine).

Where a mark meets that definition, it is considered functional "even if there is 'no indication that the mark has any bearing on the use or purpose of the product or its cost or quality.'"[297] Consequently, while trademark protection is improper where it "would significantly hinder competition by limiting the range of adequate alternative designs," "distinctive and arbitrary arrangements of predominantly ornamental features that do *not* hinder potential competitors from entering the same market with differently dressed versions of the product are . . . eligible for trademark protection."[298] Stated differently, "aesthetic functionality, mean[s] a design that communicates the use, purpose, cost, or quality of the product in a way that competitors cannot avoid replicating without incurring costs."[299]

In making a determination regarding aesthetic functionality, "courts must carefully weigh the competitive benefits of protecting the source-identifying aspects of a mark against the competitive costs of precluding competitors from using the feature."[300] Furthermore, courts must "take care to ensure that the mark's very success in denoting (and promoting) its source does not itself defeat the markholder's right to protect that mark."[301] "Because aesthetic function and

---

[297] *Christian Louboutin*, 696 F.3d at 220 (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001) (brackets omitted)).

[298] *Id.* at 222 (brackets and internal quotation marks omitted).

[299] *DayCab Co., Inc. v. Prairie Tech., LLC*, 67 F.4th 837, 847 (6th Cir. 2023) (internal quotation marks omitted).

[300] *Christian Louboutin*, 696 F.3d at 222 (internal quotation marks omitted).

[301] *Id.*

branding success can sometimes be difficult to distinguish, the aesthetic functionality analysis is highly fact-specific."[302]

As the United States Court of Appeals for the Sixth Circuit has noted, "there are few aesthetic designs that are so fundamental to an industry that competitors cannot fairly compete without free use of them."[303] "Accordingly, a party's initial burden to show that a design lacks aesthetic functionality is not substantial; the plaintiff need only show that the design is not a competitive necessity such that exclusive use would put competitors at a significant non-reputation related disadvantage."[304]

Using these standards as a benchmark, it is clear that the available evidence demonstrates that, at the summary judgment stage, Penn State has met its "not substantial" burden to demonstrate that prohibiting Vintage Brand from using the challenged marks would not place Vintage Brand at a significant non-reputational disadvantage.[305]

As an initial matter, neither party has attempted to define the "relevant market" that must be used to assess whether the Penn State Marks are aesthetically functional. In the Court's view, there are two likely markets that could apply to Penn State's Marks: the collegiate goods market in general, or the Penn State-branded

---

[302] *Id.*

[303] *DayCab Co., Inc.*, 67 F.4th at 848 (brackets and internal quotation marks omitted).

[304] *Id.* (ellipsis and internal quotation marks omitted).

[305] *Id.*

goods market specifically. The Court need not assess which market is at play here[306] because, even accepting the narrower definition, it cannot be said, as a matter of law, that Penn State's exclusive use and control of its marks would put Vintage Brand at a significant non-reputation related disadvantage.

It is not necessary for Vintage Brand to use the specific Penn State Marks to compete in the athletics apparel marketplace or even the Penn State apparel marketplace. For example, Vintage Brand could use non-trademarked Penn State historical images that omit the Penn State Marks.[307] Or Vintage Brand could use its own creative language to attempt to entice Penn State supporters to purchase its goods.[308] Vintage Brand could even seek to use non-protected color schemes to invoke Penn State in the minds of consumers without infringing upon any trademark. For instance, many alumni and supporters or Syracuse University or Bucknell University would undoubtedly associate a bright orange and navy blue necktie with their favored university—and likely purchase such goods—even if that tie lacked any marks that explicitly associated it with those universities.

---

[306] *See Vitamins Online, Inc. v. Heartwise, Inc.*, 71 F.4th 1222, 1240-41 (10th Cir. 2023) (outlining considerations for defining the scope of the relevant market). It seems likely, based on those considerations, that the narrow definition is appropriate here although, in the absence of any briefing on this issue, the Court declines to take any firm position on the matter.

[307] Vintage Brand's brief in support of its motion for summary judgment at ECF pages 17 and 27 contain several attractive images that appear to be usable if Vintage Brand were to omit trademarks from the image such as the words "PENN STATE."

[308] For example, companies are prohibited from using the term "Super Bowl" without authorization; many creative companies skirt this prohibition by using terms such as "the Big Game"—a reference that any fan of the National Football League instantly recognizes.

Although prohibiting Vintage Brand from using the Penn State Marks would undoubtedly place Vintage Brand at a disadvantage in trying to win over Penn State supporters, the evidence is simply insufficient at this stage to describe that disadvantage as significant. Consequently, there remains a genuine issue of material fact as to whether the marks are aesthetically functional, and summary judgment on that ground will be denied.

As a final note, the Court cannot ignore the practical impact of any ruling that finds a university's marks are aesthetically functional because consumers wear goods bearing those marks only to express support for the institution itself. This would essentially render those marks wholly unprotectable, even if use of the marks would lead to confusion regarding the source or sponsorship of the product. Such a conclusion would stray dangerously close to the polar opposite of the per se approach rejected by this Court, and would mean that no trademark for universities would ever be valid for tangible goods. That is a conclusion that the Court cannot adopt.

### c.    Likelihood of Confusion and Balancing of the *Lapp* Factors

Finally, Vintage Brand asserts that consideration of the relevant *Lapp* factors demonstrates an absence of confusion.[309] Specifically, Vintage Brand contends that there is no evidence of actual confusion, no evidence that Vintage Brand intended to confuse the public, or any evidence that the marks are strong trademarks for

---

[309]  Doc. 127 at 34-38.

merchandise or similar to the composite historical images used by Vintage Brand.[310]

As Vintage Brand notes, "the burden of proving likelihood of confusion rests with

the plaintiff," even where the mark is incontestable.[311]

A review of the available evidence, as applied to the relevant *Lapp* factors,[312]

demonstrates that there are factual conflicts that may not be reconciled by this Court

but, rather, must be left to a jury to resolve. First, there is some "degree of similarity

between [Penn State's] mark and the alleged infringing" products sold by Vintage

Brand, as those products and the images they bear incorporate Penn State Marks.[313]

And although Vintage Brand uses composite images that, as a general matter, do not

appear to identically copy the Penn State Marks, as Penn State correctly notes, the

marks must be viewed with respect to the overall impression they make, such that

certain changes and additions to the marks do not necessarily mean that the marks

are not confusingly similar.[314] The direct copying of portions of the Penn State Marks

into Vintage Brand's composite images means that a jury could reasonably find that

---

[310] *Id.*

[311] *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004).

[312] The parties do not dispute that four factors are not relevant here, those factors being: factor 4, the length of time the defendant has used the mark without evidence of actual confusion arising; factor 7, whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; factor 8, the extent to which the targets of the parties' sales efforts are the same; and factor 10, other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market. *Compare* Doc. 127 at 34-38 *with* Doc. 143 at 29-42.

[313] *A & H Sportswear*, 237 F.3d at 211.

[314] *See* Doc. 143 at 30 (citing *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994)).

the images used by Vintage Brand are similar to Penn State's Marks; a jury could likewise conclude that the marks are not similar.[315] This factor is therefore neutral.

Second, as to the strength of the owner's marks, they are somewhat strong. Penn State has used the marks exclusively for many years, and has licensed those marks for use on a variety of goods and apparel.[316] The strength of these marks lends in favor of finding confusion.

