## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-01091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; and CHAD HARTVIGSON, | |
| Defendants. | |

## MEMORANDUM OPINION

### NOVEMBER 4, 2024

This trademark dispute has proceeded in due course and is now approaching trial. Pursuant to this Court's scheduling deadlines, the parties have filed a number of pretrial motions. These motions primarily relate to the relatively mundane requests for evidentiary rulings that form the basis of most motions *in limine*. But, in certain instances, these motions seek to effectively strike defenses in a manner perhaps more appropriately brought in a dispositive motion filed well in advance of trial and with a more robust factual record placed before the Court. As discussed below, while the evidence that may be presented at trial will be trimmed back, the core of this case and the defenses presented—primarily relating to the question of whether a trademark claim may lie, or whether consumers are confused, when

consumers allegedly purchase goods bearing a protected mark for reasons unrelated to source identification—may properly be presented to a jury.

## I.    BACKGROUND

In 2022, The Pennsylvania State University ("Penn State") filed a second amended complaint alleging that Vintage Brand, LLC, Sportwear, Inc., Chad Hartvigson, Erik Hartvigson, and Michelle Young (collectively "Vintage Brand") alleging that Vintage Brand had: (1) willfully infringed on Penn State's trademarks in violation of 15 U.S.C. § 1114 (Count One);[1] (2) sold and marketed counterfeit products in violation of Sections 1114, 1116(d), and 1117 (Count Two);[2] (3) unfairly competed and falsely designated Penn State as the source of Vintage Brand's products in violation of Section 1125(a) (Count Three);[3] (4) falsely advertised and endorsed its products' affiliation with Penn State in violation of Section 1125(a) (Count Four);[4] diluted Penn State's trademarks in violation of Section 1125(c) and 54 Pa. C.S. § 1124 (Counts Five and Six, respectively);[5] and (7) infringed on Penn State's common-law trademarks (Count Seven).[6]

Much of the relevant history and the facts related to the underlying dispute was outlined in some detail in this Court's prior summary judgment Memorandum

---

[1]    Doc. 67 ¶¶ 99-105. Specifically, Penn State alleges that Vintage Brand infringed on its PENN STATE, TPSU, Nittany Lion Logo, Pozniak Lion Logo, and Penn State Seal marks. *Id.*

[2]    *Id.* ¶¶ 106-12.

[3]    *Id.* ¶¶ 113-16.

[4]    *Id.* ¶¶ 117-25.

[5]    *Id.* ¶¶ 126-34 (Count Five), 135-40.

[6]    *Id.* ¶¶ 141-45.

Opinion addressing the competing motions for summary judgment and to exclude certain expert opinions.[7] Because most of this discussion is not directly relevant to the pending motions *in limine*, those facts will not be repeated here.

Based on the facts underlying this matter, in February 2024, this Court granted in part and denied in part the parties' competing motions for summary judgment; granted Vintage Brand's motion to exclude expert opinions while denying Penn State's motion to exclude expert opinions; and granted in part and denied in part Vintage Brand's motions to strike while granting in part and denying in part Penn State's motion to strike.[8]

As to the expert opinions, as relevant here, this Court excluded Penn State's expert David Franklyn's commercial impression survey ("Survey One").[9] The Court determined that Survey One was not sufficiently reliable, as it was entirely novel and therefore was not generally accepted, and lacked any known error rate or standards by which to judge it.[10] Moreover, the Court was concerned that Survey One contained demand artifacts that primed respondents to see a trademark in the survey questions, failed to adequately place the images used within a marketplace context, and failed to use a proper control image.[11] Vintage Brand did not seek to

---

[7] *See* Doc. 194. Rulings relevant to the motions *in limine* will be discussed in the body of this Memorandum Opinion.

[8] Docs. 194, 195.

[9] Doc. 194 at 20-33.

[10] *Id.* at 22-25.

[11] *Id.* at 25-32.

exclude Franklyn's likelihood of confusion survey ("Survey Two") and the Court denied Penn State's motion to exclude a survey from Vintage Brand's expert, Tülin Erdem.[12]

As to the motions for summary judgment, the Court first assessed Vintage Brand's motion.[13] The Court found that genuine issues of material fact precluded judgment as to Penn State's statutory and common law trademark infringement claims[14] and Vintage Brand's counterclaim seeking to cancel certain of Penn State's trademark registrations, but granted judgment in Vintage Brand's favor with regard to Penn State's counterfeiting, dilution, false advertising, and false endorsement claims. This Court denied summary judgment as to Vintage Brand's counterclaim seeking to cancel Penn State's Seal Designs, since visual differences between Penn State's trademarks and the Pennsylvania Coat of Arms did not permit the conclusion, as a matter of law, that the trademarks created an indistinct commercial impression.[15]

More specifically, as to the claim of willful trademark infringement, this Court determined that Penn State's evidence created a genuine issue of material fact as to whether its trademarks were merely ornamental, since Franklyn's Survey Two hinted that Penn State's trademarks indicate that it is a secondary source of any

---

[12]  *Id.* at 33-39.
[13]  *Id.* at 51-93.
[14]  The Court originally entered summary judgment as to Count Three, but later reinstated that claim. *See id.* at 85 n. 367; Doc. 212.
[15]  Doc. 194 at 91-93.

tangible goods.[16] Nor did the evidence establish as a matter of law that Penn State's trademarks were merely aesthetically functional, since Penn State had met its low burden of demonstrating a genuine dispute as to whether prohibiting Vintage Brand from using Penn State trademarks would result in a significant non-reputational disadvantage.[17] Finally, a balancing of the relevant factors sufficiently demonstrated a likelihood of confusion, such that summary judgment on the issue of willful infringement was inappropriate.[18]

However, the Court granted summary judgment in Vintage Brand's favor with regard to Penn State's counterfeiting claim, since nothing in the record supported the conclusion that Vintage Brand's use of Penn State marks deceptively suggested that Vintage Brand's goods were in fact Penn State's goods.[19] This Court also granted summary judgment in Vintage Brand's favor with respect to Penn State's dilution claim, as the images used by Vintage Brand were not substantially similar to Penn State's marks, and there was no evidence that Vintage Brand's alleged use of Penn State's marks lessened the capacity of those marks to identify and distinguish goods or services.[20]

---

[16]  *Id.* at 53-64.
[17]  *Id.* at 64-69.
[18]  *Id.* at 69-75.
[19]  *Id.* at 75-78.
[20]  *Id.* at 78-85.

Lastly, the Court granted summary judgment in Vintage Brand's favor as to claims of false advertising and false endorsement.[21] Specifically, this Court determined that there was no evidence that Vintage Brand had misrepresented the characteristics of its goods as was needed to support a false advertising claim, and further determined that Penn State's false endorsement claim could not stand independently, as it was merely a repackaged trademark infringement claim and there was no evidence that Vintage Brand had used Penn State's trademarks to identify Vintage Brand's goods or services.[22]

The Court also granted in part and denied in part Penn State's motion for summary judgment.[23] This Court denied the motion as to Penn State's claims for counterfeiting, false advertising, and false endorsement, as it had entered judgment in Vintage Brand's favor on those claims, and denied the motion as to its trademark infringement claims because—as with Vintage Brand's competing motion—genuine issues of material fact with respect to whether there was a likelihood of confusion prevented judgment in Penn State's favor.[24] It further denied Penn State's motion for summary judgment as to Vintage Brand's counterclaims except as to Vintage

---

[21]  *Id.* at 85-91.
[22]  *Id.*
[23]  *Id.* at 93-108.
[24]  *Id.* at 94-101.

Brand's ornamentality counterclaim and affirmative defenses as applied to any of Penn State's trademarks that are incontestable.[25]

Following that decision, all that remains is a pending jury trial on Penn State's claims and Vintage Brand's counterclaims. This matter is set for trial in November 2024 and, in accordance with this Court's Scheduling Order, the parties have filed their motions *in limine*.[26]

In its motion *in limine*, Vintage Brand raises nine issues.[27] Vintage Brand asserts that Penn State should be precluded from: (1) introducing evidence or argument related to Vintage Brand's revenue and profits that are unrelated to Penn State's trademarks; (2) presenting evidence related to Vintage Brand's other disputes and lawsuits; (3) characterizing Vintage Brand's products as counterfeit or suggesting that it engages in counterfeiting; (4) introducing Wayback Machine captures into evidence; (5) implying that money from any damages award would be used to fund scholarships; (6) implying that Vintage Brand's manufacturing process utilizes unethical practices; (7) introducing lay opinion testimony about consumer perceptions or recognition of Penn State's trademarks; (8) arguing or implying that images of clothing bearing the Pozniak Lion Design establish trademark rights; and (9) asserting that the Pozniak Lion Design trademark is incontestable.[28]

---

[25] *Id.* at 102-08.
[26] Docs. 221, 223, 225, 227, 229, 231, 233, 235, 237, 239.
[27] Doc. 222.
[28] *Id.*

Penn State in turn also raises nine issues. It argues that Vintage Brand should be prohibited from: (1) presenting an advice of counsel defense;[29] (2) referencing Jerry Sandusky or his crimes;[30] (3) referencing Franklyn's now-excluded Survey One;[31] (4) presenting legal testimony through lay witnesses;[32] (5) arguing that any of Penn State's claims are barred by copyright law, specifically the concept of public domain;[33] (6) offering any evidence or argument related to antitrust issues;[34] (7) presenting testimony or evidence regarding an aesthetic functionality defense;[35] and (8) introducing evidence or argument related to dismissed claims or defenses, or that its actions are protected by the First Amendment to the United States Constitution.[36] Penn State also seeks to strike Vintage Brand's aesthetic functionality defense.[37]

As explained below, Vintage Brand's motions *in limine* will be granted in part and denied in part, while Penn State's motions *in limine* will likewise be granted in part and denied in part. Penn State's motion to strike will be denied.

---

[29] Docs. 223, 224.
[30] Docs. 227, 228.
[31] Docs. 229, 230.
[32] Docs. 231, 232.
[33] Docs. 233, 234.
[34] Docs. 235, 236.
[35] Docs. 237, 238.
[36] Doc. 239.
[37] Docs. 225, 226.

## II.    DISCUSSION

Courts exercise discretion to rule *in limine* on evidentiary issues "in appropriate cases."[38] While motions *in limine* may serve as a useful pretrial tool that enable more in-depth briefing than would be available at trial, a court may defer ruling on such motions "if the context of trial would provide clarity."[39] "[M]otions *in limine* often present issues for which final decision is best reserved for a specific trial situation."[40] Thus, certain motions, "especially ones that encompass broad classes of evidence, should generally be deferred until trial to allow for the resolution of questions of foundation, relevancy, and potential prejudice in proper context."[41] Specifically, "*pretrial* Rule 403 exclusions should rarely be granted . . . a court cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence."[42] Regardless, "*in limine* rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial."[43]

---

[38]   *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 260 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

[39]   *Frintner v. TruePosition*, 892 F.Supp.2d 699, 707 (E.D. Pa. 2012).

[40]   *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 518 n.10 (3d Cir. 1997).

[41]   *Leonard v. Stemetech Health Scis., Inc.*, 981 F. Supp. 2d 273, 276 (D. Del. 2013).

[42]   *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 859 (3d Cir. 1990).

[43]   *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).

A.    **Vintage Brand's Motion** *in Limine*

1.    **Evidence Related to Vintage Brand's Profits and Revenues Unrelated to Alleged Infringement**

Vintage Brand first argues that Penn State should be precluded from introducing evidence related to Vintage Brand's profits or revenues that are unrelated to any alleged infringement upon Penn State's trademarks.[44] Vintage Brand contends that such evidence is irrelevant to any potential calculation of damages under the Lanham Act, as only revenue derived from infringing conduct is incorporated into such calculations.[45] Penn State concedes it may not affirmatively offer such evidence, but responds that any ruling should be deferred until trial, as it may introduce evidence related to Vintage Brand's other profits and revenues should Vintage Brand open the door to the admission of such evidence.[46]

The Court agrees that evidence of Vintage Brand's revenue and profits that are wholly unrelated to any alleged infringing conduct is irrelevant to this case and will grant the motion *in limine*. Penn State will be prohibited from introducing such evidence at trial. However, Penn State's concerns are well considered, and Penn State may move for reconsideration of this ruling at trial should it believe Vintage Brand has opened the door to the admission of such evidence.

---

[44]    Doc. 222 at 9-11.
[45]    *Id.*
[46]    Doc. 240 at 7.

## 2.    Evidence Related to Vintage Brand's Other Lawsuits and Disputes

Vintage Brand next argues that Penn State should be precluded from introducing evidence related to other trademark lawsuits against Vintage Brand or other similar disputes, as any possible relevance is substantially outweighed by the danger of unfair prejudice, confusion of the issues, potential undue delay, and wasting of time.[47] Penn State asserts that the evidence is relevant to Vintage Brand's intent, which is important in determining likelihood of confusion, willfulness, and an intent to confuse or deceive with respect to any disgorgement analysis; in that vein Vintage Brand's "prior adverse litigation experience" is relevant to intent since it indicates both a lack of good faith and that Penn State knew its conduct infringed on trademarks but failed to act differently.[48]

The Federal Rules of Evidence provide that evidence is relevant and generally admissible if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action."[49] However, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair

---

[47]    Doc. 222 at 11-12.
[48]    Doc. 240 at 8-13.
[49]    Fed. R. Evid. 401.

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[50]

In the abstract, prior lawsuits or other disputes involving a defendant that allege trademark infringement—such as cease and desist letters—may be relevant to intent.[51] But every case is unique, and the circumstances surrounding every alleged trademark infringement are unique. Here, several factors reduce the potential relevance of prior matters involving Vintage Brand and lead this Court to conclude that any possible relevance is substantially outweighed by dangers such as unfair prejudice, confusing the issues, and causing undue delay and wasting time.

Notably, two of the cases to which Penn State cites—the only two that Penn State points to as having final judgments of any sort—come from the United States Courts of Appeals for the Fifth and Eleventh Circuits, both of which employ the per se approach to trademark infringement adopted in *Boston Professional Hockey Association v. Dallas Cap & Emblem Manufacturing*[52] whereby trademarks are protected if they create only a mental association between the trademark and the trademark holder, even if consumers do not believe the trademark holder had

---

[50]    Fed. R. Evid. 403.
[51]    *See* Doc. 240 at 10-11 (collecting cases).
[52]    510 F.2d 1004 (5th Cir. 1975).

manufactured or sponsored the product; that approach was specifically rejected by this Court.[53]

Significant differences in legal standards with regard to trademark infringement would obviously play a large role in any determination of liability—or in a party's willingness to settle—since, as this Court noted previously, under the per se approach Vintage Brand would likely have been successful in dismissing Penn State's counterclaims.[54] More importantly, however, such legal differences would have a significant impact on any party's understanding of whether their conduct is infringing to begin with. Under the per se standard employed by other courts, Vintage Brand's conduct may well infringe whereas, under the standard adopted by this Court, Vintage Brand could reasonably believe that its conduct is legally proper. Therefore, even direct proof that Vintage Brand understood its conduct to be infringing in other circuits does not necessarily bear on whether Vintage Brand knew that its conduct was infringing here.

Moreover, each alleged act of infringement is factually unique, which would further diminish the relevance of other lawsuits or disputes as related to Vintage

---

[53] *Compare id.* (formulating approach) and *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1258-59 (11th Cir. 2017) (noting that *Boston Hockey* is "binding precedent that [the Eleventh Circuit is] bound to follow"—even if the actual application in that case appears to leave some daylight between the Eleventh Circuit and the *Boston Hockey* standard), *with* Doc. 43 at 8-17 (discussing and rejecting per se approach) and Doc. 194 at 58-59 (adopting fact-intensive approach that aims to identify whether use of a mark create confusion as to whether trademark holder approved or sponsored the tangible goods bear those marks).

[54] Doc. 43 at 10.

Brand's willfulness. Factual questions relevant to each alleged act of infringement include issues such as, for example, whether the infringement involved composite images or direct use of trademarks, whether the defendant conducted research into whether images were trademarked, or whether any trademarks had obtained indisputable status. This would necessitate an examination of the underlying cases, conduct, and trademarks to determine whether the conduct there was similar to Vintage Brand's conduct in this matter, which would not only have the potential to confuse the jury, but would undoubtedly waste significant amounts of time.[55]

Finally, introducing evidence of those other disputes "would prejudice the jury, as it would have the effect of painting [Defendants] as serial trademark infringers—even if the prior lawsuits were not resolved on their merits or with any finding of liability."[56] Because the relevance—if any—of other lawsuits or disputes involving Vintage Brand is significantly outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time, the Court will grant Vintage Brand's motion. However, this Court is amenable to reexamining this ruling at a later date should Penn State demonstrate a closer factual nexus between Vintage Brand's conduct here and its conduct in those other cases.

---

[55] Moreover, it would need to be determined when these cases arose and when Vintage Brand was placed on notice that its conduct was potentially infringing. Several of the cases cited by Penn State appear to have arisen after Vintage Brand asserts that it ceased selling Penn State themed goods. *See* Doc. 240-2 at 2-3.

[56] *Avco Corp. v. Turn & Bank Holdings, LLC*, No. 4:12-CV-01313, 2022 WL 3970830, at *7 (M.D. Pa. Aug. 31, 2022).

### 3.    Reference or Characterization of Vintage Brand's Product as Counterfeit or its Conduct as Counterfeiting

Vintage Brand next contends that Penn State should be prohibited from arguing or presenting evidence that suggests Vintage Brand's products are counterfeit, or that it is engaged in counterfeiting.[57] Penn State in turns asserts that the motion should be denied as moot, since it agrees that it will not characterize Vintage Brand's merchandise as counterfeit or its conduct as counterfeiting.[58]

The Court agrees that evidence or argument suggesting that Vintage Brand's products are counterfeit or that it is engaging in counterfeiting is inadmissible, and Penn State is prohibited from introducing such evidence or argument at trial. To the extent that Penn State believes it has relevant testimony or evidence that skirts this line, it may seek clarification of the scope of this Order at trial.

### 4.    Wayback Machine Captures

Vintage Brand further seeks to exclude Penn State's Wayback Machine captures because, Vintage Brand argues, those captures cannot be authenticated at trial.[59] Specifically, Vintage Brand asserts that the captures must be authenticated by an Internet Archive employee and, here, Penn State's attempt to authenticate the captures through a declaration is improper since: (1) the captures do not produce an accurate result as demonstrated by Internet Archive's disclaimer, errors in the pages

---

[57]    Doc. 222 at 13-14.
[58]    Doc. 240 at 13-14.
[59]    Doc. 222 at 15-20.

captured, and no postdates or estimated postdates; and (2) any authentication would go to the captures themselves, not the accuracy of the contents of the webpages depicted, which is why Penn State seeks to admit those captures.[60]

Penn State argues that it will authenticate the Wayback Machine captures by way of an affidavit from an Internet Archive employee.[61] It asserts that an affidavit is adequate if the employee providing the affidavit has sufficient personal knowledge and if, as here, there is no basis upon which to question the accuracy of the captures themselves.[62]

Federal Rule of Evidence 902 provides that certain evidence is self-authenticating including, as relevant here, any "record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with [the relevant] certification requirements."[63] In keeping with those requirements, the parties agree that Wayback Machine captures are not admissible unless authenticated by an Internet Archive employee.[64]

To authenticate the Wayback Machine captures, Penn State has submitted an affidavit—submitted under penalty of perjury—from Nathaniel E. Frank-White, a records request processor at the Internet Archive.[65] Frank-White states that the

---

[60]  *Id.*
[61]  Doc. 240 at 14-15.
[62]  *Id.* at 15-17.
[63]  Fed. R. Evid. 902(13).
[64]  Doc. 222 at 16; Doc. 240 at 14-15.
[65]  Doc. 240-6.

Wayback Machine "makes it possible to browse more than 450 billion pages stored in the Internet Archive's web archive" all of which may be searched by URL.[66] The data that is accessible via the Wayback Machine "is obtained by use of web archiving software that automatically stores copies of files available via the Internet, each file preserved as it existed at a particular point in time."[67] In addition to explaining the Wayback Machine's naming convention, Frank-White attests that the captures Penn State seeks to enter into evidence "are true and accurate copies of screenshots of the Internet Archive's records of the archived files for the URLs and the dates specified in the attached coversheet of each printout."[68]

Based on the contents of Frank-White's statement provided by Penn State, the Court must agree with Vintage Brand that the affidavit is insufficient to meet the requirements of Rule 902 and, therefore, is no proper substitute for live testimony. Notably, other than stating that "each file [is] preserved as it existed at a particular point in time,"[69] Frank-White's affidavit provides scant information upon which this Court may conclude that the Wayback Machine "produces an accurate result."[70] The affidavit does not explain, for example, how the screenshots are captured, whether there are any known error rates in the process of capturing webpages, or whether the

---

[66]  *Id.* at 2.
[67]  *Id.*
[68]  *Id.*
[69]  *Id.*
[70]  Fed. R. Evid. 902(13).

Internet Archive does anything to ensure or check the accuracy of any captures.[71] In essence, Frank-White's affidavit sufficiently attests that the proposed exhibits are accurate depictions of what is contained on the Wayback Machine, but does not adequately attest that what is contained on the Wayback Machine is accurate.[72]

Because Frank-White's affidavit is insufficient to establish the accuracy of the Wayback Machine captures, the attached exhibits are not self-authenticating under Rule 902(13).[73] Consequently, based on the information available to the Court, Vintage Brand's motion to exclude the Wayback Machine captures is granted. However, this is without prejudice to Penn State's ability to introduce evidence of the Wayback Machine captures should it introduce live testimony to authenticate

---

[71] *See, e.g., Magee v. Noe*, No. 2:20CV183-HSO-MTP, 2023 WL 116349, at *6 (S.D. Miss. Jan. 5, 2023) (affiant must speak "to the accuracy of the . . . process or system, which is necessary in order for the records generated by such an electronic process or system to be self-authenticating").

[72] Vintage Brand further argues that Frank-White may only authenticate the exhibits as to the accuracy of the Wayback Machine captures, but cannot authenticate the substance of those captures—i.e., that Vintage Brand was selling Penn State branded merchandise. Doc. 222 at 19-20. Because the affidavit submitted is insufficient to authenticate the Wayback Machine captures for any purpose, the Court will not definitively address this argument here. But testimony from an Internet Archive employee that sufficient discusses the accuracy of the Wayback Machine captures themselves—assuming Internet Archive is able to provide such testimony—would more than likely adequately demonstrate the accuracy of the underlying content as well. In any event, given the purpose for which the captures are offered, it is—at the least—questionable whether those captures may be admitted pursuant to Rule 902(11). *See United States v. Browne*, 834 F.3d 403, 409-11 (3d Cir. 2016).

[73] Penn State makes passing reference to admissibility under Rules 803(6) and 902(11), Doc. 240 at 15, but it does not actually argue admissibility under that subsection. *See id.* at 14-17. And is it not clear from Frank-White's affidavit that the Wayback Machine captures were "made at or near the time [of the relevant event] by—or from information transmitted by—someone with knowledge." Fed. R. Evid. 803(6)(A); *see id.* at 902(11) (requiring that records submitted pursuant to Rule 902(11) also meet the requirements of Rule 803(6)). The Court therefore cannot conclude that the captures are admissible under § 902(11).

those captures at trial, or authenticate the captures through an affidavit that adequately complies with Rule 902(13).

### 5.    Evidence that Licensing Revenue Funds Scholarships

Vintage Brand next asserts that Penn State should be precluded from arguing or presenting evidence that some portion of its licensing revenue funds student scholarships, as this would imply that a monetary award would be used in the same way and thereby influence the jury to find in Penn State's favor not based on the evidence, but because of altruistic motives.[74] Penn State responds that such evidence is relevant to the strength of its marks and to the public interest served by making Vintage Brand's alleged misconduct unprofitable.[75]

As an initial matter, contrary to Vintage Brand's arguments, the Court is unable to discern any identifiable prejudice that would result from the introduction of this evidence. However, potential prejudice does not come into play because the Court is likewise unable to discern any relevance to this evidence.

First, the Court rejects Vintage Brand's argument that such information is relevant to the strength of its marks. As the Third Circuit has explained, the "strength of a mark is determined by (1) the distinctiveness or conceptual strength of the mark and (2) its commercial strength or marketplace recognition."[76] As this demonstrates,

---

[74]    Doc. 222 at 20.
[75]    Doc. 240 at 17-18.
[76]    *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 282 (3d Cir. 2001).

the strength of a mark depends entirely on the recognition of the mark itself (or its distinctiveness), not broadly on the fact that individuals know of Penn State's trademarks or that its trademark licensing revenue is used to fund scholarships.

Second, while such information may be relevant to the issue of whether to disgorge profits, it is well established that any determination related to disgorgement is reserved to courts, not juries.[77] Therefore, while this information may be relevant to a disgorgement determination, it need not be presented to the jury, since the jury will not make any decision regarding disgorgement.[78] Because the Court cannot discern any relevance of information regarding the use of trademark licensing revenue for scholarship funds, Vintage Brand's motion will be granted, and Penn State will be prohibited from making reference to, or presenting evidence in support of, this fact.

### 6.    Evidence that Vintage Brand Engages in Unethical Practices

Next, Vintage Brand argues that the Court should bar Penn State from presenting evidence related to corporate responsibility standards imposed on Penn State's licensees with regard to the manufacturing process, as such evidence is irrelevant and would falsely imply that Vintage Brand engages in unethical

---

[77]    *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 217 (3d Cir. 2021). *Cf. Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 78 n.1 (3d Cir. 2009) (noting that "equitable remedies [are] to be determined by the court").

[78]    In any event, the parties have stipulated to the amount of disgorgement damages that should be awarded in the event of a jury verdict in favor of Penn State. *See* Doc. 269 at 30-31.

practices. [79] Penn State agrees that it will not argue that Vintage Brand's manufacturing process is unethical, but maintains that standards for its licensees is relevant to the validity of its trademarks and the strength of those marks.[80]

The Court cannot conclude at this time that evidence related to the standards imposed upon Penn State's licensees is entirely irrelevant. Specifically, both parties agree that a company's control over the manufacturing process of goods that bear the relevant trademark symbols may be relevant to the question of whether a trademark is valid.[81] Here, Penn State's manufacturing requirements arguably apply to the quality of the goods at issue and consumer views of those goods. Although the relevance is somewhat fuzzy, it is not clear at this time that there is not possible basis for the admission of that evidence.

Nor is any prejudice related to this evidence apparent to the Court. Although Vintage Brand argues that this testimony or evidence will only serve to imply that Vintage Brand somehow does not follow similar standards and engages in unethical practices, that connections is far from intuitive. To the extent that Vintage Brand feels that it is necessary, it may counter any such inference by presenting testimony regard its manufacturing practices.

---

[79]  Doc. 222 at 21-22.
[80]  Doc. 240 at 18-20.
[81]  *See* Doc. 240 at 19 (citing *BIEC Int'l, Inc. v. Glob. Steel Servs., Ltd.*, 791 F. Supp. 489, 533 (E.D. Pa. 1992)); Doc. 250 at 21 (citing *Angelo Bros. Co. v. A&H Co.*, 1996 WL 571720, at *5 (E.D. Pa. Oct. 7, 1996)).

Consequently, Vintage Brand's motion *in limine* will be granted in part and denied in part. It is granted to the extent that Penn State is prohibited from stating or directly inferring that Vintage Brand engages in unethical manufacturing processes. It is denied without prejudice to the extent that Vintage Brand seeks to prohibit Penn State from referencing its own manufacturing controls. The Court may revisit this issue at trial upon proper motion from Vintage Brand should the testimony or evidence presented support Vintage Brand's contention that the evidence is irrelevant.

### 7.  Lay Testimony Regarding Consumer Perception or Recognition of Penn State Trademarks

Vintage Brand next seeks to exclude any testimony from lay witnesses related to consumer beliefs and perceptions about Penn State's marks, the quality of the goods bearing those marks, or their recognition of the Penn State marks.[82] Any such testimony, Vintage Brand argues, goes beyond the personal knowledge of a lay witness.[83] Penn State asserts that it "has no intention of violating these rules" related to expert testimony, but that any ruling on the matter would be premature at this stage and could be vague to the point of incomprehensibility.[84]

---

[82]  Doc. 222 at 22-23.
[83]  *Id.*
[84]  Doc. 240 at 20-21.

In accordance with the Court's prior ruling on this type of testimony,[85] Penn State may not present lay witness testimony related to consumer beliefs and perceptions about Penn State's trademarks, the quality of the goods bearing those marks, or consumer recognition of Penn State's trademarks. Contrary to Vintage Brand's protestations, the Court does not believe there will be any significant confusion about what testimony reasonably falls outside of this prohibition. And, to the extent there are any close questions regarding whether testimony may fall afoul of this ruling, there will be ample opportunity to address that during trial.

### 8. Clothing Bearing Pozniak Lion Design

Vintage Brand also contends that Penn State should be prohibited from arguing or implying that certain clothing articles bearing the Pozniak Lion design establish Penn State's trademark rights in that design, as those articles do not show use in commerce.[86] Specifically, Vintage Brand asserts that the Pozniak Lion design has only been used in connection with the Nittany Lion Wrestling Club, the Lion Ambassadors, and a license plate program, and none of the goods offered through those programs were sold in the marketplace, as is required to establish a valid trademark.[87]

---

[85] Doc. 194 at 41-42.
[86] Doc. 222 at 23-27.
[87] *Id.*

Penn State argues that it can demonstrate at trial that goods bearing the Pozniak Lion design were transported and sold in commerce—even if they were not sold to the general public—and, in any event, goods may be used in commerce even if not sold.[88] Consequently, it asserts that Vintage Brand's motion should be denied.

While Vintage Brand is correct that, as a general matter, "bald attorney argument is insufficient to oppose a motion *in limine*,"[89] here attorney argument is not being offered to support an assertion of fact. Rather, Penn State is merely forecasting that certain evidence will be presented at trial that will demonstrate goods bearing the Pozniak Lion design have been sold in commerce.[90] Evidence of clothing bearing the Pozniak Lion design would plainly be relevant if those goods were sold in commerce. Mindful that a motion *in limine* should be granted "only when the evidence is clearly inadmissible on all potential grounds,"[91] and consistent with this Court's practice,[92] the Court will defer any ruling on this motion pending Penn State's ability to establish at trial that goods bearing the Pozniak Lion were sold in commerce.[93]

---

[88] Doc. 240 at 21-23.

[89] Doc. 250 at 24.

[90] Doc. 240 at 22.

[91] *United States v. Tartaglione*, 228 F. Supp. 3d 402, 406 (E.D. Pa. 2017).

[92] *See* Doc. 194 at 44-45.

[93] Although Vintage Brand argues that Penn State's Rule 30(b)(6) representative provided testimony that contradicts any assertion that such goods were sold in commerce, Doc. 250 at 24, the testimony does not foreclose such a possibility, as the representative testified only that he did not know if goods bearing the Pozniak Lion design were sold for money. Doc. 116-28 at 57-58.

### 9.    Incontestability of Pozniak Lion Design Registration

Lastly, Vintage Brand contends that Penn State should be precluded from asserting at trial that the Pozniak Lion design had achieved incontestable trademark status.[94] Vintage Brand argues that Penn State's application for incontestable status is null because, by the time it filed an application seeking such status, Vintage Brand had already pled affirmative defenses in this matter challenging the validity of those registrations, thereby preventing incontestable status; this is so because a finding in Vintage Brand's favor would collaterally estop Penn State from opposing cancellation in a subsequent proceeding.[95] Vintage Brand's seventh affirmative defense provides:

> Penn State's claims are barred and/or limited where Penn State's application of the text and designs described in the Second Amended Complaint to merchandise is merely ornamental and does not engender the commercial impression of a source identifying trademark.[96]

Penn State responds that its Pozniak Lion registration has achieved incontestable status, as there were no pending claims or counterclaims at the time it filed its application for incontestability and Vintage Brand's affirmative defenses do not qualify as a proceeding sufficient to prevent incontestability.[97] Even if the affirmative defenses could qualify as a relevant proceeding, Penn State asserts that

---

[94]    Doc. 222 at 27-30.
[95]    *Id.*
[96]    Doc. 72 at 40.
[97]    Doc. 240 at 23-24.

the affirmative defenses challenge only particular uses of the Pozniak Lion design and therefore does not challenge the validity of the registration itself.[98] Moreover, Penn State contends that Vintage Brand's own conduct in this and other proceedings demonstrates that it does not seek cancellation of the Pozniak Lion registration.[99]

The Lanham Act provides that a trademark may achieve incontestable status after a party submits an affidavit to the United States Patent and Trademark Office ("USPTO") attesting that, at the time the affidavit is submitted: (1) "there has been no final decision adverse to the owner's claim of ownership of such mark for such goods or services, or to the owner's right to register the same or to keep the same on the register"; (2) "there is no proceeding involving said rights pending in the United States Patent and Trademark Office or in a court and not finally disposed of"; and (3) the trademark "has been in continuous use for such five consecutive years and is still in use in commerce."[100]

Penn State filed an affidavit with the USPTO, at the earliest, on June 9, 2023 attempting to secure incontestable status for its trademarks bearing the Pozniak Lion design.[101] There is no dispute that the trademark (and the affidavit submitted by Penn State) meet the requirements for incontestability save for one: whether there was a pending proceeding involving said rights at the time that Penn State filed its

---

[98] *Id.* at 25.
[99] *Id.* at 25-26.
[100] 15 U.S.C. § 1065.
[101] Doc. 222-3. *But see* Doc. 222-4 (resubmitted affidavit dated January 3, 2024).

affidavit. Specifically, the parties contest whether Vintage Brand's seventh affirmative defense—which was filed in this case prior to Penn State having filed any affidavits with the USPTO[102] and not resolved prior thereto—qualifies as a "proceeding involving said rights" such that the affirmative defense precludes those trademarks from achieving incontestable status.

There are conflicting interpretations of the phrase "proceeding involving said rights." The USPTO has "does not consider a proceeding involving the mark in which the owner is the plaintiff, where there is no counterclaim involving the owner's rights in the mark, to be a 'proceeding involving these rights' that would preclude the filing or acknowledgment of" an affidavit in support of incontestability.[103] Relying on that language, one district court has held, without examining the underlying statutory language, that an affirmative defense does not qualify as a relevant proceeding sufficient to undermine an application for incontestable status.[104]

But that determination, not to mention the USPTO's interpretation, does not align with a plain reading of 15 U.S.C. § 1065(2), which references broadly a "proceeding involving said rights" pending in any court that has not been "finally disposed of." An affirmative defense challenging the validity of a trademark

---

[102]  Doc. 72.
[103]  TMEP § 1605.04 (8th ed. Oct. 2011, May 2024 revision).
[104]  *Marrero Enterprises of Palm Beach, Inc. v. Estefan Enterprises, Inc.*, No. 06-81036-CIV, 2008 WL 11412087, at *6 (S.D. Fla. Dec. 16, 2008).

certainly involves a party's rights in that trademark, and a successful affirmative defense here could mean that Penn State's trademarks bearing the Pozniak Lion design are invalid, or at least that Vintage Brand's use of those marks is not infringing. As the USPTO has repeatedly stated, to "the extent that a civil action in a Federal district court involves issues in common with those in a proceeding before the [USPTO], the decision of the Federal district court is binding upon the [USPTO],"[105] meaning a finding in Vintage Brand's favor would have preclusive effect before the USPTO.

In *British Broadcasting Corporation v. Scott Stander & Associates, Inc.*, the United States District Court for the Central District of California assessed whether a mark was incontestable when there was, at the time the application for incontestable status was filed, a pending "affirmative defense that [asserted] plaintiffs are not the rightful owners of any trademarks or rights to trademarks."[106] That court determined that, regardless of the fact that the challenge was brought in an affirmative defense, the defendants had "challenged plaintiffs' ownership and rights to the word mark in a pending proceeding," meaning the relevant trademark had not achieved incontestable status.[107]

---

[105] *Danelli v. Beata Music LLC*, No. 91249965, 2024 WL 1404967, at *17 (TTAB Mar. 29, 2024) (citing *DaimlerChrysler Corp. v. Maydak,* 86 USPQ2d 1945 (TTAB 2008)).

[106] No. CV 14-8047 FMO (EX), 2017 WL 11682913, at *6 (C.D. Cal. Mar. 17, 2017) (internal quotation marks omitted).

[107] *Id.*

And in *Holley Performance Products, Inc. v. Quick Fuel Technology, Inc.*, the United States District Court for the Western District of Kentucky rejected a literal interpretation of the USPTO's language holding that a proceeding in court does not qualify under § 1065(2) unless there is a counterclaim involved.[108] Instead that court registered its doubt that the USPTO's "use of the term 'counterclaim' is meant to privilege form over substance" and noted that another court had construed an affirmative defense as a counterclaim under the USPTO's definition.[109]

These decisions follow a more natural reading of the plain language of § 1065(2) and are in accord with what would appear to be the basic reason for having that rule: to prevent conflicting decisions from courts and the USPTO, particularly since any court decision would be binding on the USPTO. Consequently, the Court concludes that an affirmative defense is sufficient to preclude incontestability while that affirmative defense remains unresolved in federal court, as was the case here.

Penn State nevertheless argues that Vintage Brand's seventh affirmative defense is insufficient to preclude incontestability status because it challenges only particular uses of the Pozniak Lion marks, not their validity.[110] But as Penn State itself has previously observed, Vintage Brand's affirmative defense, asserting that

---

[108]  624 F. Supp. 2d 610, 615-16 (W.D. Ky. 2008).

[109]  *Id.* at 616. In *Holley*, all that was pending at the time the affidavit in support of an application for incontestable status was an answer denying an allegation, which the court found insufficient under § 1065(2). *Id.*

[110]  Doc. 240 at 25.

the marks are merely ornamental, "an affirmative defense on the issue of invalidity."[111] Because Vintage Brand's affirmative defense is "adverse to the [Penn State's] claim of ownership of [the Pozniak Lion] mark for such goods or services"[112] it qualifies as a proceeding under § 1065.[113]

Consequently, the Court concludes that Vintage Brand's seventh affirmative defense is sufficiently adverse to Penn State's claim of ownership in the Pozniak Lion design such that it qualifies as a proceeding that precludes (at least temporarily) Penn State from obtaining incontestability status for the Pozniak Lion design. Vintage Brand's motion *in limine* will therefore be granted, and Penn State will be prohibited from arguing at trial that its registrations involving the Pozniak Lion design have achieved incontestable status.

## B.    Penn States's Motions *in Limine*

### 1.    Advice of Counsel

Penn State in its first motion *in limine* argues that any evidence related to advice provided to Vintage Brand by its attorneys should be excluded.[114] Specifically, Penn State argues that, since none of the advice provided by counsel

---

[111]  Doc. 203 at 3-4. There is no reason why a party may not challenge both the validity of a mark and whether its use of that mark is infringing.

[112]  15 U.S.C. § 1065(1).

[113]  Penn State further argues that Vintage Brand could have directly challenged the validity of the Pozniak Lion marks in different ways but opted not to do so. Doc. 240 at 25-26. That Vintage Brand could have challenged the validity of the marks in other ways, but did not, is not relevant to whether they challenge it by way of an affirmative defense.

[114]  Docs. 223, 224.

was disclosed during discovery, not only is Vintage Brand unable to meet the requirements to present an advice of counsel defense, but any such advice would be hearsay, irrelevant, and unduly prejudicial.[115]

Vintage Brand concedes that it will not present an advice of counsel defense, but asserts that Penn State's motion is too broad.[116] Vintage Brand notes that, while it "would not be permitted to detail or describe any legal advice" it receive or "claim reliance upon that advice," it should be permitted to generally rebut any inference that it never obtained legal advice, and should be allowed to offer testimony as to beliefs regarding the use of the images at issue.[117]

The Court agrees that evidence of advice provided by counsel is inadmissible and will therefore grant the motion *in limine*; Vintage Brand will be prohibited from introducing such evidence at trial. Vintage Brand may, of course, move for reconsideration of this ruling at trial should it believe Penn State has opened the door to the admission of such evidence, or may seek clarification at the time of trial should it believe that pertinent evidence may skirt the line of this prohibition.

### 2.    Evidence Related to Jerry Sandusky

Second, Penn State seeks an Order precluding Vintage Brand from referencing Jerry Sandusky or his sexual abuse crimes, as such evidence would be

---

[115]  Doc. 224 at 4-8.
[116]  Doc. 241.
[117]  *Id.* at 2.

irrelevant and unduly prejudicial.[118] Similar to the motion *in limine* addressing advice of counsel, Vintage Brand again agrees that this evidence is inadmissible, but asserts that it should be permitted to introduce such evidence should Penn State open the door by providing evidence related to its good reputation and character outside of the context of trademark recognition and strength.[119]

Penn State's motion *in limine* will be granted and Vintage Brand prohibited from introducing this evidence at trial. Should Vintage Brand believe that Penn State has in some way opened the door to the admission of this evidence at trial, it may seek to revisit this ruling at that time.

### 3. Reference to Franklyn's Survey One

In the next motion *in limine*, Penn State contends the Vintage Brand should be prohibited from introducing evidence or testimony related to Franklyn's Survey One, as that survey has been excluded by this Court.[120] It argues that Vintage Brand's experts should not be permitted to provide their opinions of the survey, as their rebuttal opinions are no longer relevant in light of the exclusion of that survey, and any probative value is substantially outweighed by the risk of unfair prejudice, confusing the issues, and wasting time.[121] It further argues that Franklyn should not be impeached based on this excluded survey either, as Penn State has not had the

---

[118] Docs. 227, 228.
[119] Doc. 242.
[120] Docs. 229, 230.
[121] Doc. 230 at 3-5.

opportunity to appeal that decision, and introduction of that exclusion may cause the jury to believe that the Court finds Franklyn incredible, and therefore discredit Franklyn's Survey Two on that basis alone.[122]

Vintage Brand in response argues that, although Survey One is not relevant or admissible and should not be rebutted by its experts, Vintage Brand may need to rebut the survey at trial in what Vintage Brand acknowledges are the "[im]probable" scenarios where Penn State violates the exclusion order or there are inconsistencies between Franklyn's work on Survey One and Survey Two.[123] Vintage Brand also asserts that it should be permitted to reference the exclusion of Survey One as it bears on Franklyn's credibility as an expert.[124]

First, this Court agrees with the parties that any testimony or evidence seeking to rebut Franklyn's Survey One is irrelevant. While Vintage Brand argues that it may need to rebut Survey One in certain improbable scenarios, that alone is an insufficient basis upon which to deny the pending motion. Should any scenario arise that would make rebuttal testimony relevant, Vintage Brand may seek an alteration to this ruling at that time. But until then, Vintage Brand is prohibited from introducing any testimony or evidence that seeks to rebut Survey One.

---

[122] *Id.* at 5-6.
[123] Doc. 243 at 4; *see id.* at 3-4.
[124] *Id.* at 4-9.

Second, contrary to Vintage Brand's position, any relevance to Franklyn's credibility based on the exclusion of Survey One would be substantially outweighed by the danger of unfair prejudice and confusing the jury. As other courts have noted, there "is too much of a risk that the jury will give the Court's prior *Daubert* order undue weight given that it is an order by the same Court that will preside over the trial."[125] There is a significant danger that the jury will believe that, because one of Franklyn's surveys was excluded by the Judge in this matter, his other survey must also be discounted—without actually examining the content of the survey to conclude for themselves whether it is entitled to any weight.[126] Vintage Brand therefore may not reference Franklyn's Survey One for the purpose of impeaching his credibility.

Accordingly, the Court will grant Penn State's motion *in limine* in its entirety. Vintage Brand will be prohibited from referencing Franklyn's Survey One during trial.

### 4.    Legal Testimony from Lay Witnesses

Next, Penn State seeks the preclusion of any lay testimony related to the law.[127] Penn States raises concerns that Chad Hartvigson will improperly offer legal

---

[125]  *Vaporstream, Inc. v. Snap Inc.*, No. 217CV00220MLHKSX, 2020 WL 978731, at *10 (C.D. Cal. Feb. 28, 2020).

[126]  This is particularly so where the Court was not asked to determine whether Franklyn's Survey Two was excludable under *Daubert*, and Penn State cannot even point out that Survey Two was admitted by this Court under the *Daubert* standard.

[127]  Docs. 231, 232.

opinions at trial and, even if such testimony were proper, its relevance would be significantly outweighed by undue prejudice, the risk of confusing the issues, and wasting time.[128] Notably, during his deposition Hartvigson provided testimony that touched on: whether certain images were in the public domain; whether images were ornamental, merely descriptive, or used in a non-trademarked manner; whether Vintage Brand was required to obtain permission to use certain images or text; and that the collegiate sports licensing industry may violate antitrust laws.[129]

Vintage Brand responds that this Court has already held that much of the disputed testimony from Hartvigson is relevant to the issue of willfulness, which is in dispute in this case, and Hartvigson must be permitted to testify to his understandings of these matters, even though he cannot offer a legal opinion.[130] Specifically, Vintage Brand argues that Hartvigson may properly testify as to (1) his personal understanding of whether images are in the public domain, (2) how images are selected by Vintage Brand, (3) whether Vintage Brand intended to use images as a trademark or ornamentally, (4) his beliefs about whether permission was required from Penn State to use those images, and (5) his personal knowledge about obtaining a license from universities the or Collegiate Licensing Company's level of control in the process.[131]

---

[128]  Doc. 232.

[129]  *Id.*

[130]  Doc. 244 at 3-5.

[131]  *Id.* at 7-8.

To start, the parties agree on a fundamental fact: Hartvigson (and any other witness) may not testify as to what the law is or what it requires.[132] Likewise, it appears that the parties agree Hartvigson may testify as to his personal belief that Vintage Brand was not violating the law through its actions.[133] The only real dispute seems to center on how far Hartvigson (and any other witness) may go in explaining those personal beliefs.

Hartvigson[134] may testify as to his personal belief regarding many of the topics addressed by the parties, including what he was legally required to do, because, as this Court has previously held, those beliefs are germane to his intent and potential willfulness, or lack thereof.[135] However, such testimony many not cross the line into topics such as what legal advice Hartvigson received or what the law may require.[136] Even Hartvigson's testimony regarding his personal beliefs must

---

[132]  *See* Doc. 232 at 6-7; Doc. 244 at 4, 7-8.

[133]  *See* Doc. 254 at 6 ("Hartvigson can testify that he believed that his conduct did not violate Penn State's rights, and the jury can assess his credibility in making that statement").

[134]  The Court addresses this testimony as applied to Hartvigson because the parties focus on his testimony, but this holding applies to all witnesses who may be called by Vintage Brand.

[135]  Doc. 194 at 46, 49.

[136]  *Cf. United States v. Leo*, 941 F.2d 181, 196-97 (3d Cir. 1991) (noting that "[w]hile it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury, our Court has allowed expert testimony concerning business customs and practices" and holding the "testimony was relevant both to explain the practice of the industry in which this prosecution arose and to establish what someone with [the defendant's] extended background in the industry probably would know"); *Exoto Inc. v. Sunrich Co., LLC*, No. 221CV03754MEMFJEMX, 2022 WL 20650232, at *8 (C.D. Cal. Mar. 29, 2022) (permitting "testimony about industry practice based upon [the witness'] perception of the law"); *Lebanon Farms Disposal, Inc. v. Cnty. of Lebanon*, No. 1:CV-03-0682, 2006 WL 8449786, at *3 (M.D. Pa. July 5, 2006) (witness may testify to "his understanding regarding [a company's] obligations under" the law but may not testify "to the language and meaning of statutes at issue in this action").

be circumscribed since he cannot testify that his belief is based on the advice of counsel, as the Court has barred any testimony regarding the reliance on advice of counsel.

The Court recognizes that this creates a fine line and Vintage Brand will have to tread carefully at trial. There are certain lines of inquiry and answers that may be acceptable. For example, Hartvigson may properly testify "I didn't believe anything we used related to Penn State was a trademark or was used as a trademark," or "I believed every image we used was in the public domain and therefore fair game to use," or "based on my understanding of the law I thought these images were in the public domain and could be freely used."[137] Testimony would impermissibly stray into legal discussions and conclusions if he instead testified, for example, "I asked my lawyer whether these images were trademarked and was told no," or "I researched how to determine if images were in the public domain and discovered that these images were in the public domain and could be used without issue."

Given the fine line that must be walked, the Court expects some disagreement at the time of trial and will handle any issues as they arise. In light of the above discussion, Penn State's motion *in limine* will be granted to the extent that Hartvigson and any other witnesses will be prohibited from providing legal

---

[137] Of course, as discussed below, fertile ground for cross examination would then exist because the concept of the public domain does not protect Vintage Brand's conduct here.

testimony, but may testify at to their beliefs about the law and whether they intentionally infringed on any alleged trademarks.

### 5. Evidence Related to Copyright Law

Penn State also argues that Vintage Brand should be prohibited from introducing any evidence related to copyright law—specifically, the concept of the public domain.[138] First, it contends that such evidence is irrelevant, since Penn State's claims turn only on whether they hold valid trademarks and whether Vintage Brand used those marks in a manner likely to confuse consumers, while facts related to the public domain—a different form of intellectual property—have no bearing on that analysis.[139]

Second, Penn State asserts that Vintage Brand has no admissible evidence in support of their claim that any images were within the public domain, since Hartvigson has no actual knowledge of whether any images were in the public domain and cannot testify as to the requirements of copyright law.[140] Moreover, testimony related to copyright law would be speculative and constitute hearsay.[141] Third, Penn State argues that permitting the introduction of such evidence would unduly prejudice it, confuse and mislead the jury, and waste time since it would

---

[138]  Docs. 233, 234.
[139]  Doc. 234 at 4-6.
[140]  *Id.* at 6-11.
[141]  *Id.* at 10-11.

muddle various areas of the law and would force Penn State to put forth evidence attempting to rebut any public domain argument.[142]

Vintage Brand in turn argues that the motion should be denied because, in part, Penn State is improperly using a motion *in limine* to dispose of Vintage Brand's seventeenth affirmative defense,[143] which it argues is instead properly raised in a motion for summary judgment, as it is dispositive of a portion of Vintage Brand's defense.[144] Moreover, evidence that certain images are in the public domain is relevant to the seventeenth affirmative defense, as the Supreme Court of the United States has held that trademark law should not be read to conflict with copyright law.[145] Further, that evidence is, according to Vintage Brand, relevant to whether any infringement was willful.[146]

Vintage Brand also asserts that it has competent evidence that certain images were in the public domain, including Hartvigson's testimony about the criteria that he uses when searching for historical memorabilia, and the fact that dates are included on many pieces of memorabilia.[147]

---

[142] *Id.* at 11-13.

[143] That affirmative defense asserts that "Penn State's claims are barred and/or limited because the historic images reproduced by Vintage Brand and applied to merchandise are works in the public domain." Doc. 72 at 42.

[144] Doc. 245 at 9-11.

[145] *Id.* at 11-15.

[146] *Id.* at 16-17.

[147] *Id.* at 17-22.

The circumstances of this case present a difficult, and so far largely unexplored, intersection between trademark law and copyright law. Both legal concepts seek to protect the work of an individual or company from copying by others. But there are two primary differences between these legal concepts. One is their duration: "copyright law bestow[s] limited periods of protection, but trademark rights can be forever."[148] That distinction is not accidental, as the "Copyright and Patent Clause of the Constitution, Art. I, § 8, cl. 8, provides as to copyrights [that they shall be] for limited Times."[149] "The right to copy, and to copy without attribution, once a copyright has expired . . . passes to the public."[150]

The other distinction is their intended purpose. As to copyright law:

> the limited grant [of protection] is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.[151]

"The rights of a patentee or copyright holder are part of a carefully crafted bargain under which, once the patent or copyright monopoly has expired, the public may use the invention or work at will and without attribution."[152]

---

[148] *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001).

[149] *Eldred v. Ashcroft*, 537 U.S. 186, 192-93 (2003).

[150] *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33 (2003).

[151] *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).

[152] *Dastar*, 539 U.S. at 33-34 (internal citations and quotation marks omitted). This is generally referred to as the "public domain."

In contrast, "[t]he Lanham Act," [the Supreme Court has] said, does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity."[153] As the Supreme Court has explained:

> Federal trademark law has no necessary relation to invention or discovery, but rather, by preventing competitors from copying a source-identifying mark, reduces the customer's costs of shopping and making purchasing decisions, and helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product.[154]

These conflicting priorities and periods of protection can sometimes create problematic overlaps—an issue that the Supreme Court touched upon in its decision in *Dastar Corporation v. Twentieth Century Fox Film Corporation*.[155] There, a company named Doubleday had published a book about General Dwight D. Eisenhower's experience in World War II; Twentieth Century Fox later acquired the rights to that book and created a television series based upon it—a series for which Fox received copyright protections.[156] Doubleday renewed its copyright in the underlying book, but Fox did not renew its rights in the series, "leaving the television series in the public domain."[157]

---

[153] *Id.* at 34 (internal quotation marks omitted).
[154] *Id.* (brackets, internal citations, and quotation marks omitted).
[155] 539 U.S. 23 (2003).
[156] *Id.* at 25-26.
[157] *Id.* at 26.

Fox later reacquired the rights to the television series and granted exclusive rights to New Line Home Video, Inc. to distribute that series on videotape.[158] Dastar thereafter "purchased eight beta cam tapes of the *original* version of the Crusade television series, which is in the public domain, copied them, and then edited the series" before selling that as its own product.[159] Fox sued Dastar under both copyright law and trademark law.[160] The Supreme Court was called upon to answer the question of whether the word "origin" as used in the Lanham Act's prohibition against using "a false designation of origin, or any false description or representation" in connection with "any goods or services" refers "only to the manufacturer or producer of the physical 'goods' that are made available to the public" or instead "includes the creator of the underlying work" that was copied.[161]

That issue, of course, is not directly relevant to this case. However, in resolving that question and concluding that "origin" refers to the origin of physical goods rather than the underlying work itself, the Supreme Court used fairly broad language in describing the interaction between copyright (and patent) law and trademark law. That court explained that, upon the expiration of a copyright, the subject passes into the public domain and essentially belongs to the public, which

---

[158] *Id.*

[159] *Id. See id.* at 26-27.

[160] *Id.* at 27.

[161] *Id.* at 31.

has an unfettered right to copy that material without attribution.[162] Extending trademark law to cover "communicative products" that have fallen into the public domain "would create a species of mutant copyright law that limits the public's federal right to copy and to use expired copyrights."[163]

The failure to delineate between the two areas of the law would, in the Supreme Court's estimation, "be akin to finding that § 43(a) [of the Lanham Act] created a species of perpetual patent and copyright, which Congress may not do."[164] That broad language is somewhat undercut, however, by the Supreme Court's statement that Fox's trademark "claim would undoubtedly be sustained if Dastar had bought some of New Line's Crusade videotapes and merely repackaged them as its own,"[165] and its assertion that Fox could potentially bring a false advertising claim under the Lanham Act if Dastar had "substantially copied the Crusade series [and] were, in advertising or promotion, to give purchasers the impression that the video was quite different from that series."[166]

Courts and commentators have struggled in the decades since *Dastar* to determine the exact scope of that decision.[167] Since that opinion issued, only one

---

[162] *Id.* at 33-34.

[163] *Id.* (internal quotation marks omitted).

[164] *Id.* at 37.

[165] *Id.* at 31.

[166] *Id.* at 38.

[167] *See, e.g.*, Mark P. McKenna, *Dastar's Next Stand*, 19 J. Intell. Prop. L. 357, 362 (2012) (observing that "Dastar's reach remains unclear, largely because of the case's relatively unique factual context").

court has attempted to apply *Dastar* broadly to issues such as that which currently confronts this Court.[168] In *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, the United States Court of Appeals for the Ninth Circuit assessed the validity of a trademark claim that sought to limit the use of the Betty Boop cartoon character (of all things) on products—in that case on vintage posters that featured the Betty Boop character—despite the fact that the character had entered the public domain.[169]

The Ninth Circuit held, in part, that if it "ruled that A.V.E.L.A.'s depictions of Betty Boop infringed Fleischer's trademarks, the Betty Boop character would essentially never enter the public domain. Such a result would run directly contrary to *Dastar*."[170] But that opinion was quickly withdrawn by the panel[171] after, as one commentator described, an "uproar of the entertainment industry, trademark owners, and intellectual property lawyers . . . on the basis that the court had overly expanded *Dastar*."[172]

Given the context in which it arose, *Dastar* is not analogous to the matter before this Court, and does not directly answer the question of whether something

---

[168] The cases to which Penn State cites are inapposite, as those cases involved defendants seeking to invoke their own copyrights as a shield—a proposition that was rightly rejected by those courts because "a copyright is not a 'right' to use: it is a right to exclude *others* from using the copyrighted work." *E.g.*, *Univ. of Ala. Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1280 (11th Cir. 2012).

[169] 636 F.3d 1115, 1117-18 (9th Cir.), *opinion withdrawn and superseded on denial of reh'g*, 654 F.3d 958 (9th Cir. 2011).

[170] *Id.* at 1124.

[171] *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 960 (9th Cir. 2011).

[172] Irene Calboli, *Overlapping Trademark and Copyright Protection: A Call for Concern and Action*, 2014 U. Ill. L. Rev. Slip Opinions 25, 32 (2014).

that has fallen into the public domain cannot be protected under trademark law in any circumstance. Nor is the Ninth Circuit's decision in *Fleischer* helpful, as that opinion was withdrawn and, in any event, is not binding on this Court or thoroughly reasoned, with the entirety of the application of *Dastar* coming in one paragraph.

Despite the confusion surrounding the scope of *Dastar*, in attempting to define its scope and application this Court need not read beyond the opinion itself to reject the absolutist positions seemingly staked out by the parties in this case. After all, Penn State cannot be correct that "[l]iability (or defenses against liability) for one type of intellectual property does not prove or disprove liability (or defenses) for a different type of intellectual property"[173] when the Supreme Court explicitly concluded otherwise in *Dastar*, albeit in a different context.[174] Neither, however, can Vintage Brand be correct that a trademark claim cannot apply to an image that has entered the public domain,[175] or else the Supreme Court in *Dastar* would not have embraced at least certain species of trademark claims against the use of items in the public domain.[176]

---

[173] Doc. 234 at 5.

[174] *See Dastar*, 539 U.S. at 34 ("allowing a cause of action under § 43(a) for that representation would create a species of mutant copyright law that limits the public's federal right to copy and to use expired copyrights" (internal quotation marks omitted)).

[175] Doc. 245 at 11-15.

[176] *See Dastar*, 539 U.S. at 34 ("If . . . the producer of a video that substantially copied the Crusade series were, in advertising or promotion, to give purchasers the impression that the video was quite different from that series, then one or more of the respondents might have a cause of action—not for reverse passing off under the 'confusion . . . as to the origin' provision of § 43(a)(1)(A), but for misrepresentation under the 'misrepresents the nature, characteristics or qualities' provision of § 43(a)(1)(B)" (brackets omitted)). *See also* Kathryn M. Foley,

Rather, in reviewing the *Dastar* opinion, it is clear that a path between these extremes is necessary to ensure that the policy concerns of each of these oft-overlapping legal fields (trademark law and copyright law) do not undermine the primary concern of the other. Consequently, in defining the scope of that middle path based on *Dastar*'s application, the Court finds instructive the underlying purpose of each area of the law.

As the Supreme Court has explained, the Constitution itself provides for copyrights and "describes the basic Clause objective as one of promoting the Progress of Science, *i.e.,* knowledge and learning. The Clause exists not to provide a special private benefit, but to stimulate artistic creativity for the general public good."[177]

> It does so by motivating the creative activity of authors through the provision of a special reward. The reward is a means, not an end. And that is why the copyright term is limited. It is limited so that its beneficiaries—the public—will not be permanently deprived of the fruits of an artist's labors.[178]

---

*Protecting Fictional Characters: Defining the Elusive Trademark-Copyright Divide*, 41 Conn. L. Rev. 921, 959 (2009) ("*Dastar* did clarify that upon expiration of a copyright term, there exists an absolute right to copy the work without any identification of its creative source. This proposition will likely be cited by future defendants who copy public domain characters without authorization. Nonetheless, this over-simplified line of argument will fail as *Dastar* did not object to the mere possibility of copyright and trademark protection, but only to the granting of improper protection" (footnotes omitted)).

[177] *Eldred v. Ashcroft*, 537 U.S. 186, 245 (2003) (brackets, internal citations, and internal quotation marks omitted).

[178] *Id.* at 245-46 (brackets, internal citations, and internal quotation marks omitted).

Under copyright law then, any "reward to the owner [is] a secondary consideration."[179] Copyright law's primary objective is "to allow the public access to the products of [authors' and investors'] genius after the limited period of exclusive control has expired."[180]

In contrast, as summarized by the Supreme Court in *Dastar*, trademark law "reduces the customer's costs of shopping and making purchasing decisions, and helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product."[181] In line with that purpose, the Supreme Court "has recognized that '[n]ational protection of trademarks is desirable because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation.'"[182] In contrast with copyright law then, while trademark law provides benefits to consumers, historically the law "of trademark infringement 'was concerned primarily with wrongful conduct in commercial enterprises which resulted in business loss to another, ordinarily by the use of unfair means in drawing away customers from a competitor.'"[183]

---

[179] *Mazer v. Stein,* 347 U.S. 201, 219 (1954).

[180] *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).

[181] *Dastar*, 539 U.S. at 34 (brackets, internal citations, and quotation marks omitted).

[182] *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 531 (1987) (quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 198 (1985) (brackets and ellipsis omitted)).

[183] *Halicki v. Carroll Shelby Int'l, Inc.*, No. CV048813SJOPJWX, 2006 WL 8447777, at *6 (C.D. Cal. Apr. 28, 2006) (quoting *People ex rel. Mosk v. National Research Co.*, 201 Cal. App. 2d 765, 770 (1962)).

This is emphasized by what the Supreme Court has identified as the zone of interests protected by the Lanham Act. Specifically, the Lanham Act protects:

> [against] the deceptive and misleading use of marks in . . . commerce; . . . registered marks used in such commerce from interference by State, or territorial legislation; . . . persons engaged in such commerce against unfair competition; [against] fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks . . .[184]

That zone of interests generally protects against "injury to a commercial interest in reputation or sales."[185]

Attempting to navigate these concerns leaves courts balancing on a razor's edge. On one side, failing to read copyright law's concept of the public domain into cases involving trademark claims could potentially grant perpetual copyright protection to images solely by virtue of the fact that those images may contain a trademark.[186] On the other side, interpreting the public domain portion of copyright law as prohibiting a trademark claim would potentially permit companies to violate

---

[184] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131 (2014) (quoting 15 U.S.C. § 1127).

[185] *Id.* at 131-32.

[186] *See* Calboli, *supra*, at 30 ("the impact of overlapping copyright and trademark protection can easily degenerate into a mutant right capable of distorting the copyright equilibrium and severely impairing the public's ability to freely copy, adapt, distribute, and show works after their copyright has expired. This, in turn, should be prevented, as overlapping trademark rights can result in severely impacting society's creativity. In particular, freedom to copy is crucial to incremental advances in new creative works (as many copyright intensive industries know) and trademark protection in these works can severely impact this freedom. Moreover, access to knowledge can also be put at risk by overlapping protection, in that creative works would effectively not be available as part of the public domain after the expiration of the copyright term" (footnote and internal quotation marks omitted)).

the trademarks of another in a way that is calculated to confuse consumers without leaving a method of recourse for the trademark owner—for example, if Pepsi Cola prominently used on its packaging an old Coca Cola image that had fallen into the public domain to falsely imply that its products were Coca Cola products, or vice versa.

But by accounting for the primary purpose of each legal sphere, a test may be devised that largely avoids these twin harms, at least with respect to the societal benefits with which each area of the law is largely concerned. The key distinction in determining whether an image in the public domain may be subject to a trademark claim is, therefore, whether application of the public domain would implicate or undermine the primary concerns of each area of the law.

If a defendant's use of a trademark-containing-image that has fallen into the public domain is used for a creative purpose, then trademark law may not be applied, or else courts would undermine the "carefully crafted bargain" that permits the public to build upon the genius of the past and move our society forward in positive ways.[187] Failing to account for the purpose of copyright law and the public domain in such circumstances would "undermine the policy of encouraging competition in using material in the public domain and allowing new authors to build upon the

---

[187] *Dastar*, 539 U.S. at 33 (internal quotation marks omitted).

creativity of the past."[188] But if an image that bears a trademark is within the public domain, but is being used for purely commercial—as opposed to creative—purposes, then trademark law may be applied to its use; otherwise courts would undermine the purpose of trademark law in ensuring that companies reap the benefits associated with its products and reputation. Under this test, the creative expression meant to be fostered by copyright law remains largely, if not entirely, unimpeded by the application of trademark law, while the benefits that companies and individuals derive from their goodwill remain intact under trademark law.

This is in accord with other decisions related to the application of the Lanham Act to copyright cases. For example, in a pre-*Dastar* case, *Comedy III Productions, Inc. v. New Line Cinema*, the Ninth Circuit assessed whether the plaintiff could sustain a cause of action under the Lanham Act when the defendant had created a film and, as part of the film, included in the background a thirty second clip of The Three Stooges that was in the public domain.[189] The plaintiff sued, claiming a trademark in "the name, the characters, the likeness, and overall act of The Three Stooges."[190]

The Ninth Circuit concluded that the clip was not a trademark, reasoning that it was plainly covered by copyright law and if "material covered by copyright law

---

[188] Leslie A. Kurtz, *The Independent Legal Lives of Fictional Characters*, 1986 Wis. L. Rev. 429, 517 (1986).
[189] 200 F.3d 593, 594 (9th Cir. 2000).
[190] *Id.* at 595 (internal quotation marks omitted).

has passed into the public domain, it cannot then be protected by the Lanham Act without rendering the Copyright Act a nullity."[191] But in reaching that conclusion, the Ninth Circuit was careful to note that the clip in question was not used in a "purely commercial vehicle" and the defendant did not "in its use of the clip, create simulacra of The Three Stooges to sell a product" as had a company in a previous case in which the Ninth Circuit found trademark infringement.[192] The Ninth Circuit therefore rested its holding on the commercial nature, or lack thereof, of the alleged infringing use: had the defendant "used the likeness of The Three Stooges on t-shirts which it was selling, [the plaintiff] might have an arguable claim for trademark violation."[193]

Applying the creative/commercial test here, Vintage Brand cannot present evidence that the images it used were in the public domain. Its conduct here was wholly commercial in nature—it took images that were allegedly in the public domain and put them on products to sell, such as t-shirts, hats, mugs, and other physical merchandise. Applying copyright law would not further the goals of fostering creative expression but could potentially impair trademark law's goal of helping companies reap the financial and reputational-related awards associated with their product.

---

[191] *Id.*

[192] *Id.* at 596.

[193] *Id.*

The Court further rejects Vintage Brand's contention that Penn State's motion improperly seeks to dispose of an affirmative defense.[194] As Vintage Brand acknowledges, a motion *in limine* may appropriately dispose of an affirmative defense if that defense "is completely untenable as a matter of law."[195] Here, the commercial nature of Vintage Brand's use of the underlying images renders its defense related to the public domain untenable, and it is appropriate to address this issue through a motion *in limine*.[196] Consequently, the Court will grant Penn State's motion *in limine*, and Vintage Brand will be prohibited from presenting evidence that the images it used were in the public domain.[197]

### 6.    Evidence Related to Antitrust Issues

Next, Penn State contends that Vintage Brand cannot properly present evidence related to antitrust concerns.[198] Penn State notes that no court has ever refused to enforce a trademark because it was used in violation of antitrust law and argues that Vintage Brand has no admissible evidence that could establish an

---

[194]  Doc. 245 at 9-11.

[195]  *Id.* at 9 n.2 (citing *Cleveland Bros. Equip. Co., Inc. v. Vorobey*, 655 F. Supp. 3d 305, 326 (M.D. Pa. 2023)).

[196]  Vintage Brand also argues that its affirmative defense may proceed because Penn State is attempting to apply trademark law to the images in question, not the physical goods bearing those images, which is—according to Vintage Brand—barred by *Dastar*. Doc. 245 at 14-15. But *Dastar* reached its conclusion in the context of a claim for false endorsement under § 43(a). *Dastar*, 539 U.S. at 34. This Court has already disposed of Penn State's false endorsement claim, and *Dastar*'s direct holding is therefore not applicable here. Doc. 194 at 87-91.

[197]  Testimony as to Hartvigson's belief that the images were in the public domain and therefore could be used without violating trademark law is, however, relevant to the issue of willfulness, as this Court previously ruled. Doc. 194 at 46.

[198]  Docs. 235, 236.

antitrust claim, rendering irrelevant evidence related to antitrust law.[199] Even if relevant, Penn State asserts that any relevance is significantly outweighed by the danger of undue prejudice, confusing or misleading the jury, and wasting time.[200]

Vintage Brand argues, similar to its opposition to the motion addressing copyright law, that Penn State seeks to improperly dispose of a colorable affirmative defense in a motion *in limine* rather than through a motion to strike or for summary judgment, as is more appropriate.[201] In any event, Vintage Brand states that a trademark owner's violation of antitrust law is a valid defense to a trademark claim.[202] Moreover, Vintage Brand maintains that it can present competent evidence of the relevant market and issues related to the antitrust defense through Hartvigson's testimony, as he has "substantial personal experience and knowledge in the collegiate fan-apparel industry."[203]

As an initial matter, the parties agree that antitrust concerns do present a valid defense in the trademark context—they disagree, however, about whether it is a complete defense to a trademark claim, or a defense only to the incontestability of a trademark.[204] Their argument revolves specifically around the Lanham Act's provision that it is a defense if "the mark has been or is being used to violate the

---

[199]  Doc. 236 at 4-9.
[200]  *Id.* at 9-11.
[201]  Doc. 246 at 2-4.
[202]  *Id.* at 4-6.
[203]  *Id.* at 13; *see id.* at 6-15.
[204]  *Compare* Doc. 246 at 4-6, *with* Doc. 255 at 3-5.

antitrust laws of the United States."[205] The dispute over that defense's applicability arises because that language is contained in the section addressing incontestable trademarks, and therefore would appear to be a defense to incontestability only, rather than a complete defense to trademark infringement claims.[206]

Regardless of which position is correct, however, the dispute is irrelevant to this case because Vintage Brand's eighteenth affirmative defense is broad enough to encompass a request that the Court invoke its equitable power to refuse to enforce the trademarks based upon Penn State's alleged violations of antitrust law,[207] which is a well-established power of federal courts.[208] The Court therefore finds that Vintage Brand's affirmative defense is legally valid.[209]

This Court further rejects, as have many other courts, Penn State's contention that expert testimony is required to establish the foundation of an antitrust defense.[210]

---

[205] 15 U.S.C. § 1115(b)(7).

[206] *But see Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95-96 (2d Cir. 1985) ("An antitrust tie-in claim, if proven, will constitute a defense to trademark infringement").

[207] That affirmative defense states "Penn State's claims are barred and/or limited as an anticompetitive, illegal restraint of trade." Doc. 72 at 42.

[208] *Cf. Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1336 (7th Cir. 1977) (recognizing that "the defense of antitrust misuse is largely available to defeat the conclusive evidentiary force that would otherwise attach to a trademark certificate under the (Lanham) Act" but nevertheless recognizing "the equity power of a court to deny enforcement of a trademark on the part of one who has used that trademark in violation of the antitrust laws" (internal quotation marks omitted)).

[209] And, regardless of which party is correct, the resolution of this question has no bearing on the motion *in limine*. Whether antitrust concerns create a general defense or only a defense to incontestability, because a defense exists evidence related to that defense should go to a jury.

[210] *See, e.g., Lantec, Inc. v. Novell, Inc.*, 146 F. Supp. 2d 1140, 1148 (D. Utah 2001) ("the court will reject the absolute rule of the Eleventh Circuit in favor of the rule of other jurisdictions. The absence of expert testimony on the issue of relevant market and like issues is not, *per se,*

Such a rule would be particularly inappropriate within this Circuit, given the Third Circuit's repeated pronouncement that lay testimony may be "grounded either in experience or specialized knowledge . . . [and,] 'in order to be 'helpful,' an opinion must be reasonably reliable,' and Rule 701 therefore 'requires that a lay opinion witness have a reasonable basis grounded either in *experience or specialized knowledge* for arriving at the opinion that he or she expresses.'"[211] That is to say, "when a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702."[212]

Because a lay witness may be qualified to provide specialized knowledge as to the requirements to sustain an antitrust defense—such as the relevant geographic or product market—the Court will not adopt a per se rule barring such a defense in the absence of expert testimony. And here, Vintage Brand may conceivably be able to offer such testimony. Vintage Brand asserts that it will have Hartvigson—along

---

fatal to a plaintiff's antitrust claims. In other words, expert testimony is not required, but in its absence a plaintiff must show by other evidence sufficient facts from which a jury could infer market share, market power, relevant market, monopolization, dangerous probability of monopolization, and the like").

[211] *United States v. Savage*, 970 F.3d 217, 285-86 (3d Cir. 2020) (quoting *Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201 (3d Cir. 1995)).

[212] *Id.* at 286 (brackets and internal quotation marks omitted).

with university personnel engaged in licensing—testify to the requirements of an antitrust claim based on their "personal experience in the market."[213]

This evidentiary assertion is sufficient basis to deny Penn State's motion *in limine*, as the evidence it seeks to exclude is not "clearly inadmissible on all potential grounds."[214] Of course, the Court must reach this decision based upon a minimal evidentiary record. This is a large part of the reason why motions *in limine* are ill-suited as vehicles for the disposition of a claim or defense; requests to exclude a defense are better brought in a motion for summary judgment and its accompanying factual record, but Penn State inexplicably failed to move to dispose of the defense in that fashion.

### 7.    Aesthetic Functionality Defense

Penn State next argues that Vintage Brand should not be allowed to support its aesthetic functionality defense[215] with evidence of consumers' motivation in purchasing items or assertions that Vintage Brand must be permitted to compete with authorized licensees.[216] First, it contends that Vintage Brand's defense is fatally

---

[213] Doc. 246 at 10.

[214] *Holmes v. Am. Home Patient/Lincare*, No. 4:21-CV-01683, 2024 WL 1118982, at *1 (M.D. Pa. Mar. 14, 2024) (internal quotation marks omitted).

[215] Vintage Brand's fifth affirmative defense reads "Penn State's claims are barred and/or limited where Penn State precluding Vintage Brand's application of the text and designs described in the Second Amended Complaint to merchandise would put Vintage Brand at a significant non-reputation-related disadvantage," while its sixth affirmative defense asserts that "Penn State's claims are barred and/or limited where the text and designs described in the Second Amended Complaint are essential to the use or purpose of Vintage Brand's merchandise and/or affect the cost or quality of Vintage Brand's merchandise." Doc. 72 at 39.

[216] Docs. 237, 238.

flawed, as evidence "that consumers purchase Vintage Brand's products because they desire to express an affiliation with Penn State . . . is not relevant to any recognized test for aesthetic functionality," which generally examine whether forbidding use of the feature would put others at a significant, non-reputational disadvantage, or whether the feature is essential to the purpose or use of an item or affects its cost or quality.[217] Vintage Brand's defense essentially relies on consumer recognition of the Penn State trademarks, which is not an aesthetic functionality defense.[218] Because Vintage Brand's affirmative defenses are not viable, Penn State argues, evidence related to that defense is irrelevant and must be excluded.[219]

Even if the defense were viable, Penn State contends that evidence related to the reasons why consumers purchase Vintage Brand products would be inadmissible as no proffered witness has personal knowledge as to why consumers buy Vintage Brand products.[220] Penn State further asserts that such evidence should be excluded because Vintage Brand failed to properly disclose that evidence during discovery.[221]

Vintage Brand argues that, again, Penn State improperly seeks a dispositive ruling on an affirmative defense in a motion *in limine* rather than a motion to strike or for summary judgment.[222] Regardless, Vintage Brand asserts, Penn State

---

[217] Doc. 238 at 11; *see id.* at 10-14.
[218] *Id.*
[219] *Id.* at 13-14.
[220] *Id.* at 14-17.
[221] *Id.* at 17-20.
[222] Doc. 247 at 7-9.

misunderstands the doctrine of aesthetic functionality, and the proposed evidence is relevant to such a defense.[223] Specifically, reputation and recognition in the context of aesthetic functionality means recognition or reputation as to the source of the relevant good, not the trademark, and a mark is functional if it is used for a purpose other than branding—such as to allow consumers to express their affiliation or support of Penn State.[224]

As to the evidence to be presented at trial, Vintage Brand points to testimony from Penn State's representative agreeing that individuals could express their affiliation with Penn State by wearing apparel bearing Penn State imagery, as well as testimony from alumna and advertising material showing that people wear Penn State gear to affiliate themselves with Penn State.[225] Vintage Brand will also provide expert testimony that Penn State has no reputation as a source of apparel and consumers do not believe it is responsible for the quality of products.[226] Finally, Vintage Brand contends that it properly and timely disclosed any expert opinions and evidence upon which is relies for this affirmative defense.[227]

As this Court has previously noted with regard to the doctrine of aesthetic functionality, the Supreme Court in *Qualitex Co. v. Jacobson Products Co., Inc.*

---

[223] *Id.* at 9-14.
[224] *Id.*
[225] *Id.* at 15-18.
[226] *Id.* at 17.
[227] *Id.* at 18-19.

explained that, in general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.[228]

The Court further noted that "'aesthetic functionality[] mean[s] a design that communicates the use, purpose, cost, or quality of the product in a way that competitors cannot avoid replicating without incurring costs.'"[229]

The parties here dispute the precise meaning of the Supreme Court's holding in *Qualitex*. Vintage Brand argues that "reputation and recognition in the trademark context means reputation and recognition *as a source of the relevant good*—not recognition of the mark itself,"[230] while Penn State asserts that courts must account for the overall reputation of the trademark owner.[231]

The Ninth Circuit in *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.* traced the recent history of that doctrine before the Supreme Court and iterated that the Supreme Court has "offered a simple definition of functionality: 'a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'"[232] As explained by the Ninth Circuit, the Supreme Court in *Qualitex* later "considered whether a color . . . could be protected as a

---

[228] Doc. 194 at 65 (quoting *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 165 (1995)).

[229] *Id.* at 66 (quoting *DayCab Co., Inc. v. Prairie Tech., LLC*, 67 F.4th 837, 847 (6th Cir. 2023)).

[230] Doc. 247 at 10.

[231] Doc. 256 at 3-5.

[232] *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1070 (9th Cir. 2006) (quoting *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 850 n.10 (1982)).

trademark" and "underscored . . . that functionality protects against a competitive disadvantage 'unrelated to recognition or reputation'" and "because 'the [district] court found 'no competitive need in the press pad industry for the green-gold color, since other colors are equally usable,' functionality did not defeat protection."[233]

In the Ninth Circuit's view, a more recent Supreme Court case, *TrafFix Devices, Inc. v. Marketing Displays, Inc.,*[234] explained the relationship between those two holdings.[235] *Qualitex* did not displace the Supreme Court's earlier decision with respect to functionality but, instead, "'expand[ed] upon' the [earlier] definition, by observing that 'a functional feature is one the 'exclusive use of which would put competitors at a significant non-reputation-related disadvantage.'"[236] *TrafFix* explained that if "a feature is functional under [the earlier test], the inquiry ends and the feature cannot be protected under trademark law" whereas "in the context of aesthetic functionality, . . . considerations [of competitive necessity and significant non-reputation-related disadvantage] may come into play because a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation related disadvantage."[237] Consequently,

> After *Qualitex* and *TrafFix,* the test for functionality proceeds in two steps. In the first step, courts inquire whether the alleged "significant non-trademark function" satisfies the *Inwood Laboratories* definition of

---

[233] *Id.* (quoting *Qualitex*, 514 U.S. at 166, 169).
[234] 532 U.S. 23 (2001)
[235] *Au-Tomotive*, 457 F.3d at 1070-71.
[236] *Id.* at 1071 (quoting *TrafFix,* 532 U.S. at 32 (brackets omitted))
[237] *Id.* at 1071-72 (quoting *TrafFix,* 532 U.S. at 32).

functionality—"essential to the use or purpose of the article or affects its cost or quality." *TrafFix,* 532 U.S. at 32-33 (*citing Inwood Laboratories,* 456 U.S. at 850, n. 10). If this is the case, the inquiry is over—the feature is functional and not protected. *TrafFix,* 532 U.S. at 33. In the case of a claim of aesthetic functionality, an alternative test inquires whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage. *Id.; and see also Qualitex,* 514 U.S. at 165.[238]

Of course, this review does not directly address the question of whether a defendant may, in light of those Supreme Court decisions, maintain an aesthetic functionality defense when its sole argument is that the trademarks are "non-reputation-related because consumers want the images so they can express their own affiliation with the [plaintiff], not because they believe that the [plaintiff] is a reputable source for high-quality apparel."[239]

But the Ninth Circuit has persuasively answered that question in the affirmative both in *Au-Tomotive* and other cases. As the Ninth Circuit in *Au-Tomotive*—a case to which Penn State itself cites—is careful to note, the rule espoused in *Qualitex* and *TrafFix* is no bar to the aesthetic functionality defense. Rather, that doctrine must be applied "careful[ly] to prevent 'the use of a trademark to monopolize a design feature which, *in itself and apart from its identification of source,* improves the usefulness or appeal of the object it adorns.'"[240] Accordingly,

---

[238] *Id.* at 1072 (brackets and footnote omitted).
[239] Doc. 247 at 5.
[240] *Au-Tomotive*, 457 F.3d at 1073 (quoting *Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 774 (9th Cir. 1981)).

"aesthetic functionality [is generally] limited to product features that serve an aesthetic purpose wholly independent of any source-identifying function."[241]

That is precisely what Vintage Brand argues here: consumers do not purchase Vintage Brand goods bearing Penn State imagery because the marks identify the producer or sponsor of those goods but, instead, purchase those goods solely to express their affiliation with, or support of, Penn State. That is to say, the Penn State images used by Vintage Brand "serve an aesthetic purpose wholly independent of any source-identifying function."[242]

The distinction between an actionable and non-actionable aesthetic functionality defense is best exemplified by *International Order of Job's Daughters v. Lindeburg and Co.*[243] There, the Ninth Circuit examined whether the doctrine of aesthetic functionality protected the defendant's conduct in "selling jewelry and related items bearing the Job's Daughters[244] insignia" despite the fact that it was not authorized to do so, whereas other companies were so authorized.[245]

The Ninth Circuit noted that "[t]rademark law does not prevent a person from copying so-called 'functional' features of a product which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance

---

[241] *Id.* (citing *Qualitex,* 514 U.S. at 166).
[242] *Id.*
[243] 633 F.2d 912 (9th Cir. 1980).
[244] Job's Daughters is a young women's fraternal order.
[245] *Id.* at 914.

that a particular entity made, sponsored, or endorsed a product."[246] It further

explained:

> It is not uncommon for a name or emblem that serves in one context as
> a collective mark or trademark also to be merchandised for its own
> intrinsic utility to consumers. We commonly identify ourselves by
> displaying emblems expressing allegiances. Our jewelry, clothing, and
> cars are emblazoned with inscriptions showing the organizations we
> belong to, the schools we attend, the landmarks we have visited, the
> sports teams we support, the beverages we imbibe. Although these
> inscriptions frequently include names and emblems that are also used
> as collective marks or trademarks, it would be naive to conclude that
> the name or emblem is desired because consumers believe that the
> product somehow originated with or was sponsored by the organization
> the name or emblem signifies.[247]

That court went on to conclude

> that Lindeburg was not using the Job's Daughters name and emblem as
> trademarks. The insignia were a prominent feature of each item so as to
> be visible to others when worn, allowing the wearer to publicly express
> her allegiance to the organization. Lindeburg never designated the
> merchandise as "official" Job's Daughters' merchandise or otherwise
> affirmatively indicated sponsorship. Job's Daughters did not show a
> single instance in which a customer was misled about the origin,
> sponsorship, or endorsement of Lindeburg's jewelry, nor that it
> received any complaints about Lindeburg's wares. Finally, there was
> evidence that many other jewelers sold unlicensed Job's Daughters
> jewelry, implying that consumers did not ordinarily purchase their
> fraternal jewelry from only "official" sources. We conclude that Job's
> Daughters did not meet its burden of proving that a typical buyer of
> Lindeburg's merchandise would think that the jewelry was produced,
> sponsored, or endorsed by the organization. The name and emblem
> were functional aesthetic components of the product, not trademarks.
> There could be, therefore, no infringement.[248]

---

[246] *Id.* at 917.
[247] *Id.* at 918.
[248] *Id.* at 920.

Although this decision is somewhat aged and has since been narrowed in scope, "the case remains good law."[249]

Imagery, even if it is trademarked and is the reason why consumers purchase a product, is subject to the aesthetic functionality defense so long as there is sufficient evidence that the images serve an aesthetic purpose wholly independent of any source-identifying function. In such circumstances the producer or sponsor of the goods would be of no consequence to consumers and, as the Supreme Court observed in *Dastar*, "[t]he words of the Lanham Act should not be stretched to cover matters that are typically of no consequence to purchasers."[250]

The Court therefore concludes that Vintage Brand has proffered a legally sound affirmative defense in the form of aesthetic functionality. This is not to say that Vintage Brand will have an easy task of establishing this defense at trial. As the Ninth Circuit emphasized in *Au-Tomotive*:

> It is difficult to extrapolate from cases involving a true aesthetically functional feature, like a box shape or certain uses of color, to cases involving well-known registered logos and company names, which generally have no function apart from their association with the trademark holder. The present case illustrates the point well, as the use of Volkswagen and Audi's marks is neither aesthetic nor independent of source identification. That is to say, there is no evidence that consumers buy Auto Gold's products solely because of their "intrinsic" aesthetic appeal. Instead, the alleged aesthetic function is

---

[249] *LTTB LLC v. Redbubble, Inc.*, 840 F. App'x 148, 150 (9th Cir. 2021) (quoting *Au-Tomotive*, 457 F.3d at 1069).
[250] *Dastar*, 539 U.S. at 32-33.

indistinguishable from and tied to the mark's source-identifying nature.[251]

But because "aesthetic function and branding success can sometimes be difficult to distinguish, the aesthetic functionality analysis is highly fact-specific,"[252] and this issue should be submitted to the jury if Vintage Brand has evidence to support its defense.

Contrary to Penn State's assertion, the Court finds that Vintage Brand has produced sufficient evidence to support an aesthetic functionality defense—although just barely. The testimony of Penn State's Rule 30(b)(6) representative and, critically, statements from a Penn State alumna that she wears Penn State gear to football games to show "school spirit" and show that she is "part of the same crowd that's rooting for this team,"[253] combined with expert testimony that consumers do not necessarily associate Penn State with the quality of products bearing its trademarks,[254] creates a sufficient basis upon which to send this issue to the jury.

As to Penn State's argument that any evidence related to the aesthetic functionality defense should be excluded pursuant to Federal Rule of Civil Procedure 37(c)(1) for failure to provide required discovery, the Court sees no basis

---

[251] *Au-Tomotive*, 457 F.3d at 1073-74.

[252] *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 222 (2d Cir. 2012).

[253] Doc. 247-2 at 6.

[254] *See* Doc. 247 at 15-18.

upon which to exclude said evidence at this late stage[255] in the proceedings.[256] Penn State was certainly made aware of the proposed expert testimony and knew, or should have known, the general testimony that its own witnesses would provide.[257]

Accordingly, the Court finds no reason to exclude Vintage Brand from presenting evidence related to its aesthetic functionality affirmative defense. Penn State's motion *in limine* will therefore be denied.

### 8.    First Amendment and Dismissed Claims

In its final motion *in limine*, Penn State seeks to exclude evidence that its claims are limited in any way by the First Amendment to the United States Constitution, as well as any reference to claims or defenses that have been dismissed or removed from the case by amended pleadings or answers.[258] Vintage Brand does not contest this motion,[259] and it therefore will be granted.

### C.    Penn State's Motion to Strike

Finally, Penn State seeks to strike Vintage Brand's aesthetic functionality affirmative defense.[260] First, Penn State argues that Penn State's use of the trademarks in a functional manner is not a proper aesthetic functionality defense,

---

[255] It is difficult to understand why, as with many of the present motions *in limine*, this was not raised at an earlier opportunity.

[256] Doc. 238 at 17-20.

[257] Of course, Vintage Brand's experts may not stray beyond the bounds of what was disclosed in their expert reports.

[258] Doc. 239.

[259] *Id.*

[260] Docs. 225, 226.

which instead focuses on whether the trademark itself is functional.[261] Second, Penn State contends that any functionality must be unrelated to the recognition or reputation of the mark holder.[262] Finally, Penn State asserts that use of a trademark to attract fans is not protected by the doctrine of aesthetic functionality.[263]

Vintage Brand claims that Penn State improperly seeks to file a dispositive motion more than one year after the deadline without leave of the Court or good cause.[264] It further argues that, in any event, the motion fails on the merits.[265] First, trademarks are properly subject to the aesthetic functionality defense when consumers purchase the challenged features for reasons independent of source identification.[266] Second, Vintage Brand asserts that a feature is functional if it is useful for anything beyond branding, which it avers is the case here.[267] Finally, it maintains that reputation for trademark purposes refers only to reputation as to the source of the relevant goods, and here Penn State has no reputation as a source for goods.[268]

Despite the incredibly late nature of Penn State's motion, the Court need not determine whether Penn State's motion is an improper dispositive motion because,

---

[261] Doc. 226 at 11-14.
[262] *Id.* at 14-19.
[263] *Id.* at 19-21.
[264] Doc. 248 at 6-12.
[265] *Id.* at 12-25.
[266] *Id.* at 12-16.
[267] *Id.* at 16-21.
[268] *Id.* at 21-25.

for the reasons explicated above as to Penn State's motion *in limine* to prohibit evidence of aesthetic functionality, Vintage Brand has adequately stated an affirmative defense under that doctrine. As discussed previously, the aesthetic functionality defense applies "to product features that serve an aesthetic purpose wholly independent of any source-identifying function."[269]

Although that quote comes from a Ninth Circuit decision, that definition is not unique to the Ninth Circuit.[270] To the contrary, the Third Circuit has stated plainly that a "design is functional if it is useful for anything beyond branding" and the functionality analysis must focus on whether the trademark or dress "only advanced the brand."[271] So too has the Supreme Court observed that the aesthetic functionality defense applies if the disputed feature serves a "significant nontrademark function" such as identifying the type of medicine involved or simply satisfying "the noble instinct for giving the right touch of beauty to common and necessary things."[272] Much as the Third Circuit has concluded that a watermelon-colored wedge shape is functional because it serves to identify the flavor of a

---

[269] *Au-Tomotive*, 457 F.3d at 1073.

[270] Penn State's assertion that the Third Circuit has rejected the reasoning behind cases such as *Au-Tomotive* reads too much into *Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822 (3d Cir. 1981). The Third Circuit there rejected the Ninth Circuit's decisions to the extent that they "define[] aesthetic functionality in terms of consumer acceptance." *Id.* at 825. But the question of consumer acceptance was not at issue in *Job's Daughters* or *Au-Tomotive*.

[271] *PIM Brands Inc. v. Haribo of Am. Inc.*, 81 F.4th 317, 321, 322 (3d Cir. 2023).

[272] *Qualitex*, 514 U.S. at 170 (internal quotation marks omitted).

candy,[273] so too could a jury decide here that the images in question serve a functional purpose outside of "the mark's source-identifying nature."[274]

As to Penn State's assertion that functionality must be assessed solely as defined by the trademark owner,[275] there is no case in the Third Circuit that has explicitly so held. And, in any event, whether functionality is defined by the plaintiff or by the defendant's actual use is a distinction without a difference, since either method leads to the same question: whether the trademarks as used on physical goods are functional or, instead, source identifying. When viewed in that light, whether the disputed images are source identifying as defined by Penn State or as used on Vintage Brand's goods is immaterial. In either case, they either identify Penn State as the source or sponsor of the goods or they do not.

In sum, the Court concludes that Vintage Brand has presented a legally viable defense in the form of aesthetic functionality. Penn State's motion to strike will therefore be denied.

---

[273] *Id.* at 322-23.
[274] *Au-Tomotive*, 457 F.3d at 1074.
[275] Doc. 226 at 13-14; Doc. 258 at 9-12.

**III.    CONCLUSION**

In accordance with the above discussion, the motions *in limine* will be granted in part and denied in part, and the motion to strike will be denied.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge