```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2                    WILLIAMSPORT DIVISION

 3   THE PENNSYLVANIA STATE   :  CASE NO.
     UNIVERSITY               :
 4        v.                  :
     VINTAGE BRAND, LLC,      :
 5   SPORTSWEAR INC., d/b/a   :
     PREP SPORTSWEAR,         :
 6   CHAD HARTVIGSON, ERIK    :
     HARTVIGSON, and          :
 7   MICHELLE YOUNG           :  4:21-CV-01091

 8

 9                  TRANSCRIPT OF PROCEEDINGS
                         Jury Trial
10                        VOLUME I

11       Held before the HONORABLE MATTHEW W. BRANN, November 12,
     2024 commencing at 10:20 a.m., Courtroom No. 1, Federal
12   Building, Williamsport, Pennsylvania.

13

14   APPEARANCES:

15   LUCY J. WHEATLEY, ESQUIRE
     McGuireWoods LLP
16   Gateway Plaza
     800 East Canal Street
17   Richmond, VA 23219-3916
     804-775-4320
18   Lwheatley@mcguirewoods.com

19   DAVID E. FINKELSON, ESQUIRE
     McGuireWoods LLP
20   Gateway Plaza, 800 East Canal Street
     Richmond, VA 23219-3196
21   804-775-1157
     Dfinkelson@mcguirewoods.com
22        For the Plaintiff

23   Proceedings recorded by machine shorthand; transcript produced
     by computer-aided transcription.
24   _____
                    Colleen V. Wentz, RMR, CRR
25                   Official Court Reporter
                 colleen_wentz@pamd.uscourts.gov
```

APPEARANCES (cont'd)

JOHN T. FETTERS, ESQUIRE
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
206-626-6000
john.fetters@stokeslaw.com

JOSHUA D. HARMS, ESQUIRE
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
206-626-6000
josh.harms@stokeslaw.com

MARK P. MCKENNA, ESQUIRE
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
630-430-8051
mark@lex-lumina.com

LESLIE C. VANDER GRIEND, ESQUIRE
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
206-626-6000
leslie.vandergriend@stokeslaw.com
        For the Defendants

ROUGH DRAFT

```
 1          (Proceedings commenced at 10:20 a.m.)

 2          THE COURT:  The matter set for trial before this

 3    Court today is that of the Pennsylvania State University

 4    against Vintage Brand, LLC, Sportswear, Incorporated, doing

 5    business as Prep Sportswear and Chad Hartvigson.  This matter

 6    is docketed before this Court at civil No. 4:21-CV-01091.

 7          Ladies and gentlemen, as my Courtroom Deputy,

 8    Mrs. Rhinehart has indicated, I am Chief United States

 9    District Judge Matthew W. Brann.  I am a federal trial judge.

10    I was appointed to the bench by the President of the United

11    States and confirmed to this position by the United States

12    Senate under Article III of the United States Constitution to

13    serve during a term of good behavior, which has been

14    interpreted to mean for life.

15          The Court that I preside over is the United States

16    District Court for the Middle District of Pennsylvania.  This

17    federal trial court consists of 33 of the 67 counties of

18    Pennsylvania and it is divided into three venire, the Scranton

19    division, the Harrisburg division, and the division here in

20    Williamsport.

21          Let me begin by thanking you for your presence here

22    today and your willingness to serve as jurors in this case.

23    Trial by jury are rights secured by the Seventh Amendment of

24    the Constitution as the cornerstone of our judicial system and

25    it ensures that all citizens receive a fair trial by a jury of
```

**ROUGH DRAFT**

1    their peers.

2         As has often been observed, service on a jury is

3    one of the highest civic duties in this nation, second only to

4    service in the country's armed forces.  The Virginia

5    Declaration of Rights, a document that was drafted in 1776 to

6    proclaim the inherent rights of all men said and would later

7    influence several of this country's founding documents,

8    affirmed that the jury trial is preferable to any other and

9    ought to be held sacred.  Your service as prospective jurors

10   makes this system possible.  I thank each of you very much for

11   your fulfillment of this fundamental civic duty.

12        At this time, each of you is a member of the

13   venire, meaning the pool which we will ultimately choose eight

14   people to serve, and only if you are selected from this pool

15   of fellow veniremen to serve on the jury this morning will you

16   technically become a juror.  In that process, selecting the

17   eight from the veniremen is known as voir dire.  We will turn

18   to that portion of the proceedings at this time.

19        I will now conduct what is the voir dire, which

20   is a preliminary examination by the Court of all prospective

21   jurors.  Voir dire is a French term, whose rough translation

22   to English means quote, To say what is true, end quote.  As

23   the translation implies, your honesty and forthrightness is an

24   absolute requirement throughout the entire voir dire process

25   in order to ensure that this trial will be seen to completion

1    in a lawful and in a legitimate manner, free from any undue

2    influence or impropriety.  The purpose of voir dire is to

3    enable both the Court and the attorneys for the parties to

4    determine whether any of you should be excused for cause,

5    meaning that there is some legal reason, such as prior

6    knowledge of the case, familiarity with those involved, or

7    strong feelings about the subject matter which will not allow

8    to you serve as jurors in this case.  Voir dire also allows

9    the attorneys for the parties to exercise their individual

10   judgment with respect to preemptory challenges, that is

11   challenges for which no reason need be given.

12          The goal of this process is to obtain a jury that

13   can try the case objectively, based solely on the evidence

14   presented and without influence or bias of any kind.

15          The questions posed to you during this process are

16   not intended to embarrass you, but instead to give the Court

17   and the parties the information necessary to choose a fair and

18   an impartial jury.  To protect the integrity of this important

19   process, I ask each of you to listen carefully to all

20   questions and answer each one truthfully and completely.

21          The voir dire process will begin by each of you

22   reading your biography as it is listed on the form that you

23   have.  I will then ask some questions of you as a group, and

24   these questions will deal with your familiarity with the

25   parties, the attorneys, and the witnesses, and your views on

1    issues related to the subject matter of this case.  If you

2    believe that an answer to a question may raise private or

3    potentially embarrassing matters, please raise your hand and

4    simply ask to speak to me here at the bench.

5            (At this time the veniremen were questioned, and

6             the jury was impaneled.)

7        (11:57 a.m.)

8        THE COURT:  All right.  We're on the record now in

9    this matter.  The parties, through Counsel, have exercised

10   their preemptory challenges.  I would like the following

11   veniremen to please stand.  No. 1, you are Juror No. 1; No. 3,

12   you are Juror No. 2; No. 7, you are Juror No. 3; No. 8, you

13   are Juror No. 4; No. 12, you are Juror No. 5; No. 14, you are

14   Juror No. 6; No. 15, you are Juror No. 7; No. 18, you are

15   Juror No. 8.  Yeah.  17, is Juror No. 8.  This is the jury

16   that's selected in this case.  The rest of you now are

17   excused.

18            Again, if you've left any personal items in the

19   jury assembly room on the second floor, the Court Security

20   Officers will show you out.  You can retire there.  Take these

21   personal items with you.  If you don't, you are directed to

22   leave now with the thanks of the Court.  I realize many of you

23   have driven some distance to be here.  As I said to those

24   individuals who were excused for charge, this is Federal

25   Court, not County Court.  So some of you have driven two or

ROUGH DRAFT

```
 1  two-and-a-half hours to come here.  Is there anyone here from
 2  Emporium?  Usually someone from Cameron County.  Somebody from
 3  Shinglehouse?  Ulysses?  Coudersport?  Yes.  I know where you
 4  are.  I've driven to all these places.  It's not next door,
 5  is, sir?  No, it is not.  So again, thank you very much for
 6  your service here today.  You're excused with the thanks of
 7  the Court.  You may depart.
 8          Those of who you have been selected as the jurors,
 9  please remain where you are for the moment.
10          (At 11:59 a.m., the veniremen were excused.)
11          THE COURT:  Counsel, be seated.  Thank you.
12          Mrs. Rhinehart, swear in the jury, please.
13          (At this time the jury was sworn.)
14          THE COURT:  Members of the jury, now that you have
15  been sworn, I'm going to give you some preliminary
16  instructions that should serve as guidance throughout this
17  trial.  Trial will begin this afternoon and will go on until
18  probably Friday, November 22nd, 2000 24, at the latest.  As I
19  stated earlier, we will attempt to begin promptly at 9:30 a.m.
20  each morning.  We will end at approximately 5: 30 p.m. each
21  day.  We will try to break for lunch at approximately 12 to
22  12: 30 each day.  You'll be given approximately one hour for
23  lunch.  I will also endeavor to take routine breaks throughout
24  the day to give you a chance to use the restrooms and to
25  stretch your legs.  If, however, you absolutely require a
```

1    break at another time, please let one of my staff know.

2          Now a few words about your conduct as jurors.

3          First, I instruct you that during the trial and

4    until the time you retire to deliberate, you are not -- you

5    are not to discuss this case with anyone, not even amongst

6    yourselves.  I know that many of you use cell phones, smart

7    phones like Sam sung gal.  I and IPhones and other portable

8    electronic devices, lap tops, net books, and other computers,

9    both portable and fixed, and other tools of technology and

10   access the Internet and to communicate with others.  You must

11   not talk with anyone good this case or use these tools to

12   communicate electronically with anyone about the case.  This

13   includes your family and friends.  You may not communicate

14   with anyone about this case on your cell phone, through

15   e-mail, IPhone, text message or on twitter, through any blog

16   or website, through any Internet chatroom or by any other way

17   of social networking websites, including, but not limited to

18   twitter, now known as X.  Facebook, LinkedIn, Instagram,

19   123457 chat, TikTok or YouTube.  This means you should not

20   talk about the case with anyone and you should not communicate

21   with anyone about this case in any manner, such as by e-mail

22   or text message.

23         It is very important that us do not discuss the

24   case amongst yourselves until the end of the trial when you

25   retire to the jury room to deliberate.  You need to allow each

1  juror the opportunity to keep an open mind throughout the

2  entire trial.  During the trial you may talk with your fellow

3  jurors about anything else of a personal nature or comment

4  interest but not about the trial.  And also, you may tell your

5  family and friends that you have been selected to be a juror

6  in Federal Court, how long the jury -- excuse me, how long the

7  trial is expected to last, but that I have instructed you not

8  at a talk any more about the case and they should not talk to

9  you about it either.

10        The attorneys, parties, and witnesses are also not

11  permitted to talk to you about the case.  So if any attorney,

12  party, or witness does not speak to you when you pass in the

13  hall, ride in the elevator or like, remember it is not because

14  they are being rude.  It is simply because they are not

15  supposed to talk or visit with you either.  This is why it's

16  important that you wear your juror tags.  It shows that you

17  are someone who is not to be approached in any way.  If anyone

18  should try to talk to you about the case, including a fellow

19  juror, bring it to my attention immediately by telling my

20  courtroom deputy, Mrs. Rhinehart.

21        Second, do not read or listen to any anything

22  related to this case that is not admitted in to evidence.  By

23  way of example, if there is a newspaper article or radio or

24  television report relating to this case, do not read the

25  article or watch or listen to the report.

ROUGH DRAFT

1          In addition, do not try to do any independent

2     research or investigation on your own related to this case,

3     the matters in this case, or the individuals involved in this

4     case.  This means, by way of example, that you must not visit

5     the scene, conduct experiments, consult reference works or

6     dictionaries or search the Internet, websites or blogs for any

7     additional information or use a computer, cellular phone, or

8     other electronic devisor tool of technology or any other

9     method to obtain information about this case, this type of

10    case, the parties in this case, or anyone involved in this

11    case.  You must decide this case based only on the evidence

12    presented in this courtroom and my instructions about the law.

13    It would be improper for you to try to supplement that

14    information on your own.

15          Do not reach any conclusion in this case until all

16    of the evidence is in.  Keep an open mind.  Do not make up

17    your mind about the verdict until you have heard all of the

18    evidence and I have given you final instructions about the law

19    at the end of the trial and you have discussed this case with

20    your fellow jurors during your deliberations.

21          You should also not concern yourself with -- strike

22    that.  Finally, you will be allowed to take notes during this

23    trial.  My Courtroom Deputy, Mrs. Rhinehart will arrange for

24    pens and paper, and while you are permitted to take notes, you

25    are not required to do so.  How many notes you take, if any,

1    is entirely up to you.  If you do not choose to take notes, --

2    if you do choose to take notes, keep the following points in

3    mind.

4            First, do not allow note taking to distract you

5    from your task as jurors.  You must listen carefully to all of

6    the testimony and decide whether and how much to believe each

7    witness.  This will require you to watch the appearance and

8    the behavior of the witness while he or she is testifying.  It

9    may be difficult to take detailed notes and pay attention to

10   what the witnesses are saying at the same time.  Second, be

11   brief.  Do not try to write down everything that is said and

12   do not try to summarize all of the evidence.  Your notes are

13   not a transcript.  Make sure that your note taking does not

14   interfere with your listening to and understanding and

15   considering all of the evidence.

16           Third, remember that your notes are not evidence.

17   They're merely a way to refresh your memory of the evidence.

18   You should rely on your memory in reaching a decision in this

19   case.  Do not give more or less weight to the views of a

20   fellow juror just because that juror did or did not take

21   notes.  Finally, if you do take notes, keep them to yourself

22   until the end of the trial when you and your fellow jurors go

23   to the jury room to deliberate.  Be sure to take your notes

24   each time you leave the courtroom.  Please leave them in the

25   jury room when you leave at night.  After the conclusion of

**ROUGH DRAFT**

1   the case, the Court officer will collect and destroy them to

2   protect the secrecy of your deliberations.

3          Now a few words about your job as jurors and my job

4   as the judge.

5          You have two main duties as jurors.  Your first

6   duty is to decide what the facts are based on the evidence.

7   You and you alone are the judges of the facts.  You will have

8   to decide what happened.  I play no role in judging the facts.

9   Your second duty will be to apply the facts to the law that I

10  will give to you.  My role is to be the judge of the law.  I

11  can make whatever legal decisions have to be made during the

12  course of the trial and at the end of the trial, I will

13  explain to you the law which you must apply in reaching your

14  decision in this case.  You must follow the law, regard

15  whether you agree with it or not.  However,  you should not

16  take anything I may do or say during the trial as indicating

17  what I think of the evidence or what your verdict should be.

18         Let me talk to you about evidence and I'll define

19  it for.  You must make your decision in this case based only

20  on the evidence that you see and hear in court.  Do not let

21  rumors, suspicions or anything else that you may have seen or

22  heard outside of court influence your decision in any way.

23  The evidence upon which you may base your decision includes

24  only the following: One, the testimony of the witnesses, that

25  is what the witnesses say when they are testifying under oath.

1    Two, the documents and other things admitted as exhibits.

2    Three, any facts to which the parties agree, and four, any

3    facts that are judicially noticed, that is to say facts that I

4    say you must accept as true.  You should base your decision

5    only on such evidence.

6         Certain things are not evidence and must not be

7    considered.  Statements, arguments, and questions by lawyers

8    are not evidence.  Objections by lawyers are also not

9    evidence.  There are rules that control what can be received

10   into evidence and lawyers have an obligation to make an

11   objection when they believe a question or an exhibit is not

12   permitted by those rules.  However,  the objection is simply a

13   request that I make a decision on a particular rule of

14   evidence.  You should not be influenced by the fact that an

15   objection was made or by my ruling on it.  If an objection is

16   sustained, simply ignore the question.  Do not speculate about

17   what a witness might have said or what an exhibit might have

18   shown.  If an objection is overruled, treat the answer or the

19   exhibit like any other.  I may also instruct you that some

20   item of evidence should be considered only for a limited

21   purpose and you must follow that instruction.  Also, certain

22   evidence may be excluded or struck from the record, and I will

23   instruct you to disregard this evidence and you must not

24   consider any evidence or testimony that is struck or excluded.

25         At times during the trial, it may be necessary for

ROUGH DRAFT

1    me to talk with the attorneys here at the bench.  This is

2    called a sidebar or a bench conference.  During a sidebar, you

3    will hear a white noise play over the jury box.  You should

4    not be able to hear the discussion here at the bench.  If you

5    are able to hear any of the side bars, please let my Courtroom

6    Deputy, Mrs. Rhinehart know.  The purpose of these conferences

7    is not to keep important information from you.  But rather to

8    allow me to discuss with the attorneys any objections to

9    evidence and to be sure that the evidence is presented to you

10   correctly under the rules.

11           Sometimes a lawyer may request a sidebar and I may

12   not always grant that attorney's request.  Do not consider my

13   granting or denying a request for a conference as suggesting

14   my opinion of the case or what your verdict should be.

15           And finally, anything you may see or hear about

16   this case outside of the courtroom is not evidence and must

17   not be disregarded.  You must decide this case based only on

18   the evidence printed here in court, as I've noted.

19           Let me talk to you now about direct and

20   circumstantial evidence.  You'll be presented with two types

21   of evidence in this trial, direct evidence and circumstantial

22   or indirect evidence.  Direct evidence is evidence which if

23   believed directly proves a fact.  For example, a witness may

24   be testify that he saw it raining outside.  Circumstantial

25   evidence is evidence which if believed indirectly proves a

1  fact.  By way of example, if someone walked into the courtroom

2  wearing a wet rain coat and carrying a wet umbrella, that

3  would be circumstantial or indirect evidence from which you

4  could reasonably conclude that it was a raining.  You should

5  consider all of the evidence presented in this case, both

6  direct and circumstantial.  The law makes no distinction

7  between the wait that you should give to either type.

8        In weighing the evidence, you should use your

9  common sense.  Consider it in light of your every day

10  experience with people and events and give it whatever weight

11  you believe it deserves.  If your experience tells that you

12  certain evidence reasonably leads to a conclusion, you are

13  free to reach that conclusion.

14        It will up to you to decide what testimony you

15  believe and testimony you do not believe.  You are the sole

16  judges of the credibility of the witnesses.  The credibility

17  means whether a witness is worthy of belief.  You may believe

18  everything a witness says, only part of it, or none of it.  In

19  deciding what to believe you may consider a number of factors,

20  including the following: One, the opportunity and ability of

21  the witness to see, or hear, or know the things the witness

22  testifies to.  Two, the quality of the witness's understanding

23  and memory.  Three, the witness's manner while testifying.

24  Four, whether the witness has an interest in the outcome of

25  the case or any motive, bias, or prejudice.  Five, whether the

**ROUGH DRAFT**

1    witness contradicted -- excuse me.  Whether the witness is

2    contradicted by anything the witness said or wrote before

3    trial or by other evidence.  Six, how reasonable the witness's

4    testimony is when considered in light of other evidence that

5    you believe, and seven, any other factors that bear on

6    believability.

7              This is a civil case, as I have noted.  The

8    Plaintiff, the party who brought this lawsuit is the

9    Pennsylvania state university.  The Defendants are the parties

10   against whom this lawsuit are filed is Vintage Brand LLC,

11   Sportswear incorporated and Chad Hartvigson.  In this case,

12   the Plaintiff must prove its claims by standard called

13   preponderance of the evidence.  This means that the

14   Pennsylvania state university has to prove to you that what it

15   claims is more likely so than not so.  To put it differently,

16   if you were to put the evidence favorable to the Plaintiff,

17   Penn State on one side of the scale and the evidence favorable

18   to the Defendant, Vintage Brand on the opposite side of the

19   scale, the Plaintiff would have to tip somewhat on its side.

20   If Penn State fails to meet this burden, your verdict must be

21   then for the Defendants.  You may have heard of the phrase

22   proof beyond a reasonable doubt, that is a stricter standard

23   of proof that applies only in criminal cases.  It does not

24   apply in civil cases such as this one.  You should put

25   anything you may have heard about the reasonable doubt

ROUGH DRAFT

1    standard out of your mind and apply online the preponderance

2    of the evidence standard which I have just explained to you.

3              Shortly after lunch, we will begin the trial.

4    First, each side may make an opening statement.  What is said

5    in the opening statement again is not evidence but is simply

6    an outline to help you understand what each party expects the

7    evidence to show.  After the attorneys have made their opening

8    statements, each party is given the opportunity to present its

9    evidence.  The Plaintiffs' Counsel will present witnesses and

10   evidence first, because the Plaintiff has the burden of proof,

11   and the attorneys for the Defendants will have the opportunity

12   to cross-examine those witnesses.  Following the Plaintiff's

13   case, the Defendants' attorney may present witnesses and

14   evidence, and the Plaintiffs' Counsel will have the chance to

15   cross-examine these witnesses.

16             After you will of the evidence has been presented,

17   the attorneys will present to you closing arguments that will

18   summarize and interpret the evidence.  And as about -- excuse

19   necessity.  As with opening statements, closing arguments are

20   not themselves evidence.  After you've heard closing

21   arguments, I will give you final instructions concerning the

22   law that you must apply to this case.  And finally, after my

23   instructions on the law, you will apply to consider your

24   verdict.  Your deliberations are secret.  You will not be

25   required to explain your verdict to anyone.  You must reach a

1    unanimous verdict, which means that each of you must agree to

2    it.  Remember to keep an open mind during this trial.  Do not

3    make up your mind about any of the questions in this case

4    until you have heard each piece of evidence, and all of the

5    law, which you must apply.  In other words, do not come to a

6    decision until the end of the trial at which point you will

7    begin your deliberations.

8            All right, well, we are right at the noon hour, a

9    perfect place, I think, to end for the moment.  And so I'm

10   going to stand -- have you stand in recess for about an hour

11   for lunch.

12           I am not a shill for Wegman's grocery store.  But,

13   you will note that there is a Wegman's grocery store here in

14   town directly across third street.  I would commend their food

15   court to you.  Yes, I know full well that it's over priced.

16   I eat there regularly.  That's not lost on me.  But you can

17   get a reasonable variety of things to eat, and a number of the

18   restaurants in town are open, starting today, on Tuesday.

19   They will not be open on Monday, typically.  You're welcome to

20   explore that.  But again, the food court is an easy and for

21   the most part, fairly economical place to eat.  We'll stand in

22   recess for an hour, until about 1: 15 p.m.  I would like you

23   back in the building, may be 10 minutes before that, 5 minutes

24   before that.  You're going to report to the jury assembly room

25   where you were first thing this morning on the second floor.

1  The Court security officer will show you up.  There will be

2  someone from the staff will be waiting there.  And we'll try

3  to get under here another about 1:  15.  So report to the jury

4  assembly room on the second floor.  Mrs. Rhinehart, Mrs.

5  Reynolds or someone else from the staff will bring up to the

6  jury room.  Mrs. Rhinehart is going to show you the jury room

7  now, and we'll stand in resets at this time.  Please don't

8  discuss the case, I don't believe there's anything to discuss.

9  Find some other topic to talk B.  And we'll you in about an

10  hour.  Escort the jury out, please.

11          (At 12:18 p.m., the jury left the courtroom for

12  their lunch recess.  )

13

14          THE COURT:  Be seated.

15          All right.  We're back on the record now outside

16  the presence of the jury.

17          I believe there were some issues, Counsel, that you

18  wanted to discuss with me that principally relate to the

19  charge.

20          Par so I'm going to make these rulings.  I've

21  looked over everything that you've submitted the last couple

22  of days in terms of papers.  I don't think I need any

23  additional argument on this.  I heard a little bit of argument

24  this morning.  Again, I've already started to work on the jury

25  charge.  That will, of course, be modified as you'd expect

1    during the course of the trial based on the evidence and the

2    testimony presented.  But there seem to be four issues that

3    have a come up as to these instructions and let's discuss

4    those and give you some orientation of my thinking on these

5    issues at this time.

6            First, there appears to be a dispute over Vintage

7    Brand's proposed nominative fair use instruction.

8    Specifically, whether Vintage Brand may either present such a

9    defense.

10           Penn State university asserts that the only fair

11   use defense asserted in the Defendants' answers was a classic

12   fair use defense.  And I agree that it appears that the ninth

13   affirmative defense is a classic fair use offense.  Am I

14   missing something?  And if not, why Vintage Brand, should I

15   not then conclude, Mr. Fetters, that you have waived the

16   affirmative defense of nominal fair use?  After all, this

17   circuit, the United States Court of Appeals for the thirds

18   circuit, has repeatedly stated that quote, failure to raise an

19   affirmative defense by responsive pleading or by appropriate

20   motion generally results in the waiver of that defense, end

21   quote, and I am citing from, as you would expect to knows,

22   Elliott, E.  L.  L.  I.  O.  T.  T.  And Frantz, F.  C.  A.

23   N.  T.  Z.  Incorporated against Ingersol Rand company, found

24   at 4 57, fed prosecuted, 3 12, specifically at page 32 1, a

25   decision of our Court of Appeals from 2006.

ROUGH DRAFT

1          MR. FETTERS:  Your Honor, if I may defer to my

2    colleague, Mr. McKenna?

3          MR. MCKENNA:  Thank you, Your Honor.  So I think

4    the starting point here is that the Plaintiffs claim -- the

5    nature of Plaintiffs' claim and specifically what is charged

6    to be the I imagine infringement has been a moving target

7    throughout this entire case.  So it still remains unclear,

8    actually which images on any of the shirts Penn State accuses

9    of being infringing.  The emphasis on the website was a much

10   later development in the case.  As Your Honor remembers on

11   summary judgment, that question arose.  You asked for

12   supplemental briefing on the question because it was clearly

13   being argued at that time.  So Penn State's been on notice or

14   quite a long time that nominative fair use as an argument that

15   advantage was making with respect to specifically the website

16   uses.  Early in the argument, Penn State was making, it was

17   pretty advertise clear that they accused I imagine

18   infringement was referring specifically to the -- to products,

19   not to the uses on the website.  Uses on the website were just

20   the context in which those things were being sold.  Later, in

21   their more recent things, they have now started to make it

22   clear that they apparently also allegation that the uses on

23   the website are separately infringing and of course our

24   argument has always been, was on summary just a minute, was on

25   the supplemental briefing that if the -- if the products

ROUGH DRAFT

1    themselves are legal to sell, then it is legitimate for

2    Vintage Brand to sell them on the website and to refer to them

3    by name, which is with a the nominal fair use doctrine has

4    been so I think the doctrine has been in the case for quite a

5    long time.  They've been on notice of it insofar as their

6    claim refers to the website text in particular, which again,

7    has been a moving target, I think it's been pretty clear that

8    nominative fair use has been Vintage Brand's defense to that.

9            THE COURT:  Who is going to speak for Penn State?

10   Ms. Wheatley?

11           MS. WHEATLEY:  I will, Your Honor.

12           THE COURT:  Go ahead.

13           MS. WHEATLEY:  The Defendants' infringement on the

14   website was alleged in Penn State's complaint.  So Defendants

15   had the opportunity at that point to assert a Nominative fair

16   use in their defense.  As Your Honor noted, they asserted a

17   classic fair use defense.  They did not assert Nominative fair

18   use.  This has been clear from the beginning.  The website was

19   pictured in the complaint.  We discussed it in its

20   advertising.  We separated out both the goods and the way they

21   called it a Penn State Nittany Lion's store.  In raising it in

22   summary judgment does not resolve the deficiency of not

23   raising it in the pleading.  After that, discovery was closed.

24   The opportunity to depose witnesses on this issue was -- had

25   been completed.

ROUGH DRAFT

1          THE COURT:  Okay.

2          I understand.  I'll take it under advisement.

3   You'll have a read ruling in due course.

4          So second, as you all well remember, I think there

5   was a dispute in the motions In Limine about whether Vintage

6   Brand can present a defense related to anti-trust law.  I held

7   that the Defendants may present such a defense.  I was

8   initially going to ask Counsel for Vintage Brand why no

9   instructions were submitted in relation to that defense, but,

10  in Penn State's filings on Friday evening and again on

11  Saturday afternoon, they stated that Vintage Brand does not

12  intend to pursue such a defense.  Of course my decision on the

13  motion In Limine permitting evidence of anti-trust concerns

14  was premised entirely on the viability of that defense.  So

15  absence the defense, it seems to me that evidence is now

16  irrelevant in this case.  So why should I not prohibit the

17  introduction of evidence related to the  anti- trust issues?

18  Who is going to speak to that for Vintage Brand.  Mr. McKenna?

19  Mr. Fetters?

20          MR. FETTERS:  Your Honor, we think it's fairly

21  assumed within the topic of anesthetic functionality, meaning

22  that if these designs and logos on Vintage Brand's products

23  are not functioning to indicate to consumers who is

24  responsible for the quantity's products, then the alternative

25  is that Penn State is asserting these claims to control the

1    market for any images that cause the consumers simply to think

2    and invoke thoughts of the university.  And so while we have

3    no intention of explicitly making arguments, introducing

4    evidence of conspiracy to restraint trade, things like that,

5    we think that it should be fairly allowed that we make

6    arguments to -- similar to what I just expressed, that Penn

7    State is bringing this claim not because consumers are

8    confused as to the source of Vintage Brand's products, but

9    because they want to control the market of any imagery or any

10   products that simply evoke thoughts of the University, which

11   is the per se model that has been discussed it in many your

12   court's orders.

13          THE COURT:  Who is going to speak for Penn State.

14   Mr. Finkelson, go ahead.

15          MR. FINKELSON:  I will, Your Honor.  Dave

16   Finkelson.  Control the market is the language of anti-trust.

17   Your Honor allowed them to proceed with an anti-trust defense

18   in the Motion In Limine ruling.  They have communicated to us

19   and we had communicated frankly prior to that ruling that they

20   were no longer asserting it as a defense.  They reaffirmed

21   that after the fact of Your Honor's ruling.  They do not have

22   an anti-trust defense.  Evidence about controlling the market

23   or anti-competitive behaviors or suggestions is irrelevant

24   under rule 40 2, highly prejudicial under rule 40 3, and under

25   those and every other rule of evidence have zero relationship

**ROUGH DRAFT**

1    to aesthetic functionality under any articulation, whether the

2    Defendants's articulation or our articulation.

3          So we think that evidence is highly inflammatory.

4    The Defendants can tell their story without any nod to

5    anti-competitiveness, any nod to monopolization, any nod to

6    controlling the market, and we would ask that any such

7    evidence and argument be excluded.

8          THE COURT:  Good.  I'll take that under advisement,

9    as well.

10          Third, there appears to be a dispute about

11    instructions for contributory infringement.  Penn State

12    objects to any such instruction because it asserts its claims

13    against Sportswear are for direct infringement, not

14    contributory infringement.  Starting with Defense Counsel, do

15    you care to speak, perhaps, to that issue, and, in particular,

16    Penn State's assertion that contributory liability is not an

17    issue in this case.  Does Vintage Brand agree, in light of

18    that statement, that a contributory liability instruction is

19    not appropriate?

20          MR. HARMS:  Yes, Your Honor.  Penn State hasn't

21    pleaded facts supporting direct infringement against

22    Sportswear.  The only reason Sportswear is part of this

23    lawsuit is because it contributed to the alleged infringement.

24    The only theory that makes sense under the paradigm pled in

25    this case, and Penn State's upper pleading, is a contributory

1    infringement allegation is a liability for contributory

2    infringement.

3           So per the pleadings, we don't believe that there's

4    a direct claim against Sportswear for infringement, which is

5    why we believe it to be appropriate to instruct the jury in

6    that regard.

7           MS. WHEATLEY:  Your Honor, contributory

8    infringement is when the infringement contributes, say, by --

9    to providing services for the goods, but does not directly

10   affix the mark to the products or shift the products to

11   consumers.  Here, Sportswear is the party that actually

12   affixes the infringing marks to the products.  They

13   manufacture the products.  The manufacturer of infringing

14   products is always directly liable.  They are also the

15   distributor.  They actually ship the products to the

16   consumers, while Vintage Brand is the seller.  All three of

17   those are well-recognized bases for direct liability.

18          THE COURT:  All right.  Good.  I'll take that under

19   advisement, as well.

20          And fourth, Penn State is proposing an instruction

21   regarding licenses, and licensees to which Vintage Brand

22   objects.  So I assume the only licensee at issue here is CLC,

23   but perhaps I'm wrong.  So is there a dispute here about what

24   the licensor or licensee relationship has, in some way,

25   corrupted or destroyed Penn State's trademark rights here such

1    that anything beyond a basic instruction regarding licensor or

2    licensee relationship is required?

3         MR. MCKENNA:  Your Honor, I think the objection is

4    essentially that the mere reference to trademark rights

5    arising out of licensing grossly understates the actual legal

6    rules about the circumstances under which licensors are able

7    to establish trademark rights, and so I think our request is

8    if there's going to be an instruction along those lines, then

9    it needs to actually track the law and it needs to actually

10   the jury to make of findings about quality control and actual

11   quality control by Penn State, and not just contractual

12   references to it.

13        MS. WHEATLEY:  Your Honor, Defendants have taken

14   the position that the only trademark source of a product is

15   the manufacturer.  That is one of the things they have argued

16   in the jury instructions they have proposed and to limit

17   source to that.  The Lanham Act expressly recognizes

18   licensing.  There is a section of the Lanham Act that goes

19   precisely to that point that the licensor steps into the shoes

20   of the licensee, and that the licensee's use and the rights

21   therefrom inyour to the benefit of the licensor.  In other

22   words, Penn State steps into the shoes of its manufacturers

23   and the rights they derive from selling Penn State-branded

24   products go to Penn State.  And because of their argument that

25   only the manufacturer is the source, we think it is important

1    here to have an instruction for the jury so that they

2    understand that a license sore can still own a trademark and

3    have trademark rights from that.  And our instruction is

4    entirely consistent with the Lanham Act.  It's a separate

5    section.  And the Lanham Act does not require, you know,

6    extensive quality control.  But we're going to put on evidence

7    of quality control.  So I don't think that's an issue.

8              THE COURT:  All right.  Thank you.

9              MR. MCKENNA:  Can I respond to that quickly?  I

10   just want -- I think Counsel's conflating two different points

11   that I just want to make sure the Court is clear about.  So

12   the argument that Vintage Brand has consistently made is that

13   with respect to understanding the use by Vintage Brand on --

14   on its clothes that Plaintiff needs to prove that that's use

15   as a trademark, that's got one definition under the Lanham

16   Act, the use and commerce requires use to identify the source

17   of a particular product.  That's with respect to the proof

18   regarding the nature of the use on Vintage Brand's products.

19             This argument is about the acquisition of rights by

20   Penn State.  We don't dispute that the Lanham Act says that a

21   party is entitled to claim trademark rights by virtue of the

22   rights that derive from its licensee.  But it is the

23   definition of a related company under the Lanham Act that in

24   order to acquire rights in that way, you must establish

25   quality control.  So our -- again, our objection is that if

1    the jury is going to be instructed about rights acquired

2    through licensing, they need the whole picture of what's

3    required in order for that to be true.

4         MS. WHEATLEY:  Your Honor, to my knowledge,

5    Defendants have never challenged that there is quality control

6    here, and we are going to put on evidence of the same, and

7    they have not actually challenged Penn State's rights in that

8    respect.  And most importantly, they have not alleged any sort

9    of abandonment affirmative defense, which is what they would

10   have had to do if, at this late stage, they wanted to say Penn

11   State does not control use of its marks.  So a jury

12   instruction on that point would be going to an issue that is

13   not in the case.  So I think it would be very, very confusing

14   to the jury.

15        THE COURT:  All right.  I'll take that under

16   advisement, as well.  Thank you.

17        And finally, there seems to be an issue unrelated

18   to the jury instructions.  So we talked about this in camera

19   earlier.  Penn State, last Tuesday, filed a stipulation of

20   facts between the parties, although it appears that the

21   stipulated facts are not entirely stipulated to, as we

22   discussed earlier off the record.

23        So specifically, as I understand it, Vintage Brand

24   complains that Penn State is improperly refusing to stipulate

25   to Vintage Brand never sold merchandise featuring certain

ROUGH DRAFT

1  marks.  Penn State, do you generally contest this fact?  And

2  furthermore, I should add, Vintage Brand objects to the

3  inclusion of paragraphs 28 through 33 on relevance grounds.

4         So I'll start with you, Ms. Wheatley.

5         MS. WHEATLEY:  We do contest the fact that -- that

6  we should be required to stipulate that Vintage Brand has

7  never sold goods with certain Penn State marks.  There is

8  testimony, under oath, that they have designated it goes to

9  some of those marks.  And we do not have a complete record of

10 their website.  There is evidence in the case that the

11 memorabilia they assembled and that they applied to

12 merchandise includes memorabilia which has the marks that

13 they're saying we should stipulate they have never used.  So

14 we don't feel we can do that.

15        MR. HARMS:  Yes, Your Honor.  The fact that Vintage

16 Brand never made available the Lion head or chipmunk, as it's

17 occasionally called, and the paw print design on its website

18 is completely uncontested in this case.  Penn State is not

19 going to put on any contrary evidence, and under the local

20 rules, they are required to stipulate to that fact.  The only

21 party that's offering evidence contrary to that fact is

22 Vintage Brand itself.  And Vintage Brand is offering that

23 evidence, the testimony of Ms. Maffey to prove that it's

24 wrong, not to prove that the fact that those logos actually

25 appear on the website.

ROUGH DRAFT

1          So Penn State is not offering contrary evidence.

2    The fact that it's not contested otherwise, they should be

3    required to stipulate to it.

4          THE COURT:  How soon do you need a ruling on that

5    stipulation?  Is it going to affect these openings?

6          MR. FINKELSON:  I don't think the stipulation

7    affects the opening.  But it was our intent, Your Honor, to

8    read and put in to evidence the stipulation before our first

9    witness today, following openings.  And this is a little bit

10   of a different kind of factual stipulation because it's got

11   visuals, and I know it's typically just read into the record.

12   But it is our intent to present those stipulations to the jury

13   at the start of the presentation of our case following opening

14   statements.

15         THE COURT:  All right.  Well then I'll have a

16   ruling for you -- I can make a ruling on that issue over the

17   lunch hour.  I'll give you that ruling before you begin your

18   opening statements in an hour or so.  All right.  I think that

19   covers it, at least based on what I can see from your papers

20   over the course of the weekend.

21         All right.  Well, let's say -- you'll need about an

22   hour or so for lunch.  I think realistically, we are probably

23   -- and I need to research this one issue to my satisfaction.

24   So we'll stand in recess, and we'll assume we'll be back on

25   the record at about 1:30.  Mr. Finkelson, you're going to open

1    for Penn State?

2            MR. FINKELSON:  I am, Your Honor.

3            THE COURT:  And, Mr. Fetters, you're going to open

4    for Vintage Brand.  You anticipate these openings, somewhere

5    around half an hour each, I think?

6            MR. FETTERS:  Yes.

7            THE COURT:  And then we'll deal with -- I assume

8    you have at least some witnesses lined up.  Do you have a

9    sense of -- is it a number of witnesses, Ms. Wheatley?  Mr.

10   Finkelson?  Is it one or two?  By the time we -- I'm just

11   trying to discern where we will be.  We will probably be -- we

12   will probably be -- we will probably be done with opening

13   statements somewhere in the 2:30 lineup.  You might want to

14   decide at this point whether we should take a short recess at

15   that point or not.  We can.  I typically try to go an

16   hour-and-a-half to an hour and 45 minutes, you know, before

17   there's a recess.  And Mrs. Rhinehart instructs the jurors,

18   you know, use the restroom.  This is the time to do it, on the

19   recess.  It's not to be -- I don't want to interrupt you in

20   the trial.  There apparently happens -- it happened downstairs

21   last week in another trial.  Unbelievable.  Somebody had to go

22   to the bathroom, you know, in between the recesses, in my

23   mind.  But it happened.  So they get pretty clear instructions

24   here on what they do and what they shouldn't do.

25            So you might want to chart that out in your mind in

**ROUGH DRAFT**

1    terms of, you know, who you're going to call, the amount of

2    time it will take for direct and cross examination, and again,

3    I would like to get as much done today, the first day,

4    disrupted, obviously -- necessarily disrupted by the voir dire

5    process, which is nevertheless conducted, fairly

6    expeditiously.  So sort of think about that in terms of your

7    lineup of people.  But I think you'll be under way in the

8    trial probably in the 2:30, to 2:45 time frame.  And then we

9    will press on accordingly.

10           Is there anything else I need to know before I go

11   to lunch?

12           MR. FETTERS:  No, Your Honor.

13           THE COURT:  All right.

14           MR. FINKELSON:  No, Your Honor.

15           THE COURT:  All right.  You'll have the one ruling

16   on the one issue before the jury is reassembled so you can

17   prepare accordingly with regard to the stipulations.  All

18   right.  Very good.

19           Court will rise, then, until about 1:30 p.m.  Court

20   will rise.

21           (At 12:37 p.m., a lunch recess was held.)

22           (1:44 p.m.)

23           THE COURT:  All right.  We're back on the record

24   after our luncheon recess.  The jury remains in the jury room.

25   Before we bring the jury in, I will briefly rule on some of

ROUGH DRAFT

1   the outstanding issues that will impact our trial.  First,

2   given the parties' statements and Vintage Brand's statement

3   that it will not pursue an anti-trust defense, I find that

4   evidence related to anti-trust concerns is no longer relevant,

5   and such evidence has little, if any relevance to an aesthetic

6   functionality defense, and any possible relevance is

7   substantially outweighed by the possibility of unfair

8   prejudice confusing the issues and wasting time.  Evidence

9   related to anti-trust concerns will therefore be excluded from

10  the trial.

11          Second, as to the issues regarding the proposed

12  stipulations, frankly, it doesn't seem to the Court to be of

13  any great reason why the parties cannot stipulate to the

14  contested fact, for whatever reason, the stipulation cannot be

15  reached.  So I'm not going to put my thumb on the scale,

16  so-to-speak, and force any stipulations to which the parties

17  do not agree.  And therefore, the parties should leave out

18  Vintage Brand's proposed stipulation and also strike

19  paragraphs 28 through 33 from the stipulations.  The parties

20  may present whatever evidence they believe is necessary to

21  prove these facts, subject, of course, to the Federal Rules of

22  Evidence.

23          So I think I've addressed the immediate issues we

24  have to be concerned with.  Mrs. Rhinehart, if you want to

25  escort the jury in.

ROUGH DRAFT

```
 1        MR. MCKENNA:  Your Honor, if we can bring the jury

 2  in.  I want --

 3        THE COURT:  Slow down a little bit.  You're

 4  excited, but the court reporter is not so much.

 5        MR. MCKENNA:  I just wanted to add one thing on the

 6  nominative fair use, which I understand you've still taken

 7  under advisement and not ruled on.  Counsel referred to the

 8  Complaint.  During the break, we had a chance to look at the

 9  Complaint again, and I recommend to the Court, in the

10  Complaint, the Complaint -- all of the allegations of

11  infringement are by references to what are called the

12  infringing marks.  The infringing remarks is a defined term

13  and in the Complaint, the definition of infringing marks done

14  entirely by references to the shirt.  There's no separate

15  allegations regarding infringement in any other way.  There

16  are allegations that the shirts are sold on the website.  But

17  there are no additional allegations that are specifically

18  addressing infringement in any way, other than on the shirts.

19        Obviously, Vintage Brand can't have waived an

20  affirmative defense to conduct that was not clearly

21  articulated as infringing, which is what our nominative fair

22  use has always been focused on, which is not the shirts, but

23  the image -- the website references and all of the other

24  things.  So I just wanted to draw the Court's attention to

25  that.  I also draw the Court's attention to a recently decided
```

ROUGH DRAFT

1    third circuit case, Artoss, A-r-t-o-s-s, Inc., versus Artoss

2    GMBH.  There's not a federal reporter citation, but it's a

3    2024, West Law, 282, 7927.  Holding that the trial court

4    didn't err when instructing the jury on nominative fair use,

5    even though it mentioned until the Eve of trial.  Obviously

6    this is not a circumstance where it was only mentioned on the

7    Eve of trial.  This came to the Court's attention and the

8    Counsel in the Daubert hearing in May of 2023.

9              MS. WHEATLEY:  Your Honor --

10             THE COURT:  Well, do you have a microphone?  All

11   right.  Use Mr. Finkelson's?

12             MS. WHEATLEY:  I'll read from the Plaintiffs

13   Complaint.  Additionally -- this is paragraph 91.

14   Additionally, Defendants' web page for Penn State is titled

15   quote, Penn State Nittany Lion Vintage designs for apparel

16   gear and clear attempt to associate Defendants' goods with

17   Penn State and the goodwill Penn State has built over decades

18   embodied in the university marks.  I believe we very clearly

19   stated that the text on the website was part of our

20   infringement claim and we also in our count for federal

21   trademark infringement referenced the advertising of the

22   goods.'  with contend that the Defendants were very much on

23   notice that we allegation the website.  This is in addition to

24   repeated pictures of the full website and the body of the

25   complaint.

ROUGH DRAFT

1           THE COURT:  Thank you.

2           All right.  The Court am take that under

3    advisement.  Anything else?

4           MR. MCKENNA:  No, Your Honor.

5           THE COURT:  Let's get under way.  Mrs. Rhinehart,

6    escort the jury in.

7           (At 1:47 p.m., the jury entered the courtroom.)

8           THE COURT:  You may be seated.

9           All right.  We're ready to hear opening statements,

10   I believe.  Mr. Finkelson, you're opening for Penn State, I

11   believe?

12          MR. FINKELSON:  I am, Your Honor.

13          THE COURT:  Go right ahead, sir.

14          MR. FINKELSON:  Thank you.  You can't take what

15   doesn't belong to you.  Someone else's home, their car,

16   groceries you haven't paid for.  And most importantly, for

17   purposes of this case, you can't take somebody else's good

18   name.  Their identity.  For my client, that good name, that

19   identity is the Pennsylvania State University.  Penn State and

20   the symbols that the University owns and uses to communicate

21   to the public who the University is and what it stands for.

22          Walk onto any one of the more than 20 Penn State

23   campuses across the Commonwealth.  Visit any of the

24   businesses.  Many of them family owned who make a living

25   selling authentic Penn State merchandise with our permission.

ROUGH DRAFT

1   And Penn State's identity is impossible to miss.  The school

2   traces its roots back to the 1,800s.  And the evidence in this

3   case will show that for decades and decades Penn State has

4   protected its identity with trademarks.  Words and logos that

5   are registered with the United States patent and trademark

6   office that the University owns and that the University uses

7   to tell the world we are Penn State.  We stand for education,

8   for research, for community, for quality, and for excellence.

9          For Penn State, those words and symbols, its

10  trademarks, which I think you can now see up on your screens,

11  are symbols of the university's reputation.  And for the

12  businesses, many in Pennsylvania who play fair and by the

13  rules, who seek and get permission to use Penn State's

14  trademarks on merchandise and give some of the proceeds of

15  those merchandise sales back to the University, Penn State's

16  trademarks mean a livelihood.

17         But the evidence in this case will show that for

18  these Defendants, from Seattle Washington, Penn State's

19  trademarks are just a way to make a quick buck.  By breaking

20  the rules that everybody else plays by.  By just taking and

21  copying the trademarks that belong to Penn State and putting

22  them on t-shirts, you can see them up on your screen and

23  you'll hear about this during the trial, putting Penn State's

24  trademarks on t-shirts and other merchandise that the

25  Defendants sell on their own website without any permission

**ROUGH DRAFT**

1  from Penn State at all.  Profit unfairly and unlawfully from

2  the reputation that Penn State and so many others that spend

3  so much time, effort, and money, the millions of parents,

4  students, faculty, alumni and Pennsylvania merchants who

5  support the University.  And we're here, ladies and gentlemen,

6  to ask you please make the Defendants stop once and for all.

7  Give us back our name.

8          I'm Dave fin, and together with my law partner,

9  Lucy Wheatley and our team, we have the honor and the

10  privilege of representing Penn State in this case, and I want

11  to start on behalf of us, but most importantly on behalf of

12  our client, Penn State, by saying thank you.  Thank you for

13  serving on this jury.  We know what a sacrifice it is.  It is

14  taking you away from our families and your daily lives.  And

15  we're going to do our best in this trial to present the

16  evidence to you as efficiently and as clearly as we know how.

17          So this is a case about trademarks.  So first and

18  foremost, what is a trademark.  Well you already know more

19  than you may think.  Slide four, please, Mr. Burkhart.  A

20  trademark can be a name, a logo, or a design.  It's often

21  referred to as a brand.  And here's the thing.  Anyone can own

22  a trademark.  Me, you, a mom and pop business, a community

23  organization.  Penn State.  There are some examples of

24  trademarks for apparel up on your screen.  The United States

25  Marine Corps, the band, the rolling stones, the Olympics, the

ROUGH DRAFT

1    Pittsburgh Steelers, the Red Cross.  But trademark symbolizes

2    its owners' reputation.  And it tells you, as a consumer, who

3    stands behind the product.

4          You're going to learn in this case that trademarks

5    are a type of property.  And in many respects, owning a

6    trademark is a lot like owning other types of product.  Think

7    of a car or your home.  And just like a homeowner has every

8    right to keep trespassers off of their land, a trademark

9    owner, like Penn State, has the right to the exclusive use of

10   its trademark property and the right to decide who else can

11   use it.  And when someone, here, the Defendants, takes a name

12   or logo that belongs to someone else, Penn State, without

13   permission and in a way that is likely to confuse the public,

14   that's known as trademark infringement.  It's also called

15   unfair competition, which makes sense, right, because it's not

16   fair to do that.  It's not fair to Penn State.  It's not fair

17   to the small businesses who are playing by the rules.  And

18   it's not fair to consumers who may be confused in to thinking

19   that Penn State stands behind these Defendants' merchandise,

20   when that's not the case at all.

21          Which brings me to three things that I want to

22   preview for you in our short time together this afternoon, and

23   that the evidence in this case will show.

24          First, Penn State owns its name and logos as

25   trademarks.  In fact, as you'll hear, many of those trademarks

1   have been registered with the United States patent and

2   trademark office for so long that they're known as

3   incontestable.  Nobody can say Penn State doesn't own them.

4   Nobody can say that they're not valid trademarks.

5          Second, the Defendants, Chad Hartvigson and two of

6   his companies, Vintage Brand and sportswear have sold Penn

7   State apparel and merchandise on their Vintage Brand website

8   without Penn State's permission.  The evidence will show that

9   the Defendants infringed Penn State's trademarks.  They have

10  competed unfairly.  Third, the Defendants have done it on

11  purpose and they will do it again in a heartbeat if you let

12  them.  And that's where Penn State needs your help.

13         Many cases that end up in front of a jury like you

14  are about lots of money.  I'm going to tell you from day one,

15  this isn't one of those cases.

16         Yes,  the Defendants have already profited wrongly

17  from Penn State's trademarks.  And they should pay a price for

18  that.  But the amount of money that Defendants have already

19  made isn't why we're here today.  We're here because Penn

20  State, like any other university or organization or business

21  who owns trademarks has an obligation to protect those

22  valuable trademarks.  And because we can't stop Mr. Hartvigson

23  and his companies by ourselves.

24         As you'll hear, we tried because when all this

25  started, that's exactly what Penn State asked Mr. Hartvigson

1    to do.  Just stop.  But Mr. Hartvigson and his companies

2    wouldn't stop.  Penn State didn't want to file this lawsuit.

3    Penn State had to file this lawsuit to protect its trademark

4    property, to protect its reputation, and to protect all those

5    people out there who do respect Penn State's trademarks and

6    who benefit from using those trademarks lawful.

7            But bringing this lawsuit, as you'll learn, only

8    did the job part way.

9            As you'll hear, it led Mr. Hartvigson to put a

10   temporary pause on selling Penn State merchandise until this

11   lawsuit is over.  The key word there is temporary.  Because

12   Mr. Hartvigson makes no bones about it, he and his company

13   will start selling Penn State trademark merchandise again

14   tomorrow, at the click of a button, unless you tell him it's

15   not okay.

16           This trial is Penn State's only way to put a stop

17   to Defendants' unlawful use of our trademarks for good.

18           So let's talk about those Penn State trademarks

19   that are so important in this case.  They're on the board that

20   is up in front of you.  Penn State owns other trademarks as

21   well.  But the ones that you see on the board are the ones

22   that will all be focused on in this trial.  The evidence will

23   show that every one of these trademarks is meaningful and

24   valuable.  Not because they're especially pretty advertise.

25   Not because Penn State is the only thing that you can call a

1   university or the Nittany Lion is the only mass could the that

2   you can pick for a university.  They're meaningful and

3   valuable because of the reputation that Penn State and so many

4   others in its community have built in these names.  They're

5   meaningful and valuable because these trademarks have come top

6   represent Penn State and its reputation and nothing else.

7           As you'll learn, each of these trademarks also has

8   a story.  You'll hear that from Jackie he's pose.  Ms.  He's

9   pose is the retired librarian.  University.  She worked at

10  Penn State for 35 years and she literally wrote the book on

11  Penn State's symbols and they're historical symbols.  's going

12  to be the first witness we put on the stand this afternoon.

13  Ms. Esposito can you please stand so the jury can see you?

14  Thank you.

15          Let's start with the Penn State trademark.  It's

16  the one at the top of the board and everyone in this room has

17  heard of this one.  The earliest reference we could find was

18  in a yearbook from 18 90.  And in the early 1980's after many

19  years of using the name Penn State, Penn State applied for and

20  received from the United States patent and trademark office

21  the first of many trademark registrations that it's received

22  for the words Penn State in any font or style.

23          As you already know, trademarks are property.  And

24  just like your house or land comes with a deed or your car

25  comes with a title that tells the world you own it.  So, too,

ROUGH DRAFT

1   in trademarks.

2           This is the official trademark registration for the

3   trademark Penn State.  You can tell by the gold seal that's on

4   the very first page.  It tells Penn State.  It tells the

5   world, it tells you that Penn State owns it and has the

6   exclusive right to use it on merchandise.

7           The Pennsylvania state university trademark, the

8   second one on the board, the University's official name T.

9   Got that name in 19 53 and it's used it ever since.  If you've

10  ever been to a Penn State football game, the Pennsylvania

11  State University is etched in stone right next to Beaver

12  Stadium.

13          The University seal trademark.  It's the third one

14  down from the burden of proof.  That, too, was created in 19

15  53 when the University adopted the Pennsylvania state

16  university as its formal name.  It appears on a ton of

17  authentic Penn State merchandise.  But more importantly, it

18  appears on every Penn State diploma.  If you're a graduate of

19  a college or a I offer the or a high school, a diploma

20  symbolizes all the hard work you put in and that you made it.

21  And for graduates of any of Penn State's campuses across

22  Pennsylvania and for their families who helped them get over

23  the line, the University seal symbolizes that accomplishment.

24          But you'll learn in this case that not only are the

25  Defendants trying to get away with using the University seal

1   on the merchandise that they sell, they're actually trying to

2   take the University seal away from Penn State.  Believe it or

3   not, they are going to ask you in this trial to cancel the

4   seal trademark so that Penn State would not own its own seal

5   any more.

6           They're claim is that the University seal, which

7   truthfully reflects that Penn State is a public university,

8   and it says the Penn State University right on it, looks too

9   much like an insignificant any I can't of the Commonwealth of

10  Pennsylvania to be a trademark in its own right.

11          Well, the patent and trademark office didn't think

12  so.  It granted Penn State a trademark registration for the

13  University seal way back in 1984, and it's renewed it ever

14  since.  And the Defendants haven't located a single person who

15  second guesses is that.  The Nittany Lion shrine trademark.

16  The next one down on the board, it's a logo of a sculpture.

17  You probably don't know that, but there's a Nittany Lion

18  shrine sculpture on virtually every Penn State campus.  It's a

19  place to go, the place to celebrate.  The first one was

20  actually a gift of the class of 1940.  Four members of that

21  went off from that class to fight for our country in World War

22  II.  The Pozniak lion trademark.  The next to the last one on

23  the board in front you.  This one was defined by the artist,

24  Ray Pozniak in the late 1970s.  Throughout the 1980s, it was

25  actually a primary of symbol of the university's athletic

ROUGH DRAFT

1    programs, and when Mr. Pozniak passed away, the family granted

2    the rights to the Pozniak lion trademark to Penn State, which

3    has continued to honor the family's wishes by allowing a few

4    groups to use the trademark going forward, the Nittany Lion's

5    Wrestling Club, and a group called the Lion Ambassadors, which

6    is run by Penn State Alumni, and as the name suggests, are

7    ambassadors for the University for its legacy and for its

8    reputation.

9         Every one of the trademarks that I've talked about

10   so far has a registration with one of these gold seals on it.

11   Issued by the Government that says it belongs to Penn State,

12   not to the defense.

13        So when you see authentic merchandise out in the

14   marketplace with these registered trademarks, you often notice

15   it because it has a symbol with an R inside of it, and you can

16   see it on the are.  That's R or registered trademark.

17        What you'll also learn in this case is there's a

18   second way in this country to own a trademark and have all the

19   rights that come with owning it.  If you use it first and then

20   you use it continuously on products, it's yours, even if you

21   don't register it.  And no one else is allowed to use that

22   trademark in a way that confuses the public.

23        That's the case with the last trademark on the

24   board, the S lion.  And you can tell it's one of those

25   trademarks, because it has the letters TM next to it at the

ROUGH DRAFT

1  bottom.  That's TM for trademark.  The S lion symbol has a

2  long history dating back to when the Nittany Lion was pictured

3  as having a mane.  Bringing that history to life, Penn State

4  has been branding apparel and merchandise with the S. Lion for

5  years.  Long before the Defendants ever launched their Vintage

6  Brand website.

7        Now, Penn State authorizes hundreds of companies,

8  large and small to put Penn State's trademarks on apparel and

9  merchandise sold to the public online and in stores.  Is that

10  authorization is known as a license.  Think permission.  It's

11  a mutual agreement between Penn State and its licensees and

12  its mutually beneficial.  Penn State grants those licenses

13  with the help of a company called collegiate Licensing

14  Company, which is one of several entities out there that help

15  universities like Penn State connect with manufacturing and

16  retail partners so that retail letters can sell authentic Penn

17  State merchandise at all price points, low, medium, and

18  higher, to meet customers' needs.

19        And they sell that authentic merchandise and make

20  it available to customers pretty much everywhere, whether

21  that's at the Kohl's that's across the street or the Walmart

22  that's into or near the town where you live or online at

23  dick's sporting goods dot com or at any other legitimate am

24  legitimate websites.  But you're here in this trial, what

25  really sets Penn State apart from most other colleges and

1    universities is that so many of those legitimate authentic

2    merchandise sales are made by businesses right here in

3    Pennsylvania.  Those Pennsylvania businesses, their employees

4    depend on the sale of Penn State branded goods for their

5    livelihood.

6         In fact, the highest seller any where of authentic

7    Penn State branded merchandise, number one, is a store called

8    family clothes line, a family business in State College.  You

9    can see a picture of the store front of the Family Clothes

10   Line up on your screen.  You can also see the Lion's Pride

11   which is on the same street in State College, and is also

12   among the top sellers.

13        Back in the gallery today, I saw Caroline Gummo, a

14   Penn State alum, who runs the Family Clothesline, along with

15   her husband.  Ms. Gummo took time out of her day to drive here

16   today because this case is important to her, to her family,

17   and to her employees also.  Ms. Gummo, can you please stand so

18   that the jury can see you?  Thank you.

19        I'd also like to ask Stephanie Petulla to stand.

20   Ms. Petulla, also a local Penn State alum is Penn State's

21   director of licensing and visual identity.  She's at the table

22   with us today.  She's going to be here right next to you for

23   the whole trial at our table on behalf of Penn State.  Thank

24   you, Ms. Petulla.

25        Ms. Petulla will testify to you about the Penn

**ROUGH DRAFT**

1  State brand, that she helped build with these local businesses

2  and others, to ensure that Penn State's trademarks are used in

3  a way that helps the University and that protects its

4  reputation, and about how the people who make and sell genuine

5  Penn State merchandise adhere to Penn State's standards for

6  quality, Penn State's standards for safe working conditions

7  and for paid labor.

8         All of that is part of Penn State making sure that

9  customers know that the University stands behind its

10  merchandise, that customers can trust in it, so that when it

11  arrives in the mail to you or to the person you gave it to as

12  a gift, you get what you paid for, the real deal.

13         But when these Defendants sell what they sell,

14  using Penn State's trademarks, they don't have permission.

15  They don't have a license.  None of what they sell is subject

16  to Penn State's quality standards, and not a cent of the money

17  made from those sales goes back to benefit the University or

18  the company.  It just goes straight into the Defendants'

19  pockets.

20         So I've talked about the long history of Penn

21  State, the long history of Penn State's trademarks.  Defendant

22  Vintage Brand's history is a lot shorter.

23         You'll learn that out in Seattle, Mr. Hartvigson

24  started selling Penn State-branded goods on his website in

25  2018.  Those goods are printed and distributed by another

1   Defendant in this case, Prep Sportswear, which is another

2   company for which Mr. Hartvigson is the CEO and a large

3   shareholder.  Vintage Brand, just like the company's name

4   suggests.  It sells so-called vintage versions of other

5   people's brands.  No one is off limits.  Small colleges, big

6   universities, professional sports teams.  You name it.

7   Vintage Brand sells it.  Prep Sportswear prints and ships it.

8   So you can see, this case is about a lot more than just Penn

9   State.

10          So how do the Defendants pull it off?  What you'll

11  learn in this case is that Defendants start by acquiring

12  pieces of memorabilia, of Penn State and others.  Think about

13  a ticket stub or a button or a pennant.  But the Defendants

14  don't resell that memorabilia.  This is not a case about

15  reselling on E-Bay or reselling at a secondhand store.

16  Instead, the Defendants take that memorabilia and they run it

17  through a scanner, a scanner, just like you may have seen at

18  your office or at the local copy store.  They create a digital

19  image of Penn State's trademarks, and they transfer those

20  trademarks onto a t-shirt or a sweatshirt or a hat, a mug, a

21  pennant, and they slap a Vintage Brand label on it.

22          They literally copy the trademarks that Penn State

23  and so many in its community have worked to build.  And they

24  put those trademarks on merchandise that Vintage Brand sells

25  itself online.

1          Can I have slide 6, please, Mr. Burkhart?  You're

2     now looking at a page straight from the website that Vintage

3     Brand uses to pull off those sales.  You'll learn in this case

4     that the Vintage Brand website looks very much like other

5     websites out there selling authentic Penn State merchandise,

6     and that's no accident.

7          You'll actually hear by video the testimony under

8     oath of a consumer and Penn State alum, Meghan Matthew who

9     went to the Vintage Brand website and thought that it was

10    authorized by Penn State.  It's not.  But you can see on the

11    screen in front of you why she thought it was.  It's titled

12    Penn State Nittany Lion's vintage designs.  We put a red box

13    around it for you.  And as you can see, the few examples I

14    showed you when I first started talking today are just the tip

15    of the iceberg.  The Vintage Brand website offers for sale one

16    item after another, bearing the Penn State brand, the

17    trademarks that belong to Penn State.

18         What false impression about a connection to Penn

19    State does that give to consumers who visit the Vintage Brand

20    website?  That's a question about confusion, which is one of

21    the things that you're going to be asked to consider in this

22    case, whether any consumers are likely to be confused in to

23    thinking that Defendants' merchandise is put out by or

24    sponsored by, approved by or affiliated with Penn State when,

25    in fact, it isn't.

**ROUGH DRAFT**

 1          As you'll hear, and it makes sense, Defendants'

 2   merchandise doesn't have to be identical to the real thing for

 3   there to be confusion.  The question is whether it is similar

 4   enough to the real thing that when consumers see it, they

 5   think, mistakenly and incorrectly, that it has Penn State's

 6   permission.

 7          Now, as with everything else in this case, you can

 8   and should use your common sense to answer that question.  But

 9   we tested it for you, too.  You're going to hear in this trial

10   from David Franklyn, a trademark law professor at the Arizona

11   State School of Law, who specializes in conducting what are

12   known as trademark confusion studies.  Professor Franklyn

13   performed one of those studies in this case, and as he'll walk

14   through with you, it confirmed what your intuition may already

15   be telling you.  Mr. Hartvigston and his companies are causing

16   substantial confusion.

17          About one out of every three people Professor

18   Franklyn tested, believed that Vintage Brand's merchandise had

19   Penn State's blessing, which it doesn't.  As you'll learn,

20   that's more than twice, more than twice the amount of

21   confusion that all the experts in this field agree is too

22   much.

23          One more word on confusion.  Having listened to me

24   this afternoon, you already know a heck of a lot more than the

25   average consumer about genuine Penn State merchandise on the

1    one hand and Defendants' merchandise, that the evidence will

2    show, is infringing.

3           Take a look, please, at the merchandise that's been

4    up on this display the whole time I have been talking.  Ask

5    yourselves.  Is all of this merchandise the real deal?  Or is

6    it all of it fake?  Or is some the real deal and some the

7    fakes?  And if it's a mix of both, which is which?  If you

8    can't tell for sure today, just imagine what you would have

9    felt coming across these products yesterday while shopping

10   online or seeing someone wear them down the street.

11          So, in the face of all of this evidence, is there

12   any reason why Penn State should be treated differently than

13   every other owner of trademark property.  Is there any reason

14   why the rules that apply to everyone else don't apply to

15   Mr. Hartvigson and his companies?  Listen to the evidence.

16   Use your common sense.  And the only answer to that question

17   is no.

18          Mr. Burkhart, can I have slide 7, please?

19          The Defendants will tell you that what they do is

20   okay, as long as you just read the fine print.  If you squint

21   at the screens in front of you, you may be able to see an

22   example of the fine print that the Defendants like to talk

23   about at the top where Vintage Brand says on its website it is

24   not affiliated with the Penn State Nittany Lions or the

25   University book store or any college.  These so-called

1    disclaimers, the evidence will show, they don't make any

2    difference.  The fine print doesn't prevent confusion; that's

3    common sense; and the scientific studies that you'll hear

4    about in this case confirm it.

5            Defendants may also try to tell you that what they

6    do is okay because they sell to fans.  But the evidence will

7    show that selling to fans is no defense for the Defendants'

8    trademark infringement, and it's no use for that trademark

9    infringement either.

10           The university, as you already know, who have fans

11   and supporters have trademark rights, too.  Just like

12   individuals and small businesses and professional sports teams

13   and everyone else who owns and protects its reputation with a

14   name or a logo.

15           I showed you earlier today the Steelers and Rolling

16   Stones trademarks.  When you buy a Steelers shirt at a game or

17   a Rolling Stones shirt at the concert merchant, are you a fan?

18   Yes.  Would you also think that the Steelers or Rolling Stones

19   must have given permission for their names and logos to be

20   used on that t-shirt, that they're getting a share of the

21   proceeds?  Of course.  Can you, as a fan, run home, snap a

22   digital picture of the names and logos on that t-shirt and

23   start selling t-shirts yourself, featuring The Rolling Stones

24   and the Steelers?  Of course not.  And the Defendants can't do

25   that to Penn State either.

ROUGH DRAFT

1    And that brings me to my final point, and one that

2  I would ask you to be on the look out for when you hear those

3  and other excuses from the Defendants during the course of

4  this trial.

5    What will the evidence show is the Defendants' real

6  intent in this case.  Slide eight, please, Mr. Burkhart.

7  First, it will show that Defendants know exactly what

8  trademarks are and how important they are.  Both Vintage Brand

9  and Prep Sportswear have trademarks in their own names or

10  logos.  You see on your screen, Vintage Brand's trademark on

11  merchandise on the hat in the top corner.  Why?  Because

12  trademarks mean something.  They have value.  And the

13  Defendants know it.  Vintage Brand even licenses its own

14  trademark to Prep Sportswear.  So they also both know what a

15  license is and that you need to have one.

16    Second, the evidence will show that the Defendants

17  knew full well that Penn State's names and logos are

18  trademarks.  When a trademark is registered in the United

19  States, anyone can find out that it exists by searching a

20  publicly-available website that the US Government makes

21  available for anyone to search.  Before -- before he started

22  selling Penn State-branded goods, Mr. Hartvigson went to that

23  website.  He searched for and he found the trademark

24  registration for Penn State.  He knew it existed.  But he went

25  full steam ahead.

1          The Defendants know how to do this the right way.

2    But when it came to Penn State, they chose, instead, to ignore

3    the rules that all other businesses fairly play by.  They

4    chose, instead, to take and profit from Penn State's

5    trademarks without our permission, and they'll do it again

6    unless you stop them.

7          So let me end right where I started, because we

8    think this case really is as simple as it may already seem to

9    you.

10          The Defendants took what doesn't belong to them.

11    They took and trespassed on Penn State's identity without

12    permission in a way that is likely to confuse consumers into

13    to thinking that Defendants have a relationship with Penn

14    State.  They don't.  The Defendants are supporting and are

15    supported by Penn State.  They aren't.  That's called

16    trademark infringement.  That's called unfair competition.

17    And that's what we will prove to you over the course of this

18    trial.  Thank you.

19          THE COURT:  All right.  Thank you, Mr. Finkelson.

20          MR. FINKELSON:  Thank you, Your Honor.

21    Mr. Fetters, opening?

22          MR. FINKELSON:  I'm going to have my colleagues get

23    this out of the way.

24          THE COURT:  All right.  Mr. Fetters, opening?

25          MR. FETTERS:  Thank you, Your Honor.

ROUGH DRAFT

```
1          THE COURT:  Go right ahead, sir.

2          MR. FETTERS:  Well, folks, by now you've figured

3    out that this is a trademark case, and I'm guessing that when

4    you received your jury summons, maybe some of you were hoping

5    for a really interesting case, maybe a criminal case with

6    facts similar to the things you see on shows like Date Line.

7    Well, sorry to disappoint.  This is a trademark case.  But

8    we'll try to make it as informative and useful for you as

9    possible.  But you're about to get a crash course, really, in

10   trademark law.

11         And I'm guessing that for most of you, you probably

12   haven't spent all that much time really thinking about

13   trademarks or trademark law.  And you might be wondering to

14   yourself, what is this case really going to be about at its

15   essence.  Well, it's about consumers, folks just like you.

16   You see trademark law is designed to protect consumers from

17   being misled as to who is responsible for the quality of a

18   producer's products.  So when you hear the attorneys and the

19   witnesses talk about consumer confusion, confusion as to

20   source, that's what we're talking about.

21         Are consumers being mislead in to thinking that

22   Penn State is responsible for the quality of Vintage Brand's

23   products.  Let me put that slightly differently.  Do consumers

24   intend to purchase products put out by Penn State but they're

25   being misled in to purchasing products from Vintage Brand
```

ROUGH DRAFT

1  instead.  That's what Penn State is here trying to prove.  We

2  see -- we say that consumers are not confused as to who is

3  responsible for the quality of Vintage Brand's products.  And

4  we think that at the conclusion of the evidence, you'll find

5  also that the answer is consumers are not being misled as to

6  who is responsible for the quality of Vintage Brand's

7  products.

8         And I think that there are really two primary

9  reasons why the evidence will support you in reaching this

10 very same conclusion.

11        The first relates to the buying experience when

12 consumers do purchase Vintage Brand's products.  Consider

13 this.  There is only a single place to purchase Vintage

14 Brand's products.  It's at Vintage Brand's websites, www dot

15 Vintage Brand dot com.  You can't get Vintage Brand's products

16 at Macey's; you can't get them at Wegman's; you can't get them

17 at the Family Clothesline.  Only at Vintage Brand's website,

18 Vintage Brand dot com.

19        And on that website, you'll see that Vintage Brand

20 sells new merchandise, things like t-shirts, sweatshirts,

21 socks, hats, glassware, wall art, posters, puzzles featuring

22 designs like this derived originally from historic sports

23 memorabilia, and that Vintage Brand offers products like these

24 relating to hundreds of different universities and pro teams.

25        Now on this website, again, talking about the

1    consumer experience of buying Vintage Brand products,

2    consumers see that Vintage Brand places prominent disclaimers

3    throughout its website in different formats so that folks know

4    for sure that Vintage Brand's products are not sponsored,

5    licensed, or endorsed by any university or team.

6            But consider this.  It's not just the fact that

7    Vintage Brand places those disclaimers on its website.  It's

8    the fact that Penn State's licensees do something completely

9    opposite of that.  They pronounce to the world that their

10   products are officially licensed Penn State products.  And why

11   do they do that?  Well you'll hear from the evidence, there's

12   two reasons:  One, they're contractually required to do that,

13   to affix officially licensed statements to their store fronts,

14   to their websites, in their advertising, and on the products

15   themselves.  They affix officially-licensed labels and

16   stickers that are so tightly controlled, that those

17   officially-licensed stickers contain serial numbers and

18   holograms where consumers can actually look up, by typing in

19   that serial number on the website to confirm that those

20   products are officially licensed.

21           And what he does that mean?  Well, it means that

22   consumers don't have to guess.  If a consumer is genuinely

23   interested in only acquiring officially-licensed Penn State

24   merchandise, that consumer can do that, because Penn State's

25   licensees makes sure that consumers know that.  You'll hear

ROUGH DRAFT

1    that this is a valuable marketing advantage to be able to

2    promote your products as officially licensed Penn State

3    products.  And that's what those licensees get in exchange for

4    working with Penn State and all of the controls that come with

5    that.

6              And so again, what is Vintage Brand doing?  They're

7    doing the complete opposite.  They're not saying on their

8    website that they're offering officially licensed products.

9    They're not say -- staying silent on the topic.  They're going

10   so far as to affirmatively tell consumers, in multiple

11   formats, throughout the entirety of the website that their

12   products are their own, that they are not sponsored, they are

13   not licensed by any team or university or pro team.

14             Now, there's a second reason why the evidence will

15   show that consumers are not being mislead as to whether Penn

16   State is responsible for Vintage Brand's products.  And that

17   second reason is really more fundamental.  And it's about the

18   role of the historic memorabilia designs that Vintage Brand

19   prints on its shirts.  I said before that trademarks exist so

20   that consumers know who is responsible for the quality of the

21   product.  And why is that so?  Because we have a system where

22   we want to ensure that consumers have an efficient way to go

23   shopping, to make their buying decisions.  And let me give an

24   example of that.

25             I think maybe the most well-known trademark that

1  folks might think of is the Nike swoosh.  When you see that

2  Nike swoosh on the side of a shoe, you know immediately who is

3  responsible for the quality of that shoe.  That's because that

4  Nike swoosh is a trademark, and that Nike swoosh is doing

5  trademark work.  That's an important concept throughout this

6  entire trial.  Trademark work.  Communicating to consumers

7  efficiently and effectively who is responsible for the quality

8  of the shoe.  It's not just the reputation of the trademark

9  holder generally.  That's a key distinction.  The reputation

10  of the trademark holder for producing the shoe.  That's

11  trademark work.

12      When Vintage Brand wants consumers to know who is

13  responsible for the quality of Vintage Brand's products, you

14  look to the label where it says Vintage Brand.  You look to

15  the sticker on Vintage Brand's hats, which says Vintage Brand.

16  You look to the packaging that the products come in, which

17  says Vintage Brand.  That's all doing trademark work.  It's

18  acting like the Nike swoosh.

19      This -- this historical memorabilia art work that

20  Vintage Brand prints on its shirts, it's not doing trademark

21  work.  You'll hear from Chad Hartvigson, who will testify that

22  the reason that Vintage Brand prints historic memorabilia

23  artwork on its products is because he hopes that consumers

24  will find the artwork attractive.  He hopes that consumers

25  will have a sense of nostalgia, having looked at the artwork.

ROUGH DRAFT

1    And perhaps most fundamentally, he hopes that by wearing these

2    products, consumers can express their affinity, they're

3    affection, their school spirit, their fandom for their

4    favorite schools and teams.  So that when folks wear these

5    products to the games, they can show that they're part of the

6    team.  That's what this artwork does.  It's not doing

7    trademark work.

8          And what Penn State will say, as well, our

9    trademark -- we have a trademark in our name, and that appears

10   in this artwork.  But this is not a copyright case.  This is a

11   trademark case.  And what do trademarks do?  They communicate

12   to consumers who is responsible for the quality of the shirt.

13   And so just because Penn State's name appears within the

14   composition of historic memorabilia artwork and just because

15   consumers think of the university in a general sense, that

16   does not mean that consumers are being misled in to believing

17   that Penn State is responsible for the quality of this shirt.

18         Now, I mentioned at the outset that this case is

19   about consumers and that's true.  But this case is also about

20   another thing.  It's about over reach.  Over reach by the

21   University.  The University brought this lawsuit because it

22   thinks that it has trademark rights over any image that simply

23   causes consumers to think of the university and to think of

24   the university's reputation as an educational services

25   provider.  Not the reputation as a product producer.  But just

ROUGH DRAFT

1    to look at these images and think of the university.  That's

2    not how trademark law works.  And again, this is not a

3    copyright case.  It's about whether consumers are being misled

4    as to the course of Vintage Brand's products.

5         Now let me add some context.  Let me start first

6    with Chad Hartvigson.  Chad, who is here today, you'll hear

7    him testify.  Chad is a entrepreneur.  He's a former

8    professional baseball player, and he's a lifelong sports fan.

9    And, in fact, this isn't Chad's first time to Williamsport.

10   He was here in 1982 playing in the Little League World Series,

11   with a team from Washington State that achieved a historic

12   championship win over Taiwan, which was subsequently

13   documented in an ESPN documentary.

14        While Chad went on to play professional -- or

15   college baseball, he graduated with a degree in business, and

16   after graduating, he was drafted to play professional

17   baseball.  When you hear Chad explain, that like many

18   professional baseball players, he started off at the lowest

19   level of the minor leagues.  And he progressed his way up to

20   the highest level of the minor leagues, triple A baseball.

21        And you'll hear Chad explain that, unlike the folks

22   you see on t.v. playing in the big leagues, who are making

23   millions of dollars, Chad, as a minor league baseball player,

24   barely made enough money to afford food.

25        And so after he retired from professional baseball,

1    he was eager to put that business degree to work, and he was

2    eager to make it in business.  So fast-forward to 2003.

3    That's when Chad first came up and founded his first apparel

4    company called Prep Sportswear, or Sportswear, Inc. is the

5    full formal name.  And Sportswear was a first of its kind for

6    many reasons.  Prep Sportswear is an online apparel company,

7    and it was the first to create a national database of youth

8    sports leagues and teams, like Little League baseball teams,

9    and K through 12 schools across the country where parents,

10   students, coaches, fans of children playing in those leagues

11   and on those K through 12 teams to go online, find their

12   school or find their Little League, prepopulate it with

13   templates so that fans and parents could buy apparel for those

14   student athletes.

15            So, for example, if you were to go on to the Prep

16   Sportswear website, you could search Williamsport Area High

17   School, find that school, preload it with templates, with the

18   school name, school colors, all customizable so that if you

19   have a son who plays on the baseball team or a daughter who

20   plays on the softball team and you want to order shirts for

21   those kids to ware during practice, you could do that with

22   easy-to-load templates and combinations and sizes that you

23   can't find anywhere else.

24            Now, Prep Sportswear was not only innovative in its

25   website platform, it was innovative in its manufacturing

1    process.  You'll hear Chad explain that the traditional

2    methods of printing these apparel under the old regime really

3    was not cost effective.  And so Chad, and Prep Sportswear

4    created their own manufacturing and printing facility right

5    here in the US, in Kentucky where all of its products were

6    printed on demand, only after a customer placed an order.  And

7    under the old model, it was almost impossible for parents to

8    get small batch clothing like this.

9            So prep sportswear effectively created a new

10   industry within the apparel industry.

11           So through -- from 2003 until 2009, Sportswear

12   focused on the youth sports league and K through 12 business

13   model.  And even at this -- even today, this continues to be

14   the bread and butter of the company.  But in 2009, Sportswear

15   thought it would try something different, thought it would try

16   expanding its product offerings, and so it decided to start

17   offering licensed college logos printed on products, t-shirts

18   and sweatshirts.  They decided to do basically what everyone

19   else was selling within that genre.

20           And so Prep Sportswear contracted with a company

21   called licensing resources group, which through a series of

22   mergers became Deerfield, which then became Collegiate

23   Licensing Company or CLC.  And under this license, Sportswear

24   sold products featuring college's modern logos and included

25   all of their acquired officially-licensed statements on the

1  website and on the products themselves.  And over time, Chad

2  came to find that the traditional collegiate licensing regime

3  really wasn't all that compatible with sportswear directed to

4  consumer, print on demand business model.  The old licensing

5  regime was really traditionally based on the traditional

6  method of brick and mortar stores, wholesalers, retailers,

7  each imposing their own mark-ups.  And under the traditional

8  regime, the licensing industry really wasn't being able to

9  offer a lot of unique designs or color combinations or sizes.

10         And so by about 2020, that relationship with the

11  CLC ceased, and those products are no longer offered.

12         And just to be clear, Prep Sportswear were never

13  offered any products related to Penn State.  That

14  wasn't within the portfolio.

15         But let me back up to 2017.  That's when Chad

16  started considering an idea for Vintage Brand, and Vintage

17  Brand would be a new company, but it would be based on

18  something old, something very old.  And that's historic sports

19  memorabilia.

20         Now, Chad has been a life-long sports fan and a

21  sports collector for a long time, and like many in the 1980s,

22  Chad got his he start in sports collectibles, collecting

23  baseball cards.  Well, you'll hear Chad explain that his

24  interest in sports collectable has greatly expanded, and he'll

25  describe the fact that he has spent hundreds of hours meeting

ROUGH DRAFT

1    with sports collectors, going to sports collectibles trade

2    shows, searching on E-bay, going to collectors' houses and

3    sifting through dusty boxes in garages and attics, all in the

4    search for rare sports collectable from the 1940s, 50s, 60s,

5    decades and decades ago.  Why spend all this time doing that?

6            Well, once you see some of the artwork that

7    appeared on these sports collectibles from the distant past, I

8    think you'll get a sense of how amazing some of this stuff is.

9            What you see here are some examples of the Vintage

10   Brand collection of sports memorabilia with artwork related to

11   Penn State, and these are game brochures, and you can see that

12   a lot of these brochures are adorned with artwork that are

13   created by third parties that are cartoon-ish, really

14   impressive, often related to two different teams.

15           Here are examples of stickers, decals, buttons

16   within Penn State's collection.  And by the way, the button at

17   the bottom right should look familiar to you, because that's

18   where this shirt came from, the I like Penn State shirt.

19           Here are some examples of historic team tickets.

20   And these are particularly impressive for the artwork that

21   used to come on these old tick its.  And of course these

22   tickets have information about the date that they've -- that

23   these games were played.  But contrast that to anyone who has

24   gone to a modern sporting event with digital tickets.  This

25   kind of artwork just doesn't exist on tickets anymore.

1      And so what was Vintage Brand's process?  Well,

2    first, it was acquiring the complete collection of memorabilia

3    that it has, which, by the way, consists of more than 25,000

4    different items relating to hundreds of different universities

5    and pro teams.

6          At that point, Vintage Brand's founders took the

7    painstaking effort and process of enhancing or scanning the

8    artwork that appeared from that memorabilia.  And then, went

9    through the painstaking process of enhancing those scanned

10   images to deal with things like wrinkles, smudges, and to make

11   them suitable for printing on new products, so enhancing for

12   clarity and for vibrant color.  And then the final step is

13   offering those products with the enhanced artwork on things

14   like coasters, mugs, t-shirts, sweatshirts, canvas wall art,

15   all print on demand.

16         And Vintage Brand, as a startup, did not have its

17   own manufacturing facility from the outset.  And so Chad had

18   Vintage Brand contract with his other company, Prep

19   Sportswear, which did have a manufacturing facility in

20   Kentucky to print all of Vintage Brand's products.  You'll

21   hear Chad explain that now that Vintage Brand is more

22   established, it has its own manufacturing facility in

23   Nashville where it prints all of its products to this day.

24         You'll hear Chad also explain that the company

25   Vintage Brand is able to offer a huge array -- huge array of

1    design choices to consumers, as varied as the memorabilia

2    artwork that it derives from, and it's able to do so at an

3    affordable price, and it's able to sell those designs and

4    products to consumers, even if they don't sell very much.  And

5    the reason it can do that is because it's directed to

6    consumer, print on demand.

7         The old way of doing business in this industry is

8    for retailers to acquire a large stock of inventory in

9    advance, and that inventory is then placed on a rack or it's

10   sold online.  But because retailers often don't know which

11   designs are going to be favored most by consumers through

12   their purchasing behavior, it's inherently risky.  And so that

13   necessarily causes retailers to limit the number of designs

14   that they offer, limit the number of color combinations, limit

15   the sizes that can be purchased.  That's not a problem for

16   Vintage Brand and its business model of online, direct to

17   consumer, print on demand.  It can offer wide selection of

18   image variety, a wide selection of color combinations, and a

19   wide selection of sizes, everything from infant all the way up

20   to 6X.

21        So now you know about Vintage Brand and its

22   business model.  Let's take another look at the Vintage Brand

23   website.  And remember, one of the reasons -- primary reasons

24   I said that the evidence will show that consumers are not

25   confused as to who is responsible for Vintage Brand's products

1  is because of the context of the entire buying experience on

2  the Vintage Brand website.

3        What you see here is a screenshot of the Vintage

4  Brand website, and you have to keep in mind these are static

5  screenshots of a dynamic website, and so it's not quite a

6  one-to-one translation in terms of what you see here and what

7  the actual experience is on the website.  But you see at the

8  top left, the Vintage Brand name and stylized fee and logo.

9  The Vintage Brand color scheme is black and white and that

10 appears along with the name and logo on every page of the

11 Vintage Brand website.

12       At the top, the home page is organized with hyper

13 linked categories of college, baseball, football, basketball,

14 Vintage athletes and more.

15       As you scroll down, there's arrangements of

16 different mocked-up product offerings to help consumers and

17 how they want to go shopping for Vintage Brand's products.  So

18 one of the first cluster of product offerings that you see

19 here that consumers can hyperlink to expand these selections

20 are just a variety of top colleges with historic artwork, and

21 in this case, relating to the Auburn Tigers, Oklahoma Sooners,

22 Notre Dame Fighting Irish, Florida Gators, Nebraska Corn

23 Huskers, Ohio State, and Alabama.

24       So consumers can click on that link and shop

25 similar designs related to other universities.  Consumers can

1    shop, a popular option is two-team rivalries.  So if your

2    favorite school is commonly-playing each year in a big rivalry

3    game, Vintage Brand has historic memorabilia designs related

4    to that theme you can shop for.  You can isolate and look at

5    the entire directory of universities for which there's

6    historic memorabilia artwork on the Vintage Brand website, or

7    you can search by an individual at the university and find

8    artwork related to that university.

9            What you see here is what the web pages related to

10    Penn State artwork look like on the Vintage Brand website.

11    And just scrolling down here, you see that the way this is

12    organized is that Vintage Brand has digital mockups of a wide

13    variety of products, coasters, wall art, sweatshirts,

14    t-shirts, things like that, and that those different blank

15    types are populated with mockups of the range of different

16    memorabilia artwork that is available on the Vintage Brand

17    website.

18            Now going back up to the top of this page, we see

19    again the Vintage Brand name at the top left, and we have the

20    disclaimers that are visible here and here. (indicating)  And

21    there's disclaimers also at the bottom of the page.  Now

22    remember, keep in mind, it's not so much that Vintage Brand

23    has these disclaimers on its website.  It's that Vintage Brand

24    is not silent on the issue at all.  And that Vintage Brand

25    does not falsely proclaim to offer officially licensed

1    merchandise, and it's the fact that Penn State's licensees pro

2    claim to offer officially licensed merchandise, and all of

3    that combines to form 9 consumer experience when purchasing

4    these products.

5         If a consumer were to click on one of the

6    thumbnails and look at an individual product offering, you

7    might see something like this. (indicating)  Again, Vintage

8    Brand's name is in the top left.  If we zoom in on the product

9    description, you see something like this, 1950 Penn State

10   Nittany Lions mug and you'll hear from Chad explain his

11   process of researching and attempting to date these historic

12   images.  In this case, Chad and Vintage Brand believe that

13   this image first originated in 1950 on historic memorabilia.

14   You'll see another disclaimer by Vintage Brand, not affiliated

15   with or sponsored by Penn State Nittany Lions, and then below

16   that is a description of the image itself.  And it goes in to

17   the history of the Nittany Lion mascot.

18        And that's there because it's important to tell the

19   stories of these images, because that's what Vintage Brand

20   believes these images do, that they tell stories, that they

21   evoke a sense of nostalgia.  Now if a consumer places an

22   order, those products arrive at their doorstep with Vintage

23   Brand packaging, what you see with the sticker on the box and

24   the packaging in the top left.  They arrive with Vintage

25   Brand's name on the products, like you see on the label at the

1    neck and the brim of the hat.

2            And so that's the Vintage Brand website, and the

3    indicators for that website as to why consumers are not

4    confused as to source -- the source of Vintage Brand's

5    products.

6            So let's now talk again about Penn State's

7    licensees.

8            So what you see here is an excerpt from the

9    contract between Penn State's licensing agent, CLC and one of

10   CLC's licensees, Penn State's licensee, retail licensee, with

11   language requiring that licensees affix official -- official

12   license articles to all of its products that

13   officially-licensed statements be included with all

14   advertising and marketing.  And at the bottom here, you see

15   some examples of the holographic stickers and labels with

16   unique serial numbers that those products come -- that are

17   attached to the products.  Again, when I mentioned that

18   consumers can actually look up those serial numbers that they

19   can determine that their product is officially licensed.  This

20   is an example from the college vault program of an officially

21   licensed product game tag that's affixed to the product.

22           And these are some examples from the Family

23   Clothesline.  What you see on the left is right on the banner

24   of the store front of the retail outlet at State College.

25   They proudly proclaim on the banner for all to see, officially

ROUGH DRAFT

1    licensed Penn State merchandise.  There's a website address

2    there.  Penn State clothes dot com.  And of course at that

3    store you'll hear from the proprietor of that store that all

4    of their products are related to Penn State.  Their products

5    don't -- they don't offer products related to the University

6    of Alabama or other pro teams in the way that Vintage Brand

7    does.

8         On the right, you see a screenshot from their

9    website.  And again, officially licensed appears in several

10   locations, and, in fact, on every single page of website,

11   every single page, it says officially licensed Penn State

12   gear.  So again, if a consumer wants officially licensed

13   merchandise, they don't have to guess because Penn State's

14   licensees make sure that consumers know that.

15        And it's no surprise that there is no evidence of

16   actual confusion.  In fact, Penn State will offer only a

17   single witness who will attempt to testify on this issue of

18   whether anyone is confused as to who is responsible for the

19   quality of Vintage Brand's products.

20        But you'll hear that this customer is not any

21   ordinary customer.  In fact, she's not a customer at all.  She

22   is the president of the largest alumni association Chapter for

23   Penn State University in Washington D.C.  And you'll hear her

24   testify, via deposition, and she'll explain that in the summer

25   of 2022, she reached out to 100 different online businesses

1    offering products related to Penn State, 100 different online

2    businesses with essentially an identical e-mail.  She was

3    soliciting free products related to Penn State that could be

4    raffled off at an alumni association event.  And when

5    questioned about whether she visited the Vintage Brand

6    website, she said she did, and she said that she saw two logos

7    that she recalled seeing, and she was very firm about that.

8    One she described as the chipmunk head logo, which is a lion

9    head profile.  And it looks a little bit like a chipmunk.  The

10   second one she described as a paw print logo.  You'll hear

11   from Chad and you'll take a look at all of the screenshots

12   that you see from the Vintage Brand website.  But you'll hear

13   from Chad that neither one much those modern logos for Penn

14   State were ever on the Vintage Brand website at any time.  And

15   in addition to this, the time frame that she claims to have

16   been on the Vintage Brand website, the Vintage Brand web pages

17   related to Penn State were not even live and available to the

18   product.  You heard from Counsel during opening statement that

19   when Penn State brought this lawsuit, Vintage Brand

20   temporarily took those pages down.  That was in 2021.  Ms.

21   Matthew claims that she was on the website for Vintage Brand,

22   looking at these pages in the summer of 20 22.

23   There is no evidence of actual confusion.  And, in fact, this

24   is confirmed by the empirical scientific research that has

25   been conducted.

ROUGH DRAFT

1          One of the witnesses you'll hear from is Dr. Tulin

2     Erdmen.  Dr. Erdem is the chair of the marketing department at

3     New York University Stern School of Business.  And she has a

4     PhD and she is an expert if consumer behavior.  She conducted

5     a scientific survey to assess consumer reaction to the Vintage

6     Brand website to determine whether consumers are being misled

7     in to believing that Penn State is the source of Vintage

8     Brand's products.  You'll hear Dr. Erdmen explain that

9     consumers do not believe that Penn State is responsible for

10    the quality of Vintage Brand products.  There is no confusion

11    as to source.

12          Now, Penn State will offer its own survey expert,

13    David Franklyn.  You'll hear from David Franklyn and you'll

14    find that unlike Dr. Erdem, who has a PhD and is an expert in

15    consumer behavior, Mr. Franklyn has no formal training in

16    survey research.  He has no PhD, and, in fact, he's a lawyer.

17    One of the other experts you'll hear from is another defense

18    expert, Dr. David Neal, and he was retained to critique Mr.

19    Franklyn's survey.  Dr. Neal also is a PhD and an expert in

20    consumer behavior.  And he'll explain that Mr. Franklyn's

21    survey is deeply flawed in its methodology.  He used a bad

22    control.  He distorted the commercial context, in which

23    consumers purchased Vintage Brand's products and the summation

24    is his conclusions are invalid.  Junk science in, junk science

25    out.

1          So as I wrap up my comments here, I refer back to

2     the old familiar adage, there are often two sides to every

3     story.  You've just now heard from the other side.  We're here

4     today because Penn State thinks that it has the right, the

5     trademark right to control all images that simply evokes

6     thoughts of the university even when consumers are not

7     confused as to the source of those products.  And again, this

8     -- this is not a copyright case.  This is a trademark case.

9     And trademarks are designed and intended to protect consumers

10    from being misled as to who is responsible for the quality of

11    that -- of those products.

12         Ask yourself.  Do consumers intend to purchase

13    products put out by Penn State but are misled in to purchasing

14    products put out by Vintage Brand instead?  That's what Penn

15    State's trying to prove.  We say they aren't.  Or do consumers

16    intend to purchase the products put out by Vintage Brand and

17    that's what they get and that they know that those products

18    are put out by Vintage Brand?

19         Or perhaps it's a third option.  Maybe consumers

20    don't even care who is responsible for the quality of Vintage

21    Brand's products.  If a consumer does not care who is

22    responsible for the quality of Vintage Brand's products, that

23    consumer necessarily cannot be confused as to the source of

24    those products because source was never a consideration in the

25    first place.

1          I said before that the images that Vintage Brand

2    puts on its products are there to tell a story.  Similar to

3    what Sports Illustrated has done in its Commemorative 25-year

4    Anniversary issue related to Penn State.  The entirety of this

5    issue, Sports Illustrated sells, presumably to Penn State

6    fans, for compensation, the entirety of this magazine is

7    related to stories about Penn State's football team.  And just

8    because Penn State's name and logos appear within this

9    magazine, consumers aren't being misled in to thinking that

10   Penn State is responsible for the quality of this magazine.

11   This's how trademark law works.  And that's no different than

12   this.

13          The artwork that appears at the center of these

14   t-shirts, even though the Penn State name is there, is not

15   doing trademark work.  It's about Penn State.  It's not from

16   Penn State.  And that's the key trademark distinction.

17          At the conclusion of all the evidence, we think

18   that you'll reach that same conclusion.  At the conclusion of

19   all of the evidence, we'll ask that you render a verdict in

20   the Defendants' favor.  Thank you.

21          THE COURT:  Thank you, sir.

22          Counsel, if you don't disagree, I think we'll take

23   a short recess at this point.

24          Ladies and gentlemen, Mrs. Rhinehart will escort

25   you out for a 10-minute recess.  Court will rise.

ROUGH DRAFT

```
1              (At 3:00 p.m. a recess was held.)

2              (At 3:16 p.m., the jury entered the courtroom.)

3         THE COURT:  All right.  We're back on the record

4    after a short recess.  Plaintiffs' Counsel, are you ready to

5    call your first witness?  Ms.  Wheatley?

6         MS. WHEATLEY:  Your Honor, we'll start by reading

7    the factual stipulations into record.

8         THE COURT:  That's fine.  Go ahead.  As modified by

9    the Court.

10        MS. WHEATLEY:  As modified by the Court.  And

11   Mr. Burkhart will share the stipulations on the screen so the

12   that the jury is able to read along.

13        THE COURT:  The parties, the Pennsylvania State

14   University, Vintage Brand LLC, Sportswear, Inc., and Chad

15   Hartvigson stipulate to the following facts:

16             1.  Vintage Brand, LLC, formed in September, 2017.

17   Vintage Brand's members, i.e., owners consist of cofounders,

18   Chad Hartvigson, Erik Hartvigson, and Michelle Young.  Chad

19   Hartvigson owns 70 percent of Vintage Brand, while Erik

20   Hartvigson and Michelle Young each own a portion of the

21   remaining 30 percent.  Vintage Brand has no W-2 employees.

22             2.  Vintage Brand owns and operates a website,

23   Vintage Brand dot com, where consumers can purchase

24   print-on-demand apparel.

25             3.  Vintage Brand owns a collection of sports
```

ROUGH DRAFT

1    memorabilia, which consists of pennants, buttons, game

2    tickets, decals, brochures, patches, stickers, trading cards,

3    and programs bearing images from collegiate sporting events of

4    the past.  Memorabilia.

5            4.  Vintage Brand's business model consists of

6    selecting and scanning images or parts of images from its

7    collection of memorabilia and memorabilia owned by others and

8    printing those scanned images or parts of images on blank

9    products such as t-shirts, sweatshirts, hats, socks, drinkware

10    and other items.  These products are offered for sale to

11    customers across the United States through Vintage Brand's

12    website at Vintage Brand dot com.

13            5.  From 2018 to 2021, Vintage Brand's website

14    included, among other things, a team page entitled Penn State

15    Nittany Lion vintage designs on which it made available

16    merchandise featuring roughly 35 images related to Penn State.

17            6.  Vintage Brand first sold a product bearing Penn

18    State-related images in May, 2018.

19            7.  Sportswear, Inc., also called Prep Sportswear

20    formed in 2005.  Chad Hartvigson is CEO of Sportswear and owns

21    30 percent of the outstanding shares in Sportswear.  The

22    remaining 70 percent are owned by 14 individuals.

23            8.  Sportswear owns a manufacturing facility in

24    Kentucky. Because Vintage Brand did not have its own

25    manufacturing facility during the time relevant to this

1    lawsuit, Vintage Brand contracted with Prep Sportswear to

2    manufacture and ship all of the goods sold through Vintage

3    Brand's website and to provide customer service for Vintage

4    Brand.

5         9.  Penn State was founded in 1855.

6         10.  Penn State owns US Registration No. 1308610

7    for the word mark Penn State, which covers decals, stickers,

8    decorative wall plaques, drinking mugs, tankards, glasses,

9    cups, tumblers, pennants, banners, shirts, t-shirts,

10   sweatshirts, socks, hats and nontextile wall hangings.

11        11.  US Registration, No. 1308610 was registered on

12   December 11th, 1984.

13        12.  Penn State owns US registration No. 5766698

14   for the word mark Penn State, which covers decorative magnets,

15   drinking glasses, cutting boards, fabric flags, hooded

16   sweatshirts, sweatpants, caps, being headwear, coasters, and

17   jigsaw puzzles.

18        13.  US Registration No. 5766698 was registered on

19   June 4, 2019.

20        14.  Penn State owns US registration No. 1315693

21   for the word mark the Pennsylvania State University, which

22   covers decals, drinking mugs, tankards, glasses, cups and

23   tumblers.

24        15.  US Registration No. 1315693 was registered on

25   January 22nd, 1985.

ROUGH DRAFT

1          16.   Penn State owns US Registration No. 5399989

2     for the word mark the Pennsylvania State University, which

3     covers hats, jackets, shirts, shorts, sweatshirts, and

4     t-shirts.

5          17.   US registration No. 5399989 was registered on

6     February 13th, 2018.

7          18.   Penn State owns US Registration No. 5742516

8     for the word mark the Pennsylvania State University, which

9     covers decorative magnets and fabric flags.

10          19.   US registration No. 5742516 was registered on

11     May 7, 2019.

12          20.   Penn State owns US Registration No. 5305910

13     for the Pozniak Lion design mark which covers hats, t-shirts,

14     and sweatshirts.

15          21.   US. Registration No. 5305910 was registered on

16     October 10th, 2017.

17          22.   Penn State owns US Registration No. 1276712

18     for the University seal design mark, which covers decorative

19     magnetic stickers, decals, stickers, decorative wall plaques,

20     drinking mugs, tankards, glasses, cups, tumblers, pennants,

21     shirts, t-shirts, sweatshirts, shorts, and hats.

22          23.   US registration No. 1276712 was registered on

23     May 8, 1984.

24          24.   Penn State owns US Registration No. 5877080

25     for the University seal design mark, which covers coasters,

1  ceramic mugs, fabric flags, banners of textile and hooded

2  sweatshirts.

3       25.  US Registration No. 5877080 was registered on

4  October 8, 2019.

5       26.  Penn State owns US Registration No. 1350286

6  for Lion shrine design mark, which covers decorative magnetic

7  stickers, decals, drinking mugs, tankards, glasses, cups,

8  tumblers, pennants, shirts, t-shirts, sweatshirts, and hats.

9       27.  US Registration No. 1350286 was registered on

10  July 23rd, 1985.

11       28.  Vintage Brand owns US Registration No. 6029818

12  for the logo below for use in connection with online retail

13  store services.  Vintage Brand.

14       29.  Vintage Brand has sold and or offered to sell

15  t-shirts, sweatshirts, hats, koozies, pennants, drinkware,

16  coasters, posters, magnets, wall art, socks, puzzles and

17  cutting boards featuring images related to Penn State.

18       30.  The Penn State-related images that have been

19  depicted on the merchandise offered and sold by Vintage Brand

20  include, but are not limited to the following images:

21       The Vintage Brand website has numerous pages,

22  including A.  A home page, the main landing page on the domain

23  www dot Vintage Brand dot com, B, team pages, secondary

24  landing pages with Vintage imagery related to specific teams

25  or institutions, and C, product pages, pages showing digital

ROUGH DRAFT

1    mockups of potential product offerings utilizing artwork from

2    Vintage Brand's collection of memorabilia.

3         32.   A representative screen capture of Vintage

4    Brand's Penn State Nittany Lion's vintage designs team page is

5    shown here.

6         33.   The Vintage Brand website features specific

7    pages for each item offered for sale.  An image of the top of

8    an example product page is shown here.

9         34.   Vintage Brand's Penn State Nittany Lions

10   Vintage designs team page contains text beneath the header

11   which reads.  Vintage designs not affiliated with, licensed or

12   sponsored by any college, team, or league.  Vintage Brand's

13   product pages showing merchandise with Penn State-related

14   imagery contain text beneath the header which reads by Vintage

15   Brand TM, not affiliated with or sponsored by Penn State

16   Nittany Lions.

17        35.   Vintage Brand sold 1,269 products through the

18   Penn State Nittany Lion store on Vintage Brand dot com.

19        36.   Vintage Brand received revenues from sales

20   through the Penn State Nittany Lion store amounting to

21   $23,219.27.

22        37.   Neither Vintage Brand, Prep Sportswear, nor

23   Chad Hartvigson have a license to use any of Penn State's

24   trademarks.

25             THE COURT:  Very good.  Thank you.

ROUGH DRAFT

1          MS. WHEATLEY:  I'm afraid another boring part.  Now

2     I'm going to move in to evidence our large group of exhibits

3     that the parties have agreed can be admitted.

4          THE COURT:  Fine.  You may do that.

5          MS. WHEATLEY:  The Plaintiffs move to admit P-2,

6     P-4, P-6, P-8, P-10, P-12, P-14, P-16, P-18, P-20, P-23, P-24,

7     P-26, P-27, P-30, P-31, P-73, P-77, P-103, P-107, P-132,

8     P-137, P-140, P-142, P-147, P-149, P-170, P-172, P-174, P-175,

9     P-176, P-214, P-218, P-219, P-247, P-265, P-267, P-269, P-270,

10    P-272, P-274, P-277, P-279, P-280, P-283, 85, P-287, P-289,

11    P-292, P-293, P-295, P-298, P-303, P-304, P-305, P-306, P-307,

12    P-308, P-309, P-310, P-326, P-341, P-342, P-354, P-355, P-363,

13    P-364, P-383, P-407, P-409, P-421, P-423, P-424, P-425, P-427,

14    P-429, P-431, P-432, P-434, P-435, P-437, P-438, P-440, P-442,

15    P-443, P-445, P-446, P-448, P-449, P-456, P-457, P-460, P-461,

16    P-462, P-463, P-465, P-466, P-467, P-470, P-471 P-472, P-482,

17    D-126, D-137, D-139, D-141, D-185.

18          That's all, Your Honor.  So we would move to admit

19    those into evidence.

20          THE COURT:  Objection from Defense counsel?

21          MR. FETTERS:  No objection, Your Honor.

22          THE COURT:  Duly admitted.   Thank you.

23          Ladies and gentlemen, the reading of the

24    stimulation and the recitation of the exhibits that Counsel

25    have agreed to is going to save us a great deal of time.  I

1   thank Counsel for their courtesy and professionalism for

2   agreeing to the stipulations and agreeing to the admission of

3   those exhibits.

4           With that said, Plaintiffs ready to call your first

5   witness.

6           MS. WHEATLEY:  Yes.

7           THE COURT:  You may do so.

8           MS. WHEATLEY:  Plaintiff calls Jackie Esposito to

9   the stand.

10          THE COURT:  Ms. Esposito, come forward and be

11  sworn, please.

12          MR. FETTERS:  Your Honor, may we have a brief

13  sidebar?

14          (A discussion was held at sidebar off the record.)

15          (the witness, Jackie Esposito was sworn.)

16          COURTROOM DEPUTY:  Go ahead and have a seat.  The

17  chair does not move.  Can I get you to state your full name

18  and spell your last name for the record.

19          THE WITNESS:  My full name is Jacqueline Esposito,

20  J-a-c-q-u-e-l-i-n-e-.  The last name is Esposito,

21  E-s-p-o-s-i-t-o, but I go -- I'm known by Jackie.

22          THE COURT:  Go right ahead, Ms. Wheatley.

23          MS. WHEATLEY:  Thank you, Ms. Esposito.

24                          DIRECT EXAMINATION

25  BY MS. WHEATLEY:

ROUGH DRAFT

1   Q.   Can you tell the jury where you live?

2   A.   I live in State College, Pennsylvania.

3   Q.   Are you currently employed full time?

4   A.   I am not.  I'm retired.

5   Q.   Where are you retired from?

6   A.   I'm retired from Penn State.  I worked at Penn State for

7   35 years.

8   Q.   And what was your job title at Penn State?

9   A.   I was the University archivist and special projects

10  librarian.

11  Q.   And when did you start working at Penn State?

12  A.   October of 1986.

13  Q.   And when did you retire from the University?

14  A.   July 31st, 2021.

15  Q.   Since you've retired, have you had any further

16  involvement with the University?

17  A.   I do have involvement with the University.  I have

18  speaking engagements for the alumni association for the

19  life-long living -- life-long learning organization.  And I am

20  a site supervisor for the history department for interns that

21  work at historical societies.

22  Q.   And so that I don't have to do that math, how long did

23  you work for Penn State?

24  A.   35 years.

25  Q.   And what is your educational background?

**ROUGH DRAFT**

1    A.    I have a Bachelors of Arts in American political history

2    from St. Joseph's College in Brooklyn, New York.  I have a

3    Masters of arts from St. John's University in American

4    Political History and African studies, and I had everything

5    but a dissertation in higher education history at Penn State.

6    Q.    And can you tell the jury what your job at Penn State

7    entailed?

8    A.    The University archivist is in charge of documenting --

9    collecting, processing, and making accessible the documents of

10   the history of Penn State going back to 1855.  So that would

11   include all sorts of documents, everything from board of

12   trustee meeting minutes to faculty members' papers, student

13   organization papers, and it represents all of the 24 campuses,

14   the Hershey Medical School and the Dickinson Law school.

15   Q.    And can you give the jury a size -- an idea of the size

16   of the university archive?

17   A.    The University archive is about 25,000 cubic feet of

18   records, those nice white boxes sitting all over the

19   courthouse here.  It also is over a half a million

20   photographs.  A little bit over -- the library itself is 7.5

21   million books.  The archives itself has over a half a million

22   books, specifically related to Penn State history, as well as

23   artifacts and memorabilia, everything from Evan Pew's barn

24   door to the shovels for various dedications of buildings.

25   Q.    And how long has the University had an archive?

ROUGH DRAFT

1  A.   The University archive was established in 1904 in

2  anticipation of the 50th anniversary.  So the 50th anniversary

3  would have been in 1905.  The first archivist was a Penn State

4  history faculty member who began collecting materials.  He

5  collected everything from General Beaver's documentations from

6  his time as a civil war general and a member of the board of

7  trustees, as well as from his years of governor of

8  Pennsylvania to all of the documents for the Commonwealth

9  history that are duplicated in the Penn State archives --

10  Pennsylvania State archives down in Harrisburg.

11  Q.   And separate from your job at Penn State, do you

12  currently have a personal interest in the history of Penn

13  State?

14  A.   I have written at least one popular book about Penn

15  State.  I've also written numerous articles about higher

16  education implications about Penn State.  I'm also very

17  interested in written articles about Penn State women, and

18  about student organizations and the conflict -- the conflux of

19  town and gap.  It's really important to understand the history

20  of State College by understanding the relationship between

21  town and gap.

22  Q.   And I think you mentioned it, but -- if I may publish?

23  Ms. Esposito, can you tell the jury what this is?  I can bring

24  it up?

25  A.   No.  I have it.  It's the Nittany Lion, an Illustrated

**ROUGH DRAFT**

```
1    Tail.  It's the book that I wrote with a co-author about all
2    the various Nittany stories and legends that go back through
3    the history of Penn State.
4    Q.   And can you tell the jury what's shown here on the cover?
5    A.   The cover is the Nittany Lion shrine.
6    Q.   And what sort of research did you conduct to write this
7    book?
8    A.   In addition to conducting over 40 oral history interviews
9    with everyone from the class of 1940 class president and the
10   editor of the student newspaper to people -- to men who wore
11   the mascot -- they wore the suit.  We also did interviews with
12   various historians and environmentalists about the stuffed
13   Lion.  We also did research in the University archives and the
14   Pennsylvania state archives and in various other archives
15   about the role of mascots and the role of symbols at
16   universities.
17   Q.   And what got you interested in writing a book about the
18   Nittany Lion?
19   A.   I got tired of answering the question, what is a Nittany
20   Lion.  Almost every single day in my job, somebody would call
21   and ask what is a Nittany Lion.  And it was either what is its
22   gender, what type of Lion is it.  Was it a cougar or a puma or
23   -- not an African Lion.  But what exactly was the Nittany
24   Lion.  What were the Nittany traditions.  Who was Princess
25   Nittany.  And I thought, mistakenly, that if I collected them
```

**ROUGH DRAFT**

1  all and put them together and created an eight-page brochure,

2  I would never have to answer that question again.

3  Unfortunately, the eight-page brochure became a 265-page book.

4  It also became an eight-page brochure.  I did stick to that.

5  But it meant that I became the person to ask when you had

6  questions about Nittany Lion history.

7  Q.   And here you are today.

8  A.   And here I am today.

9  Q.   And when was this -- your book on the Nittany Lion

10  published?

11  A.   1997.  It is still the number one selling book for the

12  Penn State press.

13  Q.   So as I think the jury has already seen in opening, some

14  of the trademarks in this case are representations of the

15  Nittany Lion.  So I'd like to discuss him to start.  So in

16  your time in Penn State archivist, is it fair to say your work

17  encompassed research related to the Nittany Lion?

18  A.   Yes, it did.  It encompassed that kind of research almost

19  every day.

20  Q.   Now to begin, was Penn State always associated with the

21  Nittany Lion?

22  A.   No.  The college had two mascots prior to the Nittany

23  Lion.  The first mascot was Old Coalie.  It was a mule that

24  was purchased to help move lime stone to build the original

25  main administration building.  He was the mascot for about 40

1  years.  His skeleton was kept after he died and is still on

2  display in the student union building today.  The second

3  mascot was a pair of bull dogs that were purchased to guard

4  the ladies cottage.  They were purchased with the thought that

5  they would protect the ladies from scandalous young men coming

6  to visit.  And it was the bull dogs that were replaced by the

7  Nittany Lion in 1904.

8  Q.   Can you tell the jury how the Nittany Lion then came to

9  be Penn State's mascot?

10  A.   In 1904, the Penn State baseball team was on an eastern

11  road trip.  At that point in time, it meant they got on a

12  train and went to various different schools over the course of

13  a week.  At the end of the road trip, they were at Princeton

14  and they were being given a tour of campus and Princeton has

15  the Princeton tiger, and the Princeton's students were

16  bragging about how strong the Princeton Tiger was and Joe

17  Mason, who was the third baseman, bragged that back up at Penn

18  State, we had the Nittany Lion that had never been beaten in a

19  fair fight so watch out, Princeton Tiger.  He went on to score

20  three -- three times in the baseball game, and in his career

21  at Penn State, the four times they played Princeton, they won

22  three out of the four times.  He went back to campus and they

23  -- most of the athletes lived in a building known as the track

24  house.  They started talking about it and writing it up and

25  started advocating for the Nittany Lion to become the mascot

1  of the school.  That was in 1904.

2  Q.    Okay.  And was there ever a real Nittany Lion?

3  A.    There was a taxidermy Lion that was on campus.  It was in

4  a display of animals that was in the first floor of the main

5  administration building.  It was on display.  It had been

6  given to Penn State in the 1880s.  It had been captured in

7  1859 and stuffed and taxidermied and kept by a family.  It was

8  used like a rocking horse.  And they donated it to Penn State

9  to be used as part of the zoology department to demonstrate

10  extinct animals.

11        The Nittany Lion was sent to two world's fairs as

12  an example of an extinct animal.  He was then sent to the

13  Carnegie Museum in Pittsburgh and was on display in an exhibit

14  for over 40 years.  When that exhibit came down, the curators

15  of the Carnegie Museum contacted Penn State and asked them if

16  they wanted their Lion back.  And a faculty member in zoology

17  went with two graduate students to the Carnegie Museum and

18  brought the Lion back.

19  Q.    I'd like to put up on the screen demonstrative P-232,

20  which --

21        MR. FETTERS:  No objection.

22  BY MS. WHEATLEY:

23  Q.    Can we publish a picture for the jury to see?

24  A.    That is the Nittany Lion that was in the old main museum,

25  and it was on display at the Carnegie Museum.  It is now on

1    display at the old sports museum on the second floor.  It has

2    been conserved -- a conservator from the Smithsonian

3    Institution came up and conserved it.  She found out that it

4    had been treated with arsenic originally.  So it had to be

5    neutralized.  And it had to have its mangy areas replaced with

6    fur and the fur in the mange areas is actually rabbit fur,

7    because if you do DNA testing, we want the real lion fur and

8    not the rabbit fur, and so that distinguishes that.  There has

9    been DNA testing that proves that it's nearest relative is the

10   Colorado mountain Lion.

11   Q.   And during Mr. Fetter's opening, he showed a screenshot

12   of a little blurb on the Vintage Brand page about the Nittany

13   Lion?

14   A.   Um-hum.

15   Q.   And did you have any thoughts on that?

16   A.   It was with the 1950s mug --

17   Q.   Yes.

18   A.   -- that was shown in the opening.  And the description

19   with the 1950s mug was that Joe Mason was embarrassed and that

20   he -- there was no mascot.  And neither one of those

21   statements are true.  Joe Mason bragged.  As most -- he --

22              MR. HARMS:  Objection.

23              THE COURT:  Is there an objection?

24              MR. HARMS:  Objection.  Foundation.  Personal

25   knowledge.

ROUGH DRAFT

1              THE WITNESS:  We have --

2              THE COURT:  Hold on.  Go ahead.  Ms. Wheatley.

3              MS. WHEATLEY:  Ms. Esposito is the University

4    archivist who has written a book on the history of the Nittany

5    Lion.

6              THE COURT:  Objection noted.  Overruled.  I'll let

7    you explore.  Go right ahead.

8              MS. WHEATLEY:  Go ahead, Ms. Esposito.

9              THE WITNESS:  Joe Mason was a Penn State student

10   and a long-term alum, and he actually tells his own story

11   about the -- how the -- what happened in Princeton when the

12   Lion shrine sculpture was dedicated in October of 1942.  We

13   have the transcript of that in the archives.  And it doesn't

14   reflect the story that's with the 1950s mug.

15   BY MS. WHEATLEY:

16   Q.   Thank you, Ms. Esposito.

17   A.   I'm sorry.

18   Q.   No.  Don't be sorry.  And so this was sort of the

19   original Nittany Lion, what we have on the screen.  Have there

20   been other versions of the Nittany Lion over the years?

21   A.   Yes, there have.  There have been other examples of the

22   Nittany Lion.  There have been representations that included

23   an African Lion.  There have been other representations that

24   have been done by student organizations.

25   Q.   So I'd like to look at another one, demonstrative P-233,

ROUGH DRAFT

1    which I understand is without objection.

2                MR. HARMS:  No objection.

3    BY MS. WHEATLEY:

4    Q.    All right.  Can you tell the jury what we're seeing here?

5    A.    We're seeing a paper mache lion that actually looks like

6    a pig.  It's a paper mache lion that was done by the students,

7    probably for the homecoming parade.  That's usually when they

8    used a lot of paper mache.  It's from 1910.  And it would have

9    been -- the reason I'm thinking it's homecoming, is because it

10   has the letter S for state, and it has the keystone, which

11   were symbols used by Penn State back in 1910.

12   Q.    Did Penn State ever claim trademark rights in this

13   version of the Nittany Lion?

14   A.    No.

15   Q.    All right.  So I'd like to discuss now how the Nittany

16   Lion evolved to get to the Lion shrine mark Mr. Finkelson

17   talked about in opening.  Can we put up a demonstrative of the

18   Nittany Lion shrine.  And, Ms. Esposito, I have to warn you,

19   when you touch the screen, it makes those blue dots.

20   A.    I'm sorry.

21   Q.    No, don't be sorry.  I don't know how to make them go

22   away.

23                THE COURT:  Mrs. Rhinehart will take care of that.

24                MS. WHEATLEY:  Thank you very much.

25                THE WITNESS:  I'll sit on my hands.

ROUGH DRAFT

1    BY MS. WHEATLEY:

2    Q.    Do you recognize this logo on the screen?

3    A.    It's the logo that represents the Nittany Lion shrine

4    that was built on campus and dedicated in 1942.

5    Q.    And the lion shrine that's on campus, I believe earlier

6    you had said this was a picture?

7    A.    Yes.

8    Q.    Does -- do physical versions of it exist anywhere else in

9    the Penn State system?

10    A.    The full size lion shrine is only at University Park.

11    Every other location under the Penn State's purview has a

12    three-quarter size replica that sits either in the lobby or a

13    prominent place on campus.

14            In addition, the same sculptor who sculpted this

15    Lion created a model of replicas that are given out for

16    anniversaries and sold and marketed in stores, department

17    stores and stuff.

18    Q.    The replicas or anniversaries you mentioned, what sort of

19    anniversaries are those?

20    A.    They're given to employees when they've reached certain

21    landmarks, like 10 or 25 years.  They're given for outstanding

22    alumni.  They are usually made in stone and handed and given

23    as an award.

24    Q.    And can you -- are you familiar with how the Lion shrine

25    came to be built?

1  A.    Yes.

2  Q.    Can you tell the jury of how the idea for a Lion shrine

3  statue first arose?

4  A.    The towns people in downtown State College got tired of

5  having pep rallies on the corner of College and Allen --

6  that's a major intersection in town.  One of the pep rallies

7  got particularly out of control.  They had a big bonfire, and

8  it got lit with the wrong kind of fuel.  And even the

9  quarterback got knocked down by the fuels about a mile down

10  the street.  And the townspeople went to the president of the

11  University and said you have got to find a place on campus for

12  your students to have pep rallies.  And the President of the

13  University put together a committee involving art faculty, the

14  president of the student class, the editor of the Collegian

15  newspaper and several other representatives come up with a

16  place on campus where they could have a place for the students

17  to gather.  They chose a place that was centrally located.  It

18  would be by old Beaver Stadium, but -- which is now a parking

19  lot.  The Nittany Lion Inn and rec hall, which was brand new.

20  It had been built in 1939.  And once they decided a location,

21  they contracted with a sculptor who was known for sculpting

22  animal sculptures.  And that was Heinz Warneke.  He was known

23  in Pennsylvania because he sculpted the mother elephant and

24  its baby at the Philadelphia zoo.  It's still on display if

25  you go to the Philadelphia zoo.  They contracted with Heinz

1    Warneke, and he designed and built the Lion shrine sculpture.

2    Q.    And who paid for the Lion shrine sculpture?

3    A.    The money for the Lion shrine sculpture came from the

4    class of 1940 as a class gift.

5          When students started as freshman, they had a

6    deposit that was put into their accounts.  That deposit was

7    held for all four years.  And at the end of four years, they

8    could designate where the money went.  In 1940, the students

9    voted on two options, either the shrine or a scholarship.  And

10   they voted for the shrine.

11   Q.    Now, in -- in 1942, were all of the members from the

12   class of 1940 able to attend the dedication of the shrine?

13   A.    No.  As a matter of fact, the class president, who was a

14   major person involved in selecting the animal and selecting

15   the sculpture was fighting -- building bridges in France

16   during World War II.  There were significant people at the

17   dedication, and one of them was Joe Mason.

18   Q.    And you mentioned that a sculptor named Heinz Warneke

19   built the shrine.  Was anyone else involved in building the

20   shrine?

21   A.    Heinz Warneke himself had an assistant.  And the project

22   actually was part of a public work -- public arts work project

23   that the art faculty had students participate in.  So you, as

24   a student, could go by the shrine as they were sculpting it.

25   They used a system called pointillism, where they would chip

1   away at the lime stone.  And you could help do that.  It was

2   the second public art project on campus.  The first was a

3   series of murals that were in the main administration

4   building.  They were done by Henry Varnum Poor, who was a

5   well-known muralist who had done many works progress

6   administration projects in post offices, including one that

7   was down here in Williamsport.

8   Q.   Now you mentioned, I believe, that Mr. Warneke was hired

9   by the University.  Was he paid for his work?

10  A.   He was paid $5,400 to sculpt the shrine.

11  Q.   And after he built the shrine, did Mr. Warneke do any

12  other work for the University on the shrine?

13  A.   He designed the three-quarter replicas.  He also designed

14  the smaller replicas for sale and for awards.  He also came

15  back several years later when someone had taken a sledge

16  hammer to the shrine and knocked off the ear.  He came back to

17  replace the ear.  By that point, he was in his late 80s.  And

18  they picked him up at the airport and had hoped to take him

19  straight to the Nittany Lion Inn so he could rest.  But he

20  wanted to see his lion.  And when he got to his lion, he

21  touched where the ear was broken and he cried.  It's one of

22  those stories that, you know, touches me when I hear it.  We

23  have pictures of him at the site when he's touching the ear in

24  the archives.

25  Q.   And from your work in Penn State, do you have information

ROUGH  DRAFT

1   about how often the shrine is visited?

2   A.   The shrine is the most heavily visited site at Penn

3   State.  It is -- because it's open in the public, it's open

4   24/7, so people can go -- it's visited hugely during home

5   football games and the lines at graduation go for miles.

6          There was a survey done by Penn Live, which is a

7   news feed down in Harrisburg about 10, 12 years ago, and they

8   cited the Nittany Lion shrine as the second most visited site

9   in Pennsylvania; the first most visited site is the Liberty

10  Bell.

11  Q.   And the two dimensional version you have on your screen,

12  do you recall, from your time at Penn State, whether the

13  university licenses this image to be put on merchandise?

14  A.   Yes, it did.

15  Q.   And have there been various versions of the shrine

16  trademarked?

17  A.   There -- various ways that you show this shrine.  You can

18  show this shrine four dimensionally, in various different

19  positions.

20  Q.   And I know you started in the 1980s.  Was the University

21  using the shrine logo in the 1980s?

22  A.   The University was using the shrine logo from the time it

23  was created in 1942, when it was dedicated in 1942.

24  Q.   I'd like to transition to a different one of the

25  trademarks Mr. Finkelson showed in opening.  Can you put up

**ROUGH DRAFT**

1   the picture of the Pozniak logo?  Ms. Esposito, do you

2   recognize this image?

3   A.    This is the Pozniak lion.

4   Q.    And who created this?

5   A.    Ray Pozniak.  He was a Penn State alum and a graphic

6   designer.  He lived and worked in State College.

7   Q.    Do you know when he created this logo?

8   A.    The late 1970s, '78, '79.

9   Q.    And do you know anything about Mr. Pozniak personally as

10   to why he might have created this design?

11   A.    He was a very big fan.  He was specifically a very big

12   fan of the wrestling club, and he felt that the athletics

13   department needed a good logo for the uniforms.  And so he

14   designed it.

15   Q.    And was this symbol used by Penn State in the late 70s

16   and 80s?

17   A.    Mostly on intercollegiate athletic uniforms.

18   Q.    And so was it the primary athletics brand during that

19   time period?

20   A.    Yes.

21   Q.    During that time period, whether the University sold

22   other apparel, like t-shirts or hats with the Pozniak lion

23   design?

24           MR. HARMS:  Objection.  Foundation.

25           MS. WHEATLEY:  Should I respond, Your Honor?

```
 1   BY MS. WHEATLEY:
 2   Q.   Ms. Esposito, were you at the University in the 1980s?
 3   A.   I started in 1985.  I'm sorry.  October of '86.  We have
 4   documents in the archives that go beyond -- before that.
 5            MR. HARMS:  Best evidence rule, Your Honor.
 6            THE COURT:  No.  The objection's noted.  It's
 7   overruled.  The Court accepts the answer.  You may continue.
 8            MS. WHEATLEY:  Thank you.
 9   BY MS. WHEATLEY:
10   Q.   Stepping back a bit, you mentioned that Ray Pozniak
11   created the logo, and that he was a fan.  How was the
12   University able to use the logo that he created?
13   A.   He gave them permission while he was alive.  And then
14   when he died, his son, Steven, who was his executor,
15   transferred the rights to the University.
16   Q.   And I'd like to look at a document concerning that.  Can
17   we pull up Plaintiff's Exhibit 407, which has been admitted.
18            Ms. Esposito, hopefully this is in your binder?
19   A.   Um-hum.
20   Q.   It might be easier to read there.  It's sort of small on
21   the screen.  But I'll give you a second to turn to that.
22   A.   Thank you.
23   Q.   Ms. Esposito, can you explain to the jury what this
24   document is?
25   A.   It's an intellectual property purchase agreement.  It's a
```

1    purchase agreement between Steven Pozniak and Penn State

2    University for the Pozniak lion.

3    Q.   And on the first seven-page, scrolling down a bit, the

4    paragraph labeled Section 101.  Do you see the definition for

5    purchased assets in this paragraph?

6    A.   Purchased assets means all intellectual property or other

7    proprietary rights in associated with, or related to the

8    Pozniak mark, including but not limited to the Pozniak

9    registration, which is listed on schedule A.  All common law

10   rights in the Pozniak mark, any work protected by copyright

11   that consists of or features the Pozniak mark and all

12   derivative works thereof, the domain name, cat on the hat dot

13   com, and all content published at such web address, the

14   domain, all of the forgoing, together with the goodwill of the

15   business in connection with the Pozniak mark has been used,

16   and all licenses of the Pozniak mark to third parties are set

17   forth in Exhibit B.

18   Q.   All right.  And I'd like to turn to schedule A.  That's

19   mentioned here among the purchased assets.

20          Based on Schedule A, what was Penn State purchasing

21   from Ray Pozniak's son?

22   A.   The Pozniak lion so they could use it on clothing.

23   Q.   Thank you.  And I'd also like to go to Exhibit B of this

24   agreement, which is on page 11.  Are you able to see that on

25   your screen?

1    A.    Yes.

2    Q.    Now, based on this, you had mentioned that Ray Pozniak

3    had an affection for, I think, wrestling?

4    A.    Um-hum.

5    Q.    What groups were specifically included in this agreement

6    to have rights to use the Pozniak Lion?

7    A.    The Penn State Alumni Association, the Lion Ambassadors,

8    which is a student group within the Alumni Association, and

9    the Nittany Lion Wrestling Club.

10    Q.    Thank you.  Now I'd like to turn to yet another Penn

11    State mark, the S Lion logo.

12              Do you recognize this logo?

13    A.    Yes, I do.

14    Q.    Is this a design that Penn State has used on merchandise?

15    A.    Yes, it is.

16    Q.    I'd like to start by talking about the block S that's in

17    the background of the logo.  Is this -- is this something Penn

18    State has used as a symbol?

19    A.    Penn State has used the block S for -- since about the

20    1880s.  The Penn State name, the college has had its name

21    changed four times.  In 1855, when it was founded, it was

22    founded as the Farmer's High School.  That name was changed in

23    1862 to the Agricultural College of Pennsylvania.  When the

24    Land Grant Act and the Miril Land Grand Act were both signed,

25    Penn State was designated by the legislature of the

1    Commonwealth as the Pennsylvania State College, because it

2    would be the State College that would get the funds from the

3    Land Grant Act.  At that point in time, 1874, the S --  the

4    block S started being used as a symbol for Penn State.  It was

5    done that way specifically to distinguish it from the

6    University of Pennsylvania, which used a block P.  The

7    University of Pennsylvania, which is traditionally an ivy

8    league college, did not want to be associated with the State

9    College because the students at the State College were not the

10   caliber that the students at the University of Pennsylvania.

11   So there was a distinguishment made between the two.  And the

12   name was changed for a fourth time in 1953 to the Pennsylvania

13   State University.

14   Q.    Thank you.  I'd like to look at another exhibit.

15   Actually, we will just use this one as a demonstrative,

16   Plaintiff's 231.

17            MR. HARMS:  That's fine.  No objection.

18   BY MS. WHEATLEY:

19   Q.    Ms. Esposito, can you tell me -- who is pictured in that

20   picture the jury sees on their screen?

21   A.    This is Joe Mason.  He is the third baseman that made the

22   initial boast about the Nittany Lion.  He graduated with a

23   degree in mining engineering from Penn State and went to work

24   in the Pittsburgh area and in Kansas on specifically potash.

25   He actually has inventions on potash.  He's wearing a letter

ROUGH DRAFT

1  sweater he would have gotten from playing on the baseball

2  team.  He lettered in baseball for four years, and the

3  lettermen would get those sweaters at the end of each year

4  when they were designated as lettermen.

5  Q.    And so is this an example of how that block S was used

6  historically at Penn State?

7  A.    Yes.

8  Q.    And now switching back to the S lion logo.  Do you

9  recognize the lion that is shown here?

10  A.    It's an African lion that was used initially when people

11  thought about the Nittany Lion, even though there was never

12  any African lions native to Pennsylvania.

13  Q.    And so about when did Penn State switch to the -- to the

14  mountain lion?

15  A.    They switched to the mountain Lion in 1938/39, when they

16  changed both the mascot suit, as well as the lions that they

17  were using on material -- on publications and stuff.  They had

18  continued to use the mountain lion when they do retro days or

19  go back days.  They do the same thing with the school colors

20  because the school colors were originally pink and black.  We

21  would have been the pink and black mules under coalie or the

22  pink and black bull dogs before the lion.  But the school

23  colors were changed to blue and white.  And so when they do

24  retro merchandising, they tend to use pink and black and the

25  African Lion as opposed to the cougar.

1   Q.   And so does Penn State continue to use this S lion on

2   that retro style merchandise?

3   A.   Yes.

4   Q.   Now I'd like to ask you about the trademark Penn State.

5   When did the school's nickname become Penn State?

6   A.   As I mentioned, the name was changed in 1874 to the

7   Pennsylvania State College.  Almost immediately, it was known

8   as Penn State.  It's similar to the University of Pittsburgh

9   is known as Pitt, and the University of Pennsylvania is known

10  as Penn.

11          Almost immediately, it was known as Penn State.

12  And it was very much to distinguish it as the college where,

13  as the -- as the Land Grant Act requires, was open to the

14  citizens of the Commonwealth of Pennsylvania for all their

15  children.

16  Q.   And from your review of the University records, has the

17  school been consistently referred to as Penn State since the

18  1800s?

19  A.   In everything that I've seen, in documents, and in

20  talking with alums and in talking with, you know, people who

21  worked at the University, it was always known as Penn State.

22          On official documents, it's either the Pennsylvania

23  State College or the Pennsylvania State University, but in

24  nomenclature it's Penn State.

25  Q.   And, Ms. Esposito, over the years when you -- have you

1   introduced yourself to people who don't know you as working

2   for Penn State?

3   A.   I have.

4   Q.   Has anyone ever asked you what Penn State was?

5   A.   No.

6   Q.   And are you aware, starting from when you joined the

7   University in 1986, has the University consistently sold

8   merchandise with Penn State on it?

9   A.   Yes.

10  Q.   And when -- starting when you were at the University in

11  the -- in the late 1980s, did the University license the right

12  to use Penn State on apparel and merchandise?

13  A.   The University had a licensing committee that was

14  established in 1982 that would look at what items venders

15  wanted to sell and approve those items based on the vendor

16  proposals.

17  Q.   And you mentioned that the University's official name is

18  the Pennsylvania State University.  When did that become the

19  University's official name?

20  A.   1953.  It was changed specifically to reflect the amount

21  of research that was being done at the University.  There's a

22  higher education rule about who gets to use the word college

23  and who gets to use the word university.  And it has to do

24  with your research relationship.

25  Q.   And from -- in your tenure at the University from 1986 to

1    2021, was merchandise with the Pennsylvania State University

2    on it consistently sold?

3    A.    Yes.

4    Q.    Shifting gears again, I'd like to get to the University

5    seal, if we can put that up on the screen.

6          Ms. Esposito, are you familiar with this trademark?

7    A.    Yes.  It's the University seal.  It appears on -- the

8    actual seal is on diplomas and on official documents.  This is

9    a replica.

10   Q.    And when was that first adopted?

11   A.    The seal itself was first adopted back when it was the

12   Pennsylvania State College.  It was changed to the

13   Pennsylvania State University in 1953.  The seal for the

14   Agricultural College of Pennsylvania was very similar to this.

15   Q.    And what is the significance of the 1855 on the seal?

16   A.    That's the founding date of the university.

17   Q.    And why was the University seal shaped like this with the

18   scalloped edge?

19   A.    Back in the days, when you did seals, they were literally

20   -- it was literally a piece of equipment that went on wax, and

21   you would push down on the wax, and the wax would scallop like

22   that.  This replicates the scalloping of a wax seal.  The wax

23   seal goes back to ancient Roman and Greek times.  The most

24   famous one is like on the Magna Carta or the Declaration of

25   Independence.  It works that way.  The seal is very

1  specifically used for important documents like diplomas or

2  deeds to peoples' houses.

3       It's also of significant importance in terms of

4  recognizing the validity of an institution.

5  Q.   And during your time at Penn State, does your research

6  ever touch upon colleges or universities, other than Penn

7  State?

8  A.   Always.  We were always looking at what other colleges

9  were doing, specifically colleges that were considered our

10 comparison colleges, like Big Ten colleges.  But we always

11 looked at what other colleges were doing in terms of what was

12 the best practices.  And almost every college has a seal.

13      As a matter of fact, in order for you, as an

14 international student to come to Penn State, you have to show

15 your diploma with the official seal on it in order for you to

16 be accepted as an international student at Penn State.

17 Q.   Thank you.

18      And now switching gears again, has the University

19 historically created its own designs and logos?

20 A.   It created its own designs and logos back in the early

21 days and did so with its own print shop for decades up until,

22 you know, cooperate agreements, you know, got other companies

23 involved.

24 Q.   Do you know -- do you have an idea of how far back the

25 printing shop dated?

1  A.   The printing shop goes back to the 1890s, and it works

2  specifically with university office to print up things like

3  class schedules and the course catalogs, as well as to print

4  up things like sporting event tickets.  It still exists.

5  Q.   And for tickets, how did the process exist to print

6  tickets to sell to students historically?

7  A.   If you were printing tickets back in the day, you would

8  use a printing plate.  And the printing plate would -- would

9  print out blocks of blank tickets at the beginning of the

10  season.  And then as the season went on, you would put in the

11  names of the opposing teams and their logos.  You would put

12  the dates and you would put the seat markers.

13        And the reason you put the seat markers is so you

14  would have blocks.  So you would have the away team have their

15  block of seats similar to the way we do, you know, whiteouts

16  now where there's blocks of seats.  But the tickets were

17  literally sold in chunks that were called blocks.

18  Q.   I'd like to look at an example.  I believe Mr. Fetters

19  showed this in his opening when he was talking about

20  memorabilia.  Can we put Defendant's Exhibit 126 up on the

21  screen.

22        What is the date on this ticket, if we look at the

23  upper right?

24  A.   It's November 9th, 1929.

25  Q.   Based on this, who created this ticket?

1   A.    This would have been created by the University of

2   Pennsylvania, because this is an away game.  They're playing

3   at Franklin Field.  And so they would have created the blocks

4   within the dotted lines.  And Penn State would have added the

5   Keystone versus, with the Lion.  And they would have had the

6   seat numbers and the stands and all of that would have been

7   printed and sent to Penn State.  Penn State would then add

8   their part to it and distribute it to their students and

9   alums.

10  Q.    And by their part, are you referring to the upper part

11  with the Lion?

12  A.    Where it says Penn State versus, with the Lion and the

13  football with the keystone.

14  Q.    So would that be at the University print shop?

15  A.    It would have been at the University print shop, yes.

16  Q.    And would those have been sold to students?

17  A.    They would have been sold to Penn State students and

18  alumni to go to the Franklin Field.  And they would all sit in

19  the same section, you know, at Franklin Field.

20  Q.    And the design behind the Lion, what is the significance

21  of that shape?

22  A.    The keystone is significant to the history of

23  Pennsylvania.  Penn State -- the keystone, in Pennsylvania,

24  was -- Pennsylvania is considered the keystone state during

25  the American Revolution because it connected the northern

1  states with the southern states.  So the keystone has been a

2  symbol in the Commonwealth of Pennsylvania since the 1770s.

3  Penn State used it because it was the Pennsylvania State

4  College and designated by the Commonwealth as such.

5  Q.  Okay.  And I'd like to introduce a second exhibit, a

6  similar one, I believe, was in Mr. Fetter's opening.  It's

7  Defendant's Exhibit No. 185.  This is actually -- an actual

8  ticket.  May I approach?

9          THE COURT:  You may.

10  BY MS. WHEATLEY:

11  Q.  Ms. Esposito, what era is this ticket, and if we can

12  show, maybe the -- there we go -- on the screen, so the jury

13  can see it a little bit.  What era is this ticket from?

14  A.  It's November 25th, 1978.  The parts of the ticket that

15  are not typed would have been the block of ticket that was

16  used until they had the game, the opponent in the game.  In

17  this case, the block part where it's typed was actually one

18  the earliest uses of computers on campus where they would

19  actually print these out and sell them.

20          So anything that you see that's -- looks like it's

21  typed, actually was computer printed.

22  Q.  And who would have applied the Nittany Lion logo to this

23  ticket?

24  A.  The ticket office would have asked the printing shop to

25  make these tickets.

1    Q.   Thank you.  And we can put that one away.  And actually

2    I'll get it back.  May I approach?

3             THE COURT:  You may.

4    BY MS. WHEATLEY:

5    Q.   Now, you mentioned working with the licensing committee,

6    so this may be a foregone conclusion.  But in your time at

7    Penn State, did you ever have any responsibilities related to

8    the University's trademarks?

9    A.   I served on the licensing committee for about 10 years.

10   From 1989 to about 1999, at which point the licensing

11   committee changed because of our relationship with CLC.

12   Q.   And can you explain what the licensing committee did?

13   A.   The licensing committee was a committee established by

14   the president of the university to review requests by vendors

15   to use the University name and symbols on merchandise.  And

16   they would review the items -- initially we actually reviewed

17   the physical items.  When that became too big of a job, we

18   started using photographs.

19   Q.   And I'd like to introduce a document regarding the start

20   of that committee, Plaintiff's Exhibit 22.

21             MR. HARMS:  Objection, Your Honor.  Unauthenticated

22   hearsay and 403.

23             MS. WHEATLEY:  Your Honor, 901.8, this qualifies as

24   an ancient record.  803.16, this is also a statement in

25   ancient document, so it's not hearsay.

1          MR. HARMS:  It's unsigned, so it would not qualify

2    as an ancient document because there's no a sufficient

3    guarantee of trustworthiness, and it still is objectionable

4    under FRE 403, contains legal conclusions, legal argument,

5    etc.

6          MS. WHEATLEY:  Your Honor, I believe Ms. Esposito

7    can authenticate where the record was maintained, and it does

8    not contain legal argument.  It provides the historical

9    origins of Penn State's licensing of its marks and evidences

10   Penn States protections of its marks since that time.

11         THE COURT:  Objection's noted.  Overruled.  Go

12   ahead.

13   BY MS. WHEATLEY:

14   Q.   Now, looking at Exhibit P-22, Ms. Esposito.  Do you

15   recognize this document?

16   A.   It's a memorandum from Dr.  John W. Ozwald, who was

17   president of the university from 1970 to 1983.  It's dated

18   August 5th, 1982.  And it talks about establishing the

19   licensing committee.

20   Q.   Okay.  And is this document located in the University

21   archives?

22   A.   Yes,  it is.  It's part of the president's papers.

23         MS. WHEATLEY:  I'd like to move this in to

24   evidence.

25         MR. HARMS:  Same objections.

**ROUGH DRAFT**

```
 1              THE COURT:  Objection noted.  Overruled.  Duly
 2   admitted.  Do you wish to publish this, Ms. Wheatley or --
 3              MS. WHEATLEY:  Yes, I do.
 4              THE COURT:  You may publish to the jury.
 5   BY MS. WHEATLEY:
 6   Q.   Ms. Esposito, can you explain to the jury what was going
 7   on that caused this memorandum to be written?
 8   A.   In the late 1970s, there was a lot of -- there was a big
 9   push to have individualized t-shirts, usually it came out of
10   bands who wanted t-shirts.  It kind of changed the culture of
11   what students would wear to school, and so there were many
12   requests to Penn State to start using Penn State materials.
13   It was also the same time that the football team was becoming
14   very successful and the football team was going to numerous
15   championships and so it was a conflux of a change of fashion
16   as well as a change of the school's notoriety in athletics.
17   Q.   And based on this -- this demand and this concern, did
18   the University take any steps to protect its trademarks?
19   A.   The University did two things.  They did a review to see
20   how many requests had been made prior to this date.  And they
21   had a number of requests that had been made.  And so they
22   determined that there needed to be an effort made to protect
23   -- to protect the trademarks, as well as to have a committee
24   review the requests.
25   Q.   And looking -- if we could flip to page eight of the
```

1  memorandum.  I'd like to look at some of the -- what marks

2  they were interested in.

3         Do you see the section title names and marks to be

4  registered?

5  A.   The University name, together with Penn State, PSU,

6  Nittany Lion, and the University seal would be registered as

7  trademarks with respect to appropriate categories of use.

8  Q.   And so we know what Penn State is, the university's name,

9  is that the Pennsylvania State University?

10  A.   State University.

11  Q.   And university seal.  What was that referring to?

12  A.   It would have been the seal that we looked at just a few

13  minutes ago.

14  Q.   And so these symbols were among the very first trademarks

15  the University sought to protect; is that fair to say?

16  A.   Yes, yes, they were.

17  Q.   And I'd like to go back to page one and looking at the

18  history section.  I think you mentioned they had cataloged the

19  request.  Is that what you were referring to?

20  A.   Yeah.  The office of the senior vice president for

21  financing had cataloged 93 requests beginning in the year of

22  1973 of intention to use its name and other identifying works

23  in connection with commercial goods and services.  There is a

24  summary attached to this memorandum.  And they included

25  wearing apparel and alcoholic beverages, bicycle bags and

1  other things.  And the response to this requests was varied

2  depending on the nature of the intended uses.  The licensing

3  committee continued to have a standard of quality it would

4  enforce in the period of time I was on the committee.

5  Q.   And the corporate seal that's being referred to here,

6  request to use, do you know what that's referring to?

7  A.   It's the seal that we looked at earlier.

8  Q.   And the Nittany Lion, do you know what that refers to?

9  A.   It usually refers to the Nittany Lion shrine.  It can

10  also refer to the mascot.  It depends on what use it's being

11  put to.

12  Q.   So I'd like to look at an official record from this time

13  period or shortly after, after you've gotten to the University

14  related to how the university maintained its trademarks.  We

15  would like to introduce Plaintiff's Exhibit 363.

16       MR. HARMS:  No objection.

17  BY MS. WHEATLEY:

18  Q.   If we could zoom in on the top half so Ms. Esposito can

19  see that.

20       Ms. Esposito, do you recognize this document?

21  A.   It's a document from the United States patent and

22  trademark office registering the trademark -- the Penn State

23  university seal on May 8th, 1984.

24  Q.   And do you see the section titled declaration.  Who is

25  David Branagan?

1    A.    He was the assistant treasurer at the time.  He worked in

2    the office of the senior vice president for finance.

3    Q.    Okay.  And if you and -- was this declaration made under

4    penalty of perjury?

5    A.    Yes, it was.

6    Q.    And if we could go to actually page three to see -- if we

7    can zoom in on that.  Did Mr. Brannigan sign this?

8    A.    He signed and dated it April 24th, 1990.

9    Q.    Okay.  Did this declaration, do you know what the purpose

10   of this declaration was?

11   A.    It was to register the trademark for the mark for Penn

12   State.

13   Q.    Was there any effort made to show -- made to show that

14   Penn State was using its trademarks?

15   A.    Yes.  You would always have examples.  Whenever you

16   submitted a trademark registration, you would have examples.

17   Q.    Okay.  If we could scroll through, I'd like you to tell

18   me if you recognize the examples that were attached to this

19   declaration?

20   A.    There is key rings and a knife, and then the bottom one

21   is stationary.  Then you have some jewelry, you have note

22   cards, a portfolio.  The one on top is actually really

23   significant because it's a chair.  And while it looks like an

24   ordinary chair, when you served at Penn State for 25 years,

25   you get to choose what chair you will get from the University,

ROUGH DRAFT

1    and it's either a Captain's chair or a rocking chair, and it

2    has the seal on it.  It's either in blue and white or it's in

3    elms from the historic elms on campus.  When the historic

4    realms fall down, they take it down and make it in to

5    products.  And you get to choose after you've been there for

6    25 years, which one of those chairs you would like to have as

7    a gift from the university for your service.  And so that's

8    what these chairs are.  They're very significant to employees

9    because they have the seal.

10    Q.    And do you recall that this was how the University was

11    using the seal on merchandise and other items in 1990?

12    A.    Yes.

13    Q.    Now, I -- and is your work -- you were on the licensing

14    committee in 1990, correct?

15    A.    Yes.

16    Q.    So would you review those types of products?

17    A.    We would review.  We would meet every -- initially we met

18    quarterly.  Then we had to meet every month.  And we would

19    review requests from venders for products.  And we would

20    review them for the type of product they wanted to produce,

21    the type of quality of the product, how the symbols were being

22    used, and how it was going to be marketed, because oftentimes

23    they were marketed for short periods of time.  And we would

24    accept those that met the standard that had been set in the

25    documentation we put forth for the venders.  Venders always

1    had documentation as to what was expected of them.  And if the

2    venders didn't meet those expectations, their request was

3    denied.

4    Q.    And I'd like to look at a document related to the -- to

5    the declaration we just looked at.  Can we pull up Exhibit

6    364.  If we can zoom in on this.  Is this another document

7    from the patent and trademark office?

8    A.    It is.  It's from the patent and trademark office

9    recognizing that the patent that Penn State had requested was

10   approved.

11   Q.    Thank you.  I'm sorry.  Trademark?

12   A.    Yeah -- I'm sorry.  It's from the patent office -- patent

13   and trademark office.  It's from the trademark statute.  I'm

14   sorry.

15   Q.    No.  Don't.  Don't.  It's been a long day.

16   A.    This -- this is actually publicly available on the patent

17   and trademark office website.

18   Q.    Thank you.  So the patent and trademark office accepted

19   Penn State's examples of how it was using the trademark?

20   A.    Yes, it does.

21   Q.    And if you can look at the last line here, what did the

22   patent and trademark office convey to Penn State?

23   A.    Your request fulfills the statutory requirements and has

24   been accepted.

25   Q.    Thank you, Ms. Esposito.

```
 1              And one more of these to look at.  So that first

 2    one was related to the University's seal.  Can we look at

 3    Exhibit 354.

 4              MR. HARMS:  No objection.

 5    BY MS. WHEATLEY:

 6    Q.   Is this -- if we can zoom in to the top.  Is this a

 7    similar sort of declaration to the trademark office?

 8    A.   It is.  It's for the mark Penn State.  And it was

 9    submitted December 11th, 1984 by the same David Brannigan.

10    Q.   Actually scroll to the end.  And I see the date there.

11    When did he -- if you can scroll to the signature page.

12    A.   It was submitted in April 24th, 1990.

13    Q.   Was this was a renewal of the trademark?

14    A.   Yes.

15    Q.   And scrolling through the examples of use attached to

16    this one.  Can you let me know if you recognize these from

17    your time at Penn State on the licensing committee?

18    A.   Yeah.  There are all kinds of memorabilia from cheering

19    horns to the unfortunate stuffed Lion that you just showed.

20    Q.   He looks a little bummed out.

21    A.   He does look a little bummed out.  I will say that there

22    were items that the licensing committee turned down.  There

23    were two that come to my mind is particularly reasons that we

24    had reasons to turn them down.  We had at one point had a

25    request to put the lady in the red shoes.  She was posed by
```

1  the Nittany Lion, and all she had on was the red shoes.  And

2  that was supposed to be a -- put on t-shirts.  We rejected

3  that.  We also rejected a Penn State coffin, which was blue

4  and white and the -- blue on the outside, or white on the

5  inside, and all of the -- the top of the coffin was Penn State

6  symbols.  We rejected that, as well.  They were considered

7  inappropriate.

8  Q.  Understood.

9       And to your knowledge, was this declaration on the

10  use of the trademark Penn State also accepted by the trademark

11  office?

12  A.  Yes, it was.

13  Q.  When you were on the licensing committee, were potential

14  licensees required to submit samples of their products?

15  A.  Yeah.  Initially they were asked to submit samples of

16  their products, and we actually kept all the samples until it

17  became a space consideration, at which point we went to asking

18  for photographs and would only ask for samples if we had

19  additional questions.

20  Q.  And you mentioned quality restrictions on the merchandise

21  that was -- that was given permission to use the Penn State

22  trademarks.  What sort of things would you look for the

23  products?

24  A.  The quality in the production of the product, the type of

25  materials that were being used, was it being fairly sourced,

1    and also were the images appropriate to the message for the

2    University.

3    Q.   Do you recall why the University had rules in place about

4    how the trademarks were being used?

5    A.   Because the University wanted to protect what people

6    believed were symbols of its heritage and its history.  I mean

7    some of these images go back hundreds of years for Penn State.

8    And they're very tired to alums and fans in terms of how they

9    think about Penn State.

10            Specifically, the seal.  Just recently in a Penn

11   State alumni magazine, there was an alum who was asking about

12   the seal.  And then the Nittany Lion shrine is absolutely

13   affiliated with Penn State in peoples' minds.

14   Q.   And in the time you were on the licensing committee, were

15   there ever times where people sold Penn State merchandise

16   without a license?

17   A.   Yes, there were.  We would -- we would -- the University

18   would send a cease and desist letter.  If the cease and desist

19   letter wasn't sufficient to stop the sale, they would pursue

20   legal action.

21   Q.   And generally, was a cease and desist letter sufficient?

22   A.   95 percent of the time.

23   Q.   And I believe you mentioned, has -- in your experience on

24   the licensing committee, has the University generally, you

25   know, used throw back or retro designs at times?

1    A.    Um-hum.  Yes.  They used retro -- students like doing

2    that.  They like to use throw back designs, especially when it

3    comes time for the anniversary.  Because the university's

4    anniversary is February 22nd, 1855.  That's when the charter

5    was signed.  And so usually around that period of time, they

6    will -- they will do throw back.

7    Q.   And over the time you were at the University, did Penn

8    State's number of companies who were permitted to use the Penn

9    State trademarks grow?

10   A.   Exponentially, especially once the football team got

11   really popular and the football team was going to

12   championships.  And so by '82, '83, '86, when we were having

13   the good years, it grew exponentially, then was part of the

14   reason, once we joined the Big Ten, that we started working

15   with CLC because the operation became sizemetically large for

16   the six-person committee that was sitting reviewing these

17   things.

18   Q.   And when companies were granted permission to use a Penn

19   State trademark on merchandise, did Penn State receive any

20   sort of payment from those companies?

21   A.   They usually received a royalty.  The royalty was usually

22   between 7 and 10 percent.

23   Q.   Ms. Esposito, have you, yourself, ever bought Penn State

24   clothing?

25   A.   Yes.  Multiple times in my 35 years of Penn State.

1  Q.   I have to ask.

2  A.   I know.  I am -- when I'm doing public presentations, I

3  usually will wear Penn State clothing.  And several babies

4  that have been born in the family has gotten Penn State

5  clothing.  Yes, I do buy Penn State clothing.

6  Q.   And about how many pieces have you bought, would you say?

7  A.   Hundreds.  There's at least 20 in my closet right now

8  that I swap out, depending on what I'm doing.

9  Q.   If Penn State's mascot were still Coalie the mule, who

10 you mentioned earlier, would it make a difference to you in

11 wanting to buy Penn State clothing?

12 A.   It depends on what the values are for Penn State.  You

13 know, for me, Penn State's values are its education and its

14 research, and I work with a lot of students -- I've always

15 worked with a lot of students who believe that value, believe

16 what they're getting from Penn State, and so if we had gotten

17 to a point where it was going to be the black and pink mule,

18 and that was going to be what we were going to be, I think

19 that works.  I mean the University of Southern California in

20 Santa Barbara has a banana sees low as their mascot, you know.

21 I think that your loyalty is to your school, and Penn State

22 students and alums are extremely loyal to what they believe

23 the values of the school are, in my experience.

24 Q.   And so when you purchase Penn State merchandise, does the

25 University's reputation influence your purchase decision?

ROUGH DRAFT

1    A.    Yes.

2    Q.    And do you recall some of the retailers who you've gotten

3    merchandise from?

4    A.    I usually buy all of my Penn State merchandise from the

5    retailers downtown.  I like to shop local.  I'm not a big box

6    store shopper normally.  Occasionally I will go to Walmart.

7    But normally, I prefer to go to the local stores downtown.

8    Q.    And have you ever bought Penn State clothing knowing it

9    wasn't sold or authorized by the University?

10   A.    Not knowingly.

11   Q.    And does it matter to you, as a consumer, whether the

12   university approves of the Penn State clothing a merchandise?

13   A.    Yes.  But part of that is my experience at the University

14   and my years at the University, but part of it has to do with

15   the quality of the images.

16          MS. WHEATLEY:  No further questions, Ms. Esposito.

17          THE COURT:  Thank you.

18          Defense Counsel care to cross-examine?

19          MR. HARMS:  Yes, Your Honor.

20          THE COURT:  Go right ahead, sir.

21                    CROSS EXAMINATION

22   BY MR. HARMS:

23   Q.    Good afternoon.  We haven't met before, have we?

24   A.    Not that I know of.

25   Q.    Not that I know of either.

ROUGH DRAFT

1    A.    I'm not good with faces, though.

2    Q.    I'm Josh Harms.  I'm one of the attorneys for the

3    Defendants.  I have a few questions for you today.  This will

4    be pretty quick.

5            Penn State developed a licensing program in 1983, I

6    believe that's correct?

7    A.    No.  1982, yes.

8    Q.    1982.  Thank you.  Is that also when the licensing

9    committee began?

10   A.    Yes.  It was chartered by the president to take care of

11   this issue that had become too big for the finance office to

12   handle.

13   Q.    Um-hum.  And then you joined the licensing committee in

14   1986, I believe, you testified to?

15   A.    1989.

16   Q.    1989?

17   A.    My boss had been on it prior to that.  The University

18   archivist was asked to be on the committee, specifically to

19   identify historical images.

20   Q.    Understood.  I believe you mentioned in your testimony

21   that in 1989, the licensing committee retained CLC; is that

22   correct?

23   A.    The university retained CLC.  It was part of the

24   agreement that they made with the Big Ten.  The Big Ten had

25   already committed a contract with the CLC as part of the Big

1  Ten, we were encouraged to join that.

2  Q.   And that was in 1989?

3  A.   Yes.

4  Q.   You mentioned that reviewing products became too big of a

5  job for the licensing committee.  Could you explain more what

6  you meant by that?

7  A.   That's the number of venders, the type of items.  And

8  sometimes the short turnaround.

9  Q.   Um-hum.

10  A.   You know, for example, right now, the licensing committee

11  would be anticipating championship games and bowl games, and

12  you have a real short turnaround on things like that.  And

13  when the committees's only meeting once a month, or, you know

14  -- actually, this was meeting quarterly, we had to start going

15  to once a month.  And then we would have ad hoc meetings if we

16  had to or short periods of time.  So it was the number of

17  venders, the number of requests they were getting.  It was

18  much more than a six-person committee could handle.

19  Q.   And when did that start happening?

20  A.   The late 90s, '96, '97

21  Q.   Can you estimate about how many licensees for retail

22  merchandise the University had at that point?

23  A.   I could not, no.  But it was -- it was in the thousands.

24  Q.   It was in the thousands?

25  A.   Yes.

1    Q.    And you had received photographs --

2    A.    Yes.

3    Q.    -- of merchandise from --

4    A.    And all those photographs are in the binders, in the

5    records, under the licensing committee's record group.

6    Q.    Understood.  And that's what the licensing committee

7    would review?

8    A.    Yes.

9    Q.    For product quality?

10   A.    Yes.  If we had questions, we would actually ask to see

11   samples.

12   Q.    Right.  How often did you have questions?

13   A.    Maybe one in four or five times.  Maybe, you know, 10, 20

14   percent of the time.

15   Q.    10 or 20 percent of the time?

16   A.    Um-hum.

17   Q.    You were asked?

18   A.    To see actual samples.  When we stopped collecting

19   samples and we were looking at photos, when we would get

20   samples, we would send them back to the vendor.

21   Q.    Understood.  During your testimony, you mentioned

22   rejecting designs.  I think you mentioned rejecting a coffin

23   design?

24   A.    Um-hum.

25   Q.    So in those situations, you were rejecting a design,

1    rather than the physical item, correct?

2    A.    It was both.  It was both the physical item and the

3    design.

4    Q.    Okay?

5    A.    It was deemed to be inappropriate at the time.  Now I

6    don't know if it has got tone -- you know, if -- since I no

7    longer served on the licensing committee, they have since

8    approved a Penn State could have fin.

9              But at the time, we were presented with it, we felt

10   it was inappropriate.

11   Q.    Understood.  Just looking at how products appear in a

12   photograph, that doesn't really tell you about the actual

13   material though, does it?

14   A.    No.  The surrender had to provide specifications.

15   Q.    Specifications.  Can you please explain?

16   A.    There were guidelines as to every surrender as to what

17   they were to provide us so we could make decisions and there

18   were specifics as to what kind of materials had to be used

19   and, you know, the quality of the materials.

20   Q.    But you couldn't assess those materials in person?

21   A.    No.  But if we had a question, we asked for a sample.

22   Q.    Okay.  What would trigger you to have a question about

23   them?

24   A.    Usually if the imprint on the shirt was blurry, or if the

25   image did not look like it should look, you know, if -- if

1    there were misspellings, I know that sounds ridiculous, but

2    we would get examples that misspellings on them.  And, you

3    know, then you contact the vendor and ask for things to be

4    fixed.

5    Q.    So that would be an issue with the design that was

6    printed on the merchandise?

7    A.    Yes.

8    Q.    Okay.  Is that also the quality -- that also affect the

9    quality of the product, the tangible thing?

10   A.    Not -- it wouldn't necessarily have to.  I do not work in

11   retail.  I was there to review the validity of the request

12   based on the images and on the use of the marks.

13   Q.    Understood.  Did the licensing committee focus on

14   licensing designs for Penn State fan apparel and fan

15   merchandise?  Would that be a fair way to characterize it?

16   A.    That's who the audience was.  They were selling it to

17   Penn State students, Penn State alums.  I assume that those

18   people are Penn State fans.

19   Q.    Right.  And this might be a silly question, but bear with

20   me.  Why was the target market for these items Penn State

21   fans?  Why wasn't it the public generally?

22            MS. WHEATLEY:  Objection.  Foundation.

23            MR. HARMS:  I believe this is directly consistent

24   with something she talked about during her direct.

25            THE COURT:  I agree.  Objection noted.  Overruled.

1    Go ahead.

2              THE WITNESS:  Could you repeat the question?

3              MR. HARMS:  Yes.

4    BY MR. HARMS:

5    Q.   Why would the Penn State fan merchandise and fan apparel

6    be marketed directly to Penn State fans and Penn State

7    supporters, rather than the public at large?

8              MS. WHEATLEY:  I'll renew the objection, but I

9    understand.

10             THE COURT:  Objection noted.  Overruled.

11   BY MR. HARMS:

12   Q.   You may answer.

13             THE COURT:  Go ahead, ma'am.

14             THE WITNESS:  The audience for the apparel were for

15   people who supported Penn State, Penn State students, Penn

16   State alumni.  They tend to be Penn State fans.  I wouldn't

17   imagine that the general public would buying Penn State stuff

18   if they weren't Penn State fans.  My -- you know, my brother

19   lives in Brooklyn.  And the Penn State material he has is

20   stuff I've sent to him because his sister lives in State

21   College, not because he's a Penn State fan necessarily, but

22   because he's received it as a gift from somebody who is

23   associated with Penn State.

24   BY MR. HARMS:

25   Q.   You mentioned during your testimony a moment ago that

1    you, yourself, own fan apparel?

2    A.    I do.

3    Q.    And you testified, I believe, that you own it because of

4    the reputation of Penn State?

5    A.    Absolutely.

6    Q.    Can you please explain more what you mean by reputation

7    in that context?

8    A.    I personally believe in the value of the education and

9    the research that's done at Penn State.  I personally believe

10   that students from working class families should have a

11   university to go to that first generation students should have

12   a school that's theirs that they can go to that they can have

13   loyalty to.  I believe in those things that are part of the

14   mission statement of Penn State.  That's important to me.  It

15   was important to me when I was hired at Penn State.  It's

16   important to me as part of being an employee of Penn State,

17   even though I'm retired from Penn State.  That still means a

18   great deal to me.

19          And when I purchase Penn State apparel to give as

20   gifts, it's because I'm proud of the things that Penn State

21   has done.  Penn State is responsible for thousands of

22   inventions and innovations, and I am really proud of that

23   record of what Penn State has done since 1855.

24   Q.    I appreciate that answer, Ms. Esposito.

25          Let's pull up Exhibit D-105.  And we're not going

1  to publish this to the jury right now.  And I apologize.

2  Actually, let's pull up P-22.  Sorry about that.

3          Do you remember testify -- do you remember

4  testifying about this a moment ago, Ms. Esposito?

5  A.   Yes.  From -- from Dr. John Ozwald.  It's in the

6  president's papers in the University archives.

7  Q.   Let's turn down to page 3 of this memo.  And I want to

8  look at this heading one.  Advantages of protection of marks.

9  I'm going to read 1 A.  Enable the University to stop the

10  unauthorized use by any person or company of the university's

11  marks, names, or symbols.  Did I read that correctly?

12  A.   Yes.

13  Q.   And there are a few sub points below 1 A that I'd like

14  you to read to yourself.  Please let me know when you've done

15  that.

16  A.   ( The witness complies. )  Okay.

17  Q.   Does any of this mention consumer confusion, confusion

18  about the source of products?

19  A.   It's -- stops such use on goods or services for which it

20  is not authorized by a license agreement.  I don't know -- I

21  don't understand what you're leading toward.

22  Q.   Were you on the licensing committee when this memo was

23  issued?

24  A.   I was not.  I was not even working at Penn State until

25  1986.  My boss was, and when he decided to step down from the

1   licensing committee, I was appointed to the licensing

2   committee because we had -- the president's office felt there

3   needed to be a representative from the University archives on

4   the committee to protect the University's historical images.

5   Q.   We talked a moment ago about -- we can take this exhibit

6   down.  We talked a moment ago about Collegiate Licensing

7   Companies, CLC, and you testified that that relationship with

8   the University began in 1989, I believe.  Is that correct?

9   A.   Yes.

10  Q.   Let's pull up Exhibit D-105.  This won't be published.

11  And let's scroll down a little bit.  Ms. Esposito, I'd like

12  you to read this first full paragraph of this letter to

13  yourself.  And let me know when you've done that.

14  A.   ( The witness complied.  )

15       MS. WHEATLEY:  I'll object to using this exhibit

16  with this witness for lack of foundation, hearsay.

17       MR. HARMS:  Have you finished reading the first

18  paragraph of the letter, Ms. Esposito?

19       THE WITNESS:  This is from Michigan State.  This is

20  not from Penn State.

21       THE COURT:  Well, I think the question is have you

22  finished reading the first paragraph?

23       THE WITNESS:  I've read the first paragraph, yes.

24       THE COURT:  Mr. Harms, ask your next question.

25       MR. HARMS:  Thank you.

1    MS. WHEATLEY:  I will renew the objection to asking

2  the witness about a letter from Michigan State.

3    MR. HARMS:  It's a letter on behalf of Penn State

4  and Michigan State and all the other schools that CLC

5  represents.

6    THE COURT:  I'll let you explore this.  The

7  objection's overruled.  Go ahead.

8  BY MR. HARMS:

9  Q.   You see that the sentence that says on behalf of the

10  colleges that we represent.  Do you see that?

11  A.   Yes.

12  Q.   And if we scroll up to the top of the letter, we see this

13  is from the Collegiate Licensing Company, and it's dated May

14  3rd, 1991, correct?

15  A.   Yes.

16  Q.   And would the license -- the colleges that the Collegiate

17  Licensing Company represents at that time include Penn State?

18  A.   We just joined the Big Ten in 1991.

19  Q.   And you've testified earlier that the relationship

20  between Collegiate Licensing Company and Penn State began in

21  1989, I believe?

22  A.   We joined the Big Ten.  Part of the Big Ten -- joining

23  the Big Ten meant contracts with other corporations that were

24  part of the Big Ten, and Collegiate Licensing was part of

25  that.  We joined the Big Ten in 1991.  Most of the other

ROUGH DRAFT

```
 1   contracts were after 1991.  Is that --
 2   Q.   I suppose the contract between the University and CLC
 3   specifically, not the contract between the University and
 4   other sub licensees.
 5        I believe you had testified that was 1989?
 6   A.   That was my understanding, yes.  If it was earlier, I
 7   apologize for my mistake.
 8        MR. HARMS:  Your Honor, I'd move to admit this
 9   Exhibit, D-105.
10        MS. WHEATLEY:  Objection.  Foundation.  Relevance.
11        THE COURT:  What is the relevance of this?
12        MR. HARMS:  It goes --
13        THE COURT:  Where are you going with this,
14   Mr. Harms?
15        MR. HARMS:  It goes on to describe the official
16   label, if you look at the label marketing concept, under such
17   matters that are going to be explored in this case, perhaps
18   not with this witness for too long, but later in the case.
19        MS. WHEATLEY:  Objection.  Hearsay.  This has not
20   been authenticated in any way.  It is not from anyone involved
21   in this case.
22        MR. HARMS:  It's a statement by a party agent.  And
23   there was no authenticity objection.
24        MS. WHEATLEY:  We objected based on hearsay.  And
25   also, I don't think there's been any evidence that this was a
```

1  party agent, that this was on behalf of Penn State.

2           THE COURT:  Is it a party agent?  CLC?

3           MR. HARMS:  And it says the colleges that we

4  represent, and it's May of 1991.

5           MS. WHEATLEY:  There has been no witness who has

6  testified to any of the facts that Mr. Harms is asserting.

7  This is not -- Ms. Esposito has not been able to authenticate

8  this document.  I don't see how this can come into evidence.

9           THE COURT:  Yeah.  I'm inclined to agree.  I will

10  disallow it.  Objection sustained.

11           MR. HARMS:  That is all right.  We can move on.

12  BY MR. HARMS:

13  Q.   Let's go to Exhibit D-28.  This will be my last few

14  questions for you, Ms. Esposito.

15           I don't believe this has been admitted yet.  I

16  don't think there is an objection, Ms. Wheatley?

17           MS. WHEATLEY:  No.

18           THE COURT:  What's the Exhibit Number?

19           MR. HARMS:  D-28.

20           THE COURT:  D-28?

21           MR. HARMS:  Yes, Your Honor.

22           MS. WHEATLEY:  No objection, provided Ms. Esposito

23  is familiar with it.

24           THE COURT:  Let's start there.

25  BY MR. HARMS:

1  Q.   Ms. Esposito, have you seen this document before?

2  A.   I've seen documents similar to this.

3  Q.   You've seen documents similar to this, the Penn State

4  brand book?

5  A.   Yes.

6        MR. HARMS:  I would move to admit it, Your Honor.

7        MS. WHEATLEY:  I would object to asking

8  Ms. Esposito about this document if she hasn't seen it.  I

9  have no objection to asking a witness who is familiar with it

10  about it.

11        THE COURT:  Do you want to lay more of a foundation

12  with this witness, Mr. Harms, go ahead.

13        MR. HARMS:  Yes, Your Honor.

14  BY MR. HARMS:

15  Q.   How -- in what context have you seen this document

16  before?  Have you seen is it on Penn State's website?

17  A.   I have seen versions of the visual identity standards as

18  part of the licensing committee and as part of the

19  documentation in the archives of how venders and users are

20  expected to use symbols related to the University.  I don't

21  necessarily believe I've seen this one in particular.  But

22  there have been versions of this.

23  Q.   And do you understand this to be a version of what you

24  were just describing, a later version, perhaps?

25  A.   Definitely a later version.

ROUGH DRAFT

 1          MR. HARMS:  Your Honor, I would move to admit.

 2          MS. WHEATLEY:  Your Honor, if this was after

 3  Ms. Esposito's time at Penn State, I don't think it's fair to

 4  ask her to testify about it.

 5          MR. HARMS:  Your Honor, I would also note that

 6  there were no objections to this exhibit when it was

 7  identified.

 8          THE COURT:  They also didn't know which -- I think

 9  the witness was going to be explaining it.

10          What else -- what else do you have -- what else do

11  you have in terms of this exhibit in regards to questions for

12  this particular witness?

13  BY MR. HARMS:

14  Q.   Ms. Esposito, earlier you talked about the athletics

15  mark.

16  A.   The Pozniak mark?

17  Q.   The athletics mark.  I believe it's the modern mark.

18  It's a side profile of the Nittany Lion that's used for the

19  Penn State athletics teams?

20  A.   I talked about the Pozniak mark.  I haven't talked about

21  any other mark.

22  Q.   Is there another mark that the Penn State teams use

23  currently that's not the Pozniak Lion?

24  A.   Penn State, just within the last two weeks, changed their

25  marking.  I don't know what specific mark you're talking

1  about.

2  Q.   Have you heard of the chipmunk mark?

3  A.   I have, yes.  I've heard that derogatory name use.

4  Q.   And I apologize.  I don't mean to use it in a derogatory

5  --

6  A.   No.  You're not the only one.  It was widely referred to

7  as the chipmunk mark.  Yes, I am familiar with the chipmunk.

8  Q.   And would you please describe that?

9  A.   It's a lion face with puffed cheeks.  And that's why it

10  was referred to as the chipmunk, because of the puffed cheeks.

11  Q.   And that's considered to be the Penn State athletic

12  trademark, correct?

13  A.   It was used by Penn State athletics for a number of

14  years.  I don't know that it's still used by Penn State

15  athletics.

16  Q.   During that period of use, was it designated as the

17  athletic trademark?

18  A.   Not -- I don't know if that was its sole designation.

19  Q.   Okay.  What about the Lion and shield design, I'll call

20  it.  Are you familiar with that logo?

21  A.   A Lion's face in the shield?

22  Q.   Yes.

23  A.   For Penn State or -- I mean specifically for Penn State?

24  Q.   Yes.  Yes.  For Penn State, Are you aware of Penn State

25  having a logo that it uses that is a Lion in a shield?

1  A.   I've seen lots of images in publications at Penn State,

2  starting in the 1880s when the first yearbook was published.

3  There have been many versions of lions, lions and shields,

4  lions and keystones.  You'd have to be a whole lot more

5  specific.

6  Q.   This would be the modern academic trademark that Penn

7  State uses, the Lion in the shield.

8  A.   I would need to see it.  I'm sorry.

9          MR. HARMS:  No further questions, Your Honor.

10          THE COURT:  Thank you.  Any redirect?

11          MS. WHEATLEY:  Just briefly.

12                    REDIRECT EXAMINATION

13  BY MS. WHEATLEY:

14  Q.   Ms. Esposito, when you reviewed products as part of the

15  licensing committee at Penn State, did you take your job

16  seriously?

17  A.   I took every day of my job seriously.  I was responsible

18  for the University documents.  I was responsible for the

19  University's history.  I'm the person who was asked to speak

20  for those documents and to protect those documents, and to

21  make them accessible -- as accessible as possible.  I took my

22  job extraordinarily seriously.

23  Q.   And did you take the quality of Penn State's products

24  that had Penn State symbols on them seriously?

25  A.   Absolutely.  It was very important to me, and what people

1   were seeing represented Penn State.  It's still very important

2   to me.  When I do presentations, when I do workshops, I always

3   talk about the integrity and the value of Penn State and what

4   it has done in 165 years.  It has not been perfect, every one

5   of those 165 years.  But it has done a whole lot for the

6   Commonwealth that it can be very proud of.  And when people

7   look at the Penn State name and logos, that's what most alums

8   that I've met in my lifetime see when they see that image.

9          MS. WHEATLEY:  Thank you very much, Ms. Esposito.

10  No further questions.

11         THE COURT:  Any recross examination?

12         MR. HARMS:  No, Your Honor.

13         THE COURT:  Ms. Esposito, thank you very much for

14  your testimony.  You may stand down with the thanks of the

15  Court.  Unless you have a very short witness, I think this is

16  a good time to recess, Mr. Finkelson?

17         MR. FINKELSON:  Agree, Your Honor.  I think our

18  witness will be too long for that, and it's been a long day

19  for everyone.

20         THE COURT:  Indeed.

21         Ladies and gentlemen, you've heard the first day of

22  testimony.  Again, please don't discuss this case amongst

23  yourselves or with anyone else, other than if you return home

24  tonight to tell people that you are associated with that you

25  have been called to jury duty.  You're serving as a juror in a

1   federal case, and you can tell them generally what the case is

2   about.  That's it.

3          I'll have you back tomorrow ideally by about 9:15.

4   You're going to assemble in the jury assembly room by room on

5   the second floor as you did this morning.  And by 9:30, you

6   should be up in the jury room and we'll be ready to begin

7   testimony for tomorrow.  So Court will stand in recess then

8   until 9:30 a.m. Wednesday, November 13.  If you want to escort

9   the jury out, please.

10          (At 4:56 p.m., the jury left the courtroom and were

11           excused for the day.)

12          THE COURT:  So, Ms. Wheatley, Mr. Finkelson, where

13   are we going to go tomorrow?

14          MS. WHEATLEY:  I believe we will hear from

15   Ms. Petulla and Mr. Howell.  We may play some --

16          THE COURT:  I'm sorry.  Say it again?

17          MS. WHEATLEY:  Ms. Petulla, Mr. Howell.  And we may

18   play some of our designated depositions.

19          THE COURT:  What about Ms. Gummo?

20          MR. FINKELSON:  I don't think, Your Honor, we will

21   get to Ms. Gummo tomorrow.  If we have Mr. Howell, Ms.

22   Petulla and the depositions.  I think it will be likely that

23   Ms. Gummo will be pushed to the following day.

24          THE COURT:  So how long is Ms. Petulla's testimony?

25          MR. FINKELSON:  Quite long.  Mr. Howell is

1  considerably shorter.

2       THE COURT:  When you say quite long, how many --

3  Ms. Wheatley?

4       MS. WHEATLEY:  I think it could easily take three,

5  three-and-a-half hours just because of the establishing use

6  and that evidence.

7       THE COURT:  So it will take the morning in to the

8  afternoon?

9       MS. WHEATLEY:  I think quite possibly.

10       THE COURT:  What sort of cross examination do you

11  have for Ms. Petulla?  Who is going to examine?

12       MR. FETTERS:  I will be cross-examining.  But I

13  imagine it will be much shorter.  An hour, at most.

14       THE COURT:  You really think it will be that long?

15  Why would it be that long?

16       MS. WHEATLEY:  She goes through the trademark

17  registrations and the evidence of use.  And she goes through

18  the University's quality control.  I think some of that was

19  taken care of today.

20       THE COURT:  This -- well that's what I'm wondering.

21  Do the best that you can.  And Mr. Howell, what is -- he's

22  from CLC.

23       MR. FINKELSON:  He's from CLC.  I suspect that

24  Mr. Howell, on direct, will be less than an hour.

25       THE COURT:  Who is going to cross-examine?

1           MR. HARMS:  Me, Your Honor.  And the cross will not
2    be very long.

3           THE COURT:  And you want to play some depositions.

4           MR. FINKELSON:  They are, Your Honor.  We've
5    significantly reduced the deposition lengths.  So we exchanged
6    new designations with the other side over the weekend.  We're
7    under two hours in on all of the depositions that we're
8    playing in our case in chief.  So I think it's an hour and --

9           THE COURT:  So who are we hearing from tomorrow.

10          MR. FINKELSON:  So tomorrow you're going to hear--
11   we'll decide on the offered this evening.  But tomorrow you
12   will hear from both Ms.  Petulla and Mr. Howell, and then you
13   will most likely hear video testimony.

14          THE COURT:  Video.

15          MR. FINKELSON:  If we can get Ms. Gummo on, we will
16   certainly try.  That's the next in the row for us.  That will
17   leave two witnesses for us.

18          THE COURT:  But who am I hearing by way of video
19   deposition tomorrow?

20          MR. FINKELSON:  Oh.  It is -- it is -- we have
21   four.  One is Erik Hartvigson, one is Chad Hartvigson, one is
22   Michelle Young, and the other is Ms.  Matthew, who was
23   referred to today.  Those are the four that we are intend to
24   go play tomorrow, depending on time, and then there's one
25   other deponent that we're still making decisions on Mr.

1   Delong.

2          THE COURT:  And then you might get to Ms. Gummo is

3   what you're telling me.

4          MR. FINKELSON:  We may get to Ms. Gummo.  We're

5   certainly going to try.  Certainly if the cross examinations

6   are relatively short, we would get to Ms. Gummo and we'll

7   disclose her to the other side tonight, that's she'll be a

8   witness tomorrow.  And then that will leave Mr. Franklyn

9          THE COURT:  And if you don't put Ms.  Gummo on

10  tomorrow, she would role in to Thursday, the 14th.

11         MR. FINKELSON:  She would, Your Honor.  And then no

12  assurances as to the order as between Mr. McGrath and Mr.

13  Franklyn.  Those would be our two final witnesses.  I think

14  Mr. McGrath would be relatively short.  It's our current

15  expectation, Your Honor, that, you know, we'll rest our case

16  either end of day Thursday, probably more likely sometime

17  early on Friday.  But -- but resting on Thursday is not out of

18  the question if we continue to move at the pace we're moving

19         THE COURT:  Very good.  What -- may I ask.  And I

20  appreciate this.  You've listed a Sunbury of the -- I want to

21  describe sort of as the business records custodians for CLC.

22  Internet archives, an individual from San Francisco, a Mr.

23  Franklyn white, who is an Internet archivist, I guess, Garnett

24  Lee for authentication purposes?  Is there going to be a need

25  to that or have you come to stipulations on this?

1      MR. FINKELSON:  I think we've come to an agreement

2  on most of the exhibits that would have come with that.  And

3  then Your Honor has dealt.  I think we have one potential

4  authentication witness.  We have a sweatshirt that are as the

5  Pozniak lion on it.  And based on the meet and confer last

6  night, my understanding is that the Defendants are insist

7  {thaing} we put on a authenticating witness.  That

8  authenticating witness would be our client, Mr. Blue won,

9  whose sweatshirt it is.  That seems un{snes}, but if the other

10  side wants us to do that, we can put Mr. {pwul} {la} {pwon} on

11  the stand to do, that's and we would probably do that tomorrow

12  if we can't reach an agreement to avoid that tonight.

13      THE COURT:  All right.  Well do what {uz} can with

14  that.

15      All right.  Very good.

16      So with that -- Thank you, Counsel.

17      So with that in mind, so the Defense has to assume

18  that you may very well commence your case Friday.  So you're

19  going to have your witnesses around for that purpose?  No

20  reason to think it's any earlier than that, I think, once the

21  path has been chartered here.  I'm looking at you, Mr.

22  Fetters, but I mean to everyone.

23      MR. FETTERS:  We would be ready to commence Friday.

24  Once the Plaintiff rests

25      THE COURT:  All right.  So we'll stand in recess

1  until tomorrow, which is Wednesday, November 13, 9:30 a.m..

2  Court will rise.

3          (At 5:03 p.m. the proceedings were concluded.)