```
 1                IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2                      WILLIAMSPORT DIVISION

 3   THE PENNSYLVANIA STATE    :   CASE NO.
     UNIVERSITY               :
 4        v.                  :
     VINTAGE BRAND, LLC,      :
 5   SPORTSWEAR INC., d/b/a   :
     PREP SPORTSWEAR,         :
 6   CHAD HARTVIGSON, ERIK    :
     HARTVIGSON, and          :
 7   MICHELLE YOUNG           :   4:21-CV-01091

 8

 9                   TRANSCRIPT OF PROCEEDINGS
                            Jury Trial
10                          VOLUME II

11        Held before the HONORABLE MATTHEW W. BRANN, November 13,
     2024 commencing at 9:55 a.m., Courtroom No. 1, Federal
12   Building, Williamsport, Pennsylvania.

13

14   APPEARANCES:

15   LUCY J. WHEATLEY, ESQUIRE
     McGuireWoods LLP
16   Gateway Plaza
     800 East Canal Street
17   Richmond, VA 23219-3916
     804-775-4320
18   Lwheatley@mcguirewoods.com

19   DAVID E. FINKELSON, ESQUIRE
     McGuireWoods LLP
20   Gateway Plaza, 800 East Canal Street
     Richmond, VA 23219-3196
21   804-775-1157
     Dfinkelson@mcguirewoods.com
22        For the Plaintiff

23   Proceedings recorded by machine shorthand; transcript produced
     by computer-aided transcription.
24   _____
                    Colleen V. Wentz, RMR, CRR
25                     Official Court Reporter
                 colleen_wentz@pamd.uscourts.gov
```

**ROUGH DRAFT**

```
 1   APPEARANCES (cont'd)

 2   JOHN T. FETTERS, ESQUIRE
     STOKES LAWRENCE, P.S.
 3   1420 Fifth Avenue, Suite 3000
     Seattle, WA 98101
 4   206-626-6000
     john.fetters@stokeslaw.com
 5
     JOSHUA D. HARMS, ESQUIRE
 6   STOKES LAWRENCE, P.S.
     1420 Fifth Avenue, Suite 3000
 7   Seattle, WA 98101
     206-626-6000
 8   josh.harms@stokeslaw.com

 9   MARK P. MCKENNA, ESQUIRE
     LEX LUMINA PLLC
10   745 Fifth Avenue, Suite 500
     New York, NY 10151
11   630-430-8051
     mark@lex-lumina.com
12
     LESLIE C. VANDER GRIEND, ESQUIRE
13   STOKES LAWRENCE, P.S.
     1420 Fifth Avenue, Suite 3000
14   Seattle, WA 98101
     206-626-6000
15   leslie.vandergriend@stokeslaw.com
          For the Defendants
16

17

18

19

20

21

22

23

24

25

26
```

INDEX TO WITNESSES

| FOR THE PLAINTIFF | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| David Dulabon | 4 | 6 | -- | -- |
| Scott Howell | 9 | 54 | 71 | 73 |
| Stephanie Petulla | 76 | 166 | 197 | 197 |

**ROUGH DRAFT**

```
 1                    (Proceedings commenced at 9:55 a.m.)
 2              THE COURT:  We're back on the record in the matter
 3    of the Pennsylvania State University versus Vintage Brand,
 4    LLC, et al.  The matter is docketed in this Court at Civil No.
 5    21-CV-1091.  Today is Wednesday, November 13.  Ladies and
 6    gentlemen, I hope you had a restful evening.  We'll continue
 7    now with the Plaintiff's case.  Mr. Finkelson, I believe you
 8    have another Plaintiff's witness for us?  I'm sorry.
 9    Ms. Wheatley, go right ahead.
10              MS. WHEATLEY:  The Plaintiff would like to call
11    David Dulabon as our first witness.
12              THE COURT:  Come forward, sir.
13              (The witness, David Dulabon, was sworn.)
14              COURTROOM DEPUTY:  Can I get to you state your full
15    name and spell your last name for the record.
16              THE WITNESS:  Yes.  It's David Wayne Dulabon,
17    D-u-l-a-b-o-n.
18              THE COURT:  Go right ahead.
19                         DIRECT EXAMINATION
20    BY MS. WHEATLEY:
21    Q.   Good morning, Mr. Dulabon.
22    A.   Good morning.
23    Q.   Can you tell the jury what your job is at Penn State?
24    A.   I am Associate General Counsel in the Office of General
25    Counsel.  I am one of the in-house lawyers for Penn State.
```

1   Q.   And did you attend Penn State?

2   A.   Yes, I did.

3   Q.   What years?

4   A.   1994 and graduated in May, 1998.

5          MS. WHEATLEY:  Your Honor, may I approach?

6          THE COURT:  You may.

7   BY MS. WHEATLEY:

8   Q.   Mr. Dulabon, I've just handed you what's been marked as

9   Plaintiff's Exhibit 430.  I'd like to move that into evidence

10  at this time.

11         THE COURT:  Any objection?

12         MR. FETTERS:  No objection, Your Honor.

13         THE COURT:  Duly admitted.

14  BY MS. WHEATLEY:

15  Q.   Mr. Dulabon, can you identify the item I've just handed

16  to you?

17  A.   Yes.  This is my Lion Ambassador homecoming sweatshirt

18  from fall, 1997.

19  Q.   And I think you've already answered this question.  But

20  when did you get the sweatshirt?

21  A.   Yeah.  Fall 1997 for homecoming.

22  Q.   And can you share the jury the logo on it?

23  A.   Um-hum.  (Indicating).

24  Q.   And has this sweatshirt been in your possession since you

25  got it?

ROUGH DRAFT

```
1   A.    Yes, it has.

2   Q.    Okay.  And did you buy this sweatshirt?

3   A.    Yes, I did.

4   Q.    Who did you buy it from?

5   A.    I purchased it from the Lion Ambassador organization

6   itself who collected the money to pay the local State College

7   vendor who printed the sweatshirts for us.

8   Q.    Okay.  And was the sweatshirt made custom to you, or was

9   it available to others for purchase, as well?

10  A.    It was available to all members of the Lion Ambassador

11  organization who chose to purchase the sweatshirt.  It was not

12  required -- a required purchase.

13          MS. WHEATLEY:  Thank you, Mr. Dulabon.  I'll pass

14  the witness.

15          THE COURT:  Any cross examination?

16          MR. FETTERS:  Yes, Your Honor.

17          THE COURT:  Go right ahead.

18                    CROSS EXAMINATION

19  BY MR. FETTERS:

20  Q.    Good morning, Mr. Dulabon.

21  A.    Good morning.

22  Q.    Just a few questions.  You mentioned the Lion Ambassadors

23  Club.  Please explain what that is to the jury.

24  A.    Yes.  Lion Ambassadors is Penn State's student alumni

25  core.  It is part and parcel of the Penn State Alumni
```

1    Association where students -- Penn State students would apply

2    to become a member of Lion Ambassadors.  And it was -- handled

3    a number of different of activities across campus from -- the

4    goal as to promote the traditions and well-being of Penn

5    State.  And we provided tours to prospective students.  We

6    would hold, at the time, it was called card block.  It was a

7    section in the Penn State Beaver Stadium where we would flip

8    cards to spell out words during football games.  We would have

9    a cheer section at the basketball games called roar's box and

10   other types of activities to get other students involved and

11   excited about Penn State, its history and traditions.

12   Q.    Thank you.  And Lion Ambassadors, was this a volunteer

13   position or were you paid?

14   A.    We were not paid.

15   Q.    The -- is the Pozniak lion logo that is on that, is that

16   a logo that the Lion Ambassadors, to your knowledge, had

17   special permission to print on clothing?

18   A.    Yeah.  This was a logo that was used by the Penn State

19   Alumni Association.  And it was a used as a logo to identify

20   the Lion Ambassadors, Penn State's alumni core.

21   Q.    Okay.  And I understand your testimony on direct is that

22   you were able to purchase that sweatshirt that you're holding

23   up because you were a member of the Lion Ambassadors; is that

24   right?

25   A.    That is correct.

1    Q.    Do you know if you paid at cost or full retail?  Do you

2    have any knowledge of that?

3    A.    You know, I don't recall exactly.  It was probably around

4    20 bucks.  I don't know what it was at cost at the time.  But

5    it was approximately 20 bucks.

6    Q.    And if you weren't a member of the Lion Ambassadors group

7    like yourself, you wouldn't be able to purchase a sweatshirt

8    like that; is that right?

9    A.    The -- traditionally, the gear was not available to

10   nonmembers.

11   Q.    So in the year that you bought that, the time that you

12   bought that, if I was a member -- not a member of the Lion

13   Ambassadors and I went to any of the number of on-campus

14   retail outlets, I wouldn't be able to purchase that

15   sweatshirt?

16   A.    Not this specific sweatshirt, no, because this was --

17   this was a sweatshirt that was available to the members within

18   the Lion Ambassadors.

19              MR. FETTERS:  All right.  Thank you.

20              THE COURT:  Anything else?

21              MS. WHEATLEY:  No further questions.

22              THE COURT:  Mr. Dulabon, thank you very much for

23   your testimony.  You may stand down with the thanks of the

24   Court.

25              THE WITNESS:  Thank you, Your Honor.

```
 1              THE COURT:  Counsel, call your next witness,
 2    please.
 3              MR. FINKELSON:  Plaintiffs call Scott Howell to the
 4    stand.
 5              THE COURT:  Mr. Howell, come forward and be sworn,
 6    please.
 7              (The witness, Scott Howell, was sworn.)
 8              COURTROOM DEPUTY:  Can I get you to state your full
 9    name and spell your last name for the record.
10              THE WITNESS:  My name is Scott Howell, S-c-o-t-t
11    H-o-w-e-l-l.
12              THE COURT:  Go right ahead, sir.
13                         DIRECT EXAMINATION
14    BY MR. FINKELSON:
15    Q.   Good morning, sir.  Can you please introduce yourself to
16    the jury.
17    A.   Of course.  My name is Scott Howell.  I am the senior
18    director of partnerships at CLC.  I have been there for 12
19    years, and I work closely with Penn State, among other
20    clients.
21    Q.   And is CLC an acronym for a longer company name?
22    A.   Yes.  My apologies.  The Collegiate Licensing Company,
23    also known as CLC.
24    Q.   Where do you reside, Mr. Howell?
25    A.   I live in Dallas, Texas.
```

ROUGH DRAFT

1    Q.   Can you give the jury a sense of your background prior to

2    joining the Collegiate Licensing Company?

3    A.   So I did my undergrad at the University of Texas where I

4    majored in sport management and Spanish.  After I graduated, I

5    went to grad school to further my studies in sport

6    administration at the University of North Carolina.

7              Once I graduated there, I applied for a job at CLC

8    as a coordinator supporting multiple schools, and that's where

9    I've been ever since for the past 12-plus years.

10   Q.   What degree did you obtain in graduate school?

11   A.   Sport administration, and our focus at North Carolina was

12   in collegiate sports.

13   Q.   And was that a Masters Degree?

14   A.   Yes, it was.

15   Q.   What year did you join CLC?

16   A.   I joined in the summer of 2012.

17   Q.   Can you give the jury a little better sense of what CLC

18   is?

19   A.   Of course.  I think the best way to understand it is

20   universities and colleges of various sizes across the country

21   hire us to help manage and grow their trademark licensing

22   programs.

23             Now I'd say our efforts are in three different

24   areas:  So brand management, brand marketing, and brand

25   protection.  So brand management, we assist the universities

1    in running their program.  What does that mean?  There are a

2    whole host of companies who want to -- are licensees, so

3    approved vendors who are able to make their products.  So we

4    basically streamline that process.  So we have a system that

5    allows all these companies to submit their artwork, their

6    requests.  They can add new licensees, they can monitor them

7    and ensure that they are making quality product from that

8    standpoint.

9         Marketing is the next part.  So we have all these

10   products.  It's been approved.  Now it's in the marketplace.

11   So we want people to know about it and be able to purchase it

12   and know how to purchase it and -- wherever they are.  And so

13   we run -- we partner with retailers from a national campaign

14   standpoint, and I work with them with local campaigns, as

15   well.

16        And the third part is brand protection.  And

17   unfortunately, that's needed because there are a lot of bad

18   actors out there that want to take advantage of Penn State and

19   other schools and their brands.  And so we are proactively

20   reaching out and taking down out infringing and, you know,

21   knockoff product online or in the retail marketplace and

22   ensuring that the current licensees who are approved are

23   adhering to the terms of their license agreement.

24   Q.   What are your responsibilities at CLC as senior director

25   of partnerships?

1  A.    So I work in our group called partnerships.  And so what

2  that is is we're kind of the day-to-day contacts for our

3  license -- for our university partners.  So I am over three

4  areas.  It's basically the west coast -- think of like the

5  old, you know, Pack 12 institutions, you know, Cal and

6  Stanford, also the northeast, which is going to be Syracuse,

7  West Virginia, and in the third territory is the Midd West,

8  which includes Penn State.  So I oversee about 30 schools.

9  And so I have basically oversee three different teams.  And we

10 have basically two people assigned to each territory, not

11 including myself.

12 Q.    And Penn State is one of the universities that's within

13 the ambit of your responsibility?

14 A.    Yes, it is.

15 Q.    Penn State is a CLC client currently; is that correct?

16 A.    Yes, they are.

17 Q.    For how long has that been the case, sir?

18 A.    Since the early 90s.

19 Q.    How do you and your team work with Penn State?

20 A.    Certainly.  So every school's different, but with Penn

21 State specifically, we have calls -- dedicated calls every

22 other week.  But I would say that Penn State is a very active

23 client and we're in constant communication, if not daily with

24 them.  And so what we work with them is we try to understand

25 what their goals and needs and their specific program are

1  because everyone's different.  And so we're setting up

2  meetings to understand how their royalties are trending, so

3  how their performance in the marketplace is.  Are they up or

4  are they done at certain retailers.  Who -- you know, we're

5  working on marketing campaigns to grow their exposure up

6  there.  If legal issues come up, we're working on taking down

7  bad products off the Internet.

8          And so these are just very broad goals.  But then

9  we have very specific initiatives that we work with their

10 program, as well.

11 Q.  When did you personally first starting -- when did you

12 personally start working with Penn State upon joining CLC?

13 A.  So initially when I first started, I was a coordinator,

14 and I supported three different territories, and one of those

15 territories included Penn State.  So I was working with Penn

16 State from 2012 to 2013.  Over time, I elevated in my roles at

17 CLC.  And then I was not working with them until 2021 again.

18 And I've been working with them for the past three-and-a-half

19 years.

20 Q.  When you renewed your responsibilities with Penn State in

21 2021, did you do anything to get up to speed on what Penn

22 State and CLC had done together in the intervening years?

23 A.  Absolutely.  You know, I've been there for 12 years.  So

24 I've been around on different teams who had been working with

25 Penn State.  So obviously I had those conversations.  But the

```
 1   good thing that we have is we have a whole bunch of analysis
 2   and data at our hands.  So on one piece, we have all these
 3   annual reports, and what we do for each individual school at
 4   the end of every year, we go through and analyze their
 5   program.  So how does they do, you know, what programs did
 6   they initiate.  And so I read those reports.  I talked with
 7   other team members.  And then at our hands at all times, we
 8   have our data system, so I can see the performance of the
 9   program.  I can see how they've trended, as well, so I have
10   that to look back at at any point in time, you know, in the
11   past 12 -- you know, any time during that period where I was
12   not working with them.
13   Q.   Are there any other universities in Pennsylvania for
14   which you have responsibility in addition to Penn State?
15   A.   Yes.  There are two.  I also work with the University of
16   Pittsburgh and Villanova University, as well.
17   Q.   Does CLC also partner with organizations other than
18   colleges and universities?
19   A.   We do.  While college is our primary focus and the vast
20   majority of it, we do have partnerships with other
21   organizations.  So think of sororities and fraternities, so we
22   have a handful of those that we represent on their licensing
23   needs, as well.  And then there are some other agent or groups
24   such as, like, the National Baseball Hall of Fame.  We also
25   work with those partners, as well.
```

ROUGH DRAFT

1   Q.   Are there other companies out there who do what CLC does

2   for other colleges and universities?

3   A.   Yes.  There's actually many different options that a

4   school could take.  And so there are other agencies -- well,

5   there's one called Nexus.  There's one called Exemplar who

6   have schools like the University of Pennsylvania.  There's

7   another one called Affinity, which they have a couple of

8   schools like Kansas State and Mississippi State.  And then

9   there's Fanatics Licensing.  They have several schools, as

10  well, like Notre Dame and Oregon and Wisconsin.

11          And then I would say the other option, which seems

12  a little weird, but some schools do it themselves.  So schools

13  like Ohio State, Iowa, University of Southern California,

14  those are all schools that run their trademark licensing

15  programs in-house.

16  Q.   Thank you, Mr. Howell.  Are you generally aware of the

17  Penn State trademarks that are at issue in this lawsuit?

18  A.   I am.

19  Q.   And the board that I spoke about with the jury during my

20  opening statement yesterday, do you see that and do you

21  recognize on that board the trademarks that are at issue in

22  this lawsuit?

23  A.   I do.

24  Q.   If I refer to Penn State branded merchandise in asking

25  you questions today, will you understand that to include

ROUGH DRAFT

1    merchandise bearing each of the Penn State trademarks that are

2    at issue in this lawsuit?

3    A.    Yes.

4    Q.    And does that include Penn State, the Pennsylvania State

5    University, the University seal mark, the Lion shrine mark,

6    the Pozniak lion trademark, and the S lion trademark?

7    A.    Yes.

8    Q.    Can we have Exhibit P-24, please, which has been

9    admitted.  Do you see what has been marked as Exhibit P-24 in

10   front of you, Mr. Howell?

11   A.    I do.

12   Q.    What is it?

13   A.    Yes.  So this is what we call internally an art sheet.

14   And the purpose of this art sheet is to pull together the

15   school's logos, and, in this case, Penn State had -- the top

16   use these logos.  It's not an exhaustive list of all of the

17   university's marks or logos.  But this is kind of a quick

18   reference that we assemble at the direction of each individual

19   institution.  And what we do is we put it on an art sheet like

20   this, and we provide it to their approved licensees.  So they

21   use this when they're creating designs or t-shirts or cups.

22   And then basically, they take this -- make designs and submit

23   it to Penn State for approval.

24   Q.    What is the date on this art sheet, Exhibit P-24?

25   A.    Yes.  This is a version from November -- that was created

1    on November 6th, 2017.

2    Q.    Did I hear you that the art sheet is created by CLC in

3    consultation with Penn State?

4    A.    Yes.

5    Q.    Do you see on the 2011 -- strike that.  Do you see on the

6    2017 art sheet that is P-24 references to the Penn State word

7    mark?

8    A.    Yes, I do.

9    Q.    Are there also references to the University seal mark and

10   several variations of it?

11   A.    Yes.  Three.

12   Q.    And does the Pennsylvania State University trademark

13   appear as part of the seal, as well?

14   A.    It does.

15   Q.    And do you also see on the art sheet the lion shrine

16   trademark and variations of that lion shrine trademark?

17   A.    Yes.

18   Q.    Can we please show the witness Exhibit P-23?  You and the

19   jury now have in front of you, Mr. Howell, what's been marked

20   as P-23.  Can you identify for the jury what this is please?

21   A.    Yes.  This is an earlier iteration of an art sheet that

22   was completed on May 25th, 2011.

23   Q.    Can you tell the jury whether the 2011 art sheet has the

24   word trademark Penn State included within it?

25   A.    It does.

```
1    Q.    How about the University seal mark and its variations?

2    A.    Yes.

3    Q.    And does it also have the Pennsylvania State University

4    included on it as part of the seal?

5    A.    It does.

6    Q.    Does it also have the lion shrine mark presented, as

7    well, on this art sheet?

8    A.    Yes.

9    Q.    And are those the ones colored in in yellow on the

10   screens in front of you and the jury?

11   A.    You are correct.

12   Q.    Since you joined the company, has CLC been involved in

13   Penn State's licensing of rights to use the Penn State and the

14   Pennsylvania State University word marks on merchandise?

15   A.    Absolutely.

16   Q.    How about the University seal trademark and the lion

17   shrine trademark?

18   A.    Those, as well, yes.

19   Q.    As of the time you joined CLC in 2012, was Penn State

20   authorizing licensed manufacturers to use each of those

21   trademarks, Penn State, the Pennsylvania State University, the

22   University seal, and the lion shrine on merchandise?

23   A.    Yes.  Yes.

24   Q.    Has that continued to this day, sir?

25   A.    Absolutely.
```

ROUGH DRAFT

1  Q.   Does CLC keep track of retail sales of license

2  merchandise branded with each of those trademarks that we just

3  talked about belonging to Penn State?

4  A.   Yes.  We have the ability to track those sales.

5  Q.   And when you joined CLC in 2012, were retailers selling

6  licensed merchandise with each of these trademarks, Penn

7  State, the Pennsylvania State University, the University seal,

8  and the lion shrine?

9  A.   Yes, they were.

10  Q.   Have retailers sold licensed merchandise with each of

11  those trademarks continuously from that time in 2012 through

12  today, sir?

13  A.   Yes.

14  Q.   Now, I note that the S lion logo which is at the bottom

15  of the board and is part of this case is not shown on the two

16  art sheets that we just looked at.

17           Do you have an understanding of why that is?

18  A.   I do.

19  Q.   And what is that, sir, if you could explain to the jury?

20  A.   So many institutions, you know, these are older

21  institutions have many variations of previous marks.  And so

22  they have those on a separate art sheet typically known as

23  college vault.  So these are vintage logos and they put

24  together those logos, as well.  And so that's on a separate

25  art sheet that we also manage.

1    Q.    Can you describe for the jury, please, what the college

2    vault program is?

3    A.    Yes.  So the college vault is a program that focuses on

4    these vintage marks.  So knowing that there are many consumers

5    out there, each one of those different marks, like the S lion

6    here, resonates with many different people in a different way.

7    And they have special connection to that mark.  So we want to

8    be able to create product for those consumers as well.  And so

9    we manage those logos as well, in addition to these other

10   marks on here in creating product in the marketplace.

11   Q.    Was it CLC who started the college vault program?

12   A.    We did, yes.

13   Q.    And in what year did CLC start the college vault program?

14   A.    2007.

15   Q.    What type of merchandise is included in the college vault

16   program?

17   A.    It includes all types of merchandise, from t-shirts,

18   hats, fleece, drinkware, over hard goods, as well.

19   Q.    Can we please show the witness Exhibit P-383, which has

20   already been admitted in to evidence?

21          Can you identify for the jury what exhibit P-383

22   is, Mr. Howell?

23   A.    Yes.  This is a presentation that CLC put together for

24   our clients with the college vault program and the status

25   update of the program.

1    Q.   Mr. Burkhart, can you please pull up page nine.  Can you

2    describe for the jury the image that's shown on the right in

3    this exhibit, please, Mr. Howell?

4    A.   Yes.  So this image is a t-shirt from a licensing,

5    original retro band for Boston College, and that utilizes one

6    of their vintage marks that was part of the college vault

7    program.

8    Q.   Has Penn State been part of the college vault program

9    since the beginning?

10   A.   Yes.

11   Q.   Can we please call up Exhibit P-26, which has also been

12   admitted.  You mentioned a moment ago how college vault has

13   its own art sheet.  Is Exhibit P-26 the college vault art

14   sheet for Penn State?

15   A.   It is, yes.

16   Q.   What is the date on this document, sir?

17   A.   It is January 24th, 2011.

18   Q.   And would it reflect the various vintage marks that Penn

19   State was using on licensed merchandise as of January 24th,

20   2011?

21   A.   Yes.

22   Q.   Is the S lion trademark on this 2011 art sheet, and if

23   so, can you point it out to the jury, please, sir?

24   A.   It is mark No. 16 on the art sheet.

25   Q.   Looking at this 2011 college vault art sheet, would have

1   been the highest performing vintage marks for Penn State in

2   terms of sales?

3   A.   It would be the S lion mark absolutely, that is the one

4   with the most sales that I see and the most frequented at the

5   retail marketplace.

6   Q.   And S lion products continued to be best selling vintage

7   products, excuse me, for Penn State from 2011 through today?

8   A.   Absolutely.

9   Q.   How many authorized manufacturers are there for Penn

10  State branded vintage items that are part of college vault?

11  A.   There's around 30 to 40 approved licensees.

12  Q.   Does that include any licensees here in Pennsylvania?

13  A.   It does.  There's kind of a larger one called L-2.

14  They're based out of -- outside of Philadelphia.  And then

15  also another company, which is more local to Penn State is the

16  Family Clothesline.  They're a retailer, but they also --

17  they're like J&W interest.  They are also the Family

18  Clothesline retailer.  They have rights, as well, as a local

19  carve-out for the Penn State program.

20  Q.   Were retailers selling Penn State licensed apparel and

21  merchandise branded with the S lion back when you started with

22  CLC back in 2012?

23  A.   They were.

24  Q.   Have retailers sold Penn State licensed apparel and

25  merchandise branded with the S Lion continuously from then

1  until today?

2  A.    Yes.

3  Q.    Now you pointed out where the S lion appears on this art

4  sheet.  Does this college vault art sheet also include certain

5  Penn State word marks?

6  A.    It does, yes.

7  Q.    And are those highlighted in yellow for the jury's

8  benefit?

9  A.    Yes, in various -- in various manners.

10  Q.    And those include Nos. 17 through 19 on the exhibit, and

11  also it looks like 18, 19, 21, and several others?

12  A.    Correct.

13        MR. FINKELSON:  May I approach, Your Honor?

14        THE COURT:  You may.

15  BY MR. FINKELSON:

16  Q.    I'm going to show you what has been admitted as Exhibit

17  P-437.  Can you see that, Mr. Howell?

18  A.    Yes, I do.

19  Q.    What Penn State trademark is featured on the t-shirt?

20  A.    That is the vintage mark of the S lion.

21  Q.    And is that an example of branding with a Penn State

22  trademark?

23  A.    Absolutely.

24  Q.    Thank you, sir.  If we could call up, just for the

25  witness's benefit for starters, please, Mr. Burkhart, Exhibit

1   P-385.  Do you recognize Exhibit P-385, Mr. Howell?

2   A.   I do.

3   Q.   And can you just explain what it is, sir?

4   A.   Yes.  So as I mentioned earlier about how I got up to

5   speed on the program once I came back to Penn State, looking

6   at annual reports.  This is a version of that, the 2010/11

7   year.  So it's a comprehensive year of their licensing

8   program.

9           MR. FINKELSON:  I would ask to move Exhibit P. 385

10  in to evidence and publish it to the jury, please.

11          MR. FETTERS:  No objection.

12          THE COURT:  Duly admitted.  You may publish.

13  BY MR. FINKELSON:

14  Q.   Is the jury looking at the first page of this 2010/2011

15  annual report that you just described, sir?

16  A.   Yes, that's the cover sheet.

17          COURTROOM DEPUTY:  You have to take a minute.

18          MR. FINKELSON:  So the answer to that question is

19  actually no.  But you wouldn't know and I wouldn't know.

20          COURTROOM DEPUTY:  Do you want it shown to the

21  gallery, as well?

22          MR. FINKELSON:  Everything can be shown to the

23  gallery.

24  BY MR. FINKELSON:

25  Q.   I believe the jury can now see Exhibit P. 385.  And is

1  this the 2010/2011 annual report for Penn State that you were

2  describing, sir?

3  A.   It is.

4  Q.   Can we please turn to page 21st of the pdf, Mr. Burkhart?

5  What Penn State product and trademark is shown on this page,

6  sir?

7  A.   Yes.  This is the -- it's a t-shirt bearing the vintage

8  logo of the S lion product, which is part of the college vault

9  program.

10 Q.   What does that t-shirt's presence in the fiscal year 2011

11 annual report indicate to you and to the jury?

12 A.   So what this page is dedicated to on that brand

13 development and brand marketing, it is referring to the --

14 this is discussing the college vault program and Penn State's

15 program specifically.  So you can see in that second bullet,

16 there is over $30,000 in royalties collected for Penn State

17 from college vault -- the college vault program, and that's

18 based off of sales, like that t-shirt, which was actively for

19 sale in the market during that time period.

20 Q.   Thank you, sir.  Can we please pull up Exhibit P-400,

21 just for the witness, please.

22        Do you recognize exhibit P-400, Mr. Howell?

23 A.   I do.

24 Q.   And before we publish it to the jury, can you just state

25 briefly for the record what it is?

1    A.   Yes.  So this is another annual report that's strictly

2    about Penn State and CLC's marketing efforts on behalf of Penn

3    State during that fiscal year.

4            MR. FINKELSON:  I would ask to move Exhibit P-400

5    into evidence and publish it for the jury.

6            MR. FETTERS:  No objection.

7            THE COURT:  Duly admitted.  You may publish.

8            MR. FINKELSON:  It's going to be proof that I

9    listen.

10   BY MR. FINKELSON:

11   Q.   The jury now has P-400 in front of them, Mr. Howell.  Is

12   this the 2021 to 2022 annual report strategic marketing

13   solutions program for Penn State?

14   A.   Yes.

15   Q.   And is this type of document a strategic marketing

16   solutions program report something that CLC provides to its

17   clients like Penn State on a regular basis?

18   A.   Yes.  Every year, we do.

19   Q.   Mr. Burkhart, can you please pull up page 14.  Can you

20   explain to the jury what they are looking at on page 14 of

21   Exhibit P-400, please, Mr. Howell?

22   A.   Yes.  This is -- it is a summary of a retail campaign

23   that we did with Rally House, which has many locations of Penn

24   State product.  So this was a digital campaign that we did.

25   So these were adds that were on the Internet, through social

1    media, highlighting basically during the back-to-school

2    season, for a campaign called College Colors Day.  And so this

3    campaign is displaying a product.  And here you can see it has

4    the S lion mark with product on -- in the middle there.

5    Q.   Thank you, Mr. Howell.  And I would just ask you if you

6    can, just to slow down a little bit in your answers just so

7    that the court reporter can follow you.

8    A.   Of course.

9    Q.   And does the presence of the S lion merchandise in this

10   exhibit indicate to you that vendors were actively marketing S

11   lion branded apparel at the time of this document?

12   A.   Yes.  We feature product that is available for purchase

13   for the consumers that the retailers are carrying.

14   Q.   So to what extent have CLC Penn State, or Penn State's

15   authorized vendors featured the S lion in college vault

16   marketing campaigns?

17   A.   It's featured prominently because it's one of those top

18   marks, as I had mentioned to you.  So it's one of those

19   popular that we see in the retail marketplace where retailers

20   want to bring in that specific design.

21   Q.   What are the total dollar sales of Penn State licensed

22   products with Penn State's S Lion trademark from say 2017 to

23   the present?

24             MR. HARMS:  Objection.  Relevance.

25             MR. FINKELSON:  Your Honor, it's directly relevant

ROUGH DRAFT

1    to the issues in this case.

2                THE COURT:  I agree.  Objection overruled.  Go

3    ahead.

4                THE WITNESS:  It's around $1 million since 2017.

5    BY MR. FINKELSON:

6    Q.   We talked earlier about the lion shrine trademarks.  What

7    are the total dollar sales of Penn State licensed products

8    with Penn State's lion shrine trademark from 2017 to the

9    present?

10   A.   That is also over a million dollars, as well.

11               MR. FINKELSON:  Can we bring back up P-24, please,

12   Mr. Burkhart?  And if you could zoom in on the seal marks,

13   please.

14   BY MR. FINKELSON:

15   Q.   These are the University seal -- variations of the

16   University seal trademarks we looked at earlier; is that

17   right, Mr. Howell?

18   A.   It is.

19   Q.   Is it common, in your experience, for colleges and

20   universities to have a seal?

21   A.   Absolutely.

22   Q.   And is it something that most schools have, in your

23   experience?

24   A.   Absolutely.

25   Q.   And how well does authorized merchandise with Penn

1    State's University seal sell, in your experience?

2    A.   It sells very well, across different products.  You'll

3    see it, especially on a lot of fleece -- you know, hoodies, as

4    well, but then probably most notably you would see it, you

5    know, graduation items, so graduation announcements, diploma

6    frames, that's where you really see it being really popular.

7    Q.   Sweatshirts, as well?

8    A.   Sweatshirts.

9    Q.   Can we pull up Exhibit P-392 just for the witness,

10   please.  Do you recognize exhibit P-392, Mr. Howell, and if

11   you can turn to the second page, Mr. Burkhart?

12   A.   Yes.

13   Q.   And is this a 2017 to 2018 trademark licensing annual

14   report for Penn State?

15   A.   It is.

16        MR. FINKELSON:  I would ask to move Exhibit P-392

17   in to evidence, please, Your Honor, and have it published to

18   the jury.

19        MR. HARMS:  No objection.

20        THE COURT:  Duly admitted.  You may publish.

21   BY MR. FINKELSON:

22   Q.   I see the reference to IMG College Licensing on -- on the

23   exhibit, the second page of the exhibit.  Who is that, sir?

24   A.   That is CLC.  It was a name we used to go by in this time

25   period.

1   Q.   Super.  Mr. Burkhart, can you pull up page 24, please?

2   Mr. Howell, can you please describe for the jury what it's

3   looking at here on page 24 of this exhibit under the header

4   top product designs?

5   A.   Yes.  So we mentioned earlier that we can track sales by

6   individual designs.  So this is a summary of the top 10

7   selling designs in terms of sales.

8           So for example, like in the bottom right-hand

9   corner, I talk about diploma frames with the University seal

10  mark.  You can see that right there.  And what that's saying

11  is that $124,203.20 of sales were sold for that particular

12  item during that fiscal year.

13  Q.   Thank you, sir.  Can you tell the jury, please, what are

14  the total dollars of Pennsylvania licensed products with Penn

15  State's University seal trademark from 2017 to the present?

16  A.   All together, it is over $3-and-a-half million.

17  Q.   And looking at the board that we used in openings

18  yesterday and just to remind the jury, does the University

19  seal include the word trademark, the Pennsylvania State

20  University?

21  A.   It does.

22  Q.   Setting aside its appearance within the seal, have

23  retailers also sold other Penn State license merchandise and

24  apparel on which the trademark, the Pennsylvania State

25  University appears, but not as part of the seal?

ROUGH DRAFT

1    A.    It has.

2    Q.    And has that been true from the time that you joined CLC

3    in 2012 continuously through to the present?

4    A.    Absolutely.

5    Q.    How would you characterize the volume of sales of

6    merchandise having the Pennsylvania State University but not

7    as part of the university seal?

8    A.    It is -- there are quite a bit of sales, and it is a

9    notable trademark that is used on designs.

10    Q.    Turning to the trademark Penn State, have retailers

11    continuously sold licensed Penn State apparel and merchandise

12    with that Penn State trademark from the time you joined CLC in

13    2012 through to the present?

14    A.    Absolutely.

15    Q.    How would you characterize the sales volume of Penn State

16    licensed items with that Penn State word trademark since 2017?

17    A.    It's definitely one of the most popular and used items

18    off of that art sheet.  So I was -- just off of this past

19    year, in terms of sales, just the use of Penn State alone was

20    over $10 million in one year.

21    Q.    Would it be fair to say that the sales from 2017 through

22    to the present of items using the word trademark Penn State

23    are roughly $10 million in each of those years?

24    A.    Yes.

25            MR. FINKELSON:  May I approach, Your Honor?

ROUGH DRAFT

1    THE COURT:  You may.

2    BY MR. FINKELSON:

3    Q.   Mr. Howell, I'm just showing you what was marked earlier

4    today as Exhibit P-430.  Do you recognize the Penn State

5    trademark that appears on this sweatshirt?

6    A.   Yes.  That's the Pozniak lion.

7    Q.   Has CLC kept track of sales revenues associated with Penn

8    State licensed merchandise bearing that Pozniak lion

9    trademark?

10   A.   We have.

11   Q.   During what time period, approximately, has CLC been

12   involved in tracking that?

13   A.   Since 2017.

14   Q.   Have retailers sold Penn State licensed merchandise with

15   the Pozniak lion during the period between the second half of

16   2017 and the present?

17   A.   They have.

18   Q.   When was the earliest such sale during that specific time

19   period, according to CLC's records?

20   A.   According to our records, it was in February, 2018 was

21   the first sale with -- with an apparel piece bearing that

22   mark.

23   Q.   And am I correct that prior to 2017, CLC did not track

24   sales on a mark-by-mark basis as it relates to the Pozniak

25   lion, correct?

1   A.   Correct.  We just had records of all the artwork

2   submissions.

3   Q.   Which retailer, to your understanding, made the sale of

4   the Pozniak lion merchandise in February of 2018?

5   A.   It was Barns and Nobel, when is the University's book

6   store on campus.

7   Q.   When it comes to overall sales of branded licensed

8   apparel and merchandise, how does Penn State compare, in

9   volume, to other CLC partner stores?

10  A.   Penn State consistently ranks in our top 10 schools with

11  the highest grossing income amount of sales.

12  Q.   Are there things about Penn State's branded merchandise

13  program that you would consider unique or different from other

14  universities?

15  A.   Yes.  I would say with every school's unique, but

16  especially with Penn State, with their local marketplace.  And

17  when I say local marketplace and what I mean is it's very

18  unique to have so many local retailers that service Penn State

19  in the retail marketplace.  So what I mean by that is think of

20  College Avenue.  If you've been there, there's across the

21  street from campus, there's a ton of retailers such as Family

22  Clothesline, McClenahen's Lions Pride.  Typically, there's

23  around five or six for Penn State just across the street.

24  That's not common for most other schools.  They may have one

25  other campus, but the majority of their stuff is going to be

1    in their book store, online, or other retailers like Walmart

2    or Dick's Sporting Goods.  And that piece for Penn State

3    specifically makes up a large amount of their business

4    compared to other schools.

5    Q.    How many authorized partners does Penn State have,

6    approximately overall, for the sale of Penn State-branded

7    products?

8    A.    They have around 500.

9    Q.    And does that mean that Penn State-branded products are

10   only available in that number of stores?

11   A.    No, no, no, no, no.

12   Q.    What does the 500 refer to?

13   A.    So the 500 refers to approved licensees.  So these people

14   have requested the ability to manufacturer products with Penn

15   State marks, and that they submit all those designs for

16   approvals for Penn State.  And they have relationships and

17   they have a license agreement through CLC.

18   Q.    So they're approved manufacturers; is that right?

19   A.    Correct.

20   Q.    And then the products are then made available in

21   thousands of retail stores and online?

22   A.    Yes.  So they have the ability to sell wherever they want

23   to.  So that's, you know, those campus -- or those local

24   stores that we just talked about, they can sell online, all

25   over.

1  Q.    How big would you describe the online presence of Penn

2  State authorized licensed branded merchandise?

3  A.    It's -- it continues to grow year after year.  It's about

4  probably 20 percent of their overall sales come from online.

5  Q.    Let's switch gears for a second and talk about royalties.

6  A.    Okay.

7  Q.    So when a partner sells authorized Penn State-branded

8  merchandise, does Penn State receive a share of the proceeds?

9  A.    Yes.

10 Q.    And what is the name for those proceeds?

11 A.    Those are what we call royalties.

12 Q.    And is CLC involved in the calculation or payment of

13 those royalties as it relates to Penn State, and if so, what

14 is CLC's role?

15 A.    Yes.  Our role is that every institution sets their own

16 royalty rate for their products.  And that can vary for many

17 different factors.  That's the institution's decision.  They

18 communicate that to us, and we have on records.

19        And so what happens is whenever a licensed -- an

20 approved licensee reports sales that they made to a retailer,

21 they have to report those to CLC.  And what they do is, you

22 know, they report those sales.  We have it in our system what

23 the royalty rate should be, and it calculates it.  And the

24 licensee pays us.  And then we pay the institution those

25 royalties on a quarterly basis.

ROUGH DRAFT

1   Q.   Are the royalty rates for all Penn State branded products

2   the same, or does it depend on product categories?

3   A.   No.  It depends on product categories.

4   Q.   And so are there different royalty rates, for example,

5   for apparel versus non-apparel, versus college vault?

6   A.   Yes, there are.

7   Q.   For Penn State, what is the royalty rate at the lowest

8   end?

9   A.   The lowest royalty rate is 10 percent, and usually that's

10  reserved for co-branding opportunities.  And so what I mean by

11  that is it could be with the NBA clear association.  It could

12  with be Disney.  This is where there's another rights holder

13  or a license holder, what we call -- what we call, and they

14  have those co-branded marks with Penn State and Disney

15  together.  That's on the low end.

16  Q.   Would you say co-branding is common in the industry?

17  A.   It is.

18  Q.   It's often the case that two entities' trademarks appear

19  on the same piece of apparel?

20  A.   It does.

21  Q.   Let's set aside co-branding and focus on products that

22  just have one entities' trademark on it.  Let me ask you this.

23  Are you familiar with the Defendant in this case, Vintage

24  Brand and its website?

25  A.   I am.

1   Q.   What do you know about Vintage Brand?

2   A.   I know that it's been an issue that -- that Vintage Brand

3   has been an issue with many schools.

4            MR. HARMS:  Objection.  Excluded.  Subject matter.

5            MR. FINKELSON:  We're not getting into any subject

6   matter that Your Honor has excluded.

7            THE COURT:  I'd steer clear of this area,

8   Mr. Finkelson.  While I will overrule the objection, I'd steer

9   clear of it.

10           MR. FINKELSON:  Thank you, Your Honor.

11  BY MR. FINKELSON:

12  Q.   Have you been to the Vintage Brand website?

13  A.   Yes.

14  Q.   When a product is sold by a vendor like Vintage Brand on

15  its own website, what's the basic royalty rate that Penn State

16  receives for apparel items, if such a vendor is a licensed

17  vendor?

18  A.   For the use of, say, Penn State, the Penn State mark on

19  the top of Pennsylvania State, it 18 percent.

20  Q.   And would that also be true, that 18 percent for the

21  University seal trademark and the lion shrine trademark?

22  A.   Yes.

23  Q.   What if the product that is sold by a vendor like Vintage

24  Brand on its own website, if it were a licensee, what if that

25  product was part -- had a trademark that was part of the

1  college vault program.  What would the royalty rate be for

2  that?

3  A.   It would be 22 percent for apparel and non-apparel or

4  hard goods items.

5  Q.   And setting aside the college vault trademarks for a

6  second and just focusing on trademarks like Penn State, the

7  Pennsylvania State University, the University seal and the

8  lion shrine, what is the royalty rate for those trademarks

9  when sold on non-apparel items by a company like Vintage

10 Brand, who is selling on its own website?

11 A.   That would be 14 percent.

12 Q.   So you've identified a number of different royalty rates;

13 do I have that right?

14 A.   Yes.

15 Q.   In each instance, if a vendor, such as Vintage Brand, if

16 it were licensed, if a vendor, such as Vintage Brand sold

17 product, what price is the royalty rate applied to in order to

18 calculate what amount goes to the University?

19 A.   So in a case, if Vintage Brands was licensed, what they

20 would do is if they were selling a t-shirt, they -- the

21 royalty calculation would be based off the final sale that

22 they set to the customer.

23 Q.   So would you apply the royalty rate to the retailers

24 price; is that right?

25 A.   Correct.

1  Q.   So if the jury wanted to calculate the dollar amount of

2  royalties that would go to Penn State for sales made by a

3  vendor of the same type as Vintage Brand, if it were licensed,

4  and the sales totaled $23,219.27, how would the jury do that?

5  A.   Well, it depends, because it depends on what type of

6  products they're selling, if it's all the regular marks or if

7  they're including the S lion apparel or not.  But for this

8  sake, I think just to make it easier, we would take that

9  lowest rate, which is 14 percent, and we would multiply that

10 14 percent against that $23,000 number, and that would be the

11 royalties that would be due to Penn State.

12 Q.   And using that royalty rate, would that be the most

13 conservative calculation?

14 A.   Yes, because if it were apparel items, it would be at 18

15 percent.  If it was vintage items, whether it's apparel or not

16 apparel, that would be 22 percent.

17        MR. FINKELSON:  May I approach, Your Honor, and

18 hands the witness a calculator?

19        THE COURT:  You may.

20 BY MR. FINKELSON:

21 Q.   I'm just going to ask you, Mr. Howell, to do that math

22 for the benefit of the jury.  So if you were to do that

23 calculation and you would apply a 14 percent royalty rate to

24 $23,219.27 in sales, what would be the resulting dollar

25 amount?

1    A.    23,000 --

2    Q.    $23,219.17, applying a 14 percent royalty rate?

3    A.    That would be $3,250.69.

4    Q.    Thank you, sir.  Can we please call up Exhibit P-480 for

5    the benefit of the witness.  Ms. Rhinehart, this is the

6    document, if we could just publish it for the jury and

7    Counsel.  So I would move Exhibit P-480 in to evidence,

8    please.

9              THE COURT:  Any objection?

10             MR. FINKELSON:  And publish it to the jury.

11             MR. HARMS:  No objection.

12             THE COURT:  Duly admitted.  You may publish.

13   BY MR. FINKELSON:

14   Q.    Do you recognize Exhibit P-480, Mr. Howell?

15   A.    Yes.  This is a royalty report --

16   Q.    And --

17   A.    -- in sales.

18   Q.    It has multiple tabs as Excel spreadsheets often do; is

19   that right, sir?

20   A.    Yes, on the bottom left, you can see those tabs.

21   Q.    And does this royalty report contain data for fiscal year

22   2016, '17, '18, '19, '20, '21, and '22?

23   A.    It does.

24   Q.    And would this royalty report have calculations for all

25   the sales of Penn State-branded licensed merchandise during

1    those respective periods of time?

2    A.    It includes the sales information in that highlighted

3    yellow column.

4    Q.    And it also includes sales by unit; is that right?

5    A.    Correct.

6    Q.    And it also includes amount of royalties paid to Penn

7    State on a license or -- a licensee by licensee basis; is that

8    correct, sir?

9    A.    Yes.

10   Q.    We can take that down, please.  And just to be clear, we

11   don't need to call it back up, but that data is prepared and

12   maintained by CLC in the ordinary course of its business; is

13   that right, sir?

14   A.    It is, yes.

15   Q.    So talking about the Vintage Brand website, just so

16   reorient the jury, you've been to that website before,

17   correct?

18   A.    I have.

19   Q.    How would you compare the look of the Vintage Brand

20   website to the websites you have reviewed of authorized

21   sellers of Penn State branded apparel and merchandise?

22         MR. HARMS:  Objection.  Opinion testimony.

23         MR. FINKELSON:  It's not calling for opinion

24   testimony.  The witness has testified that he has been to the

25   website.  I can lay a foundation that he's been to the other

ROUGH DRAFT

```
 1   websites, as well.
 2           THE COURT:  Do you mind doing that?  Objection
 3   sustained.  I'll allow you to lay the foundation.
 4   BY MR. FINKELSON:
 5   Q.   Have you visited the websites of authorized sellers of
 6   Penn State-branded apparel and merchandise in the course of
 7   your responsibilities at CLC?
 8   A.   Yes.  I've been to sites like Fanatics, Dick's Sporting
 9   Goods, Rally House, many other retailers who sell Penn States
10   products.
11   Q.   And has that enabled you to see how those websites look
12   and feel as compared to one another and also how they look and
13   feel as compared to the Vintage Brand website?
14   A.   It has.
15   Q.   How would you compare the look of the Vintage Brand
16   website to the websites you have reviewed of authorized
17   sellers of Penn State-branded apparel and merchandise?
18   A.   I would say it looks and feels very similar.  The user
19   experience is very similar, as well.
20           So you can go to a tab and you can search by
21   college or pro teams.  You can -- there's a search bar that
22   you can type in Penn State or any other school and it will
23   bring you a list of results.  It has apparel items, t-shirts,
24   sweatshirts, headwear, and it also has non-apparel items, just
25   like any other retailer does, in selling legitimate and
```

1    licensed product.

2    Q.    Thank you, sir.  Can we please call up for the witness

3    P-172, which has been pre-admitted.  And if we can publish it

4    to the jury, please.

5              THE COURT:  Any objection?  I assume not.

6              MR. HARMS:  No objection.

7              THE COURT:  Duly admitted.  You may publish.

8              MR. FINKELSON:  Thank you, Your Honor.

9    BY MR. FINKELSON:

10   Q.    Can you identify for the jury what it's looking at,

11   Mr. Howell, on Exhibit P-172?

12   A.    So this is a screenshot of a website from 47 Brand, which

13   is an approved licensee or Penn State and many other

14   licensees, and what this is showing search results on a page

15   dedicated to Penn State products.

16              So you can see that it has vintage items such as

17   the S Lion on that second row on the right.

18   Q.    Is this one of the websites that you were talking about

19   earlier that you said has a similar look and feel to the

20   Vintage Brand website?

21   A.    Yes.  It's a licensee who makes product and also sells it

22   on their own website, as well.

23   Q.    And when it comes to having permission to do that, what

24   is the difference between 47 Brand and Vintage Brand?

25   A.    47 Brand requested the ability to make Penn State product

1   and was approved and they submit everything for approval to

2   Penn State to review.  So everything you see here went to Penn

3   State and they reviewed it and said yes, that their

4   comfortable with these items, and they're legitimate on

5   licensed items.

6   Q.   Are you familiar with the term sponsored links, or

7   sponsored advertising on Google and similar search engines?

8   A.   I am.

9   Q.   Are you aware whether or not Vintage Brand has used

10   sponsored links or advertising, for example, on Google to sell

11   Vintage Brand's collegiate merchandise?

12   A.   I am.

13   Q.   And what's your understanding of that, sir?

14   A.   So think of it, if I'm putting in any type of school, you

15   know, vintage t-shirt and I type that in to Google, it's going

16   to have, you know, those first four to five top links that

17   says sponsored by, I've seen Vintage Brands come up for other

18   schools in the past, and also at the top, you'll see a whole

19   host of images of different t-shirts, too.  So you can have it

20   -- you can have a school, and there might be a Vintage Brand's

21   link mixed in with something from Fanatics or Dick's Sporting

22   Goods or all these of these other retailers with approved

23   licensed merchandise.

24   Q.   And if you click on one of those sponsored pictures of a

25   Vintage Brand item, does that take the shopper directly to the

1    product page on Vintage Brand's website for that item.

2              MR. HARMS:  Objection.  Leading.

3              THE COURT:  Overruled.  Go ahead.

4              THE WITNESS:  It would take you directly to that

5    image there that you saw on the sponsored link, yes.

6    BY MR. FINKELSON:

7    Q.   Thank you, Mr. Howell.  Let's talk about marketing.  Does

8    CLC engage with Penn State in marketing and advertising Penn

9    State-branded merchandise.  We referred to this earlier today,

10   but if you could just speak to the jury about that, sir?

11   A.   We do.  So we work with Penn State and many of our

12   institutions on different marketing programs.

13             So there's kind of two buckets.  One is going to be

14   kind of larger, national campaigns with these big retailers.

15   So you saw that example earlier with Rally House and that was

16   a digital campaign to promote Penn State products.  So that

17   can come back to the school, around the holidays.  Those are

18   the campaigns that we work with various retailers.

19             There's also -- we work with license or schools

20   like Penn State on individual and kind of localized efforts to

21   promote their product or certain methods that they want to

22   come out.  So we work with them in a variety of ways.

23   Q.   In your experience, how does Penn State compare with

24   other colleges and universities in terms of the extent that

25   advertising and promotion of its branded merchandise,

1   including branded merchandise with the trademarks that are at

2   issue in this case?

3   A.    They are on the higher end of -- in terms of investment

4   among other schools in the industry.

5   Q.    What kind of advertising dollars are we talking about

6   annually, approximately?

7   A.    Around 45 to $50,000.

8   Q.    Does -- does the advertising that CLC does in

9   collaboration with Penn State of authorized branded

10  merchandise include online advertising and social media

11  advertising, as well?

12  A.    Yes, it does.

13  Q.    In terms of authorized vendors that advertise Penn

14  State-branded apparel and merchandise online, can you give a

15  few examples of vendors who do that?

16  A.    Of licensees who create or the retailers?

17  Q.    Licensees -- licensees, why don't we do that, yes?

18  A.    Yes.  So examples of that, you saw 47 earlier.  They make

19  apparel items.  Think of Yeti, they do advertising, as well.

20  Home field is another company who specializes in a lot of

21  vintage type of marks that they sell online, as well.

22  Q.    And would that include vintage marks, like the S Lion?

23  A.    Yes.  Yes.

24  Q.    And is the word mark Penn State pretty prominent in Penn

25  State's marketing and advertising campaigns?

1    A.    Absolutely.

2    Q.    In your role at CLC, do you have some visibility to the

3    retail pricing of Penn State merchandise?

4    A.    The only visibility that I see is whatever they offer in

5    store or online.

6    Q.    Because am I right, you frequently actually go in to

7    stores or look at websites where Penn State branded

8    merchandise is being sold?

9    A.    Yes.  So whenever I make campus visits, so whenever I go

10   to Penn State and I go to State College, I'm in the

11   marketplace going to all those local retailers or if I'm in

12   Pittsburgh, I'm going in to Dick's Sporting Goods, it's really

13   important in our job to see where the product is in the

14   marketplace, to see, you know, the quality, what product is

15   selling out there, what designs are going, it's important for

16   us to see.  So I'm always in the market place.

17   Q.    So are Penn State licensed products available to

18   customers at a variety of price points?

19   A.    Yes, they are.

20   Q.    And who actually sets the prices that are charged to

21   customers for Penn State branded products?

22   A.    So whenever a licensee is approved to sell -- to sell

23   merchandise, what they do is they sell it directly to the

24   retailers, and they negotiate on whatever that price is going

25   to be.  That's step one.  And then once the retailer has it,

1    they have the ability to set the price to the consumer at the

2    end of the day, and they control and set that price what you

3    see online or when you walk in to Walmart.

4    Q.    What involvement, if any, does CLC or Penn State have

5    with respect to the prices that retailers set for Penn State

6    branded merchandise?

7    A.    We have no part in setting the price or in anything along

8    toes lines.

9    Q.    Having been to the Vintage Brand website, are you

10   familiar with the pricing of Defendant Vintage Brand's

11   merchandise that relates to Penn State?

12   A.    I am.

13   Q.    How would you compare the price of Vintage Brand's Penn

14   State merchandise with authorized licensed Penn State

15   merchandise?

16   A.    In some cases it's comparable.  But if some cases, it's

17   much more comparable to other price options that retailers

18   carry Penn State products.

19            So as I mentioned, you know, we want to meet the

20   consumer where they are.  So we have various types of

21   products.  So everything down from Walmart and Dollar Stores

22   to those local retailers, they all have a affordable options

23   for quality product, as well, that are lower than some of

24   those prices that I have seen on their website.

25   Q.    You just mentioned quality.  Let's talk about that.  From

1   CLC's vantage point, how important is product quality when it

2   comes to Penn State branded apparel and merchandise?

3   A.   It's -- it's very important.  You know, whenever Penn

4   State's approving something, they're putting their reputation

5   on the line and they're endorsing this.  So they want to make

6   sure that it meets all of their brand standards as a program.

7   Q.   What steps does CLC take in collaboration with Penn State

8   to ensure product quality?

9   A.   Well, I would say there's -- there's many different steps

10  along the process.  But I can kind of take you into three

11  phases of if the company wants to become licensed with Penn

12  State, there's kind of three continual touch points.  So let's

13  say it's a brand new company who is not in the -- who is not

14  licensed.  We have a whole application process.  And in that

15  process, they have to submit sample -- quality samples of what

16  their product is going to be.  They have to fill out

17  information regarding their business and marketing strategy.

18  They have to provide if they have any retail interest.  They

19  have to provide information about their credit history.  We

20  want to make sure that these are good partners who are coming

21  in to this space.  So we collect all of that information and

22  we process it to Penn State or any other institution for them

23  to review that product, as well.

24          And so once they make a determination and say they

25  want to approve it, they have to go through our process of

1    getting -- of finishing the licensing, and they have to sign a

2    license agreement.  And within that license agreement, there's

3    a whole -- many requirements that they have to do.  So they

4    have to submit for approval for all designs.  They have to

5    report royalties for all the sales that they have.  They have

6    to adhere to a code of conduct.  And what code of conduct is,

7    is to make sure that when -- whoever in their supply chain is

8    making that so.  Product with their marks, it's in working

9    conditions, it's being ensuring that the employees are being

10   paid properly, all of those factors, as well.  And then once

11   that licensee say that they've had a license for a year, we

12   have an annual review process for every licensee that the

13   school will go through.  And they can make a determination as

14   to whether or not they want to renew that licensee or if they

15   want to not renew that licensee.

16          So they're looking at having they submitted that --

17   they're looking have they've been out in the marketplace.  Is

18   the quality of that product good.  They're looking at other

19   items to make sure that there haven't been any issues.  And so

20   there's a constant review process of every licensee.

21   Q.   How frequently does Penn State reassess its list of

22   authorized vendors such as quality and corporate

23   responsibility?

24   A.   Every licensee gets reviewed once a year.  But I would

25   say while there's a formal review, there's communication and

1    monitoring of all of these licenses throughout the process.

2    Q.    So we've touched on a lot of areas.  I think we're at

3    CLC's sports Penn State's branded merchandise.  Are there any

4    other big ones that we haven't covered that you would like to

5    bring to the jury's attention?

6    A.    Outside of corporate responsibility would be another huge

7    part of priority for Penn State.

8    Q.    How about enforcement?  Is that something -- I think you

9    mentioned earlier, is enforcement something for which CLC

10   supports Penn State's branded merchandising?

11   A.    It is.

12   Q.    What does enforcement entail?

13   A.    So there's a couple of ways to look at enforcement.  So

14   as I talked about earlier, I'm in the marketplace.  And so I'm

15   checking to make sure that, you know, when I see a Penn State

16   product that, you know, that these are approved vendors, that

17   it has holograms on it, and making sure that these items were

18   approved by Penn State.

19          But there's also -- we do enforcement, we'll say,

20   at the Rose Bowl, for example, and Penn State is at the Rose

21   Bowl.  We support a team of investigators and law enforcement

22   to go before and during and after the games to make sure that

23   no one is selling infringing product at those events.

24   Actually, went one time for the Rose Bowl when Penn State

25   played USC a few years back in support there.  But that's kind

1    of, you know, where we're in the moment, on the ground.

2         But there's a whole other world online.  And so we

3    do a whole lot of proactive enforcement in trying to take down

4    infringing items from marketplaces like Amazon, Etsy, Red

5    Level, and all these other Chinese entities that are flooding

6    the market with unlicensed product.

7    Q.   Do consumers ever contact CLC directly to inquire whether

8    a certain seller's merchandise is approved by a school?

9    A.   Actually, they do.

10   Q.   Why does CLC provide that mechanism of contact for

11   consumers?

12   A.   So on our website, we have the ability for anyone to

13   submit inquires in to us.  And so I like to think of it as,

14   you know, the Penn State, the consumers and the supporters are

15   another set of eyes and ears for the brand, and that they are

16   questioning to -- they see something that's suspicious in the

17   marketplace, we'll get those inquires for our team to review

18   on our legal side to determine is it licensed, or is it

19   something that we need to address.

20   Q.   Last set of questions for you.  Can you please call up

21   slides from Defendant's opening, 16 and 17, Mr. Burkhart?

22   We're going to look at 16 first and 17.  We will switch to

23   that.  These were up in opening statement yesterday.

24         Are you familiar, Mr. Howell, with this label and

25   on the prior slide, the stickers that are on -- on the slide?

ROUGH DRAFT

A.    I am.

Q.    Why does CLC encourage authorized partners to include labels and stickers like this?  You can take it down, Mr. Burkhart.

A.    Well, I guess the simple answer is because infringers exist.  So whether that's an infringer like Vintage Brands or other companies like them, or Chinese entities, you know, who are online selling, you know, thousands of items and pumping the marketplace with infringing items.  That's why holograms exist.  We need some -- another level of authentication.  So think of it -- if you're going to a retailer, right, and you see a wall of items that have Penn State or the S lion logo, you're drawn potentially to that or a consumer might be because that's a Penn State brand.  They know that.  They're the source of these products and why that's there.

        And so when you walk up a little closer and you pick up one of those t-shirts and you see that hologram on there.  And that's a second level of authentication saying yes, this is an officially licensed product.  So I kind of think of it as almost, like, a two-factor authentication.  You have your username, you have your password, you log in.  That's kind of like Penn State's, you know, that's the S lion, that's the Penn State mark.  But before you can go through with that transaction, they want to make sure that you're actually who they say you are, so they send a text message

**ROUGH DRAFT**

1    with a code.  You put that code in, and you have access.

2    That's what the hologram does.  It's basically saying yes,

3    confirming that yes, this is an officially licensed Penn State

4    product.

5              So do we want to have put this label on every piece

6    of product of Penn State out there?  In an ideal world, no.

7    But infringers like Vintage Brands and others and these

8    Chinese companies, we need it there to give the consumers

9    confidence that this is a legitimate and approved merchandise.

10             MR. FINKELSON:  I will pass the witness.  Thank

11   you, Mr. Howell.

12             THE COURT:  Thank you, sir.  Do you care to

13   cross-examine?

14             MR. HARMS:  Thank you.  Yes, Your Honor.

15             THE COURT:  You may do so.

16                       CROSS EXAMINATION

17   BY MR. HARMS:

18   Q.   Good morning.

19   A.   Good morning.

20   Q.   CLC acts as the exclusive licensing agent of many

21   colleges and universities, correct?

22   A.   We do.

23   Q.   How many?

24   A.   Over 700.

25   Q.   Over 700.  You said earlier in your testimony that it

1    seems a little weird that some of those non-CLC license

2    universities run their own licensing programs.  Why does that

3    seem a little weird to you?

4    A.    Well, it's just -- it's an independent decision of every

5    individual institution.  So when you run your own licensing

6    program, that means that you have to track all the artwork and

7    you don't have -- you may not have the infrastructure.  You're

8    tracking down royalty payments, you're tracking down checks,

9    so whether that's -- if you have, you know, 500 licensees,

10   you're tracking down all those checks, you know, on a

11   quarterly basis, and knowing some licensees, many don't pay on

12   time, that's a lot of work.  So, you know, it definitely -- it

13   works for some.  But it's a lot more work.  And when you have

14   so many issues at hand of infringers and everything else, it

15   really divides your time that you can't focus on the things

16   that -- to really build grow your brand.

17   Q.    So CLC handles the marketing for the companies -- I

18   apologize -- the universities that it represents?

19   A.    It -- if that's a priority for the school, we partner

20   with them for the marketing, yes.

21   Q.    And the enforcement, as well?

22   A.    At the direction of the university, yes.

23   Q.    At the direction of the university.  And one of the

24   universities that CLC respects is Penn State, as we've talked

25   about today, correct?

1   A.    Yes.

2   Q.    About how many different licensees does CLC negotiate

3   with on behalf of Penn State?

4   A.    500 companies have requested the rights for Penn State.

5   Q.    And each of those licensees has a license agreement with

6   CLC, correct?

7   A.    Correct.

8   Q.    And to be clear, we're talking about a contract, like a

9   pen and paper contract?

10  A.    Yes.

11  Q.    You've been at CLC for 12 years, I believe you testified;

12  is that right?

13  A.    You are correct.

14  Q.    And during your testimony, you mentioned various license

15  requirements.  Can I assume that you're familiar with the CLC

16  licenses -- the license agreements?

17  A.    Yes.

18  Q.    Let's pull up Exhibit D-103.

19          MR. FINKELSON:  This is not in evidence, but I'll

20  waive for Counsel.

21  BY MR. HARMS:

22  Q.    Can you see that?

23  A.    I can.

24  Q.    And in the left-hand corner of this document, what do you

25  see?

1   A.   It is the CLC logo.

2   Q.   And reviewing this first paragraph, who do you understand

3   to be the parties to this agreement?

4               MR. FINKELSON:  Objection, Your Honor.

5               THE COURT:  Go ahead.

6               MR. FINKELSON:  Objection.  No foundation has yet

7   been laid that the witness is familiar with this document.

8               THE COURT:  Are you going to lay a foundation,

9   Mr. Harms?

10              MR. HARMS:  Certainly.

11              THE COURT:  Go right ahead.  Objection sustained.

12  Go ahead.

13  BY MR. HARMS:

14  Q.   Earlier, you talked about license requirements that CLC

15  imposes upon sub licensees, correct?

16  A.   Yes.

17  Q.   And are those license requirements in a standard retail

18  license agreement prepared by CLC quite frequently?

19  A.   There's a difference between the application process and

20  then once a licensee has been approved.

21  Q.   Are there different requirements in the contract the

22  licensee signs and after -- and after they're approved.  Is

23  that what you're testifying to today?

24  A.   What I'm saying is there's a review process for when a

25  licensee wants to be -- if they're a brand new licensee and

1   they're going through the application process, there's

2   different requirements in the information that we gather, and

3   if they're approved, then there's a set of requirements that

4   they have to approve and follow.

5   Q.   And those requirements are set forth in a standard retail

6   license agreement; is that correct?

7   A.   Yes.

8   Q.   And you're familiar with that agreement, correct?

9   A.   I am.

10  Q.   Can we please bring up Exhibit D-103 again, please.

11  Thank you.  Is this the standard retail product license

12  agreement?  And we can scroll up and down, if you'd like?

13  A.   Yes.

14  Q.   This is it?

15  A.   Yes.

16          MR. HARMS:  Your Honor, I would move Exhibit D-103

17  into evidence and publish to the jury.

18          MR. FINKELSON:  No objection, Your Honor.

19          THE COURT:  Duly admitted.  You may publish to the

20  jury.

21  BY MR. HARMS:

22  Q.   Reviewing the first paragraph of this agreement, who do

23  you understand to be the parties to it?

24  A.   CLC, and in this case, it appears to be Ahead, LLC?

25  Q.   And you say this case.  Why?

1  A.    Because there's a standard license agreement for every

2  different licensee.

3  Q.    So this would be used with other licensees, correct?

4  A.    Correct.

5  Q.    Let's scroll down to Appendix A, which is on page 28 of

6  this document.  Appendix A is titled Collegiate Institutions,

7  correct?

8  A.    Yes, it is.

9  Q.    And let's scroll down to the next page.  And these are

10 more collegiate institutions within that list, and it looks

11 like.  And let's go to the next page.  And here is M through

12 T.  Do you see Penn State included on this list?

13 A.    I do.

14 Q.    So Penn State's one of the collegiate institutions

15 defined in this agreement?

16 A.    Yes.

17 Q.    Let's go up to the last page of the agreement before the

18 appendices.  So we see the signature blocks here, correct?

19 A.    I do.

20 Q.    And we see that collegiate licensing company, CLC is

21 signing on behalf of all of the universities that we just

22 looked at, correct, all the collegiate institutions?

23 A.    Collegiate, as -- yes.

24 Q.    Let's go up to page three of this document, and we'll

25 look at definition T.  This reads official label means the

1    officially licensed collegiate products tag or label in the

2    form prescribed by CLC to be affixed to each licensed article,

3    its packaging and advertising materials prior to advertising,

4    distribution, or sale of any licensed article.

5           Did I read that correctly?

6    A.   Yes.

7    Q.   And earlier when you were talking about hologram, you

8    understand the hologram to be a reference to the official

9    label?

10   A.   Yes.

11   Q.   Now let's jump to page 14 of this agreement, and we're

12   going to look specifically at paragraphs 11-A. and 11-B.  11-A

13   reads:  Licensee shall, prior to advertising, distribution, or

14   sale of any licensed article, affix an official label to each

15   licensed article, its packaging and advertising materials.  In

16   addition, licensee shall affix licensee's authorized brands to

17   each licensed article, its packaging, and advertising

18   materials.

19           I'll skip to 11-B.  Licensee and/or its authorized

20   manufacturers are responsible for affixing the official label

21   to each licensed article, its packaging, and advertising

22   materials.

23           did I read all of that correctly?

24   A.   Yes.

25   Q.   So CLC contractually requires all of the university sub

1  licensees to use a label that says officially licensed

2  collegiate products; correct?

3  A.   Yes, as I mentioned before.

4  Q.   Can licensees choose to not use the official label?

5  A.   They can not use the label, but they have to request the

6  ability to not use the label for -- on -- and that's up to the

7  institution, which rarely happens.  I can't think of a case.

8  Q.   You can't think of any case where a licensee hasn't

9  chosen to use an official label before?

10  A.   Correct.

11  Q.   Have the official labels -- the official label holograms,

12  have they changed at all during your 13 -- 12 or 13 years of

13  your time at CLC?

14  A.   Yes, they have.

15  Q.   How have they changed?

16  A.   There's additional security techniques that are in the

17  hologram, in addition a QR code, as well.

18  Q.   So you mentioned the QR code.

19  A.   Um-hum.

20  Q.   What is a QR Code, as background?

21  A.   So QR code is -- you know, you go, especially now in the

22  menus, and you click on a little, you know, square and it's on

23  the hologram, as well.  And so that QR Code is on our

24  hologram.  And basically, as I talked about earlier, if you

25  click that, it basically confirms -- it can confirm the

1    authenticity that this is a licensed product.

2    Q.    And do the official label holograms also have serial

3    numbers?

4    A.    They do.

5    Q.    And what is the purpose of those serial numbers?

6    A.    So those serial numbers may not mean anything to you, but

7    it does to me.  So if I go out into the marketplace and I

8    don't know what that product is, what I can do is I can look

9    up that hologram number and I can confirm to see who that

10   licensee is and when they ordered those holograms.  And then I

11   can also make sure it -- to see if they're an approved

12   licensee, as well.

13   Q.    CLC guards the official label holograms fairly closely;

14   is that correct?

15   A.    Yes.

16   Q.    And that's because it would be a problem for CLC if it

17   lost control of those holograms, correct?

18   A.    Well, they're sensitive and because we want to make sure

19   that they're authentic -- authentic.

20   Q.    Does CLC own a registered trademark for the hologram for

21   the official label?

22   A.    I don't know.

23   Q.    You don't know that.  So CLC wants consumers to know that

24   licensed products are officially licensed, correct?

25   A.    I think consumers want to know, too, but yes.

1    Q.    And that's why CLC contractually obligates all of its

2    licensees, sub-licensees to use the official label, correct?

3    A.    That's one reason, yes.

4    Q.    Have you heard of the company Fanatics?

5    A.    I have.

6    Q.    And Fanatics is a licensee you work with; I believe you

7    testified about that earlier, right?

8    A.    Yes.

9    Q.    It's actually a pretty significant Penn State licensee,

10    right?

11    A.    They are.

12    Q.    Doesn't Fanatics have an advertising -- advertising tag

13    line about the officially licensed nature of its products?

14    A.    I --

15    Q.    Isn't its tag line officially licensed everything?  Have

16    you heard that before?

17    A.    I haven't -- I don't know.

18    Q.    Okay.  Earlier you testified about going to different

19    websites selling collegiate fan merchandise.  And you

20    testified -- I think you testified about visiting Fanatics and

21    47 Brand; is that correct?

22    A.    Yes.

23    Q.    And you also testified about visiting the Vintage Brand

24    website, correct?

25    A.    Yes.

1  Q.   And on Vintage Brand website, you saw something that is

2  not on the 47 Brand website, correct, and that's a disclaimer,

3  right?  You saw the disclaimer on the Vintage Brand's website?

4  A.   I have seen them and where I can't see them.

5  Q.   Thank you.  Has CLC ever promoted the officially-licensed

6  product label to consumers?  Has it ever told consumers to

7  look for the label?

8  A.   There have been examples where schools have had these

9  look for the label campaigns in which they're trying to

10  educate the consumers about the hologram, the authentic

11  licensed product and especially where those proceeds are going

12  to the Universities, to scholarships or to various other

13  initiatives.

14  Q.   Let's take a look at D-105.  At the top of this document,

15  it says the Collegiate Licensing Company, correct?

16  A.   It does.

17  Q.   And that's your employer, as you've testified?

18  A.   Yes.

19       MR. FINKELSON:  I'll just object to the use of this

20  document with this witness.  It's dated 1991.  This witness

21  was not working at CLC and perhaps not old enough to be

22  working anywhere.

23       THE COURT:  Perhaps.  Where are you going with

24  this, Mr. Harms?

25       MR. HARMS:  It speaks to the label.  It's the look

1    to the label marketing concept that the witness just testified

2    to.  And it -- it existed in 1990.

3              THE COURT:  All right.  Well, I'll let you explore

4    to the extent he can answer this question.  The objection's

5    noted.  It's overruled at this juncture.  Go ahead.

6              MR. HARMS:  Thank you.

7    BY MR. HARMS:

8    Q.   And then next to the name, the Collegiate Licensing

9    Company, we see the seal, correct?

10   A.   The digitally licensed collegiate product, yes.

11   Q.   Yes.  Now looking at the first paragraph of this letter,

12   I'd like that to review -- I'd like you to review that to

13   yourself.  Let me know once you have.

14   A.   (The witness complies.)  Okay.

15   Q.   So this letter concerns a CLC licensee.

16             MR. FINKELSON:  Objection, Your Honor.  Counsel is

17   just reading a document that is not in evidence into the

18   record.

19             MR. HARMS:  Your Honor, I will move this in to

20   evidence.

21             MR. FINKELSON:  And I'll object to it being moved

22   in to evidence.  It's hearsay, and there's no foundation for

23   this witness.

24             THE COURT:  Well, it's the foundational end of it

25   that I'm concerned about primarily.  So to that extent, the

1  objection is sustained.  You're welcome to try to lay a

2  foundation with regard to this witness and this document.

3  BY MR. HARMS:

4  Q.   You mentioned the look-to-the-label marketing concept

5  before.  Can you speak a little more to that?

6  A.   So some schools have, as I mentioned, have done this

7  campaign or promotion to basically explain to why they have

8  the hang tags on there and also why it's important to buy

9  licensed product versus unlicensed product.  So as I said,

10  every campus is different on how they take those royalties

11  that they earn.  But a large number of schools that may go

12  back in to educational programs on campus.  It goes to

13  scholarships that go to students, whether that's on the

14  University or on the athletic side.  So the idea is that we

15  really want people to know the importance of not just buying

16  the licensed product because of quality and meets brand

17  standards, it's not using, you know, child labor for those

18  examples, but also that their purchase, their financial

19  purchase and their support of the university, that purchase is

20  going back to fund good things that they have on campus.

21  BY MR. HARMS:

22  Q.   So the official label allows consumers to know that

23  that's what's happening, correct?  That was your testimony

24  right now.

25  A.   It's authenticating that yes, it's an officially-licensed

1    product at that university.

2    Q.    Thank you.  You testified earlier about reviewing quite a

3    bit of CLC internal documents to get up to speed on Penn

4    State.  Are you familiar generally with CLC internal documents

5    from a decade ago when you started?

6    A.    That's a broad -- a broad question.  Annual reports, yes.

7    Q.    Yes.  Annual reports.  Do university's retail licensees

8    and the license manufacturers, do they bear the expense of

9    manufacturing the goods that they sell?

10   A.    The licensee, specifically?  Sorry.

11   Q.    Yes.

12   A.    They -- yes.  They create that -- they produce all of

13   those products and the expenses that, you know, go in to the

14   production.

15   Q.    And do those licensees also bear the expense of

16   advertising the goods with some marketing efforts by CLC, as

17   well?

18   A.    I'm not sure I follow exactly.

19   Q.    Does the University, to your knowledge, advertise

20   licensees' goods?

21   A.    Some do -- some make the choice to do so, yes.

22   Q.    And about what proportion is that?

23   A.    I don't know the exact number of schools who do that.

24   It's a good amount, but not every school chooses to do so.

25   Q.    You testified about quality control earlier, and you

1  testified that at the onset of the relationship, a potential

2  licensee applying for a license would submit an example of a

3  good.  Is it just one example of a piece of merchandise that

4  they submit?

5  A.   So we ask for a representative example or kind of a, you

6  know, if they want to do apparel items, we want, you know, a

7  sweatshirt, a hoodie a Polo, a t-shirt, whatever they're

8  doing, a representative sample is what we say.

9  Q.   And who reviews that?

10 A.   So we have an internal staff in our team that reviews it.

11 We have an applications team that reviews all of these items,

12 as well.  And then also they'll get support from our -- they

13 have an apparel or non-apparel department, as well, and then

14 the schools have the ability to request samples for

15 themselves, too.

16 Q.   Does the University review it?

17 A.   So we take all of that information as we get an

18 application that comes in.  We provide all of those documents,

19 put it in a request to our online system, where the schools

20 review -- they can review all of those times and they can ask

21 additional items if they have additional questions that we can

22 figure out their answer.

23 Q.   So the University reviews the examples online on the CLC

24 portal?

25 A.   They can, or if they want, they can request a specific

1  sample for themselves.

2  Q.   What's the proportion of that?

3  A.   It -- probably less -- it's less schools request direct

4  samples.

5  Q.   And that's just at the onset of the licensing

6  relationship, correct?

7  A.   That's just at the onset, but then the reviewing -- they

8  can request samples throughout the time that that company is

9  licensed.  They can get samples throughout the year.

10  Q.   I believe you testified earlier that the universities can

11  review samples after the initial application online; is that

12  how that typically occurs, that they're reviewing additional

13  samples for renewals, for example, online?

14  A.   They -- not necessarily.  They could be online, but

15  they're looking at data -- they're looking at various points

16  of data, or they're going out into the marketplace and looking

17  at a product themselves.

18  Q.   What points of data are they looking at?

19  A.   So they're looking at to see -- remember when I showed

20  you, like, there's 10 images of the sales that were reported

21  by licensees.  They're looking at what sales did this licensee

22  have.  What products.  What designs did they have in there.

23  Did they do vintage designs.  They can see all of that

24  information at the time of the renewal, or at any point of the

25  year.

ROUGH DRAFT

1   Q.   So they're looking at designs and sales numbers?

2   A.   Designs, sales numbers, retailers, products.  They're

3   looking at all -- a whole host of areas.

4   Q.   But they're looking at these things online.  They're not

5   actually typically looking at a tangible good that they

6   licensed, correct?

7   A.   I wouldn't necessarily agree with that to be --

8   Q.   They typically are looking at tangible goods when they're

9   making a renewal decision?

10  A.   Well, a lot of the schools are on campus.  So they may go

11  to the book store and they see a whole host of different items

12  that they can see from various licensees and products.

13  Q.   And, Mr. Howell, just to be clear --

14          MR. FINKELSON:  Your Honor, I would just ask

15  Counsel not to cut off the witness while --

16          THE COURT:  Did you finish answering the question,

17  Mr. Howell?

18          THE WITNESS:  I did.

19          THE COURT:  Go ahead, Counsel.

20  BY MR. HARMS:

21  Q.   Mr. Howell, the book stores on university campus only

22  carries a very small percentage of the hundreds of -- of goods

23  from the hundreds of licensees, correct?

24  A.   It depends on the school.  I can't say that definitively.

25  Q.   Are you aware of Penn State reviewing tangible samples of

1  each of its hundreds of licensees' goods within the past year?

2  A.   I know that the Penn State licensing department goes to

3  many retailers across the street multiple times a month.

4  Q.   Across the street?

5  A.   So on College Avenue --

6  Q.   Right.

7  A.   -- so they have the book store and all those five or six

8  retailers that I discussed earlier, yes.

9  Q.   So they go across the street, but they have 500 licensees

10  that they're not reviewing the quality of their products?

11  A.   Within the last -- there's a whole host -- there's a lot

12  of licensees that are represented in those retail outlets.

13  Q.   What is CLC's primary source of revenue?

14  A.   That would be the royalties that -- a share of the

15  royalties that come in from the sale of licensed products.

16          MR. HARMS:  No further questions, Your Honor.

17          THE COURT:  Thank you.  Any redirect,

18  Mr. Finkelson?

19          MR. FINKELSON:  Very brief, Your Honor.

20          THE COURT:  Go ahead, sir.

21                  REDIRECT EXAMINATION

22  BY MR. FINKELSON:

23  Q.   Mr. Howell, you were talking a moment ago about those

24  serial number -- serial numbers that appear as part of the

25  hologram.  Do you recall that?

A.   Yes.

Q.   To your understanding, are those used by the United
States Customs?

A.   Yes, they are.

Q.   Why?

A.   Because, as I had mentioned earlier, especially now,
there's a flood of infringing product coming in from China.
And so a lot of schools will register some of their trademarks
at -- with the US Customs and Border Patrol, so when those
shipments come in, they're looking at these items to make sure
they're licensed.  So that's a way to have these holograms on
there to make sure that these are legitimate products.

Q.   You talked about the holograms and the labels.  Let me
ask you this.  When a consumer is shopping online for product,
do they see the hologram or the label generally?

A.   No.

        MR. HARMS:  Objection.

        THE COURT:  What's the objection?

        MR. HARMS:  Lack of personal knowledge.
Foundation.

        THE COURT:  Do you want to lay a foundation,
Mr. Finkelson?

BY MR. FINKELSON:

Q.   We talked earlier how you have been to many, many
websites of companies who are selling Penn State-branded

1  products; is that right, sir?

2  A.    Yes.

3  Q.    And some of those are authorized sellers of Penn State

4  merchandise?

5  A.    They are.

6  Q.    And some of those, like Vintage Brand, are not authorized

7  sellers of merchandise, correct?

8  A.    Correct.

9  Q.    Okay.  Now, focusing on those websites that are

10  legitimately selling authorized Penn State merchandise.  When

11  you go onto that website and you're looking at product, is the

12  hologram or the official -- officially licensed label

13  generally visible to the person looking at it on the website?

14  A.    No.

15  Q.    How about when somebody's walking down the street wearing

16  a piece of Penn State-branded merchandise.  Is the hologram or

17  the label visible to the public at that point in time?

18  A.    No.  When I buy a licensed piece, I take it off and take

19  the tags off and then I wash it and wear it.

20          MR. FINKELSON:  No further questions, Your Honor.

21          THE COURT:  Thank you.  Mr. Harms, anything else?

22          MR. HARMS:  Yes, Your Honor.

23          THE COURT:  Go ahead, sir.

24                    RECROSS EXAMINATION

25  BY MR. HARMS:

ROUGH DRAFT

1  Q.   Earlier you testified about viewing the Fanatics website,

2  correct, selling Penn State wear?

3  A.   I did.

4  Q.   Please pull up Exhibit D-291.  Do you recognize this as

5  being a web page from the Penn State Fanatics online store?

6  And we can zoom in, if that will help.

7  A.   Yes.  It's the Fanatics Penn State page.

8       MR. HARMS:  Your Honor, I would move Exhibit D-291

9  in to evidence and publish to the jury, please.

10      MR. FINKELSON:  No objection, Your Honor.

11      THE COURT:  Admitted.  You may publish.

12 BY MR. HARMS:

13 Q.   Let's scroll down to -- right there.  That's perfect.

14 Under details on the right-hand column, you see a bullet

15 point, correct?

16 A.   Yes.

17 Q.   The bullet points, one of them, the last one says

18 officially licensed, correct?

19 A.   Correct.

20      MR. HARMS:  No further questions.

21      THE COURT:  Thank you.  All right, Mr. Howell.

22 Thank you very much for your testimony.  You may stand down.

23 Is Mr. Howell here under subpoena?

24      MR. FINKELSON:  Mr. Howell is not here under

25 subpoena, and we would ask that he be dismissed.

1          THE COURT:  You're dismissed, sir, again, with the

2     thanks of the Court.

3          MR. FINKELSON:  Subject, Your Honor, to, if needed,

4     calling him in rebuttal, which we don't currently anticipate,

5     but he would be stay sequestered in view of that.

6          THE COURT:  Thank you, sir.  This is an opportune

7     time, I think, ladies and gentlemen, to take a brief recess.

8     We'll stand in recess for 10 minutes.  Mrs. Rhinehart, escort

9     the jury.  Court will rise.

10          (At 11:33 a.m., the jury left the courtroom and a

11           recess was held.)

12          (11:50 a.m.)

13          THE COURT:  Back on the record now after our

14     mid-morning recess.  Counsel for the Plaintiff, are you ready

15     to call your next witness?  Ms. Wheatley?

16          MS. WHEATLEY:  Yes.  We would like to call

17     Stephanie Petulla.

18          THE COURT:  Ms. Petulla, come forward and be sworn,

19     please.

20          (The witness, Stephanie Petulla, was sworn.)

21          COURTROOM DEPUTY:  Can I get you to state your full

22     name and spell your last name for the record.

23          THE WITNESS:  Sure.  Stephanie Ann Petulla,

24     P-e-t-u-l-l-a.

25          THE COURT:  Go right ahead, Ms. Wheatley.

1                    DIRECT EXAMINATION

2   BY MS. WHEATLEY:

3   Q.   Ms. Petulla, could you tell the jury where you're

4   employed currently?

5   A.   Sure.  I'm employed at the Pennsylvania State University.

6   Q.   And are you an alum of Penn State?

7   A.   I am an alum of Penn State.

8   Q.   And how long have you worked for Penn State?

9   A.   I've worked for Penn State over 20 years now.

10  Q.   And do you live in State College currently?

11  A.   I live outside of State College in on Osceola Mills,

12  Pennsylvania.

13  Q.   Did you grow up in this area?

14  A.   I did not.  I grew up actually near the Wilkes-Barre

15  Scranton area.  Outside of there, I went to Tunkhannock Area

16  High School.

17  Q.   And what is your job title at Penn State?

18  A.   I'm the director of licensing and visual identity.

19  Q.   And how long have you been in that role?

20  A.   So it was two years exactly on November 1st.

21  Q.   And have you had other roles at Penn State?

22  A.   I have.  Prior to that, I was the director of visual

23  identity from May of 2022 until I started both visual identity

24  and licensing in November of '22.

25            Prior to that, I worked in athletics for 19 years

 1   in a variety of roles from communications to digital

 2   communications to helping out with our E-commerce graphic

 3   design, social media, things of that nature.

 4   Q.   And when you were with athletics before you got to your

 5   current role, did that role involve branding and trademarks?

 6   A.   It did, yes.  I was in charge of the day-to-day

 7   operations for our E-commerce and our official athletic

 8   website.

 9   Q.   And does Penn State sell branded merchandise through that

10   E-commerce athletics website?

11   A.   We do.

12   Q.   And so talking about your current role as director of

13   licensing, can you describe for the jury what that involves?

14   A.   Sure.  As the director of licensing, we work closely with

15   our licensees and retailers to try and provide authentic and

16   branded products to our fans, alumni, current students,

17   professors that aligns with our values and provides them with

18   what they want to have show their affinity for the University.

19   Q.   And can you describe for the jury what would your

20   day-to-day be in your role?

21   A.   Sure.  So day-to-day, we deal with calls from licensees

22   about what they might want to do or what new things they might

23   have come up with.  We also deal a great amount with our own

24   university population, so our own communicators, our own

25   marketers about how they can use the mark or how they might

1    hope to use the mark.

2            So there are really a number of different ways.

3    Some of it is within retail.  Some of it is what our units are

4    also trying to do with their use of mark, either on products

5    or on their own internal letterhead or things of that nature.

6    So there really isn't a typical day.  It changes from

7    day-to-day.  But it all involves our brand and our visual

8    identity.

9    Q.   And about how many people work with you in your

10   department on merchandise licensing?

11   A.   So we have two other people in our department.

12   Q.   Okay.  And how many requests to -- to use the Penn State

13   brands on merchandise do you receive a year?

14   A.   So we receive typically over 14,000 pieces of artwork a

15   year and several hundred license requests.

16   Q.   And do you oversee Penn State merchandise for all of Penn

17   State's campuses?

18   A.   Yes.  All of Penn State campuses are included in our

19   program.

20   Q.   And about how many campuses is that total?

21   A.   We have more than 20 across the Commonwealth.

22   Q.   And Mr. Howell talked about this a little bit, but from

23   your perspective, can you tell us what the process is for

24   someone who wants to use the Penn State trademarks to obtain a

25   license to do so?

1    A.    Sure.  So for anyone that expresses interest in our

2    office in becoming a licensee, we point them in the direction

3    of CLC's website, which has all the intake information that

4    Mr. Howell talked about.  They'll go through the license

5    process and provide all of the information and documentation

6    that we require there.  And then we will go in and review the

7    application within the CLC system.

8    Q.    And what type of criteria does Penn State have for who

9    can use the Penn State trademarks?

10   A.    So there are a lot of criteria that we have.  We look

11   across the board at how they conduct their business, the

12   quality of their products, what their scope might be, what

13   they're offering, if it's a new product for our fans or things

14   of that nature.  So there really are several different

15   checkpoints that we feel like all lend to the quality of the

16   products that we allow to have Penn State branded with them.

17   Q.    And when you say how someone conducts their business,

18   what are you looking for there?

19   A.    Yeah.  So a lot of times we'll be looking at things like,

20   you know, fair labor, wages, things of that nature.  We'll

21   also be looking at what their business plan is, how they

22   intend to market and interact with the university.  So there

23   are a number of different factors that we look for in our

24   licensing partners.

25   Q.    Is this -- is fair labor and wage standards, is that

1   something that you receive feedback on from, you know, people

2   within the University?

3   A.   Yes.  We have received feedback before from our students

4   and our faculty on questioning some of the practices of our

5   partners, things of that nature, asking us to hold people to

6   certain standards so that wages are fair so that working

7   conditions are fair with who manufactures our product.

8   Q.   What about if, for example, a smaller business applies to

9   be a licensee and they don't meet your criteria.  Do you just

10  say no, or do you have any further involvement?

11  A.   So we actually have -- we have a program called Community

12  Connect for our smaller vendors.  So a lot of that will be

13  people that you might see at a craft show or we actually have

14  a local bakery that also falls into that.  So a lot of times,

15  those will be smaller businesses that may just have one person

16  that's administrating that business.  And we have confidence

17  that with where they're located or what they're doing, that

18  they may not necessarily meet the standard of a large

19  corporation that operates multi-nationally, but if it's the

20  local board and brush down the street, we know enough about

21  them to also be able to license them through that Community

22  Connect portal.

23  Q.   And setting aside standards as to fair labor and wages,

24  does Penn State have any requirements about the type of

25  products that can use a Penn State trademark on them?

A.   Yes.  So we do have standards.  There are certain types
of products, there are certain product categories that we will
not allow.  So we won't allow gambling at this point.  We
won't allow tobacco at this point, different product
categories like that that we just don't feel like it's
appropriate for the University to be associated with.
Q.   Can you think of any recent examples where the University
decided to not work with someone or stop working with someone
because they were, you know, advertising or using a product in
a way you did not agree with?
A.   To stop or not work with a company?
Q.   Either.
A.   So yes.  There will be times that if we feel like a
product just does not align that we will decline use.  Right
now, one of the most recent ones I can think of is a winery
that wanted to be licensed, and we just weren't ready to go
into that with them yet.  So we told them we would keep their
information and go back to them.  But at this point, we
weren't going to license that.
Q.   If a company is advertising in a way that -- that doesn't
fit with the University's reputation, will that impact your
relationship with them?
A.   Yes, it can.  We want to make sure that all the
advertising is appropriate to what we expect to be aligned
with our brand.

1    Q.    And finally, in terms of actual product quality, does

2    Penn State monitor that?

3    A.    We do.  So there are a number of different ways we

4    monitor it.  I think Scott talked a little bit about on

5    occasion, they will take samples in and they will evaluate

6    them on our behalf.  We will ask for samples, as well, if it's

7    a new product or an emerging company, to make sure that the

8    quality is in accordance of what we feel like our fans would

9    expect.  We don't want our fans to purchase something and then

10   be disappointed that they got a Penn State product that didn't

11   fit what they felt like they should have gotten from a quality

12   standard.

13   Q.    And so when you're taking in a sample, let's say of a

14   t-shirt -- I believe -- is there a -- is there sort of a

15   shorthand test that you apply when you're looking at that

16   physical product?

17   A.    Sure.  So there can be a sort of wash and wear tests that

18   we put through.  A lot of it is touch and feel, right.  Some

19   of the products if they're brand new or if it's a brand new

20   licensee, we'll actually take them home.  We'll wash and wear

21   them ourselves, we'll put it through a couple of cycles, just

22   to make sure that they're of the quality that we expect,

23   especially if it's a new vendor that we're not particularly

24   familiar with that doesn't yet have a history within

25   collegiate licensing.

1    Q.    Do consumers ever contact Penn State about the quality of

2    Penn State merchandise?

3    A.    We do.  We have gotten calls before about the quality of

4    the merchandise or shipping times or whatever it is.  They

5    definitely associate back to we have a responsibility for the

6    goods that bear our name.

7    Q.    And finally, does the University look at and approve how

8    the actual trademark appears on the merchandise?

9    A.    Yes.  So the artwork that comes in, it's all brought in

10   through the CLC system that Scott described a little bit in

11   his testimony.  That will come; our staff members can go in

12   and we will look at every piece of artwork.  So we will look

13   to make sure that things are spelled correctly, that the

14   complete trademarks are there, that the colors are portrayed

15   in the way that we expect them to be.  Placement of logos,

16   things of that nature.  We do look at every piece of artwork.

17   Q.    One example of that review, how all the trademarks are

18   actually used, are you familiar with operation hat trick?

19   A.    Yes.

20   Q.    What is operation hat trick?

21   A.    So operation hat trick is one of the co-branded products

22   that Scott talked about.  It goes back to a nonprofit

23   organization called operation hat trick which benefits our

24   veterans.

25              So we work with them to put product out in the

1   marketplace that has more of a military feel.  Part of the

2   proceeds then via operation hat trick goes back to veteran's

3   charities, whether they be local to campus or national things

4   that that initiative is doing.

5   Q.   And since we just heard from Mr. Howell, why does Penn

6   State work with CLC?

7   A.   So we work with CLC because we literally do not have

8   enough staff to take care of all of the requests that come in

9   to us.  So they perform a very integral administrative task to

10  us.  We are the decision makers.  But as far as taking the

11  money in or providing sort of that back bone system that

12  people do bring the artwork in through or some of the legal

13  takedowns that we talked about, we just do not have the staff

14  to meet the demand and run a program of this size on our own.

15  Q.   And in your role, do you work with licensees and

16  retailers directly?

17  A.   We do, yes.  We talk to a number of our licensees and

18  retailers, really at any time.  We always tell them that we're

19  available to them.  We want to help them bring the products to

20  our fans.  But also run their own successful business, whether

21  it's a local business oar a regional business.  It matters to

22  us how our licensees and retailers are doing and what they

23  need from us in order to facilitate their business.

24  Q.   And have you ever been involved with any special Penn

25  State designs that commemorate past alums or events?

1  A.    Sure.  Yeah.  I mean we're always trying to find the next

2  product really that our fans want to connect with.  So you

3  know, this fall, we reached out to the original retro band and

4  talked about doing a design with Saquon because Saquon Barkley

5  is now back in Philadelphia.  We feel kind of a renewed vigor

6  for products that also relate him back to Penn State.  So for

7  the Eagles fans that still want to be proud that he went to

8  Penn State and might be fans of both, we talked to the

9  original retro band about putting a specific brand in the

10 marketplace that kind of had a little of a Pennsylvania flavor

11 overall that would encompass the feeling that he was back in

12 the state, had a picture of Saquon, so of course, he had to

13 approve that because that's his image.  And then had our

14 marks, as well.  So that's just one example of kind of a

15 special product that we worked with.

16 Q.    And you mentioned the Community Connect program.  Do

17 people in the community ever reach out to your department

18 about using Penn State's name or logos?

19 A.    They do.

20 Q.    Can you give some examples of when people have asked

21 permission?

22 A.    Sure.  So quite regularly, we'll either get phone calls

23 or we have a generic e-mail address that we monitor for the

24 University where we will get requests for graduation cakes and

25 cookies.  We'll also get requests for grave stones and urns,

1  things of that nature that are really a very personal request

2  for them to use the University's logo that they know that the

3  company that they're working with needs permission to do.  And

4  we are happy to provide them with a one-time letter to be able

5  to have the logo on their family members' grave stone or to

6  celebrate graduation or their acceptance into the University

7  with a cake with our -- our licensed trademarks on it.

8  Q.    Now, to circle back, we've used a lot of terms, you know,

9  licensee, licensor, you know, retailer.  So is the licensor

10  Penn State?

11  A.    Yes.  We are the licensor.

12  Q.    Say.  So you own the trademarks?

13  A.    Yes.

14  Q.    And the licensee is who, in this process?

15  A.    So the licensee are those companies that we have given

16  permission to use our trademarks.

17  Q.    Are they generally manufacturers?

18  A.    They are generally -- generally manufacturers, yes.

19  Q.    And the retailer, who is that?

20  A.    So the retailers is who is actually selling the product.

21  So we do have licensees that also sell their own product.  But

22  we have some licensees that just sell to our other retailers

23  that then sell to the public

24      Q    So does Penn State have any licensees within the

25  state of Pennsylvania?

ROUGH DRAFT

1    A.    We do.  We have several licensees within the state of

2    Pennsylvania, some of which have come up, League Legacy is

3    located in Hanover, outside of Philadelphia.  The Family

4    Clothesline is located in State College, and Tyrone,

5    Collegiate Pride is also located in State College, who is one

6    of our licensees, so we have a number of licensees in

7    Pennsylvania, yes.

8    Q.    And so does Penn State -- and this a silly question.  But

9    does Penn State have retailers in the State of Pennsylvania?

10   A.    Yes.  We will have retailers in the State of

11   Pennsylvania.  So whether that be a Dick's Sporting Goods or a

12   Rally House or Kohl's or any of our local retailers in State

13   College, we have retailers throughout the state.

14   Q.    What percentage of Penn State's branded merchandise is

15   sold through retailers that are local to the University area?

16   A.    So while it varies, our campus local sales are in general

17   between 42 and 46 percent of our business.

18   Q.    And do you know how that compares to other universities

19   that have large licensing programs?

20   A.    Sure.  It's a much higher percentage than most licensing

21   programs.  We have a vibrant community and really great town

22   and gal relationships where some of our alums, when they come

23   back into town, that's where they want to shop.  They want to

24   go wherever their favorite store was when they were in school

25   or where they worked when they were in school.  And that's

1    where they end up doing their shopping.  So it really is very

2    individual to us.  Some schools will just have their book

3    store, and that's who services their community.  We have a

4    number of choices up and down College Ave which serve our

5    community.

6    Q.    And is Penn State-branded merchandise sold on campus in

7    State College?

8    A.    It is.  It's sold on campus at State College, And it's

9    also sold at all of our Commonwealth campuses across the

10    state.

11    Q.    And can you give me some examples of how Commonwealth

12    campuses outside of State College will sell Penn State

13    merchandise?

14    A.    Sure.  So in addition to their book stores, our

15    Commonwealth campuses all have either varsity teams or they

16    have teams that participate in the PSU VC, so they play each

17    other.  So all of their athletic teams always want

18    merchandise, obviously that goes beyond their uniforms, so if

19    mom or dad wants to be proud that their son or daughter is on

20    the baseball team or the softball team, there are always gear

21    sales going on for those folks.  There are student

22    organizations on those campuses, whether it be an organization

23    that's supporting THON that wants to have t-shirts produced,

24    there are always things going on on our Commonwealth campuses,

25    as well, that have licensed merchandise involved with them.

1    Q.    And so speaking of those local retailers, do you visit

2    the brick and mortar retail stores that sell authorized

3    merchandise?

4    A.    We do.

5    Q.    Can you give me some examples of those stores?

6    A.    Sure.  So our office is actually located in downtown

7    State College.  So we're really fortunate because we can take

8    what we call field trips on almost any day of the week and go

9    down to one of our stores.  And if there's a particular

10   product we want to check out or even if we just want to see

11   how things are looking and kind of casually take in how people

12   are shopping, we can always sort of go on those field trips.

13          So I mean some of our stores have thousands of

14   products in them, so everything from mugs to key chains to

15   cutting boards to hoodies to sculptures of the Beaver Stadium

16   itself.

17          So there are so many things we can look at.  And

18   it's really such an asset to us that we have that vibrant

19   retail community because we can go down and really touch and

20   feel and see more of the product than probably most

21   universities can on a daily basis.

22   Q.    I'd like to pull up what's been marked Defendant's 137,

23   which is already in evidence.  And we can just flip through

24   the pictures so you can see them.  And then I'd like to go

25   back to the first one and you can tell me what we're looking

**ROUGH DRAFT**

1    at here.

2              So what is this a picture of, Mrs. Petulla?

3    A.    So this is a picture of the store front of Lions Pride

4    which is on College Ave in State College.

5    Q.    And does Lions Pride sell authorized Penn State products?

6    A.    They do.

7    Q.    And do you know the family that owns Lions Pride?

8    A.    I do, yes.  The Moyer family owns Lions Pride.

9    Q.    And about how often would you say a member of your staff

10   is in Lions Pride looking at what they're selling?

11   A.    You know, one of our staff members actually used to work

12   at Lions Pride so she's in there probably more than she would

13   like to admit.  But I mean, we're in there no less than once

14   or twice a month, and that's really just Lions Pride itself.

15   That doesn't count how many times we go downtown in a month.

16   Q.    And now looking at page three of this exhibit, is this

17   the store front for Lions Pride?

18   A.    Yes, it is.

19   Q.    Now, does Penn State own that name, Lions Pride?

20   A.    We do not.

21   Q.    Do you have any issue with the family calling their store

22   Lions Pride?

23   A.    We do not.

24   Q.    Why not?

25   A.    Lions Pride or lions itself is not one of our registered

1  trademarks.  We do not own it.

2  Q.    And the logo on the top that's sort of like a lion logo,

3  does that belong to Lions Pride?

4  A.    It does belong to Lions Pride, yep.

5  Q.    Does Penn State have any issue with them using it?

6  A.    We do not.

7  Q.    Fair to say, though, that the mention of lions near State

8  College is evoking Penn State?

9  A.    Yes.  I think that's fair to say.

10  Q.    Now, if we could pull up Defendant's 139, which is also

11  in evidence.  If you could -- I don't know if that's one or

12  more pictures.  Just so Ms. Petulla can see it.

13          All right.  Can you tell us what we are looking at

14  here?

15  A.    Sure.  This is Rapid Transit Sports, which is another one

16  of our local retailers.  They don't just sell Penn State

17  merchandise.  They also sell running shoes is one of the

18  things that they're able to outfit you with.  But that's

19  another one of our retailers that's just off of College Ave in

20  State College.

21  Q.    Do you know the people who run this store?

22  A.    I do, yes.  So funny story.  The people that run this

23  store actually used to sell baseball uniforms to my

24  father-in-law for my husband's team when he was growing up.

25  So they've been part of the community for so long that when

1    Jay came into the office, that's the first thing he said.  He

2    said hey, I know your father-in-law.  We used to do business

3    all the time when your husband was a lot younger.  So that's

4    just how long some of these retailers have been around.  But

5    it really is all inner-connected.

6    Q.    Yes.  Do you have any idea how long Lions Pride has been

7    around?

8    A.    It's been there for decades.  I mean it was there when I

9    went to school, and I went to school in the 90s, which seems

10   like only yesterday, but it's further and further away as we

11   go.

12   Q.    And now one more I want to put up.  Can we put up

13   Defendant's Exhibit 141.  And I'll let you scroll through so

14   we can see the pictures, and then we'll go back to the first

15   one.  All right.  And what is pictured here?

16   A.    So this is the Family Clothesline.  This is another one

17   of our retailers on College Ave in State College.

18   Q.    And I believe we're going to hear from someone from

19   Family Clothesline either today or tomorrow.  But can you tell

20   me just a little bit about the family that runs this?

21   A.    Sure.  So the Gummo family owns the Family Clothesline.

22   They've owned it for decades at in point.  So I work most

23   often with Caroline Gummo who will reach out regularly if they

24   have questions or concerns.  So if they have delivery concerns

25   with any of the licensees that they're taking in or they

1  actually are a licensee themselves, so they will print

2  products.  So if they have questions about maybe a new

3  treatment that they're trying to use or a new way they're

4  trying to print out a garment, sometimes she'll have us come

5  down and make sure that we're comfortable with how the

6  trademarks appear.  They also work with a lot of our student

7  groups.  So homecoming and THON are always big times of years

8  that people are trying to do co-branded t-shirts that --

9  they're always asking us if the designs are okay, if they're

10 pushing the edge of either our trademark or someone else's

11 trademark as the students orgs are trying to put them

12 together.

13         So we hear from the Family Clothesline all the

14 time.

15 Q.   About how often are you in the store looking at items in

16 the Family Clothesline store?

17 A.   I'm probably in there -- this is the one I'm probably

18 guilty of.  I'm probably in there three or four times a month

19 minimum.

20 Q.   And is that relationship of looking at products with the

21 retailers, talking about methods, talking about what customers

22 want, is that typical of Penn State's relationships with its

23 licensees and retailers?

24 A.   Yeah.  I mean we really try and be accessible to all of

25 them.  So especially our local retailers.  They're just down

1    the street from us.  So we try and have them in to the office

2    at least once a year where we're talking to them about how

3    things are going, how our office, through the process that we

4    control, we can possibly help them with, what products they

5    might be hearing from their customers that their customers

6    would like to see that are licensed so we can kind of be on

7    the lookout for those potential business partners.

8            So we're -- we're as accessible as our licensees

9    would like us to be.  We don't ever really not answer a

10   question or a phone call.  If someone's calling us asking us

11   either what the right way to do something is or what our

12   preferred way for our brand is, but we try to be as accessible

13   as possible.  That's our job.

14   Q.   And do you ever look at websites that sell authorized

15   Penn State merchandise?

16   A.   I do.

17   Q.   Can you give me some examples of those websites?

18   A.   Sure.  I'll go to shop dot Go PSU Sports dot com.  I'll

19   go to the website for Dick's Sporting Goods.  Just ordered

20   from Rally House not long ago.

21           So quite regularly, we'll go on and visit various

22   online retailers.

23   Q.   Very fluid how you said shop dot go PSU sports dot com.

24   A.   Yes.  I've been saying it for years.

25   Q.   So -- so is it the case that authorized Penn State

1  products are sold on non-Penn State websites?

2  A.    Yes.

3  Q.    Is -- is that even more typical than it being sold on a

4  Penn State website?

5  A.    Yes.  I would say it's really common for our products to

6  appear on a website like 47 Brand where there are a number of

7  other colleges and that environment and Rally House where

8  there are a number of other colleges and pro teams in that

9  online shopping environment.  It's very common.

10  Q.    And so I'd like to look at an example of a product for

11  sale on an authorized website.  Can we pull up Exhibit P-132,

12  which is in evidence.  Okay.  What is this a screenshot of,

13  Ms. Petulla?

14  A.    So this is a screenshot of Lions Pride website where

15  they're selling a Penn State hoodie.

16  Q.    And in looking at the website, is -- in the upper left

17  corner, is that the Lions Pride brand?

18  A.    Yes, it is.

19  Q.    Okay.  And is that typical for authorized websites?

20  A.    Yes.  That's pretty typical.

21  Q.    And is Penn State's brand on the item?

22  A.    Yes, it is.  Penn State itself, our registered trademark

23  is on there, as is the lion shrine.

24  Q.    And is the lion shrine also a registered trademark?

25  A.    It is a registered trademark.

1   Q.   Okay.  And is this product was made with Penn State's

2   permission?

3   A.   That's correct.

4   Q.   Now, Ms. Petulla, I want to make sure we're all clear on

5   what we're talking about here.  So what if I buy an authorized

6   sweatshirt like this one from Lions Pride and I decide I want

7   to resell it on E-bay.  Is that allowed?

8   A.   Absolutely.

9   Q.   So Penn State does not, in any way, restrict the resale

10  of authorized merchandise?

11  A.   Not at all.  Once you buy it, it's yours and you're free

12  to do with it what you want.

13  Q.   And memorabilia, anyone free to buy or sell that?

14  A.   Absolutely.  Um-hum.

15  Q.   But what about if I take a genuine Penn State product,

16  either an old one or a new one, and I, you know, photocopy it

17  and then mass produce it on new merchandise.  Is that okay?

18  A.    It's never okay to do that with someone else's trademark.

19  Q.   All right.  I'd like to look at another screenshot.

20  Sorry.  Plaintiff's Exhibit 342, which is in evidence.  Taking

21  a look at this, do you recognize what is shown here?

22  A.   Yes.  This is the Vintage Brand website where they're

23  selling a Penn State t-shirt.

24  Q.   Now, comparing this to the Lions Pride website we just

25  looked at, are they basically in the same format?

1    A.    Yes.

2    Q.    And do they both have the retailer's logo in the upper

3    left corner?

4    A.    Yes, they do.

5    Q.    And do you see Title 1950 Penn State Nittany Lion's men's

6    premium blend ring spun t-shirt?

7    A.    Yes.

8    Q.    To your knowledge, is this actually a t-shirt from the

9    1950s?

10   A.    To my knowledge, it is not.

11   Q.    And do you see the language underneath the title?  I'm

12   sorry.  Underneath the highlighted part where we just read,

13   1950.

14   A.    Simon, maybe you can help me out a little bit.  Thank

15   you.  Yes.  I see the language.

16   Q.    What does that say, if you're able to read it?

17   A.    So we're right under the 1950s portion, right, so the

18   gray fine print.  It says by Vintage Brand, not affiliated

19   with or sponsored by Penn State Nittany Lions.

20   Q.    And what is your impression of that language?

21   A.    I don't think that that language is clear.

22   Q.    Would you describe it as -- in your experience with

23   marketing and how you place things on websites, is this

24   something a consumer would typically read?

25              MR. FETTERS:  Objection, Your Honor.  Calls for

1    speculation.  Lack of foundation.

2              MS. WHEATLEY:  Your Honor, Ms. Petulla's industry

3    is licensing and she looks at these websites all the time and

4    is involved in marketing.

5              MR. FETTERS:  We had a Motion In Limine that I

6    believe was granted --

7              THE COURT:  Say it again, sir.

8              MR. FETTERS:  We had a Motion in Limine that I

9    believe was granted on this topic relating to speculating as

10   to consumer beliefs.

11             THE COURT:  Is it that where you're headed with

12   this witness, Ms. Wheatley?

13             MS. WHEATLEY:  No, I'm not heading in to what the

14   consumer would believe.

15             THE COURT:  All right.  The objection's overruled.

16   I'll let you explore it, provided you're not going in that

17   direction.  Thank you.

18   BY MS. WHEATLEY:

19   Q.  Ms. Petulla, in your experience, when Penn State is

20   advertising something, do they put things they want the

21   consumer to read in big letters or in small letters?

22   A.  They're normally in more dominant text size.

23   Q.  Thank you.  So we can put that down.  Now I'd like to get

24   in to -- well --

25             MS. WHEATLEY:  Your Honor, would you like us to

```
 1  keep going?  We could break here, but I can --
 2           THE COURT:  Could you go on for maybe another 20
 3  minutes or so?  Would that suit?
 4           MS. WHEATLEY:  Yes.  Absolutely.  All right.
 5  BY MS. WHEATLEY:
 6  Q.   So now I'd like to get into the trademarks themselves.
 7           Are you familiar with the trademark that's are up
 8  on that board?
 9  A.   Yes.
10  Q.   Now, sort of -- there are a number of trademarks here.
11  So I want to talk about how sort of they fit in Penn State's
12  story.
13           So starting with Penn State and the Pennsylvania
14  State University.  What is their importance to Penn State?
15  A.   I mean it's intrinsically important.  It's our identity.
16  Penn State and the Pennsylvania State University are what we
17  go by every day in a number of ways.
18  Q.   Are there many things at Penn State that don't have
19  either Penn State or the Pennsylvania State University on it?
20  A.   I mean I think if you go to really any of our campuses,
21  there aren't really many steps that you can take without
22  seeing either Penn State or the Pennsylvania State University
23  on something, whether it's physical wall signage or a business
24  card on someone's desk or their name marker.  The identity is
25  everywhere.
```

1   Q.    And how about the University seal?  Where does the

2   University seal fit in the -- in the group of the University's

3   trademarks?  What is it for?

4   A.    Sure.  So the primary use for the University seal is on

5   official documents that are being sent out, diplomas.  I know

6   my diploma has it.  It also says the Pennsylvania State

7   University on it.  It's the official standard seal for the

8   University.

9   Q.    And how about the lion shrine.  Where does that fit in?

10  A.    So the line shine is really -- it's right there in the

11  fabric of what Penn State is.  It exists on Penn State's

12  campus in University Park.  As Jackie said, there is also a

13  three-fourths replica on every single Commonwealth campus.  It

14  is used to convey awards or for alumni or for staff.  So the

15  shrine itself has -- has also become to be a visual embodiment

16  of our brand.

17  Q.    And how about the Pozniak lion?  Can you tell me sort of

18  what activities the Pozniak lion is used with?

19  A.    Sure.  So the Pozniak lion is used primarily with our

20  Lion Ambassadors, and it is also used with our Nittany Lion

21  Wrestling Club.

22  Q.    And finally, I'd like to do a quick overview with the S

23  lion.  So how is the S lion being used with Penn State?

24  A.    So the S lion is used on vintage product in the

25  marketplace.  It's also heavily used by our current athletic

1  team on University's Park campus as well.  In fact, I'm almost

2  positive we just put this up on some construction fencing

3  around the Beaver Stadium project.

4  Q.   And are any of these marks, is it there -- are any of

5  these the core athletics mark?

6  A.   No.  None of these are the core athletics mark.

7  Q.   So if you are -- if you are -- are these the marks that

8  are primarily marketed to fans?

9  A.   I mean I would say that there's a lot of that that goes

10  on.  Obviously there's a lot of internal use for a lot of

11  these marks, but a number of these, yes, are marketed heavily

12  to our fans, especially through our retail product.

13  Q.   Do some of these marks relate more to Penn State's

14  education?

15  A.   Yes, for sure.  Things like the seal do resonate more

16  from an educational standpoint.  So if there's a student that

17  may be coming on campus that's interested in research or

18  something else, they -- they may pick the seal over something

19  that's more athletic.  It's really there to represent the

20  educational and resource -- or I'm sorry, research endeavors

21  of the university.

22  Q.   And does Penn State have standards for how each of these

23  specific marks is supposed to appear?

24  A.   Yes.  We do have standards.  You know, some of them are a

25  little bit more open than others.  So for Penn State, there's

ROUGH  DRAFT

1  not necessarily a specific color or a specific font that has

2  to be used.  That's just really that everything's spelled

3  correctly and looks as it should.  If you're looking at

4  something like the S lion, the colors and making sure that

5  everything's, you know, balanced out correctly.  We may have a

6  little bit more from a regulation standpoint on.

7  Q.   And your standards for how the marks are used, are those

8  just applied to licensees, or do they apply to Penn State, as

9  well?

10  A.   They apply to Penn State, as well.  So if there's an

11  internal staff member or marketing or communications person,

12  we coordinate with them, just as often as we do our licensees

13  and retailers, to make sure that the brand is consistently

14  represented.

15  Q.   And can you describe how you review these trademarks on

16  -- when they are going to appear on merchandise?

17  A.   Sure.  So that artwork will come in through the CLC

18  system.  Each sweatshirt and t-shirt will come in separately.

19  So even if it just says Arch Penn State, which is one of our

20  most popular designs, that will come in every single time and

21  we'll just make sure that it has the Penn State on it, that it

22  contains the registration mark and then we'll approve it and

23  move onto the next piece of artwork.

24  Q.   And this review process, does that also include both

25  merchandise sold to the general public and merchandise used

1  internally?

2  A.    It does.  So it would include any promotional merchandise

3  that someone like undergraduate admissions or the college of

4  communications might use.  It includes all of our student

5  organizations merchandise.  It also includes anything that

6  goes to retail.  So it really spans.

7  Q.    For internal merchandise, say, for example, merchandise

8  for a student club, is that merchandise still sold at some

9  point in the process?

10  A.    It is, yes.

11  Q.    Can you explain how that happens?

12  A.    Sure.  So oftentimes our student groups will find someone

13  like collegiate pride or -- or Happy Valley Customs, it is --

14  which is the Family Clothesline.  And they will ask them to

15  facilitate an order for them that is approved by the

16  University.  Then they will pay that manufacturer, that

17  licensee to produce those goods.  And so they are paying for

18  the sale of those goods, even though it's not walking into a

19  store where anyone can buy the name of their club, they are

20  still purchasing those goods.

21  Q.    And you mentioned making sure there are no misspellings

22  when approving uses of the word marks up there, what things do

23  you look for when you're approving uses of the logos shown up

24  there?

25  A.    Sure.  So we're looking at the complete trademarks are

1    there.  That if it's the seal, it's completely being used in

2    all of its forms.  That we're really not missing anything.

3            So we -- we like to make sure that by the time the

4    product makes it to the consumer, it's what they would expect.

5    And we believe that a quality product would include trademarks

6    that are correct.

7    Q.    And does Penn State offer any vintage style merchandise?

8    A.    We do.

9    Q.    And does Penn State's vintage still merchandise have to

10   meet a certain quality standard?

11   A.    It does.  It should be in what we call the better or best

12   category.  It's a little bit of an elevated collection for the

13   Vintage merchandise.

14   Q.    And so we talked about trademarks.  But I want to talk

15   about how third parties might become aware of Penn State's

16   trademarks.  Have you ever visited the trademark office's

17   website?

18   A.    Yes.

19   Q.    Have you ever used that website to find information on

20   what trademarks are registered?

21   A.    Yes, I have.

22   Q.    Can you explain to the jury a little bit about how that

23   search works?

24   A.    Sure.  Which you go to the trademark office's website,

25   there's actually a bar that you can search that anyone can

**ROUGH DRAFT**

105

1   publicly search what trademarks might be already owned by

2   other people.

3        So even if we wanted to put in Penn State right

4   now, I could go in and see what categories of goods we own

5   that trademark in or if someone turned a different design in

6   to us that also included someone else's trademark, I've gone

7   in before and looked for other peoples' trademarks.  So one of

8   our Vintage licensees just sent us a design not long ago that

9   also had an older Orange Bowl logo on it.  And I was curious

10  and wanted to make sure that even though it wasn't our

11  trademark, that a design that contained Penn State was not

12  also infringing on someone else's trademark.  So I went in

13  there.  They've actually abandoned that trademark because it

14  doesn't say FedEx and it's not sort of the modern one that

15  they use.  So they don't own it any more, and we would be able

16  to, then, use it.

17       So we check regularly to make sure that we are

18  respecting everyone else's trademarks the way that they would

19  wish ours to be respected, as well.

20  Q.   And is this search, is it available to anyone in the

21  public?

22  A.   It is.

23  Q.   Okay.  And is it free?

24  A.   It is free.

25  Q.   Okay.  And have you searched for Penn State on there?

1    A.    Yes, I have.

2    Q.    And it shows up?

3    A.    It does show up.

4    Q.    Okay.  And you mentioned an example of when Penn State,

5    you know, you chose not to use a -- or you considered whether

6    or not a trademark was registered by someone else before using

7    it.  Would Penn State ever use a trademark that was registered

8    by someone else?

9    A.    We would not.  It doesn't belong to us.

10   Q.    Ms. Petulla, you were here for Mr. Fetter's opening.

11            As director of licensing, is it your understanding

12   that it is okay to copy someone's trademark as long as you

13   don't claim to be officially licensed?

14   A.    No.  It's never okay to use someone else's trademark.

15   Q.    Okay.  And is it necessary to put officially licensed

16   next to a trademark to show that you own that trademark?

17   A.    So there are other ways, like the registration mark that

18   shows you that someone owns that trademark.

19   Q.    And do you even need to use the registration symbol?

20   A.    No.

21   Q.    You just own it?

22   A.    Just own it.

23   Q.    And Ms. Petulla, as director of licensing, do you oversee

24   the University's trademarks generally?

25   A.    Yes.

1   Q.   Okay.  And so are you familiar with the University's

2   trademark registrations?

3   A.   Yes.

4   Q.   And so to your knowledge, how does Penn State obtain a

5   trademark registration?

6   A.   Sure.  If we were going to obtain a trademark, we

7   generally start with our own folks in the office of general

8   Counsel, and take that trademark to them, ask them to sort of

9   do their first evaluation of it, if it's a trademark that we

10  feel like yes, in fact, we do own as a university.  We will

11  work with outside Counsel at McGuire Woods to go through the

12  registration process with the US PTO where we show use of that

13  trademark.  And then someone there will review it.

14  Q.   So there's a -- so there's first an application; is that

15  correct?

16  A.   That's correct.

17  Q.   And then the trademark office reviews it?

18  A.   That's correct.

19  Q.   And do they make a decision on whether or not you get to

20  have a trademark?

21  A.   Yes, they do.  They review the application and make a

22  decision on whether or not we should own the trademark.

23  Q.   Okay.  And you mentioned samples of use.  What is your

24  role in that process?

25  A.   Sure.  So oftentimes, our office will be responsible for

```
 1    collecting samples of use.  So either during that application

 2    process or during our renewal process, we actually just went

 3    through a renewal process for one of our other trademarks.  So

 4    our staff will go downtown and online and find actual places

 5    where the trademark is being used on certain classes of goods.

 6    So whether it be a mug or a pen or a pennant, we will actually

 7    find physical specimens of where that trademark is being used

 8    to be able to show use to the trademark office.

 9    Q.    And do you take, then, photographs of those examples?

10    A.    Yes, we do.

11    Q.    And are they submitted to the trademark office?

12    A.    They are submitted, yes.

13    Q.    And then does the trademark office approve those samples

14    of use?

15    A.    Yes, they do.

16    Q.    All right.  So I'd like to look just in a big overview

17    the trade -- at the trademark registration that's are at issue

18    in this case.  I don't know if we have an example of those.  I

19    can show you the real things, as well, but so the jury can

20    see.  Well, I will start with Exhibit 2, which is the word

21    mark Penn State.

22              MS. WHEATLEY:  Permission to approach, Your Honor?

23              THE COURT:  You may.

24    BY MS. WHEATLEY:

25    Q.    So Ms. Petulla, what I've just handed you, what are
```

**ROUGH DRAFT**

1    these?

2    A.    So these are the official certificates that we received

3    back from the trademark office that tell us that we, yes, do,

4    in fact, own the trademark that this particular certificate

5    would deal with.

6    Q.    Okay.  And if you flip both of these over -- open, what

7    trademarks are these for?

8    A.    So this first one is for Penn State.  Also Penn State.

9    Q.    Now, turning back to the front of these, if you could

10   show the jury there's a gold seal on the front.  Can you

11   explain what that means?

12   A.    Sure.  The gold seal really signifies to anybody that

13   this is a official document, that the trademark office

14   reviewed this, agreed with our application, that the trademark

15   was Penn State's, and awarded us this trademark officially.

16   Q.    Okay.  And is there a signature on the front?

17   A.    There is a signature on the front.

18   Q.    Okay.  And is this an actual ink signature?

19   A.    It actually is an ink signature, which doesn't always

20   happen anymore.  But it is a pen to paper signature, yes.

21   Q.    So is it signed by an officer of the trademark office?

22   A.    It is.  This one, the certifying officer was Wanda

23   Montgomery.

24   Q.    Okay.  And do you see on the front of this one, it has a

25   term, Section 8 partial and 15.  Do you know what Section 15

1    refers to?

2    A.    Yes.  So Section 15 means it's incontestable.

3    Q.    Okay.  And what is your non-lawyer understanding of what

4    incontestable means?

5    A.    So if it's incontestable, it really shouldn't be

6    contested.  It's not really up for debate.  It is ours.  It is

7    incontestable.

8    Q.    All right.  And we looked at the second page where the

9    trademark is pictured.  Looking in the upper right-hand

10   corner, can you tell me when this was first registered to Penn

11   State?

12   A.    Sure.  December 11th, 1984.

13   Q.    And looking underneath Penn State, where can we see who

14   this was registered too?

15   A.    It's registered to the Pennsylvania State University.

16   Q.    Okay.  And on this second and third pages, do you see a

17   long list of goods?

18   A.    Yes.

19   Q.    What are these?

20   A.    So these are all goods that this trademark is registered

21   for.

22   Q.    And do you see some items that are crossed out?

23   A.    Yes.

24   Q.    What do those markings mean?

25   A.    So items crossed out in red mean that they're no longer

1  being used as trademark items.

2  Q.   Okay.  So the University has given up on selling

3  phonograph records, for example?

4  A.   Yes.

5  Q.   Now, I won't ask you to read through all of the items

6  that are covered here, but can you tell me, does this

7  registration cover drinking mugs, tankards, glasses, cups, and

8  tumblers?

9  A.   Yes, it does.

10  Q.   And does it cover pennants and banners?

11  A.   Yes, it does.

12  Q.   And does it cover shirts, t-shirts, sweatshirts, socks,

13  and hats?

14  A.   Yes, it does.

15  Q.   Okay.  Now I'd like to look at the second Penn State

16  registration.  You can look at the one that's marked P-4.

17        So is this also a certified copy hand-signed by an

18  officer at the trademark office?

19  A.   Yes, it is.  This one's certified, and the certifying

20  officer was Pam Grant on this one.

21  Q.   Okay.  And turning the page to the registration

22  certificate where we've got the list of goods, does this one

23  cover decorative magnets?

24  A.   Yes,  it does.

25  Q.   Okay.  And does it cover coasters, ceramic mugs, and

ROUGH DRAFT

1    cutting boards?

2    A.    Yes, it does.

3    Q.    And does it cover jigsaw puzzles?

4    A.    Yes, it does.

5    Q.    And to your knowledge, did the trademark office, before

6    granting this, look at examples of how Penn State was using

7    Penn State on these items?

8    A.    Yes, it does.

9    Q.    Now, we just looked at a whole long list of items.  Does

10   Penn State actually use the mark Penn State on those types of

11   products?

12   A.    Yes.

13   Q.    Okay.  Now, you've heard here that Vintage Brand started

14   selling in 2018.  Was the University -- the University selling

15   apparel in these types of items with Penn State on it before

16   Vintage Brand started selling?

17   A.    Yes.

18   Q.    Okay.  Now, we're going to get in to some actual items

19   that the University offers that have Penn State on them.  Can

20   -- permission to approach, Your Honor?

21            THE COURT:  You may.

22   BY MS. WHEATLEY:

23   Q.    All right.  So what I've handed you up there is

24   Plaintiff's 467, which has already been admitted, Plaintiff's

25   456, which has already been admitted, and Plaintiff's 460, and

ROUGH DRAFT

```
 1   then there are some other things that I think we'll probably
 2   look at after -- after the break.
 3           So could you pull out Plaintiff's 467, and we'll
 4   put a picture up there on the screen so the jury can see it
 5   more closely.  I'm sorry to make you go --
 6   A.   That's okay.
 7   Q.   -- shopping there.
 8           On this one, can you show the jury where Penn State
 9   appears on this item?
10   A.   Sure.  So on this particular one, it happens to be on the
11   back neck of the Polo shirt.
12   Q.   Okay.  And is this an authorized piece of apparel?
13   A.   Yes.
14   Q.   Okay.  And does Penn State generally use its trademark in
15   all different spots on a piece of apparel?
16   A.   Yes.  It can appear on a number of different places.
17   Q.   Okay.  I'd like to look at another example.
18           Can we look at Plaintiff's Exhibit No. 457.  So is
19   this a piece of authorized Penn State apparel?
20   A.   It is.  This is a piece of authorized Penn State apparel
21   that has our Penn State trademark on it, the words, and then
22   has the trademark of the seal on it.
23   Q.   Okay.  And can we also look at Plaintiff's Exhibit 460.
24   I think it's fairly obvious, but can you point out where Penn
25   State appears on that one?
```

1   A.   Sure.  Penn State appears on front chest, right there.

2   And the lion shrine appears right below it.

3   Q.   And is it also a piece of authorized merchandise?

4   A.   This is a piece of authorized merchandise from Lions

5   Pride.

6   Q.   Okay.  And does Penn State need to own a separate

7   trademark registration for each font that it uses Penn State

8   in?

9   A.   No.  So the trademark registrations for Penn State are

10  for the words.  So whatever the font treatment is, whatever

11  the color is, the words Penn State are still owned by the

12  University.

13  Q.   Thank you.  And I think you mentioned that the one you

14  just last showed with Penn State and the shrine uses multiple

15  Penn State trademarks.  Is that pretty common?

16  A.   Yes.  That's pretty common.  It's pretty common, more

17  common lately to use sometimes four or five on the same.  It

18  just depends on the style.

19  Q.   What is the goal there in using four or five Penn State

20  trademarks?

21  A.   You know, I think that it's just fashion.  It's a little

22  bit of a trend.  But I think really outwardly, people want to

23  have the association to Penn State.

24          MS. WHEATLEY:  Is this a good place to break, Your

25  Honor?

```
 1              THE COURT:  Is it for you?

 2              MS. WHEATLEY:  Yes.  Yes.

 3              THE COURT:  Ladies and gentlemen, we're partway

 4    through the direct examination of this witness.  But it's best

 5    that we probably stand in recess for lunch at this point.

 6    We'll take lunch for an hour.  I'd like to have you back,

 7    ideally, maybe 10 minutes early.  So we'll stand in recess,

 8    then, until 1:45 p.m.  If you could come back to the jury

 9    assembly room at about you 1:35, I'd appreciate it.

10              Again, I commend Wegman's grocery store and their

11    food court to you.  You can get lunch there.  Overpriced

12    lunch, admittedly, but lunch, as opposed to wondering the

13    streets of Williamsport trying to find a restaurant that's

14    open.  Although you're welcome to do that.  And I'm not

15    telling you what to do.  I'm just giving you general guidance

16    as opposed to a dictate.

17              Mrs. Rhinehart, if you will escort the jury out.

18    Enjoy your lunch.  Don't discuss the case among yourselves or

19    with anyone else.  Mrs. Rhinehart.

20              (At 12:45 p.m., the jury left the courtroom for

21               their lunch recess.)

22              (2:08 p.m.)

23              THE COURT:  We're back on the record now after a

24    somewhat extended recess.  We're partway through the direct --

25    thank you.  Direct testimony of Ms. Petulla.  Ms. Wheatley.
```

1    I think you have some additional examination of this witness.

2              MS. WHEATLEY:  Correct.

3              THE COURT:  Go right ahead.

4                   DIRECT EXAMINATION (cont'd)

5    BY MS. WHEATLEY:

6    Q.   Ms. Petulla, if you could pull out your red well there,

7    the pair of socks, the water bottle, and the coasters.  And

8    that is Plaintiff's 465, 429, 442, which are already in

9    evidence.  Do these have the Penn State trademarks on them?

10   A.   They do.  On the socks, there is the Penn State here, the

11   athletic mark on the coasters, which I'm not sure if that --

12   on the coasters, the buses, the Penn State University, the

13   primary athletic mark is on there.  And then Penn State, and

14   then Penn State is also on the water bottle.

15   Q.   Does the water bottle contain any other trademarks?

16   A.   Yes.  Yeti is on the water bottle, and then on the label

17   on the bottom, there's actually the Family Clothesline is on

18   there.

19   Q.   Is that common to have multiple trademarks from different

20   companies on a product?

21   A.   Absolutely.

22   Q.   What does it mean?

23   A.   You know, this is a Yeti water bottle.  It's also a Penn

24   State water bottle, our trademark and brand is on there, and

25   it's sold by the Family Clothesline.

1    Q.   Okay.  And the coasters, there's a picture of a blue bus

2    on there.  Is that common -- is that a Penn State trademark?

3    A.   The blue bus is not a Penn State trademark.  The

4    Pennsylvania State University on the bus is the trademark.

5    Q.   And is it common for Penn State to use additional artwork

6    in addition to trademarks on its products?

7    A.   Yes.

8    Q.   All right.  Now, I would like to look at a Vintage Brand

9    product, which I believe you have up there.  Do you have the

10   sweatshirt that is Plaintiff's 292 up there?  Have you seen

11   this product before?

12   A.   Yes.

13   Q.   Okay.  Does this product use a Penn State trademark?

14   A.   It does.  It uses Penn State right here, which is our

15   trademark, and it has the seal behind.

16   Q.   And does Penn State's trademark registration for Penn

17   State cover sweatshirts like this one?

18   A.   Yes.

19   Q.   And it covers it in that front that's shown there?

20   A.   It covers it in whatever font or font color is used.

21   Q.   Okay.

22        MS. WHEATLEY:  I'm come up and collect your

23   merchandise now, if I can approach, Your Honor?

24        THE COURT:  You may.

25        MS. WHEATLEY:  Actually, I'll swap those out for

1    the next.

2    BY MS. WHEATLEY:

3    Q.    Next I'd like to look at a -- another Vintage Brand

4    product on the website.  If we can pull up Plaintiff's Exhibit

5    341.  Do you recognize this document?

6    A.    Yes.

7    Q.    Okay.  What is this showing here?

8    A.    It's like a screen capture of the Vintage Brand website.

9    Q.    Okay.  And does the product shown here use the Penn State

10   mark?

11   A.    Yes.  It uses the words Penn State.

12   Q.    Okay.  And I'd like to sum this up and look at the

13   registration and this shirt here and then one of the Penn

14   State shirts we just looked at.  Simon, can you put --

15   Mr. Burkhart, can you put those up on the screen?

16            Ms. Petulla, what is shown on the left?

17   A.    So on the left is our -- is a portion of our trademark

18   certificate for Penn State.

19   Q.    Okay.  And what is shown in the middle?

20   A.    That is the Vintage Brand Penn State shirt.

21   Q.    Okay.  And what is shown on the right?

22   A.    That's the Lions Pride Penn State shirt.

23   Q.    Okay.  And does the Penn State trademark registration

24   cover trademarks on the front of products?

25   A.    Yes.

1   Q.   And we talked earlier about when Penn State sends samples

2   of how it is using its trademarks to the trademark office,

3   does Penn State send those -- send samples of shirts with Penn

4   State on the front of shirts?

5   A.   Yes.

6   Q.   And does the trademark office approve those samples as

7   showing trademark use?

8   A.   Yes.

9   Q.   All right.  I'd like to turn to the Pennsylvania State

10  University.

11            MS. WHEATLEY:  Your Honor, may I approach?

12            THE COURT:  You may.

13            MS. WHEATLEY:  Thank you.

14  BY MS. WHEATLEY:

15  Q.   Ms. Petulla, I've just handed you what's been marked as

16  Plaintiff's Exhibits 6, 8, and 10.  Can you tell me, these

17  three registrations, do you know what trademark they're for?

18  You can look on the inside to tell.

19  A.   I looked at two.  So these are all of the Penn State

20  University.

21  Q.   Okay.  And do these all have the gold seal to show that

22  they are certified?

23  A.   They do.

24  Q.   Okay.  And do these all have -- are these all

25  hand-signed, as well?

1   A.   Yes, they are.

2   Q.   Okay.  And for -- starting with P-6, if you could open

3   that one up.  And looking on the second page of that one, can

4   you tell the jury when the Pennsylvania State University was

5   registered?

6   A.   January 2nd of 1985.

7   Q.   Okay.  And on this one, I'd like to go through a few of

8   the goods and services.  Does this one cover decals?

9   A.   Yes.

10  Q.   Does it cover drinking mugs, tankards and tumblers?

11  A.   Yes.

12  Q.   And flipping back to the first page, and zooming in, is

13  this one incontestable?

14  A.   Yes, it is.  You can see the Section 15 there.

15  Q.   Okay.  And now I would like to turn to the Pennsylvania

16  State University registration that was marked as Exhibit 8,

17  Plaintiff's 8.  If we could go to the second page.  And

18  looking at this one, is any apparel covered here?

19  A.   Yes.  Hats, jackets, shirts, shorts, sweatshirts,

20  t-shirts, and ties.

21  Q.   Okay.  We can move on from that one.  If we can pull up

22  Plaintiff's Exhibit 10.  And we can go to the second page.

23  Does this one also cover the Pennsylvania State University?

24  A.   It does.

25  Q.   And does this one cover decorative magnets?

1    A.    Yes.

2    Q.    Does this one cover fabric flags?

3    A.    Yes, it does.

4    Q.    Okay.  We can set those aside, and I would like to look

5    at some of the goods that are listed in those registrations.

6              Can you pull out from your red well what's been

7    marked as 466 and 445 of the Plaintiffs' exhibits that have

8    both already been admitted?

9    A.    Um-hum.

10   Q.    What trademark appears on that shirt right there?

11   A.    So the Pennsylvania State University appears, as does the

12   primary athletic mark.

13   Q.    Okay.  And if you could show the jury the banner and tell

14   them what trademark appears there?

15   A.    Sure.  The Pennsylvania State University appears again,

16   as does Penn State.

17   Q.    And has the University -- I'm sorry.  Has the

18   Pennsylvania State University appeared on merchandise since

19   you started working at the University?

20   A.    Yes.

21   Q.    And what year was that?

22   A.    I started in 2003.

23   Q.    Okay.  And same question for Penn State.  Has that

24   appeared on merchandise since you started working there in

25   2003?

1  A.   Yes.

2  Q.   All right.  Now, I would like to move on to the

3  University seal.

4          Do we have a picture of that on the screen?  Do you

5  recognize this?

6  A.   Yes.

7  Q.   Okay.  Is that the University seal?

8  A.   It is.

9  Q.   Okay.  And I believe you testified earlier this appears

10 on your diploma?

11 A.   It does.

12 Q.   And does the seal incorporate any other Penn State

13 trademarks?

14 A.   It incorporates the Pennsylvania State University around

15 the outside.

16 Q.   And why does it say 1855?

17 A.   That's the year the University was established.

18 Q.   Okay.  And does Penn State have any restrictions on how

19 the University seal can be used?

20 A.   Yes.  It must always be used as a whole piece.  It cannot

21 be taken apart.  It must always be used as a whole piece.

22 Q.   Okay.  So the -- you'll never see the seal without the

23 words the Pennsylvania State University?

24 A.   No.  Never.

25 Q.   Okay.

```
 1            MS. WHEATLEY:  Your Honor, may I approach?

 2            THE COURT:  You may.

 3            MS. WHEATLEY:  Thank you.

 4   BY MS. WHEATLEY:

 5   Q.   You have now the registration certificates marked as

 6   Plaintiff's Exhibit 12 which has been admitted and Plaintiff's

 7   Exhibit 14.  Can you tell the jury what -- what trademark are

 8   these registrations for?

 9   A.   These registrations are for the Penn State University

10   seal.

11   Q.   Looking at Plaintiff's 12, is this registration

12   incontestable?

13   A.   It is.

14   Q.   Okay.  And turning to the second page, what year, if we

15   can zoom in so you can read it, what year was this trademark

16   registered?

17   A.   May 8th, 1984.

18   Q.   Okay.  And looking down at the goods and services this

19   covers, we're going to go to the second page.  Does this one

20   cover drinking mugs, tankards, cups, and tumblers?

21   A.   It does.

22   Q.   Does it cover pennants?

23   A.   It does.

24   Q.   Does it cover shirts, t-shirts, sweatshirts, and hats?

25   A.   It does.
```

Q.   Okay.  And then switching to Plaintiff's 14, the second

registration.  Is this also a registration for the University

seal?

A.   It is.

Q.   Okay.  And going to the second page, does this cover

coasters and ceramic mugs?

A.   It does.

Q.   Okay.  To your knowledge, does the trademark office

register trademarks if they determine that they are Government

insignia?

A.   No.

Q.   Okay.  And how do you know that?

A.   That's just the general knowledge I have from my

position, that that's not something that they do.

Q.   Okay.  And to your knowledge, to maintain these

registrations, do the University submit information to the

trademark office about its use of the seal?

A.   We do.  Um-hum.

Q.   Okay.  Now, for the University seal, fair to say the

University sells merchandise featuring the seal on it?

A.   Yes.  That's correct.

Q.   Okay.  And was that going on when you were a student at

Penn State in the 1990s?

A.   Yes.

Q.   And it's been continuously going on since 2003 when you

```
 1   started at Penn State?

 2   A.    That's correct.

 3   Q.    Okay.  I'd like to look at a few of those products.

 4            MS. WHEATLEY:  Your Honor, may I approach?

 5            THE COURT:  You may.

 6   BY MS. WHEATLEY:

 7   Q.    All right.  So now I would like to look at Plaintiff's

 8   443, Plaintiff's 425, and Plaintiff's 435 and Plaintiff's 448.

 9   So could you show each one of those items to the jury?  We'll

10   start with 443, the sweatshirt.  Is this typical of how the

11   seal would be used on a sweatshirt?

12   A.    Yes.

13   Q.    Okay.  Can we look at Plaintiff's 425.  Is that typical

14   of how the seal would be used on a pennant?

15   A.    Yes.

16   Q.    Can we look at Plaintiff's 435, the mug.  Is that typical

17   how the seal would be used on a mug?

18   A.    Yes.

19   Q.    Okay.  And finally, Plaintiff's 448.  Is that typical of

20   how a seal might be -- the seal might be used on a t-shirt?

21   A.    Yes.

22   Q.    Okay.  And are all of these authorized Penn State

23   products?

24   A.    They are.

25   Q.    Now, I'd like you to look -- for you to look in your
```

ROUGH DRAFT

126

1  folder at a Vintage Brand product, if you could pull out the

2  mug in there.  I realize I'm making you do a lot of juggling

3  here?

4  A.    It's okay.  I haven't dropped anything yet.

5  Q.    Have you seen this product before?

6  A.    Yes.

7  Q.    Okay.  And is it your understanding that this is a

8  Vintage Brand product?

9  A.    Yes.

10  Q.    Does this product use a version of the university seal?

11  A.    It use uses a version of the university seal, albeit a

12  little incomplete because there's no 1855.

13  Q.    Okay.  Do you see any other Penn State trademarks on

14  there?

15  A.    So the lion shrine obviously is very close to what's

16  going on there.  And then there's been an attempt for Nittany

17  Lions here.  But it's really only half.

18  Q.    Okay.  And to your knowledge, was this offered for sale

19  by Vintage Brand?

20  A.    Yes, it was.

21  Q.    Okay.  And I'd like to sum this all up.  Simon -- or

22  Mr. Burkhart, do you mind putting up the registration

23  certificate for the Penn State University and the University

24  seal, the Vintage Brand product and the seal mug?

25          Ms. Petulla, there on the screen on the left, what

1    are we seeing there under P-6?

2    A.    That's an excerpt of our trademark registration for the

3    University seal.

4    Q.    Okay.  And what is above that one also on the left?

5    A.    The Penn State University, an excerpt of that

6    registration.

7    Q.    And in the middle, what are we looking at there?

8    A.    That is the mug that Vintage Brand sold with the

9    University seal on it.

10   Q.    Okay.  And on the right, what are we looking at there?

11   A.    That is a mug from one of our licensees with the seal on

12   it which contains the Pennsylvania State University.

13   Q.    Thank you.

14          Now I'd like to take a look at the lion shrine

15   logo.  Do you recognize this lion shrine, Ms. Petulla?

16   A.    I do.

17   Q.    And --

18          MS. WHEATLEY:  May I approach, Your Honor?

19          THE COURT:  You may.

20   BY MS. WHEATLEY:

21   Q.    I should correct myself.  The exhibit number for the

22   Vintage Brand mug we just looked at is Plaintiff's 280, which

23   was previously admitted.

24          Ms. Petulla, looking at what's been marked as

25   Plaintiff's 16 and Plaintiff's Exhibit 18, what are -- what

1  are these documents here?

2  A.   So these are the official registration certificates for

3  two different versions of the lion shrine.  But they both have

4  the gold seal, both signed again.

5  Q.   Are both of these incontestable?

6  A.   They are.

7  Q.   And looking at Exhibit P-16 first.  If we can go to the

8  second and third pages.  Can you tell me what is shown there?

9  A.   So these are the categories and the mark that are part of

10  this registration document.

11  Q.   Okay.  And in terms of goods, does this registration

12  cover drinking mugs, tankards, and tumblers?

13  A.   It does.

14  Q.   Okay.  And going to the third page, does this cover

15  pennants and banners?

16  A.   It does.

17  Q.   And does this registration cover shirts, t-shirts,

18  sweatshirts, and hats?

19  A.   It does.

20  Q.   Okay.  And if we can turn to exhibit -- Plaintiff's 18.

21  You said this was a different version of the shrine logo?

22  A.   Yes.  This is a slightly different version of the shrine

23  logo.

24  Q.   Okay.  Can we look at that on the second page.  And what

25  goods are covered by this registration?

1    A.    Hot dogs.

2    Q.    Okay.  So I'd like to talk about the hot dog

3    registration.  And I believe Frankfurter is the same thing?

4    A.    Yes, that's my understanding.

5    Q.    Are there Penn State hot dogs using this logo?

6    A.    There are.  I just saw them in one of the grocery stores

7    near us a couple of weeks ago.

8    Q.    Is that a local company that uses this logo?

9    A.    Yes.  It's a regional company.  Kessler's has the hot

10   dogs that bear this mark.

11   Q.    And how long has that company been selling Nittany Lion

12   hot dogs?

13   A.    It's my understanding that it's been decades since

14   they've been selling Nittany Lion hot dogs.

15   Q.    And they've always used this shrine?

16   A.    Yes.  They've always used this logo with our permission.

17   Q.    And are Penn State trademarks used on other food

18   products?

19   A.    Yes.  Yeah.  There are many products that are sold by our

20   Creamery that have Penn State marks on them.  So whether it's

21   your favorite ice cream flavor or the milk that comes from the

22   dairy, there are a number of products in the Creamery that

23   bear Penn State marks.

24   Q.    And for -- the Creamery, for example, do they -- they

25   sell food items, but do they also sell merchandise, such as

1    t-shirts or kitchen items?

2    A.    They do.  They sell mugs right now.  They sell cutting

3    boards.  They're looking to expanding in to other merchandise

4    for Creamery fans.

5    Q.    Okay.  To your knowledge, does Vintage Brand sell hot

6    dogs?

7    A.    Not to my knowledge.

8    Q.    But do they sell any related products?

9    A.    They do sell cutting boards.  They sell mugs, so they

10    sell some things similarly.

11    Q.    Thank you.

12          Now setting aside the hot dogs, does Penn State

13    sell clothing with the lion shrine logo?

14    A.    Yes.

15    Q.    And Penn State licenses the lion shrine logo to others to

16    sell clothing?

17    A.    Yes.

18    Q.    And turning --

19          MS. WHEATLEY:  May I approach, Your Honor?

20          THE COURT:  You may.

21    BY MS. WHEATLEY:

22    Q.    Does the shrine appear on pennants?

23    A.    Yes.

24    Q.    Okay.  So I'd like to first look at a few apparel items.

25    Can we look at Plaintiff's Exhibit 440 and Plaintiff's Exhibit

**ROUGH DRAFT**

431.  So looking at Plaintiff's Exhibit 440, can you show the

jury where the shrine appears?

A.    Sure.  The shrine appears right here.  (Indicating).

Q.    Okay.  And we can set that aside.  Looking at Plaintiff's

Exhibit 431, the hat.  You can show the jury where that

appears?

A.    So the lion shrine appears right here on the hat.

Q.    Okay.  And has shrine merchandise, such as this, been

sold by Penn State as long as you've worked at Penn State,

since 2003?

A.    Yes.

Q.    Okay.  Do you know if Penn State was selling merchandise

with the shrine logo in 1980s?

A.    Yes.

Q.    Okay.  How do you know that?

A.    We would visit campus pretty regularly and the book store

was always a stop for us.

Q.    Now I -- if you could pull out Exhibit P-272.  It's a

gray t-shirt.  To your knowledge, is this a Vintage Brand

product?

A.    Yes.

Q.    Okay.  And does a version of the lion shrine appear here?

A.    It does.

Q.    Okay.  I'd like you to apply the touch and feel test.  Is

there any quality concern you have about this shirt?

1   A.    Yeah.   I mean we would have concern with how the logo is

2   placed on here.   It's kind of plasticy and I -- I would

3   probably tell our licensees that I think we could do better.

4   Q.    Thank you.   And so I'd like to just do a quick comparison

5   and not make you hold these things up side-by-side.   If we can

6   pull up Plaintiff's Exhibit's -- Plaintiff's Exhibit 16,

7   Plaintiff's Exhibit 272, and Plaintiff's Exhibit 440 side-by-

8   side.

9        Can you briefly tell the jury what they are looking

10  at here?

11  A.    Sure.   So on the left-hand side, that's an excerpt of our

12  registration certificate from the trademark office for the

13  lion shrine.   In the middle is one of the Vintage Brand

14  products with the lion shrine on it.   And on the right is a

15  t-shirt from Homefield, who is one of our licensees, that also

16  has the lion shrine on it.

17  Q.    And so now I'd like to look at some of the pennants you

18  have up there, Plaintiff's Exhibit 269 and Plaintiff's Exhibit

19  270.

20       Can you tell me what company are these two from?

21  A.    These are both from Vintage Brand.

22  Q.    Okay.   How can you tell?

23  A.    I'm familiar with this version and just familiar with

24  these products from being on the site.

25  Q.    Okay.   And would the information you have necessarily be

1  available to the ordinary consumer?

2  A.    When I went to their site, the products were -- was left.

3  Q.    And do you recognize any Penn State trademarks on these

4  products?

5  A.    Yes.  So Penn State appears on this pennant and obviously

6  that's supposed to be a version of the lion shrine.  The lion

7  shrine is also on here, as is the Pennsylvania State

8  University as part of this partial seal.

9  Q.    Okay.  And turning to the dark blue pennant that you're

10  holding up right now, would you consider this to be high

11  quality for the consumer?

12  A.    We would not.

13  Q.    Why not?

14  A.    You know there are a lot of partial trademarks on here

15  that we would not generally approve in our artwork system.  We

16  would send them back for correction, including the seal that

17  does not have the 1855 on it.  The pen is pretty much half of

18  our trademark but creates confusion with the University of

19  Pennsylvania by just putting pen on a pennant.  And then

20  Nittany is half of what our mascot name is but not the full

21  mascot.  So there are several things about the pennant that we

22  would ask to have changed.

23  Q.    So for Plaintiff's Exhibit 270 which you're holding up in

24  your hands, would you have any concern about sending this

25  product to a consumer?

134

A.    I would have concerns that if the consumer had this

product, because I believe that they bought it because the

description said it was a Penn State product, but it really is

not a high quality Penn State product.  It's like a fragmented

trademark product, and I think that it would be hard for

someone that perhaps would receive this as a gift that knows

what they're looking at to be really excited that they got

this gift.  It just -- it's not representative of our brand.

It's trying to be, but it's not representative of our brand.

Q.    Okay.  And so, if you could set those two aside, but I

will want you to compare them to some additional Penn State

pennants in a moment.

        And if you can pull out Plaintiff's Exhibit 424,

Plaintiff's Exhibit 426, Plaintiff's Exhibit 423, and

Plaintiff's Exhibit 427.

        COURTROOM DEPUTY:  426 is not on this list.

        MS. WHEATLEY:  Then I would ask to move in to

evidence Plaintiff's Exhibit 426.

        MR. FETTERS:  What is it?

        MS. WHEATLEY:  It's one of the pennants.

        MR. FETTERS:  No objection.

        THE COURT:  No objection?

        MR. FETTERS:  No objection.

        THE COURT:  Duly admitted.  You may publish S.

BY MS. WHEATLEY:

1    Q.    So starting with 426, which is the S and the Penn State.

2    Can you identify the trademarks that are on that one?

3    A.    Sure.  Penn State is on here, as is the S lion.

4    Q.    Okay.  And if you can also look at 424 is the shrine on

5    that one?

6    A.    Yes.  Right at the top here.

7    Q.    Okay.  And then finally, if you can look to the banner,

8    427.  Is -- can you point out to me the Penn State trademarks

9    on this banner?

10   A.    Sure.  The Penn State is up here at the top, the S, which

11   is our varsity S, the University seal, the primary athletic

12   mark, and Nittany Lions.

13   Q.    And is this typical to mix sort of the older retro

14   trademarks with the athletics logo?

15   A.    Yeah.  It can be.

16   Q.    And based on the touch and feel of these products versus

17   the Vintage Brand pennants, who are your observations?

18   A.    In my opinion, these are much higher quality and much

19   better made.

20   Q.    Thank you.  All right.  If you can set those aside.  If

21   you can pack those, I'll swap these out.

22            MS. WHEATLEY:  Your Honor, may I approach?

23            THE COURT:  You may.

24   BY MS. WHEATLEY:

25   Q.    All right.  I'd like to move onto the Pozniak lion.  So

1  if we could put the Pozniak lion logo up on the screen.  Thank
2  you Mr. Burkhart.  The Pozniak lion logo, can you describe
3  generally how it's used?
4  A.    So the Pozniak lion logo is used primarily for our Lion
5  Ambassadors and also used by the Nittany Lion Wrestling Club.
6  Q.    Okay.  And as director of the licensing, do you also have
7  responsibility for this logo?
8  A.    I do.
9  Q.    And I'd like to look at the Pozniak lion trademark,
10  exhibit -- Plaintiff's Exhibit 20.  Is this a certified copy
11  of the Pozniak lion trademark registration?
12  A.    Yes, it is.
13  Q.    Okay.  And going to the second page, does this
14  registration cover apparel?
15  A.    It does.
16  Q.    What type of apparel?
17  A.    Namely hats, t-shirts, sweatshirts, jackets, and Polo
18  shirts.
19  Q.    Okay.  And does Penn State currently allow groups to use
20  this logo on those items?
21  A.    Yes.
22  Q.    Okay.  And from 2017 to the present, has Penn State ever
23  not used the Pozniak lion logo on merchandise?
24  A.    We've used it continuously.
25  Q.    Now, the Pozniak lion merchandise, is it sold?

**ROUGH DRAFT**

1   A.   It's sold to the Lion Ambassadors and to the Nittany Lion

2   Wrestling Club Members.

3   Q.   Okay.  In your view, is there any benefit in having this

4   logo be limited to these groups?

5   A.   Yes.  It's always been an identifier for those groups,

6   but additionally, we're also respectful of the agreement that

7   we entered into with the Pozniak family that said that that

8   was really the intended use.

9   Q.   Now I'd like to look at a few examples of use Pozniak

10  lion.  Before you pull those out, that would be exhibit 458

11  and exhibit 459.  I would like to move those in to evidence.

12          MR. FETTERS:  No objection.

13          THE COURT:  Duly admitted.

14  BY MS. WHEATLEY:

15  Q.   Can you go ahead and pull 458, 459, and actually you may

16  have 430 up there, as well, which I think was previously

17  admitted.

18  A.   I do not.

19          MS. WHEATLEY:  You do not.

20          COURTROOM DEPUTY:  That one is not either.

21  BY MS. WHEATLEY:

22  Q.   While they're grabbing that one, can you tell the jury

23  what we're seeing with the two items you have up there?

24  A.   Yes.  So this is a shirt for the student ambassadors,

25  which is the Penn State student alumni core that David

**ROUGH DRAFT**

1    covered, and a hat.

2    Q.    Thank you very much.

3            MS. WHEATLEY:  And may I approach, Your Honor?

4            THE COURT:  You may.

5    BY MS. WHEATLEY:

6    Q.    Ms. Petulla, do you also recognize the item I've just

7    handed you?

8    A.    Yes.

9    Q.    What is this item?

10    A.    So this is a Lion Ambassadors sweatshirt from homecoming

11    of '97.

12    Q.    Okay.

13            MS. WHEATLEY:  I'd like to move into evidence

14    Plaintiff's Exhibit 430.

15            MR. FETTERS:  No objection.

16            THE COURT:  Duly admitted.

17    BY MS. WHEATLEY:

18    Q.    Now, if we could, I'd like to pull up Plaintiff's Exhibit

19    196.  Ms. Petulla, do you recognize the image that's shown on

20    your screen?

21    A.    Yes.

22    Q.    What is this showing?

23    A.    So this is an Instagram post from the Nittany Lion

24    Wrestling Club where they use, as their avatar, the Pozniak

25    lion.  And then it's also on the wrestling club member shirt.

1   Q.   And are you familiar with the Nittany Lion wrestling club

2   page?

3   A.   Yes.

4   Q.   And when was this posted?

5   A.   This was posted on May 17th of 2018.

6   Q.   Okay.

7         MS. WHEATLEY:  I'd like to move this in to

8   evidence.

9         MR. FETTERS:  No objection.

10         THE COURT:  Duly admitted.

11         MS. WHEATLEY:  May we publish?

12         THE COURT:  You may publish, as well.

13         MS. WHEATLEY:  Thank you.

14   BY MS. WHEATLEY:

15   Q.   And so is this -- this image here, is this typical of how

16   the wrestling club uses the Pozniak lion?

17   A.   Yes.

18   Q.   And to your knowledge, do they also use the Pozniak lion

19   as sort of their avatar on their page?

20   A.   Yes, they have.

21   Q.   And if we can move up -- move -- look at what is

22   Plaintiff's Exhibit 202.

23         Ms. Petulla, do you recognize this post here?

24   A.   Yes.  This is a post from the Lion Ambassadors.

25   Q.   Okay.  And what was the date of this post?

ROUGH DRAFT

1   A.    September 22nd, 2015.

2   Q.    Okay.

3         MS. WHEATLEY:  We would like to move that in to

4   evidence, as well.

5         MR. FETTERS:  No objection.

6         THE COURT:  Duly admitted.

7         MS. WHEATLEY:  May we publish?

8         THE COURT:  Publish as well.  You may publish.

9   BY MS. WHEATLEY:

10  Q.    All right.  Plaintiff's Exhibit 202, I think you said

11  this is from 2015.  And it's a Lion ambassadors post.  Do they

12  also use the Pozniak lion as their sort of avatar on their

13  Instagram account?

14  A.    They do, yes.

15  Q.    And is there a Pozniak lion apparel in this picture?

16  A.    There is.  The two members that are recruiting new are

17  wearing it on the t-shirt and then on the left chest of the

18  quarter-zip fleece.

19  Q.    And are these designs that the licensing department at

20  Penn State approved?

21  A.    Yes.  They would have approved them.

22  Q.    Okay.  And are the Lion Ambassadors prominent on campus

23  at Penn State?

24  A.    They are.  The Lion Ambassadors are prominent and have a

25  very visible part of campus life giving tours and really

1    serving as a conduit between the alumni association and

2    current students and prospective students.

3    Q.    And does the Pozniak lion appear anywhere else, other

4    than the Nittany Lion wrestling club and the Lion Ambassadors?

5    A.    Not to my knowledge that we have approved.

6    Q.    Does it appear on license plates?

7    A.    Oh, yes.  It does appear on license plates.  Yes.  I

8    always forget about the license plates.  But it does appear on

9    license plates in several different states that are available

10   to members of our alumni association.  So our alumni

11   association helps to facilitate some of the states have to

12   have requirements of how many people are interested or what to

13   have a license plate of that type, so yes.

14   Q.    And I believe we established this earlier, but the

15   Pozniak lion merchandise, is it sold to students?

16   A.    Yes, it is.

17   Q.    All right.  Switching gears again a bit, Ms. Petulla.

18   Have you searched the Vintage Brand website before?

19   A.    Yes.

20   Q.    Okay.  Can we pull up Exhibit Plaintiff's 298.

21          Do you recognize this document?

22   A.    Yes.

23   Q.    Can you tell the jury what this document is?

24   A.    So this is -- if you had gone to Vintage Brand website

25   and searched for Penn State, this is what would come up.

1    Q.   Okay.  And turning to page 29 of this listing, do you

2    recognize a Pozniak lion item on this page?

3    A.   Yes.  In the upper right-hand corner, there's a Pozniak

4    lion on a Penn State basketball hat.

5    Q.   Okay.  And does the Pozniak lion -- is the basketball

6    team at Penn State permitted to use the Pozniak lion?

7    A.   Not currently.

8    Q.   Okay.  And I would like to just tie this all together

9    before we leave the Pozniak lion.  Can we put up Plaintiff's

10   19, Plaintiff's  298, and Plaintiff's 459.

11            Can you tell the jury what they're seeing here?

12   A.   Sure.  So on the left-hand side, that's the excerpt of

13   the trademark certificate for the Pozniak lion.  In the center

14   is the Vintage Brand Penn State basketball hat that uses the

15   Pozniak lion.  And then on the right-hand side is the Pozniak

16   lion as it should be used for our Lion Ambassadors or the

17   Nittany Lion Wrestling Club through an official licensee.

18   Q.   And, Ms. Petulla, all of the trademark registrations we

19   looked at here today, are all of these registrations current?

20   A.   Yes.

21            COURTROOM DEPUTY:  Can I interrupt for a second?

22   You are referencing P-19, and I believe it should be P-18.

23            MS. WHEATLEY:  I apologize.  Thank you.

24            COURTROOM DEPUTY:  They're the same, but one is

25   physical, one is not.  We talked about that.  But so it's all

1    the same one number going.

2              MS. WHEATLEY:  Yes.  Thank you.  Can I also move in

3    to evidence, if it's not already done, Plaintiff's Exhibit 20?

4              COURTROOM DEPUTY:  20 is.

5    BY MS. WHEATLEY:

6    Q.    Are all of the registrations we looked at today certified

7    and hand-signed by an officer at the trademark office?

8    A.    Yes, they are.

9    Q.    Okay.  Does Penn State own all of the registrations that

10   we looked at today?

11   A.    Yes, we do.

12   Q.    And Penn State continues to use all of these registered

13   trademarks on merchandise?

14   A.    Yes.

15   Q.    And Penn State has continuously used all of these

16   registered trademarks on merchandise since at least 2017?

17   A.    That's correct.

18   Q.    Okay.

19              Now I would like to look at the S lion logo, which

20   is the last of the marks on our list.  I believe you said

21   earlier the S lion is on merchandise, but it's also been

22   really popular with the athletic department?

23   A.    Yes.  It's probably one of their favorites.

24   Q.    And what is the earliest date that you personally know

25   that the S lion merchandise was sold by Penn State?

ROUGH DRAFT

1   A.    You know, probably back to 2017 when I had the online

2   store, at the very least, that would have been.  Yeah.

3   Q.    Okay.  And does Penn State own a registration for this

4   logo?

5   A.    We do not.

6   Q.    Okay.  And has Penn State ever tried to register this

7   logo?

8   A.    Not to my knowledge.

9   Q.    Okay.  And why would Penn State not register this logo?

10  A.    We don't always register all of our logos.  And for this

11  particular one, with the totality of it, and also including

12  the words Penn State, which is our trademark, we did not

13  pursue the registration for that, and instead, used the T.M.,

14  which is another way to indicate that we own the trademark for

15  it, but have not gone through that formal registration

16  process.

17  Q.    And as I believe Mr. Howell testified, is it your

18  understanding that this one is licensed through the college

19  vault program?

20  A.    Yes, that's correct.

21  Q.    And in your experience, do Penn State's licensees

22  generally use the T.M. symbol with this logo?

23  A.    Yes.

24  Q.    And does Penn State have other trademarks it has not

25  registered?

1  A.   Yes.

2  Q.   If we can pull up Plaintiff's Exhibit 107.  Ms. Petulla,

3  can you tell the jury what we're seeing here?

4  A.   So this is a screen capture of the Penn State athletics

5  online store of vintage S lion mug made by one of our

6  licensees.

7  Q.   Okay.

8        MS. WHEATLEY:  Your Honor, may I approach?

9        THE COURT:  You may.

10 BY MS. WHEATLEY:

11 Q.   All right.  All right, Ms. Petulla.  Can you pull out

12 what's been marked as Plaintiff's 432, which should match the

13 screen shot on your screen.  Okay.  Is this pretty much the

14 mug that's being sold on the go PSU website?

15 A.   Yes.

16 Q.   And that's the S lion on the front?

17 A.   Yes.

18 Q.   And it uses the T.M. symbol?

19 A.   That's correct.

20 Q.   Can you pull out the Penn State S lion items in your

21 batch?

22 A.   Yep.

23 Q.   Can you show those to the jury and point out the S lion,

24 Plaintiff's Exhibit 446, Plaintiff's Exhibit 449, and

25 Plaintiff's Exhibit 437?

1  A.   So on this 47 t-shirt, it says Penn State up here and the

2  S lion is right here in the middle above Nittany Lion.  And

3  then on this t-shirt from the Family Clothesline, the S lion

4  appears in the middle.

5  Q.   And that's Plaintiff's 437, I believe.

6  A.   Which one would you like me to go to next?

7  Q.   Plaintiff's 449, the hat.

8  A.   Okay.  So this is a 47 Brand hat that has the S lion on

9  it.  It's difficult to see because it's tonal, but the

10 trademark -- but the trademark symbol is still here.

11 Q.   Okay.  And the trademark symbol appeared on all of these

12 products, correct?

13 A.   All of them.  Um-hum.

14 Q.   And I'd also like to look at the screen shots as to how

15 much the S lion is sold through some other retailers.  I'll

16 give you a chance to set those aside.

17        Can we pull up what has been marked Plaintiff's

18 Exhibit 176.

19        Are you familiar with the website shown here?

20 A.   Yes.  This is Home Field, who is one of our college vault

21 partners.  This is their website for Penn State.

22 Q.   Okay.  And you mentioned their college vault partners.

23 What kind of products do they sell?

24 A.   They sell Vintage products with Vintage marks on them.

25 Q.   Can you look at page two.  Are they selling any S lion

ROUGH DRAFT

1    products?

2    A.    They are.  Kind of in the middle on the right-hand side

3    there.

4    Q.    Okay.  And these are all authorized?

5    A.    Yes.  These are all authorized.

6    Q.    Okay.  And can we pull up what's been marked as

7    Plaintiff's Exhibit 101.  Which website is being shown here on

8    the screen shot?

9    A.    So this is the official athletic store.

10   Q.    And is there S lion merchandise for sale here?

11   A.    Yes, there is.

12   Q.    Okay.  And the athletic store, is that what you were in

13   charge of?

14   A.    Yes.  All right.

15            COURTROOM DEPUTY:  That one has not been moved in.

16            MS. WHEATLEY:  I apologize.  Can we move in

17   Plaintiff's Exhibit 101.

18            MR. FETTERS:  No objection.

19            THE COURT:  Duly admitted.

20            MS. WHEATLEY:  Can we publish that to the jury?

21            THE COURT:  You may publish.

22   BY MS. WHEATLEY:

23   Q.    Can we pull up Plaintiff's Exhibit 103.  Is this one

24   previously admitted?

25            COURTROOM DEPUTY:  Yes.

ROUGH DRAFT

1    BY MS. WHEATLEY:

2    Q.    And what are we looking at here, Ms. Petulla?

3    A.    This is from our book store's website.  So this is a --

4    the half-zip with the S lion on the left chest.

5    Q.    And, Mr. Burkhart, do you mind zooming in so we can see

6    the S lion.

7            So the S lion, another trademark that appears in

8    different formats on different products?

9    A.    Yeah.  It can appear in different places on different

10    products.

11    Q.    Okay.  And finally, I'd like to pull up Plaintiff's

12    Exhibit 326.  And, Ms. Petulla, are you familiar with this

13    screenshot?

14    A.    Yes.

15    Q.    What are we looking at here?

16    A.    This is a screen shot from Vintage Brand's website.

17    Q.    Okay.  And what are they selling?

18    A.    They're selling a stainless steel can insulator as

19    they're calling it.

20    Q.    Okay.  And can you zoom in on that?  And does this

21    feature the S lion?

22    A.    It does feature the S lion.

23    Q.    Okay.  And did Vintage Brand also use the T.M. with it?

24    A.    They do.

25    Q.    Okay.  And then do you have up there with you Plaintiff's

1  Exhibit 267, which is another S lion sweatshirt?

2  A.    Yep.

3  Q.    Okay.  Now, does this product have any markings on it,

4  other than the trademark on the front?

5  A.    I could not find any.

6  Q.    What is your understanding of what this product is?

7  A.    It's my understanding that this is a Vintage Brand

8  sweatshirt with the S lion on it.

9  Q.    Okay.  And does it also use the T.M. symbol?

10 A.    It does.

11 Q.    Okay.  And Mr. Burkhart, would you mind putting up,

12 please, Plaintiff's 267 and Plaintiff's 437.  What are we

13 looking at here, Ms. Petulla?

14 A.    So on the left, you have the sweatshirt from Vintage

15 Brand with the S lion on it.  On the right is the Family

16 Clothesline t-shirt with the S lion on it.

17 Q.    And based on your personal knowledge, can you confirm

18 sales of the S lion since at least 2017?

19 A.    Yes.

20 Q.    All right.

21       Switching gears a bit, I'd like to look at some

22 information that Vintage Brand provided to Penn State.

23       Can we pull up what's been marked as Plaintiff's

24 Exhibit 29.  I'd like to move this in to evidence and publish

25 this to the jury.

ROUGH DRAFT

```
1            MR. FETTERS:  No objection.

2            THE COURT:  Duly admitted.  You may publish.

3   BY MS. WHEATLEY:

4   Q.   Ms. Petulla, are you familiar with that this document is?

5   A.   Yes.

6   Q.   Okay.  What is this document?

7   A.   It has some of the sales history for the Vintage Brand

8   products by -- by mark, by logo, by trademark.

9   Q.   Okay.  And can we go to the second page -- or looking at

10  the -- where their sales information starts on page three.

11  And if -- looking at this, what is Vintage Brand's best

12  selling Penn State design?

13  A.   It's this design with Penn State on it, with the keystone

14  and a Nittany Lion.

15  Q.   Okay.  And what is the best selling type of item for

16  Vintage Brand with this Keystone Penn State?

17  A.   It looks like t-shirts and sweatshirts.

18  Q.   Okay.  And then zooming back out, what is the next most

19  popular design that Vintage Brand sells?

20  A.   The S lion is the next most popular design.

21  Q.   Okay.  And what are the best selling items for the S

22  lion?

23  A.   Sweatshirts and t-shirts.

24  Q.   Okay.  And then going on to the next page, if we can look

25  at the next items.  Is that the design we looked at earlier?
```

1    A.    It is.  It's the design we looked at earlier with the

2    seal and the Penn State on it.

3    Q.    Okay.  And scrolling down, can we look at the next one.

4    Does that one also feature Penn State?

5    A.    It does.  Penn State's on there, as well.

6    Q.    Okay.  What do the top four selling designs all have in

7    common?

8    A.    They all use our trademark Penn State.

9    Q.    Okay.  And if we can scroll back to the top, I just want

10   to ask you what was the revenue generated from the first item

11   with the keystone Lion?

12   A.    So the --

13   Q.    I'm sorry.  We'll get there.

14   A.    That's okay.  So the renew on the left-hand side is

15   $7,118.92.

16   Q.    Okay.  And scrolling down again, if we went through this

17   and went through all of the Penn State items, what is your

18   understanding as to what the least selling designs were?

19   A.    They appear to be things that either Penn State is

20   smaller on or just a very small part of -- like a ticket stub

21   type of thing or things of that nature.  There's also that one

22   partial design that just went by where the trademarks aren't

23   quite all there.

24   Q.    Okay.  All right.  We can set that one aside.

25            Now does Penn State itself spend anything to

1    promote or advertise its branded merchandise?

2    A.    We do.

3    Q.    Can you tell the jury how do you that?

4    A.    Yes.  Due to staffing and our relationship with CLC, CLC

5    takes care of most of our marketing, so we've set aside 1

6    percent a year to go back in to our marketing fund for special

7    initiatives, digital advertising and other campaigns.

8    Q.    And can you give the jury an idea of what that general

9    spend is yearly?

10   A.    Sure.  So we just went with CLC to plan next year's

11   spend, and at this point, it's a little over $100,000.

12   Q.    And why does Penn State invest in advertising its

13   products?

14   A.    We feel like it's important to get our individual

15   initiatives out there so if we have a special collection of

16   something that's coming up or something that we want to raise

17   our fan awareness about, we feel pretty strongly about getting

18   our brand out there in the ways that we want to see it

19   portrayed.

20   Q.    So switching gears again, Ms. Petulla, have you ever

21   Googled Vintage Brand, Penn State products?

22   A.    Yes.

23   Q.    Okay.  And when you do that, do the Vintage Brand

24   products appear side-by-side in any way with authorized Penn

25   State products?

1   A.   Yes, they do.

2   Q.   Okay.  I'd like to pull up what's been marked as

3   Plaintiff's Exhibit 209.  Ms. Petulla, are you familiar with

4   this?  Yes?

5   A.   Yes.

6   Q.   And what is being shown here?

7   A.   This is a screen capture of a Google search.

8   Q.   This is a Google search that you've done?

9   A.   Yes.  I've done a Google search like this.

10          MS. WHEATLEY:  I'd like to move and publish this to

11   the jury.

12          MR. FETTERS:  No objection.

13          THE COURT:  It will be admitted.  You may publish.

14   BY MS. WHEATLEY:

15   Q.  Ms. Petulla, can you tell the jury what was being searched

16   for here?

17   A.   So you can see Penn State Vintage Brand is what was being

18   searched for.

19   Q.   Okay.  And looking at the search results, do you see a

20   link for the Vintage Brand website?

21   A.   Yes.  It's the first link.

22   Q.   Okay.  Mr. Burkhart, could we zoom in on what that first

23   link looks like?

24          Ms. Petulla, is there -- I guess what is the link

25   title given here, if you were to click on it?

1    A.    The Vintage Brand or the Penn State Nittany Lion vintage

2    apparel and jerseys.

3    Q.    The Penn State part?

4    A.    Okay.  So the large part is Penn State Nittany Lions

5    Vintage apparel and jerseys.

6    Q.    And is there anything on this link that tells you that

7    Vintage Brand is not an authorized seller of Penn State

8    merchandise?

9    A.    There is not.

10   Q.    Okay.  And let's scroll down to page two to the shopping

11   results.  If we can zoom in on those so we can see them.  Are

12   there any results here that appear to be from Vintage Brand,

13   Ms. Petulla?

14   A.    Yes.  There are two results that appear to be from

15   Vintage Brand.

16   Q.    Okay.  And the results alongside here, are these from

17   authorized merchants?

18   A.    They are.  They're from several of our college vault

19   partners, 47 Brand, the Original Retro Brand, yes.

20   Q.    And is there anything on these shopping links that tells

21   you that these are unauthorized versus the ones that are

22   around them that are authorized?

23   A.    There's not.

24   Q.    If we go down an additional page to page three, do you

25   see more Vintage Brand products alongside authorized products?

1   A.    Yes.

2   Q.    Can you point out some places where you see that?

3   A.    Sure.  There are two in the top row there towards the

4   right on the next row below it; in the center there is one.

5   There's one in the third row, second in with the Pozniak lion

6   on it.  Okay.

7   Q.    And finally, going down to page four, do you see more

8   Vintage Brand products alongside authorized products?

9   A.    Yes.  So top row, second one in.

10  Q.    And we can put that one aside.

11        Switching gears, I'd like to talk a little bit

12  about where the line is and some image that Penn State is fine

13  with anyone using and does not claim --

14        MS. WHEATLEY:  Your Honor, may I approach?

15        THE COURT:  You may.

16  BY MS. WHEATLEY:

17  Q.    Ms. Petulla, could you pull out what has been marked as

18  Plaintiff's Exhibit 461.  Do you recognize this item?

19  A.    Yes.  This is a mug that Vintage Brand is selling.

20  Q.    Okay.  Does this mug contain any Penn State trademarks?

21  A.    It does not.

22  Q.    Do you have any reason to think that Penn State would say

23  that a company needs a license to sell this mug?

24  A.    We would not.

25  Q.    Okay.  Why not?

1  A.   It doesn't contain any of our trademarks.  So we would

2  not say that.

3  Q.   Okay.  Now, would Penn State be concerned if it was

4  labeled a Penn State product?

5  A.   Yes.

6  Q.   And why?

7  A.   Because that's using our trademark to sell a product that

8  is not necessarily something that has our trademarks on it.

9  So it's using our name to advertise.

10 Q.   But a mug without Penn State trademarks is fine to sell?

11 A.   Um-hum.  That's fine.

12 Q.   And that's fine, even if at some time it was one time

13 associated with Penn State but is no longer associated with

14 Penn State?

15 A.   Yes.

16 Q.   And can you also pull out the jigsaw puzzle, Plaintiff's

17 Exhibit 462?  Can you tell the jury what this is?

18 A.   Sure.  This is a jigsaw puzzle of a blueprint of Beaver

19 Stadium.

20 Q.   And do you know what company sells this product?

21 A.   This is a Vintage Brand product, yes.

22 Q.   Okay.  Now does this puzzle contain any Penn State

23 trademarks?

24 A.   It does not.

25 Q.   Okay.  Would Penn State have any issue with the company

1  selling this item?

2  A.   We would not.

3  Q.   Okay.  What about if this item was labeled as a Penn

4  State Nittany Lion product?

5  A.   Yes.

6  Q.   Okay.  Now I noticed some consistent colors between these

7  products and a lot of the items we saw today.  What are Penn

8  State's colors?

9  A.   So our primary colors are navy and white.

10  Q.   Do people wear Penn State colors to football games?

11  A.   Yes.

12  Q.   To you, does wearing blue and white signal that you're a

13  fan of Penn State?

14  A.   It can.

15  Q.   Does Penn State own the colors blue and white?

16  A.   We do not.

17  Q.   Does Penn State try and stop people from selling blue or

18  white apparel?

19  A.   No.

20  Q.   What about the phrase We Are.  Is that something that you

21  recognize?

22  A.   It's something I recognize, yes.  But we do not own the

23  trademark for We Are.

24  Q.   Okay.  So do people try and stop people from selling We

25  Are apparel?

1    A.    We do not try and stop people from selling We Are

2    apparel, only apparel that says We Are Penn State, because

3    Penn State is our trademark.

4    Q.    Okay.  So are there ways to signal that you are a fan of

5    Penn State without using Penn State trademarks to make money?

6    A.    Yes.

7    Q.    Moving on to pricing.  As director of licensing, are you

8    familiar with what Penn State merchandise costs to consumers?

9    A.    Yes.

10   Q.    Does Penn State sell a range of price points?

11   A.    Penn State merchandise is sold at a range of price

12   points, yes.

13   Q.    Can you briefly describe to the jury what that means?

14   A.    Sure.  So we believe it's important to have a variety of

15   price points out there to really match our customer and go to

16   where they are.

17          So there can be products in Walmart that may be

18   more cost effective.  There could products in Target,

19   Fanatics, Dick's, things of that nature that really run the

20   gamut of price point, but we feel it's important to cover a

21   lot of distance in that area so that our fans can enjoy

22   something that is also within their budget.

23   Q.    I'd like to pull up Plaintiff's Exhibit 470, which I

24   believe has been previously admitted in to evidence.

25          So I'd like to look at the prices on this website

1  versus the prices you just talked about, Ms. Petulla.  Is --

2  do you recognize what is shown on Plaintiff's Exhibit 470?

3  A.    Um-hum.

4  Q.    What is shown here?

5  A.    So this is sort of the Penn State section of the Vintage

6  Brand website.

7  Q.    Okay.  And scrolling through these screenshots, do you

8  see the prices?  And we can scroll through slowly so you can

9  see them.

10  A.    Um-hum.

11  Q.    All right.  Can we go back to the beginning.  Sorry.  Can

12  we zoom in, for instance, on the S lion shirt on the first

13  page.  So, Ms. Petulla, does Penn State sell t-shirts for

14  around $22.95?

15  A.    Um-hum.

16  Q.    Okay.  If we can zoom out and look at a sweatshirt.  I'm

17  sorry.  Just back up a page.  Does Penn State generally sell

18  sweatshirts for around 34.99?

19  A.    There are sweatshirts with Penn State on there that are

20  officially licensed that could be around this price.

21  Q.    And just from a your general scroll through the website,

22  are all these prices in line with the prices you find

23  authorized Penn State products for?

24  A.    Yes.

25  Q.    And to be clear, there are Penn State products that cost

1    a few dollars more and there are Penn State items that cost a

2    few dollars less?

3    A.    That is correct.

4    Q.    And just flipping back to Exhibit 470, do you see the

5    small print under Penn State Nittany Lions?

6    A.    Yes.

7    Q.    As a consumer, is that something you would generally

8    read?

9    A.    No, it's not.

10   Q.    And even if it's read by a consumer, does that tell you

11   that these are not genuine products?

12            MR. FETTERS:  Objection, Your Honor.  Calling for

13   speculation.

14            MS. WHEATLEY:  I'm sorry.  I'll rephrase.

15            THE COURT:  Objection noted.  Please rephrase.

16   BY MS. WHEATLEY:

17   Q.    Ms. Petulla, does that tell you personally, as a

18   consumer?

19   A.    I do not feel like it's clear.

20   Q.    Thank you.  And, Ms. Petulla, you've bought Penn State

21   clothing, correct?

22   A.    Yes.

23   Q.    About how many pieces of Penn State clothing have you

24   bought?

25   A.    Since the 90s, probably a couple hundred, if I had to

**ROUGH DRAFT**

161

```
 1   guess.
 2   Q.   Okay.  So we've talked about local retailers.  Do big box
 3   retailers also sell Penn State clothing?
 4   A.   Yes.  Yeah.  You can find Penn State clothing in Sam's
 5   Club.  You can find it in Walmart.  You can find it in Target,
 6   CVS.
 7   Q.   And to your knowledge, have you ever bought knockoff Penn
 8   State clothing?
 9   A.   Not to my knowledge.
10   Q.   Okay.  And why not?
11   A.   It doesn't represent the values of the university or go
12   back to support the University because of what I do and the
13   ecosystem that I've always been around, I know that, and I --
14   it's important for me that it be an authorized product of the
15   university and go back to support the University in some way.
16   Q.   Is the revenue Penn State receives from licensing its
17   trademarks important revenue source for the University?
18   A.   Yes, it is.
19   Q.   Approximately this year, how much in licensing revenues
20   did the University receive?
21   A.   So last fiscal year, we received about $6.6 million in
22   royalty revenue.
23   Q.   And does everyone who uses the Penn State trademarks to
24   profit, to make money give a portion back to the University?
25   A.   Yes.  The only people that do not would be our -- what we
```

1    call our internal licensees.  So there are licensees that can

2    work with our own university groups, and if the University

3    group uses university funds, there are no royalties on those

4    products.

5            We just don't think it makes sense for one part of

6    Penn State to charge another part of Penn State.  So as long

7    as university funds are being used, so if undergraduate

8    admissions were to purchase something to give away to

9    prospective students, we do not charge undergraduate

10   admissions a royalty on that.

11   Q.   Thank you.  And I should have clarified that last

12   question.  Does everyone who uses the University marks with

13   permission give a portion of their revenues back?

14   A.   Yes.

15   Q.   Okay.  Now we looked at a number of the products that the

16   Defendants sell today.  Is there anything on Defendants'

17   products themselves that signals to you that they are not Penn

18   State authorized products?

19   A.   No.

20   Q.   Does the Vintage Brand tag tell consumers that the

21   products are not authorized Penn State products?

22   A.   No.

23   Q.   And if you just saw someone wearing the Vintage Brand

24   Penn State products on the street, is there any way to tell

25   that they are not Penn State's products?

ROUGH DRAFT

1    A.    No.

2    Q.    And, Ms. Petulla, as director of licensing at Penn State,

3    do you know generally which people and companies have been

4    granted permission to use Penn State's trademarks?

5    A.    Yes.  So in general, we have a good awareness of who's

6    been licensed if there's ever a question in our mind, we go in

7    to the CLC system and double-check because obviously 500

8    licenses can be a lot and we want to be make sure we're

9    accurate before we accuse someone of producing Penn State

10   merchandise or infringing on the brand.

11   Q.    And has Penn State given Vintage Brand permission to use

12   any of Penn State's trademarks?

13   A.    We have not.

14   Q.    Has Penn State given Sportswear permission to use any of

15   Penn State's trademarks?

16   A.    We have not.

17   Q.    Has Penn State given Chad Hartvigson permission to use

18   any of Penn State's trademarks?

19   A.    We have not.

20   Q.    And do you know whether Vintage Brand ever asked for Penn

21   State's permission to use any of Penn State's trademarks?

22   A.    To the best of my knowledge, no.

23        MS. WHEATLEY:  Thank you, I -- Your Honor, I'd like

24   to pass the witness, but we have a proffer related to a Motion

25   In Limine.  But we can do that on a break.

ROUGH DRAFT

```
 1              THE COURT:  Why don't we take that recess now.
 2              Mrs. Rhinehart, why don't you escort the jury out.
 3    Ladies and gentlemen, we'll take a 10-minute recess, ladies
 4    and gentlemen of the jury.
 5              (At 3:16 p.m., the jury left the courtroom.)
 6    BY MS. WHEATLEY:
 7    Q.   Ms. Petulla, do you have any knowledge of how Penn State
 8    uses its licensing revenues?
 9    A.   Yes.
10    Q.   Can you describe what your knowledge of that is?
11    A.   Yes.  It's my understanding that some of it goes to
12    scholarships; some of it goes to a general fund of sorts; and
13    some of it goes to the Levi Land Fund over in athletics, which
14    takes care of a number of things, including mental health,
15    operations, scholarships, other expenses that the athletic
16    department incurs.
17    Q.   Thank you, Ms. Petulla.  I'll pass the witness.
18              MR. FETTERS:  No questions on that topic.
19              THE COURT:  So that's not going to be explored at
20    all?
21              MR. FETTERS:  No, Your Honor.
22              THE COURT:  All right.  Very good.  We'll stand in
23    recess for 10 minutes, and you're ready to cross-examine then?
24              MR. FETTERS:  I am.
25              THE COURT:  Beyond the cross examination, I think
```

1  we'll then go right in to the next witness, which I think,

2  Mr. Finkelson, I'm looking to you, is a deposition?

3          MR. FINKELSON:  That's correct.

4          THE COURT:  Is it a video deposition?

5          MR. FINKELSON:  Yes.  We have several video

6  depositions.  We have five of them, just so Your Honor knows.

7  21 minutes, 21 minutes, 8, and 5 of the same guy.  But two

8  depositions.  So 13 minutes total.  And then the last one is

9  48 minutes.

10          THE COURT:  Is that Mr. McGrath?

11          MR. FINKELSON:  No.  Mr. McGrath is appearing live

12  in our case and by deposition in Defendants' case.  The last

13  one is Ms. Maffey.  So depending on how long the cross is, and

14  if I could read that clock, which is very challenging to read

15  --

16          THE COURT:  No.  It's not the best.  I didn't order

17  the clock.  That's -- someone else did.  I don't like it

18  either.  But it's there.  And I'm just too busy to fuss and

19  get another one.

20          MR. FINKELSON:  So depending on how long the cross

21  is, I would think at a minimum, we can get through the first

22  four of those.

23          THE COURT:  Yeah.  I agree.  Let's see where we go.

24  Take your time -- do your cross examination the way you want

25  to do it.  And then we'll just -- we'll assess and begin --

1    kind of role the deposition testimony.

2           MR. FINKELSON:  Ms. Wheatley will introduce each of

3    those videos.

4           THE COURT:  All right.  Let's take a 10-minute

5    recess.  Court will rise.

6           (At 3:19 p.m., a recess was held.)

7           (3:33 p.m.)

8           THE COURT:  We're back on the record now after a

9    mid-afternoon recess.  Mr. Fetters, I believe you have some

10   cross examination.

11          MR. FETTERS:  Yes, Your Honor

12          THE COURT:  Go right ahead, sir.

13                      CROSS EXAMINATION

14   BY MR. FETTERS:

15   Q.   Good afternoon, Ms. Petulla, my apologies.

16   A.   Good afternoon.

17   Q.   Long day.  John Fetters on behalf of the Defendants.

18          I'd like to start by asking you some questions

19   about some testimony during your direct -- direct examination

20   that caught my ear, and it was toward the latter part of your

21   testimony, and I believe you said that you bought hundreds of

22   Penn State products over the years, since your days as a

23   student at Penn State to the present.  And you've never

24   purchased an unlicensed Penn State product; is that correct?

25   A.   Not that I know of.

Q.    And the second thing you said that I'd like to follow up

with is that when you were looking at actual Vintage Brand

products in the past and here in the courtroom, that you said

that there's nothing on those Vintage Brand products to

indicate that those products are not officially licensed by

Penn State; did you say words to that effect?

A.    They look like Penn State products.

Q.    Okay.  So I want to follow up on that.  You were here

earlier today when Mr. Howell was testifying, correct?

A.    Um-hum.

Q.    And Mr. Howell works for College Licensing Company?

A.    Um-hum.

Q.    College Licensing Company is the exclusive licensing

agent for Penn State?

A.    That's correct.

Q.    And as the exclusive licensing agent for Penn State, CLC

takes the alliance share of the work administrating Penn

State's licensing program; is that correct?

A.    They do help us administer the program, yes.

Q.    And one of those things that they do is enter into

contracts on Penn State's behalf with manufacturing and retail

licensees; correct?

A.    Correct.

Q.    And have you seen those contracts yourself?

A.    The standard licensing agreements?

1   Q.   Yes.

2   A.   Correct.  I've seen the standard licensing agreement,

3   um-hum.

4   Q.   So you've seen those, and then you heard earlier today

5   Mr. Howell testify that those contracts require licensees of

6   Penn State to affix officially licensed hang tags on their

7   products, correct?

8   A.   Yes.

9   Q.   Those licensees of Penn State are contractually-required

10  to attach holograms to their products, correct?

11  A.   That's what it says on the agreement, yes.

12  Q.   And those licensees are required to attach holograms

13  that, in fact, have ways -- unique serial numbers that can be

14  looked up in -- a two-factor verification system is how they

15  described it, correct?

16  A.   That's how he described it.

17  Q.   And -- to assume you can be absolutely certain that the

18  products are officially licensed Penn State products, correct?

19  A.   I think when they're buying them at retail in person,

20  yes.

21  Q.   Okay.  And not only is that a contractual requirement

22  with respect to the products, Penn State licensees are

23  required to include officially-licensed statements in their

24  advertising, correct?

25  A.   That's what it said in the standard agreement, yes.

ROUGH DRAFT

1    Q.    And that would include on their websites?

2    A.    I would assume that that would include -- be included in

3    advertising.

4    Q.    Okay.  Now, I want to go back to your testimony on direct

5    examination when you said that there's nothing on Vintage

6    Brand's products by which you could tell that they were not

7    officially licensed.  Was there any officially-licensed hang

8    tag on those Vintage Brand products?

9    A.    No, there was no officially-licensed hang tag on that

10   product.

11   Q.    Were there any officially-licensed hologram stickers on

12   Vintage Brand's products?

13   A.    There are not.

14   Q.    You also testified that you looked -- you showed the jury

15   an example of a mug produced by Vintage Brand with a picture

16   of a lion on it; do you recall?

17   A.    The lion that was the shrine that also had the shield on

18   it or later where there were no Penn State marks on the mug?

19   Which mug?

20   Q.    The later one.  Just the lion's face?

21   A.    Just the lion's face, um-hum.

22   Q.    In blue ink.  The white mug.

23   A.    Yes.  Yep.

24   Q.    And you said that in your view, that mug, you would not

25   consider that mug to be an infringement on Penn State's marks,

1  right?

2  A.    In and of itself, correct.

3  Q.    You also said that there was a puzzle put out by Vintage

4  Brand; do you recall that?

5  A.    Yes.

6  Q.    And that puzzle was of Beaver Stadium.

7  A.    That's correct.

8  Q.    And it had navy blue colors and white?

9  A.    Yes, it did.

10  Q.    And you said that in your view, you wouldn't consider

11  that puzzle to be an infringement of Penn State's trademark

12  rights; is that right?

13  A.    Not the puzzle itself.

14  Q.    But, if I remember your testimony correctly, I think you

15  said that if those products were sold on the Vintage Brand

16  website and if there was any reference to Penn State

17  University on that website, that then that -- you would

18  consider that to be an infringement; is that right?

19          MS. WHEATLEY:  Objection.  Misstates testimony.

20          THE COURT:  No.  I think that was -- I think that

21  was more or less what her testimony was.  I'll overrule the

22  objection.  You can explore that, Mr. Fetters.  Go ahead.

23  BY MR. FETTERS:

24  Q.    Do you need me to repeat that question?

25  A.    If you could, that would be helpful.  Thank you.

1  Q.   Okay.  I think we have established that you said that the

2  mug of the lion face alone and the Beaver Stadium puzzle

3  alone, you wouldn't consider those to be an infringement of

4  Penn State's trademarks, correct?

5  A.   Not the products themselves.

6  Q.   But if those products were sold on the Vintage Brand

7  website, and if that website made any reference, including the

8  words Penn State or Penn State University, then would you

9  consider those products to be infringing on Penn State's

10 trademarks?

11 A.   So I think that that's an interesting question the way

12 that you worded it, and I want to make sure that my answer is

13 clear within the ecosystem of that question.

14         I think in my testimony, what I was referring to is

15 if Vintage Brand were to use our trademark, Penn State, to

16 describe the Beaver Stadium puzzle, then on some level, yes,

17 we, as an institution, would have an issue with that.

18 Q.   Okay.  So if on the product page with the Beaver Stadium

19 puzzle, it said Penn State Beaver Stadium puzzle, and maybe

20 there was some description that Beaver Stadium is the stadium

21 that Penn State plays its football games, it has a seating

22 capacity of over 100,000, one of the largest seating

23 capacities in the country, the stadium was, I believe, named

24 after General or --

25 A.   Governor Beaver.

1  Q.    My apologies.  I'm from Washington.

2  A.    That's okay.

3  Q.    Had some -- a description like that, in your view, would

4  you then consider that to be infringing on Penn State's

5  trademarks?

6  A.    In my view, there would be some things that I believe

7  lived in a gray area of trademark.  And at that point, I would

8  take it to our Counsel internally to have a discussion with

9  them about it as they're our legal representatives and are

10 much more educated on the topic than I am to make the call of

11 whether we, as an institution, would perceive that as an

12 infringing product.

13 Q.    Okay.  And what if there was a disclaimer on the product

14 page that said Vintage Brand vintage designs not authorized,

15 licensed, sponsored, or affiliated with any university or

16 team.  Would that change your answer in any way?

17 A.    I do not believe that that's clear.

18 Q.    You don't believe that that disclaimer is clear?

19 A.    I don't believe it's clear, no.

20 Q.    What about if that webpage, in addition to including that

21 disclaimer, had nothing -- no statements, marketing

22 statements, descriptions whatsoever saying that the product

23 was, in fact, officially licensed.  Would that change your

24 answer at all?

25 A.    Okay, so I'm following.  I just want -- I want to be

ROUGH DRAFT

1    helpful, but I wants to make sure I understand, as well.

2            So in that instance, the totality of the website

3    that you're describing to me would include what element?

4    Q.   The products that we've talked about, either the mug or

5    the puzzle?

6    A.   The puzzle, um-hum.

7    Q.   Description of Penn State, Beaver Stadium puzzle with the

8    description of -- relating to Beaver Stadium's history, a

9    disclaimer stating that the product is by Vintage Brand, not

10   sponsored, affiliated, or licensed by any university or team,

11   and there's no statement whatsoever anywhere on that page or

12   the rest of the website saying that any of those products were

13   officially licensed?

14   A.   I would still likely have a conversation with our Counsel

15   about it.

16   Q.   And on that point, you're not a lawyer, are you?

17   A.   I am not.

18   Q.   Didn't go to law school?

19   A.   No.  Thought I wanted to in fifth grade, but then

20   switched, obviously quite dramatically.

21   Q.   What did you study at Penn State?

22   A.   I was a communications major.

23   Q.   And when legal issues, trademark issues come up, you

24   would defer, obviously, to Penn State's in-house Counsel or

25   outside Counsel?

ROUGH DRAFT

```
1    A.    Correct.
2    Q.    In fact, we heard very briefly from one, maybe one, maybe
3    the only in-house Counsel this morning, correct?
4    A.    Yes.  We heard from David this morning.
5    Q.    Okay.  Let's talk a little bit about product quality
6    control.  I think you testified that your office includes two
7    other employees aside from yourself?
8    A.    That's correct.
9    Q.    And if I remember correctly, I think you said that Penn
10   State receives something on the order of 14,000 design
11   approvals per year; is that right?
12   A.    That's correct, yes.
13   Q.    That sounds like a lot for three people to handle.  Do
14   you have to rely on CLC quite a bit to help with that?
15   A.    So there's always an initial look from CLC.  A lot of it
16   has to do with the co-branding and then they'll pass it
17   through to us.  But we have eyes on the other 14,000.  I mean
18   some of them are realistically as simple as that a product
19   will say Penn State on it.  If Penn State is there with the
20   registration mark, that's a pretty quick approval on our --
21   from our standpoint, so.
22   Q.    And am I correct in understanding that there is a website
23   portal maybe called Brand 360, something to that effect?
24   A.    Yes.  Brand Manager.
25   Q.    Brand Manager.  And that's something that -- a software
```

1    that CLC hosts and maintains; is that right?

2    A.    That's correct.  It enables the licensee to upload their

3    artwork into the system, and then CLC passes it through to us

4    for our approval.

5    Q.    Okay.  And so is it -- do you get pinged or an e-mail or

6    in some fashion prompting you to take a look at a design on

7    your computer screen and you can click approve, disapprove, or

8    is it more complicated than that?

9    A.    Thankfully we do not get 14,000 e-mails on each piece of

10   artwork.  We have too manually go in, which our staff does on

11   an everyday basis and look through art work.  So that's how

12   the system works.

13            If we ask a licensee a question through the system,

14   then there will be an e-mail ping when think respond to that

15   question.  But each individual submission does not necessarily

16   come with an e-mail to us.

17   Q.    Okay.  And from the design approval perspective, is that

18   all occurring in a digital format, or are they sending you

19   product samples in conjunction with a design approval in order

20   to do it in combination?

21   A.    So I think that's a good question.  We do not always get

22   samples.  For a licensee that's existed for a while, as well

23   as a new licensee, if we see something in artwork that we're

24   either not sure how it's going to be fabricated or how it's

25   going to be imprinted or what it's actually going to look

1    like, like just say, for instance, it's a patch and it looks

2    not the best to us, we're going to ask for a sample of that

3    because we want to make sure that it's actually coming out the

4    way that we feel like it will in the artwork.

5              So for most of the licensees that we've had for a

6    while, it's pretty predictable when we see the artwork and we

7    see the description that's also on the artwork of how it's

8    actually going to be imprint that had we have a quality

9    assurance there from their past record.

10   Q.   I think I remember hearing, too, that on a yearly basis,

11   there is a renewal analysis that -- through your licensees

12   that also involves some inspection of product samples; is that

13   right?

14   A.   There can be, yes, especially if there are concerns.

15   Q.   And then as I recall from your testimony, you mentioned

16   doing just sort of impromptu field trips across the street or

17   down the street --

18   A.   Yep.

19   Q.   -- to look at products in your local licensees retail

20   establishments; is that correct?

21   A.   That's correct.

22   Q.   Beyond that, do you -- do you ever visit a manufacturing

23   facility of retail manufacturer -- of a licensee manufacturer?

24   A.   Sure.  I think that's a great question.  I have not

25   personally had the opportunity yet to visit one of our

1    factories in person.  That's one of the things that as our

2    membership in the fair labor association and the worker's

3    rights consortium gives us is the assurity that those folks

4    are putting our licensees through processes that then include

5    factory visits, include audits for safety and payment of

6    workers and things of that nature.

7            So the partners that we contract with do that on

8    our behalf, too.  Three people is a small amount to be able to

9    administrate the whole procedure.  So we have to -- we have to

10   rely on our trusted partners, which include the Fair Labor

11   Association and the Worker's Rights Consortium.

12   Q.   Do you know off the top of your head how many

13   manufacturing licensees Penn State has?

14   A.   That's a great question.  I don't know, off the top of my

15   head.  Some licensees will have multiple manufacturers that

16   they will disclose in their supply chain.

17   Q.   Do you know if any of the manufacturing licensees for

18   Penn State, whether they manufacture their blank products in

19   other countries?

20   A.   Yes.  Some do manufacture their products in other

21   countries.

22   Q.   What are some of those other countries?

23   A.   L-2, which is our Pennsylvania licensee manufactures in

24   El Salvador.  Some people manufacture in China.  There's

25   really quite a few different countries that I would say are

1    more known for manufacturing of their products.

2    Q.    You also talked about different retail licensees sort of

3    spanning the spectrum.  And I think you used the phrase you

4    want to meet your -- the Penn State consumers where they are;

5    does that sound right?

6    A.    Yes.

7    Q.    And so, for example, Penn State licensee might be a

8    company like Nordstrom; is that the right?

9    A.    We could have a product in Nordstrum.

10    Q.    Or Neman Marcus?

11    A.    If one of our licensees have sold to those department

12    stores, then yes.  So we have better, best categories.  We

13    have specialties, sporting good stores.  It kind of runs the

14    gamut, everything from a Dollar Store to a Walmart, to yes,

15    potentially some of those larger stores.  If one of our

16    licensees sells to them, can carry the product.

17    Q.    Including some of the mass retailers, 7/11, Wegman's, you

18    could kind officially-licensed products at those retail

19    locations?

20    A.    That's correct.

21    Q.    Is it fair to assume that there's going to be differences

22    not only in price-point for officially-licensed Penn State

23    products that are sold at somewhere like Nordstrum or Sax or

24    Neman Marcus compared to 7/11 or Wegman's?

25    A.    There may be a difference in pricepoint, but they should

1    all still reflect the quality that's expected from Penn State.

2    The ones that are higher end or specialty stores may have

3    things that go beyond screen print.  So they may include

4    patches or embroidery or embellishment that will affect the

5    price.  But there should still be a base quality standard of

6    which our goods exists

7    Q.   And so a product that one might be able to purchase at

8    Wegman's or 7/11 bearing officially-licensed Penn State

9    trademarks, you're saying that the quality is going to be

10   comparable to a similar product that you might find at Sax or

11   Nordstrum?

12   A.   I think the quality is still going to be pleasing to our

13   consumers.  They may not be a one-to-one same consideration

14   between a Nordstrum and a Walmart.  But the customer, I

15   believe, will still be satisfied with whatever they buy,

16   wherever they buy it, if it's licensed merchandise of ours.

17   And if it's not, we like to hear about it so we request

18   discuss it with our licensee and improve the quality.

19   Q.   During your direct testimony, you talked about a Google

20   search that you performed.  I'd like to revisit that.

21   A.   Sure.

22   Q.   Can you put up Exhibit Plaintiff 209, I believe.  Now

23   correct me if I'm wrong, the search term that you used here on

24   Google is Penn State Vintage Brand; is that right?

25   A.   That's correct.

**ROUGH DRAFT**

1  Q.    How did you come up with that search term?

2  A.    Vintage apparel, Vintage Brand, this case.  That's what I

3  Googled.

4  Q.    And so it's true, though, that you actually searched,

5  included the words of Vintage Brand, the company.  Is that

6  right?

7  A.    So Vintage Brand is in there, yes.

8  Q.    The full company name?

9  A.    That's correct.

10 Q.    And was it your assumption that consumers might do a

11 similar Google search as this, including the word brand in the

12 search for Vintage Penn State apparel?

13 A.    I think they easily could.  As you see there by the

14 second example, original retro brand is actually also one of

15 our vintage licensees.  So do I expect someone necessarily to

16 always remember original retro brand when their searching.

17 I'm not sure that I do.  So if they combined it with vintage

18 and brand, it would be a natural connection that they could

19 make, in my opinion.

20 Q.    When you performed this search -- let me first ask you

21 this.  Before you did this, you had seen the Vintage Brand

22 website before performing this search; is that correct?

23 A.    I had.

24 Q.    How many times?

25 A.    I couldn't say exactly.

1    Q.    And do you have any information in terms of search engine

2    algorithms and whether prior search history or cookies have

3    any effect in what comes populated when running search terms?

4    A.    So I am definitely not an Internet search expert.  I'm

5    not going to say that I am.

6              However, if the premise is that I searched Vintage

7    Brand and Penn State so many times that that's what the search

8    engine optimization brought to the top, our products were only

9    temporarily on here during my time as licensing director.  So

10   it's not like I went in to my office every day and searched

11   Penn State Vintage Brand that it would affect the search

12   engine optimization as I understand it.

13   Q.    Did you clear your cookies or search history before doing

14   this search?

15   A.    I did not.

16   Q.    Now, you testified also that when running this search,

17   Vintage Brand's products would appear side-by-side with

18   officially-licensed products; is that right?

19   A.    That's correct.

20   Q.    And you said that there's no way to tell, if they're

21   looking at that, which products were officially-licensed and

22   which ones weren't; is that right?

23   A.    I do not believe there is.

24   Q.    But if you were to click on Vintage Brand's product

25   offering that shows up, you go to a webpage that would include

```
 1   the disclaimer that Vintage Brand's products are not
 2   sponsored, licensed, or affiliated with any team or
 3   university, right?
 4   A.   That disclaimer is there in fine print, yes.
 5   Q.   And if you were to click on, for example, a Family
 6   Clothesline link that might appear --
 7   A.   Um-hum.
 8   Q.   -- you would certainly see, in many locations throughout
 9   that webpage, that those products are officially-licensed by
10   Penn State, correct?
11   A.   You would, but I believe when you search, once you click
12   on the product image you want, I'm not really sure that that's
13   exactly what you're scanning the websites for at that point.
14   You're already, in my opinion, kind of attached to that
15   product.  You've already seen it; you've liked it enough to
16   click.
17   Q.   You talked about Family Clothesline a little bit in your
18   direct testimony.  I'd like to put a photo exhibit -- Defense
19   Exhibit 141, please, on the screen.  And I believe this has
20   been admitted.
21        Do you recognize this photo?
22   A.   I do.  This is the entrance to the Family Clothesline.
23   Q.   Okay.  And what's written on the banner there that we
24   see?
25   A.   Sure.  Their awning says Officially Licensed Penn State
```

1    Merchandise.

2    Q.    And is there website also located on that banner?

3    A.    Their website is located on that banner.

4    Q.    Since we're here, I see a logo, and I think you referred

5    to it during your direct testimony as the primarily athletic

6    mark?

7    A.    That's correct.

8    Q.    Is it also known as the lion head logo?

9    A.    It can be.

10    Q.    Has it ever been referred to as the chipmunk logo?

11    A.    If it is, it's not one of my favorite terms.  It's

12    definitely a Nittany Lion.

13    Q.    But is it true that that logo that we're looking at, that

14    the jury sees right now, has also been referred to, at times,

15    as the chipmunk logo?

16    A.    Sure.

17    Q.    Now, let's take a look at Defense Exhibit 131, please.

18    Do you recognize this?

19    A.    I do.

20    Q.    And what is it?

21    A.    This is the Family Clothesline's website, Penn State

22    Clothes dot com.

23    Q.    Okay.  And there's a blue -- navy blue box in the center

24    of the landing page.  Do you see that?

25    A.    Yes.

1    Q.    And what does that say?

2    A.    It says officially-licensed NIL apparel.

3    Q.    And can we zoom in at the top left around the box of the

4    Family Clothesline at the top of the webpage.  Is there any

5    indication that the products there are officially licensed?

6    A.    Yes.

7    Q.    Okay.  And then I believe if we scroll down on this page,

8    yeah, is there any indication that the products offered on

9    this website are officially-licensed in this box?

10   A.    It does.  I believe it says it when it says we're proud

11   to be officially-licensed distributor.

12   Q.    Is that your sense -- you talk to Penn State retail

13   licensees, certainly the ones on campus; is that right?

14   A.    Um-hum.

15   Q.    Are those local Penn State licensees proud to offer

16   officially-licensed products?

17   A.    I believe they are, but you can ask one of them.

18   Q.    And this verbiage -- maybe you don't know -- but my

19   understanding is that verbiage that you see in this blue box

20   repeats on every single page of this website; is that right?

21   A.    It would probably be the footer of their website, so it

22   would repeat over and over automatically.

23   Q.    Okay.

24              COURTROOM DEPUTY:  Do you want to admit it at all?

25              MR. FETTERS:  Oh, is it not admitted?

**ROUGH DRAFT**

185

```
 1              COURTROOM DEPUTY:  Just because you referenced it,

 2   it doesn't go to the jury.  It doesn't do anything.

 3              MR. FETTERS:  Oh, they didn't see it all?

 4              COURTROOM DEPUTY:  No.  You have to ask for it to

 5   be published.  If you don't ask, it doesn't go.

 6              MR. FETTERS:  Oh, I see.  Can you put it back up?

 7              COURTROOM DEPUTY:  You have to ask for it be

 8   admitted and published.

 9              MR. FETTERS:  Move to admit.

10              MS. WHEATLEY:  No objection.

11              THE COURT:  Duly admitted.  You may publish to the

12   jury.

13   BY MR. FETTERS:

14   Q.   Zoom in on the center, please.  All right.  And then the

15   Family Clothesline at the top left.  And then the box at the

16   bottom.  Thank you.

17              All right.  Going back to another part of your

18   direct testimony, I believe you had some product samples of

19   officially-licensed Penn State apparel.  I recall one of them

20   was a white Polo shirt with a Penn State trademark on the back

21   collar.  Do you recall that?

22   A.   Um-hum.  I do.

23   Q.   There was another one that I think had a small Penn State

24   trademark, like, in the chest area.  Do you recall that?

25   A.   The seal with the Penn State trademark over it, yes.
```

1    Q.   You also testified that you've been on -- to the Vintage

2    Brand website and looked at all the product offerings by

3    Vintage Brand; is that right?

4    A.   Yes.

5    Q.   Did you see any products offered by Vintage Brand where

6    they were printing the Penn State-related artwork in small --

7    near the collar of a shirt?

8    A.   I don't recall anything, no.

9    Q.   Do you recall any product offerings by Vintage Brand

10   where they were offering to print Penn State-related artwork

11   in sort of a small badge at the top left?

12   A.   I don't recall any, no.

13   Q.   Where, typically, would Vintage Brand's artwork be

14   printed?

15   A.   Their artwork is mostly printed on the center chest, very

16   large.

17   Q.   All right.  Let's take a look at Defense 28, please.  I

18   don't believe that this has been admitted.  So if there's an

19   objection, I can lay some foundation.  This is the brand book.

20        MS. WHEATLEY:  No objection.

21        MR. FETTERS:  Move to admit and move to publish,

22   Your Honor.

23        THE COURT:  Duly admitted.  You may publish.

24   BY MR. FETTERS:

25   Q.   Ms. Petulla, do you recognize this document, which has

1  been admitted as Defense Exhibit 28?

2  A.    Yes.  This is the visual identity standards, so the brand

3  book is how we refer to it with our internal constituents.

4  Q.    Is this a document that you, in your department, is in

5  charge of and puts out and manages?

6  A.    So there are aspects of this that we, from a licensing

7  visual identity office contribute to.  But this is a larger

8  document that's maintained by the strategic communications

9  office.

10  Q.    Is this something that's published for anyone to see on

11  the -- or on the Penn State webpage?

12  A.    Yes, it is.

13  Q.    Okay.  And what is the purpose of the brand book?

14  A.    So the primary purpose of the brand book is actually

15  internal.  It's referenced mainly by our internal

16  constituents, almost consistently, with how they should either

17  editorially refer to the University when they're writing about

18  it, some of the brand themes are on it.  There are visual

19  identity standards on the brand book, as well.

20  Q.    Okay.  Let's go ahead and scroll down.  So this would be

21  on Bates page 5722.  And there's a section at the top titled

22  who we are, our brand framework.  Do you see that?

23  A.    I do.

24  Q.    Can you please just read that aloud to the jury?

25  A.    Sure.  What makes Penn State special is sometimes hard to

1    put into words.  But defining what makes us different is the

2    first step in further engagement with our audiences.  This

3    section will walk you through our brand purpose, brand

4    positioning, tag line, and manifesto.  Together, this

5    framework will give you the grounding you need to elevate Penn

6    State in the minds of our stakeholders through consistent and

7    unified branding.

8    Q.    Thank you.  And we can shrink that and then go to page

9    5723, the next page, please.  And there's a heading that reads

10   One Community, Impacting Many.

11   A.    Yes.

12   Q.    And would you -- would you mind reading the -- that next

13   paragraph aloud, please?

14   A.    The one that starts There is something special?

15   Q.    Yes, please.  Thank you.

16   A.    There is something special at Penn State that converts

17   the I to the We, and puts us all on a path together, Students,

18   Faculty, Staff, and Alumni, to create meaningful impacts in

19   Pennsylvania and beyond.  It's important that we recognize

20   individuality but show that we are stronger and better

21   together.  It's what unites all of us and connects Penn

22   Staters anywhere in the world.  We're not just a university.

23   We're a community driven to make a difference.

24   Q.    Thank you.  And I see that there's a logo here, too.  It

25   looks like a paw print.  Do you recognize that logo?

1    A.    I do.

2    Q.    Is that a logo that Penn State licenses?

3    A.    It is.

4    Q.    Is that just referred to as the paw print logo?

5    A.    It is.

6    Q.    Let's go ahead and go to page 5724, please.  And at the

7    top, there's a heading titled Brand Pillar.  What is a brand

8    pillar?

9    A.    You would be in a better position to ask our marketing

10   department what they mean by brand pillar.  This is their

11   portion of the visual identity site.

12   Q.    Okay.  We can shrink that.  There's a brand pillar,

13   culture of we.  Let's go ahead and zoom in on that.  And can

14   you go ahead and read that to the jury?

15   A.    Our land grant is our reason for being.  Our individual

16   passions are met with collaboration, culminating in a culture

17   that is rooted in supporting and inspiring each other from our

18   classrooms to the world.

19   Q.    Thank you.  You can shrink that.  And then there's a

20   brand tag line, with the tag line We are Penn State.  I think

21   you mentioned that during your direct testimony.  Can you go

22   ahead and please read that to the jury?

23   A.    Sure.  From the original story about what it means to be

24   a team, humility, and all-for-oneness, we get, We are Penn

25   State.  From there, it grew.  The common collegiate experience

ROUGH DRAFT

```
 1   we all feel together, aligns us under We.
 2            The shared desire to impact those in our
 3   communities and beyond aligns us under We.
 4            The community that all understands that hard work,
 5   humility, and humanity is a shared ideal aligns us under We.
 6            And in the most natural way, without hyperbole,
 7   guile, or bravado, we can simply state that if you share these
 8   same ideals, then you can say We are Penn State.
 9   Q.   Thank you.  You can shrink that.
10            Now I was watching a Penn State football game
11   recently; it may have been against Washington where the
12   huskies got trampled on?
13   A.   I'm sorry.
14   Q.   I didn't go to the University of Washington, so it was
15   okay.
16   A.   Okay.
17   Q.   But coming back from a commercial break, and the students
18   and the fans were chanting something.
19   A.   Yes.
20   Q.   You're familiar with this chant?
21   A.   Yes.
22   Q.   What is it?
23   A.   So the stadium cheers, it's generally referred to as We
24   Are, and the other side of the stadium will answer Penn State.
25   Q.   And when the fans at the game, at Beaver Stadium chant We
```

**ROUGH DRAFT**

1  Are Penn State, do you interpret that as the fans expressing

2  the community of Penn State?

3  A.    Sure.

4  Q.    And in your view, does that community include current

5  students?

6  A.    Yes.

7  Q.    Does that community of Penn State include faculty and

8  staff?

9  A.    Yes.

10  Q.    Does that community include alumni?

11  A.    Yes.

12  Q.    How about just residents of rural -- of Central

13  Pennsylvania or Pennsylvania at large who are just fans of the

14  university's football team?

15  A.    Absolutely.

16  Q.    So by chanting We are Penn State, they collectively

17  express that they're members of the Penn State community,

18  correct?

19  A.    Correct.

20  Q.    And you would agree that one of the ways that fans of

21  Penn State can express that they're a member of the Penn State

22  community, that they can express their school spirit, that

23  they can express their affinity for the University and its

24  football team is wearing a shirt that quite literally says I

25  like Penn State.  Do you agree with that?

**ROUGH DRAFT**

1          MS. WHEATLEY:  Your Honor, we are renewing our

2     objection in the Motion In Limine to this topic.

3          THE COURT:  Do you care to reply?

4          MR. FETTERS:  This goes directly to anesthetic

5     functionality in terms of the -- we have a Vintage Brand shirt

6     that I displayed in opening statement that says We are Penn

7     State or I like Penn State.  And it goes to the nontrademark

8     role that the artwork is playing.

9          THE COURT:  Ms. Wheatley?

10         MS. WHEATLEY:  As we've -- would Your Honor like to

11    hear any further on this?

12         THE COURT:  Do you care to reply?

13         MS. WHEATLEY:  Yes.

14         THE COURT:  Go ahead.

15         MS. WHEATLEY:  We would argue that this is not

16    relevant to the issue of trademark infringement or the issue

17    of anesthetic functionality.

18         MR. FETTERS:  If the images of the artwork on

19    Vintage Brand's products do not function to indicate who is

20    responsible for the quality of those products, in fact, they

21    are doing something --

22         MS. WHEATLEY:  Your Honor, may we have a sidebar on

23    this?

24         THE COURT:  You may come to sidebar briefly.  Go

25    ahead.

1          THE COURT:  Everyone's coming.

2          (The following occurred at sidebar.)

3          THE COURT:  Now remember, these are the -- the

4   little grenades, that's the microphone.  If you want to pick

5   that up.  Maybe hold that up so Colleen can hear.  So where

6   did we leave off?  Tell me.

7          MS. WHEATLEY:  As we said in our Motion In Limine,

8   anesthetic functionality goes to whether a mark has an

9   intrinsic esthetic function, so for instance, if there's a

10  color that can be used for fashion purposes on a shoe.  The

11  use of a mark to express fandom is not anesthetic

12  functionality --

13         THE COURT:  To express?

14         MS. WHEATLEY:  A fan -- esthetic functionality.

15  The Jack Daniels case made it very clear that a trademark can

16  be used for an expressive purpose does not in any way

17  invalidate it or mean that it is not source identifying.

18         So our position would be that this line of

19  questioning is not relevant and should not be in the case.

20  And we made that argument in our Motion to strike and our

21  Motion In Limine, and we want to renew the objection on the

22  record.

23         MR. FETTERS:  Your Honor, I believe you've ruled on

24  this in the context in Motion In Limine.  So I would just

25  reiterate the position that we've already taken, which is that

1    if the marks -- the designs serve any nontrademark function,

2    then that is relevant to our as esthetic functionality

3    defense.  It is also relevant to likelihood of confusion in

4    that if the artwork is not serving a trademark function, then

5    it necessarily consumers cannot be confused as to source.

6            MS. WHEATLEY:  I would also note that their

7    argument is that the very designs are esthetically functional

8    -- that their designs are esthetically functional to their

9    customers, not that Penn State's trademarks are esthetically

10   functional.  I understood that was the format we were

11   presenting this defense.

12           MR. FETTERS:  My question was directly relevant to

13   a Vintage Brand product.  That I like -- my question to her

14   was if a fan wears an I like Penn State shirt -- I can hold it

15   up; it's the same shirt I used in opening -- that that is a

16   way for that fan to express their community to Penn State to

17   express their affinity.  So it is about Vintage Brand's

18   products.

19           THE COURT:  All right.  Anything else?  I

20   understand, I think.

21           MS. WHEATLEY:  And I would say we've said that

22   Ms. Petulla cannot testify as to consumer perception, and I

23   tried to observe that line.  So I don't see how she can answer

24   fairly that question.  It's outside the scope of her personal

25   knowledge.

1          MR. FETTERS:  I'm asking about her personal view on

2     it.  These questions are all about her.

3          MS. WHEATLEY:  I think there's a difference between

4     her personal view and why she wears Penn State products.  One

5     would be from her personal knowledge and one would be her

6     opinion as to consumer perception or consumer activity.

7          MR. FETTERS:  She testified that the chant we Are

8     Penn State allows everyone to express their community --

9          THE COURT:  Well, do you want to rephrase your

10    question to her that, this the objection and phrase it along

11    the lines that Ms. Wheatley has suggested.  I'm not sure it

12    makes a great deal of difference, but maybe it does.

13         MR. FETTERS:  If you tell me I need to do that, I

14    can do that.

15         THE COURT:  Well --

16         MR. FETTERS:  I think the question, as answered in

17    my view, is proper and should be answered, but if you --

18         THE COURT:  Well, does it spoil it if you modify it

19    slightly?  I don't know that there's a great deal of

20    difference, but maybe there's some difference.

21         MR. FETTERS:  I don't know that it spoils it.  I'm

22    happy to ask it that way.

23         THE COURT:  Why don't you ask it that way.  Would

24    you just put that back over -- that's great.  Thanks.

25              (The sidebar discussion was concluded.)

**ROUGH DRAFT**

196

```
1              THE COURT:  Mr. Fetters, go ahead.

2              MR. FETTERS:  Thank you.

3              MS. WHEATLEY:  Your Honor, just -- I will object to

4    have the overruling on the record.

5              THE COURT:  Oh, yes.  The objection is noted.

6    Overruled.  Thank you.  Mr. Fetters, go ahead.

7    BY MR. FETTERS:

8    Q.   All right.  I'm holding up Defense Exhibit 311.  I don't

9    know if this has been admitted.  I'm using it for illustrative

10   purposes, but I can move to admit it now.

11             MS. WHEATLEY:  No objection to the exhibit.

12             THE COURT:  Duly admitted.

13   BY MR. FETTERS:

14   Q.   Ms. Petulla, you see here a Vintage Brand t-shirt.  It's

15   Defense Exhibit 311.  Do you see that?

16   A.   I do.

17   Q.   Okay.  If you were to wear this shirt to a Penn State

18   game and it says I like Penn State, do you personally feel

19   that wearing this shirt would express that you're a part of

20   the Penn State community?

21   A.   I think it expresses my support of the team.

22   Q.   Okay.

23             MR. FETTERS:  Okay.  Thank you.  No further

24   questions.

25             THE COURT:  Thank you.  Any redirect examination?
```

```
 1              MS. WHEATLEY:  Yes, Your Honor.

 2              THE COURT:  Go right ahead.

 3                        REDIRECT EXAMINATION

 4   BY MS. WHEATLEY:

 5   Q.    Ms. Petulla, you indicated that you purchase Penn

 6   State-branded authorized products from time to time, correct?

 7   A.    That's correct.

 8   Q.    Why go you purchase those products?

 9   A.    I purchase them for a number of reasons.  I purchase them

10   because I want to support the University; I purchase them

11   because I feel pride in the University and its mission; I

12   purchase them for my son because I secretly want him to go

13   there, not so secretly; so I purchase them for a number of

14   reasons, whether they be for myself or gifts for others.  I

15   feel like it's a great way to support the University and

16   reinforce the mission.

17   Q.    Does quality play any role in your decision to purchase

18   Penn State products?

19   A.    Yes.

20   Q.    And do you have any knowledge as to the quality of Penn

21   State products?

22   A.    Yes.

23   Q.    Does the Penn State brand on a product signify quality in

24   any way to you?

25   A.    I believe that it does.  When I come to work to do my job
```

1   every day, I try to do it to the best of my ability, to

2   connect our fans with merchandise that reinforces the mission

3   of the university in a quality way.

4   Q.   Ms. Petulla, I'd like to look back at Exhibit 470, which

5   Mr. Fetters pulled up or discussed the language on there.

6   Thank you.  And I believe he was discussing the small print

7   under the store name Penn State Nittany Lions Vintage Designs.

8   Do you see that?

9   A.   Yes.  I can see it now.

10  Q.   And can you scroll down to the second page of this

11  document.  Do you see the socks there?

12  A.   Yes.

13  Q.   And that had the lion head on them that we talked about,

14  Penn State not --

15  A.   Yes.

16  Q.   -- not regarding as a trademark?

17  A.   Yes.

18  Q.   Would you characterize that as a vintage design?

19  A.   Yes.

20  Q.   And so looking back at this disclaimer on the first page,

21  does this disclaimer, even if you read it, tell you that the

22  Penn State trademarks on here are not affiliated with Penn

23  State?

24  A.   I do not believe it's clear.

25  Q.   Okay.  And does this disclaimer tell you that Penn State

1    asked Vintage Brand to stop?

2    A.    It does not.

3            MS. WHEATLEY:  No further questions.

4            THE COURT:  Thank you.  Any recross examination,

5    Mr. Fetters?

6            MR. FETTERS:  No, Your Honor.

7            THE COURT:  All right.  Ms. Petulla, thank you very

8    much for your testimony.  You may stand down with the thanks

9    of the Court.

10           Call your next witness, please.

11           MS. WHEATLEY:  Your Honor, the Plaintiff would like

12   to call Michelle Young, co-founder of Vintage Brand by

13   video-recorded deposition.

14           THE COURT:  Very good.  You're ready to play that?

15   And you say it is Michelle Young?

16           MS. WHEATLEY:  Yes, Your Honor.

17           THE COURT:  Thank you.  Hold on.  Let's pause it.

18   Start again.

19           (At this time the deposition of Michelle Young was

20            played for the jury.)

21           (4:14 p.m.)

22           (4:36 p.m.)

23           MS. WHEATLEY:  Your Honor, we would like to move

24   into evidence the exhibits that came in through that

25   deposition, Plaintiff's Exhibit 247, which was Exhibit 16 in

1    the deposition, and Plaintiff's Exhibit 482, which was Exhibit

2    18 in the deposition, and then I believe Plaintiff's Exhibit

3    470, which was Exhibit 6 was already in evidence.

4              MR. FETTERS:  No objection.

5              THE COURT:  Duly admitted.

6              MS. WHEATLEY:  Next, Your Honor, we would like to

7    call Erik Hartvigson, co-founder and president of Vintage

8    Brand as a witness by video deposition.

9              THE COURT:  You may plays it.

10              (4:37 p.m.)

11              (The jury watched the video deposition of Erik

12               hartvigson.)

13              (4:59 p.m.)

14              MS. WHEATLEY:  Your Honor, we would like to move

15    into evidence the exhibits that came in during that

16    deposition, Plaintiff's Exhibit 77, Plaintiff's Exhibit 265,

17    and I believe Exhibit 298 is already in evidence.

18              MR. FETTERS:  No objection.

19              THE COURT:  Duly admitted.

20              MS. WHEATLEY:  The Plaintiff, and I believe this

21    may be our last witness for the day, would like to call Meghan

22    Maffey, an individual consumer who contacted Vintage Brand to

23    the stand by video deposition.

24              THE COURT:  Go right ahead.  You may play the

25    video.

1           (5:00 p.m.)

2           (The video of Meghan Maffey was shown to the jury.)

3           (5:49 p.m.)

4           THE COURT:  Ms. Wheatley?

5           MS. WHEATLEY:  We would like to move in Plaintiff's

6   Exhibit 27 and Plaintiff's Exhibit 73.

7           MR. FETTERS:  No objection.

8           THE COURT:  Duly admitted.

9           MS. WHEATLEY:  Your Honor, would this be a good

10  place to break for the day?

11          THE COURT:  It is, I think.

12          So, ladies and gentlemen, we're going to stand in

13  recess this evening.  I believe there are several more, I

14  believe, video depositions that we're going to start with

15  tomorrow?

16          MR. FINKELSON:  I think we'll probably get to them

17  later on in the day tomorrow, Your Honor, and they're like a

18  total of 85 minutes.

19          THE COURT:  Understood.  All right.  So there will

20  obviously be some live testimony, but there some other

21  videotaped depositions that need to be played for you.

22          So again, as I have instructed you, please don't

23  discuss this case amongst yourselves or with anyone else.

24  There has, I've been advised, some media coverage of this

25  case.  You are to avoid reading any articles about this case

1    or any television or radio coverage that might exist.  You

2    need to come back tomorrow, as you did this morning, at about

3    9:15 a.m.  We will try to get under -- under way at about 9:30

4    tomorrow, which is Thursday, November 14th.  I wish you a

5    pleasant evening.  Mrs. Rhinehart, escort the jury out.

6              (At 5:50 p.m., the jury left of the courtroom and

7               were excused for the day.)

8              THE COURT:  Be seated, please.  This is just

9    logistics.

10             (At 5:54 p.m., the proceedings were concluded for

11              the day.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25