```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2                    WILLIAMSPORT DIVISION

 3   THE PENNSYLVANIA STATE   :  CASE NO.
     UNIVERSITY               :
 4          v.                :
     VINTAGE BRAND, LLC,      :
 5   SPORTSWEAR INC., d/b/a   :
     PREP SPORTSWEAR,         :
 6   CHAD HARTVIGSON, ERIK    :
     HARTVIGSON, and          :
 7   MICHELLE YOUNG           :  4:21-CV-01091

 8

 9               TRANSCRIPT OF PROCEEDINGS
                        Jury Trial
10                      VOLUME III

11        Held before the HONORABLE MATTHEW W. BRANN, November 14,
     2024 commencing at 10:17 a.m., Courtroom No. 1, Federal
12   Building, Williamsport, Pennsylvania.

13

14   APPEARANCES:

15   LUCY J. WHEATLEY, ESQUIRE
     McGuireWoods LLP
16   Gateway Plaza
     800 East Canal Street
17   Richmond, VA 23219-3916
     804-775-4320
18   Lwheatley@mcguirewoods.com

19   DAVID E. FINKELSON, ESQUIRE
     McGuireWoods LLP
20   Gateway Plaza, 800 East Canal Street
     Richmond, VA 23219-3196
21   804-775-1157
     Dfinkelson@mcguirewoods.com
22        For the Plaintiff

23   Proceedings recorded by machine shorthand; transcript produced
     by computer-aided transcription.
24   _____
                   Colleen V. Wentz, RMR, CRR
25                  Official Court Reporter
                colleen_wentz@pamd.uscourts.gov
```

ROUGH DRAFT

```
 1   APPEARANCES (cont'd)

 2   JOHN T. FETTERS, ESQUIRE
     STOKES LAWRENCE, P.S.
 3   1420 Fifth Avenue, Suite 3000
     Seattle, WA 98101
 4   206-626-6000
     john.fetters@stokeslaw.com
 5
     JOSHUA D. HARMS, ESQUIRE
 6   STOKES LAWRENCE, P.S.
     1420 Fifth Avenue, Suite 3000
 7   Seattle, WA 98101
     206-626-6000
 8   josh.harms@stokeslaw.com

 9   MARK P. MCKENNA, ESQUIRE
     LEX LUMINA PLLC
10   745 Fifth Avenue, Suite 500
     New York, NY 10151
11   630-430-8051
     mark@lex-lumina.com
12
     LESLIE C. VANDER GRIEND, ESQUIRE
13   STOKES LAWRENCE, P.S.
     1420 Fifth Avenue, Suite 3000
14   Seattle, WA 98101
     206-626-6000
15   leslie.vandergriend@stokeslaw.com
          For the Defendants
16

17

18

19

20

21

22

23

24

25

26
```

**ROUGH DRAFT**

                    INDEX TO WITNESSES

FOR THE PLAINTIFF        DIRECT    CROSS    REDIRECT    RECROSS

David Franklyn             19        81

(On Qualifications)         7

Caroline Gumma            159       172

Thomas McGrath            180       185

1      (Proceedings commenced at 10:17 a.m.)

2      THE COURT:  We're back on the record now in the

3  matter of the Pennsylvania State University versus Vintage

4  Brand, LLC, et al, docketed in this Court at Civil No.

5  4:21-CV-01091.

6      Ladies and gentlemen, I hope you had a restful

7  evening.  We are going to continue with the Plaintiff's case

8  today.  Are we ready to call -- Counsel, are you ready to call

9  the next witness?  Oh, I'm sorry.  There is an objection.  I

10  beg your pardon, Mr. McKenna.

11      MR. MCKENNA:  May we make it at sidebar?

12      THE COURT:  Yes.  Come to sidebar.

13      (The following discussion occurred at sidebar.)

14      THE COURT:  Let the record reflect that I am at

15  sidebar with Counsel.  There's an objection to Plaintiff's

16  next witness.  Mr. McKenna, go ahead.

17      MR. MCKENNA:  Yes, Your Honor.  We would like to

18  make on the record an objection to what is currently labeled

19  as slide 44.  In Mr. Franklyn's presentation, that's a slide

20  that purports to reproduce some results from Dr. Erdem's

21  study.  As we may have heard before, Mr. Franklyn is going to

22  be called as a rebuttal expert to Dr. Erdem.  Dr. Erdem hasn't

23  yet had a chance to testify about her survey.  This one is

24  especially misleading because actually, as it turns out, the

25  numbers that Mr. Franklyn is using here are not even from

1  Dr. Erdem's initial report.  They are in a supplemental

2  analysis that she did in response to Mr. Franklyn's rebuttal

3  report.  So there's no way I can even explore this on cross

4  examination without walking him through the fact that he's got

5  a rebuttal report, and that that's what -- so we're going to

6  be previewing rebuttal testimony when she hasn't even had a

7  chance to testify yet.

8          In addition to that, the -- the image that he's

9  presenting is highly misleading because it's cropped out the

10  net confusion numbers when -- and that only has the

11  possibility of confusing the jury by presenting gross

12  confusion numbers that aren't relevant.

13          MR. FINKELSON:  Your Honor, it is -- the slide is

14  usable as a demonstrative.  The testimony relating to it is

15  admissible in evidence.  It's not rebuttal testimony.  It's

16  part of the affirmative opinions that Mr. Franklyn or

17  Professor Franklyn, excuse me, will be presenting today.  It's

18  not a critique of Dr. Erdem's opinions.  It's a -- an

19  indication of what those opinions are and how they align in

20  many respects with Professor Franklyn's.  And the data shown

21  on the slide comes directly out of a chart prepared by

22  Dr. Erdem herself.

23          THE COURT:  Anything else?

24          MR. MCKENNA:  No, Your Honor.

25          THE COURT:  All right.  I'm going to allow

**ROUGH DRAFT**

1    Plaintiff to explore this accordingly, consist with my

2    commentary when we were in camera.  Objection noted and

3    overruled.

4              MR. FINKELSON:  Counsel, just for the record, Your

5    Honor, we had also sought to use the script and admit it into

6    evidence.  Not to be confused with slide 44, it's Plaintiff's

7    Exhibit 44.  And I understand that Counsel for the Defendants

8    has raised an objection to that.  It's not hearsay.  It would

9    be helpful on appeal.  It's helpful for the jury.  So we would

10   ask that that be admitted.  We understand Your Honor's

11   position, but just wanted to get a ruling on that.

12             THE COURT:  I understand.  And, again --

13             MR. MCKENNA:  We oppose that.  We don't oppose the

14   admission of the survey screenshots to show the images, but

15   the exhibit itself is cumulative evidence and also likely to

16   confuse the jury because it has very -- a number of different

17   "if this, then that" statements.  And that should be done by

18   testimony.

19             THE COURT:  Understood.  And that objection -- that

20   objection, itself, is sustained.  I think that it is

21   cumulative discussion.

22             So, Counsel, thank you very much.

23             MR. FINKELSON:  We'll just keep that as

24   demonstrative.  We accept Your Honor's ruling and are

25   reserving our objection.

ROUGH DRAFT

```
 1              THE COURT:  Certainly.  And the slide, of course,
 2    that will go in.  That's beyond dispute, I think.  Counsel,
 3    thank you both very much.
 4              (The discussion at sidebar was concluded.)
 5              THE COURT:  All right.  Counsel, thank you very
 6    much.  Plaintiff's Counsel ready to call its next witness?
 7              MR. FINKELSON:  We are, Your Honor.  Penn State
 8    calls Professor David Franklyn.
 9              THE COURT:  Professor, would you come forward and
10    be sworn, please.
11              (The witness, David Franklyn, was sworn.)
12              COURTROOM DEPUTY:  Can I get you to state your full
13    name and spell your last name for the record?
14              THE WITNESS:  Sure.  My name is David Joel
15    Franklyn.  The last name is spelled F-r-a-n-k-l-y-n.
16              THE COURT:  Go right ahead, sir.
17              MR. FINKELSON:  Thank you, Your Honor.
18                  DIRECT EXAMINATION ON QUALIFICATIONS
19    BY MR. FINKELSON:
20    Q.    Can you please introduce yourself to the jury.
21    A.    Sure.  My name is David Franklyn.  I'm a law professor at
22    Arizona State University in Phoenix, Arizona, where I run the
23    McCarthy Institute for intellectual property and technology
24    law.  I teach intellectual property law classes.
25    Q.    And do those intellectual law property law classes have a
```

1  particular focus on trademark law, among other subjects.

2  A.   Yes.  I teach from time to time all types of intellectual

3  property law, including patent, copy right and trade secret

4  law.  But my main focus as a law Professor is on the subject

5  area of trademark law.

6  Q.   What are you here to discuss with the jury today,

7  Professor Franklyn?

8  A.   My primary focus of discussion with you folks is a survey

9  that I was asked to conduct for this case on a topic called

10  the likelihood of consumer confusion, and more broadly

11  speaking, the relationship that consumers see or might see

12  between Penn State university and Vintage Brands, what was the

13  relationship based on the sales activities of Vintage Brands,

14  of merchandise that bear -- that boar the trademarks of Penn

15  State university.

16  Q.   Did you help prepare a set of slides to share with the

17  jury, along with your testimony today, professor Franklyn?

18  A.   Yes,  I did.

19  Q.   Mr. Burkhart, could we please call those up starting

20  slide -- substantive slide one, so slide two.  Let's first

21  talk about your credentials, Professor Franklyn.  First, can

22  you till the jury a little bit more about your current job as

23  a law Professor?

24  A.   Yes.  Excuse me.  I alluded to it a few moments ago.  But

25  I am a law Professor at Arizona state university.  The main

1    campus is located in Tempe, Arizona.  But the law school is in

2    downtown Phoenix.  And as I already said, I teach a lot of

3    classes there, and I cover intellectual property, but I also

4    sometimes teach civil procedure, which has to do with some of

5    the topics that get a case to a place like this in a civil

6    procedure system.  And I've also taught over the years morale

7    philosophy and the law and also constitutional law.

8    Q.    For how long have you been a law Professor?

9    A.    28 years.

10   Q.    And in addition to your tenure as a law Professor, have

11   you ever served as a business school Professor?

12   A.    I have.  For three years, I had a joint appointment at a

13   school called the golden gate university in downtown San

14   Francisco.  Immediately before I moved to Arizona state

15   university, and at that school, I had a joint appointment as a

16   Professor of law and as a Professor of business in the Ageno

17   School of Business.

18   Q.    What did you teach as a professor in the business school

19   as part of that joint appointment, sir?

20   A.    I taught a variety of seminars on marketing and consumer

21   perceptions and consumer behavior.  And surveys, the use of

22   surveys to measure consumer behavior, and some of those

23   classes were attended by a mixture of law students and

24   business school students who were interested in the brand as

25   both a legal idea and as a marketing entity because there's an

ROUGH DRAFT

1    intersection between those two things.

2        Q     Have you taught trademark survey design outside of

3    the classroom, as well, sir?

4    A.    Yes,  I have and can you till the jury about that?

5    A.    Well, I've done it many occasions, but one that probably

6    was, in my personal career, the most significant, was I was

7    invited by the European union -- they have an entity called

8    the EUIPO, which stands for the European Union Intellectual

9    Property Office.  It's kind of like our United States patent

10   and trademark office.  That office is located in Alicante,

11   Spain, and they invited me to come over and do a full day

12   seminar or all of their judges on the use of surveys and the

13   way that we use them in trademark cases primarily in the

14   United States because they haven't -- they don't have a

15   tradition of using them in the European union, but they've

16   been kind of toying with the idea of doing it and wanted to

17   see how we do it over here.

18   Q.    I know you stated here and you noted previously you're

19   the director of the McCarthy institute for intellectual

20   property and technology law.  First, who does the McCarthy

21   refer to in that title?

22   A.    Well he's my mentor.  He's 87 years old, still very

23   sharp.  And Tom McCarthy, John Thomas McCarthy was, and is

24   regarded as one of the preeminent scholars of trademark law in

25   the United States and has been so for many, many decades.  And

ROUGH DRAFT

1  he is the author of a seven volume treatise, thorough

2  treatise, in just about every aspect of trademark law that you

3  can think about, and it's been cited in over 7 state and

4  federal court judicial opinions by judges, and -- including

5  many, many times by the United States Supreme Court, including

6  recently, and so the McCarthy institute is named after Tom

7  McCarthy and Tom McCarthy has, since, has been the founding

8  director.  He and I founded it together in 2001 when we were

9  both teaching at the University of San Francisco law school.

10  And I became named as the executive director and have been so

11  ever since.

12  Q.    And in a nutshell, what does the McCarthy institute do?

13  A.    The McCarthy institute does a lot of things, but at a

14  general level, it is dedicated to the -- to conducting

15  research to be published on various aspects of intellectual

16  property law, and that research is sometimes done by

17  professors or groups of professors.  Sometimes it's done by

18  students with the professors where we try to have the students

19  be named on the -- as named authors on the articles to help

20  promote them in their careers.

21        We also have put on events, conferences.  For

22  example, we put on a conference two days ago in Los Angeles on

23  various intellectual property issues.  We put on symposium.

24  We put on special speaker series.  We did one of those not too

25  far from here.  And we do workshops, some outside the law

ROUGH DRAFT

1   school, some inside the law school.  And in addition to that,

2   we have a wonderful student mentorship program where right

3   now, we have approximately 40 students out of a law school

4   that has 700 students, and 40 of them have signed up to be

5   McCarthy fellows, where they have expressed an interest in

6   going and possibly going in to a career in intellectual

7   property law, and we try to give them opportunities that will

8   help mentor them in that direction and we also try to write

9   blog posts with them and sometimes full blown papers with

10  them.

11  Q.   Thank you, Professor Franklyn.  And then I note on the

12  third item listed on your slide is that you are the founder of

13  Franklyn I.P. Consulting; is that correct?

14  A.   Yes, and can you tell the jury what Franklyn I.P.

15  Consulting is?

16  A.   Franklyn I.P. Consulting is a company that I started on

17  the side, in addition to my work as a Professor that conducts

18  market research, what sometimes we refer to as consumer

19  perceptions of various issues that can arise in cases like

20  this that -- of how people perceive trademarks on clothing or

21  other items, and I run the company.  I employee full-time

22  employees and data scientists, data statisticians, and -- so

23  that's sort of my side company, if you will.

24  Q.   Thank you, sir.  Let's talk about your educational

25  background.  Can you give the jury a sense of that, please?

ROUGH DRAFT

1   A.    Sure.  In -- in 19 -- excuse me 83, I graduated from

2   college.  And I went to college at a school called Evangel

3   University, which is a Christian liberal arts college located

4   in Springfield, Missouri, and I received a Bachelor of Arts

5   Degree with a triple concentration in the subject areas of

6   history, philosophy, and theology.  And then later, a few

7   years later, I received my Juris Doctorate Degree from the

8   University of Michigan Law School with honors.

9   Q.    Did you do anything between college and law school, and

10  if so, what?

11  A.    Yes.  I was -- four years between -- I took four years

12  off, trying to figure out what I wanted to do with my life.

13  And in those four years, I initially went to seminary at a

14  school called Fuller Theological Seminary in Pasadena,

15  California, and then decided against that career path and

16  taught high school in the inner city of Los Angeles.  I taught

17  English and history at a school called Pater Noster High

18  School.

19  Q.    Thank you, sir.  Have you published in the field of

20  trademark law and trademark surveys, Professor Franklyn?

21  A.    Yes, I have.

22  Q.    Can you give the jury a sense of that, please?

23  A.    Yes.  I'm the editor in chief of one volume commentary

24  called McCarthy desk encyclopedia of intellectual property

25  law.  And I am coauthor on that, and Professor McCarthy and

1    other intellectual property law Professor from George

2    Washington University in Washington D.C.  And then I've also

3    authored a number of articles on intellectual proper law,

4    including trademark law and on trademark surveys.  And then I

5    have either presented or organized conferences on intellectual

6    property law at a number of places, including at the schools

7    that I have worked at, but sometimes we take our conferences

8    outside of the school and have been fortunate enough to have

9    been hosted by a number of American corporations that have

10   conference rooms in them, including the ones that I guess --

11   can the jury see this line?

12   Q.   The jury can see this, unless -- and unless Ms. Rhinehart

13   tells me that I'm wrong, so.

14   A.   Okay.  Well, we were fortunate enough, before the

15   pandemic, to be hosted for an intellectual property conference

16   at Google.  In the Silicon Valley, a year ago, we were hosted

17   by the Oracle Corporation, which is also in the Silicon Valley

18   in California.  We have been hosted by the Microsoft

19   Corporation in Seattle, and by Time Warner in New York City,

20   in Manhattan, and other -- and by Fox, in Los Angeles comes to

21   mind.  And we also have gone to NYU and the University of

22   Oxford.  And we have put on two conferences so far on

23   copyright law with the UCLA law school, one at UCLA's campus

24   Los Angeles, and one at -- ASU happens to have a mini campus

25   in Los Angels.  And we hosted that conference there.

1  Q.   Let's talk a little bit more about your survey

2  experience.

3           First, let me ask you, how many consumer surveys

4  have you conducted over the course of your career, Professor

5  Franklyn?

6  A.   Well, I would say well over 200.  I've lost count because

7  some of them have been for academic purposes, because as I

8  mentioned, I write about surveys, as well as conduct them in

9  litigation context.  But it may be over 300.  I really have

10  lost track.

11  Q.   Can you give the jury a couple of examples of clients who

12  have retained you as a survey expert?

13  A.   I've been retained by the International Olympic Committee

14  to -- in advance of the Brazilian 2016 Olympics to assess

15  potential issues that may arise with third parties unrelated

16  use of the Olympic committee's trademarks, like the rings on

17  clothing and other merchandise in Brazil and even on the

18  Internet.  And I was their chief consultant in connection with

19  trademark issues for the 2016 Olympics.

20           In addition to that, I've conducted surveys for the

21  Coca-Cola Company, for Nike, for Converse with regard to --

22  with Nike, with regard to the Air Force One gym shoe, with

23  Converse, with regard to the Chuck Taylor high top gym shoe.

24  I've been retained by -- let's see what else.  By alcohol

25  brands, and by -- just a lot of companies.

ROUGH DRAFT

```
 1   Q.   That's very helpful, sir.
 2   A.   Oh, there's one more, because it's close to here.  I've
 3   done substantial work for the Hershey company in Hershey,
 4   Pennsylvania on alleged infringement of the look and feel of
 5   the Reese's Pieces peanut butter cup packages and on the
 6   Hershey candy bar with and without the almonds and the way
 7   that it's packaged and some unrelated, unauthorized third
 8   parties' alleged copying of their packaging that was alleged
 9   to create trademark infringement.
10   Q.   Are you familiar with what are known as trademark
11   likelihood of confusion surveys?
12   A.   Yes, I am.
13   Q.   Can you give the jury an understanding of what a
14   trademark likelihood of confusion survey is?
15   A.   Yes.  Well, in order to do that, I needed to say a little
16   bit about the background of why these surveys are so prevalent
17   or at least somewhat prevalent in cases like this.  Trademark
18   law, generally speaking, requires proof that consumers --
19   relevant consumers are or would be confused between, let us
20   say authorized merchandise and unauthorized or infringing
21   merchandise about what is the source of that -- of the
22   infringing merchandise, who made it, who sponsored it, who
23   approved it, and whether the trademark owner is, in some way,
24   affiliated with that endeavor.
25           And because of that feature in trademark law, one
```

ROUGH DRAFT

1    way of trying to provide relevant evidence on the issue of

2    confusion is to conduct a confusion survey, and so these types

3    of surveys have arisen in these cases, with some frequency, to

4    provide help to the jury, to the trier of fact about whether

5    such confusion exists.

6    Q.    And you mentioned source sponsorship and affiliation.

7    Are those measures of confusion relevant to determining who is

8    responsible for product quality?

9    A.    Yes.

10   Q.    Of the surveys that you've conducted in your career,

11   approximately how many have been trademark likelihood of

12   confusion surveys?

13   A.    At least 80.  Although the reason why I -- I'm not trying

14   to brag, but I'm reluctant to say is is I was recently -- I

15   did 30 of them for Hershey's.  And that's in addition to the

16   80 and others in the last, you know, year.  So at least 80,

17   but probably quite a bit more.

18   Q.    Approximately how many times have you testified about

19   trademark surveys?

20   A.    When we say testified, sometimes we use the word a little

21   bit loosely.  I've testified -- we mean testified either in a

22   deposition where I am sworn under oath and actually could be

23   put in to evidence, such as I believe yesterday, there was

24   some depositions that were videotaped and put in to -- in to

25   testimony in this case.  I have been retained and testified

ROUGH DRAFT

```
1    either by way of deposition or by way of physical appearance
2    in court well over 150 times.
3    Q.   And in your capacity as a survey expert, have you
4    conducted surveys on behalf of both trademark owners who are
5    alleging infringement, as well as Defendants who are accused
6    of infringement?
7    A.   I have.  I don't personally pick and choose between
8    Plaintiffs or Defendants.  I don't have biases about that.
9    And I would say that I have been retained, roughly speaking, a
10   good half the time by the Plaintiffs and half of the time by
11   the Defendants.  Here, I was retained by the Plaintiff in this
12   case.
13   Q.   And do your survey results, once the survey is run,
14   always support the position of the party who hired you?
15   A.   They do not.  And, in fact, I make it very clear to the
16   people who hire me that I'm going to do the best job that I
17   can to conduct a neutral survey, and if they don't like the
18   results, they're still going to have to pay me.
19   Q.   Speaking of payment --
20   A.   And they do.
21   Q.   Were you compensated, Professor Franklyn, at your
22   standard consulting rate of $675 an hour for the work that you
23   performed in this case?
24   A.   Yes, I was.
25   Q.   Does your compensation -- you already answered this a
```

ROUGH DRAFT

1   better way than my question will present it, but does your
2   compensation in any way depend on the outcome of the result?
3   A.   No.  I refuse to do that, and I actually believe that
4   would be unethical and perhaps illegal.  And so I don't get a
5   bonus based on how the -- the outcome of the case or extra
6   compensation based on the outcome of the case.
7               MR. FINKELSON:  Your Honor, I would tender
8   Professor Franklyn on the use of surveys, including likelihood
9   of confusion surveys to measure consumer purchasing behavior.
10              THE COURT:  Mr. McKenna, do you care to voir dire
11   this witness as to his qualifications?
12              MR. MCKENNA:  No objection at this time.
13              THE COURT:  Very well.  This expert -- this witness
14   is duly admitted as an expert for the reasons set forth by
15   Plaintiff's Counsel.  Go right ahead, Mr. Finkelson.
16              MR. FINKELSON:  Thank you, Your Honor.
17                      DIRECT EXAMINATION
18   BY MR. FINKELSON:
19   Q.   What, specifically, Professor Franklyn, was your
20   assignment in this case?
21   A.   My assignment was, as I believe perhaps I briefly alluded
22   to a few moments ago, was to test the perceptions of people
23   who have bought or possibly might buy the merchandise that is
24   offered or was offered for sale by the Defendant in this case,
25   Vintage Brand, but only some of that merchandise, the

ROUGH DRAFT

1  merchandise in particular that bears Penn State's trademarks

2  and logos on it, to determine if the people who buy products

3  or might buy products from Vintage Brands, are likely to think

4  that Penn State made those products, sponsored, approved of

5  the sale of those products, or that Penn State is in some way

6  affiliated with this endeavor by Vintage Brands, and in all of

7  those ways, stands behind the products that are being sold by

8  Vintage Brands.  That was my assignment.

9  Q.   And when you're measuring consumer confusion in a case

10 like this, what are you trying to assess specifically?  In

11 other words, is there a governing concept about the level of

12 confusion that experts in this field, like you, understand as

13 you approach this survey task?

14 A.   Yes, there is.  There has evolved -- you know you don't

15 have to do a survey in a trademark case.  And there -- there's

16 a way to litigate and prove confusion without a survey.  And

17 sometimes Plaintiff's lawyers don't hire a survey expert and

18 they just argue that there's confusion based on common sense

19 and circumstantial evidence and things like that.

20        But when a survey is done, it must, in some ways,

21 conform with established methodologies.  They've been so long

22 now, for the last several decades, that the Courts have

23 established -- establish the methodologies for how to do it.

24 But there has also arisen some -- if I might call it this --

25 like, benchmark percentages.  So if a survey is done, it needs

ROUGH DRAFT

1    to have a certain level of confusion that is found to be

2    considered what we call appreciable.  And I want to talk about

3    that word for just a moment because well before surveys were

4    done, in the history of American trademark law, judges said

5    that if there's an appreciable --

6            MR. MCKENNA:  Objection, Your Honor.  Mr. Franklyn

7    is not an expert on the law.  He's allowed to testify as an

8    expert regarding surveys.  But if he's going to give us a

9    treatise in what cases are held about that, I believe that's

10   the judge's province for the jury.

11           MR. FINKELSON:  It's not our intention to have

12   Professor Franklyn testify on the law.  I don't believe he was

13   doing that, Your Honor.  He's speaking about what's

14   established in the field of survey research, which is, of

15   course, guided both by the research of academics, as well as

16   the case law principals that survey experts, like Professor

17   Franklyn, are bound to apply.

18           MR. MCKENNA:  The testimony he was giving was about

19   a benchmark derived from cases, Your Honor.

20           THE COURT:  The objection's noted.  It's overruled.

21   Go right ahead, sir.

22           THE WITNESS:  Well, the standard that has arisen --

23   well, is based on a verbal standard, and then it's become

24   translated in to kind of a number.  And the verbal standard is

25   whether an appreciable number, an appreciable number of

1  relevant consumers are likely to confuse as to the source,

2  manufacturing source, sponsorship, entity, affiliation by the

3  trademark owner -- I should say sponsorship by the trademark

4  owner, or approval by the trademark owner of the merchandise

5  that is being sold that bears its trademarks.

6        And so the question, then, for survey experts

7  becomes what is an appreciable amount or level of consumer

8  confusion.  And it means, as best as I can tell, more than

9  trivial, but less than substantial.  And by that, what I mean

10  is, in order to show a meaningful level of consumer confusion,

11  it is not necessary that 100 percent of the people who buy

12  Vintage Brand's products think they were made or licensed or

13  are affiliated with Penn State University.  That's not

14  necessary.  It's neither necessary to prove or to show in a

15  survey that a majority of people are confused.

16        Rather, just that an appreciable number are

17  confused.

18        So that in that sense, that's the standard.  And

19  when it comes to surveys, if the survey is done, to try to

20  interpret that, with appreciable -- the social science

21  literature, primarily the case law, actually, has settled on a

22  number of about 15 percent, which might sound low, but about

23  15 percent.  Some cases go even lower.  I testified a few

24  weeks ago in a court in Indiana where I had found only 11

25  percent of people were confused, and yet the judge said that's

ROUGH DRAFT

1    enough to go to the jury.  And so it's a little bit -- if you

2    will, mushy around the edges, it could be a little bit lower

3    than 15 percent, a little bit higher, but that's the

4    benchmark.  That's what we're looking for.

5    BY MR. FINKELSON:

6    Q.    And let me ask you this, Professor Franklyn.  Does --

7    why does confusion matter in case like this?

8    A.    That's a good question.  I think it can be counter

9    intuitive sometimes to lay people, for jurors, where were we

10   even talking about confusion if we're talking about so-called

11   knockoffs and, you know, other issues.  And I deal with this

12   all the time when I teach this class to new law students.

13   Like why -- why are we talking about confusion.  And the

14   reason we're talking about confusion is because -- I don't

15   want to draw an objection, built it's because the law has said

16   that in order for there to be infringement, an appreciable

17   level of people must be confused about the source or approving

18   agency or entity or sponsoring entity behind the accused

19   goods.  And -- and if there isn't consumer confusion, there

20   isn't really a risk of harm, harm to whom, one might say?  And

21   harm to two different entities or two different groups of

22   people.  What we're concerned about is whether consumers who

23   buy the merchandise in question here, Vintage Brand, whether

24   they would be harmed if they think Penn State made these

25   goods, licensed these goods, stands behind these goods, and

1   buy them, in part, on that false belief because Penn State

2   didn't do any of those things.  I don't think that's in

3   dispute in this case, then consumers are being, at least some

4   of them, misled, and the law speaks to create a branding

5   environment, if you will, in the United States, that's very

6   clearly branded.  So people know what they're buying, who

7   stands behind it, who they can complain to if they don't like

8   it, have trust in it, that it was made consistent with things

9   like fire retardation laws and isn't going to fall apart at

10  the seems in a clothing case like this, and then they make an

11  informed decision about whether they want to buy it based on

12  proper impressions and assumptions and information about

13  that--  those products.

14         So we call this the consumer protection rationale

15  and since we're -- we're concerned about protecting consumers,

16  we do consumer confusion surveys to make sure that consumers

17  are not buying merchandise with a -- either muddy mind about

18  it, about who stands behind it or false impressions about it.

19         And the other purpose for doing this is related to

20  the brand owner.  Because if many consumers are not --

21         MR. MCKENNA:  Objection, Your Honor.  This is now a

22  treatise about trademark's purposes.  It does not -- it does

23  not have anything to do with this survey.  He's now trying to

24  teach the jury about trademark laws purposes, and that's the

25  Court's purpose of the instructions that the Court will give

1    the jury, Your Honor.

2            MR. FINKELSON:  Your Honor, the witness is not

3    instructing the jury.  The witness is trying to explain to the

4    jury, which surely has questions about why we're talking about

5    confusion in a case like this.  He's trying to explain to the

6    jury why confusion is relevant and -- and talking about the

7    groups of -- of people, both consumers and brand owners to

8    which that's directed.

9            THE COURT:  Objection's noted.  It's overruled.  Go

10   ahead.

11   BY MR. FINKELSON:

12   Q.   Please proceed, Professor Franklyn.

13   A.   So the second rationale -- the first one is to protect

14   consumers from false impressions.  The second rationale is to

15   protect the brand owners, such as Penn State, because in a

16   system like ours, a capitalist system, we care about whether

17   the entity that invested to create value in its brand reaps

18   the reward of that value, and they won't or possibly won't

19   reap the reward of the value much their investment or brand if

20   consumers are confused about who made or sponsored or stand

21   behind -- stands behind the merchandise.

22           And so in that sense, the consumer confusion issue

23   and the consumer confusion survey serves as way to protect the

24   brand owner against knockoffs, against infringement.

25   Q.   Thank you, sir.  And we're going to get in to the details

1    of your survey and the numbers in a moment.

2            First, can you pleads tell the jury, at a high

3    level, what conclusions you reached based on the consumer

4    confusion study that you conducted in this case?

5    A.   Yes.  I reached the conclusion, and it is my opinion that

6    there is a substantial risk of consumer confusion in this

7    case.  Even though I'm only looking or was only looking to see

8    if there was a so-called appreciable risk, I found a

9    substantial risk.  I found that the levels of consumer

10   confusion exceeded that sort of minimal threshold, if you

11   will, or typical -- numerical interpretation of the word

12   appreciable -- appreciable, and I found there's a substantial

13   risk of consumer confusion, which I think I will have an

14   opportunity to explain more about.

15   Q.   And that substantial confusion, did you find that it

16   arose from the merchandise that Vintage Brand is selling, as

17   well as the Vintage Brand website?

18   A.   Yes.

19   Q.   All right.  With your permission, Professor Franklyn, I'd

20   like to now walk the jury in detail through your study and the

21   results that you found, but not if I press the wrong button.

22   Thank you, Mr. Burkhart.

23           Okay.  First, when did you conduct the survey, sir?

24   A.   I conducted it -- now it's two years ago.  It's hard to

25   believe, but law cases last a long time, and folks like me get

1   hired often earlier in the case well before it goes to trial.

2   And so I just wanted the jury to understand why the data was

3   collected two years ago.

4            I conducted -- I designed, fielded the surveys in

5   November of 20 22.

6   Q.    How many people participated or qualified to participate,

7   I should say in your survey?

8   A.    A total of 600 and 16 people participated in the survey.

9   Q.    Do you consider that to be a statistically significant

10  number, Professor Franklyn?

11  A.    I do.  We want to make sure that we talk to enough

12  people, such that we can draw generalizations from that

13  sample, we call it a sample.  Obviously we didn't talk to

14  everybody who has bought or might buy the type of merchandise

15  that Vintage Brands is selling.  But we need to collect a

16  sample that's large enough that we can extrapolate from, based

17  on statistical analysis and have a low enough margin of error

18  that we can be confident that if we were, for example, to

19  reconduct the survey, let's say 1,000 times, we could be at

20  least 95 percent confident that in 95 percent of those times,

21  we would get similar -- very, very similar results, as we got

22  this time.  And therefore, we can make generalizations that

23  are based on scientific principals about the level of

24  confusion.

25  Q.    Was your survey conducted in person or online?

ROUGH DRAFT

A.    It was conducted online.

Q.    And is that a well accepted practice in the survey field today?

A.    It is today.  It wasn't in the very beginning years of the Internet, like in 1999, or the commercial Internet, when it started to explode, because there was some reluctance to believe that an online survey was really verifiable, in terms of verifying the identities of the people who were purported to participate in the survey.

        But since then, third party companies have grown up in the United States, and there's actually quite a few of them, and they gained respect for providing panels of people who volunteer to take surveys, like this, but not just like this, about all kinds of things like market research, like should, you know, Schick razor company start selling more to women, and if so, how could they market.  And so these same companies that provide panels of survey takers to folks like me also provide them across the board in market research and market research is just done very substantially, not entirely, but very substantially online now, because of the existence of these kinds of companies, and so it's become not only acceptable, but by far, the dominant methodology of conducting -- for conducting this type of market research.

Q.    Are you familiar with the concept of a consumer study being double blind and was that true of the survey that you

conducted in this case?

A.    Yes.  In order to avoid bias, a survey should be double blind.  And what it means is that the people taking the survey don't know who is administering it.  Nor -- literally.  Like they don't -- they don't know the identity of the company that's administering it.  They don't know that it was commissioned by -- I'm sorry, by Penn State.  None of them knew that, who took the survey, and they don't know that -- for what purpose it's being done.  They don't know and they didn't know who I am or -- and that it was being commissioned by me.

        And similarly, although this might not be technically part of the definition of something being double blind, I think it's relevant.  I don't know who they are.  I don't know their names, the names of the people, the survey platform company provided them, knows their names.  They could be -- may be subpoenaed, it's information that could be found.  But I don't know the names of the people, so they're blind to me, in that sense.  I can't reach out to them, find them, bias them, and they don't know who commissioned the survey.

Q.    Can we please call up P.  44, Mr. Burkhart, and this can be published to the jury.  I won't move it in to evidence.  But it can be seen by the jury.  Professor Franklyn, do you recognize P.  44, and if so, can you tell the jury what it is, please?

1   A.   Yes.  It's the first page of a multi-page document that I

2   sometimes refer to as my survey script.  I prepare this with

3   the help of my team, and this lays out all of the questions

4   that we're going to ask survey takers in the survey.  And then

5   from this script, it gets turned in to the actual version of

6   the survey that the surveys takers will see.  So the survey

7   takers don't see this script.  This is an intermediate process

8   in the making of a survey.

9   Q.   And is the survey broken up essentially in to two

10  sections, a screening session and also a main questionnaire

11  that we'll look at?

12  A.   Yes.  The general practice here is to screen in people

13  who are relevant market participants in a relevant market.

14  And then after they pass the screening questions, they proceed

15  to what might be called a main questionnaire or the meat of

16  the survey.  And I think we'll get to that point.

17  Q.   Absolutely.  Thank you Mr. Burkhart.  Can you please call

18  up P.  45.

19          MR. FINKELSON:  Your Honor, I would move exhibit P.

20  45 in to evidence and ask that it be published to the jury,

21  please.

22          MR. MCKENNA:  No objection.

23          THE COURT:  Duly admitted.  You may publish.

24          THE WITNESS:  Is it possible there's a clearer

25  rendition of this or is this the best that we can do?

ROUGH DRAFT

```
 1              MR. FINKELSON:  I think this is the best that we
 2    can do.  But we've replicated to it on slides which we'll move
 3    to a second or two.
 4              THE WITNESS:  Okay.  Because I'm seeing it as
 5    fuzzy, and I hope the jury isn't seeing it as fuzzy.
 6              MR. FINKELSON:  Thank you, Professor Franklyn.
 7    BY MR. FINKELSON:
 8    Q.   Can you just tell the jury what exhibit P.  45 is?
 9    A.   These are screenshots of the questions and the way that
10    they appear to survey takers.  Not quite the way they appear.
11    Because here you see two questions in a row.  But we doesn't
12    do that in the way that it appeared to survey takers.  They
13    saw like a screen on their computer.  And it had one question
14    at a time.  And then they had to answer it, and then they had
15    to click next and they would move forward to the next screen
16    with the next question.  And they couldn't go backwards
17    because we don't want them to somehow maybe be influenced like
18    they're learning as they go through the survey and they think
19    oh, I want to answer a question differently.  And the reason
20    we do that is because we want to capture their first
21    impressions based on what we're asking them.
22              So this is not exactly how it appeared, but what
23    this is, technically, is what I attached to my expert report
24    when I filed it and sent it to the opposing Counsel in this
25    case, is an exhibit of the screenshots of the survey.
```

1  Q.   And have you put all of those screenshots on slides that

2  we're about to walk through for the jury in an easier and

3  perhaps to your comment, less blurry fashion?

4  A.   Yes, sir.

5  Q.   Can we have the slide back up, please, Mr. Burkhart.  So

6  we're going to go slide by slide so the jury can see exactly

7  what the survey takers saw and the questions they were asked.

8  So why don't we start at the beginning of the process,

9  Professor Franklyn, and tell the jury where you started and

10 what they're looking at on their screens.

11 A.   Okay.  So after the survey takers passed five or six

12 screener questions and were allowed in, by -- what I mean by

13 passed is, for example, we asked them what age they were.  And

14 --

15 Q.   I think we're going to get to those next.  I think those

16 are on the next slide, but go ahead, sir.

17 A.   Well I just wanted to give a sense to the jury.

18 Q.   Please.

19 A.   Generally of what a screener question is.  In case

20 they're wondering.  The screener -- so if we asked them are

21 you 18 or older, what is your age, we're not surveying people

22 who are 16, for example.  So if they were, they didn't get to

23 take the survey.  That.'s what we mean by screener question.

24          And then -- so -- but if they got to go to what we

25 call the meat of the survey or the main questionnaire, the

1    first thing they would see is this, which is sometimes called

2    a Captcha.  And the primary purpose of this type of question,

3    as I understand it, is to make sure that robots aren't taking

4    the survey.  And so they need to click I am not a robot.  And

5    if they do, then they click the box to the bottom right that

6    says next.  And they proceed to the next screen.

7    Q.    Thank you, sir.  Okay.  So what did you then ask your

8    survey takers as part of this screening process is that you've

9    described?

10   A.    Well, as I mentioned a minute ago, this is a screening

11   question.  I asked them their age.  Age under 18, they click

12   that, they couldn't take the survey.  If they click prefer not

13   to answer at the very bottom, they couldn't take the survey

14   because I couldn't tell, for example, if they were only 16, if

15   they said they preferred not to answer.

16          But as long as they clicked in one of these age

17   ranges, they could say the survey.

18   Q.    And then what did you ask them next, sir?

19   A.    Their gender.  Male or female, or prefer not to answer.

20   And as long as they clicked either male or female, they were

21   allowed to continue.  They could not click prefer not to

22   answer and continue.

23   Q.    And what did you ask them next?

24   A.    What state do you currently live in.  Here we were trying

25   to get a sense of whether our sample -- excuse me -- would be

1    roughly geographically disbursed throughout the United States.

2    Because it was our understanding that Vintage Brands, the

3    Defendant in this case, sells merchandise or offers to sell

4    merchandise for sale on the Internet that's available

5    throughout the United States, and so we wanted to see if we

6    were -- we were collecting data that is from various regions

7    in the country.  And that when they put -- when they clicked

8    on that little arrow next to please select, there was a drop

9    down bar.  Maybe some of you have seen these before.  And it

10   -- and in alphabetical order, from Arizona, all the way

11   through to, like, Wyoming, and they clicked what state they

12   lived in, and then they clicked next.

13   Q.   Thank you, Professor Franklyn.  What did you ask next to

14   your survey takes as part of the screening process?

15   A.   Well, I asked a question that was aimed to make sure, at

16   a minimum, that nobody taking this survey worked for Penn

17   State or Vintage Brands.  Because if they did, they might be

18   biased in some way, and it wasn't necessary to collect

19   information from folks like that.  And so we gave them various

20   answer choices.  I won't go through them all.  But, for

21   example, if a person said they work in higher education, which

22   is the second to the last item, that could be Penn State.  We

23   didn't want to say Penn State.  But it could be.  And so we

24   excluded them.  Similarly, we excluded people who said they

25   worked for a company that makes, manufacturers, or sells

1   apparel, because that could be somebody who works at or even

2   owns Vintage Brands.  And so we excluded them.  Those were the

3   two main things we were concerned with here.

4           Now, is custom and practice in a survey like this

5   to also exclude from customer survey people who work in market

6   research and in advertising on the theory that they may be

7   trying to game a survey like this based on their knowledge,

8   their sophistication with market research and we don't want

9   that.  We just want regular market participants.  And so if

10  they clicked in advertising or in market research, they were

11  excluded.

12          However, everybody else, unless they clicked none

13  of the above was able to proceed.

14  Q.   Let me ask you a question about the order of the

15  responses that are listed here on slide 11 in response to this

16  question.

17          Does the order in which the potential answers

18  appear stay the same or does it -- does it change?  And I ask

19  that both with respect to this question, as well as later

20  questions in your survey?

21  A.   No.  It wasn't always in this order.  This just happens

22  to be the order of the screenshots that we took.  But there's

23  a principal and a social science literature that says that

24  sometimes people who take surveys like this will just almost

25  knee jerk click on the first thing they see or be influenced

1  by the first thing they see.

2          And so we randomize the order of these answer

3  choices so that they didn't always see what you see here as

4  item No. 1, they saw one of these things as item No. 1, but

5  they were shuffled around statistically and randomized.

6  Q.    Let's turn to the next question you asked, which is about

7  purchasing behavior.  Why did you ask this question?

8  A.    I'm trying to figure out if people, who are taking the

9  survey are in the market for clothing, because the Defendant

10  is selling clothing, Vintage Brands, primarily.  And what's

11  used here is primarily Vintage Brands' clothing that bears

12  Penn State's registered, and I believe in the one instance,

13  unregistered trademark.  You can have an unregistered

14  trademark in the -- in the United States.  But Penn State was

15  doing that.  And so we wanted to make sure that people taking

16  the survey have either recently, in the recent past, or were

17  going in the near future purchase clothing.

18          Now we asked more refine questions as we go along.

19  But this is getting us in to are we talking to the right kind

20  of people.

21  Q.    And in this question, you're starting with whether the

22  survey takers had made such purchases within the -- the

23  preceding 12 months, correct?

24  A.    Right.  So we're looking for people here who clicked, at

25  least in this rendition of the order, item No. 3, clothing

1  apparel.

2  Q.   And as you noted, you then asked some follow-up questions

3  related to this, correct?

4  A.   Yes.

5  Q.   And are we looking at one of those follow-up questions

6  now?

7  A.   Yes.  And I'll just read this to the jury, if I might.

8  It says until the prior question, you mentioned that you have

9  purchased clothing/apparel.  So if in that prior question they

10 didn't click clothing/apparel, they didn't see this question.

11 But if they saw this question, they were asked.  You mentioned

12 you purchased clothing/apparel for yourself or other -- or for

13 others -- in the prior question, I think it said for others

14 within your household -- within the past 12 months.  Have you

15 purchased any of the following types of clothing/apparel.  And

16 here, you see item No. 1, our answer choice No. 1, is college

17 sports apparel.  Apparel featuring teams at the collegiate

18 level.  Again, here we're refining our inquiry to see how many

19 people have purchased a type of clothing that Vintage Brands

20 sells.

21 Q.   In the next question, you're asking within the past 12

22 months, have you purchased college sports apparel fee touring

23 any of the following universities, and you provide a list of

24 13 universities and a none of the above option.  Why did you

25 ask this question?

1   A.   Well, you know, I wanted to make sure that at least some

2   of the people taking the survey had purchased collegiate

3   sports apparel from universities that have sports programs,

4   and so we did some research on that.  And we came up with this

5   list of 13.  There's nothing magical about this list of 13.

6   It doesn't have to be this particular list.  But we wanted to

7   know, after we collected our sample, how people -- how people

8   are purchased, and if they had purchased from any of these

9   universities, and if you will notice, the third from the

10  bottom is Penn State University.  So we also wanted to collect

11  on that, in particular.  We didn't consider it necessary for

12  purposes of our survey that every single one of the 600 people

13  clicked that box and said they had purchased Penn State

14  university clothing or apparel.  And I don't think it's

15  necessary for the -- scientifically for the survey.  But I

16  wanted to know, and so we asked the question.

17  Q.   Was this also a quality control question, as related to

18  the question that came right before it?

19  A.   In a sense.  In a soft sense, and by quality control, as

20  I interpret that, if people said they had purchased clothing

21  and if people had said they had purchased collegiate sports

22  apparel, I wanted to say okay, can you name some colleges

23  whose sports apparel you have purchased, kind of just make

24  sure they're not making it up.

25  Q.   Turning to your next question, what did you ask the

1  survey participants next?

2  A.   This is now going to be almost identical to the three or

3  four slides that the jury has just seen, except, and I would

4  note for their attention, that it focuses the survey taker on

5  the future, not the past.  The series of questions that we

6  just saw leading up to this focused on the past, like the last

7  12 months, have you done the following.

8       Here, we're saying in the next 12 months, which of

9  the following are you likely to purchase for yourself or

10  others in your household.  Select all that apply.  So they

11  could select all of these, if they wanted.  But we were

12  looking for people, again, who indicated an inclination that

13  in the next 12 months, they would be in the market for

14  clothing.

15  Q.   And then I think as you noted, did you then ask them the

16  same next two questions that you had asked previously about

17  their preceding purchasing behavior?

18  A.   Yes.  Somebody's skipping along kind of fast here on the

19  slides.

20       We asked them in the next 12 months, they were

21  going to purchase these three types of clothing, collegiate,

22  celebrity or professional sports apparel, and again, collect

23  data on this.

24  Q.   And then the same slide we looked at?

25  A.   Yeah.  Again, looking forward in the next 12 months, are

1   you likely to purchase apparel featuring any of the following

2   universities, same 13 universities.  Here you see Penn State

3   much higher on the list.  And I think this is a nice

4   illustration of how these items were randomized.  This is just

5   a screenshot from the survey of when it was random --

6   randomized, that -- let me see -- yeah.  Penn State University

7   was item No. 4 instead of, like, 11.

8   Q.   What did you next ask your survey takers to do as -- as

9   part of the screening process?

10  A.   Yes.  I am concerned that when people take the survey,

11  they're at least reasonably engaged with the survey and not --

12  that they're paying attention, that their mind isn't wondering

13  and -- too badly.  All of our minds wonder somewhat,

14  especially when you're listening to a boring survey expert

15  like me testify.  But we want them to be engaged.  And this is

16  a quality assurance question.  I also think of it as kind of

17  an engagement test, and we're asking them to type the word

18  west.  So now they don't have to just -- they don't just click

19  a circle.  They have to do something, which means they really

20  need to read this to make sure they do what they're asked to

21  do.  and that -- it signals that they're engaging, they're

22  reading, they're paying attention.

23          And please type the word west in the blank next to

24  the other box to continue.  And so we're looking for people to

25  type in to that box next to other the word west.

ROUGH DRAFT

1   Q.   And if they don't do that, and instead, press agree or

2   strongly agree, what happens?

3   A.   They're kicked out of the survey.  They don't get to keep

4   going.  It's -- and we don't include them and their answers in

5   our final database.

6   Q.   Is the jury now looking at the last page of the screening

7   portion of your study and if so, can you explain to them what

8   you asked at this point?

9   A.   Yes.  At this point in the survey, we're now ready to ask

10  sort of the, you know, the central questions about whether

11  they think Penn State is the maker of Vintage Brands'

12  merchandise, has sponsored it, is affiliated with it, has

13  approved it or has licensed it.

14          But before I get into that, I always do this.  And

15  I think I always do it in exactly this wording.  And I give

16  them instructions.  And they have to agree to follow these

17  instructions.  And if they don't agree to follow these

18  instructions, they can't go on.  And the instructions are very

19  important to me.  And so I -- if, with your permission, I'll

20  read them.

21  Q.   Please.

22  A.   The first one is please take the survey in one session

23  without interpretation.  The second is please keep your

24  browser -- excuse me.  Maximized for the entire survey.

25  Because we're going to be showing them pictures and we want to

1    make sure they can see them.  While taking the survey, please

2    do not consult any other websites -- don't get on your iphone

3    as it were and try to learn things about the questions we're

4    asking you.  Please answer all the questions on your own

5    without talking to anybody else, like your husband, your wife,

6    your best friend.  We want -- we want their answers.  Please

7    do not guess.  If you don't know for any question, please

8    indicate so.  And we gave them a chance to indicate that they

9    don't know.  If you normally wear eyeglasses, this might seem

10   silly -- silly or trivial, but it happens.  If you don't norm

11   -- if you normally wear eyeglasses or contact lenses when

12   viewing a computer screen, please wear them for the survey.

13   And then as I mentioned, they had to say I understand and

14   agree to the above instructions.  And I think of this as a

15   mini contract between me -- allthough they don't know who I

16   am, and them.  And they're going to follow these instructions

17   and therefore we're going to get as unbiased results as we can

18   under the circumstances.

19   Q.    Thank you, sir.  Did you prepare a slide summarizing the

20   various screening criteria that we've talked about, and

21   perhaps others, as well, and if so, can you just summarize for

22   the jury the screening thresholds that everybody needed to

23   meet in order to then go on and answer the meat and potatoes

24   of the survey?

25   A.    Sure.  I don't want to be repetitive and I think the jury

1    has probably absorbed what I have said.  But over the age of

2    18, purchased the relevant kind of merchandise, did not work

3    in higher education or selling apparel or market research,

4    passed the Captcha quality control test and agreed to follow

5    the instructions, and then there's a sixth one that we haven't

6    talked about at all, which is that they completed the survey

7    in a quote/unquote, reasonable time.

8            It is customary in a survey like this to not

9    include in a final data set what we call speeders, people who

10   speed through the survey, and -- in a nonengaged way, too

11   fast, and so what I do is I have my staff, usually two or

12   three people on it, take the survey and take it as fast as

13   they can, but still engaging with the survey, thinking,

14   reading every word, and then we -- we kind of time that.  And

15   we come up with what we call a speed threshold.  And if

16   somebody's below that, we don't count them.

17   Q.   Now you mentioned that there were 600 and 16 individuals

18   that passed your screening and qualified for your survey.

19   What did you do next with those individuals?

20   A.   Okay.  So for the people now who have passed and are

21   going to take the survey, we divided them in to three groups.

22   And this slide illustrates how we did that.  There's -- there

23   was a group of -- it's roughly 200 people, so you take 600.

24   You divide it by 3, you get 200 in each cell.  Is's not

25   exactly that.  But that's what we were aiming for.  The reason

**ROUGH DRAFT**

1  why is it's not exactly that is because it's an online survey,

2  as we're getting closer and closer, sometimes the survey

3  platform has to shut down the survey, and so it gets as close

4  as they can to what we ask them to do, which is 200 per cell.

5  And we divided or piped these people into three groups.  One

6  group was called test cell 1, one was test cell 2, one was the

7  control cell.  And I think you and I will talk in a few

8  moments about what a control cell is, and what a test cell is.

9  I think we're going to wait on that?

10  Q.   No.  Why don't we go ahead and do that because this is

11  the jury's first orientation to how a study like this is -- is

12  constructed, so for starters, can you tell the jury what a

13  test cell is in a consumer survey like the one you conducted?

14  A.   Yes.  A test -- now here we have two test cells, which

15  isn't what we always have.  We always have at least one test

16  cell.  But here we had two test cells because the people in

17  test cell one and the people -- well first of all, what's the

18  difference between a test cell and the control cell.  A test

19  cell will show everybody in the test cell of a survey of this

20  type at least one picture of a article of clothing

21  manufactured under the authority of Vintage Brands, but

22  without permission from Penn State that has Penn State's

23  trademarks on it, and then we'll ask them a series of

24  questions about that picture.  And so in test cell 1, they saw

25  one t-shirt that is a Penn State branded Vintage Brands sold

1   t-shirt.  In test cell 2, they saw a different Vintage Brands

2   sold, but Penn State branded T.  Shirt.  Other than that,

3   exactly the same questions.  You know, exactly the same

4   screening criteria.  The only difference between test cell 1

5   and test cell 2 was the exact piece of clothing sold by

6   Vintage Brands that we showed them.

7           Now in the control cell, we did something a little

8   different.  We picked a piece of merchandise that does not

9   bear anywhere on it a trademark or logo of Penn State

10  university or reference to Penn State university, and the

11  verbiage around the piece of clothing to see if anybody in the

12  control cell still says when we ask them, do you think this is

13  affiliated with anybody else?  And if they say Penn State,

14  there's no reason they should say that.  There's nothing

15  that's prompting them, logically, to say that.  And so we call

16  that noise or we call that evidence of pure guessing.  And

17  then we come up with a percentage of people in the control

18  cell who did that.  And in an abundance of caution, we

19  subtract that level of, if you will, confusion from the

20  control cell from the confusion that we found in the two test

21  cells to come up with the -- what might they call the net or

22  the reportable level of consumer confusion.  And so I think we

23  will show people here the pictures.

24          But the picture that people saw in the control cell

25  was a piece of Vintage Brands merchandise that had no Penn

1  State logos or trademarks on it.

2  Q.    So the folks who are in the test cells here you had two

3  of them.   They see the Vintage Brands merchandise that is

4  accused of infringement in this case, right?

5  A.    Yes.

6  Q.    And the folks who were in the control cell, in your

7  survey, they don't, correct?

8  A.    Correct.

9  Q.    And I think I did the math.   So in total, you had 300 92

10 people across your two test cells; is that right?

11 A.    Yes.

12 Q.    And then 200 and 24 people in your control group?

13 A.    Yes.

14 Q.    Is there a name in the scientific literature for the type

15 of survey -- specific type of survey that you conducted here?

16 A.    Yes.   The name actually probably doesn't come from the

17 scientific literature, as was alluded to a little bit earlier

18 in this direct examination, as a survey expert, I am bound to

19 adhere to two different sources of authority on proper

20 methodology.   One is the social science literature, which says

21 things like don't ask biasing questions, don't ask leading

22 questions.   Don't do other things that are considered to be

23 improper in a survey like this.

24       But because these surveys are used in a legal

25 context, just like this, Courts have developed their own rules

1    about what can be done and their own names for different types

2    of, if you will, ordained or blessed or appropriate types of

3    survey methodologies.

4            This type of survey has been named the Ever ready

5    survey because if my memory serves me correctly, it was a

6    version of it was first done and accepted by a court in a case

7    involving the Ever ready battery.  And so that's where it gets

8    its name, and it's been considered to be a very, generally

9    speaking, sound and reliable method for testing confusion in

10   certain types of trademark cases.

11   Q.   Have you conducted Ever ready surveys before this case?

12   A.   Many, many, many.  I'm doing many right now.

13   Q.   In the -- in the survey like the one you conducted, why

14   not just show all qualified participants a side by side of

15   Defendants' merchandise and an authorized Penn State

16   merchandise?

17   A.   What I think what you mean by that is if -- we could do

18   that, and in other types of cases we do do that, and that type

19   of survey, what we call a side by side comparison survey is --

20   has gotten its own name, based on its own case where it was

21   blest by a court, and that's called a Squirt survey.  I think

22   it had to do with the soda pop Squirt.  And in that kind of

23   survey, you might show okay, here's a Vintage Brand version of

24   Penn State branded merchandise.  Here's an authentic version

25   of it that it's been authorized by Penn State.  And then ask

1    them the questions.

2            The problem with doing a survey like that in this

3    case is that people, in the real world, might not see Vintage

4    Brand merchandise right next to -- either online or off line,

5    sold, offered for sale, right next to each other.  And so in

6    -- given that, what we try to do is -- in this type of survey,

7    is just show them the allegedly infringing merchandise.  Here,

8    Vintage Brands's merchandise that that bears the Penn State

9    logo and trademarks on it and name.  And then ask them the

10   question.

11           So as not to prompt them or prejudice them in to

12   saying Penn State.

13           And that's why this type of survey is different

14   than a side by side survey.

15   Q.   Professor Franklyn, you may be able to press a clear

16   button on your monitor that will clear the --

17   A.   The lines I actually draw --

18   Q.   You can't draw them again unless -- unless they're

19   cleared.

20   A.   You didn't tell me that if I touched the screen --

21   Q.   I didn't tell you had a toy.

22   A.   Did somebody just clear it for me?

23           COURTROOM DEPUTY:  I did.

24           THE WITNESS:  Thank you.

25   BY MR. FINKELSON:

1  Q.   Let's show the jury the actual images, Professor Franklyn

2  that you showed the survey takers, starting with the one on

3  the screen now.

4            Can you tell the jury, first of all, is this the

5  image that you showed to your test cell one?

6  A.   Yes.  Test cell one, which remember, these are the people

7  who are going to see at least one version of the accused

8  merchandise sold by Vintage Brand.  This is a gray t-shirt

9  which like.  Would you like me to elaborate what's on it.

10  Q.   I would, please, Professor.

11  A.   So on this t-shirt, there is a picture of what Penn State

12  has called, over the years, their Nittany Lion logo or their

13  Nittany Lion trademark.  The Lion is sitting on what appears

14  to be a rock.  Underneath the rock is the word Nittany, and

15  superimposed on the rock is a seal, and on the seal, it says

16  Penn State university.

17            So I believe it is actually the seal, the official

18  formal seal and trademark of Penn State university.  And so

19  this is what we showed them in test cell 1.

20  Q.   And have you heard this logo of the Lion that's sitting

21  on the rock referred to as the Nittany Lion shrine trademark?

22  A.   I have.  Yes.

23  Q.   And then you referred to the University seal, and you

24  understand that this is a t-shirt that was sold by Vintage

25  Brand on its website; is that right, Mr. Franklyn?

ROUGH DRAFT

50

A.   It is.  This is an exact replica of the website at the

time or shortly before the time that I conducted my survey.

This is what we might call the product page.  So for example,

if somebody typed in to Google Vintage Brand, Penn State

athletic ware or something like that, they would have seen at

the top of the Google results, search results a bunch of

different merchandise, and if they clicked on this one, they

would have been taken right to this page, not to the landing

page, if you will, or the home page of Vintage Brands.  They

would have been taken here.  And this is what they would have

seen right before they decided to buy it, if they decided to

buy it.

        And I would note a few things about it.

Q.   Please.

A.   One which is in the top left corner, you see the V.

Which is the logo of Vintage Brands, which they either have or

are trying to get trademarked at the US trademark office.  You

also see their name, Vintage Brand.  And then over to your

right -- well, first -- I'm sorry.  Right above the t-shirt,

it's faint on this version of the screenshot, but it says Penn

State Nittany Lions.  And that's -- we didn't put that in

there.  That's what Vintage Brand put in there.  And then on

the right it says 1950, Penn State Nittany men's premium blend

ring spun t-shirt.

        And I believe they put the number in there, 1950

 1    bays part of their brand, Vintage Brands is to offer what they

 2    consider Vintage versions or long lasting versions of -- of

 3    merchandise, sports -- college sports merchandise.

 4            And so they apparently associated with 19 50.  I'm

 5    not sure that's actually the first time this ever appeared,

 6    but that's what they say.  And then they have the price and

 7    some other relevant information about the merchandise.  And

 8    then you see the green bar, which says add to cart.  So if

 9    they click on that, they add it to the cart, they go to

10    checkout.

11    Q.   If you look under the 19 50 Penn State Nittany Lions

12    men's premium blend ring spun t-shirt language, Professor

13    Franklyn, what appears under that on the image that you showed

14    to your survey takers?

15    A.   Yes.  It's very hard to read, and I say that on purpose.

16    But it's also a fact.  But what it says is buy Vintage Brand,

17    and after that, they have a T.M.  T.M.  Usually means they

18    haven't it registered yet, but they're trying to get it

19    registered, and they're claiming what's called common law

20    rights in it, that they're claiming that it's their trademark,

21    the name of their company, they want everyone to know that, so

22    they put the T.M.  And then they put next to there, -- this is

23    very hard for me to read, counselor, I must say.  Oops.  I did

24    it again.

25    Q.   Can you zoom it?

1   A.   It says not affiliated with or sponsored by Penn State

2   Nittany Lions, which is interesting phraseology.  It doesn't

3   say simply not affiliated with or sponsored by Penn State.  It

4   says not affiliated with or sponsored by Nittany Lions.

5   Q.   Let me ask you this.  Why did you include that language

6   on the test image that you showed to the consumers who took

7   your survey?

8   A.   Because on the test cell, at least, it would have been

9   inappropriate for me to take it off.  This is, as I understand

10  it, an attempt by Vintage Brands to tell consumers that

11  they're not affiliated with or sponsored by Penn State because

12  they know if they create the impression that they are, that

13  they're liable.  And they're here trying to tell people that

14  they're not.  And so I thought well okay, let's show it to

15  survey takers.  See if they notice it, see if they absorb it,

16  see if they understand what it means.

17          But not hide it.  And so it was put on there.  And

18  I would also add, counselor, we told people in the survey that

19  they could blow up the images just the way you did, if they

20  couldn't read something.  And so in the language of the law,

21  this is sometimes referred to as a disclaimer.  A disclaimer

22  of association or affiliation or a sponsorship.

23          And we see these with some frequency.  But not

24  always.

25  Q.   Can we turn to -- thanks.  Let's show the jury the image

1  and the website content that you showed to the folks who were

2  in your test cell 2, Professor Franklyn.  Is that a blue

3  t-shirt with the Penn State S lion on it?

4  A.    Yes,  it is.  My understanding is that Penn State refers

5  to this particular logo as their S lion logo and trademark.

6  It says on it Penn State.  It's got the Lion here in the

7  middle.  It is blue instead of gray.  And although we asked

8  survey respondents exactly the same questions about this that

9  we asked about the gray one, I would note a few things that

10  are different -- similar and different about this image.

11  Q.    Let me ask you first, and then want to get to that.  Does

12  this image, like the image you used in test cell 1 came

13  straight off Vintage Brand's website?

14  A.    Yes.  It was -- it was a screenshot taken at or around

15  the time that -- or before that I conducted my survey.  And it

16  is what we call the product page that people see right before

17  they make their purchases, if they're going to make one.

18  Q.    And could consumers get to the product page that is shown

19  in your test cell 2 in much the same way that you described a

20  minute ago for your test cell 1?

21  A.    Yes.  Just to reiterate.  By typing in to Google a

22  relevant inquire inquiry term, getting an image and Google

23  search results with this shirt, actually this exact shirt in a

24  box, like in a ribbon, I assume the jury has seen this before

25  when they've been doing Google searches, sometimes this is

1    called the Google shopping part of the page, even though

2    there's a Google shopping tab, Google also refers to this

3    ribbon at the top as Google shopping.  And then if somebody

4    were to click on this particular shirt, they would be taken

5    right to this page from Google.  So step one is the inquiry.

6    Step two is see egg the results.  And step three is clicking

7    on this.  And step four is seeing this, the product page.

8    Step five, is the check out.

9    Q.    Thank you, Professor Franklyn.  You wanted to walk

10   through a couple of the elements that are on this test cell 2

11   image.

12   A.    I did.  Again, we see at the top left hand corner the

13   logo and name of Vintage Brand right next to each other.

14   Again, we see directly above the t-shirt, although it's in

15   light gray and somewhat faint font the words Penn State

16   Nittany Lions.  And on the right, we see somewhat similar

17   verbiage as we saw next to the gray one, but actually, we see

18   somewhat different verbiage, as well.  Here we see 19 50 Penn

19   State Nittany Lions icon in this case -- and there's an R.

20   And a circle.  And I don't know why they put that there, to be

21   honest with you, because that's certainly not a registered

22   trademark of Vintage Brands.  But they put an R.  In a sickle

23   next to that, and then they put the size, and then underneath

24   is the same language we saw before.  Although it's in the

25   smallest print, font size of anything on the page.  And it

1    says by Vintage Brands, not affiliated with or sponsored by

2    Penn State Nittany Lions.

3        And then underneath that is a longer description of

4    the product, and I note that only because I noticed that the

5    words Penn State occurred multiple times on this version, and

6    that's one of the reasons why I tested two different t-shirts

7    and not just one.  Because sometimes Vintage Brands included a

8    description of Penn State products like this, and sometimes

9    they included the shorter description like the one we saw on

10   the gray t-shirt.

11       So in this version of Vintage Brands sales

12   materials, they say, for example, in -- on the first two

13   lines, the Nittany Lion is the mascot of the Penn State

14   Nittany Lions, the athletic teams of the Pennsylvania state

15   university located in University Park, Pennsylvania, USA.

16       And then they go on with some more sentences, and

17   here, again, they say after that, the mascot was the creation

18   of Penn State Senior H.G. -- I guess that means senior in

19   college -- H.D. Joe Mason in 1907.  While on a 1904 trip to

20   Princeton, Mason had been embarrassed that Penn State did not

21   have a mascot.  Mason did not let that deter him.  He

22   fabricated the Nittany Lion on the spot and proclaimed that it

23   would easily defeat the Princeton Bengal Tiger.  The lions

24   primary means of attack against the Tiger would be its strong

25   right arm capable of slaying any foes, and then they refer

56

```
 1   again to the Nittany Lions and then in the final line, again

 2   they use the words Pennsylvania.  When they say a creature

 3   that roams Central Pennsylvania until the 1880s.

 4            And what I thought notable about this was how many

 5   times they said Penn State or Penn State University, which I

 6   wanted to see if that had any effect on whether consumers

 7   thought that Penn State approved of this or sponsored it.

 8   Q.   Thank you, Professor Franklyn.  So we've looked at the

 9   two test cell images that you tested.

10            Are you aware, Professor Franklyn, that there is

11   other Penn State-branded merchandise and apparel sold by

12   advantage that is at issue in this case beyond just the two

13   items that you specifically tested?

14   A.   Yes.  I understand that there's actually quite a bit of

15   other Penn State branded merchandise and I think that the jury

16   will see a much larger collection of it during the course of

17   this trial.

18   Q.   And did your survey allow you to draw conclusion about

19   those other items as well, and if so, why?

20   A.   Yes,  it did.  And the reason why is because in every --

21   or virtually every instance in which Vintage Brand sold Penn

22   State branded merchandise, they used a layout that was

23   identical or highly similar to one of these two layouts that I

24   tested.  And also, they included either the word -- words Penn

25   State or Penn State university or one of its other registered
```

1    trademarks like the Nittany Lion on that merchandise.  And so

2    in that sense, in my opinion, these two specimens were

3    representative of the group enough that I could draw,

4    extrapolate conclusions about confusion across the board.

5    Q.   So you've shown the jury the two pieces of merchandise

6    that you tested in your test cells.  Let's talk to the jury

7    about the merchandise and web page that you used for purposes

8    of your control.

9            So -- because the slides don't go in to the record,

10   Professor Franklyn, if you could just describe for the record

11   and more importantly, for the jury, what you used as your

12   control cell image?

13   A.   Yes.  The 200 or so people who were in the control cell,

14   the control group saw this, what the jury seize right now.

15   And this is actually a t-shirt sold or -- which has been sold

16   by Vintage Brand.  And I thought it would make a good control

17   because the purpose of the control is to see if people are

18   guessing and therefore, what the guessing rate is in a survey

19   of this type which we might call noise.  And so again, you see

20   Vintage Brands at the top left.  You don't see over this

21   t-shirt any reference to Penn State university Nittany Lions.

22   You don't see any reference to Penn State at all on this

23   image.  You don't see the so-called disclaimer of association

24   or affiliation with Penn State because for this merchandise,

25   it's irrelevant.

ROUGH DRAFT

58

1          And if I had included it, it might have prompted

2     some people to think that there was some association of Penn

3     State, and again, we don't want to do that for the control.

4     We want to see if people are guessing based on no reason,

5     based on what they're looking at.

6          And so, otherwise, we follow the basic layout of

7     the page that -- that they always used, and I think this is a

8     screenshot of the page -- the product page for this particular

9     product, Vintage Brands.

10          And so here, people say Penn State made this, is

11     affiliated with it, sponsored or approved it, they're not only

12     wrong, but there's no basis for them to be saying it.  And I

13     get a measure of guessing, like irrational guessing that I can

14     then use to subtract from the confusion I found in the control

15     cell to be cautious about the rate of confusion.

16     Q.   You take the amount of confusion that you got in your

17     control cell and you subtract it from what you found in your

18     test cells to be conservative about the results?

19     A.    Yes.  And it is -- it is advisable, based on -- in the

20     social science literature.  This is where the social science

21     literature teaches us how to -- one way to measure for

22     guessing.  And -- and then -- measure the guessing in a

23     separate cell, with a separate group of people, and then

24     generalize that it probably is the amount of guessing that

25     occurred in the test cell, and subtract it.

```
 1   Q.    Super.  All right.

 2          Well let's now shift gears, now that the jury has

 3   seen the images that you tested and talk about the questions

 4   that you asked the survey takers about these images, and we'll

 5   start with test cell one and just to reorient to the jury,

 6   these are the folks, right, Professor Franklyn, who saw the

 7   gray Vintage Brand t-shirt with the Nittany Lion shrine and

 8   the University seal trademark on it; is that right?

 9   A.    Right.  Roughly 200 people who saw this particular image,

10   I think I'm going to now be reporting on what they said.

11   Q.    So for the folks who were in your test cell who saw this

12   image, what was the very first thing you asked them at this

13   point in the survey?

14   A.    I think you have the wrong slide.

15   Q.    Okay.

16   A.    Oh, I'm sorry.

17   Q.    You're asking me what did I ask them or what did I find?

18   A.    I'm asking you what you asked them.  So I want to walk

19   through the questions.

20   Q.    Oh, I'm sorry.  I misunderstood your question.  I

21   apologize.

22   Q.    No.  No problem.

23   A.    Yes.  Yes.

24   Q.    So I'm asking you to start walking the jury through,

25   which I think we'll do on a slide by slide bases the questions
```

**ROUGH DRAFT**

```
 1   that you asked the survey takers in your test cell one.  Can
 2   you explain to the jury what you asked first?
 3   A.   The first thing I asked survey takers was whether they
 4   can -- whether they able to view the image.  Because if, for
 5   whatever reason, they couldn't view it, their data isn't going
 6   to be helpful to me, because the questions are based on their
 7   ability to view the image.  So if they clicked I view --
 8   viewed the image clearly, they will were allowed to continue.
 9   If they said I was not -- I was unable to view image clearly,
10   they didn't get the next questions, the next series of
11   questions.
12   Q.   And for those who could view it clearly, what did you
13   then ask the survey takers?
14   A.   I asked them the first four confusion questions.  And the
15   first question is what company makes or puts out this product.
16            And then, instead of this being a multiple choice
17   style question, which is sometimes called a closed end he had
18   question, because there's no -- no opportunity to type in your
19   own thoughts or words, this is an open ended question.  And
20   there was a box.  And they could type in their answer.  They
21   could say Penn State, they could say the University, they
22   could say Vintage Brands, they could say I don't know.  They
23   could say Baylor if they wanted to.
24   Q.   Let me ask you, why do you ask this question, what
25   company makes or puts out this product?  Why is that a
```

1  relevant question?

2  A.   Well, again, this is because the law tells us it's a

3  relevant question.  That if people are confused about who

4  makes or puts out the product, then that's the kind of

5  confusion that has to be accounted, along with other types of

6  confusion that are identified in the law as being relevant to

7  the inquiry.  And so that's why I asked it.

8  Q.   And how would you know if there was confusion based on

9  the answer that the survey taker filled in to the box?  What

10 response would be indicative of that?

11 A.   Well first and foremost, I would note that they were

12 confused if they typed in Penn State or Penn State university.

13 And so I, and my team looked at all their answers and counted

14 up how many people said in this box, Penn State makes it or

15 puts it out.  Or I also counted if they said the University.

16 Because in my opinion, the only university referenced here on

17 the picture is Penn State, and it's logical, in my opinion, to

18 conclude that if they said the University, they were referring

19 to Penn State university.

20 Q.   And why would that reflect confusion?

21 A.   Well because Penn State didn't make it.

22         Now we might say -- and I will say this to the

23 jury.  Because confusion is a funny word.  It might mean

24 they're mistaken.  They are mistaken, because Penn State

25 didn't make T.  But trademark law says mistake is also a no,

1    no, creating a mistake.

2         Confusion is I'm not sure, but I wonder -- I think

3    may be Penn State made it.  It's kind of a more mottled mental

4    state.  And -- but if they said Penn State or the University,

5    and Penn State didn't make it or put this product out, then

6    that is taken as evidence that they are confused about the or

7    engine of this product.

8         If they said Vintage Brands, you know, Vintage

9    Brands did make this product.  Or at least it hired another

10   company to make it without Penn State's permission.  And they

11   -- and they did put it out.  So I didn't count it as

12   confusion.  I counted it as perceiving the situation the way

13   it is.

14   Q.   And after survey takers filled in the box about what

15   company makes or puts out this product, what did you then ask

16   them?

17   A.   Why do you say that?  Again, it's an open ended question.

18   And here, I'm trying to see if they're tying their answer to

19   the Penn State trademarks and logos, or references to Penn

20   State in the rest of the product page.

21   Q.   What question did you next ask your survey takers in test

22   cell one?

23   A.    I asked them next do you believe this product -- so I

24   showed them the picture each time I asked them the question.

25   That's why it's reproduced here on the screen in the way the

1  survey taker would have seen it.  So they could look at it

2  again and it's not a memory test.  It's an interpretation

3  test.

4          And I say do you believe this product is not

5  sponsored or approved by any other company.  Here I don't say

6  which company or Penn State.  Just do you believe this product

7  is not sponsored or approved by any other company or

8  institution.  Is sponsored or approved by another company or

9  institution or I don't know.  If think said they believe it is

10  sponsored or approved by another company, they get a follow-up

11  question and this line of questioning.  If they click it is

12  not sponsored or approved by any other company, then you ask

13  them which company and why did they say that.

14  Q.   And why is sponsorship or approval relevant to this

15  exercise?

16  A.   Because the federal trademark act says it is, that's

17  infringement if there is confusion as to manufacturing source,

18  sponsoring source, or approval source of the product, or

19  affiliation source with the product.  And so I am here

20  tracking the language and concepts from the federal trademark

21  act of what it says are the relevant types of confusion, and

22  and it put them into the survey.

23  Q.   And then I think you indicated if a respondents checked

24  the box that says it is sponsored or approved by another

25  company or institution, they then got a next question, and

1   what was that question, sir?

2   A.    It's reproduced here.  What other company do you believe

3   sponsored or approved this product.

4   Q.    And were surveys takers given an opportunity to provide a

5   written response to that, and what did do you with that

6   information?

7   A.    They were.  And here, again, similar to the preceding

8   question of this type in this survey, I'm looking for the

9   answer as evidence of potential confusion, Penn State, Penn

10  State university, or the university to see if they are

11  mistaken or confused about who, if anybody, sponsored or

12  approved this product.

13  Q.    And why would an answer saying Penn State in response to

14  this question indicate confusion?

15  A.    Because Penn State didn't sponsor this product.  Penn

16  State did not approve of this product.  And if somebody thinks

17  it did, then they think -- they're confused or mistaken that

18  they think that Penn State stands behind this produce and is

19  in some sense response or taking responsibility for this

20  product.  And that's simply factually not true, and,

21  therefore, if they said that, I see they have a misimpression.

22  Q.    And then did you ask a follow-up question on that

23  subject?

24  A.    I did.  I asked why do you say that, and I asked it for

25  the same reason I asked it before, which is to see if people

1  tie that confusion or miss impression to the use of the logos,

2  the Penn State logos on the merchandise.

3  Q.   What was the next question that you asked your survey

4  takers and why?

5  A.   I asked them do you believe that the company that makes

6  or puts out this product is affiliated with another company or

7  institution, is not affiliated with another company or

8  institution, or I don't know.  Why.

9  Q.   Why did you ask that question?

10  A.   You did ask me to answer that.  Because again, the

11  federal trademark statute and the case law interpreting says

12  that if people have the mistaken impression that the trademark

13  owner is affiliated with the -- in this case, unauthorized

14  seller of the merchandise, that that is relevant to whether

15  there is this type of confusion that goes to the issue of

16  infringement.

17  Q.   So if one of your survey takers clicked the box that says

18  is affiliated with another company or institution, were they

19  then asked what company or institution is affiliated with the

20  company that makes or puts out this product.

21  A.   Yes,  they were.  And this slide shows that once again, I

22  didn't prompt them.  I didn't give them a multiple choice

23  list, one of which an -- answers of which was Penn State

24  university.  I wanted to get it from their own mind without

25  prompting, based on what they saw on the image.  And here I'm

1  looking to see if they think Penn State is affiliated with

2  Vintage Brands.  If they think Vintage Brands made this and

3  put it out.  And so that's the point of this.

4  Q.   Why would an answer indicating Penn State is affiliated

5  with the company that makes or puts out this product show con

6  fusion?

7  A.   Because Penn State isn't affiliated with Vintage Brands.

8  It hasn't give ten a license to Vintage Brands.  It hasn't

9  approved of Vintage Brands.  It hasn't blest these sales.

10           And if people think that it is affiliated, they're

11  mistaken.  They're confused.  And they -- they -- thereby may

12  assume that Penn State is vouching for this merchandise.

13  Q.   And did these folks then get to answer a why question

14  like the ones we've talked about for the prior questions, as

15  well?

16  A.   Yes.  And for the same reason.  Why do you say that.  Why

17  do you say that you think that Penn State, or whoever, is

18  affiliated with the company that makes the product, to see if,

19  again, they tie it to the trademarks.

20  Q.   What was the next question that you asked your survey

21  takers in test cell one?

22  A.   I asked them do you believe that the company that sells

23  this product is licensed to sell this product by a company or

24  institution, is not licensed to sell it.  I don't know.  I

25  have no opinion.

Q.    Why did you ask this question?

A.    I asked this question for a couple of reasons.  First of all, in the commentaries, and in the case law, there is authority for asking this type of question that -- asking a question about licensing is appropriate.  I asked it also because it was my understanding that the Court in this matter was interested in part on peoples' beliefs about licensing.  And so this was my attempt to both follow the governing authorities and to comply with the court's suggestion.

Q.    And the question you asked was do you believe the company that sells the product is licensed to sell the product by another company or institution or is not licensed to sell the product by a company or institution, and I don't know or have no opinion.

A.    Yes, I did.

Q.    And then did you -- since we've been through this with a whole series of questions before, did you then ask the same who, and why questions as we saw in the prior?

A.    Yes.  If you don't mind just not showing the next slide.  What company or institution is licensed to sell it.  And why do you say that.  And here I'm looking for evidence that people think Penn State has provided a license here.

Q.    Does this complete all of the questions that survey takers were asked in your test cell one?

A.    Yes.  I think this was the last question.  There's no,

```
 1   like, final wrap-up question.  This is it.  This is the end
 2   and it's over.
 3   Q.   Now, you also asked questions of the survey takers in
 4   your test cell 2, correct?
 5   A.   Yes.
 6   Q.   All right.  Is the jury looking on their screens at he
 7   very first question that you presented to the folks in your
 8   test cell two and does it look familiar as it relates to test
 9   cell one?
10   A.   Yes.  As I mentioned earlier, test cell 2 and the
11   so-called test group, which had two parts, 200-ish people and
12   -- in part A.  And 200 I shall people in part B.  Or cell 2 of
13   B.  They answered all of the identical questions, the same
14   questions are the same wording.  The only difference is the
15   image they were looking at.  And so here, I call this, you
16   know, the blue t-shirt in test cell 2.  In test cell 1, it was
17   the gray t-shirt.  But in addition to the t-shirts being
18   different colors, they were also Penn State trims on those
19   t-shirts.  And there was also -- as I mentioned earlier,
20   somewhat different verbiage on the right side, in terms of how
21   many times on this product page Vintage Brand mentioned Penn
22   State.
23   Q.   But the very same questions that were then asked in test
24   cell one and that are reflected in Plaintiff's Exhibit 45 were
25   also asked in test cell 2.  So there's no reason to go through
```

1    each of those?

2    A.    No.  That's right.  That's right.

3    Q.    Did you then analyze the data from both of your test

4    cells and tabulate the results?

5    A.    I did.

6    Q.    Let's take a look at the results for each of these test

7    images and we'll start with the first, which is the gray

8    t-shirt with the Nittany Lion shrine and university seal

9    trademarks.

10          Do you see the slide that is up in front of you

11   right now, Professor Franklyn?

12   A.    I do.

13   Q.    Okay.  Can you please explain your conclusions with

14   respect to confusion in test cell one, starting with what you

15   show at the bottom of the screen?

16   A.    Sure.  Well, I found an aggregate of 31 percent of people

17   were confused in one of the ways tested, at least one of the

18   ways.  I didn't double count anybody.  So if somebody said

19   they thought there was an affiliation and a sponsorship and an

20   approval, it wasn't counted as three points of confusion.  It

21   was just counted as one point of confusion.

22          But the -- and so that's the test cell is an

23   aggregate of what you see on the right, and what we call

24   deduping, which is -- means we're not going to count confusion

25   in a duplicated way.  Par and so the part on the right breaks

ROUGH DRAFT

70

1    it down for the jury to show that 21 percent of the 200 or so

2    people in the test cell thought Penn State sponsored or

3    approved Vintage Brand's gray t-shirt.

4          12 percent thought Vintage Brand was -- I'm sorry,

5    Penn State was in some way affiliated with the sale of that

6    t-shirt.  And 8 percent thought that Penn State had given a

7    license for the sail of that t-shirt.  5 percent thought that

8    Penn State had actually made the t-shirt with one of its own

9    factories.  And then -- and this is also customary in

10   practice, in surveys of this type, is to add up all of the

11   types of confusion, since they're all potentially relevant to

12   the legal issue, is to add them all up to come up with a

13   combined rate of confusion, which is what the 31 percent is.

14   Again, not double counting.  But 31 percent of the people, of

15   the 200, were con confused in at least one of these ways, and

16   some in multiple ways.

17   Q.   And the not double counting, that's visible to the jury

18   in the fact that if you add up the numbers in the right-hand

19   side, 21 percent, plus 12 percent, plus 8 percent, plus 5

20   percent, that adds up to more than 31 percent, but you do your

21   due duping to get to the 31 percent?

22   A.   Yes.  That's right.

23   Q.   So 31 percent confusion shown here with respect to test

24   cell No. 1.  Can you walk the jury through the results you

25   found with respect to confusion for test cell 2, which was the

1  blue t-shirt with the S lion trademark and the accompanying

2  text from the Vintage Brand website?

3  A.   Yes.  Here I found a total of 12 percent more confusion.

4  Test cell one was 31 percent ago gate.  Test cell 2 was 4 3

5  percent.  My hypothesis in this, that it's perhaps, because of

6  all the mentioning -- the further mentioning of Penn State on

7  this product page.

8          And in any event, this is the rate of aggregate

9  confusion in test cell 2 is 4 3 percent, and the shirt the

10  chart on the right breaks it all down.  Again, it's -- we

11  didn't double count anybody.  But we aggregated it.  We came

12  up with a total of 4 3 percent in test cell 2 who saw the blue

13  t-shirt and were asked all the same questions, were confused,

14  in at least one, if not more than one of the ways -- the types

15  of confusion at issue.

16  Q.   And just for purposes of the record, with respect to

17  sponsorship approval, confusion for test cell 2, did you find

18  25 percent?

19  A.   Yes.

20  Q.   And did you find 12 percent as it relates to affiliation

21  confusion?

22  A.   Yes.

23  Q.   And 14 percent with respect to licensing confusion?

24  A.   Yes.

25  Q.   And 9 percent with respect to made by confusion?

1  A.    Yes.

2  Q.    And then after deduping, 4 3 percent in the aggregate?

3  A.    That is correct.

4  Q.    Okay.

5  Q.    Did you stop at calculating the percentages for just the

6  testing images?

7  A.    23406789 because as I mentioned earlier, the proper

8  procedure is then to test -- is to calculate the amount of

9  confusion, if any, in the control group, and deduct it from

10 the total amount of confusion one finds in the cell group.

11 Q.    Let's turn to that.  Do you recognize the image on slide

12 40, and can you tell the jury what it is?  I believe we looked

13 at it earlier?

14 A.    Yeah.  This is again taken from the Vintage Brand

15 website.  It is not a Penn State piece of merchandise.  It

16 doesn't allude to Penn State any where on here.  It says

17 Vintage Brand on the t-shirt.  It says up in the left corner.

18 It says it's -- in a few other places on this slide, and

19 again, I asked all of the same questions, and I looked at the

20 answers to it to see if anybody said Penn State.

21 Q.    So again, all of those questions that you walked through

22 with respect to test cell one, you asked all of those same

23 questions of your control group with respect to the Vintage

24 Brand t-shirt that you used as your control image?

25 A.    Yes.

1  Q.    And you thin tabulated and analyzed the control group

2  results; is that right, sir?

3  A.    Yes.

4  Q.    Let's look at the results from your control group.

5           First, can you explain to the jury what your data

6  showed in your control group, starting with what you said

7  forth on the bottom of this slide and then we'll go to the

8  right hand side of the slide?

9  A.    Yes.  I found 4 percent confusion in the control cell.

10  But I want to make something very clear.  Absolutely no one in

11  the control cell said Penn State.  So why do I get 4 percent

12  confusion?  Because in an abundance of caution, and because I

13  used a similar criteria in the test cell, I counted them as

14  confused if they said the University or the college or the N.

15  C.  Double A.  Even though they didn't say Penn State, and so

16  all of that 4 percent would be people who said one of those

17  things, the college or the University.

18           Now they may not really think there's any

19  affiliation with Penn State, because there's nothing on here

20  about Penn State.  And so a reasonable interpretation of the

21  data in the control cell is that there's zero noise.  There is

22  zero confusion.  But to be cautious, I counted those other

23  answers as potential evidence of confusion and came up with

24  these numbers.  2 percent of the people, 200 and something

25  people in the control cell said university or college or N.

1    C.   Double A.   2 percent thought there was an affiliation with

2    some college or some university, 1 percent thought they had --

3    there was a license, and I deduped again and came up with 4

4    percent.

5    Q.   You've done a lot of surveys, Professor Franklyn.   Is

6    this the amount of noise, 4 percent, that you would generally

7    expect to see when a proper control is run in a survey of this

8    kind?

9    A.   Yes,  it is.  And I would be personally -- it would raise

10   questions in my mind if I had seen something like 20 percent.

11   If I had seen 20 percent of the people here saying Penn State,

12   based on looking at a picture like this, that doesn't say Penn

13   State on this, I would think may be I did something wrong in

14   this -- in this survey and in particular, in the control

15   group.  But it's not unusual to get under 5 percent of the

16   people guessing.  And so I did think it was within the realm

17   of normal -- normally expected guessing or noise.

18   Q.   Thank you, sir.  What did you do with this 4 percent

19   figure from your control cell once you calculated it?

20   A.   I deducted it from the levels of confusion from the test

21   cell.

22   Q.   Let's look at that, Professor Franklyn.  Focusing on test

23   cell 1, what did you get as a figure when you subtracted the 4

24   percent from your control cell confusion from what you found

25   in your first test cell, and can you take the jury through

1  that math?

2  A.    Yeah.  It's very simple, actually.  31 percent, minus 4

3  percent is 27 percent.  So that's what I reported as the net

4  level of confusion from control cell 1.

5  Q.    And did you then do the same exercise with respect to

6  control cell 2?

7  A.    Yes.

8  Q.    I'm sorry.  Test cell 2?

9  A.    Test cell 2 in the control group.

10  Q.    Thank you.  And returning now to slide 4 3.  Here do you

11  have the results that we've talked about, 4 3 percent for test

12  cell 2 and 4 percent for the control cell, and if so, what did

13  do you with those numbers and what conclusion did you reach?

14  A.    Again, I simply subtracted the 4 percent from the control

15  cell, treating it as noise, from the 43 percent of confusion

16  in the test cell 2, and got 39 percent, and reported that as

17  my final conclusion for test cell 2.

18  Q.    So we've talked about your test cell 1 conclusion, 27

19  percent, your test cell 2 conclusion of 39 percent net

20  confusion.  What do those percentages mean in plain English?

21  A.    There's a lot of confusion, far above the 15 percent

22  benchmark that has been created or suggested by the case law.

23  Double or almost double the amount that is kind of the minimum

24  threshold, that this is -- this is a substantial amount of

25  confusion and a substantial risk that people will think that

1    Penn State has either made, sponsored, is affiliated with, or

2    is approving of the -- of the merchandise that Vintage Brands

3    is selling.

4    Q.   Overall, in the aggregate, across your test cell 1 and

5    test cell 2, was it the case that approximately one out of

6    every three test takers exhibited confusion?

7    A.   Yes, around 33 percent, or a third, when you put the two

8    test cell sub groups together, exhibited at least one, if not

9    more than one of the relevant types of confusion.

10   Q.   And is that more than double the 15 percent benchmark

11   that you've testified to is widely accepted and recognized in

12   the field?

13   A.   Yes,  it is.

14   Q.   We asked a moment ago about your -- your questions about

15   licensing confusion.  Do you recall that?

16   A.   Yes.

17   Q.   Let me ask you this.  Was your conclusion that you're

18   just given to the jury change at all if you didn't count

19   survey takers who were confused based only on your question

20   about licensing?

21   A.   No, it would not.  The -- if I took that out of the

22   aggregate, I think the numbers would be within about 2 percent

23   all combined different.

24   Q.   So no difference at all in the conclusion that there's

25   substantial confusion here?

A.    No.  You've referenced a couple of times how you included

references to college or university or the N.  C.  Double A.

Do you recall that testimony?

A.    I do.

Q.    If you hadn't counted the more general references to

college, university, or the N.  C.  Double A.  In your survey,

how, if at all, would that have affected your results?

A.    If I only included answers that said Penn State, some

went up a little bit, some went down a little bit, but all of

the bottom line conclusions were in the same vicinity and

bottom line numbers, and still, far exceeding the kind of

minimum amount of threshold confusion we're looking for.

Q.    And then we talked earlier about the list of 13

universities in one of your screening questions.  Did your

survey show any difference in the level of confusion between

people who had previously purchased or planned on purchasing

Penn State apparel versus apparel of other universities?

A.    No, it did not.

Q.    Other than your own survey, Professor Franklyn, is there

any other evidence that you considered that supports your

conclusion that there's substantial confusion in this case?

A.    Yes,  there is.

Q.    Can you please explain that to the jury?

A.    Yes.  Vintage Brands's hired their own expert that you

will hear from in this case, named Dr. Erdem.  And Dr. Erdem

1    conducted her own survey.  And while I have many disagreements

2    with it, I -- I have one finding in there that I thought was

3    striking, and that I thought was consistent with my own

4    findings.

5    Q.   I've put the next slide up on the screen with reference

6    to that.  Can you explain to the jury what you mean, Professor

7    Franklyn?

8    A.   Yes,  well in the top right-hand corner, you see a

9    picture of Dr. Erdem.  And on the left side, you see that she

10   also did two sub groups in her test cell.  And she had test

11   group one in which she showed that sweatshirt that -- the

12   Nittany Lion logos on it and it's referred to as the 19 29

13   Penn State Nittany Lion's logo.  And then her test cell group

14   2, she showed a sweatshirt with the same image that I showed

15   on the t-shirt in my test cell 1 which is the 19 50 Penn State

16   Nittany Lions logo, and then she asked similar, but not

17   identical questions that I have, for the ones I asked, and

18   what she found, at least in her test cell, and I do want to be

19   fair with this and can be fair to the jury, these are not her

20   bottom line conclusions because she came up with different

21   conclusions in her control cell that she will report on and I

22   will also talk about, but at least in her test cell, she came

23   up with these numbers, that in the aggregate, and it's circled

24   here in red, 35 percent of the people in test group one were

25   confused, and one of the relevant ways, and her test group 2,

1    44 percent were confused, which are amazingly similar to the

2    30 -- you know, 41 percent that I found.  And I thought well,

3    at least at this stage of her survey, we're find of in

4    agreement.  And she's finding substantial confusion.

5              And I -- I wanted to point that out.

6    Q.   Is there anything else about Dr. Erdem's survey that

7    supports your opinion?

8    A.   Yes.  She asked a question in her survey, how many of you

9    think that Vintage Brands -- that the law required Vintage

10   Brands --

11             MR. MCKENNA:  Objection, Your Honor.  This is now

12   clearly treading into rebuttal testimony.  Dr. Erdem hasn't

13   been able to had a.  She hasn't had this to the jury.  This

14   can only be misleading.

15             MR. FINKELSON:  Your Honor, this isn't rebuttal

16   testimony.  This is in the same vain as the question the

17   witness just answered, and this is my last question of the

18   witness.

19             THE COURT:  Very good.  Objection noted.

20   Overruled.  I'll allow it.  Go if ahead, sir.

21             THE WITNESS:  Determine asked her survey takers the

22   question how many of you survey takers believe that the law

23   required Vintage Brands to get permission from Penn State to

24   sell this merchandise.

25             And 87 percent of the people who took her survey

1    said yes.  87 percent.  It's the highest number of any number

2    in any of the surveys.

3            And what that told me is that those folks thought

4    either that Penn State had given permission.  Permission, in

5    this context would be a license, probably, either oral, or in

6    writing to Vintage Brands, which it did not, and so they had

7    overwhelmingly, a mistaken impression of what had gone on

8    here.  Or they thought that license had been given and

9    therefore they're confused because it wasn't given, or they

10   thought it wasn't given, and that Vintage Brands is infringing

11   and selling knockoffs and just didn't get the license.

12           And that data I found compelling and reinforcing

13   that my overall conclusion that there is a substantial risk of

14   confusion and miss impression in this situation

15           MR. FINKELSON:  Professor Franklyn, thanks for your

16   patients with me and for walking the jury through your survey.

17   I will pass the witness, Your Honor.

18           THE COURT:  All right.  Very good.  Thank you sir.

19           I think, ladies and gentlemen, this is an opportune

20   time to take a luncheon recess.  We'll stand in recess until

21   1:30 p.m.  And then Mr. McKenna will have some questions for

22   Professor Franklyn on cross examination.

23           Mrs. Rhinehart, escort the jury, please.

24           (At 12:25 p.m., the jury left the courtroom and had

25            their luncheon recess.)

1              THE COURT:  Be seated.

2              All right.  I think we're on track, as anticipated.

3              MR. FINKELSON:  We are on track.

4              THE COURT:  All right.  Well, let's stand in

5       recess, then, for an hour, until 1:30.  Maybe being back a

6       little bit before that.  Dr. Franklyn, eat on your own if you

7       could.  So don't intermix with the attorneys, and Court will

8       rise until that time.

9              (At 12:26 p.m., a lunch recess was held.)

10             (At 1:45 p.m., the jury entered the courtroom.)

11             THE COURT:  All right.  We're back on the record

12      now after our luncheon recess.  Professor Franklyn, I'll have

13      you resume the witness stand, please.

14             Mr. McKenna, you have some cross examination, I

15      believe?

16             MR. MCKENNA:  Yes, we do.

17             THE COURT:  Go right ahead, sir.

18                        CROSS EXAMINATION

19      BY MR. MCKENNA:

20      Q.   Good afternoon, Mr. Franklyn.

21      A.   Good afternoon.

22      Q.   We're acquainted, obviously.  But just for the record and

23      for the jury's benefit, I'm Mark McKenna.  I'm one of the

24      attorneys representing Vintage Brand.

25             Mr. Franklyn, I'd like to just start with a couple

1    of questions about your background.  You mentioned during your

2    direct that you have a bachelors degree in history,

3    philosophy, and theology?

4    A.    Yes.

5    Q.    You have a law degree?

6    A.    Yes.

7    Q.    Those are the only degrees you have?

8    A.    Yes.

9    Q.    You don't have any degrees in marketing?

10   A.    No.

11   Q.    No degrees in consumer psychology?

12   A.    No.

13   Q.    No degrees in research methods or statistics?

14   A.    No.

15   Q.    Okay.  And if I heard your testimony right, you said you

16   have done over 200 trademark surveys?

17   A.    Yes.

18   Q.    And about 80 to 100 of those are likelihood of confusion

19   surveys, you estimated?

20   A.    Yes.

21   Q.    And I think in your testimony you said that you had

22   testified in over 150 legal cases?

23   A.    By way of deposition or hearing or trial.

24   Q.    The vast majority of those were deposition, right?

25   A.    Yes.

**ROUGH DRAFT**

1  Q.   I think in an earlier hearing in this case, you testified

2  that you had been in -- admitted as a survey expert somewhere

3  around 10 times; does that sound right?

4  A.   In actual hearings, I've been -- a year ago, I think, is

5  when you're referring to that number.  I've been admitted as a

6  survey expert at least five or six times since then.  So I

7  think the number now, in terms of appearing at a hearing like

8  this, is around 15 or 16.

9  Q.   Okay.  Around 15 or 16.

10         And at your deposition, you identified three cases

11  that you could recall where your testimony had been excluded;

12  is that right?

13  A.   Yes.

14  Q.   Okay.  Those are the ones you could recall.  So at least

15  three times you've been excluded?

16  A.   Yes.

17  Q.   Okay.  In addition to the cases where your testimony's

18  been excluded, your survey work was criticized by the District

19  Court in the Northern District of Florida, wasn't it?

20  A.   Yes.  Yes.

21  Q.   Do you recall doing a survey in a case called MGFV

22  Properties versus Viacom CBS?

23  A.   Yes.

24  Q.   That was a case that involved a dispute between a bar

25  called the Florabama Lounge and a MTV show called Florabama

ROUGH DRAFT

1    Shore?

2    A.    Yes.

3    Q.    And you worked for the Plaintiff in this case, the

4    Florabama Lounge?

5    A.    I did.

6    Q.    And you did a likelihood of confusion survey?

7    A.    I did.

8    Q.    Right.  You claimed in your survey to find confusion?

9    A.    I did.

10   Q.    The Defendants in that case moved to exclude your

11   testimony, didn't they?

12   A.    They did.

13   Q.    And before the Court resolved that, it actually entered

14   summary judgment and dismissed all of your clients' claims?

15   A.    On grounds unrelated to my survey.

16   Q.    Okay.  Well, if we could bring up the slides, please.

17         COURTROOM DEPUTY:  To go to everyone?

18         MR. MCKENNA:  To everyone.  These are

19   demonstrative.

20         MR. FINKELSON:  Can I see them first, please,

21   before they go to -- the first one before it goes to the jury?

22         MR. MCKENNA:  They probably need to go to slide.

23   Yes.

24         MR. FINKELSON:  That cannot go to the jury.  It

25   appears that that is being used solely for impeachment

1    purposes, in which case we would object to it being shown more

2    broadly than to the witness.

3          THE COURT:  What's your intention?  What's your

4    intention?

5          MR. MCKENNA:  I think Mr. Franklyn testified that

6    this case was dismissed, not having anything to do with him.

7    The Court specifically commented on his survey.

8          THE COURT:  So who are you -- are you showing this

9    just to the witness?

10          MR. MCKENNA:  Well, at the moment, I hoped to show

11    it to the jury.

12          THE COURT:  And your objection, Mr. Finkelson, is

13    it should not be shown to the jury?  You want a limiting

14    instruction?

15          MR. FINKELSON:  I would object to it in multiple

16    respects.  First of all, I don't think showing a witness a

17    Court opinion is impeachment of that witness anyway.  It's a

18    Court statement.  It's not the witness's.  To the extent

19    Mr. McKenna is using it for impeachment and Your Honor finds

20    it's proper for that purpose, like any impeachment evidence,

21    it shouldn't be published to the jury.  It can be shown to the

22    witness and the witness can be asked about it.

23          THE COURT:  I would stick with the witness at this

24    point.  Let's see where you go with it, Mr. McKenna.  So,

25    Mrs. Rhinehart, just show the exhibits, such as they are, to

1    Professor Franklyn only, please, at this juncture.  All right.

2    Go ahead, sir.

3    BY MR. MCKENNA:

4    Q.   Mr. Franklyn, does that refresh your recollection, that

5    when the Court dismissed the claims against your client, it

6    described the Plaintiffs' surveys, including yours, as poorly

7    constructed?

8    A.   The judge did say that in passing.

9    Q.   Thank you.  Okay.  So we'll come back to that survey

10   later on, maybe.  But for now, I want to focus specifically on

11   your survey in this case.  If you could -- I'm just going to

12   show this immediately.  This is just a slide from the survey,

13   but I'll show it to Counsel first.

14           MR. FINKELSON:  No objection, Your Honor.

15           THE COURT:  Go right ahead.

16   BY MR. MCKENNA:

17   Q.   Publish to the jury, as well, please.  Mr. Franklyn, do

18   you recognize this product?

19   A.   Yes.

20   Q.   This is one of the Vintage Brand products you tested in

21   your survey?

22   A.   Yes.

23   Q.   And is it your understanding that Penn State accuses this

24   product of infringing Penn State trademarks?

25   A.   That is my understanding.

```
 1    Q.   And what is it about that t-shirt that allegedly makes it

 2    infringing?

 3    A.   Well, I believe Penn State claims that it has a trademark

 4    in the Nittany Lion and in the seal.

 5    Q.   Okay.  So the image on front of the shirt?

 6    A.   Yes.

 7    Q.   Okay.  And Mr. Franklyn, in preparing your report, you

 8    reviewed the complaint in this case?

 9    A.   I did.

10    Q.   And you understand that Penn State is seeking in this

11    case to stop Vintage Brand from selling merchandise just like

12    this?

13    A.   Could you please repeat that?  I didn't hear the tail end

14    of your question.

15    Q.   Yeah.  You understand that in this case, Penn State is

16    seeking to stop Vintage Brand from selling merchandise like

17    this, including this shirt?

18    A.   Well, I think both from making it or causing it to be

19    made and then selling it.

20    Q.   Right.  So not just they need -- Vintage Brands needs to

21    change in words on the website and then it would be fine to

22    sell this product, but selling the product itself is an

23    infringement.  That's your understanding of the allegation?

24    A.   Yes.

25    Q.   Okay.  Mr. Franklyn, do you have any data that tells us
```

1  the percentage of confusion that's being caused specifically

2  by the image on the shirt?

3  A.    Yes.

4  Q.    You do.  What's that percentage?

5  A.    That's the percentage of confusion that I've already

6  reported on.

7  Q.    It's your testimony that all of the confusion that you

8  reported in your survey is attributable specifically to that

9  image?

10  A.    It is attributable to that image as shown to survey

11  takers and based on their follow-up questions and the number

12  of people who indicated the presence of that image as being

13  part of why they thought there was an affiliation or a

14  sponsorship, relationship or a license is data that I looked

15  at, and that supports my conclusion that the confusion that

16  they reported was related to this image.

17  Q.    Okay.  All of the confusion that you reported is related

18  to this image.  That's your testimony?

19  A.    No.  That's -- my testimony is that I found levels of

20  confusion.  They were asked about this image on the product

21  page.  This is the predominant image that they were shown over

22  and over.  And they were also asked, in a survey, why they

23  thought there was an affiliation or sponsorship relationship,

24  and a great number of them pointed to these logos.

25  Q.    Okay.  Let's walk through the way that the survey

1    unfolded, and maybe I can ask you some more questions about

2    that.  If you could -- I'm just going to show this to Counsel

3    first.

4            MR. FINKELSON:  No objection, Your Honor.

5            THE COURT:  Go ahead.

6    BY MR. MCKENNA:

7    Q.   If you could show this to the witness and to the jury

8            THE COURT:  You may publish.

9    BY MR. MCKENNA:

10   Q.   Mr. Franklyn, both of your test stimuli depicted an

11   allegedly infringing t-shirt as part of a screenshot from

12   Vintage Brand's website, right?

13   A.   Yes.  The product page.

14   Q.   Okay.  And let's -- and so -- as we're looking at it,

15   both the test cell, number one on the left, test cell No. 2 on

16   the right.

17   A.   Yes.

18   Q.   Okay.  So let's focus on the test cell on left, here,

19   test cell one.  And the one we see there, not only depicts the

20   t-shirt, but it also has text that describes the images on the

21   t-shirts, right?

22   A.   It does.  As I pointed out on my direct, that there's

23   considerable amount of text on the product page that refers to

24   Penn State.

25   Q.   Okay.  And I'd like to advance slides, if you could pull

1    that down.

2              MR. FINKELSON:  No objection, Your Honor.

3              THE COURT:  You may publish.

4    BY MR. MCKENNA:

5    Q.   Okay.  So now, that image, right, this is what your

6    survey takers saw.  So it's not just the t-shirt by itself?

7    A.   No.  It's not.  There are reasons for that.

8    Q.   Okay.  And I would just like to show them side-by-side.

9              MR. MCKENNA:  Your Honor, may we publish?

10             MR. FINKELSON:  No objection, Your Honor.  And just

11   to make it easier for you, Mr. McKenna, if you're just showing

12   slides from his report with boxes around them, I am -- I have

13   no objection whatsoever.

14             MR. MCKENNA:  Great.  That will speed it up.

15             MR. FINKELSON:  If you have something outside the

16   scope of that, just tell me.

17             THE COURT:  So noted.  You may publish.

18   BY MR. MCKENNA:

19   Q.   Okay.  So now just looking at screenshot that's your

20   stimulus here and -- which is on the right, comparing it to

21   the t-shirt, you would agree with me that respondents who

22   named Penn State as the source of that might have been

23   reacting to the image, right?  They might have been reacting

24   to the image on the t-shirt?

25   A.   Do you have more to that question.  As compared to what.

**ROUGH DRAFT**

1  Q.   Well that's my question.  So they might have been

2  reacting to the image on the t-shirt.  They might have been

3  just reading the label that says Penn State, or some

4  combination of both of those; is that Yes?

5  A.   Yes and no.

6  Q.   Yes and no.  Do you have some basis for knowing which

7  ones they were responding to?

8  A.   Yes.

9  Q.   What's that?

10  A.   Well because I asked them if they said they were -- that

11  they thought that Penn State made this merchandise, approved

12  of it, or was affiliated with it.  I asked them why.

13  Q.   Right.

14  A.   And so in reading their answers to why, I was able to get

15  some evidence or some information about what about the image

16  they saw influenced them to have that impression.  And I would

17  add that when you do a survey like this, which is often

18  referred to as a point of purchase survey, as opposed to a

19  survey that is done post-sale, the survey expert is supposed

20  to present the merchandise in the context that is presented to

21  consumers.  And here, it would have been wrong to present the

22  t-shirt by itself, because this is a point of purchase.  In

23  fact, right before the step purchase, type of survey.  And so

24  this is the context in which Vintage Brands -- brand was

25  presenting Penn State merchandise to consumers.  And so if the

ROUGH DRAFT

1  way that it's contextualized adds to the impression of

2  sponsorship or approval or affiliation, then that's considered

3  to be a part of what would happen in the real world.  But in

4  the real world, when people are buying this shirt and they saw

5  it in this kind of contextualization and were making --

6  getting impressions, the impressions were based -- would be

7  based on the combination of the merchandise, but also the way

8  that it was presented, and so I was faithful to that in

9  designing and conducting and implementing and interpreting the

10  results of the survey.

11  Q.   Thank you.  Let's talk first about your first answer to

12  that was that you asked these follow-up questions where when

13  you asked people who put out this shirt or who sponsored it,

14  you asked them why they said that.

15  A.   Yes, I did.

16  Q.   And you said that you could read those responses and then

17  could you use them to sort of tie back to give you confidence

18  that those were answers that were really about the Penn State

19  imagery?

20  A.   I don't know if I used the word confidence.  There's a

21  developed body of social science literature on exactly what

22  you're talking about, which is the role that verbatims play or

23  should play in the interpretation of survey results.  And the

24  literature teaches, quite clearly, that the verbatims are

25  supposed to play a kind of qualitative role, which helps you

**ROUGH DRAFT**

1  understand if, at least some of the people taking the survey

2  who are confused, tie the confusion to the trademarks at

3  issue, and can state that in their verbatim responses.  But

4  that as a rule of thumb, the guiding authorities say that the

5  level of legally relevant confusion that is supposed to be

6  considered is supposed to be considered based on the numbers,

7  based on the number of people who say they think it's

8  affiliated.

9  Q.   Is there any where in your report, Mr. Franklyn, where

10  you provide a detailed analysis of the verbatim answers?

11  A.   Well I don't recall.  If -- I have a -- I don't recall

12  from my expert report.  It was prepared about two years ago.

13  If I have some excerpts of the verbatim answers.  I usually

14  do, particularly the ones that tie the -- a person's

15  confusion, if any, to the trademarks at issue.  I just don't

16  recall.

17  Q.   Okay.  I have a copy of your report if you'd like to

18  refresh your recollection with it?

19  A.   Sure.

20  Q.   Okay.

21       THE COURT:  You may approach.

22       MR. MCKENNA:  Thank you, Your Honor.

23  BY MR. MCKENNA:

24  Q.   Mr. Franklyn, you recognize that to be a copy of your

25  report in this case?

ROUGH DRAFT

1    A.    Just give me a second please, counselor.

2    Q.    Sure.

3    A.    Okay.  I've looked at it.

4    Q.    Mr. Franklyn, can you point me to something in the report

5    where you've done a detailed analysis of the verbatim

6    responses to that follow-up question?

7    A.    I did not in this particular report.

8    Q.    You did not.  And if you could -- Josh, if you could

9    bring up for me the slide about the survey responses about

10   certainty.  If you could take this down for the jury and give

11   Counsel a chance to see it.  So I'll ask a question first.

12           Your verbatim responses, when you asked people why

13   they gave the answers they did, in a number of cases, included

14   responses were people said something like I'm just guessing.

15           MR. FINKELSON:  Objection, Your Honor.  This is a

16   document that Mr. McKenna has put up on the screen is not from

17   anything that Mr. Franklyn has said.  It's from Dr. Erdem's

18   report, if I recall correctly.

19           MR. MCKENNA:  They're quotations from the appendix.

20   It was the data that Mr. Franklyn supplied.

21           MR. FINKELSON:  Objection, Your Honor.  This is

22   hearsay.  It's a report of a different expert.  It's not

23   proper impeachment

24           THE COURT:  What is it again, Mr. McKenna?

25           MR. MCKENNA:  They're quotations from the verbatim

1    responses from Mr. Franklyn's survey that he's just now

2    testified that he used as a way to guarantee the answers.

3           THE COURT:  Objection noted.  Overruled.  Go ahead.

4           MR. MCKENNA:  If you can publish it, please, to the

5    witness.

6           MR. FINKELSON:  I would object to it -- you said

7    publish to the witness?

8           THE COURT:  Yes.

9           MR. FINKELSON:  I don't object to it being

10   published to the witness.

11          MR. MCKENNA:  I would also like it published to the

12   jury.

13          THE COURT:  Well, let's deal with the witness at

14   this point.

15   BY MR. MCKENNA:

16   Q.   Mr. Franklyn, just so I can repeat the question.  You

17   mentioned a few minutes ago that you reviewed the verbatim

18   responses to the question about why people said the answers

19   that they did when you asked them who put this product out.

20   And they gave you an answer.  And then you said why do you say

21   that.  I think your testimony a minute ago was those answers

22   were how you knew that people were responding to things that

23   were about Penn State on the shirt or on the website, right?

24   A.   I don't think that's what I said.

25   Q.   It's not.  The verbatim answers didn't factor into your

1  analysis?

2  A.   Now you just said something different.  In your first

3  question to me, you asked me it would give me confidence that

4  I knew that their confusion was related to the trademarks.

5  And your second rendition of the question, you changed the

6  wording.  And you basically said that's not something I

7  considered.  Those are two very different things.  I

8  considered the verbatims, the way you're supposed to, which is

9  anecdotal evidence, but not overriding evidence that

10  contradicts the numbers from the survey.

11  Q.   Right.  So if we could go back, my initial question that

12  I asked you was what's the percentage of confusion that is

13  attributable specifically to the images.  And I asked that

14  because you agreed with me that people could be reacting to

15  the images or they could just be reading the text on the web

16  page.  Do you remember that?

17  A.   Yes, but if they're confused by one or the other or both,

18  that is relevant confusion, because that is -- that's the way

19  that Vintage Brand chose to present this -- these products to

20  consumers, and if they create the impression, for example,

21  that Penn State is sponsoring this or affiliated through a

22  combination of the image and then the use of the word Penn

23  State all over or in many places around the image, then that's

24  considered to be part of the mixture of information that could

25  create the misimpression that Penn State is authorizing,

ROUGH DRAFT

1    approving, or affiliated with the sale of this merchandise.

2          So the attempt to try to separate the image from

3    the verbiage around it is not proper.

4    Q.   So you would agree with me that your survey can't answer

5    the question of whether -- of what the confusion level is

6    specifically about the t-shirt apart from the rest of the

7    contents?

8    A.   It -- the survey wasn't attempting to measure that.

9    That's what we would measure in what's called a post-sale

10   confusion survey if people are just walking around the street

11   with these t-shirts on and in that kind of a survey, we would

12   not show people the product page with all of this information.

13   We might show people, I'm doing one of these right now,

14   somebody wearing Uggs, walking around on the street, after the

15   product has already been purchased, but when you're doing a

16   survey like this to try to see if there's point of purchase

17   confusion, you need to show the product as it's presented and

18   the way in which it's presented right before it's purchased.

19   And that's why the surrounding context is considered relevant

20   and is not considered dissectable or separatable from the

21   product itself.

22   Q.   Okay.  So let's talk about that for a second because

23   you've now mentioned this several times about showing it in

24   the real commercial context.  Okay.

25          But you -- you would agree with me that it's

1    entirely possible to test confusion in the real commercial

2    context and still, to isolate particular features that you

3    were trying to demonstrate were the cause of confusion?

4    That's the point of a control?

5    A.    It could be one point of a control.  I'm not sure really,

6    to be honest with you, that I understood your question.

7    Q.    Okay.  Well, let me try it this way.  Your survey used a

8    test and control design.  Right?

9    A.    Correct.

10   Q.    Okay.  And the way that a test and control design works

11   is that you have people assigned to different conditions,

12   right?

13   A.    Different groups.

14   Q.    Different groups.  All right.  One group seize the test

15   condition -- the test image.  At least one other group sees a

16   different image.  That's a control image.  Right?

17   A.    That is correct.

18   Q.    Okay.  And the reason that the test is called a test is

19   because it's got the situation that you're trying to evaluate,

20   right, so that would be, in your description, an exact replica

21   of the Vintage Brand website.  That would be in the test

22   condition?

23   A.    I'm -- I'm pausing to answer your question because you

24   used the phraseology an exact replica of the --

25   Q.    Well, I think that's what you described.

1   A.   I'm not done answering, counselor, if you mind, please,

2   just give me a moment and be a little bit patient, I'd like to

3   finish my answer, if I may.  May I?

4   Q.   Certainly.

5   A.   Okay.  You -- you said that it has to be an exact replica

6   of the website.  What -- what one is trying to do here is to

7   the extent a reasonably practical replicate at least one

8   significant manner in which people in the real world would

9   come upon Vintage Brand's goods and -- at the point or near

10  the point of purchase.  And so to that extent, I replicated

11  the product pages for two different products, two different

12  t-shirts in -- from the Vintage Brand's website as they

13  appeared at the time that I took -- that I designed and

14  implemented my survey.

15  Q.   Okay.  And in the test/control format, one keeps

16  everything constant, everything the same from the test to the

17  control, except the thing that you're trying to test; isn't

18  that right?

19  A.   Yes, with some caveats.  I can't say categorically or

20  absolutely yes, but generally speaking, that is the goal.

21  Q.   So we can tell what a survey is testing, right, by asking

22  what did it hold constant, what did it keep the same.  And

23  what did it change.  Right?

24  A.   I don't understand your question.

25  Q.   Well, what's the point of keeping things constant from

1  the test and the control?  Why is that important to do?

2  A.   Well, one is trying to isolate between the test and in

3  the cell if there is confusion based on the way that the

4  accused product has been presented to the public in the real

5  world by the Defendant, whereas in the control, one is trying

6  to figure out if people are confused based on something else,

7  and if they would register confusion when there appears to be

8  no reason for them to be confused.

9  Q.   Right.  And the way that that works is you keep things

10 the same in the test and the control, except for something

11 that you're changing, because then, everything that is kept

12 the same washes out.  Right?

13 A.   I still -- I don't understand the question.

14 Q.   You don't understand.  So let's try to use an example.

15 Let's imagine that there was a new soda released on the

16 market.  Okay.  And let's imagine that Coca-Cola thought the

17 brand name of that soda is too similar to Coca-Cola.  Right.

18 And then let's imagine they hired you to do a survey to test

19 whether that was true.

20 A.   Okay.

21 Q.   Okay.  So the test was designed to figure out whether the

22 name of the product was too similar.

23 A.   You mean confusingly similar.

24 Q.   Yes.  Confusingly similar.

25 A.   Okay.

**ROUGH DRAFT**

1  Q.   So in your test condition, you would present this new

2  soda as you say, in some marketplace context, right?

3  A.   Yes.  So for example, if we were doing it in a situation

4  like this, and the accused party was selling, let's say Cubba

5  Bear Cola, and they were selling it on a website that had some

6  verbiage around this, and I were doing a point of purchase

7  survey, I would try to replicate that to the extent reasonably

8  possible.

9        However, however, there is another rule about

10  controls that one has to balance against the rule of

11  replicating in the test and in the cell, as much as possible

12  everything except what you're testing for confusion.  And that

13  is that you introduce in to the control things that would

14  present variables that could influence people in the control

15  to guess that there is a relationship.  And so one has to be

16  careful about how -- how one replicates what's in the test or

17  duplicates it when one moves in to the control.

18  Q.   Okay.  Now let's go back to my example with respect to

19  the soda.  Now there might be a lot of reasons, right, why a

20  consumer might think that a new soda came from Coca-Cola,

21  aside from just the name of the new soda, right?

22  A.   I don't know what you're talking about.

23  Q.   You don't.  You don't think it's possible that people who

24  confronted a new soda might just think, well gosh, I think

25  most soda comes from Coca-Cola because it's a really big

1  company and they might answer Coca-Cola for that reason.

2  A.    I suppose that's possible.

3  Q.    That's possible.  And it might be that they're used to

4  buying soda in a particular store, and so they just kind of

5  think any soda that I find in that store is from Coca-Cola.

6  That's possible, too?

7  A.    That's sounds quite cockamamie to me.

8  Q.    Really?

9  A.    Yes.

10  Q.    Well let's assume for the sake of argument, that people

11  thought there might be multiple reasons that someone might

12  think that a name that was somewhat similar to Coca-Cola would

13  make the people respond with the Coca-Cola answer, right.

14  Wouldn't the point of a test and control be to rule out

15  answers, other than the brand name, if that's the thing you

16  were trying to test?

17  A.    Wouldn't the -- could you say that again, please?

18  Q.    Yeah.  If people in the test thought this new soda came

19  from Coca-Cola, just because that's the first thing that came

20  to I didn't remember mind, that wouldn't really be

21  attributable to the brand name, would it?

22  A.    To what brand name?

23  Q.    The brand name of the new soda that we've been testing?

24  A.    I -- it's hard for me to answer your questions in such an

25  abstract manner without more context.

1  Q.   Okay.  You're not sure whether the point of a test and a
2  control is to hold things constant to isolate the thing you're
3  trying to test?
4  A.   It's one point of a control.  It's not the only point of
5  a control.
6  Q.   Okay.  Well, let's -- let's come back to that in just a
7  minute.  Now, you said that you've been showing respondents
8  the screen shot, rather than just showing them image because
9  you wanted to replicate the real marketplace.  Right?
10  A.   I wanted to replicate the way that, at least some people,
11  and see Vintage Brand's goods in the real marketplace on
12  Vintage Brand -- Vintage Brand's website at or about the time
13  that they're about to make a purchase from that website.
14  Q.   Right.  Now, at the beginning of the testimony, you
15  agreed with me that it was important to know whether the shirt
16  itself was infringing because, among other things, Penn State
17  doesn't just seek to stop Vintage Brand from selling it on
18  those particular web pages, but to selling it at all.  And you
19  agreed with me that that was because the shirt itself was
20  infringing.
21  A.   I don't know exactly what I said or whether I said it in
22  that way.  But it -- in general, it is my understanding that
23  Penn State seeks to prevent Vintage Brands from selling these
24  t-shirts on its website, and in any way that would suggest to
25  consumers that Penn State was involved with the sale.

ROUGH DRAFT

1  Q.   Okay.  Let's take a look at what you said you were

2  testing.  I'm just going to show this to Mr. Franklyn at the

3  beginning here.  Okay.  Mr. Franklyn do you see that?

4  A.   I do.

5  Q.   Yes.  You can see it?

6  A.   Yes.

7  Q.   You recognize that as a description of your conditions in

8  your survey?

9  A.   I -- I just don't call them conditions.  Dr. Erdem calls

10  her cells conditions or her sub cells.  I'm not used to seeing

11  that language.  I just call them cells.  But I think that's

12  what you mean.  But I don't want to put words in your mouth.

13  Q.   You recognize this as being from your report and the

14  description of your cells.

15        MR. FINKELSON:  Objection, Your Honor.  Improper

16  impeachment.  He's just showing the witness a copy of his

17  expert report.

18        MR. MCKENNA:  I'm asking him if he recognizes it

19  because I want to demonstrate with him what he claims to be

20  testing.

21        MR. FINKELSON:  He can establish that Mr. Franklyn

22  said something in his report, and I'm sure Mr. Franklyn will

23  agree or disagree.

24        THE COURT:  Are you -- is this from Dr. Franklyn's

25  report?

1              MR. MCKENNA:  It is.

2              THE COURT:  Mr. Franklyn's report.  Are you using

3    this to impeach, or you're not sure yet?

4              MR. MCKENNA:  Well, it depend on what he says, so

5    I'm -- if I could, for a moment?

6              THE COURT:  Yeah.  The objection is noted at this

7    point and overruled for the moment, at least.  Go ahead.

8    BY MR. MCKENNA:

9    Q.   So, Mr. Franklyn, when you described your cells, in your

10   words, in cell 1, respondents with the interested -- within

11   the interested universe were shown the image of a t-shirt

12   manufactured by Vintage Brand with the Nittany Lion -- or the

13   Nittany rock trademark on it, correct?

14   A.   Yes.

15   Q.   And in cell 2, you say all elements of the survey were

16   identical, except that respondents were shown an image of the

17   t-shirt by Vintage Brand with the Penn State S lion logo on

18   it, correct?

19   A.   Yes.  I see it.

20   Q.   And then you say in cell 3, a control cell, all elements

21   of the survey were identical, except that respondents were

22   shown an image of a t-shirt manufactured by Vintage Brand with

23   the Vintage Brand trademark on it.

24   A.   Yes, I do.

25   Q.   Okay.  So in your description, all elements of the survey

1    are identical in all of these conditions, except the t-shirt

2    that's shown?

3    A.   Well, first of all, as I noted in my direct, the -- in

4    cell 2, not only was the t-shirt shown not identical, but the

5    verbiage around it was not identical to the verbiage around

6    the image in cell 1.  It was, however, identical to the -- to

7    the verbiage that was surrounding the t-shirt that was shown

8    in cell 2, as it appeared on Vintage Brand's website.

9    Q.   Right.

10   A.   But there wasn't identicality between the verbiage around

11   it in cell 1 and cell 2.

12   Q.   Right.  I agree with you with what you say here is not

13   true.  It's not identical.  But this is what you say.  Am I

14   right?

15   A.   I think you just misunderstood me.  What I say here is

16   respondents within -- in cell 1 -- respondents within the

17   interested universe were shown an image of a t-shirt

18   manufactured by Vintage Brand with the Nittany Lion rock

19   trademark on it.

20   Q.   Right.

21   A.   In cell 2, all elements of the survey were identical,

22   meaning all of the questions, except that respondents were

23   shown an image of a t-shirt manufactured by Vintage Brand with

24   the Penn State S lion logo trademark on it.

25   Q.   Right.

ROUGH DRAFT

1    A.   What I meant by here that all elements of the survey were

2    identical is that I asked the identical questions about the

3    pictures, not that the verbiage surrounding the pictures were

4    identical.  That would be a misunderstanding of what I

5    intended to communicate.

6    Q.   Right.  Well, it's what you said, which is that all

7    elements are identical.  So we agree that it's actually not

8    true that all elements are identical.  Right?  These are now

9    just screenshots from the survey, so I assume --

10   A.   Well, it depends on how one interprets the survey.  I

11   didn't say all elements of the visual stimuli were identical.

12   I said all elements of the survey, and by that, what I meant,

13   is the survey questions were word-for-word the same.

14   Q.   Right.

15   A.   So I don't think that you're properly understanding what

16   I said in my expert report.

17   Q.   Okay.  So maybe we can just look at the images and we can

18   agree that if you're comparing, which is your test -- your

19   cell 1 image on the left and your control on the right, that

20   the differences there are not just that the t-shirts are

21   different, but also there are textual differences there,

22   right?

23   A.   Yes.  There are text wall differences, and I pointed that

24   out in some detail on direct examination.

25   Q.   Right.  And each of your respondents only saw these

1  pages, right, by which I mean you didn't show any of your

2  respondents a purchase flow that maybe started with the

3  Vintage Brand website and then went to another page.  These

4  are the only images that your respondents saw, right?

5  A.    That's right.

6  Q.    So these would be the only thing that respondents in your

7  survey could have been reacting to.  Because it's the only

8  things that they were looking at?

9  A.    Correct.

10  Q.    And so looking at them side by side, you agree with me

11  that it's not true that the -- that the images on the shirt

12  are the only thing that had changed?

13  A.    I agree that I -- that that's because Vintage Brand uses

14  different language around each of these t-shirts.

15  Q.    So -- so if it were important to know the amount of

16  confusion specifically associated with this image, your survey

17  doesn't actually hold everything else constant and isolate

18  them, does it?

19  A.    Well, as I said, in a point of purchase confusion survey,

20  one wouldn't do that, because the confusion that is legally

21  actionable can be related to the verbiage around the image.

22  And if it suggests a connection between Penn State and Vintage

23  Brand, which a third of the survey takers found that it did,

24  that's part of the infringement.

25  Q.    So your survey only gives us information about the use of

1  this, on this website, with this verbiage?

2  A.   Well, except --

3  Q.   That is the only thing you tested?

4  A.   Well, except that I tested two different versions of the

5  verbiage.  And I found that even when the references to Penn

6  State were fewer, there was still a very substantial amount of

7  consumer confusion.

8  Q.   Right.  When tested this way, that you can't isolate

9  between the image and anything else?

10 A.   It's not -- it's not proper in a survey of this type to

11 isolate between the image and the surrounding material,

12 because the surrounding material, the surrounding references

13 to Penn State, if they're interpreted in this context where

14 they're shown, a Penn State branded piece of merchandise, and

15 if that creates confusion, then that is infringement.

16 Q.   Okay.  Let's talk a little bit more about exactly how you

17 did that, showing them, on the website.

18           So you described what you said you were testing as

19 the images of the shirts on the site of Vintage Brand, right?

20 That's what you used as your --

21 A.   I'm sorry.  Could you say that once more.

22 Q.   You were showing images of the t-shirt on the Vintage

23 Brand website.  That's what your design was?

24 A.   On the product page of the Vintage Brand website for

25 these two t-shirts.

1    Q.    Okay.  And -- in this image, what you see is that you --

2    you have told the respondents in this to review this item.  It

3    is an image as it appears on the website and they should

4    review it as in considering purchasing the item.  Do you see

5    that at the top?  You directed the respondents to look at this

6    image --

7    A.    I didn't say --

8    Q.    -- this product.

9    A.    Yes, but you -- I'm sorry that I'm sounding picky.  But

10   it's very important for me to listen to your questions very

11   carefully, and the way they're worded and to respond to them.

12   You said a moment ago that this image is a copy of apparel as

13   it appeared.  It doesn't say there at the top in the red box.

14   It says below is an image of an item of apparel for sale on a

15   website.

16   Q.    Right.

17   A.    Please review this as if you were considering the

18   purchase of this item.

19   Q.    Right.  And your testimony was that you were showing them

20   this on the Vintage Brand website.

21   A.    Well, I wasn't showing it on the Vintage Brand website.

22   No.  That's not my testimony.

23   Q.    This is not an image of the Vintage Brand website?

24   A.    This is -- this is an image taken from the Vintage Brand

25   website.

1   Q.   Right.  Okay.  So it's an image taken from the Vintage

2   Brand website that's meant to replicate what this product

3   looked like for sale on the Vintage Brand website.

4   A.   On the product page of the Vintage Brand website.

5   Q.   Okay.  All right.  And when you asked your respondents

6   your various confusion questions who puts it out, sponsors,

7   you directed them specifically to -- with questions about the

8   product, right, so here's one example.  This is the first

9   screenshot.  What company makes or puts out this product.

10  A.   What's your question?

11  Q.   I'm just asking.  Is that correct?  You directed them to

12  answer the questions about the product?

13  A.   I asked them what company makes or puts out the product.

14  I didn't direct them to do anything.

15  Q.   Okay.  You asked them to focus on the product.  And then

16  you asked them questions about the product, the product here

17  being the t-shirt.

18  A.   I didn't ask them to focus on the product.  Again, I just

19  said what company makes or puts out the product, and I showed

20  them an image of the product in its context on the product

21  page, leaving it to them, that is the survey takers, to decide

22  what to focus on, whether the shirt alone or all of the rest

23  of the surrounding context.

24  Q.   Okay.  Now, you say that you did this, that you showed

25  them with -- with all of the surrounding context because

ROUGH DRAFT

1  that's the way they appeared on the Vintage Brand website.

2  That is what you said?

3  A.   I said that's the way they appeared at the time I did my

4  survey on the product page.

5  Q.   Right.

6  A.   Of the Vintage Brand website.

7  Q.   But consumers who were really shopping or Penn State

8  apparel on the product page of the Vintage Brand website would

9  have seen that they were on the Vintage Brand website,

10  wouldn't they?

11  A.   Would have seen that they were on the Vintage Brand

12  website.

13  Q.   Obviously they would have seen the Vintage Brand web

14  address, the URL?

15  A.   Well, they would have -- they would have seen a URL that,

16  to the best of my knowledge, included both the name Vintage

17  Brand -- it was a complex URL -- and, followed by, like, back

18  slash Penn State.

19  Q.   Right.  Okay.

20  A.   That's what they would have seen.

21  Q.   Okay.  Mrs. Rhinehart, if you could just take that down.

22  I'm going to just skip ahead.   Mr. Franklyn, on your survey

23  --

24          MR. MCKENNA:  Now if you could please show it to

25  Mr. Franklyn.

BY MR. MCKENNA:

Q.   On your survey, the respondents didn't actually see the product with a URL, did they?

A.   No.  They did not see the URL.

Q.   Because you removed it?

A.   To the best of my recollection, I removed it.  Yes.

Q.   Yes.  So it's not actually true that you -- that any of the respondents saw the products as they appeared on the product page of the Vintage Brand website because this is not actually how anyone would have seen it shopping on the product page of the Vintage Brand website?

A.   Well, it is, I guess, with the exception of Vintage Brand slash Penn State URL.

Q.   Right.  Is it your testimony that people don't notice or pay attention to the web address of the page that they're on?

A.   No.  I didn't say that.

Q.   So you removed real world context about this page for what reason?

A.   Honestly, I don't recall if it was inadvertent or if there was a reason for it.

Q.   Yeah.  So you were doing a survey that you have now repeated over and over was meant to show, as consumers were shopping on the web page, but you removed the URL and you don't know why?

A.   Well, I think that one of the reasons may have been that

1   it included the word Penn State in it.  And it was a complex

2   URL, and we were trying to take the product page and isolate

3   it as it would have appeared to consumers at the time.

4   Q.    Isolate but remove something that we would have seen.

5   A.    They may have seen.

6   Q.    They may have seen.  You're not sure -- do you have any

7   evidence that consumers don't pay attention to the web address

8   that they're using when they're shopping on a website?

9   A.    I don't have any evidence of this case in particular.

10   But I have -- well, I think that it's probably an open

11   question of what -- to what degree people who shop online

12   focus on URL's in particular, when, or at all, when they're

13   trying to make a decision about whether they want to buy a

14   particular piece of merchandise.

15   Q.    But you don't know how it would have affected answers

16   here because you removed it?

17   A.    I don't know how the URL would have affected answers here

18   or if it would have at all.

19   Q.    Okay.  Thank you.

20        MR. MCKENNA:  Mrs. Rhinehart, please take that

21   image down.

22   BY MR. MCKENNA:

23   Q.    Now I'd like to focus here specifically on the t-shirt

24   that you used in your stimulus.  I'm going to just get to that

25   image.  Okay.

ROUGH  DRAFT

1          MR. FINKELSON:  Again, as long as you're showing

2   him from his report, I have no -- no objection -- from the

3   exhibits, no objection.

4          MR. MCKENNA:  Can we publish to the jury, please.

5   BY MR. MCKENNA:

6   Q.   Now, Mr. Franklyn, in your report, you said that the role

7   of a control cell is to account for noise in the data set.

8   You said that in your testimony also?

9   A.   Yes.

10  Q.   Okay.  And in your report, you said, i.e., could any

11  shirt, offered on the Vintage Brand website create a latent

12  connection with a university or Penn State specifically.

13  That's what you defined as noise.  Do you remember that?

14  A.   Are you representing to me that that I said that in my

15  expert report?

16  Q.   Yes, I am.

17  A.   Oh.  Well,

18  Q.   You have a copy if it in front of you if you would like

19  to refresh your recollection that.'s on page 38?

20  A.   Oh.  Give me one second.  Yes.  I see what you're talking

21  about.

22  Q.   Okay.  Is it really your testimony, Mr. Franklyn, that

23  the only thing a control is supposed to do would be to test

24  whether any shirt on the Vintage Brand website would prompt

25  Penn State answers?

1    A.    I don't think that's the only role of a control.  But I

2    think it is a one of the roles of a control.

3    Q.    Would you agree with me that a plain white t-shirt with

4    no imagery on it at all would be a bad control?

5    A.    No.

6    Q.    Why not?

7    A.    Well, because remember we're trying to figure out if

8    people will name Penn State as being the maker or being the

9    sponsor or having approved of a piece of merchandise, even if

10   there's no reference on that merchandise to Penn State by

11   name, or use of one of Penn State's trademarks.  And

12   therefore, we're trying to pick something that really doesn't

13   reference Penn State, which is why I picked this control.

14   Q.    Right.  Well my question was about a plain white t-shirt

15   with no imagery, which I agree would certainly not reference

16   Penn State.  I was asking whether you thought that was an

17   acceptable control?

18   A.    I don't know.  I'd have to think about that.

19   Q.    Okay.

20   A.    I didn't consider using a plain white t-shirt here.

21   Q.    Right.  Mr. Franklyn, I'm sure you're familiar with Dr.

22   Shari Diamond?

23   A.    I am.

24   Q.    She is a leading expert in survey design.

25   A.    I have coauthored an article with Dr. Shari Diamond, yes.

1   Q.   And she is co-editor with one of the leading treatises

2   about survey design?

3   A.   Yes.

4   Q.   You're familiar with her Chapter is specifically about

5   controls?

6   A.   I am.  I am, yes.

7   Q.   Okay.  So as -- you would agree, then, with Professor

8   Diamond when says a control stimulus should retain as many

9   non-infringing characteristics of the test stimulus as

10   possible, with the exception of the key characteristic you're

11   trying to test?

12   A.   Yes.

13   Q.   You would agree with that?

14   A.   Yes.

15   Q.   And a plain white t-shirt wouldn't share any

16   characteristics with the allegedly infringing products here,

17   except that they were both t-shirts, right?

18   A.   I think that's fair to say.

19   Q.   So there would be no reason at all for respondents to say

20   that a plain white shirt came from Penn State?

21   A.   Yes, that's -- I think that's right in the sense that it

22   didn't share any of the allegedly infringing characteristics.

23   Q.   And it wouldn't share any of the non-infringing

24   characteristics, except that it was a t-shirt?

25   A.   I think that's fair to say.

```
 1   Q.   Yeah.  Now, the t-shirt that you used, Mr. Franklyn, the
 2   Vintage Brand t-shirt, that shirt doesn't use any kind of
 3   college sports imagery, does it?
 4   A.   No.
 5   Q.   No.  A shirt with college or sports imagery would
 6   certainly share more characteristics with the allegedly
 7   infringing shirts than a plain white t-shirt, wouldn't it?
 8   A.   Only in an abstract conceptual sense, like if I had used
 9   a control, Buffalo Bills or a -- oh, let's say, University of
10   Michigan, Wolverine, I could have done that, I suppose.
11   But it could also introduce other variables --
12   Q.   Right.
13   A.   -- in to the test that I -- I wouldn't have wanted to
14   introduce, whereas this t-shirt that I picked, is an actual
15   t-shirt sold by Vintage Brands -- Vintage Brand on its
16   website, and it is sold in a way that doesn't have any
17   reference to Penn State at all on it.  And for those reasons,
18   I thought it hued to the guidelines that it doesn't share any
19   of the allegedly infringing characteristics of the accused
20   product, including verbiage on the top or around it that
21   refers to -- I'm sorry, to Penn State.
22   Q.   Right.
23   A.   Because it's my understanding in this case that Penn
24   State alleges infringement, not based solely on what's on the
25   t-shirt, but the use -- the unauthorized use of Penn State's
```

1    name all around the t-shirt to suggest a connection.

2    Q.   Mr. Franklyn, my question is specifically --

3    A.   Well, it's important to the answer.  I'm sorry to cut you

4    off.  But it's important to the answer.  Penn State's alleging

5    that the references to Penn State all around the imagery were

6    not authorized, and that they add to the confusion, then

7    that's part of what I had to consider in picking a control.

8    Q.   My question was about the choice of the t-shirt, not

9    about any of the other stuff on the page.  And I think you

10   agreed with me that a plain white t-shirt wouldn't have shared

11   any characteristics, except for being a t-shirt.  It wouldn't

12   have shared any of the non-infringing characteristics, right?

13   A.   Well, that's an interesting question.

14   Q.   You're not sure if a plain white t-shirt?

15   A.   Can I please finish?  That's all I ask.  I have listened

16   to your questions.  Okay.  And I'm trying to give you a

17   thoughtful answer.

18          I don't know that there are, on the two test images

19   that I have used of the Nittany Lion and the S.  Lion t-shirts

20   any, like, dissectable, separating non-infringing elements

21   that -- that's all that's on those t-shirts is the trademarks

22   and the logos.

23   Q.   So you couldn't have done anything closer, right?

24   Couldn't, for example, have used something like this.

25          MR. FINKELSON:  Objection, Your Honor.  May we

1   approach?

2               THE COURT:  Remember the microphones.

3               (The following discussion occurred at sidebar.)

4               MR. FINKELSON:  Counsel has put up on the screen an

5   image from Mr. Franklyn's survey Number one.)

6               MR. MCKENNA:  No, it's not.  It is not.  I actually

7   took a screenshot from Amazon last night that.  The control in

8   survey one is Game Day.  It's a different shirt.

9               MR. FINKELSON:  Is it up on anyone's screen?

10              MR. MCKENNA:  It's an image from Amazon.

11              MR. FINKELSON:  I may have to get the one from

12  survey one.  It looks almost identical

13              THE COURT:  It's similar, but it's not the same.  I

14  remember the other one.  I remember -- just hold on a second.

15  Just spin around.

16              MR. FINKELSON:  Should I go back to Counsel table

17  and look at it, and then we can come back to sidebar?  I don't

18  think we can otherwise see it.

19              THE COURT:  Turn the white noise off.  Turn the

20  white noise off and put it up.  Now put the white noise on

21  again, would you please.  All right.

22              MR. FINKELSON:  Obviously -- as long as he's going

23  to ask him about this shirt and tie it to confusion and not

24  say anything about survey one, not suggest --

25              THE COURT:  No, No, he has not.

ROUGH DRAFT

1          MR. FINKELSON:  But first of all, Your Honor, I

2    recognize -- I was confused that it was the same shirt.

3          THE COURT:  Yeah.  Understood.

4          MR. FINKELSON:  We now see it's a different one.  I

5    do think this is an area where Counsel needs to tread

6    carefully.  I don't think -- I don't have an objection to

7    showing this image.

8          MR. MCKENNA:  My purpose is just to talk to this

9    about this being an alternative control that he could have

10   used that would have shared more characteristics with the

11   infringing product.

12         THE COURT:  That's fine.

13         MR. FINKELSON:  Understood.

14         THE COURT:  We're good.  That's fine.

15         (The sidebar was concluded )

16   BY MR. MCKENNA:

17   Q.   Mr. Franklyn, I just want to go back just to make sure we

18   understand.

19         COURTROOM DEPUTY:  Who am I showing?

20         MR. MCKENNA:  Publish to everyone.

21   BY MR. MCKENNA:

22   Q.   So you agree with me that -- with Dr. Diamond, that a

23   control stimulus should retain as many non-infringing

24   characteristics as possible, with the exception of the thing

25   that's being tested; you agree with me on that?

1  A.   As a general guideline, but again, these guidelines need

2  to be balanced sometimes against other considerations in

3  picking an appropriate control.

4  Q.   Is it -- would it be your testimony that this shirt that

5  just says game time and has a football image on it, would be

6  introducing infringing alternatives, but would be -- this

7  shares a lot of non-infringing characteristics -- a lot more

8  than a plain white shirt, doesn't it?

9  A.   Yes.

10  Q.   It does.  And --

11  A.   Well, wait, wait, wait.

12  Q.   Is it --

13  A.   Can I change my answer?

14        THE COURT:  Hold on.  Yeah.  Well, yes, of course.

15  Don't talk over each other because I can't follow and I dare

16  say the jury can't.  So go ahead.  You wanted to answer.  Go

17  ahead, Professor.

18        THE WITNESS:  Thank you, Your Honor.  Counselor,

19  could you please repeat your question?

20  BY MR. MCKENNA:

21  Q.   Yes.  We've agreed that as a general principal, that a

22  control should share as many non-infringing characteristics as

23  possible.  Right?

24  A.   With what?

25  Q.   With the test image.

1   A.   Yes.

2   Q.   Okay.  And you've agreed with me that this image shares

3   more non-infringing characteristics with the test images than

4   would have a plain white t-shirt?

5   A.   I don't agree with that.

6   Q.   You don't.  You don't think the introduction of anything

7   sports related would share similarities with the things you

8   tested that aren't present in a white t-shirt?

9   A.   The test image did not have the word game on it.  It

10  didn't have a football on it.  It didn't have the word time on

11  it.  And so therefore, this t-shirt that you're showing me

12  shares notice of appeal element, design element whatsoever

13  with the test images.

14  Q.   So your testimony is in order to share non-infringing

15  characteristics, those have to be features that are found in

16  the test image, but that aren't alleged to be trademarks?

17  A.   Yes.

18  Q.   So a control that has more similarities in the sense that

19  it has sports imagery on it, that's not a better control than

20  a plain white t-shirt that has no similarities at all?

21  A.   It may or may not be, but that's not what you asked me.

22  You asked me if this shares more non-infringing elements than

23  a plain white t-shirt, which itself is hypothetical because

24  that's not what I used.  But let's just go with it.  That this

25  shares more non-infringing elements with the test images than

1  a plain white t-shirt.  And I'm telling you, frankly, and

2  confidently, that that's not true.

3  Q.    Okay.  Well, let's go back to take a look at your shirt,

4  and then add one more here, which your control t-shirt also

5  doesn't make any reference to the Commonwealth of

6  Pennsylvania, right?

7  A.    No, it does not.

8  Q.    No.  And shirts with references to the Commonwealth of

9  Pennsylvania surely would have non-infringing overlap, right,

10 with the test cell, by your description, in order for it to be

11 sharing non-infringing characteristics, those things would

12 have to be present in the test, right?

13 A.    I'm sorry.  I didn't understand your question.

14 Q.    I think when you were saying before that the reason why

15 the sports imagery was not sharing non-infringing

16 characteristics, is because the words game, time, and the

17 football weren't in any of the Penn State imagery that was on

18 the test cell, right?

19 A.    That's correct.

20 Q.    The word Pennsylvania is, isn't it?

21 A.    Is what?

22 Q.    Is in the seal that you tested in one of the images?

23 A.    Of one of the test images?

24 Q.    Yes.

25 A.    Yes.

1    Q.    The word Pennsylvania?

2    A.    Yes.  It's in the -- the seal of, I believe, Penn State

3    University.

4    Q.    And Penn State doesn't own all references to

5    Pennsylvania, right?

6    A.    No.

7    Q.    So a shirt that made reference to the Commonwealth of

8    Pennsylvania would share non-infringing characteristics with

9    the test image?

10   A.    I don't agree with that.

11   Q.    You don't.  You don't agree that the word Pennsylvania,

12   that the University doesn't own, being present in the control

13   would share non-infringing characteristics?

14   A.    No.

15   Q.    Okay.  Why not?

16   A.    Because in the context of this survey, if I had put the

17   word Pennsylvania on the control image, it may have provoked

18   or prompted some -- and asked them -- asked the survey takers,

19   do you think that this product is affiliated with any other

20   entity, the way that that word Pennsylvania appears in the --

21   in the seal of the State of Pennsylvania also includes the

22   word state, not just the word Pennsylvania.  It's the State of

23   Pennsylvania.  And it's quite possible that somebody looking

24   at that quickly would have thought oh, I wonder if this is a

25   -- connected with Penn State, particularly since Penn State

ROUGH DRAFT

```
 1   University has a seal of its own that says Penn State
 2   University on it.
 3            And so that would have been risky to do that.
 4   Q.   So you think any reference to the state of Pennsylvania
 5   in the control would have been illegitimate because it might
 6   have reminded people of Penn State?
 7   A.   I didn't say it that categorically.  I said my answer was
 8   about the specific hypothetical you gave me.  And -- and my
 9   answer remains.
10   Q.   Okay.  Now your control not only doesn't use any sports
11   imagery, right?
12   A.   Well, it doesn't use any logo or name of any team.
13   Q.   Right.  Or image of a football or a basketball, nothing
14   like that?
15   A.   That's right.
16   Q.   And it doesn't use the word Pennsylvania.  What it does
17   use really prominently is the name Vintage Brand, right
18   A.   That's right.
19   Q.   And you were showing that to people on the Vintage Brand
20   website, right?
21   A.   Yes.  Because they sell that product on the website.
22   Q.   Right.  And you'll notice that the name that's on the
23   front of the shirt, the logo that you used as a test, that
24   matches the Vintage Brand logo that's in the top left?
25   A.   I do.
```

1   Q.   Yeah.  Okay.  Now, you showed respondents on this page,

2   right, you showed them that image on a page that otherwise

3   makes no references to any schools or any sports, right?

4   A.   Well, it does say at the top, right over the picture of

5   the t-shirt the following.  It says leagues, Vintage athletes.

6   Then it says athletes.  And so let me just look at it for one

7   more second, because there's right there three references to

8   athletics.  And then -- well, those -- and then above that, in

9   the darker lettering directly to the right of the Vintage

10  Brand logo that you have outlined in red, which I want to make

11  sure the jury understands, that you -- you added that, that's

12  not the way that it appeared on the Defendant's website, but

13  you see it says college.

14  Q.   Right.

15  A.   And then it says baseball, and then it says football.

16  And then it says basketball.  And then it says vintage

17  athletics.

18  Q.   Right.

19  A.   And so no, I don't agree with you that there was no

20  reference to college athletics on the stimuli that I presented

21  in the control group.

22  Q.   No reference to the names of any colleges?

23  A.   No.  But that's not what you asked me.

24  Q.   Okay.

25  A.   You asked me whether there was any --

1   Q.   Then I'll rephrase the question for you.  You see there
2   are no references to the names of any colleges here.
3   A.   I see no references to the name of any particular
4   college, but I see reference to college, baseball, football,
5   basketball, and vintage athletes.
6   Q.   Okay.
7   A.   So that there is a suggestion, if you will, by the
8   context that this is related to athletic wear.
9   Q.   Mr. Franklyn, you said -- you agreed with me earlier that
10  you were familiar with Dr. Diamond, and you were familiar with
11  the survey book, and in particular, familiar with her control
12  chapter, right?
13  A.   Yes, sir.
14  Q.   Okay.  So I'm sure, then, you're also familiar with the
15  principal that she describes there that a control has to be
16  something that could plausibly have come from the Plaintiff,
17  right?
18  A.   I don't recall that particular sentence in that
19  particular Chapter.  But --
20  Q.   Do you recall that she cites several cases where surveys
21  have been dismissed because they didn't use a control that
22  could plausibly have come from the Plaintiff?
23  A.   Well, I think that this could not have come from the
24  Plaintiff for the reason that if Penn State had sold this,
25  they would have needed permission from Vintage Brand, the same

**ROUGH DRAFT**

1    way that Vintage Brand needed permission from Penn State.

2         However, I don't think that's an overriding

3    consideration for this particular survey.  And as I tried to

4    tell you, that all of these are guidelines.  They're not

5    absolute rules.

6         The survey stimuli needs to be picked in the

7    context of each survey based on countervailing considerations

8    and guidelines that need to be balanced against each other.

9    Q.   And that's why it was okay for you to use a design that

10   couldn't plausibly have come from Penn State.

11   A.   Well, I -- I think it was more than okay for me to use

12   this as a control for the purpose that I was using it for.

13   And that it doesn't, in any way, suggest, at least in an

14   express way, an affiliation with Penn State, because if it

15   did, which all of Penn State's merchandise does, okay, so in

16   the context of this case, to say something that plausibly

17   could have come from the Plaintiff, would almost, by

18   definition mean something that had Penn State's name and/or

19   logos on it.  And if I did that, that would have violated a

20   different guideline for picking an appropriate control.

21   Q.   I think I've asked you about two -- at least two other

22   kinds of characteristics that would have made it more

23   plausibly like something that could have -- they could have

24   used sports imagery which you said you didn't -- you didn't

25   think it could use?

ROUGH DRAFT

1  A.    That I didn't think what?

2  Q.    I asked you about using a different control, sports

3  imagery, and you said no, you couldn't do that?

4  A.    I didn't say that.  You asked me a question about whether

5  sports imagery of the type shown on, I guess, Game Day, the

6  Game Day t-shirt with the football.

7  Q.    The shirt I showed you said Game Time.

8  A.    Game Time.  I apologize.  Whether that shared

9  characteristics with the allegedly infringing merchandise, and

10 I said it did not.

11 Q.    Okay.

12 A.    Share any of them.  That was the context in which you

13 asked me those questions.

14 Q.    Now, wouldn't a shirt with sports imagery on it more

15 plausibly have come from Penn State, even ones that didn't use

16 the words Penn State or any other terms, but just said game

17 time and use the football.  Don't you think that would more

18 plausibly come from Penn State then a black and white t-shirt

19 that says Vintage Brand?

20 A.    Well I don't know.  You know, as I mentioned a moment

21 ago, to my knowledge, Penn State doesn't sell, or at least the

22 vast bulk of the clothing that they sell, doesn't have generic

23 athletic imagery on it.  It is branded with the name and/or

24 logos of Penn State.

25        So when you say well, yes, but it would be more

ROUGH DRAFT

```
1   plausible, that's not really the issue here.  The issue is
2   whether it is the type of thing that Penn State sells.  And it
3   isn't.
4   Q.   Right.  It isn't the type of thing Penn State sells.  And
5   that means it's not plausibly from Penn State?
6   A.   Correct.
7   Q.   Right.
8   A.   I'm talking game time.
9   Q.   Also -- and your control.  Not plausibly from Penn State,
10  right?
11  A.   Correct.  Because in this case, to try to follow that
12  guideline is -- as a practical matter, almost impossible
13  because every -- everything Penn State sells, in terms of
14  clothing and through its authorized sellers, unlike Vintage
15  Brands, does carry the name Penn State and Penn State logos on
16  it.
17  Q.   Okay.  So just to be clear, Mr. Franklyn, when you used
18  your Vintage Brand shirt as the control image, it just
19  happened that zero percent of your respondents named Penn
20  State as the shirt -- as the source of the shirt; isn't that
21  it right?
22  A.   It's not just so that it happened, that's a fact that no
23  one named it.
24  Q.   Right.
25  A.   No one named Penn State.
```

ROUGH DRAFT

1  Q.    In fact, zero percent of the respondents in your control

2  condition named Penn State in response to any of your

3  questions, did they?

4  A.    That's correct.

5  Q.    Right.  So when 0 percent of your respondents mention

6  Penn State across any of those questions, that would seem like

7  pretty good evidence that the control couldn't plausibly have

8  come from Penn State?

9  A.    That -- that is true, and that's because it didn't, and

10  there was no suggestion in any -- in the product that was

11  shown or the verbiage around it that it was connected with

12  Penn State.

13  Q.    Right.  Agreed.

14        So just to be clear, again, the fact that you found

15  zero percent in the control cell on every one of your

16  questions naming Penn State, meant that you didn't have to

17  subtract anything from your gross confusion numbers, did you?

18  A.    In my opinion, that is correct.  I didn't have to

19  subtract anything, but I did.  I subtracted 4 percent.

20  Q.    Yeah.  But by -- only because you also counted answers

21  that didn't specifically name Penn State, right?

22  A.    Yes.  And because I also counted -- let's be -- let's be

23  precise, please.  I counted university and college as

24  potential evidence of confusion in my test cell because there,

25  I thought that the survey takers -- and there weren't that

1  many who said that, but because there, I thought that my

2  survey takers, when they said university might have been

3  referring to the University that they saw on the t-shirt,

4  which was Penn State.  Here, if somebody said university or

5  college, they could have easily been influenced by the use of

6  the word college at the top, and in other places.

7  Q.   Right.

8  A.   And like athletic wear, that there was an affiliated

9  college of some sort or athletic organization of some sort

10  that was affiliated with this piece of merchandise.

11       However, they would not have said Penn State

12  because there's no suggestion of Penn State.

13       But because I used that metric and that criteria in

14  my test cell, in other words, answers that said university or

15  college, I felt that it was, perhaps not necessary, but more

16  fair to use the same criteria in judging whether there was

17  confusion in the control cell.

18       And so when I found those answers in the control

19  cell, I found 4 percent of them, I decided okay.  Let's count

20  it as confusion in the control cell and deduct it.  But no,

21  strictly speaking, it would have been legitimate for me to say

22  there was no confusion and therefore, the rates in the control

23  cell and therefore, the rates of confusion in the test cell

24  are actually 4 percent higher than I reported, and even more

25  significant, not a lot, but more significant than I reported.

1   Q.   Do you think it would have been legitimate for you to add

2   those questions in the test, but not in the control?

3   A.   To add.  They weren't questions.

4   Q.   Well I think what I just heard you say is, yeah, it would

5   have been okay to have counted the answers where someone said

6   college or university or NCAA in the test, but not take them

7   out in the control.

8   A.   It would -- it -- it crossed my mind as a possibility

9   because of the difference in the context, and I decided that

10  the better practice here was to use the same criteria for what

11  counted as confusion in both the test and in the control.

12  Q.   Okay.  I want to shift gears a little bit and talk a

13  little bit about the way you selected your population for the

14  survey.

15          Now, in your direct testimony, you talked a little

16  bit about one of the screeners where you screened out, you

17  removed people who selected that they worked for higher

18  education?

19  A.   Yes.

20  Q.   Is that right.  Why did you do that?

21  A.   Well I think as I said in my direct, that it was a way of

22  making sure that no Penn State employees took the survey.

23  Q.   Okay.  Why didn't you just ask people if they worked for

24  Penn State?

25  A.   Well, it wasn't just an attempt to screen out from the

1    survey the people who work for Penn State.  It was an attempt

2    to screen out people who worked for or had a family member who

3    worked for any entity that was in higher education.  And -- on

4    the theory that -- or the supposition that those people might

5    have a little different view of what they were looking at and

6    whether they thought that was an affiliation between the two

7    entities.

8            And so although I gave it as an example, to screen

9    out people who worked for Penn State, that wasn't the only

10   type of people I was trying to screen out.

11   Q.   I understand.  So if you were, though, trying to screen

12   out Penn State employees, would it have been okay for you in

13   that screener question to have asked, do you work for Penn

14   State?

15   A.   I'd have to give that thought, more thought.  I'd have to

16   think about that.

17   Q.   Okay.  The target population for your survey was

18   purchasers or potential purchasers of college sports apparel;

19   is that right?

20   A.   Yes.

21   Q.   Okay.  And by -- just to be clear, by target population,

22   what you mean by those are the people whose views you were

23   interested in testing?

24   A.   Primarily.  Yes.

25   Q.   Okay.  So -- now if you could show Mr. Franklyn this,

1  this is just a screenshot from one of his surveys, I think you

2  can publish it to the jury, as well.

3          So that's why you screened potential participants

4  to include only those people who were purchasers or potential

5  purchasers of college sports apparel.  That's the point of

6  this question?

7  A.    Yes.  Now remember, they were first asked whether they

8  purchased clothing in the last 12 months or intend to in the

9  next 12 months?

10  A.    Right.

11  Q.    Right.  Got it.  But only people who checked the box here

12  for college sports apparel qualified for the survey, right?

13  A.    That was the target.

14  Q.    Right.  So you excluded everybody else.  I'm just making

15  sure I understand.  That's what it means to be a screener?

16  A.    That -- that's what it can mean to be a screener.  A

17  screener can also be a data collection point.  But it -- it

18  was an attempt to get that -- those people, or as many of

19  those into the survey as possible.

20  Q.    Okay.  Now, you -- and those are the people that you

21  thought were important to have in the survey because those are

22  the people you understood to be Vintage Brands' customers?

23  A.    Well, yes, except that I also thought that Vintage Brand

24  customers could be almost anybody, as I -- I was here

25  yesterday, and I listened to one of the witnesses who was an

1    employee of Vintage Brand's say that their target was anybody,

2    anybody could come upon their website and buy their clothing.

3    Q.    Well, but you didn't include anybody in your survey.

4    A.    No.  I included people who buy clothing.

5    Q.    Right.  Because -- buy college sports apparel.

6    A.    That was the target.

7    Q.    Right.  Okay.  But in addition to those two -- those

8    questions, right, about screening, you actually asked two more

9    questions that you talked about with Counsel.  Right.  First,

10   you asked respondents whether, in the last 12 months, they had

11   purchased apparel featuring any of the schools on this list.

12   Right?

13   A.    Yes.

14   Q.    Right.  And then you also asked whether, in the next 12

15   months, respondents were likely to buy apparel featuring any

16   of those same schools, right?

17   A.    Yes.

18   Q.    So -- I think you said there wasn't anything magical

19   about this list of schools.  It was just a group of schools

20   that had sports that you knew of?

21   A.    Yes.  And kind of generally speaking, you know, major

22   sports programs.

23   Q.    Right.  But the list always included Penn State, right?

24   A.    As one of the schools, yes.

25   Q.    As one of them.  For every respondent?

1    A.    Yes, sir.

2    Q.    So before you asked any of the respondents questions

3    about the Vintage Brand products, you asked every one of them

4    twice about Penn State merchandise?

5    A.    Not quite.

6    Q.    You didn't?

7    A.    No.  I asked them whether they have purchased apparel

8    from any of the following universities, and Penn State --

9    Q.    Was one of them?

10   A.    -- was listed as one of 13.

11   Q.    Okay.  And you did that twice?

12   A.    In the -- yes, in the sense, again, for the jury, that

13   one time it was whether you had done so, looking backwards 12

14   months, and the we are time is whether you intended to buy

15   merchandise featuring any of the following universities or

16   their sports teams in the next 12 months.

17   Q.    Got it.

18          Now, I think on direct you said, correct me if I'm

19   wrong, here, that you wanted to check to see if those who said

20   they had purchased or were planning to purchase, you said, it

21   was kind of like a soft quality check, you said okay.  Name

22   some.  Right?

23   A.    Yes.

24   Q.    Except you didn't ask anyone to name schools.  Did you?

25   A.    No.  Well I asked them to check one of the boxes.

1  Q.    You named the schools.

2  A.    I gave them a list, and they could check as many or few

3  as they wanted.

4  Q.    Right.

5  A.    Or none.

6  Q.    It wasn't like an open ended question where you said have

7  you purchased college sports apparel and they said yes.  And

8  then you said from what schools.

9  A.    No.  It wasn't set up like that.  This is what's called a

10  closed-ended question, with a defined and finite set of

11  potential answers.

12  Q.    Yeah.  And you said it was a sort of a soft quality

13  control.  What answer would have indicated poor quality?

14  A.    Well, you know, that's a good question.  It wouldn't have

15  necessarily indicated poor quality to me.  It was just a way

16  for me to collect data to see if people could identify some

17  schools or any schooling from which they had bought -- or in

18  connection with they had bought this type of merchandise.

19  Q.    Right.  And did you fail anyone for their answer to this?

20  A.    No.  This was not meant as a kick out question.

21  Q.    Right?

22  A.    It was just meant as a data collection question, and to

23  be honest, we weren't sure what we would do with the data once

24  we got it.  We would just look at it.

25  Q.    Right.  And data collection questions where you're not

1    using them to screen people out, that you just want to look at

2    the data, you can do those at the end of the survey, right?

3    A.    Yes.

4    Q.    Right.  But you didn't?

5    A.    No, I didn't.

6    Q.    Okay.  I -- just to close a loop there, you didn't use

7    the answers to these questions in any way to screen anyone out

8    or in to your survey?

9    A.    That is correct.

10   Q.    Okay.  So before we finish, I'd like to talk a little bit

11   about the way -- you can take these down, please -- about the

12   way you counted responses here.

13              So after you showed respondents the screen shot for

14   their cell, right -- I think you can show it to both the

15   witness and the jury.  This is just from the survey.

16              All right.  After you showed respondents the screen

17   shot for their condition, you started asking them a series of

18   questions, right?

19              This is the first one you asked.  Who puts out this

20   product.  Who makes or puts out.

21   A.    Yes.

22   Q.    Okay.  And it actually turns out that the overwhelming

23   majority of people answered that question by saying Vintage

24   Brand.  Didn't they?

25   A.    Yes.  That's correct.

Q.   When you were tabulating your results, you counted as
confused anyone who said Penn State put out the product?

A.   I tabulated as confused in response to this question
anyone who said Penn State, the University, or the college, or
the NCAA.

Q.   Right.  And earlier, you were telling me that you used
the follow-up question, the next question, which is why do you
say that.  Right.  And I think we agreed that there's nowhere
in your report where you do an analysis of those verbatims?

A.   No.  I mean I agree.  Yes.  That's correct.

Q.   How many of the respondents said something in the
verbatim answers that clearly identified the images on the
t-shirt?

A.   I checked that later, and asked my staff to check it, and
I don't recall the exact number or percentage, but I remember
that it was a significant bulk of people who identified the
images.

Q.   A significant bulk of the minority of people who said
Penn State?  Is that what you mean?

A.   Of the 33 percent who said --

Q.   Well let's focus on this question.  This question, I
think you said 5 percent of people said Penn State?

A.   Yes.  I was answering -- yes.  For just this question, of
the 5 percent who said Penn State.

Q.   Right.

1  A.   I don't know if I looked at it just -- if I looked at the

2  percentage of people who tied it to the logos question per

3  question.

4  Q.   Right.

5  A.   As opposed to just across all the questions since all of

6  them are legally actionable forms of confusion.

7  Q.   Right.

8  A.   And if you look at it across all the questions, a great

9  number of people tied their confusion to the name Penn State

10 and -- and to the -- or to the logos and trademarks of Penn

11 State.

12 Q.   Okay.  So just being clear, a minority of respondents --

13 with respect to this question, in particular, only 5 percent

14 said Penn State.  And then some unknown percentage of that 5

15 percent gave you an answer to your verbatim that somehow

16 confirmed that?

17 A.   It's not that it confirmed that.  Again, you're putting

18 -- I don't mean to be argumentative, Counselor, but you're

19 putting words in my mouth.  It's not that I looked at it to

20 see if it confirmed it.

21       Under standard and generally accepted principals of

22 survey design and data analysis, we don't look at the

23 verbatims to see if people tie the confusion across the board

24 to the allegedly infringing parts of the articles.  In fact,

25 Dr. Shari Diamond says, in her book -- I don't remember the

1   exact page and quote, but she says it would be wholly improper

2   and an error to do that, that they should be used just

3   qualitatively in case no one says that it's tied to the logos,

4   then the survey expert should pause before coming to a

5   conclusion that there is significant or appreciable confusion

6   related to the trademarks at issue.  But as long as some of

7   them do, the trademark survey expert, the better practice is

8   to go with the overall numerical number, and the reason is

9   because we have a control that is supposed to sort out for

10  noise and, once upon a time, when surveys were done like this,

11  there -- there were no control groups.  And so the question of

12  why do you say that is an artifact of a type of control group

13  or control that Dr. Diamond says is no longer necessary, and

14  that Jerri Swann, an expert in this area says is an artifact

15  that of the past and probably should gotten rid of now that we

16  have control groups.  So I just want to be very clear here in

17  court with the purposes of the verbatims, that they're to

18  guide us, but they shouldn't be used to override the numbers,

19  the numerical analysis, now that we use control groups.

20  Q.   Okay.  So we agree that the verbatim answers can't give

21  us a specific percentage, right?

22  A.   Not these types of verbatim answers in response to the --

23  in to these types of -- the why do you say that question.

24  Q.   Right.  So really, what you're saying is it's the quality

25  of the control that really helps us have confidence in those

ROUGH  DRAFT

1   numbers?

2   A.   Well there's the existence of the control that obviates

3   the -- or that teaches against using the verbatims to reduce

4   the amount of control -- I'm sorry, confusion as calculated by

5   the numbers.  And that's based on a number of authorities,

6   including an article that Dr. Neal is cited in as -- as

7   authority for this proposition.

8   Q.   Okay.  A few more questions about the ways you counted.

9   After this question that we see on the screen, who makes or

10  puts it out, you proceeded to ask a series of other questions,

11  right.  The next question was you asked whether respondents

12  believed that this product was sponsored by or approved by

13  another company or institution.  Right.

14  A.   Well, that's not the way it was worded.  The way it was

15  worded is in front of us now.  I don't know if the jury is

16  looking at this right now.  But --

17  Q.   Why don't you read it to us?

18  A.   Sure.  It says what other company do you believe

19  sponsored -- now this -- they only got asked this question if

20  they first said do you believe this product is not sponsored

21  or approved by any other company or institution or is

22  sponsored or approved by another company or institution.

23  Because if they said they think it's not sponsored or approved

24  by any other company or institution, they weren't shown the

25  follow-up question, which is what other company.

1  Q.   Right.

2  A.   Because we don't want to lead them in to thinking there

3  must -- there must be some other company that has sponsored or

4  approved the product before asking them the more foundational

5  question of whether they think any other company sponsored or

6  approved it.

7  Q.   Right.  It wouldn't have been proper if somebody said

8  they don't think it's sponsored by anyone for you to then say

9  who is it?

10 A.   Correct.

11 Q.   Right.  Okay.  So -- now, when you're counting responses

12 to these questions about sponsorship or approval, these are

13 the ones where you counted anyone who said university or

14 college or NCAA in addition to Penn State, right?

15 A.   Yes.  But again, I -- for the jury's sake, I want to make

16 it very clear that the vast majority of people who we counted

17 as confused said Penn State or Penn State university.  Very

18 few other people said the University or the college.

19 Q.   All right.  But you recorded those results with the

20 University, NCAA or college included in them?

21 A.   I did, yes.

22 Q.   Okay.  Your next set of questions followed the same

23 pattern, right, basically asking people something like this.

24 Do you believe the company that makes or puts out the product

25 is affiliated, is not affiliated, I don't know.  And I assume

1  you'd say the same thing here, only the people who said yes,

2  they think it is affiliated were asked, who is it?

3  A.    Yes.   Only it a person said that they did believe that

4  the company that makes it or puts it out, is affiliated with

5  another company or institution, if they said yes, then they

6  got asked the related follow-up question.

7  Q.    Okay.   Now, Mr. Franklyn, what's the difference between

8  being sponsored or approved by another company, or being

9  affiliated with them?

10  A.    Well that's a good question.   Trademark law and the case

11  law that applies t and interprets it doesn't really define

12  those terms of art.   But generally -- I mean I -- I could give

13  you examples that I think are more in the nature of a

14  sponsorship relationship than an affiliation relationship.

15  Q.    Right.   So I disagree with you that those are legal

16  words.   But you didn't ask these questions to lawyers.   You

17  asked them to ordinary consumers, right?

18  A.    Yes.   And -- and the -- the vast body of social science

19  research that has weighed in on this issue has taught against

20  defining these terms in a survey for survey takers, and

21  letting them use their own interpretation of these words, that

22  that's the better practice.

23  Q.    Yeah.   And then you asked that question in three

24  different forms, right?

25  A.    I'm not sure I follow you.

ROUGH DRAFT

1   Q.   Your survey asks four questions, who makes or puts it

2   out, right.  What's -- and we can go back to the screen if we

3   need to.  Right.  Who makes or puts it out.  Are they

4   sponsored or approved, are they affiliated.  Are they

5   licensed.

6   A.   Yes.

7   Q.   Four questions, and you think the respondents understood

8   the difference between those different questions?

9   A.   To the best extent that we can do in a survey of this

10  type without trying to give them definitions of those words

11  where the social science literature says we shouldn't do that,

12  and if we did do that, and there is no legally sanctioned

13  definition for those words in the case law, we, as survey

14  experts would be criticized for biasing the survey

15  respondents.

16  Q.   Okay.

17          So, before I finish talking a little bit about your

18  reporting of your numbers, at the beginning of your direct

19  testimony, you talked about the importance of sample size and

20  specifically mentioned margin of error and the 95 percent

21  competent interval?

22  A.   Yes.

23  Q.   What's the margin of error in your study?

24  A.   I believe it's around or less than 5 percent.

25  Q.   And is that reported in your study any where?

1    A.    It's not in my expert report.  But my team has calculated

2    it.

3    Q.    Okay.  And what -- what's the basis of the calculation?

4    How do you do it?

5    A.    There's a formula.  I don't have it in front of me.

6    Built there's a formula that one uses to come up with the

7    margin of error.

8    Q.    Okay.  Could I have slide 44 from your direct, please?

9              MR. FINKELSON:  Sure.

10             MR. MCKENNA:  If you could put it up, that would be

11   great.

12   BY MR. MCKENNA:

13   Q.    Okay.  Mr. Franklyn, at the end of your testimony, you

14   made some references to Dr. Erdem's study.  And you

15   particularly showed these numbers.  Right?

16   A.    I showed this slide with these numbers with the caveat

17   that these were just her initials numbers.  And she later

18   lowered them based on various aspects of her survey that I

19   disagreed with and, you know, said we would have an

20   opportunity to talk to the jury about all of that later in

21   this case.

22   Q.    Mr. Franklyn, these aren't her initial numbers.  Josh, if

23   you could give me exhibit 7.1.

24             COURTROOM DEPUTY:  I don't have this going to the

25   jury.

1          MR. MCKENNA:  Let me ask him a question about it

2    first.

3          COURTROOM DEPUTY:  I just wanted to let you know.

4          MR. MCKENNA:  Thank you.

5    BY MR. MCKENNA:

6    Q.   Mr. Franklyn, this is he exhibit 7.  1 from Dr. Erdem's

7    report.  I assume you're familiar with her report?

8    A.   I am.

9    Q.   This is the figure where she's reporting net confusion

10   about source and business relationship, which are her two

11   measures, right?

12   A.   Yes.

13   Q.   Right.  Now, earlier when we were talking about the

14   control test experiment, net confusion is what you said, like

15   that's bottom line answer, right?  Net confusion is when you

16   subtract out the confusion in the control from what you find

17   in the test, right?

18   A.   Yes.

19   Q.   And it's net -- when you were talking about that

20   benchmark, about the number you're supposed to -- it's net

21   confusion that matters, isn't it?

22   A.   Yes.

23   Q.   Yes, it is.  All right.  So this is the figure that's

24   from Dr. Erdem's actual initial report.  You'll notice that

25   the numbers that she reports here are different than the ones

1  you have in your chart, right?

2  A.   Yes.  Um-hum.

3  Q.   Okay.  These are different.  So these are not -- what you

4  have in your chart are not her initial numbers.  What those

5  are actually from are from a supplemental analysis that she

6  did, when she was telling -- explaining why your criticisms

7  were wrong, but then showing why they didn't matter; isn't

8  that what your slide is?

9  A.   Well, that's a loaded statement.

10  Q.   Yeah.

11  A.   She filed a report.  I analyzed it.  I analyzed her data.

12  And in her initial report, she only counted as confused people

13  who said literally Penn State.  To the best of my

14  recollection, she -- maybe she also included people who said

15  Penn State university.  But she didn't include anybody who

16  said the college or the University in the test cell where it

17  seemed clear to me that if they said the college or the

18  University, looking at a piece of merchandise that clearly had

19  Penn State on it, they meant Penn State.

20          And she didn't include those as being confused, and

21  I criticized her for it in a rebuttal report that I filed.

22          After that, she changed her mind, and she filed a

23  supplemental report, and she -- well, as you said, she

24  disagreed with me.  But I guess, in an abundance of caution,

25  she decided to include those, I think, because she thought it

was the right thing to do.  Or at least was a reasonably

prudent right thing to do.  And after she did that, her

numbers of confusion went way up from, like what you see of 20

percent or 19 percent or 32, or 30 -- up to the 30s and into

the 40s.

Q.   Mr. Franklyn, what's the net confusion level reported by

Dr. Erdem in test group 1 and test group 2?

A.   I don't recall off the top of my head.

Q.   It's right on the screen in front of you.  What's the net

confusion number?

A.   Okay.  Thank you.  She -- I had not wanted to get into

this with you, but I will.

Q.   I know.

A.   Well, no, not because I -- I didn't want the jury to see

this.  But because it's actually full of other subsidiary

issues that we're going to be addressing after she testifies.

I'm going to be rebutting her.

Q.   Right.

A.   And addressing all of these.  She takes 30 and 40 percent

confusion and turns it in to 1 to -- 1 to 12 percent at the

most, or negative 3 to 12 percent confusion, doing what I

believe to be improper mental gymnastics.

Q.   Mr. Franklyn, Dr. Erdem will have an opportunity to

explain her survey.

A.   Yes.  I'm aware of that.  But --

1    Q.    You'll have an opportunity to reply.

2    A.    But you've opened the door and you've asked me about

3    this.

4    Q.    My question is what is the net confusion chart reported

5    in this chart?

6    A.    Well, I just told you her net confusion numbers are the

7    ones we're looking at.

8    Q.    Right.  Well -- now Josh, if you could give me exhibit 4,

9    1 A.  Please.

10          Now exhibit 4.  1.  A.  Is what your chart is drawn

11    from.  This is when she did the supplemental analysis that you

12    say she added all these things to make it responsive to you?

13    A.    To my criticisms, in writing.

14    Q.    What's the net confusion reported on this chart,

15    Mr. Franklyn?

16    A.    I don't know that it is reported on this chart.

17    Q.    Really?

18    A.    Well I'm looking --

19    Q.    Over on the right, there's a column that's labeled net

20    confusion?

21    A.    Let me look.

22    Q.    I think it's highlighted on the screen now?

23    A.    Oh, yes.  Thank you.  Yes, yes.

24          MR. FINKELSON:  Your Honor, the witness and Counsel

25    are just talking past each other.

```
 1            THE COURT:  Maybe you'd like to blow it up for Mr.

 2    Franklyn.

 3            MR. FINKELSON:  Thank you, Your Honor.

 4    BY MR. MCKENNA:

 5    Q.   What he is the net confusion reported in there,

 6    Mr. Franklyn?

 7    A.   Exactly what you've blown up.

 8    Q.   And those numbers are?

 9    A.   4 percent and 14 percent.

10    A.   Yes.  And as I said, I -- I didn't -- I don't agree with

11    those for reasons we will talk about later.

12    Q.   Right.

13    A.   But what I was simply trying to communicate in response

14    to the question from Mr. Finkelson, he asked me is there

15    anything else in the evidence in this case, in the data in

16    this case that supports your conclusion that there is a

17    substantial amount of consumer confusion in this case.  And my

18    answer was yes.  Dr. Erdem had findings, before she paired

19    them down in all kinds of ways, that were very close to the

20    levels of confusion that I found.

21            And I said, to be fair to her, she did further

22    things with those numbers, but at the time least initially,

23    she found rates of confusion that were in the 30's and 40's.

24    Q.   Right.  So again, we'll hear from Dr. Erdem on it.

25            But I just wanted to be clear, that when you
```

1  reported Dr. Erdem's numbers here, you have excluded the net

2  confusion numbers, right?  You've cropped those out of the

3  image?

4  A.   Yes, and I explained that.

5  Q.   Right.  Even though you agree that it's net confusion

6  that is actually the benchmark measure?

7  A.   Yes,  if it's -- if it's properly calculated net

8  confusion.  Dr. Erdem had a bad control that used the word

9  Penn State in it 49 or 51 times, and so a whole bunch of them

10  said about her control that was affiliated with Penn State.

11  Of course they said that, because she prompted them to say

12  that.  And then she used that to take 40 percent confusion and

13  turn it in to zero, and it's a complete violation of standard

14  practices for surveys of this type.  It's egregious error, and

15  so yes, she does get to these lower numbers of net confusion,

16  but in complete contravention of survey rules.

17  Q.   Okay.  Well we'll have plenty of time to talk about that.

18  I just want to finish by noting, though, that when you

19  presented Dr. Erdem's confusion numbers to the jury, you

20  cropped out the net confusion, just like you cropped out the

21  URL that you showed to your respondents in your survey,

22  rights?

23  A.   Well, you're comparing to apples and oranges, with all

24  due respect, Mr. McKenna, or should I say Professor McKenna,

25  but they're not the same thing, and I explained to the jury

ROUGH DRAFT

1    and the Court, that I was just referencing her initial

2    confusion numbers after she corrected them in response to my

3    criticisms, and said to be fair to her, that's not her final

4    numbers, and more will be said about that.

5          So I don't think I was misleading the jury about

6    it.  But I do think it is significant that in her test cell,

7    in her test cell, cells, because she also had two sub sets in

8    her test cell, she found rates of confusion that were

9    remarkably similar to mine in the 30 to 40 percent range.  And

10   I -- I looked at that, because I don't believe her control is

11   legitimate, and I don't believe that her other measures that

12   she used to reduce confusion are legitimate, that in my

13   opinion, those findings corroborate my findings, and I wanted

14   the jury to hear that.

15   Q.   I understand that's your characterization.  Thanks for

16   your time, Mr. Franklyn.

17         THE COURT:  Any redirect, Mr. Finkelson?

18         MR. FINKELSON:  Just give me one moment, Your

19   Honor.  I have no questions for the witness, Your Honor.

20         THE COURT:  Professor Franklyn, thanks for your

21   testimony.  You may stand down with the thanks of the Court.

22   This is an opportune time to take a brief afternoon recess.

23   We will stand in recess, then, for about 10 minutes.  If

24   you'll escort the jury, Mrs. Rhinehart.  Court will rise.

25         (At 3:31 p.m., the jury left the courtroom and a

ROUGH DRAFT

1          recess was held.)

2          (3:51 p.m.)

3          THE COURT:  We're back on the record now after an

4   afternoon recess.  The jury remains in the jury room.  I

5   believe, Mr. Finkelson, your next witness is going to be

6   Caroline Gummo; is that correct?

7          MR. FINKELSON:  That is correct.

8          THE COURT:  And, Mr. Smith, I think you're

9   conducting that examination?

10         MR. SMITH:  That's correct.

11         THE COURT:  All right.  Before we begin that

12  examination, we discussed the matter earlier regarding the

13  scope of Ms. Gummo's testimony.  We discussed this in camera.

14  So before we proceed with Ms. Gummo's testimony, I'm going to

15  rule on the pending disagreement regarding the e-mail that

16  Ms. Gummo received, wherein someone apparently discusses

17  confusion regarding Vintage Brand's products.

18         I agree that a limiting instruction is appropriate

19  here in informing the jury that it may not consider the e-mail

20  for any purpose, other than to establish the date of the

21  Family Clothesline had notice of Vintage Brand.  I agree that

22  the statements in the e-mail, otherwise, constitute hearsay,

23  and the Pennsylvania State University cannot introduce the

24  contents of that e-mail to establish actual confusion without

25  permitting Vintage Brand to cross-examine the author of the

1   e-mail regarding the nature of that confusion.

2           I find that the United States Court of Appeals for

3   the Third Circuit's decision in Kos Pharmacy, and Kos is K-o-s

4   Pharmacy, Incorporated, against Andrx, A-n-d-r-x Corporation,

5   found, Counsel, at 369, F3d, 700, a decision of our Court of

6   Appeals from 2004 is in **atticent.  There, the Third Circuit

7   found that a declaration was admissible to consider as

8   evidence, but did so in the context of a Motion for a

9   preliminary injunction, which is noted lacks any rules of

10  evidence, quote, Akin to the strict rules governing the form

11  of affidavits that may be considered in summary judgment

12  proceedings, end quote.

13          That found in the Kos Pharmacy case at page 718.

14          Also found certain evidence admissible as a factual

15  claim such as that the declarant had received reports of

16  confusion but did not hold that the underlying statements

17  regarding confusion would be admissible.  Found, again in the

18  Kos case at pages 719 and 720.

19          So I'll instruct the jury as follows when the

20  e-mail is received.

21          I will say this:  Members of the jury, you are

22  about to see an e-mail.  I instruct you that you may consider

23  this piece of evidence solely for the purpose of establishing

24  when the Family Clothesline learned of the existence of

25  Vintage Brand.  You may consider it for no other purpose.

ROUGH DRAFT

1          All right.  With that, then, we will proceed.

2     Mrs. Rhinehart, if you'll box the jury, please.

3          MR. SMITH:  Before we do that, Your Honor, if I may

4     for the record.  Penn State would like to note that they

5     object to the limiting instruction.  We do not believe such an

6     instruction is necessary.  The statements contained in the

7     e-mail are not hearsay.  At most, they speak to Ms. Lucci's

8     state of mind.  That statement of mind is incorrect, and so it

9     would be admitted not for the truth of her statement of mind

10    or truth of anything stated in that e-mail, but rather the

11    falsity, and therefore it would not constitute hearsay.

12         THE COURT:  So noted.  Objection overruled.  Box

13    the jury.

14         (At 3:55 p.m., the jury entered the courtroom.)

15         THE COURT:  Thank you.  You may be seated.  Mr.

16    Smith, call your next witness.

17         MR. SMITH:  The Plaintiff calls Caroline Gummo.

18         THE COURT:  Caroline Gummo, if you'd come forward

19    and be sworn, please.

20         (The witness, Caroline Gummo, was sworn.)

21         COURTROOM DEPUTY:  Can I get you to state your full

22    name and spell your last name for the record.

23         THE WITNESS:  Sure.  It's Caroline Gummo,

24    G-u-m-m-o.

25         THE COURT:  Mr. Smith, go right ahead.

ROUGH DRAFT

```
 1                      DIRECT EXAMINATION
 2   BY MR. SMITH:
 3   Q.   Good afternoon, Ms. Gummo.  Can you please introduce
 4   yourself to the jury?
 5   A.   I'm sorry.  Could you say that again.  It was hard to
 6   hear you.
 7   Q.   Oh.  Could you please introduce yourself to the jury.
 8   A.   Yes.  My name is Caroline Gummo.  I'm the chief operating
 9   officer for the Family Clothesline, located in downtown State
10   College.
11   Q.   And where do you currently reside?
12   A.   I reside in Tyrone, Pennsylvania.
13   Q.   Could you please tell the jury what Family Clothesline
14   is?
15   A.   What Family Clothesline is?  It's a local Penn State
16   retail store that's located right across from the University.
17   We sell a variety of Penn State merchandise, apparel, anything
18   that you could imagine with a Penn State mark on it, we have
19   it in the store.
20   Q.   And how long have you worked at Family Clothesline?
21   A.   I started back in 2005, 2006.  So it's been -- almost 20
22   years.
23   Q.   Could you tell the jury some of the roles you've had at
24   Family Clothesline during that time?
25   A.   Sure.  With a small business and a family run business,
```

1    you ever every role there.'s nothing that didn't fall

2    underneath at some point my responsibilities.  But I was head

3    apparel buyer.  I was a sales floor manager at one point.

4    Receiving inventory manager.  Oversaw all of our advertising

5    and marketing at different points.

6    Q.   At a high level, Could you please explain the

7    relationship between Family Clothesline and Penn State?

8    A.   Yes.  So we -- we sell officially licensed Penn State

9    merchandise at our store.

10   Q.   Do you have any connection to Penn State, other than

11   owning and operating a business in State College?

12   A.   Yes.  So my husband and I both attended Penn State.  My

13   husband also played baseball at Penn State, and then after

14   that, went -- proceeded onto playing with the Tampa bay devil

15   raise organization.  But we have a cooperate sponsorship, that

16   that entails sponsoring different athletic programs in the

17   University.  We attend many, many different Penn State events,

18   and my husband and I facilitate a Penn State scholarship for

19   graduating high school senior to attend Penn State.

20   Q.   Does the relationship between Family Clothesline and Penn

21   State, being that you're required to be here to testify before

22   the jury?

23   A.   Absolutely not.

24   Q.   Why did you decide to testify?

25   A.   It's a great question.  And I've thought about that a

1    lot.  There's several reasons why I've decided to come here.

2    The outcome of this case could have a significant impact on my

3    business.  Penn State is my bred and butter.  It's my

4    livelihood.  It's what pays my bills and puts food on my

5    table.  So the outcome of this case could really, really

6    change how I operate and how my business operates.

7              Second of all, I'm here for my staff.  Alongside

8    them, we have powered our blood, sweat and tears into this

9    business over the last 40 years.  And third, I'm here for my

10   children, that they will have an opportunity to run this as a

11   second generation -- I'm sorry, as a third generation

12   business.

13   Q.   Can you tell the jury a little bit about how family

14   Clothesline got started?

15   A.   My father-in-law, my late father-in-law, John Gummo

16   started the business in 1985.  Over the years, we have

17   expanded and grown and changed to what we are currently right

18   now.  He passed away in -- very unexpectedly in 2017, and then

19   myself and my husband and his brother purchased the business

20   in 2019, so we're raising it as a second generation.

21             While busy raising our third generation hopefully.

22   Q.   Mr. Burkhart, can you please pull up what has been marked

23   as D-1 41.  Ms.  Gummo, is this your store in State College?

24   A.   Yes,  it is.

25   Q.   Does Family Clothesline have any other brick and mortar

1  stores?

2  A.   No.  This is our only location.

3  Q.   Mr. Burkhart, if you could turning to page five, please.

4  Ms. Gummo, do you see in the picture where it says Penn State

5  clothes, dot com?

6  A.   Yes, I do.

7  Q.   What is that?

8  A.   That is our web domain name.

9  Q.   Does your online store sell nationally?

10  A.   Yes.  We sell nationally and we sell internationally.

11  Q.   Does Family Clothesline manufacture any of its own

12  apparel?

13  A.   Yes.  So in Tyrone, we have a -- we're virtually

14  integrated company.  So we have our own production facility

15  where we screen print and embroider clothing that we retail in

16  our store in State College.

17  Q.   Between your store website and manufacturing facility,

18  roughly how many people does Family Clothesline employ?

19  A.   Well over 100 people.

20  Q.   You were here for Defendants' opening statement on

21  Tuesday, right?

22  A.   Yes, I was.

23  Q.   Do you remember Defendants' Counsel mentioning several

24  times that Family Clothesline markets itself as quote,

25  officially licensed Penn State merchandise?

1    A.    I do.

2    Q.    Let's talk about that for a moment.  Mr. Burkhart, can

3    you please turn to page 4 of exhibit D-1 41.  Ms.  Gummo, are

4    you required to put that statement on your awning or on your

5    website?

6    A.    No.

7    Q.    Then why do you do it?

8    A.    I put the words officially licensed as many places as I

9    can.  It's not only the awning.  It's on my bags; it's on my

10   marketing; it's on my website.  It's something that I'm

11   extremely, extremely proud of.  We want everyone to know about

12   our relationship with the University.

13   Q.    Does putting that statement on your awning mean that you

14   don't think that the Penn State trademark stand for quality?

15   A.    No.  I think it's important that we share that we're

16   officially licensed.

17   Q.    Let's take a look at one of your product pages.  Mr.

18   Burkhart, if you would please pull up P-1 47.  Ms.  Gummo, can

19   you explain to the jury what P-1 47 is.

20   A.    It's a screenshot of my website with what one of my Penn

21   State t-shirts on there.

22   Q.    Do you see the CLC hologram sticker on this website?

23   A.    No, I do not.

24   Q.    Why not?

25   A.    We are just showing that -- you know, it's not -- it's

1    not necessary because we are showing that it is a Penn State

2    garment, with the word mark and the seal underneath it, so it

3    is understood that it is a Penn State licensed product.

4    Q.   Can you please zoom in on the shirt.

5             Ms.  Gummo, what are the Penn State trademarks on

6    the shirt?

7    A.   There are two.  There is the Penn State Arch text that is

8    above the seal.  And then you have the official seal that's

9    below the text Penn State.

10   Q.   You can take that down, please.  Ms.  Gummo, when did

11   Family Clothesline first become a licensee of Penn State?

12   A.   To the best of my recognition -- or my -- my memory, it

13   was in the late 90's when Penn State interviews the guidelines

14   on how to utilize their trademarks, we step right in line and

15   follow whatever programs that they had put in to place.

16   Q.   Can you give the jury an overview of what's involved in

17   securing a license to use Penn State's trademarks?

18   A.   Yes.  So it's a multi step process.  Initially, you're

19   going to be reaching out to the University.  You're going to

20   explain your intentions, how you're going to be using the

21   marks, what products you're going to be putting the marks on.

22   If you're -- you get their blessing at that point, you're

23   going to be reaching out to CLC, you'll get the agreement in

24   place, but then there's multiple pieces to that agreement.  We

25   need to maintain a insurance policy with a specific liability

1    amount.  We also have to have an F.  L.  A.  Certification and

2    do multiple trainings throughout the year to meet our fair --

3    fair labor agreements that we have in place.  And we have to

4    also make sure that we are submitting all of the artwork and

5    -- artwork that we're using with the Penn State trademarks for

6    approval.

7    Q.    Does Penn State impose any restrictions on the way the

8    marks appear on your merchandise?

9    A.    So they do have certain restrictions on what products

10   that they are allowed to go often.  For instance, we're not

11   allowed to do shot glasses or like lady's undergarments.  They

12   do have restrictions on how the marks are used.

13   Q.    In addition to how the marks appear, are there any

14   quality standards that you have to ad peer to?

15   A.    Absolutely.  So any time that we're -- we have a concept

16   that we would like to use, we need to explain on what products

17   we would like to utilize the marks on.  We have to explain the

18   fabrication of it, the blends, how the marks are going to be

19   applied, whether they're going to be screen printed or

20   embroidered on there.  And we really do have to show a proof

21   -- a design concept in place prior to that.

22   Q.    Let's take a look at how these standards operate in

23   practice.  May I approach, Your Honor

24          THE COURT:  You may.

25          MR. SMITH:

1   Q.    I'm going to hand you a couple of shirts marked P.  4 37,

2   P.  2 72, and P.  4 38.  Ms.  Gummo, let's start with P.  4

3   37, which I believe should be on the top?

4   A.    Um-hum.

5   Q.    What is this?

6   A.    So this is one of the shirts that you can purchase at our

7   store here.

8   Q.    Can you take the jury through some of the elements of

9   that shirt?

10  A.    So this is what I like to call one of my staff favorite

11  t-shirts, and that being said, is that this is what we all

12  love to wear.  It's a super soft ultra soft fabric.  It's got

13  the manufacturing information on the top of the shirts, as

14  well as our hang tag with our information on it, and you can

15  see our branding on there, as well as Penn State's.  And then

16  on the front of the shirt, you have a screen-printed Penn

17  State vault mark that's on the front of it.  It's got a really

18  super soft hand, really clear, crisp -- it aligns really well

19  up with Penn State's guidelines on fabrication and design, as

20  well as it meets my company's requirements internally.

21  Q.    Does the fact that the t-shirt include the Family

22  Clothesline label mean that Penn State is not involved in

23  ensuring the quality of that product?

24  A.    No.  That -- Penn State is involved in every aspect of

25  making sure that these are quality products that we're putting

ROUGH  DRAFT

1  out.

2  Q.    And why are they involved in that?

3  A.    Well, because they've given us permission to use their

4  marks on this garment.

5  Q.    Let's take a look at P-437 -- or P-438.

6  A.    This one? (indicating)

7  Q.    Yes.

8  A.    Okay.

9  Q.    Can you explain to the jury what that shirt is?

10  A.    This is one of the t-shirts that we produce at our store.

11  Q.    And does that contain similar elements to the first shirt

12  that we just looked at?

13  A.    Yes.  It's got the graphic on the front that has been

14  screen-printed, hang tagged, manufactured, same thing.

15  Q.    And you would have had -- you would have had to go

16  through a similar approval process as you do for the first

17  shirt?

18  A.    Yes.  Any time we're using a Penn State license mark,

19  we're going through the exact same approval process.

20  Q.    Would you have to adhere to the same quality standards?

21  A.    Absolutely.

22  Q.    Even though it has Family Clothesline on the tag?

23  A.    Sure.  Absolutely.  Penn State's given us permission to

24  use their marks so we do need to follow their guidelines on

25  what is required for their quality.

**ROUGH DRAFT**

168

```
1  Q.   Let's turn to the last one, P-272.

2  A.   I apologize for that.

3  Q.   Do you recognize this product, Ms. Gummo?

4  A.   Yes, I do.

5  Q.   What is it?

6  A.   This is a product that was from Vintage Brands.  It's a

7  t-shirt from Vintage Brand.

8  Q.   How does this shirt compare to the others?

9  A.   It's got a similar -- it's got their branding on the

10 inside.  Interesting enough, they have gone ahead and removed

11 the manufacturing information provider.  It's most likely a

12 Hanes Jersey or Gulden product that they've removed the

13 manufacturing tag and put their branding on the inside of it.

14 It's also got the artwork adhered to the front of it.  A

15 little bit different process than what we do.  A lot stiffer.

16 This process feels almost like a sheet of plastic on the front

17 of the shirt.

18           MR. SMITH:  May I approach, Your Honor?

19           THE COURT:  You may.

20 BY MR. SMITH:

21 Q.   Ms. Gummo, do you have any understandings as to how

22 Family Clothesline sales compare to other Penn State

23 licensees?

24 A.   We are one of the top Penn State licensees.

25 Q.   As a small business owner, wouldn't you be better off if
```

1   you didn't have to run all of your designs by Penn State?

2   A.   No.  You know, initially, it may seem like the easier

3   way, and we wouldn't have to pay the -- you know, a percentage

4   back to the University, and our profitability would increase

5   initially.  But quickly, my business would pretty much

6   collapse.  And you're going to open up a Pandora's box where

7   anything could go in this market, and the Penn State marks are

8   going to be mutilated and changed to the point of beyond

9   recognition.

10  Q.   Ms. Gummo, changing your gears slightly, I'd like to show

11  you what has been marked as P-477.  Do you recognize this

12  document?

13           THE COURT:  Is this the -- is this the e-mail at

14  issue?

15           MR. SMITH:  Yes, Your Honor.  We just intend to

16  authenticate the document for the moment.

17           THE COURT:  Is it being shown to the jury?

18           COURTROOM DEPUTY:  No.

19           MR. SMITH:  No, Your Honor.

20           THE COURT:  Go ahead.

21  BY MR. SMITH:

22  Q.   Ms. Gummo, do you recognize this document?

23  A.   Yes, I do.

24  Q.   What is it?

25  A.   This is an e-mail from my head graphic designer, Leo

1    Lucci to the former licensing director at Penn State, Maureen

2    Riedel.

3            MR. SMITH:  Penn State moves to admit P-477.

4            THE COURT:  Counsel for the Defense?

5            MR. FETTERS:  No objection.

6            THE COURT:  All right.  Before it's published to

7    the jury, members of the jury, you're about to see an e-mail.

8    And I instruct you now that you may consider this piece of

9    evidence solely for the purpose of establishing when the

10   Family Clothesline learned of the existence of Vintage Brand.

11   You may consider it for no other purpose.  You may publish to

12   the jury.

13   BY MR. SMITH:

14   Q.   Ms. Gummo, do you see on this e-mail where it refers to

15   Vintage Brand?

16   A.   I do.

17   Q.   Do you know whether that refers to Defendant, Vintage

18   Brand?

19   A.   Yes, it does.

20   Q.   To your knowledge, was this the first time that Family

21   Clothesline was made aware of Vintage Brand?

22   A.   Yes.

23   Q.   Ms. Gummo, is Vintage Brand one of your competitors?

24   A.   Yes, they are.

25   Q.   And what would be the impact on Family Clothesline's

1   business if Vintage Brand were permitted to continue to sell

2   unauthorized merchandise?

3           MR. FETTERS:  Objection, Your Honor.  Relevance.

4           MR. SMITH:  The damage to Penn State and Penn

5   State's licensees is directly relevant to one of the questions

6   that the jury will be asked to decide.

7           MR. FETTERS:  We think her explaining the damage

8   that she would sustain to her -- her retail outlet is

9   irrelevant under the trademark infringement claims.

10          THE COURT:  I note the objection.  I'll overrule

11  it.  I'll let you explore this, Counsel.  Mr. Smith, go ahead.

12  BY MR. SMITH:

13  Q.   I'll repeat the question for you, Ms. Gummo.  What would

14  be the impact on Family Clothesline if Vintage Brand were

15  continued to -- were permitted to continue to sell

16  unauthorized Penn State-branded merchandise?

17  A.   There would be an impact.  I would most likely see a

18  financial impact because we're not really sure what sales

19  we've lost as customers have purchased products from Vintage

20  Brands versus us.  I don't know what potential sales I may

21  lose, because people will be visiting and purchasing product

22  from Vintage Brands.

23          And I also, on the other part of it, is I don't

24  know how many people have bought product or will buy product

25  from Vintage Brands will receive a product like we just saw

1  here, and assume that that's the quality that is allowed by

2  Penn State.

3          MR. SMITH:  Pass the witness, Your Honor.

4          THE COURT:  Thank you.  Any cross examination?

5          MR. FETTERS:  Yes, Your Honor.

6          THE COURT:  Go right ahead.

7                    CROSS EXAMINATION

8  BY MR. FETTERS:

9  Q.   Good afternoon, Ms. Gummo.  My name is John Fetters.

10  Just briefly, the way I understand it, that as a licensee,

11  there's a contract that Family Clothesline enters into with

12  the Collegiate Licensing Company; is that right?

13  A.   That's correct.

14  Q.   All right.  Have you ever seen that contract before?

15  A.   Yes, I have.

16  Q.   And that contract includes certain terms and conditions

17  imposed by CLC on behalf of Penn State that licensees, like

18  the Family Clothesline must adhere to; is that correct?

19  A.   That's correct.

20  Q.   And that contract includes provisions related to

21  requirements about the use of the officially licensed labels

22  and advertising and on products; is that right?

23  A.   Can you repeat the question, please?

24          Q    The contract between CLC and Family Clothesline

25  includes some requirements as to the use of the officially

1    licensed statements and things like advertisement, marketing,

2    hollow graphic stickers, and labels on products; is that

3    right?

4    A.   There is requirements to use a hologram sticker.

5    Q.   And under that contractual arrangement, there are also

6    some -- certain requirements about CLC and Penn State being

7    allowed to impose certain quality control measures on

8    licensees like the Family Clothesline; is that correct?

9    A.   I believe so, yes.

10   Q.   And am I correct to understand that one of the benefits

11   of adhering to those requirements that are imposed by CLC and

12   Penn State is that the Family Clothesline gets to offer

13   officially licensed Penn State merchandise; is that correct?

14   A.   Yes.

15   Q.   And one of those benefits is, in fact, promoting the fact

16   that those products that you offer at the Family Clothesline

17   are, in fact, officially licensed?

18   A.   We're very proud of the fact that we're officially

19   licensed.

20   Q.   And I'd like to pull up exhibit D. 95, please.  Excuse

21   me.  Let's go with first exhibit, D-1 31.  I believe this has

22   been admitted.  Is this a screenshot of the Family Clothesline

23   website?

24   A.   Yes, it is.

25   Q.   And if we look at the top left, if we can zoom in around

**ROUGH DRAFT**

```
 1   the Family Clothesline.  Does it say official lay licensed
 2   there?
 3   A.    Yes.
 4   Q.    Okay.  We can zoom out of there.  And then there's a blue
 5   rectangle under the football with some white lettering.  It
 6   says officially licensed Penn State clothing and merchandise.
 7   Do you see that?
 8   A.    Yes.
 9   Q.    And then there's officially licensed language in the
10   center of that; is that right?
11   A.    Yes.
12   Q.    One of the additional benefits of being -- you can close
13   that -- or leave the exhibit up.  Bring that one back up.
14             One of the additional benefits of the Family
15   Clothesline being an officially licensed Penn State retailer,
16   manufacturer, is that the Family Clothesline gets to offer
17   Penn State's primary athletic mark, correct?
18   A.    That is part of one of the trademarks.
19   Q.    And that's called the Lion head mark; is that right?
20   A.    Yes,  it is.
21   Q.    And I've heard other witnesses refer to that as the
22   chipmunk mark.  Have you ever heard that he reference before?
23   A.    I have heard that term.
24   Q.    Do you see that logo on this page?
25   A.    Yes,  I do.
```

1  Q.   Is it on the Yeti products there?

2  A.   Um-hum.  Yes.  Correct.

3  Q.   And then if you -- if you zoom in on the Lu Lu Lemon

4  products, is it also shown there?

5  A.   Yes, it is.

6  Q.   And then if you scroll down on this exhibit, Brock, is

7  that lion head logo on this page, as well?

8  A.   Yes, it is.

9  Q.   Is that a pretty popular logo on the products that you

10  sell at the Family Clothesline?

11  A.   All the Penn State marks are really popular at this

12  point.

13  Q.   Because this is the primary athletic logo, is it fair to

14  assume that this logo is featured most commonly with Penn

15  State's athletic teams?

16  A.   Can you please repeat the question?

17  Q.   Yeah.  Because this is the primary athletics logo for

18  Penn State, is this logo the most common to be featured, for

19  example, on the Penn State football uniforms?

20  A.   As the primary athletic mark, yes, it is required to use

21  it for Penn State athletics.

22  Q.   And Penn State's football team, would you consider them

23  to be highly successful in the support of football, including

24  in recent years?

25  A.   I'm not a football expert.

1   Q.   Okay.  Do you know if Penn State's football games are

2   regionally, nationally televised?

3   A.   I'm not an expert on where they're televised.

4   Q.   Okay.  You're -- have you ever been to a home football

5   game?

6   A.   Yes,  I have.

7   Q.   I understand that Penn State's Beaver Stadium is one of

8   the largest seating capacity in the country.  Is that your

9   understanding?

10   A.   That is my understanding.

11   Q.   More than 100,000 seating capacity?

12   A.   That is my impression, yeah.

13   Q.   The college I went to only had about 35 thousand, so

14   that's -- that's quite big.

15         I also understand that the tailgating before a Penn

16   State home football game is pretty epic, as, well.  A lot of

17   people attend that; is that true?

18   A.   Yes.  People do attend those, yes.

19   Q.   And when there is a home football game, do -- does the

20   Family Clothesline tend to see a marked increase in foot

21   traffic into your brick and mortar store?

22   A.   During those seven home football games, yes, we de see

23   increased foot traffic.

24   Q.   And do you also tend to see increased sales at that time,

25   when there's home football games?

1  A.   Yes.  That typically goes hand in hand with increased

2  foot traffic.

3  Q.   And at the Family Clothesline, would you say that you

4  sell a lot of products featuring the primary athletics mark

5  when is that increased foot traffic?

6  A.   We sell a lot of products with a lot of different Penn

7  State trademarks.

8  Q.   Now Vintage Brand, they don't have a brick and mortar

9  store in State College, do they?

10  A.   Not that I'm aware of.

11  Q.   And your store, you don't sell Vintage Brand products at

12  your store, do you?

13  A.   No.  I'm not allowed to sell Vintage Brand.

14  Q.   And all of the products that you sell at your store are

15  related to Penn State university, correct?

16  A.   Yes.  They are.

17  Q.   And there are other official Penn State license retail

18  brick and mortar stores in State College; is that right?

19  A.   There are other -- please repeat the question.

20  Q.   Are there other officially licensed retailers of Penn

21  State apparel in State College, kind of like the Family

22  Clothesline?

23  A.   Yes,  there are.

24  Q.   How many, to your knowledge?

25  A.   Officially licensed, I'm not -- I'm not sure.

ROUGH DRAFT

1   Q.    Okay.

2   A.    I don't feel comfortable answering that.

3   Q.    Was it Lions Den.  Does that sound familiar?  Or Lions

4   Pride?

5   A.    So Lions Den is a bar right around the corner.  But:

6   Lions Pride is an officially -- an officially-licensed

7   retailer.

8   Q.    Okay.  Would you -- do you know if those other officially

9   licensed retailers experience increased foot traffic during

10  home football games?

11          MR. SMITH:  Objection.  Lack of personal knowledge.

12          THE COURT:  No.  I'll overrule the objection.  She

13  can answer if that's in the purview of her knowledge.

14  BY MR. FETTERS:

15  Q.    Are you aware of whether those other officially-licensed

16  licensed experience other increased foot traffic?

17  A.    I'm not aware of what their foot traffic numbers are on a

18  Game Day.

19  Q.    Do you know if -- strike that.  Do you know if Vintage

20  Brand sells any apparel branded with the primary athletics

21  mark, the lion head logo?

22  A.    I'm not aware.

23          MR. FETTERS:  No further questions.

24          THE COURT:  Thank you.  Any redirect examination,

25  Mr. Smith?

ROUGH DRAFT                                     179

```
1              MR. SMITH:  No, Your Honor.

2              THE COURT:  Ms.  Gummo, thank you very much for

3    your testimony.  You may stand down.  If you're here under

4    subpoena, you're released from the same and may return to

5    State College or you may stay for the rest of the trial,

6    what's your pleasure.

7              THE WITNESS:  Thank you

8              THE COURT:  Plaintiff's Counsel should call your

9    next witness.

10             MS. WHEATLEY:  Plaintiffs call Chad Hartvigson, CEO

11   of prep sportswear by video deposition in his capacity as

12   cooperate representative of the.

13             THE COURT:  Very well.  You may play that video.

14             (4:23 p.m.)

15             (The videotaped deposition of Chad Hartvigson was

16              played for the jury.)

17             (4:31 p.m.)

18             THE COURT:  Very good.  Plaintiff's Counsel should

19   call your next witness.

20             MS. WHEATLEY:  Your Honor, we would like to confirm

21   that Plaintiff's Exhibit 30 and Plaintiff's Exhibit 298 were

22   admitted into evidence that came in through that deposition.

23             Plaintiff's calls Chad Hartvigson, co-founder of

24   Vintage Brand by video deposition and in his capacity as

25   corporate representative of Vintage Brand.
```

1          (4:32 p.m.)

2          (The videotaped deposition of Chad Hartvigson was

3     played.)

4           (4:37 p.m.)

5          MS. WHEATLEY:  Your Honor, the Plaintiff would like

6     to call Thomas McGrath to the stand.

7          THE COURT:  Okay.

8          (The witness, Thomas McGrath, was sworn.)

9          COURTROOM DEPUTY:  Can I get you to state your full

10    name and spell your last name for the record.

11         THE WITNESS:  Charles Thomas McGrath,

12    M-c-g-r-a-t-h.

13         THE COURT:  Ms. Wheatley, go right ahead.

14                    DIRECT EXAMINATION

15    BY MS. WHEATLEY:

16    Q.   Good afternoon, Mr. McGrath.  Where do you currently

17    live?

18    A.   Port Matilda, Pennsylvania.

19    Q.   What do you do for work?

20    A.   I'm now retired.

21    Q.   Where did you work before retiring?

22    A.   At Penn State.

23    Q.   And how long did you work for Penn State?

24    A.   From April of 2014, for nearly nine years.

25    Q.   Are you required to be here today to testify?

ROUGH DRAFT

1  A.   No, I'm not.

2  Q.   And what role did you have during your time at Penn

3  State?

4  A.   I was the associate athletic director for business

5  relations.

6  Q.   And what did your job in the Penn State athletics

7  department entail?

8  A.   I oversaw several others in athletics, created services,

9  marketing, ticketing, sponsorship, multi media rights,

10  probably a few other things in there, too.

11  Q.   Prior to working at Penn State, did you have other roles

12  represented to sports and branding?

13  A.   Excuse me?

14  Q.   Prior to working at Penn State, did you have other roles

15  related to sports and branding?

16  A.   Yes.  My whole career has pretty much been in sports and

17  branding.  I started in 1978 with USA bask ball, which was the

18  entity that put together teams that represented the United

19  States in international competition.

20  Q.   And after working with US national basketball, did you

21  work in -- with other sports teams?

22  A.   Yes,  I did.  I left US basketball and went to work with

23  the Boston Celtics with the NBA and worked in their front

24  office as vice president for administration.

25  Q.   From your experience in the industry, do companies, other

1  than universities, license their trademarks?

2  A.   Yes, they do.  Entertainment companies, professional

3  sports teams quite frequently, a lot of entities use

4  trademarks.

5  Q.   Were you on the licensing committee at Penn State?

6  A.   Yes, I was.

7  Q.   In that role, were you involved in Penn State's efforts

8  to enforce its trademarks?

9  A.   Yes.

10  Q.   What steps does Penn State -- what steps does Penn State

11  take to enforce its trademarks?

12  A.   There are a few.  I mean certainly cease and desist

13  letters of people that we suspect are infringing.  It is also

14  monitored through the patent office for applications nor new

15  trademarks to see if they are infringing Monday or similar to

16  the trademarks that Penn State might have.

17        Looking at URL's or websites that might contain

18  some of Penn State's trademarks and working to have those

19  reassigned to the University.

20  Q.   And how do you identify infringement of Penn State's

21  trademarks?

22  A.   We would learn that from our day-to-day activities or

23  where we would be in the community.  Public would tell us

24  about them.  We would see them from a number of different

25  sources, on Game Day at Penn State football games, there's a

1  lot of activity going on, and some of those vendors would not

2  be selling licensed merchandise and we would learn from those

3  experiences.

4  Q.   To your understanding, why are these enforcement measures

5  necessary?

6  A.   Well, if you're not protecting your marks and you lose

7  control of them.  You ever to maintain the integrity of your

8  marks and how they're being used.

9  Q.   And in your experience, how would enforcement efforts

10  typically be received by someone you talk to or sent a letter

11  to?

12  A.   Generally pretty positively.  I think a lot of people

13  don't know or understand the trademark issues or if they just

14  put together something without any bad intent, and most of the

15  time when you share with them your -- your ownership of those

16  marks with the registration of those marks, they very -- very

17  promptly say oh,  I didn't know, and stop using the mark or

18  infringing on it.

19  Q.   Can you think of any examples you can recall when that

20  happened?

21  A.   There was one instance of a group out of New Jersey that

22  was putting together a man cave opportunity where you could

23  promote or think would put a tailgate for you or a man cave

24  together for you, and they were using a lot of our trademarks.

25  And we reached out to them, notified them that those marks

1    were protected.  And again, they -- they immediately said they

2    didn't realize that, and I think within a week, they took down

3    the infringing marks.

4    Q.   And what does Penn State do next if a company doesn't

5    respond positively to a cease and desist letter?

6    A.   Usually it's litigation, because that's the only way that

7    we can get them to stop.

8    Q.   And when did you first become aware of the Defendant,

9    Vintage Brand?

10   A.   It was in 20 19.  I'm not sure of the exact date, but it

11   was during that type year.

12   Q.   And did Penn State do anything when Penn State learned

13   that Defendants were selling unauthorized Penn State

14   merchandise?

15   A.   We sent he them a cease and desist letter.

16   Q.   I'd like to pull up what's been marked Plaintiff's

17   Exhibit 31, which I believe is already in evidence.

18         Mr. McGrath, is this a copy of that cease and

19   desist letter?

20   A.   Yes,  it is.

21   Q.   And turning to page 2 of this letter, a second to the

22   last paragraph, what did Penn State ask Vintage Brand to do?

23   A.   To stop using the marks.

24   Q.   Did Penn State demand any money?

25   A.   I think they left it open, but no.  I think the

1  motivation of this was primarily to get them to stop.

2  Q.    And to your knowledge, did Penn State also send a letter

3  to Prep Sportswear?

4  A.    Yes, we did.

5  Q.    And did Prep Sportswear respond?

6  A.    No.

7  Q.    And what made the University decide to file the lawsuit

8  we're all here for today in 2021?

9  A.    They didn't stop.

10  Q.    Thank you.

11          MS. WHEATLEY:  I'll pass the witness

12          THE COURT:  Thank you.  Care to cross-examine?

13          MR. FETTERS:  Yes, Your Honor

14          THE COURT:  You may do so.

15                  CROSS EXAMINATION

16  BY MR. FETTERS:

17  Q.    Good afternoon, Mr. McGrath.

18  A.    Good afternoon.

19  Q.    We met previously, once remotely.  Good to see you again?

20  A.    Um-hum.

21  Q.    Can we pull Plaintiff's Exhibit 31 back up, please.  P.

22  31.  Now, when we met previously it was in the context of a

23  deposition; is that right?

24  A.    That's correct.

25  Q.    And in the context of that deposition, do you recall

1  whether your understanding of you testified as a spokesperson,

2  so-to-speak, on behalf of the university?

3  A.   Yes.

4  Q.   The cease and desist letter dated December 17th, 2020,

5  did you review this at the time that you were employed by Penn

6  State before this letter was sent out?

7  A.   I believe I saw it after it had gone out.

8  Q.   I just want to take a look at a couple of statements.

9  The first paragraph, there's a sentence that starts with the

10  words since 18 55 and I'll just go ahead and read it eighth

11  ask if I read this correctly.  But it says since 1855, Penn

12  State has grown to 24 campuses, 34,000 faculty and staff

13  members, and over 100,000 students.  It is well-known

14  throughout the United States, and the world for its

15  educational programs, offering undergraduate and graduate

16  academic courses, as well as a variety of student activities,

17  including athletics, which are televised to national and

18  sometimes international audiences.

19         Did I read that correctly?

20  A.   Yes, you did.

21  Q.   And then the second paragraph, there's two sentences

22  towards the end of the second paragraph that I'm going to

23  read, as well.

24         It says, As a result of Penn State's efforts,

25  consumers have come to associate the Penn State marks with

1    Penn State's outstanding academic curriculum, research

2    contributions, intercollegiate sports teams, and charitable

3    services.

4              Did I read that correctly?

5    A.   Yes, you did.

6    Q.   Do you agree with that statement?

7    A.   Yes.

8    Q.   After all, Penn State's -- Penn State is an educational

9    institution; is that right?

10   A.   Yes,  it is.

11   Q.   Its primary mission is to educate students?

12   A.   Primary, yes.

13   Q.   Of all of the 34,000 faculty and staff members employed

14   by Penn State, would you say that the vast majority of those

15   folks are engaged in the primary mission of educating

16   students?

17   A.   I -- I wouldn't know.

18   Q.   Going back to this paragraph, the final sentence reads,

19   Penn State has also consistently sold apparel and merchandise

20   bearing the Penn State marks for over 50 years.  Did I read

21   that correctly?

22   A.   Yes.

23   Q.   But the sentence before that makes it clear that the Penn

24   State marks are associated with the reputation for Penn State

25   as an academic institution for its intercollegiate sports

**ROUGH DRAFT**

1    teams and for its charitable services, correct?

2    A.    Could you rephrase that?  I didn't understand the

3    question.

4    Q.    Sure.  I'll just go back to the sentence right before

5    that it reads.  As a result of Penn State's efforts, consumers

6    have a come to associate the Penn State marks with Penn

7    State's outstanding academic curriculum, research

8    contributions, intercollegiate sports teams, and charitable

9    services.

10          Did I read that he correctly?

11   A.   Yes,  you did.

12          MR. FETTERS:  No further questions.

13          THE COURT:  Thank you.  Any redirect of this

14   witness?

15          MS. WHEATLEY:  No redirect, Your Honor.

16          THE COURT:  Mr. McGrath, thank you very much for

17   your testimony.  You may step down.  You're free to depart or

18   remain for the balance of the trial at your election.

19          Plaintiffs have any other witnesses?

20          MR. FINKELSON:  I don't believe so, Your Honor.

21   With the indulgence of the court, could we just have a five

22   minute recess to confirm that we are prepared to rest our case

23          THE COURT:  Yes.

24          THE COURT:  We'll stand in recess, ladies and

25   gentlemen, for just a moment.  Mrs. Rhinehart, would you

ROUGH  DRAFT

1    escort the jury out, please.  Court will rise.

2                 (At 4:50 p.m., the jury left the courtroom and a

3                  recess was held.)

4                 (5:09 p.m.)

5         THE COURT:  Wear back on the record after a brief

6    recess.  The jury remains in the jury room.  I think there are

7    some ministerial matters that Counsel wants to address with me

8    before the jury returns.  We'll start with you.

9         MR. FINKELSON:  There are, Your Honor.  For

10   Plaintiff, Ms. Wheatley will address it.  We have a proffer of

11   certain exhibits that go to the issue of incontestability as

12   it relates to certain marks that were covered by Your Honor's

13   Motion In Limine rulings.

14        So Ms. Wheatley is going to make a proffer of those

15   in to evidence.  And then if we could get the jury back in to

16   the jury box, we will move in to evidence a couple of

17   unobjected-to exhibits in the presence of the jury.  And then

18   it will be our intent to rest at that point

19        THE COURT:  All right.  Very good.  Ms. Wheatley,

20   go right ahead.

21        MS. WHEATLEY:  Your Honor, Plaintiffs would like to

22   move into evidence Plaintiff's Exhibit 371, 372, and 373,

23   which evidence the incontestability of the Pozniak lion.

24   These are official records from the United States Patent and

25   Trademark Office certifying that the Pozniak lion is an

1    incontestable trademark.

2              THE COURT:  Any objection to that?

3              MR. FETTERS:  We object to the evidence, not to the

4    proffer.  But we object to the evidence substantively for all

5    the same reasons stated in our Motion In Limine briefing.

6              THE COURT:  Anything else by way of argument?

7              MS. WHEATLEY:  Your Honor, we would renew the

8    arguments we made in the Motion In Limine briefing that the US

9    PTO correctly found that the Pozniak lion was incontestable

10   because there was no pending claim against the registration of

11   the Pozniak lion.  This litigation no longer involves any

12   claim that the Pozniak lion is invalid or should be canceled.

13   And for that reason, it properly went incontestable.  And so

14   it should be treated as incontestable here, and the evidence

15   is such and should be granted.

16             THE COURT:  Anything else?

17             MR. FETTERS:  Again, Your Honor, we would rest on

18   the arguments asserted in the briefing at this point.

19             THE COURT:  All right.  Put the white noise on a

20   minute.  Mr. Kempen?

21             (At this time, a discussion was held at sidebar off

22              the record.)

23             THE COURT:  All right.  I've reviewed my November 4

24   memorandum opinion and order, and I haven't heard anything in

25   the trial that would change my view of that, so the Defense

1    Motion is -- or the Defense argument is sustained.

2            Anything else?

3            MS. WHEATLEY:  No, Your Honor.  The remaining

4    exhibits can be moved in in the presence of the jury.

5            THE COURT:  Very good.  Box the jury, please.

6            (At 5:14 p.m., the jury entered the courtroom.)

7            THE COURT:  You may be seated.  Thank you.  All

8    right.  Ms. Wheatley, I think there are some exhibits or --

9    Ms.  Wheatley, go right ahead.

10            MS. WHEATLEY:  Plaintiff would like to move into

11   evidence Plaintiff's 360, Plaintiff's 361, and Plaintiff's

12   478.

13            THE COURT:  Any objection?

14            MR. FETTERS:  No objection.

15            THE COURT:  Duly admitted.

16            MS. WHEATLEY:  Thank you, Your Honor.  With that,

17   the Plaintiff, The Pennsylvania State University would rest

18   its case.

19            THE COURT:  All right.  Very good.  Ladies and

20   gentlemen of the jury, as you've heard from Plaintiff's

21   Counsel, the Plaintiff has rested.  This is a good point to

22   break off tonight.

23            Again, there has been some media coverage of this

24   case which, you know, the Court is indifferent to, but

25   welcomes, of course.

ROUGH DRAFT

1            But to the extent you are to find, accidentally,

2     some article relating to this case, don't read it.  And

3     remember, it is you and you alone who have heard all of the

4     testimony and reviewed all of the evidence of the case.

5            The one reporter, an article that was handed to me

6     by one of my clerks, indicated that there were seven members

7     of the jury.  Well, there aren't.  There are eight members of

8     the jury.  Is's a basic fact, but the media got it wrong.  So

9     you see where I am?  It's you and you alone who have listened

10    to all the testimony and heard all of the evidence in this

11    case.  You've only heard half of the case so far.  Don't

12    discuss the case amongst yourself.  Don't discuss the case

13    with anyone else.

14            Mrs. Rhinehart is going to buy some donuts for you

15    tomorrow morning, so that should please you tomorrow -- Juror

16    No. 3 says he'll be happy, at least.  And so have a pleasant

17    evening.  I'll have you back tomorrow at 9:15 a.m.  We'll have

18    you hopefully in the box at about 9:30 a.m., and we will lead

19    off with the Defense case.

20            I wish you a pleasant evening.  Mrs. Rhinehart,

21    escort the jury out, please.

22            (At 5:17 p.m., the jury left the courtroom and were

23             dismissed for the evening.)

24            THE COURT:  Please be seated.  All right.  With the

25    Plaintiff having rested, the Court will now entertain any

1    Motions under the Federal Rules of Civil Procedure.

2              Mr. Harms, go ahead.

3              MR. HARMS:  May I approach the podium?

4              THE COURT:  You may.

5              MR. HARMS:  A brief in support of this Motion

6    should be uploaded to the ECF system any moment.  But I will

7    make the Motion orally, as well.

8              Defendants are seeking judgment as a matter of law

9    under rule 50(a) as to confusion or, in the alternative, as to

10   the University's claims for post-sale confusion, initial

11   interest confusion, and with respect to its trademark rights

12   and the Pozniak lion design.

13             With respect to confusion generally, Plaintiffs's

14   case in chief has made clear that this case is not about

15   source confusion.  This case is not trademarks at all.  This

16   case about preventing uncompensated circulation of cultural

17   indicators, of logos that mean things to Penn State fans that

18   are untethered to the rationale of trademark law.

19             And without having met its burden to establish

20   something more than that, Plaintiff cannot succeed on its

21   infringement claims.

22             I would point the Court to the case Board of

23   Governors of the University of North Carolina versus

24   Helphingstine.  It's a reported case.  It's 714, Federal

25   Supplement, 167.  It was issued in 1989 by the Middle District

1  of North Carolina, and this is, like this case, a case about

2  ancient merchandise.

3        In that decision that I just cited, the Court

4  denied summary judgment to the University and previewed

5  essentially the college's burden at trial.

6        The college was suing Helphingstine and his

7  company, Johnny T-shirt.  Quoting from that decision, Given

8  that there is a distinct possibility that individuals who buy

9  products from Johnny T-shirt do not base their decision upon

10  whether the product is sponsored or endorsed by UNC CH and

11  that Plaintiffs bear the burden of establishing likelihood of

12  confusion, the Court holds that UNC-- UNC-CH must meet its

13  burden by showing more than simply the identity of the marks.

14        Instead, it must provide evidence establishing that

15  individuals do make the critical distinction as to sponsorship

16  or endorsement, or direct evidence of actual confusion.

17        Your Honor, Plaintiff's case in chief has ended,

18  and they have not showed -- shown that consumers make that

19  critical distinction as to sponsorship or endortion.

20        I'll start with Ms. Esposito.  She testified that

21  she purchases Penn State fan apparel.  When asked about why

22  she does that, she said the University's reputation.  And when

23  asked what reputation, she gave an impassioned, laudable

24  answer about the University, that she appreciates the

25  University because it's a research institution and educational

1  institution.

2          Her answer did not mention -- her answer did not

3  make that critical distinction that Helphingstine said it was

4  the Plaintiff's burden to establish in a case like this.

5          Moving on to Ms. Petulla, the University's director

6  of licensing.  On redirect, she was asked why do you purchase

7  those products, those products being collegiate merchandise.

8  And she answered, and I quote, I purchase them for a number of

9  reasons.  I purchase them because I want to support the

10 University.  I purchase them because I feel pride in the

11 University and its mission.  I purchase them for my son

12 because I secretly want him to go there, not so secretly.  So

13 I purchase them for a number of reasons, whether they be for

14 myself or gifts for others.

15         Again, Ms. Petulla is not making that critical

16 distinction as to sponsorship or endorsement that it's the

17 Plaintiffs' burden to make.

18         All the other evidence adduced in this trial so far

19 has pointed to logos printed front center-eye t-shirt or

20 appearing ornamentally otherwise on merchandise as not doing

21 the trademark work that it has to for source confusion to

22 exist.

23         For example, Scott Howell of CLC testified quite

24 openly about how the official label has been applied to

25 officially-licensed collegiate merchandise for, in his

ROUGH DRAFT

1    experience, over a decade because it is a source identifier.
2    And I want to draw that comparison for Your Honor.
3         CLC claims that a small holographic label with a QR
4    Code and a serial number serves as a source identifier, and it
5    also claims that a logo printed on the front center of a
6    t-shirt is doing the same thing.  They're not doing the same
7    thing.  And judgment as a matter of law should be entered
8    because of it.  There's no issue of fact that should go to a
9    jury.
10        If this case goes to a jury, the only way it can
11   reach a verdict in the Plaintiff's decision is if it assumes
12   that licensure is required.  If it has that preconceived legal
13   belief that would drive the verdict in this case, that's the
14   only way that the jury could reach a decision in the
15   Plaintiffs' favor.
16        If the Court isn't inclined to grant judgment as a
17   matter of law as to confusion generally, the Court should
18   grant judgment as a matter of law to the different types of
19   confusion that Plaintiff has suggested in this case.  Both of
20   these have not been pled, but post-sale, and initial interest
21   confusion have been suggested by the University throughout its
22   case in chief.
23        First, post-sale confusion is not available.  The
24   Court actually, in its summary judgment ruling, at docket
25   entry 194, page 30, apologies -- specifically determined that

 1  this is not a post-sale confusion case.  And that's because

 2  post-sale confusion can only exist when there's an appreciable

 3  difference in product quality.  Here, there's not an

 4  appreciable difference in product quality.  And the University

 5  hasn't offered any evidence of post-sale confusion.

 6          Mr. Franklyn testified this afternoon that he did

 7  not conduct a post-sale confusion survey.  He conducted a

 8  point of sale confusion survey.

 9          So both because there's not a showing of an

10  appreciable degree of difference in product quality, and

11  because there's otherwise no evidence in the record of

12  confusion happening post-sale, Defendants are also -- are

13  entitled to judgment as a matter of law as to that theory.

14          With respect to initial interest confusion, the

15  University has entered one exhibit purporting to show initial

16  interest confusion, and that was shown to Ms. Petulla during

17  her testimony.  The exhibit was a Google search that she

18  conducted for the phrase Penn State Vintage Brand.  The Third

19  Circuit has described initial interest confusion as a bait and

20  switch scheme.  Ms. Petulla testified that she searched Penn

21  State Vintage Brand because of this case.  She was

22  affirmatively looking for what she would characterize as the

23  bait.  That's not evidence of initial interest confusion.  It

24  can't be.

25          Further, beyond the lack of evidence that

1    Plaintiffs have proffered for this theory, many cases, and

2    they are cited in the brief that will be uploaded if it hasn't

3    been already to the Court's ECF system, many cases have held

4    that mere Google search results are not enough to show initial

5    interest confusion, and it's because of the practicality of

6    searching on the Internet.  Consumers are ready at any time to

7    hit the back button.  If they go on to a landing page and they

8    see something they don't like, if they see Vintage Brand's

9    disclaimers, they hit the back button.  If they don't see the

10   Family Clothesline's official claims, claims of official

11   licensure, then maybe they don't hit the back button if that's

12   what they care.  But Courts have held that consumers are savvy

13   enough to know when to hit the back button or when they're not

14   to.

15         So as a matter of law, the exhibit that was

16   preferred, to the extent it's given any weight, is

17   insufficient for that reasoning.

18         Further, with respect to the Pozniak lion design,

19   the trademark rights are only acquired through use of a mark

20   in the ordinary course of trade.  The only evidence that's

21   been adduced so far during trial has been affirmative

22   testimony from Ms. Esposito, from David Dulabon, and from Ms.

23   Petulla that the Pozniak lion designs's only used internally,

24   sold to the Lion Ambassadors as their uniform, and to the

25   Nittany Lion Wrestling Club.

ROUGH DRAFT

1          Internal use of that nature, internal transactions

2     are not used in commerce in the ordinary course of trade.

3     Therefore, as a matter of law, the University cannot maintain

4     rights in the Pozniak lion design as to at least apparel.

5          Finally, the University has offered registration

6     for the Pozniak lion design that covers license plates.

7     License plates are something that the Government offers.

8     License plates are not in the ordinary course of trade.  And

9     there is a case cited in our briefing, Clemente Properties

10    Inc. versus Pierluisi Urrutia -- it's a rather hard name to

11    pronounce.  I apologize.  It's reported at 693, Federal

12    Supplement 3rd, 215.  It's a 2023 case.  And it is directly on

13    point.

14         If Your Honor has no questions, I will pass.

15         THE COURT:  Not at this time, Mr. Harms.  Thank

16    you.  Who is going to speak for Penn State?

17         MR. FINKELSON:  Ms. Wheatley, Your Honor.

18         MS. WHEATLEY:  Your Honor, I'll take Defendant's

19    arguments in order.  First, the suggestion that there has been

20    no showing of evidence of confusion in this case is incorrect.

21    We heard from Professor Franklyn who conducted a confusion

22    survey.  That is, at present, entirely unrebutted.  That is

23    direct evidence of confusion.  We also heard from Meghan

24    Matthey, who as a consumer, provided testimony as to confusion

25    the jury needs to consider.

ROUGH DRAFT

1    Even so, we wouldn't have to provide any of this

2 evidence of confusion because where the parties directly

3 compete with respect to the goods, the Court need rarely look

4 beyond the mark itself in assessing trademark infringement.

5 That's from Interspace Corp v. Lapp, Inc., 721, F2d, 460,

6 Third Circuit, 1983.  Country Floors, Inc., v. Gepner, 930,

7 F2d, 1056, 1063, Third Circuit, 1991.  Where the dominant

8 portion of the two marks are the same, confusion is likely.

9    We have here directly competing goods that use

10 identical marks in identical places.  That alone is enough to

11 meet our burden.

12    But in addition, we've shown evidence of actual

13 confusion testified to by multiple witnesses.  So I think

14 there is no question here that the Plaintiff has met its

15 burden to show confusion.

16    We've also shown evidence on a number of other Lapp

17 factors.  We've shown that the prices are the same.  We've

18 shown evidence that both parties are sold side-by-side in

19 shopping links on the Internet.  So consumers encounter their

20 advertising in the same places.

21    On the issue of post-sale confusion, we had several

22 witnesses, including Ms. Petulla, testify that there was no

23 way to tell Plaintiffs' products from Defendants' products

24 when you see them on the street.  Professor Franklyn did not

25 testify that his survey was not probative of post-sale

1    confusion.  His survey, in fact, does look at the merchandise.

2    His survey simply also tested the marketplace context and the

3    impact of the disclaimer.  But it was certainly probative of

4    marketplace confusion that it showed confusion, even with that

5    disclaimer in place.

6            So there is evidence of post-sale confusion here.

7            I believe at summary judgment, Your Honor referred

8    to the issue with post-sale confusion being evidence of a

9    difference in quality.

10           We had several witness -- witnesses testify as to a

11   difference in quality.  That included Ms. Petulla, who

12   compared the shirts.  She also compared the pennants.  She

13   showed that Defendants's pennants were not something you would

14   want to receive as a gift, I believe was her testimony,

15   because they mutilated the name of the school, so it showed

16   the Penn State logos with the name of the other school, which

17   is certainly low quality.  She also mentioned that the actual

18   fabrication of the pennants themselves was substantially below

19   the quality of authorized Penn State merchandise.

20           Caroline Gummo, who we just heard of, also compared

21   the quality of the products.  And she showed that the way that

22   the Defendants' product was fabricated was lower quality,

23   likely to wear less well, and not something that would want to

24   be associated with the University.

25           So Your Honor's concern with post-sale confusion at

ROUGH DRAFT

1  the summary judgment stage has been answered by the evidence

2  at trial.

3       The evidence we put forward of initial interest

4  confusion was also more than sufficient to meet our burden.

5  We showed that the products show up side-by-side, both in

6  shopping and in web results.  There is no disclaimer.  I am

7  not quite sure what Counsel's talking about that if you press

8  the back button, there is no initial interest confusion.  The

9  entire point of initial interest confusion, why it is called

10 that is to address confusion that occurs when the consumer

11 first encounters the product and is tempted to purchase the

12 product.  And even if the confusion is dispelled once they get

13 to, for example, the web page, they have still been deceived

14 in to visiting the infringing page by that initial interest

15 confusion.  And that is exactly what we showed, that there was

16 no way a consumer could tell the difference between the web

17 link shown on the page of Defendants' infringing product and

18 Plaintiff's product.

19      The fact that Ms. Petulla conducted the search in

20 no way invalidated it, and there was no objection to that

21 evidence being put on the record, or if there was, it was

22 overruled.

23      And in addition, the -- the way the evidence showed

24 the link side-by-side was highly probative of initial interest

25 confusion.

```
 1          Finally, the web search that was done, Penn State
 2   Vintage Brand, it was not for Defendants' company.  Vintage
 3   Brand is, in fact, a generic name for what Defendants sell.
 4   The witness actually pointed that out.  Their competitor is
 5   called retro band, which is a pair of words with the exact
 6   same meaning.  So certainly it was not an a typical search for
 7   a consumer that is looking for Vintage, meaning old, and
 8   brands meaning trademarks would be searching for, you know,
 9   Plaintiffs' products.  They are looking for Vintage versions
10   of Plaintiffs' branded products.
11          So we think there has been evidence of initial
12   interest confusion put on the record.
13          With respect to Counsel's comment about Plaintiff
14   not meeting its burden based on the Middle District of North
15   Carolina case, certainly the Middle District of North Carolina
16   does not govern in this court.  That is not authority.
17   Counsel acknowledged that that case involved apparently a
18   denial of summary judgment, which was certainly not a matter
19   of taking the case away from the jury and announcing final
20   judgment.  So I don't think -- see how it is applicable here.
21          The theory espoused in that case, which appears to
22   be a variation of idea that if fans like products, that you
23   can't have a trademark in your name has been rejected by
24   almost every single court that has considered it.  We have a
25   list of citations two pages long from courts all over the
```

1    country, not just in the 11th and 5th circuits, but in the

2    Second Circuit, in the Ninth Circuit, and many other courts,

3    and our briefing on the esthetic functionality issue.  And

4    furthermore, the Plaintiff has no burden on that issue.

5    Defendants have pled it as an affirmative defense.  And it is

6    an affirmative defense, even if in formulation, so there can

7    be no statement that we have failed to meet our burden there

8    because we had no burden in the first place.

9            On these issues, I think we would also request

10   permission to submit a brief more fully setting out the case

11   law and our arguments

12           THE COURT:  Well, you're welcome to do so, but I

13   intend to rule orally this evening.  But I leave that up to

14   you.  If you would like to write, Ms. Wheatley, and you're a

15   good writer, so I wouldn't want to deprive you that

16   opportunity or the opportunity to bill the Pennsylvania State

17   University.

18           MS. WHEATLEY:  Well I think we would take the

19   opportunity to submit a brief, Your Honor.  What time would

20   you need it by?

21           THE COURT:  Well I'm going to rule here

22   momentarily.  So if you want to spend the next two minutes,

23   you're fine.  I move right along, Ms. Wheatley, if you haven't

24   already figured that out.  And I'm not over-confident in my

25   abilities, but I'm confident.  Not arrogant, but confident.

1          MS. WHEATLEY:  Additional evidence, I would draw

2   the Court's attention to on the issue of the Pozniak lion, we

3   had virtually every witness testify as to sales of that

4   merchandise.  And they were not internal sales.  They were not

5   sales to an employee of the university to another employee of

6   the university or something like that.  They were sales to

7   students who are students and others.  There was testimony to

8   sales beyond students.  There was testimony to sales in the

9   PSU book store.  So these were sold in commerce.  You heard

10  that from Mr. Howell.  You heard that from Mr. Dulabon.  We

11  heard that from Ms. Petulla.  We heard that from

12  Ms. Esposito.  So there was extensive evidence that

13  merchandise bearing the Pozniak lion was sold in commerce for

14  certainly at least since 2017, which would be all Penn State

15  would need to do to establish that it's Pozniak lion

16  registration is valid, and the fact that we have a trademark

17  registration already does that.

18          Penn State's collection of trademark registrations

19  also meet our burden on ownership and validity.  We provided

20  evidence as to use in commerce for each one of those marks and

21  each one of those registration -- each one of those designs

22  for -- before, from the bra the period of infringement, so

23  we've also met our burden there on showing that we have

24  trademark rights, and that has not been rebutted.  So we've

25  met the first two elements of ownership and validity.

**ROUGH DRAFT**

1          So I believe we have met our burden here on every

2    point, but let me -- let me make sure there is nothing else I

3    should say here today anyway.

4          And briefly to address the testimony that

5    Ms. Esposito testified that the University's reputation

6    factored in to why she purchased Penn State's products.  This

7    is not proof that Penn State has not met its burden to show

8    infringement or to show that it has trademark rights.  It is,

9    in fact, proof of the opposite.  Because if the purported

10   functionality of mark is related to the reputation of the mark

11   holder, it is, by definition, not functional.

12          I would also add that Defendants have framed their

13   defense in this case as their marks being esthetically

14   functional, and there has been virtually no evidence of that.

15   In Plaintiff's case, they produced one t-shirt, and there was

16   no testimony that would say -- there was no testimony, from an

17   actual purchaser whatsoever, and there was certainly no

18   testimony that the sole reason to purchase Defendant's one

19   t-shirt was due to some sort of functional reason unrelated to

20   the reputation of Penn State.  And certainly we have no burden

21   to prove nonfunctionality.  We're not offering a trade dress.

22   We are offering trademark registrations.  The burden to prove

23   nonfunctionailty only applies to trade dress.  That's in the

24   statute of the Lanham Act.  And of course, we've offered ample

25   evidence as to confusion on multiple factors.  But certainly

1  as to sponsorship affiliation, licensing, connection,

2  approval.

3          THE COURT:  Thank you.  Mr. Harms, anything else?

4          MR. HARMS:  Yes.  I will be brief.  With respect to

5  confusion, generally, I am not arguing esthetic functionality.

6  I am arguing that Plaintiff has not done enough to invoke

7  trademark law, that the burden of them to show that consumers

8  are making this critical distinction, as the Helphingstine

9  Court put it, is required to invoke trademark law in the first

10  instance.  That's their burden.  I am not talking about an

11  affirmative defense of esthetic functionality.  That's a very

12  separate topic.

13          With respect to initial interest confusion, I would

14  just like to read from the decision of the Ninth Circuit in

15  the Toyota motor sales case.  It's Toyota Motor Sales, USA,

16  Inc., versus Tabari, 610, Federal Reporter 3d, 1171.  The page

17  I'm going to read from is 1179.  Consumers skip from site to

18  site ready to hit the back button whenever they're not

19  satisfied with the site's contents.  They fully expect to find

20  some sites that aren't what they imagined based on a glance of

21  the domain name or search engine summary.  Outside the special

22  case of trademark dot com or domains that actively claim

23  affiliation with the trademark holder, consumers don't form

24  any expectations about the sponsorship of a website until they

25  have seen the landing page.

1          Nothing further.

2          THE COURT:  Thank you.  Put the white noise on,

3   please.  Mr. Kempen, pay me a visit.

4          (A discussion was held at sidebar off the record.)

5          THE COURT:  With respect to the Defendant's Federal

6   Rule of Procedure 50 Motion, that rule provides that, quote,

7   If a party has been fully heard on the issue during a jury

8   trial and the Court finds that a reasonable jury would not

9   have a legally-sufficient evidentiary basis to find for the

10  party on that issue, the Court may grant a Motion for judgment

11  as a matter of law against the party, end quote.  This is

12  Federal Rule of Civil Procedure 50(a)(1).

13         The United States Court of Appeals for the Third

14  Circuit has held that, quote, A Motion for judgment as a

15  matter of law under Rule 50(a) will be granted only if viewing

16  the evidence in the light most favorable to the nonmoving

17  party, there is no question of material fact for the jury and

18  any verdict, other than the one directed, would be erroneous

19  under the governing law, end quote.

20         Counsel, I'm citing for that, the matter of

21  Mullhond, M-u-l-l-h-o-n-d against Government, County of Berks,

22  Pennsylvania, found at 706, F3d, 227, specifically at page

23  237, a decision of our Court of Appeals from 2013.

24         In deciding this question, the Court, quote, May

25  not weigh evidence to determine the credibility of witnesses

1    or substitute its version of the facts for that of the jury,

2    end quote.  Citing to Rodriguez against Southeastearn

3    Pennsylvania Transportation Authority, found, Counsel, at 119,

4    F, 296, specifically at page 298, a decision of our Court of

5    Appeals from this year, 2024.  Stated differently, quote,

6    Where there is conflicting evidence that could reasonably lead

7    to inconsistent inferences, the Court may not direct a verdict

8    predicated on its determination that some witnesses were more

9    credible than others, end quote.  Citing Rippee, R-i-p-p-e-e

10   against Grand Valley Manufacturing Company, 762, F2d, 25,

11   specifically at page 26, a decision of our Court of Appeals

12   from 1985.

13          The Court here concludes that judged by that

14   standard, the Defendant's Motion must be denied, in part.

15   Plaintiff has presented sufficient evidence that owns the

16   trademarks and those trademarks are valid.  And there is

17   sufficient evidence related to a likelihood of confusion

18   regarding Vintage Brand's use of those trademarks, as well.

19   Notably, the testimony from Meghan Maffey regarding her

20   confusion and the survey conducted by Professor David Franklyn

21   showed what he believes is a strong likelihood of confusion.

22   This, along with other evidence presented during the

23   Plaintiff's case in chief is sufficient, when viewed in the

24   light most favorable to the Plaintiff, to establish

25   Plaintiff's claims as against Vintage Brand.

1    Furthermore, testimony from Erik Hartvigson and

2    Michelle Young is sufficient under that standard to establish

3    Chad Hartvigson's personal liability.

4    But I find the evidence is insufficient to send the

5    claims to the jury as against Sportswear, Inc.  I have been

6    unable to locate any case where a manufacturer was held

7    directly liable for trademark infringement where it merely

8    manufactured goods at the direction of a company that is also

9    accused of trademark infringement.

10    And I assume that Counsel for Penn State have

11    failed to locate any such case based on their citations and

12    their objections to Vintage Brand's proposed contributory

13    liability instruction.

14    I'm looking specifically, Counsel, at ECF No. 280,

15    at page 70, which cites to Penn State's Amended Complaint.

16    Title 15, United States Code, Section 11141 and the

17    Fifth Edition of McCarthy on trademarks and unfair

18    competition, at Section 25:26, none of which directly

19    addresses this issue.

20    So here, it does not seem to be in dispute that

21    Sportswear only manufactured the goods in question, did not

22    design the products, create them, advertise them, or sell

23    them.  Chad Hartvigson testified that Vintage Brand designs

24    the products and is responsible for fitting images on the

25    products.  Vintage Brand takes the orders and collects the

1  money, then sends the order and the money to Sportswear to

2  produce the items.  Sportswear appears to be a classic

3  middleman, and I have heard no evidence that Sportswear's

4  conduct makes it directly liable for trademark infringement.

5          Under a theory of contributory liability, there may

6  well be sufficient evidence, if this matter were to have gone

7  to a jury, Penn State expressly disclaimed a theory of

8  contributory liability both in its objections to Defendant's

9  instructions on contributory liability and in chambers before

10  we met before me when discussing that issue.

11          So accordingly, Defendant's Rule 50 Motion is

12  denied as to Vintage Brand and Chad Hartvigson.  It is granted

13  as to Sportswear.  Judgment will be entered in favor of

14  Sportswear, Incorporated as to all claims against it.

15          All right.  With that said --

16          MS. WHEATLEY:  Your Honor, can we be heard on the

17  Sportswear point.  I wasn't aware they were moving on that

18  particular issue as to liability for the manufacturer.

19          THE COURT:  You can be heard on it, but I think --

20  I've heard nothing that would contradict my ruling.

21          MS. WHEATLEY:  Your Honor --

22          THE COURT:  -- or Penn State's approach to it,

23  unless we've missed something.  And we've looked thoroughly.

24          MS. WHEATLEY:  Your Honor, 15 USC, 1125.  Any

25  person who on or in connection with any goods or services or

1    any container for goods uses in commerce any word, term, name,

2    symbol, or devise, or any combination thereof or any false

3    designation or origin false or misleading description of fact

4    or false or misleading representation of fact which is likely

5    to cause confusion or to cause a mistake or to deceive can be

6    liable for trademark infringement.  Any person.  That would

7    include manufacturers.

8           Prep Sportswear, the evidence we've heard

9    unequivocally from Mr. Hartvigson just today, they affix the

10   infringing mark to the goods.  There is no way a party can be

11   more directly liable.  It does not matter at whose direction

12   it is.  There is no case law that simply because you are

13   directed to affix the mark by someone else that you are not

14   directly liable.  And that is entirely inconsistent with the

15   statute.  The manufacturer of the infringing good is the

16   classic party who is directly liable for being the infringer.

17          We also heard testimony from Mr. Hartvigson in his

18   depositions testimony that Sportswear has the requisite

19   knowledge here because they had licensed university marks in

20   the past, and so they knew that they could not affix

21   infringing marks on to products, but they did it anyway.

22          We also heard testimony that Sportswear also

23   received a cease and desist letter.  So they had the requisite

24   knowledge they were infringing Penn State's marks, and they

25   continued to infringe.  The manufacturer is absolutely

1   directly liable here.  It is the plain language of the

2   statute.  Any person.  There is no carve-out for

3   manufacturers.  The traditional source of a contributory

4   liability would be something like a platform that has no

5   direct role in actually creating the infringing goods, such as

6   Amazon or an E-bay.  It has never been held that you can only

7   secure a contributory liability against the party that fixes

8   the infringing mark to the infringing goods.  That is, in

9   fact, the classic core infringement.

10          THE COURT:  Thank you.  Mr. Harms, your thoughts?

11  I assume you want to reply.

12          MR. HARMS:  Your Honor, I would allow Mr. McKenna.

13          THE COURT:  All right.  Mr. McKenna, go ahead.

14          MR. MCKENNA:  Your Honor, I want to focus on the

15  plain language of the statute.  Infringement provisions, both

16  of them, including 1125(a) require use in commerce.  Use in

17  commerce is a defined term in the statute.  15 USC 1127

18  requires use of the mark as a trademark.  You use it -- use of

19  the mark in the ordinary course of trade to designate the

20  source of goods and services.  A mere manufacturer can't

21  possibly be doing that.  There's no evidence offered here that

22  Sportswear was ever selling these products itself or using

23  them as a trademark.

24          We obviously dispute that Vintage Brand is using it

25  as a trademark, but there's no evidence whatsoever with

ROUGH DRAFT

1    respect to Sportswear.  That's the plain language of the

2    statute.

3            THE COURT:  Well, that's how I read it.

4            MS. WHEATLEY:  May I be heard, Your Honor?

5            THE COURT:  I mean Vintage Brand is a different

6    matter.  So we -- and Mr. Hartvigson is a different matter, of

7    course, as the owner.  But not -- not Prep Sportswear or

8    Sportswear, Incorporated, I don't think.

9            MS. WHEATLEY:  Use -- manufacturing a product is

10   certainly use in commerce.  Again, it is core use in commerce.

11   They are manufacturing a product.  Sportswear, there's

12   evidence on the record they actually ship the product.  They

13   provide the customer service for the product.  They, in fact,

14   all of the employees who actually work for Vintage Brand are

15   Sportswear employees.  Vintage Brand has no employees.  The

16   only people who provide customer service, the only people who

17   do anything for Vintage Brand are Sportswear employees, which

18   we heard in the depositions, Michelle Young, Chad Hartvigson,

19   Erik Hartvigson.

20            The nonuse as a trademark point that Mr. McKenna

21   made, which is not what I understood is the basis for the

22   Court's order, but there is no requirement for trademark use

23   in the statute.  Numerous courts have rejected that there is a

24   requirement of trademark use.  The Third Circuit has no

25   element of a trademark use in the test in A&H.  And, in fact,

1    the statute makes it very clear that there is no requirement

2    that a party be using the mark as a trademark.

3         Again, 1125 says use in commerce of any word, term,

4    name, symbol or device.  The statute certainly knew how to say

5    the word trademark.  It did not say the word trademark.  And

6    other portions of the statute, such as the -- the dillusion

7    provisions of the statute do require use as a trademark.  And

8    that is made specifically clear.  But the infringement

9    portions do not require use of trademark.  They, in fact,

10   specify that any term, name, or symbol, if it is used in

11   commerce, can be an infringement.

12        Numerous courts have rejected this idea that there

13   is an extra element of trademark use, notably in the Winfrey

14   case in the Second Circuit.  The Ninth Circuit has rejected

15   this idea, and the Third Circuit has never acquired it.

16        So there's no basis to grant judgment as a matter

17   of law in Sportswear on the issue of trademark use.  We would

18   request that we be permitted to submit a Motion for

19   reconsideration on this issue, Your Honor.

20        THE COURT:  You may brief accordingly.  Anything

21   else, Mr. McKenna?

22        MR. MCKENNA:  Doesn't sound like it.  Obviously, we

23   would prefer to respond, if they brief.

24        THE COURT:  That's fine.  You may respond.  All

25   right.  Anything else for tonight?

**ROUGH DRAFT**

1          MR. FINKELSON:  Nothing for Plaintiff, Your Honor.

2          MR. FETTERS:  Nothing for the Defense.

3          THE COURT:  All right.  And the Defense is ready to

4    proceed tomorrow with --

5          MR. FETTERS:  Yes, with Dr. Neal, followed by Chad

6    Hartvigson.  And I think that will take the balance of

7    tomorrow.

8          THE COURT:  All right.  That's understood.

9          All right.  Very good.  Court will stand in recess,

10   then, until 9:30 a.m. tomorrow, which is Friday, November 15.

11   Court will rise.

12          (At 5:55 p.m., the proceedings were concluded for

13           the day.)

14

15

16

17

18

19

20

21

22

23

24

25