```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
                    WILLIAMSPORT DIVISION

THE PENNSYLVANIA STATE    :  CASE NO.
UNIVERSITY                :
      v.                  :
VINTAGE BRAND, LLC,       :
SPORTSWEAR INC., d/b/a    :
PREP SPORTSWEAR,          :
CHAD HARTVIGSON, ERIK     :
HARTVIGSON, and           :
MICHELLE YOUNG            :  4:21-CV-01091


                  TRANSCRIPT OF PROCEEDINGS
                         Jury Trial
                         VOLUME IV

     Held before the HONORABLE MATTHEW W. BRANN, November 15,
2024 commencing at 10:26 a.m., Courtroom No. 1, Federal
Building, Williamsport, Pennsylvania.



APPEARANCES:

LUCY J. WHEATLEY, ESQUIRE
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
804-775-4320
Lwheatley@mcguirewoods.com

DAVID E. FINKELSON, ESQUIRE
McGuireWoods LLP
Gateway Plaza, 800 East Canal Street
Richmond, VA 23219-3196
804-775-1157
Dfinkelson@mcguirewoods.com
     For the Plaintiff

Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription.
_____
                  Colleen V. Wentz, RMR, CRR
                  Official Court Reporter
             colleen_wentz@pamd.uscourts.gov
```

1    APPEARANCES (cont'd)

2    JOHN T. FETTERS, ESQUIRE
     STOKES LAWRENCE, P.S.
3    1420 Fifth Avenue, Suite 3000
     Seattle, WA 98101
4    206-626-6000
     john.fetters@stokeslaw.com
5
     JOSHUA D. HARMS, ESQUIRE
6    STOKES LAWRENCE, P.S.
     1420 Fifth Avenue, Suite 3000
7    Seattle, WA 98101
     206-626-6000
8    josh.harms@stokeslaw.com

9    MARK P. MCKENNA, ESQUIRE
     LEX LUMINA PLLC
10   745 Fifth Avenue, Suite 500
     New York, NY 10151
11   630-430-8051
     mark@lex-lumina.com
12
     LESLIE C. VANDER GRIEND, ESQUIRE
13   STOKES LAWRENCE, P.S.
     1420 Fifth Avenue, Suite 3000
14   Seattle, WA 98101
     206-626-6000
15   leslie.vandergriend@stokeslaw.com
          For the Defendants
16

17

18

19

20

21

22

23

24

25

26

INDEX TO WITNESSES

FOR THE DEFENDANT DIRECT    CROSS    REDIRECT    RECROSS

David Neal              11      36       11

On Qualifications        5

Chad Hartvigson         80

**ROUGH DRAFT**

1           (Proceedings commenced at 10:26 a.m.)

2           THE COURT:  All right.  We're back on the record

3    now in the matter of the Pennsylvania State University against

4    Vintage Brand, LLC, et al. docketed in this Court at Civil No.

5    4:21-CV-1091.

6           The jury remains in the jury room so that I can

7    give you some further -- give Counsel further guidance

8    regarding the Defense Motion under Federal Rule of Civil

9    Procedure 50(a)(1) that I ruled on yesterday.

10          I've received some additional papers now from

11   Plaintiff, Penn State.  I believe that Vintage Brand wishes to

12   reply, potentially some reply briefing.  And so I am going to

13   hold in abeyance my ruling on the -- the Rule 50(a)(1) issue,

14   certainly pending completion of the Defense' case, which we

15   assume will be perhaps late in the day Monday.  So that will

16   give Counsel an opportunity to further brief the issue and for

17   me to give some thought to whether I'm going to change my mind

18   on that, on a Motion for reconsideration.

19          So with that said, I think we're ready to begin the

20   Defense case.

21          MR. MCKENNA:  We are, Your Honor.

22          THE COURT:  Mrs. Rhinehart, do you want to box the

23   jury, please.

24          (At 10:27 a.m., the jury entered the courtroom.)

25          THE COURT:  Ladies and gentlemen, I hope you had a

1    restful evening.  Counsel and I have spent a little bit of

2    time this morning discussing some ministerial issues.

3    Although we're getting on the record a little later than we

4    hoped, our discussions this morning will speed the plow,

5    so-to-speak with regard to the completion of this case.

6            I believe we're ready to present the Defense case.

7    Defense Counsel, is that right?

8            MR. MCKENNA:  That's right, Your Honor.

9            THE COURT:  All right.  Mr. McKenna, do you want to

10    call your first witness.

11            MR. MCKENNA:  Defendants call Dr. David Neal.

12            THE COURT:  Dr. Neal, come forward and be sworn,

13    please.

14            (The witness, David Neal, was sworn.)

15            COURTROOM DEPUTY:  Can I get you to state your full

16    name and spell your last name for the record.

17            THE WITNESS:  Sure.  It's David Thomas Neal,

18    N-e-a-l.

19            THE COURT:  Go right ahead, sir.

20                    DIRECT EXAMINATION ON QUALIFICATIONS

21    BY MR. MCKENNA:

22    Q.   Good morning, Dr. Neal.  Can you introduce yourself to

23    the jury, please?

24    A.   Certainly.  My name is David Neal and I'm the managing

25    partner of Catalyst Behavioral Sciences.

**ROUGH DRAFT**

1    Q.    And, Doctor, what does Catalyst Behavioral Sciences do?

2    A.    We are a boutique survey research firm.  So I design

3    surveys in a range of different context.  Some of them are in

4    lawsuits like this one.  But I also do a lot of surveys for

5    companies, essentially market research surveys.  I've worked

6    with some of the big brands that you might know, Microsoft

7    Intel, Johnson & Johnson, I do a lot for Procter & Gamble, so

8    brands like Bounty Paper Towel and Tide detergent and

9    Gillette.

10          And in the third bucket of work I do is something

11   that's called epidemiological survey.  So those are surveys

12   for sometimes charities or for non-government organizations,

13   folks like the CDC, the Bill and Melinda Gates Foundation.

14   That's where we're using surveys to try to understand the big

15   population health problem.

16   Q.    And Dr.Neal, just so we can understand a little bit more

17   about your survey work outside of the context of lawsuits,

18   could you briefly tell us about one of those projects that you

19   were describing?

20   A.    Sure.  So I just finished a big five-year project for the

21   CDC, and it was focused on the big percentage of the

22   population who's at risk of getting type 2 diabetes.  And so

23   it was a survey of those folks in the United States to help

24   try and identify ways to help people make some small changes

25   to their eating and exercise to kind of push down the risk of

ROUGH DRAFT

1    things progressing to the point where you get type 2 diabetes.

2    Q.    Thank you.  And, Dr. Neal, what were you asked to do in

3    this case that you'll be talking to us about today?

4    A.    I was asked to conduct an independent scientific review

5    of the likelihood of confusion survey that you heard

6    Mr. Franklyn talk through yesterday and to reach my own

7    conclusion about whether the survey was done in a

8    scientifically valid way, and whether he was accurate in

9    reaching the conclusion that he shared yesterday.

10   Q.    Okay.  And, Dr. Neal, before we get into your review of

11   Mr. Franklyn's survey in depth, could you please briefly walk

12   us through your academic training?

13   A.    Sure.  So I did my PhD in Australia, as you can probably

14   hear lingering in my accent.  I grew up in Australia, but I

15   moved to the US about 20 years ago, became a citizen, did more

16   study at Duke in North Carolina.  And there, I was -- I ran an

17   interdisciplinary social science research group, so

18   essentially helping professors run mostly surveys in all sorts

19   of different academic fields.  And then following that, I was

20   an assistant professor at USC in California in LA.  And then

21   after that, I started my research firm.

22   Q.    And, Dr. Neal, have you taught classes at universities

23   relating to consumer psychology or experimental survey design?

24   A.    I have.  I've taught both of those subjects at Duke and

25   at USC.  And that includes to undergraduates and then also to

1  graduate students.

2  Q.   And you mentioned survey work in both health behavior and

3  consumer behavior when you were describing your work earlier.

4  Could you tell us about some of the organizations that have

5  funded your survey research on health behavior?

6  A.   Sure.  So some examples would be the National Science

7  Foundation, the Centers for Disease Control, the World Bank,

8  the Bill and Melinda Gates Foundation, USA ID, and I've also

9  done some work recently for the Surgeon General of the Army on

10  soldier fitness and mental health.

11  Q.   And what about your survey research on consumer behavior.

12  What would be some of the funding sources for those -- that

13  work?

14  A.   So I mentioned some of the companies earlier, so I might

15  repeat those ones again, but some additional ones more in that

16  kind of apparel and footwear space would be Adidas,

17  Timberland, Vans, the North Face, and there are other consumer

18  brands that I mentioned earlier, like Johnson & Johnson and

19  Procter and Gamble, folks like that.

20  Q.   Thank you, Dr. Neal.  Have you published articles in

21  peer-reviewed journals or books on topics relating to consumer

22  psychology or experimental survey design?

23  A.   I have 26 peer-reviewed publications and maybe two of

24  them I'll quickly mention because they're more relevant or

25  especially relevant.

1                In 2012, I won the outstanding contribution award

2    presented by the Society for Consumer Psychology.  And then a

3    couple of years ago, I published a Chapter in the book that

4    folks have been holding up at various times in the trial

5    yesterday.  It's the sort of main book that experts who do

6    supervisors in trademark cases rely upon.  So I have a Chapter

7    in that book on Psychological considerations in designing

8    trademark surveys.

9    Q.   Dr. Neal, that would be this book (indicating)?

10   A.   That's the one.

11   Q.   Have you acted as a scientific peer reviewer for other

12   people's articles?

13   A.   I have.  I do a fair amount of peer review analysis,

14   those kind of independent scientific reviews of papers being

15   submitted for publication in an academic journal, and I do

16   that for journals in psychology and in consumer behavior.

17   Q.   Dr. Neal, have you previously served as an expert

18   witness?

19   A.   I have.

20   Q.   About how many times?

21   A.   Oh, across what time period?

22   Q.   Maybe just in the last few years?

23   A.   I'd say something in the order of 15 to 20 times.

24   Q.   That you've been an expert.

25   A.   Yes.

ROUGH DRAFT

10

1  Q.   Okay.  And how many times have you testified, if you've

2  sort of expanded that out over --

3  A.   I think now over 60 times.

4  Q.   And what sorts of cases were those?

5  A.   Most of them are trademark cases, so very similar to this

6  case here.  That's probably 60, 70 percent.  And then the

7  remainder would be patent cases, so again, intellectual

8  property law, but a little bit different from trademarks.  And

9  then some false advertising cases.

10 Q.   And -- and where was that testimony before?  What kinds

11 of tribunals?

12 A.   Most of it's in federal court, so like where we are here

13 today.  Some of it's in the international trade commission,

14 some of it is in front of the US PTO, so it's the Government

15 entity that manages patents and trademarks.

16 Q.   And Dr. Neal, has your work as an expert witness involved

17 the design and implementation of surveys to assess likelihood

18 of confusion?

19 A.   Yes, it has.

20 Q.   About how many of those surveys have you been involved

21 in?

22 A.   A rough estimate would be somewhere well over 70.

23 Q.   And yesterday, the jury heard Mr. Franklyn talk about the

24 Everready method.  Are you familiar with that method?

25 A.   I am.

1   Q.    Have you used that survey method yourself?

2   A.    I have.  Again, a rough estimate would be at least 50 or

3   60 times.

4   Q.    Dr. Neal, has your testimony regarding a trademark survey

5   ever been excluded by a Court?

6   A.    No, it has not.

7   Q.    Are you being paid for your work in this case?

8   A.    I am.  It's my standard hourly rate.

9   Q.    And does your pay in this case depend in any way on the

10   outcome?

11   A.    No.  I'm paid the same amount regardless of what the

12   outcome of the case is.

13          MR. MCKENNA:  Your Honor, we tender David Neal as

14   an expert in the field of psychology and the design and

15   implementation of surveys.

16          THE COURT:  Do you care to voir dire this witness?

17          MR. FINKELSON:  No need, Your Honor.  No objection.

18          THE COURT:  All right.  He's duly admitted for the

19   reasons set forth by Counsel for the Defense.  Go right ahead,

20   sir.

21          MR. FETTERS:  Thank you, Your Honor.

22                    DIRECT EXAMINATION

23   BY MR. FETTERS:

24   Q.    Dr. Neal, earlier you mentioned your assignment in the

25   case.  But just to get us started, could you remind us of what

1  your goal was?

2  A.   Yeah.  My goal was to conduct a scientific review of

3  Mr. Franklyn's confusion survey and reach my own conclusions

4  about whether I think the study was done properly and whether

5  his conclusion about likelihood of confusion was -- was a

6  sound one.

7  Q.   And how did you approach that goal?  What was your

8  methodology?

9  A.   Very similar to the same time process you would do in any

10  peer review process.  So you start by very carefully reading

11  every question in the questionnaire and looking at the

12  structure of the overall questionnaire, comparing it to the

13  standards in the field, looking at how recruitment of

14  respondents happened, and the second step, you look at the raw

15  data.  So basically every person's answer to every question.

16  And you reanalyze it to check all of the conclusions.  And

17  then finally, you write up a report with any -- any major

18  problems that you found in the survey.

19  Q.   Okay.  And, Dr. Neal, could you briefly describe your

20  understanding of the purpose of Mr. Franklyn's confusion

21  survey?

22  A.   Sure.  Yeah.  Why don't we use Mr. Franklyn's own words.

23  I think that we have a slide that has his description.

24  Q.   I understand that Plaintiff has no objection.  So if we

25  can make sure that it's published to the jury.

1          MR. FINKELSON:  Your Honor, we've reviewed the

2    demonstratives and have no objection.

3          THE COURT:  No objections.  All right.  Duly

4    admitted.  You may publish.

5          THE WITNESS:  So as you can see here, Mr. Franklyn

6    describes his aim for the confusion survey as being retained

7    to assess using standard and generally-accepted statistical

8    and consumer market survey methods the level of confusion

9    between Vintage Brand and Penn State.

10   BY MR. MCKENNA:

11   Q.   Okay.  And again, just starting at a high level, what was

12   your understanding of the structure of Mr. Franklyn's

13   confusion survey.

14   A.   We obviously spent a lot of time going through this

15   yesterday, so I'll just briefly remind us, and we've got a

16   slide here that walks us through the structure, right.

17          So starting at the top, Mr. Franklyn started by

18   recruiting a little over 600 people in the United States who

19   are likely purchasers of college and university apparel.  And

20   then he took that 600 people and he broke them up into three

21   groups, so roughly 200 in each of the groups, and he calls

22   those cells.

23          So in test cell one, people saw the imagery that

24   you can see underneath test cell 1, so that gray Nittany Lion

25   t-shirt, plus some text from the website Vintage Brand

1   website.

2           In test cell No. 2, a different 200 saw the S lion

3   design on that blue t-shirt, and again, some additional text

4   next to it from the Vintage Brand website.  And then finally,

5   in the control cell, he showed a white Vintage Brand t-shirt,

6   again with different text next to it from the website.

7   Q.   And after he had assigned the respondents to these

8   different groups, then what happened?

9   A.   So then the final step was to ask a set of questions to,

10  in his view, get at confusion, basically who do you think is

11  the source of this t-shirt, do you think it's sponsored by

12  anyone, affiliated with anyone, or did it receive a licensing

13  from anyone.

14  Q.   And, Dr. Neal, how did Mr. Franklyn analyze the data from

15  those responses and what conclusions did he draw?

16  A.   So if we move onto the next slide, we can see -- so what

17  Mr. Franklyn did was for each of the people in those three

18  groups, he counted up the number and then he turned it into a

19  percentage, the percentage of people who, in his view,

20  identified Penn State as either the source of the t-shirt or

21  as, you know, getting permission or sponsoring it or licensing

22  it.  And as we heard him describe yesterday, he thinks that

23  confusion level was pretty high.  He thinks it's 27 percent

24  for one of the t-shirts, the Nittany Lion one, and he thinks

25  it's 39 percent for the blue S lion design.  And so that's how

**ROUGH DRAFT**

15

1  he reached his conclusion that there's a significant level of

2  confusion in his mind.

3  Q.   Okay.  And, Dr. Neal, having reviewed Mr. Franklyn's

4  survey and his data, do you agree with the conclusion he

5  reached?

6  A.   I do not.  I respect Mr. Franklyn, but for a series of

7  reasons that I'll walk you through in a moment, I think he

8  made some very significant mistakes that led him to those

9  numbers, so I do not agree with him that his survey shows a

10 significant level of confusion.

11 Q.   And could you briefly summarize for us why you disagree

12 with Mr. Franklyn?

13 A.   Certainly.  I think we have a slide that these are my top

14 five concerns.  And so I'll kind of walk you through these

15 briefly and then we'll go back and hear about them in a little

16 bit more detail.

17        So the first flaw is that his survey actually

18 doesn't tell us whether the t-shirts themselves are causing

19 confusion because he made a mistake where he changed more than

20 just the t-shirt across his test and his control cells.  And

21 that's something we call a scientific confound, and it means

22 that he can't link the confusion back to the t-shirts

23 themselves.  So that's problem number one.

24        Problem number two, we heard about this yesterday,

25 was that when he showed people the Vintage Brand website, he

1   cut, from the top where it says Vintage Brand dot com, so he

2   kind of took out a really powerful piece of information that

3   when you are shopping online, tells you where you're buying.

4   I'm buying from Vintage Brand dot com.  That was cut out of

5   the stimulus.

6       So I think that really created a lot of ambiguity.

7   People didn't know where they were shopping.  And, in turn,

8   that is going to lead people to guess.  So that's my second

9   worry about the survey.

10      The third one is that he asked a fourth question

11  about confusion.  Typically, in Everready surveys, you might

12  ask two or three questions.  He added on an extra question for

13  some reason, I don't really know why he did that.  So I -- he

14  kind of went back to the tree to shake the tree to see if he

15  could get some more Penn State answers, and that inflated his

16  confusion level.

17      Flaw number four is that in a survey like this,

18  you're trying to work out who thinks that the Plaintiff, so

19  Penn State, puts out those goods, or is in some way connected

20  with the Vintage Brand's goods.  So what you're supposed to do

21  is count up people that say Penn State or something that is

22  obviously a reference to Penn State.  But Mr. Franklyn went

23  much broader than that.  So he counted people who never said

24  Penn State in response to any question, and just said

25  something like NCAA.  So I think he went too broad in what he

1  counted as confusion, and that, again, inflated the confusion

2  level.

3           And then the final one is that he broke a really

4  important rule in Everready surveys, which is that you're not

5  allowed to do something that gets your survey respondents to

6  think about the Plaintiff in an unofficial way.  And we'll

7  talk about how he did that.  But the technical word is

8  priming.  It's kind of laying a little seed in the mind of the

9  survey respondent that gets them to start to think about the

10  Plaintiff, so here, Penn State, in a way that's artificial and

11  is not is happening in the real world.  And again, that tends

12  to have the effect of increasing the likelihood that people

13  will start saying Penn State when you ask them questions.

14  Q.    Okay.  Thank you.  And, Dr. Neal, in your mind, are all

15  five of those flaws equally serious?

16  A.    No, not really.  They're all serious, in my view, but

17  some of them I regard as very serious, so those are the ones I

18  call fatal flaws, if we move onto the next slide.  So flaw

19  number one and flaw number two and flaw number five, those are

20  the ones that, in my judgment, are really, really serious.

21  Flaw number three and flaw number four are still problems, but

22  I think are less serious.

23  Q.    And, Dr. Neal, what do you mean by a fatal flaw versus a

24  less serious one?

25  A.    So a fatal flaw is a flaw that is kind of so serious that

1    it makes the survey data unusable.  We're trying to draw a

2    scientific conclusion, and if there's a fatal flaw in a

3    survey, it means we really can't use the survey to answer that

4    question.

5           And he, in my view, has three flaws that feed into

6    that fatal category.

7    Q.   Okay.  Let's expand a little bit on each of those.

8           Could you start with flaw one, please, and describe

9    in more detail why it matters.

10   A.   Sure.  So I think it might be helpful to look at the

11   imagery that he put in front of folks.  So we looked at this

12   in some detail yesterday.  But let's look first and maybe we

13   can zoom into it, at what folks in test cell one saw.

14          Okay.  So remember about 200 of the 600 people saw

15   this image.  And I want to point out a couple of things about

16   it.  It -- as you can see, it includes the Nittany Lion on the

17   gray t-shirt.  And that is one of the things that Penn State

18   is really worried about and says is causing confusion and

19   calling it an infringing mark, and this product, in their

20   view, is causing confusion.  But that's not the only thing on

21   this page that makes reference to Penn State.  If you take a

22   look at the things that we put a red box around, the page

23   makes reference elsewhere to Penn State, as well.

24          So, in fact, it's got it in fairly large bold black

25   lettering over on the right-hand side.  It says Penn State

1  Nittany Lions.  Right.  So why -- that might seem a subtle

2  thing, but it's very important, because what it means is the

3  -- the stimulus, if you put in front of people, it does the

4  right thing in terms of showing people a product with the mark

5  that they're so concerned about, but it does something else

6  that obviously is going to make people think about Penn State.

7  It has the words in black and white, large font to the right.

8          So let's just kind of remember that distinction and

9  then go on and see the next -- the next one.

10  Q.   Now, you want to call out --

11  A.   Yeah.  If we can now look -- now zoom into test cell two.

12  Exactly the same patent is here.  He did the right thing in

13  terms of showing people a t-shirt with one of the allegedly

14  infringing marks.  This is the S lion.  That's okay.  But in

15  this case, there's even more references to Penn State outside

16  of the t-shirt itself.

17          So you can see them highlighted over there to the

18  right.  So in both of his test cells, he's shown a product

19  that Penn State is worried about, plus he's shown multiple

20  other things on the page.  It says Penn State, Penn State,

21  Penn State.

22          Why is that a problem?  Let's have a look at the

23  control cell next.  So here's his control.  And if we can zoom

24  in to that, all right, you'll see here a t-shirt that doesn't

25  have any of the infringing or allegedly confusing marks on it,

1   and that's fine.  Plus over on the text to the right, no

2   mentions of Penn State whatsoever.

3           So what does that mean?  If we zoom back out to the

4   three images?  What does it tells us?  It tells us that in

5   both of his test cells, he's got something on the t-shirt

6   itself that is alleged to cause confusion.  But he's also got

7   something over here that mentions Penn State.  So there's two

8   possible things that when people look at it, they could be

9   thinking Penn State.  And in his control, both of those things

10  are gone.  So I'll unpack why that's a problem.

11  Q.   Okay.  Dr. Neal, why would you describe that as such a

12  serious problem?

13  A.   Well, in scientific parlons, it's what we call a

14  scientific confound.

15  Q.   And could you describe a little bit what does that term

16  mean?  Maybe if you could use an example to help explain?

17  A.   Sure, so the beauty of an experiment is that everything

18  is kept constant except one thing.  All right.  And then if an

19  experiment's done really well like that, you can be sure that

20  any differences between the test and the control are caused by

21  that one thing.  But what that means is you can only change

22  one thing across your test and your control.

23          Now let's take a look at what is going on here.  My

24  understanding is that what Penn State is worried about is the

25  t-shirts and the use of the images on the t-shirts themselves.

1          So that is the thing that they argue is causing

2    people to be confused.  So that's the one thing that they

3    needed to isolate.  But that's not the survey that

4    Mr. Franklyn actually ran.  He created a survey where two

5    things are present in the test, and both of those things are

6    missing in the control.  So what it means is that we have no

7    idea what is explaining that difference between the test cells

8    and the control cells.  It could be the images on the t-shirt.

9    But it could be the mentions of Penn State to the right of the

10   product.  And so perhaps I could, you know, use an example to

11   --

12   Q.   I think that might be helpful.  Is the thing you're

13   describing, is that limited to surveys that have to do with

14   trademarks?

15   A.   No.  This is -- which is kind a general scientific

16   principal.  So let me may be give a quick example.  So let's

17   say someone -- some brilliant person in this room invented a

18   new medication for blood pressure.  All right.  And a new

19   formula, no one's ever come up with it before.  And they

20   wanted to work out, is this actually an effective medication

21   that drop's people blood pressure.  All right.  So what would

22   you do?  You would design a randomized experiment.

23          You take a whole bunch of people who have got high

24   blood pressure, and they're not on my medication today.  All

25   right.  So you've got 400 of those people.  And you'd split

1    them into two groups.  200 of them would get your new drug

2    that you are so confident is going to work.  And the other 200

3    would get a placebo, like a sugar pill, something like that.

4    So everyone takes their pill every day and you come back two

5    weeks later, and you look at the blood pressure two of the

6    groups.  And if the blood pressure has dropped in the folks

7    who were getting your medication and it hasn't dropped as much

8    in the folks who were getting the placebo, you're proven that

9    your drug causes a drop in blood pressure.  So that's a proper

10   design because only one thing varied across the test and the

11   control.  The drug that you care about.

12        Mr. Franklyn's survey doesn't work like that.

13   Let's imagine that instead, you made a mistake, and the folks

14   who got your one drug also got put on a second drug for blood

15   pressure.  All right.  So now what do you have?  You've got a

16   test group where people are on two medications, and you've got

17   a control group where people are on zero medications.  And now

18   let's say these -- these guys, the folks in the test group,

19   their blood pressure does drop.  You've got a difference

20   between your test and your control, but you have no idea which

21   drug caused that change.  All right.  That is exactly the

22   situation we have here.

23        The images on the t-shirt are drug number one.  And

24   all of those references to Penn State to the right, those are

25   drug number two.  So Mr. Franklyn did find a difference

1  between his test and his control, but we don't know if it's

2  drug one or drug two that's causing that change.  And that's

3  why this is such a big deal.

4  Q.   So Dr. Neal, just to be clear, the mentions that you

5  refer to, the descriptions of the products, those are actually

6  -- those are actually on the Vintage Brand website.  So are

7  you suggesting Mr. Franklyn shouldn't have shown his test cell

8  participants the images on the website?

9  A.   No, no, no.  He was right and totally fine for him to use

10 those website images.  The mistake he made was he needed a

11 control where those that were drug number two was kind of held

12 constant.  He needed a control where those references to Penn

13 State were present in the control, as well.  And then he would

14 have been able to compare and say, okay, the t-shirts are

15 adding confusion over and above the mentions of Penn State on

16 the webpage itself.

17        So there was a way he could have fixed this problem

18 and come up with a design where he could really draw a

19 conclusion about the t-shirts themselves, which is what Penn

20 State is worried about.

21 Q.   Okay.  Dr. Neal, you described this as one of the flaws

22 that you said was fatal.

23 A.   That's right.

24 Q.   Why is it fatal?

25 A.   Well, it's fatal, because my understanding is Penn State

1    is not objecting to -- it's not saying that the confusion is

2    being caused by the descriptions on the website.  It wants

3    Vintage Brand to stop selling the t-shirts because it says

4    that the t-shirts are causing confusion.

5              So given that that's what they're concerned about,

6    Mr. Franklyn had to prove that the t-shirts are causing

7    confusion.  And as I've explained, his design just doesn't do

8    that.  We don't know one way or the other.  That's why I call

9    it a fatal flaw.

10   Q.   Dr. Neal, were you present in the courtroom yesterday

11   when Mr. Franklyn was testifying?

12   A.   I was.

13   Q.   And do you remember that I asked Mr. Franklyn if he had

14   any data showing the percentage of consumers who were confused

15   specifically about the images on the front of the Vintage

16   Brand's products?

17   A.   I do remember that.

18   Q.   Dr. Neal, in your opinion, does Mr. Franklyn have any

19   data that shows the percentage of consumers who are confused

20   by the images printed on Vintage Brand's products?

21   A.   He does not because of his confound, because of his

22   problem, he's got a difference -- he can point to a number, 27

23   percent or 39 percent, but he -- he cannot tell us what piece

24   of that number is because of the t-shirt or because of the

25   words Penn State were used next to the product describing it.

```
 1   Q.   Okay.  Let's move onto flaw two, Dr. Neal.  What's the
 2   second flaw.
 3   A.   Okay.  So if we move on -- I think we have a slide -- I
 4   need to clear this.  How do -- thank you.  Excellent.
 5             Okay.  So as you know, when you're shopping online,
 6   at the top of the webpage, it will tell you in the browser
 7   where you're shopping from.  So it will say Amazon dot com or
 8   Adidas dot com, wherever you're shopping.  That's obviously a
 9   very powerful piece of information that tells you what the
10   source of the goods is.  All right.  It literally tells you
11   where you are buying from.  And so if someone went to Vintage
12   Brand website, they would see that information.  We can see it
13   on the left-hand side here.  It's in pretty small font.  I
14   don't know if you can zoom in there.
15   Q.   Can you zoom in on the --
16   A.   You want to go to the left.  Yeah.  So this is -- you're
17   familiar to you, I'm sure.  This is the URL of a web address
18   where you're shopping.  And it says Vintage Brand dot com.
19             Now, Mr. Franklyn's survey, for some reason, that
20   was cropped out of the image.  So what does that mean?  It
21   means that people just saw, if we can go to the image on the
22   right, it means that people just saw a screenshot, but they
23   had no idea, there was nothing there to tell them this is
24   Vintage Brand dot com.  And why is that such a problem?  Well,
25   you know, just from common sense, we know that the web address
```

1    kind of tells you where you're buying from.  So if that is

2    being excluded and cut out, what is that going to do?  It's

3    going to create a lot of uncertainty because I don't know

4    where this website is.  I don't know what the website is.

5            And what happens when people are uncertain in

6    surveys.  Well, there's a problem that we sometimes call a

7    reading test.  And the reading test is a sort of known problem

8    in surveys, which is that when people are uncertain and you

9    keep asking them questions, eventually they're going to start

10   reading back things that are on the screen.  So Penn State is

11   on the screen, they're uncertain, they can't see the web

12   address, it means they're more likely to start guessing things

13   like Penn State.

14   Q.   So again, Dr. Neal, these are shown, at least in -- part

15   of this was shown because it was on the website, and you

16   mentioned the URL in the context.  Why is it important that

17   the test image match the real world context?

18   A.   Well, just -- I mean as a general principal in surveys,

19   any survey is trying to get a measure of something that's

20   happening in the real world.  All right.  So it's very

21   important that your survey doesn't alter or manipulate or cut

22   out anything that could be really important and is present in

23   the real world.

24           So here, obviously the web address tells you where

25   you're buying from.  That would be present in the real world,

1    and it was cut out of Mr. Franklyn's survey, and I think

2    that's obviously a big problem.

3    Q.    And in your opinion, what effect would removing the

4    Vintage Brand URL likely have had on the survey results?

5    A.    I kind of touched on that.  I think the main problem is,

6    you take away the information about where people are shopping,

7    suddenly the uncertainty goes up.  They are being asked to

8    answer the question, so they're going to start -- people would

9    be more likely to guess.  And they'll start reading things

10   from off the screen, including Penn State.  So I think that's

11   the effect that cutting that information out likely would have

12   had on people's answers.

13   Q.    And Dr. Neal, you've identified flaw two also as a fatal

14   flaw.

15   A.    I did, yes.

16   Q.    Why is removing the URL a fatal flaw here?

17   A.    Well, just because the whole point of an Everready survey

18   is to work out who do people think is putting out the goods,

19   or is affiliated with it.  And if you cut out the web address,

20   that told them who is the source of the goods, that's a big

21   problem.  People get that in the real world.  They didn't get

22   it in the Franklyn survey.

23   Q.    Let's move on to flaw three.  Could you describe that

24   flaw for us?

25   A.    Sure.  Yeah.  So what we can see here is little blue

1    boxes.  These are the different questions that Mr. Franklyn

2    asked about confusion.  And the first three of them are pretty

3    standard, right.  So he asked about who do you think puts out

4    these t-shirts and do you think they got sponsorship or

5    approval of anyone, are they affiliated with anyone.  That's

6    pretty standard and normal.  He added a fourth question about

7    licensing.  And I have never seen that before.  I think it's

8    unusual for a couple of reasons.  It -- I'm not a lawyer, but

9    I know if I was going through this survey and someone asked me

10    do I think this product is sponsored or approved by anyone and

11    then I was asked do I think it's affiliated with anyone, and

12    then I was asked if it was licensed by anyone, I wouldn't

13    really have a clear sense of how those things were different.

14         So I think it's -- this is another example of this

15    survey kind of going back to the tree and trying to shake out

16    as many Penn State answers as it possibly could, using kind of

17    redundant questions.

18         So, you know, the more people -- the more questions

19    you ask, even if -- especially, I should say, especially if

20    they're overlapping and not really different from the question

21    you asked earlier, eventually people will just start guessing.

22    It's kind of a problem with some surveys.

23    Q.    And, Dr. Neal, you said you were critical of this, but

24    you don't put this in a category of fatal by itself.  Why not?

25    A.    Yeah.  I don't think this is a fatal flaw.  I think it

1    was a mistake.  But I -- there are relatively few people --

2    additional people who came up with Penn State because of this

3    extra question.  So I think it's a design flaw, but I would

4    not put it in the category of being a fatal flaw.

5    Q.   Okay.  And could you now describe flaw 4 and tell us why

6    that matters?

7    A.   Sure.  Yeah.  We had some discussion about this

8    yesterday.  But the whole point of an Everready survey like

9    this is to basically put in front of survey respondents the

10   Defendant's product, the thing that's alleged to be causing

11   confusion, and then see if they spontaneously think of the

12   Plaintiff, so in this case, Penn State.  So what you're

13   supposed to do is look at people's answers and say okay, this

14   person definitely is definitely think of Penn State.  This

15   person is definitely thinking of Penn State.  This person

16   isn't.

17            Now, Mr. Franklyn used a very unusual coding method

18   where even if a person never said Penn State, at any time to

19   any of his four questions, he still coded them as confused and

20   thinking of Penn State if they wrote NCAA or if they wrote

21   college, or if they wrote university.

22            So he used way too broad criteria to count someone

23   as thinking of the Plaintiff, even if they never mentioned the

24   Plaintiff.

25   Q.   So, Dr. Neal, yesterday Mr. Franklyn explained that

1  approach by saying that in the context of this survey, it was

2  reasonable to interpret those answers as referencing Penn

3  State.  Do you remember that?

4  A.    I do.

5  Q.    And does that change your opinion?

6  A.    No, because the -- our job as survey experts is to be

7  neutral and not to kind of substitute our opinions for the

8  opinions of the people taking the survey.

9          So let's think about a survey respondent who saw

10 these products and never said Penn State at any point.  And

11 then they just wrote NCAA.  Mr. Franklyn, with respect -- he

12 doesn't have any basis for saying I know that person was

13 thinking of Penn State, even though they never said Penn

14 State.

15         So the survey expert has to stay hands off with the

16 data.  And it's improper for him just to assume that he

17 request get inside the head of the survey respondent and kind

18 of answer for them, and change their answer and NCAA to a

19 reference to Penn State.

20 Q.    Okay.  And Dr. Neal, flaw 4 is the second one that you

21 said that you regarded as serious but not fatal by itself?

22 A.    Yeah.  Yeah, that's right.  I think it fits this pattern

23 of, you know, repeatedly doing things that kind of inflated

24 the apparent confusion.  But again, there weren't that many

25 people who gave an answer like this.  So the overall effect on

1   it on the data is relatively small, and so I don't -- I think
2   this is bad, but not fatal to the survey.
3   Q.   Okay.  Dr. Neal, I think we're up to the final flaw,
4   number five.  Could you explain that to us?
5   A.   Sure.  So I think we have a slide to help here, and
6   again, there was some discussion of this yesterday, right.
7            So let me just start by saying one of the kind of
8   really important golden rules of one of these surveys is that
9   you can't do something early on in a survey that might lay a
10  seed and make people start to think about the Plaintiff before
11  they look at the Defendant's goods, because the whole goal
12  here is to see, when someone looks at one of these t-shirts on
13  the Vintage Brand website, do they spontaneously think of Penn
14  State.  Do they think Penn State is the source of that or is
15  affiliated.  So you can't do anything early on that -- that
16  lays a seed that might artificially make people start to think
17  about Penn State.
18           And Mr. Franklyn did that.  So what we can see here
19  are some questions that he included in his screening part of
20  his survey.  So basically, the sort of early survey questions
21  before people even got to the point of seeing the goods at
22  issue, and you can see in question 5-B, he asked within the
23  past 12 months, have you purchased college sports apparel,
24  including any of the following universities.  And then he
25  provided a whole bunch of options.  And one of the options

1    there was Penn State University.  And then he repeated that --

2    he did exactly the same thing a second time, in question 6-B.

3    Q.    Okay.  Dr. Neal, you mentioned that this is a sort of

4    cardinal rule.  Is this the sort of thing that you would see

5    discussed in the scientific literature?

6    A.    Yes.  It's a -- psychologist survey experts refer to this

7    as the priming problem.  So it's kind of -- it's exactly the

8    same as, like, priming a pump to get air out of it or priming

9    -- in the old days, priming the carburetor with gas to get in

10   to the engine.  It's the idea of doing something in a survey

11   at the start that kind of nudges or plants a little seed in

12   the mind of the survey respondent that's artificial, and might

13   get them to start to think about Penn State or start to be

14   more likely to offer up Penn State as an answer later on.

15              So this is a kind of a textbook example of doing

16   that.

17   Q.    So, Dr. Neal, are you saying that it would never be

18   appropriate to refer to Penn State in an Everready survey?

19   A.    Well, it's very rarely done.  I can imagine it could be

20   some circumstances where if you were doing it to replicate

21   something that happens in the real world, maybe then it would

22   be okay.  But that doesn't apply to Mr. Franklyn's survey

23   here.  Right.  This -- when people go to the Vintage Brand

24   website, they're not answering questions about whether they

25   bought things from Penn State there's the past 12 months.

1          So he's done something artificial here in his

2   survey that doesn't happen in the real world that planted a

3   little seed in the mind of the survey respondent immediately

4   before, and then looked at Vintage Brand's goods.

5   Q.   And, Dr. Neal, as far as you understand from

6   Mr. Franklyn's survey, how did he use the answers to those

7   questions?

8   A.   Well, that's another thing that's a bit concerning.

9   These questions had no purpose in his survey.  So in his

10  report, he doesn't use them to screen in or out anyone.  He

11  doesn't analyze his data in his report based on peoples'

12  answers here.  So they didn't really have any purpose.  It

13  seems to me -- I don't know the motivation.  But it seems to

14  me that the -- at least the effect was to get people to -- get

15  peoples' mental wheels to start turning around Penn State,

16  just before they then looked at Vintage Brand's clothing.

17  Q.   And just to be clear, the likely effect of that on

18  responses would have been what, in your judgment?

19  A.   Well, any time you make a Plaintiff kind of closer to the

20  surface in peoples' thinking, and then you show them the

21  Defendants' goods, they're going to be much more likely to

22  start answering in ways that refer back to the Plaintiff.

23  It's kind of like -- if I said the word doctor to you, the

24  word nurse is a little bit more accessible in your thinking.

25  Q.   Doctor -- Dr. Neal, do you remember yesterday

1  Mr. Franklyn said that he asked those questions because he was

2  wanting to collect some data about whether people were

3  purchasing Penn State products were taking the survey.  Do you

4  remember that?

5  A.    I do.

6  Q.    And does that change your opinion?

7  A.    No, it doesn't for a couple of reasons.  One is he didn't

8  do that in his report.  It might have been his motivation.

9  But if it was, it's a very easy fix, which is just ask these

10 questions at the end of the survey.  Don't lay the seed in the

11 mind of the survey respondent just before you're going to show

12 them the Defendants' goods, where this problem can emerge.

13 Just put the question at the end of the survey, then it can't

14 bias anything because there's nothing that's going to come

15 after it.

16 Q.    Dr. Neal, just -- you described flaw five as a fatal

17 flaw, as well?

18 A.    I did, yes, because this is just such a cardinal rule in

19 Everready surveys that you can't do something that's going to

20 artificially make people think about the Plaintiff, and then

21 ask fair questions about the Defendants' goods and whether

22 they might be put out by the Plaintiff, because you just laid

23 that seed.

24 Q.    Okay.  Thanks, Dr. Neal.  So just to summarize here for

25 the jury.  Could you just tell us your overall conclusion

1    regarding Mr. Franklyn's confusion survey?

2    A.    Certainly.  We can move into the final slide.

3          So I've walked you through five flaws.  Three of

4    them, in my view, are really extremely serious, and those are

5    the ones I called fatal.  It's my strong opinion that because

6    of these flaws, Mr. Franklyn's survey really simply cannot

7    answer the question that we need to know, which is there a

8    significant likelihood of confusion going on here caused by

9    the goods themselves.  So just to briefly recap.  The first

10   one is that the survey, because of that confound, the fact

11   that he changed two things in the test and -- and had both of

12   those things missing in the control, he didn't isolate the

13   t-shirts themselves, so he can't draw any conclusions about

14   them.  And then we saw that he artificially removed the

15   reference to Vintage Brands from -- Vintage Brand from the

16   website, so removing that really powerful piece of information

17   telling you where you're buying from, and then the final one

18   was priming people, nudging them to think about Penn State in

19   an artificial way right before he showed them the Defendants'

20   goods.  Those are my three main worries.

21   Q.    Thank you, Dr. Neal.  Pass the witness.

22         THE COURT:  Thank you.  Do you care to

23   cross-examine?

24         MR. FINKELSON:  Yes, Your Honor.  Do you want me to

25   proceed?

```
 1              THE COURT:  Yes.  You may do so.
 2                     CROSS EXAMINATION
 3   BY MR. FINKELSON:
 4   Q.   Good morning, Dr. Neal.  Nice to see you.
 5   A.   You, too.  Good morning.
 6   Q.   The jury didn't hear you say anything, Dr. Neal, about a
 7   survey that you conducted in this case, did they?
 8   A.   That's correct.
 9   Q.   And that's because you didn't do a survey of your own,
10   right?
11   A.   Yes.  I was asked to review Dr. Franklyn's survey.
12   Q.   And the Defendants and their attorneys in this case, they
13   never asked you to conduct one, correct?
14   A.   I believe because one might be being conducted by someone
15   else.
16   Q.   And I was actually going to ask you that question.  But
17   the fact is, you've conducted many, many trademark confusion
18   surveys in your day, haven't you, sir?
19   A.   That's certainly fair.  And I've done lots of rebuttals.
20   That's a pretty common practice.  Sometimes you get asked to
21   run a survey.  Sometimes you get asked to look at someone
22   else's surveys and see if there are problems in it.  And so
23   I've done both of those.
24   Q.   In this case, you're serving as a rebuttal expert,
25   correct?
```

ROUGH DRAFT

37

A.    Correct.

Q.    There have been other cases in which you've served as a

rebuttal expert in which you have not only critiqued the other

side's expert, but have run a survey of your own, correct,

sir?

A.    Yes.  I can't think of one where that side also had

another person who was doing a survey like applies here.  But

you are right.

Q.    Because the fact is, in this case, the Defendants left

the task of conducting a confusion survey, instead, to

Dr. Erdem, who, as you know, had only done that kind of survey

a few times, right, sir?

A.    I don't know how many times she's done those surveys.

But yes, she was the person doing the survey, and -- for

Vintage Brand, and I was the person asked to look at

Dr. Franklyn -- I'm sorry -- Mr. Franklyn's survey.

Q.    Let's talk about Mr. -- Professor Franklyn's survey.

        Had you been asked to conduct a survey in this

matter, Dr. Neal, you agree, don't you, that an Everready

would have been the right survey method to use?

A.    I haven't thought about that, but I think on -- probably,

that's likely to be correct, yes.

Q.    And there's no question, right, that an Everready is a

standard, well-established way to test for confusion in a case

like this?

1  A.   If it's executed correctly, an Everready is a powerful

2  tool, as I explained.  Unfortunately, Mr. Franklyn's Everready

3  was not executed correctly.

4  Q.   And I didn't ask you about Mr. Franklyn.  I'm just asking

5  you about Everready surveys generally, sir.

6           You're familiar, aren't you, Dr. Neal, with the

7  term double-blind as it relates to surveys?

8  A.   Yes.

9  Q.   And to avoid source or affiliation or bias, had you been

10 asked to do a survey in this case, would you have assured that

11 the survey was double blind?

12 A.   Yes.  We need to probe the details of how you're thinking

13 about double blind, but as a general rule, surveys in

14 trademark cases should be double blind.

15 Q.   In fact, you, yourself, have referred to double blind as

16 the gold standard, haven't you, sir?

17 A.   Well, I think I would need to see the context of that,

18 but double blind is an important goal for a survey to meet,

19 yes.

20 Q.   You testified in the Barry versus Medtronic case, didn't

21 you, sir?

22 A.   Yes.

23 Q.   And in the Barry versus Medtronic case, I believe you

24 also mentioned double blind.  Would you please explain for us

25 what that means.  And your answer was, Sure.  So that's kind

1    of a gold standard, you know, in designing a survey.  That was

2    your testimony, then, and you agree today, double blind is the

3    gold standard, right, sir?

4    A.    It is a gold standard.  It's an important thing, yes.

5    Q.    And Professor Franklyn's survey was double blind.  Yes or

6    no?

7    A.    I believe it was, yes.

8    Q.    And had you been asked to do a survey in this case, would

9    you have instructed the survey takers not to guess?

10   A.    That is a fairly standard instruction to have at some

11   point in the survey.  Again, you're kind of asking me very

12   abstract questions outside of the context of a particular

13   survey.  But I agree that it's generally good practice to tell

14   people not to guess.

15   Q.    And Professor -- I'm sorry.  I didn't mean to cut you

16   off, sir.  And Professor Franklyn did that too, didn't he?

17   A.    Well, unfortunately, he didn't do that for his key source

18   confusion question.  He didn't instruct people not to guess

19   there.  In fact, he didn't give them an opportunity even not

20   to give an answer.  But in other places in the survey, he

21   didn't make that mistake.

22   Q.    Let's actually look at what Professor Franklyn did.

23   Mr. Burkhart, can you please pull up slide 19 from

24   Mr. Franklyn's survey that he shared with the jury yesterday.

25   You were in court yesterday, correct, Dr. Neal?

A.    I'm sorry?

Q.    You were here when Professor Franklyn walked the jury

through each of the steps in his survey, weren't you, sir?

A.    I was.

Q.    And you saw the slide that's on the screen and in front

of the jury now, correct?

A.    I believe so.

Q.    And you understood Professor Franklyn's testimony that he

insisted that all of his survey takers read this question and

note whether they understood it or not, and if they didn't

understand it, they weren't allowed to proceed, correct, sir?

A.    I think I recall him saying that.

Q.    And do you disagree that Professor Franklyn directly

instructed his survey takers, quote, Please do not guess.  If

you don't know for any question, please indicate so?

A.    He did that, but as I explained a moment ago, in

subsequent questions, he denied people the opportunity to not

have an opinion or to say that they were guessing.

Q.    And that -- and you are -- again, you were here, right?

The jury wasn't imagining when Mr. Franklyn went through more

why questions in his survey with open-ended boxes than -- than

I could even keep track of.  You were here for that testimony,

weren't you, sir?

A.    Yes.  I don't see how it's relevant to this, but I was

here for that.

1    Q.    You -- had you been asked to conduct a survey in this

2    case, you also would have randomized the answer choices that

3    were presented to survey takers, wouldn't you have?

4    A.    Yes.  All counter-balance, there are a couple of methods

5    for handling that issue, but as a general rule, unless

6    something is ordered, like age, you would randomize response

7    options.

8    Q.    And Professor Franklyn also randomized response options,

9    didn't he?

10    A.    Yes.  That's why I did not criticize that.

11    Q.    And you also agree in it's good practice in a survey this

12    kind to include control steps in the screening process?

13    A.    Yes.

14    Q.    Would that include such things as a Captcha that that the

15    jury has heard about, which we have all seen to make sure that

16    we're not computer bots?

17    A.    Yes.  That's right.

18    Q.    And Professor Franklyn did that in his survey, didn't he,

19    sir?

20    A.    Did he.

21    Q.    And would the quality control that you would use, had you

22    -- had you been asked to conduct a survey, would that have

23    also considered a screening question that tests whether the

24    survey taker is paying attention?

25    A.    Yes.

1  Q.   And you agree that Professor Franklyn did that also,

2  right?

3  A.   Yes.

4  Q.   And surely, had you been asked to do a survey in this

5  case, which you were not, you would have included images of

6  the allegedly infringing Vintage Brand apparel in your test

7  cells?

8  A.   Yes, I would have.  Yes.

9  Q.   Is it fair to say that you would have asked survey takers

10 a question about who puts out or is the source of the

11 allegedly infringing Vintage Brand apparel?

12 A.   Yes.  I think I would have asked -- I would have said if

13 they had an opinion and I would have given them an opportunity

14 that they didn't have an opinion, which Mr. Franklyn did not

15 do.

16 Q.   And again, sir, you've testified lots of times, right,

17 Dr. Neal?

18 A.   A few times, yeah.

19 Q.   And you know how this works.  I -- this is my one shot to

20 ask you questions and then Mr. McKenna, he gets to stand up

21 and ask you anything I wants, right.  Anything he thinks you

22 need to explain, he can do that, right?  You understand that?

23 A.   Yes.

24 Q.   Okay.  I'd just appreciate it then, sir, if you'd just

25 answer the questions that I ask.  And --

ROUGH DRAFT

43

1  A.    Yeah.

2  Q.    And Mr. McKenna can ask you to elaborate on anything that

3  you think is incomplete.

4  A.    Okay.  To be fair, sir, sorry.  You proposed a specific

5  question and I need to explain that I would not ask the

6  question that way because I think it was an error in it.  So I

7  was just trying to clarify that.

8  Q.    In the Everready surveys that you've done, Dr. Neal, in

9  your career, do you generally ask a question about who puts

10 out or is the source of the allegedly infringing item, yes or

11 no?

12 A.    I don't ask it exactly like that, but I do ask a question

13 like that.

14 Q.    Okay.  And if you had been asked to conduct the survey in

15 this case, would you also have asked questions about how who

16 the survey takers believe approves the allegedly infringing

17 Vintage Brand apparel?

18 A.    Yes.

19 Q.    And approval, that's basically synonymous with

20 permission, sir?

21 A.    Well that's an emperical question, but often people treat

22 it as if they are synonymous.

23 Q.    And, in fact, you, quite frankly, treat permission and

24 approval as synonymous when you're testifying in exercises

25 just like the one we're doing today, don't you, sir?

ROUGH DRAFT                                                44

1   A.   I think that's fair, yes.

2   Q.   And would you have also asked, correct, if you were

3   conducting this survey, who the survey takers believe the

4   allegedly infringing Vintage Brand apparel was affiliated

5   with?

6   A.   Some -- some version of that, yes, I would have.

7   Q.   You might have used the word affiliated.  You might have

8   used the synonym connected, but one of those two, correct?

9   A.   That's fair.

10  Q.   Would you then have added up the survey takers who said

11  Penn State in response to questions covering either approval,

12  or affiliation of the allegedly infringing Vintage Brand

13  merchandise to calculate a percentage of gross confusion?

14  A.   Yes,  I would have.

15  Q.   And that's standard practice, isn't it?

16  A.   Correct.

17  Q.   If one person is confused about source and another person

18  is confused about, say, affiliation, that's two people who you

19  would count as confused, right?

20  A.   Correct.

21  Q.   Would you then also have used a control image to identify

22  preexisting belief and other noise and subtract the level of

23  that noise from your gross confusion to calculate the amount

24  of net confusion?

25  A.   I wouldn't characterize it quite like that.

1    Q.    Okay.  Where did I go wrong?

2    A.    Well the purpose of a control is to isolate whatever the

3    alleged cause of confusion is.  So the control should be as

4    close as possible to the test, except for the thing that is

5    alleged to be causing confusion.

6    Q.    And have you not, Dr. Neal, referred to what you're

7    trying to identify in the control as being, for example,

8    preexisting beliefs?

9    A.    That is one example of what you are controlling for.

10   Q.    And another example is what you call noise?

11   A.    Yes.  That's another example.

12   Q.    And another example is just straight up guess, correct?

13   A.    Correct.

14   Q.    Somebody is looking at a picture of -- you know, the

15   Vintage Brand merchandise and they say, you know -- they're

16   going to say Vintage Brand no matter what.  You show them a

17   picture of the Eiffel Tower and they say Vintage Brand.

18   You're trying to identify that situation, right?

19   A.    That's fair.

20   Q.    And so for that reason, the choice of a control image is

21   absolutely critical in a likelihood of confusion survey,

22   right, Dr. Neal?

23   A.    I very much agree with you.  Yeah.

24   Q.    And you testified to this jury a few moments ago on

25   direct that what Professor Franklyn needed to have was a

ROUGH DRAFT
46

1    control where references to Penn State were present in the

2    control, correct?

3    A.    That's -- that would be one method to fix the problem in

4    his design.

5    Q.    But you know full well, Dr. Neal, that if the allegedly

6    infringing marks are presented to survey takers in both the

7    control condition and the test condition, that defeats the

8    purpose of a control condition all together, doesn't it?

9    A.    I don't think you have that right.

10   Q.    Okay.  Well, let's -- you recall, Dr. Neal, testifying in

11   the AWGI v. Atlas matter?

12   A.    Yes, I do.

13   Q.    Okay.  Can we pull up, Mr. Burkhart, that testimony for

14   Dr. Neal?  I'd request that we publish that, please.

15            THE COURT:  Any objection?

16            MR. MCKENNA:  I'm reading it.  Just give me a

17   minute.  Assuming Dr. Neal recognizes it, I have no objection.

18            THE WITNESS:  Yes, I do.

19            THE COURT:  You may publish.

20   BY MR. FINKELSON:

21   Q.    This, what the doctor is looking at here, Dr. Neal, if

22   it's appeared on their screens is testimony that you gave in

23   an expert report, correct, sir, in a case much like this one?

24   A.    Correct.

25   Q.    Is that right, sir?

1    A.    Correct.

2    Q.    And the highlighted language where -- starts by you

3    referring to priming, which is a topic that you talked about

4    today, right, Dr. Neal?

5    A.    Yes.

6    Q.    And you said quote:  As a result, the allegedly

7    infringing marks are presented to respondents in both

8    conditions.

9            Do you see that, sir?

10   A.    Yes.

11   Q.    And by that, you were referring to the test condition or

12   cell and the control cell, right, sir?

13   A.    Correct.

14   Q.    And you went on to say, and if I'm misreading this, you

15   tell me.  If I'm misquoting it.  But you went onto say quote.

16   This defeats the purpose of a control condition, which is to

17   remove the allegedly infringing materials, but keep all else

18   constant.

19            Have I read that correctly, sir?

20   A.    100 percent.

21   Q.    And that was your testimony under oath in that matter,

22   correct, sir?

23   A.    And it's the same testimony here.  It's the same point.

24   Q.    Have you ever -- have you ever testified, Dr. Neal,

25   before -- let me ask you this.  Another thing you said earlier

1    today, when you were referring to Professor Franklyn's control

2    images, you have the three up on -- or test images and control

3    images, you have the three on the screen side-by-side, and I

4    wrote this down.  You said it was fine -- that was your word

5    -- it was fine for -- for Professor Franklyn's control not to

6    have any of the infringing marks.

7           Do you remember that testimony?

8    A.    Yes.

9    Q.    It's more than fine for Professor Franklyn's control not

10   to have any of the infringing marks; it's mandatory?

11   A.    I agree.

12   Q.    That it -- that it did not have that, correct?

13   A.    I agree.

14   Q.    Because if the infringing marks are shown to the control

15   group, to go back to your -- your drug analogy, which I really

16   like, by the way, you're not giving your control group a sugar

17   pill at all.  You're giving them the drug if they're seeing

18   the infringing marks, right?

19   A.    Correct.

20   Q.    And that's a no-no?

21   A.    We need to zero in on the infringing marks on what.

22   Q.    And we're going to do that.

23   A.    Okay.

24   Q.    We're going to do that.  Let me ask you another question.

25           You've never testified before, have you, Dr. Neal,

1    that a control image that you tested is more confusing than a

2    test image that you tested, resulting a finding of negative

3    confusion?

4    A.    I think I may have actually found that once.  I'm not

5    entirely sure.  But I believe that has happened to me in one

6    case.

7    Q.    Okay.  You testified in another trial like this one.

8    That was the -- I'm not good at these types of -- Ermays case.

9    Do I have that right?

10   A.    You do.

11   Q.    Okay.  Ermays versus Rothchild case.  You testified on

12   behalf of Rothchild in that case, didn't you, sir?

13   A.    I did.

14   Q.    Under oath, did you not state during the trial of that

15   matter, quote: I don't think I have ever run a survey that's

16   found even zero confusion or found zero confusion.

17   A.    Yes.  That case was several years ago.

18   Q.    Okay.  So you're not sure whether you've ever found

19   negative confusion or not since then?

20   A.    I believe I have -- what I was trying to say is I believe

21   I have found negative confusion in one case, presumably it's

22   since then.

23   Q.    We've talked about a couple of cases in which you've been

24   involved, and you've talked earlier today in response to

25   Mr. McKenna's questions about your prior testimony in

1    trademark cases and patent cases and the like.  Do you recall

2    that?

3    A.    Yes.

4    Q.    And do you remember yesterday when Mr. McKenna was asking

5    Professor Franklyn about a different case than this one in

6    which Mr. Franklyn's opinion had been critiqued by a court?

7    A.    Yes.

8    Q.    Okay.  But you know full well, don't you, Dr. Neal, that

9    there's nothing particularly unusual about that?

10   A.    I mean it does happen from time to time, yes.

11   Q.    Yeah.  It happens to the best of them when you testify

12   frequently, doesn't it.  And judges and experts sometimes see

13   things differently?

14   A.    Occasionally, that's true.

15   Q.    And to be fair, it's happened to you too, right?

16   A.    On one occasion, yes.

17   Q.    One occasion right here in Pennsylvania?

18   A.    That's rights.

19   Q.    Okay.  And it's also true that in the Barry V. Dupue case

20   in which you testified right here in Pennsylvania, the Court

21   excluded your testimony on the grounds that your survey's

22   serious design flaws rendered its results meaningless, and

23   again, unreliable, correct?

24   A.    I think that's the same one case that you're talking

25   about.  Yes, correct.

1   Q.   Let's talk about this issue of -- I'm going to get in to

2   some of the flaws that you've identified.

3        The issue of counting NCAA or the college or the

4   University.

5   A.   Right.

6   Q.   One of your critiques of Professor Franklyn, as I

7   understand it, is that you -- you don't think he should have

8   counted as confused the folks who said the college or the

9   University or NCAA as opposed to the words Penn State, right?

10  A.   Correct.  Or something that was obviously Penn State.

11  Q.   But you would agree, wouldn't you, Dr. Neal, that this

12  had almost no quantitative impact on Professor -- on

13  Professor's Franklyn's calculation of the amount of confusion?

14  A.   It had a very minimal impact, and that's why I described

15  it as a nonfatal flaw and I stated -- I thought it was a bias

16  in a way that he coded things, but didn't have much of an

17  impact.

18  Q.   In fact, to be fair, you said something different.  What

19  you said was that it was another example of Professor Franklyn

20  inflating the numbers in Penn State's favor.  That's what you

21  told the jury no less than 15 minutes ago, right?

22  A.   Yes.

23  Q.   But, in fact, as you know, had Professor Franklyn not

24  counted the folks who said NCAA or college or university, the

25  bottom end of his percentage range of confusion would have

1  actually gone up.  Not down.

2  A.   Well I think you're referring to his net number.

3  Q.   I am -- I am referring to his net number, sir.

4  A.   Yes.  I was referring to his gross number.  So by having

5  that over inclusive criteria, it is accurate to say he had

6  more people in his test cells who were coded as referring to

7  Penn State who never mentioned Penn State at any point.

8  Q.   You understand that with respect to his test cell -- one

9  of his test cells, he testified to the jury yesterday of net

10  confusion of 27 percent.  Right?

11  A.   Correct.

12  Q.   And had Professor Franklyn done the thing that you said

13  he should have done and not looked at any answers that said

14  NCAA or college or university, that number would have actually

15  gone up to 28 percent, right.  So it didn't inflate his

16  numbers by doing that.  It actually, conservatively, drew them

17  down in Defendant's favor?

18  A.   The net number, you are correct.  It's still a design

19  flaw.  It still shows a pattern of counting in a way that is

20  excessively favorable to Penn State.

21  Q.   So your -- your testimony is that by coming in here and

22  telling the jury there was less confusion than he could have

23  told the jury there was, that was Professor Franklyn biasing

24  his testimony in favor of Penn State, sir?

25  A.   I'm saying that he -- I'm saying that -- I heard Mr.

1    Franklyn say yesterday that even a respondent who never said

2    Penn State, but said NCAA that Mr. Franklyn could go into the

3    mind of that person and decide that they, in fact, were

4    thinking of Penn State.

5         My criticism of that is that it's wrong for a

6    survey expert to do that.  Whether it did have the effect of

7    inflating his grow numbers, you are correct, that his net

8    numbers, it may be -- made them go down by one.  And that's

9    why I said it wasn't a fatal flaw.

10        My job is to point out mistakes.  And to be fair,

11   and I think I acknowledged this, this is a mistake that didn't

12   have a big impact on the data.  And that's how I represented

13   it.

14   Q.   And I appreciate that, sir.  Let's talk about another one

15   of those.

16   A.   Sure.

17   Q.   And that's your critique of Professor Franklyn for

18   including a question about licensing, right?

19   A.   Yes.

20   Q.   Okay.  But you know and you heard Professor Franklyn

21   testify to this yesterday, that he did that in response, in

22   part, to a question that the Court had raised in this case,

23   right?

24   A.   Right.

25   Q.   Okay.  And you also know that Professor Franklyn's

```
 1   decision to include people in the numbers that he presented to
 2   this jury as confused, based on licensing also had very little
 3   quantitative impact on his net confusion results?
 4   A.   And I think I explained that in my direct.  I agree with
 5   you.
 6   Q.   Professor Franklyn didn't double count, right?
 7   A.   I didn't say he double counted.  I said he asked
 8   additional questions beyond what's normal.
 9   Q.   But you agree, he didn't double count, did he?
10   A.   Correct.  He did not.
11   Q.   And if someone -- so that means that if somebody said
12   Penn State, in response to a licensing question, right, but
13   also said yes to one of the questions about source or
14   sponsorship or affiliation, he only counted that person once?
15   A.   Correct.  I do.
16   Q.   And isn't it true that there were only 13 people in
17   Professor Franklyn's whole entire survey who answered Penn
18   State to the licensing question, but didn't answer Penn State
19   in response to any of the questions about source, sponsorship,
20   or affiliation?
21   A.   I think that's about right.  That's why I described it as
22   not being a fatal flaw.
23   Q.   Right.  Because if you backed those 13 people out of
24   Professor Franklyn's results, if one were to agree with you
25   that they shouldn't have been in there, the fact is that
```

1    Professor Franklyn's net confusion survey results still would

2    have shown confusion, gauged by his opinions, right, sir, of

3    more than 1 out of every three?

4    A.    That's correct, but of course all of the other flaws

5    still apply.  But you are right.

6    Q.    And that's why -- I'm trying to be -- I knew you were

7    going to say that.  And that's why I said according to his

8    opinion.  I know you've got other differences of opinion, but

9    I'm trying to at least -- I think there's a few places where

10   you and I do agree.  And I think this is -- this is one of

11   them.

12         Let's please pull up Dr. Neal's slide 6 from the

13   direct examination, please, Mr. Burkhart.  Okay.  This was

14   your flaw 1 that you discussed with the jury, right?

15   A.    Yes.

16   Q.    Okay.  And in flaw 1, in part, right, you're critiquing

17   Professor Franklyn for including, quote, multiple references

18   to Penn State and Nittany Lion outside the accused product in

19   the test cells, right?

20   A.    Correct.

21   Q.    And by the accused product, you're basically saying

22   outside the t-shirt itself?

23   A.    Yes.  That's right.

24   Q.    Do you dispute, Dr. Neal, that the images that Professor

25   Franklyn used in his test cells and that are shown on this

1   slide six, minus your red boxes, came straight off Vintage

2   Brand's website?

3   A.   Well, with the exception that he cropped off the URL.

4   Q.   Well the URL isn't on this page either, is it?

5   A.   That's my point.  So these -- these were not taken

6   directly off, because he cropped off Vintage Brand.

7   Q.   Right?

8   A.   But with that exception.

9   Q.   The images that you're showing on slide 6 are the images

10  that Professor Franklyn showed to his test cells, right?

11  A.   Correct.  But I thought your question was whether they

12  were taken from the Vintage Brand website.

13  Q.   They were taken from the Vintage Brand website,

14  understanding that you think it -- he should have also taken

15  the URL.  And I'm coming to that?

16  A.   Gotcha.

17  Q.   But other than that point, do you we agree --

18  A.   I think we're in agreement.

19  Q.   All right.  Good deal.

20          You also agree, right, that Professor Franklyn was

21  correct to use screenshots of Defendant's website as stimuli

22  in his survey?

23  A.   Yes, I agree.

24  Q.   And all of the references in the images that Professor

25  Franklyn used and that are shown here in the red boxes on your

1  slide six, all of those references to Penn State, to be clear,

2  came from Vintage Brand, not from Professor Franklyn, right?

3  A.    That's correct.

4  Q.    Okay.  But it's still your opinion, correct, that it was

5  not okay to include references to Penn State any where in the

6  test cells, other than in the Vintage Brand t-shirts

7  themselves.  Do I have that right?

8  A.    No.  That was not my testimony.

9  Q.    You testified that what Penn State was concerned about is

10  the shirt or is concerned about is the shirt.  That was your

11  testimony, right?

12  A.    Correct.

13  Q.    Okay.  But you know full well, don't you, Dr. Neal, that

14  Penn State has accused Defendants's t-shirts, sweatshirts,

15  cups, hats, and website of infringing Penn State's trademarks

16  in this case?

17  A.    Well, I'm not entirely sure about that.  I've read your

18  complaint very clearly.  Yes, -- yes, you accused those

19  products.  But my understanding is that your position is that

20  Vintage Brand should stop selling these products.  You are

21  not, as I understand it, saying keep selling the products but

22  tweak some things on the website.

23  Q.    We're not say being, as you read the amended complaint,

24  that -- that there's an issue with Defendants' webpage?

25  A.    I don't see any where in your complaint where -- I'm not

1    a lawyer -- but where you say it is the -- the t-shirts or

2    other products may be fine by themselves, but they become

3    infringing in combination with other things going on the

4    website.

5           My understanding is you want Vintage Brands --

6    Vintage Brand to stop selling the accused goods, and that

7    means to show that the accused goods are causing confusion,

8    you needed a survey that isolated the accused goods.

9    Q.   Please call up, if you would, please, Mr. Burkhart, the

10   second amended complaint on page 31, paragraph 91, and we'll

11   see if Dr. Neal is correct about not mentioning the webpage.

12          You recognized -- you've read this complaint.  I

13   saw it in your materials you considered, right?  You've

14   reviewed that?

15   A.   This the second amended complaint?

16   Q.   It is, sir.

17   A.   I have.

18   Q.   And in paragraph 91 of the second amended complaint on my

19   client's behalf specifically said, additionally -- in addition

20   to the t-shirts?

21   A.   Correct.

22   Q.   Defendants' webpage for Penn State is titled Penn State

23   vicinity's Vintage designs for apparel and gear, in a clear

24   attempt to associate Defendants' goods with Penn State and the

25   goodwill Penn State has built over decades as embodied in the

1    University marks.

2            Have I read that he correctly, sir?  Yes or no?

3    A.    Yes, you have.

4    Q.    Let's talk about the URL because that's where you -- I

5    think you wanted do go next.  It comes logically next, right?

6    That was the next flaw on your list of flaws, right?

7    A.    Okay.

8    Q.    Okay.  Can we see Dr. Neal's slide 8, please, Mr.

9    Burkhart.  This is your slide that you discussed with the

10   jury, right, Dr. Neal?

11   A.    Taken from Mr. Franklyn's survey, at least the image on

12   the right.  But yes.

13   Q.    Right.  The image on the right is one of the pieces of --

14   allegedly infringing merchandise that Professor Franklyn

15   tested in his test cell, correct?

16   A.    Correct.

17   Q.    And as I understand it, not including the Vintage Brand

18   URL that you show on this slide, often his test images, that

19   is a problem that you see with Professor Franklyn's survey,

20   fair?

21   A.    Yes.

22   Q.    Okay.  And your opinion is that Mr. Franklyn should have

23   -- let me ask it this way.  You see, looking at this test

24   image on slide 8, you see the Vintage Brand trademark in bold

25   letters on the page, right?

ROUGH DRAFT

1   A.    In the top left hand corner?

2   Q.    Yes.

3   A.    Yes.

4   Q.    And so it's your opinion that even though Professor

5   Franklyn's test cell image had the Vintage Brand trademark, he

6   should have additionally told test takers that this was the

7   Vintage Brand website, right?

8   A.    Absolutely.

9   Q.    Okay.  Well, do you at least agree with me, Dr. Neal,

10  that Professor Franklyn was consistent in that he didn't

11  include the Vintage Brand URL on his control image either?

12  A.    That -- that is correct.

13  Q.    And you also agree, don't you, that the test images and

14  the control images should be consistent when it comes to the

15  use or the nonuse of a Vintage Brand URL?

16  A.    Well, I don't agree that the nonuse is legitimate.  As I

17  explained, it was wrong to occlude, to exclude the reference

18  to Vintage Brand dot com from the test and the control.  So --

19  Q.    And I understand -- I'm asking you a different question,

20  as I think you appreciate.  So I understand that's your

21  opinion.  But my question is this.  You agree with me, don't

22  you, that the test images and the control image should be

23  consistent with respect to URL?

24  A.    Well, I think that's a bit of a trick question.  If

25  you're saying should they be consistently wrong?  Does that

1    make them better?  Is consistently wrong better than

2    inconsistently wrong?  I'm not sure.  The URL.

3    Q.    I'm not sure -- I'm not sure either.

4    A.    It's an SAT question.

5    Q.    I'm confused.

6    A.    The URL should have been there in both of them.  And I

7    agree with you that it was missing from both of them.

8    Q.    Okay.  I think we're -- I think -- I think I understand

9    you.

10          It's your opinion that the URL that exists in the

11   real world should have been present on Professor Franklyn's

12   test cells and on his control cell?

13   A.    Correct.

14   Q.    Okay.  In this slide, you have the caption real world

15   marketplace URL showing.  Correct?

16   A.    Yes.

17   Q.    And then under that, you have you have a red box.  And

18   the red box is what you're calling the real world marketplace

19   URL that says Vintage Brand dot com.  Right, sir?

20   A.    Correct.

21   Q.    And it's your testimony to this jury that the URL in the

22   real world for the Vintage Brand -- the Vintage Brand product

23   page that has the t-shirt with the Penn State lion shrine and

24   the Penn State university seal trademark is Vintage Brand dot

25   com?

ROUGH DRAFT
62

```
 1  A.   Well I think that would depend on which browser you are
 2  using, because 134 -- well, at a minimum -- at a minimum, you
 3  would say Vintage Brand dot com, which Mr. Franklyn excluded.
 4  I'm certainly not an expert on browsers.  But my understanding
 5  is now some browsers just show you what's called the top level
 6  domain.  So Vintage Brand dot com.  And then some of them will
 7  show you the whole thing.  So back slash whatever came after
 8  it.
 9        So depending on what browser someone was on,
10  everyone, as I understand it, would see Vintage Brand dot com.
11  Nobody in Mr. Franklyn's survey saw that.  Some people,
12  depending on browser, might also see some additional content.
13  Q.   So are you or are you not standing by the testimony that
14  you've give own to this jury, that with respect to Professor
15  Franklyn's test page, the URL would have been Vintage Brand
16  dot com?
17  A.   My -- my point was that he excluded the URL.
18  Q.   And he excluded it for a reason, Dr. Neal.  He excluded
19  it because, as you know -- as you know, the URL didn't just
20  say Vintage Brand.  It said Penn State.  Exactly the words
21  that you've told this jury he shouldn't have been using the
22  test cell and he can't be using in the control {1E8}, right?
23  A.   Well, sir, if that's his explanation for it, why didn't
24  he offer that explanation on the stand.
25  Q.   He said yesterday to this jury, Dr. Neal, that the URL
```

1   string includes the words Penn State and we're going to look

2   at the exhibit right now.  Mr. Burkhart, can I please call up

3   just for the benefit of the witness, please, P-318.  And for

4   Mr. McKenna, as well.

5           And I would seek to move exhibit P-318 into

6   evidence.  There's no objection?

7           MR. MCKENNA:  What one is this?

8           MR. FINKELSON:  This is our Exhibit P-318.  It's a

9   screenshot of the exact website product page that Mr. Franklyn

10  tested.

11          MR. MCKENNA:  Okay.  No objection.

12          THE COURT:  Duly admitted.

13  BY MR. FINKELSON:

14  Q.   Dr. Neal, you've spent some time with the test images,

15  right --

16  A.   Yes.

17  Q.   -- that Professor Franklyn used in his -- in his study?

18  A.   Yes.

19  Q.   Okay.  And you recognize this as -- as the product page

20  for win of the test images that Professor Franklyn tested,

21  don't you, sir?

22  A.   I do.

23  Q.   Okay.  Mr. Burkhart, can you please go to the bottom of

24  the page and note the URL that is part of this screen capture,

25  which the parties have all used in this case.  Do you see that

ROUGH DRAFT

64

```
 1  highlighted language, Dr. Neal?
 2  A.   I do.
 3  Q.   And the URL for this product page that Professor Franklyn
 4  tested is not just Vintage Brand dot com, to be to be fair,
 5  right?  The URL is Vintage Brand dot com back slash L.  Back
 6  slash college, back slash T.  Back slash, most importantly,
 7  Penn State, and then lots of other information.  Right, sir?
 8  A.   A couple of points.
 9  Q.   If you -- if you would --
10  A.   It's not a yes or no, first of all.
11  Q.   Well, let me ask it as a yes or no question, and then, to
12  be fair to you, my next question is going to be tell the jury
13  your couple of points.  Okay?
14  A.   Okay.  Thank you.
15  Q.   So first, yes or no.  Was the URL on the product page
16  that Professor Franklyn tested Vintage Brand dot com, back
17  slash, a number of things, including back slash Penn State?
18  A.   That was the URL, what people saw that or not depends on
19  what kind of browser you had.
20  Q.   Okay.  And as I promised.
21  A.   Thank you.
22  Q.   If you -- is there another point you want to make, or did
23  you get that one out?
24  A.   The point is -- so everyone should have been able to know
25  where they were shopping from.  So they should have been able
```

1    to see Vintage Brand dot com.  I think it's totally fair what

2    you're saying that some people might have also seen the back

3    slash, yada, yada, yada, Penn State.

4            That, it seems now, you're accepting my point that

5    it was right for Mr. Franklyn to be excluding these other

6    references to Penn State.  Because now you seem to be

7    embracing the idea that he cut that off because it was good

8    for him to be excluding these other references to Penn State.

9    So I think you are, finally enough, you are agreeing with the

10   very point you're trying to make, that he shouldn't have had

11   superfluous references to Penn State appearing in his test

12   that he's missing in control.

13   Q.   I don't think we're agreeing.  But you would agree with

14   me, I think, Dr. Neal, that the URL had the words Penn State

15   in it, and one of the guiding principals in structuring a test

16   like this, is that the word Penn State shouldn't be in the

17   control, and you've testified to this jury that you also

18   believe that the same URL that's shown in the test should be

19   shown in the control, had Professor Franklyn done what you are

20   suggesting, he would have been putting the word Penn State in

21   the URL that was shown to his folks in the control, and I

22   guarantee you, there would have been another box on your

23   slide, frankly, I think, an even bigger box that said that's

24   the biggest fatal flaw of all.  That's the biggest fatal flaw

25   of all.  And --

**ROUGH DRAFT**

1  A.    No.

2  Q.    And that's correct, sir, isn't it?

3  A.    No.  I'm very -- I'm very sorry, but you're wrong on two

4  points.  The first point is that -- the first point is that I

5  did not agree with you that you couldn't use Penn State in the

6  control outside of the product itself.

7         So that's my whole point, that the references to

8  Penn State outside of the accused product should have been

9  carried over into the control.  That's the only way

10 scientifically to work out if the product is causing

11 confusion.  So that's the first way that you are wrong.

12        The second way with respect was it would have been

13 fine for him to include Vintage Brand's URL, Vintage Brand

14 URL.  He should have done that because that's a pretty

15 powerful coup telling you where the heck you're buying from.

16 And he should have done it in both his test and control.  And

17 it would have been totally fine for the URL to include Penn in

18 both.  Okay.  So that's --

19 Q.    To be clear, Penn State.

20 A.    Yes.  That's right.

21 Q.    Okay.  So your testimony to this jury is that it would

22 have been totally fine for Professor Franklyn to use the words

23 Penn State, with this jury, who has been with us all week

24 knows it is a Penn State trademark, it would have been totally

25 fine for him to use that in the control.  That's your

ROUGH DRAFT

67

1  testimony to this jury?

2  A.   If the goal -- if the goal was to work out if the

3  t-shirts are causing confusion and he wanted to replicate the

4  marketplace reality, that's exactly what he had to do, because

5  otherwise, he's left with the design he has, where we simply

6  do not know if the confusion numbers he has are being driven

7  by the t-shirts or are being driven by the description of the

8  text on the page.

9          And if it is your goal to say, and I believe it is,

10 the t-shirts are a problem, then he needs to be able to add --

11 he needs to be able to attribute a confusion number to the

12 t-shirts themselves.  And with this problem, I can't.

13 Q.   I'm sorry.  I didn't know you weren't finished.

14         Let's talk about your last critique -- I think it's

15 Dr. Neal's slide 12.  The last one is this use of leading

16 questions, right, that primed, and those are the questions

17 that -- can you go to the next line?  The one that has the

18 questions that Dr. Neal was talking about with the drop down.

19 Is that before or after that slide?  Perfect.

20         So, right.  This was the -- these were the

21 questions.  Do you want to take a second to grab some water?

22 A.   Oh, no.  That's fine.  Thank you.

23 Q.   These were the questions that you were talking about with

24 the jury, I think, as the last one on your list that you went

25 through, right?

1    A.    Yes.

2    Q.    You have no reason to believe, do you, Dr. Neal, that the

3    survey takers who saw this list of 13 universities would show

4    particular attention to Penn State?

5    A.    I mean I presume people are reading what's put in front

6    of them.  That would be a quality control issue.  And I think

7    Mr. Franklyn would testify that he thought people read what

8    was put in front of them.

9    Q.    It wasn't -- that wasn't my question, to be fair.  So if

10   you could answer my question, yes or no, do you have any

11   reason to believe that the respondents who saw this list of 13

12   universities would show particular attention to Penn State?

13   A.    I presume they read it.  But I have no reason to think

14   they gave it more attention than any others.

15   Q.    Right.  In fact, I think you've already testified in

16   deposition in this case that you would have no reason to think

17   that they would show particular attention to Penn State.

18   A.    As I just said, yes.

19   Q.    Okay.  Nonetheless, your critique, right, is that because

20   survey takers saw Penn State as part of this list during the

21   screening process, by the time they actually took the survey

22   questions, you think they may have been more likely to say

23   Penn State than they would have in the real world.  Right?

24   A.    Because the seed had been put in their minds for this

25   question, yes.

1   Q.   That was the laying the seed testimony that you gave to

2   the jury a few minutes ago, right?

3   A.   Correct.

4   Q.   But with reference to Professor Franklyn's control, you

5   know, they know, I know, and most importantly people are about

6   to know that that didn't actually happen at all.  Right?

7   A.   Well, can you clarify what you mean by it happened.

8   Q.   What I mean by it happening is that you testified that

9   you thought that these questions were going to make people

10  more likely to say Penn State than they would have in the real

11  world.  But the fact is, as you know, in Professor Franklyn's

12  control, nobody, not a single person said Penn State?

13  A.   Yes.  But there's a very good reason why --

14  Q.   And I'll let you explain that in response to

15  Mr. McKenna's questions.  But how many people were in

16  Professor Franklyn's control?

17  A.   I think roughly 220-ish.

18  Q.   224.  So that's -- you have a better memory than I would

19  have had for that issue.  You will don't have notes in front

20  of you.  224 people.  Zero out of 224 people said Penn State,

21  even though every single one of those control group survey

22  takers were asked the screening questions that included Penn

23  State, that you say surely would have made them think about

24  Penn State.  Yes or no?

25  A.   Yes.  I was referring to the test cell, but yes, you were

1  right.  Nobody said it in the control cell.

2  Q.    And the number zero, right, sometimes social science and

3  social scientist, there are words that -- the rest of us don't

4  understand, but zero means zero here, just like any time else?

5  A.    Right.  Correct.

6  Q.    And this is another one that you call a fatal flaw,

7  right?

8  A.    Yes.

9  Q.    Okay.  And are you familiar, Dr. Neal, with someone in

10  your field who has written that rebuttal experts are sometimes

11  inclined to declare fatal flaws with a survey with a fervor

12  reminiscent of 17th Century Salem?

13  A.    What a beautiful piece of prose.  I wonder who wrote

14  that.

15  Q.    You know the guy who wrote that.  That was you, right?

16  A.    Correct.

17  Q.    And for that reason, you, yourself, have cautioned that

18  it is really important for a rebuttal expert like you to ask

19  whether the critique actually alters the final conclusion of a

20  survey in a material way.  Right?

21  A.    Yes.  And that's the kind of principal enshrined in my

22  idea of fatal versus not fatal flaws.

23  Q.    And so understanding that you critique Professor

24  Franklyn's survey, you understand that Professor Franklyn

25  found net confusion of 27 to 39 percent?

**ROUGH DRAFT**

A.   Yes, using his method, yeah.

Q.   And now I want to set his survey aside and just talk about likelihood of confusion surveys in general.

So you agree, don't you, that net confusion of 27 to 39 percent significant any exceeds typically accepted thresholds for establishing a likelihood of confusion?

A.   I think it's fair to say that if the survey was done properly and those fatal flaws were not there and you found that level of confusion, that would be a sufficient level of confusion.

Q.   And I know now and everybody in the room knows you don't think Professor Franklyn did it right.  You've made that point.  You're going to have the opportunity to make it again. Can we just leave that to the side because I just want to talk to you about surveys more generally.  So assuming a survey is run in a way that you view is correct, that's what I have in mind when I'm asking these questions.

So if a survey that's done right finds net confusion of 27 to 39 percent, you agree, that significantly exceeds typically accepted flesh holds of establishing likelihood of confusion?

A.   I probably wouldn't use the word significantly exceeds. But I agree with you that if a survey is done right found that level would -- would certainly exceed commonly accepted thresholds.

1    Q.    And we'll come back to the word significant -- in a

2    second then.

3            You were here yesterday, weren't you, when

4    Professor Franklyn testified about the 15 percent threshold

5    for appreciable confusion?

6    A.    Yes.

7    Q.    Okay.  And you agree with him on that, don't you?

8    A.    I think -- it's not really a survey expert's opinion.

9    It's more of what Courts have accepted being enough versus

10   not, but I certainly agree that courts have looked for numbers

11   around that level.

12   Q.    In fact, you've testified, haven't you, Dr. Neal, that 15

13   percent is the magic number for concluding that there's a

14   material amount of confusion?

15   A.    Something like that.  Yes.  The -- based on what Courts

16   have decided.  Because I don't think it's really the job of

17   survey expert to come up with that number.

18   Q.    But -- but the words magic number, those can be the words

19   of a survey expert to come up with --

20   A.    Correct.

21   Q.    And you've uttered them, correct?

22   A.    Correct.

23   Q.    You've even called 15 percent a really material amount of

24   confusion.  Haven't you?

25   A.    I'll take your word for it.

1    Q.    Okay.  Do you want me to show it to you?

2    A.    I trust you.

3    Q.    Okay.  You have no reason to dispute that you called 15

4    percent a really material amount of confusion?

5    A.    Yeah.  I mean I would like to see the context of it, but

6    I -- it it's your point, I'm willing to accept it.

7    Q.    And if at least one out of every four people are being

8    confused, you would agree, wouldn't you, that that's a

9    significantly higher percentage than 15 percent magic number?

10   A.    Well significantly kind of implies a statistical thing.

11   So I would prefer to avoid phrases like that.  But I agree

12   that 25 is larger than 15.

13   Q.    Okay.  Well, let me ask you this.  Wouldn't you agree,

14   Dr. Neal, that net confusion of even 18 percent significantly

15   exceeds typically an accepted thresholds for establishing

16   likelihood of confusion?

17   A.    Again, I just -- the term significant -- now you're

18   saying is 18 significantly larger than 15?  You're -- I'd

19   rather avoid significantly because it implies statistical

20   thresholds.  So 18 is larger than 15.

21   Q.    Well today you're -- you're uncomfortable using the word

22   significantly.  But you haven't been uncomfortable using the

23   word significantly before, have you?

24   A.    I don't know.

25   Q.    Okay.  Let's look at the D.H.  Case, Mr. Burkhart.

ROUGH DRAFT

1   You're familiar with the D.H.  Pace case.  You testify he had

2   anesthesia an expert in that case, Dr. Neal?

3   A.    Yes.

4   Q.    Okay.  And this was your testimony in that case in your

5   expert report at paragraph 4.  3.  Can you publish that to the

6   jury, please.  You recognize this, right, Dr. Neal?

7   A.    Yes.

8   Q.    Okay.  And highlighting the last sentence, you say,

9   quote, Even the lowest net confusion level, that you found in

10  that case, which was 18 percent, quote, significantly exceeds

11  typically acceptable thresholds for establishing a likelihood

12  of confusion, end quote.  Correct, sir?

13  A.    Yes.  And I may have conducted the statistical testing

14  there.  So -- that's why I was hesitant to agree, as a general

15  rule, because in this case, I presume -- this was several

16  years ago, but would have conducted that statistical test.

17  Q.    But you certainly agree, you've referred to confusion of

18  18 percent as significantly exceeding the 15 percent magic

19  number, right?

20  A.    Yes,  with that statistical caveat.

21  Q.    And you agree with me, because it's just math, right,

22  that 27 percent is more than 15 percent and, in fact, it's a

23  good bit more than 18 percent, which is already significant,

24  right?

25  A.    Can't fault the math.

```
 1   Q.   And 39 percent, that's more than double 18 percent?
 2   A.   As I said, if that came from a valid survey, those would
 3   be meaningful numbers.
 4   Q.   Dr. Neal, I appreciate your patience with me.  Thanks for
 5   answering my questions.  And I will pass the witness.
 6   A.   Pleasure.
 7             THE COURT:  Thank you, sir.  Any redirect?
 8             MR. MCKENNA:  Yes, Your Honor.
 9             THE COURT:  Go right ahead.
10                    REDIRECT EXAMINATION
11   BY MR. MCKENNA:
12   Q.   Dr. Neal, Counsel asked you a question about a case in
13   Pennsylvania where your survey had been criticized?
14   A.   Yes.
15   Q.   What kind of case was that?
16   A.   It was a patent case.  And it's currently under appeal.
17   Q.   Did it have anything to do with likelihood of confusion
18   or trademarks?
19   A.   No.
20   Q.   Dr. Neal, is it your understanding, based on your
21   research, that when survey takers are told not to guess, they
22   never guess?
23   A.   No.  An instruction like that is designed to reduce
24   guessing.  It doesn't totally eliminate the problem.  And the,
25   of course, you can make other mistakes later on in a survey
```

1    that kind of get people guessing again.  And I identified some

2    of those in Mr. Franklyn's survey.

3    Q.   So do survey experts take other steps in designing their

4    survey to minimize guessing, beyond just telling people not to

5    guess?

6    A.   They do.

7    Q.   So I want to remind you, Counsel asked you a question

8    about a report of yours where you were criticizing someone

9    else for including trademarks in the control.

10            Do you remember that?

11   A.   Yes.

12   Q.   And I think the point Counsel was trying to make was to

13   say that you agreed with him that it would be a problem to

14   include the Plaintiffs' trademarks in the control.

15   A.   Correct, yes.

16   Q.   And it sounded like there was something you wanted to

17   explain about what you meant by that criticism?

18   A.   Yes.  So I was trying to make the point, that the phrase

19   or the paragraph that was put up on the screen is 100 percent

20   consistent with the point that I'm trying to make here, which

21   is the only thing that should be different between the test

22   and the control is the trademark at issue.

23            So here, if that is Penn State is concerned about

24   these shirts bearing these -- what it refers to as infringing

25   marks, the products causing confusion, then that's what needed

1    to be shown in the test, and everything else had to be -- only

2    that could be removed in the control.  Everything else held

3    constant.  So that the paragraph of text that we put up on the

4    screen and that I think Counsel thought was somehow the

5    opposite of what I was saying here, is actually the exact same

6    point that I'm making here.

7    Q.    Okay.  Could we bring up the control from Mr. Franklyn's

8    survey.

9            MR. MCKENNA:  This is published to the jury?

10           COURTROOM DEPUTY:  Yes.

11           MR. MCKENNA:  Okay.  Thank you.

12   BY MR. MCKENNA:

13   Q.    Dr. Neal, in Counsel's examination to you, he was

14   suggesting to you that the URL, right, that had -- that Mr.

15   Franklyn had removed, that he had removed it because, in the

16   test, it would have included back slash information that might

17   have referred to Penn State?

18   A.    Correct.

19   Q.    Okay.  So let me first ask, in your view, would it have

20   been legitimate for Mr. Franklyn to remove the URL just

21   because some people who might have seen it would have also

22   seen back slash information about Penn State?

23   A.    No.

24   Q.    Why not?

25   A.    Because again, the control needs to be identical to the

1   test, except for whatever one thing you're trying to isolate.

2   So he should have shown Vintage Brands, so that the people

3   knew where they were shopping.  And then if that involved

4   showing Penn State back slash, that should have been present

5   in the test and the control, and it's effect would have

6   canceled out.  So it wouldn't have helped either.  It would

7   have canceled out.

8   Q.   So actually, Dr. Neal, if we look at the control image

9   here, does that control image have any references to Penn

10  State anywhere?

11  A.   No, it does not.

12  Q.   If you imagine what the URL would have been in the real

13  world for this page, is that likely to have been Vintage Brand

14  dot com back slash Penn State?

15  A.   Unlikely.

16  Q.   Why?

17  A.   Because this is not making any reference to Penn State.

18  Q.   So if the URL's were used in both the test and the

19  control as they appeared in the real world, the control

20  probably wouldn't have had the Penn State references then,

21  would it?

22  A.   That's correct.

23  Q.   So Mr. Franklyn's defense that he removed it so that it

24  wouldn't be in the control doesn't really have anything to do

25  with the real world, does it?

```
1   A.    No.   That's correct.

2              MR. MCKENNA:  No further questions.

3              THE COURT:  Thank you.  Any recross examination

4   based on the redirect examination?

5              MR. FINKELSON:  No, Your Honor.

6              THE COURT:  Dr. Neal, thank you very much for your

7   testimony.  You may stand down with the thanks of the Court.

8              Is there a desire for Counsel to excuse Dr. Neal?

9              MR. MCKENNA:  I don't have any more for Dr. Neal,

10  so I would like to excuse him.

11             MR. FINKELSON:  I have no objection to excusing

12  Dr. Neal.

13             THE COURT:  You're excused, Dr. Neal.  Thank you

14  very much.

15             Ladies and gentlemen, I think before we continue

16  any further part of the Defense case, this is an opportune

17  time to take our lunch recess.  We'll stand in recess until

18  about 1:15 p.m.  I'd ask you to back in the courthouse a few

19  minutes before that.  We'll have someone to bring you back.

20  We'll try to begin promptly between 1:00 and 1:30.  Escort the

21  jury.

22             (At 12:13 p.m., the jury left the courtroom for

23              their luncheon recess.)

24             (2:05 p.m.)

25             THE COURT:  We're back on the record now after an
```

ROUGH DRAFT

```
 1   extended luncheon recess.  I apologize for the delay.  I had
 2   an administrative call from some of my colleagues who are
 3   hyperventilating about some administrative matter.  It wasn't
 4   worth my time, unfortunately, but I had to deal with it.  All
 5   right.
 6             I think the Defense ready to call its next witness.
 7             MR. FETTERS:  Yes, Your Honor.
 8             THE COURT:  Go right ahead.
 9             MR. FETTERS:  The Defense calls Chad Hartvigson to
10   the stand.
11             THE COURT:  Mr. Hartvigson, come forward to the
12   stand, please.
13             (The witness, Chad Hartvigson, was sworn.)
14             COURTROOM DEPUTY:  Can I get you to state your full
15   name and spell your last name for the record.
16             THE WITNESS:  Chad Allen Hartvigson, spelled
17   H-a-r-t-v-i-g-s-o-n.
18             THE COURT:  Mr. Fetters, go right ahead.
19             MR. FETTERS:  Thank you, Your Honor.
20                         DIRECT EXAMINATION
21   BY MR. FETTERS:
22   Q.   Mr. Hartvigson, let's start by telling the jury a little
23   bit about yourself.  Where do you currently live?
24   A.   Seattle, Washington
25   Q.   How long have you lived in Washington?
```

A.    I've lived in Washington most of my life.  Outside of

eight years, I was playing professional baseball, I spent the

rest of my life in Seattle.

Q.    Are you married?

A.    Yes, I am.

Q.    Is your wife, does she work with Sportswear or Vintage

Brand in any way?

A.    No.  My wife's a doctor, and she's an anesthesiologist.

Q.    Any children?

A.    Yes.  I have two little girls.

Q.    Now, this case is about sports apparel and I understand

that this is not the first time that you've been in

Williamsport in a sports-related context; is that right?

A.    That is correct.

Q.    Can you tell the jury a little bit about that?

A.    I was here as an 11-year-old baseball player, playing in

the Little League World Series.  I played on the first team

from the United States to upset the Taiwanese in 1982 to win

the Little League World Championship.  That's still considered

today the biggest upset in the 85-year history of the Little

League World Series.

Q.    And I understand that ESPN made a documentary about that;

is that right?

A.    Yes.  In 2012, ESPN came out with their first 30 for 30.

They previewed 30 of the most interesting sporting events in

1  history.  And we were fortunate to be featured as one of the

2  documentary films.

3  Q.  So you had some success as a Little League baseball

4  player.  Did that success and interest in baseball continue

5  after that?

6  A.  Yes, it did.

7  Q.  How so?  Did you play in high school?

8  A.  I did.

9  Q.  Okay.  And then after high school, did you play baseball

10  in college?

11  A.  Yes.

12  Q.  Where did you play?

13  A.  I received a baseball scholarship to go to the University

14  of Notre Dame where I spent two years playing at the

15  University of Notre Dame.

16  Q.  And let me back up.  What position did you play at Notre

17  Dame?

18  A.  I was pitcher.

19  Q.  And then you spent two years at Notre Dame pitching for

20  them.  What happened after that?

21  A.  I transferred back to Seattle, to the University of

22  Washington where I played baseball there for three years, was

23  the team captain for two years on two Pac-12 championship

24  teams.  I was all Pac-12 player and honorable mention All

25  American.

ROUGH DRAFT

83

```
 1   Q.   Okay.  And so after you played baseball -- well, let me
 2   ask you this first.  Did you graduate from the University of
 3   Washington?
 4   A.   Yes, I did.
 5   Q.   What did you study and what did you earn your degree in?
 6   A.   I earned my degree in business economics.
 7   Q.   After you graduated from the University of Washington,
 8   did you continue playing baseball?
 9   A.   Yes, I did.
10   Q.   How so and for whom?
11   A.   I played for six years, the San Francisco Giants
12   organization, the Texas Rangers organization, and the Colorado
13   Rockies organization.
14   Q.   For folks who are not quite familiar with how major
15   league baseball works, you mentioned some professional
16   baseball teams, big league teams that folks are probably
17   familiar with, but did you have to start out playing in the
18   minor leagues, for example?
19   A.   Yes, I did.  I started playing in short season A
20   baseball, and I advanced up to triple A, which is the highest
21   level in the minor leagues.
22   Q.   And, you know, you're a professional baseball player;
23   you're drafted by these big league teams.  Did you ever make
24   it into the big leagues?
25   A.   No, I did not.
```

ROUGH DRAFT

1  Q.   And so was triple A the highest level that you made it

2  to?

3  A.   Yes, that's correct.

4  Q.   Most people think of major baseball players, the big

5  leaguers, making lots of money, driving Ferraris.  Was that

6  your circumstance?

7  A.   No.  I actually started in short season A.  I was making

8  $850 a month.  And I made it up to the top level, which is --

9  you through six levels to get to triple A.  And at the very

10 top, I was making $2,000 a month.

11 Q.   Okay.  What period of years are we talking about here

12 where you were playing in the minor leagues?

13 A.   I was drafted in 1994, and I played through the 1999

14 season.

15 Q.   Okay.  So what happened in 1999?  Did you stop playing

16 baseball at that time?

17 A.   I did.

18 Q.   And what did you do at that point?

19 A.   At that point, I joined my brother in insurance sales,

20 and spent two years selling life insurance with my brother.

21 Q.   Okay.  Let's talk a little bit about Prep Sportswear,

22 also the formal name, Sportswear, Inc.  That's a company that

23 you're involved in?

24 A.   Yes.

25 Q.   How did you -- is it a company that you started?

A.    Yes, it is.

Q.    Okay.  Tell the jury a little bit about how you first

conceived of Prep Sportswear and how you started to bring that

together?

A.    In 1992, it was my first season at the University of

Washington.  And I transferred schools from the University of

Notre Dame where we had -- were outfitted with a much larger

budget than the University of Washington had for baseball.

And we had practice uniforms and we had practice gear we wore

in the gym and identified us as Notre Dame baseball players.

        When I transferred to the University of Washington,

there was a very little budget for baseball.  Most of the

money was put in to football and basketball.  And so I

identified right away, we looked a little silly on the

baseball field when everybody had he different colored

uniforms and we were all wearing our high school gear.

        And so I went out and acquired t-shirts and

sweatshirts and shorts for all the players on the team that

said Washington Baseball.  And so we started wearing those in

the gym and wearing them around the field.  And within a few

weeks, the baseball office had a bunch of inquires from

parents and girlfriends and alumni that would like to have a

Washington baseball sweatshirt or t-shirt.  And that was kind

of the start of the idea that there was what I call a small

niche market to that -- were under-served, meaning there

1    wasn't product on the market for those markets.

2            And it was particularly associated with high

3    schools.  So if you look at your typical high school, it has

4    an average of 36 sports and activities.  So that can mean

5    anything from the baseball, softball and soccer teams to the

6    debate, the band, and the music department.

7            So I knew there was these little tiny micro markets

8    within all these schools that nobody was providing gear for.

9    And I thought wow, if you could reach the market and reach the

10   people, there would be a lot of demand for the product.

11   Q.    Okay.  So you have this idea that sprang from your time

12   in college, and do I take it after you retired from

13   professional baseball, you moved back to Washington?

14   A.    That is correct.

15   Q.    Okay.  So you have this idea.  How did you actually go

16   about bringing this idea for this new company to fruition?

17   A.    So we get to 2003 and the Internet had started to evolve.

18   You know, being in Seattle and being exposed to seeing Amazon

19   already had grown for about eight years.  I had heard a lot

20   about the Internet.  I had heard a lot about Amazon and its

21   success selling books and tapes at that point in time on the

22   Internet.  I thought that's an interesting concept with the

23   idea that we've had -- that I had had for 11 years was we can

24   probably get to that in consumer that is at the high school

25   whose son or daughter plays on the soccer team.

1          And so we had the idea that if we put a website up

2    and we had -- you know, made available all these products for

3    these high schools, that we could reach the consumer.  We

4    thought that might be a pretty good business.

5    Q.   Now, I'll ask you a little bit more about the website and

6    the K through 12 schools that would ultimately become part of

7    that website.  But who was involved, if anybody, with working

8    with you in these early days?

9    A.   So my brother and I, after selling insurance for two

10   years, had decided to start our own investment firm.  So we

11   had started that in 2002.  And so I went to him in 2003.  We

12   were only a year in to starting the investment firm.  And said

13   hey, I think the idea that I had in college works if we access

14   the Internet to make this thing happen.  And he looked at me

15   and thought I was nuts because we were already starting a

16   business, and it was very difficult.

17          But on the side, I had two 60-year-old parents who

18   had been struggling to find employment.  And so the idea was I

19   was going to spend 50 percent of my time at the investment

20   company, and I was going to break off and spend 50 percent of

21   my time setting up this new business, and that my parents,

22   eventually when it was set up, my parents would be able to run

23   it, and we would find some people to help them.

24          So that was the initial start.  So it became,

25   basically, a full family business between myself, my brother

1  was doing some paperwork; he managed the checking book.  And

2  between the two of us, we funded it, and brought my parents in

3  to help us support it.

4  Q.   Now let's go back to the business concept of an online

5  apparel company focusing on fan apparel for K through 12

6  schools.  Tell the jury a little bit about, okay, that's the

7  idea.  How do you actually -- what does that mean in real

8  practical terms?  How would someone actually use that website

9  to make a purchase, for example?

10 A.   Right.  So the first thing we needed to do is we needed

11 to build a database that had every single school in the

12 country.  So at the time, the only database that existed was

13 the federal Government database.  And that database had access

14 to everybody.  And what it really contains is a lot of

15 demographic information.  So it would have the name of the

16 school, the address, and then you would have to go through,

17 break down, you know, gender and how many kids are on free

18 lunch and things like that.

19        So when we accessed that information, we just

20 assumed that it would also let us the mascots of the schools

21 and the colors of the schools.  Well, of course, that wasn't

22 there.  And so the first real big hurdle that we faced was we

23 were going to have to compile that information ourselves.

24        And so if you go back to 2003, very few schools, K

25 through 12 had operational websites.  So we looked at each

1    other and said well, where are we going to get this

2    information, because you really can't build the stores unless

3    you have the mascot names and the school colors.

4            So there's 30,000 high schools in the country.  And

5    so we decided we would call every single one of them.  And we

6    did.  And between myself, my mom, and two assistants, we spent

7    two years, in our spare time, calling all the schools and

8    asking them two questions.  What's your mascot; what are your

9    school colors.  And we built that database.

10           And so once that database was built, we were able

11   to publish that online and create stores, dynamic stores,

12   meaning you would see images and you could click on them and

13   then we would make that product and send it directly to the

14   consumer.

15   Q.   So you've talked about the business concept; you've

16   talked about building the online apparel company where

17   purchases can be made.  You talked about the due diligence of

18   calling the schools.  How about actually the products

19   themselves.  What was the process of getting that going?  How

20   did you get the products that you ultimately could sell?

21   A.   So, you know, our vision was we are going to do what we

22   call aggravate the front end.  So that meant we were going to

23   go out and try to find the market, find the people that really

24   wanted to buy the product and bring them to the website,

25   operate the website, and take the orders.  And then we were

ROUGH DRAFT

90

done.  We were going to take those orders and send them to

somebody else who already had a printing operation set up that

could actually print the items and send them directly to the

consumers.

So we started down that road, launched the website

in the summer of 2003.  And we quickly proved that there was a

pretty good market for -- demand for those products.  So

people started visiting the website and started placing

orders.  And we had set up with a local screen printing shop

to actually fill the orders.

And so we would print off at my parents' house, at

the time the company started in their garage.  And we would

print off the sheets of paper, and we would take them, drive

up to the print shop, it was about 20 minutes away, and give

them the pieces of paper to fulfill those orders.  And it

would take them about three or four days.  But we were driving

up there every day to give them the new orders and pick up

whatever they were completed finishing, and we would actually

ship it.

And the problem was, and they had told us this when

we started, that it's not conceivable to print one single

customized piece.  So we were paying -- we were charging $12

for every t-shirt we sold on our website, but it was costing

us $36 to have that shirt printed by this outfitted firm.

So on one hand, we were, like, all right; we've

1  proved this market.  On the other hand, we're, like, don't

2  sell too much stuff because we're losing $24 on every shirt

3  that we sell.

4  Q.   So you described this challenge that you ran into in the

5  existing structure of the apparel industry at that time.  What

6  did you do to address that?

7  A.   So we did that for about a year.  And we had the market

8  proved out.  And during that year, I was traveling up and down

9  the west coast trying to find somebody that had the ability to

10 print something at a much lower cost, one single piece.  And

11 we couldn't find anybody.  Everybody thought we were nuts.

12 The lowest anybody could go was 24 pieces of the exact same

13 item.

14        And so my brother said hey, good learning lesson.

15 Come back to the investment firm.  We'll find something else

16 for mom and dad to do.  And I said no.  I think we can figure

17 this out.

18        So I asked my dad if we could start to use his

19 garage as an R and D facility to try and figure out how can we

20 lower the cost.  And where our target was -- we had to get

21 down to $6 to print individual customized item.  And so we

22 went into the garage, and sure enough, it took us 6 months,

23 through trial and error, but we invented a new way to print

24 t-shirts at less than $6, which allowed us to build the

25 business.

1  Q.   What is this new way that you invented?

2  A.   So we leveraged some of the existing technology that was

3  in the banner industry.  So if you think of a big plastic

4  banner, maybe like a Bud Weiser banner you would see out at a

5  softball field or an advertisement.  We used some of the

6  materials that were being used in that industry to cut out

7  graphics and to -- we ended up applying them to cotton and

8  polyester using heat and pressure, which we were told at the

9  time by Hewlett Packard and Epson, they had tried all these

10  things and it didn't work.

11      Well, we figured it out in the garage, and it did

12  work.  And that became a whole new industry segment of what

13  grew from that in to what we call today direct to garment

14  printing.

15  Q.   So it sounds like in your parents' garage, you had to

16  prove the concept on the manufacturing and printing side.

17  What did you do with that?  Did you decide to expand and see

18  where that could go?

19  A.   Yeah.  So we expanded on that.  We added embroidery.  We

20  figured out how to auto -- automatically digitize files, so

21  for instance, if you see something that's stitched up here in

22  the left chest, you usually need somebody to go through and

23  code that design on a computer with a software program.  And

24  that's labor intensive.  So it usually takes somebody an hour

25  or two to do that.  And once they do that, then you have the

1    file, and you print a bunch of the items.  So if you're doing

2    hundreds of them, it makes sense.  But if you're only going to

3    do one single piece, you can't spend that time doing the file.

4    So we built the actual software for ourselves to automatically

5    digitize that file as somebody orders it online.  And so it

6    goes directly to the embroidery machine and we can stitch one

7    single piece of item.

8            And so we did that, and around 2006, that expanded

9    the product line.  And now we are printable items and

10   embroidery items.

11   Q.   And you talked about the early days in your parents'

12   garage.  Did you eventually expand to a manufacturing

13   facility, something like that?

14   A.   Yeah.  So we stayed three years in my parents' garage.

15   Both my parents worked 50-plus hours a week for zero pay.  All

16   three of us didn't get paid a single dime for the first three

17   years.

18           It was all a longer term vision, a longer term plan

19   to eventually hopefully create something that was sustainable,

20   and full we did it, we would get paid at the end.

21           And so we started down that road.  My mom had no

22   formal education and, you know, she grew up in Virginia, in a

23   trailer park.  And my dad did not go to college either.  And

24   so, you know, we did some training with them.  And we didn't

25   have a lot of automation in the garage.  My mom actually

1  handwrote the first 10,000 shipping labels to consumers.  She

2  sat there and wrote up address.  That's what she did all day

3  long.  And my dad would take those orders, and he would drive

4  up to the local post office and stand in line every single

5  day, and have -- pay to ship those directly to the consumers.

6  And they both did that for three years.  And they ended up

7  staying with the company for 11 years, until they were little

8  over 70 years old.  They worked pretty hard.  We've got 5,000

9  employees over 22 years, and I'd say they're probably two of

10  the hardest workers I had ever seen.

11  Q.    The manufacturing facility that Sportswear uses at

12  present, is that owned by Sportswear?

13  A.    Yes, it is.

14  Q.    Where is that located?

15  A.    That is located -- as we scaled the facility out, we left

16  the garage after three years and went to downtown Seattle

17  where we had a 5,000 square foot facility.  We stayed in that

18  for two years and outgrew it.  And then we moved to another

19  portion of Seattle.  And we had an 18,000 square foot

20  facility.

21          And at that point, we got to about 2010, and we

22  realized that we needed a much bigger facility.  And the

23  largest manufacturing facility at that time in Seattle was

24  about 25,000 square feet, and that was within about 30 miles

25  of Seattle.

1           And so we realized we also needed a different

2    shipping port.  So shipping way up here in the United States

3    and shipping all over the country was about the most -- it was

4    the least cost effective shipping point in the country.  Plus,

5    we saw the effect Amazon -- we saw the effect that their

6    vision was going to be able to get stuff to consumers either

7    same day they ordered it or the next day.  And so consumer

8    expectations, even though we weren't competing with them, the

9    expectations with consumers was going to be hey, I ordered

10   this; I want it shipped the next day.  So we realized we

11   needed to be somewhere more centralized.  So what we did is we

12   moved that manufacturing facility to a 91,000 square foot

13   facility in Louisville, Kentucky, and it's been there since

14   2010.

15   Q.   How may employees are at that facility in Louisville?

16   A.   We do fluctuate anywhere from 100 to 200, depending on

17   the seasonality of the business.

18   Q.   Now so far, the examples that you talked about and the

19   offerings from Prep Sportswear, we talked about K through 12

20   schools, designs related to those schools.  Did Sportswear

21   eventually expand its product offerings in to college-related

22   designs?

23   A.   Yes, we did.

24   Q.   Please tell the jury about that.

25   A.   So in 2009, we were approached by one of the license

ROUGH DRAFT

96

```
 1   agencies in the college market, a licensee resource group

 2   known as LRG.  And they asked us at the time if we could

 3   create an online store for a couple of the smaller colleges

 4   that they represented.  At that time, there were very few, if

 5   any, options for these smaller colleges to have products

 6   available and printed for them.  So we did that.

 7   Q.   Okay.  How would it work under the licensing agreement?

 8   Would they give you a portfolio and designs to print on

 9   clothing or some other way?

10   A.   Sure.  So they gave us an art sheet that basically had

11   their approved marks.  And then we would take those marks and

12   put together our own designs, and then we would submit them to

13   them, and they would say yes or no or make this change here.

14   Once they're approved, we would put them up on the website.

15   Q.   And under the LRG license, what kind of logos are we

16   talking about?  Were these, like, modern logos?  Vintage

17   logos?  How would you describe those?

18   A.   They were modern logos and logos they were currently

19   using at their schools.

20   Q.   Just to be clear, was Penn State one of the part of the

21   LRG license that Sportswear had?

22   A.   No.

23   Q.   So you've heard some of the testimony today about

24   officially licensed labels and such and statements on

25   websites.  When Prep Sportswear had this license, did Prep
```

1  Sportswear include similar types of officially-licensed

2  statements on its websites, on its products?

3  A.   Yes, we did.  We were required by the licensing agency to

4  put on the pages where those products were shown, that we were

5  officially licensed.

6         And then on the products, as we shipped them out of

7  our facility, we were required to take a sticker and place

8  that -- they call it a hologram on that product -- so that

9  when that product shipped and a consumer receives it, they

10 understand that that's an officially-licensed product.

11 Q.   And you heard about the hologram, the officially-licensed

12 holograms and some security features.  Do you have personal

13 awareness of whether things like that, security features,

14 holgorams, were those a part of the Prep Sportswear license?

15 A.   Yes, they were.

16 Q.   Can you tell the jury a little bit more about what was

17 entailed when using those holograms?

18 A.   Yeah.  So the holograms are very closely protected.  You

19 purchase those directly from the licensing agency.  And they

20 come with a tracking number on them.  So we would get those.

21 They would track them.  And it was -- they were on top of it,

22 because we would start to run out in the facility and if

23 somebody didn't notice we were running out of those stickers,

24 they would call us and say hey, you're about to ready to run

25 out of stickers in 30 days; you need to order more.  And so we

ROUGH DRAFT

```
 1  would order more, and we would affix them to every single

 2  product that we sold.

 3  Q.   Did you view it as a benefit to Prep Sportswear to be

 4  able to market officially-licensed college gear and to sell

 5  officially-licensed college gear?

 6  A.   Sure.  It was, you know, telling people that, hey, this

 7  is officially-licensed gear, and if you wanted to buy

 8  officially-licensed gear, here it is.

 9  Q.   Okay.  So if I understand the progression correctly, from

10  2003 until 2009, Prep Sportswear focus was on K through 12; is

11  that right?

12  A.   That is correct.

13  Q.   And then from 2009 moving forward, was K through 12 plus

14  some officially-licensed logo gear?

15  A.   Yes.

16  Q.   Okay.  Tell the jury about how things progressed with the

17  licensed gear.  Did that remain static; did things change over

18  time with that license?

19  A.   Sure.  So once we started doing that, it began to grow.

20  LRG grew significantly.  I think when they first came to us,

21  you know, they maybe had a hundred colleges.  That grew

22  significantly.  There was another licensing agency that was in

23  a similar size to them called Strategic Marketing Affiliates.

24  They went by SMA.  We signed an agreement with them to take on

25  their colleges, as well.  So those were kind of two competing
```

1    firms.

2          And then about a year later, that puts us around

3    2011, we signed a licensing agreement with the Collegiate

4    Licensing Company, CLC.

5    Q.    Okay.  And as that license sort of evolved from the

6    mergers and acquisitions you described, did, at any point,

7    Prep Sportswear start offering logos by Penn State?

8    A.    No.

9    Q.    Okay.  So what ended up happening -- well, let me ask you

10   this.  When CLC came in to play, did they do anything -- the

11   jury's heard some testimony about certain quality control

12   provisions had been in play for Penn State licensees.  So my

13   question is, did Prep Sportswear experience any quality

14   control parameters or requirements under the CLC license?

15          MS. WHEATLEY:  Objection.  402, 403.

16          MR. FETTERS:  This is relevant to the -- whether

17   the licensees are engaging in quality management of their

18   programs.  And so he -- Prep Sportswear, he has direct

19   knowledge of CLC's similar programs, and he can testify to

20   that to his personal knowledge.

21          MS. WHEATLEY:  Objection.  The witness just

22   testified this did not involve Penn State, so it has no

23   relevance to this case.

24          MR. FETTERS:  It's the same licensing agent.  The

25   witness for --

1          THE COURT:  I would agree with that.  I'd note the

2     objection.  Overruled.  You have may go ahead.  Proceed.

3     BY MR. FETTERS:

4     Q.   Do you need me to repeat the question?

5     A.   I got it.  So when we initially applied for a license

6     with CLC, it was a pretty thorough process.  And at the end of

7     the process, they asked us for some sample products.  And my

8     response was what products would you like.  And they said just

9     send us a box full of products.

10          So we picked some products, we printed on the

11    products, and we shipped those directly to Atlanta, to the CLC

12    office.  I didn't hear anything back about the products.  And

13    so I asked them any -- any additional products.  I heard

14    nothing.

15          So we had that license for quite a while.  We never

16    were asked again for quality products.  In fact, at one point

17    in time in our relationship, I invited portions of their

18    executive team, their vice presidents of apparel, to our

19    manufacturing plant because at the time, we were the only ones

20    doing customized print-on-demand products in the collegiate

21    market.  And they said no need to come to your facility.

22          All we wanted to do was we were hoping to expand

23    our relationship with them and showed them some of the

24    capabilities that we had, that we knew were not in the market

25    because it was technology we had developed ourselves.  And

ROUGH DRAFT                                             101

1    they never visited the facility, and they never once again

2    asked to see any products from us.

3    Q.   Now you touched on your facility having different

4    capabilities and methods to apply designs to apparel.  Can you

5    tell the jury a little bit more about that?  What are the

6    different methods and whether there are certain advantages and

7    disadvantages of those methods.

8    A.   So when we first started in the garage in 2003, you know,

9    we proved out a very -- what now is a very primitive process

10   to print those shirts.  Over the course of the last 22 years,

11   we've seen seven migrations of our printing technology in our

12   facility.  So it's come a long ways.  And most of that is due

13   to the success of that entire print-on-demand industry.  The

14   big companies like Epson, Hewlett Packard stepped in and

15   really started innovating around the printing technologies.

16           So today, we use a process called dye sublimation

17   and direct to film.  Yesterday, there was some testimony

18   around quality of products in the field.  They talked about

19   feeling the products.   Most of those products that you are

20   going to see in brick and mortar stores, retail stores are

21   printed with the traditional process of screen printing, which

22   is a process that is very efficient if you're doing a large

23   numbers of items that you're printing.  And so that's a

24   process where you put ink across the top of the garment.  And

25   I think we're all familiar with how that feels.

ROUGH DRAFT

1        The new digital printing technologies are entirely

2   different.  So you're looking to print a single individual

3   unit, so one unit of a customized shirt.  And those processes,

4   particularly the dye sublimation, you print that first out on

5   paper.  And then you take that paper, and through heat and

6   pressure, you take the ink, and it absorbs directly into the

7   fabric.  So the difference in that is that that is into your

8   fabric, rather than sitting on top of your fabric.  And that's

9   going to give you the best finished product and the best --

10  the best hand.

11       Now the products that were shown up here yesterday

12  for Vintage Brand, those were using a different manufacturing

13  process.  Those are used what we call direct to film, DTF for

14  short.  And that is all new in the last couple of years.  And

15  what's unique to that is that's going to bring the efficiency

16  way down.  It reduces a lot of the labor involved.  It allows

17  you to very closely monitor and manage the brand colors within

18  print.

19       So what you do with that is you print it almost on,

20  like, a wax paper.  And then that wax paper, you take, and you

21  can -- with pressure and heat, you can push that onto the

22  garment, and that also sits on top, similar to screen

23  printing.  The difference is, in order to get that ink to

24  adhere to that film, there is a layer of what is 95 percent

25  salt water that sits on top of that layer.  So when you

**ROUGH DRAFT**

1    pressure that onto the shirt, some of that salt water solvent

2    sits on top of that print.  When you wash the shirt, that --

3    that comes out.  And so the products yesterday, when they were

4    talking about the fabrication feeling plasticy, that's the way

5    it feels.  Once you wash it, it comes out, and you have that

6    natural hand.  And that product should lasts longer, and you

7    can even dry clean it, compared what you can do with

8    traditional screen printing.  We've all screen printing where

9    it starts to kind of fade and fall apart.  This will last much

10   longer.  This DTF, I believe it's -- I believe that everybody,

11   over the next 10 years, will be using.

12   Q.   Now, the CLC license model, did you find over time that

13   that was a perfectly compatible fit with Sportswear's direct

14   consumer online print-on-demand model?

15   A.   No.  That -- the biggest challenge that we faced with the

16   licensing industry was it began to consolidate quite quickly.

17           MS. WHEATLEY:  Objection.  MIL 6.

18           MR. FETTERS:  We can move on, Your Honor.

19           THE COURT:  All right.  Objection noted.

20   Sustained.  Go ahead.

21   BY MR. FETTERS:

22   Q.   Does Sportswear currently sell any products under the CLC

23   license?

24   A.   No, we do not.

25   Q.   Do you know roughly when Sportswear stopped selling under

ROUGH DRAFT

1   that license?

2   A.   2020.

3   Q.   Does Sportswear currently sell any products with

4   college-related designs under a license?

5   A.   Yes.

6   Q.   And who, generally, are those licenses with?

7   A.   A licensing agency called Affinity Licensing.

8   Q.   Okay.  And any direct licenses within individual

9   universities?

10  A.   Yes.

11  Q.   Just roughly, about how many?

12  A.   Two dozen.

13  Q.   Does Prep Sportswear sell any designs related to colleges

14  that aren't licensed?

15  A.   Yes.

16  Q.   What's an example of a type of school for that?

17  A.   North Seattle College, Tacoma College, Everett College,

18  Edmonds College.  Those are all small -- very small colleges

19  that when we first started selling those 15 years ago, roughly

20  around 2009, there was either no supply in the market or

21  nowhere you could buy these.  We used very generic text-based

22  designs on those.

23  Q.   Now you've been here in the courtroom throughout the

24  trial.  You've heard, I believe, some testimony related to

25  Penn State licensees discussing fair labor practices and

1    requirements.  Does Prep Sportswear belong or adhere to any

2    fair labor requirements, corporate ethic requirements, things

3    like that?

4    A.    Yes.  So the Fair Labor Association goes by FLA, we have

5    been a member of FLA since 2012.  And FLA really got its start

6    with the Clinton administration, actually, put this in in

7    1999.  And what they do is they really look at safety and fair

8    labor wages around the globe.  Especially it became important

9    because we were off-shoring a lot of our apparel manufacturing

10   and printing in Southeast Asia.

11          And so we're a member of that.  You pay a fee each

12   year, which is a pretty high fee.  You do continuing education

13   every quarter.  And they actually audit the facilities.  So

14   our facility, because of its size, we are able to self-audit,

15   but we send in about a 20-page documentation about the

16   facility to them every single year.  And then they have

17   auditing services, people that go out to the facilities

18   through our supply chains.  So they're not our facilities, but

19   if we're buying something from a facility that is making,

20   like, a blank t-shirt, they to have an auditor at that

21   facility, and so we're part of that.

22   Q.    What kind of financial investment, just generally, has it

23   taken for Prep Sportswear to get its manufacturing facility up

24   and running to it what it is today?

25   A.    Yeah.  So we have about $15 million worth of printing

1    equipment in our facility.  And we've invested over $20

2    million into the software technology that drives that

3    facility.

4    Q.    All right.  Let's switch gears now a little bit and talk

5    about Vintage Brand.

6          When did you first start conceiving of the idea of

7    Vintage Brand?

8    A.    That would have been August of 2017.

9    Q.    Okay.  So tell the jury a little bit about that.  What is

10   the idea and what was the -- the issue that you were looking

11   to address in the marketplace?

12   A.    So, you know, I've been a life-long sports fan, you know,

13   collected baseball, football, and basketball cards in the 70s,

14   and 80s, and I have quite of the few game programs and things

15   that I have attended that I've kept over time.  And we started

16   noticing that vintage apparel and vintage designs were

17   starting to come to the market in 2017.  We thought that there

18   would be a pretty good market for some of these sports

19   collectibles.

20         And so we started looking online and come to find

21   out on E-Bay, you know, so many people, sports collectors or

22   people that are just individual collectors at home were

23   selling off a lot of their collectibles.  And so we started

24   looking at some of those graphics and thought, wow, those

25   graphics are pretty unique, pretty artistic.  I wonder if we

1    could reproduce those images at a very high, what we call

2    resolution, it means a lot of pixels in there, to be able to

3    print them on consumer items, like mugs and t-shirts and hats.

4    And so we tested that, and we were able to make it work to the

5    point where the product was high enough quality that we could

6    reproduce those images.  And so we figured, gosh, we may have

7    started a whole entire another market here by leveraging

8    historical images in a new way.

9    Q.    Now you used the word we.  Who else was involved in

10   considering this new business concept?

11   A.    Right.  So my second cousin, Erik Hartvigson, who had

12   worked at Prep Sportswear for eight years, and Michelle Young,

13   another person at Prep Sportswear that had been there at that

14   point in time, for 12 years.

15   Q.    All right.  And you described to the jury that you had

16   your own personal collection of sports memorabilia where you

17   were engaging in the proof of concept.  Was that sufficient,

18   in your view, or did you think that you needed to go out and

19   acquire more?

20   A.    No.  If we were going to take this to market, we

21   obviously had to have quite a few images, things across all

22   different sports, all different years, all different decades,

23   eras.  And so we started to collect different sports

24   collectibles.

25   Q.    How did go about actually doing that?

ROUGH DRAFT

108

A.    So initially, we started purchasing things on E-Bay.  And

that became almost like a full-time job doing that, searching

for things, trying to find things that were very interesting,

trying to find things that we thought would have historical

value.

            And I purchased the first couple thousand items off

of E-Bay.  And then after that, as I started doing more

research, there were quite a few message boards and areas

where a lot of these collectors were talking.  And a lot of

times they were trying to trade each other's collectibles.

And it became very common, we learned, that a collector

usually focused on one specific thing.  And we found a lot --

because I'm a former baseball player, I found it very

interesting that there were collectors that were trying to

collect, for instance, every game ticket where Reggie Jackson,

a famous Yankee baseball player had hit a home run.  And

that's what that guy was doing.  He was trying to get all 500

home runs Reggie Jackson hit, every game ticket.

            And so once we saw there were all these

individuals, we started reaching out to some of them to see if

potentially, we could partner with them and utilize and

leverage the collectibles that they had.

Q.    So you talked about E-Bay, talking with other collectors.

Did you do anything else, go to trade shows or things like

that?

A.    Yes.  We did go to trade shows.  We started by going to a
couple of state shows in the State of Washington.  Those are
usually held at community centers or high schools or community
colleges.  And they have them in the gym for a whole weekend.
And these collectors drive from around the state, and they set
up a table.  And most of them are there just to show their
collections.  But they are selling things.

          So we started going to those, and we actually would
bring a scanner with us.  And some of them we were able to
buy, and -- buy collectibles from.  And other ones, they just
wanted to show them.  They didn't want to give them up.  But
they found it very interesting that all we wanted to do is
plug the scanner into the wall and scan that image and pay
them a fee and allow us to scan that image.

          And so we ended up buying some of the collectibles,
and other ones, we just got a digital scan of that sports
collectible.

Q.    And I would imagine that in meeting with all these sports
collectors, maybe you encountered some quirky folks.  Any
notable encounters with collectors?

A.    Yes.  So I was communicating with quite a few collectors
online.  And there was an individual that I met online, and
his name was Larry.  And he lived -- he ended up living about
an hour drive outside of Seattle.  And so after talking with
Larry for a month about his collection via e-mail, Larry

ROUGH DRAFT

110

1    invited me to his house.  So I made the hour drive out to

2    Larry's house.  All I knew is, you know, Larry was an avid

3    collector, and he had a collection that he said took up his

4    entire garage.

5            So I made the drive out there.  Larry answers the

6    door.  And Larry is about 6'6", and about 270 pounds, this

7    massive guy.  And he brings me into his house.  We walk

8    upstairs into a bedroom.  And I said I thought it was all in

9    the garage.  And he said well, wait until you see the garage.

10   It's entirely full.  But this is my special addition, special

11   collection.

12           And so we walk in there, and come to find out,

13   Larry is a retired accountant.  And Larry had taken binders,

14   and he had them all around the room on shelves.  And each one

15   of them was labeled.  And he says wait until you see.  And I'm

16   just looking at all of the binders.  And I said well, what do

17   you have?  And he tells me well, I have -- I have a lot of

18   stuff.  And the toughest ticket to find, the toughest sports

19   ticket to find are all the baseball all star games.  That's

20   the most valuable ticket and the hardest one to find out

21   there.  And those games started in 1933.

22           So I said do you have any of the major league

23   baseball all star games.  And he said I have every single one

24   of them since 1954.  And he pulls out a file, and he sits

25   there -- and they're all in plastic sheets, and they all have

ROUGH DRAFT

111

1   a story written next to them.  So I spent the next hour going

2   through those.  And then he says I every major league baseball

3   game that's ever been played since 1967.  And I just kind of

4   looked at him and he said if a world series had seven games, I

5   have all seven tickets.  If it went four games, I have all

6   four tickets.  And he pulls out a couple more binders.  And we

7   sat there for the next couple of hours and went through them.

8   And then he pulls out all the Super Bowl tickets that had ever

9   been played.

10       And then he tells me that, because he grew up in

11  LA, and his dad took him to the first -- took him to his first

12  USC/Notre dame football game when he was five years old in

13  1954.  And he said I've been to every single -- these teams

14  play each year.  He said I've been to every single Notre Dame

15  and USC football game that's been played in LA since 1954.

16  And I have the game ticket and I have the program.  And he

17  brings all of those out.

18       So I looked at Larry, and I say hey.  Here's what

19  we're doing.  I would love to be able to scan all of these

20  images and have you keep them.  I just want to scan them.  And

21  I'm willing to give you $2,500 if you'll allow me to take just

22  these notebooks.  I told him I'd give him my driver's license.

23  You know where I'm at.  You know where I am.  I wouldn't run

24  off with them.  and I'll bring them back in two weeks.

25       And Larry started crying.  He said, you know, my

ROUGH DRAFT                                                      112

1    worst fear is I've collected these my entire life.  I have two

2    older daughters and they told me the first thing they're going

3    to do when I'm gone is they're going to call out somebody to

4    come and haul this stuff out of my house.

5           So I told him hey, our goal is one, is to build a

6    business around this, but it's to preserve the history of

7    these events.  So Larry took my $2,500 cash.  I took those

8    back to Seattle at the office.  We spent the next two weeks

9    scanning them.  And I returned back out there and collected

10   more of his stuff and gave him another $2,500.

11   Q.   Now, when you're meeting with collectors, going to trade

12   shows, investigating on E-Bay for these sports collectibles,

13   are you just looking for anything and everything, or is there

14   certain things or certain types of items that you're looking

15   for?

16   A.    Yeah.  There's a criteria that we used.  First and

17   foremost, you know, we're looking for historical images that

18   have some type of vintage artistic look to them.  And so we

19   want anything that was pre 1989.  We weren't looking for

20   anything that was older that the year 1989.  So that was first

21   and foremost.

22          The next thing is we were making sure that every

23   single image didn't contain a copyright notice.  So that's the

24   little C with a circle that you would see on an image.  If

25   that was on there, we weren't going to use it.  And then the

ROUGH DRAFT

113

1    third thing was we were making sure that we didn't use any

2    images that were currently being used in the market, meaning

3    they weren't being used by the universities to -- for

4    educational services, and they weren't used by the

5    University's athletic departments.

6              And the fourth criteria was they had to be unique,

7    interesting, fun, or have some type artistic value that we

8    thought people would like to see on a mug, a shirt, or a hat.

9    And that was the criteria we used to search through these

10   historical images.

11   Q.   Now you mentioned 1989 as sort of the newest of the

12   collection.  What's the oldest, if you know, that you have in

13   your collection?

14   A.   Yeah.  So we have a ticket, a game ticket from 1869,

15   college football ticket.  And we have a handful of things

16   before 1900, and then the collection starts mostly around the

17   1920s.

18   Q.   Is there a predominant decade or a couple of decades for

19   which your collectibles originated, or is it pretty widely

20   distributed?

21   A.   The most interesting stuff starts in the late 40s, early

22   50s.  And really the 50s through the 60s is where you find the

23   most graphical art.  If you think back in time, you know, the

24   t.v. started and Madison Avenue started, and you start to see

25   a lot of graphical elements.  Photography came in vogue in the

1  60s, so there's a lot of great imagery.  And so really the 50s

2  and 60s became an area we were really focused in finding

3  historical images.

4  Q.    How many items on an approximate basis does Vintage Brand

5  currently own sports collectibles?

6  A.    We have 25,000 sports collectibles.  We've invested

7  $250,000 in those collectibles.

8  Q.    Now in the process of acquiring these collectibles, did

9  do you any research or investigation for yourself to kind of

10  learn about the context of when the memorabilia was first

11  produced?

12  A.    Yes.  So we have a historical dating process that we go

13  through.  You know, the first is a lot of the collectibles we

14  have actually are dated.  So you think of a game ticket, a

15  program for a game, a lot of the buttons have dates on them.

16  So that was -- that's kind of the first -- first part.

17          And then we go to the second one, and we are

18  acquiring these, particularly on E-Bay, a lot of times we're

19  buying what's called an allotment.  And so instead of just

20  buying one individual item, there might be a collector that's

21  selling, like, 12 tickets or 12 game programs or, you know, 6

22  programs and a couple of buttons with it.  So when you buy an

23  allotment, you could see that it was all from really the same

24  era, that the type fonts were the same, the imagery was the

25  same.  And so something in that allotment would be dated.  Not

**ROUGH DRAFT**

1  everything, but maybe one or two things.  So that would give

2  you a pretty good idea of when the rest of it was created.

3          And then the third one was we had developed

4  relationships with quite a few developers -- or with dealers.

5  And so we started talking with those dealers and saying hey,

6  we found this.  When do you think this was created.  And a lot

7  of these guys are experts in that arena and they would come

8  out and say hey, this is from the early 50s.  And so, we had

9  those.  And then we started finding things and saying, well,

10  gosh, we don't know when this is dated.  You can go on E-Bay

11  and do an image search and look for something that's similar

12  on the same and maybe find two or three dealers that are

13  selling that same product online and see that all three of

14  them are listed as the same date.

15          So that was another way to determine the date of

16  these things.  And then we did -- we used a site called sports

17  logos, dot net.  This individual, Chris Kreamer, he started

18  this site in 1997.  And he's become known as the authority on

19  sports logo history.  And his website has all sports -- all

20  sorts of professional sports teams and colleges going back

21  before the 1900s and listing and showing the dates for all

22  those logos.

23  Q.   Now you mentioned meeting with collectors and looking at

24  vintage game tickets and, you know, not knowing anything about

25  it, and may not think that vintage game tickets have anything

ROUGH DRAFT                                    116

```
 1   interesting from an artistic point of view.  Can you tell the
 2   jury a little bit about how these vintage game tickets that
 3   you examined and ultimately acquired compare to modern day
 4   tickets?
 5   A.   Yeah.  So, you know, it's interesting to look at all
 6   these tickets.  They've changed so much over time, and a lot
 7   of it has to do with technology's influence on the tickets.
 8            So once you get into the 90s, you start seeing a
 9   lot of type fonts.  So instead of having imagery and really
10   cool graphics on a ticket, it starts to just be text.
11            And then as you get into modern times now, you
12   know, the tickets have entirely gone away.  You know, you
13   either print it at home on a white piece of paper, or you're
14   using, you know, your smart phone to get into a game.
15   Q.   Let's go ahead and take a look at some of the memorabilia
16   items from within the collection.  And for now, we'll just do
17   the PowerPoint slides for the witness and Counsel and the
18   Court, if that's okay.
19            Mr. Hartvigson, I'm just going to ask you some
20   foundational questions to see if you recognize these photos
21   here.  And we'll just have you take a look, and then we'll
22   scroll through the next page, please.  Okay.  Take a look at
23   those.  And then next slide, please.  And then the next slide,
24   please.  Next slide, please.  All right.  And you can go back
25   to the start.
```

ROUGH DRAFT

117

```
 1              Now, Mr. Hartvigson, do you recognize the items
 2    that are shown in these PowerPoint slides?
 3    A.    Yes, I do.
 4    Q.    And what are they?
 5    A.    These are sports collectibles that I acquired myself.
 6              MR. FETTERS:  Your Honor, I'd move to admit
 7    exhibits -- it's going to be a long list -- maybe is there any
 8    objection before I do that?
 9              MS. WHEATLEY:  No objection.
10              MR. FETTERS:  Do you want me to read off the list?
11    All right.  So this is Exhibit D-143, D-144, D-145, D-146,
12    D-203, D-206, D-215, D-147, D-166, D-148, D-167, D-232, D-236,
13    D-238, D-240, D-243, D-246, and D-250.  Move to publish to the
14    jury.
15              THE COURT:  And to admit?
16              MR. FETTERS:  Oh, and to admit, yes.
17              THE COURT:  Any objection?
18              MS. WHEATLEY:  No objection, Your Honor.
19              THE COURT:  Duly admitted.  You may publish.
20    BY MR. FETTERS:
21    Q.    All right.  Mr. Hartvigson, the jury can now see what you
22    looked at briefly.  And I do have physical items that I also
23    would like to admit in conjunction with -- they have the same
24    numbering.  Okay.  It's not for everything.  But I do have the
25    buttons and with -- with the Court's permission, I'd request
```

1    to approach the witness.

2            THE COURT:  You may do so.

3    BY MR. FETTERS:

4    Q.    Now Mr. Hartvigson, can you just generally describe what

5    you have there at the witness stand and what the jury is

6    seeing on the screen?

7    A.    Yes.  These are the physical sports collectibles that we

8    see on the screen.

9    Q.    Okay.  And are these collectibles in relation to Penn

10   State?

11   A.    Yes, they are.

12   Q.    Now, you talked about some investigation and research

13   that you would do to try to date some of these items.  For the

14   buttons that you see on the screen, does the information on

15   the buttons themself provide any indication as to the dates

16   that these items were first originated?

17   A.    Yes, they do.  For instance, the first button here in the

18   upper left corner that says Cotton Bowl, Penn State, Penn

19   State's played in four Cotton Bowls, so we know that they --

20   they played their first one 1948, and then they played again

21   in 75 'and '76.  We know this button is from 1976 from that

22   game, in particular, because there's identical button for the

23   team they played in that game.

24   Q.    Okay.  And there's -- I see there's one for the Gator

25   Bowl, as well.  Is there a similar type of analysis that can

1    be applied for that one?

2    A.    Yes.  I believe they played in that game four times.  61

3    and 62 are the first two years and this is from 1976.  And

4    it's similar.  There's a button, that they played in that

5    event that also correspondence to that.

6    Q.    And I'm going to ask you an obvious question.  But the

7    button at the bottom right, is there any indication of when

8    that first originated?

9    A.    Sure.  So that has imprinted on it 1982.

10    Q.    Okay.  Let's go -- advance to the next slide, please.

11    And what are we seeing here?

12    A.    These are football Game Day programs for Penn State

13    games.

14    Q.    Okay.

15            MR. FETTERS:  Permission to approach, Your Honor?

16            THE COURT:  You may.

17            MR. FETTERS:  For these, I'd also like to admit the

18    physical exhibits.

19    BY MR. FETTERS:

20    Q.    What are those, Mr. Hartvigson?

21    A.    These are the physical sports collectibles that are shown

22    here on the screen.

23    Q.    Okay.  Do -- well, let me ask you first.  Are you

24    generally aware of what the purpose of a game program is?

25    A.    Yes.

1    Q.    What is that?

2    A.    So a game program is printed specifically for that game.

3    And it usually has content related to that game.  So rosters

4    for the games, some advertising, and maybe a few articles

5    written about the teams for that season or that particular

6    game.

7    Q.    Now the artwork that we see on these game programs, it's

8    a little bit cartoonie.  Is that kind of typical of a

9    particular era?

10    A.    Yes.

11    Q.    Tell the jury a little bit more about that, what era.

12    A.    So the one on the left there, that's 1986.  So you can

13    see some of the graphical animated components that are on that

14    program.  And if you look at the second one, that's from 1985.

15    And then you get in to the next one that's split between Penn

16    State and North Carolina State.  That's from 1967.  You can

17    kind of see the contrast between the first one and that one.

18    And you can just tell just by looking at it, it's a little

19    older.  You're not using as much color and the mascot images,

20    and it's a little more dull.

21          And then the last one there, that's from -- I'm not

22    sure what year that one's from.  That one looks to be in the

23    70s, and it's got some animation there with the mascot and

24    then some photography down at the bottom.

25    Q.    Okay.  Let's take a look at this next slide here.  What

121

1    do we see on the screen?

2    A.   So we've got more collectibles.  all but the one on the

3    far left are sports tickets, game tickets.  The one on the far

4    left, we call that a game schedule.  So that's showing the

5    schedule for Penn State in the 1947 season.

6    Q.   Okay.  And then how about here on this slide?

7    A.   These are two pennants.

8    Q.   Okay.  And lastly, with permission of the Court to

9    approach?

10             COURTROOM DEPUTY:  I don't think I have these

11   numbers.

12             MR. FETTERS:  D-200 and D-201.  Move to admit.

13             MS. WHEATLEY:  No objection.

14             THE COURT:  Duly admitted.

15             COURTROOM DEPUTY:  I don't have the next ones

16   either.

17             MR. FETTERS:  I thought I covered those.  I'm

18   sorry.  D-218, D-219, D-220, D-224.

19             MS. WHEATLEY:  No objection.

20             THE COURT:  Duly admitted, and you may publish, as

21   well.  You also may approach the witness.  Go ahead.

22             MR. FETTERS:  Thank you.

23   BY MR. FETTERS:

24   Q.   Mr. Hartvigson, what is it that I just handed you and

25   that the jury is looking at on their screens?

1    A.    These are decals and stickers.

2    Q.    Is there anything notable about any of these decals or

3    stickers?

4    A.    Yes.  The one in the lower left corner, this one here,

5    this one's really unique.  This is from the early 1930s.  And

6    the sports collector that I purchased this from is -- he is in

7    Berkeley, California, just off of Telegraph Avenue across the

8    street from the University of California.  And I think he has

9    a citation from the books of world records as being the

10   largest collector in the world of music -- of music posters.

11   And for record album jackets.

12          And he's a musician himself.  He is a creative

13   artist.  And through his collections that he sells there in

14   his brick and mortar store.  He at some point in time started

15   to collect sports decals.

16          And so he has -- this might be self-proclaimed, but

17   he has what he's calls the largest sports collectors --

18   sticker decals in the world.  And so we've printed -- we've

19   purchased quite a few sports decals from him.  And so this is

20   one of my favorites that we've purchased from him.  I don't

21   think this is a depiction that I've seen.  And he told me this

22   is the rarest of the collectibles of the decals that he had.

23   So we acquired this from him.

24   Q.    Thank you, Mr. Hartvigson.  You can set those to the

25   side.

123

```
1              So you've discussed the idea for Vintage Brand.
2    You've covered now the acquisition of Vintage Brand's
3    collection of 2500 different items of sports memorabilia.
4    What's the next step of actually getting this business going?
5    A.   So we had to take those sports collectibles and manually
6    scan each one.  It's a very tedious process to scan it.  And
7    then once it's scanned, it gets uploaded to our database.  And
8    then we have to go through it and enhance those images.
9              So a lot of these images are very old.  You know,
10   the one I just showed you is nearly a hundred years old.  We
11   have to make sure that the colors are right, that there's no
12   water damage, there's no blemishes on it.  And some of the
13   lines between the colors have to be reinforced in order for
14   those images to be reproduced on additional items.
15   Q.   The process that you just described, is that a time
16   consuming process?
17   A.   Yes.  Very time consuming.
18   Q.   Would you be able to estimate how much time was invested
19   into that?
20   A.   Yeah.  Well, just to give you an idea, we have 25,000
21   images that we've taken and put on our server.  And over six
22   years, we've had the time to put up 15,000 of those images.
23   There's still another 10,000 that we haven't been able to get
24   to.
25   Q.   Now, other than just the time limitations, are there
```

 1    other reasons why you may not scan an item or even if you do

 2    scan an item, not actually use it as a Vintage Brand product

 3    offering?

 4    A.   Sure.  So like I shared with you, a lot of this is

 5    purchased on E-Bay.  So we'll see the image on a computer

 6    screen, buy it.  It shows up, and I would have it all shipped

 7    to my house.  And I would look at everything and inspect it

 8    when I received it.  And there are quite a few things that

 9    contain copyright notices.  So we would take those, throw it

10    downstairs in the basement.  And everything that was usable, I

11    would take to the office and then the team would scan them.

12    Q.   Can we take the PowerPoint presentation down just to --

13    stop publishing to the jury.  I think there might be one more

14    slide that I didn't ask about.

15          This is D-183, D-202, D-204, and D-207.

16          MS. WHEATLEY:  No objection.

17          THE COURT:  You're moving for admission only at

18    this point?

19          MR. FETTERS:  Yeah.  Move to admission D-183,

20    D-202, D-204, and D-217.

21          THE COURT:  Duly admitted.

22          MR. FETTERS:  Permission to publish?

23          THE COURT:  You may publish, as well.

24    BY MR. FETTERS:

25    Q.   Now, Mr. Hartvigson, what are we looking at here?

ROUGH DRAFT    125

1  A.   So these are additional Penn State sports collectibles

2  that I published.

3  Q.   Okay.  Just because vintage brand has an item of

4  memorabilia, I think I asked you, does that mean that it ends

5  up on the website.  Do you know if the designs from these

6  items of memorabilia made it up onto the Vintage Brand

7  website?

8  A.   So these designs did not make it up, and the reason why

9  is through the process of evaluating these images, we

10  determined that these are marks that the school is currently

11  using.

12  Q.   And the button on the right just says Penn State.  There

13  really isn't any additional artwork.  Does Vintage Brand offer

14  any products across the board that are just the names of a

15  university or just text alone?

16  A.   No.

17  Q.   All right.  Now, you touched on already the image

18  enhancement process.  Is what the jury is looking at on the

19  screen -- and let's go ahead and take that down.

20        So what we're looking at -- Mr. Hartvigson, can you

21  identify what we're looking at here on the screen?

22  A.   Yes.  These are sports collectibles on the left, and on

23  the right, that's the enhanced version of the graphic.

24  Q.   Okay.

25        MR. FETTERS:  Your Honor, I'd move to admit D-236,

1    D-254, D-9, and D-8.

2            MS. WHEATLEY:  No objection.

3            THE COURT:  Duly admitted.

4            MR. FETTERS:  Permission to publish.

5            THE COURT:  You may publish, as well.

6    BY MR. FETTERS:

7    Q.    So again, Mr. Hartvigson, is there demonstrating the

8    image enhancement process from left to right?

9    A.    Yes.

10   Q.    Okay.  All right.  I think we can take down the

11   PowerPoint.  Thank you.  So we've now walked through the

12   process of acquiring the vintage sports collectibles, scanning

13   those collectible, enhancing those collectible.  Let's now

14   talk about the Vintage Brand website.

15           Can we bring up Plaintiff's Exhibit 263.  And I

16   believe this has been admitted already.

17           MR. FETTERS:  And permission to publish?

18           COURTROOM DEPUTY:  It has not been admitted.

19           MR. FETTERS:  Oh, it has not.

20   BY MR. FETTERS:

21   Q.    Mr. Hartvigson, do you recognize what -- what you see

22   here as Plaintiff's Exhibit 263?

23   A.    Yes.  This is the Vintage Brand home page.

24   Q.    All right.  Is this a screenshot of the Vintage Brand

25   home page?

1  A.    That is correct.

2         MR. FETTERS:  Move to admit Plaintiff's Exhibit

3  263.

4         MS. WHEATLEY:  No objection.

5         THE COURT:  Duly admitted.

6         MR. FETTERS:  Permission to publish

7         THE COURT:  And you may pub lush to the jury.

8  BY MR. FETTERS:

9  Q.    Okay, Mr. Hartvigson, by now, the jury has seen quite a

10 bit the Vintage Brand home page.  I don't want to belabor T.

11 Built let's go through it with your guidance.

12        So first thing, let me ask you this.  What is the

13 Vintage Brand website, the URL?

14 A.    WWW dot Vintage Brand dot com.

15 Q.    Are Vintage Brands's products sold any where other than

16 at the URL you just described?

17 A.    No.  We only sell products on our domain at Vintage Brand

18 dot com.

19 Q.    Okay.  So I'd like you to point out some of the features,

20 how this home page is generally organized, if you could just

21 give the jury an orientation of how this is laid out, please.

22 A.    Sure.  So if you look at the top of the left corner of

23 the page, you'll see the Vintage Brand logo with our V and the

24 name Vintage Brand.  And then as you see across the top, the

25 navigation there, you'll see different channels or categories

1  that we sell, historical images in.  So the first one is

2  college.  And then baseball, football, and basketball.  So

3  those are all different historical images or different teams

4  and colleges.  And then we have vintage athletes.  Those are

5  vintage athletes who have helped us help create their own

6  personal brands.  And so we've created those brands for them

7  and share up to 50 percent of the sales with them directly.

8        And then in the More area, that's has additional

9  things.  We have historical items for the Orange Bowl, the

10  Rose Bowl, the Fiesta Bowl and then a lot of famous boxing

11  events that have happened over the last 100 years.

12  Q.   And if we scroll down to the top college designs, there's

13  a grouping of products there.

14        Let me first ask, do any of the products that we

15  see here on the Vintage Brand home page, do any of those

16  actually exist right now?

17  A.   No.  So none of the products on Vintage Brand website

18  actually exist.  These are all dynamic, meaning that they're

19  made on demand with images and products.  And once a consumer

20  places an order for these products, then we actually print

21  that product in our facility and send it directly to the

22  consumer.

23  Q.   And the artwork that we see on these t-shirts, did that

24  artwork derive from memorabilia items?

25  A.   Yes.  All of the artwork you see here came from

1  historical images and sports collectibles.

2  Q.   It looks like top college designs what's top college

3  designs mean?  Why is that there?

4  A.   If you -- are you asking if you clicked on that?

5  Q.   Yeah.  Exactly?

6  A.   If you clicked on that link right there, that button that

7  says shop college, then you would go to a page that has

8  hundreds of different colleges and images showing all those

9  images that consumers have liked the most on a single page.

10  Q.   And the product mock-ups we see here on these t-shirts,

11  is that artwork all related to a single university or team?

12  A.   No.  Those are all different colleges there.

13  Q.   Okay.  And if we scroll down a little bit, please.  The

14  next one or heading -- we can actually go down to the next

15  page.  It's split a little bit.  But yeah, retro sweatshirts.

16  If I were to click on that, what mighty see?

17  A.   It would be very similar.  You would click on it and you

18  would see hundreds of different sweatshirts with different

19  historical images from all different teams.

20  Q.   Okay.  And then scrolling down a little bit.  It looks

21  like the next section there is favorite tees.  What's that a

22  hyperlink to?

23  A.   This hyperlinks to some of our best sealing tee shirts,

24  again, with historical images from all different colleges.

25  Q.   And then scrolling down a little bit more, it looks like

1  new Vintage designs.  What would that go to?

2  A.   So this would go to the newest designs that we've

3  uploaded into the website.  So if you wanted to come back and

4  I've already gone through all the pages, which would be very

5  difficult because there's quite a few pages.  But if you came

6  back and just want to see what he's new, those are all

7  highlighted in that section.

8  Q.   Okay.  And then we can scroll down kind of toward -- keep

9  going.  Keep going.  Yeah kind of toward the bottom, the

10 Contact Us is kind of what I'm looking for.  Let's pause here

11 for a second.  It looks like this may be customer reviews; is

12 that right?

13 A.   That's correct.

14 Q.   Tell the jury a little bit about how --

15          MS. WHEATLEY:  Objection.  Hearsay.

16          MR. FETTERS:  I'm going to ask him the process

17 about how uploading the customer reviews worked.

18          MS. WHEATLEY:  Objection.  They're up here on the

19 screen.

20          MR. FETTERS:  This isn't offered to prove the

21 matter asserted.

22          MS. WHEATLEY:  Objection.  Can we take this down.

23          THE COURT:  Who is it displayed to at this point?

24          MR. FETTERS:  It's been admitted.

25          MS. WHEATLEY:  It's to the jury, but he is

1    obviously displaying the customer reviews.  He doesn't need to

2    display them to talk about how they are uploaded.

3              MR. FETTERS:  The document's been admitted.  It's

4    not being offered to prove the truth of the matter asserted.

5              THE COURT:  It's being offered for what purpose?

6              MR. FETTERS:  That customers have the ability to

7    submit reviews, and ultimately, the next question is can

8    customers reach out contact Vintage Brand.

9              MS. WHEATLEY:  402 and 403 for the fact that

10   customers can submit reviews.  I don't see the relevance at

11   all.

12             THE COURT:  The objection is noted.  It's

13   overruled.  You may -- you may display and you may question

14   the witness regarding this exhibit.

15             MR. FETTERS:  Thank you, Your Honor.

16   BY MR. FETTERS:

17   Q.   Is there a way for customers to submit reviews on the

18   Vintage Brand website?

19   A.   Yes.  All of the pages allow for reviews, and we actually

20   encourage reviews.  So after you order a product from us, we

21   ask you to give a review at that point about the shopping

22   experience.  And then after you receive the product, we send

23   you both a text message and an e-mail asking for your honest

24   review.  As an online business, our business is scrutinized

25   more than a brick and mortar retailer.  Online, somebody can

1    go in and do a review.

2         If somebody is looking to buy something here, they

3    can easily click on a button and go and look at the reviews.

4    It's very easy to find.  So if we're not getting good reviews,

5    if we going to run a successful business, we want to make sure

6    we're doing a really good with service.  We want to make sure

7    we're doing a really good job with quality.

8         And we ask for reviews.  And one of the reasons is

9    we're offering so many different images, and we're offering so

10   many different products, that if something is not working well

11   and somebody has a problem with it, we want to know so we can

12   go back and look at it.  And if we're getting multiple poor

13   reviews for a certain image or a certain product, we can go

14   back and pull that off and make sure that it's not out there

15   and nobody else has that experience.

16   Q.   Does Vintage Brand have the ability to edit the text of

17   reviews that are posted?

18   A.   Yes, we can.  But one of the biggest challenges --

19        MS. WHEATLEY:  Objection, Your Honor.  I'll renew

20   the objection.  Now he's talking about the ability to edit the

21   reviews.  They're hearsay, and I don't see the relevance .

22   402. 403.

23        MR. FETTERS:  We're not offering it to prove the

24   truth of the matter asserted.  We're just offering it for the

25   circumstances in which Vintage Brand might remove it or review

 1  if.  The witness would testify about those types of

 2  circumstances.  That's all it's being offered for.

 3          THE COURT:  Objection's noted.  It's overruled.

 4  You may display the to the witness.  Go right ahead.

 5          THE WITNESS:  Can you repeat the question?

 6  BY MR. FETTERS:

 7  Q.  Yeah.  Does Vintage Brand have the ability to either edit

 8  or remove a review?

 9  A.  Yeah.  So there's two components to it.  If someone's

10  using it as a service review saying hey, how do I return

11  something, we don't want that being posted.  It doesn't have

12  anything to do with the product.

13          Contrary to that, we want negative reviews to be on

14  the site.  If you have a poor experience, we want to know.  If

15  something doesn't fit, we want to know.  If the image isn't

16  working, we want to know.  And we want to know if the

17  description is well.  One of the largest challenges you have

18  as an online apparel retailer is sizing and fabrication.

19          So we're so used to being able to touch apparel

20  items that you we buy and we're so used to being able to try

21  something on at a brick and mortar store that we don't get

22  that opportunity online.  So we rely on the customers to be

23  able to tell other customers their experience and what they

24  think.  So if somebody is looking for a thick sweatshirt and

25  they receive it and it's a thin sweatshirt, we want those

ROUGH DRAFT    134

```
 1   voices heard so the next consumer will say oh, this is a thin
 2   sweatshirt.  Maybe I want to try to find something a little
 3   thicker.  So we use those customer reviews to help.  And we
 4   also use them to help improve our business.
 5   Q.   Now, down here at the bottom, it looks like there's a
 6   Contact Us hyperlink; is that right?
 7   A.   Yes, that's correct.
 8   Q.   And I think we have another screen shot that would show
 9   what you would go to if you clicked that.
10          Can we go ahead and take the presentation down,
11   please.  And if you could pull up Plaintiff's Exhibit 264.
12   Mr. Hartvigson, do you recognize this screenshot?
13   A.   Yes, I do.
14   Q.   What is it?
15   A.   That the contact page for consumers to contact Vintage
16   Brand.
17   Q.   All right.
18          MR. FETTERS:  Move to admit exhibit Plaintiff 264.
19          MS. WHEATLEY:  Objection.  But I understood it was
20   already admitted.
21          MR. FETTERS:  Oh, if it's already admitted, then I
22   withdraw that.
23          THE COURT:  Mrs. Rhinehart?
24          COURTROOM DEPUTY:  No, it's not.
25          MS. WHEATLEY:  It's not.  Then objection for the
```

1  hearsay reasons that I articulated earlier.

2          MR. FETTERS:  It's a way to submit contact e-mails

3  to the company.  It's not hearsay.  It's not being offered for

4  the truth of the matter asserted.  It's to explain how

5  customers, prospective customers can send communications to

6  Vintage Brand.

7          MS. WHEATLEY:  He just articulated that it is being

8  submitted for the truth of the matter asserted, which is the

9  -- this is the way you can submit this information.

10          MR. FETTERS:  This is a screenshot of a website.

11  This is not being offered -- there have been multiple

12  screenshots of the Vintage Brand website displayed throughout

13  the Plaintiff's case.

14          THE COURT:  Objection noted.  Overruled.  Go ahead.

15          MR. FETTERS:  Permission to publish?

16          THE COURT:  You may publish, as well.

17          COURTROOM DEPUTY:  And it's admitted?

18          THE COURT:  Yes.  It is admitted.  The objection to

19  the admission is overruled and you may publish to the jury.

20          MR. FETTERS:  Thank you.

21  BY MR. FETTERS:

22  Q.   Mr. Hartvigson, can you please explain again what we see

23  on the page?

24  A.   Yes.  That's the contact page for consumers to contact

25  Vintage Brand.

ROUGH DRAFT                                                        136

1   Q.   Okay.  Is there an e-mail address that's listed here?

2   A.   Yes, there is.

3   Q.   And what is that e-mail address?

4   A.   Customer service at shop Vintage Brand dot com.

5   Q.   And what is meant by direct message?

6   A.   Direct message is a chat message.  So nine hours a day,

7   Monday through Friday, our customer service team is there.  If

8   you want to chat live with an agent, you can do that.  And

9   then seven days a week, you can send an e-mail in and our goal

10  is to respond to those e-mails within 24 hours.

11  Q.   As part of this litigation, did you do any investigation

12  in terms of whether Vintage Brand had e-mails or chat messages

13  from customers related to artwork relating to Penn State?

14  A.   Yes, I did.

15  Q.   And do you know if those e-mails and chats were produced

16  to the University in the course of had litigation?

17  A.   Yes, they were.

18  Q.   Did you personally review those communications yourself?

19  A.   Yes, I did.

20  Q.   Okay.  We can take this one down.  Now, before we get in

21  to discussion of the Vintage Brand pages related to Penn

22  State, I want to back up first and talk about do you know

23  generally the time frame when those web pages on the Vintage

24  Brand website featuring artwork related to Penn State, when

25  those became live and accessible to the public.

1   A.   Yes.  That would have been April of 2018.

2   Q.   Okay.  And then did those web pages come down for any

3   reason, and if so, when?

4   A.   Yes.  We took those down in August of 2021.

5   Q.   Why did you do that?

6   A.   Penn State filed a federal lawsuit in June of 2021.  And

7   we made the decision to take down the Penn State historical

8   images pending the outcome of the complaint.

9   Q.   And after Vintage Brand took those web pages related to

10  artwork related to Penn State down, did Vintage Brand

11  thereafter put them back up?

12  A.   Yes.  We were asked to put those back up in February of

13  2022, pending a discovery in this case, so both sides could

14  take screenshots of the website.

15  Q.   And about how long would you estimate that they were up

16  in February, 2022?

17  A.   I believe it was about two weeks.

18  Q.   Okay.  And then so after that two-week period, did they

19  go back down?

20  A.   Yes, they did.

21  Q.   Okay.  And then after that, did they -- those web pages

22  go back at any point?

23  A.   Yes.

24  Q.   When was that?

25  A.   I think it was in August and September of 2023.

1   Q.   Of 2023 or 2024?

2   A.   2024.  I'm sorry.

3   Q.   And what was the purpose for that?

4   A.   That was when both sides, Penn State first requesting

5   sample products be manufactured and printed for trial.

6   Q.   And you've seen various witnesses hold up Vintage Brand

7   products throughout trial.  Is that what you're referring to,

8   so that those products could be manufactured?

9   A.   That is correct.

10  Q.   All right.  I want to talk about a very specific period,

11  and that's the summer of 2022.  Do you know if the Vintage

12  Brand web pages with artwork relating to Penn State were live

13  and accessible to the public in the summer of 2022?

14  A.   No, they were not.

15  Q.   How sure are you?

16  A.   I'm 100 percent sure.

17  Q.   You were here when Meghan Maffey testified via video

18  deposition; is that correct?

19  A.   That is correct.

20  Q.   If we could bring up Plaintiff's Exhibit 73, which I

21  understand has already been admitted and publish to the jury.

22  Now, do you recognize this to be the e-mail that Ms. Maffey

23  discussed in her video deposition?

24  A.   Yes.

25  Q.   And do you see the date that's placed on this e-mail at

ROUGH DRAFT    139

1    the top right?

2    A.    Yes.  It's August 1st, 2022.

3    Q.    Okay.  Do you recall what she said in terms of when she

4    believes she visited the Vintage Brand website?

5    A.    Yes.  It was either on that date or a few days before

6    that.

7    Q.    Okay.  And is it possible that Ms.  Maffey viewed the

8    Penn State-related web pages or any designs on the Vintage

9    Brand website related to Penn State in the summer of 20 22?

10   A.    No.

11   Q.    How sure are you?

12   A.    I'm 100 percent sure.

13   Q.    Now, do you recall Ms. Maffey also testifying that --

14   well, let me ask you this.  Just because the Vintage Brand web

15   pages with artwork related to Penn State were down, was the

16   rest of the Vintage Brand website up, the home page, for

17   example, the pages represented to other schools?

18   A.    Yes, it was.

19   Q.    Okay.  So it's possible that Ms. Maffey viewed other

20   aspects of the site?

21   A.    Yes.  That is correct.

22   Q.    Do you recall Ms. Maffey testifying also that she

23   recalled seeing the chipmunk logo and the paw print logo?

24   A.    Yes, I do.

25   Q.    Did you have occasion to hear other witnesses testify and

ROUGH DRAFT

140

1    identify the look of those two logos?

2    A.    Yes.

3    Q.    Has Vintage Brand at any time sold or offered, put on its

4    website any designs featuring the chipmunk logo?

5    A.    No.

6    Q.    Has Vintage Brand put up on its website or offered to

7    sell at any time any products featuring the paw print logo?

8    A.    No.

9    Q.    Okay.  All right.  Let's take a look now at a screenshot

10   of the Vintage Brand designs relating to Penn State.  So if we

11   could put up Defense Exhibit 13.  And I believe this has been

12   admitted.  It may be a different version.  Do you recognize

13   this screenshot, Mr. Hartvigson?

14   A.    Yes, I do.

15   Q.    What is it?

16   A.    This is a page on the Vintage Brand website featuring

17   historical images of Penn State.

18   Q.    Okay.

19            MR. FETTERS:  Move to admit Defense 13.

20            MS. WHEATLEY:  Can you can you scroll so I can see

21   the whole thing?  Is that the entire --

22            MR. FETTERS:  There should be more.

23            MS. WHEATLEY:  No objection.

24            THE COURT:  Duly admitted.

25            MR. FETTERS:  Request to publish?

```
1              THE COURT:  You may publish.
2              MR. FETTERS:  We can go back up to the top there.
3    Thank you.
4    BY MR. FETTERS:
5    Q.   So again, Mr. Hartvigson, what is it now that the jury is
6    looking at?
7    A.   This is a page on the Vintage Brand website that features
8    historical images of Penn State.
9    Q.   Okay.  And again, as we did with the home page, can you
10   just orient the jury to sort of the layout of this -- these --
11   of this web pages in a general sense?
12   A.   Yeah.  So at the top, you'll see different product
13   categories.  Going left to right, t-shirts and sweatshirts and
14   hats.  That's the very top there, that's different categories
15   that you can go to.  So you could -- if you clicked on
16   colleges, there's roughly 350 different colleges featured on
17   the website with historical images for each of them.  And then
18   if go across the top, baseball would be -- there's major
19   league baseball teams in there with their historical images.
20              And then you go to football.  There's NFL teams in
21   there with their historical images.  If you go to basketball,
22   there's NBA teams with their historical images.  And as you
23   come down the page, there's -- you can go to different product
24   categories, and that would start to segment out these images
25   that you see on the page of what's available at each one of
```

ROUGH DRAFT

142

```
1    these product categories.

2    Q.    Okay.  And is it currently clicked to the All setting?

3    A.    It is.

4    Q.    And what -- because that's clicked, what is the result?

5    A.    You're seeing all of the products that are available with

6    historical images of Penn State.

7    Q.    Okay.  And you can go and eliminate that.  And just to

8    give the jurors a sense of what those product offerings are,

9    if you could scroll at, you know, a leisurely pace down so

10   they can a sense of that.

11            Now again, are any of these products in existence

12   right now in a general sense?

13   A.    No.

14   Q.    Are these, then, just digital mock-ups?

15   A.    That's correct.

16   Q.    And it seems as though we see a wide variety of different

17   artwork from memorabilia; is that correct?

18   A.    Yes.

19   Q.    So what's the point of having a landing page like this

20   for -- from your perspective, what's the point of organizing

21   it this way for the consumer?

22   A.    Well, a consumer can look at this page and scroll down

23   and see all the different images and graphics that are

24   available.

25   Q.    Okay.  I see there's a 30 percent off discount code.  Can
```

1  you just explain to the jury generally how Vintage Brand's

2  discounting works?

3  A.   Yeah.  So this was taken sometime ago.  We currently have

4  another offer on the site.  Everything's 50 percent off.

5  We're making everything on demand, so it's extremely

6  efficient.  We're trying to provide products at the lowest

7  price point we can for consumers.  So here, this is showing

8  the products are 30 percent off.  You can see that in --

9  underneath each image, you've got a red highlighted prices.

10  What the price is -- the price of each item on the page there.

11  Q.   Now I see a heading.  It says Penn State Nittany Lion

12  designs.  Do you see that?

13  A.   Yes.

14  Q.   Why is it called that?  What is the purpose of that?

15  A.   That's a header.  And it's a description of what is on

16  the page.

17  Q.   A description of the products?

18  A.   Yes.

19  Q.   Okay.  And is there -- can we zoom on that, please,

20  Brock.  That red box that you just -- and what's written

21  underneath that description of the products?

22  A.   It reads Vintage designs not affiliated with, licensed,

23  or sponsored by any college, team, or league.

24  Q.   Now, Mr. Hartvigson, we're looking at pdf screenshots of

25  the website, right.  Is that -- is that exactly how the

1  consumer is going to see this and experience this when they're

2  either on their web browser on on their mobile phone?

3  A.   No.

4  Q.   How -- what would be some of the differences between

5  looking at screenshots here in court and what it might look

6  like on a computer or a mobile phone?

7  A.   Yeah.  So the page is stretched out a lot longer here.

8  If you were to look at this on your phone, it's a lot thinner,

9  so the phone gets about this thin.  (Indicating).  What we've

10 done is we've put the -- what we call the disclaimer there

11 that's highlighted on the page, we've made that in the largest

12 possible print that we could possibly do to get it on your

13 phone.  We don't want you to have to scroll across and read

14 that disclaimer.  We want you to see the whole thing.  So we

15 put it as large as we could possibly can to get that entire

16 message on your screen.  So it's on the top of the page.  It's

17 one of the first thing that you see.

18 Q.   Now, there's also above the version -- the disclaimer,

19 there's highlighted there what looks like there's a scrolling

20 box above that.  Can you tell the jury what that is?

21 A.   Yeah.  So that's what we would consider marketing.  That

22 is talking about what's available at Vintage Brand.  So it

23 goes through and talks more about the products and the

24 categories specifically that we sell.  And within that, we

25 also included additional disclaimers.

ROUGH DRAFT

145

```
1              So in case you miss it in one spot and you want to

2    look and see what else is available on the website, there's an

3    additional disclaimer in there.

4    Q.    Okay.  And because, again, this is a pdf screenshot as

5    opposed to the real thing, are we able to scroll through this

6    version that we see right now?

7    A.    No.  Not on this flat pdf.

8    Q.    And we can go ahead and take that down.  And then just

9    for the witness and Counsel's benefit and the Court's, can we

10   put up Defense 321(b) please.  Do you see that?

11   A.    Yes.

12   Q.    And what do you recognize this verbiage to be?

13   A.    This is the marketing verbiage that was in that scroll

14   down that you highlighted.

15   Q.    Okay.  So what I would ask for you to do is please read

16   that aloud for the jury.

17   A.    Shop Penn State Nittany Lions Vintage designs for

18   apparel, clothing, gear, and merchandise for all sports

19   Fanatics at the Penn State Nittany Lion shop on Vintage Brand

20   dot com.  Vintage Brand is not affiliated with the Penn State

21   Nittany Lion book store or the Penn State Nittany Lions.  Shop

22   historic Penn State Nittany lions fan gear and Vintage college

23   apparel to give your team the ultimate home field advantage.

24   The Vintage Penn State Nittany Lion store has throw back

25   {nint} clothing and Vintage sports merchandise, including old
```

ROUGH DRAFT

146

1    school Penn State Nittany Lion mascots.  Visit hip Vintage

2    Brand to choose from thousands of retro sports, mascots and

3    Fanatics merchandise in the Penn State Nittany Lion sports

4    shop, including Penn State Nittany Lion t-shirts, sweatshirts,

5    hoodies, jerseys, long-sleeve shirts, hats, lids, socks,

6    koozies, mugs, drinkware, posters, canvas, pennants, and more.

7             Vintage Brand is not affiliated with the NFL shop,

8    Major League Baseball shop, the NBA store, or NCAA shop.

9    Find the ultimate selection of vintage Penn State Nittany

10   Lions football jerseys, baseball jerseys, or basketball

11   jerseys for all sports Fanatics.  Visit the Penn State Nittany

12   Lions sports store on Vintage Brand today.

13            Thank you, Mr. Hartvigson.  Who made the decision

14   to include disclaimers on the Vintage Brand website?

15   A.   That would be me.

16   Q.   Why?

17   A.   We wanted to make it very clear that we were not

18   affiliated, associated, sponsored by Penn State.  That we do

19   not have a license with Penn State, and that Penn State, in no

20   way or form guarantees the quality of the Vintage Brand

21   products, nor does Vintage Brand have a license with Penn

22   State.

23   Q.   Are there any pages on the Vintage Brand website that

24   lack this disclaimers like the one that you just read?

25   A.   No.  Every single page contains four different

**ROUGH DRAFT**

1    disclaimers.

2    Q.    On any page of the Vintage Brand website, are there

3    statements proclaiming to offer officially-licensed

4    merchandise?

5    A.    No.

6    Q.    Does Vintage Brand offer any officially-licensed

7    merchandise?

8    A.    No.

9    Q.    All right.

10          MR. FETTERS:  All right.  We can take that one

11   down.

12   BY MR. FETTERS:

13   Q.    Let's take a look now as to a specific page of artwork

14   relating to Penn State.  Can would pull up for the witness,

15   Counsel, and the Court only Defense Exhibit 13.

16          My apologies.  Let me move forward here in my

17   outline.  Let's go to Defense Exhibit 11.

18          All right, Mr. Hartvigson, hopefully you can see

19   that on your screen.  Do you recognize what you're seeing here

20   often the screen?

21   A.    Yes, I do.

22   Q.    What is it?

23   A.    It's a Vintage Brand page on the website that's featuring

24   a mug with a historical image of Penn State.

25   Q.    And, Brock, if you could just scroll down for Counsel and

ROUGH DRAFT                                          148

1    the Court's benefit to see the page.  I believe there's a

2    second page, as well.

3              Move to admit Defendant's Exhibit 11, please.

4              THE COURT:  Any objection?

5              MS. WHEATLEY:  No objection.

6              THE COURT:  Duly admitted.

7              MR. FETTERS:  Move to publish

8              THE COURT:  And you may publish.

9    BY MR. FETTERS:

10   Q.   Mr. Hartvigson, can you describe for the jury what

11   they're seeing on the screen, what we're looking at here?

12   A.   Yeah.  This is a page on the Vintage Brand website that's

13   featuring a mug with a historic image of Penn State.

14   Q.   I want to ask you a question first.  There -- toward the

15   top left under the black discount bar, it says leagues,

16   college teams.  Do you see where I'm looking at, the -- yeah.

17   Q.   What is the purpose of that?  Why is that there?

18   A.   That's referred to as a bread crumb.  And so that's a

19   common practice on all websites, particularly in a retail

20   websites.  So it allows the consumer to see where they are in

21   the shopping experience.

22   Q.   Okay.  I won't bring up the exhibits of the memorabilia

23   item, but hopefully folks remember there was a decal with

24   artwork that looks similar to this; is that right?

25   A.   That's correct.

```
 1    Q.    Maybe you have it next to you there.  Do you know --
 2    what's the exhibit number on that?
 3    A.    219.
 4    Q.    Okay.  Exhibit 219.  So is that what we're seeing on the
 5    product page on the screen, is that an enhanced image that
 6    derived from the decal that's to your right?
 7    A.    That's correct.
 8    Q.    And then so the right of the image on the mug, there's
 9    words that says 1950 Penn State Nittany Lion mug with some
10    text beneath that.  What is generally -- why is that language
11    there on the right?
12    A.    That's a historical description of the image.
13    Q.    Okay.  Let's start first with the 1950 Penn State Nittany
14    Lions mug description.  Why does it say 1950?
15    A.    Because we believe this image originated from 1950.
16    Q.    And can you remind the jury what Vintage Brand's sort of
17    standard practice and procedures were to investigate when the
18    images from sports memorabilia, to your best estimate, were
19    first put out?
20    A.    Yeah.  So we -- you know, we have a historical dating
21    process.  We go through a variety of references on the
22    Internet.  I think I shared sports logos dot net, different
23    sports collectors, E-Bay listings and cross reference those
24    listings to come up with a date that we establish and publish
25    on our website.
```

1   Q.   Okay.  And it looks like underneath that description,

2   there's another disclaimer; is that right?

3   A.   That's right.

4   Q.   What's that disclaimer say?

5   A.   It says by Vintage Brand is not affiliated with or

6   sponsored by Penn State Nittany Lion.

7   Q.   Okay.  And then below that, there's a description -- I

8   won't ask you to read it entirely to the jury, but are you

9   familiar with what this description entails?

10  A.   Yes.

11  Q.   Can you just summarize that for the jury?

12  A.   Yeah.  It basically outlines the history of the Nittany

13  Lion mascot and how that name came about.

14  Q.   Okay.  And were you here when Ms. Esposito was

15  testifying?

16  A.   Yes, I was.

17  Q.   Did you hear her have a critique as to this description?

18  A.   Yeah.  I think we agreed on how it originated, Joe Mason

19  in 1907, a former baseball player.  I think the discrepancy

20  was in -- in our description.  It says that he was embarrassed

21  that they used the name that he created.  And she countered we

22  that he was excited, so, this came from public sources, you

23  know, so I -- I'm not sure.  We would be glad to correct that,

24  in that's easily to be corrected.

25  Q.   On that point, if the customer or not even a customer

1    were to communicate, send an e-mail to Vintage Brand,

2    suggesting that something be corrected, would that be

3    something that Vintage Brand would consider and I do?

4    A.   Oh, we would love that.  That's, you know, we call that

5    crowd sourcing from consumers.  The more information they can

6    provide us, great.  If there are historical errors in

7    descriptions or anything on the website, yeah, we want to hear

8    that.

9    Q.   Okay.  Now, describe how the verbiage we've been looking

10   at describes the image on the mug.  Let's scroll down a little

11   bit, Brock.  I see a section, product detail.  Keep going.  I

12   don't think we need to zoom in on.  But what's the general

13   purpose of product details?

14   A.   That's the description of the physical product outside of

15   the image.  So here, you know, it's a -- how many ounces the

16   mug is, what's the, fabrication.  It's a ceramic much.  It's

17   lead-free and it's microwave safe.

18   Q.   Okay.  And we can keep going, scrolling down.  What do we

19   see here?

20   A.   These are additional products that same image is

21   available on.

22   Q.   Okay.  And what would happen if someone were to click on

23   these products?  Would that hyperlink to another product page?

24   A.   Yes.  We would end up on a product page for that item

25   that looks very similar to this, but you would just have that

1   product featured on the page.

2   Q.   Okay.  We can go ahead and take this exhibit down, Brock.

3   Thanks.  Now, if we could bring up for Counsel and the Court,

4   Plaintiff's Exhibit 302, please.  And, Mr. Hartvigson, do you

5   recognize what's on the screen?

6   A.   Yes. Yes, I do.

7   Q.   What is it?

8   A.   These are two Vintage pennants.

9   Q.   And I don't plan to show anything other than right here.

10  But I can scroll down if you'd like to see more.

11          MS. WHEATLEY:  If that's all you're showing --

12  well, actually, if you're going to admit it, I should see it.

13          MR. FETTERS:  Can you zoom out and scroll down so

14  Ms. Wheatley can see it, please.

15          MS. WHEATLEY:  No objection.

16          MR. FETTERS:  Move to admit Plaintiff's Exhibit

17  302, please.

18          MS. WHEATLEY:  I have no objection.

19          THE COURT:  Duly admitted.

20          MR. FETTERS:  Move to publish.

21          THE COURT:  You may publish.

22  BY MR. FETTERS:

23  Q.   So now the jury is seeing what you're seeing,

24  Mr. Hartvigson.  Can you repeat again what we're looking at?

25  A.   These are Vintage pennants.  The product mockups that we

ROUGH DRAFT

```
 1  eon the Vintage Brand website, did these derive from sports
 2  memorabilia owned by Vintage Brand?
 3  A.   Yes, they do.
 4  Q.   Okay.  Let's take a look at that -- let's go ahead and
 5  take that down, Brock, and bring up for the witness only
 6  Plaintiff's Exhibit 245.  And what is it that you see at
 7  Plaintiff's 245?
 8  A.   I see the physical sports collectable pennant.
 9  Q.   And is this an actual memorabilia owned by Vintage Brand?
10  A.   That's correct.
11           MR. FETTERS:  Move to of admit Plaintiff's Exhibit
12  245.
13           MS. WHEATLEY:  No objection.
14           MR. FETTERS:  And publish.
15           THE COURT:  You may publish.
16  BY MR. FETTERS:
17  Q.   This is an item of memorabilia within Vintage Brand's
18  collection?
19  A.   Yes.
20  Q.   Okay.  And then we can take that down and then bring up
21  Plaintiff's Exhibit 247, please, for the witness only.  Do you
22  recognize this, Mr. Hartvigson?
23  A.   Yes.  This is another Vintage pennant.
24  Q.   Owned by Vintage Brand within its collection of
25  memorabilia?
```

ROUGH DRAFT                                                                154

```
1   A.    Yes.

2   Q.    Okay.

3              MR. FETTERS:  Move to admit --

4              COURTROOM DEPUTY:  It's already admitted.

5              MR. FETTERS:  Move to publish

6              THE COURT:  You may publish.

7   BY MR. FETTERS:

8   Q.    Okay.  With this in mind, I want you to bring back to the

9   screen shot of the pennants from the Vintage Brand website and

10  I want to ask -- well, let me ask you first.  Were you -- did

11  you hear witnesses describe that there were some errors in the

12  Vintage Brand product that derived from this pennant?

13  A.    Yes, I did.

14  Q.    And what is your explanation for those errors?

15  A.    Yes.  So those were human errors.  The pennants were a

16  late edition to the collectible that we've added to the

17  website.  One of the challenges with the pennants is the

18  dimensions.  They're extremely long.  So when we put those on

19  a scanner to scan, we have to do three scans of that pennant.

20  So it's about this long.  The scanner is only so big.  And so

21  we were manually scanning all of those.  It appears that the

22  state portion of this pennant, the last third of that product

23  was omitted from the scan.  And so we have one individual

24  scanning, and that's going into a database file.  And then

25  there's whole other group of people that are doing the
```

1  enhancements.  So somebody received a partial -- the scanned

2  pennant, not knowing that there was an additional portion of

3  it.  And it produced that and published it to the website.

4  Q.    Okay.  You can take that down.  In the course of this

5  trial, have you become aware of any other errors in relation

6  to the scanning enhancement process as it relates to the

7  artwork relating to Penn State?

8  A.    Yes.

9  Q.    What is that?

10  A.    There was a TM that was left on the S lion image on the

11  Vintage Brand website.

12  Q.    When you say it was left on, what do you mean by that?

13  A.    So the collectable that we used, the decal for the S

14  lion, it had a T.M. on the original artwork, and that T.M.

15  should have been removed from that image before we published

16  that to our website.

17  Q.    All right.  So now we've talked about the Vintage Brand

18  memorabilia, the website, the product pages and the individual

19  product page.  What happens next if a consumer clicks add to

20  cart and enters their payment information.  Does the consumer

21  receive a payment confirmation, something like that?

22  A.    Right.  So as soon as you place an offered, you receive

23  an order confirmation.  So first you'll see a screen that said

24  your order's been accepted.  You'll receive an e-mail in your

25  e-mail box that's from Vintage Brand.  That gives you tracking

**ROUGH DRAFT**

156

order, tracking information.  And then it gives you contact

information if you have a problem, how to contact us through

e-mail or through chat.  And then if you provided your phone

number in the process of checking out, we send you a text

message as well from Vintage Brand.  And then we will send you

an additional text message when your order actually ships so

that you have the tracking information, and we also send an

e-mail with that same tracking information.

Q.   What's a typical time line between order and delivery of

the product for Vintage Brand?

A.   We create the product within two days and we ship it via

US postal service, and from our facility in Nashville,

Tennessee, that reaches 99 percent of the country within three

days.

          So if you're in the Midd West or East Coast, you're

probably going to get it in one to two.  If you're in Seattle

or California, it's going to be about three days shipping

time.

Q.   All right.  Let's talk a little bit more about how

Vintage Brand's products are actually printed and made.

          The general time frame that we're kind of focused

on in this litigation is 2008 to 2021, during that time frame,

did Vintage Brand manufacturer and print its own products?

A.   No, it did not.

Q.   Who did that?

ROUGH DRAFT

157

1    A.    Sportswear, Incorporated.

2    Q.    Why did Vintage Brand -- well, let me ask you this first.

3    Was that a contractor arrangement?  What was the actual nature

4    of that arrangement between he Sportswear and Vintage Brand?

5    A.    That was a fulfillment agreement between Sportswear and

6    Vintage Brand.

7    Q.    What would be the -- what was included within the scope

8    of services provided by Sportswear within that fulfillment

9    agreement?

10   A.    So they would print and fulfill the orders, and they ship

11   those orders to the consumers, and they provided the service

12   on those orders and supplied the tracking information, or if

13   they had a problem with the order and wanted to return it,

14   they would process that.

15   Q.    Why did Vintage Brand contract with an outside company,

16   Prep Sportswear, to fulfill orders as opposed to just starting

17   its own manufacturing facility on day one?

18   A.    So Vintage Brand was a new company.  We were investing

19   all of our resources in finding collectibles, historical

20   images, and then building our new technology on the web to be

21   able to have a website that could handle all of our images,

22   and so our focus was really 100 percent on what we call the

23   front end, meaning the website and getting all of that built

24   out.  What we didn't want to do is also try and spend the time

25   finding a location to print, acquiring all the equipment,

1    hiring people, training people, and trying to get the best

2    quality product out there.

3            We felt like our best chance of success was to

4    really focus on the service side with the website, and let

5    somebody who had the quality control in place to really do the

6    manufacturing on the back end.  It also reduces the investment

7    risk that you have to make up front.  We're already investing

8    millions of dollars on the front end to build this stuff and

9    acquiring collectibles.  No sense in going out and building a

10   fulfillment center when we weren't sure if the business would

11   be successful.

12   Q.   And does the Vintage Brand at the present continue to

13   contract with Sportswear for fulfillment?

14   A.   No, it doesn't.

15   Q.   Who prints Vintage Brand's products?

16   A.   Vintage Brand prints all of their own products out of a

17   facility in Nashville, Tennessee.

18   Q.   How many people are employed at that facility?

19   A.   There's 30 people there presently

20   Q.   All right.  Let's back up again to the period of 2018 to

21   2021 and you talked already about how the application process

22   of printing Vintage Brand's products.  Let's talk about where

23   the actual fabric and shirts, things like that come from.

24           Where do -- where did Sportswear get those

25   underlying blanks, like.  T-shirts?

ROUGH DRAFT

1   A.   So we've been working for about 14 years with Berkshire

2   Hathaway.   That's the ninth largest company in the United

3   States, primarily owned by Warren Buffett.   He owes Fruit of

4   the Loom, Russell Athletic, and Jerseys within his Berkshire

5   holdings.   They're based out of Bowling Green, Kentucky, so

6   it's only about 120 miles south of our Louisville facility.

7   So we've been working with them very closely for the last 14

8   years to utilize their manufacturing facilities to acquire

9   blanks, meaning, like, a blank white t-shirt or a sweatshirt

10  that we then print on.

11  Q.   What quality control measures, if any, did Sportswear

12  employ and implement when it came to printing and

13  manufacturing Vintage Brand's products?

14  A.   So the facility in Louisville is quite complex.   There's

15  91,000 square feet.   We have $15 million worth of printing

16  equipment in there.   We have had as many as 250 employees in

17  there.   There's been times in November and December where we

18  are operational 24 hours a day, seven days a week.   And so

19  it's really built out with a lot of people in different work

20  stations and workloads.

21         So we have a portion within the facility where

22  there's people that pick product, and what that means is they

23  go around and they pick a blank product that somebody's

24  already ordered, like, say, a white t-shirt, and it flows

25  through the facility.   And the next place it hits is what we

1    call QC, and that stands for quality control.  And so it's
2    whole -- we have 10 people on that line, and they take those
3    blank products, and all they're doing is looking to make sure
4    that blank product is good.  And what I mean by good is
5    sometimes in a warehouse facility, if a white t-shirt is
6    dropped on the floor, it will get a dark mark on it.  Or
7    sometimes we'll get a t-shirt that has a hole in it.  So
8    they're going through inspecting that garment to make sure
9    that it's good to print on.  We don't want to -- we want to
10   get that out before we spend the time and effort and money to
11   print on it.  So we're checking that up front.  So it's a
12   consumer control, but it's also a cost control for us.
13        Then it goes to the floor and gets printed.  After
14   it's printed, it flows up to another quality assurance work
15   flow table where they're actually looking at that printable
16   portion of the product, what we've printed on that product.
17   Is it straight; is it printed in the right location; and
18   making sure that the colors are right and that it's not
19   pilling.  And so once they've approved that, then that goes to
20   shipping.
21        So at shipping, that person's job is to scan that
22   tote, that that item's in, and then they get a full visual on
23   their computer screen that they can see.  So they're looking
24   at here's what the consumer thinks they've purchased, and
25   here's -- I have the physical item now in front of me.  So

1  they're making sure that it looks exactly like that image that

2  the consumer thinks they're going to receive.

3           And if that's all good, then they pack it in our

4  packaging and they ship it out the door.

5  Q.   All right.  Now let's transition a little bit to talk

6  more about the products that Vintage Brand actually sold --

7  well, actually, hang on.  Let me cover a subject that relates

8  to Sportswear.

9           When a consumer makes a purchase on the Vintage

10  Brand website, which company collects the money from the

11  customer?

12  A.   That would be Vintage Brand.

13  Q.   How would, if at all, is Sportswear compensated for the

14  fulfillment services that it provides Vintage Brand?

15  A.   So Vintage Brand would then take those proceeds and send

16  them to Sportswear.  Sportswear is manufacturing on Vintage

17  Brand's behalf, and then there's a revenue share back to

18  Vintage Brand.

19  Q.   Okay.  Now, let's talk about the actual sales that

20  Vintage Brand had on the products decorated with historic Penn

21  State imagery.

22           Can we pull up Plaintiff's Exhibit 29 for the

23  witness, please.  And I believe this has been admitted.  Okay.

24  This has been admitted, so we'll go ahead and publish it.

25           Do you recognize this, Mr. Hartvigson, and please

1    scroll down.  You might recognize the table that appears.

2    There we go.

3    A.    Yes, I do.

4    Q.    What is this?

5    A.    This is a table that we provided during discovery that

6    outlines all of the sales from historical Penn State images.

7    Q.    Okay.  Is this information that you compiled?

8    A.    Yes.  I compiled all of this.

9    Q.    All right.  If we could zoom in a little bit, and I'd

10   like to scroll through this just so the jury gets an

11   understanding of -- let's stay at the top of what products

12   Vintage Brand actually sold related to Penn State.

13         So maybe orient the jury.  What do we see here in

14   terms of the image that's in the left table, the left column.

15   A.    So in the left, you first see that -- the historical

16   image itself.  And then below that, you see that image number

17   that Vintage Brand uses to identify that image.

18         And then the next thing it shows are the dates that

19   that image was offered or sold on the Vintage Brand website.

20   And then we see the gross revenue.  So that's the revenue

21   number that consumers paid for those products.  And then the

22   next portion is the net profit, so that's the amount of money

23   that was made from that image.

24   Q.    Okay.  And then the next column, I see total items 356.

25   What does that refer to?

1  A.   That's the total number of items that were purchased with

2  this image on it.

3  Q.   Okay.  And then below that, does that give the blank

4  product type t-shirt, sweatshirt, the total number of blank

5  types that that artwork appeared on?

6  A.   Yes.  That's a breakdown of category, how many times that

7  image was produced on those different categories.

8  Q.   Okay.  And if we scroll down, please, Brock.  And just

9  for this line -- image, which I understand has been referred

10 to as the S lion logo.  You've heard that terminology?

11 A.   Yes.

12 Q.   How many total items were sold by Vintage Brand bearing

13 that artwork?

14 A.   170.

15 Q.   Okay.  And if we keep going down.  How about this item

16 here.  How many total items of this image?

17 A.   228.

18 Q.   Okay.  And the next one, please.  How about for this

19 image?

20 A.   139.

21 Q.   Okay.  Going down.  And for this image?

22 A.   25.

23 Q.   Okay.  And down, please.  For this image?

24 A.   60.

25 Q.   Okay.  And let me -- the image that we see there that's a

164

1   Lion's face and I like Penn State, was that one of the buttons

2   that you had to your right?

3   A.   Yes, it is.

4   Q.   Okay.  And scroll down, please.  This image here, how

5   many items were sold for that?

6   A.   32.

7   Q.   You were present when Ms. Petulla testified; is that

8   right?

9   A.   Yes.

10  Q.   Do you recall her testifying about a Beaver Stadium

11  puzzle?

12  A.   I do.

13  Q.   Is that this image here?

14  A.   Yes, it is.

15  Q.   Okay.  If Ms. Petulla had feedback in terms of how the

16  Vintage Brand product description could be modified to suit

17  their concerns, would that be information that Vintage Brand

18  would welcome and consider and potentially implement?

19  A.   Yes.  We would love that feedback.

20  Q.   Okay.  Let's go ahead and scroll down a little bit more.

21  How about for this image here?

22  A.   23.

23  Q.   Is this the Cotton Bowl or the Cotton Bowl buttons that

24  you have to your right?

25  A.   Yes.  That he is the Cotton Bowl from 1975.

1    Q.    Okay.  Scrolling down, please.  What image is this?

2    A.    This is an image of Beaver Stadium quite a while ago,

3    probably in the 60s.  We sold 26 of those items.

4    Q.    You say quite a while ago.  Does the stadium look a

5    little bit different now?

6    A.    Yeah.  It looks more like the college you went to.

7    Q.    All right.  If you scroll down a little bit more, please.

8    How many items for this artwork?

9    A.    25.

10   Q.    Okay.  Continue, please.  And for this artwork?

11   A.    Nine.

12   Q.    Continue now.  For this one?

13   A.    Five.

14   Q.    Next.  This one.

15   A.    26.

16   Q.    Next.  This one?

17   A.    8.

18   Q.    Next.  This one?

19   A.    40.

20   Q.    Okay.  Next one.

21   A.    12.

22   Q.    Next one, please.  This one?

23   A.    18.

24   Q.    I want to pause for a moment on this one.  Are you aware

25   of anything unique as it relates to this particular artwork?

1   A.   Yeah.  This is -- this is a really important image.  This

2   is something we specifically looked for and searched for.

3   Q.   And, Mr. Hartvigson, can I interrupt you for a second.  I

4   think we have a larger version of this image.  It's Defense

5   Exhibit 250.  Can we bring this down and just for the witness,

6   please.

7             Do you recognize Defense Exhibit 250?

8   A.   Yes.

9   Q.   What is it?

10  A.   This is a football schedule for the 1947 season.

11  Q.   Okay.  And is this within Vintage Brand -- this is one of

12  the enhanced images that Vintage Brand offered on its website?

13  A.   Yes.

14            MR. FETTERS:  I'd move to admit --

15            COURTROOM DEPUTY:  This is already admitted.

16            MR. FETTERS:  Oh, it's already admitted.  Publish

17  to the jury, please.

18  BY MR. FETTERS:

19  Q.   All right.  I interrupted you, Mr. Hartvigson.  Please

20  continue.  What is the significance, as you understand it, of

21  this image?

22  A.   So this both a historic image to Penn State as a

23  university and to this country, as a whole.  This Penn State

24  team in 1947, this team is -- there are stories about this

25  team from the start in 1946.  And the last game of the season

1  that season, they were headed to the University of Miami to

2  play their last football game.  And they were notified the

3  University of Miami was a segregated football team.  It means

4  it was only white players.

5          Penn State was notified that they had to leave

6  their black players at home if they were going to come to the

7  University of Miami and play that game.  The players

8  collectively decided that they would not go.

9          So then when the next season came around in 1947,

10  that same conversation came up.  And one of the players on the

11  team that was an offensive linemen, he stood up and said, We

12  are Penn State, and these conversations are over.

13          Penn State went on to play that season in the

14  Cotton Bowl, and that was the start of desegregation in

15  American sports.  And it also was the start and the origin of

16  the We Are Penn State cheer.

17  Q.  All right.  Thank you, Mr. Hartvigson.  If you can go

18  back to Plaintiff's Exhibit 29 where we left off with this

19  image.

20          How many items were sold featuring this artwork?

21  A.  18.

22          MR. FETTERS:  Permission to approach?

23          THE COURT:  You may.

24  BY MR. FETTERS:

25  Q.  I'm showing you what's been marked for identification at

```
 1    Plaintiff's Exhibit 298.  Please just look at that to yourself

 2    for now.  Do you recognize that?

 3    A.    Yes.

 4    Q.    What is it?

 5    A.    It's a canvas of that image.

 6    Q.    Is that -- is that a Vintage Brand product?

 7    A.    Yes, it is.

 8              MR. FETTERS:  Move to admit.

 9              MS. WHEATLEY:  No objection.

10              THE COURT:  Duly admitted.

11              MR. FETTERS:  Okay.  Move to display to the jury.

12              THE COURT:  You may display.

13    BY MR. FETTERS:

14    Q.    All right.  You can go ahead and display that,

15    Mr. Hartvigson.

16              So that artwork, you only sold 18 products.  What

17    kind of products were those that you had sales for?

18    A.    We sold two canvas wall arts, one metal wall art, four

19    posters, five magnets, one cutting board, and five puzzles.

20    Q.    Okay.  18 sales.  How much gross revenue from that

21    artwork?

22    A.    $263.13.

23    Q.    That amount of sales and that amount of revenue, do you

24    have -- is that a success for Vintage Brand?  Is that a

25    failure?  Is that a product failure?  What's Vintage Brand's
```

ROUGH DRAFT
169

```
1   view on that type of sale of revenue?
2   A.   So because of the efficiency of the manufacturing process
3   that we put together with the technology we developed, once we
4   have that image, we can make all these things cost
5   effectively.  And so we make money off each incremental item
6   that we sell.  So our goal is to have a large selection of
7   items for people to purchase.  And we're looking to make just
8   a little bit of money off of each one.
9            So from an economic standpoint, you know, we made
10  money.  But more importantly, from a historical preservation,
11  we've preserved not only this image, we've preserved this
12  story for other people to tell later in life.
13  Q.   All right.  And let's just quickly move through the rest
14  of these items.  How many sales for that?
15  A.   Five.
16  Q.   Okay.  And down.  For this image.  How many sales?
17  A.   Ten.
18  Q.   Next.  How many sales?
19  A.   Five.
20  Q.   Okay.  For this image?
21  A.   Zero.
22  Q.   Okay.  And then there's another table down below.  We can
23  kind of skip down.  And this -- for this -- this image, how
24  many sales?
25  A.   Zero.
```

ROUGH DRAFT                                                          170

```
1    Q.   Okay.  Next, for this image?

2    A.   Zero.

3    Q.   Okay.  Next, for this image?

4    A.   Zero.

5    Q.   Okay.  Next for this image?

6    A.   Zero.

7    Q.   Okay.  Next?

8    A.   Zero.

9    Q.   And the next one?

10   A.   Two.

11   Q.   Okay.  And the next one?

12   A.   Six.

13   Q.   And the next?

14   A.   11.

15   Q.   Okay.  And anymore?  For this image?

16   A.   11.

17   Q.   And the next one?

18   A.   12.

19   Q.   Okay.  The next one.  The last one?

20   A.   Three.

21   Q.   All right.  We can take that down.  Thank you.

22            THE COURT:  Mr. Fetters, I don't want to interrupt

23   the flow of your examination.  I assume you have a little more

24   for this witness?

25            MR. FETTERS:  Yeah.  We're going to talk about
```

1    product samples, shipping and product samples, and that's the

2    end of this witness.

3            THE COURT:  I think we ought to take a short recess

4    at this point.  Ladies and gentlemen, we'll stand in recess

5    for about 10 minutes.  Court will rise.

6            (At 4:06 p.m., the jury left the courtroom and a

7             recess was held.)

8            (At 4:25 p.m., the jury entered the courtroom.)

9            THE COURT:  Back on the record now after our late

10    afternoon recess.  Mr. Fetters, you have some additional

11    questions for this witness.

12            MR. FETTERS:  Yes, Your Honor.

13            THE COURT:  Go right ahead.

14    BY MR. FETTERS:

15    Q.    If you could bring up for the witness, the Court, and

16    Counsel, Plaintiff's Exhibit 323, please.  Mr. Hartvigson, do

17    you recognize this document?

18    A.    Yes.

19    Q.    What is it?

20    A.    This is a Vintage Brand website, and it's a page

21    featuring historical image of Penn State.

22    Q.    And if you could just scroll down for Counsel and the

23    Court's benefit.  And if we could go back up.

24            MR. FETTERS:  Move to admit Plaintiff's Exhibit

25    323.

ROUGH DRAFT

172

1         MS. WHEATLEY:  No objection.

2         THE COURT:  It will BE admitted.

3         MR. FETTERS:  Move to publish.

4         THE COURT:  You may publish.

5    BY MR. FETTERS:

6    Q.   Mr. Hartvigson, we talked about the T.M. symbol earlier,

7    and I just wanted to go back so the jury could see that.  Is

8    this what you were talking about, that T.M. symbol

9    inadvertently retaining on that t-shirt?

10   A.   Yes.  That's correct.

11   Q.   The description that you have there also, what is the

12   date that Vintage Brand has identified for this artwork?

13   A.   1950.

14   Q.   How did Vintage Brand go about landing on that date?

15   A.   We used our historical data process, referencing

16   different images on the web, as well as looking at the sports

17   logos dot net website, and looking at E-bay dealers that were

18   offering different listings.

19   Q.   And were you here when Ms. Esposito testified about this

20   logo, the S lion logo?

21   A.   Yes, I was.

22   Q.   And does her testimony impact your view at all of the

23   date that's identified here by Vintage Brand?

24   A.   Yeah.  I think a more correct date is probably 1953 based

25   on some of the knowledge that we learned through her

ROUGH DRAFT

1   testimony.

2   Q.   Okay.  If we can go ahead and take that exhibit down.

3   Let's bring up Defense Exhibit 18 for the witness, please.  Do

4   you recognize Defense Exhibit 18, Mr. Hartvigson?

5   A.   Yes, I do.

6   Q.   What is it?

7   A.   That is orders, completed orders for Vintage Brand that

8   are wrapped in Vintage Brand-branded wrapping paper.

9   Q.   Okay.

10             MR. FETTERS:  Defense moves to admit D-18.

11             MS. WHEATLEY:  No objection.

12             THE COURT:  Duly admitted.

13             MR. FETTERS:  Move to publish.

14             THE COURT:  You may publish.

15  BY MR. FETTERS:

16  Q.   All right.  Now that the jury can see this, can you just

17  describe.  It looks like there's some wrapping paper around

18  something; is that right?

19  A.   Yeah.  So at the top you have socks that have been

20  imprinted, and they're in a wrapper.  But then below, what

21  Counsel's pointing out is that is an order that has been

22  wrapped in wrapping paper, Vintage Brand-brand wrapping paper.

23  So every order that comes through, we package it in individual

24  bags, and then we wrap it with branded crepe paper before it

25  goes in to a Vintage Brand-branded black bag.

ROUGH DRAFT

174

```
 1   Q.   Okay.  We can go ahead and take that down, please, and
 2   bring up for the witness D-20.  Do you recognize what this
 3   image depicts?
 4   A.   Yes.
 5   Q.   What is it?
 6   A.   That is a box with a Vintage Brand sticker on it.  Most
 7   likely that has some sort of drinkware contained in it.
 8   Q.   Okay.
 9           MR. FETTERS:  Move to admit Defendant's Exhibit 20.
10           MS. WHEATLEY:  No objection.
11           THE COURT:  Duly admitted.
12           MR. FETTERS:  Move to publish.
13           THE COURT:  You may publish.
14   BY MR. FETTERS:
15   Q.   Now that the jury can see it, is a sticker like that
16   typical for -- to be placed on cardboard boxes when shipping
17   products?
18   A.   Yes.  We place that on all of the boxes that ship direct
19   to consumer.
20   Q.   Okay.  We can go ahead and take that down and put up for
21   the witness Defendant's Exhibit 22, please.
22           Do you recognize this photo?
23   A.   I do.
24   Q.   What is it?
25   A.   That's a t-shirt highlighting the neck tag with the
```

```
1    Vintage Brand logo name imprinted on it.
2    Q.   Okay.
3              MR. FETTERS:  Move to admit D-22.
4              THE COURT:  Any objection?
5              MS. WHEATLEY:  No objection.
6              THE COURT:  Duly admitted and you may publish.
7    BY MR. FETTERS:
8    Q.   Again, Mr. Hartvigson, is the label that we see here
9    pretty typical of what Vintage Brand imprints on t-shirt
10   products?
11   A.   That's correct.
12   Q.   And what about Vintage Brand's other products,
13   sweatshirts, any number of products.  Does Vintage Brand
14   typically place its name and logo on all products?
15   A.   We -- from 2018 to 2021, we placed it on all products.
16   More recently, some of the flees, which means sweatshirts, we
17   have not been placing that -- that tag on the sweatshirts.
18   Q.   Is that an alternate tag?
19   A.   Yeah.  There's an alternate tag.  We use a sticker that
20   we put on the front, up here, (indicating) rather than on the
21   label.
22   Q.   Okay.  We can take that down and please put up for the
23   witness only Defense Exhibit 21.  Do you recognize what's
24   depicted in this exhibit?
25   A.   Yes.  That's a Vintage Brand hat.
```

```
 1              MR. FETTERS:  Move to admit D-21.

 2              MS. WHEATLEY:  No objection.

 3              THE COURT:  Duly admitted.

 4              MR. FETTERS:  Move to publish.

 5              THE COURT:  You may publish.

 6   BY MR. FETTERS:

 7   Q.   And is this typical in terms of placing a Vintage Brand

 8   sticker on hats, Mr. Hartvigson?

 9   A.   Yes.

10              MR. FETTERS:  Okay.  We can take that down.

11   BY MR. FETTERS:

12   Q.   Now, I'd like to transition to inspecting and just having

13   you show the jury some actual Vintage Brand product samples.

14   The first one that I'll show you has been marked for

15   identification as D-302.  Do you recognize that,

16   Mr. Hartvigson?

17   A.   Yes.

18   Q.   Maybe to speed things along, I might just bring these

19   items up and we'll do them together.  All right.  Go ahead and

20   take a look at those and just identify each of those objects,

21   what they are, what you recognize them.

22   A.   So I have a t-shirt.  Do you want hem to hold them up or

23   anything?

24   Q.   Not yet.  Just identify them.

25   A.   A t-shirt, Vintage Brand stainless steel mug.  A tumbler,
```

ROUGH DRAFT                                                177

1   and then coasters.

2   Q.   Okay.  And I believe those are all marked, and confirm

3   for me if that's correct, Mr. Hartvigson, D-302, D-300, and

4   D-348.  Is that what you have?

5   A.   Yes.

6   Q.   Okay.

7            MR. FETTERS:  Move to admit those exhibits.

8            MS. WHEATLEY:  No objection.

9            THE COURT:  Duly admitted.

10  BY MR. FETTERS:

11  Q.   Okay.  And if you would just please hold those up to the

12  jury and just briefly describe what they are.  You don't need

13  to spend a lot of time on it.

14  A.   Okay.  This is a stainless steel 8-ounce mug.  It's

15  imprinted with an imprint there on the front.  This is a

16  coaster that you would set a drink on a table.  All four of

17  these are a set.  They're all the same.  This is a canvas that

18  we can hang on a wall.  And this is a long sleeve t-shirt.

19  Q.   Okay.  And I believe there -- some of the packaging that

20  we saw on the photo there, maybe just hold that up for the

21  jury, as well.

22  A.   So this has already been opened, but this is what would

23  be been wrapped around that product.  That's crepe paper that

24  we wrap all the products in, branded with Vintage Branded.

25  Q.   Mr. Hartvigson, the exhibit number on the coasters,

178

```
 1  please?  Can you read that off?
 2  A.   351.
 3  Q.   Okay.  And I'm going to -- oh, let me ask you first.  The
 4  artwork that appears on those products, was that one of the
 5  stickers or decals that we looked at early on with the jury?
 6  A.   Yes.  It's right here.
 7           MR. FETTERS:  Permission to approach, Your Honor?
 8           THE COURT:  You may approach.
 9  BY MR. FETTERS:
10  Q.   Okay, Mr. Hartvigson, I believe I've just handed you
11  what's been marked for identification as 351, 354, and D-349.
12           Is that what you see in front of you?
13  A.   That's correct.
14  Q.   What are those?
15  A.   So we have a stainless steel --
16  Q.   Don't show them yet.
17  A.   Oh.  Stainless steel mug, t-shirt, and a koozie.
18  Q.   Okay.
19           MR. FETTERS:  Move to admit Exhibits 311, D-354,
20  D-349.
21           MS. WHEATLEY:  No objection.
22           THE COURT:  Duly admitted.
23           MR. FETTERS:  Permission to show the jury?
24           THE COURT:  You may publish, show the jury.
25  BY MR. FETTERS:
```

1    Q.   Okay.  Mr. Hartvigson, please explain just briefly for

2    the jury's benefit, each of those items.

3    A.   So this is a stainless steel mug.  As I point out, it's

4    hard to see from there, but there's an embossing here with the

5    Vintage Brand logo, the Vintage Brand's name is embossed into

6    the product.

7            This is a koozie so a can warmer or a can cooler, I

8    guess you'd call it.  So you'd put your drink in here.  And

9    then this is a t-shirt.

10   Q.   Okay.  You can put those to the side now, Mr. Hartvigson.

11   Okay.  As part of getting ready for this trial, did you also

12   personally purchase Penn State-related products that you

13   understood to be officially licensed by Penn State?

14   A.   That's correct.

15   Q.   Was one of those companies called Fanatics?

16   A.   Yes.

17   Q.   Do you have a general understanding of Fanatics before

18   making these purchase?

19   A.   Yes.  Fanatics has tried to acquire one of my other

20   companies three times.

21   Q.   What is your understanding of the general nature of the

22   products that Fanatics offers?

23   A.   It's basically put under their tag line, which is

24   officially licensed everything.

25   Q.   Okay.  And for the witness only, can you put up Defense

ROUGH DRAFT

180

```
1    Exhibit 267, please.  And just take a look, and we can scroll
2    down just to orient you to this document.
3              Does Defense Exhibit 267 look familiar to you?
4    A.   Yes.
5    Q.   What is it?
6    A.   That's a receipt for the products that I ordered from
7    Fanatics.
8    Q.   Okay.
9              MR. FETTERS:  Move to admit Defendant's Exhibit's
10   267.
11             MS. WHEATLEY:  No objection.
12             THE COURT:  Duly admitted.
13   BY MR. FETTERS:
14   Q.   All right.  We can just publish that just to show the
15   jury.  They see that now, and maybe just scroll down.
16             THE COURT:  You may publish.
17   BY MR. FETTERS:
18   Q.   It's in black and white.  Okay.  We can go ahead and take
19   that down, and I'm going to hand you what's been marked as
20   Defendant's Exhibit 269, 270, and 271.
21             Mr. Hartvigson, can you identify what those
22   exhibits are?
23   A.   Yes.  It's three t-shirts.
24   Q.   Do those three t-shirts correspond with the receipt that
25   we looked at a moment ago?
```

1    A.    Yes.

2              MR. FETTERS:  Move to admit Defendant's Exhibits

3    269, 270, and 271.

4              MS. WHEATLEY:  No objection.

5              THE COURT:  Duly admitted.

6              MR. FETTERS:  Permission to show the jury, Your

7    Honor.

8              THE COURT:  You may display to the jury.

9    BY MR. FETTERS:

10   Q.    All right.  Mr. Hartvigson, can you just take those

11   products out of the packaging and show them one-by-one to the

12   jury.

13             Can you describe that -- your general description

14   of what that is?

15   A.    Yes.  This is a Nike t-shirt with the Penn State name on

16   there and the Lion's head.

17   Q.    You say it's a Nike t-shirt.  How do you know that?

18   A.    Because the Nike logo is right on the front of the shirt,

19   and it's also here on the tag.

20   Q.    Okay.  Is there an officially-licensed hologram sticker

21   on that name tag at all?

22   A.    Yes.  That's right here.  (indicating)

23   Q.    Okay.  And the next product you have?

24   A.    This is another Nike t-shirt with Penn State printed on

25   the front.

1  Q.   Okay.  This is going to sound obvious, but how do you

2  know it's by Nike?

3  A.   Nike's prominently placed on the front, and there's a

4  Nike swoosh right there on the neck tag.

5  Q.   And the next product, please?

6  A.   And there's a license hologram there.  (indicating)

7  Q.   And what is that shirt?

8  A.   This is another Nike t-shirt, the Nike name and swoosh

9  there on the upper left.  And then it says Penn State

10  Football.

11  Q.   Okay.  Is there an officially-licensed hologram sticker

12  on that product?

13  A.   Yes, there is.

14  Q.   Okay.

15  A.   And there's a Nike tag, as well.

16  Q.   Okay.  I think this product may also have corresponded

17  with that receipt.

18          MR. FETTERS:  Permission to approach, Your Honor?

19          THE COURT:  You may approach.

20  BY MR. FETTERS:

21  Q.   Do you recognize that product, as well?

22  A.   Yes, I do.

23  Q.   Does that correspond with the purchase receipt we looked

24  at earlier?

25  A.   Yes, it does.

1          MR. FETTERS:  Move to admit Defendant's Exhibit

2    273.

3          THE COURT:  Any objection?

4          MS. WHEATLEY:  No objection.

5          THE COURT:  Duly admitted.

6          MR. FETTERS:  Permission to show to the jury?

7          THE COURT:  You may display to the jury.

8    BY MR. FETTERS:

9    Q.   Mr. Hartvigson, can you please show that to the jury and

10   describe, generally, what that is?

11   A.   So this is a Champion t-shirt with Penn State Football

12   and the Lion's head printed on it.

13   Q.   How do you know it's by Champion?

14   A.   Their logo is on the neck tag.

15   Q.   Okay.  Is there officially-licensed --

16   A.   And their logo also appears on the sleeve.  (indicating)

17   Q.   Is there an officially-licensed sticker on that product?

18   A.   There is an officially-licensed hologram and a tag

19   telling you it's Champion's product.

20   Q.   Okay.  All right.  You can put those to the side,

21   Mr. Hartvigson.  All right.  Let's put up for the witness only

22   Defendant's Exhibit 277.  And so the Counsel and the Court can

23   see that, just scroll down for a bit for Mr. Hartvigson's

24   benefit.  Go back up.

25          Mr. Hartvigson, do you recognize Defense Exhibit

ROUGH DRAFT                                                184

1   277?

2   A.   I do.

3   Q.   What is it?

4   A.   That's a receipt from Nittany Outlet, products that I

5   ordered.

6   Q.   What's your understanding of what the Nittany Outlet is?

7   A.   I believe that's one of the retail store fronts here in

8   college -- near the college, and -- and they also sell online,

9   in the E-commerce site.

10  Q.   Do you have an understanding of whether the Nittany

11  Outlet sells officially-licensed Penn State products?

12  A.   Yes, they do.

13          MR. FETTERS:  Move to admit Defense Exhibit 277.

14          MS. WHEATLEY:  Could you just scroll down to the

15  second page?  Sorry.  Could you just scroll down to the

16  bottom?  Okay.  No objection.

17          THE COURT:  Duly admitted.

18          MR. FETTERS:  Move to publish.

19          THE COURT:  You may publish.

20  BY MR. FETTERS:

21  Q.   Again, Mr. Hartvigson, is this the receipt for the

22  Nittany Outlet purchases that you made?

23  A.   Yes, it is.

24  Q.   What's your characterization of the price comparison in

25  your view of these products from Nittany Outlet versus the

ROUGH DRAFT                                                    185

1    Fanatics products?

2    A.    So the t-shirts here are being sold at 14.99, very low

3    entry level price point, and the t-shirts that I just showed

4    you from Fanatics are selling more in the 34.99 to 39.99

5    range.

6              MR. FETTERS:  You can take that down.  Permission

7    to approach, Your Honor.

8              THE COURT:  You may approach.

9    BY MR. FETTERS:

10   Q.   Mr. Hartvigson, I'm handing you these exhibits.  If you

11   could just read the exhibit numbers for the benefit of the

12   Court.

13   A.    D-278, D-279, D-283.

14   Q.    And do you recognize those exhibits?

15   A.    Yes.

16   Q.    Do they correspond to the receipt that we just looked at?

17   A.    Yes, they do.

18   Q.    Okay.

19             MR. FETTERS:  Move to admit.

20             MS. WHEATLEY:  No objection.

21             THE COURT:  Duly admitted.

22             MR. FETTERS:  Permission to show to the jury.

23             THE COURT:  You may display to the jury.

24   BY MR. FETTERS:

25   Q.    Mr. Hartvigson, can you show the jury each of those

1  products?

2  A.   So it's a t-shirt that as Penn State on the front, and it

3  has the seal.

4  Q.   Do you know who made that shirt?

5  A.   Yes.  This is made by New Agenda on a Gildan t-shirt.

6  Q.   Are you familiar with Gulden?

7  A.   Yes.

8  Q.   What is Gulden?

9  A.   Gulden is a Canadian company.  They're the largest

10  t-shirt manufacturing company in the world.

11  Q.   And the next item that you have there?

12  A.   This is another Gulden t-shirt with Penn State printed on

13  it and the Lions head.

14  Q.   Okay.  And the next one?

15  A.   This is a Nike t-shirt, and this also has the Lion's

16  head.

17  Q.   Is there -- amongst the products that you've handled up

18  there that you understand to be from officially-licensed Penn

19  State retailers, have you noticed any difference in terms of

20  the look and feel of the product -- you know, the touch and

21  feel of the product?

22  A.   No.  There was one product that was more of a

23  moisture-wicking fabric.  The rest of them are all pretty much

24  the same.

25  Q.   Let's go ahead and take a look at Defendant's Exhibit 281

```
1   just for the witness.  Do you recognize Defendant's Exhibit

2   281?

3   A.    Yes, I do.

4   Q.    What is it?

5   A.    That's a receipt from the Family Clothesline that I

6   purchased apparel.

7   Q.    Okay.  And just scroll down for the benefit of Court and

8   Counsel.

9            MR. FETTERS:  Move to admit Defendant's Exhibit

10  281.

11           MS. WHEATLEY:  No objection.

12           THE COURT:  Duly admitted.

13           MR. FETTERS:  Move to publish.

14           THE COURT:  You may publish.

15  BY MR. FETTERS:

16  Q.    Again, Mr. Hartvigson, can you explain what that this is?

17  A.    This is a sheet showing the three items that I purchased.

18  Q.    Okay.  And what's your characterization of the price

19  points for these products in relation to the other ones that

20  we've looked at?

21  A.    So this is Nike and Under Armor products, and you're

22  paying 34 to $35 for the same t-shirts Gulden is selling at

23  $14.99.

24  A.

25           MS. WHEATLEY:  Objection.  602.  Foundation.
```

1          MR. FETTERS:  He just had the receipt up for the

2     last -- the last set of products.

3          MS. WHEATLEY:  What is his foundation for saying

4     it's the same t-shirt?

5          MR. FETTERS:  The Gulden.  Gulden.  Same underlying

6     like products.

7          MS. WHEATLEY:  But he has no foundation for saying

8     it's the exact same t-shirt.

9          MR. FETTERS:  Sounds to me like an item for cross

10    examination, not an evidentiary ruling.

11         MS. WHEATLEY:  Well, he has no foundation to make

12    that statement.

13         THE COURT:  What's the foundation?

14         MR. FETTERS:  That he understands that the product

15    manufacturer of the blank is Gulden across the board.  And I

16    believe that's what he's testifying to.

17         MS. WHEATLEY:  Mr. Hartvigson has laid no

18    foundation for his understanding of this third party company.

19         THE COURT:  Can you flesh this out a bit?

20         MR. FETTERS:  Yes.

21         THE COURT:  Objection sustained.  Go ahead.

22    BY MR. FETTERS:

23    Q.   Mr. Hartvigson, I think you testified previously that

24    you're aware of a company called Gildan; is that right?

25    A.   That's correct.

1   Q.   How did you become aware of the company called Gildan?

2   A.   I've been in the sports apparel industry for nearly 30

3   years.  Gildan is the largest manufacturer of t-shirts in the

4   world.  We've purchased products from Gildan over the course

5   of time.

6   Q.   Okay.  And have you had occasion to handle, touch, and

7   feel products manufactured by Gildan?

8   A.   Yes.

9   Q.   How many times?

10  A.   Thousands.

11  Q.   All right.  What -- can you repeat what you said?  What's

12  your impression of the touch and feel of the product quality

13  of the products that you have had up in front of you?

14  A.   They're very, very similar, if not the same.

15  Q.   Okay.

16          MR. FETTERS:  Permission to approach, Your Honor?

17          THE COURT:  You may approach.

18  BY MR. FETTERS:

19  Q.   I'm approaching the witness with what's been marked as

20  Defendant's Exhibit 284.  Do you recognize this?

21  A.   Yes.

22  Q.   What is it?

23  A.   This is the order that I placed with the Family

24  Clothesline.

25  Q.   Does that correspond with the receipt that we looked at?

1   A.    Yes, it does.

2           MR. FETTERS:  Move to admit.

3           MS. WHEATLEY:  No objection.

4           THE COURT:  Duly admitted.

5           MR. FETTERS:  Permission to show to the jury.

6           THE COURT:  You my display to the jury.

7   BY MR. FETTERS:

8   Q.    Mr. Hartvigson, first, can you pull -- well, let's take a

9   look at the box itself.  Does that identify where the -- the

10  box that it came from, Family Clothesline?

11  A.    Yes.  It came from Family Clothesline.  It's right on the

12  box.

13  Q.    And then the bag, did that come within the box?

14  A.    Yes.  It's in another Family Clothesline bag.

15  Q.    Okay.  And then go ahead.  The t-shirt itself.  What kind

16  of t-shirt is that?

17  A.    This is an Under Armor t-shirt.  You can tell by the

18  Under Armor logo on the front.  And then it says Penn State.

19  You also have an Under Armor tag inside the neck.  Also on the

20  back of the neck.  And also on the tag.  And then you have a

21  licensed hologram on there, as well.

22  Q.    Okay.  You can put that to the side.  We just have a few

23  more topics to cover, which I don't think will take very long.

24          Let me ask about Vintage Brand's advertising and

25  marketing.  Does Vintage Brand engage in any advertising or

ROUGH DRAFT

191

```
1   marketing.

2   A.   Can you repeat that question?

3   Q.   Yeah.  Vintage Brand, in terms of advertising or

4   marketing, like t.v. commercials, things like that, does

5   Vintage Brand engage in that?

6   A.   No.

7   Q.   Does Vintage Brand utilize Google marketing?

8   A.   Yes.

9   Q.   Google ads?

10  A.   Yes.  Yes.

11  Q.   How does that work?  What's the nature of Vintage Brand's

12  -- the services that Vintage Brand acquires through Google

13  ads?

14  A.   Yeah.  We use a program called Dynamic Search Ads, where

15  we provide Google with a budget each month.  And then they

16  send our ads out across their network to prospective people

17  that are doing searches on Google.

18  Q.   Does that involve key words of any sort?

19  A.   No.  We don't do any key word campaigns.

20  Q.   You know I just realized -- this is my neglect.  I should

21  have seen these here.

22           MR. FETTERS:  Permission to approach, Your Honor.

23           THE COURT:  You may approach.

24  BY MR. FETTERS:

25  Q.   I'm handing you what's been marked as Defendant's Exhibit
```

1    367.  Mr. Hartvigson, do you recognize that?

2    A.    Yes, I do.

3    Q.    What is it?

4    A.    This is a Hanes t-shirt with Penn State printed on it,

5    and the Lion's head.  The Hanes tag is here, and the hologram

6    officially-licensed is on the back.

7    Q.    Did you -- we need to move to admit that.  Did you -- how

8    did you come to acquire that t-shirt?

9    A.    I purchased that here in Williamsport when I arrived on

10   Monday evening across the street at Wegman's.

11   Q.    Okay.

12            MR. FETTERS:  Move to admit -- can you say the

13   exhibit number?

14            THE WITNESS:  D-367.

15            MR. FETTERS:  Move to admit D-367.

16            MS. WHEATLEY:  No objection

17            THE COURT:  Duly admitted.

18   BY MR. FETTERS:

19   Q.    All right.  I want to ask you first about -- I believe we

20   talked about marketing.  I wanted to ask you about did Vintage

21   Brand do any promotional trips to different sports stadiums in

22   the early days of its founding?

23   A.    Yes, we did.

24   Q.    Can you tell the jury about what the nature of that was?

25   A.    We visited some college football facilities on their

ROUGH DRAFT

193

1    college football game days, and we handed out Vintage

2    Brand-branded koozies for free to fans during their tailgating

3    activities.

4    Q.    Okay.  Did you have a trip out here to State College to

5    do that at Beaver Stadium?

6    A.    We did.  We visited Beaver Stadium on September of 2019.

7    Q.    Why did you go to Beaver Stadium as opposed to any other

8    stadium?

9    A.    We went to a few stadiums, but we chose Beaver Stadium

10   nine months in advance.  We felt -- there was a game in

11   September that we were very interested in.  Penn State was

12   playing Ohio State, and we thought that might be the college

13   Game Day of the week game.  It ends up it was.  Both teams

14   were undefeated.  Penn State was ranked ninth.  Ohio State was

15   ranked fourth.  And we came out here to that game.  We knew it

16   would be a fun environment and a good place to promote Vintage

17   Brand.

18   Q.    And when you were at Beaver stadium, were you wearing

19   Vintage Brand apparel?

20   A.    Yeah.  So we were wearing black Vintage Brand t-shirts,

21   so Vintage Brand printed on the front, black Vintage Brand

22   hats with Vintage Brand printed across the front, and we had

23   on black wristbands that said Vintage Brand.

24   Q.    The jury has seen, in the context of the expert survey

25   screenshots and actual product mockup with Vintage Brand on

ROUGH DRAFT                                                    194

1  the chest on the Vintage Brand website.  Does that -- does

2  Vintage Brand actually have that on its website?

3  A.   Yes.

4  Q.   Why?

5  A.   That's a very easy way for us to promote the brand, very

6  cheep and effective.  We view it as a wearable business card.

7  Q.   Just to wrap up, Mr. Hartvigson, this case is about

8  whether consumers are being misled in to thinking that Penn

9  State is responsible for the quality of Vintage Brand's

10 products.  So I'm just going to ask you that straight

11 question.

12         From your perspective, is Vintage Brand trying to

13 trick consumers in to believing that Penn State is responsible

14 for the quality of Vintage Brand's products?

15 A.   No.  I believe we make it very clear on the Vintage Brand

16 website that all the products are provided by Vintage Brand.

17 No products are made by Penn State.  No products are

18 affiliated with Penn State.  No products are sponsored by Penn

19 State.  And Penn State is definitely not held accountable for

20 the quality of the products.  Vintage Brand is held to the

21 quality of the products.

22         MR. FETTERS:  No further questions.

23         THE COURT:  Thank you.  Counsel, would you come to

24 sidebar for a moment, please.

25         (The following discussion occurred at sidebar.)

ROUGH DRAFT                                              195

```
 1              THE COURT:  That took longer than I anticipated,

 2    but that's fine.  I assume it will be best to get in to cross

 3    examination Monday morning because you're going to have a bit

 4    of cross examination for this witness.  Ms. Wheatley, you're

 5    going to examine, correct?

 6              MS. WHEATLEY:  Yes.

 7              THE COURT:  You're -- how much time are you going

 8    to have?  An hour-and-a-half.

 9              MR. FINKELSON:  We had estimated that we may have

10    need an hour and 45 when Mrs. Rhinehart asked us.  But we will

11    try to cut it down over the weekend.  And we would ask that

12    the witness be sequestered over the weekend.

13              THE COURT:  Yes.  I'll speak to him about that.  So

14    that's fine.

15              MR. FINKELSON:  We did have a couple of issues to

16    raise arising from the testimony.

17              THE COURT:  Do you want to address that outside of

18    the presence of the jury?

19              MR. FINKELSON:  Happy to.

20              THE COURT:  Why don't we do that --

21              MR. FINKELSON:  One relates to a limiting

22    instruction we're going to request in view of the copyright

23    related testimony that the witness gave.  But --

24              THE COURT:  All right.

25              MR. FINKELSON:  It's certainly fine for the jury to
```

1  be instructed on that on Monday.

2       THE COURT:  Understood.  So let's discuss that

3  momentarily.  All right.  I'll excuse them for the day then.

4  Hang on a minute.  Thank you.

5       (The discussion at sidebar was concluded.)

6       THE COURT:  All right.  Ladies and gentlemen, I've

7  spoken to Counsel.  Obviously there's going to be a bit of

8  cross examination for Mr. Hartvigson, as you'd expect.  So I

9  think it's best that we recess out for the day.

10      Again, there has been some media coverage of this

11 case.  Do not read or listen to any articles or discussion of

12 this case either in print, any website you should go to or

13 blog, I suppose if there's any blog, any radio or television

14 program.  Don't discuss the matter amongst yourselves.

15      We're going to recess until next Monday, which is

16 November 18.  Again, if you could be back in the courthouse by

17 about 9:15.  That day, we'll resume testimony from

18 Mr. Hartvigson by way of cross examination.  And then I think

19 the defense had their expert, would has been referenced,

20 Dr. Erdem, and then I think we'll be probably moving toward

21 the close of the Defendant's case on Monday, at least as the

22 attorneys have charted that out for me at this juncture.

23      So I wish you a pleasant weekend.  Save travels.

24 Mrs. Rhinehart, if you'll escort the jury out, please.

25      (At 5:00 p.m., the jury left the courtroom and were

ROUGH DRAFT
197

```
 1          excused for the weekend.)

 2          THE COURT:  Mr. Hartvigson, I invite you back to

 3  Counsel table.

 4          All right, so you -- somebody had a question,

 5  Ms. Wheatley, or you need some instruction from me or --

 6          MS. WHEATLEY:  Yes, Your Honor.  Two issues.  The

 7  first issue, the witness did mention copyright a number of

 8  times in regards to the criteria he applied to the images on

 9  his website.  We understood that to be within Your Honor's

10  order.  Your Honor did invite us to cross-examine the witness

11  vigorously on whether copyright can be a defense to trademark

12  law.

13          The issue in why we are requesting a limiting

14  instruction is that we know from Mr. Hartvigson's deposition

15  that he said very clearly his entire belief about trademark

16  law, his entire knowledge of trademark law came from advice of

17  Counsel, which of course is a door we cannot open.  They did

18  not assert that defense, and I certainly don't want to cross

19  examine on hearsay and the law, and the jury will have no way

20  to evaluate who is frankly right on the law between

21  Mr. Hartvigson and Mr. Myself having received no instructions

22  as to the law.

23          So our request would be a limiting instruction from

24  Your Honor that closely parallels that -- the comment in your

25  opinion as to the fact that copyright law was -- public domain
```

ROUGH DRAFT                                                198

 1  does not protect the Defendant's conduct here.  And then my

 2  cross examination could be on that instruction, to the extent

 3  I need to cross examine at all.

 4          THE COURT:  So you'd like me to open court, then,

 5  Monday with that -- that instruction as it were, a limiting

 6  instruction to the jury.

 7          MS. WHEATLEY:  Yes, Your Honor.

 8          THE COURT:  All right.  Who is going examine --

 9  well, Mr. Fetters, I guess that's really a question for you.

10  So any objection to that?

11          MR. FETTERS:  Well, I guess I would object to -- I

12  think that the witness said that all he did was look to see if

13  there's a C symbol and to remove that.  He didn't say that if

14  it did have that, it was entitled to certain right or that

15  Vintage Brand was entitled to certain protections.  He didn't

16  say that he understood what the legal significance of that to

17  be.  I think lay jurors understand, just generally, that C's

18  with circles exist in the world.  And so all he said was that

19  he looks for that, and he removes it.  He didn't make any

20  conclusion as to what significance that is.

21          THE COURT:  I think -- I think this doesn't amount

22  to a greet deal.  But I think a limited instruction -- sort of

23  a limited limiting instruction.  I'll craft that consistent

24  with my recent ruling of -- well, whenever it was, ten days

25  ago.  And if you'd like me to begin the discussion, just -- if

1   you'd remind me of that, Ms. Wheatley, and I will give them --

2   provide that limiting instruction before you begin your cross

3   examination of Mr. Hartvigson.

4           Anything else?

5           MS. WHEATLEY:  Thank you, Your Honor.

6           THE COURT:  Mr. Fetters, I'll hear from you in just

7   a moment.  Ms. Wheatley, go ahead.

8           MS. WHEATLEY:  The other issue was there was

9   extensive testimony during direct regarding other -- there was

10  extensive testimony during the direct examination regarding

11  other schools that both Prep Sportswear and Vintage Brand sold

12  products from, Vintage Brand, there were images shown of those

13  school's products.  For Prep Sportswear, there was discussion

14  of the many, many high schools he has sold for.  And in our

15  opinion, this very much opened the door to some limited cross

16  examination as to the fact that many, many of those schools

17  have issued cease and desist letters.  Many, of those school

18  have, in fact, sued Mr. Hartvigson and are not at all happy

19  that those logos are shown on those sites.

20          Without allowing that to happen, the conclusion is

21  inescapable that Penn State is apparently the only one that

22  thinks that this is unlawful, and that the conduct shown on

23  this website is typical and standard.  They did not have to

24  show or discuss that, but they did, and we think that the door

25  has been opened to show that Mr. Hartvigson has been asked to

 1   stop repeatedly and has been sued repeatedly.

 2          We would not get into the results of any lawsuit.

 3   We would simply limit it to establishing that he is doing this

 4   against the wishes of many of the schools whose products were

 5   shown in the Defendants' exhibits.

 6          MR. FETTERS:  Your Honor, the fact that Vintage

 7   Brand has product offers related to other university and pro

 8   teams is not some new piece of information that the jury heard

 9   about for the first time.  I said it in my opening statement

10   and slides -- in slides that were in my opening statement that

11   Penn State did not object to, did not object to during my

12   opening statement.

13          So even if this were a valid evidentiary argument,

14   it was waived.

15          But it's not a valid evidentiary argument.  There

16   is no unfair suggestion that because Vintage Brand or

17   Sportswear, an entirely different website, offered products

18   related to other schools, that that somehow opens the door to

19   other -- other cease and desist letters and other lawsuits.

20   It simply does not equate to that.

21          We did not suggest or assert that Penn State is the

22   only one that is doing this by saying that.  It was a

23   discussion of what the business model is, and what's available

24   on the Vintage Brand website, that frankly, both sides have

25   been talking about up until this point.  It's just simply not

1    a new issue.

2          So there -- if there is an issue from an

3    evidentiary perspective, it has been waived.  And -- but I

4    don't think it's an evidentiary issue to begin with that would

5    open the door to other cease and desist letters and other

6    lawsuits.  And of course if we do that, it's going to be a

7    mini trial within a mini trial on each of those, a discussion

8    of differences in circuit law for each of those different

9    matters, and this case will be prolonged.

10          THE COURT:  We're not going to do that.

11          So are you telling me you're going to go through

12   each of these schools and examine them?  I'm not going to let

13   that happen.  We'll be here until Thursday, and that's --

14   that's not the Matthew Brann approach to trial, if you haven't

15   figured that out already.  I advise you of that now.  We move

16   right along to the best of -- with my level of impatience,

17   which is masked, you know, as you can tell with a certain

18   amount of humor, but I'm impatient.  And you know what?  These

19   are just ordinary people.  So you've got to cut to the chase.

20   Get it out and move on to the next thing.  Trust me on this.

21   I know.

22          And do you know how I know.  I talk to the jurors

23   afterward.  And I've had -- I mean -- how many trials have I

24   had this year, Janel?  Seven?  Eight?  Something like that.  I

25   mean this is not my first rodeo.  I'm just passing that along

1  to you.  Maybe that was sort of lost on me as a practicing

2  attorney.  Believe me, it's not as a judge.  I'm helping you

3  out.  You just don't think so.  Well, everybody.  I'm helping

4  everybody out.

5          So I -- this is a closed question.  The question

6  itself -- I want to take it under advisement; I want to think

7  about that this weekend; I'll give you a ruling on that Monday

8  morning.  But to the extent I allow it, you can't go through,

9  well now, what about Bowling Green State University.  Geez, I

10 mean, we'll be here until next St. Swithin's Day in that case.

11         I mean broadly-speaking, yes, if I permit it at

12 all.  I haven't decide if I would.

13         MS. WHEATLEY:  Your Honor, I can give you a preview

14 of exactly what I would ask.

15         THE COURT:  Good.

16         MS. WHEATLEY:  I would point to the exhibit that

17 was shown and say this school has filed a lawsuit against you

18 trying to get you to stop, correct?  Done.  This one.  And use

19 this page.

20         THE COURT:  Which -- which page is it?

21         MS. WHEATLEY:  Plaintiff's Exhibit 263.

22         THE COURT:  Yes.  Hand that up.  How many -- how

23 many schools are listed?  I didn't even -- it's hard for me to

24 see that exhibit.

25         MS. WHEATLEY:  There are seven.

1          MR. FETTERS:  Your Honor, can I add two points?

2    One, again, that exact image was in my opening statement,

3    which was give to Plaintiff's Counsel, not objected to.

4          THE COURT:  Noted.

5          MR. FETTERS:  Number two, part of the likelihood of

6    confusion analysis in this case is the marketplace context on

7    the Vintage Brand website.  And one of the arguments that

8    we've made consistently is that because, amongst other things,

9    Vintage Brand offers historic memorabilia artwork related to

10   numerous teams, that that is one of the factors that we think

11   leads consumers to not be confused.

12         So to say that that piece of our likelihood of

13   confusion evidence opens the door to other cease and desist

14   and other lawsuits, we would object to that.

15         THE COURT:  No.  Understood.

16         MS. WHEATLEY:  And, Your Honor, but I think

17   Mr. Fetters just established the factual nexus that you were

18   looking for before you would allow any evidence of this type

19   in and saying this is the exact same thing he does they do

20   with Penn State.  And so that's all we would establish, and --

21         THE COURT:  I got it.  I got it.  I've got to think

22   that over.  That's -- that's, as I said, in my view, a close

23   question.  All right.

24         There's something else, Ms. Wheatley?

25         MR. FINKELSON:  We would just ask, as we did at

1  sidebar, that Mr. Hartvigson be sequestered.

2          THE COURT:  I'm going to give that instruction.

3  Mr. Fetters, you had something?

4          MR. FETTERS:  Yeah, it was just a dove tail on the

5  instruction for Monday.  We would just request permission to

6  hear it before its given and an opportunity to make a record,

7  if necessary.

8          THE COURT:  That's fine.  We'll take it up.  Just

9  -- I'll remember that, I think, but if I don't, just say to

10  Mr. Kempen, if he's out here or Mrs. Rhinehart that you want

11  to speak to me first.  We'll get that sorted out and we'll

12  make a record of that, to the extent that we need to.  And I

13  will give you -- I will also give you the ruling in camera or

14  outside the presence of the jury on this -- on this other

15  issue, without explaining further.  What else?

16          MR. FETTERS:  That's it, Your Honor.

17          MS. WHEATLEY:  Nothing further from us.

18          THE COURT:  All right.  Again I have taken under

19  advisement the Motion for reconsideration.  I know,

20  Mr. McKenna, you're working on briefing for that.

21          MR. MCKENNA:  That's right.

22          THE COURT:  What's that?

23          MR. MCKENNA:  I said that's right.

24          THE COURT:  Okay.  And to the extent that you -- do

25  you have a sense of -- I'm not pushing.  I'm just asking --

```
 1   when do you think you're going to have that to me?
 2              MR. MCKENNA:  Your Honor, I think this morning you
 3   said certainly you'd like it before the close of our case, and
 4   I would think we'll certainly aim to do that.
 5              THE COURT:  Yeah.  So we'll assume that that's
 6   going to come in at some point on Monday.  And to the extent
 7   that when you get it, if you think you need to reply -- yet
 8   you really don't.  Remember, while it's true, that when I'm
 9   reviewing matters -- judges do it different ways -- I tend to
10   read back to front.  It's kind of a curious thing.  So I'll
11   actually read the reply briefs and then I read the briefs in
12   opposition and then I read the brief in the support of the
13   underlying motion.  Let's say I have a Plaintiff's Motion for
14   summary judgment.  That's my style.  Some judges do it that
15   way.  That sort of makes sense to me to do it.
16              I have almost never read a reply brief that amounts
17   to anything.
18              MR. FINKELSON:  Let this be the first, Your Honor.
19              THE COURT:  Well, I knew there would be a Finkelson
20   response to that.  But I am telling you, I have never -- I
21   don't think I've ever read a reply brief that you've labored
22   over and the clients have paid God's knows how much money for,
23   that really amounts to anything.  It just doesn't move the
24   needle.  You know, the precompisition does, the underlying,
25   you know -- it's good briefing and your briefing is good.  I
```

 1  appreciate that.  But I wouldn't get energized about the reply

 2  and having to worry about writing that because I want to make

 3  a ruling on it, and I think I can, independently of this, I

 4  think independently.

 5          I've already done some research on this because

 6  it's a nuance question.  And, you know, there's a question

 7  about the manufacturing of it, all right, which is what my

 8  ruling is on.  There is also an end of it that deals with

 9  shipping.  You might want to pay to some shipping-related

10  issues.  See where we're going with this?  I don't know that

11  I've decided that.  But there's -- it's a very nuanced

12  question.  So with regard to the manufacturing, I'm

13  comfortable with my ruling with regard to the shipping

14  component.  It may be another matter worth taking under -- you

15  know, I remind you that there is no such thing for a Motion

16  for reconsideration in the Federal Rules of Civil Procedure.

17          Did you know that?  Did A.E. Dick Howard tell you

18  that in Virginia?  Well, if he didn't, I'm telling you that

19  now.  It doesn't exist, and yet, it's -- there are Motions for

20  reconsideration constantly.  I will reconsider, if I need to

21  reconsider.  I'm not above that, of course.

22          Now, anything else?  All right.  So you know where

23  we're going to go.  Monday morning, we'll come in; we'll make

24  those rulings.  We'll get you oriented.  We'll get

25  Mr. Hartvigson sorted around in terms of cross examination.

ROUGH DRAFT

```
1            Mr. Hartvigson, this is going to be hard sort of
2    for you to do, probably.  But you've got to be, unfortunately,
3    sequestered, you know, at this point from conversation with
4    your Counsel because you -- you know, we've taken a recess,
5    but you're really -- you're still are under oath and I've got
6    to take up cross examination.  It's not an ideal circumstance,
7    but it does happen.
8            So I just -- I give you -- I admonish you on that
9    point.  And to the extent Mr. McKenna and Mr. Fetters will
10   speak to you about that and explain to you what that means in
11   greater detail.  I'm sorry to put that burden on you, but
12   that's just the way we recessed out today.
13           The last thing I would say to you, and this is up
14   to you; this is not a directive; you can do what you want.
15   But, you know, if you haven't -- I know what you've been doing
16   probably.  I hate to think that you've been going over to
17   Wegman's to get those overpriced -- we're off the record.
18           (At 5:14 p.m., the proceedings were adjourned.)
19
20
21
22
23
24
25
```