# UNPUBLISHED OPINIONS

AVS Foundation v. Eugene Berry Enterprise, LLC, Not Reported in F.Supp.2d (2011)

2011 WL 6056903, 101 U.S.P.Q.2d 1256

2011 WL 6056903
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

AVS FOUNDATION and
Pittsburgh Steelers, LLC, Plaintiffs,
v.
EUGENE BERRY ENTERPRISE,
LLC and Eugene Berry, Defendants.

No. 11 CV 01084.
|
Dec. 6, 2011.

**Attorneys and Law Firms**

Bernard M. Schneider, Brucker, Schneider & Porter,
Pittsburgh, PA, for Plaintiffs.

William R. Ellis, Roetzel & Andress, Cincinnati, OH, for
Defendants.

*MEMORANDUM OPINION*

ARTHUR J. SCHWAB, District Judge.

### I. Introduction

 **\*1** This is an action for trademark infringement in violation
of the Lanham Act, 15 U.S.C. § 1125. Currently before this
Court is the Motion for Summary Judgment of the Plaintiffs,
AVS Foundation and Pittsburgh Steelers, LLC (collectively
hereinafter "Plaintiffs"). Doc. No. 29. The Court has reviewed
Plaintiffs' Motion for Summary Judgment, the memorandum
of law in support (Doc. No. 30), the parties' concise statements
of the facts (Doc. Nos. 31 and 48), Defendants' Brief in
Opposition to the Motion for Summary Judgment (Doc. No.
47), Plaintiffs' Reply thereto (Doc. No. 50), Defendants' Brief
in Opposition (Doc. No. 58), and Plaintiffs' Reply Brief
thereto (Doc. No. 61). For the reasons set forth below, the
Court will grant Plaintiffs' Motion for Summary Judgment in
its entirety.

### II. Factual Background

The following facts are material and undisputed unless
otherwise indicated herein.

For approximately the past 35 years, "The Terrible Towel®"
has been a symbol used by Pittsburgh Steelers fans. The
famous Pittsburgh sports writer and Pittsburgh Steelers
football broadcasting personality, Myron Cope, first owned
the trademarks for "The Terrible Towel®" products, and
subsequently these trademarks were given to the Allegheny
Valley School Foundation ("Foundation"). Plaintiffs in this
case are the Foundation, which is a Pennsylvania non-
profit corporation and a 501(c)(3) charitable organization,
and the Pittsburgh Steelers ("Steelers"), a Pennsylvania
limited liability company that has had exclusive right to
market and sell items bearing the Foundations trademarks. [1]
Since May 13, 2008, the Foundation has been the sole and
exclusive owner of the registered federal trademarks "The
Terrible™" and "The Terrible Towel®." [2] In addition, since
May 13, 2008, the Foundation has been using "A Pittsburgh
Original" in black and gold color palate on their products by
prominently featuring it on the merchandise with one of the
Foundation trademarks.

[1]    The Foundation uses the proceeds raised through
the sale of trademarked merchandise to support
the Allegheny Valley School, a Pennsylvania
nonprofit corporation and 501(c)(3) charitable
organization that provides homes, residential care
and habilitative services to intellectually and
developmentally disabled persons.

[2]    These trademarked items include: "The Terrible
Towel®"; "Myron Cope's Official The Terrible
Towel®"; "Myron Cope's Official The Terrible
Toddler Towel®"; "Myron Cope's Official The
Terrible Towel®" Apron; "Myron Cope's Official
The Terrible Toddler Towel®" Bib; "Myron Cope's
Official The Terrible Towel®" Cloth Vehicle Flag;
"Myron Cope's Official The Terrible Towel®"
Floor Mats; "Myron Cope's Official The Terrible
Towel®" Footballs; "Myron Cope's Official The
Terrible Towel®" Gloves; "Myron Cope's Official
The Terrible Towel®" Non–Textile Wall Hangings;
"Myron Cope's Official The Terrible Towel®"
Pillows; and "Myron Cope's Official The Terrible
Tote® ."

On May 13, 2011, Defendant, Eugene Berry Enterprise
("Enterprise") filed its application to register as a trademark,
"THE TERRIBLE T–SHIRT," with the United States
Patent and Trademark Office. On June 15, 2011, the
Foundation's legal counsel wrote to Enterprise's attorney

2011 WL 6056903, 101 U.S.P.Q.2d 1256

to inform it of the Foundation's trademarks and stated the Foundation's intent to oppose the application with a request for Enterprise to withdraw its application. However, despite the aforementioned request by Foundation, sometime during the week of August 15, 2011, Defendant asked National Retail Graphics to print tee shirts emblazoned with the words "THE TERRIBLE T–SHIRT A PITTSBURGH ORIGINAL" in a black and gold color palate. Before filling the order, Mark Cornman ("Cornman"), an employee of national Retail Graphics, indicated to Defendant, Eugene Berry ("Berry"), the sole officer and member of Enterprise, that he was familiar with the "The Terrible Towel®" trademark of the Foundation and asked Berry if he had any relation to the Foundation.

**\*2** In response, Plaintiffs allege that Defendants brought to National Retail Graphics a letter purporting to be from the Foundation that gave Defendants authority to produce and sell the aforementioned tee shirt, which Plaintiffs claim is fraudulent because Defendants did not have permission to use the mark. Acting on the belief that the letter was authentic, National Retail Graphics produced the t-shirts for Defendants, which Defendants subsequently began to sell.

Defendants claim that the letter was a proposal and that Mr. Mark Cornman (hereinafter "Cornman") who would get permission from the Foundation for Defendants because he had worked with the Foundation in the past. Defendants did not allege that they received a letter back from the Foundation with regards to permission to use the Foundations mark on a tee shirt, before they sold the shirts.

### III. Legal Standard

Summary judgment should be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under applicable law. *See Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 248 (1986). Further, a material fact is "genuine" where, "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Penn. Coal Ass'n v. Babbit,* 63 F.3d 231, 236 (3d Cir.1995).

The threshold inquiry is whether there are, "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250. Once the moving party has properly supported its showing that there is no triable issue of fact and demonstrated an entitlement to judgment as a matter of law, then the non-moving party, "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita,* 475 U.S. at 586. In order to accomplish this the non-moving party must, "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Further, Section (d) of Rule 56 states that, "if a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declaration or to take discovery; or (3) issue any other appropriate order."

**\*3** Here, Defendants claim that they are entitled to further discovery prior to a ruling on the Motion for Summary judgment because there are still unresolved issues of genuine fact. However, in viewing all the evidence before the Court in the light most favorable to the Defendants, no discovery will change the disposition of any genuine fact.

Therefore, it is proper for the Court to consider Plaintiffs' Motion for Summary Judgment in light of the facts currently presented and determine whether the movant must prevail as a matter of law.

### IV. Discussion

Defendants contend that Plaintiffs' Motion for Summary Judgment is premature because more discovery is necessary. Doc. No. 58. However, Defendants have had ample time to seek discovery (or at least commence discovery); and nothing on the record (by way of affidavit or otherwise) indicates that any discovery has occurred. On September 20, 2011, the Court entered a Case Management Order (hereinafter "CMO"), which gave the parties the standard 150 days to complete fact discovery to include: all interrogatories, depositions, requests of admissions, and requests for production. Doc. No. 27. Also addressed in the CMO is Federal Rule of Civil Procedure 26(a)(1), which requires that

2011 WL 6056903, 101 U.S.P.Q.2d 1256

parties exchange all non-exempt relevant information within fourteen (14) days of the initial case management conference. This initial exchange within fourteen (14) days presumably occurred on schedule, or at least no motion has been filed with the Court to compel said disclosure, for failure to comply with Rule 26(a)(1).

Further, on November 30, 2011, Defendants, through their third attorney, admit in their supplemental memorandum of law in opposition to Plaintiffs' Motion for Summary Judgment that, "as of the current date, no discovery has been conducted." Doc. No. 58, page 2. Thus, as of the filing of Defendants' supplemental memorandum of law, seventy-seven (77) days have passed with no discovery requests, communication of interrogatories, notice of depositions or motions to compel being undertaken. And, as of the filing of this Memorandum Opinion, the record remains void regarding any discovery efforts by Defendants.

Additionally, a party who files a F.R.C.P. Rule 56(d) motion must establish that the information that would preclude summary judgment exists. However, even if further discovery were permitted in this case, Defendants have failed to establish in their affidavit any specific material fact that would preclude summary judgment. Doc. No. 58–1. The generalities listed by the Defendants do not rise to the standard necessary to preclude summary judgment because, "one who resists summary judgment but does not contradict the operative facts in his adversary's affidavit must utilize discovery, and suspicion alone without discovery is not enough." *Robin Construction Co. v. U.S.,* 345 F.2d 610, 614 (3d Cir.1965). Therefore, it is proper to consider the pending Motion for Summary Judgment because sufficient uncontested facts are before the Court and ample time has been given to Defendants' for discovery.

**\*4** In addressing the Motion for Summary Judgment, Plaintiffs contend that Defendants violated trademark law by creating t-shirts for the start of the 2011–2012 NFL that read, "The Terrible T-shirt A PITTSBURGH ORIGINAL." The Lanham Act, 15 U.S.C. § 1125(a)(1) provides in relevant part that:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or

> any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Thus, trademark infringement under the Lanham Act is established, and relief by the Court, is proper where a plaintiff can prove that: "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Fision Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 472 (3d Cir.1994).

### A. The Trademark is Valid, Protectable & Owned by Plaintiffs

In looking to the first two elements of the three part test for trademark infringement of competing goods, the court is to determine if, "(1) the mark is valid and legally protectable and (2) the mark is owned by the plaintiff." *Fision Horticulture,* 30 F.3d at 472. In addressing this issue, the United States Court of Appeals for the Third Circuit has determined that a mark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years subsequent to registration, that there is no pending proceeding contesting the owner's rights to registration, and that there has been no adverse decision concerning the registrant's ownership or right to registration. *Id.*

Here, Plaintiffs have filed affidavits with the Court stating that "The Terrible™" has been a registered trademark and in continuous use for more than twenty consecutive years, that there are no pending proceeding contesting the owner's rights to the trademark's registration, and that there has been no adverse decision concerning the Foundation's ownership or right to registered trademark. Therefore, the "The Terrible™"

2011 WL 6056903, 101 U.S.P.Q.2d 1256

trademark is presumed to have met the first two elements of the trademark infringement test for non-competing goods.

### B. Defendants' Use of the Mark is Likely to Create Confusion

In analyzing the third prong, the United States Court of Appeals for the Third Circuit requires that the District Court determine that a defendant's use of the registered mark to identify goods or services is likely to created confusion amongst reasonable persons of the general public concerning the origin of the goods or services. *See Checkpoint System, Inc. v. Check Point Software Technologies, Inc.,* 269 F.3d 270, 279 (3d Cir.2001); *also Sabinsa Corporation v. Creative Compounds, LLC,* 609 F.3d 175 (3d Cir.2010). In order to establish the likelihood of confusion of marks, a court is to consider the following ten factors set forth by the United States Third Circuit Court of Appeals:

> **\*5** (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods though not competing, are marketed through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendants market.

*Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 463 (3d Cir.1983); *citing to Scott Paper Company v. Scott's Liquid God, Inc.,* 589 F.2d 1225, 1229 (3d Cir.1978). The ten factors

are discussed below in the appropriate order based on the uncontested, genuine facts established for this motion for summary judgment.

### 1. The Strength of the Foundation's Mark

The most substantial trademark protection is provided to marks involving arbitrary or fanciful terms that are inherently distinctive as opposed to generic names that function as the common descriptive name of a product class or descriptive terms that forthwith convey an immediate idea of the ingredients, qualities or characteristics of the goods. *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir.1986). Arbitrary or fanciful terms bearing no logical or suggestive relation to the actual characteristics of the goods and suggestive terms, which merely suggest rather than describe the characteristics of the goods both are "automatically protectable" types of marks under common law trademark law even where not registered. *Id.* at 297.

An increased level of trademark protection is provided to a "famous mark" as the term is used in the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c)(1). A famous mark is protected under the Act from any use of the mark in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury. A mark is defined as "famous" under the Act where:

> [I]t is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following: (i) the duration, extent and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (ii) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) the extent of actual recognition of the mark;

2011 WL 6056903, 101 U.S.P.Q.2d 1256

[and] (iv) Whether the mark was registered ....

**\*6** 15 U.S.C. § 1125(c)(2)(A). "The degree of acquired or inherent distinctiveness of a mark bears directly upon the issue of whether that mark is famous." *Times Mirror Magazines, Inc. v. Las Vegas Sports News, LLC.,* 212 F.3d 157, 166 (3d Cir.2000).

Plaintiffs marks illustrate the characteristics of both a fanciful, distinctive mark and of a famous mark. Like the mark "Kodak" for camera products and "Lifesavers" for candy, the Plaintiffs' marks do not describe the products to which they apply except for the meaningful relationship cultivated over time that inextricably connects them and gives them popular meaning, especially in the Greater Pittsburgh area. In the case of the Foundation's marks, the meaning is due solely to the advertising and publicity efforts first of Myron Cope and then Allegheny Valley School and the Foundation. More particularly, due to more than 35 years of use of first The Terrible Towel® mark and then the other related marks in connection with the Pittsburgh Steelers professional football team; the Foundation's marks visibility to fans viewing Pittsburgh Steelers football games in person and on television (such games regularly being televised on national television with several of the games through the years being among the most watched television programs in American television history); media articles about "The Terrible Towel®" and what it means and represents; the distribution through numerous channels of commerce; and the stature of Pittsburgh sports writer and Steelers broadcaster, Myron Cope, who conceived the idea of "The Terrible Towel®" and was responsible for conveying ownership of the idea to the Foundation; the Foundation's marks have become widely recognized by the general consuming public of the United States as a designation os goods originating from a single source, namely Myron Cope's intended owner and beneficiary of the Marks, the Foundation. Wikipedia, The Free Encyclopedia, "Terrible Towel", http://en.wikipedia.org/wiki/Terrible_ Towel (last modified 28 November 2011).

This Court also takes judicial notice of the marks' fame and notoriety as a fact "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). In similar cases, courts have taken judicial notice of a trademark's fame where such fame can be readily and accurately determined. *See, e.g. B.V.D Licensing Corp. v. Body Action Design, Inc.,*

846 F.2d 727, 728 (Fed.Cir.1988). The Foundation's Marks clearly warrant such judicial notice. As an example of the Foundation's Marks readily determinable fame, the Wikipedia Free Internet Encyclopedia devotes six pages to the "Terrible Towel®" noting that it has been taken to the peak of Mount Everest and into space on the International Space Station and that "it is clearly the most famous sports rally towel in use." Wikipedia, *supra.*

### *2. Degree of Similarity Between the Marks*
**\*7** Where marks share an identical dominant word, this alone is strong evidence of likelihood of confusion. *American Plan Corp. v. State Loan & Finance Corp.,* 365 F.2d 635, 639 (3d Cir.1966), See *American Steel Foundries v. Robertson,* 269 U.S. 372, 381, 46 S.Ct. 160, 70 L.Ed. 317 (1926). The court can weigh whether the combination of words, devices or symbols making up the challenged mark are being used to deceive the public into believing that the goods of the infringer originated with the plaintiff. *Polo Fashions, Inc. v. Extra Special Products, Inc.,* 451 F.Supp. 555, 560–61 (S.D.N.Y.1978) (concerning an action arising under the Lanham Act, 15 U.S.C. § 1125).

A black and gold tee shirt with the words "The Terrible T–Shirt A Pittsburgh Original" is strikingly similar to Plaintiffs' marks. This utilization of the word "Terrible" along with similar coloring and a reference to "A Pittsburgh Original" is an apparent attempt to create confusion as to the tee shirts' source.

### *3–4. Evidence of Actual Confusion and Length of Time Defendants Have Used the Mark Without Evidence of Confusion*
"Actual confusion is potent evidence of the likelihood of confusion." *Gideons International, Inc. v. Gideon 300 Ministries, Inc.,* 94 F.Supp.2d 566, 584 (W.D.Pa.1999). In the context of determining if there is evidence from which a factfinder could conclude actual confusion, the United States Court of Appeals for the Third Circuit has noted that, "[a]lthough only likelihood of confusion, and not actual confusion, is required by the Lanham Act, actual confusion usually implies a likelihood of confusion. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 197, 203 (3d Cir.1999). Actual confusion in this case is demonstrated by The National Retail Graphic's employee, Cornman, immediately questioning Berry concerning his connection with Allegheny Valley School when Berry attempted to have

the tee shirts produced by National Retail Graphics. See Declaration of Mark Cornman, Doc Nos. 2–3.

### 5. The Intent of Defendants In Adopting the Mark

In analyzing the intent of a defendant, courts are to consider: (1) whether the defendant chose the mark to intentionally confuse consumers in order to capitalize on the senior mark's goodwill; and (2) the due care used by a defendant in investigating his mark prior to adopting it. *Sabinsa,* 609 F.3d at 187. In considering the tee shirt logo and design, Defendants' attempted to use the success and reputation of the Plaintiffs' products by creating the impression that Defendants' tee shirts contain an authorized version of the Plaintiff's marks. Also, while it is contested that Defendants' fraudulently produced a letter purporting to be from Plaintiffs' to Cornman at National Retail Graphics; it is undisputed that Defendants' began to sell the tee shirt without receiving any specific approval in writing and knowing that the targeted market of Pittsburgh Steelers fans might view this as a authorized product. See Declaration of Mark Cornman, Doc No. 2–3. Finally, Defendants' intent can also be evidenced by ignoring the Foundation's challenge to their attempt to register the tee shirt mark.

### 6. The Price of the Goods and Care & Attention Expected of Consumers When Purchasing

**\*8** Products such as bibs, towels, etc. featuring one of the Foundation's marks by their nature do not require a substantial financial investment by the purchaser. Accordingly, like many purchases, it does not represent a type of purchase for which the consumer can be expected to exercise great care and/or attention. Under such facts, it can reasonably be presumed that any black and gold, low cost cloth item featuring one of the Foundation's Marks or any substantially similar mark

would be assumed by the average consumer to be one of the Foundation's products in that line.

### 7–10. Channels of Trade and Advertisement; Extent That Sales Targets are the Same; The Relationship of the Goods in the Mind of the Public; and Similarity of Market Area

The parties' advertising and marketing targets are the same customers (*i.e.* Pittsburgh Steelers fans looking for items with one of the Foundation's marks featured thereon, so that they can show their support for the football team). Where similar customers are similarly targeted, the likelihood of confusion between marks is substantially increased. *Sabinsa Corp.* 609 F.3d at 188. Defendants timed their attempt to produce and sell tee shirts with the start of the 2011 NFL season, which would insure maximum financial gain on their part because sales are particularly high for Steelers merchandise at that time. See Declaration of Timothy Carey, Doc No. 16.

After consideration of the aforementioned three elements set forth in the Lanham Act and the ten factors in the *Lapp Test,* it is determined that Plaintiffs' are entitled to summary judgment.

### V. Conclusion

Accordingly, for the reasons set forth in this Memorandum Opinion, Plaintiffs' Motion for Summary Judgment (Doc. No. 29) will be granted.

An appropriate Order follows.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 6056903, 101 U.S.P.Q.2d 1256

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 13028160
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

COACH, INC. and Coach Services, Inc., Plaintiffs,

v.

The BAG PLACE, CO., Nyuk Sin Kim,
JK Weng International, Inc., Junke Weng
and Does 1 Through 10, Defendants.

Civil Action No.: 10-6226 (JLL)
|
Signed 05/03/2012
|
Filed 05/07/2012

**Attorneys and Law Firms**

Christine A. Shaw, Michael L. Rosenberg, Sterns & Weinroth, P.C., Trenton, NJ, for Plaintiffs.

Steven David Wallach, Princeton, NJ, for Defendants.

**OPINION**

JOSE L. LINARES, UNITED STATES DISTRICT JUDGE

**\*1** This matter comes before the Court by way of an unopposed motion for summary judgment by Plaintiffs Coach, Inc. and Coach Services, Inc. (hereafter "Coach" or "Plaintiff") pursuant to Federal Rule of Civil Procedure 56. (CM/ECF No. 35). No oral argument was heard. Fed. R. Civ. P. 78. Based on the reasons that follow, Plaintiff Coach's motion for summary judgment is GRANTED.

**I. BACKGROUND**

Despite having filed an Answer to Plaintiff's Complaint (CM/ECF No. 17) and being served with Requests for Admissions, Interrogatories, and Requests for Production of Documents on November 1, 2011, Defendants JK Weng International, Inc. and Junke Weng (hereafter "Defendants") have neither responded nor been granted an extension to date. (Shaw Decl. ¶ 3). Plaintiff Coach filed the instant motion on March 9, 2012. (CM/ECF No. 35). As noted above, Defendants did not file any Opposition thereto.

The underlying facts are as follows. Plaintiff Coach manufactures, markets, and sells handbags, wallets, accessories, eyewear, footwear, jewelry and watches. (Pl.'s Mot. for Summ. J., 2; Lau Decl. ¶ 4). The average suggested retail price for an authentic Coach handbag is approximately $300.00. (Lau Decl. ¶ 13). In the Complaint, Coach details approximately fifty United States Federal Trademark Registrations it owns which relate to its products (hereafter the "Coach Trademarks" or "Coach Marks"). (Compl. ¶ 16). The Complaint states that all registrations are valid and are incontestable. (Compl. ¶ 17). Additionally, Coach submits that its products have acquired strong secondary meaning. (Pl.'s Mot. for Summ. J., 2). Coach also submits that it is the owner of a "variety of unique and distinctive trade dresses consisting of one or more features, including sizes, shapes, colors, designs, fabrics, hardware, hangtags, stitching patterns and other non-functional elements comprising the overall look and feel incorporated into Coach products" (hereafter "Coach Trade Dresses"). (Pl.'s Mot. for Summ. J., 2; Statement of Undisputed Material Facts ¶ 9).

In October 2010, Coach retained the private investigative firm Allegiance Protection Group, Inc. (hereafter "Allegiance") and commenced an investigation into the unauthorized sale of counterfeit Coach products. (Lau Decl. ¶ 13). Despite the fact that Coach has never granted Defendants any license or other permission to use any Coach Trademark, Trade Dress, or otherwise, Coach received information that Defendants were "engaged in designing, manufacturing, advertising, promoting, distributing, selling, and/or offering for sale products bearing logos and source-identifying indicia and design elements that are studied imitations of the Coach Marks." (hereafter the "Infringing Products"). (Lau Decl. ¶ 10, 15).

On approximately October 19, 2010, an Allegiance investigator entered the Bag Place, operated by Defendants, and observed approximately one hundred bags and wallets offered for sale by Defendants. (Lau Decl. ¶ 13). For only $20.00, the investigator bought a brown handbag which bore multiple Coach Trademarks. (Id.). Specifically, the bag contained the following Coach trademarks: Signature "C", "Coach Leatherware Est. 1941", Coach Lozenge, and the Coach Tag Design. (Id.). In addition, there was a paper price tag affixed to the bag which bore the Coach Lozenge trademark. (Id.).

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 9 of 117

Coach, Inc. v. Bag Place, Co., Not Reported in Fed. Supp. (2012)

2012 WL 13028160

**\*2** Upon examination, Coach determined that the handbag was a counterfeit. (Lau Decl. ¶ 14). The counterfeit handbag was distinct from a genuine Coach product because of the following characteristics: the hardware on the handbag is not used on authentic Coach merchandise; the affixed paper price tag is not manufactured or used by Coach; the poor craftsmanship, particularly with regard to the quality of the stitching; and, at $20.00, the price of the bag was approximately $275.00 less than the suggested retail price of an authentic Coach handbag. (Id.). In addition, Defendants allegedly refused to identify where they purchased or obtained the counterfeit merchandise at issue and disposed of the Infringing Products after being informed of Plaintiff's request that the merchandise be sent to Plaintiff's offices for confiscation as a condition of a potential settlement agreement. (Shaw Decl. ¶¶ 9-10).

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party must first demonstrate that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The court construes facts and inferences in the light most favorable to the non-movant in order to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). An issue is "genuine" if the evidence is such that a reasonable jury could find for the non-moving party. Id. at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). "Thus, if a reasonable fact finder could find in the nonmovant's favor, then summary judgment may not be granted." Norfolk Southern Ry. Co. v. Basell USA Inc., 512 F.3d 86, 91 (3d Cir. 2008).

Summary judgment is not appropriate simply because the motion is unopposed. Anchorage Assocs. v. V.I. Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990). Rather, a Court may grant an unopposed motion for summary judgment "if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to" judgment as a matter of law. Fed. R. Civ. P. 56(e)(2)-(3); Anchorage Assocs., 992 F.2d at 175. Where a nonmoving party fails to oppose a motion for summary judgment, "the Court will accept as true all material facts set forth by the moving party with appropriate record support." Kadetsky v. Egg Harbor Twp. Bd. of Educ., 164 F.Supp.2d 425, 431 (D.N.J. 2001) (quoting Anchorage Assocs., 992 F.2d at 175).

## III. DISCUSSION

As an initial matter, pursuant to Federal Rule of Civil Procedure 36, a party may serve a written request for admission as to the truth of any matter within the scope of discovery. Rule 36(a) provides that "a matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Fed. R. Civ. P. 36(a) (3). Here, Plaintiff served Requests for Admissions upon Defendants and Requests for the Production of Documents on November 1, 2011. (Shaw Decl. at ¶ 3). However, Defendants did not respond to such requests and no extension of time has been granted. (Id.) Nor did Defendants respond to the instant motion or accompanying statement of material facts. Accordingly, the matters addressed in Coach's requests are deemed admitted and the Court may properly consider such in conjunction with Plaintiff's motion for summary judgment. See Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976) (finding that deemed admission was properly considered in motion for summary judgment), cert. denied Mead Johnson & Co. v. Goodman, 429 U.S. 1038, 97 S.Ct. 732 (1977); see also Sunoco, Inc. (R&M) v. MX Wholesale Fuel Corp., 565 F.Supp.2d 572, 577 (D.N.J. 2008).

**\*3** The Court now turns to the substantive portion of Plaintiff's motion. As noted above, Plaintiff brings the following causes of action: trademark counterfeiting and infringement under the Lanham Act (15 U.S.C. § 1114) (Counts I and II); trade dress infringement (15 U.S.C. § 1125(a)) (Count III); false designation of origin and false advertising (15 U.S.C. § 1125(a)) (Count IV); trademark dilution (15 U.S.C. § 1125(c)) (Count V); trademark counterfeiting under N.J. Stat. Ann. § 56:3-13.16 (Count VI); unfair competition in violation of N.J. Stat. Ann. § 56:4-1 et seq. (Count VII); common law trademark infringement (Count VIII); and unjust enrichment under the common law of New Jersey (Count IX). Plaintiff seeks a permanent injunction, statutory damages, and an award of attorney's fees and costs.

**Coach, Inc. v. Bag Place, Co., Not Reported in Fed. Supp. (2012)**

2012 WL 13028160

## 1. Liability

### A. Trademark Infringement, False Designation of Origin, and Unfair Competition

The definition of trademark infringement is the "use of a mark so similar to that of a prior user as to be 'likely to cause confusion, or to cause mistake, or to deceive.' " Kos Pharms. Inc. v. Andrx Corp., 369 F.3d 700, 711 (3d Cir. 2004); 15 U.S.C. § 1114(1). Trademark infringement and false designation of origin are analyzed under the same standard under the Lanham Act. Chanel, Inc. v. Gordashevsky, 558 F.Supp. 2d 532, 536 (D.N.J. 2008) (citing A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000)). In order to succeed on either claim, a plaintiff must demonstrate that "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d at 210 (3d Cir. 2000).

The validity, protectability, and ownership requirements are met when a mark is federally registered and becomes "incontestable" under the Lanham Act. Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc. 214 F.3d 432, 438 (3d Cir. 2000) ("If the mark at issue is federally registered and has become incontestable, then validity, legal protectability, and ownership are proved.") (citing Ford Motor Co. v. Summit Motor Prods., 930 F.2d 277, 292 (3d Cir. 1991)). "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration." Fisons, 30 F.3d at 472 n.7; see also Commerce Nat., 285 F.Supp.2d at 484 n.4 (D.N.J. 2003) (citations omitted). If, however, a mark "has not been federally registered or, if registered, has not achieved incontestability, then 'validity depends on proof of secondary meaning, unless the unregistered or contestable mark is inherently distinctive.' " Commerce Nat., 285 F.Supp.2d at 438.

In its Complaint, Coach states that all of the marks listed in the preceding paragraph are incontestable. (Compl. ¶ 17). Similarly, the motion for summary judgment states in a conclusory manner that "Coach satisfies the first two requirements of the test because federal registration is conclusive evidence of the validity, protectability and ownership of the mark." (Pl.'s Mot. for Summ. J., 6). Both of the cases on which Plaintiff relies for that proposition specifically deal with incontestability. However, Plaintiff does not point to an affidavit and it is unclear to the Court whether the marks have been in continuous use for five consecutive years, there is a pending proceeding, or there has been an adverse decision concerning the registrant's ownership or right to registration. Importantly, the extensive list of federally registered trademarks contained in the Complaint includes trademarks with dates of registration as recent as 2008 and 2009. (Compl. ¶ 16). As noted above, in order for a mark to become incontestable, it must be in continuous use for five years. Without an affidavit setting forth which marks are incontestable and the basis therefore, the Court cannot make such a finding.

**\*4** As to distinctiveness or proof of secondary meaning, Plaintiff provides the following in a declaration of counsel for Coach who is responsible for trademark and anti-counterfeiting efforts: "Products bearing the Coach Marks are widely recognized and exclusively associated by consumers, the public, and the trade as being high quality products sourced from Coach, and have acquired strong secondary meaning. Coach products have also become one of the most popular in the world, with Coach's annual global sales currently exceeding $3 billion dollars." (Lau Decl., ¶ 8; Statement of Undisputed Material Facts, ¶¶ 5–6). As Defendants do not dispute these contentions, the Court finds that is sufficient to satisfy the first two elements.

As to the third requirement, a likelihood of confusion "exists 'when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.' " Fisons, 30 F.3d at 472 (quoting Dranoff-Perlstein Assoc. v. Sklar, 967 F.2d 852, 862 (3d Cir. 1992)). [1] The Third Circuit has held that "where the identical mark is used concurrently by unrelated entities, a likelihood of confusion is inevitable." Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc., 143 F.3d 800, 804 (1998) (citing Opticians Ass'n. of America v. Independent Opticians of America, 920 F.2d 187, 195 (3d Cir. 1990)). Here, there were a number of Coach Trademarks on the Infringing Products, which is inherently likely to confuse. See Coach, Inc. v. Fashion Paradise, LLC, Civ. No. 10-4888, 2012 WL 194092, at *2 (D.N.J. 2012) (citing Coach, Inc. v. Cellular Planet, Civ No. 2:09-241, 2010 WL 1853424, at *1 (S.D. Ohio, May 7, 2010) (counterfeit items sold out of the trunk of a car could be distinguished from genuine Coach items on that basis, but the counterfeit nature of the goods meant

Case 4:21-cv-01091-MWB Document 322-8 Filed 11/18/24 Page 11 of 117

Coach, Inc. v. Bag Place, Co., Not Reported in Fed. Supp. (2012)

2012 WL 13028160

they are inherently likely to confuse)). Therefore, the Court grants summary judgment in favor of Plaintiff as to trademark infringement (Count II) and false designation of origin (Count IV).

1      Generally, a court will determine whether there is a likelihood of confusion based on a number of factors. The Third Circuit has set forth a non-exhaustive list of factors which include the following: "(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, competing or not competing are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market." A & H Sportswear, 237 F.3d at 215.

Accordingly, the Court finds that Coach also establishes its claims for New Jersey unfair competition, N.J. Stat. Ann. § 56:4-1 et seq., and its common law trademark infringement, N.J. Stat. Ann. § 56:3-13.13 (protecting common-law trademark infringement claims). "[T]he elements for a claim for trademark infringement under the Lanham Act are the same as the elements for a claim of unfair competition under the Lanham Act and for claims of trademark infringement and unfair competition under New Jersey statutory authority and common law...." J&J Snack Foods Corp. v. The Earthgrains Co., 220 F.Supp.2d 358, 374 (D.N.J. 2002); see SK & F, Co. v. Premo Pharm. Labs., Inc., 625 F.2d 1055, 1066 (3d Cir. 1980) ("[E]xcept for the interstate commerce requirement, the elements of the unfair competition torts proscribed by New Jersey law and by section 43(a) of the Lanham Act are the same."); see also Primepoint, LLC v. PrimePay, Inc., 545 F.Supp.2d 426, 432 (D.N.J. 2008). Because Coach

has established its federal claims, it also satisfies its claims brought under New Jersey law in this regard. See Coach, Inc. v. Bags & Accessories, Civ. No. 10-2555, 2011 WL 1882403, at *5 (D.N.J. May 17, 2011) (granting motion for default judgment and noting that "this Court has found liability under federal law to be sufficient to establish liability under state law."). Therefore, the Court additionally grants summary judgment in favor of Plaintiff as to its claims for unfair competition in violation of N.J. Stat. Ann. § 56:41 et seq. (Count VII), and common law trademark infringement (Count VIII).

**B. Trademark Counterfeiting**

 **\*5**   To establish trademark counterfeiting, a plaintiff must show the following: (1) defendant infringed a registered trademark in violation of the Lanham Act, U.S.C. § 1114(1)(a); and (2) the defendant intentionally used the trademark knowing that it was counterfeit or was willfully blind to same. Chanel v. Gordashevsky, 558 F.Supp.2d at 536. "The only distinction between the standard for federal trademark counterfeiting and the standard for establishing infringement is that to obtain treble or statutory damages for a counterfeiting claim, a plaintiff must show that the defendant intentionally used the plaintiff's trademark, knowing that it was counterfeit." Id. at 536-37.

First, as discussed above, Defendants infringed the Coach Trademarks at issue. Second, the Court finds that Defendants did so willfully. Willful conduct can be established through "deliberate and unnecessary duplicating of a plaintiff's mark ... in a way that was calculated to appropriate or otherwise benefit from the good will the plaintiff had nurtured." Securacomm Consulting, Inc. v. Securacom Incorporated, 166 F.3d 182, 187 (3d Cir. 1999) superseded by statute on other grounds as recognized in Banjo Buddies, Inc. v. Renosky, 399 F.3d 182, 187 (3d Cir. 1999) (quoting W.E. Basset Co. v. Revlon, Inc., 435 F.2d 656, 662 (2d Cir. 1970)); accord Coach, Inc. v. Fashion Paradise, LLC, Civ. No. 10-4888, 2012 WL 194092, at *3 (D.N.J. January 20, 2012). The sale of "goods using such strong and established marks conclusively demonstrates [a defendant's] desire and purpose to trade on" the good will of the owner the mark. Chanel v. Gordashevsky, 558 F.Supp.2d at 538 (citing Microsoft Corp. v. CMOS Tech., 872 F.Supp. 1329, 1335 (D.N.J. 1994)). Here, the fact that the Infringing Products contained multiple Coach Trademarks demonstrates that such was calculated to appropriate the good will nurtured by Plaintiff. Therefore, the Court grants summary judgment in favor of Plaintiff Coach as to Count I.

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 12 of 117

Coach, Inc. v. Bag Place, Co., Not Reported in Fed. Supp. (2012)

2012 WL 13028160

Plaintiff additionally brings a cause of action pursuant to N.J. Stat. Ann § 56:3-13.16, which provides civil liability against a person who engages in trafficking of counterfeit marks. Courts in this District have found that establishing a counterfeiting claim under federal law is sufficient to impose liability under state law as well. See e.g. Coach, Inc. v. Fashion Paradise, LLC, 2012 WL 194092, at *5 ("[B]ecause Plaintiffs have sufficiently stated their federal claims for trademark counterfeiting, the Plaintiffs have also stated a claim for trademark counterfeiting under N.J. Stat. Ann. § 56:3-13.16 ..."); Axelrod v. Heyburn, Civ. No. 09-5627, 2010 WL 1816245, at *3 (D.N.J. May 3, 2010); Thus, for the reasons above, the Court also grants summary judgment on Count VI.

**C. Trade Dress Infringement**

In addition to trademarks, section 43(a) of the Lanham Act also protects " 'certain words, symbols, collocations of colors and designs, or other advertising materials or techniques' that the purchasing public has come to associate with goods from a single source." Rose Art Indus., Inc. v. Swanson, 235 F.3d 165, 171 (3d Cir. 2000). Trade dress is "the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color or color combinations, texture, graphics, or even a particular sales technique." Id. at 172. In order to establish trade dress infringement, a plaintiff must show the following: (1) the infringing design is non-functional, (2) the design is inherently distinctive or has acquired secondary meaning, and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product. McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 357 (3d Cir. 2007).

**\*6** Plaintiff pleads all of these elements in the Complaint. (Pl.'s Mot. for Summ. J., 8). The first and second elements are satisfied because Coach describes its trade dresses as a "variety of unique and distinctive trade dresses consisting of one or more features, including sizes, shapes, colors, designs, fabrics, hardware, hangtags, stitching patterns and other non-functional elements comprising the overall look and feel incorporated into Coach products," which Coach submits have acquired secondary meaning. (Pl.'s Mot. for Summ. J., 2, 8; Statement of Undisputed Material Facts ¶ 9). As to the third element, the Infringing Products sold by Defendants "bore the same non-functional elements and hardware" as an authentic Coach product. (Pl.'s Mot. for Summ. J., 8). Therefore, the Court grants Coach's motion with respect to Count III.

**D. Trademark Dilution**

"The federal cause of action for trademark dilution grants extra protection to strong, well-recognized marks even in the absence of a likelihood of consumer confusion—the classical test for trademark infringement—if the defendant's use diminishes or dilutes the strong identification value associated with the plaintiff's famous mark." Times Mirror Magazine, Inc. v. Las Vegas Sports News, LLC, 212 F.3d 157, 163 (3d Cir. 2000). To be entitled to relief a plaintiff must prove the following:

> (1) the plaintiff is the owner of a mark that qualifies as a "famous" mark in light of the totality of eight factors listed in § 1125(c)(1); (2) the defendant is making commercial use in interstate commerce of a mark or trade name; (3) defendant's use began after the plaintiff's mark became famous; and (4) defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.

Times Mirror Magazine, Inc. v. Las Vegas Sports News, LLC, 212 F.3d 157, 163 (3d Cir. 2000); 800-JR-Cigar, Inc. v. GoTo.com, Inc., 437 F.Supp.2d 273, 293 (D.N.J. 2006).

As argued by Plaintiff, global annual sales currently exceed $3 billion dollars and "[p]roducts bearing the Coach [M]arks are widely recognized and exclusively associated by consumers, the public, and the trade as being high quality products sourced from Coach and have acquired strong secondary meaning ... Moreover, Defendants' actions lessen the capacity of such marks to identify and distinguish Coach products." (Pl.'s Mot. for Summ. J., 9). Generally, as provided by the Third Circuit, a court may consider eight non-exclusive factors in order to determine whether a mark is famous. Times Mirror Magazines, 212 F.3d at 163. [2] Therefore, Plaintiffs have sufficiently established the first and fourth elements, particularly because the motion is unopposed.

2      The factors a court may consider are as follows: "(A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 13 of 117

Coach, Inc. v. Bag Place, Co., Not Reported in Fed. Supp. (2012)

2012 WL 13028160

extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods and services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties; and (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register." Times Mirror Magazines, 212 F.3d at 163; 15 U.S.C. § 1125(c)(1)(A)-(H).

Plaintiff does not address the second and third elements in its brief and such is not perfectly clear from the record. However, two recent decisions in this District by Chief Judge Jerome Simandle dealt with this precise issue in the context of two motions for default judgment brought by Coach and involving a series of claims including trademark dilution. Coach, Inc. v. Fashion Paradise, LLC, 2012 WL 194092, at *4; Coach, Inc. v. Bags & Accessories, 2011 WL 1882403, at *4. As to the use in commerce element, Judge Simandle found that the fact that an investigator employed by a Pennsylvania investigative firm purchased an infringing good in Atlantic City, New Jersey was evidence that the infringing goods traveled in interstate commerce. Coach, Inc. v. Fashion Paradise, LLC, 2012 WL 194092, at *4. He wrote as follows: "More importantly, the quantum of commercial activity needed to demonstrate interstate commerce is not great; even in a criminal case, interstate commerce is satisfied by the mere fact that a contraband article, such as a firearm, was manufactured outside the state in which it was found when it was possessed." Id. (citing 18 U.S.C. § 922(g); United States v. Gatlin, 613 F.3d 374, 380 (3d Cir. 2010)). Here, as reflected on the investigative firm's letter head, the firm is located in New York, and the point of sale was Defendants' store in Union City, New Jersey. (Lau Decl., Ex. A).

*7  As to the remaining element, that Defendants began using the mark after it became famous, Judge Simandle wrote that "given that [Coach's] trademarks have been in existence for several decades and used continuously without abandon, the Court concludes that Defendants' use began after the mark in question became famous." Id. This conclusion also fits within the context of this Court's discussion above regarding willful infringement. Also, as the motion under present consideration

is unopposed and Defendants failed to participate in the discovery process, the Court finds it sufficient to establish liability on the part of Defendants for trademark dilution.

**E. Unjust Enrichment**

Finally, Plaintiffs bring a cause of action for unjust enrichment under New Jersey common law. Coach argues that "the Defendant was profiting from counterfeit items based on Coach's reputation and benefitting from the billions of dollars Coach has expended to advertise and promote its product. Defendants do not deny buying and selling products bearing Coach [M]arks and benefitting from the sale of these products." (Pl.'s Mot. for Summ. J., 10). Courts in this District have found liability for unjust enrichment in similar cases brought by Plaintiff, stating "[h]ere the Defendants were profiting from counterfeit items based on Coach's reputation. It would be unjust for the Defendants to enrich themselves without compensating the Plaintiffs, so a cause of action for unjust enrichment has been established." Coach, Inc. v. Fashion Paradise, LLC, 2012 WL 194092, at *6 (granting motion for default judgment); Coach, Inc. v. Bags & Accessories, 2011 WL 1882403, at *5 (granting motion for default judgment). Therefore, the Court grants summary judgment in favor of Plaintiff as to Count IX.

**2. Remedies**

Plaintiff seeks a permanent injunction, statutory damages, as well as an award of attorney's fees, investigative fees, and costs. The Court will address each in turn.

**A. Permanent Injunction**

Plaintiff seeks a permanent injunction pursuant to Federal Rule of Civil Procedure 65. The Lanham Act authorizes permanent injunctive relief to prevent or restrain further infringement. See 15 U.S.C. § 1116(a). [3] "A permanent injunction, in accordance with 15 U.S.C. § 1116 is proper 'only when there is a likelihood not only that customers could have been misled in the past, but that customers will be misled in the future.' " Microsoft Corp. v. CMOS Technologies, Inc., 872 F.Supp. 1329, 1336 (D.N.J. 1994) (quoting Weight Watchers Intern. Inc. v. Stouffer Corp., 744 F.Supp. 1259, 1288 (S.D.N.Y. 1990)).

[3]     15 U.S.C. § 1116(a) provides, in part: "The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant

Coach, Inc. v. Bag Place, Co., Not Reported in Fed. Supp. (2012)

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 14 of 117

2012 WL 13028160

injunctions, according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office...."

The Supreme Court has held that "well-established principles of equity" dictate that in order to obtain a permanent injunction, a plaintiff must show the following:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay, Inc. V. MercExchange, LLC, 547 U.S. 388, 391 (2006). In considering whether to issue a permanent injunction in a trademark case, courts in this District have applied similar factors. In Chanel, Inc. v. Gordashevsky, the Court set forth the standard as follows:

> **\*8** Generally, to obtain a permanent injunction, a plaintiff must show that (1) the Court's exercise of equity jurisdiction is proper, (2) the [p]laintiff succeeded on the merits, and (3) the balance of equities tips in favor of injunctive relief. The first factor contains three sub-parts which require the plaintiff to show (1) plaintiff has no adequate legal remedy; (2) the threatened injury is real, not imagined; and (3) no equitable defenses exist.

558 F.Supp.2d at 539 (citations omitted); see also Louis Vuitton Malletier, S.A. v. Mosseri, Civ. No. 07-2620, 2009 WL 3633882, at *5 (D.N.J. October 28, 2009); Microsoft Corp. v. Gonzales, Civ. No. 06-4331, 2007 WL 2066363, at *7 (D.N.J. July 13, 2007).

As detailed below, the Court finds that these factors weigh in favor of the issuance of a permanent injunction. First, Coach will suffer irreparable injury absent an injunction because if one does not issue, Defendants will likely continue selling counterfeit Coach goods. Further, "[t]rademark infringement amounts to irreparable injury as a matter of law." S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 378 (3d Cir. 1992).

Second, the remedies available at law are inadequate to compensate Coach. Specifically, monetary damages will neither sufficiently compensate for the injury to Plaintiff's reputation nor deter future infringement by Defendants. See Microsoft Corp. v. Gonzales, 2007 WL 2066363, at *7; see also Louis Vuitton Malletier, S.A. v. Mosseri, 2009 WL 3633882, at *5. In addition, the threatened future injury is real. The fact that Defendants refused to identify where they obtained the Infringing Products increases the likelihood that they will do so in the future. Finally, as this motion is unopposed, the Court is unaware of any equitable defenses that may exist.

Third, in balancing the harm to the parties, the Court "must 'ensure that the issuance of a an injunction would not harm the infringer more than a denial would of the mark's owner.' " Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc., 143 F.3d 800, 804 (3d Cir. 1998) (quoting Opticians, 920 F.2d at 197). Here, to the extent that Defendants will suffer monetary loss as a result of being enjoined from continuing to infringe upon Plaintiff's intellectual property, Defendants "can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself." Opticians, 920 F.2d at 197.

The final factor, the public interest, also favors the issuance of an injunction in this case. "Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." Id. (citing Bill Blass, Ltd. v. Saz Corp., 751 F.2d 152, 156 (3d Cir. 1984) ("There is public interest in the protection of the trademark and to avoid confusion in the public.")); W.L. Gore & Assoc., Inc. v. Totes, Inc., 788 F.Supp. 800, 813 (D. Del. 1992). Therefore, having weighed the four relevant factors and finding that under the circumstances all favor an award of injunctive relief, the Court GRANTS Plaintiff's request to permanently enjoin Defendants from infringing upon the Coach Trademarks.

**B. Statutory Damages**

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 15 of 117

Coach, Inc. v. Bag Place, Co.; Not Reported in Fed. Supp. (2012)

2012 WL 13028160

Under the Lanham Act, a successful plaintiff may recover actual damages measured by the defendant's profits, or may elect an award of statutory damages where an award cannot be calculated. Chanel, Inc. v. Gordashevsky, 558 F.Supp.2d 532, 537 (D.N.J. 2008); 15 U.S.C. § 1117. Here, as Defendants have not provided Coach with any basis through which it can calculate actual damages, it elects statutory damages in an amount set by the Court. (Pl.'s Mot. for Summ. J., 13).

 *9  "In the absence of clear guidelines for setting a statutory damage award, courts have tended to use their wide discretion to compensate plaintiffs, as well as to deter and punish defendants, often borrowing from factors developed in fixing a statutory damage award for copyright infringement." Louis Vuitton Malletier and Oakley, Inc. v. Veit, 211 F.Supp.2d 567, 583 (E.D. Pa. 2002); Chanel, Inc. v. Gordashevsky, 558 F.Supp.2d at 537. In "cases concerning multiple marks, courts have been inclined to either award the maximum without multiplication or to lower the per mark award." Id. at 584.

Under the Lanham Act, a plaintiff may recover "not less that $1,000 or more than $200,000 per counterfeit mark per type of good or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 117(c)(1). The range of recovery increases to a maximum of $2,000,000 per mark per type of good where the use of the counterfeit mark is willful. 15 U.S.C. § 117(c)(2).

Here, Plaintiffs seek statutory damages in connection with two types of Coach products, handbags and wallets. (Pl.'s Mot. for Summ. J., 14; Lau Decl. ¶ 13). Four Coach trademarks were infringed: "Coach Leatherware Est 1941"; Coach Signature "C"; Coach Lozenge; and Coach Tag Design. (Pl.'s Mot. for Summ. J., 14; Lau Decl. ¶ 13). In addition, by not responding to Plaintiff's Request for Admission, Defendants admitted to selling wallets with the "Coach Leatherware Est. 1941" and Coach Tag Design trademarks.

Accordingly, the amount of statutory damages must be not less than $4,000 or more than $800,000 for infringement relating to the handbags, and not less than $2,000 or more than $400,000 in connection with the wallets. Therefore, the total damage award must be not less than $6,000 or more than $1,200,000.

Plaintiff requests "that the Court start with a baseline statutory award of $100,000 per mark per type of good, for a total statutory award of $600,000 ($100,000 x 4 marks per handbag

+ $100,000 x 2 marks per wallet)." (Pl.'s Mot. for Summ. J., 15). Plaintiff cites amounts awarded in a number of cases in this District in support of that request and states that "a $600,000 award would sufficiently deter Defendants and others from engaging in counterfeit activities involving Coach's trademarks, compensate Coach for its damages and punish Defendants, all of which are stated goals of the Lanham Act's statutory damages provision." (Id. at 15-16). [4] However, particularly in light of the fact that a number of cases cited involve infringement through the Internet, Plaintiff does not establish how such an award would be appropriate in this case. Rather, a number of other cases involving similar circumstances awarded statutory damages ranging from $10,000 to $30,000 per infringing mark. Platypus Wear, Inc. v. Bad Boy Club, Inc., Civ. No 08-2662, 2009 WL 2147843, at *7 (D.N.J. July 15, 2009) (awarding $10,000 per violation); Coach, Inc. v. Ocean Point Gifts, Civ. No. 09-4215, 2010 WL 2521444 (D.N.J. June 14, 2010) (awarding $10,000 per infringement); Coach, Inc. v. Bags & Accessories, Civ. No. 10-2555, 2011 WL 1882403 (awarding $10,000 per infringement); Coach, Inc. v. Fashion Paradise, LLC, Civ. No. 10-4888, 2012 WL 194092 (awarding $30,000 per violation); Coach v. Perfume Place, Civ. No. 10-6265 (D.N.J. Feb. 21, 2012) (awarding $30,000 per infringing mark and noting that the request for a $100,000 baseline statutory award was excessive because the case only involved a single store rather than infringement through the Internet or a repeat offender).

| 4 | Specifically, Plaintiff cites the following: Louis Vuitton Malletier, S.A. v. Mosseri, Civ. No. 07-2620, 2009 WL 3633882 (involving online sale of counterfeit goods); Chanel v. Mosseri, Civ. No. 07-2619 (D.N.J. May 20, 2008) (defendant sold infringing products through websites); Coach, Inc. v. Fashion Paradise, LLC, Civ. No. 10-4888, 2012 WL 194092; Chanel v. Craddock, Civ. No. 05-1593, 2006 WL 1128733 (D.N.J. April 27, 2006) (involving Internet based infringement); Coach v. Perfume Place, Civ. No. 10-6265 (D.N.J. Feb. 21, 2012). (Pl.'s Mot. for Summ. J., 15). |
|---|---|

 *10  "Statutory damage awards for Lanham Act violations in this District are influenced in part by the point of sale of the infringing goods, specifically in cases of counterfeit goods sold on the Internet, and influenced in part on the monetary value of the item counterfeited." Coach, Inc. v. Fashion Paradise, LLC, 2012 WL 194092, at *7. Thus, as

Coach, Inc. v. Bag Place, Co., Not Reported in Fed. Supp. (2012)
2012 WL 13028160

others in this District, the Court will consider the following factors:

> (1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the [trademark]; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.

Id. (quoting Platypus Wear, Inc. v. Bad Boy Club, Inc., Civ. No 08-2662, 2009 WL 2147843, at *7 (D.N.J. July 15, 2009)). [5]

[5]  As discussed above, courts often borrow from factors developed in the Copyright infringement context, which the court did in Platypus.

In the present case, the investigator hired by Plaintiff "observed approximately one hundred bags and wallets offered for sale by Defendants." (Lau Decl. ¶ 13). However, it is not clear to the Court whether all were counterfeit Coach products. As discussed above, the Court found that the conduct here was willful. In addition Defendants refused to provide any information as to where they purchased the counterfeit items and disposed of approximately 100 counterfeit handbags and wallets. (Pl.'s Mot. for Summ. J., 14). The Court also takes note of the fact that the sale here took place in a single store, as opposed to the Internet, where the potential for unbridled infringement is of far more concern.

Having considered the past awards in this District, the point of sale, the extent of sales, and the lack of evidence concerning Plaintiff's losses, the Court will exercise its discretion to award Plaintiff $30,000 per mark, which amounts to $180,000 in statutory damages for Defendants' Lanham Act violations.

## C. Attorney's Fees and Costs

The Lanham Act provides that a court may award reasonable attorney's fees to the prevailing party in exceptional cases. 15 U.S.C. § 1117(a). Although the statute does not explicitly define "exceptional," in general a "trademark case is exceptional for purposes of an award of attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful." Veit, 211 F.Supp.2d at 585 (citing Securacomm Consulting, Inc. v. Securacom, Inc., 224 F.3d 273, 280 (3d Cir. 2000)). In addition, "§ 1117(b) provides that the court shall award attorneys' fees in cases where the defendant is found to have intentionally sold counterfeit goods in violation of § 1114." Microsoft Corp. v. CMOS Technologies, Inc., 872 F.Supp. 1329, 1341 (D.N.J. 1994). An award of attorney's fees may also include fees for investigators working under the direction of an attorney. Coach, Inc. v. Fashion Paradise, LLC, 2012 WL 194092, at *9 (citing Chanel v. Gordashevsky, 558 F.Supp.2d at 539).

Finally, "[t]he general rule in trademark cases is that a decree finding defendants have committed intentional infringement carries costs." CMOS Technologies, 872 F.Supp. at 1341. As discussed above, the Court has already determined that Defendants' conduct was willful. Therefore, the Court will award Plaintiff reasonable fees and costs.

## IV. CONCLUSION

**\*11**  For the above stated reasons, the Court GRANTS summary judgment in favor of Plaintiff for all counts. Therefore, the Court GRANTS Plaintiff's request for a permanent injunction, statutory damages, and attorney's fees and costs.

An appropriate Order accompanies this Opinion.

## All Citations

Not Reported in Fed. Supp., 2012 WL 13028160

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 2301221 (Trademark Tr. & App. Bd.)

THIS OPINION IS A PRECEDENT OF THE TTAB

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)

IN RE ALABAMA TOURISM DEPARTMENT

Serial No. 87599292

May 6, 2020

**\*1** Jean Voutsinas and Kai-Wen Hsieh of Frankfurt Kurnit Klein & Selz, P.C., for Alabama Tourism Department

William H. Dawe, III
Trademark Examining Attorney
Law Office 108
Kathryn E. Coward, Managing Attorney

Before Mermelstein, Lynch, and Larkin
Administrative Trademark Judges
Opinion by Larkin
Administrative Trademark Judge:

Alabama Tourism Department ("Applicant") seeks registration on the Principal Register of the mark shown below:



for "Advertising and marketing services, namely, promoting travel and tourism related to historical information on civil rights in the United States," in International Class 35. [1]

The Trademark Examining Attorney refused registration of Applicant's mark under Section 2(b) of the Trademark Act, 15 U.S.C. § 1052(b), on the ground that the mark includes a simulation of the flag of the United States. [2]

Applicant appealed after the Examining Attorney made the refusal final. The case is fully briefed.[3] We affirm the refusal to register.

**I. Record on Appeal**[4]

The record on appeal includes the following:

• A Wikipedia entry entitled "Flag of the United States," made of record by the Examining Attorney,[5] and Applicant;[6]

• The first page of search results from the USPTO's Trademark Electronic Search System ("TESS") database listing applications and registrations that Applicant claims are for marks comprising the American flag in some form;[7]

• Copies of pages from the TESS database regarding registrations of marks comprising the American flag in some form, made of record by Applicant;[8]

• Pages regarding applications that were refused because they contained the American flag, made of record by the Examining Attorney;[9]

• Webpages displaying the American flag, made of record by the Examining Attorney;[10] and

• The results of Google database searches regarding the American flag, made of record by Applicant,[11] and the Examining Attorney.[12]

**II. Section 2(b) Refusal**

**A. Applicable Law**

**\*2** Section 2(b) of the Trademark Act, 15 U.S.C. § 1052(b), prohibits registration, on either the Principal or Supplemental Register, of a mark that "[c]onsists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof." As the Board explained in a case involving municipality insignia, the text of Section 2(b) was carried over from the Trademark Act of 1905 to the Lanham Act of 1946 in substantially the same form, and the absolute bar that it imposes against registration of marks that contain flags and other governmental insignia reflects the sentiment that such insignia are symbols of government authority that ought to be reserved for signifying the government. *In re Dist. of Columbia*, 101 USPQ2d 1588, 1597 n.14 (TTAB 2012), *aff'd sub nom In re City of Houston*, 731 F.3d 1326, 108 USPQ2d 1226 (Fed. Cir. 2013).

There is very little case law discussing the registrability of a mark that "consists of or comprises the flag . . . of the United States."[13] The Board's 1973 decision in *In re Waltham Watch Co.*, 179 USPQ 59 (TTAB 1973), clarified that if a flag depicted in a mark incorporates common elements of flag designs but the flag is readily distinguishable from any actual flag of a government, refusal under § 2(b) is not appropriate. *Id.* at 60. The Board's most recent precedential decision under § 2(b) clarified that refusal is appropriate "if the design would be perceived by the public as a flag, regardless of whether other matter appears with or on the flag," *Family Emergency Room*, 121 USPQ2d at 1887-88, and set forth some general principles that govern the application of § 2(b) to all flags referenced in that section.

As the Board explained in *Family Emergency Room*, the word "comprises" in the clause "[c]onsists of or comprises," which appears in subparts (a)-(d) in § 2 of the Trademark Act, means "includes." *Family Emergency Room*, 121 USPQ2d at 1887 n.2 (citation omitted). Section 2(b) thus "prohibits registration of a mark that *includes* a flag . . . or any simulation thereof." *Id.*

The Board also noted that § 2(b) requires that registration be refused "if the proposed mark includes a true representation of [a] flag . . . or a simulation thereof," *id.* at 1887, and held that the "word 'simulation' in the statute 'is used in its usual and generally understood meaning, namely, to refer to something that gives the appearance or effect or has the characteristics of an original item.'" *Id.* (quoting *Advance Indus.*, 194 USPQ at 346). "Whether particular matter is a simulation of a flag is determined by a visual comparison of the matter and the actual flag." *Id.*

**\*3** The Board in *Family Emergency Room* held that "the relevant question is whether consumers will perceive matter in the mark as a flag." *Id.* at 1888. The Board further observed that "[m]arks containing elements of flags in a stylized or incomplete form are not refused under Section 2(b)," *id.* (citing *Waltham Watch*, 179 USPQ at 60), and held that the "focus of the analysis is on the relevant purchasers' general recollection of the flag, 'without a careful analysis and side-by-side comparison.'" *Id.* (quoting *Advance Indus.*, 194 USPQ at 346).

The Board in *Family Emergency Room* cited the § 2(b) examination guidelines in the TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP"), which the Board stated were "appropriate under the statute." *Id.* The Board noted that the TMEP "provides applicants and examining attorneys with a reference work on the practices and procedures relative to prosecution of applications to register marks in the USPTO," *id.*, and contains a section "devoted entirely to marks containing the Swiss federation flag or coat of arms." *Id.* (citing TMEP § 1205.01(d)).

The TMEP similarly contains examination guidelines for "Flags and Simulations of Flags" that discuss the American flag, and display multiple examples of American flag-related marks that should and should not be refused registration under § 2(b). TMEP § 1204.01(a)-(b). The TMEP instructs examining attorneys to consider the following factors that the Board found in *Family Emergency Room* to be appropriate in determining whether consumers will perceive matter in the mark as a flag: "(1) color; (2) presentation of the mark; (3) words or other designs on the drawing; and (4) use of the mark on the specimen(s)." TMEP § 1204.01(a) (citing *Family Emergency Room*, 121 USPQ2d at 1888 (discussing these factors in the context of the Swiss flag)). Although black-and-white drawings do not depict color, Section 1204.01(a) instructs that these factors should be considered "in regard to both color drawings and black-and-white drawings," and states that "[g]enerally, a refusal should be made where a black-and-white drawing contains unmistakable features of the flag along with indicia of a nation, or is shown on the specimen in appropriate colors of that national flag." *Id.* Section 1204.01(a) displays "Examples of Situations Where Registration Should Be Refused," including five involving the American flag.

**\*4** The TMEP also provides examples of situations where consumers would not perceive a design as a flag, such that refusal under § 2(b) would not be warranted. TMEP § 1204.01(b) (stating that "[m]arks containing elements of flags in a stylized or incomplete form are not refused under §2(b)," and that "[t]he mere presence of some significant elements of flags, such as stars and stripes (U.S. flag) . . . does not necessarily warrant a refusal."). Section 1204.01(b) lists the following scenarios under which registration should not be refused under § 2(b) and includes seven examples of registrable stylized designs of the American flag:
• The flag design is used to form a letter, number, or design.

• The flag is substantially obscured by words or designs.

• The design is not in a shape normally seen in flags.

• The flag design appears in a color different from that normally used in the national flag.

• A significant feature is missing or changed.

TMEP § 1204.01(b).

"Although the [TMEP] does not have the force of law, it 'sets forth the guidelines and procedures followed by the examining attorneys at the'" USPTO. *In re Int'l Flavors & Fragrances, Inc.*, 183 F.3d 1361, 51 USPQ2d 1513, 1516 (Fed. Cir. 1999)

(quoting *W. Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1664 n.8 (Fed. Cir. 1994)). As in *Family Emergency Room*, we hold that both sets of the "above standards, as set forth in the TMEP, are appropriate under the statute" to consider in determining whether consumers will perceive a mark as consisting of or comprising a flag. *Family Emergency Room*, 121 USPQ2d at 1888. We will apply those standards in our analysis of the registrability of Applicant's proposed mark under § 2(b).

**B. Summary of Arguments**

We summarize immediately below the general arguments of Applicant and the Examining Attorney. We address their specific arguments in our analysis of the merits of the refusal.

**1. Applicant's Arguments**

Applicant's arguments address four of the scenarios in TMEP § 1204.01(b), namely, that the "flag design in Applicant's Mark (i) is missing significant features of the U.S. flag, (ii) forms another design, (iii) is substantially obscured by other designs in Applicant's mark, and (iv) is not in a shape normally seen in the U.S. flag." 4 TTABVUE 6.

Applicant also argues that "the fact that the USPTO has approved numerous marks with designs that contain obvious depictions of the U.S. flag shows that marks containing stylized or incomplete flag elements should not be refused registration under §2(b)." *Id.* at 6-7. Applicant devotes a significant portion of its reply brief to its claim that the registration of other marks involving elements of the American flag justifies registration of Applicant's mark. 8 TTABVUE 5-9.

**2. The Examining Attorney's Arguments**

**\*5** The Examining Attorney argues that Applicant's mark includes a simulation of the U.S. flag under two of the factors set forth in TMEP § 1204.01(a), the presentation of the flag in the mark and the words associated with the drawing. 6 TTABVUE 5-7. [14] With respect to the factors in TMEP § 1204.01(b), the Examining Attorney argues that none of the five scenarios in which a § 2(b) refusal should not be issued exists, *id.* at 7-8, and that the flag design in Applicant's mark is not analogous to any of the examples in § 1204.01(b) of marks that should not be refused registration. *Id.* at 8.

With respect to the third-party marks, the Examining Attorney argues that "the issue for consideration here is whether the U.S. flag depicted in applicant's mark will be perceived by the public as a simulation of a U.S. flag; not whether other U.S. Registrations contain stylized U.S. flags." *Id.* at 9. He argues that each application must be considered on its own merits, and that the issuance of registrations containing elements of the U.S. flag is not relevant to the registrability of Applicant's mark. *Id.* at 9 n.1. He concludes that "[u]sing the guidelines established by Sections 1204.01(a) and (b) of the TMEP as to when a § 2(b) refusal should and should not be issued, it is clear that applicant's mark must denied registration under § 2(b) because the black-and-white drawing of the mark contains the unmistakable features of the U.S. flag." *Id.* at 10.

**C. Analysis of Refusal**

**1. Whether the flag design would be perceived as a simulation of an actual U.S. flag, applying the considerations in TMEP § 1204.01(a)**

We determine whether the flag design in Applicant's mark is a prohibited simulation of the U.S. flag "by a visual comparison of the [design] and the actual flag." *Family Emergency Room*, 121 USPQ2d at 1887 (citing *Waltham Watch*, 179 USPQ at 60). We depict below the American flag and Applicant's mark:

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 21 of 117



15



Although Applicant's flag design is not an exact reproduction of the American flag, it contains "unmistakable features of the flag," TMEP § 1204.01(a), in the form of the flag's stars and stripes in their familiar positions on the flag. These features of Applicant's design "give[ ] the appearance or effect or ha[ve] the characteristics of the original item[s]" on the actual flag. *Family Emergency Room*, 121 USPQ2d at 1887. Indeed, Applicant's original description of its mark expressly identified its flag design **as** the U.S. flag, referring to "the man in front holding a stick bearing the U.S. flag over his shoulder." [16]

 **\*6**  Applicant argues that its flag design does not appear in its mark in what Applicant claims to be "the typical display of a single U.S. flag show [ing] the front side of the flag," 4 TTABVUE 7, but the features of the U.S. flag do not change depending on the manner of its display. The flag design in Applicant's mark is displayed on what Applicant describes as a "stick," and that manner of display simulates how the U.S. flag may appear when it is displayed on an angled flagpole, as shown below:



17

By Applicant's own admission in its original description of its mark, in its particular orientation in Applicant's mark, Applicant's flag design is intended to depict or simulate the U.S. flag.

The words in Applicant's mark reinforce the perception of the design as at least a simulation of the U.S. flag. Section 1204.01(a) of the TMEP displays as examples of marks that should be refused registration under § 2(b) the designs shown below:



According to TMEP § 1204.01(a), the design on the left "is refused because the word SWISS emphasizes that the design is intended to be a simulation of the Swiss flag," while the design on the right "is refused because the word Texas emphasizes that the design is intended to be the state flag of Texas." *Id.* In both examples, as here, the wording names the nation or state whose flag is depicted in the mark and reinforces a consumer's perception of the design as that nation's or state's flag or a simulation thereof.

In Applicant's mark, the features of the U.S. flag are similarly accompanied by "indicia of a nation," *id.*, the letters "U.S.," which abbreviate the words "United States," [18] in the words "U.S. CIVIL RIGHTS TRAIL." The reference to the United States leaves no doubt, in the words of Applicant's original description of its mark, that "the man in front [is] holding a stick bearing the U.S. flag over his shoulder." [19]

Taking into account "the relevant purchasers' general recollection of the [U.S.] flag, 'without a careful analysis and side-by-side comparison,'" *Family Emergency Room*, 121 USPQ2d at 1888, when we view Applicant's flag design against the backdrop of

the "words or other designs on the drawing," TMEP § 1204.01(a), and in the context of the intended use of Applicant's mark in "promoting travel and tourism related to historical information on civil rights in the United States," we find that the U.S. flag and Applicant's flag design are highly similar and that the average member of the public would perceive Applicant's flag design to be a simulation of an actual U.S. flag. [20] We add that we would make the same finding even if the relevant purchasers engaged in a more careful analysis and compared Applicant's design to the U.S. flag. "[T]he matter sought to be registered, when considered in its entirety, is prohibited under Section 2(b) because the proposed mark includes a design consisting of or comprising a simulation of the flag of [the United States]." *Family Emergency Room*, 121 USPQ2d at 1889.

**2. Whether the elements of the flag create a distinct commercial impression other than as the U.S. flag, applying the considerations in TMEP § 1204.01(b)**

**\*7** We turn now to Applicant's arguments that its mark contains a stylized flag design and is thus registrable under four of the five scenarios set forth in TMEP § 1204.01(b) because consumers would not perceive the design as the U.S. flag or a simulation thereof.

**a. Whether Significant Features of the U.S. Flag Are Missing or Changed**

Applicant first argues that significant features of the U.S. flag are missing or changed in its flag design. 4 TTABVUE 7. Applicant cites a WIKIPEDIA description of the U.S. flag as "consist[ing] of thirteen equal horizontal stripes of red (top and bottom) alternating with white, with a blue rectangle in the canton (referred to specifically as the 'union') bearing fifty small, white, five-pointed stars arranged in nine offset horizontal rows, where rows of six stars (top and bottom) alternate with rows of five stars." *Id.* [21] As noted above, Applicant claims that "the typical display of a single U.S. flag shows the front side of the flag" and that "[o]rdinary consumers would therefore expect to see the stars at the top left corner of the flag, followed by the red and white stripes," citing the results of a "Google image search of the U.S. flag." *Id.* [22]

Applicant argues that "[u]pon encountering Applicant's mark, consumers will readily find that a number of [the] well-known features of the U.S. flag are missing," *id.* at 8, because its flag design (1) "is not in a rectangular shape and does not have four corners;" (2) "[m]ultiple stripes are missing, and the stripes that do appear in the flag design are all slanted in varying directions, and are not horizontal;" (3) "white dots appear on the flag design" instead of "the well-known five-pointed stars in a U.S. flag;" (4) the "rectangular shape of the union in the U.S. flag is also missing--in Applicant's mark, the union appears as a triangle;" and (5) "instead of facing the front, the flag in Applicant's mark is backward facing (the 'union' appears in the right corner, not the traditional left), which is different from how U.S. flags are commonly displayed." *Id.* Applicant analogizes its flag design to the following example in TMEP § 1204.01(b) of a registrable design in which a significant feature of the U.S. flag has been changed:



*Id.* at 7.

Applicant's arguments miss the mark. As discussed above, what Applicant calls the "well-known features of the U.S. flag," 4 TTABVUE 8, do not disappear or change depending on the particular manner of the flag's display. In certain manners of display, such as that shown in Applicant's mark and below



**\*8**  some features of the U.S. flag may not be entirely visible or may appear in different orientations than when they appear in what Applicant claims is the "the typical display of a single U.S. flag shows the front side of the flag," *id.* at 7,[23] but they are not "missing" or "changed" in the manner contemplated by TMEP § 1204.01(b). The flag displayed immediately above shares many of the characteristics that Applicant attributes to its flag design, including a "triangular" display of the union, non-horizontal stripes slanted in varying directions, and a "backward facing display," *id.* at 8, but no reasonable observer of that flag would believe that features are missing or changed, or view it as something other than the U.S. flag.

The scenario in TMEP § 1204.01(b) in which a "significant feature is missing or changed" is exemplified by the design shown above, in which the stars in the union of the U.S. flag have been rearranged to form what appears to be the letter "U." That rearrangement changes a "significant feature" of the U.S. flag, the layout of the rows of stars, to create a new design that does not simulate the actual flag. Applicant's flag design does not change the U.S. flag in this manner, and this scenario in TMEP § 1204.01(b) does not apply to Applicant's mark.

**b. Whether the Flag Design is Used to Form a Letter, Number, or Design**

Applicant next argues that "the flag element in Applicant's Mark forms and is incorporated in a greater overall design, namely, a depiction of a scene from the civil rights movement." 4 TTABVUE 10. Applicant analogizes its mark to one of the two marks that are shown in TMEP § 1204.01(b) as examples of this scenario:[24]



Applicant argues that in the example above, "[t]here is no doubt that the mark depicts a U.S. flag, especially in view of the term 'U.S.A.' located directly below the flag design," but claims that the mark is registrable "because its flag component is incorporated in a design, namely, a map of the continental United States." *Id.*

Applicant also analogizes its mark to the mark at issue in the Board's nonprecedential decision in *3P Learning*:[25]



4 TTABVUE 9. Applicant argues that "[a]lthough the mark contains multiple countries' national flags in their entireties (including the U.S. flag), the Board reversed the refusal to register under §2(b) because the flags form another design," because "the flags 'do not have the commercial impression of national flags but rather as designations of individuals from various nations,'" and because the other elements of the mark minimize the flags' individual impact and "emphasize[ ] the international aspect of the applied-for goods and services." *Id.* at 9-10 (quoting *3P Learning*, 12 TTABVUE 11-12 (Serial No. 85641327) (amended decision)).

**\*9** Applicant argues that when "[e]ncountering Applicant's Mark, consumers would first notice the four walking human figures, prominently displayed in the front and center of the Mark" and that "[s]eeing those figures in conjunction with the phrase U.S. CIVIL RIGHTS TRAIL and the flag design, consumers would immediately understand Applicant's Mark to be a symbol of the civil rights movement." *Id.* at 10. Applicant contends that "[t]he flag design, which takes up less than one fourth of Applicant's Mark, merely completes such symbol" and that its "purpose is to describe and emphasize the other design elements, such as the significance of the walking figures and who they portray (civil rights activists)." *Id.*

Applicant claims that "[l]ike the national flags in the mark in *In re 3P Learning PTY Ltd.*, Applicant's flag design signifies something other than a national flag," specifically, "the hard work, sacrifice, long journey, and emotions that civil rights activists encountered while fighting to obtain equal rights for African Americans in the United States," *id.*, and that the "flag design and component term U.S. are mere background characters that provide information and support for that depiction." *Id.* at 10-11.

As noted above, we are not bound by the decision or analysis in *3P Learning*, but the case is easily distinguishable. The Board found that in the subject mark, each national flag was "use[d] as the torso of each figure" and that such use was "use 'to form a design'" within the meaning of that particular scenario in TMEP § 1204.01(b). 12 TTABVUE 10 (Serial No. 85641327). The Board noted that "the use of the flag in a manner that serves as the torso of the individuals is not a traditional flag design and while they may be generally recognizable, as incorporated in this mark, they do not have the commercial impression of national flags but rather as designations of individuals from various nations." *Id.* at 11. The Board concluded that the flags are not being displayed as flags, but rather are incorporated into the design as torsos of individuals. In this case, where each flag forms the torso of individuals positioned in a circle around a globe signifying the international aspect of Applicant's goods and services we find that it is not barred by Section 2(b).

*Id.* at 12.

Unlike the flag designs in the mark in *3P Learning*, or in the marks in TMEP § 1204.01(b), the first of which is shown above and the second of which is shown below,



Applicant's flag design is not incorporated into wording or another design element, but is a self-standing design within Applicant's mark. Although the flag design is conceptually related to the design elements of the mark, that alone is insufficient to implicate this scenario in TMEP § 1204.01(b). The American flag is similarly part of the designs in the examples of unregistrable marks in TMEP § 1204.01(a) depicted below, which we consider more analogous because all significant features of the flag are present and the words or designs in the marks do not affect the flag designs in such a way that significant features of the U.S. flag are changed or missing:



 **\*10**  The flag design in Applicant's marks does not "form[ ] **another** design," TMEP § 1204.01(b) (emphasis added), specifically, "a letter, number, or design," *id.*, such as "USA," a map, or a torso, as contemplated under TMEP § 1204.01(b). As a result, this scenario is inapplicable to Applicant's mark.

**c. Whether the Flag Design is Substantially Obscured by Words or Designs**

Applicant's third argument is that "TMEP §1204.01(b) specifies that registration should not be refused where the flag in a mark is substantially obscured by designs." 4 TTABVUE 11. Applicant analogizes its mark to the mark shown below, which is displayed in TMEP §1204.01(b) as an example of a mark that fits this scenario:



Applicant argues that "just like the example from the TMEP above, registration should not be refused here because the flag in Applicant's Mark is substantially obscured by other designs." 4 TTABVUE 12. Applicant claims that "the designs of two adult figures cover both sides of the flag design, and the design of a child figure conceals almost all of the bottom half of the flag." *Id.*

The adverb "substantially" in TMEP § 1204.01(b) means "to a large degree."[26] Unlike the flag design in the example shown immediately above, the flag design in Applicant's mark is not obscured to a large degree by other elements of the mark:



Although portions of some of the stripes in the flag disappear behind the silhouette of the walking child and certain edges of the unfurled banner disappear behind the silhouettes of two of the walking adults, the simulations of the stars in the "union" and most of the stripes, as well as the flag as a whole, remain clearly visible, and the flag is immediately recognizable as such. As evidenced by the example accompanying this scenario in § 1204.01(b), as well as the examples of registrable marks in the preceding section, in which depictions of people or other elements appear in front of the flag designs, this scenario contemplates marks in which a significant portion of a flag design is not visible. The flag design in Applicant's mark does not meet that criterion, and this scenario is inapplicable, because the flag design is not so obscured that consumers would not perceive it as the U.S. flag or a simulation thereof.

**d. Whether the Flag Design is Not in a Shape Normally Seen in the U.S. Flag**

Finally, Applicant invokes the scenario in TMEP § 1204.01(b) that states that registration should not be refused "where the flag in a mark is not in a shape normally seen in flags." 4 TTABVUE 12. Applicant analogizes its mark to the two examples of such marks shown in TMEP § 1204.01(b). The first example is shown below:



**\*11** Applicant argues that in this mark, "only a corner of the flag is depicted, without all the stripes and stars traditionally associated with the U.S. flag," and that "[s]imilarly, in Applicant's Mark, only a small triangular portion of the flag appears, and not all the stars and stripes are visible. Approximately only one third of the stars that normally appear on the U.S. flag are visible in Applicant's Mark, and only a small portion of stripes can be seen." 4 TTABVUE 12. Applicant also argues that "whereas the American flag ordinarily appears as a rectangle, Applicant's Mark contains a small triangular portion of the U.S. flag, followed by some stripes located behind one of the walking figures and angled sideways and downward." *Id.* at 12-13.

The second example in this scenario in TMEP § 1204.01(b) is shown below:

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 31 of 117



Applicant argues that this example

consists of two rectangular U.S. flags that display parallel rows of stars and stripes. However, because the flags are vertical and elongated, they are not considered to be in the normal flag shape and therefore the mark is registrable. Similarly, the flag in Applicant's Mark is not displayed horizontally and is not in the normal flag shape. In fact, the flag in Applicant's Mark is even less similar to an actual U.S. flag than the example in the TMEP and noted above because, unlike the above example, the flag in Applicant's Mark is not rectangular, does not have four corners, and does not display the requisite parallel rows of stars and stripes in a U.S. flag. . . . Applicant's Mark is not in a shape normally seen in flags.

*Id.* at 13.

Applicant's arguments that its flag design is "not in the normal flag shape" of the U.S. flag because the design "is not rectangular, does not have four corners, and does not display the requisite parallel rows of stars and stripes in a U.S. flag," *id.*, are similar in nature to its arguments that significant elements of the U.S. flag are missing or changed due to the manner of display of the flag design in Applicant's mark. As shown and discussed above, the particular manner in which the flag design is displayed in Applicant's mark is consistent with the manner in which the U.S. flag appears when it is displayed on a flagpole. The required "visual comparison of the [design] and the actual flag," *Family Emergency Room*, 121 USPQ2d at 1887, may take into account

any reasonable form in which the actual flag may appear or be displayed. Applicant's flag design is not artificially elongated or strangely shaped, as in the examples in TMEP § 1204.01(b) shown above, and there is thus no basis for finding that the design is "not in a shape normally seen in" the U.S. flag as contemplated in TMEP § 1204.01(b). This scenario also does not apply to Applicant's mark because Applicant's design would be perceived as the U.S. flag or a simulation thereof.

**e. Summary**

**\*12**  None of the four asserted scenarios in TMEP § 1204.01(b) applies to Applicant's mark because the flag "design shown in the proposed mark is not sufficiently altered, stylized, or merged with the other elements in the mark, so as to create a distinct commercial impression, other than as a simulation of the [U.S.] flag." *Family Emergency Room*, 121 USPQ2d at 1889.

**3. The Existence of Third-Party Registrations of Marks Containing Elements of the U.S. Flag**

In its appeal brief, Applicant cites and depicts more than 30 registered marks that contain elements of the U.S. flag. 4 TTABVUE 15-22. [27]  Applicant argues that "the Examining Attorney ignored the numerous registrable, stylized marks that contain unmistakable features of the U.S. flag," *id.* at 14, which "include the seven registrable marks featured in TMEP § 1204.01(b) as well as many marks registered and appliedfor on the U.S. Trademark Register that contain recognizable U.S. flags." *Id.* Applicant claims that these registrations and applications show that "stylized marks with designs that include flags are generally not refused registration under § 2(b)." *Id.* at 22.

Applicant argues that most of the examples
contain much more complete depictions of U.S. flags than Applicant's Mark. To refuse registration of Applicant's Mark while permitting registration of the foregoing marks would be to treat Applicant's Mark inconsistently with Trademark Office practice. Applicant should be permitted to rely on the Trademark Office's practice with respect to the foregoing marks. The courts and the TTAB encourage the Trademark Office to use a uniform standard in assessing marks and Applicant is entitled to such consistent treatment.

*Id.* (citing *In re Nett Designs, Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001)).

In its reply brief, Applicant argues that the
Examining Attorney does not address the Board's and courts' desire for consistent treatment of marks that are similar in nature, merely stating that "each application must be considered on its own record" (Footnote 1, Examining Attorney's brief). The Examining Attorney's refusal to address this need for consistent treatment at the Trademark Office is surely not an oversight as indeed, it would be impossible for the Examining Attorney to reconcile his decision to deny registration here with the decision to register or allow these other marks.

8 TTABVUE 5.

Applicant acknowledges that "the Board and courts are not bound by prior registrations for analogous marks," but argues that the Board and the courts "encourage consistency in the Trademark Office's assessment of the registrability of marks, and on numerous occasions have looked at prior registrations and/or applications to determine the registrability of a particular mark." *Id.* [28]  Applicant contends that "[w]hen those other flag marks are considered, it is clear that the Examining Attorney's refusal in this case 'is clearly inconsistent with what this applicant had come to expect from the United States Patent and Trademark Office over the past decade of prosecuting several similar applications.'" 8 TTABVUE 6 (quoting *Alphonse Capone Enters.*, 10 TTABVUE 7 (Serial No. 85453371)).

**\*13**  Applicant's rely brief concludes with the argument that

[t]here is simply no justification for why these marks, which contain in many cases complete and accurate depictions of American flags with all of their elements plainly visible and which form the centerpiece of the marks, were permitted registration but Applicant's Mark was refused. Based on and in reliance on the numerous federal registrations and allowed applications for marks containing obvious U.S. flag designs, it is reasonable for Applicant to think that Applicant's Mark would not encounter a § 2(b) refusal.

*Id.* at 9.

These arguments, particularly Applicant's accusation that the Examining Attorney's "refusal to address this need for consistent treatment at the Trademark Office is surely not an oversight as indeed, it would be impossible for the Examining Attorney to reconcile his decision to deny registration here with the decision to register or allow these other marks," *id.* at 5, are misplaced. The Examining Attorney's obligation was to determine the registrability of the applied-for mark under § 2(b) based on the appearance of the flag design in Applicant's mark and a comparison of that design to the American flag, *Family Emergency Room*, 121 USPQ2d at 1887, taking into account the considerations and examples of registrable and unregistrable marks set forth in TMEP § 1204.01 and the record made during prosecution. He properly determined that the mark was unregistrable under the statute, and neither he nor we have any obligation "to reconcile his decision to deny registration here with the decision to register or allow . . . other marks." 8 TTABVUE 5. [29]  In addition, Applicant's evidentiary submission almost certainly presents an incomplete picture of USPTO practice, as it omits marks in applications that were refused registration under § 2(b) in a manner likely to be highly consistent with the action in this case.

Applicant cites the Federal Circuit's decision in *Nett Designs* for the proposition that the "court encourages the PTO to achieve a uniform standard for assessing registrability of marks." 4 TTABVUE 22 (citing *Nett Designs*, 57 USPQ2d at 1566). In the very next sentence in the opinion, however, the court held that "[n]onetheless, the Board (and this court in its limited review) must assess each mark on the record of public perception submitted with the application," *id.*, and the court subsequently held that the third-party "registrations that Nett Designs submitted to the examiner" had "little persuasive value" even on the issue of whether the phrase THE ULTIMATE BIKE RACK in the applied-for mark was merely descriptive of bicycle racks and had to be disclaimed. The court held that "[e]ven if some prior registrations had some characteristics similar to Nett Designs' application, the PTO's allowance of such prior registrations does not bind the Board or this court." *Id.*

**\*14**  The Board recently reiterated that "[w]hile we recognize that 'consistency is highly desirable,' . . . consistency in examination is not itself a substantive rule of trademark law, and a desire for consistency with the decisions of prior examining attorneys must yield to proper determinations under the Trademark Act and rules." *In re Am. Furniture Warehouse Co.*, 126 USPQ2d 1400, 1407 (TTAB 2018) (quoting *In re Omega SA*, 494 F.3d 1362, 83 USPQ2d 1541, 1544 (Fed. Cir. 2007) and citing *In re Cordua Rests.*, 823 F.3d 594, 118 USPQ2d 1632, 1635 (Fed. Cir. 2016)). We do not believe that our decision here is inconsistent with the registration of the third-party marks cited by Applicant, but to the extent that it is, it is the decision required under the statute on the record before us.

For the reasons discussed above, the Examining Attorney properly determined that Applicant's mark is unregistrable under § 2(b) based on our precedent and applying the examination guidelines set forth in TMEP § 1204.01. We need to go no further to affirm the refusal to register.

**Decision**: The refusal to register is affirmed.

1    Application Serial No. 87599292 was filed on September 7, 2017 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's allegation of a bona fide intention to use the mark in commerce. Applicant disclaimed the exclusive right to use U.S. CIVIL RIGHTS TRAIL apart from the mark as shown. Applicant's amended description of its mark reads as follows: "The mark consists of a circle displaying the wording U.S. CIVIL RIGHTS TRAIL and design; the design consists of a three concentric circle design in which the wording U.S. CIVIL RIGHTS TRAIL appears between arched in between the inner most and the middle concentric circles; the images of two men, one woman and a child walking with the man in back wearing a hat and the man in front holding a stick bearing flag over his shoulder appear superimposed on the inner and middle concentric circle; the inner concentric circle is incomplete on the bottom; the bottom of the middle concentric circle is shaded beneath the feet of the individuals with two small five point stars on each end and one larger five point star in the middle." Color is not claimed as a feature of the mark.

2    The phrase "flag . . . of the United States" appears in Section 2(b). The flag of the United States is also referred to, both colloquially and in Section 1204.01(a) of the TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") (Oct. 2018), as the "American flag," and we will use the two terms interchangeably.

3    Citations in this opinion to the briefs refer to TTABVUE, the Board's online docketing system. *Turdin v. Tribolite, Ltd.,* 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). Specifically, the number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page number(s) of the docket entry where the cited materials appear.

4    Citations in this opinion to the application record are to pages in the Trademark Status & Document Retrieval ("TSDR") database of the United States Patent and Trademark Office ("USPTO"). We summarize only those portions of the record that are germane to the appeal.

5    December 19, 2017 Office Action at TSDR 58-68.

6    June 11, 2018 Response to Office Action at TSDR 26-34; January 8, 2019 Response to Office Action at TSDR 25-33.

7    June 11, 2018 Response to Office Action at TSDR 9, 35; January 8, 2019 Response to Office Action at TSDR 36-37.

8    June 11, 2018 Response to Office Action at TSDR 37-127; January 8, 2019 Response to Office Action at TSDR 38-128.

9    July 11, 2018 Office Action at TSDR 2-12.

10   January 31, 2019 Final Office Action at TSDR 2-13, 21-26.

11   January 8, 2019 Response to Office Action at TSDR 34-35.

12   January 31, 2019 Final Office Action at TSDR 14-20.

13   In its appeal brief, Applicant cites *In re Family Emergency Room LLC,* 121 USPQ2d 1886 (TTAB 2017), which involved the Swiss flag; a civil infringement decision, *Bros. of the Wheel M.C. Exec. Council, Inc. v. Mollohan,* 909 F. Supp. 2d 506 (S.D. W. Va. 2012), which discussed in passing the validity of a registration of a mark containing the American flag; a Board decision involving the Norwegian flag, *Knorr-Nahrmittel A.G. v. Havland Int'l, Inc.,* 206 USPQ 827 (TTAB 1980); and two non-precedential Board decisions, *In re Certa ProPainters, Ltd.,* Serial No. 77046679 (TTAB Nov. 14, 2008) and *In re 3P Learning Pty Ltd.,* Serial No. 85641327 (TTAB Sept. 30, 2014), involving the Canadian flag, and a composite mark containing the flags of 12 countries, respectively. The only Section 2(b) case cited by the Examining Attorney in his brief is *Family Emergency Room,* which in turn cited and quoted *In re Advance Indus. Sec., Inc.,* 194 USPQ 344 (TTAB 1977), a case involving the Coat of Arms of the United States.

14   The Examining Attorney argues that the two other factors, the color of the mark and the use of the mark on a specimen, do not apply to Applicant's intent-to-use application. 6 TTABVUE 6. We note, however, that merely because Applicant

has not claimed that color is a feature of the mark does not mean that Applicant could not depict the flag design in the mark in its black-and-white drawing in any color or combination of colors. *See In re Data Packaging Corp.*, 453 F.2d 1300, 172 USPQ 396, 397 (CCPA 1972) ("there is no reason why an applicant should not be able to obtain a single registration of a design mark covering all different colors in which it may appear, that is to say, not limited to a particular color."). Accordingly, we must assume that Applicant could display the flag design in its mark in the traditional red, white, and blue of the U.S. flag.

15   December 19, 2017 Office Action at TSDR 58.

16   September 7, 2017 Application at TSDR 1.

17   January 31, 2019 Final Office Action at TSDR 24.

18   December 19, 2017 Office Action at TSDR 48 (acronymfinder.com).

19   In its reply brief, Applicant argues that the "term 'U.S.' modifies the wording 'CIVIL RIGHTS TRAIL,' not the flag elements," and that "[u]pon seeing the term 'U.S.,' consumers would not think about the U.S. flag," but "would consider 'U.S.' as an indicator of the civil rights movement in the United States." 8 TTABVUE 3-4. We disagree. Applicant is correct that "U.S." modifies "CIVIL RIGHTS TRAIL," in the same way that "Swiss" modifies "Guard" and "Texas" modifies "Rock Association" in the examples given in TMEP § 1204.01(a), but as in those examples, the abbreviation "U.S." "emphasizes that the design is intended to be" the U.S. flag or "a simulation of the" U.S. flag. *Id.* We would find, in any event, that the flag design in Applicant's mark is a simulation of the U.S. flag even absent the reference to the U.S.

20   In the absence of restrictions on the classes of consumers of the services identified in the application, we find that the services are directed to members of the general public. *See Family Emergency Room*, 121 USPQ2d at 1888 (finding that consumers of hospital services were the general public).

21   January 8, 2019 Response to Office Action at TSDR 26. As noted above, we must assume that the flag design in the mark may be depicted in the red, white, and blue of the U.S. flag.

22   *Id.* at TSDR 34-35.

23   In that regard, we note that the position and manner of display of the U.S. flag prescribed by 4 U.S.C. § 7 varies depending on the circumstances of the flag's display.

24   Applicant does not address the other example, but we show and discuss it below following our discussion of the example cited by Applicant and the mark in a non-precedential decision cited by Applicant.

25   "Board decisions which are not designated as precedent are not binding on the Board, but may be cited and considered for whatever persuasive value they may hold." *In re Soc'y of Health & Physical Educators*, 127 USPQ2d 1584, 1587 n.7 (TTAB 2018).

26   CAMBRIDGE DICTIONARY (dictionary.cambridge.org/us, last accessed on May 1, 2020. The Board may take judicial notice of dictionary definitions, including online dictionaries. *See, e.g., In re Omniome, Inc.*, 2020 USPQ2d 3222, *2 n.17 (TTAB 2020).

27   Applicant also cites and displays marks in pending applications. 4 TTABVUE 14-16. We need not consider the applications because "[a]n application is not evidence of anything except that the application was filed on a certain date . . . ." *Wet Seal, Inc. v. FD Mgmt., Inc.*, 82 USPQ2d 1629, 1634 n.11 (TTAB 2007).

28   In support, Applicant cites *In re Women's Publ'g Co.*, 23 USPQ2d 1876 (TTAB 1992), and three non-precedential cases, *In re Armadahealth, LLC*, Serial No. 86713902 (TTAB June 28, 2017), *In re Alphonse Capone Enters., Inc.*, Serial No. 85453371 (TTAB Apr. 19, 2013), and *HEB Growers Co.*, Serial No. 85027087 (TTAB June 29, 2012). 8 TTABVUE 5.

29    The cases cited by Applicant in support of its argument that "on numerous occasions [the Board and courts] have looked at prior registrations and/or applications to determine the registrability of a particular mark," 8 TTABVUE 5, are distinguishable because none of them involved a Section 2(b) refusal. The precedential *Women's Publ'g* decision involved genericness, descriptiveness, and acquired distinctiveness, while the non-precedential decisions in *Armadahealth* and *HEB Grocery* involved descriptiveness. The Board noted in *Armadahealth* and *HEB Grocery* that in descriptiveness cases such as those two and *Women's Publ'g*, "[c]ase law recognizes that [third-party] registrations can be used as a form of dictionary definition to illustrate how a term is perceived in the trade or industry." 15 TTABVUE 11 (Serial Nos. 86713902 and 86802355); 10 TTABVUE 9 (Serial No. 85027087). The non-precedential decision in *Alphonse Capone Enters*. involved a refusal to register on the ground that the applicant sought "registration of more than one mark." 10 TTABVUE 1 (Serial No. 85453371). The Board noted in that case that the applicant had previously registered similar marks based "upon one substantially similar, and another identical specimen," to the one at issue on appeal, *id.* at 7, and that the refusal was "clearly inconsistent with what this applicant had come to expect from the United States Patent and Trademark Office over the past decade of prosecuting several similar applications, and even one identical application." *Id.*

2020 WL 2301221 (Trademark Tr. & App. Bd.)

---

**End of Document**                                     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

121 U.S.P.Q.2d 1886 (Trademark Tr. & App. Bd.), 2017 WL 1345063

THIS OPINION IS A PRECEDENT OF THE TTAB

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)

IN RE FAMILY EMERGENCY ROOM LLC

Serial No. 86709923

March 14, 2017

**\*1**  Joshua G. Jones of Reed and Scardino for Family Emergency Room LLC

Heather D. Thompson
Trademark Examining Attorney
Law Office 109
Michael Kazazian, Managing Attorney

Before Quinn, Wellington, and Coggins
Administrative Trademark Judges
Opinion by Quinn
Administrative Trademark Judge:

Family Emergency Room LLC ("Applicant") filed an application to register on the Principal Register the mark shown below



(CEDAR PARK FAMILY EMERGENCY ROOM disclaimed) for "hospitals" in International Class 44. [1]

The Trademark Examining Attorney refused registration under Section 2(b) of the Trademark Act, 15 U.S.C. § 1052(b), on the ground that the proposed mark includes a simulation of the flag of Switzerland.

When the refusal was made final, Applicant appealed and requested reconsideration. The request for reconsideration was denied, proceedings in the appeal were resumed, and Applicant and the Examining Attorney filed briefs.

Section 2(b) provides that:
No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it--

\* \* \* \*

(b) Consists of or comprises [2] the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof.

Applicant argues that its proposed mark contains "a rhombus or diamond shape with a series of lines in front of the rhombus," and that the mark "while certainly borrowing elements of the Swiss national flag, does not run afoul of Section 2(b)." 7 TTABVUE 3. Applicant relies upon two non-precedential Board decisions, and two abandoned applications in support of its position that the mark is registrable.

The Examining Attorney maintains that the mark includes a design of a white cross on a red ground, and that this is the flag or a simulation of the flag of the Swiss Confederation, that is, Switzerland. Contrary to Applicant's contention that this portion of the mark is a rhombus design, the Examining Attorney states that "the tilted angle of the applicant's figure gives the appearance of a flag on display [that] serves to emphasize the resemblance to the Swiss flag." 9 TTABVUE 5. The Examining Attorney also distinguishes the present case from the two nonprecedential Board decisions, and two third-party applications (now abandoned), all relied upon by Applicant in connection with its argument that the Office has approved similar marks in the past. In support of the refusal, the Examining Attorney introduced a representation of the Swiss flag.

 **\*2**  Registration must be refused under Section 2(b), in pertinent part, if the proposed mark includes a true representation of the flag of a foreign nation, or is a simulation thereof. [3]  The word "simulation" in the statute "is used ... in its usual and generally understood meaning, namely to refer to something that gives the appearance or effect or has the characteristics of an original item." *In re Advance Indus. Sec., Inc.*, 194 USPQ 344, 346 (TTAB 1977). *See In re Waltham Watch Co.*, 179 USPQ 59, 60 (TTAB 1973). Whether particular matter is a simulation of a flag is determined by a visual comparison of the matter and the actual flag. *Id.*

Under standard examination procedure, a refusal is issued if the design would be perceived by the public as a flag, regardless of whether other matter appears with or on the flag. Trademark Manual of Examining Procedure (TMEP) § 1204.01(a) (Jan. 2017). Thus, the relevant question is whether consumers will perceive matter in the mark as a flag. TMEP §1205.01(d)(ii). Marks containing elements of flags in a stylized or incomplete form are not refused under Section 2(b). *See In re Waltham Watch Co.*, 179 USPQ at 60; TMEP § 1204.01(b). The focus of the analysis is on the relevant purchasers' general recollection of the flag, "without a careful analysis and side-byside comparison." *In re Advance Indus. Sec., Inc.*, 194 USPQ at 346. In this case, the relevant consumer is the recipient of hospital services, which is, of course, the general public.

The TMEP provides applicants and examining attorneys with a reference work on the practices and procedures relative to prosecution of applications to register marks in the USPTO. TMEP § 1205.01(d) is devoted entirely to marks containing the Swiss Confederation flag or coat of arms. The present application involves a flag design, so we focus our attention on the Swiss flag design (as opposed to the Swiss coat of arms). As indicated in TMEP § 1205.01(d): "[T]he Swiss flag consists of a white equilateral cross displayed upright on a red square." Examining attorneys have been appropriately instructed to consider the following factors when determining whether matter in a mark will be perceived as the Swiss flag:
• the colors, if any, that appear in the matter;

• the stylization of the matter and its relationship to other elements in the mark;

• the presence of any words or other designs on the drawing that might create or reinforce the impression that the matter is the Swiss flag; and

• the presentation and use of the mark on the specimen of record, if one is provided.

TMEP § 1205.01(d)(ii). The determination of whether a refusal under Section 2(b) must issue should be based on how the mark is displayed in the drawing, described in the application, or used in the specimen of record. *Id.* Examining attorneys must refuse registration under Section 2(b) if the mark contains an element composed of an upright equilateral cross on a square or a rectangle (or simulation thereof) that is not significantly stylized, altered, or merged with other elements in the mark, and, in relevant part, the drawing shows the cross in white and the square or rectangle in red. TMEP § 1205.01(d)(ii)(A). On the other

hand, even if the mark contains an upright equilateral cross on a square or a rectangle (or simulation thereof), a Section 2(b) refusal should not be issued if, in relevant part, the flag shown in the mark is sufficiently altered, stylized, or merged with other elements in the mark, so as to create a distinct commercial impression. TMEP §§ 1204.01(b); 1205.01(d)(ii)(C). The above standards, as set forth in the TMEP, are appropriate under the statute.

**\*3**  The flag of Switzerland is shown below (www.cia.gov; August 21, 2015 Office Action, p. 2):



The design in the proposed mark, which the Examining Attorney views as a simulation of the Swiss flag, is shown below:



In the required description of the mark (*see* Trademark Rules 2.37 and 2.52(b)(5)), Applicant describes this portion of its proposed mark as "a white cross on a red field, [with] red diagonal lines on the left edge of the field." In the required color description of the mark (*see* Trademark Rule 2.52(b)(1)), Applicant states, *inter alia*, that the colors white and red are claimed as a feature of the mark.

When the design in the proposed mark, featuring a white cross on a red ground, is compared to the red and white Swiss flag, we find that they are highly similar, and that the addition of the lines at the left of the design, and the very slight tilt of the design, are insignificant in altering the commercial impression of the design. Although the red field technically is not a square (but, rather, as Applicant states, a rhombus [4] ), it would likely be perceived as a square viewed from a slight angle. Given the close approximation of the Swiss flag in Applicant's design, it is not unreasonable to assume that many consumers might not even notice the slight tilt and lack of right angles of the red ground. Similarly, the addition of the stylized wording CEDAR PARK FAMILY EMERGENCY ROOM to the right of the white cross and red ground design does not change the perception of that design from a simulation of the Swiss flag. Simply put, the design shown in the proposed mark is not sufficiently altered, stylized, or merged with the other elements in the mark, so as to create a distinct commercial impression, other than as a simulation of the Swiss flag. The average member of the general public seeing the proposed mark would associate the design feature with the flag of Switzerland. Accordingly, the matter sought to be registered, when considered in its entirety, is prohibited under Section 2(b) because the proposed mark includes a design consisting of or comprising a simulation of the flag of Switzerland.

The two third-party applications (shown below), now abandoned, relied upon by Applicant are entirely unpersuasive. [5]



First, such applications are evidence only of the fact that they were filed; they have no other probative value. *In re Pedersen*, 109 USPQ2d 1185, 1196 n.45 (TTAB 2013), citing *In re Juleigh Jeans Sportswear, Inc.*, 24 USPQ2d 1694 (TTAB 1992). Second, these two examples appear in TMEP § 1205.01(d)(v), with analysis that clearly distinguishes each of the proposed marks from the one sought to be registered in the present application. As indicated in the TMEP, a Section 2(b) refusal is not appropriate in the first mark because the relevant matter does not appear in the shape of the Swiss flag, which is not the situation with the present applied-for mark. With respect to the second mark, although the mark contains an upright equilateral cross in white on a red background, this matter is integrated into a stylized silhouette of a house and, accordingly, the mark creates a commercial impression of something entirely different from the Swiss flag. This second situation is very different from the design in the present mark.

**\*4**  We have considered Applicant's remaining arguments, including its arguments based on two unpublished Board decisions,[6] and do not find them persuasive.

*Decision:* The refusal to register is affirmed.

[1]   Application Serial No. 86709923, filed July 30, 2015 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on an allegation of a bona fide intention to use the mark in commerce. The application includes the following statements: "The mark consists of a white cross on a red field, red diagonal lines on the left edge of the field, the words 'Cedar Park' over the words 'family emergency room' wherein the letters 'ER' in 'emergency' are larger and in bold font. The colors white, red and gray are claimed as a feature of the mark."

[2]   As the Federal Circuit explained when construing the identical "consists of or comprises" language in Section 2(a), "the word 'comprises,' at the time of the statute's enactment in 1905, meant 'includes.'" *In re Fox*, 702 F.3d 633, 105 USPQ2d 1247, 1250 (Fed. Cir. 2012), citing *Webster's Academic Dictionary* 121 (Springfield, Mass., G. & C. Merriam Co. 1895). Section 2(b) thus prohibits registration of a mark that *includes* a flag of a foreign nation or any simulation thereof.

[3]   In the view of Professor McCarthy: "Section 2(b)'s absolute bar is apparently founded upon the thinking that these kinds of governmental insignia, such as a national flag or seal, should not be registered as symbols of origin for commercial goods and services. That is, these kinds of governmental insignia ought to be kept solely to signify the government and not be sullied or debased by use as symbols of business and trade." 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 19:79 (4th ed. Dec. 2016). In this connection, registration of all such official insignia is barred regardless of the identity of the applicant, that is, the statutory prohibition allows no exception even when the applicant is a government entity seeking to register its own flag, coat of arms, or other insignia. *In re City of Houston*, 731 F.3d 1326, 108 USPQ2d 1226 (Fed. Cir. 2013).

4    A rhombus with right angles is a square. (www.merriam-webster.com). The Board may take judicial notice of dictionary definitions, *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), including online dictionaries that exist in printed format or have regular fixed editions. *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377 (TTAB 2006). *See In re Thomas White Int'l Ltd.*, 106 USPQ2d 1158, 1160 n.1 (TTAB 2013).

5    Application Serial Nos. 85250677 and 78916348, respectively. Even if these applications had not been abandoned, for the reasons expressed below, we would reach the same result in this appeal.

6    Application Serial Nos. 77046679 (dated November 14, 2008) and 85641327 (dated September 30, 2014).

121 U.S.P.Q.2d 1886 (Trademark Tr. & App. Bd.), 2017 WL 1345063

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

85 U.S.P.Q.2d 1187 (Trademark Tr. & App. Bd.), 2007 WL 763166

THIS OPINION IS A PRECEDENT OF THE TTAB

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER LLC) [1]

v.

WNBA ENTERPRISES, LLC

OPPOSITION 91160755; 91160763

March 13, 2007

**\*1** Donald F. Frei and Sarah Otte Graber of Wood Herron & Evans LLP for Nike, Inc.

Anil V. George of NBA Properties, Inc. for WNBA Enterprises, LLC

Before Holtzman, Drost and Cataldo

Administrative Trademark Judges

Opinion by Holtzman

Administrative Trademark Judge:

Applicant, WNBA Enterprises, LLC, has filed two applications to register the mark shown below.



Application Serial No.78246426 is for the following goods in Class 18:

> Athletic bags, shoe bags for travel, overnight bags, umbrellas, backpacks, baby backpacks, duffel bags, tote bags, luggage, luggage tags, patio umbrellas, valises, attache cases, billfolds, wallets, briefcases, canes, business card cases, book bags, all purpose sports bags, golf umbrellas, gym bags, purses, coin purses, fanny packs, waist packs, cosmetic cases sold empty, garment bags for travel, handbags, key cases, knapsacks, suitcases, toiletry cases sold empty, trunks for traveling and rucksacks.

Application Serial No. 78246393 is for the following goods in Class 25:

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 43 of 117

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...

Clothing, namely hosiery, footwear, basketball shoes, basketball sneakers, T-shirts, shirts, sweatshirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, caps, warm-up suits, warm-up pants, warm-up tops, jackets, wind resistant jackets, parkas, coats, cloth baby bibs, head bands, wrist bands, aprons, boxer shorts, slacks, caps, ear muffs, gloves, mittens, scarves, woven and knit shirts, dresses, cheerleading dresses and uniforms.

Both applications were filed on May 6, 2003 based on an allegation of a bona fide intention to use the mark in commerce.

Opposer filed a notice of opposition against each application,[2] asserting as its ground for opposition, priority and likelihood of confusion under Section 2(d) of the Trademark Act.[3] In particular, opposer alleges prior use and ownership of at least 15 registrations of marks that consist of or comprise an S and star design, principally the following two marks,

     

for goods described by opposer as "clothing, clothing accessories, headwear, footwear, back packs, athletic bags, stationery items, sports bottles, sporting equipment, and related goods and services," including Registration No. 1210630 for the mark



for "adult and youth wearing apparel, namely, jackets and warm-up suits" in Class 25.

Opposer also asserts ownership of at least 15 pending applications that consist of or comprise the S and star design, including application Serial No. 74468405 for the mark

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 44 of 117

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...



**\*2** for "luggage, namely, back packs, knapsacks, all purpose sports bags, gym and novelty tote bags" in Class 18.

Opposer claims that applicant's mark, when applied to applicant's goods, so resembles opposer's previously used and registered family of S and star design marks as to be likely to cause confusion.

Applicant, by its answers, admits opposer's "ownership and status" of its pleaded Registration No. 1210630 and application Serial No. 74468405. Applicant also admits that opposer is the owner of the other registrations and applications pleaded by opposer; and that all the pleaded applications (except pleaded application Serial No. 78380777) were filed prior to the filing date of the opposed application. Applicant has denied the remaining salient allegations.

The record includes the pleadings; the files of the involved applications; and, by stipulation of the parties, testimony in the form of declarations submitted by both parties. Opposer submitted the testimony and "supplemental" testimony, with exhibits, of Elizabeth Kain, contract manager of Exeter Brands Group, LLC, which manages the licensing and marketing of opposer's trademarks; and the testimony, with exhibits, of Sarah Otte Graber, counsel for Official Starter LLC. In addition, opposer filed a notice of reliance on status and title copies of a number of its pleaded registrations; TESS and TARR copies of certain pleaded applications; and applicant's responses to opposer's discovery requests. [4]

Applicant submitted the testimony of Emilio Collins, vice president, global marketing partnerships of NBA Properties, Inc.; the testimony, with exhibits, of Carolanne McAuliffe, director, WNBA Marketing Partnerships; and the testimony, with exhibits, of Anil V. George, intellectual property counsel at NBA Properties, Inc. Both parties filed briefs and opposer filed a reply brief.

### The Parties

Applicant, WNBA Enterprises, LLC, owns the intellectual property of the WNBA, a professional women's basketball league affiliated with the NBA. The WNBA is composed of 14 teams, including the San Antonio Silver Stars. Applicant's mark is one of the trademarks of the San Antonio Silver Stars team. The WNBA games are played in WNBA arenas in metropolitan markets including Madison Square Garden in New York; the Target Center in Minneapolis, Minnesota; and the SBC Center in San Antonio, Texas.

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 45 of 117

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...

Opposer manufactures and sells a variety of men's, women's and children's sports-related clothing, such as jerseys, outerwear and headwear; and sports-related goods such as basketballs, baseballs, sports bags and backpacks. Opposer, through its predecessors, has been using marks that consist of or comprise the S and star logo with clothing and sports bags since 1980. [5] The marks are used by placing them directly on the goods, on hang tags and labels associated with the goods, and on packaging for the goods.

Opposer sells its merchandise under its private brand, and is also licensed to co-brand its merchandise with the names and logos of sports leagues and teams. Opposer has established marketing relationships with professional sports leagues, such as the National Football League (NFL), the National Hockey League (NHL), Major League Baseball (MLB) and the National Basketball Association (NBA); as well as collegiate basketball teams in the National Collegiate Athletic Association (NCAA). In addition, opposer provided official athletic gear, including sports bags, duffle bags and clothing for the 1996 U.S. Olympic team.

**\*3** Opposer has been licensed to manufacture and market products bearing the names and logos of the NBA and certain individual teams since 1981. In particular, the marks have been used and promoted in connection with clothing, sporting goods and bags of the NBA team the "San Antonio Spurs," located in San Antonio, Texas. Opposer has also promoted its sports-related products in association with NCAA collegiate basketball teams located in Texas.

Opposer promotes and advertises its marks and goods through product catalogs; through advertisements in sports-related magazines, such as Sports Illustrated, NBA HOOP, and Vibe, and non-sports magazines such as Complex; through endorsements by prominent professional athletes, including NBA players; and on banners displayed during professional sports games. In 2005, opposer contracted to have large banners "showing the Starter S\* Mark" displayed at courtside in 11 stadiums where NBA basketball teams play, including the "Target Center" arena, located in Minneapolis, Minnesota; and in 16 stadiums at courtside where NCAA basketball teams play. (Kain Decl., ¶¶ 10, 14.)

Opposer sells its products in general retail stores, in sporting goods stores such as Foot Locker and Champs Sports, and on the websites of K-Mart, Wal-Mart and www.gifts.com.

Applicant is involved with creating and marketing logos for the WNBA teams, including the San Antonio Silver Stars, for consumer merchandise. The WNBA has established a merchandising program around the trademarks of its teams, and uses the marks on consumer products including apparel, bags and carrying cases. The WNBA has product and "sponsorship partner relationships" with such companies as Nike, Reebok, Russell Athletic, Nokia and Coca Cola, which advertise their products in conjunction with the WNBA and WNBA team logos. (Collins Decl., ¶5.) The "sponsorship" relationships include advertising, cross-promotional activities and specific WNBA team sponsorships.

Each WNBA team logo is part of a larger merchandise marketing plan that creates and promotes an overall team "identity." (McAuliffe Decl., ¶4.) Applicant's S and star design mark is part of a category of WNBA team identities known as secondary team logos. The secondary team logos are used to "complement" the primary team logos which incorporate a team name or nickname along with the team's geographic indicator. The primary logo of the San Antonio Silver Stars is shown below.



Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 46 of 117

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...

Although the subject applications were filed on an intent-to-use basis, applicant started using the mark



in May 2003 on clothing. Products bearing this team logo, as is customary with WNBA consumer products in general, simultaneously depict one or more WNBA league logos on hangtags or stickers associated with the goods.

The WNBA has an active and loyal fan base with more than 28 million adult fans. During the 2004 season, over 2 million spectators attended WNBA games for the sixth consecutive year. The WNBA games are televised on networks, including ABC, ESPN, and ESPN2. Since 1997, the WNBA has operated a league website located at www.wnba.com with an online store and information about the WNBA players and the league. The website received 79.6 million page views in 2004, and receives about 900,000 unique visitors per month.

## PRIORITY

 **\*4**  Opposer, by its notice of reliance, has made of record status and title copies of certain of its pleaded registrations for the marks consisting of or comprising the

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 47 of 117

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...



logo. [6]

The mark



is the subject of the following registrations:

Registration No. 1210630 for "adult and youth wearing apparel-namely, jackets and warm-up suits" in Class 25;

Registration No. 1614937 for "adult and youth wearing apparel, namely, jackets, warmup shirts and suits, wind resistant jackets, sweatshirts and suits, t-shirts, head bands, wrist bands, shorts, polo shirts, sweaters, tank tops and hats" in Class 25; and

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 48 of 117

Registration No. 2772524 for "gloves" in Class 25.

That mark is also the subject of Registration No. 2553955 for "sport bottles sold empty" in Class 21; and Registration No. 2851159 for goods in Class 28 including pumps for inflating sports equipment, basketball nets, baseball batting gloves, and baseball catcher shin guards. [7]

The mark



is the subject of the following registrations:

Registration No. 1478788 for "adult and youth wearing apparel, namely-jackets, warm up suits, wind resistant jackets, sweat suits, t-shirts, head bands, wrist bands, shorts, polo shirts, sweaters, tank tops, undershirts and hats" in Class 25;

Registration No. 2772525 for "gloves" in Class 25; and

Registration No. 2247531 for "clothing for infants and toddlers, namely French creepers, one piece jumpers, rompers, coveralls, pants, shirts, sleepers, headbands and bonnets" in Class 25.

Additional registrations made of record by opposer for the mark

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 49 of 117

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...



are as follows: Registration No. 2105473 for "basketballs, footballs, soccer balls, flying discs, golf bags, golf balls, golf club head covers, baseball batting gloves, baseballs and volleyballs" in Class 28; Registration No. 2847787 for goods in Class 28 including pumps for inflating sports equipment, basketball nets, baseball batting gloves, and baseball catcher shin guards; Registration No. 2134015 for goods in Class 16 including pens, pencils and stationery; Registration No. 2179091 for goods in Class 16 including binder sets and composition books; Registration No. 2070084 for "wrist watches" in Class 14; Registration No. 2553954 for "sport bottles sold empty" in Class 21; Registration No. 2556281 for "eyeglasses, sunglassses and eye-glass cases" in Class 9; and Registration No. 2209298 for "retail store services in the field of apparel and accessories" in Class 42.

Thus, opposer's standing has been established, and its priority with respect to the registered marks for the goods and/or services identified therein is not in issue. [8] King Candy Co., Inc. v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

 **\*5**  Opposer has also demonstrated priority based on use of the mark



on apparel, and use of the mark

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 50 of 117



on sports bags prior to the May 6, 2003 constructive date of first use of the subject applications. [9] Ms. Kain states in her declaration that opposer has used "Starter's S* marks" with clothing and sports bags since at least as early as 1980. (Decl., ¶7.) Opposer has submitted photographs and catalogs showing use of one or both versions of the mark on various items of sports-related clothing and on hangtags for the clothing; and use of the STARTER S and star design mark on sports bags, such as backpacks and gym bags. [10]

Priority having been established, we turn to the question of likelihood of confusion.

**LIKELIHOOD OF CONFUSION**

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue. In re E.I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). In any likelihood of confusion analysis, however, two key considerations are the similarities or dissimilarities between the marks and the similarities or dissimilarities between the goods. See Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976).

**Family of marks**

Opposer has pleaded and argues in general terms that it owns a family of "S and star design" marks for a variety of sports-related products. In addition to its two principal S and star design marks, opposer contends that it has also used other marks incorporating the S and star design, such as STARTER TEAM WEAR DREAM WEAR STARTER S and star design; IT STARTS WITH THE RIGHT ATTITUTDE STARTER S and star design; and STARTER ALL-AMERICAN TEEN S and star design. However, the requisite showing of a family of marks has not been made. The fact that opposer may have used and/ or registered several marks incorporating this feature, is not in itself sufficient to establish the existence of a family of marks. See J & J Snack Foods Corp. v. McDonald's Corp., 932 F.2d 1460, 18 USPQ2d 1889 (Fed. Cir. 1991). As stated by the Court "There must be a recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods." J & J Snack Foods, supra at 1891. Accordingly, opposer must demonstrate that the marks asserted to comprise the family, or a number of them, have been used and advertised in promotional material or in everyday sales activities in such a manner as to create common exposure and thereafter recognition of common ownership based upon a feature common to each

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 51 of 117

mark. See Truescents LLC v. Ride Skin Care LLC, 81 USPQ2d 1334 (TTAB 2006) citing American Standard, Inc. v. Scott & Fetzer Co., 200 USPQ 457, 461 (TTAB 1978).

**\*6**  We have insufficient evidence that opposer has promoted any number of its claimed marks together to the public. Opposer's evidence consists largely of either internal documents or marketing materials, such as product catalogs and promotional brochures, directed to merchandisers. None of this material is evidence of public exposure to such marks, or in any event, of the extent of public exposure to such marks. In fact, there is little or no evidence of actual use of any "S and star design" marks together other than the S and star design alone and the S and star design with the word STARTER. Even then, the two marks appear together for the most part only on clothing, and not on a variety of sports-related products. [11]

In any event, the existence of a family of marks would not necessarily enhance opposer's claim of likelihood of confusion in this case because applicant is seeking registration for the exact feature that opposer claims is the basis of its family of marks claim without any additional word or design elements, and opposer owns registrations for the claimed family feature itself.

Therefore, we will determine the issue of likelihood of confusion based on the individual marks that are the subject of opposer's registrations and/or for which opposer has established prior use. In our analysis we will focus on the marks of opposer which can be considered closest to applicant's mark and goods, namely the mark



in Registration Nos. 1210630 for "adult and youth wearing apparel-namely, jackets and warm-up suits" in Class 25; 1614937 for "adult and youth wearing apparel, namely, jackets, warmup shirts and suits, wind resistant jackets, sweatshirts and suits, t-shirts, head bands, wrist bands, shorts, polo shirts, sweaters, tank tops and hats" in Class 25; and 2772524 for "gloves" in Class 25; and opposer's previously used mark

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 52 of 117



for sports bags.

**Goods**

**Serial No. 78246393 (Class 25)**

The goods in this application are identified as follows:

> Clothing, namely hosiery, footwear, basketball shoes, basketball sneakers, T-shirts, shirts, sweatshirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, caps, warm-up suits, warm-up pants, warm-up tops, jackets, wind resistant jackets, parkas, coats, cloth baby bibs, head bands, wrist bands, aprons, boxer shorts, slacks, caps, ear muffs, gloves, mittens, scarves, woven and knit shirts, dresses, cheerleading dresses and uniforms.

The apparel identified in opposer's Registration Nos. 1210630, 1614937 and 2772524 is identical in part to the apparel identified in applicant's '393 application. The overlapping goods include, for example, t-shirts, sweatshirts, sweatpants, tank tops, sweaters, hats, warm-up tops, jackets, wind resistant jackets, head bands, wrist bands, boxer shorts, slacks and gloves.

**Serial No. 78246426 (Class 18)**

*7  The goods in applicant's '426 application are identified as follows:

> Athletic bags, shoe bags for travel, overnight bags, umbrellas, backpacks, baby backpacks, duffel bags, tote bags, luggage, luggage tags, patio umbrellas, valises, attache cases, billfolds, wallets, briefcases, canes, business card cases, book bags, all purpose sports bags, golf umbrellas, gym bags, purses, coin purses, fanny packs, waist packs, cosmetic cases sold empty, garment bags for travel, handbags, key cases, knapsacks, suitcases, toiletry cases sold empty, trunks for traveling and rucksacks.

These goods are identical in part to opposer's sports bags which include backpacks and gym bags. Furthermore, the clothing identified in opposer's registrations is closely related to the Class 18 goods in applicant's '426 application. Wearing apparel is complementary in nature to accessories for clothing such as purses and tote bags, and items which are used to transport clothing or carry personal articles such as backpacks, duffel bags and garment bags. Applicant itself offers or intends to offer both types of products under its S and star design mark and the evidence shows that opposer markets both types of products under a variation of its S and star design mark. In this regard we also consider under the tenth du Pont factor, "the variety of goods on which a mark is or is not used (house mark, 'family' mark, product mark)." Although opposer has not established a family of marks, opposer has used and registered the S and star design, with or without the word STARTER, for apparel and sports apparel as well as for other sports-related products and equipment. Such products include basketballs, footballs and baseballs, pumps for inflating sports equipment, sunglasses, batting gloves, shin guards, and sports bottles. The fact that opposer applies its marks to a variety of sports products makes it more likely that purchasers, aware of opposer's use of the mark on a variety of sports products, when seeing a similar mark used in connection with backpacks, duffel bags and other sports bags, are likely to believe that these products are also being produced or sponsored by opposer. See Genesco Inc. v. Martz, 66 USPQ2d 1260, 1271 (TTAB 2003) ("this factor may favor a finding that confusion is likely even if the goods are not obviously related"). Thus, this factor, as well as the relatedness of apparel and bags, would favor opposer. See Uncle Ben's Inc. v. Stubenberg International Inc., 47 USPQ2d 1310 (TTAB 1998).

**Channels of trade**

Absent any restrictions in the respective applications and registrations, we must presume that applicant's apparel and bags and opposer's apparel are sold through all normal channels of trade for those goods, including all the usual retail outlets. See Canadian Imperial Bank v. Wells Fargo, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1987). Opposer's evidence shows that the normal channels of trade for these products, as well as opposer's sports bags, include general retail stores, sporting goods stores such as Foot Locker and Champs Sports, and online retail outlets such as the websites for K-Mart and Wal-Mart. In addition, applicant states that it intends to sell its goods through all the normal channels of trade including traditional retailers and sporting goods stores. (Resp. to Interrog. No. 15.)

**Purchasers/cost**

 **\*8** Applicant does not dispute that the respective goods are identical and/or closely related or that the channels of trade for the goods would be the same. Applicant's arguments concern the purchasers for these goods.

Applicant argues that the sophistication of sports consumers precludes the likelihood of confusion. Applicant contends that its products are primarily purchased by, or for, fans of the WNBA and each of its teams. According to Ms. McAuliffe and Mr. Collins, sports fans are very discerning and specific in their loyalties to individual teams; they are accustomed to seeing banners and other marketing materials of third-party sponsors in and around the basketball arenas where WNBA teams play; and they will not be confused into thinking that the sponsor's products are licensed WNBA products. Mr. Collins states that NBA and WNBA fans are well-acquainted with the concept of sports marketing; that they understand the role of sponsorships in the sports world; and that fans are aware that a "sponsorship relationship" does not function as a source identifier with the league or team with which the sponsorship exists.

Opposer, for its part, contends that the typical consumers of opposer's goods are men, women, boys and girls interested in sports in general and in association with professional sports leagues and teams. According to Ms. Kain, the consumers for opposer's products, although interested in their particular teams, are typically not sophisticated buyers but rather buy on a whim or without much deliberation.

The problem with both opposer's and applicant's arguments is that they fail to consider that the goods as identified in applicant's involved applications for apparel and bags, and opposer's registrations for apparel are not restricted to a particular class of

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 54 of 117

purchasers, i.e., sports fans. Furthermore, for the most part the identified goods are not even restricted to sports-related use. It is well settled that the determination of likelihood of confusion must be based on a comparison of the goods as identified in the applications and registrations, rather than on the basis of what evidence might show the actual nature of the goods or actual purchasers of the goods to be. See J & J Snack Foods Corp., supra; and Octocom Systems Inc. v. Houston Computers Services Inc., 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990).

Thus, applicant's and opposer's presumptions about who the relevant purchasers for these goods are or what they would know or think when confronted with the respective marks on the goods described in the applications and registrations are not relevant. It must instead be presumed that while sports fans may be among the purchasers of these goods, in the absence of any specific restrictions in the applications or registrations as to the classes of purchasers, we must presume that both applicant's apparel and bags, and opposer's apparel reach all the usual classes of purchasers, including ordinary consumers.

*9  In any event, ordinary consumers would also be considered potential purchasers of the parties' sports-related clothing, such as warm-up tops and pants, and their sports-related bags, such as gym bags and "all purpose sports bags."

Further, the record shows that both parties' goods are relatively inexpensive. Ms. Kain states that opposer's clothing and bags range from $15-$100, "depending on the nature of the goods." Ms. Kain later states, and the website printouts from www.walmart.com show, that opposer's clothing ranges in price from $5 to $40. [12]  Applicant's website shows shirts priced from $20 to $60. It is unlikely that these products would be purchased with the exercise of a great deal of care. See, e.g., Specialty Brands, Inc. v. Coffee Bean Distributors, Inc., 748 F.2d 669, 223 USPQ 1281 (Fed. Cir. 1984) (purchasers of relatively inexpensive products are held to a lesser standard of purchasing care.)

We also note that the WNBA has "sponsorship partner relationships" with companies including Nike, opposer herein. We find that such a relationship, if anything, would enhance the likelihood that even more discerning consumers (assuming, as applicant claims, that sports fans are more discerning) would be confused as to sponsorship if applicant were to market its goods with a mark similar to the marks of opposer. [13]  See, e.g., Carlisle Chemical Works, Inc. v. Hardman & Holden Ltd., 434 F.2d 1403, 168 USPQ 110, 112 (CCPA 1970) ("Human memories even of discriminating purchasers…are not infallible.").

**Fame**

Thus, we turn to a discussion of the marks, and first to the factor of fame because this factor "plays a 'dominant role' in the process of balancing the du Pont factors." Recot Inc. v. Becton, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000). We find that the evidence is not sufficient on this record to prove that opposer's S and star design is a famous mark. See Blue Man Productions Inc. v. Tarmann, 75 USPQ2d 1811, 1819 (TTAB 2005) ("it is the duty of a plaintiff asserting that its mark is famous to clearly prove it.").

Ms. Kain testified that opposer has used the marks consisting of or comprising the S and star design for over 20 years. She has provided sales figures for the years 2000-2005 for apparel, footwear, headwear and bags at the wholesale level ranging from $125 million in 2000 to $289 million in 2004, and then dropping to $109 million in 2005. Ms. Kain explains that the wholesale figures "translate to be double when the goods are sold at retail." (Supp. Decl., ¶3). The sales figures appear in the abstract to be substantial. However, we cannot determine the significance of these figures in a vacuum, and opposer has not provided a meaningful context for them, such as evidence of opposer's market share for the goods. As stated by the Federal Circuit, "[r]aw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, but raw numbers alone in today's world may be misleading…. Consequently, some context in which to place raw statistics is reasonable." Bose Corp. v. QSC Audio Prods., 293 F.3d 1367, 63 USPQ2d 1303, 1309 (Fed. Cir. 2002). See also Fossil Inc. v. Fossil Group, 49 USPQ2d 1451, 1457 (TTAB 1998); and General Mills Inc. v. Health Valley Foods, 24 USPQ2d 1270 (TTAB 1992).

*10  Further, sales figures, in and of themselves, while perhaps demonstrating the popularity of a product do not necessarily reflect awareness or recognition of the mark applied to the product. See, e.g., In re Bongrain International (American) Corp.,

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 55 of 117

894 F.2d 1316, 13 USPQ2d 1727 (Fed. Cir. 1990). For example, there is no breakdown in sales between those products offered solely under opposer's S and star design marks and those products which are co-branded with league and team logos. Consumers' motivation to purchase opposer's products may be attributed to their recognition of sports team logos rather than any recognition of opposer's S and star design marks.

Opposer's additional evidence is not much more revealing. Ms. Kain testified as to advertising and promotional expenditures for only a two-year period, stating that opposer spent over $7.5 million in marketing and promoting the marks in 2001, and $10 million in 2002 in marketing in association with the NBA and NCAA. In addition, because all of opposer's catalogs (including the catalog relating to the 1996 Olympics) and most of its promotional materials are directed to merchandisers, it is unclear whether a substantial portion of those amounts was spent on promotion to consumers. Nor, in any event, do we have any evidence of the extent to which these materials have been distributed to the trade.

Opposer has introduced numerous internal documents, including marketing recaps, plans and strategies, a "board meeting presentation," a sponsorship and promotional agreement, and an annual report, none of which is probative evidence of consumer exposure to or awareness of the mark. We also point out that while these materials are accepted as true and accurate copies of opposer's authentic business documents they are of record only for what they show on their face, at least to the extent that there is no testimony concerning the truth or accuracy of the information contained in those documents. [14]

While endorsements of products by famous athletes can no doubt increase brand awareness, opposer has not indicated the frequency or duration of any such promotions. [15] Nor has opposer provided information regarding banner advertising for more than a single year. We cannot determine from opposer's vague and general statements regarding its asserted "star system" program what, if any, impact this program has had on consumers.

Finally, while Ms. Kain states that opposer's goods are currently being sold in general retail stores and on the websites of K-Mart, Wal-Mart and www.gifts.com, we have no evidence of the number of stores (other than in Texas) in which the products are currently sold or the length of time the products have been sold on these websites.

Opposer may have established successful relationships with sports leagues and teams over the years but the extent to which ultimate consumers have been exposed to or are aware of opposer's S and star design mark, on this record, is simply not clear.

 **11**  Accordingly, the evidence falls short of establishing fame. Nevertheless, we find that the evidence is sufficient to show that opposer's S and star design mark has achieved at least some degree of recognition and strength in the market and that the mark is therefore entitled to a broader scope of protection than might be accorded a less distinctive mark. Further, as will be discussed below, while star designs in and of themselves may be weak, there is no evidence which would effectively diminish the scope of protection to be accorded opposer's S and star design mark as a whole.

### Marks

In determining the similarity or dissimilarity of marks, we must consider the marks in their entireties in terms of sound, appearance, meaning and commercial impression. See du Pont, supra. See also Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005).

We turn first to a comparison of opposer's mark



as shown in Registration Nos. 1210630, 1614937 and 2772524 for apparel, with applicant's mark



for identical apparel and closely related bags.

As to sound, applicant essentially argues, relying on Diamond Alkali Co. v. Dundee Cement Co., 343 F.2d 781, 145 USPQ 211 (CCPA 1969), that the letter in the marks will not be pronounced. Applicant contends that "because the marks are comprised of a common letter and geometric shape, consumers must look to the particular stylization of the lettering and the overall appearance of the composite marks" to distinguish source.

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 57 of 117

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...

The Federal Circuit has observed in In re Electrolyte Laboratories, Inc., 913 F.2d 930, 16 USPQ2d 1239, 1240 (Fed. Cir. 1990), that "the nature of stylized letter marks is that they partake of both visual and oral indicia." However, it is also true that, as stated by the Board in Textron Inc. v. Maquinas Agricolas "Jacto" S.A., 215 USPQ 162 (TTAB 1982), "when letter marks are presented in a highly stylized form, so that they are essentially design marks incapable of being pronounced or conveying any inherent meaning, then differences in the lettering style and design may be sufficient to prevent a likelihood of confusion. In these cases similarity of appearance is usually controlling and the decision will turn primarily on the basis of the visual similarity of the marks."

While the marks in this case both include a stylized letter S, the letters are not so highly stylized that the marks as a whole would be perceived as purely visual designs. The Diamond Alkali case cited by applicant involved the following two marks,



(applicant's mark) and

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 58 of 117

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...



(opposer's mark), both asserted to be a stylized letter D. The Court noted the Board's observation that opposer's mark "would normally be regarded as consisting of an arbitrary design which is capable of many different interpretations rather than as a letter 'd'", and concluded that "symbols of this kind do not sound." Diamond Alkali at 213.

 **\*12** That is not the situation we have here. In the present case, the letter itself is still an essential feature of each mark. The stylization of the letter is not so extreme or striking that when viewing the marks in their entireties, the stylization overwhelms the underlying letter making it virtually unrecognizable or subordinate to the overall design. See, e.g., In re Fisher Tool Co., Inc., 224 USPQ 796 (TTAB 1984) and Textron Inc. v. Maquinas Agricolas "Jacto" S.A., supra. In fact, the stylization itself is not particularly distinctive or unusual and in both marks is easily recognizable as the letter "S."

Thus, the question of similarity or dissimilarity does not turn in this case only on a visual comparison of the marks. We find that the letter "S" in these marks is capable of being spoken and, to that extent, the marks would sound the same when spoken and they would have the same letter mark meaning.

Applicant also argues that the marks are different in appearance and create different commercial impressions, enumerating the differences as follows:
The Starter mark is a simple, flat design without dimension which contains a rigid, hard-edged, geometric "S" in both, the shape of which is formed out of the negative shape of the star. The left side of the Starter Mark's star does not contain a border while the remainder of the star has a dark border traced around the outside of the star. The left side of the Starter Mark's star also has closed tips, while the right side of the star has tips that are unclosed or chopped. The Starter Mark is an interlocking design, the shapes of which are dependent on one another, such that if one were to take away the star portion of the mark, the "s" would cease to exist..................................................................................................................................

In contrast, the Silver Stars Mark contains a highly stylized, fluid "S" design absent from any hard curves or edges, which floats in the middle of a dimensional angled star, giving a sense of movement and energy to the design. The star in the Silver Stars

Mark star is essentially bilateral; unlike the star in the Starter Mark, every side of the Silver Stars Mark's star has a border and every side of the star has closed tips. Moreover, the Silver Stars Mark is actually a double or concentric star, that is, a star within a star, in contrast to the single star in the Starter Mark...............................................................................................................................

We find that the marks are similar in appearance and that they create the same overall commercial impression and that the differences in stylization and placement of the two elements are not as important as the overall visual similarities in the marks. The marks contain the same two elements - the letter "S" and a five-pointed star design. In both marks the two elements are equal in size and in relative proportion to each other. Although the letter "S" precedes the star in opposer's mark and appears on top of the star in applicant's mark, the S is physically connected to the star in both marks and it creates the first and most significant visual impact in both marks.

 **\*13**  Applicant has made very fine distinctions between the marks and we do not find them either individually or cumulatively significant. It is well settled that marks must be compared in their entireties, not dissected into component parts and the minute details of each part compared with other parts. See Dan Robbins & Associates, Inc. v. Questor Corporation, 599 F.2d 1009, 202 USPQ 100 (CCPA 1979). In the normal marketing environment, purchasers would not usually have the luxury of examining marks in such minute detail. We must also consider that the average purchaser is not infallible in his recollection of trademarks and often retains only a general, rather than a specific, recollection of marks that he may previously have seen in the marketplace. In re Mucky Duck Mustard Co., 6 USPQ2d 1467 (TTAB 1988). Keeping in mind that the marks may not even be seen at the same time, ordinary purchasers who are familiar with opposer's S and star design mark on clothing, upon later encountering applicant's mark on identical and/or closely related clothing and bags, would not necessarily remember fine details about the mark they had previously seen, given their hazy and imperfect recall, and they may remember the marks as being the same. Even those purchasers who notice and remember the differences in the marks, or who are, as applicant claims, knowledgeable about "sponsorship activities," are likely to believe in view of the overall similarities in the marks that opposer is licensing a slightly different version of the same mark and mistakenly assume that applicant's brand of clothing and bags is therefore sponsored by opposer. [16]

Applicant argues that opposer's mark is weak and not entitled to protection beyond "the exact iteration for which it has a registration." In support of its position, applicant has introduced a number of third-party registrations and applications, including two registrations and an application which are apparently owned by applicant. Applicant contends that opposer's mark coexists on the Principal Register with similar marks for similar goods which, according to applicant, reflects a crowded marketplace of S and star design marks. The registrations and applications are set forth in the chart below.

| | | |
|---|---|---|
| S (design) | Reg. No. 2007273 issued to The Baseball Club of Seattle, L.P. | Clothing, namely, shirts, caps, shorts, t-shirts, etc. |
| S star (design) | Reg. No. 2978808 issued to WNBA Enterprises, LLC | Clothing, namely hosiery, footwear, basketball shoes, t-shirts, etc. |

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 65 U.S.P.Q.2d 1187...

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 60 of 117

| | | |
|---|---|---|
| | Reg. No. 2756590 issued to WNBA Enterprises, LLC | Clothing, namely, hosiery, footwear, t-shirts, etc. |
| | Reg. No. 2624045 issued to Southern Sun | Shirts, pants, hats and jackets |
| | Reg. No. 2940851 issued to James David Turman | Clothing, namely, coats, jackets, shirts, etc. |
| | Reg. No. 2819782 issued to Chrishell (Partnership) | Clothing, namely, t-shirts, shorts, sweatpants, sweat shirts, etc. |
| | Ser. No. 78486926 filed by Stelari, LLC | Handbags and straps for handbags |
| | Ser. No. 78249556 filed by WNBA Enterprises, LLC | Athletic bags, backpacks, duffel bags, tote bags, luggage, etc. |
| | Ser. No. 78724960 filed by The Baseball Club of Seattle, L.P. | Athletic bags, backpacks, duffel bags, tote bags, etc. |
| | Ser. No. 76648484 filed by Weefeet Company | Clothing, namely, socks, shirts, shorts, sweatshirts and t-shirts |

Evidence of widespread third-party use can serve to diminish the strength of a mark and thus the scope of protection to which a mark is entitled. However, third-party registrations are not evidence of use. [17] The existence of these marks on the register is not evidence of what happens in the marketplace or that customers are familiar with them. AMF Incorporated v. American Leisure Products, Inc., 177 USPQ 268, 269 (CCPA 1973) ("little weight is to be given such registrations in evaluating whether

there is likelihood of confusion."). Moreover, pending applications are not evidence of anything except that the applications were filed on a certain date.

**\*14**  Furthermore, the appearance and/or commercial impressions of the marks in these registrations and applications differ markedly from the appearance and/or commercial impression of opposer's mark. The star is not a prominent feature of the mark in Ser. No. 78486926; and it forms part of a composite suggesting a weather vane in Ser. No. 76648484. The multiple stars within the S design in Reg. No. 2624045 create a ribbon effect, certainly not present in opposer's mark. The remaining marks do not contain a geometric star design at all. The mark in Reg. Nos. 2978808 and 2756590, and Ser. No. 78249556 features a sun design; the mark in Ser. No. 78724960 and Reg. No. 2007273 contains the more complex compass star design; the mark in Reg. No. 2819782 suggests a setting sun or rising star; and the mark in Reg. No. 2940851, if anything, resembles a pinwheel. Simply put, none of the marks in these registrations and applications is as similar to opposer's mark as applicant's mark.

In addition, Ms. Kain testified that she is not aware of any unaddressed third-party uses of and/or registrations or applications for similar S and star designs marks for apparel and bags or other sports-related goods. Opposer has submitted evidence of its efforts to police its mark against other entities using what opposer believes to be conflicting S and star marks by cease and desist letters and/or by instituting proceedings against such entities. These matters have either been resolved in opposer's favor or are being pursued by opposer.

In further support of applicant's contention that the mark is weak, applicant argues that the mark is comprised of common elements, a five-pointed star and the letter "S," neither of which, according to applicant, is inherently distinctive. In support of this contention, applicant relies on Philip Morris Incorporated v. Rothmans of Pall Mall Limited, 180 USPQ 592 (TTAB 1973) holding that star designs, like other common geometric shapes, are not distinctive.

It is true that cases have held that star designs are not particularly distinctive, in and of themselves. Opposer's own record shows that star designs in various forms are commonly used on apparel and accessories by sports teams in their logos (for example, the Dallas Cowboys, Houston Astros and Orlando Magic). However, opposer's mark in this case is not a star design alone. It is a composite consisting of a letter and star design. There is no evidence that the letter "S" is commonly used in the sports field or on clothing and bags generally, and certainly no evidence of widespread use. Nor has applicant pointed to any authority stating that a letter mark in and of itself is not distinctive.

In a further attempt to distinguish the marks, applicant argues that opposer's mark is usually used and registered with the word STARTER and that applicant's mark, which is a "secondary" logo, is marketed in connection with its "primary" logo for the San Antonio Silver Stars team. This argument is not relevant. The word STARTER is not part of this registered mark of opposer's, and the "primary" logo is not part of applicant's mark.

**\*15**  We turn then to a comparison of opposer's mark

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 62 of 117

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...



in application Serial No. 74468405 for bags, where STARTER is part of the mark, with applicant's mark



for identical goods, keeping in mind that when goods are identical, "the degree of similarity necessary to support a conclusion of likely confusion declines." Shen Manufacturing Co., Inc. v. The Ritz Hotel Limited, 393 F.3d 1238, 73 USPQ2d 1350, 1354 (Fed. Cir. 2004).

For the reasons stated above and the additional reasons which follow, we find, notwithstanding the addition of the word STARTER to opposer's mark, that the overall similarities between the respective marks outweigh their differences.

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 63 of 117

It has been held that the addition of a trade name or house mark or other such matter to one of two otherwise similar marks will not serve to avoid a likelihood of confusion. See, e.g., First International Services Corp. v. Chuckles Inc., 5 USPQ2d 1628 (TTAB 1988); In re The U.S. Shoe Corp., 229 USPQ 707 (TTAB 1985); and In re Apparel Ventures, Inc., 229 USPQ 225 (TTAB 1986). We believe that principle is applicable here. The S and star design, which is applicant's entire mark, is still a significant component of opposer's composite mark and it creates a strong visual impact apart from the word STARTER. Further, while the star component of opposer's mark may be weak, there is no evidence that the unitary S and star design as a whole is weak and entitled to only a narrow scope of protection, and certainly not so narrow that it should only extend, as applicant claims, to an "exact iteration" of opposer's mark. In fact, as we found earlier, opposer's S and star design mark as a whole has achieved a greater degree of distinctiveness than might be accorded a star mark in general and it is therefore entitled to a broader scope of protection. Thus, while the word STARTER obviously adds to the differences in the marks, it is not sufficient to distinguish the marks when viewed in their entireties. Compare Knight Textile Corp. v. Jones Investment Co., 75 USPQ2d 1313 (TTAB 2005). We find that purchasers who are familiar with opposer's sports bags sold under its S STARTER and star design mark would be likely to believe, upon encountering a mark that consists entirely of a similar S and star design for the identical goods, that the goods originated with or are associated with or sponsored by the same entity.

**Actual confusion**

Applicant argues that the parties' marks have coexisted in the marketplace for nearly three years without confusion and that the absence of actual confusion is a critical factor weighing against a finding of likelihood of confusion. Applicant points to a number of cases, including Oreck Corporation v. U.S. Floor Systems, Inc., 803 F.2d 166, 231 USPQ 634 (5th Cir. 1986) and Keebler Company v. Rovira Biscuit Corporation, 624 F.2d 366, 207 USPQ 465 (1st Cir. 1980), finding no likelihood of confusion where the evidence of actual confusion was lacking and where the time period of concurrent use was even shorter than three years.

 *16  Suffice it to say that the facts in the cases cited by applicant differ substantially from the facts herein and do not compel a finding in this case or in any given case that a three-year period of contemporaneous use without confusion is per se significant. The lack of actual confusion is only one of a number of factors to be considered in determining likelihood of confusion and in this case we find that it is outweighed by all the other factors in opposer's favor. In fact, the evidence in this case is not sufficient to show that a meaningful opportunity for actual confusion has existed. In addition to the relatively brief period of contemporaneous use, and notwithstanding that WNBA games in general may receive wide public exposure and attention, there is no specific evidence regarding the nature and extent of public exposure to this particular mark during the period of contemporaneous use.

We find, in view of the similarity of the marks, and because the marks are used in connection with identical and/or closely related goods that are sold in the same channels of trade to the same ultimate consumers, that confusion is likely.

To the extent that there is any doubt on the issue of likelihood of confusion, it is settled that such doubt must be resolved in favor of the prior user and/or registrant. Broderick & Bascom Rope Co. v. The Goodyear Tire and Rubber Co., 531 F.2d 1068, 189 USPQ 412 (CCPA 1976); and Crown Radio Corp. v. Soundscriber Corp., 506 F.2d 1392, 184 USPQ 221 (CCPA 1974).

**Decision:** The consolidated oppositions are sustained, and registration to applicant is refused.

---

1    The Board on August 23, 2005 granted opposer's motion to substitute Nike, Inc. as plaintiff herein.

2    Opposition No. 91160755 was filed on May 21, 2004 against Serial No. 78246426; Opposition No. 91160763 was filed on May 24, 2004 against Serial No. 78246393. The oppositions were consolidated by the Board on August 23, 2005.

NIKE, INC. (SUBSTITUTED FOR OFFICIAL STARTER..., 85 U.S.P.Q.2d 1187...

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 64 of 117

3    Opposer also alleges dilution as a ground for opposition. Inasmuch as opposer submitted no evidence or argument on this claim, the claim will be given no further consideration.

4    We note that Ms. Kain did not reference any exhibits in the testimony itself, but instead simply attached a listing of over 100 exhibits to the end of her declaration. Ms. Kain should have at least provided some explanatory cross-reference of the exhibits to the relevant testimony. Opposer introduced the documents in response to discovery requests under Trademark Rule 2.120(j)(3)(i) in the same manner, making it difficult to determine which documents were responsive to which discovery requests.

5    Ms. Kain refers to these marks as a group identifying them as "Starter's S* marks." There is no testimony relating to any individual mark.

6    We note, however, that the copy of Registration No. 2179091 shows the status of that registration as "cancelled," and therefore this registration has not been considered. We also note that the status and title copies of two registrations, Registration Nos. 2200628 and 2209298, do not reflect that Section 8 affidavits, while due before the April 27, 2005 date of preparation of the status and title copies by the Office, were filed by opposer, and Office records now show that these registrations were cancelled on July 30, 2005 and September 11, 2005, respectively. It appears that the status and title copies were prepared by the Office after the expiration of the grace period for filing the affidavits, but before the time for automatic cancellation of the registrations had passed. When a Federal registration owned by a party has been properly made of record, and the status of the registration changes between the time it was made of record and the time the case is decided, the Board will take judicial notice of the current status of the registration, as shown by the records of the Office. See TBMP §704.03(b)(1)(A) (2d ed. rev. 2004). Accordingly, the cancelled registrations have not been considered.
We also note that the status and title copies of the registrations show ownership in Official Starter LLC. Ms. Kain testified that on May 31, 2005, which was subsequent to the date of preparation of these records, Official Starter LLC assigned its rights in the marks to Nike, Inc. We take judicial notice that Office records have now been updated to reflect ownership of the registrations in the name of Nike, Inc.

7    Neither this registration, nor Registration Nos. 2134015 and 2209298, discussed infra, were pleaded by opposer in the notice of opposition. However, applicant has not objected to opposer's reliance on the three unpleaded registrations. Accordingly, we treat these unpleaded registrations as having been tried by implied consent of the parties and we deem opposer's pleading amended to assert the registrations under Fed. R. Civ. P. 15(b).

8    Opposer submitted TESS and TARR records of certain of its pleaded applications with its notice of reliance. The Office records now show that all of those applications, except Serial No. 74468405 for STARTER S and design for "luggage; namely, back packs, knapsacks, all purpose sport bags, duffel bags, gym and novelty tote bags" in Class 18 and Serial No. 74428320 for RUGGED TERRAIN S STARTER and design for wearing apparel in Class 25, have been abandoned. In any event, pending applications are evidence only that the applications were filed on a certain date. They are not evidence of use of the marks. See Viking Boat Co. v. Viking Camper Supply, Inc., 191 USPQ 297 (TTAB 1976). Further, applicant's admissions in its answers of opposer's ownership of the pleaded applications and opposer's "ownership and status" of application Serial No. 74468405 are not admissions that the marks in the applications are in use.

9    Office records indicate that opposer's application Serial No. 74468405 for the STARTER S and star design mark in Class 18 matured into Registration No. 3036990 on January 3, 2006, after the close of opposer's testimony period on September 30, 2005.

10    There is no evidence by opposer or any admission by applicant that opposer has used the mark S and star design alone on bags.

11    Opposer refers generally to its claimed "star system" marketing strategy which includes the mark "LOOK FOR THE STAR," and that slogan can be seen on hangtags in photographs of clothing and in a photograph of a basketball. However,

opposer has not explained this strategy in any detail and its impact, if any, on consumers cannot be determined. Further, the claimed family feature is the S and star design, not the "star" feature alone.

12    From what we can glean from the record, the price difference may depend at least in part on whether the products are branded only with its own marks or are co-branded with team names and logos.

13    Applicant has cited several cases, including Boston Professional Hockey Association v. Dallas Cap & Emblem Manufacturing Co., 510 F.2d 1004, 185 USPQ 364 (5th Cir. 1975), cert. denied, 423 U.S. 868 (1975) and National Football League v. Wichita Falls Sportswear 532 F.Supp. 651, 215 USPQ 175 (W.D. Wash. 1982), in support of its arguments regarding a claimed "association in the minds of consumers between team-branded products and services, on the one hand, and nationally recognized sports teams or professional sports leagues, on the other." First, as we noted, the goods in this case, as identified, are not limited to purchase by sports fans. Further, while the courts in the cited cases found generally that sports fans are motivated to purchase products bearing the logos of their favorite teams, the courts made no pronouncements about the discerning nature of such purchasers, or any special ability to distinguish trademarks. In fact, each of the cited cases found a likelihood of confusion as to authorization or sponsorship.

14    As a result of the manner in which the documentary exhibits were introduced in connection with Ms. Kain's testimony, we cannot clearly determine, with respect to many of the exhibits, which documents relate to which testimony.

15    Opposer's examples of magazine advertisements are of little probative value in this regard. The advertisement featuring Shaquille O'Neal (exhibit 28) is an endorsement of products offered under the STARTER mark, not the S and star design mark. The remaining advertisements (exhibits 28-33) are photographs of unidentified models wearing opposer's apparel, and in any event do not appear to be endorsements by any recognized athletes. There is an example of what Ms. Kain identifies simply as "a promotional brochure" (exhibit 50) dated 1993, and the portion of record consists of three pages featuring Karl Malone. This brochure, like all the other catalogs and brochures of record, appears to have been directed to wholesalers, and there is no indication that it was distributed to the public.

16    Contrary to applicant's apparent contention, Section 2(d) of the Trademark Act protects not only against confusion as to source, but also as to affiliation, connection or sponsorship. See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §23:8 (4th ed. 2006). See also Hilson Research Inc. v. Society for Human Resource Management, 27 USPQ2d 1423 (TTAB 1993); and American Stock Exchange, Inc. v. American Express Co., 207 USPQ 356 (TTAB 1980).

17    The Section 7(b) presumptions accorded a registration on the Principal Register, including the presumption of use of the mark, accrue only to the benefit of the owner of the registration, and thus only come into play in an inter partes proceeding when the registration is made of record by its owner. See TBMP §704.03(b)(1)(B).

85 U.S.P.Q.2d 1187 (Trademark Tr. & App. Bd.), 2007 WL 763166

---

**End of Document**                                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    24

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 66 of 117

Nike, Inc. v. Eastern Ports Custom Brokers, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3472628

2018 WL 3472628
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

NIKE, INC., Plaintiff,

v.

EASTERN PORTS CUSTOM
BROKERS, INC., et al., Defendants.

Civil Action No.: 2:11-cv-4390-CCC-MF

|

Signed 07/18/2018

|

Filed 07/19/2018

**Attorneys and Law Firms**

Safia Anisa Anand, Olshan Frome Wolosky LLP, Newark, NJ, for Plaintiff.

**OPINION**

CLAIRE C. CECCHI, U.S.D.J.

**\*1** This matter comes before the Court upon the motion of Plaintiff Nike, Inc. ("Nike" or "Plaintiff") pursuant to Federal Rule of Civil Procedure 56 for summary judgment as to liability on Counts I, II, III, V, and VI of Plaintiff's Amended Complaint, ECF No. 143, and upon the cross-motions of Defendants City Ocean Logistics Co. ("Logistics") and City Ocean International, Inc. ("International," and collectively with Logistics, "Defendants") for summary judgment on all counts, ECF Nos. 147; 148. The Court held oral argument in this matter, ECF No. 179, and issued an order for supplemental briefing, ECF No. 200, with which the Parties complied. ECF Nos. 201; 202. For the reasons set forth below, Nike's motion is granted, and Defendants' cross-motions are denied. Also before the Court is Plaintiff's motion for default judgment against Defendant Eastern Ports Custom Brokers, Inc. ("Eastern Ports") pursuant to Federal Rule of Civil Procedure 55(b)(2). ECF No. 166. For the reasons set forth below, Plaintiff's motion for default judgment is granted.

# I. BACKGROUND

## A. The Parties

Nike is an American corporation that has been in the business of advertising, offering for sale, and selling footwear and footwear-related products in the United States since 1971. *See* Plaintiff's Statement of Material Facts Not in Dispute Pursuant to Local Rule 56.1 ("PSMF"), ECF No. 143-1 ¶ 1.[1] Nike possesses Federal Trademark registrations for several widely recognized marks, including "Nike," "Swoosh Design," "Swoosh," "Nike Air," and "Air Force 1," which are used in conjunction with many of Nike's footwear products. *Id.* ¶¶ 2-3. Nike's marks are recorded with the U.S. Department of Treasury and United States Customs and Border Protection ("Customs"). *See id.* ¶ 4.

[1]   Local Rule 56.1 requires a party filing a motion for summary judgment to file a statement of material facts not in dispute. *See* Local Civ. R. 56.1. An opponent of the motion must provide a responsive statement, addressing each material fact and "indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents." *Id.* Any material fact not disputed "shall be deemed undisputed" for purposes of deciding the motion. *Id.* For many of Plaintiff's material facts, Defendants responded with "neither admitted nor denied" and cursorily stated that the evidence "speaks for itself" without designating a citation or specific fact contained therein. *See* Defendants' Response to the Statement of Material Facts Not in Dispute Submitted by Plaintiff ("DRSMF"), ECF No. 155-1. The Court deems admitted those statements that Defendants did not properly deny.

Logistics is an ocean transportation intermediary organized under the laws of China that performs services as a non-vessel operating common carrier ("NVOCC"). Defendant Logistics' Statement of Undisputed Material Facts ("LSMF"), ECF No. 147-1 ¶ 1.[2] As an NVOCC, Logistics arranges for third-party transportation services related to the shipment (export) of goods from China. *Id.* ¶ 4.

[2]   Logistics and International have submitted nearly identical Statements of Material Facts. *Compare* LSMF *with* ECF No. 148-1. Therefore, when citing to these documents, the Court will cite only to the Statement of Material Facts by Logistics. Further, unless otherwise noted, Plaintiff admits the

Nike, Inc. v. Eastern Ports Custom Brokers, Inc., Not Reported in Fed. Supp. (2018)

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 67 of 117

2018 WL 3472628

statements for which the Court cites Defendants' Statements of Material Facts.

**\*2** International is an ocean transportation intermediary and NVOCC organized in California and doing business in California and New Jersey. *Id.* ¶¶ 12-14. As an NVOCC in the United States, International is a transportation service company that arranges for various third-party transportation services related to the shipment of cargo to and from the United States. *Id.* ¶ 15. International acts as the agent of Logistics in the United States with respect to shipments of cargo originating in China. *Id.* ¶ 19.

Eastern Ports is a licensed customs broker formed under the laws of the State of New York. *See* PSMF ¶ 35.

### B. Transportation of the Counterfeit Nike Footwear from China to New Jersey

Between December 2008 and March 2009, Defendants arranged for the transportation of ten containers from China to the United States. *Id.* ¶¶ 5-14. The first eight containers passed through Customs undetected and were retrieved by a buyer. *Id.* ¶ 14. Defendants now deny knowledge of those containers' whereabouts or who retrieved them. Plaintiff's Supplemental Statement of Disputed Material Facts, ECF No. 154-12 ¶ 3.[3] In March 2009, Customs seized the last two shipments at the Port of Newark (the "Seized Shipments"). PSMF ¶ 5. The Seized Shipments collectively contained 20,320 pairs of counterfeit Nike shoes (the "Counterfeit Nike Footwear"). *Id.* ¶¶ 5, 9.

[3]    The Court deems this statement admitted, despite Defendants' assertion that it is disputed "in part." *See* ECF No. 163-1 ¶ 3. This is because Defendants have not meaningfully responded to Plaintiff's statement. *See supra* n.1; *McCann v. Unum Provident,* 921 F.Supp.2d 353, 359 (D.N.J. 2013) (deeming certain facts undisputed because "failure to reference evidence of record demonstrates that there is no reason to disbelieve the statements of fact contained in the [p]aragraphs at [i]ssue").

Logistics arranged for the Seized Shipments to be transported to the United States through a third party NVOCC by the name of Top Shipping Logistics Co. ("Top Shipping"). *Id.* ¶ 26. Top Shipping arranged for the Seized Shipments to be placed on a cargo ship operated by China Shipping Container Lines Co., Ltd. ("China Shipping"). LSMF ¶ 31; PSMF ¶ 31. In arranging for the transportation of the

Seized Shipments, Logistics issued house Bills of Lading,[4] identifying Chaozhou Taodu Sanitary Ware Fittings Co., Ltd. ("Chaozhou Taodu") as "shipper" and Saint-Gobain Ceramics and Plastics ("Saint-Gobain") as "consignee." PSMF ¶ 16. The Bills of Lading indicated that the Seized Shipments contained "ceramic tile." *See* ECF Nos. 147-4 at 7; 147-5 at 9. Logistics admits that it has never had any direct contact with either Chaozhou Taodu or Saint-Gobain.[5] PSMF ¶ 17; DRSMF ¶ 17. Through issuing the Bills of Lading, Logistics represented that it was the carrier of the goods and that International was responsible for the cargo delivery.[6] PSMF ¶ 18.

[4]    "A bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." *Norfolk Southern Ry. v. James N. Kirby, Pty Ltd.,* 543 U.S. 14, 18-19, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004).

[5]    The Parties agree that Saint-Gobain was a victim of identity theft in this case. *See* ECF No. 154-12 ¶ 68.

[6]    The Court deems this statement admitted, despite Defendants' assertion that it is disputed, in that Defendants have not properly denied such statement under Local Rule 56.1. *See supra* nn.1, 3.

International acted as the agent for Logistics in the United States for the Seized Shipments. *Id.* ¶ 23. After Logistics arranged for the containers to be placed onto a ship with China Shipping through Top Shipping, China Shipping issued master Bills of Lading, also called waybills. *Id.* ¶ 27; *see also* ECF Nos. 147-4 at 5; 147-5 at 4. The waybills identify Top Shipping as the shipper and International as the consignee. PSMF ¶ 27. The waybills also indicate that the "Notify Party" was International for each shipment. *See* ECF Nos. 147-4 at 5; 147-5 at 4. International also hired Eastern Ports to act as the customs broker for the Seized Shipments. PSMF ¶ 34. As the delivery agent for Logistics, International issued Arrival Notices, Commercial Invoices, Packing Lists, and Bills of Lading for the Seized Shipments to Eastern Ports to clear the containers through Customs. *Id.* ¶¶ 39-40. International provided Eastern Ports with a power of attorney in the name of Saint-Gobain. *Id.* ¶ 36. Neither International nor Logistics knows the source of the Saint-Gobain power of attorney. DRSMF ¶ 37. Once Customs seized the shipments, International sent China Shipping a fax by which it abandoned its rights as consignee to the Seized Shipments. *Id.* ¶ 45.

2018 WL 3472628

International also made payments for the Seized Shipments to China Shipping for its use of the cargo ship, to Eastern Ports for its custom brokerage services, and to Customs for the duty required. PSMF ¶¶ 32,44.

### C. Relevant Procedural History

**\*3** On July 28, 2011, Nike filed suit against Eastern Ports. *See* ECF No. 1. The complaint was subsequently amended to include Logistics and International as defendants. Amended Complaint ("Am. Compl."), ECF No. 68. The Amended Complaint alleges five claims arising out of the Lanham Act: trademark counterfeiting (Count I), trademark infringement (Count II), false designation of origin and federal unfair competition (Count III), [7] trademark dilution (Count IV), and unlawful importation of goods bearing infringing or counterfeit marks in violation of federal law (Count V); and a violation of the Tariff Act (Count VI). *See id.* [8]

[7] "[T]he Lanham Act Section 43(a) proscribes unfair competition or, as the statute refers to it, 'false designation of origin' or 'false description.' " *E.A. Sween Co. v. Deli Express of Tenafly, LLC*, 19 F.Supp.3d 560, 568 (D.N.J. May 13, 2014) (citing 15 U.S.C. § 1125(a) ).

[8] Eastern Ports filed a Third Party Complaint against Customs, China Shipping, Logistics, and International. *See* ECF No. 10. Eastern Ports subsequently dismissed its Third Party Complaint against Customs with prejudice. *See* ECF No. 33. The Court also dismissed the Third Party Complaint against China Shipping, Logistics, and International pursuant to Federal Rule of Civil Procedure 41(b) for failure to prosecute. ECF No. 140.

On December 19, 2014, Nike and Defendants filed the instant motions for summary judgment. The motions are all opposed. The Court held an oral argument as to the instant motions. [9] The parties subsequently engaged in unsuccessful settlement negotiations.

[9] On February 6, 2015, Nike filed a Motion to Strike a number of exhibits filed by Defendants in further support of their motions for summary judgment and in opposition to Nike's motion for summary judgment. *See* ECF No. 153. Pursuant to the Joint Stipulated Order entered by this Court on October

23, 2015, Defendants withdrew from the record the following: December 12 2015 Declarations of Marco Hu, ECF Nos. 147-2; 148-2; March 10, 2015 Declarations of Marco Hu, ECF No. 160-5; and March 2015 Declaration of Li Yong Mei, ECF No. 160-4. Nike has also withdrawn its objection to the Court's consideration of the December 18, 2015 Declarations of Ava Yushow Lin, ECF Nos. 147-3; 148-4. *See* ECF No. 183.

In August 2013, Nike requested a certificate of default against Eastern Ports after Eastern Ports failed to obtain new counsel following the withdrawal of its previous counsel. *See* ECF No. 73. On August 28, 2013, the Clerk of the Court entered the certificate of default. *See* ECF No. 75. On June 19, 2015, Nike moved for default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2) against Eastern Ports. *See* ECF Nos. 166; 167.

## II. SUMMARY JUDGMENT

### A. LEGAL STANDARD

Summary judgment is appropriate if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials" demonstrate that there is no genuine issue as to any material fact, and, construing all facts and inferences in a light most favorable to the non-moving party, "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

The moving party has the initial burden of proving the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party meets this burden, the non-moving party has the burden of identifying specific facts to show that, to the contrary, there exists a genuine issue of material fact for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (citations omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e)] is not

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 69 of 117

Nike, Inc. v. Eastern Ports Custom Brokers, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3472628

to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit."); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact," the opponent must "exceed the 'mere scintilla' threshold ....") (citations omitted). A fact is "material" if a dispute "might affect the outcome of the suit under governing law," and a "genuine" issue exists as to that fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court's role is to determine whether there is a genuine issue for trial, not to weigh the evidence and decide the truth of the matter. *Id.* at 249, 106 S.Ct. 2505.

**B. DISCUSSION**

**\*4** For the following reasons, the Court grants Nike's motion for summary judgment on Count I (Trademark Counterfeiting), Count II (Trademark Infringement), Count III (Unfair Competition), Count V (Unauthorized Importation), and Count VI (Violation of the Tariff Act). The Court denies Defendants' motions on all counts.

**1. Trademark Counterfeiting, Trademark Infringement, and Federal Unfair Competition**

In the Third Circuit, claims for trademark infringement, pursuant to 15 U.S.C. § 1114, and federal unfair competition, pursuant to 15 U.S.C. § 1125(a), are measured by identical standards. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). To hold a defendant liable for these claims, a plaintiff must show: (1) the marks at issue are valid and legally protectable, (2) the marks are owned by the plaintiff, and (3) the defendants' use of the marks to identify goods is likely to cause consumer confusion concerning their source. *Id.* at 211. "The only distinction between the standard for federal trademark counterfeiting and the standard for establishing infringement is that to obtain treble or statutory damages for a counterfeiting claim, a plaintiff must show that the defendant intentionally used the plaintiff's trademark, knowing that it was a counterfeit." *Chanel, Inc. v. Gordashevsky*, 558 F.Supp.2d 532, 536-37 (D.N.J. 2008).

Here, Defendants do not dispute for purposes of the instant motions that the first two elements of validity, legal protectability, and ownership are met. Logistics' Memorandum of Law in Support ("Def. Br. in Supp."), ECF

No. 149-1, at 18. [10] As to the third element, the Court must conduct a two-part analysis: (1) whether "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark," and (2) "the more elementary question of whether [defendants] made any use of the mark." *Zany Toys, LLC v. Pearl Enterprises, LLC*, No. 13-5262, 2014 WL 2168415, at \*8 (D.N.J. May 23, 2014) (internal quotation marks and citations omitted).

[10]    Because Logistics and International submitted virtually identical memoranda in opposition to Nike's motion for summary judgment, *compare* Def. Br. in Supp., *with* ECF No. 148-3, the Court's citations to arguments made in Logistics' brief will serve as citations to both.

The first part of this analysis—the likelihood of confusion by ordinary consumers—is not in dispute. Defendants concede that, for purposes of the instant motions, there is a likelihood of confusion concerning the source of the goods, Def. Mem. in Supp. at 18, as similarity between the marks in question is the most important factor in determining likelihood of confusion, *A & H Sportswear, Inc.*, 237 F.3d at 216, and counterfeit goods, by definition, are intended to create consumer confusion. *See S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992) ("We have held that 'there is a great likelihood of confusion when an infringer uses the exact trademark' as the plaintiff") (internal citations omitted); *Cartier Int'l A.G. v. Daniel Markus, Inc.*, No. 10-1459, 2013 WL 5567150, at \*8 (D.N.J. Oct. 8, 2013) (noting likelihood of confusion "clearly" established where marks on counterfeit products were identical to registered marks). Here, based upon independent examinations by Nike and Customs, the shoes and the marks they bear are near-identical counterfeits of Nike's shoes and marks. *See* PSMF ¶¶ 7-9. Accordingly, the Court concludes that, had the Counterfeit Nike Footwear been introduced into the market, there would have been a likelihood of confusion sufficient to sustain a cause of action for trademark infringement.

**\*5** Likelihood of confusion is not actionable, however, absent the second part of the analysis: Defendants' "use" of a trademark in commerce. *FragranceNet.com, Inc. v. FragranceX.com, Inc.*, 493 F.Supp.2d 545, 549 (E.D.N.Y. 2007); *see, e.g., Zany Toys, LLC*, 2014 WL 2168415, at \*8. Defendants argue that they are not liable because their actions do not amount to a "use" as required by the statute. *See* Def. Br. in Supp. at 18.

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 70 of 117

Nike, Inc. v. Eastern Ports Custom Brokers, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3472628

The Lanham Act defines "use in commerce" as follows:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce--
>
> (1) on goods when--
>
> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>
> (B) the goods are sold or transported in commerce[.]

15 U.S.C. § 1127 (emphasis added). [11] The Lanham Act defines "commerce" as "all commerce which may lawfully be regulated by Congress," *id*, and the United States Constitution makes clear that Congress has the power "[t]o regulate Commerce with foreign Nations," which includes the importation of goods from abroad. U.S. Const. art. I, § 8, cl. 3; *see also Combe Inc. v. Dr. Aug. Wolff GmbH & Co. KG Arzneimittel*, No. 17-935, 2018 WL 1533016, at *6 (E.D. Va. Mar. 28, 2018) ("§ 1127 requires that goods upon which a mark is used be 'sold or transported' in commerce subject to regulation by Congress."). "Further, even in cases where [Customs] seizes counterfeit products at the port of entry, *before* they are further transported or distributed, liability still attaches under both Sections 32 [infringement] and 43(a) [false designation of origin/federal unfair competition] of the Lanham Act." *Philip Morris USA Inc. v. Liu*, 489 F.Supp.2d 1119, 1122 n.2 (C.D. Cal. 2007). [12]

[11]  The Parties do not dispute that § 1127's definition of "use in commerce" applies to trademark infringement, *see* Def. Br. in Supp. at 21-22, and that District Courts in this Circuit have applied such definition in trademark infringement cases. *See, e.g., Buying For The Home, LLC v. Humble Abode, LLC*, 459 F.Supp.2d 310, 321-22 & n.10 (D.N.J. 2006) (looking to § 1127's definition of "use in commerce" in evaluating unfair competition and trademark infringement claims); *Fagnelli Plumbing Co. v. Gillece Plumbing & Heating, Inc.*, No. 10-00679, 2010 WL 2994163, at *5-6 (W.D. Pa. July 27, 2010) (concluding that defendants met § 1127's "use in commerce" definition and

therefore that plaintiff adequately pled the second element of 15 U.S.C. § 1125(a)(1)(A) ).

[12]  In other words, to constitute a transportation in commerce, the statute "does not require that the goods clear inspection by Customs" and then travel through interstate commerce. *Philip Morris USA, Inc. v. Lee*, 481 F.Supp.2d 742, 748 (W.D. Tex. 2006).

Here, Defendants appear to make two arguments to support their contention that their actions do not amount to a "use in commerce:" (1) they had no knowledge of the counterfeit nature of the goods or an intent to transport counterfeit goods; and (2) they never physically possessed or handled the counterfeit goods. Logistics argues that it "merely booked a cargo container with an ocean common carrier for the shipper ...." *See* Def. Br. in Supp. at 10. International argues that it only "engaged a U.S. Customs broker, defendant Eastern Ports, to clear entry of the cargo on behalf of the consignee, Saint-Gobain." *See id.* Defendants contend that they are "innocent service provider[s]" who "neither knew nor had any reason to have known that [their] services were being used by the actual, direct counterfeiters to assist in the shipment of product from China to the U.S." *Id.* at 18, 125 S.Ct. 385.

**\*6**  The Court finds Defendants' arguments unavailing. First, it is clear that trademark infringement is a strict liability statute, and the implication of a mental requirement in liability is contrary to a plain reading of the statute. The statute provides separate sections for liability and damages of trademark infringement, and it is only in the damages stage that a mental element becomes a relevant consideration. Section 1114 provides that "anyone who shall ... use in commerce any ... counterfeit ... of a registered mark ... which such use is likely to cause confusion, or to cause mistake, or to deceive ... *shall be liable* in a civil action by the registrant for the remedies hereinafter provided." 15 U.S.C. § 1114 (emphasis added). Defendants urge the Court to read in a requirement that Defendants have knowledge or intent to use a counterfeit good in commerce as an element of liability. The Court declines to do so. The statute is clear that anyone who uses the mark in commerce in such a way that may cause confusion is liable. As indicated above, the statute defining liability does not include any mental element. Intent or knowledge becomes relevant only at the damages stage of the inquiry. Therefore, for purposes of liability, Nike need not show that Defendants intended to transport counterfeit goods, or that they had knowledge of the counterfeit goods in the

Case 4:21-cv-01091-MWB     Document 322-8     Filed 11/18/24     Page 71 of 117

Nike, Inc. v. Eastern Ports Custom Brokers, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3472628

Seized Shipments. *See Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 187 (3d Cir. 2010) ("Evidence of a defendant's intent is not a prerequisite for finding a Lanham Act violation ...."); *N.V.E, Inc. v. Famous*, No. 08-1633, 2009 WL 2194538, at *3 (D.N.J. July 21, 2009) ("[U]nder the Lanham Act, sellers of counterfeit products bear strict liability. In that regard, the plaintiff does not have to prove that the defendant intended to sell counterfeit products, or even that the defendant was willfully blind to the fact the goods were counterfeit.") (internal citations omitted) Here, as Plaintiff has moved for summary judgment as to liability only, Defendants' knowledge or intent is not relevant to the analysis.

Second, Defendants' efforts in the importation of commercial quantities of counterfeit goods constitutes "transportation in commerce" pursuant to the Lanham Act, 15 U.S.C. § 1127, despite the fact that Defendants did not physically transport the containers. "Whether the 'use in commerce' requirement is satisfied is assessed on a case-by-case basis, based on the totality of the circumstances." *Nexsan Techs., Inc. v. EMC Corp.*, 260 F.Supp.3d 68, 75 (D. Mass. 2017). The Court finds a number of cases on this issue instructive, which it will address below.

In *Nike v. KAL Am., Inc.*, the Central District of California addressed facts nearly identical to the instant matter, and determined that "[b]ecause Plaintiff has alleged that Defendants were participants in the transportation of the goods in question, it has sufficiently alleged the 'use in commerce' elements" of claims for trademark counterfeiting, trademark infringement, and false designation of origin. No. 15-5269, 2016 U.S. Dist. LEXIS 141266, at *7-8 (C.D. Cal. May 2, 2016). In that case, the defendants were a customs broker and NVOCC responsible for the transportation of counterfeit goods to the United States. *Id.* at *1-2. The NVOCC defendant acted as the consignee and the court found that Plaintiff had sufficiently alleged that the NVOCC defendant had "materially assisted in [the] transportation and importation, including by way of hiring and paying to arrange and cause the clearance of the goods." *Id.* at *4. The NVOCC had also "passed on a false and fraudulent power of attorney and false and fraudulent shipping documents to KAL," the customs broker. *Id.*

Further, in *Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.*, the Eastern District of New York found that arranging for transportation is sufficient to qualify as a "use in commerce" pursuant to § 1127. No. 08-0068, 2010 WL 2133937, at

*5 (E.D.N.Y. Mar. 11, 2010), *report and recommendation adopted*, No. 08-0068, 2010 WL 2160058 (E.D.N.Y. May 27, 2010). More specifically, the court found the defendant liable, despite the fact that it did not make a sale of counterfeit goods, explaining that the defendant "used the counterfeit marks in commerce by arranging for their transport into the United States." *Id.*

Finally, in *Lee*, 481 F.Supp.2d 742, the Western District of Texas found a defendant who was an officer in a company that arranged for the transportation of counterfeit cigarettes into the United States liable for trademark infringement and false designation of origin. The *Lee* Court expressly rejected the defendant's contention that for liability to attach, the plaintiff needed to allege that the defendant *possessed* the counterfeit goods. The court explained that "in alleging that [the defendant] *arranged for* the importation of the cigarettes that were seized in the Port of Houston ... Plaintiff has set forth a basis for its claims that [the defendant] used the counterfeit marks in commerce." [13] *Id.* at 748 (emphasis added).

[13]     Defendants argue that *Lee* is factually distinguishable, as the defendant in *Lee* had knowledge of the counterfeit nature of the goods. *See* ECF No. 155 at 9. However, as explained above, knowledge is not an element or a prerequisite of liability pursuant to the Lanham Act. Therefore, the act of arranging for transportation in commerce of counterfeit goods is sufficient to constitute "use in commerce" under the Lanham Act. *See supra*.

Moreover, Defendants cite to *Liu, 489 F.Supp.2d at 1122*, for the proposition that a defendant is required to have physically moved cargo in order to be liable under the Lanham Act. Nonetheless, the defendant's unloading and transporting of the cargo in *Liu* was only one consideration of the court. As discussed below with reference to the instant case, the *Liu* court also found relevant the fact that the defendant had signed the bill of lading. *See id.*

*7 As in the aforementioned cases, the Court finds that Defendants were actively involved in arranging for the transportation of the Counterfeit Nike Footwear. Logistics created a house Bill of Lading that identified the goods as "ceramic tile" and identified the shipper and ultimate consignee as two parties Logistics never had direct contact with. PSMF ¶¶ 16-17. Logistics also arranged for the Seized Shipments to be placed on a cargo ship operated by China

Nike, Inc. v. Eastern Ports Custom Brokers, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3472628

Shipping. LSMF ¶ 31; PSMF ¶ 31. As in *Liu, 489 F.Supp.2d at 1122*, International was identified as consignee on the master Bills of Lading issued by China Shipping. PSMF ¶ 27; *see also* ECF Nos. 147-4 at 5; 147-5 at 4. International hired Eastern Ports as a customs broker for entrance of the containers into the United States and issued Arrival Notices, Commercial Invoices, Packing Lists, and house Bills of Lading to Eastern Ports to clear each container through Customs. PSMF ¶¶ 39-40. Like the defendant in *KAL Am., Inc.*, International provided Eastern Ports with a power of attorney in the name of Saint-Gobain, a company International never had contact with. *Id.* ¶ 36. International also made payments for the Seized Shipments to China Shipping for its use of the cargo ship, to Eastern Ports for its custom brokerage services, and to Customs for the duty required. *Id.* ¶¶ 32, 44.

Despite these actions, Defendants contend that they did not actively participate in placing the Counterfeit Nike Footwear into transport, and therefore that they should not be found directly liable for trademark infringement. In support of their argument, Defendants cite to *GMA Accessories, Inc. v. BOP, LLC*, 765 F.Supp.2d 457 (S.D.N.Y. 2011), in which the court found that defendants who operated a showroom to facilitate sales between wholesale buyers and sellers were not directly liable for trademark infringement because the defendant had merely brokered a sale of, instead of having "sold" counterfeit goods. The court explained that "[t]here [was] no evidence that [defendant] took title to the merchandise, maintained an inventory of merchandise, bore the risk of loss or other traditional indicia of status as a seller." *Id.* at 464.

The Court finds this case inapposite.[14] Although Defendants urge the Court to accept the allegation that Defendants played a negligible role in arranging for the transportation of the Counterfeit Nike Footwear, unlike in *GMA*, the undisputed facts here demonstrate that Defendants indeed took responsibility for such goods. First, Logistics represented that it was responsible for the cargo by issuing a house Bill of Lading for the containers. PSMF ¶ 18. Second, International was identified as the consignee on the master Bill of Lading. *See* ECF Nos. 147-4 at 5; 147-5 at 4. Third, International also represented to Eastern Ports and China Shipping that the goods in the containers were accurately represented in the entry documents, such as the Arrival Notice, Commercial Invoice, Packing List, and house Bills of Lading. PSMF ¶ 40. Fourth, Nancy Zhang, who works for the shipping vessel, testified that China Shipping relies on the NVOCC to ensure that the goods in the containers match the

descriptions on the Bills of Lading that the NVOCCs supply, since the containers are sealed when China Shipping receives them. *See* Deposition of Nancy Zhang, dated April 8, 2013, ECF No. 154-9, 59:14-60:11; 65:5-25. Finally, International abandoned its interest in writing to China Shipping after the containers had been seized. Thus, unlike in *GMA*, where the defendants merely operated a showroom to facilitate sales between wholesale buyers and sellers, Defendants here played an active role in arranging for the transportation of the Counterfeit Nike Footwear, including by taking responsibility for the goods and making representations regarding the nature of the goods. Accordingly, the Court finds that Defendants both materially participated in the transportation of the Seized Shipments of Counterfeit Nike Footwear, and that these actions constitute "use in commerce" pursuant to § 1127.

14    The Court also finds that the cases cited by Defendants in their supplemental letter brief are distinguishable. Defendants acknowledge that *Alzheimer's Foundation of America, Inc. v. Alzheimer's Disease & Related Disorders Association, Inc.*, No. 10-3314, 2018 WL 2084168 (S.D.N.Y. May 1, 2018) is "not factually analogous to the instant matter." ECF No. 202 at 3. Moreover, Defendants merely cite to *Combe*, 2018 WL 1533016, at *6, for the proposition that a "defendant's activities cannot satisfy the 'use in commerce' requirement where the record is devoid of evidence that [a] defendant actually sold or transported any goods in the United States or to a United States citizen," which, as discussed above with respect to Defendants' efforts in arranging for the transportation of the Counterfeit Nike Footwear, is not the case here. ECF No. 202 at 3; *see also id.* at 2 (citing to *H-D U.S.A., LLC v. SunFrog, LLC*, No. 17-711, 2018 WL 1757655 (E.D. Wis. Apr. 12, 2018), *appeal filed*, No. 18-2073 (7th Cir. May 11, 2018), in support of their argument that Defendants did not partake in the requisite level of involvement to have used the Counterfeit Nike Footwear in commerce).

**\*8** For the reasons set forth above, the Court finds that Defendants' efforts in the importation of commercial quantities of counterfeit goods bearing spurious Nike trademarks constituted a "use in commerce," and Nike's claim for summary judgment as to liability against Logistics and International is granted for Trademark Counterfeiting (Count I), Trademark Infringement (Count II), and Federal Unfair

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 73 of 117

*Nike, Inc. v. Eastern Ports Custom Brokers, Inc.*, Not Reported in Fed. Supp. (2018)

2018 WL 3472628

Competition (Count III),[15] and Defendants' motions are denied.

[15]    Nike's Amended Complaint alleged both that Defendants "imported" counterfeit Nike footwear and that they "have materially contributed" to the importation of counterfeit Nike footwear. *See* Am. Compl. ¶¶ 54, 55. As the Court finds Defendants directly liable, the Court need not reach the issue of contributory liability.

### 2. Trademark Dilution

Defendants move for summary judgment to dismiss Nike's claim for Federal Trademark Dilution (Count IV).[16] Defendants' motions appear to allege that they are entitled to summary judgment because they have not engaged in the "use of a mark ... in commerce." Def. Br. in Supp. at 13. As stated previously, the Court finds that Defendants have used Plaintiff's mark in commerce, as defined under the Lanham Act. Accordingly, Defendants have not met their initial burden to show the absence of a genuine issue of material fact, *see Celotex*, 477 U.S. at 323, 106 S.Ct. 2548, and their motion for summary judgment as to Count IV is denied.

[16]    Plaintiff has not moved for summary judgment on this count.

### 3. Unauthorized Importation, 15 U.S.C. § 1124

Nike and Defendants move for summary judgment on Nike's claim for importation of goods bearing infringing marks, pursuant to Section 42 of the Lanham Act, 15 U.S.C. § 1124. Section 42 provides that, with the exception of goods imported for personal use: "no article of imported merchandise which shall copy or simulate the name of any domestic manufacture, or manufacturer, or trader ... shall be admitted to entry at any customhouse of the United States." 15 U.S.C. § 1124.[17]

[17]    Defendants appear to raise the issue of whether 15 U.S.C. § 1124 provides a private right of action. *See* Def. Br. in Supp. at 15. However, Defendants acknowledge that courts have found an implied right arising from the statute, and concede that

for purposes of the instant motions only, that 15 U.S.C. § 1124 provides Nike with a private right of action. *See id.*; *see also Lee*, 481 F. Supp. 2d at 748 ("[W]hile 15 U.S.C. § 1124 does not itself provide a remedy to the holders of infringed trademarks, 15 U.S.C. §§ 1116 and 1117 authorize injunctive relief and damages, respectively, for a 'violation of any right of the registrant of a mark registered in the Patent and Trademark Office.' Several courts have interpreted these provisions as creating a private cause of action under 15 U.S.C. § 1124.") (citing *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992); *Summit Tech., Inc. v. High–Line Med. Instruments Co.*, 922 F.Supp. 299, 308 (C.D. Cal. 1996) ).

"In order to establish a violation of Section 42, 'a trademark owner need only prove that the defendant imported goods bearing copies of its federally registered marks.' " *Philip Morris USA Inc. v. C.H. Rhodes, Inc.*, No. 08-0069, 2010 WL 1196124, at *4 (E.D.N.Y. Mar. 26, 2010) (citations omitted), *report and recommendation adopted*, No. 08-0069, 2010 WL 1633455 (E.D.N.Y. Apr. 21, 2010). Courts have imposed Section 42 liability on defendants involved in importation activities, including where the defendants arranged and assisted with their importation. *See id.* (noting that defendant arranged for the importation of counterfeit goods to the United States); *Lee*, 481 F.Supp.2d at 749 (same); *Phillip Morris USA Inc. v. Marlboro Express*, No. 03-1161, 2005 WL 2076921, at *5 (E.D.N.Y. Aug. 26, 2005) (finding liability where defendant arranged for the importation of "at least five separate shipments of [counterfeit] cigarettes from China").

**\*9** Here, Defendants arranged for the importation of the Counterfeit Nike Footwear. As stated above, Logistics created a house Bill of Lading, which identified the goods as "ceramic tile" and identified the shipper and ultimate consignee as two parties Logistics never had direct contact with. PSMF ¶¶ 16-17. Logistics also arranged for the Seized Shipments to be placed on a cargo ship operated by China Shipping, LSMF ¶ 31; PSMF ¶ 31. International was identified as consignee on the master Bills of Lading issued by China Shipping, PSMF ¶ 27; *see also* ECF Nos. 147-4 at 5; 147-5 at 4, hired Eastern Ports as a customs broker for entrance of the containers into the United States, and issued Arrival Notices, Commercial Invoices, Packing Lists, and house Bills of Lading to Eastern Ports to clear each container through Customs. PSMF ¶¶ 39-40. International also made payments for the Seized Shipments to China Shipping for its use of the

Nike, Inc. v. Eastern Ports Custom Brokers, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3472628

cargo ship, to Eastern Ports for its custom brokerage services, and to Customs for the duty required. *Id.* ¶¶ 32,44.

The Court finds that based on Defendants' actions, there is no genuine issue of fact that Defendants imported goods bearing copies of Nike's federally registered marks. Accordingly, the Court grants Plaintiff's motion for summary judgment as to Count V, and denies Defendants' motions.

### 4. Tariff Act, 19 U.S.C. § 1526

"The Tariff Act prohibits the importation of merchandise bearing a registered trademark owned by a U.S. trademark holder and recorded with [Customs] without the owner's written consent." *U.S. Sun Star Trading, Inc.*, 2010 WL 2133937, at *5. More specifically, Section 526 of the Tariff Act provides:

> [I]t shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States, under the provisions of sections 81 to 109 of Title 15, and if a copy of the certificate of registration of such trademark is filed with the Secretary of the Treasury, in the manner provided in section 106 of said Title 15, unless written consent of the owner of such trademark is produced at the time of making entry.

19 U.S.C. § 1526(a). The statute further provides that any person dealing in such merchandise may be enjoined from doing so. 19 U.S.C. § 1526(c).

Defendants argue in their motions for summary judgment that "[t]he Tariff Act provides no additional private right to Nike other than what is expressly afforded to trademark owners and

registrants under the Lanham Act." Def. Br. in Supp. at 17. This argument is unavailing. Courts have repeatedly found that the relevant provision of the Tariff Act, 19 U.S.C. § 1526, provides a private right of action. *See KAL Am., Inc.*, 2016 U.S. Dist. LEXIS 141266, at *9 (finding a private right of action pursuant to the Tariff Act, 19 U.S.C. § 1526(a), (c) ); *Pepsico, Inc. v. Torres*, No. 92-5459, 1993 WL 455222, at *2 (C.D. Cal. 1993) (explicitly finding a private right of action pursuant to the Tariff Act); *Deckers Outdoor Corp. v. Huang*, No. 15-04772, 2017 WL 1842556, at *4 (E.D.N.Y. Apr. 20, 2017), *report and recommendation adopted*, No. 15-04772, 2017 WL 1854728 (E.D.N.Y. May 5, 2017); *Atmos Nation, LLC v. Kashat*, No. 14-11019, 2014 WL 2711961, at *3 (E.D. Mich. June 16, 2014); *Liu*, 489 F.Supp.2d at 1122; *U.S. Sun Star Trading, Inc.*, 2010 WL 2133937, at *5; *Ahava (USA), Inc. v. J.W.G., Ltd.*, 250 F.Supp.2d 366, 371 (S.D.N.Y. 2003); *Houbigant, Inc. v. ACB Mercantile*, 914 F.Supp. 964, 982 (S.D.N.Y. 1995). Accordingly, Defendants' motions as to Count VI are denied.

Nike argues that it is entitled to summary judgment as to liability for Defendants' violation of the Tariff Act, as Plaintiff has shown that there is no genuine issue of fact that Defendants imported the counterfeit goods, and that Plaintiff has registered its marks with Customs. The Court agrees. As explained above, the Court finds that there is no genuine issue of material fact that both Defendants were actively involved in the importation of counterfeit goods. Moreover, Defendants do not dispute that Nike owns and registered the trademarks at issue with the Patent and Trademark Office, Secretary of Treasury, and Customs and Border Protection, as required by the statute. PSMF ¶¶ 3-4. Accordingly, Nike's motion for summary judgment as to Count VI is granted.

## III. DEFAULT JUDGMENT

**\*10** Nike seeks entry of a default judgment against Eastern Ports. ECF No. 166. On April 22, 2013, Judge Dickson granted an informal application by Cowan, Liebowitz, & Latman, P.C. to withdraw as counsel for Eastern Ports with the consent of Eastern Ports. *See* ECF Nos. 51; 57. In granting the request, the court also ordered Eastern Ports to retain new counsel within thirty days of that order, and that if Eastern Ports "fails to retain new counsel within such time, appropriate sanctions may result, up to and including a default judgment being entered against it." ECF No. 57. In the more than five years since that order, no new counsel has entered an appearance on behalf of Eastern Ports. Plaintiff filed a request for default, which was entered by the Clerk of the Court on August 28, 2013. *See* ECF No. 75. On June 19, 2015,

2018 WL 3472628

Plaintiff filed with this Court the instant motion for default judgment pursuant to Federal Rule of Civil Procedure 55(b), which was served upon Eastern Ports by first class mail on June 19, 2015. [18] *See* ECF Nos. 166; 167. For the following reasons, Plaintiff's motion for entry of a default judgment against Eastern Ports is granted as to all counts, and this Court awards Nike damages in the amount of $240,000.

[18]   Because Eastern Ports previously appeared in this matter, Eastern Ports "must [have] be[en] served with written notice of the application [for default judgment] at least 7 days before [a decision is rendered]." Fed. R. Civ. P. 55(b)(2). Here, Plaintiff served its motion for default judgment and all papers thereto on Eastern Ports on June 19, 2015. ECF Nos. 166; 167. Because more than seven days have passed since such date, the Court may properly adjudicate Plaintiff's motion. *See Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Moskowitz Motor Transp., Inc.*, No. 05-5605, 2007 WL 608436, at *2 (D.N.J. Feb. 23, 2007) (finding that the court was satisfied that defendant was served with notice of a motion for default judgment and its supporting documentation where plaintiff sent such documentation via first class mail).

### A. Legal Standard for Entry of Default Judgment

Federal Rule of Civil Procedure 55(a) provides that default judgment may be entered against a party that has "failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). Rule 55(b) allows the Court to enter a judgment by default upon application of a party. The Third Circuit has held with respect to Rule 55(a) that "[b]y its very language, the 'or otherwise defend' clause is broader than the mere failure to plead." *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 917 (3d Cir. 1992). The *Hoxworth* Court also stated that default judgment pursuant to Rule 55 may be imposed for, *inter alia*, failure to comply with a court's order to retain substitute counsel. *Id.* at 918. Accordingly, courts have entered default judgment as a sanction against a defendant even where, as here, an answer has been filed. *See Opta Sys. LLC v. Daewoo Electronics Am.*, 483 F.Supp.2d 400, 406 (D.N.J. 2007); *Ramada Worldwide v. SB Hotel Mgmt.*, No. 14-2186, 2016 WL 5030354, at *2 (D.N.J. Sept. 19, 2016).

"Both the Federal Rules of Civil Procedure and a court's inherent authority to control its docket empower a district court to dismiss a case as a sanction for failure to follow procedural rules or court orders." *Knoll v. City of Allentown*, 707 F.3d 406, 409 (3d Cir. 2013). In *Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863 (3d Cir. 1984), the Third Circuit enumerated six factors a district court must consider before it dismisses a case pursuant to such authority. The Third Circuit has required consideration of these factors "when a district court enters a default judgment pursuant to Rule 55(b) as a sanction for failure to plead or otherwise defend." *Knoll*, 707 F.3d at 409. The factors the Court must consider include: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to follow the court's order; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense. *Poulis*, 747 F.2d at 868.

### B. *Poulis* Factors

*11  Upon consideration of the *Poulis* factors, the Court determines that the sanction of entering default judgment against Eastern Ports is appropriate.

First, as to Eastern Port's personal responsibility, it is well settled that a corporation cannot represent themselves *pro se* and must obtain counsel in federal court. *See Rowland v. California Men's Colony*, 506 U.S. 194, 201-02, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993) ("It has been the law for the better part of two centuries ... that a corporation may appear in the federal courts only through licensed counsel"). Here, Eastern Ports alone is responsible for its own failure to comply with the court's April 22, 2013 order to retain new counsel. *See* ECF No. 57. As the Third Circuit has held, default judgment is an appropriate sanction "for failure to comply with [a court's] unambiguous orders to obtain substitute counsel." *Hoxworth*, 980 F.2d at 918-19; *see also Ramada Worldwide*, 2016 WL 5030354, at *2.

Second, Plaintiff has been prejudiced by Eastern Port's failure to retain corporate counsel pursuant to the court's April 22, 2013 order, because Plaintiff has incurred additional costs and has been unable to move forward with the case as against Eastern Ports. *See Malik v. Hannah*, 661 F.Supp.2d 485, 490-91 (D.N.J. 2009); *Ramada Worldwide*, 2016 WL 5030354, at *2.

Third, Eastern Ports has shown a history of dilatoriness in that it ignored the court's April 22, 2013 order when it failed to retain new counsel to defend this case. Moreover, for the past five years, it has taken no action in this matter.

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 76 of 117

Nike, Inc. v. Eastern Ports Custom Brokers, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3472628

Fourth, the Court may find willfulness or bad faith where no reasonable excuse for the conduct in question exists. *See Harrington v. All American Plazas, Inc.*, No. 08-3848, 2010 WL 2710573, at *3 (D.N.J. July 7, 2010). Here, Eastern Ports has not offered an excuse regarding its failure to retain counsel, and has not made any filings with the Court since the April 22, 2013 order to retain counsel. In fact, since that order, the Court has also dismissed Eastern Ports' Third Party Complaint for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b), finding that Eastern Ports' "total inaction since withdrawal of counsel ... sends a clear message to this Court that [Eastern Ports] has refused to prosecute and desires to abandon this case." ECF No. 140 (internal quotation marks omitted). This Court also found that under the *Poulis* factors, dismissal of Eastern Ports' Third Party Complaint was appropriate in light of Eastern Ports' disregard of the court's April 22, 2013 order, and subsequent inaction and refusal to prosecute its case. *Id.* Further, since this Court's order dismissing the Third Party Complaint, in November 2014, more than three-and-a-half years have since passed, indicating that Eastern Ports does not intend to comply with this Court's orders, or to make any additional appearances in this case.

Fifth, as for alternative sanctions, courts in this district have found that "[w]here a defendant refuses to comply with court orders, alternative sanctions are likely to be ineffective." *See Harrington*, 2010 WL 2710573, at *3 (citing cases).

Sixth, the Court finds that Nike has stated legitimate claims against Eastern Ports, and that there is no basis for Eastern Ports to claim a meritorious defense. Nike's Amended Complaint alleges the same causes of action against all Defendants. *See generally* Am. Compl. This Court has determined above that Logistics and International's actions in arranging for the transportation and importation of the counterfeit goods constituted a "use in commerce," such that these Defendants are liable for trademark infringement, unfair competition, unlawful importation, and a violation of the Tariff Act. As to Eastern Ports, Nike has alleged that Eastern Ports actively participated in the importation of the counterfeit goods by causing entry documents to be filed with Customs for the Seized Shipments. As a customs broker, Eastern Ports was required to obtain a valid power of attorney from Saint-Gobain before conducting business with Customs. *See* 19 CFR 141.46 ("Before transacting Customs business in the name of his principal, a customhouse broker is required to obtain a valid power of attorney to do so."). Accordingly,

the Court finds that Eastern Ports actively participated in the importation and transportation of the Seized Shipments and grants Plaintiff's motion for default judgment against Eastern Ports as to Counts II, III, V, and VI.

**\*12** The Court also grants Nike's motion for default judgment as to trademark counterfeiting. Again, "[t]he only distinction between the standard for federal trademark counterfeiting and the standard for establishing infringement is that to obtain treble or statutory damages for a counterfeiting claim, a plaintiff must show that the defendant intentionally used the plaintiff's trademark, knowing that it was a counterfeit." *Chanel, Inc.*, 558 F.Supp.2d at 536-37. As discussed *supra*, the Court concludes that Eastern Ports infringed Nike's trademarks, satisfying the first element of trademark counterfeiting. "On the issue of intentional use of such mark knowing such mark is counterfeit, [Eastern Ports] has admitted this fact by default." *AARP v. Sycle*, 991 F.Supp.2d 224, 229-30 (D.D.C. 2013); *Adobe Sys. Inc. v. Kern*, No. 09-1076, 2009 WL 5218005, at *3 (N.D. Cal. Nov. 24, 2009) (accepting as true plaintiff's allegations in the complaint that defendant infringed plaintiff's trademarks intentionally with respect to a trademark counterfeiting claim because "[u]pon a defendant's default, the factual allegations of the complaint ... are deemed admitted"); *Dunkin' Donuts Franchised Restaurants LLC v. JF-Totowa Donuts, Inc.*, No. 09-2636, 2013 WL 1352246, at *2 (D.N.J. Apr. 2, 2013) (holding that even where default is entered against a defendant for failure to retain substitute counsel after the defendant has filed an answer to a complaint, "the factual allegations in a complaint, other than those as to damages, are treated as conceded by the defendant"). Accordingly, the Court grants Plaintiff's motion for default judgment as to Count I.

As for trademark dilution, Count IV, Section 43(c) of the Lanham Act provides:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or

2018 WL 3472628

dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c). The Act further provides:

[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A).

Here, the Court finds that Plaintiff has established that the mark qualifies as famous. As an initial matter, the Court takes judicial notice that the Nike brand is widely recognized in the general consuming public. *See Rolls-Royce Motor Cards, Ltd. v. Davis*, 15-0417, 2016 WL 3913640, at \*7, 2016 U.S. Dist. LEXIS 32551, at \*19 (D.N.J. Mar. 11, 2016) ("I take judicial notice that the name 'Rolls-Royce' is well established and very well known."). Further, Nike has established with the Declaration of Lori Colbert, the North America Brand Protection Manager for NIKE, Inc. that the brand was initiated in 1971, and that since this time, Nike has "created, developed and promoted its original Nike Trademarks used on products through the expenditure of extraordinary efforts and millions of dollars." *See* ECF No. 166-8.

Second, as the Court previously found, Eastern Ports made commercial use in interstate commerce of the mark in that it attempted to import the Counterfeit Nike Footwear into the United States. Third, this use in commerce began after Nike's

mark became famous. Fourth, the use by Eastern Ports is likely to cause dilution by blurring. As the court stated in *E.A. Sween Co.*, 19 F.Supp.3d at 574, "[t]his may be inferred from the fact that Defendant has used [Plaintiff's] exact marks" in the products Defendant used in commerce. Therefore, the Court grants Plaintiff's default judgment motion on its claim for trademark dilution, Count IV.

**C. Damages**

 \*13  After a plaintiff succeeds in showing that a violation of its registered marks has occurred, that plaintiff may recover actual damages measured by the defendant's profits. 15 U.S.C. § 1117(a). Alternatively, § 1117(c) provides that on election of the plaintiff or where actual damages cannot be calculated, an award of statutory damages can be awarded of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(1). If, however, the Court finds that a defendant's infringement was willful, then the maximum award increases to $2 million per mark per type of goods or services sold, offered for sale, or distributed. 15 U.S.C. § 1117(c)(2).

Nike argues that the conduct of Eastern Ports was willful and that the Court should award statutory damages of $400,000 for each of the eight trademarks infringed, for a total amount of $3,200,000. [19] *See* Plaintiff's Memorandum of Law in Support of Motion for Default Judgment ("Default Mem."), ECF No. 167 at 31. In further support of this proposition, Nike states that the total value of all ten shipments, eight of which are not at issue in this matter, is $3,400,000, which is very close to the requested $3,200,000. *Id.* at 31-32, 125 S.Ct. 385. Nike also argues that as statutory damages are meant to serve as a substitute for actual damages, "Eastern Ports' inability to answer for the first eight shipments is exactly the evidentiary gap that the statutory damage provision of the Lanham Act was intended to fill." *Id.* at 33, 125 S.Ct. 385.

[19]    Nike has not moved for a proof hearing to calculate damages.

"Because statutory damages are meant to serve as a substitute for actual damages the Court should discern whether the requested damages bear some relation to the actual damages suffered." *Coach, Inc. v. Ocean Point Gifts*, No. 09-4215, 2010 WL 2521444, at \*6 (D.N.J. June 14, 2010) (internal quotations omitted) (citing *Gucci Am. v. Duty Free Apparel, Ltd.*, 315 F.Supp.2d 511, 520 (S.D.N.Y. 2004) ("To the extent possible, statutory damages 'should be woven out of the same

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 78 of 117

Nike, Inc. v. Eastern Ports Custom Brokers, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3472628

bolt of cloth as actual damages.' "), *amended in part on other grounds by* 328 F.Supp.2d 439 (S.D.N.Y. 2004) ). In determining how to best exercise their discretion in granting statutory damages, courts have often borrowed from the factors used in considering statutory damages for copyright infringement, seeking to both deter and punish defendants while adequately compensating plaintiffs in situations where it is difficult, if not impossible, to determine actual damages. *See Coach, Inc. v. Quisqueya Agency Inc.*, No. 13-3261, 2014 WL 3345434, at *2 (D.N.J. July 8, 2014). To determine damages, this District has also adopted factors that have been used in the Second Circuit:

> (1) [T]he expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.

*See Ocean Point Gifts*, 2010 WL 2521444, at *7 (citing *Platypus Wear, Inc. v. Bad Boy Club, Inc.*, No. 08-02662, 2009 WL 2147843, at *7 (D.N.J. July 15, 2009); *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986) ).

In *Ocean Point Gifts*, the court surveyed relevant Lanham Act cases, and determined that two factors overwhelmingly motivated statutory damage awards: the point of sale of the infringing goods and the monetary value of the item counterfeited. 2010 WL 2521444, at *6. The court concluded that cases involving the internet distribution of counterfeit luxury goods routinely resulted in "high damage awards due in part to the wide market exposure that the internet can provide." *Id.*

**\*14** As stated previously, for the Court to award damages over the maximum $200,000 per mark, the defendant's conduct must have been willful. *See* 15 U.S.C. § 1117(c) (2). Here, the Court concludes that Eastern Port's conduct was willful. *See Adobe Sys. Inc.*, 2009 WL 5218005, at *8 ("Defendant has elected not to defend this case and dispute

any of Plaintiff's allegations in the Complaint. Thus, in light of Defendant's default, his willfulness as pled in the Complaint is admitted."); *see also Dr. JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F.Supp.2d 1038, 1050 (N.D. Cal. 2010) ("Willfulness can also be inferred from a defendant's failure to defend."). Accordingly, the Court may award statutory damages to Nike in an amount no more than $2,000,000 per counterfeit mark per type of goods distributed. Where, as here, Nike owned eight infringed marks,[20] the maximum amount the Court may award is $16,000,000. Nonetheless, as discussed below, the Court does not find an award in this amount appropriate in the instant matter.

[20]    The eight marks infringed include: "NIKE" word mark; Swoosh Design; "SWOOSH" word mark; Nike Air with Swoosh Design; "NIKE AIR" word mark; Nike and Swoosh Design; Swoosh Air Design; and "AIR FORCE 1" word mark. *See* Default Mem. at 7.

Plaintiff has provided documentation from Customs indicating that the total value of the Counterfeit Nike Footwear contained in the Seized Shipments was over $688,580.00, or $347,004.00 for one container and $341.582.00 for the second container. *See* ECF No. 166-8 at 17-19. While Nike urges the Court to take into consideration the fact that there were eight previous shipments, which likely also contained the same amount of Counterfeit Nike Footwear, the Court declines to base its damages calculation on an admittedly speculative assumption. The Court will award $30,000 per mark for a total award of $240,000. This award acknowledges the scale of the operation, in that over 20,000 pairs of counterfeit footwear were seized, the value of the counterfeit footwear seized, the need to deter Eastern Ports and other companies from engaging in the transportation of counterfeit goods, and the Court's determination that Eastern Ports willfully engaged in its infringing actions. This award also acknowledges the fact that the containers were seized before they were sold into the market, and therefore Nike did not suffer any actual lost profits, and the limited types of goods bearing counterfeit marks, namely only footwear. *See Chanel, Inc. v. Matos*, 133 F.Supp.3d 678, 688 (D.N.J. 2015) (finding an award of $30,000 per infringement was sufficient to compensate plaintiff for losses and to deter defendant when infringement was willful and the types of goods bearing counterfeit marks were limited); *Coach, Inc. v. Fashion Paradise, LLC*, No. 10-4888, 2012 WL 194092, at *8 (D.N.J. Jan. 20, 2012) (awarding $30,000 per infringement because that amount took into account defendants' culpability and

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 79 of 117
Nike, Inc. v. Eastern Ports Custom Brokers, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 3472628

willfulness, was significant enough to compensate plaintiffs and to deter defendants, and acknowledged the fact that the sales took place at a small shop); *Coach, Inc. v. Bag Place, Co.*, No. 10-6226, 2012 WL 13028160, at \*10 (D.N.J. May 7, 2012) ("Having considered the past awards in this District, the point of sale, the extent of sales, and the lack of evidence concerning Plaintiff's losses, the Court will exercise its discretion to award Plaintiff $30,000 per mark[.]").

### D. Injunctive Relief

Nike also seeks entry of a permanent injunction, pursuant to 15 U.S.C. § 1116(a), to enjoin Eastern Ports from "importing, distributing, selling, and offer[ing] for sale, or assisting in the sale, distribution, importation, and offer for sale, of any goods that infringe on the Nike's Trademarks or otherwise trade on the Nike Trademarks or goodwill." Default Mem. at 33. In *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), the Supreme Court held that the traditional four-factor test used by courts in equity should be used for a permanent injunction in the patent context. Subsequently, the Third Circuit held that "although *eBay* in particular arose in the patent context, its rationale is equally applicable in other contexts, including cases arising under the Lanham Act." *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 214 (3d Cir. 2014). The factors a plaintiff must demonstrate for a permanent injunction are:

> **\*15** (1) [T]hat it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc.*, 547 U.S. at 391, 126 S.Ct. 1837.

An analysis of the aforementioned four factors clearly demonstrates that Nike is entitled to a permanent injunction enjoining Eastern Ports from importing, distributing, selling and offering for sale, or assisting in the sale, distribution, importation, and offer for sale, of any goods that infringe Nike's trademarks. Nike has suffered an irreparable injury based in part on Eastern Port's active participation in the importation of the counterfeit goods. *See supra*. Furthermore, damages are unlikely to prevent or impede future trademark infringement. The balance of hardships between the Parties weighs in favor of Nike, as such relief only requires that Eastern Ports abide by the law and cease from actively participating in the importation of counterfeit goods. Finally, the public interest will be served, as the injunctive relief requested will reduce or eliminate the likelihood of confusion as it pertains to Nike's trademarks. Accordingly, the Court finds that Nike's requested relief is reasonable and necessary to prevent further violations of Nike's trademark rights, and will grant Nike's request for injunctive relief against Eastern Ports.

### IV. CONCLUSION

For the foregoing reasons, the Court finds that Nike is entitled to summary judgment on its claims for: Trademark Counterfeiting (Count I), Trademark Infringement (Count II), Unfair Competition and False Designation of Origin (Count III), Unauthorized Importation (Count V), and a violation of the Tariff Act (Count VI) against Defendants Logistics and International. The Court denies Defendants Logistics and International's summary judgment motions on all counts. Lastly, the Court grants Nike's motion for default judgment against Eastern Ports on all counts, awards Nike damages in the amount of $240,000, and grants its motion for injunctive relief. An appropriate Order accompanies this Opinion.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3472628

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 80 of 117

Peet v. Beard, Not Reported in Fed. Supp. (2015)
2015 WL 7568300

2015 WL 7568300
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Lawrence PEET, Plaintiff
v.
Jeffrey A. BEARD, et al., Defendants.

Civil No. 3:10-CV-482
|
Signed 11/25/2015

**Attorneys and Law Firms**

James D. Famiglio, Law Offices James D. Famiglio P.C.,
Broomall, PA, Stuart A. Carpey, Kreithen, Baron & Carpey,
P.C., Conshohocken, PA, Dino Privitera, Privitera & Hurley
LLC, Fredric S. Eisenberg, Eisenberg Rothweller Winkler
Eisenberg & Jack P.C., Philadelphia, PA, for Plaintiff.

Timothy P. Keating, Lindsey A. Bierzonski, Office of
Attorney General of Pennsylvania, Harrisburg, PA, Alan S.
Gold, Gold & Robins, P.C., Jenkintown, PA, for Defendants.

**MEMORANDUM OPINION**

Martin C. Carlson, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** The Prison Litigation Reform Act, 42 U.S.C. § 1997
("PLRA") requires that prisoners present their claims through
an administrative grievance process prior to seeking redress
in federal court. Specifically, the Act provides that: "No
action shall be brought with respect to prison conditions under
[§ 1983], or any other federal law, by a prisoner confined
in any jail, prison, or other correctional facility until such
administrative remedies as are available are exhausted." 42
U.S.C. § 1997e(a). In this prisoner civil rights case the
parties present us with a legal Hobson's choice regarding the
application of the PLRA's exhaustion requirement. On one
hand, the plaintiff asks us to excuse his failure to exhaust
prison grievances, and find that the grievance process was
unavailable to him, even though it is entirely undisputed that
Peet never attempted to lodge any grievance relating to the
injuries he suffered. On the other hand, the defendants ask
that we dismiss this case based upon Peet's acknowledged
and total failure to pursue prison grievances, even though the
defendants took no steps to assert this potentially dispositive

issue for the past five years of this litigation, beyond listing
the failure to exhaust as an affirmative defense in their answer
to Peet's complaint. Thus, while Peet asks us to excuse his
complete failure to exhaust his administrative remedies, the
defendants urge us to excuse a five year failure to assert this
defense, once the defendants had properly raised this issue in
their answer to Peet's complaint.

Now pending in this action is a motion filed by the defendants,
styled as a "motion for bifurcation," which is in reality a
motion that seeks a defense judgment on the grounds that
the plaintiff failed to exhaust, or even attempt to exhaust,
his administrative remedies at any time prior to bringing
this action. (Doc. 110.) Despite the defendants having waited
more than five years to advance this issue after first raising
this defense in an answer filed in June 2010, and despite
the defendants having declined to raise this as an issue in
their timely motion for summary judgment filed in September
2014, we find that the current case law compels a finding that
the defendants have not waived this affirmative defense under
the PLRA. Having reached that conclusion, we are further
constrained to find that the undisputed facts compel a finding
that the plaintiff did not exhaust his administrative remedies
prior to filing suit, and therefore the defendants are entitled
to judgment in their favor, and to have Peet's claims against
them dismissed, thus obviating the need for trial.

**II. BACKGROUND AND STATEMENT OF THE
CASE**

On March 16, 2008, at around 10:00 p.m., Lawrence Peet,
an inmate in the custody of the Pennsylvania Department
of Corrections previously housed at the State Correctional
Institution at Camp Hill, suffered the second of two seizures
that day while he was lying on his bunk, which was situated
next to a scalding hot radiator. After his second seizure of
the day, Peet collapsed out of his bed and became trapped
against the radiator, with his face in direct contact with the
burning surface. The record indicates that a frantic scene
then ensued within the cell and on the cell block, with Peet's
cellmate screaming for help and other inmates causing a
commotion. Nevertheless, according to some evidence in the
record, the response to the emergency was slow, and it took
anywhere from five to ten minutes before corrections officers
arrived at the cell door. Meanwhile, Peet was convulsing,
spitting up blood, all the while with his face pinned against
the radiator for as long as 15 minutes before corrections
officers entered the cell and provided aid. Although the parties
dispute whether corrections officers responded adequately
under the circumstances, what is not disputed is that by

the time correctional officers arrived, Peet's face had been in direct contact with the radiator for several minutes, and the results were ghastly: Peet suffered extreme burns, facial disfigurement, and permanent blindness in his right eye. He required extensive hospitalization in a burn unit and had multiple surgeries, including skin grafts.

**\*2** Peet commenced this civil action on March 3, 2010, asserting claims against more than 50 DOC officials and employees. Peet alleged that the defendants violated his constitutional rights through their deliberate indifference to his epileptic condition, in violation of the Eighth Amendment to the United States Constitution, and that their indifference resulted in Peet suffering his second seizure unsupervised in a cell, and resulted in Peet sustaining severe injury. Peet also alleged that the defendants violated his due process rights under a "state created danger" theory of liability, asserting that the defendants affirmatively acted in a manner that exposed to Peet a foreseeable and increased risk of serious harm that later ensued.

The Commonwealth defendants answered the complaint on June 24, 2010. Tucked within the Commonwealth defendants' answer were a number of affirmative defenses, including the defense that "Plaintiff failed to exhaust his administrative remedies by failing to file any grievances concerning the conditions in which he was incarcerated. Therefore, any claim that Plaintiff may have be barred by his failure to exhaust his administrative remedies prior to the filing this action." (Doc. 23, Answer, ¶ 125.) For more than five years after raising this affirmative defense, the defendants never again raised the issue or filed a dispositive motion to address the merits of the affirmative defense. It was, as a practical matter, forgotten.

The parties subsequently engaged in extensive discovery and pre-trial litigation over a lengthy period of time. Following this process, and the exchange of expert reports, Peet agreed to dismiss all but five of the original defendants, whom he determined had direct involvement in the constitutional deprivations alleged. Following this stipulated dismissal, Peet continues to assert his claims against the former Superintendent of SCI-Camp Hill, John Palakovich; Unit Manager Renee Zobitne; Sergeant Scott Seese; and Corrections Officers David Pierre and Manda Steinour-Eger (collectively, the "defendants"). Peet seeks to hold Palakovich and Zobitne liable for the alleged constitutional violations based upon their asserted failures as supervisors, and their own deliberate indifference to policies and procedures that exacerbated his risk of injury. Peet's claims against the

remaining three defendants are based on his allegation that they were indifferent to the risk of harm that Peet faced by returning to his prison cell that contained a hot radiator after suffering a serious seizure; and that they responded in a dilatory and indifferent manner after Peet suffered the seizure that resulted in his severe injuries. As part of the substantial amount of discovery taken in this case, and the myriad factual issues presented by both sides, Peet retained the services of at least one expert, a former warden of a major state penitentiary, who issued a report critical of the way in which Peet's medical condition was monitored, and about the response to the emergencies that Peet presented after suffering multiple grand mal seizures in a cell containing a scalding hot radiator. (Doc. 92, Ex. 29.)

The remaining corrections defendants moved for summary judgment, which was subject to extensive briefing by the parties. (Docs. 79, 80, 81, 82, 83, 84, 85, 89, 90, 91, 92, 101.) The defendants made a number of substantive arguments in support of the motion, including to attack Peet's Eighth Amendment claims; to argue that Defendants Palakovich and Zobitne lacked personal involvement in the alleged constitutional deprivations; to assert that the defendants were entitled to qualified immunity; and to contend that the plaintiff failed to demonstrate sufficient support for a state-created danger claim. The Court subsequently issued a lengthy memorandum and order granting the defendants' motion for summary judgment with respect to the plaintiff's substantive due process claims under a state-created danger theory of liability, but otherwise denied the motion with respect to all remaining claims. (Doc. 102, 103.) At the conclusion of the opinion, the Court observed:

> **\*3** In the end, this is an action involving a tragic set of circumstances involving an inmate with a cascading array of health problems, chief among them a seizure disorder that in March 2008 was unstable. Those circumstances led to the plaintiff suffering an extraordinary set of injuries, and lifelong disfigurement, and led to the filing of this litigation. Following discovery, we find that the evidence that has been adduced could support the plaintiff's claims that the remaining defendants were deliberately indifferent to his serious

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 82 of 117

Peet v. Beard, Not Reported in Fed. Supp. (2015)

2015 WL 7568300

medical needs on March 16, 2008, and that their response to his serious medical condition was dilatory and inadequate. That same evidence, however, falls short of demonstrating that these defendants affirmatively put in motion the events that ultimately resulted in the plaintiff's second seizure, and the injuries that sadly ensued, or that they took affirmative action to increase the risk of its occurrence. Accordingly, the defendants' motion for summary judgment will be denied with respect to the plaintiff's Eighth Amendment claims, and granted with respect to his claims that the defendants violated his substantive due process.

(Doc. 102, at 56-57.) At this point, the case was ready for trial on the remaining claims and was, in fact, scheduled for trial.

As the Court and the parties proceeded forward, the Court convened a telephonic case-management conference and scheduled the matter for settlement proceedings before The Honorable William I. Arbuckle, III, of this Court. That conference was held on July 30, 2015, and again on August 6, 2015, but was unsuccessful in resolving the case. Judge Arbuckle scheduled a follow-up conference to be held on September 3, 2015. Almost immediately after this order was entered, however, the remaining defendants filed what they called a "motion for bifurcation." (Doc. 110.) In their brief supporting the motion, the defendants clarified what was meant by a motion for bifurcation: despite having declined to raise the issue of administrative exhaustion at any point during the previous five years of litigation after identifying it as a potential affirmative defense, the defendants now urged the Court to "bifurcate the trial and first hold a bench trial on the issue of exhaustion of administrative remedies, which may preclude the necessity for a jury trial altogether." (Doc. 111, at 1.) [1] In effect, having declined to actively assert this issue at the outset of the case, and having declined to seek early resolution of this case by advancing this affirmative defense through a timely motion for summary judgment filed in September 2014, the defendants belatedly raised the defense on the eve of trial through a "motion for bifurcation."

[1]    What is a further curiosity in this case is that Peet filed a previous action based upon the very same events in this case, and that case was voluntarily dismissed by Peet, pursuant to a stipulation, after the defendants brought up the issue of exhaustion at the outset of the case by way of a motion to dismiss. See Civil No. 3:09-CV-2380 (filed December 3, 2009, and closed on February 25, 2010). Then Peet filed this action on March 3, 2010, approximately one week after the first action was dismissed. Despite the issue of exhaustion having been raised promptly in the first action, leading to the closure of that case in a matter of a few short months, the issue was not pressed in any meaningful way in the instant action for more than five years, despite having been included as an affirmative defense in an answer filed on June 24, 2010.

At the conclusion of the briefing on the motion, the Court scheduled an evidentiary proceeding for October 5, 2015, and directed the parties to submit pre-hearing proposed findings of fact and conclusions of law. (Doc. 118.) Thereafter, the Court suspended the extant case-management deadlines pending a ruling on the exhaustion issue. (Doc. 120.) Prior to the hearing, the parties submitted a stipulation as to facts that the parties agreed were undisputed. Among those agreed-upon facts were that Peet had received notification of the Pennsylvania Department of Corrections' grievance policies; the applicable grievance procedures necessary to exhaust claims prior to filing a lawsuit in federal court; that Peet knew how to obtain a grievance form; that the facility grievance coordinator could extend the grievance deadline in cases where, such as here, the inmate was temporarily transferred from the facility where the grievance had to be filed; that even after returning to SCI-Camp Hill in March 2009, Peet never requested a grievance form in this case and never submitted a grievance; and that Peet believed he was beyond the time for filing a grievance and so declined to do so, since he is by nature a "laid back guy" who "did not want to make any waves." (Doc. 121.) The parties also stipulated that Peet never asked to have the grievance deadlines suspended or enlarged so that he could bring his claims administratively, and therefore "never filed a grievance under the grievance system in effect at the time of his injuries prior to initiating this lawsuit." (Id. ¶¶ 28-29.)

 *4    During the proceeding, no further evidence was presented or introduced, and the parties were in essential agreement on all of the relevant facts, including the fact that prison officials did not take steps to prevent Peet from

2015 WL 7568300

filing a grievance. The hearing, therefore, consisted largely of argument by counsel, with the Commonwealth insisting that Peet's failure to exhaust his administrative remedies compels the dismissal of this action more than five years after it was filed, and with Peet claiming that his failure to exhaust should not be deemed a bar to this litigation because, under the circumstances, he did not have an adequate remedy available to him because he had missed the deadline for filing a grievance, was physically incapable of filing a grievance while he recuperated from his life-threatening injuries within the 15-day time requirement, and therefore to file a grievance would have been futile.

The Court also focused the parties' attention on the case of Drippe v. Tobelinski, 604 F.3d 778 (3d Cir. 2010), and directed them to present argument on its application to the facts and circumstances presented in this particular action, where it appeared that the Commonwealth in essence sought to file a second dispositive motion more than one year after the dispositive motions deadline had expired, and after the Court had adjudicated a comprehensive motion for summary judgment months before. The Court noted that in Drippe, the Third Circuit Court of Appeals held that a district court abused its discretion after it entertained, on the eve of trial, an oral motion for summary judgment based on the affirmative defense that the plaintiff failed to exhaust his administrative remedies, which was filed seven months after the dispositive motions deadline, without first securing leave of court. In particular, the Third Circuit ruled that by addressing a motion that had been raised in that fashion, the district court violated Rule 6(b) of the Federal Rules of Civil Procedure, and the appeals court remanded so that the moving party could file "the appropriate motion under Rule 6(b)(1)(B)...." Id. at 779. We presented this case to the parties for their consideration and reflection on its relevance to this suit.

Upon consideration of the arguments presented by counsel, and finding the current case law in this field to be both clearly established and largely inflexible under the undisputed facts of this case, we are constrained to find that Peet's claims are barred because he failed to exhaust his administrative remedies prior to filing suit – indeed, because he failed to file any grievance at any time, or even to seek leave to file a grievance out of time. Federal law, as it presently stands and has been interpreted by our court of appeals, compels judgment in the defendants' favor on these undisputed facts.

This result is, however, troubling in this particular case. It is hard to look past the fact that Peet's original action was

dismissed precisely because his failure to exhaust remedies was asserted in a motion to dismiss filed promptly pursuant to Rule 12(b)(6). Approximately one week after that first suit was dismissed, Peet refiled his claims in this civil action, and not long thereafter the defendants answered the complaint and raised, as an affirmative defense, the possibility that Peet had not exhausted his administrative remedies. For reasons that are unclear, the Commonwealth declined to pursue this issue further, or to raise this issue in a motion to dismiss, or in a timely filed motion for summary judgment, or indeed at any time within one year after the dispositive motions deadline had run in this action. The defense was raised and then allowed to lay dormant.[2] This defense litigation strategy, in turn, created a Hobson's choice for the plaintiff. He could either abandon his lawsuit in the face of a latent affirmative defense which had not been actively pursued by the defendants, or move forward with this litigation. Over the past five years, Peet pursued the latter course, litigating his legal claims arising from this disfiguring injury.

[2]     It appears that defendants' counsel may have become aware of the issue, and its potential significance, while they were preparing for trial.

**\*5**  It was not until the eve of trial – and after more than five years had passed, considerable time had been spent, discovery had been completed, retained experts had furnished reports, and significant expenses had been incurred by the parties – that the defendants filed the "motion for bifurcation", essentially seeking another bite at the dispositive apple in this case. The entire course of this litigation could have been cut short, and expenses significantly curtailed, had the defendants moved for judgment on the basis of an affirmative defense that would, if applicable, have resolved every claim in this case early on.

Nevertheless, although we are somewhat troubled by the way in which the defendants have belatedly raised this issue after failing to address it for nearly the entirety of this case – a case that was filed after its predecessor was dismissed because of the plaintiff's acknowledged failure to exhaust his administrative remedies –we find that dismissal is warranted here on the basis of the undisputed facts to which the parties have stipulated. The facts make clear that Peet did not exhaust available administrative remedies prior to filing this action, and the defendants are entitled to judgment in their favor on this threshold issue. Trial on Peet's claims for liability is therefore unnecessary.

Peet v. Beard, Not Reported in Fed. Supp. (2015)

2015 WL 7568300

## II. DISCUSSION

### A. Administrative Exhaustion Under the PLRA.

The Prison Litigation Reform Act, 42 U.S.C. § 1997 ("PLRA") requires that prisoners present their claims through an administrative grievance process prior to seeking redress in federal court. Specifically, the Act provides that:

> No action shall be brought with respect to prison conditions under [§ 1983], or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). In accordance with the PLRA, prisoners must comply with exhaustion requirements with respect to any claim that arises in the prison setting, regardless of the type of claim asserted, or the relief sought. See Porter v. Nussle, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); Booth v. Churner, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues.").

As the statute's language makes clear, the exhaustion of available administrative remedies prior to filing suit is mandatory. See Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court – or any other – to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis.") (quoting Beeson v. Fishkill Corr. Facility, 28 F. Supp. 2d 884, 894-95 (S.D.N.Y. 1998)). Whether an inmate has exhausted administrative remedies is a question of law that is to be determined by the court, even if that determination requires the resolution of disputed facts. See Small v. Camden County, 728 F.3d 265, 270-71 (3d Cir. 2013); see also Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010).

Moreover, the exhaustion requirement of the PLRA is one of "proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 84 (2006). Failure to comply with the procedural requirements

of the available grievance system will result in a claim being deemed procedurally defaulted. Id. at 90; Spruill v. Gillis, 372 F.3d 218, 227-32 (3d Cir. 2004). An inmate cannot circumvent the PLRA's exhaustion requirement by failing to properly exhaust the prison's administrative review process, or by waiting until such remedies are no longer available to him. Woodford, 548 U.S. at 95. However, if an inmate shows that the actions of prison officials directly caused the inmate's procedural default of a grievance, the inmate will not be held to strict compliance with the exhaustion requirement. Brown v. Croak, 312 F.3d 109, 112-13. Likewise, "[w]here [the inmate] failed to receive even a response to the grievances addressing the...incidents, much less a decision as to those grievances, the [administrative remedy] process was unavailable to him." Small v. Camden County, 728 F.3d. at 273. If there is an impediment to an inmate's ability to grieve a matter, the inmate is required to pursue such grievance once the impediment has been removed. Oliver v. Moore, 145 F. App'x 731, 735 (3d Cir. 2005).

**\*6** In this regard, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances", Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." Davis, 49 F. App'x at 368. See also Brown v. Croak, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000) (exhaustion requirement met where Office of Professional Responsibility fully examined merits of excessive force claim and uncontradicted correctional officers impeded filing of grievance).

Further, while courts have acknowledged that, in certain limited circumstances, a failure to exhaust can be excused when "the [administrative remedy] process was unavailable to [the inmate]," Small v. Camden County, 728 F.3d. at 273, none of the cases which recognize this exception to the PLRA's total exhaustion requirement involve the scenario presented here, where the inmate unilaterally and completely declined to pursue any grievances since he is by nature a "laid back guy" who "did not want to make any waves." (Doc.

121.) Rather, case law in this field has typically applied a functional analysis to this issue and measured the functional unavailability of grievances by examining the institutional response to the inmate's actual efforts to pursue grievances. Thus, we can find no legal authority which extends this doctrine to an inmate's unilateral choice to forego any effort to pursue a grievance. Quite the contrary, case law has consistently held that an inmate's personal sense of the futility of attempting exhaustion does not excuse compliance with this requirement prescribed by law. Nyhuis v. Reno, 204 F.3d 65, 72 (3d Cir. 2000). In short it seems that an inmate must at least try to exhaust his administrative remedies before it can be said that those remedies are entirely unavailable.

The Department of Corrections maintains a grievance system that offers inmates a three-phase grievance and appeals procedure. See DC-ADM 804; see also 37 Pa. Code § 93.9(a). Pursuant to DC-ADM 804, inmates must first file grievances with the Facility Grievance Coordinator at the facility where the events upon which the complaint is based occurred. If the inmate is dissatisfied with the initial review of his grievance, he may appeal the decision to the Facility Manager (Superintendent). Upon receiving a decision from the Superintendent, the inmate may file an appeal with the Secretary's Office of Inmate Grievances and Appeals (SOIGA) within 15 working days of the Superintendent's decision. Id. The parties have stipulated that during the time period relevant to this action, the DOC's grievance policy provided for four circumstances under which the grievance coordinator could grant an extension of time for an inmate to file a grievance, including a temporary transfer from the facility where the grievance should have been filed.[3] (Doc. 121, ¶ 17.) Again, compliance with the DOC's administrative grievance process is mandatory prior to bringing suit in federal court, and the failure to do so will result in that suit being subject to dismissal pursuant to the clear terms of the PLRA. Nyhuis, 204 F.3d at 73.

[3]    The other exceptions included a permanent transfer, an authorized temporary absence for an extended period, and delays in mail delivery. (Doc. 121, ¶ 17.)

**B. Delay in Seeking Dispositive Relief for a Plaintiff's Failure to Exhaust.**

**\*7** Although this legal framework is well-settled and familiar to the Court and the parties, we also note that the Third Circuit has, on occasion, expressed reservation about a defendant's belated assertion of the defense, particularly where the defense was not raised within the time limits prescribed by the court for filing a motion for summary judgment. This was the situation presented in Drippe, where a defendant declined to move for summary judgment on the grounds that the plaintiff failed to exhaust administrative remedies prior to filing suit, but instead raised the issue in an oral motion that was lodged on the eve of trial. Indeed, the oral motion was raised after jury selection, immediately prior to trial commencing, and seven months after the deadline the court prescribed for filing dispositive motions. 604 F.3d at 782. Nevertheless, the district court considered the motion, despite it having been filed out of time, and found that the plaintiff's failure to exhaust compelled entry of summary judgment in the defendant's favor in advance of trial. The plaintiff appealed and the Third Circuit reversed. 604 F.3d at 779.

The appellate court's ruling was, however, narrow. The court emphasized that it does not "read a strict timing requirement into the PLRA for prosecution of the affirmative defense of failure to exhaust." Id. at 781. The court also noted that district courts enjoy "great deference with regard to matters of case management." Id. at 783. However, the court recognized that "there are times when a district court exceeds the permissible bounds of its broad discretion." Id. Guided by the Supreme Court's holding in Lujan v. National Wildlife Federation, 497 U.S. 871 (2011), the Third Circuit noted that following Lujan, federal courts have found that Rule 6(b) of the Federal Rules of Civil Procedure imposes a "strict requirement that litigants file formal motions for Rule 6(b) time-extensions when attempting to file in contravention of a scheduling order." Id. at 784.[4]

[4]    Rule 6(b) provides in relevant part that "[w]hen an act may or must be done within a specified time, the court may, for good cause shown, extend the time: (A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or (B) on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b). In Lujan, the Supreme Court held that a district court did not abuse its discretion when it declined to permit the introduction of affidavits that were filed untimely and in violation of the district court's scheduling order. The Court held that Rule 6(b) not only conferred discretion on a district court, but specifically prescribed "the mechanism by which that discretion is to be invoked and exercised."

Peet v. Beard, Not Reported in Fed. Supp. (2015)

2015 WL 7568300

497 U.S. at 895-96. The Supreme Court found that after the time for filing a motion has expired, a district court could only "for cause shown" and "in its discretion" extend the time for filing "upon motion." Id. at 896 n.5.

In light of Lujan and this interpretation of Rule 6(b), the Third Circuit addressed whether the district court's consideration of the defendant's untimely motion for summary judgment, which was raised orally and without request for leave of court, violated Rule 6(b). The Third Circuit held that to comply with Lujan and the requirements of Rule 6(b)(1)(B), "a party must make a formal motion for extension of time and the district court must make a finding of excusable neglect...before permitting an untimely motion." Id. at 785. In Drippe, the appeals court could not evaluate the district court's purported finding of excusable neglect since the record was barren of evidence to suggest that the district court had, in fact, made such a finding. Id. Instead, the court found that "[t]he District Court's entertainment of [the oral motion to dismiss], some seven months after the scheduling deadline for dispositive motions, does not comply with Rule 6(b) as construed by Lujan." Id.

In reaching this conclusion, the Third Circuit does not appear to have been simply invoking the strictures of the Rule, but was also clearly influenced by the fact that the way in which the motion was raised – orally, without notice, after a jury had been selected, and immediately before trial was to commence – placed the plaintiff in an unfair position that was the very reason Rule 6(b) prescribes certain procedural requirements for the filing of late motions. In particular, the Rule requires that late filings must "contain a high degree of formality and precision" in order to "put [ ] the opposing party on notice that a motion is at issue and that he therefore ought to respond." Id. (quoting Lujan, 497 U.S. at 896 n.5). The court of appeals further observed something particularly relevant to this case: "The resolution of this issue – failure to exhaust administrative remedies – was highly fact-intensive and required a judgment by the District Court whether the specific grievances complied with the specific prison's grievance procedure." Id. The court found that the plaintiff should have had an opportunity to research and brief the issue, and that compliance with Rule 6(b) would have provided that opportunity. Id. Accordingly, the court of appeals reversed the entry of summary judgment, and remanded to allow the defendant to file a motion for an extension of time in compliance with Rule 6(b)(1)(B). Id. at 785-86. That is precisely what the defendant did.

*8 The victory for the plaintiff in Drippe was, ultimately, little more than a procedural and pyrrhic one. On remand, the defendant moved for an extension of time pursuant to Rule 6(b). The district court found that untimely motion for summary judgment could not be considered, and therefore scheduled the matter for trial. However, less than two weeks before trial, the defendant filed a motion to bifurcate trial pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, requesting that the court hold a bench trial on the legal issue of exhaustion, and then hold a jury trial on the issue of liability if necessary. Drippe v. Gototweski, 434 F. App's 79, 81 (3d Cir. 2011). The district court granted that motion, held a short bench trial on the exhaustion issue, and then found that the plaintiff had not exhausted his claims. The district court consequently dismissed the case, and no trial on liability ever occurred. The plaintiff appealed, asserting among other things that the defendant had waived his right to assert the defense of exhaustion. Id.

The Third Circuit disagreed with the plaintiff's argument and the suggestion that its prior decision provided the plaintiff with any more relief, or that it compelled a finding that the defendant had waived the right to seek relief because of the plaintiff's failure to exhaust administrative remedies:

> Drippe first argues that Gototweski waived the defense of exhaustion by failing to raise it in a timely motion for summary judgment. He asserts that Gototweski did not simply waive his ability to raise this defense on summary judgment, but that this is an affirmative defense that must be raised in pre-trial motion, and by failing to do so, Gototweski waived the defense entirely. In the present case, there is no dispute that Gototweski raised his affirmative defense in his Answer to Drippe's Amended Complaint. That he did not make a timely dispositive motion based upon this affirmative defense in no way means that he waived the defense; instead, he waived only his ability to receive summary adjudication of that defense. The standard for affirmative defenses is that "[f]ailure to raise an affirmative defense by responsive pleading *or* by appropriate motion generally results in the waiver of that defense." Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991) (emphasis added). Gototweski raised the affirmative defense in his responsive pleading, and he was, therefore, entitled to pursue this defense at trial, even if he waived the right to summary relief on that claim.

Drippe v. Gototweski, 434 F. App'x 79, 81 (3d Cir. 2011).

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 87 of 117
Peet v. Beard, Not Reported in Fed. Supp. (2015)
2015 WL 7568300

In the absence of other authoritative guidance from the court of appeals, these principles control our disposition of this particular case.

### C. The Defendants Preserved the Exhaustion Defense in Their Answer, and Under Prevailing Law are Permitted to Seek Judgment in Their Favor Prior to a Trial on Liability, Despite Waiting to Present this Issue for Five Years.

Turning to the case at bar, there is no dispute that the defendants raised the exhaustion issue as an affirmative defense in their answer. (Doc. 23, Answer, ¶ 125.) There is, thus, no question that the defense was technically raised in a timely way and preserved, even if it was not actively pursued throughout the case until the defendants moved to bifurcate – something that Drippe instructs is permissible, and does not result in waiver of the right to have the issue adjudicated by the court, even if it may not technically be done via an untimely motion for summary judgment.

There is also, in the end, no dispute that Peet never exhausted his administrative remedies prior to filing suit. Despite the tragic circumstances that led to this case being filed, including Peet's painful burns and disfiguring injuries; and despite the fact that Peet spent considerable time in hospital settings and other correctional facilities while he convalesced, Peet never took any steps at any time to file a grievance with prison officials regarding their alleged indifference to his serious medical needs. Although Peet was returned to SCI-Camp Hill in March 2009, and although the facility's grievance coordinator had the discretion to grant an extension of the 15-day deadline for filing a grievance based on Peet's considerable absence from the facility during his period of convalescence, Peet never requested an extension and never filed a grievance.

**\*9** Peet now argues that at that time he had no effective remedy. In this regard, Peet advances a textual argument, based upon the then-existing language of the Department of Corrections grievance policy. In particular, Peet argues that the policy on effect at the time of his injury did not expressly allow prison officials to grant extensions of time for the filing of grievances based upon the unusual constellation of circumstances presented here, an inmate injury that resulted in lengthy hospitalization.[5] Therefore, Peet contends that under the written policy grievance relief was unavailable to him.

5      We note that the text of this policy has been subsequently amended to expressly provide greater discretion to prison when considering requests for extension of time to lodge grievances.

The difficulty with this textual argument is that it is entirely hypothetical because it is undisputed that Peet never attempted to file a grievance. Given the clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires," Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002), repeatedly voiced by the courts, and the settled principle that an inmate's subjective sense of the futility of a grievance does not excuse compliance with the law, Nyhuis v. Reno, 204 F.3d 65, 72 (3d Cir. 2000), we are constrained to agree with the defendants that because Peet never sought the relief that could have been available to him under the grievance process – both an extension of the deadline to file, and administrative response to his serious claims – we will never know what may have occurred administratively had Peet filed the grievances and appeals as required under the DOC rules. And, at this point, what Peet is really arguing is that by the time he filed this lawsuit, he was well beyond the time prescribed for filing a grievance, and thus he had no adequate means of exhausting his claims administratively. This argument is simply unsupported by the law in this field, which is exacting, admits of few exceptions, and seems to consistently require a prisoner to at least try to exhaust his administrative remedies before it can be said that those remedies are entirely unavailable.

Peet has chalked up his decision not to file a grievance as one consistent with his laid-back personality, and his efforts not to "make waves", but whatever the reason for his failure, they cannot be attributed to prison officials, who are not alleged to have done anything to prevent or even dissuade Peet from filing a grievance. Peet also never asked to have his grievance deadline extended, and we thus have no way of knowing what response prison officials may have had to Peet's claims and his requests for relief had they been brought timely. All we know is that Peet brought this lawsuit without filing even a first-level grievance, and we know that prison officials did not interfere with Peet's right to do so. Given that an inmate's failure to exhaust will only be excused "under certain limited circumstances", Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate," Davis v. Warman, supra, 49 F. App'x at 368, we are unable to find legal grounds under

Peet v. Beard, Not Reported in Fed. Supp. (2015)

2015 WL 7568300

current case law for excusing this complete failure to even attempt to comply with the PLRA.

Furthermore, in this case the defendants moved to bifurcate trial, just as <u>Gototweski</u> did following the court of appeals' remand in <u>Drippe</u>. Despite being discomfited with the belated way in which this issue was presented, the Court scheduled an evidentiary proceeding in response to the motion, after the plaintiff had adequate notice and opportunity to present evidence and argument in opposition to the defense. The parties submitted pre-hearing memoranda, including a joint stipulation of facts and proposed conclusions of law. Among the facts that the parties stipulated to were the fact that following his injuries and convalescence in both hospitals and other correctional facilities, Peet was returned to SCI-Camp Hill in March 2009, at which time he received a copy of the DOC Inmate Handbook. It is undisputed that Peet was thus furnished with the information he needed regarding the various requirements prescribed by the DC-ADM 804 governing inmate grievances. The parties agree that Peet was unable immediately following his injuries to submit a grievance in March 2008, and also that the DC-ADM 804 provided for enlargements of the grievance-filing deadlines under certain circumstances. Peet has testified that he believed that he was out of time to file a grievance, and that in any event he "never filed any grievances because he is a laid back guy and did not want to make any waves." (Doc. 121, ¶ 27.) It is undisputed that Peet never asked to speak with the grievance officer or the Deputy Superintendent at SCI-Camp Hill about securing a waiver of the 15 working day filing requirement for grievances, and that he "never filed a grievance under the grievance system in effect at the time of his injuries prior to initiating this lawsuit." (<u>Id.</u>, ¶ 27.)

 **\*10** We are thus left in this case with facts that are wholly unsupportive of Peet's claims that he had no administrative remedy available to him. Peet did, in fact, potentially have administrative remedies available to him. Although Peet's circumstances were extreme and unusual, and resulted in his absence from SCI-Camp Hill for nearly one year while he recovered, the stubborn fact is that he was returned to SCI-Camp Hill, the site of his injuries and the claims he is attempting to prosecute, and that Peet was obliged at that time to at least attempt to seek administrative relief under the DC-ADM 804. Peet did not do so, and his failure now has dire consequences under the current prevailing law in this field.

As we noted at the outset of this decision, this result is in many ways an unsatisfactory Hobson's choice. The defendants

asserted Peet's failure to exhaust as an affirmative defense in June 2010, just months after raising the issue in Peet's earlier-filed action that was dismissed for precisely the reason presented now. The parties and the Court have spent years litigating and administering this lawsuit – time and resources that could have been put to other matters had the defendants pursued relief on their affirmative defense early on. There was never any dispute that Peet failed to exhaust his claims; he has at all times been forthright that he never filed a grievance. What the parties disputed, apparently, was the significance of this admitted failure.

Yet the court had no opportunity to address the significance of the fact of Peet's non-exhaustion because the issue was never squarely raised and litigated until more than five years had passed, after the dispositive motions deadline had expired, when the court and parties prepared for an imminent trial. Yet, as noted above and as is reflected in the <u>Drippe</u> proceedings, the defendants' delay in seeking judgment on the affirmative defense does not result in their waiver of that defense; it merely requires the court to consider the defense in a different procedural framework than would ordinarily be used when resolving a motion for summary judgment. Yet, this procedural distinction does not yield a substantive difference when the defense is eventually considered.

As noted, the law in this area is strict and largely unyielding, particularly in cases where there is no evidence that any correctional officer or other authority interfered with or prevented an inmate from pursuing administrative relief that is available to him. In this case, Peet did not file any grievance, or seek an extension of the time in which he could do so – relief that was available to him through the DOC's own policies, which were policies with which Peet was familiar. We are compelled, therefore, to conclude that Peet failed to exhaust administrative remedies available to him; the defendants preserved and did not waive their right to seek relief on this affirmative defense; and the undisputed facts regarding Peet's failure to exhaust now compel judgment in the defendants' favor on Peet's remaining claims.[6]

6       We close with a final note to the parties. It has been said that "hard cases make bad law" <u>N. Sec. Co. v. United States, 193 U.S. 197, 364 (1904)</u>(Holmes J., dissenting). All parties acknowledge that the circumstances of this case are undeniably hard. In this setting the parties may well be advised to seek out efforts to avoid making potentially bad law by engaging in further mediation of this

2015 WL 7568300

case. If the parties wish to follow this course they should jointly notify the court so we can make arrangements to provide them with this opportunity, and defer further filing deadlines in this case, if necessary.

An appropriate order will follow.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 7568300

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4107159

2008 WL 4107159
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

PENNZOIL–QUAKER STATE CO., Plaintiff,
v.
Keith R. SMITH, d/b/a Lube Pro, Defendant.

No. 2:05cv1505.
|
Sept. 2, 2008.

**Attorneys and Law Firms**

Michael S. Metteauer, Fulbright & Jaworski, Austin, TX,
Timothy P. Ryan, Wendy West Feinstein, Eckert, Seamans,
Cherin & Mellott, Pittsburgh, PA, for Plaintiffs.

James P. Ross, John T. Haller, Jr. & Associates, Cranberry,
PA, for Defendant.

### *MEMORANDUM ORDER*

DAVID STEWART CERCONE, District Judge.

**\*1** Plaintiff's Complaint was received by the Clerk of Court
on October 28, 2005, and was referred to United States
Magistrate Judge Lisa Pupo Lenihan for pretrial proceedings
in accordance with the Magistrate Judges Act, 28 U.S.C. §
636(b)(1), and Rules 72.1.3 and 72.1.4 of the Local Rules for
Magistrate Judges on November 2, 2005.

The Magistrate Judge's Report and Recommendation, filed on
March 7, 2008 (Doc. No. 48), recommended that Plaintiff's
Supplemental Motion for Summary Judgment (Doc. No. 42)
be granted as to Count I (Federal Trademark Infringement),
Count III (Federal Unfair Competition), Count V (Common
Law Trademark Infringement and Unfair Competition), and
Count VII (False Advertising), and denied as to Count II
(Trademark Counterfeiting), Count IV (Federal Trademark
Dilution), Count VI (Pennsylvania Trademark Dilution),
and Count VIII (Unjust Enrichment). The Report and
Recommendation further recommended that Defendant's
Motion for Summary Judgment (Doc. No. 38) be granted
as to Counts II, IV, VI and VIII, and denied as to
Counts I, III, V, and VII. The Report and Recommendation
further recommended that summary judgment be entered in

Plaintiff's favor as to all of the affirmative defenses raised by
Defendant in his Memorandum of Fact and Law in Support
of Defendant's Motion for Summary Judgment (Doc. 39).
The Report and Recommendation also recommended that
Plaintiff's request for a permanent injunction and an award of
reasonable attorneys' fees and costs be granted, but Plaintiff's
request for statutory damages be denied.

Service was made on counsel for all parties. On March
17, 2008, Defendant filed Objections to the Report and
Recommendation (Doc. No. 50), objecting only to that
portion of the Magistrate Judge's recommendation that
awarded reasonable attorney's fees to Plaintiff. On that same
date, Defendant filed a Suggestion of Bankruptcy (Doc. No.
49), indicating that on September 20, 2007, he filed for
relief under Chapter 13 of the United States Bankruptcy
Code at Docket No. 07–25925. In light of the pending
bankruptcy, the Court ordered this case statistically closed,
and further ordered defense counsel to show cause why his
conduct in failing to timely notify the Court of the bankruptcy
proceeding did not violated Rule 11(b). Defense counsel filed
a response to the show cause order (Doc. No. 52) on April 7,
2008.

While this issue remained pending, on July 18, 2008, Plaintiff
filed a motion to reinstate the case (Doc. No. 53), in light of
the July 8, 2008 Stipulated Order of the Bankruptcy Court
("Stipulated Order") granting Plaintiff's motion for relief from
the automatic stay *nunc pro tunc*. In the Stipulated Order, the
Bankruptcy Court approved the parties' agreement to terms
relating to Pennzoil's claims against the Defendant/Debtor,
including among others:

1. The lifting of the stay shall be *nunc pro tunc*, effective
   as of the commencement of the Bankruptcy case;

2. The lifting of the stay shall include enforcement of all
   injunctive or other equitable relief, and enforcement and
   recovery of any monetary relief that may be granted in
   the District Court case;

**\*2** 3. Defendant/Debtor agrees to withdraw his
   Objections to the Report and Recommendation (Doc.
   No. 50), and agrees that if the Magistrate Judge reinstates
   the previously issued Report and Recommendation,
   or issues a revised Report and Recommendation on
   terms substantially equivalent to the initial Report and
   Recommendation, he will not lodge objections.

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 91 of 117
Pennzoil-Quaker State Co. v. Smith, Not Reported in F.Supp.2d (2008)

2008 WL 4107159

4.  Defendant/Debtor agreed not to oppose a request by Plaintiff that it be permitted to withdraw its counterfeiting and dilution claims in the District Court case so that the Magistrate Judge may reissue the Report and Recommendation in virtually the same forms except for those claims;

5.  Defendant/Debtor agreed that Plaintiff has the right to petition the District Court for an award of attorneys' fees and other monetary relief pursuant to the Report and Recommendation, and that he will not oppose such request for attorneys' fees.

*See Stipulated Order,* at ¶¶ 5.A., 5.B., 5.C., 5.E., & 5.F. (attached to Doc. No. 53 as Ex. 1). On July 21, 2008, the Magistrate Judge entered an order reinstating the case and subsequently held a status conference on August 13, 2008, at which time the Magistrate Judge reinstated the original Report and Recommendation filed on March 7, 2008, in light of the lifting *nunc pro tunc* of the automatic stay as of the commencement of the Bankruptcy case. The Magistrate Judge noted at the status conference that the Order to Show Cause issued on March 31, 2008 remained pending and that the parties suggested that this issue be addressed simultaneously with the fee petition that Plaintiff intended to file pursuant to the Report and Recommendation and the Stipulated Order. (Doc. No. 56.) On August 18, 2008, Plaintiff filed a Stipulation for Voluntary Dismissal of Count II (Federal Trademark Counterfeiting), Count IV (Federal Trademark Dilution), and Count VI (Trademark Dilution under State Law) (Doc. No. 57), which was approved by the Court on August 19, 2008 (Doc. No. 58).

After a *de novo* review of the pleadings and documents in the case, together with the Report and Recommendation, and the Stipulated Order, and the Court having approved the Stipulation for Voluntary Dismissal of Counts II, IV, and VI, the following Order is entered:

AND NOW, this *26th* day of *August,* 2008,

IT IS HEREBY ORDERED that Plaintiff's Supplemental Motion for Summary Judgment (Doc. No. 42) is GRANTED IN PART AND DENIED IN PART. Plaintiff's Motion is GRANTED as to Counts I, III, V, and VII, but DENIED as to Count VIII. Judgment is entered in favor of Plaintiff on Counts I, III, V, and VII.

IT IS FURTHER ORDERED that Defendant's Motion for Summary (Doc. No. 38) Judgment is GRANTED IN PART AND DENIED IN PART. Defendant's Motion is GRANTED as to Count VIII, but DENIED as to Counts I, III, V, and VII. Judgment is entered in favor of Defendant as to Count VIII.

IT IS FURTHER ORDERED that Judgment is entered in favor of Plaintiff as to all of the affirmative defenses raised by Defendant in his Memorandum of Fact and Law in Support of his Motion for Summary Judgment (Doc. No. 39).

 **\*3** IT IS FURTHER ORDERED that Plaintiff's request for a permanent injunction is GRANTED. In particular, the Court orders that:

1.  Defendant and Defendant's agents, servants, employees, attorneys, and all those persons in active concert or participation with him, from using the PENNZOIL marks, in commerce, in any manner with regard to his oil change business, Lube Pro;

2.  Defendant shall deliver to Plaintiff any and all signage and other advertising or promotional materials in the possession of Defendant or under his control bearing any of the PENNZOIL mark; and,

3.  Defendant shall file with the Court, within thirty (30) days of the date of this Order, a report in writing and under oath setting forth in detail the manner and form in which Defendant has complied with this Injunction Order.

IT IS FURTHER ORDERED that Plaintiff's request for an award of reasonable attorneys' fees is GRANTED, but its request for an award of statutory damages is DENIED. Plaintiff shall file its Fee Petition and supporting documentation within 20 days of the date of this Order. The Court will address the issue raised in its Show Cause Order dated March 31, 2008 when considering Plaintiff's Fee Petition.

The Report and Recommendation of Magistrate Judge Lenihan, dated March 7, 2008, and reinstated on August 13, 2008, excluding that part of the Report and Recommendation addressing the claims voluntarily dismissed by Plaintiff on August 18, 2008, is adopted as the opinion of the Court.

*REPORT AND RECOMMENDATION*

LISA PUPO LENIHAN, United States Magistrate Judge.

## I. *RECOMMENDATION*

It is respectfully recommended that Plaintiff's Supplemental Motion for Summary Judgment (Doc. No. 42) be granted as to Count I (Federal Trademark Infringement), Count III (Federal Unfair Competition), Count V (Common Law Trademark Infringement and Unfair Competition), and Count VII (False Advertising), and denied as to Count II (Trademark Counterfeiting), Count IV (Federal Trademark Dilution), Count VI (Pennsylvania Trademark Dilution), and Count VIII (Unjust Enrichment). It is further recommended that Defendant's Motion for Summary Judgment (Doc. No. 38) be granted as to Counts II, IV, VI and VIII, and denied as to Counts I, III, V, and VII. It is further recommended that summary judgment be entered in Plaintiff's favor as to all of the affirmative defenses raised by Defendant in his Memorandum of Fact and Law in Support of Defendant's Motion for Summary Judgment (Doc. 39). It is further recommended that Plaintiff's request for a permanent injunction and an award of reasonable attorneys' fees and costs be granted, but Plaintiff's request for statutory damages be denied.

## II. *REPORT*

This case involves claims for trademark infringement, counterfeiting, dilution, unfair competition, false advertising, and unjust enrichment under the Trademark Act of 1946, as amended, 15 U.S.C. § 1051 *et seq.* ("Lanham Act"), and Pennsylvania state law. Specifically, Plaintiff, Pennzoil–Quaker State Company ("PQS") asserts that Defendant, Keith R. Smith, d/b/a Lube Pro ("Smith" or "Defendant"), displayed signs belonging to and containing the registered trademark of PQS, in prominent locations on Defendant's business premises without PQS's permission, to advertise that PQS's products were featured in Defendant's oil-changing business, while in fact, 3% or less of the oil used at Defendant's facility is genuine Pennzoil brand motor oil. PQS contends that despite repeated requests to remove the signs, Defendant has failed to do so and, consequently, his actions have caused confusion among consumers and others regarding the source, sponsorship, and/or affiliation of Defendant's services.

**\*4** This Court has original subject matter jurisdiction over Plaintiff's Lanham Act claims pursuant to 28 U.S.C. §§ 1331 and 1338, and 15 U.S.C. § 1121(a), and has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). Venue is proper in this District pursuant to 28 U.S.C.

§ 1391(b) since the alleged infringement occurred in this District.

Both parties have moved for summary judgment. PQS requests summary judgment in its favor on three of its claims—trademark infringement (Count I); trademark counterfeiting (Count II), and false advertising (Count VII).[1] In support of its motion, PQS submits that it has conclusively established all of the elements of each of its claims, and no genuine issues of fact exist for trial. Therefore, PQS maintains that it is entitled to judgment in its favor as a matter of law. Smith has cross-moved for summary judgment on all claims and defenses, arguing that PQS has failed to produced any evidence of counterfeiting, dilution, unfair competition, false advertisements, or unjust enrichment, nor has PQS offered or produced any evidence which establishes or tends to establish that: (1) any of the signs at issue were "spurious counterfeit marks"; (2) Smith's conduct was malicious, fraudulent, deliberate, willful, intentional, and in bad faith with full knowledge and conscious disregard of PQS's rights; and (3) Smith engaged in a deliberate course of conduct to deceive consumers. Smith further argues that PQS is guilty of laches in not removing the signs at issue and for not taking immediate legal action, and such inaction, as well as PQS's acquiescence, encouragement, and/or abandonment of the signs, have created and/or contributed to the confusion or likelihood of confusion, if any. Therefore, Smith submits that he is entitled to judgment in his favor as a matter of law.[2]

[1]     Plaintiff initially moved for summary judgment on only three claims in order to simplify the analysis and because its other claims provide no relief not already provided by these three claims. However, in Plaintiff's Memorandum in Opposition to Defendant's Cross–Motion for Summary Judgment (Doc. No. 47) ("Pl.'s Mem. in Opp'n"), Plaintiff argues that summary judgment in its favor is appropriate on its remaining claims as well, since Smith has cross-moved for summary judgment on all claims and defenses. (Pl.'s Mem. in Opp'n at 22–23.) Plaintiff's remaining claims include federal unfair competition (Count III), federal trademark dilution (Count IV), common law trademark infringement and unfair competition (Count V), trademark dilution under Pennsylvania law (Count VI), and unjust enrichment (Count VIII). (Compl.¶¶ 39–47, 50–51.)

[2]
    In his cross-motion for summary judgment, Smith contends that the material issues of fact are not disputed. However, in responding to Plaintiff's motion for summary judgment, Smith argues that material facts are in dispute. He cannot have it both ways.

**A. *Statement of Relevant Facts and Procedural History***
The following relevant facts are not disputed. PQS owns the trademark PENNZOIL and owns valid, subsisting, and incontestable federal trademark registrations for the PENNZOIL marks listed in paragraph 12 of its Complaint, which bear registration dates ranging from 1961 to 1998. Since at least 1915, PQS and its authorized distributors and dealers have used the PENNZOIL mark and PENNZOIL logo, which incorporate a Liberty Bell design, in connection with the sale and promotion of lubricants and other petroleum products. PQS's authorized oil-change facilities use its marks to indicate that the facilities feature PENNZOIL products. PQS has expended great resources promoting its PENNZOIL marks throughout the United States and Pennsylvania. (Pl.'s Stmt. of Undisputed Facts (Doc. 44) ("SUF"), ¶¶ 1–5; Def.'s Mem. of Fact & Law in Supp. of Mot. for Summ. J. (Doc. 39) ("Def.'s Mem."), Section 6, Part F, ¶¶ 1–5.) Smith recognizes the PENNZOIL name and bell logo as the trademark of Pennzoil. (Smith Dep. at 31, Tab A in Pl.'s App.) [3]

[3]
    Although in his Answer to paragraph 8 of the Complaint Defendant has denied that the PENNZOIL mark is well known, his admissions to Plaintiff's Statement of Undisputed Facts (¶¶ 1–5) and his deposition testimony belie that denial. Moreover, Smith's bare denial in the face of uncontroverted evidence to the contrary does not create a material issue of fact.

**\*5** In May of 2004, Smith purchased the Lube Pro facility located at 635 Route 228 in Mars, Pennsylvania, from Thomas Napierkowski for $25,000.00. (Pl.'s SUF, ¶¶ 6–7; Def.'s Mem., § 6, Part F, ¶¶ 6–7.) The Agreement between Napierkowski and Smith dated May 4, 2004 ("Agreement of Sale"), provided that possession and use of the business premises and equipment would be transferred upon receipt in full of the agreed sale price, and any debt incurred by and for the business prior to the date of the Agreement of Sale are the responsibility of the seller. (Ex. 43 in Def.'s App.) [4] Smith did not investigate whether Mr. Napierkowski had any bona fide ownership interest in the assets he was selling. (Pl.'s SUF, ¶ 8; Def.'s Mem., § 6, Part F, ¶ 8.)

[4]
    While both parties refer to Thomas Napierkowski as the selling party, the Agreement indicates that the seller is Nadine Napierkowski. The Court need not resolve this discrepancy as it is not relevant to the disposition of the cross-motions for summary judgment.

At his Lube Pro facility, Smith displays exterior and interior signage prominently bearing the PENNZOIL marks. (Pl.'s SUF, ¶ 10; Def.'s Mem., § 6, Part F, ¶ 10; *see also* Ex. 1, 5, 5A, 6, 7, 20, 26, 35–39 in Def.'s App.) In particular, Smith prominently displayed a road-side sign stating "We Feature PENNZOIL products" immediately beside the words "Lube Pro" at his Lube Pro facility. [5] (Pl.'s SUF, ¶ 11.) This road-side sign was located along a main thoroughfare in the Mars, Pennsylvania area, and its purpose was to draw people into the oil-change facility. (Pl.'s SUF, ¶¶ 13–14; Def.'s Mem., § 6, Part F, ¶¶ 13–14.) This road-side sign was removed sometime after December 2005. [6] (Def.'s Dep. at 108–112.) Smith also displays a large PENNZOIL sign on the front, right-hand side, of the exterior of his facility. (Pl.'s App., Tabs C & D; Def.'s App. Ex. 5.) On the interior his facility, Smith displays a PENNZOIL sticker on a cabinet inside the Lube–Pro work bay. (Pl.'s SUF, ¶ 17; Def.'s Mem., § 6, Part F, ¶ 17; Def.'s App., Ex 5A.) Additionally, Smith displays interior and exterior signage bearing the marks of other oil product manufacturers whose oil products he uses in his oil change business. (Def.'s Mem., § 6, Part F, ¶¶ 10–11; *see also* Ex. 1, 5A, 7–12, 20, 26, 31–32 in Def.'s App.) [7]

[5]
    This road-side sign is depicted in the photograph identified as Exhibit 3 of Smith's Deposition. (Tab B in Pl.'s App.; *see also* Ex. 1 in Def.'s App.)

[6]
    Defendant submits that the "We Feature PENNZOIL Products" sign was removed within a couple weeks after he purchased the new sign in December of 2005. Plaintiff disputes that the sign was removed at that time. For purposes of the pending motions, the actual date of removal is not critical to the Court's ruling.

[7]
    The other oil products include Valvoline, Mobil, Rotella T, and Castrol.

Smith did not display any signs along the roadway as large or prominent as the PENNZOIL sign. (Pl.'s SUF, ¶ 43; Def.'s Mem., § 6, Part F, ¶ 43.) Although Smith stated at his deposition that he does not advertise that he "features" any

brand of motor oil other than PENNZOIL (Smith Dep. at 145), he forgot that he also displays a sign at his oil-change business which states "We feature Valvoline Products" (Def.'s Mem., § 6, Part F, ¶ 44).

The PENNZOIL signage displayed at Smith's Lube Pro facility was obtained by a previous owner of the facility, Mr. Howard, doing business as Howard's Express Lube.[8] (Pl.'s SUF, ¶ 12: Def.'s Mem., § 6, Part F, ¶ 12.) In August of 1995, Mr. Howard executed a Pennzoil Sign Addendum, which provides in relevant part:

[8]    It appears that Howard's Express Lube was operated as a Pennzoil franchise during Mr. Howard's ownership. (Smith Aff. ¶ 3; Ex. 4 in Def.'s App.)

**2.01 Loan of Sign Panels to Operator.** Within 30 days after the date of this Addendum ... Pennzoil shall loan and cause to be delivered to Operator Sign Panels to be installed at Operator's Center.... Pennzoil loans the Sign Panels to Operator at no charge.

**\*6** ...

**2.03 Sign Panels Property of Pennzoil.** Operator acknowledges and agrees that the Sign Panels shall at all times remain the sole property of Pennzoil. In the event Operator discontinues featuring Pennzoil brand motor oil and lubricants at Operator's Center, Operator agrees and grants to Pennzoil the right to enter upon Operator's property and to remove the Sign Panels at any time. Operator agrees to reimburse Pennzoil, upon demand by Pennzoil, for all costs incurred by Pennzoil in connection with the removal of the Sign Panels from Operator's Center ....

Pennzoil Sign Addendum, ¶¶ 2.01, 2.03 (Ex. 4 in Def.'s App.). Smith testified he was unaware of this Addendum until Plaintiff's counsel showed it to him at his deposition on October 9, 2006. (Smith Dep. at 48–49.) Mr. Howard eventually sold his business to Mr. Napierkowski. Upon learning that Mr. Napierkowski, doing business as Lube Pro, was selling bulk lubricants in association with Plaintiff's registered trademark PENNZOIL as an unauthorized PQS jobber, counsel for PQS wrote to Mr. Napierkowski on February 25, 2004, requesting that he immediately discontinue all sales of bulk lubricants in association with the PENNZOIL trademark and remove the

Pennzoil commercial sign from his business premises.[9] (Tab H in Pl.'s App.) After receiving no response from Mr. Napierkowski, on April 30, 2004, less than one week prior to Napierkowski's sale of Lube Pro to Smith, counsel for PQS sent another cease and desist letter to Mr. Napierkowski via certified mail. (*Id;* Pl.'s SUF, ¶ 28; Def.'s Resp. to Pl.'s SUF, ¶ 28.) According to Smith, Mr. Napierkowski never informed him of the cease and desist letters from PQS. (Pl.'s SUF, ¶ 28; Def.'s Resp. thereto, ¶ 28; *see also* Smith Dep. at 107.)

[9]    PQS sent the February 25, 2004 correspondence via certified mail, return receipt requested. Correspondence dated April 30, 2004 from counsel for PQS to Napierkowski indicates that a return receipt verified delivery of the February 25th correspondence to Napierkowski on February 27, 2004. (Tab H in Pl.'s App.)

After Smith acquired ownership of Lube Pro, Plaintiff's representatives called on Smith on several occasions to request that he sign a contract to be an authorized distributor of Pennzoil products. (Smith Dep. at 58–59.) Smith declined these offers because, in his opinion, PQS charged too much for the bulk oil and he could not make a profit at that rate. (*Id.*) Apparently, after several unsuccessful attempts to sign up Smith as its authorized distributor, PQS requested in writing on October 14, 2004 that he "immediately discontinue all sales of bulk lubricants in association with the—PENNZOIL®—trademark and ... remove the Pennzoil logo sign from [his] business premises." (Ex. 10 to Smith Dep., Tab J in Pl.'s App.) In that correspondence, counsel for PQS specifically referred to the commercial sign displaying the PQS trademark logo located at the front of the building in which Smith's Lube Pro business is located.[10] (*Id.*) Although he understood from the October 14th letter that PQS wanted him to take down the sign, Smith refused to take down the sign, believing that the October 14th letter was merely a ploy by PQS to get him to sign a distributor contract. (Smith Dep. at 60.) Smith believed that he owned the sign in question based on the following language in the Agreement of Sale with Napierkowski: "Possession and use of the above said business premises and equipment shall be transferred upon receipt in full of the agreed sale price." (Smith Dep. at 31 (quoting Agreement of Sale, Ex. 43 in Def.'s App.).) Smith did not take any action in response to the October 14th letter, such as consult an attorney, respond to PQS, or remove the sign in question. (Pl.'s SUF, ¶ 31; Def.'s Mem., § 6, Part F, ¶ 31.)[11]

10    This sign is the road-side sign that stated "We Feature PENNZOIL Products" identified as Exhibit 3 to Smith's deposition. (Tab B in Pl.'s App.)

11    Smith does not deny this statement, other than to argue that the letter came from Shell, not Pennzoil. This is a distinction without a difference. Although the stationary has "Shell Oil" in the heading, the writer clearly indicates in the first sentence of the October 14th correspondence that she is representing "Pennzoil–Quaker State Company" in trademark matters. (Pl.'s App., Tab J.)

**\*7** On December 13, 2004, PQS sent Smith another letter demanding the removal of the PENNZOIL sign from the Lube Pro facility and the discontinuance of sales of bulk lubricants in association with the PENNZOIL trademark. (Pl.'s App., Tab K.)

On March 16, 2005, counsel for PQS sent Smith a letter to follow-up a conversation that occurred between Smith and PQS's agent, Roger Krivosky, during which it is alleged that Mr. Krivosky requested that Smith remove the "4 x 4 panels on the sign at [his] premises which display the "Pennzoil" trademark." (March 16, 2005 Correspondence from Kimbley L. Muller (Pl.'s App., Tab I).) In the March 16th correspondence, counsel informed Smith that the PENNZOIL sign at issue was loaned to a predecessor-in-interest of his oil-change business and title was never transferred to Smith or any of his predecessors. (*Id.*) PQS also informed Smith that the March 16th letter was a last request to remove the "featured by" 4 x 4 Pennzoil signs from his premises prior to commencing legal action against him. (*Id.*) Additionally, PQS informed Smith of its belief that he was violating the Lanham Act and Pennsylvania laws by creating consumer confusion in the marketplace by displaying signs indicating that the Lube Pro facility features Pennzoil products when in fact he did not even have Pennzoil products available for his consumers. (*Id.*) Finally, counsel for PQS informed Smith of the Plaintiff's willingness to remove the sign at its own expense to resolve the matter and requested that Smith grant its independent contractor permission to enter his premises for that limited purpose. (*Id.*) Smith testified at his deposition that he did not recall reading the March 16, 2005 letter, but stated that even if he had, he would not have returned the sign to PQS. (Pl.'s SUF, ¶ 27; Def.'s Mem., § 6, Part F, ¶ 27; Smith Dep. at 54.)

Smith admits that he is not an authorized distributor of PENNZOIL products, and that he did not obtain Plaintiff's consent prior to using PQS's signage. (Pl.'s SUF, ¶¶ 24–25; Def.'s Mem., § 6, Part F, ¶¶ 24–25.) However, Smith maintains that because he bought the sign from Napierkowski, he owned it and therefore he did not need the permission or consent of PQS to use the PENNZOIL signage. (Def.'s Mem., § 6, Part F, ¶ 25.) Moreover, Smith does not deny that he continued to willfully use the PENNZOIL mark and PENNZOIL signage after PQS demanded that stop, but rather, reiterates his position that he owned the signage and therefore was not required to stop using it. (Pl.'s SUF, ¶ 33; Def.'s Mem., § 6, Part F, ¶ 33; Smith Dep. at 143–44.)

More than 95% of all the oil used by Smith in his oil change business comes from bulk containers. (Pl.'s SUF, ¶ 34; Def.'s Mem ., § 6, Part F, ¶ 34.) Since purchasing Lube Pro in 2004, Smith has never made a bulk purchase of PENNZOIL motor oil, because he believes it is too expensive. (*Id.* at ¶ 35.) Nor has Smith ever purchased PENNZOIL motor oil from the local distributor of PENNZOIL motor oil in the Mars, Pennsylvania area, Purvis Brothers. (*Id.* at ¶¶ 36–37.) In 2005, Smith used approximately 5,000 gallons of oil in connection with his oil-change services, and approximately 100 to 150 gallons of which were PENNZOIL, which was purchased in pre-packaged, one-quart containers for less than $ 1,000.00 in the aggregate, usually from Costco, Walmart, or similar type stores. (*Id.* at ¶¶ 38–39; *see also* Smith Dep. at 41, 64; Smith Aff. ¶ 19.) The primary brands of motor oil used by Smith in 2005 were AGIP and Ultra Lube. (Pl's SUF, ¶ 40; Def.'s Mem., § 6, Part F, ¶ 40.)

**\*8** Smith only used PENNZOIL brand products in his oil change business if specifically requested by the customer. (*Id.* at ¶ 45.) Smith estimated that customers specifically requested that he use PENNZOIL brand products less than once a week, and possibly as little as once a month. (*Id.* at ¶ 46.) In addition, less than one percent of Smith's customers request a specific brand of motor oil. (*Id.* at ¶ 47.) At the time of his deposition, Smith was charging fleet customers $ 29.95 per oil change; in 2005 he charged $ 26.95 for fleet customers. (*Id.* at ¶ 48–49.)

PQS instituted the present action on October 28, 2005. Discovery is now complete and both sides have moved for summary judgment. The motions have been fully briefed and are ripe for disposition.

### B. *Summary Judgment Standard*

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When the parties have filed cross-motions for summary judgment, as in this case, the summary judgment standard remains the same. Transguard Ins. Co. of Am., Inc. v. Hinchey, 464 F.Supp.2d 425, 430 (M.D.Pa.2006). "When confronted with cross-motions for summary judgment, ... 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.' " *Id.* (quoting Marciniak v. Prudential Fin. Ins. Co. of Am., No. 05–4456, 184 Fed. Appx. 266, 270 (3d Cir. June 21, 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." *Id.* (citing Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir.1998)).

### C. Analysis

**\*9** At issue in this case are three Pennzoil signs displayed at Smith's Lube Pro facility: (1) the large road-side "We Feature Pennzoil Products" sign (removed sometime after December 2005); (2) the large Pennzoil sign attached to the front right-hand side of Smith's facility; and (3) a Pennzoil logo sign at the bay entrance. PQS submits that the number, prominence,

and plain language of the Pennzoil signs displayed by Smith lead customers to the conclusion that he uses Pennzoil motor oil when customers request an oil-change and that Smith's oil change business is affiliated with PQS. However, only 2 to 3 percent of the motor oil used by Smith is genuine Pennzoil brand oil, as Smith primarily uses AGIP and Ultralube brand oils which are less expensive. Moreover, Smith is not affilitated with PQS nor is he authorized to use the Pennzoil marks in his oil change business. Thus, PQS contends that by baiting customers into the Lube Pro facility with the trusted Pennzoil marks and then using a less expensive off-brand motor oil instead, Smith has obtained the benefit of the Pennzoil marks, without following any of the quality control provisions required by PQS or undertaking the purchase commitments required of authorized Pennzoil oil-change facilities which, according to PQS, are utilized to deter precisely this type of bait-and-switch conduct. (Pl.'s Mem. of Law in Supp. of Supplemental Mot. for Summ. J. (Doc. 43) at 3–4.)

Smith responds, essentially, that he owns the Pennzoil signs by virtue of the Agreement of Sale between Napierkowski and himself, and he did not engage in any so-called "bait and switch" tactics.

### 1. *Plaintiff's Motion for Summary Judgment*

Initially, Plaintiff has moved for summary judgment on its trademark infringement claim (Count I), trademark counterfeiting (Count II), and false advertising (Count VII). Subsequently, in response to Defendant's motion for summary judgment on all claims, Plaintiff also requests summary judgment on its remaining claims of federal unfair competition (Count III), federal trademark dilution (Count IV), common law trademark infringement and unfair competition (Count V), and trademark dilution under Pennsylvania law (Count VI). Each of these claims is addressed below.

### a. *Federal Trademark Infringement (Count I), Federal Unfair Competition (Count III), & Common Law Trademark Infringement and Unfair Competition (Count V)*

Under the Lanham Act, trademark infringement is defined as " 'use of a mark so similar to that of a prior user as to be 'likely to cause confusion, or to cause mistake, or to deceive.' ' " Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 469 (3d Cir.2005) (quoting Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 711 (3d Cir.2004) (quoting 15

U.S.C. § 1114(1))). In other words, " '[t]he law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion.' " *Id.* (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir.1994)). Therefore, to establish a claim for trademark infringement under the Lanham Act, a plaintiff must prove that: " '(1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark is likely to create confusion concerning the origin of the goods or services.' " *Id.* at 470 (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 197, 202 (3d Cir.1999) (en banc)) (footnote omitted). This standard also applies to Plaintiff's federal unfair competition claim under 15 U.S.C. § 1125(a)(1)(A). *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 210 & n. 5 (3d Cir.2000) (citation omitted). The burden of proving these claims rests with the plaintiff.[12] *Id.* at 210–11; *Freedom Card,* 432 F.3d at 470 n. 14 (citation omitted). Here it is undisputed that PQS owns the Pennzoil mark, a valid and legally protectable mark. Therefore, the only issue for this Court to resolve is whether PQS has established Smith's use of the Pennzoil signs is likely to create confusion concerning the origin of the motor oil used in his oil change business.[13]

[12]    Thus, the Court's analysis and conclusion regarding Plaintiff's federal trademark infringement claim applies equally to Plaintiff's federal unfair competition claim. In addition, the Court need not address separately Plaintiff's Pennsylvania common law claims of trademark infringement and unfair competition. The elements of common law trademark infringement under Pennsylvania law are identical to elements of federal trademark infringement under the Lanham Act, except for the element of interstate commerce required in the latter. *Standard Terry Mills, Inc. v. Shen Mfg. Co.,* 803 F.2d 778, 780 n. 4 (3d Cir.1986) (citations omitted). Likewise, Pennsylvania law and the Lanham Act are identical with regard to unfair competition, except for the federal requirement of interstate commerce. *Artus Corp. v. Nordic C o., Inc.,* 512 F.Supp. 1184, 1187 (W.D.Pa.1981). Therefore, the Court's analysis and holding as to the federal trademark infringement and unfair competition claims applies equally to Plaintiff's claims of common law trademark infringement and unfair competition under Pennsylvania law.

[13]    Plaintiff submits that Smith has admitted the essential elements of Plaintiff's trademark infringement claim. Smith disputes this statement. From a review of the briefs and concise statements of undisputed facts and responses thereto, it appears that Smith does concede the first two elements of Plaintiff's trademark infringement claim, but disputes the third element —the likelihood of confusion.

 **\*10**  " 'A likelihood of confusion exists when consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a similar mark.' " *Freedom Card,* 432 F.3d at 470 (quoting *A & H Sportswear,* 237 F.3d at 211). In evaluating this factor, the relevant inquiry is whether consumer confusion is likely, not whether it is possible. *Id.* (citing *A & H Sportswear,* 166 F.3d at 198). In the case of direct confusion, which is at issue here, the Court of Appeals has adopted a ten-factor, non-exhaustive test in determining whether similar marks create a likelihood of confusion, which is commonly referred to as the "*Lapp* factors." *Id.* The ten "*Lapp* factors" consist of the following:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;

> (2) the strength of the owner's mark;

> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;

> (5) the intent of the defendant in adopting the mark;

> (6) the evidence of actual confusion;

> (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

> (8) the extent to which the targets of the parties' sales efforts are the same;

> (9) the relationship of the goods in the minds of consumers because of the similarity of function;

> (10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product

in the defendant's market, or that he is likely to expand into that market.

*Id.* at 471 (quoting *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 463 (3d Cir.1983) (citation omitted). As the Court of Appeals noted in *Lapp,* "[w]here the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself. In those cases the court will generally examine the registered mark, determine whether it is inherently distinctive or has acquired sufficient secondary meaning to make it distinctive, and compare it against the challenged mark.... Once a trademark owner demonstrates likelihood of confusion, it is entitled to injunctive relief." 721 F.2d at 462 (citing 15 U.S.C. § 1114(1) (1976)).

In analyzing the *Lapp* factors, the Court may accord different factors different weights, based on the particular factual circumstances, but should employ the factors that are appropriate to a given situation. *Freedom Card,* 432 F.3d at 471 (citing *A & H Sportswear,* 237 F.3d at 215). Indeed, given the qualitative nature of the inquiry, some factors may not be relevant in a particular case.[14] *Id.* (citing *A & H Sportswear,* 237 F.3d at 215).

[14]    In that instance, the trial court should explain its basis for not utilizing certain factors in order to facilitate appellate review. *Id.* at 471 n. 16 (citing *A & H Sportswear,* 237 F.3d at 215 n. 8.)

With these precepts in mind, the Court turns now to an analysis of the likelihood of confusion element, which requires application of the *Lapp* factors to the evidence in this case.

**(1) Degree of Similarity between the Conflicting Marks**

 *11  Plaintiff submits that this factor militates in favor of finding that confusion is likely, as the marks in question are identical. In response, Smith argues that "semantically, [there is] no 'degree of similarity' as in the case where a defendant's counterfeit was similar to a plaintiff's original." Smith further responded that the marks in question were loaned, abandoned, given or sold by Plaintiff to Lube Pro. The Court finds the evidence shows that the marks in question are identical, and Smith concedes as much. "The single most important factor in determining likelihood of confusion is mark similarity." *A & H Sportswear,* 237 F.3d at 216 (citing *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 476 (3d Cir.1994)).

Such similarity is determined by asking whether the marks create the same overall impression when viewed separately. *Id.* "Marks 'are confusingly similar if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship.' " *Id.* (citing *Fisons Horticulture, supra* ). Because it is uncontested here that the marks are identical, the Court agrees with Plaintiff that this factor militates strongly in favor of likelihood of confusion.

**(2) Strength of the Owner's Mark**
Plaintiff submits that this factor also militates in favor of finding a likelihood of confusion. In support of this position, Plaintiff argues that it has used its PENNZOIL mark since 1915 and has invested heavily in its development and promotion, and that Defendant has conceded this point. Defendant has not proffered any response to Plaintiff's argument on this *Lapp* factor.

Ordinarily, in measuring the strength of the owner's mark, the Court must evaluate two factors: "(1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) its commercial strength (factual evidence of marketplace recognition)." *Freedom Card,* 432 F.3d at 472 (citing *A & H Sportswear,* 237 F.3d at 221). Plaintiff has proffered Defendant's admissions to its Statement of Undisputed Facts and his admissions in his Answer to the complaint to demonstrate the commercial strength of the PENNZOIL marks. (Pl.'s SUF, ¶¶ 1–5; Def.'s Mem., Section 6, Part F, ¶¶ 1–5; Def.'s Answer to Compl., ¶¶ 7, 11.) While lacking in detail, Plaintiff's *uncontested* statements indicate generally that Plaintiff has expended great resources over the years to promote and advertise its PENNZOIL mark extensively throughout the United States and Pennsylvania, and has used the PENNZOIL mark and logo since at least 1915 in connection with the sale and promotion of lubricants and other petroleum products. In light of the fact that these statements are uncontested, the Court concludes that the commercial strength of the PENNZOIL mark is great within the lubricant/petroleum products market.

As to the conceptual strength of the mark, usually the Court must determine in which of the following four categories, ranging from strongest to weakest, to place a given mark: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; or (4) generic. *Freedom Card,* 432 F.3d at 472 (citing *A & H Sportswear,* 237 F.3d at 221). Generic marks do not receive any protection as they are not considered trademarks. *A & H Sportswear,* 237 F.3d at 222 (citation omitted). Moreover,

a mark which is merely descriptive of an applicant's goods or services cannot be registered unless the applicant shows that the mark has secondary meaning. [15] *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 196, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). However, a descriptive mark that has acquired a strong secondary meaning may be considered strong. *Blockbuster Entm't Group,* 869 F.Supp. at 510.

[15]    " 'To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.' " *Blockbuster Entm't Group v. LAYLCO, Inc.,* 869 F.Supp. 505, 510 (E.D.Mich.1994) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). Common indicators of secondary meaning include: "(1) advertising expenditures; (2) consumer studies linking the name to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Id.* (citations omitted).

**\*12** The primary purpose in assigning a level of distinctiveness to a given mark is to ascertain whether the mark is protectable as a trademark in the first instance. *A & H Sportswear,* 237 F.3d at 222 (citing *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir.1986) (other citations omitted)). Once protectability has been demonstrated, the classification of a mark as arbitrary, suggestive or descriptive is secondarily used to ascertain the degree of protection a mark should receive. *Id.* Although this classification system is useful in determining conceptual strength, it is not dispositive. *Id.* (citations omitted).

Thus, the distinctiveness element appears to have more relevance where the trademark is not registered, or where there is a question as to the validity of the registration. *See, e.g., A.J. Canfield Co.,* 808 F.2d at 296 (an unregistered trademark is entitled to protection under section 43(a) of the Lanham Act but only where the designated trademark achieves a certain level of inherent distinctiveness, *i.e.,* something other than "generic"); *A & H Sportswear,* 237 F.3d at 221 (in determining whether a mark is protectable as a trademark, court must classify the mark in one of four categories ranging from strongest to weakest). Neither situation is present here. Rather, Plaintiff has produced federal registration certificates for all of its PENNZOIL

marks, and Defendant has admitted to their validity and incontestability. [16] (Compl. ¶ 12; Answer ¶ 12.) It is well settled that once a trademark is federally registered and has achieved incontestability, its validity and legal protectability are established. *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 291 (3d Cir.1991) (en banc) (citing *Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 194 (3d Cir.1990)).

[16]    "A registered trademark becomes incontestable after the owner files an affidavit stating that it has been in continuous use in commerce for five consecutive years subsequent to registration, that it is still in use, and there are no pending proceedings and no adverse decision concerning the registrant's ownership or right to registration." *Total Containment, Inc. v. Environ Prods., Inc.,* 921 F.Supp. 1355, 1407 n. 24 (E.D.Pa.1995) (citing 15 U.S.C. § 1065), *aff'd in part & vacated in part on other grounds,* 106 F.3d 427 (Fed.Cir.1997). Although Plaintiff has not presented proof of incontestability as outlined in 15 U.S.C. § 1065, Defendant has conceded that the mark is incontestable. Therefore, the Court assumes without deciding, for purposes of this report and recommendation, that incontestability has been established.

Assuming then that Plaintiff's marks are incontestable, they are conclusively presumed to be either nondescriptive or to have acquired secondary meaning. *Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 924 (10th Cir.1986) (citing *Park'N Fly, supra; Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1184–85 (5th Cir.1980) (other citation omitted)). As such, Plaintiff's marks are entitled to strong protection, but just how strong is not ascertainable on this summary judgment record. Plaintiff has not set forth any facts or argument as to the level of distinctiveness of its marks, and Defendant has failed to respond altogether to Plaintiff's position on the second *Lapp* factor. Nonetheless, it appears that Plaintiff's marks cannot be classified as either generic, or arbitrary or fanciful, since Plaintiff's mark does not constitute a common description of goods, nor does it use terms that " 'bear no logical or suggestive relation to the actual characteristics of the goods.' " *A & H Sportswear,* 237 F.3d at 221 (quoting *A.J. Canfield Co.,* 808 F.2d at 296). That leaves the categories of suggestive or descriptive. With regard to the latter, at a minimum, the Pennzoil mark is presumed to have secondary meaning, *i.e.,* the mark identifies to consumers the source

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 100 of 117
Pennzoil-Quaker State Co. v. Smith, Not Reported in F.Supp.2d (2008)
2008 WL 4107159

of the lubricant/petroleum, because it is undisputed that the PENNZOIL mark has been registered since 1961, and is incontestable. *Beer Nuts,* 805 F.2d at 924. Beyond that, the Court refuses to venture, given the lack of argument by the parties on this point. That being said, the Court concludes that the strength of Plaintiff's mark is sufficiently strong to weigh in favor of likelihood of confusion.

### (3) Price of Goods & Sophistication of Consumers

**\*13** The third *Lapp* factor examines the price of the goods and other factors which are indicative of the care and attention expected of consumers when making a purchase. In this regard, Plaintiff submits that the relatively small amount Defendant charges for oil change services, particularly in conjunction with the prominent use of Plaintiff's PENNZOIL mark, will not encourage consumers to carefully examine transactions with the Defendant or to make inquiries regarding the source of his products. Plaintiff further submits that customers rarely specify a brand of motor oil, most likely because Defendant's signage prominently and unequivocally stated "We Feature Pennzoil." In response, Defendant posits that his fees for oil change services are lower than that charged by Plaintiff's authorized dealers, and suggests that customers most likely chose his oil change facility, not because they were confused about Lube Pro being an authorized Pennzoil dealer, but rather due to the lower price he charged for an oil change. In support of his argument, Defendant refers the Court to the case of *Artus Corp. v. Nordic Co.,* Civ. A. No. 77–1437 (W.D.Pa.) (Ziegler, J.), but he does not provide any citation to the ruling by the magistrate judge on which he relies. [17] (Def.'s Mem. (Doc. 39) at 24.)

[17]     Judge Ziegler, in his opinion reported in *Artus Corp. v. Nordic Co.,* 512 F.Supp. 1184, 1192 (W.D.Pa.1981), indicated that further hearings would be conducted regarding the additional relief sought by the plaintiff. According to Defendant, these hearings were conducted by a magistrate judge, who ultimately found that Artus had not proven damages and the customers of Artus who purchased the Nordic product were not confused, and perhaps purchased the Nordic product simply because that product was lower in price than that of Artus. (Def.'s Mem. (Doc. 39) at 24.) Defendant's reliance on an unpublished, unreported opinion, which is not even attached to his memorandum of law or binding on this Court, is misplaced.

The Court finds that given the relatively small amount charged for the oil change services, and that the purchasers of Defendant's oil change services are ordinary consumers rather than professionals or commercial buyers, Defendant's customers are less likely to carefully examine their transactions with Defendant or to inquire about the source of his products. In *Checkpoint Systems,* the Court of Appeals opined that generally courts have not found a violation of the Lanham Act where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers. 269 F.3d at 284 (citing *Versa Prods. Co. v. Bifold Co. (Mfg.),* 50 F.3d 189, 204 (3d Cir.1995)). Citing a leading treatise on trademarks, the Court of Appeals noted: " 'the price level of the goods or services is an important factor in determining the amount of care the reasonably prudent buyer will use. If the goods or services are relatively expensive, more care is taken and buyers are less likely to be confused as to source or affiliation.' " *Id.* at 284 (quoting J. Thomas McCarthy, 3 *McCarthy on Trademarks & Unfair Competition,* § 23:95 (4th ed.2000)). The Court of Appeals further noted that likewise:

> "[w]here the relevant buyer class is composed solely of professional, or commercial purchasers, it is reasonable to set a higher standard of care than exists for consumers. [Thus,] where the relevant buyer class is composed of professionals or commercial buyers familiar with the field, they are sophisticated enough not to be confused by trademarks that are closely similar. That is, it is assumed that such professional buyers are less likely to be confused than the ordinary consumer."

**\*14** *Id.* (quoting 3 *McCarthy on Trademarks,* § 23:101).

On the other hand, purchasers are less likely to exercise a great degree of care in determining the source of a product which is inexpensive, and therefore, the likelihood of confusion is greater. *Blockbuster Entm't,* 869 F.Supp. at 514 (citing *Hindu Incense v. Meadows,* 692 F.2d 1048, 1051 (6th Cir.1982)). Here, the record shows that the cost of an oil change at Defendant's facility ranged from \$26.95 to \$29.95. (Smith Dep. at 26, 99–100.) In addition, the record does not contain

any evidence to suggest that the consumers are sophisticated, or are professional or commercial buyers. Accordingly, the Court finds that the cost of an oil change is relatively inexpensive, and therefore, consumers are not likely to exercise a high degree of care in selecting an oil change facility. Thus, this factor weighs in favor of a likelihood of confusion.

**(4) Length of Time Mark Used by Defendant Without Evidence of Actual Confusion, and**

**(6) Evidence of Actual Customer Confusion**

Because the evidence is the same for both the fourth and sixth *Lapp* factors, the Court will analyze them together. The fourth *Lapp* factor considers the length of time the Defendant has used the mark without evidence of actual confusion arising. "When parties have used similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products, there is an inference that future consumers will not be confused either." *Fisons,* 30 F.3d at 476 (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1230 (3d Cir.1978) (finding of no likelihood of confusion was based in part on absence of any evidence of actual confusion over a forty-year period)). Also, in evaluating this factor, courts should consider whether the products are ones that consumers spend little time and care in selecting, as confusion as to the source of such products may pass unnoticed. *Id.* [18]

[18] In a footnote, the Court of Appeals explained that " '[p]urchasers are unlikely to bother to inform the trademark owner when they are confused about an inexpensive product.' " *Fisons,* 30 F.3d at 476 n. 12 (quoting *Beer Nuts,* 805 F.2d at 928).

As to the sixth *Lapp* factor, although evidence of actual confusion is the best evidence of likelihood of confusion, it is not required to find a likelihood of confusion. *Checkpoint Sys.,* 269 F.3d at 291 (citing *Versa Prods.,* 50 F.3d at 205; *Fisons,* 30 F.3d at 476). However, where evidence of actual confusion exists, it may be highly probative of the likelihood of confusion, since such evidence is difficult to find due to many instances going unreported. *Id.* (citations omitted).

With regard to the fourth factor, Plaintiff submits that since actual confusion has been occurring, this factor does not apply. On the other hand, Defendant responds that he has been in business since May of 2004 and Plaintiff has failed to produce any evidence of actual confusion or palming off

by either Defendant or his employees. [19] Defendant further submits that he has denied same. [20] As will be shown below, neither representation is accurate.

[19] This statement is belied by the record, in particular, Smith's deposition and the vendor invoices.

[20] Defendant's bare denial of Plaintiff's evidence and/ or legal arguments, without pointing to evidence in the record which supports such denial, is insufficient under Fed.R.Civ.P. 56(e).

**\*15** With regard to evidence of actual confusion, the sixth factor, PQS maintains that Smith has acknowledged multiple instances of actual confusion. In support of this assertion, PQS cites to Smith's deposition testimony and documentary evidence in the form of invoices from vendors. (Pl.'s SUF, ¶¶ 19–23; Pl.'s App., Tabs A & G.) Specifically, PQS characterizes Smith's testimony as stating that the PENNZOIL signage at his oil change facility is causing consumer confusion. (Pl.'s Br. (Doc. 43) at 6.) PQS further submits that Smith testified that customers have inquired whether his Lube Pro location is "Jiffy Lube," [21] and that people have been confused and thought that Defendant was actually Plaintiff. (*Id.*) With regard to the vendor invoices, PQS submits that the invoices demonstrate that companies doing business with Smith sometimes refer to it as "Mars Pennzoil." (*Id.*) PQS cites *Checkpoint Sys., supra,* in support of its position that courts routinely find the existence of actual confusion to be the best indicator of a likelihood of confusion, and place great weight on this evidence.

[21] In its Memorandum of Law in Support of Summary Judgment, PQS states that it owns the Jiffy Lube chain of oil-change centers which feature PENNZOIL lubricants and display PENNZOIL signage; however, PQS does not point to where in the record this fact is established nor does it provide evidence to show that consumers generally associate Jiffy Lubes with PENNZOIL.

In response, Smith posits that any confusion that existed was caused by PQS, and it has failed to show the relevancy of the misdirected invoices. (Def.'s Mem., § 6, Part F, ¶¶ 19–23.) In addition to his deposition testimony, Smith proffers his affidavit in support. In his affidavit, Smith denies any attempt by him or any of his employees to: (1) confuse anyone into believing his Lube Pro facility was in any way affiliated with Pennzoil; (2) palm off any oil of any other manufacturer as

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 102 of 117
Pennzoil-Quaker State Co. v. Smith, Not Reported in F.Supp.2d (2008)
2008 WL 4107159

Pennzoil brand motor oil; and (3) to use any "bait and switch" tactics. (Smith Aff. ¶¶ 15–17.) Smith further avers that none of his customers or suppliers have complained to him about any confusion, palming off, or "bait and switch" tactics. (*Id.* at 18.) [22]

[22]    Defendant further submits that conspicuously absent from the record is any evidence of palming off or bait and switch tactics. Plaintiff responds that by virtue of the fact that Defendant has admitted that his intent in displaying the sign with the PENNZOIL mark was to attract customers, this is evidence of classic palming off, or bait and switch. This argument is addressed *infra* under the fifth *Lapp* factor.

A close review of the deposition transcript shows that Smith testified that on approximately six occasions from May of 2004 until October of 2006, a customer has come into his business asking if it is a Jiffy Lube. (Smith Dep. at 42.) Smith further testified that he believes that the reason why these customers ask if he is a Jiffy Lube is that they have a coupon for Jiffy Lube and they want to know if he will honor the coupon, which he does to generate future business. (*Id.*) According to Smith, some Jiffy Lube facilities are Pennzoil facilities but not all of them. (*Id.*) However, Smith denied that his oil-change business has been referred to from time to time as the "Pennzoil store." (Smith Dep. at 41.) Significantly, the Court notes that the record is devoid of any statements, verified or otherwise, from the six consumers who inquired as to whether Defendant's Lube Pro facility was a Jiffy Lube.

The record also contains three invoices from three different vendors sent to Smith's business address—635 Route 228, Mars, PA 16046. (Pl.'s App., Tab G.) The first invoice is from Diehl Automotive Group dated August 25, 2005 and addressed to "Mars Pennzoil" at 635 Route 228, Mars, PA. [23] The second invoice was sent from North Star Pontiac/GMC/Oldsmobile dated April 21, 2005 and addressed to "Pennzoil Lube Pro" at the same address. [24] The third invoice, a bill of lading from FBC Chemical Corp., is dated October 12, 2004, and addressed to "Lube Pro Pennzoil" at the same address. [25] When asked to explain why these vendors included a reference to Pennzoil in the name on the invoice, Smith testified that when he placed these orders, the vendors did not have an account set up for his oil change business, Lube Pro, nor did they have his tax I.D. number, as indicated by the blank space next to that line on the Diehl invoice dated August 25, 2005. (Smith Dep. at 46.) He explained

that he placed the order by phone and the vendors sent the invoices thinking he was a Pennzoil facility. (*Id.*) After that, the vendors updated the information in their computers and subsequent invoices were directed to "Lube Pro." (*Id.*) As to a fourth invoice dated August 31, 2005 and sent by Diehl to "Pennzoil Express Lube" at 578 Pittsburgh Road, Butler, PA 16002, [26] Smith stated that invoice was sent to him by mistake as it was not addressed to his business, Lube Pro; rather, the name and address on that invoice is completely different. (Smith Dep. at 47.)

[23]    This invoice bears Bates stamp no. LP0004945 in Tab G of Pl.'s App.

[24]    This invoice bears Bates stamp no. LP0004264 in Tab G of Pl.'s App.

[25]    This invoice bears Bates stamp no. LP0000344 in Tab G of Pl.'s App.

[26]    This invoice bears Bates stamp no. LP0004946 in Tab G of Pl.'s App.

**\*16** While Smith admitted during his deposition that "somebody" was confused about his facility being a Pennzoil facility, his remark, when taken in context, appears to be in regard to the August 31, 2005 invoice from Diehl. (Smith Dep. at 47.) PQS has taken this statement by Defendant out of context and construed it as an admission by Defendant that the PENNZOIL signage at his oil change facility is causing consumer confusion. The Court does not read Defendant's statement so broadly. Smith also admitted that once in a while he has received Pennzoil mail at his offices, [27] but that this confusion was started by Plaintiff's distributor when he gave the Pennzoil sign to Howard's. (*Id.* at 47–48.)

[27]    Smith explained that his remark in his deposition regarding occasionally receiving mail intended for Pennzoil was limited to the four invoices noted above. (Def.'s Mem., § 6, Part F, ¶ 23.)

While it is clear that the Court may consider the vendors' invoices as evidence of actual confusion, [28] there is nothing in the record, however, to suggest that the vendors mistakenly referred to Pennzoil on the invoices because of Defendant's display of the signage containing the PENNZOIL mark. In *Total Containment, supra,* two instances of confusion were noted; however, in neither instance, was any explanation offered as to why the consumer was confused as to the identity of the product. [29] 921 F.Supp. at 1411. The district

court concluded that these two instances of confusion did not constitute clear and convincing evidence of actual confusion and found that factor four weighed in favor of the alleged infringer. *Id.* In the case at bar, Defendant's argument suggests two possible explanations for the confusion with the three invoices, neither of which is predicated on the unauthorized use of the sign displaying the PENNZOIL mark: the confusion could have resulted from outdated information contained in the vendors' computer data bases, or due to the fact that Mr. Howard, a previous owner of Smith's oil change business, operated the facility as a Pennzoil franchise during his ownership. In addition, after the initial confusion with the name on the three invoices, no further instances were reported over a two-year period. Where an alleged infringer sells his product or provides services for an appreciable amount of time without evidence of actual confusion, an inference arises that continued marketing will not lead to consumer confusion in the future. *Checkpoint Sys.,* 269 F.3d at 291. For these reasons, the Court concludes that the vendor invoices do not constitute highly probative evidence of a likelihood of confusion.

28      *Checkpoint Sys.,* 269 F.3d at 292. In *Checkpoint Sys.,* the Court of Appeals held that the Lanham Act protects against all types of confusion, including initial interest confusion, by not only the consumers of the goods, but also, by experts, the media, and investors. 269 F.3d at 291–92. Initial interest confusion arises when confusion creates initial customer interest, but no actual sale is completed as a result of the confusion. *Id.* at 292 (citing 3 *McCarthy on Trademarks,* § 23:6).

29      The two instances of actual confusion noted by the district court included: (1) a letter from a station operator to his parent company complaining about a problem with the alleged infringer's product, but incorrectly identifying it as the trademark owner's product; and (2) a telephone call to the trademark owner requesting information about the product of the alleged infringer, whom the caller thought was a subsidiary of the trademark owner. *921 F.Supp. at 1411.*

Nor does the Court find that the half dozen instances of consumer confusion over Defendant's facility being a Jiffy Lube in a two and one-half year period highly probative of a likelihood of confusion. Again, no statements of the confused consumers were proffered, and Defendant offered a plausible explanation for the confusion. Accordingly, the Court finds that the evidence of actual confusion is insufficient to permit weighing the fourth and sixth *Lapp* factors in Plaintiff's favor.[30]

30      In *Holiday Inns of Am., Inc. v. B & B Corp.,* 409 F.2d 614, 617 (3d Cir.1969), the plaintiff's evidence of actual confusion consisted only of some statements in a deposition of one of the defendants that certain conversations with hotel guests, and correspondence on approximately twelve occasions in one year, disclosed an impression that defendants' operation was affiliated with plaintiff's hotel chain. The court of appeals found that this evidence of actual confusion was scanty at best. *Id.* Here, the evidence of actual confusion from the customers wanting to redeem Jiffy Lube coupons is of comparable quality.

**(5) Defendant's Intent in Adopting the Mark**

**\*17** The fifth *Lapp* factor examines the intent of the Defendant in adopting the mark. As to Defendant's intent, PQS proffers Smith's deposition testimony, wherein he stated that the intent of the road-side sign stating "We Feature PENNZOIL Products" and displaying the PENNZOIL logo was to attract business. (Smith Dep. at 39–40, 70.) According to PQS, Smith further testified that less than 5% of his oil inventory consists of genuine PENNZOIL products. (Smith Dep. at 89–90.) PQS submits that although Smith's primary advertisement is for PENNZOIL products, he does not dispense those products unless a customer specifically requests them. (Smith Dep. at 18, 34, 39–40, 64–65, 70–73, 144–45.) According to PQS, Smith's testimony clearly shows that he intended to attract customers through the prominent use of a famous mark and then provide them with less expensive, off-brand products that are unfamiliar even to him. (Smith Dep. at 127–29.) Defendant responds that his intent in "adopting" the marks was simply to leave up the signs which he paid for and owned and used without knowledge of PQS' contract with Howard, or its letters to Napierkowski. Defendant further submits that it was his intent to keep up the signs at a time when he could not afford to take down the road-side sign and to replace it. (Def.'s Mem. (Doc. 39) at 25.)

Although evidence of a party's intentional use of another party's mark to cause confusion is not required to establish a violation of the Lanham Act, evidence of intentional use of another party's mark closely similar to an existing mark, weighs strongly in favor of finding the likelihood

of confusion. *Checkpoint Sys.,* 269 F.3d at 286 (citations omitted).

In the present case, the record contains persuasive evidence of intent to cause confusion by Defendant. Through his admissions to Plaintiff's Statement of Undisputed Facts and his deposition testimony, Smith admitted that from the time he purchased Lube Pro in May of 2004 up until sometime after December 2005, he prominently displayed a road-side sign stating, "We Feature PENNZOIL Products" along a main thoroughfare in Mars, Pennsylvania, for the purpose of drawing customers into his oil-change facility. He further admitted that only 100 to 150 gallons of oil out of a total of 5,000 gallons used in 2005 in his oil change facility, *i.e.,* two and three percent, came from PENNZOIL products purchased in one-quart containers, and never in bulk. Smith further testified that he only used PENNZOIL brand products if specifically requested by the customer, and that usually happened less than once a week, and possibly as little as once a month. In fact, less than one percent of Defendant's customers requested a specific brand of motor oil when they come in for an oil change. The primary brands of motor oil used by Defendant in 2005 were AGIP and Ultra Lube. In addition, even after Defendant was informed by PQS of his alleged trademark infringement and PQS requested in writing on three separate occasions that he remove the sign with the PENNZOIL mark, Defendant still refused to remove the sign. Defendant does not deny that he continued to willfully use the PENNZOIL mark and PENNZOIL sign after PQS demanded that he stop, but contends he was justified in doing so because he owned the signage, having acquired it from Napierkowski, and therefore, was not required to stop using it. The Court finds that these admissions by Defendant demonstrate persuasive evidence of an intent to cause confusion, and therefore, are highly probative of a likelihood of confusion..

 **\*18** It is clear that PQS, and not Defendant, owns the PENNZOIL mark, and Defendant is not an authorized dealer of PQS, nor did he seek or obtain PQS's permission to use its mark. Therefore, the fact that Defendant believed he owned the sign is of no moment here. Moreover, prior to instituting the present lawsuit, PQS and/or its agent clearly informed Defendant that he did not own the sign as per their lease agreement with a predecessor in interest. Rather than attempt to resolve the issue prior to litigation or consult an attorney, Defendant chose to ignore the letter and continued to display the sign like the proverbial ostrich with its head in the sand. The Court will not reward Defendant for such dilatory

conduct. Had he simply removed the infringing sign as PQS requested, Defendant could have avoided this entire lawsuit.

A case which is very similar factually to the case at bar is *Prompt Elec. Supply Co., Inc. v. Allen–Bradley Co.,* 492 F.Supp. 344, 210 U.S.P.Q. 569 (E.D.N.Y.1980). In that case, after the plaintiff was no longer an authorized distributor of defendant's products, it continued to display defendant's sign and trademarks at its place of business without defendant's permission. *Id.* at 571. The defendant produced evidence to show that only its authorized distributors are permitted to display its sign and trademark and plaintiff had been terminated as a distributor. *Id.* at 572. The court further noted that fixed to the facade of plaintiff's place of business is the defendant's sign containing its distinctive trademark and the words "Allen–Bradley Motor Control Headquarters," which is placed next to a sign containing the name of plaintiff's business and generic descriptions such as "lighting fixtures" and "electrical supplies." *Id.* The plaintiff did not display the signs or trademarks of any other distributors on the facade of his place of business. In light of those facts, the Court found that a clear inference could be drawn that plaintiff held itself out to be an authorized distributor of defendant, not merely a seller of its parts, through the use of defendant's sign on the facade of its building. *Id.* The court rejected plaintiff's defense that it was merely using the defendant's sign to advertise that it sold defendant's products, noting that without more, that defense was inadequate. *Id.* at 572. Accordingly, the court held the continuing unauthorized use of sign and trademark presented likelihood of confusion that infringer was authorized dealer of owner's products and granted injunctive relief. *Id.* at 572–73.

Similarly here, Defendant Smith continued to display the sign "We Feature PENNZOIL Products" even though he was not an authorized dealer of PENNZOIL products and after he had been informed that he did not own the sign and requested to take it down. In addition, the "We Feature PENNZOIL Products" sign was placed along side a Lube Pro sign and displayed in a prominent location on Defendant's business premises. No other distributors signs or trademarks appear in that location, thus giving consumers the impression that Defendant is an authorized distributor of PENNZOIL products. Therefore, based on *Prompt Elec.,* Plaintiff has established a strong likelihood of confusion, entitling it to injunctive relief.

 **\*19** Accordingly, the Court finds that the fifth *Lapp* factor weighs strongly in Plaintiff's favor.

### (7) Marketing/Advertising of Non–Competing Goods Through Same Channels of Trade

The seventh *Lapp* factor considers whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media. PQS submits that since it and its licensees, as well as Defendant, operate oil change centers, the channels of trade are identical. Defendant has not provided a response on this factor, from which the Court infers that Defendant agrees with Plaintiff. Courts have held that as to the seventh factor, " 'the greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion.' " *Checkpoint Sys.,* 269 F.3d at 288–89 (citation omitted). While the record does not contain any evidence as to the trade exhibitions, publications, or other media used by the parties in marketing their oil change services, or as to how the parties use their respective sales forces to sell their products to consumers, this lack of evidence does not weigh against the likelihood of confusion. This factor simply does not apply here because it addresses non-competing goods, and the parties directly compete as they both operate oil change facilities in the same geographical market.

### (8) Similarity of Targets of Parties' Sales Efforts

As to the eighth *Lapp* factor, PQS argues that both parties share the same customer base—general motorists and fleet vehicles. Defendant has not provided a response to this factor, from which the Court infers that Defendant agrees with Plaintiff. It is obvious from the record that the parties operate directly competing oil change businesses in the same geographic area, and therefore, their customer base significantly overlaps. When parties target the same consumers through their sales efforts, a stronger likelihood of confusion exists. *Checkpoint Sys.,* 269 F.3d at 289 (citing *Lapp,* 721 F.2d at 463–64). Therefore, this factor weighs in Plaintiff's favor.

### (9) Relationship of Goods in Consumers' Minds Because of Similarity of Function

With regard to the ninth *Lapp* factor, PQS maintains that this factor does not apply here because the parties' services are identical. Defendant responds that PQS has not produced any evidence regarding the state of mind of consumers with regard to the services and/or products involved here. The Court agrees with PQS that this factor does not apply here. The ninth factor is applied only where the goods or services are not competing or do not occupy the same markets. Since the evidence shows that the parties here are in direct competition for the same services, the Court finds the ninth *Lapp* factor does not apply.

### (10) Other Factors Indicating Consumers Might Expect Prior Owner to Compete in Same Market or Expand Into That Market

As to the tenth *Lapp* factor, PQS submits that this factor does not apply here because the parties' services are identical. Defendant, on the other hand, responds again that PQS has failed to produce any evidence that he is likely to expand, or that he is even financially able to expand, or that the consuming public may expect him to expand. For the reasons stated with regard to the ninth *Lapp* factor, the Court finds the tenth factor likewise has little relevance here. [31]

[31]    The Court of Appeals has indicated that with regard to factor ten, evidence of converging markets is " 'pivotal in non-competing products cases.' " *Checkpoint Sys.,* 269 F.3d at 290 (quoting *Lapp,* 721 F.2d at 463).

### *Totality of Lapp Factors*

**\*20**  In summary, the Court applied seven of the ten *Lapp* factors to the evidence in this case and concluded that five of the seven factors weighed in favor of a likelihood of confusion. Significantly, the Court found that mark similarity, the most important factor in a case such as this where the parties are in direct competition, strongly favored a likelihood of confusion. Similarly, the Court found strong evidence that Defendant's intent in adopting the mark was to cause consumer confusion. Moreover, although the evidence was not as strong, the strength of Plaintiff's mark also favored a likelihood of confusion, as did the price of an oil change, and the similarity of targeted consumers. On the other hand, the Court found that the length of time that the mark was used without evidence of actual confusion, and instances of actual confusion, did not weigh in Plaintiff's favor. Although there was some evidence of actual customer confusion, it was not highly probative due to the lack of documentation that the reason for the confusion was the display of the PENNZOIL marks, while alternative explanations existed for the confusion. Factors four and six are not determinative, however, as they are outweighed in both quality and quantity by the Court's findings as to the other factors.

Accordingly, the Court concludes that the combination of the *Lapp* factors delineated above establishes a substantial likelihood of confusion. *See Holiday Inns of Am., Inc. v. B & B Corp.,* 409 F.2d 614, 617 (3d Cir.1969);[32] *Prompt Elec. Supply Co.,* 492 F.Supp. 344, 210 U.S.P.Q. at 572–73. Therefore, the Court holds that Plaintiff is entitled to injunctive relief on its claims of federal trademark infringement and unfair competition, and common law trademark infringement and unfair competition under Pennsylvania law.

[32]   The Court's conclusion is buttressed by the Third Circuit's decision in *Holiday Inns of Am., Inc. v. B & B Corp.,* 409 F.2d 614, 617 (3d Cir.1969), wherein the court of appeals held that because the appropriate test is a likelihood of confusion, not actual confusion, the plaintiff could have rested its case on the proposition that use of the identical mark upon identical services is alone sufficient to establish a likelihood of success where it is accompanied by proof of an additional factor—that the identical names are present in the same market place to compete for the same customers. In the case at bar, the evidence establishes that the marks are identical, as are the services and customers, which would appear to be sufficient under *Holiday Inns* to establish a likelihood of confusion.

### b. Trademark Counterfeiting (Count II)

Plaintiff also moves for summary judgment on its claim of trademark counterfeiting under the Lanham Act. Section 1114(1) prohibits the use in commerce of any counterfeit of a registered mark or the actual counterfeiting of any registered mark in connection with the sale, distribution or advertising of goods or services which is likely to cause confusion or mistake, or to deceive. 15 U.S.C. § 1114(1)(a) & (b). For purposes of a federal counterfeiting claim under the Lanham Act, the term "counterfeit mark" is defined as "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered; or a spurious designation that is identical with, or substantially indistinguishable from, a [registered mark]." 15 U.S.C. §§ 1116(d) (1)(B)(i) & (ii), 1127. However, a counterfeit mark does not include any mark or designation for which the manufacturer or producer had authorization to use at the time of manufacture or production.

15 U.S.C. §§ 1116(d)(1)(B). Thus, to establish a claim of trademark counterfeiting, a plaintiff must prove that: (1) the defendant "infringed a registered trademark in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a), and (2) intentionally used the trademark knowing that i[t] was counterfeit or was willfully blind to such use." *Louis Vuitton Malletier & Oakley, Inc. v. Veit,* 211 F.Supp.2d 567, 580–81 (E.D.Pa.2002) (citing *Playboy Enter., Inc. v. Universal Tel–A–Talk, Inc.,* No. Civ.A. 96–6961, 1998 WL 767440, at *7 (E.D.Pa. Nov.3, 1998)). The only material difference between the standard for federal trademark infringement and trademark counterfeiting is the requirement of proving defendant intentionally used the plaintiff's trademark, knowing it was a counterfeit, which, if proven, entitles the plaintiff to an award of treble and/or statutory damages. *Playboy Enter., Inc. v. Universal Tel–A–Talk, Inc.,* 48 U.S.P.Q.2d 1779, 1782, 1998 WL 288423, at *3 (E.D.Pa. Jun.3, 1998) (citing 15 U.S.C. § 1117(b) & (c)).

**\*21** In support of its motion for summary judgment on it federal trademark counterfeiting claim, Plaintiff posits that it has conclusively established that Defendant is using counterfeits of the federally registered PENNZOIL marks for the goods and services covered by Plaintiff's registrations. In particular, Plaintiff submits that Defendant, in connection with the same products and services at Lube Pro, has displayed its registered mark covering lubricant oils and greases on the road-side sign, and had displayed its registered mark covering automobile service stations on the side of the Lube Pro facility and also inside the work bay. Plaintiff further argues that the fact that Defendant's mark is identical to Plaintiff's mark, rather than a mere simulation, does not minimize the counterfeit nature of the goods and services associated with them, and cites in support *Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.,* 425 F.3d 708, 722 (9th Cir.2005). Finally, Plaintiff submits that Defendant's use of these counterfeit marks was intentional, as demonstrated by his admission that his purpose in displaying the road-side sign is to attract customers, that he displays PENNZOIL signs more prominently than any other brand of motor oil while less than five percent of his inventory consist of genuine PENNZOIL products, and he does not use PENNZOIL products unless specifically requested to do so.

The Court has searched at length in Defendant's memorandum of law for his argument in opposition. Far from a model of clarity, Defendant's memorandum does not appear to provide any legal argument or authority in opposing Plaintiff's request for summary judgment on its trademark counterfeiting claim, other than two conclusory statements denying that the signs,

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 107 of 117
Pennzoil-Quaker State Co. v. Smith, Not Reported in F.Supp.2d (2008)
2008 WL 4107159

signage or product labels were or are spurious counterfeit marks, reproductions, counterfeit or colorable imitations, and denying that Plaintiff has failed to produce evidence of same. (Def.'s Mem. of Law (Doc. 39) at 34 & 38.) It is well settled that conclusory statements fall short of the substantive legal analysis required to bring an issue before the court. *Massie v. U.S. Dep't of Hous. & Urban Devel.,* C.A. No. 06–1004, 2007 WL 184827, *3 n. 5 (W.D.Pa. Jan.19, 2007) (citing *Pennsylvania v. U.S. Dep't of Health & Human Serv.,* 101 F.3d 939, 945 (3d Cir.1996) ("stating that conclusory assertions, unaccompanied by a substantial argument, will not suffice to bring an issue before the court")), *vacated in part on other grounds on reconsideration,* 2007 WL 674597 (W.D.Pa. Mar.1, 2007). Despite this inadequacy in Defendant's argument, the Court finds, as a threshold matter, that Plaintiff has failed to establish as a matter of law, an essential element of its claim—that the marks in question are counterfeit.

The plain language of the statute indicates that the term "counterfeit" refers to the mark itself, not the nature of the goods and services associated with the mark as Plaintiff suggests. Moreover, even if Plaintiff's statement of the law was correct, in this case there were no actual counterfeit goods or services attached to the PENNZOIL marks. The facts here show that the marks used by Defendant were genuine PENNZOIL marks, not counterfeits, copies or reproductions, and said marks were used on signs to attract customers into his oil change business, but were not "attached to" the non-PENNZOIL products/lubricants he actually used in his oil change facility. Plaintiff's reliance on *Idaho Potato Comm'n* is misplaced, as that case involved the unauthorized use of a certification mark, as distinguished from a trademark.[33] Thus, *Idaho Potato Comm'n* is distinguishable both legally and factually and not dispositive here.

[33] The Ninth Circuit specifically noted that certification marks differed from trademarks in a number of significant ways which impacted its analysis of the counterfeiting claim. 425 F.3d at 716 (citing 3 *McCarthy on Trademarks,* § 19:91 (4th ed. 2005) ("A certification mark is a special creature for a purpose uniquely different from that of an ordinary trademark or service mark."). For example, certification marks are subject to cancellation, if certain conditions occur. *Id.* In addition, certification marks serve other

public interests besides the prevention of public confusion. *Id.*

**\*22** The Court finds instructive the decision of the Sixth Circuit Court of Appeals in *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185 (6th Cir.1997), which involved a holdover franchisee who continued to use the franchisor's original trademark after the franchise had been terminated. There the court of appeals held that "[a]lthough the use of an original trademark is without authorization, it is not the use of a counterfeit mark." *Id.* at 1192; *see also Motor City Bagels, L.L.C. v. Am. Bagel Co.,* 50 F.Supp.2d 460, 489 (D.Md.1999) (citing *U.S. Structures, supra* ) (same). Although the Defendant here was never an authorized distributor of PENNZOIL products, and therefore, was never authorized to use the PENNZOIL marks, the Court finds that his use of the original trademark after he acquired ownership of the Lube Pro, without authorization from Plaintiff, constitutes infringement, but is not the use of a counterfeit mark.

Accordingly, the Court finds, as a matter of law, that Plaintiff has failed to establish an essential element of its trademark counterfeiting claim, and therefore recommends that Plaintiff's motion for summary judgment on this claim be denied. It is further recommended that summary judgment be entered in Defendant's favor on this claim.

### c. False Advertising (Count VII)

Next, Plaintiff moves for summary judgment on its claim for false advertising under Section 43(a) of the Lanham Act. To prevail on a claim for false advertising under the Lanham Act, a plaintiff must prove that the defendant:

> "use[d] in commerce any word, term, name, symbol, or device or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities ...."

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.,* 401 F.3d 123, 136 (3d Cir.2005) (quoting 15 U.S.C. § 1125(a)(1)(B)). As to the latter requirement, a plaintiff can satisfy its burden by demonstrating one of two things—either that the commercial message is literally false, or the commercial message is literally true or ambiguous with the tendency to deceive consumers. *Id.* (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.,* 290 F.3d 578, 586 (3d Cir.2002)). If the plaintiff establishes that the commercial message is literally false, then it need not show that the buying public was misled. *Id.* (citing *Johnson & Johnson–Merck Consumer v. Rhone–Poulenc Rorer Pharm., Inc.,* 19 F.3d 125, 129–30 (3d Cir.1994)). However, if it cannot show literal falsity, then plaintiff must establish " 'actual deception or at least a tendency to deceive a substantial portion of the intended audience.' " *Id.* (quoting *Rhone–Poulenc,* 19 F.3d at 129).

**\*23** In support of its motion for summary judgment on its false advertising claim, Plaintiff argues that it has conclusively established each element of its claim. In particular, Plaintiff submits that Defendant has committed false advertising in two respects. First, Plaintiff submits that Defendant's signage misleads consumers into believing that he is, or is affiliated with, Plaintiff. Consequently, Defendant is misrepresenting the origin of his services. Second, Plaintiff contends that Defendant attracts customers to his business by using its trademarks, but uses a different, less expensive product in place of Plaintiff's product, and, therefore, Defendant misrepresents the nature and quality of his goods by representing them as PENNZOIL brand goods when they are not .[34] Plaintiff further submits that a substantial portion of consumers have been deceived as demonstrated by the numerous instances of confusion reported by Defendant. Other than conclusory denials about engaging in such "bait-and-switch" tactics, Defendant does not offer any argument in opposition to Plaintiff's false advertising claim.

[34]    Plaintiff posits that this form of false advertising amounts to a "bait-and-switch" operation, which tactic is deemed unlawful by the Federal Trade Commission under 15 U.S.C. § 45(a), and cites in support *Tashof v. Fed. Trade Comm'n,* 437 F.2d 707, 709 (D.C.Cir.1970); 16 C.F.R. § 238.0 (2006). Plaintiff submits the fact that Defendant may maintain a handful of bona fide PENNZOIL products does not change the false nature of

his advertising. *Tashof,* 437 F.2d at 710 n. 8. The Court agrees. A small amount of sales of the advertised PENNZOIL products is merely an incidental by-product of the fundamental bait and switch operation, and adds an aura of legitimacy to the overall operation. *Id.*

The Court finds that the record evidence here establishes literal falsity in the form of a "bait-and-switch" operation. In this case, the commercial message conveyed by Defendant is that he "features PENNZOIL products" when in fact only two to three percent of the oil used in his oil change business is PENNZOIL brand motor oil. Defendant admitted that he prominently displayed the road-side sign to draw customers into his oil-change facility, and then proceeded to use either AGIP or Ultra Lube products over 97 percent of the time. These admissions demonstrate the literal falsity of Defendant's commercial advertising.[35] In addition, the "switch" may be inferred from the evidence of bait advertising and minimal sales of the advertised PENNZOIL products. *Tashof v. Fed. Trade Comm'n,* 437 F.2d 707, 710 n. 8 (D.C.Cir.1970). Accordingly, the Court finds that Plaintiff has established the elements of its false advertising claim under the Lanham Act. Therefore, the Court recommends that summary judgment be granted in Plaintiff's favor on this claim.

[35]    The Court rejects Plaintiff's argument that a substantial portion of consumers have been deceived as demonstrated by the numerous instances of confusion reported by Defendant. Plaintiff's proof is thin at best, for the reasons set forth above in relation to the fourth and sixth *Lapp* factors.

### d. Federal & State Trademark Dilution Claims (Counts IV & VI)

Plaintiff also requests that summary judgment be entered in its favor on its claims of federal trademark dilution and state trademark dilution under Pennsylvania law.[36] To set forth a *prima facie* claim for relief under the Federal Trademark Dilution Act of 1995 ("FTDA"), a plaintiff must plead and prove that: (1) the plaintiff owns a famous mark that is distinctive, inherently or through acquired distinctiveness; (2) the defendant makes use in interstate commerce of a mark or trade name; (3) the defendant's use began after the plaintiff's mark became famous; and (4) the defendant's use is likely to cause dilution by blurring or dilution by tarnishment of the famous mark. 15 U.S.C. § 1125(c)(1) (2006); *Diane Von*

*Furstenberg Studio v. Snyder,* No. 1:06cv1356 (JCC), 2007 U.S. Dist. LEXIS 66633, *10, 2007 WL 2688184 (E.D.Va. Sept. 10, 2007). [37] The standard under Pennsylvania statutory law for establishing trademark dilution [38] is substantially similar to the FTDA, *Louis Vuitton,* 211 F.Supp.2d at 582, with the exception that the Pennsylvania statute retains the FTDA's pre–2006 amendment standard in prong four, *i.e.,* "causes dilution." Thus, the standard for proving trademark dilution is more easily met under federal law than under Pennsylvania law.

[36]    In its own motion for summary judgment, Plaintiff did not move for summary judgment on these claims. However, Defendant has moved for summary judgment on all claims, and in response, Plaintiff requests that summary judgment be entered in its favor on its federal and state trademark dilution claims. The Court may enter summary judgment in the nonmovant's favor where it believes that the movant has had adequate notice of the basis for that judgment, and where clear support exists for such judgment. *Banks v. Lackawanna County Comm'rs,* 931 F.Supp. 359, 363 n. 7 (M.D.Pa.1996) (citing 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Proc.,* § 2720 at 29–35 (1983) (other citation omitted). While Defendant has had adequate notice of the basis for Plaintiff's request for summary judgment on the federal and state trademark dilution claims, the Court finds that Plaintiff has not met its burden of proof as to the *prima facie* elements of its dilution claims.

[37]    In 2006, Congress amended the Federal Trademark Dilution Act to change the causation requirement in prong four from "causes dilution" to "likely to cause dilution." *Diane Von Furstenberg Studio,* 2007 U.S. Dist. LEXIS 66633, at *10, 2007 WL 2688184 (citing 15 U.S.C.S. § 1125(c)).

[38]    The Pennsylvania statute on trademark dilution is codified at 54 Pa. Con. Stat. Ann. § 1124.

**\*24**  As to determining whether a particular mark is famous, the FTDA states that a "mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). To assist courts in making this determination, Congress has set forth four factors which, if relevant, may be considered in assessing whether a

particular mark possesses the requisite degree of recognition. 15 U.S.C. § 1125(c)(2)(A) (i)-(iv). [39] It is clear from the multi-factor standards and legislative history to the FTDA that the level of recognition required for a mark to be deemed famous under the FTDA is greater than that required for trademark infringement. *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.,* 212 F.3d 157, 171 (3d Cir.2000) (Barry, J., dissenting) (citing S.Rep. No. 100–515, *reprinted in* 1988 U.S.C.C.A.N. 5577, at 5604). Indeed, Congress has provided examples of marks it considers truly famous, such as "Kodak," "Buick," and "Dupont." *Id.* (citing H.R.Rep. No. 104–374 at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 1029, 1031).

[39]    The 2006 amendment to the FTDA also sets forth definitions of "dilution by blurring" and "dilution by tarnishment," and lists six factors to be considered with regard to the former. 15 U.S.C. § 1125(c)(2)(B) & (C).

In support of its request for summary judgment on its claims of trademark dilution under the FTDA and Pennsylvania dilution statute, Plaintiff argues merely that "[t]here is no genuine dispute that all of the elements of these claims are present here." (Pl.'s Mem. in Opp'n to Def.'s Cross–Mot. for Summ. J. & in Further Support of Pl.'s Mot. for Summ. J. (Doc. 47) at 23–24.) Given the number of factors to be evaluated in determining whether Plaintiff's mark has achieved the requisite level of recognition to be deemed famous, and Plaintiff's lack of legal analysis and proffered evidence on this point, the Court finds that Plaintiff has failed to establish entitlement to injunctive relief under the FTDA or the Pennsylvania dilution statute. Accordingly, the Court recommends that summary judgment be entered in favor of Defendant on these claims.

### e. Unjust Enrichment (Count VII)

In support of summary judgment on this claim, Plaintiff recites the elements of unjust enrichment and asserts in conclusory fashion that there is no genuine dispute that all of these elements have been met here. However, Plaintiff offers no legal argument and analysis in support thereof, which precludes the Court from considering Plaintiff's request. *See Massie,* 2007 WL 184827, at *3 n. 5 (citation omitted) (conclusory assertions, unaccompanied by a substantial argument, will not suffice to bring an issue before the court). Moreover, Plaintiff did not move for summary judgment on its unjust enrichment claim, but requests summary judgment be entered in its favor on this claim in response to

2008 WL 4107159

Defendant's motion for summary judgment. Given the lack of development of the legal argument and analysis, neither the Defendant nor the Court has adequate notice of the basis of Plaintiff's claim/argument. *See* Note 36, *supra*.

**\*25** Therefore, the Court finds that Plaintiff has failed as a matter of law to establish the elements of an unjust enrichment claim. Accordingly, the Court recommends that summary judgment be entered in favor of Defendant on this claim.

### 2. Defendant's Affirmative Defenses

In opposition to Plaintiff's motion for summary judgment, Defendant raises several additional affirmative defenses not previously addressed, including failure to join two indispensable parties (Mr. Howard and Mr. Napierkowski), abandonment, dilution by Plaintiff of its own mark, acquiescence, waiver, laches, estoppel, unclean hands, nominal fairness of use, and statute of limitations. Plaintiff has filed a response, with supporting analysis and legal authority, denying that any of these affirmative defenses apply and seeking summary judgment in its favor. For the reasons that follow, the Court finds that none of these defenses have any merit.

#### a. Failure to Join Indispensable Parties

Defendant asserts that Plaintiff has failed to name two indispensable parties, namely Mr. Howard and Mr. Napierkowski, his predecessors in title. In support of this argument, Defendant submits that Plaintiff has never sought any remedy or relief from either Howard or Napierkowski for the alleged wrongful selling of the road-side sign. (Def.'s Mem. (Doc. 39) at 35.) This argument is completely devoid of merit. Under Fed.R.Civ.P. 19(a)(1), joinder of a person, who is subject to service of process and whose joinder will not deprive the court of subject matter jurisdiction, is required in one of two situations: (1) where complete relief cannot be accorded among the existing parties in that person's absence; or (2) where that person claims an interest relating to the subject of the law suit and is so situated that disposing of the action in the person's absence may impair the person's ability to protect the interest or leave an existing party subject to a substantial risk of incurring multiple or inconsistent obligations because of the interest. Defendant has failed to show that either situation is present here. Therefore, the Court recommends a finding in favor of Plaintiff on this affirmative defense.

#### b. Abandonment

Defendant's next affirmative defense is that in 2000 or 2001, Plaintiff abandoned the road-side sign containing the PENNZOIL mark. Although Defendant fails to offer any additional argument or support on this defense, it appears that he is referring to when Mr. Howard sold the oil change business to Napierkowski, and Plaintiff allegedly did not attempt to retrieve its signs.

Section 45 of the Lanham Act sets forth two instances where abandonment of a trademark will be deemed to have occurred:

(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

**\*26** (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark.

15 U.S.C. § 1127. Defendant's argument appears directed to the first instance of abandonment.

In this case, the evidence of record shows that on at least two occasions, shortly after Plaintiff discovered the sale of the business to Napierkowski, it sent letters to Napierkowski demanding that he cease and desist from using the PENNZOIL mark in association with the sales of bulk lubricants and displaying the PENNZOIL sign. Before Plaintiff could take any further action against Napierkowski, he sold the business to Defendant. As soon as Plaintiff discovered that Napierkowski sold the business to Defendant, Plaintiff sent three letters requesting removal and return of its sign, and Plaintiff's agent visited Defendant's place of business and demanded same on at least one occasion. The Court finds that the undisputed evidence of record does not establish any express or inferred intent to abandon its mark or the sign displaying its PENNZOIL mark. Accordingly, the Court recommends a finding in favor of Plaintiff on this affirmative defense.

#### c. Dilution by Plaintiff of its Own Mark

Defendant contends that Plaintiff has diluted its own trademark by (1) "giving away its trademark to unrelated business (sic) and/or competitors such as Mr. Napierkowski;" (2) "[s]elling its trademark online without restrictions to anyone including competitors[;]" and (3) "[s]elling its product in bulk with its logo to anyone including competitors, without restrictions on its use or resell and doing so at retail outlets such as Costcos, WalMart and Sam's Club at discount prices." (Def.'s Mem. (Doc. 39) at 35.) Defendant's argument is completely meritless as it consists mainly of speculation, nonverified facts, and conclusory statements and arguments. As to Defendant's contention, the Court finds this is pure speculation without any evidentiary support in the record. As to the second and third contentions, again there is no evidentiary foundation as to the particular facts of these sales, nor does Defendant cite any legal authority that would support his novel theory that a trademark owner's sales via the internet or through warehouse stores of its trademarked products, without more, somehow negate its ownership rights to its marks.

In support of this novel theory, Defendant offers a plethora of irrelevant and non-material evidence [40] in addition to his deposition testimony that he purchased PENNZOIL lubricants at Costco, WalMart and Sam's Club. For the most part, this evidence is unverified as it is not accompanied by a supporting affidavit, but in any event, its lack of relevance precludes Defendant's reliance on it to justify his unauthorized use of Plaintiff's PENNZOIL mark on signs used to lure customers into his oil change facility, giving them the mistaken impression that he featured PENNZOIL lubricants. Just because a number of items bearing the PENNZOIL marks and logos appear in various ads, NASCAR sponsorships, websites, catalogs, photographs or the like, their mere existence does not provide the Court with any basis from which to conclude that Plaintiff somehow released its marks/logo to the public at large to use in whatever way they wanted. In addition, because this evidence is neither material or relevant, it does not create a genuine issue of fact. Accordingly, the Court recommends a finding in favor of Plaintiff on this novel defense theory.

[40]    This evidence consists of printouts from Plaintiff's website offering various promotional items with the PENNZOIL logos for sale, and his "newly discovered evidence," which consists of a photo of a NASCAR stock car sponsored by Plaintiff and bearing the PENNZOIL logo; two catalogs, one containing nostalgic reproductions of various

oil companies' signs, including PENNZOIL, and the other containing oil change center and carwash supplies with photos of PENNZOIL products; a promotional offer for a SHELL ROTELLA sign; and photos of a tanker truck bearing a SHELL logo.

### d. Acquiescence, Laches, Estoppel & Waiver

**\*27** The equitable defenses of acquiescence, laches, estoppel and waiver are related and therefore will be considered together. Generally, estoppel is not considered a separate defense, but rather, is referred to as either "estoppel by laches" or "estoppel by acquiescence." *Analytic Recruiting, Inc. v. Analytic Res., L.L.C.,* 156 F.Supp.2d 499, 515 (E.D.Pa.2001) (citing *Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assurance Co.,* 943 F.Supp. 509, 517 n. 5 (E.D.Pa.1996) (citing 4 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* §§ 30.01–30.03 (3d ed.1996)). When asserting an estoppel defense, the defendant is claiming in essence that he changed his position in reliance upon the misleading representation of the plaintiff. *Id.* (citation omitted).

Laches consists of two elements: (1) plaintiff's delay in instituting suit is inexcusable; and (2) defendant was prejudiced by such delay. *Santana Prods.,* 401 F.3d at 138 (citing *Univ. of Pittsburgh v. Champion Prods., Inc.,* 686 F.2d 1040, 1044 (3d Cir.1982)). Where a plaintiff files suit before the analogous state statute of limitations runs, the defendant bears the burden of showing that plaintiff's delay, if any, in instituting suit was inexcusable and the defendant suffered prejudice from the inexcusable delay. On the other hand, if the plaintiff files suit after the analogous state statute of limitations has run, then the defendant enjoys the benefit of the presumption that plaintiff's delay in instituting suit was inexcusable and defendant suffered prejudice from the delay. The burden then shifts to plaintiff to rebut this presumption. *Id.* at 138–39 (citing *E.E.O.C. v. Great Atlantic & Pacific Tea Co.,* 735 F.2d 69, 80–81 (3d Cir.1984)). The Court of Appeals has held that claims for trademark infringement, unfair competition and false advertising under Section 43(a) of the Lanham Act are most analogous to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, which has a six-year "catch-all" limitation period. *Id.* at 138 (citations omitted). In the case at bar, Defendant acquired the oil change business in May of 2004, and Plaintiff first learned of that acquisition sometime between May of 2004 and October 2004, when it sent the first of three cease and desist letters. Plaintiff instituted the present action in October 2005, approximately 17 months after Defendant

acquired the business and first engaged in the infringing conduct and Plaintiff discovered these facts. Consequently, Plaintiff filed suit before the expiration of the applicable statute of limitations, [41] and thus, Defendant bears the burden of establish both elements of laches.

[41]     In his Answer to the Complaint, Defendant also pleads statute of limitations as an affirmative defense, but he does not raise it in his motion for summary judgment. In any event, such defense is not available here as the record clearly shows that Plaintiff instituted suit within the six-year statute of limitations which has not yet expired.

"The doctrine of acquiescence applies when the trademark owner, by affirmative word or deed, conveys its implied consent to another" to use its name or mark. *Pappan Enter., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 804 (3d Cir.1998) (citing 4 *McCarthy on Trademarks & Unfair Competition* § 31.51 at 31–76 (4th ed.1997)). Finally, "waiver, in the strict sense, is the intentional relinquishment of a known right." *Paradise Hotel Corp. v. Bank of Nova Scotia,* 842 F.2d 47, 51 (3d Cir.1988) (citation omitted).

**\*28**  Defendant's theory as to these defenses is that since 2000 or 2001, Pennzoil has acquiesced to the use of its road-side sign by Napierkowski, and then by Defendant, and/or is estopped and/or is guilty of laches. Defendant further asserts if Plaintiff had not allowed Mr. Napierkowski to use the sign for four years, Defendant "would, for the sake of argument, not [have] been under the impression that his use of the sign was legal and/or the sign would have been removed prior to [Defendant]'s purchase of the sign. Defendant's argument completely misses the mark.

First, there simply is no evidence here to show that Defendant changed his position in reliance upon a misleading representation made by the Plaintiff. Defendant has always maintained that he owned the signage in question. Moreover, he fails to identify what, if any, misleading misrepresentation was made to him that actually caused him to change his position. Second, Defendant has failed to establish both elements of his laches defense. The delay here was minimal; from the time Defendant acquired the business in May of 2004, until this law suit was filed in October 2005, only 17 months had passed, mostly due to Plaintiff's attempt to resolve this dispute out of court and Defendant's failure to respond to Plaintiff's cease and desist letters. Shortly after learning that Defendant acquired the business from Napierkowski,

counsel for Plaintiff sent a cease and desist letter (in October 2004), followed by two more letters in December of 2004 and March of 2005. Under these circumstances, the Court cannot find any basis for finding inexcusable delay. Likewise, Defendant has not proffered any explanation as to how he has been prejudiced by this delay. Third, with regard to acquiescence, the Defendant again fails to identify any affirmative words or acts by Plaintiff that can be construed as conveying its implied consent to the use of its signs containing the PENNZOIL mark by Defendant. The record evidence here shows exactly the opposite—that Plaintiff repeatedly attempted to get both Napierkowski and Defendant to cease and desist from displaying the signs with its PENNZOIL marks. This conduct hardly constitutes acquiescence. Finally, as to the waiver defense, Defendant offers no legal argument or authority in support of this defense. As noted earlier, it is well settled that conclusory statements fall short of the substantive legal analysis required to bring an issue before the court. *Massie,* 2007 WL 184827, at \*3 n. 5 (citation omitted) (conclusory assertions, unaccompanied by a substantial argument, will not suffice to bring an issue before the court).

Because Defendant has failed to meet his burden of proving the defenses of estoppel, laches, acquiescence and waiver, the Court recommends that summary judgment be granted in Plaintiff's favor on these affirmative defenses.

### e. Unclean Hands

Essentially, courts will apply the equitable doctrine of unclean hands when the "party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." *Highmark, Inc. v. UPMC Health Plan, Inc.,* 276 F.3d 160, 174 (3d Cir.2001) (citing *Keystone Driller Co. v. Gen. Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933)). "The nexus 'between the misconduct and the claim must be close.' " *Id.* (citing *In re New Valley Corp.,* 181 F.3d 517, 525 (3d Cir.1999)).

**\*29**  Defendant's defense of unclean hands is predicated on his claims that Plaintiff is engaged in unfair trade practices [42] by virtue of its palming off and false designation of origin of geographic source of its products. In this regard, Defendant asserts that PQS is a Delaware Corporation, which is owned by a Texas Corporation, which in turn is owned by an international corporation. Defendant further asserts that no oil products produced by PQS come from the geographic area of Pennsylvania, despite the fact that PENNZOIL uses

"Pennsylvania" and "Quaker State" in its name, the Pittsburgh Steeler black and gold colors in its color scheme, and the Liberty Bell in its logo. (Def.'s Mem. (Doc. 39) at 36.) Defendant contends that by using the PENNZOIL mark and logo, Plaintiff is palming off foreign oil to the citizens of Pennsylvania as "Pennsylvania grade oil" and/or as "100% PURE PENNSYLVANIA" and/or "Supreme Pennsylvania Quality." (Def.'s Mem. (Doc. 39) at 36.) In support of this argument, Defendant proffers two nostalgic tin signs (Exhibits 54 and 55) depicted in a catalog selling nostalgic reproductions of tin signs from various oil companies, which state, respectively, "100% PURE PENNSYLVANIA OIL" and "Supreme Pennsylvania Quality." Defendant also refers the Court to the case law cited by *Plaintiff* at page 11 of its brief with regard to its false advertising claim under Section 43(a) of the Lanham Act.

42    In his Answer to the Complaint, Defendant asserts as a defense that Plaintiff's use of its marks as set forth in its Complaint constitutes a violation of the UTPCPL, 73 P.S. § 201–1 *et seq.* (Answer, ¶ 59.) Defendant does not offer any argument or analysis of the required elements of a violation of the UTPCPL. Therefore, the Court finds that Defendant has failed to prove entitlement to the defense that Plaintiff violated the UTPCPL.

In response, Plaintiff submits that obviously its use of these marks and the sales of reproductive antique signs do not constitute a perpetration of a fraud on the public. Perhaps more importantly, Plaintiff believes that Defendant is essentially challenging the validity of its trademark under Section 2(e)(1) of the Lanham Act, [43] for being primarily geographically deceptively misdescriptive. According to Plaintiff, such a challenge to a trademark must be made within five years of the registration of the mark pursuant to 15 U.S.C. § 1064(1), which has not occurred.

43    15 U.S.C. § 1052(e).

The Court has previously set forth the elements of a claim for false advertising under the Lanham Act, and Defendant has failed to establish any of the elements of such a claim through either his above cited arguments or evidence. [44] In addition, to the extent Defendant is challenging the validity of the trademark as being primarily geographically deceptively misdescriptive, such a challenge must fail as more than five years has passed since registration of Plaintiff's trademarks. 15 U.S.C. §§ 1052, 1064. Having failed to show that Plaintiff

committed an unconscionable act immediately related to the equity Plaintiff seeks in respect to this litigation, Defendant has not established a defense of unclean hands. Therefore, the Court recommends a finding in favor of Plaintiff on this affirmative defense.

44    The Court notes that the description of the signs as "nostalgic" signifies that they are representative of a period of time dating back many years, and the antique signs submitted as Exhibits 54 and 55 appear to reflect Plaintiff's Pennsylvania heritage at the time. The Court fails to see how this rises to the level of false advertising to support a defense of unclean hands.

### f. Nominative Fairness of Use

Next, Defendant submits that he and Napierkowski simply used the PENNZOIL signage to tell customers what they did —sold quick oil changes using any one of numerous brands of oil—and through the signage given to them by the numerous manufacturers, including Pennzoil and Shell, informed the customers of what brands of lubricants they sold, and that this amounts to nothing more than nominative fair use. Defendant cites the legal standard for establishing nominative fair use, but fails to show how the evidence here establishes each of these elements.

**\*30**  To establish the defense of nominative fair use, the defendant must prove three things: "(1) that the use of plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service; (2) that the defendant uses only so much of the plaintiff's mark as is necessary to describe plaintiff's product; and (3) that the defendant's conduct or language reflect the true and accurate relationship between plaintiff and defendant's products or services." *Century 21 Real Estate Corp. v. Lendingtree, Inc.,* 425 F.3d 211, 222 (3d Cir.2005). Although he bears the burden of proving all three of these elements, Defendant in this case has not met his burden with respect to the second and third elements.

As Plaintiff points out in its response, arguably the use of the word "PENNZOIL" in some context is necessary to communicate that a particular oil change facility sells PENNZOIL brand products, if indeed that is true, and therefore arguably, the first element is met here. However, as to the second prong, Defendant has not conclusively established that he used only so much of Plaintiff's mark as is necessary to describe Plaintiff's products. If, as Plaintiff

suggests, Defendant had posted a sign in uniform lettering listing all of the brands of motor oil used, including the PENNZOIL brands, this element would be met. However, Defendant only listed the PENNZOIL brand on the road-side sign which indicated the brands of motor oil featured. Finally, as to the third prong, the evidence of record clearly shows that Defendant's conduct and language does not reflect the true and accurate relationship between Plaintiff's and Defendant's goods or services. Up until several months after this lawsuit was filed, Defendant displayed a large road-side sign stating "We Feature PENNZOIL Products" which incorporated the PENNZOIL logo, and continues to display a five foot wide PENNZOIL logo sign on the side of his building facing oncoming highway traffic, and several other PENNZOIL logo signs in and around his building. Defendant is not an authorized PENNZOIL distributor/dealership, and he uses PENNZOIL lubricants in his oil changes only two to three percent of the time. Yet, the signage displayed by Defendant suggests otherwise. Therefore, Defendant has also failed to establish the third prong of nominative fair use.

Accordingly, the Court finds that Defendant has failed to establish all three prongs of the defense of nominative fair use. Therefore, the Court recommends that summary judgment be granted in Plaintiff's favor on this affirmative defense.

### 3. *Defendant's Motion for Summary Judgment*
Defendant asserts that his motion for summary judgment should be granted because no material facts remain in dispute and he is entitled to summary judgment and a dismissal of the complaint because the Plaintiff has failed to produce any evidence which establishes or tends to establish: (1) that any of the signage in question was "spurious counterfeit mark," (2) counterfeiting, (3) dilution, (4) unfair competition, (5) false advertisements, (6) unjust enrichment, (7) that Defendant's conduct was "malicious, fraudulent, deliberate, willful, intentional, and in bad faith, (8) that Defendant engaged in a deliberate course of conduct to deceive customers, (9) intent, (10) actual confusion, (11) the likelihood of confusion, (12) palming off, (13) the use of bait and switch tactics, (14) actual damages. (Def.'s Mot. for Summ. J. (Doc. 38); Def.'s Mem. (Doc. 39) at 38.) Defendant further asserts that Plaintiff's evidence consists basically of "hyperbol[e] and sophisms by counsel." (Def.'s Mem. (Doc. 39) at 38.) In addition, in his motion for summary judgment Plaintiff asserts several equitable defenses, to wit, that Plaintiff is guilty of abandonment, laches, and acquiescence, and as a consequence of this conduct, Plaintiff has created

and/or contributed to confusion or the likelihood of confusion, if any. (Def.'s Mot. for Summ. J.)

**\*31**  Defendant's argument in support of his motion for summary judgment and in opposition to Plaintiff's summary judgment motion consists mainly of bare denials, conclusory statements, and speculative arguments completely lacking in any factual support or foundation. Although Defendant has attached some fifty-five exhibits to his brief, most have not been verified or authenticated and very few have any relevance here.[45]  Plaintiff submits that none of these documents, nor the speculative based conclusions Defendant draws from them, create a material issue of fact that would preclude summary judgment against Defendant. Plaintiff specifically argues that none of these submissions rebuts his testimony that: (1) Plaintiff has not authorized Defendant to use PENNZOIL signage; (2) PENNZOIL signage is the most prominent signage at his business; (3) Defendant displayed a large "We Feature PENNZOIL Products" road-side sign until several months after suit was filed; (4) Defendant ignored Plaintiff's three demand letters as well as a visit from Plaintiff's agent seeking removal of the PENNZOIL signage, beginning shortly after Defendant acquired the business, and Defendant still refuses to remove the remaining PENNZOIL signage; (5) Defendant uses PENNZOIL lubricants in less than 5 % of his oil changes; and (6) several suppliers and about a half dozen customers initially confused Defendant with Plaintiff or Plaintiff's authorized oil change centers. After reviewing Defendant's submissions, the Court agrees with Plaintiff that they do not create a material issue of fact, and indeed, are not relevant or material in the first instance.

[45]  The majority of exhibits in Defendant's appendix comprise his "newly discovered evidence," and include, among other things, advertisements for a window sticker machine and label making machine capable of reproducing the PENNZOIL logo; two catalogs, one offering nostalgic reproductions of tin signs of various oil companies (including PENNZOIL), and the other (Kwik Industries) offering oil change center supplies (including PENNZOIL logoed items); a photograph depicting PENNZOIL sponsorship of NASCAR car/driver; and an article from April 2007 National Oil & Lube News (mostly hearsay) about this lawsuit; and Shell sales promotional materials; and current photographs of his oil change facility (exterior and interior).

The relevant and material, verified evidence submitted by Defendant in this case consists of Defendant's deposition testimony and the photographs and other documents identified therein; Defendant's affidavit and documents attached thereto; Defendant's admissions in his Answer to the complaint; and his admissions to Plaintiff's Statement of Undisputed Facts. As noted above, none of this evidence creates a genuine issue of fact as to any element of Plaintiff's claims for federal trademark infringement, federal unfair competition, common law trademark infringement and unfair competition, and false advertising. To the contrary, Defendant's verified submissions establish that Plaintiff is entitled to judgment as a matter of law on these claims, as discussed at length above in regard to Plaintiff's motion for summary judgment.

In an attempt to overcome Plaintiff's showing of likelihood of confusion for recovery on its claims of federal trademark infringement and unfair competition, and common law trademark infringement and unfair competition, Defendant describes ten different aspects of his oil change business which he claims distinguishes it from Plaintiff's oil change facilities, ranging from business cards and stationary, to uniforms, vehicles, interior work bay, and scope of services provided. (Def.'s Mem. (Doc. 39) at 8–11.) However, Defendant misses the mark with these comparisons, as they have no bearing on the issue of the likelihood of confusion involving the unauthorized use of Plaintiff's *trademark*. Defendant's argument would be more appropriately directed to a claim of trade *dress* infringement,[46] which is not being asserted here.

[46]    The term " '[t]rade dress' refers to the design or packaging of a product which serves to identify the product's source.' " *McNeil Nutritionals, L.L.C. v. Heartland Sweeteners, L.L.C.,* 511 F.3d 350, 357 (3d Cir.2007) (quoting *Shire U.S. Inc. v. Barr Labs. Inc.,* 329 F.3d 348, 353 (3d Cir.2003)). "It is 'the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color or color combinations, texture, graphics, or even a particular sales technique.' " *Id.* (quoting *Rose Art Indus., Inc. v. Swanson,* 235 F.3d 165, 171 (3d Cir.2000)).

**\*32**  Another attempt by Defendant to down play the effect of his prominent display of PENNZOIL marks, *i.e.,* which creates a likelihood of confusion, is his submission of undated photographs of various other smaller signs for oil and other

products at his oil change facility, which he specifically points out "were taken recently and only reflect the general appearance of Defendant's location after suit." (Def.'s Mem. (Doc. 39) at 6; Def.'s App. Ex. 2, 5a, 6, 7, 8–12, 26–34.) These signs have little relevance here as they do not accurately depict, by Defendant's own admission, the actual display of signs at Defendant's business up to and at the time this litigation was instituted.

In summary, Defendant concedes, and the Court finds, that there are no genuine issues of fact as to any of the claims or defenses asserted herein. However, Defendant has failed to establish that he is entitled to judgment as a matter of law as to Plaintiff's claims of Federal Trademark Infringement (Count I), Federal Unfair Competition (Count III), Common Law Trademark Infringement and Unfair Competition (Count V), and False Advertising (Count VII). Defendant has also failed to establish that he is entitled to judgment as a matter of law with respect to all of his affirmative defenses. Accordingly, the Court recommends that Defendant's motion for summary judgment be denied as to these claims and defenses.

**4. *Plaintiff's Request for Injunctive & Monetary Relief***
Plaintiff also requests that the Court award certain injunctive and monetary relief to the extent that the Court has granted summary judgment in its favor on its claims of federal and state trademark infringement, federal and state unfair competition, false advertising, federal trademark counterfeiting, federal and state trademark dilution, and unjust enrichment.

*a. Permanent Injunction*
Plaintiff has requested a permanent injunction to prevent Defendant from continuing his infringing and counterfeit use of its PENNZOIL mark. Plaintiff contends that failure to issue such injunction will result in further irreparable harm to it and public confusion.

Having recommended that summary judgment be entered in Plaintiff's favor as to its claims of federal trademark infringement and unfair competition, common law trademark infringement and unfair competition under Pennsylvania law, as well as false advertising under the Lanham Act, the Court holds that Plaintiff has proven its entitlement to permanent injunctive relief as to these claims under 15 U.S.C. § 1116. Moreover, in light of Defendant's intentional conduct in continuing to display the infringing sign after learning that he lacked authority to display the PENNZOIL sign,

Case 4:21-cv-01091-MWB    Document 322-8    Filed 11/18/24    Page 116 of 117
Pennzoil-Quaker State Co. v. Smith, Not Reported in F.Supp.2d (2008)

2008 WL 4107159

in continuing to display two additional signs bearing the PENNZOIL mark, and his continued and unjustifiable belief that he owns the signs, the Court finds that Plaintiff has and will continue to suffer irreparable harm. *See Times Mirror Magazines,* 212 F.3d at 169 (holding that lack of control over the use of one's own mark amounts to irreparable harm (citing *Opticians Ass'n v. Indep. Opticians,* 920 F.2d 187, 195 (3d Cir.1990) ("stating that potential damage to a mark holder's reputation or goodwill or likely confusion between parties' marks constitute irreparable injury for the purpose of granting a preliminary injunction")). Accordingly, the Court recommends that an order be entered:

**\*33** (1) Permanently enjoining Defendant and Defendant's agents, servants, employees, attorneys, and all those persons in active concert or participation with him, from using the PENNZOIL marks, in commerce, in any manner with regard to his oil change business, Lube Pro;

(2) Directing Defendant to deliver to PQS any and all signage and other advertising or promotional materials in the possession of Defendant or under his control bearing any of the PENNZOIL marks;

(3) Directing Defendant to file with this Court and to serve upon PQS, within thirty (30) days after entry and service on Defendant of a permanent injunction order, a report in writing and under oath setting forth in detail the manner and form in which Defendant has complied with the injunction order.

### b. Monetary Damages for Trademark Counterfeiting

Plaintiff has elected to recover statutory damages under 15 U.S.C. § 1 117(c) for federal trademark counterfeiting instead of actual damages and profits under 15 U.S.C. § 1117(a). However, because the Court has held that Plaintiff has failed to establish a claim for federal trademark counterfeiting, statutory damages are not available to Plaintiff.[47] Therefore, the Court recommends that Plaintiff's claim for statutory damages under Section 1117(c) be denied.

[47] Moreover, recovery of treble damages and reasonable attorneys' fees under 15 U.S.C. § 1117(b), which is predicated on a proven violation of Section 1114(1)(a) involving a counterfeit mark, is likewise unavailable.

### c. Reasonable Attorneys Fees and Costs

Plaintiff has requested reasonable attorneys fees and costs under 15 U.S.C. § 1117(a), which provides for the award of attorneys fees to the prevailing party but only in exceptional cases. Plaintiff submits that this Court should find exceptional circumstances exist here, as Defendant's acts were willfully undertaken in order to mislead consumers and trade off of its goodwill, and Defendant refused to stop using Plaintiff's marks despite repeated demands to stop. Accordingly, Plaintiff contends it is entitled to reasonable attorney's fees and costs.

Although the term "exceptional" is not defined in the Act, the Court of Appeals has held that a trademark case will be deemed "exceptional" for purposes of awarding reasonable attorneys' fees under the Lanham Act where the infringement is proven to be malicious, fraudulent, deliberate or willful. *Securacomm Consulting, Inc. v. Securacom, Inc.,* 224 F.3d 273, 280 (3d Cir.2000); *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.,* 952 F.2d 44, 47 (3d Cir.1991). In determining what conduct will rise to the level of malicious, fraudulent, deliberate or willful conduct, the Court of Appeals has instructed that "a district court must make a finding of culpable conduct on the part of the losing party, such as bad faith, fraud, malice, or knowing infringement, before a case qualifies as 'exceptional.' " *Ferrero,* 952 F.2d at 47 (citations omitted). The Court of Appeals further noted that a factor that may be relevant in declining to award attorneys' fees under Section 1117(a) is the plaintiff's failure to show any damages. *Id.* at 47–48 (citing *Hindu Incense v. Meadows,* 692 F.2d 1048, 1052 (6th Cir.1982) (noting that a case is unexceptional for purposes of awarding fees under Section 1117(a) where there has been no loss of sales due to the infringement); *VIP Foods, Inc. v. Vulcan Pet, Inc.,* 675 F.2d 1106, 1107 (10th Cir.1982) (holding case was unexceptional where there was lack of evidence to establish plaintiff suffered monetary damages and lack of finding by court that defendant intended to deceive or confuse public or willfully infringe plaintiff's trademark)). The *Ferrero* court also cited with approval Judge Pollak's "reasoned exposition of what constitutes an exceptional case" in *Jones Apparel Group, Inc. v. Steinman,* 466 F.Supp. 560, 564 (E.D.Pa.1979):

**\*34** [B]ad faith intentionally must be shown for a case to qualify as exceptional; it must be demonstrated that the "defendant intended to pass off" goods he was selling as those manufactured by the plaintiff, and "[a] strong showing would seem [to be] required to warrant a finding of intentionality."

2008 WL 4107159

*Ferrero,* 952 F.2d at 48 (citing *Jones Apparel,* 466 F.Supp. at 564).

Applying these standards to the proven, undisputed facts of this case, the Court concludes that there is sufficient evidence of intentional bad faith to warrant an award of attorneys fees and costs. The facts supporting this finding include Defendant's refusal to take down the sign with Plaintiff's mark after repeated requests to do so, and after being informed that he did not own the sign and was committing violations of the Lanham Act; Defendant had numerous opportunities to avoid this law suit but refused to work out a compromise, even after being apprised that he did not own the signs; Plaintiff was forced to institute the present law suit as a last resort in order to get Defendant to take down the signs displaying the PENNZOIL marks on his oil change facility; Defendant engaged in false advertising under Section 43(a) of the Lanham Act through a "bait-and-switch" operation (*see* discussion *supra* regarding Plaintiff's false advertising claim); and Defendant's infringement of Plaintiff's marks was intentional (*see* discussion *supra* regarding the fifth *Lapp* factor). Tipping the scale slightly in the direction of unexceptional, are two factors. First, some of the evidence of intentional conduct is circumstantial and/or inferred from Defendant's conduct (*i.e.,* the "switch" part of the "bait-and-switch" operation), thus suggesting that the showing required to warrant a finding of intentionality may not be strong. Second, Plaintiff did not present any proof of actual damages, but opted instead to seek statutory damages, which proved to be unsuccessful in light of the Court's ruling on Plaintiff's trademark counterfeiting claim. However, given that it is often difficult to prove lost sales where, as in this case, there is no probative evidence of actual confusion and Plaintiff's unsuccessful attempt to recover statutory damages, the failure to prove any damages does not weigh very strongly against finding an exceptional case.

Thus, the totality of the evidence weighs in favor of finding bad faith, particularly Defendant's refusal to take down the signs, thereby forcing Plaintiff's hand in bringing this litigation. Therefore, the Court recommends that Plaintiff's request for attorneys' fees and costs be granted. Plaintiff

will be directed to submit a fee petition with appropriate itemization/documentation [48] within thirty (30) days of the order entering judgment in its favor.

[48]    Plaintiff's fee petition shall be limited to time spent on those claims on which it ultimately prevailed, to the extent such time is segregable.

### III. CONCLUSION

It is respectfully recommended that Plaintiff's Supplemental Motion for Summary Judgment (Doc. No. 42) be granted as to Count I (Federal Trademark Infringement), Count III (Federal Unfair Competition), Count V (Common Law Trademark Infringement and Unfair Competition), and Count VII (False Advertising), and denied as to Count II (Trademark Counterfeiting), Count IV (Federal Trademark Dilution), Count VI (Pennsylvania Trademark Dilution), and Count VIII (Unjust Enrichment). It is further recommended that Defendant's Motion for Summary Judgment (Doc. No. 38) be granted as to Counts II, IV, VI and VIII, and denied as to Counts I, III, V, and VII. It is further recommended that summary judgment be entered in Plaintiff's favor as to all of the affirmative defenses raised by Defendant in his Memorandum of Fact and Law in Support of Defendant's Motion for Summary Judgment (Doc. 39). It is further recommended that Plaintiff's request for a permanent injunction and an award of reasonable attorneys' fees and costs be granted, but Plaintiff's request for statutory damages be denied.

**\*35**  In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b) (1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 4107159

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.