**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY,<br><br>          Plaintiff and<br>          Counter-Claim Defendant,<br><br>     v.<br><br>VINTAGE BRAND, LLC,<br><br>          Defendant and<br>          Counter-Claim Plaintiff,<br><br>and<br><br>SPORTSWEAR INC. d/b/a PREP SPORTWEAR; and CHAD HARTVIGSON,<br><br>          Defendants. | Case No. 4:21-cv-01091-MWB<br>(Hon. Matthew W. Brann)<br><br>JURY TRIAL DEMANDED |

**DEFENDANTS' BRIEF IN SUPPORT OF
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, ALTERNATIVELY, FOR A NEW TRIAL**

Mark P. McKenna, Esq., *pro hac vice*
Illinois I.D. No. 6272699
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, New York 10151
Phone: (646) 898-2055
Fax:     (646) 906-8657
Mark@lex-lumina.com

John T. Fetters, Esq., *pro hac vice*
Washington I.D. No. 40800
Joshua D. Harms, Esq., *pro hac vice*
Washington I.D. No. 55679
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, Washington 98101
Phone: (206) 626-6000
Fax:     (206) 464-1496
John.Fetters@stokeslaw.com
Joshua.Harms@stokeslaw.com

i

# <u>TABLE OF CONTENTS</u>                    **Page**

I.      INTRODUCTION ..................................................................................1

II.     BACKGROUND ...................................................................................1

III.    ARGUMENT........................................................................................2

        A.    Legal Standards ........................................................................2

                  1.    Renewed Motion for Judgment as a Matter of Law ...................2

                  2.    Motion for a New Trial ......................................................3

        B.    Sportswear, as an Invisible Middleman, Cannot Be Subject to Direct Liability ........................................................................4

        C.    The Verdict Form Was Confusing and Inconsistent with the University's Position ..............................................................10

        D.    The Jury Considered Three Types of "Confusion" but This Case is About Only One.................................................................13

                  1.    Initial Interest Confusion ...................................................14

                  2.    Post-Sale Confusion.........................................................16

        E.    The University Failed to Prove that Defendants Made Trademark Use of the Asserted Marks................................................17

        F.    The University's Own Witnesses Established Aesthetic Functionality........................................................................20

        G.    The University Lacks Trademark Rights in the Pozniak Lion ..........22

        H.    The Charge Regarding the University Seal Misstated the Law .........23

IV.     CONCLUSION...................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abitron Austria GmbH v. Hetronic International, Inc.*,
    600 U.S. 412 (2023) ............................................................................ 18

*Atari Interactive, Inc. v. Printify, Inc.*,
    714 F. Supp. 3d 225 (S.D.N.Y. 2024) ................................................ 10

*Beck v. City of Pittsburgh*,
    89 F.3d 966 (3d Cir. 1996) .................................................................. 2

*Blancha v. Raymark Indus.*,
    972 F.2d 507 (3d Cir. 1992) ................................................................ 11

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
    269 F.3d 270 (3d Cir. 2001) ........................................................ 14, 15

*Clemente Properties, Inc. v. Pierluisi Urrutia*,
    693 F. Supp. 3d 215 (D.P.R. 2023) .................................................... 23

*Co. Wrench, Ltd. v. Highway Equip. Co.*,
    2014 WL 4546793 (W.D. Pa. Sept. 12, 2014) .................................... 10

*Galena v. Leone*,
    638 F.3d 186 (3d Cir. 2011) ................................................................ 2

*H-D U.S.A., LLC v. SunFrog, LLC*,
    311 F. Supp. 3d 1000 (E.D. Wis. 2018) ............................................ 8, 9

*In Re Cnty. of Orange*,
    2022 WL 3137036 (T.T.A.B. Aug. 4, 2022) ...................................... 23

*In re Fox*,
    702 F.3d 633 (Fed. Cir. 2012) ............................................................ 23

*Jack Daniel's Properties, Inc. v. VIP Products LLC*,
    599 U.S. 140 (2023) ...................................................................... 17, 18

**Cases** (cont.)                                                              **Page(s)**

*KAWS, Inc. v. Printify Inc.*,
  2024 WL 3916493 (S.D. Fla. Aug. 23, 2024)......................................... 10

*King Spider LLC v. Panda (Hong Kong) Tech. Co., Ltd.*,
  2025 WL 89123 (S.D.N.Y. Jan. 14, 2025) ........................................... 10

*Lightning Lube, Inc. v. Witco Corp.*,
  802 F. Supp. 1180 (D.N.J. 1992) ...................................................... 3

*Lind v. Schenley Indus., Inc.*,
  278 F.2d 79 (3d Cir. 1960)............................................................ 3, 4

*Magee v. Gen. Motors Corp.*,
  213 F.2d 899 (3d Cir. 1954)............................................................ 3

*Morgan Creek Prods., Inc. v. Foria Int'l, Inc.*,
  91 U.S.P.Q.2d 1134 (T.T.A.B. 2009) ................................................ 22

*Novartis AG v. Novadoz Pharm. LLC*,
  2025 WL 1482417 (D.N.J. May 22, 2025) ......................................... 20

*Ohio State University v. Redbubble, Inc.*,
  989 F.3d 435 (6th Cir. 2021)................................................... 4, 5, 6, 8

*PIM Brands Inc. v. Haribo of Am. Inc.*,
  81 F.4th 317 (3d Cir. 2023)....................................................... 20, 21

*Shrey v. Kontz*,
  981 F. Supp. 2d 333 (M.D. Pa. 2013) .............................................. 13

*Strick Corp. v. Strickland*,
  162 F. Supp. 2d 372 (E.D. Pa. 2001) ............................................... 15

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
  610 F.3d 1171 (9th Cir. 2010)....................................................... 15

*Villanueva v. Brown*,
  103 F.3d 1128 (3d Cir. 1997)......................................................... 3

**Cases (cont.)**                                                    **Page(s)**

*Virgin Island Mar. Serv., Inc. v. Puerto Rico Mar. Shipping Auth.*,
  978 F. Supp. 637 (D.V.I. 1997) ............................................................ 3

**Statutes**

15 U.S.C. § 1052(b) ........................................................................ 23, 24

15 U.S.C. § 1127 ............................................................................ 18, 22

**Rules**

Fed. R. Civ. P. 50(b) .............................................................................. 2

Fed. R. Civ. P. 59(a)(1)(A) .................................................................... 3

**Other Authorities**

McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.)............ 16

## I.    INTRODUCTION

Pursuant to Rules 50(b) and 59(a) of the Federal Rules of Civil Procedure, Vintage Brand, LLC ("Vintage Brand"), Sportswear Inc. ("Sportswear"), and Chad Hartvigson (collectively "Defendants") respectfully renew their request that this Court enter judgment as a matter of law in their favor and against The Pennsylvania State University (the "University"). In the alternative, Defendants request that this Court vacate the judgment and grant a new trial.

## II.    BACKGROUND

Trial in this matter commenced on November 12, 2024. Defendants moved for judgment as a matter of law at the close of the University's case. Doc. 311; Ex. C at 194:5–209:10. The Court initially granted Defendants' motion in part and denied the motion in part. Ex. C at 209:14–212:24. Specifically, the Court held that the University failed to adduce "evidence that Sportswear's conduct makes it directly liable for trademark infringement," *id*. at 212:12–14, and ordered that judgment be entered in Sportswear's favor, *id*. at 212:21–24. The Court otherwise denied the motion. *Id*. The University then filed a motion for reconsideration, Docs. 312–13, which the Court granted, Docs. 329–30; Ex. E at 235:5–242:6. Thus, the Court ultimately denied Defendants' first motion for judgment as a matter of law *in toto*. Doc. 331.

Defendants renewed and supplemented their motion for judgment as a matter of law at the close of their case. Doc. 324; Ex. E at 230:25–231:15, 232:10–13. The Court denied that motion. Doc. 331; Ex. E at 246:1–7.

The jury found in favor of the University and against Defendants. Doc. 335. The Court then ordered the University to file any motions seeking further relief no later than December 4, 2024. Doc. 338.

The University moved for a permanent injunction, Docs. 342–43, and for an award of attorneys' fees, Docs. 344–45. On June 25, 2025, the Court entered a permanent injunction and denied the University's motion for attorneys' fees. Docs. 367–69.

## III.    ARGUMENT

### A.    Legal Standards

#### 1.    Renewed Motion for Judgment as a Matter of Law

Under Rule 50(b) of the Federal Rules of Civil Procedure, parties may renew motions for judgment as a matter of law after the jury's verdict and entry of final judgment. Such a motion should be granted "if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)). "[T]he focus of . . . [the]

inquiry is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly base its verdict." *Villanueva v. Brown*, 103 F.3d 1128, 1133 (3d Cir. 1997).

### 2.    Motion for a New Trial

The Court may grant a new trial "for any reasons for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A).

This Court has discretion to grant a new trial for many reasons, including that the verdict "was against the weight of the evidence." *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 88 (3d Cir. 1960). The Court "may set aside the verdict even though there is substantial evidence to support it." *Virgin Island Mar. Serv., Inc. v. Puerto Rico Mar. Shipping Auth.*, 978 F. Supp. 637, 648 (D.V.I. 1997), *aff'd*, 162 F.3d 1153 (3d Cir. 1998) (citation omitted). And the Court is free "to consider the credibility of witnesses and weigh the evidence" when deciding whether to grant a new trial. *Lightning Lube, Inc. v. Witco Corp.*, 802 F. Supp. 1180, 1185 (D.N.J. 1992), *aff'd*, 4 F.3d 1153 (3d Cir. 1993). Indeed, it is "an abdication of the judge's functions with respect to" a motion for a new trial to view the evidence in the light most favorable to the party in whose favor the verdict was rendered. *Magee v. Gen. Motors Corp.*, 213 F.2d 899, 900 (3d Cir. 1954).

Particularly relevant to this case is the Third Circuit's instruction in *Lind v. Schnley Industries Inc.*, regarding the scrutiny with which to assess the weight of evidence in a complex case:

> Where a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors a verdict should be scrutinized more closely by the trial judge than is necessary where the litigation deals with material which is familiar and simple, the evidence relating to ordinary commercial practices.

*Lind*, 278 F.2d at 90–91. This is exactly the sort of complicated case that calls for close scrutiny of the verdict.

## B. <u>Sportswear, as an Invisible Middleman, Cannot Be Subject to Direct Liability</u>

The Court has already considered direct liability for Sportswear arising from its actions as Vintage Brand's undisclosed printer and shipper of goods.[1]  Doc. 329; Ex. C at 209:14–212:24; Ex. E at 235:5–242:6.  Accordingly, Defendants will address aspects of the Court's reasoning that should be considered with the benefit of the trial record.

In its opinion granting the University's motion for reconsideration, this Court relied on *Ohio State University v. Redbubble, Inc.*, 989 F.3d 435 (6th Cir. 2021). As

---

[1] During post-trial motion practice, the University brought to the Court's (and Sportswear's) attention Sportswear's inadvertent offering for sale of certain goods. Doc. 356 at 3–5; Doc. 356-3. Sportswear immediately remedied that issue upon learning of it. This post-verdict matter should not influence the Court's assessment of the evidence adduced at trial.

this Court described, Redbubble "allowed artists to create clothing designs hosted on its website; upon sale, Redbubble printed the clothing with the designs, shipped it to customers, **and affixed a Redbubble tag**." Doc. 329 at 9 (emphasis added). That last fact—Redbubble's affixation of the Redbubble tag—was a critical one, according to the Sixth Circuit:

> [I]t seems that one key distinction between a direct seller who "uses" a trademark under the Act and a mere facilitator of sales who does not is the degree to which the party represents itself, rather than a third-party vendor, as the seller, or somehow identifies the goods as its own.

*Redbubble*, 989 F.3d at 448. And that critical fact is precisely what differentiates Sportswear from Redbubble. The Sixth Circuit found Redbubble directly liable because Redbubble held itself out to consumers as the true seller of the goods; not only did Redbubble deliver infringing goods "in Redbubble packaging with Redbubble tags," it also "classifie[d] its goods as 'Redbubble products' and ma[de] clothes identified as 'Redbubble garments.'" *Id*. Below are exhibits submitted in the *Redbubble* litigation, showing a Redbubble-branded webpage (left) and packaging (right), as well as a shipping label (bottom) identifying the source of infringing goods as "An Artist On Redbubble":





*Ohio State University v. Redbubble, Inc.*, Case No. 2:17-cv-01092 (S.D. Ohio), ECF 17-3 at 47, 58, 64 (attached as Exhibit G).

Sportswear's involvement in the sale of accused products was nothing like Redbubble's. Sportswear printed products selected by Vintage Brand customers

from images on the Vintage Brand website (shown below, top); Sportswear attached

Vintage Brand tags to those products (middle); and it shipped those products in

Vintage Brand packaging (bottom):





 

Trial Exs. P-310, D-18, D-20, D-21.

Unlike Redbubble, Sportswear was a fulfilment vender completely invisible to consumers who received Vintage Brand products—at no point did Sportswear "represent[] itself, rather than [Vintage Brand], as the seller," or in any way "identif[y] the goods as its own." *Redbubble*, 989 F.3d at 448.

For the same reasons, this case is readily distinguishable from *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000 (E.D. Wis. 2018), also relied on by the Court. SunFrog "affixe[d] its own trademarks and logos onto the products themselves, the products' tags, or both." *Id.* at 1014. And SunFrog ran the website "where third parties [could] upload designs and logos, place them onto clothing, hats, mugs, or other items, and sell them." *Id.* at 1009. SunFrog even allowed customers to share their designs with other customers on the SunFrog's "All Art

database." *Id.* at 1014. SunFrog, like Redbubble, acted as the true seller of the infringing goods by holding itself out as the seller of the infringing goods:



*H-D U.S.A., LLC v. SunFrog, LLC*, Case No. 2:17-cv-0071 (E.D. Wis.), ECF 49-2 at 3 (attached as Exhibit H).

Sportswear didn't affix any of its own trademarks or logos on the accused products or on Vintage Brand's website. Sportswear didn't run the website where consumers could select Penn State-related images to print on products. Indeed, Sportswear was never even visible to consumers.[2]

---

[2] It is true, as this Court noted, that "Sportswear manufacture[d] the goods on demand, affixe[d] the marks, and ship[ped] them directly to the customers." Doc. 369 at 12. But Sportswear never affixed *Sportswear's* marks or shipped the goods

Both *Redbubble* and *SunFrog* demonstrate that direct liability turns on whether customers view the alleged infringer as the "true seller" of infringing merchandise—not simply on whether the alleged infringer was involved in printing or distributing the products. Several other cases have rejected direct liability making precisely that distinction. *See King Spider LLC v. Panda (Hong Kong) Tech. Co., Ltd.*, 2025 WL 89123, at *6 (S.D.N.Y. Jan. 14, 2025) (applying the "key distinction" from *Redbubble* and finding it relevant that the defendant did not "generate, own, and manage any allegedly infringing listings" of products); *Atari Interactive, Inc. v. Printify, Inc.*, 714 F. Supp. 3d 225, 234 (S.D.N.Y. 2024) ("Customers go through the entire purchase process . . . without any knowledge that the order is being facilitated by Printify."); *KAWS, Inc. v. Printify Inc.*, 2024 WL 3916493, at *5 (S.D. Fla. Aug. 23, 2024) ("Printify does not advertise any products for sale to end consumers on its website [and] Printify's name does not appear on the products or any shipping materials.").

## C.    The Verdict Form Was Confusing and Inconsistent with the University's Position

An error or defect in a verdict form may warrant a new trial. *See Co. Wrench, Ltd. v. Highway Equip. Co.*, 2014 WL 4546793, at *1 (W.D. Pa. Sept. 12, 2014). A

---

with any *Sportswear* identification; it affixed *Vintage Brand's* marks and used Vintage Brand packaging.

new trial may also be granted to address a jury verdict "tainted by confusion." *Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992).

Defendants consistently objected to the University's proposed jury instructions and verdict form because the instructions and verdict form failed to identify the Vintage Brand images that the jurors needed to compare to the University's marks in order to evaluate infringement. *See* Doc. 278 at 5; Doc. 293 at 9–10. As Defendants' counsel argued at the charging conference, the University's verdict form offered "no princip[led] way to understand which uses of the Penn State mark they claim[ed] [were] infringing or not." Ex. E at 385:17–25. Indeed, counsel noted during his objection that "[j]ust today in the courtroom, Penn State represented that one of the images that was act *[sic]* was actually in the statement of material facts [Doc. 122 at 97], they're not alleging is infringing." Ex. E at 385:7–11. That was the 1947 Game Schedule (Trial Ex. D-298), which the University specifically said it was not suing over, Ex. E at 106:25–107:11, and later disclaimed again during its closing argument, Ex. F at 8:13–14 ("It's not about this.").[3]

The jury's responses to the verdict form used by the Court demonstrate that the jury obviously was confused. The verdict form asked, "Did the Plaintiff prove

---

[3] The University has repeatedly hidden behind the scope of its pleading to limit evidence and argument about images that it did not want the jury to evaluate specifically. *E.g.*, Ex. E at 107:12–108:11, 387:5–17; Doc. 279 at 3.

by a preponderance of the evidence that any of the following Defendants infringed Plaintiff's alleged [trademark claimed by Penn State]."[4] Doc. 335 at 2–4 (Questions One through Seven). The jury answered "YES" for all defendants and all seven marks with one inexplicable exception: Sportswear's alleged infringement of the mark THE PENNSYLVANIA STATE UNIVERSITY. *Id.* at 2. As Defendants argued above, none of Sportswear's conduct should have exposed it to direct liability with respect to any of the University's claimed marks. But certainly there is no explanation for this part of the jury's verdict—no evidence offered by either party would have differentiated use of that one mark by Sportswear.

The University claims that Defendants have "attempted to recast Penn State's claims as focusing on entire 'images' rather than the Penn State Marks," Doc. 357 at 16. But this case has always been about *the images*.[5] Because the verdict form did not require image-by-image analysis, the jury did not answer the infringement question with respect to Vintage Brand's different uses. This error in the verdict form was particularly acute in light of the many alleged marks and images at issue,

---

[4] The verdict form did not align with the charge, which assumed the jury would assess infringement on an image-by-image basis. *See, e.g.*, Doc. 334 at 25 ("you must consider each image as a whole"); *id.* at 29, 31.

[5] The Court's summary judgment ruling expresses that "[v]iewing these images as a whole, a jury could reasonably conclude that many—if not most or all—appear easily distinguishable from the Penn State Marks." Doc. 194 at 99.

for which a careful likelihood of confusion analysis was always going to be challenging.

**D.    The Jury Considered Three Types of "Confusion" but This Case is About Only One**

This was a point-of-sale confusion case. That is the only type of confusion Mr. Franklyn's survey tested. Ex. C at 98:1–11. And, as set forth below, the record is insufficient as a matter of law to establish initial-interest or post-sale confusion. Nevertheless, the University routinely invited the jury to consider those types of confusion despite having no evidence supporting either.

Because Plaintiffs had no evidence of initial-interest or post-sale confusion, the Court should have granted Defendants' motion for judgment as a matter of law (Doc. 311 at 10–15; Ex. C at 197:22–199:22) and instructed the jury to disregard argument regarding these two additional types of confusion. Having denied Defendants' motion, the University was required to request an instruction on initial-interest and post-sale confusion, and in the absence of that, the jury was left without any guidance as to the relevance of, or predicates for, those types of confusion. *See generally* Doc. 334.

Because this issue concerns a defect in the jury charge, the Court has "wide latitude" in granting a new trial. *Shrey v. Kontz*, 981 F. Supp. 2d 333, 347 (M.D. Pa. 2013).

### 1.     Initial Interest Confusion

Initial interest confusion is a type of "bait and switch" that "will affect the buying decisions of consumers in the market for the goods, effectively allowing the competitor to get its foot in the door by confusing consumers." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 294 (3d Cir. 2001).

The University presented evidence suggestive of initial interest confusion but insufficient to prove it. Stephanie Petulla testified about an exhibit she created by conducting a Google search for the phrase "penn state *vintage brand*":



Trial Ex. P-209; *see also* Ex. B at 154:8–156:22. In closing, the University suggested that testimony could be understood as sufficient to show likely confusion:

> What did your eyes tell you when you saw how Defendants' website shows up right alongside licensed genuine merchants when you searched for vintage-style Penn State merchandise on Google. There's no way to tell the difference.

Ex. F at 16:4–8. But the University did not plead initial interest confusion, *see generally* Doc. 67, and this evidence is insufficient as a matter of law to prove a "bait and switch" scheme.

*First*, Ms. Petulla conceded she crafted a Google search to search for Vintage Brand, specifically. Ex. B at 181:16–18. In other words, the only evidence the University offered in support of a "bait and switch" scheme is an example of affirmatively seeking out the "bait."[6]

*Second*, many courts, including the Ninth Circuit, have rejected such evidence as being probative of the type of confusion that trademark law cares about:

> [Consumers] skip from site to site, ready to hit the back button whenever they're not satisfied with a site's contents. They fully expect to find some sites that aren't what they imagine based on a glance at the domain name or search engine summary. . . . [C]onsumers don't form any firm expectations about the sponsorship of a website until they've seen the landing page—if then.

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1179 (9th Cir. 2010); *see also Strick Corp. v. Strickland*, 162 F. Supp. 2d 372, 377 (E.D. Pa. 2001) ("Internet surfers are inured to the false starts and excursions awaiting them").

*Third*, the Third Circuit has held in connection with initial interest confusion that "[w]here confusion has little or no meaningful effect in the marketplace, it is of little or no consequence in our analysis." *Checkpoint*, 269 F.3d at 297. Any initial interest "confusion" in this case is irrelevant to the function of the marketplace. The University's authorized licensees emphasize that they are officially licensed. *See,*

---

[6] Ms. Petulla also testified that she had previously searched for, and visited, the Vintage Brand website, yet failed to clear her browser history or cookies. Ex. B at 182:10–183:5.

*e.g.*, Trial Ex. D-131 (The Family Clothesline website); Ex. C at 174:19–175:15. In fact, they are contractually required to do so. Trial Ex. D-103 at 14, ¶ 11(a)–(b); Ex. C at 174:4–8.

### 2. Post-Sale Confusion

This Court previously observed that this case does not "involve a theory of post-sale confusion[.]" Doc. 194 at 30. That is because "post-sale confusion is reserved for cases where the junior use of the mark makes substantially inferior products; most cases involve luxury brands." *Id*. at 31–32 n.158 (citing MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:7 (5th ed.)). The University made no allegation of inferiority in its pleading. *See generally* Doc. 67. Nor did it adduce any evidence of substantially inferior product quality at trial.

The University's counsel nonetheless made arguments to the jury and adduced testimony directed at post-sale confusion. *E.g.*, Ex A at 55:1–3 ("just imagine what you would have felt coming across these products yesterday while shopping online or seeing someone wear them down the street"); Ex. B at 74:11–12 ("How about when somebody's walking down the street wearing a piece of Penn State-branded merchandise[?]"); Ex. F at 15:18–21 ("What are they telling you when I put that display case[7] up in front of you on the very first day we were here together. Pretty hard to tell which was real and which was fake.").

---

[7] The display case itself was a post-sale confusion demonstrative.

Simply, this is not a case involving "substantially inferior products," Doc. 194 at 30 n.158, and the case therefore cannot "involve a theory of post-sale confusion," *id*. at 30. The University's own evidence demonstrated that there is no substantial difference in the quality of the parties' products: Ms. Petulla testified that officially licensed merchandise can be purchased at retailers ranging from Nieman Marcus to 7-Eleven, and that such merchandise varies in both price and quality. Ex. B at 179:17–181:8. And Caroline Gummo, owner of Family Clothesline, was presented with one of Vintage Brand's t-shirts and testified "[i]t's probably most likely a Hanes, Gildan, or a Jersey product . . . ." Ex. C at 169:15–16. Thus, that product was of the same quality as officially licensed merchandise. Chad Hartvigson purchased an officially licensed Hanes t-shirt from the Wegman's across the street from the courthouse. Trial Ex. D-367; Ex. D at 193:16–194:1; *see also, e.g.*, Trial Exs. D-278–79 (officially licensed Gildan t-shirts).

**E.    The University Failed to Prove that Defendants Made Trademark Use of the Asserted Marks**

During the pendency of this case, the Supreme Court issued two decisions concerning the nature of the *defendant's use* of an allegedly infringed mark. First, in *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023), the Supreme Court described use "as a designation of source ***for the infringer's own goods***" as the type of use the Lanham Act "most cares about." *Id*. at 153 (emphasis

added).[8] And less than one month later, in *Abitron Austria GmbH v. Hetronic International, Inc.*, 600 U.S. 412 (2023), the Supreme Court expressed that, through the Lanham Act, "Congress proscribed the use of a mark in commerce under certain conditions," *id.* at 423. Specifically, the Lanham Act makes actionable only "use in commerce," which the statute defines as use of the mark "to 'identify and distinguish [the mark user's] goods . . . and to indicate the source of the goods.'" *Id.* at 428 (alteration in original; quoting 15 U.S.C. § 1127).

The University did not establish that Defendants use the accused images to indicate the source of their own goods. The University's witnesses testified about the non-source-related reasons for purchasing fan apparel. Ex. A at 136:14–138:19 (Jackie Esposito); Ex. B at 115:18–22, 198:13–17 (Stephanie Petulla). Indeed, on re-direct, Ms. Petulla was asked why she purchases products bearing University imagery, and she responded with a list of reasons unrelated to the quality of the goods bearing those images. Ex. B at 199:1–12. Even when she was leadingly asked whether the "Penn State Brand on a product signif[ies] quality," Ms. Petulla provided a non-answer: "I believe that it does. When I come to work to do my job

---

[8] Transcript of Oral Argument at 12:4–12, *Jack Daniel Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (Mar. 22, 2023) (Jackson, J.) ("[I]s the artist using this mark as a source identifier, . . . if they aren't, then I guess the Lanham Act doesn't apply because . . . the Lanham Act worries about confusion that arises from use of a mark as a source identifier.").

every day, I try to do it to the best of my ability, to connect our fans with merchandise that reinforces the mission of the University in a quality way." *Id*. at 199:19–24.

The dearth of meaningful evidence was reflected in the University's summation. Its argument about its trademarks was reduced to "[w]e own it," Ex. F at 7:3–4, and "Defendants have taken them," *id*. at 8:4–6. Indeed, the University was so committed to that simple narrative that it specially ordered Certificates of Registration with gold seals that are no longer automatically issued by the USPTO.[9] Trial Exs. P-4–P-20 *see also* Ex. F at 7:3–4 ("We own it. It's got a gold seal on it. It's ours.").

There is a single source of evidence concerning whether Defendant's "use" was a source-indicative one: the testimony of Dr. Tülin Erdem. She testified that only three to four percent of consumers believe that the University is responsible for the quality of products bearing allegedly infringing images. Ex. E at 154:8–13. Judgment should be entered in Defendants' favor or a new trial should be conducted with the jury charge including Defendants' proposed trademark use instruction. Doc. 266 at 17.

---

[9]   *See USPTO Issuing Electronic Registration Certificates*, USPTO, https://www.u spto.gov/trademarks/laws/electronic-registration [perma.cc/8PWC-GLRD].

**F.**    <u>**The University's Own Witnesses Established Aesthetic Functionality**</u>

The Court instructed the jury that, to succeed on its aesthetic functionality defense, Defendants must "demonstrate that protection of the features as trademarks would impose a significant non-reputation-related competitive disadvantage on Vintage Brand." Dkt. 334 at 36. That is consistent with the Third Circuit's recent decision holding that a "design is functional if it is useful for anything beyond branding." *PIM Brands Inc. v. Haribo of Am. Inc.*, 81 F.4th 317, 321 (3d Cir. 2023). Phrased differently, "a nonfunctional feature is one that 'is unrelated to the consumer demand and serves merely to identify the source of the product or business." *Novartis AG v. Novadoz Pharm. LLC*, 2025 WL 1482417, at *3 (D.N.J. May 22, 2025) (cleaned up).

In the Third Circuit, "[f]unctionality is not a high bar." *PIM Brands*, 81 F.4th at 321. Defendants cleared that bar through the testimony of the University's own witnesses.

Ms. Esposito testified that she purchased University merchandise because of the University's "reputation," but she made no mention of the University's reputation as the source of merchandise, explaining that she meant she is "proud of the things that Penn State has done." Ex. A at 138:15–16. Ms. Esposito does not buy University merchandise because of the University's reputation as the source of quality merchandise. Indeed, the fact that licensed merchandise is available at such

a wide range of price and quality points makes it exceedingly unlikely that any consumers are relying on the Penn State imagery to tell them anything about product quality. Ex. B at 179:17–181:8.

Ms. Petulla testified that a shirt (Trial Ex. P-457) was decorated with the University's claimed marks because "it's just fashion. It's a little bit of a trend. . . . [P]eople want to have the association to Penn State." Ex. B at 115:18–22; *see also id*. at 78:12–16 (testifying that consumers want to "show their affinity for the University"). Ms. Petulla further testified that she, personally, purchases University merchandise because she "want[s] to support the University," because she "feel[s] pride in the University," and because she secretly wants her son to go to the University. *Id*. 199:1–12.

This testimony, from the University's own witnesses, firmly establishes aesthetic functionality, certainly in a trial in the Third Circuit, where that defense "is not a high bar." *PIM Brands*, 81 F.4th at 321.

Remarkably, the University instructed the jury to disregard the aesthetic functionality defense because, "[i]f aesthetically functional had anything to do with this case, . . . don't you think that [Defendants] would have at least mentioned the word anesthetic *[sic]* functionality to you before[?]" Ex. F at 21:8–15. The University asked the jury to ignore the defense because it did not have a principled retort.

**G.**    **The University Lacks Trademark Rights in the Pozniak Lion**

Section 45 of the Lanham Act provides that "[t]he term 'use in commerce' means the bona fide use of a mark *in the ordinary course of trade*, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127 (emphasis added).

At trial, the University conceded through its witnesses that it has only used the Pozniak Lion design on apparel in connection with the Lion Ambassadors and Nittany Lion Wrestling Club. Ex. B at 101:16–20, 142:13–15. But such uses do not lead to the acquisition of trademark rights. *See, e.g.*, *Morgan Creek Prods., Inc. v. Foria Int'l, Inc.*, 91 U.S.P.Q.2d 1134 (T.T.A.B. 2009). The University's extremely limited, admittedly non-commercial use is the result of an agreement with Ray Pozniak's family. Ex. A at 47:17–48:3.

David Dulabon, the University's in-house counsel, offered his own 1997 Lion Ambassador sweatshirt into evidence (Trial Ex. P-430) and confirmed that he was able to purchase it only because he was a member of the Lion Ambassadors. Ex. B at 8:8–20. Ms. Petulla's testimony was consistent with that limitation on the "sale" of goods being limited to internal members, i.e. only outside the ordinary course of trade. Ex. B at 138:8–16.

Ms. Petulla also testified—after being reminded by counsel—that the University licenses the Pozniak lion for use on license plates. Ex. B at 142:13–23.

But that is also not a commercial use. *See Clemente Properties, Inc. v. Pierluisi Urrutia*, 693 F. Supp. 3d 215, 243 (D.P.R. 2023).

## H.    <u>The Charge Regarding the University Seal Misstated the Law</u>

Section 2(b) of the Lanham Act precludes registration of a design that "[c]onsists of or comprises the flag or coat of arms or other insignia . . . of any State or municipality[.]" 15 U.S.C. § 1052(b). "The word 'comprises,' at the time of the statute's enactment in 1905, meant 'includes.'" *In re Fox*, 702 F.3d 633, 638 (Fed. Cir. 2012). The question, therefore, is whether the Penn State seal *includes* anything which creates the commercial impression of the Pennsylvania coat of arms. *See In Re Cnty. of Orange*, 2022 WL 3137036, at *12 (T.T.A.B. Aug. 4, 2022). It does.

The jury charge incorrectly stated, "a trademark must be cancelled if it includes the coat of arms of a state in such a manner that ***consumers would perceive that trademark as a government insignia***." Doc. 334 at 39 (emphasis added). But the question is not whether consumers would perceive a trademark, as whole, as a government insignia. The question, instead, is simply whether a trademark *includes* government insignia, or at least includes something that would be perceived as government insignia. Ex. E at 377:23–378:11.

The Court took judicial notice of the Pennsylvania Coat of Arms:



Doc. 334 at 41. And there is no dispute that the Seals, shown below, *include* the Coat of Arms:

     

*Id*. at 40. Thus, the Seals are unregistrable under the plain text of 15 U.S.C. § 1052(b), but the jury did not reach that conclusion because they were considering whether consumers would perceive the Seals as government insignia.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter judgment in their favor or, alternatively, grant a new trial.

Dated:  July 9, 2025.                    Respectfully submitted,

                                         By: */s/ Joshua D. Harms*
                                             Joshua D. Harms, Esq., *pro hac vice*
                                             John T. Fetters, Esq., *pro hac vice*
                                             Leslie Vander Griend, Esq., *pro hac vice*
                                             Valerie A. Walker, Esq., *pro hac vice*
                                             Washington I.D. Nos. 55679, 40800,
                                             28090, 52584
                                             STOKES LAWRENCE, P.S.
                                             1420 Fifth Avenue, Suite 3000
                                             Seattle, Washington 98101
                                             Phone:   (206) 626-6000
                                             Fax:     (206) 464-1496
                                             Joshua.Harms@stokeslaw.com
                                             John.Fetters@stokeslaw.com
                                             Leslie.VanderGriend@stokeslaw.com
                                             Valerie.Walker@stokeslaw.com

                                             Mark P. McKenna, Esq., *pro hac vice*
                                             Illinois I.D. No. 6272699
                                             LEX LUMINA PLLC
                                             745 Fifth Avenue, Suite 500
                                             New York, New York 10151
                                             Phone:   (646) 898-2055
                                             Fax:     (646) 906-8657
                                             Mark@lex-lumina.com

                                             Marc H. Perry, Esq.
                                             PA Supreme Court I.D. No. 68610
                                             POST & SCHELL, P.C.
                                             1717 Arch Street, 24th Floor
                                             Philadelphia, Pennsylvania 19103
                                             Phone:  (215) 587-1101
                                             Fax:    (215) 320-4159
                                             mperry@postschell.com
                                                 *Attorneys for Defendants*

25

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.8(b)</u>

I hereby certify that the foregoing brief complies with Local Rule 7.8(b) because it does not contain more than 5,000 words. This brief contains 4,912 words (not including the caption page submission date and signature, Certificate of Compliance, or Certificate of Service) according to the word count feature of the word processing software used to prepare this memorandum.

Dated: July 9, 2025        By: <u>/s/ *Joshua D. Harms*</u>

                     Joshua D. Harms, Esq., *pro hac vice*
                     Washington I.D. No. 55679
                     STOKES LAWRENCE, P.S.
                     1420 Fifth Avenue, Suite 3000
                     Seattle, Washington 98101
                     Phone:   (206) 626-6000
                     Fax:        (206) 464-1496
                     Joshua.Harms@stokeslaw.com

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system on this 9th day of July 2025, which constitutes service on Plaintiff pursuant to Fed. R. Civ. P. 5(b)(2)(E):

Courtney S. Schorr, Esquire
McGuire Woods LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA  15222-3142

Claire H. Eller, Esq., *pro hac vice*
Lucy J. Wheatley, Esq., *pro hac vice*
David E. Finkleson, Esq., *pro hac vice*
McGuire Woods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA  23219-3916

Kyle S. Smith, Esq., *pro hac vice*
McGuire Woods LLP
501 Fayetteville St., Suite 500
Raleigh, NC 27601

Jessica S. Maupin, Esq., *pro hac vice*
McGuire Woods LLP
2000 McKinney Ave., Suite 1400
Dallas, TX 75201
*Attorneys for The Pennsylvania State University*

Dated:  July 9, 2025.          By: <u>/s/ *Joshua D. Harms*</u>
                                   Joshua D. Harms, Esq., *pro hac vice*
                                   Washington I.D. No. 55679
                                   STOKES LAWRENCE, P.S.
                                   1420 Fifth Avenue, Suite 3000
                                   Seattle, Washington 98101
                                   Phone:   (206) 626-6000
                                   Fax:      (206) 464-1496
                                   Joshua.Harms@stokeslaw.com

27