Third, "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase," which is functionally equivalent to asking how sophisticated the consumers are, is fairly difficult to parse.[317] Penn State has provided no evidence whatsoever that consumers seeking to purchase Penn State products are not sophisticated. On the one hand, one could easily imagine that many alumni of Penn State are sophisticated and discerning when it comes to purchasing products that demonstrate their support of their alma mater. On the other hand, one could just as easily imagine consumers being unsophisticated in their purchases—perhaps a fair-weather fan looking for a sweatshirt to wear to the single Penn State football game that he will attend. But one imagines that the first scenario is more likely, and devotees of Penn State will be discerning in their purchase of Penn State-related merchandise, similar to how "consumers will be

---

[315] This is discussed in more detail below in addressing Penn State's motion for summary judgment.

[316] Doc. 122 ¶¶ 7, 9-11, 14-17, 24-27, 30-34, 42-45.

[317] *A & H Sportswear*, 237 F.3d at 225.

discriminating in their selection of swimwear."[318] Given the lack of evidence here, however, this factor is neutral or weighs only slightly in Vintage Brand's favor.[319]

As to the fifth factor, Vintage Brand's intent in allegedly infringing upon Penn State's Marks, Penn State argues that intent may be inferred by Vintage Brand's decision to conduct preclearance trademark searches.[320] But this tells only part of the story. As Vintage Brand notes, the website where consumers go to purchase its products is replete with disclaimers noting that Vintage Brand has no affiliation with any university.[321] Vintage Brand's mark appears on many of its goods, and none of the goods contain an official label that would mark the product as having been endorsed by Penn State.[322] This evidence is critical, since mere evidence of an intent to copy is insufficient to satisfy this factor; the defendant must have intended "to *confuse* consumers."[323]

Vintage Brand's use of disclaimers indicates a lack of intent to deceive, even if other evidence may hint at intent. As the law professor amicus brief notes, such "clear labeling can indicate that the goods are (or are not) authorized by the

---

[318] *Id.*

[319] Penn State asserts that Vintage Brand's products are sold at relatively low prices, indicating that customers would assume the goods were offered by the same source. Doc. 143 at 34. However, Penn State provides no legal support for this proposition. And even if there were support for its argument, the examples used in Franklyn's second survey tends to undercut any assertion that the goods are sold at low prices. *See* Doc. 94-2 at 27-29.

[320] Doc. 143 at 41-42.

[321] Doc. 128 ¶¶ 13-14, 16-17.

[322] *Id.* ¶ 19.

[323] *A & H Sportswear*, 237 F.3d at 225-26.

trademark holder."[324] Given the available evidence that Vintage Brand did not intend to confuse consumers—balanced somewhat by some evidence of possible intent—this factor weighs slightly in Vintage Brand's favor.

As to one of the most critical factors, actual confusion, Penn State has offered some evidence of confusion. First, Penn State points to some testimonial evidence of actual confusion, although as Vintage Brand points out the testimony itself is not definitive.[325] Moreover, the second Franklyn survey—discussed previously—demonstrates that consumers may actually be confused about the source of Vintage Brand's products despite the use of disclaimers.[326] This tends to indicate actual confusion.[327]

Of course, in contrast Vintage Brand has presented Erdem's survey, which indicates no likely confusion as to Vintage Brand's products and alleged use of Penn State's Marks.[328] While both Vintage Brand and Penn State attempt to undermine

---

[324] Doc. 167 at 19.

[325] Doc. 143 at 35-36. *But see* Doc. 127 at 35-36 (Vintage Brand explaining weaknesses in Penn State's testimonial evidence of actual confusion).

[326] Doc. 94-2 at 39-45.

[327] Professorial amicus argues that any potential for confusion is adequately addressed through the use of clear labeling and disclaimers. Doc. 167 at 19-21. The assertion that there may be circumstances where consumers believe, at a minimum, that university sponsored tangible goods by creating partnership with producer or authorizing production, and that labeling can dispel any such confusion, is cogent and well taken. But here there are issues of fact—described previously—that preclude any conclusion that the use of disclaimers here prevented confusion. Under the fact-intensive approach set forth by numerous other courts, and as adopted by the Court here, there remains a genuine issue of material fact as to whether consumers were confused by Vintage Brand's use of Penn State's marks, or whether its disclaimers were sufficient to avoid liability for trademark infringement.

[328] *See* Doc. 94-7 at 31-45.

each other's expert surveys, these arguments "go to the weight of the survey"[329] and it must be left to the jury to ultimately conclude which survey merits greater weight. This factor therefore, at most, weighs slightly in Penn State's favor, although clear issues of fact here would preclude summary judgment.

Finally, as to the ninth factor, "the relationship of the goods in the minds of consumers because of the similarity of function,"[330] this factor again compels the denial of summary judgment, as it leads to a genuine issue of material fact that requires resolution by a jury. As Penn State notes, its marks appear on a variety of officially sanctioned goods similar to those offered by Vintage Brand.[331] But while Vintage Brand's goods are similar in function and are alleged to feature Penn State's Marks, the images used are composites that are different in appearance than any used by Penn State or licensed by Penn State. And more importantly, Vintage Brand's use of disclaimers on its website arguably distances the relationship of the goods in the minds of consumers. Ultimately, the available evidence simply does not permit the Court to conclude, as a matter of law, that this factor weighs either in Penn State's favor or Vintage Brand's favor.

In sum, a balancing of all relevant factors demonstrates insufficient strength to merit summary judgment in Vintage Brand's favor. Rather, there remain

---

[329] *P & P Imports LLC v. Johnson Enterprises, LLC*, 46 F.4th 953, 963 (9th Cir. 2022) (internal quotation marks omitted).

[330] *A & H Sportswear*, 237 F.3d at 211.

[331] Doc. 143 at 34; *see* Doc. 122 ¶¶ 13, 19, 29, 37, 40, 41, 47.

significant factual issues as to the Penn State's claim of trademark infringement that preclude summary judgment. Accordingly, Vintage Brand's request for summary judgment on that claim will be denied.

## 2.    Counterfeiting Claim

The Court next turns to Vintage Brand's assertion that it is entitled to summary judgment as to Penn State's counterfeiting claim. Vintage Brand argues that Penn State's claim is not colorable because: (1) Penn State's claim is overbroad as many of the marks apply only to goods that Vintage Brand has never sold; (2) Vintage Brand's composite images are not substantially indistinguishable from Penn State's marks, particularly since Vintage Brand's own trademark is displayed on its ordering website and packaging; (3) there is no likelihood of confusion; and (4) Vintage Brand's designs do not indicate who made the underlying product, meaning no reasonable person could believe that Penn State produced the products.[332]

The Court agrees that Vintage Brand is entitled to summary judgment as to Penn State's counterfeiting claim. Under the Lanham Act, a counterfeit mark is defined as, *inter alia*, "a counterfeit of a mark that is registered on the principal register in the [USPTO] for such goods or services sold, offered for sale, or distributed and that is in use."[333] The Lanham Act further defines a counterfeit as a

---

[332] Doc. 127 at 40-45. With respect to Vintage Brand's last argument, as discussed above the Court rejects the assertion that confusion may relate only to the producer of the goods.
[333] 15 U.S.C. § 1116(d)(1)(B)(i).

"spurious mark which is identical with, or substantially indistinguishable from, a registered mark."[334]

"Although 'spurious' is not a statutorily defined term under the Lanham Act, courts . . . have defined it as 'deceptively suggesting an erroneous origin; fake.'"[335] Therefore, courts have explained that "counterfeiting occurs only where the substantially identical mark is used 'to pass off the infringer's product as the original, rather than merely presented in a manner likely to confuse some consumers as to the origin or sponsorship of the infringer's product.'"[336]

Here, the evidence simply does not demonstrate that Vintage Brand's alleged use of the Penn State Marks is likely to cause confusion as to the origin of the goods sold by Vintage Brand. First, it is nearly impossible to believe that any rational consumer would expect that an institution of higher education produces its own merchandise and, therefore, equally difficult to believe that any consumer would be confused as to the origin of Vintage Brand's goods that carry the Penn State Marks. Second, it is undisputed that Vintage Brand's mark appears at the top of its webpage, is placed prominently on all packaging containing Vintage Brand's goods, and many

---

[334] *Id.* § 1127.

[335] *Antetokounmpo v. Paleo Prods. LLC*, No. 20-CV-6224 (JGK), 2021 WL 4864537, at *2 (S.D.N.Y. Oct. 18, 2021). *See also Lontex Corp. v. Nike, Inc.*, 384 F. Supp. 3d 546, 555 (E.D. Pa. 2019) (adopting same definition of spurious).

[336] *Ill. Tool Works Inc. v. J-B Weld Co., LLC*, 469 F. Supp. 3d 4, 10 (D. Conn. 2020) (quoting *Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC*, No. 17 CIV. 8796 (NRB), 2019 WL 274967, at *3 (S.D.N.Y. Jan. 7, 2019)).

of Vintage Brand's products are labeled with that mark.[337] Given that Vintage Brand placed its own mark "prominently on the packaging," "it is implausible that a consumer would be deceived."[338]

Penn State nevertheless argues that there need not be confusion solely as to the producer of the goods, and confusion as to sponsorship or affiliation is sufficient.[339] But nothing in the Lanham Act compels such a reading. While the Lanham Act directly states that trademark infringement may occur where there is likely confusion as to, *inter alia*, sponsorship or approval of the goods,[340] it provides no such definition for counterfeiting claims.[341] Rather, as explained above, the Lanham Act defines counterfeit as the spurious use of a mark,[342] and spurious is best understood to mean something that is fake or deceptively suggesting an erroneous *origin*.[343]

This definition precludes Penn State's desired interpretation of the statute. An improper use of a mark that only suggests an erroneous affiliation or sponsorship cannot be said to suggest an erroneous origin; those are distinct concepts. Counterfeiting is an attempt to make consumers believe that certain goods are the genuine article, not that the goods are made by a different company that has been

---

[337] Doc. 153 ¶¶ 12, 19.
[338] *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1081 (9th Cir. 2020).
[339] Doc. 143 at 47-48.
[340] 15 U.S.C. § 1125(a)(1)(A).
[341] *Id.* § 1116(d)(1)(B)(i).
[342] *Id.* § 1127.
[343] *Lontex Corp.*, 384 F. Supp. 3d at 555.

endorsed by the mark holder. Therefore, this Court agrees with other courts that have concluded counterfeiting does not occur when a product is "merely presented in a manner likely to confuse some consumers as to the origin or sponsorship of the infringer's product."[344]

There is simply no evidence from which a jury could conclude that Vintage Brand used Penn State's Marks in a manner deceptively suggesting an erroneous origin or that the goods were fake Penn State goods. Consequently, Vintage Brand is entitled to judgment in its favor as to Penn State's counterfeiting claim.

### 3.    Dilution Claim

Turning to Penn State's dilution claim, Vintage Brand first argues that the PENN STATE text mark is not famous, as: the term is geographically descriptive and therefore not distinctive; evidence of sales and advertising is insufficient to permit and inference of fame; and there is insufficient evidence of actual recognition of the PENN STATE text mark.[345] Second, Vintage Brand contends that the historic designs its uses are not sufficiently similar to the PENN STATE text mark to support a dilution claim.[346] Third, Vintage Brand asserts that it is not using the historic images as trademarks, and therefore its use does not fall within the anti-dilution statutes.[347] Fourth, Vintage Brand submits that Penn State cannot establish any likely

---

[344] *Ill. Tool Works Inc.*, 469 F. Supp. 3d at 10.
[345] Doc. 127 at 45-51.
[346] *Id.* at 51.
[347] *Id.* at 51-52.

or actual dilution, as there is no evidence of actual dilution and no likely dilution since "Penn" refers to both a state and another university, there was uncontrolled use of the words "PENN STATE" prior to 1982, and dilution by tarnishment cannot apply to Vintage Brand's use of the mark, as it celebrates the positive history of Penn State's athletic programs.[348]

"The federal cause of action for trademark dilution grants extra protection to strong, well-recognized marks even in the absence of a likelihood of consumer confusion—the classical test for trademark infringement—if the defendant's use diminishes or dilutes the strong identification value associated with the plaintiff's famous mark."[349] "The dilution doctrine is founded upon the premise that a gradual attenuation of the value of a famous trademark, resulting from another's unauthorized use, constitutes an invasion of the senior user's property rights in its mark and gives rise to an independent commercial tort for trademark dilution."[350] To establish a federal claim of dilution, a plaintiff must demonstrate:

1. The plaintiff is the owner of a mark that qualifies as a "famous" mark in light of the totality of the eight factors listed in § 1125(c)(1),

2. The defendant is making commercial use in interstate commerce of a mark or trade name,

3. Defendant's use began after the plaintiff's mark became famous, and

---

[348] *Id.* at 52-53.
[349] *Times Mirror Mags., Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000).
[350] *Id.*

4. Defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.[351]

The standard for a dilution claim under Pennsylvania law is substantially similar, but is limited to acts within Pennsylvania, and requires actual dilution, rather than likely dilution as is required under federal law.[352]

Regardless of whether the PENN STATE Mark qualifies as famous under the statute,[353] Penn State's dilution claims fail for two reasons: the mark as used by Vintage Brand is not substantially similar to Penn State's Mark, and there is no evidence that Vintage Brand's use of the mark lessens the capacity of Penn State's Mark to identify and distinguish goods or services.

First, as other courts have noted, "a dilution plaintiff must be threatened by a very similar, if not identical, mark."[354] "Courts have repeatedly rejected dilution claims unless the marks are essentially the same" and "differences such as the use

---

[351] *Id.*

[352] *Dille Fam. Tr. v. Nowlan Fam. Tr.*, 207 F. Supp. 3d 535, 548 (E.D. Pa. 2016); *Pa. State Univ. v. Parshall*, No. 4:19-CV-01299, 2022 WL 2712051, at *15 (M.D. Pa. Feb. 17, 2022), *report and recommendation adopted*, No. 4:19-CV-01299, 2022 WL 2714998 (M.D. Pa. Mar. 31, 2022).

[353] *See Times Mirror Mags*, 212 F.3d at 163 (listing eight non-exclusive factors for courts to consider in determining whether a mark is famous). This Court has stricken as least some of Penn State's evidence in favor of its asserted fame.

[354] *Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 379 (D.N.J. 2002) (collecting cases).

of house marks 'alone' can defeat dilution claims."[355] Even the use of "a different font renders the marks at issue different" and weakens any claim of dilution.[356]

Here, the images used by Vintage Brand are different than the PENN STATE Mark, even if only subtly. A number of Vintage Brand's products that use the mark contain additional elements, such as, for example, a lion holding a football, a circular image containing an alligator and words stating "GATOR BOWL" and "JACKSONVILLE FLORIDA," a circular image of a man running through cotton accompanied by the words "Cotton Bowl" and "DALLAS TEXAS," a highly stylized lion cub with a snarling face, a circular image of a masted ship, and a frontal image of a lion's face accompanied by the words "I LIKE PENN STATE."[357] The aforementioned images are depicted below:



[355] *Id.* (quoting *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201, 1209-10 (1st Cir. 1983)).

[356] *Healthbox Glob. Partners, LLC v. Under Armour, Inc.*, No. CV 16-146-SLR, 2016 WL 3919452, at *9 (D. Del. July 19, 2016).

[357] Doc. 128 ¶¶ 15, 18, 19, 22.



Additionally, many of Vintage Brand's finished products include its own house mark on the product,[358] as depicted below:



These additional words and/or images, along with Vintage Brand's inclusion of its own trademarks on the finished products and multiple disclaimers of any affiliation with any university undercut the assertion that Vintage Brand's use of the PENN STATE Mark is sufficiently similar to the mark itself so as to amount to actionable dilution.

For example, in *Healthbox Glob. Partners, LLC v. Under Armour, Inc.*, the court found that the marks at issue were sufficiently distinguishable so as to defeat

---

[358] *Id.* ¶ 19.

a claim of dilution where the defendant had used a different font and included its own trademark, despite using the identical term "Healthbox."[359] And in *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, the United States Court of Appeals for the First Circuit found no actionable dilution despite defendant's use of the identical "ASTRA" mark because the defendant also printed its own name in full view on the products it produced, and made clear during sales negotiations that it, and not the plaintiff, produced the product.[360]

Similarly, here Vintage Brand uses additional symbols and words in its products to accompany the PENN STATE Mark, which distinguishes Vintage Brand's products.[361] Vintage Brand also uses its own trademark on many of its products, and its website not only prominently features its name, but disclaims any affiliation with any university. These acts distinguish Vintage Brand's use of the relevant mark and, because its mark and the PENN STATE Mark are not "essentially the same,"[362] the available evidence compels the conclusion that no dilution has occurred here.

Second, Penn State's dilution claims fail because there is no evidence that Vintage Brand's use of the PENN STATE Mark "causes dilution by lessening the

---

[359] 2016 WL 3919452 at *9.

[360] 718 F.2d 1201, 1209 (1st Cir. 1983).

[361] *See also Pharmacia Corp.*, 201 F. Supp. 2d at 379 (collecting cases).

[362] *Id.*

capacity of the plaintiff's mark to identify and distinguish goods or services."[363] As Penn State notes, "the central issue" is "whether Vintage Brand's use of the PENN STATE Mark lessens the degree to which consumers associate that mark with Penn State."[364]

Penn State points to no evidence that this has occurred. To the contrary, the parties seem to agree in their briefs that consumers are likely buying Vintage Brand's Penn State-related goods because they wish to express some form of affiliation with Penn State—they only disagree on whether they are purchasing goods from Vintage Brand because of confusion of whether Vintage Brand is officially linked to Penn State.[365] This would not seem to lead to any dilution of the PENN STATE mark; rather, it would appear that Penn State implicitly agrees that Vintage Brand's use of the PENN STATE Mark *strengthens* the degree to which consumers associate that mark with Penn State by continuously linking the PENN STATE Mark with Penn State.[366]

These two factors compel the conclusion that no genuine issues of material fact remain as to Penn State's state and federal dilution claims. Penn State has failed

---

[363] *Times Mirror Mags., Inc.*, 212 F.3d at 163.
[364] Doc. 143 at 51.
[365] *Compare* Doc. 127, *with* Doc. 143.
[366] Although perhaps not legally relevant, it is interesting to note that Penn State's infringement claim is premised on the exact opposite notion—that consumers are confusing the goods and believe Penn State is involved in some way with Vintage Brand. If that is the case, it is difficult to conclude that any dilution would likewise be occurring.

to produce sufficient evidence in support of those claims, and Vintage Brand is entitled to summary judgment in its favor.

### 4.      False Advertising and False Endorsement Claims[367]

As to Penn State's false advertising claim, Vintage Brand asserts that the Court should grant summary judgment in its favor because, as a matter of law, any alleged false association between two businesses is insufficient to support such a claim.[368] With respect to Penn State's false endorsement claim, Vintage Brand argues that summary judgment is appropriate because any confusion relates only to the images that Vintage Brand uses, not the physical goods themselves.[369]

As an initial matter, Penn State offers no response to Vintage Brand's assertion that Penn State's false advertisement claim is deficient as a matter of law, and appears to have abandoned this claim.[370] Even assuming that it has not, Vintage Brand is correct that Penn State's false advertisement claim cannot survive summary judgement.

---

[367] Penn State also raises a claim for unfair competition and false designation of origin, alleging that Vintage Brand's use of the Penn State Marks is "likely to cause confusion, mistake, or deception as to the source of origin of the goods and services provided by Defendants." Doc. 67 ¶ 114. However, the Third Circuit has unambiguously held that confusion as to origin, as referenced in 15 U.S.C. § 1125(a), "refers solely to the place of origin and not to the creator, manufacturer, or any broader conception of the term 'origin.'" *Parks LLC v. Tyson Foods, Inc*, 863 F.3d 220, 229 (3d Cir. 2017). Penn State's claim is premised solely on the contention that Vintage Brand's use will cause confusion as to affiliations or associations with Penn State— not that consumers will be confused as to the geographic origin of the goods. Doc. 67 ¶ 114. Accordingly, Penn State's claim fails as a matter of law.

[368] Doc. 127 at 54.

[369] *Id.*

[370] *See* Doc. 143.

As the Third Circuit has observed, "the statement at issue in a false advertising claim must 'misrepresent the nature, characteristics, qualities, or geographic origin' of a product."[371] Consequently, "a misrepresentation is actionable under § 1125(a)(1)(B) only if it misrepresents the characteristics of the good itself—such as its properties or capabilities. The statute does not encompass misrepresentations about the source of the ideas embodied in the object (such as a false designation of authorship)."[372]

Based upon that law, the Third Circuit in *Parks LLC v. Tyson Foods, Inc.* rejected false advertisement claims that "depend[ed] upon the purported false association between" two similar marks.[373] That court explained: "PARK'S FINEST is only misleading in the way that Parks suggests if a consumer makes the connection between PARK'S FINEST and PARKS and has in mind a pre-existing association between PARKS and high quality products. This is a [trademark infringement] claim and nothing more."[374] Because the false advertisement claim was merely a repackaged trademark infringement claim, that claim was legally infirm.[375]

Here too, Penn State's claim rests on its allegation that Vintage Brand's use of the marks is likely to deceive consumers "regarding the affiliation, connection, or

---

[371] *Parks LLC*, 863 F.3d at 226 (quoting 15 U.S.C. § 1125(a)(1)(B) (brackets omitted)).

[372] *Id.* at 227 (quoting *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 590 (6th Cir. 2015)).

[373] *Id.*

[374] *Id.*

[375] *Id.* at 226-28.

association of Defendants with Penn State, or as to the sponsorship or approval by Penn State of Defendants' Goods."[376] As there is no allegation that Vintage Brand has misrepresented the characteristics of the goods themselves, and this claim instead appears to be a repackaged trademark infringement claim, it fails as a matter of law, and summary judgment will be granted in Vintage Brand's favor.

The Court next turns to Vintage Brand's assertion that summary judgment in its favor is appropriate as to Penn State's claim for false endorsement. These claims arise under § 43(a)(1)(A) of the Lanham Act. Such claims "are rare," as claims under § 43(a)(1)(A) ordinarily proceed as general trademark claims.[377] Nevertheless:

> To prove a violation of § 43(a)(1)(A) in a false endorsement case, a plaintiff must show that: (1) its mark is legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the plaintiff's sponsorship or approval of those goods or services.[378]

Here, the Court need not analyze whether Penn State has produced sufficient evidence in support of its false endorsement claim, because this claim is duplicative of its trademark infringement claim and cannot stand independently. The two claims are functionally identical: in its trademark infringement claim, Penn State alleges that Vintage Brand's use of the Penn State Marks is likely to cause confusion by deceiving consumers into believing "that those goods offered by Defendants in

---

[376] Doc. 67 ¶ 119.
[377] *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1018 (3d Cir. 2008).
[378] *Id.* at 1014.

connection with the Infringing Marks are provided by, sponsored by, approved by, licensed by, affiliated or associated with, or in some other way legitimately connected to Penn State, when there is no such relationship,"[379] while the false endorsement claim likewise alleges that "Defendants' use of the Infringing Marks is likely to deceive a substantial portion of the target consumer audience, or actually deceives the target consumers, regarding the affiliation, connection, or association of Defendants with Penn State, or as to the sponsorship or approval by Penn State of Defendants' Goods."[380]

Essentially, both claims assert that Vintage Brand's use of the Penn State Marks is likely to, and is, causing confusion as to Penn State's association, sponsorship, approval, or affiliation with Vintage Brand and its products. Although Penn State tries to avoid this conclusion by arguing that the "false endorsement claim hinges on Vintage Brand's use of misleading content (including non-trademarked content) on its website to falsely suggest an endorsement by Penn State," the paragraphs of the second amended complaint to which Penn State cites do not support that argument.[381] Rather, Penn State's claim appears to be based solely upon Vintage Brand's use of the Penn State Marks on Vintage Brand products.[382] Penn State's allegations contain only the most perfunctory references to advertising or

---

[379] Doc. 67 ¶ 102.
[380] *Id.* ¶ 119.
[381] Doc. 143 at 52 (citing Doc. 67 ¶¶ 23-27, 36-37).
[382] *See* Doc. 67 ¶¶ 117-25.

misleading representations—and no references to, or examples of, misleading content.[383]

Penn State has not provided any images or other evidence of representations or advertisements by Vintage Brand, leaving only the images of Vintage Brand's products themselves as potential advertisements—accompanied by disclaimers on Vintage Brand's website that state it has no affiliation with any university.[384] But these images merely circle back to the core of Penn State's complaint: that Vintage Brand used Penn State's Marks on its products.[385] The images of products are not

---

[383] *Id.* Substantially similar references to advertising in Count One emphasize the identical nature of these claims. *Compare id.* ¶ 101-02 (alleging in Count One that "Defendants are using the Infringing Marks in advertisements for goods and services that do not originate with, and are not sponsored by or affiliated with, Penn State," which is "likely to cause confusion, mistake, or deception as to . . . [whether] the Infringing Marks are provided by, sponsored by, approved by, licensed by, affiliated or associated with, or in some other way legitimately connected to Penn State"), *with id.* ¶ 118 (alleging in Count Two that "Defendants' use in commercial advertising and promotions of the Infringing Marks in connection with Defendants' Goods constitutes a false or misleading representation of fact regarding the affiliation, connection, or association of Defendants with Penn State, or as to the sponsorship or approval by Penn State of Defendants' Goods").

[384] In its motion for summary judgment, Penn State highlights the goods themselves, descriptions that consumers may use to search for Penn State designs, and language describing the historical images. Doc. 114 at 37-38. But it does not describe, let alone produce any evidence to demonstrate, how this language creates the false impression that that Penn State has endorsed Vintage Brand's products.

[385] Interestingly, this Court has been unable to locate a single case within this circuit where the plaintiff successfully brought both a trademark infringement claim and false endorsement claim—let alone a case where both claims were based upon the same conduct. *See Acosta v. Faraones Nightclub*, No. CV 18-17710 (MAH), 2023 WL 4946960 (D.N.J. Aug. 3, 2023); *Geiger v. SA & G Corp.*, No. 2:22-CV-01797, 2023 WL 5515975 (D.N.J. Aug. 25, 2023); *Pellegrino v. Epic Games, Inc.*, 451 F. Supp. 3d 373 (E.D. Pa. 2020); *Cozzens v. DaveJoe RE, LLC*, No. CV 17-11535 (NLH/JS), 2019 WL 522071 (D.N.J. Feb. 11, 2019); *Johnson v. Park Ave. Rest. Corp.*, No. CV 17-7452 (WHW-CLW), 2018 WL 1535267 (D.N.J. Mar. 28, 2018); *Dille Fam. Tr. v. Nowlan Fam. Tr.*, 207 F. Supp. 3d 535 (E.D. Pa. 2016); *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008). Perhaps this is due to the fact that, when a defendant has infringed upon a trademark, there will rarely be separate conduct that would constitute false endorsement. *Cf. Emondson v. 2001Live, Inc.*, No. 8:16-CV-3243-T-17AEP, 2017 WL

advertisements or misleading, any more than the goods themselves could rightly be considered advertisements or misleading statements.

Because Penn State's claim of false endorsement is just another way of saying that Vintage Brand's trademark infringement creates confusion as to association, sponsorship, approval, affiliation, that claim is derivative of its trademark infringement claim and constitutes an improperly pled trademark claim. As such, the false endorsement claim cannot proceed, and Vintage Brand is entitled to summary judgment in its favor on that claim.[386]

Moreover, even if the claim were not duplicative, summary judgment would still be appropriate. As noted above, to prove a claim of false endorsement, the plaintiff must demonstrate, *inter alia*, that the defendant used the plaintiff's marks

---

10085028, at *3 (M.D. Fla. Mar. 30, 2017) (holding that the statement "that the Eleventh Circuit has never recognized a separate claim of false endorsement distinct from trademark infringement under § 43(a) appears to stand for the . . . proposition that a plaintiff cannot assert [both] claims for false endorsement and trademark infringement under 15 U.S.C. § 1125(a)(1)(A)"). Had Vintage Brand taken some separate action that constitutes false endorsement by, for example, mailing free goods to newly-admitted Penn State students congratulating them on their acceptance, Penn State could bring an actionable false endorsement claim. *Cf. Nations Fund I, LLC v. Westward Mgmt. Co., LLC*, No. 6:20-CV-00498-AA, 2021 WL 4491712, at *3 (D. Or. Sept. 30, 2021) (permitting similar claims of fraud and fraudulent inducement to proceed where they were "based on distinct theories of defendants' intent and plaintiff's reliance").

[386] *Cf. Telescope Media Grp. v. Lucero*, 936 F.3d 740, 760 (8th Cir. 2019) (holding that, although the plaintiffs brought an associational-freedom claim, the claim was "really a disguised free-speech claim" because they did not object to forced association, rather, their "real objection is to the message of the videos themselves, which is just another way of saying that the MHRA violates their free-speech rights" and allowing only the free speech claim to proceed); *Franzone v. Lask*, No. 14CIV3043GHWGWG, 2016 WL 4154276, at *11 (S.D.N.Y. Aug. 5, 2016) (dismissing fraud claim as duplicative where "the claim of fraud is premised on the same facts as [the] malpractice claim").

"to identify its goods or services."[387] There is no evidence of such use here. To the contrary, the evidence establishes that Vintage Brand uses its own trademark on its goods to identify itself as the producers of its goods.[388] This provides an additional basis to enter judgment in Vintage Brand's favor as to Penn State's false endorsement claim.

### 5.    Whether Seal Designs Must be Cancelled

Finally, the Court turns to Vintage Brand's assertion that summary judgment should be entered as to its counterclaim seeking cancellation of Penn State's seal design marks.[389] Vintage Brand argues that the Lanham Act precludes the registration of a design that consists of or includes the insignia of a state and, since Penn State's registration numbers 1,276,712 and 5,877,080 include the Commonwealth of Pennsylvania's Coat of Arms, they must be cancelled.[390] Penn State responds that marks are unregistrable only if consumers would perceive the mark as a governmental designation, and Vintage Brand points to no evidence regarding consumer perception of the challenged marks, and visual differences in challenged marks preclude summary judgment.[391]

---

[387] *Facenda*, 542 F.3d at 1014.
[388] Doc. 153 ¶ 19.
[389] Doc. 127 at 55-56.
[390] *Id.*
[391] Doc. 143 at 22-23.

The Lanham Act precludes the registration of any mark that "[c]onsists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof."[392] "Comprises" is interpreted to mean "includes" and, therefore, the Lanham Act "prohibits registration of a mark that *includes* a flag of a foreign nation or any simulation thereof."[393] However, the ultimate question is not simply whether a mark contains a government's insignia, but whether relevant consumers would "perceive matter in the mark as a" government insignia.[394] Registration should therefore not be refused if the insignia used within the mark "is sufficiently altered, stylized, or merged with other elements in the mark, so as to create a distinct commercial impression."[395]

It is true, as Vintage Brand notes, that the challenged marks contain the entirety of Pennsylvania's Coat of Arms,[396] as demonstrated below:

---

[392]  15 U.S.C. § 1052(b).
[393]  *In Re Fam. Emergency Room LLC*, 121 U.S.P.Q.2d 1886, 1889 n.2 (T.T.A.B. 2017). *See also In re Fox*, 702 F.3d 633, 638 (Fed. Cir. 2012) (same), *abrogated on other grounds by In re Tam*, 808 F.3d 1321 (Fed. Cir. 2015).
[394]  *In Re Fam. Emergency Room LLC*, 121 U.S.P.Q.2d at 1890.
[395]  *Id.*
[396]  *See* Doc. 127 at 56.

|  **Penn State Marks** | **Pennsylvania Coat of Arms** |
|---|---|

  

However, Vintage Brand presents no evidence as to whether Penn State's Marks, which merge Pennsylvania's Coat of Arms into a circle featuring the words "The Pennsylvania State University 1855" with a scalloped design on the outside is insufficient to create a distinct commercial impression. Certainly, the wholesale incorporation of Pennsylvania's Coat of Arms implies some governmental affiliation, and may indicate to consumers that the mark is itself a government insignia or simulation thereof. But given the visual differences between the marks and Pennsylvania's Coat of Arms, the Court cannot conclude as a matter of law—based on the available evidence—that Penn State's Marks do not create a distinct commercial impression. Summary Judgment will therefore be denied as to Vintage Brand's second counterclaim.

### G.   Penn State's Motion for Summary Judgment

Penn State has also moved for partial summary judgment on its claims and Vintage Brand's counterclaims.[397] As to Penn State's claims, it seeks summary

---

[397] Doc. 113.

judgment with regard to its trademark infringement, unfair competition, counterfeiting, and false endorsement claims.[398] With respect to Vintage Brand's counterclaims, Penn State seeks judgment in its favor as to any ornamentality affirmative defense and counterclaim, and as to Vintage Brand's efforts to cancel Penn State's Seal Marks.[399]

### 1.     Penn State's Claims

As an initial matter, as explained above, summary judgment is appropriate in Vintage Brand's favor with respect to Penn State's claims for counterfeiting, false advertising, and false endorsement. Accordingly, Penn State's motion for summary judgment as to those claims will be denied, and the Court will only consider whether judgment should be entered in favor of Penn State with regard to its trademark infringement claims.

Penn State argues that it is entitled to summary judgment in its favor on its trademark infringement claims for two reasons. First, Penn State contends that it has produced clear evidence of confusion, as it owns valid (and often incontestable) marks.[400] And, Penn State asserts, Vintage Brand is using nearly identical marks on directly competing goods, which it argues conclusively establishes its claims as a matter of law.[401] Second, Penn State insists that, even under the relevant *Lapp*

---

[398]   Doc. 114 at 19-42.
[399]   *Id.* at 42-53.
[400]   *Id.* at 21-23.
[401]   *Id.* at 23-28.

factors, its evidence establishes a likelihood of confusion such that it is entitled to summary judgment.[402]

Vintage Brand responds that Penn State cannot establish as a matter of law a likelihood of confusion.[403] First, Vintage Brand argues that, when viewed as a whole, Vintage Brand's images are easily distinguishable from Penn State's marks and, therefore, Penn State's claims are not established as a matter of law.[404] Vintage Brand further asserts that its goods only compete with Penn State goods to the extent that consumers want their products to contain Penn State images in order to express their affiliation with Penn State.[405] Lastly, Vintage Brand contends that there is no evidence of actual confusion, or that Vintage Brand intended to cause confusion.[406]

The Court's determination in denying Vintage Brand's motion for summary judgment on this claim largely guides the analysis—and outcome—of Penn State's competing motion. To succeed on its trademark infringement claim, Penn State "must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion."[407] As discussed previously with regard to Vintage Brand's motion for summary judgment, the only element of the claim genuinely at

---

[402] *Id.* at 28-33.
[403] Doc. 137 at 14-32.
[404] *Id.* at 17-23.
[405] *Id.* at 23-25.
[406] *Id.* at 25-32.
[407] *A & H Sportswear*, 237 F.3d at 210.

issue here is whether there is a likelihood of confusion. The evidence is insufficient to conclude that, as a matter of law, likelihood of confusion has been established; rather, such a determination must be left to a jury.

As to Penn State's more novel argument that a likelihood of confusion is established because Vintage Brand is using nearly identical marks on directly competing goods, that contention fails on summary judgment. It is true that the Third Circuit has often noted that where plaintiff and defendant are in direct competition, and "the identical mark is used concurrently by unrelated entities, the likelihood of confusion is inevitable."[408] Regardless of whether Penn State and Vintage Brand are in direct competition, there is a significant question as to whether the images used by Vintage Brand are sufficiently identical to Penn State's Marks so as to trigger a finding of confusion as a matter of law.

While there is no dispute that many of Vintage Brand's offered products contain Penn State Marks within the images, these images are often composite images based upon historical memorabilia or other images. In support of its argument, Penn State points to the near identical nature of its marks and many of the pieces of the composite images used by Vintage Brand in its goods.[409] For example, from the following two images, Penn State emphasizes the Penn State Seals:[410]

---

[408] *Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 804 (3d Cir. 1998).
[409] *See* Doc. 114 at 25.
[410] *Id.*



But Penn State's efforts violate the anti-dissection rule. It is well established that, when analyzing trademarks, the marks "must be examined as a whole" and, therefore, a "composite mark should not be fragmented into its various pieces."[411] Because marks "must be considered as a whole in determining likelihood of confusion,"[412] "dissecting marks often leads to error."[413] The anti-dissection rule stems from the commonsense proposition that, because court must analyze "whether the labels create the same overall impression when viewed separately,"[414] "the message of a whole phrase may well not be adequately captured by a dissection and recombination."[415]

When viewing Vintage Brand's images in their entirety, a reasonable jury could well conclude that those images and the Penn State Marks are not sufficiently similar. For example, Penn State cites to numerous goods that utilize different Penn

---

[411] *Berner Int'l Corp. v. Mars Sales Co.*, 987 F.2d 975, 981 (3d Cir. 1993) (quoting MCCARTHY § 11:10 at 458). *See also A & H Sportswear*, 237 F.3d at 216 (noting "the general rule that marks should be viewed in their entirety").

[412] *Koninklijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, No. CV113684SRCCLW, 2017 WL 3719468, at *22 (D.N.J. Aug. 29, 2017) (quoting *Juice Generation, Inc. v. GS Enterprises LLC*, 794 F.3d 1334, 1340-41 (Fed. Cir. 2015)).

[413] *Berner Int'l Corp.*, 987 F.2d at 981 (brackets and internal quotation marks omitted).

[414] *A & H Sportswear*, 237 F.3d at 216 (internal quotation marks omitted).

[415] *Koninklijke Philips Elecs. N.V.*, 2017 WL 3719468 at *22 (quoting *Juice Generation, Inc.*, 794 F.3d at 1340-41).

State Marks but, as depicted below, those marks are often only a small portion of the historical images that include larger depictions that may well not be affiliated, in the mind of a consumer, with Penn State, and sometimes even list other universities— as the images were pulled from old game materials.[416] Examples of images cited by Penn State that contain Penn State Marks are displayed below:


417


418


419


420


421


422


423


424

---

[416] *See, e.g.*, Doc. 138 ¶ 162.

[417] *Id.* Alleged to have copied PENN STATE, THE PENNSYLVANIA STATE UNIVERSITY, and the Penn State Seal marks.

[418] *Id.* Alleged to have copied THE PENNSYLVANIA STATE UNIVERSITY, Penn State Seal, and Lion Shrine Logo marks.

[419] *Id.* Alleged to have copied PENN STATE Mark.

[420] *Id.* Alleged to have copied PENN STATE Mark.

[421] *Id.* Alleged to have copied PENN STATE and Lion Shrine Logo marks.

[422] *Id.* Alleged to have copied PENN STATE Mark.

[423] *Id.* Alleged to have copied PENN STATE Mark.

[424] *Id.* Alleged to have copied PENN STATE Mark.





Viewing these images as a whole, a jury could reasonably conclude that many—if not most or all—appear easily distinguishable from the Penn State Marks. Again, "[t]he test for . . . similarity is whether the labels create the same overall impression when viewed separately."[428] Only "if ordinary consumers would likely conclude that the two products share a common source, affiliation, connection or sponsorship" should a court determine that the marks are confusingly similar.[429] Many of these composite images do not necessarily evoke affiliation with, or sponsorship from, Penn State.

In just the examples provided above, many images are old admissions tickets from prior football games and, in several of those tickets, Penn State is not even the featured team but is, instead, relegated to a lesser position on the ticket. Not only could a jury reasonably conclude that these images connote no connection

---

[425] *Id.* Alleged to have copied PENN STATE Mark.
[426] *Id.* Alleged to have copied PENN STATE Mark.
[427] *Id.* Alleged to have copied PENN STATE Mark.
[428] *A & H Sportswear*, 237 F.3d at 216 (internal quotation marks omitted).
[429] *Id.* (internal quotation marks omitted).

whatsoever to a university but, if they did, the jury could reasonably conclude that they implied affiliation with a university other than Penn State. Given these differences in the images and Penn State's Marks, the Court cannot conclude as a matter of law that a likelihood of confusion has been established, and summary judgment is not appropriate on that ground.

That leaves a possibility of a likelihood of confusion based only upon the relevant *Lapp* factors. As discussed in addressing Vintage Brand's motion for summary judgment, the Third Circuit has created a nonexhaustive list of ten factors that may be considered in determining whether there is a likelihood of confusion.[430]

And, as discussed previously, consideration of these factors leads to the inevitable conclusion that genuine issues of material fact remain as to the balancing of these factors, and this is an issue that must be left for resolution by a jury. First, although there is some degree of similarity between the images used by Vintage Brand and the Penn State Marks, significant differences between the marks and Vintage Brand's composite images mean that a jury could easily reach differing conclusion regarding this factor. Although Penn State's Marks are somewhat strong, any analysis as to "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase,"[431] is hampered by the fact that Penn State—similar to Vintage Brand in its motion for summary

---

[430] *A & H Sportswear*, 237 F.3d at 211.
[431] *Id.*

judgment—points to no evidence that consumers seeking to purchase Penn State products are not sophisticated.[432]

As noted previously, with respect to Vintage Brand's intent in allegedly infringing upon Penn State's marks, given Vintage Brand's use of disclaimers, this factor weighs slightly against a finding of a likelihood of confusion. As to evidence of actual confusion, competing surveys and ambiguity in the available evidence create genuine issues of material fact that must be resolved by a jury. Finally, as to the ninth factor, "the relationship of the goods in the minds of consumers because of the similarity of function,"[433] there again remains a genuine issue of material fact that requires resolution from a jury, given Vintage Brand's use of composite images and disclaimers on its website.

Consequently, similar to Vintage Brand's motion for summary judgment, a balancing of all relevant factors demonstrates insufficient strength to merit summary judgment in Penn State's favor. Rather, there remain significant genuine issues of material fact that preclude summary judgment. Accordingly, Penn State's request for summary judgment on its trademark infringement claim will also be denied.

---

[432] Penn State again asserts that Vintage Brand's products are sold at relatively low prices, meaning that consumers are not overly attentive when purchasing those goods. Doc. 114 at 30-31. However, Penn State provides no evidence to support its assertion that customers are inattentive when purchasing such goods. The Court cannot rely upon the cases cited by Penn State to conclude that t-shirts as a general matter are not purchased with a high degree of care—cases that were based upon the unique evidence presented therein.

[433] *A & H Sportswear*, 237 F.3d at 211.

### 2.      Vintage Brand's Counterclaims

Penn State further seeks judgment as to some of Vintage Brand's counterclaims and affirmative defenses.[434] First, Vintage Brand seeks judgment on Vintage Brand's Affirmative Defenses Seven and Eight—arguing that Penn State's marks are merely ornamental—and Counterclaim Two, which seeks cancellation of the PENN STATE Mark and Penn State Seal Mark as merely ornamental.[435] Second, Penn State seeks judgment as to Vintage Brand's attempt to cancel the Penn State Seal Marks, as differences between those marks and the Pennsylvania Coat of Arms mean they do not fall within the prohibition on marks containing governmental insignia.[436]

### a.      Ornamentality Counterclaim and Affirmative Defenses

Before addressing the substance of Penn State's motion, as discussed with regard to Vintage Brand's motion for summary judgment, the marks that Penn State seeks to enforce—save for the Pozniak Lion Design—are incontestable, and Vintage Brand cannot challenge Penn State's trademark infringement claims "on the ground that [the marks] are merely" ornamental.[437] Summary judgment is therefore appropriate as to Vintage Brand's Affirmative Defenses Seven and Eight, with the

---

[434]   Doc. 114 at 42-53.

[435]   *Id.* at 42-49.

[436]   *Id.* at 49-53.

[437]   *Marketquest Grp.*, 316 F. Supp. 3d at 1264 (citing *Park 'N Fly*, 469 U.S. at 194; 15 U.S.C. § 1115(b)).

exception of the defense as it relates to Penn State's Pozniak Lion Design and any contestable registrations.[438]

The Court must therefore determine whether there is sufficient evidence for the defense to proceed as to any contestable registrations, and whether there is sufficient evidence for Vintage Brand's Second Counterclaim to proceed to trial, which seek cancellation as merely ornamental of two contestable marks—the PENN STATE Mark and Penn State Seal Mark.

Penn State argues that the affirmative defenses and counterclaim must fail because: (1) Vintage Brand has presented no evidence that the marks are perceived only as ornamentation; (2) the use of trademarks on merchandise to indicate a secondary source is not mere ornamentation; and (3) this Court does not have jurisdiction to cancel trademark registration based on an as-applied ornamentality challenge.[439]

Addressing the third argument first—as it relates to the Court's authority to even consider the first two arguments—Penn State contends that considerations of whether mark specimens are acceptable is reserved solely to the examining attorney,

---

[438] The Court rejects the argument that contestable registrations may not be challenged on ornamentality grounds when the marks' most salient features are contained in incontestable marks, Doc. 114 at 43-44, as incontestability requires proof of use as a mark, and such proof will naturally vary from mark to mark.

[439] *Id.* at 44-49. As discussed previously, the Court agrees that the Penn State Marks cannot be considered merely ornamental simply because they indicate a secondary source—i.e., that they do not indicate the manufacturer of the goods but, rather, indicate Penn State's approval, affiliation, association, or sponsorship of the goods/manufacturer of the goods.

and is not reviewable by the USPTO or district courts.[440] Penn State's argument, although novel, is ultimately without merit.

Penn State does not, and cannot, cite to a single case that has reached the conclusion it suggests, and nothing in any statute appears to divest courts of the power to consider as-applied challenges. To the contrary, courts routinely consider as-applied challenges to trademarks.[441] More importantly, Vintage Brand does not appear to be challenging the adequacy of the specimens that Penn State provided in support of its trademark applications, but is challenging whether those marks were in fact used as marks in service, or were merely ornamental.[442]

This issue is broadly within the authority of the USPTO and district courts to consider, as even Penn State's own cited case demonstrates. In *Century 21 Real Estate Corporation v. Century Life of America*,[443] the TTAB determined that it should not consider a challenge to the "sufficiency of the specimens submitted with an application."[444] However, the TTAB emphasized that "the underlying question of service mark usage . . . would constitute a proper ground for opposition" and, in any

---

[440] Doc. 114 at 48-49.

[441] *See, e.g., Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 918-20 (9th Cir. 1980) (considering an as-applied functionality defense to a trademark-infringement claim); *Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286, 304-05 (S.D.N.Y. 2000) (considering whether word "PILATES" is generic with respect to equipment and services offered in connection with the Pilates exercise method); *Brandwynne v. Combe Int'l, Ltd.*, 74 F. Supp. 2d 364, 381 (S.D.N.Y. 1999) (examining genericness of challenged term "as applied to products involving the vaginal area").

[442] *See* Doc. 72.

[443] 10 U.S.P.Q.2d 2034, 1989 WL 281901 (T.T.A.B. 1989).

[444] *Id.* at *1.

event, the appellant there took aim at the wrong target, as "[o]bjections to the specimens made by the Examining Attorney during examination are not actually to the acceptability of the specimens themselves, but are that the specimens do not show trademark use of the matter for which registration is sought."[445]

Because the case law supports the notion this Court maintains jurisdiction to consider Vintage Brand's ornamentality counterclaim, the Court will not grant summary judgment in Penn State's favor on that ground. Consequently, this Court must consider Penn State's remaining arguments in favor of summary judgment.

As to Penn State's assertion that Vintage Brand has presented no evidence that the marks are perceived only as ornamentation, that argument likewise fails. Vintage Brand's evidence is sufficient, at the summary judgment stage, to permit this counterclaim and affirmative defenses to process to trial as to any contestable marks.

First, the survey produced by Dr. Erdem provides significant evidence that consumers are not confused with regard to the origins of Vintage Brand's merchandise, or as to whether Vintage Brand and Penn State maintain a business relationship.[446] And although that survey was primarily geared toward a confusion analysis, the survey is helpful in understanding whether Penn State's marks are perceived as ornamentation by consumers. The fact that consumers viewed products

---

[445] *Id.* at *1-2.
[446] *See* Doc. 94-7 at 9-45.

bearing the Penn State Marks and perceive no connection between the manufacturer (here, Vintage Brand) and Penn State is strong evidence that they view the marks only as ornamental, not as indicative of a primary or secondary source.

Second, Vintage Brand has produced some circumstantial evidence that consumers view the marks as only ornamental. For example, Penn State's designated representative testified at a deposition that consumers are able to "express affinity or affiliation with Penn State . . . by wearing clothing decorated with Penn State's logos."[447] Moreover, at least some retailers who sell officially licensed Penn State merchandise market those goods as a method to express their allegiance to, or affiliation with, Penn State.[448] Additionally, under its licensing agreements, Penn State requires that licensees attach a label to all goods that states they are officially licensed by Penn State.[449] The very fact that Penn State requires such labels indicates that the marks themselves may not be source indicators.

Although these pieces individually do not constitute overwhelming evidence of ornamentality, taken together this evidence is sufficient to satisfy Vintage Brand's burden. Accordingly, Penn State is not entitled to summary judgment on Vintage Brand's counterclaim of ornamentality, or affirmative defense, as they pertain to any contestable marks.

---

[447] Doc. 153 ¶ 29.
[448] *Id.* ¶ 101.
[449] Doc. 153 ¶ 94.

### b.     Registration of Penn State Seal Mark

Finally, the Court addresses Penn State's assertion that it is entitled to judgment in its favor as to Vintage Brand's Counterclaim One, seeking cancellation of the Penn State Seal Marks (registration numbers 1,276,712 and 5,877,080).[450] Penn State argues that summary judgment is appropriate because numerous visual differences between Pennsylvania's Coat of Arms and the Penn State Seal Marks means that the marks do not fall within the prohibition against use of government insignia in trademarks.[451] Vintage Brand responds that the Penn State Seal Marks indisputably incorporate Pennsylvania's Coat of Arms and therefore must, as a matter of law, be cancelled.[452]

Neither party is correct. As discussed earlier, the Lanham Act precludes the registration of any mark that "[c]onsists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof."[453] In determining whether a mark comprises such insignia, the factfinder must assess whether relevant consumers would "perceive matter in the mark as a" government insignia.[454] Registration should therefore not be refused if the insignia used within the mark "is sufficiently altered, stylized, or

---

[450] Doc. 114 at 49-53.

[451] *Id.*

[452] Doc. 150 at 54-55.

[453] 15 U.S.C. § 1052(b).

[454] *In Re Fam. Emergency Room LLC*, 121 U.S.P.Q.2d at 1890.

merged with other elements in the mark, so as to create a distinct commercial impression."[455]

Again, the challenged marks contain the entirety of Pennsylvania's Coat of Arms.[456] Penn State has made alterations to the Coat of Arms in its marks, which strip the Coat of Arms of its colors and merge Pennsylvania's coat of arms into a circle featuring the words "The Pennsylvania State University 1855" with scalloped design on the outside. As noted previously, there is insufficient evidence to determine, as a matter of law, that these alterations are insufficient to create distinct commercial impression. But neither are these additional elements sufficient to conclude as a matter of law that the marks *do* create a distinct commercial impression. It would be reasonable, based upon the similarity of the Seal Marks and Pennsylvania's Coat of Arms, for a jury to conclude that the marks appear to be governmental insignia without distinct commercial impression. Penn State's motion for summary judgment must therefore be denied as to Vintage Brand's Counterclaim One.[457]

---

[455] *Id.*

[456] *See* Doc. 127 at 56.

[457] This case is unlike the case to which Penn State cites, *City of New York v. Blue Rage, Inc.*, 435 F. Supp. 3d 472 (E.D.N.Y. 2020). There, the court determined at summary judgment that the challenged marks were not governmental insignia. *Id.* at 488-89. But that decision rested upon the obvious visual evidence "that the NYPD Shield does not reproduce the City Seal in its entirety, but rather incorporates only a few of its elements in a peripheral manner." *Id.* at 488. That is not the case here, where Pennsylvania's Coat of Arms was copied in its entirety, with only minor alterations made to the Coat of Arms when incorporated into Penn State's Marks.

## IV.   CONCLUSION

For the foregoing reasons, Vintage Brand's motion to exclude is granted, its motion to strike is granted in part and deferred in part, and its motion for summary judgment is granted in part and denied in part. Penn State's motion to exclude is denied, its motion to strike is granted in part and denied in part, and its motion for summary judgment is granted in part and denied in part.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge